JC4EDONC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          11 Cv. 692 (LAK)

5                             19 Cr. 561 (LAP)

6

   STEVEN DONZIGER,
7
                Defendant.          Conference
8
   ------------------------------x
9
                                  New York, N.Y.
10                                 December 4, 2019
                                   9:30 a.m.
11

12  Before:

13              HON. LORETTA A. PRESKA,

14                             District Judge

15                      APPEARANCES

16

17  RITA M. GLAVIN, ESQ.
    BRIAN MALONEY, ESQ.
18       Special Prosecutors

19  ANDREW J. FRISCH, ESQ.
        Attorney for Defendant
20

21

22

23

24

25

JC4EDONC

1        (Case called)

2        THE COURT:  Good morning, counsel.

3        Would you please be seated.

4        United States v. Donziger.

5        Is the prosecution ready?

6        MS. GLAVIN:  Yes, your Honor.  Rita Glavin and Brian

7   Maloney.  Good morning.

8        THE COURT:  Good morning.

9        Is defense ready?

10        MR. FRISCH:  Good morning, your Honor.

11        For Mr. Donziger, Andrew Frisch.

12        THE COURT:  Good morning, Mr. Frisch.

13        How would you like to proceed, Mr. Frisch?

14        I think we're here by way of update.

15        MR. FRISCH:  Yes.  Let me start by talking about two

16   issues that are separate but also related.

17        The first is setting a trial date and a motion

18   schedule because that's where we're headed.  I have spoken to

19   Ms. Glavin about this.  She prefers a trial date in May to

20   accommodate her second, Mr. Maloney, who is seated to her left,

21   who I understand is beginning a trial in March.

22        The first best available date for Ms. Glavin, as I

23   understand it, is May.  Putting aside the release issues for a

24   moment, that's consistent with my schedule as well.  I have a

25   trial firmly scheduled before Judge Korman in March.  It's a

JC4EDONC

1    case in which chambers reached out to me to appoint me to

2    represent this person CJA.  He is in custody.  He's a foreign

3    national.  He was extradited here and it's a complex case and

4    it's not going to plead out.  Anything can happen, but it's

5    about 98 percent certain it will go to trial, so a May date

6    works for me as well if the Court can accommodate us.

7             My concern continues to be the issue with regard to

8    Mr. Donziger's confinement, which is one of the reasons why I

9    wrote to the Court yesterday to give the Court and Ms. Glavin

10   some advance preview of what I might say today about that.

11            Here's what I believe, Judge, to be the bottom line.

12   I think we can and should be able to do this.  I think on the

13   one hand we can acknowledge the issues of judicial authority

14   that are raised by the charges in this case.  I think we should

15   be able to embrace and understand and litigate those issues --

16   as we're going to -- but also acknowledge the reality of some

17   of the facts, and the risk of flight and the extent to which

18   any concern about it at all can be adequately addressed other

19   than under these circumstances.

20            When we were last here, Ms. Glavin talked and your

21   Honor talked about the possibility of flight to Ecuador, which

22   I will tell the Court I didn't know much about until the past

23   two days when I'd gone online and learned a little bit about

24   Ecuadorian politics -- which I might add was little bit of a

25   refreshing change from waking up and reading about American

JC4EDONC

1    politics.

2             That said, the lawyers in the Chevron case necessarily

3    met with representatives of the Government because of the

4    Government's role in the case.  That was not unusual.

5             But as to President Correa, former President Correa,

6    he's not in Ecuador anymore.  He's essentially -- he's

7    certainly in Belgium, from my understanding from what I'm

8    reading online, is in exile in Belgium, and he and his people

9    are out of favor with the current regime led by President

10   Moreno who has starkly changed politics in Ecuador, as

11   reflected in the remarks of Vice President Pence referred to in

12   my letter, to try and curry favor with the current

13   administration.

14            So Mr. Donziger has no incentive to flee to Ecuador,

15   or anywhere, but certainly the current political climate makes

16   it impossible -- if it were even plausible -- to get there

17   without a passport.

18            Your Honor said at the last court appearance, I

19   believe -- and we have the transcript if I'm wrong -- that

20   nothing has changed.  I think everything has changed.

21            Officer Harmon, who I said last time -- and continue

22   to believe is exceptionally professional -- she is a straight

23   arrow, she calls balls and strikes as she sees them -- has

24   recommended a monitored curfew.

25            I don't believe that's necessary, but that's

JC4EDONC

preferable to the current state of affairs.  She's a neutral,

independent officer of the court and that's her take.  She's no

pushover.  She wouldn't be taking this position unless she

truly believed that was appropriate in this case.

         In another significant change of circumstances,

Ms. Glavin's stated position -- for the first time a week or

two ago -- is that she believes that this case is properly

treated as a misdemeanor.  It's still very serious, and we will

take it seriously, but that changes things as least with regard

to Ms. Glavin's position and represents an important and

significant changed circumstance.

         I appreciate the distinction that Ms. Glavin and your

Honor have made between the disciplinary hearing and appeal in

the Second Circuit, but those are things Mr. Donziger has done

since August 6th.  He's appeared to challenge these things,

which is the direct opposite of any risk of flight --

especially in a case which is a misdemeanor, at least in the

eyes of Ms. Glavin, and where there is already a secured bond

in place.

         Of course, there's all the sureties who have come

forward.  We can talk about their financial stake in this, but

the fact is that there are an awful lot of them and most of

them are very sophisticated and accomplished people who have

looked at this case, know this man very well -- as I've come to

know him -- and are confident he's not going anyplace, he's

JC4EDONC

 1   completely engaged in this, and wants a trial to establish his

 2   innocence.

 3           Now, I don't know what the Court's calendar is.  What

 4   I can tell the Court is that the pretrial motions in this case,

 5   like the case itself, are going to raise some interesting

 6   issues of law and interesting issues of fact.  I think it will

 7   take Ms. Glavin sometime to respond and it will take me

 8   sometime to prepare the best possible motion papers, but I can

 9   work as quickly as required, and I think it will take the Court

10   sometime to reflect on the motions and to resolve them.

11           So I think the May trial date, while it may not be

12   optimal, it's what appears what we can do given our respective

13   schedules.  I don't want see to Mr. Donziger continue to be on

14   home confinement under these circumstances for a period of time

15   that exceeds even what Mr. Cutler got as his sentence -- albeit

16   the facts are different -- every case is different -- but

17   that's the most comparable case that we can find.

18           That's our view with regard to the trial date.  I

19   would ask the Court to reconsider your ruling on the conditions

20   of his release.

21           THE COURT:  May I just ask you, in your letter, on

22   page 2, you had discussed the position of the factual situation

23   of the change of administration in Ecuador; and then in the

24   second paragraph you say that Mr. Donziger has no ties with

25   anyone in Ecuador.

JC4EDONC

1              I guess I would find that shocking because he worked

2      with these plaintiffs for so many, many years and apparently so

3      closely that I don't understand that statement and why they

4      wouldn't be delighted to take in the person who worked for them

5      for so many years.

6              MR. FRISCH:  With due respect, Judge, what I said was

7      Mr. Donziger has no ties with anyone in Ecuador, or anyplace

8      else in the world, that would have any incentive to help him

9      violate American law.

10              The fact that he knows people in Ecuador and that he

11      knows people who are friendly to him doesn't overcome the fact

12      of all the indicia that shows he's here, he's engaged in this

13      case, and he has no incentive to go anywhere, especially under

14      all the circumstances that we've stated.

15              Nobody in the world, as far as I know, has any

16      incentive to help this man run away from this case or to

17      violate American law.

18              THE COURT:  But that's exactly what I'm saying.  I am

19      not sure I wouldn't presume that the individuals whom Mr.

20      Donziger represented all these years and fought for all these

21      years would not be inclined to take care of him.  That's my

22      point.

23              MR. FRISCH:  Your Honor, my understanding is that

24      these people who he represented are indigenous people, local

25      communities in the Amazon.  My understanding is that, while I

JC4EDONC

believe he may know other people than just people of that

standing, nobody has an incentive, as far as I know, to help

him violate the terms of his bond here and leave this country.

He has no incentive to do that.  He has no passport.

He has no way of getting there.  And the fact that he is so

engaged in this case, and so eager to establish his innocence,

and fight for himself by the demonstrated record of this case,

should overcome any such concern, especially since there's a

secured bond in place, especially in light of Officer Harmon's

recommendation of a monitored curfew.

We can talk about increasing the bond.  I don't know

how we increased the bond to a figure that embraces 27 people

with the 3 already on the bond to create a sufficient financial

incentive.  Under the circumstances of this case, I don't think

it's necessary.  I don't think we need to go there.  But we can

talk about it.  We can talk about what the Court's comfortable

with under these circumstances.

Officer Harmon has recommended a monitored curfew for

someone with no record, with a family, a son, has lived in

Manhattan for, I believe, 25 years or so with no criminal

record.

It's not a crime of violence.  It's a case where he

appeared in civil court every time required.  Submitted lots of

papers.  I don't see why this is a risk of flight at all; why

this is not ROR.

JC4EDONC

1          But, OK, I realize I'm not going to win that argument.

2          We already have a secured bond in place and we can

3     keep him on monitoring but impose the curfew recommended by

4     Officer Harmon.  Whatever concerns the Court may have, we want

5     to address so that he's not on electronic monitoring 24/7, home

6     confinement 24/7, but I can't see why under all these

7     circumstances that a monitored curfew wouldn't address those

8     concerns.

9          THE COURT:  Thank you.

10         Ms. Glavin.

11         MS. GLAVIN:  Your Honor, two points.  First, with

12    respect to Mr. Frisch's letter, which was filed last night at

13    6:17 p.m., I was surprised to receive the letter because I had

14    been in communication with Mr. Frisch yesterday as well as

15    Monday and he never hinted to me that this letter was going to

16    be filed or that he would be making the arguments that he made

17    in his letter.

18         But what's done is done.  To the extent that

19    Mr. Frisch raises -- and it is quite surprising to me to hear

20    this -- that Mr. Donziger is now distancing himself from

21    Ecuador and his extensive ties there over the last 25 years --

22    that do include ties with high-level Government officials --

23    and, in fact, using the Government of Ecuador to pursue his

24    interests and the interests of his thousands of clients that

25    reside in Ecuador currently, I would like an opportunity to

JC4EDONC

1    respond, if the Court deems it necessary, on his ties to

2    Ecuador in writing and sort of list them out, which is what

3    informs my concern about risk-of-flight in this particular

4    case.

5           THE COURT:  You don't have any objection to that, Mr.

6    Frisch?

7           MR. FRISCH:  Do I have an objection to Ms. Glavin

8    having an opportunity to submit something in response?  Of

9    course not.

10          THE COURT:  We always tell law students not to ask the

11   court for anything you haven't asked your opponent for.  This

12   is why.  Wonderful.

13          To the extent you want to talk about trial dates.  I

14   can give you any of the following, and I know, Mr. Frisch, it

15   might be influenced by the outcome of your argument, but I can

16   give you February 3rd, April 20th, May 4th, or June 15th.

17          I'm not asking you to tell me now because I know it

18   will be influenced by the outcome of the reconsideration

19   request.

20          Where are we on preparing for trial, Friends?   Is

21   there any update on that?   I thought you were going to know

22   something today.

23          MS. GLAVIN:  My understanding is that we're going to

24   trial, your Honor, which is why we're seeking a trial date.  I

25   have not gotten an indication from Mr. Frisch that this is

JC4EDONC

1   going to resolve itself.

2           MR. FRISCH:  We have all been doing this long enough

3   to know there is a possibility of disposition in any case.  I

4   hope to keep lines of communication open with Ms. Glavin.  That

5   said, it's prudent to be setting a trial date as that certainly

6   is something that could happen in this case, so it's prudent to

7   be talking about a schedule.

8           THE COURT:  OK.  You have dates available.  It's a

9   broad range of dates for you.  Once you decide on a trial date,

10   I will ask you to figure out a schedule for your motions to

11   give yourselves time to write them and certainly give me time

12   to read them.

13           What else today, Friends?

14           MR. FRISCH:  Nothing else from Mr. Donziger.  Thank

15   you.

16           MS. GLAVIN:  If I might have a moment to confer with

17   Mr. Frisch.

18           THE COURT:  Yes, ma'am.

19           MS. GLAVIN:  So, your Honor, I think it makes sense to

20   try and hold one of those dates down so that I can be

21   contacting witnesses and getting people to adjust their

22   schedules.

23           Mr. Frisch indicated to me that he thinks the

24   June 15th date would work best for him given his own schedule.

25   That's fine with me.  I would prefer to lock that date down

JC4EDONC

```
 1     knowing that Mr. Frisch may come back and seek another date.  I
 2     prefer to get something on the calendar.
 3              THE COURT:  You're welcome to have that, but we'll
 4     hold the other dates for you.
 5              MS. GLAVIN:  Yes.
 6              MR. FRISCH:  I wanted to add to that the reason I
 7     asked for June 15th is that I just can't say for certain how
 8     long the Judge Korman trial is going to take and I want to give
 9     myself enough of a window between the end of that trial and the
10     beginning of this one, which is why I prefer June 15th over
11     May 4th.  But I think if your Honor can simply hold that date
12     and let us know if becomes a problem, hopefully we can report
13     back and confirm or not.
14              THE COURT:  That's the question.  Do you want to set a
15     date for you now to report back?  Two weeks, first week in
16     January?  What do you want?
17              MR. FRISCH:  I think that makes sense.  I think,
18     obviously, Mr. Donziger and I would be guided to some extent by
19     the result of the other application, but sure, a couple of
20     weeks probably makes sense.
21              THE COURT:  What do you want, December or the first
22     week of January?
23              MS. GLAVIN:  That's fine, with me.  Your Honor.
24              MR. FRISCH:  Let me check my schedule, if I could.
25              THE COURT:  Yes, sir.
```

JC4EDONC

1          MR. FRISCH:  I think that's OK.

2          THE DEPUTY CLERK:  How's January 6th at 10 a.m.?

3          MR. FRISCH:  That's good.

4          MS. GLAVIN:  That works, your Honor.

5          THE COURT:  As we have been doing, I take it there is

6    no objection in an excess of caution to excluding time between

7    today and January 6th?

8          MR. FRISCH:  Correct, Judge.

9          MS. GLAVIN:  Yes, your Honor, but not conceding that

10   the speedy trial act applies.

11         THE COURT:  Exactly.  In order to permit counsel to

12   figure out what we're doing next, time between today and

13   January 6th is excluded from calculation under the speedy trial

14   act without ruling that it is applicable.

15         Anything else today, Friends?

16         MR. FRISCH:  No, Judge.  Thank you.

17         MS. GLAVIN:  No, your Honor.

18         THE COURT:  Thank you, counsel.  Good morning.

19         (Adjourned)

20

21

22

23

24

25