UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------- x

UNITED STATES OF AMERICA

              - against -                    19 CR 561 (LAP)
                                          11 CV 691 (LAK)
STEVEN DONZIGER,

                  Defendant.

----------------------------------------------------- x

MOTIONS ON BEHALF OF STEVEN DONZIGER FOR RELIEF, INCLUDING:

(1) DISQUALIFICATION OF ANY SOUTHERN DISTRICT JUDGE FROM PRESIDING
OVER THIS CASE OR, ALTERNATIVELY, THAT A JURY BE EMPANELED TO HEAR
MR. DONZIGER'S PETTY OFFENSE IF A SOUTHERN DISTRICT JUDGE PRESIDES;

(2) DISQUALIFICATION OF ATTORNEYS FROM SEWARD & KISSEL LLP AS
PROSECUTORS BASED ON SEWARD'S DIRECT AND INDIRECT TIES
TO THE OIL AND GAS INDUSTRY AND THE CHEVRON CORPORATION;

(3) DISMISSAL OF JUDGE KAPLAN'S CHARGES BASED ON VIOLATION OF
THE UNITED STATES SUPREME COURT'S COMMAND THAT A JUDGE SHOULD
USE "THE LEAST POSSIBLE POWER ADEQUATE TO THE END PROPOSED"
BEFORE INVOKING CRIMINAL CONTEMPT.

<div style="margin-left:40%;">

Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000
afrisch@andrewfrisch.com

*Attorneys for Steven Donziger*

</div>

Table of Contents

*Preliminary Statement*                                                              3

*Introduction*                                                                       4

*A.*   *Judge Kaplan's Demonstrable Bias*                                             8

   *1.*   *Referee Horan's Recommendation that Interim Suspension*                    9
          *of Mr. Donziger's License to Practice Law, Based Solely*
          *on Judge Kaplan's Judgment, Be Lifted*

   *2.*   *Chevron's Claims of Alleged Fraud in Ecuador Were*                        10
          *Reviewed and Rejected in Ecuador by the Ecuadorian Courts*

   *3.*   *Before a Bench Trial, Judge Kaplan Expressed Allegiance*                  11
          *with Chevron  and Suggested the Cause of Action that*
          *Judge Kaplan Later Sustained*

*B.*   *No Southern District Judge Should Preside Over this Case or*                 14
       *Rule on Pretrial Motions*

*C.*   *This Court Should Not Preside Over this Case*                                15

*D.*   *If a Southern District Judge Presides Over Trial of Mr. Donziger's*          16
       *Petty Offense, A Jury Should Be Empaneled*

*E.*   *Seward is Not Disinterested and Should Be Disqualified*                      17

   *1.*   *Summary of Publicly-Available Information*                                17

   *2.*   *Seward Should Be Disqualified*                                            22

*F.*   *Judge Kaplan Improperly Invoked the Power of Criminal Contempt*             24

   *1.*   *The Law Requires More than Alleged Violation of an Order*                 24

   *2.*   *Mr. Donziger's Conduct Did Not Warrant Criminal Contempt*               26

*G.*   *Seward Has A Duty to Disclose its Communications with Gibson Dunn*          33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

         - against -                 19 CR 561 (LAP)
                                   11 CV 691 (LAK)

STEVEN DONZIGER,

             Defendant.

-------------------------------------------------- x

<u>Preliminary Statement</u>

        The criminal charges in this case were initiated after the United States Attorney declined to prosecute them.  Despite the command of the United States Supreme Court that the power of criminal contempt be exercised delicately and with great care, and only as a last resort, Judge Kaplan invoked Rule 42 of the Federal Rules of Criminal Procedure to appoint prosecutors from a law firm with disqualifying ties to the oil and gas industry in which the Chevron Corporation ("Chevron"), the plaintiff in the underlying civil suit, is one of the so-called "majors," or "supermajors,[1]" and long ago announced its resolve to undo the $9 billion judgment against it "until Hell freezes over, and then we'll fight it out on the ice."

        While virtually every invocation of criminal contempt follows offensive conduct in the Judge's presence as where a litigant curses at a judge, risks permanent harm to justice as where a witness fails to comply with an order to testify, or otherwise serves materially to obstruct justice, Judge Kaplan invoked the power of criminal contempt here in a different context, in lieu

---

[1] *See https://en.wikipedia.org/wiki/Big_Oil* ("[i]n the maritime industry, six to seven large oil companies that decide a majority of the crude oil tanker chartering business are called 'Oil Majors'" or "supermajors").

of the United States Attorney, to punish a human rights advocate because Chevron professed dissatisfaction with the manner and speed with which he surrendered his interests in the judgment as he made progress enforcing it outside the United States.  Judge Kaplan did so despite the alleged contemnor's innumerable filings beseeching him to see the illegality of ordering disclosures of privileged and constitutionally protected material on pain of even civil contempt; assuring him that he would otherwise make the disclosures if unsuccessful on appeal; and otherwise attempting to jump through vengeful hoops set by Chevron to exact every drop of retribution from the attorney who had dared to take on Big Oil and win.

By these motions, Steven Donziger moves for relief, including the following:

1.    Dismissal of Judge Kaplan's criminal charges;

2.    Disqualification of the prosecutors based on the opinion of Professor Ellen Yaroshefsky, an accomplished and highly-credentialed expert in legal ethics;

3.    Random reassignment of this case to a Judge from outside this District; and

4.    Disclosure of the prosecutors' communications with Chevron's counsel.

<u>Introduction</u>

The viability of criminal contempt rests as much on the power to invoke it as guardrails necessary to prevent its abuse.  A judge's power to vindicate judicial authority must be exercised "delicate[ly] . . . to avoid arbitrary or oppressive conclusions" [*see Cooke v. United States*, 267 U.S. 517, 539 (1925)], precisely because it is a judge who is the complainant, may charge the crime in lieu of a grand jury, and imposes punishment absent any pre-determined legislative parameters.  *See, e.g., Bloom v. Illinois*, 391 U.S. 194, 202, 207 (1968) (cautioning against "vesting the judiciary with completely untrammeled power to punish contempt"); *Lewis*

*v. United States*, 518 U.S. 322, 328-29 (1996) (contempt "often strikes at the most vulnerable and human qualities of a judge's temperament"); *Offutt v. United States*, 348 U.S. 11, 14 (1954) ("a judge should not himself give vent to personal spleen or respond to a personal grievance"); *Sandstrom v. Butterworth*, 738 F.2d 1200, 1208 (11th Cir. 1984) ("a single-minded focus on authority and order to the necessary exclusion of due process serves neither value well"). *See also Codispoti v. Pennsylvania*, 418 U.S. 506, 515 (1974) (there is "no justification for dispensing with the ordinary rudiments of due process"); *Green v. United States*, 356 U.S. 165, 188 (1958) ("[T]he answer to those who see in the contempt power a potential instrument of oppression lies in assurance of its careful use and supervision").

To guard against intemperate use of the contempt power, a judge "must be restrained by the principle that "only '[t]he least possible power adequate to the end proposed' should be used in contempt cases." *Young v. United States ex rel. Vuitton*, 481 U.S. 787, 801 (1987) (quoting *United States v. Wilson*, 421 U.S. 309, 319 (1975) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821)). Thus, the United States Supreme Court reversed a conviction of criminal contempt against Chicago attorney Thomas C. McConnell even though he violated an order of a district judge. *In re McConnell*, 370 U.S. 230 (1962). After the judge barred McConnell from asking questions to establish an alleged cause of action, McConnell persisted, believing that the questions were necessary to elicit required proof or at least preserve the judge's ruling for appellate review. Justice Black writing for the Court explained that "[t]he arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty." *Id.* at 236.

Rule 42 of the Federal Rules of Criminal Procedure codifies the power of a judge to punish contempt [*see, e.g., Michaelson v. United States*, 266 U.S. 42 (1924) (the power of contempt is essential to the administration of justice)], but also grants an additional power to a judge not typically available in any other type of prosecution:  "Revised Rule 42(a)(2) now explicitly addresses the appointment of a 'prosecutor' and adopts language to reflect the holding in [*Vuitton*], permitting a judge to appoint a 'disinterested' private counsel to prosecute the alleged contempt when the government declines."  *See* Fed. R. Cr. P. 42, Advisory Committee Notes on Rules - 2002 Amendment.

Justice Scalia strenuously argued that federal judges themselves have no power to prosecute contemnors for disobedience of court judgments nor any "derivative power to appoint an attorney to conduct contempt prosecutions."  *Vuitton*, 481 U.S. at 825 (Scalia, J., concurring).  While the Supreme Court in *Vuitton* validated the power of a judge to appoint a disinterested prosecutor when the United States Attorney declines to prosecute an alleged contempt, Justice Scalia opined that "the most tyrannical licentiousness" emerges from judges "in effect making laws, prosecuting their violation, and sitting in judgment of those prosecutions."  *Vuitton*, 481 U.S. at 822.  Justice Scalia argued that judges have no power to appoint private attorneys to prosecute contempt because "[p]rosecution of individuals who disregard court orders (except orders necessary to protect the courts' ability to function) is not an exercise of '[t]he judicial power of the United States,' U.S. Const., Art. III, §§ 1, 2."  *Id*. at 815, 825.  "[P]ermitting a judge to promulgate a rule of behavior, prosecute its violation, and adjudicate whether the violation took place . . . is no less fundamental a threat to liberty than is deprivation of a jury trial, since 'there is no liberty if the power of judging be not separated from the legislative and executive

powers.'" *Id*. at 824 (quoting 1 Montesquieu, Spirit of the Laws 181, as quoted in The Federalist No. 78, p. 523 (J. Cooke ed. 1961)).  While the Court's majority and Justice Scalia disagreed about the scope of the judicial power to prosecute contempt, they understood that judges invoking criminal contempt must exercise utmost restraint -- and ensure scrupulously fair procedures -- to avoid arbitrary and oppressive results, especially where the Executive Branch has declined to prosecute.

The circumstances of Steven Donziger's criminal case validate the Supreme Court's (and Justice Scalia's) concerns about abuse of the contempt power and demonstrate why its exercise here crosses the line.  Mr. Donziger's case raises a confluence of highly atypical circumstances: (1) the criminal case arises from an especially contentious bare-knuckles civil litigation initiated by Chevron, one of the world's largest oil companies, represented by one of the world's most aggressive law firms, in which Judge Kaplan announced his hostility to Mr. Donziger before the case began; suggested a cause of action to Chevron which was soon thereafter filed by Chevron and sustained by Judge Kaplan at a bench trial; and expressed his allegiance with Chevron's agenda; and (2) despite the Supreme Court's repeated pronouncements that the power of criminal contempt be invoked with delicacy and great care, Judge Kaplan appointed lawyers to prosecute Mr. Donziger whom he had to have known had direct and indirect ties to the oil and gas industry; threw transparency to the wind and appears to have arranged for a colleague to preside in lieu of the District's usual protocols for judicial assignment; and invoked criminal contempt where, demonstrably from the nature and timing of the charges themselves, it was not "[t]he least possible power adequate to the end proposed." *See Vuitton*, 481 U.S. at 801.

After Judge Kaplan initiated this criminal case, Chevron moved *in limine* to

preclude Mr. Donziger from invoking the Fifth Amendment at a contempt hearing in the civil case.  Judge Kaplan denied Mr. Donziger's renewed motion to hold Chevron's motion in abeyance pending resolution of the criminal charges, faulting Mr. Donziger for not moving for an extension of time to respond rather than abeyance.  Whatever the merit of that immaterial distinction, Judge Kaplan did not see fit to treat Mr. Donziger's motion to hold Chevron's motion *in limine* in abeyance as a motion for an extension of time to satisfy his view of the proper styling of the relief sought.  The record contains far too many examples of this type of hair-splitting, consistently in favor of Chevron and against Mr. Donziger, to resist the inference that the criminal charges arise from Judge Kaplan's ideological bias in favor of Chevron, an advocate's strategy to prejudice Mr. Donziger, and personal pique.

Far from exercising the contempt power delicately and with care, Judge Kaplan set the stage for this case by appointing private attorneys from a firm tied to the oil and gas industry to prosecute; by apparently selecting and arranging for a particular colleague to preside; and by fashioning charges for which criminal sanction was unnecessary and unworthy.  To correct Judge Kaplan's improvident actions and to protect the viability of the contempt power, as well as the rights of human rights advocates, the relief requested herein should be granted.[2]

A.    *Judge Kaplan's Demonstrable Bias*

Three fact-finders have reviewed circumstances relevant to this case at fact-finding trials or hearings: (1) Judge Kaplan at a bench trial on a charge of racketeering that Chevron filed after Judge Kaplan suggested that Chevron do so; (2) the Ecuadorian trial court that ordered Chevron to pay about $9 billion in compensatory damages; and (3) Referee John R.

---

[2]  These motions incorporate by reference all proceedings and submissions to date.

Horan, a former Assistant United States Attorney in this District appointed by the Supreme Court

of the State of New York Appellate Division, First Department, to determine the appropriate

sanction to impose on Mr. Donziger on referral from this Court's Grievance Committee based on

Judge Kaplan's findings after the bench trial. The only appellate courts to subject the factual

record to *de novo* review are the Ecuadorian high courts. Of these various fact-finders, only

Judge Kaplan sustained and sought to punish Mr. Donziger for Chevron's claims of fraud.

1.   *Referee Horan's Recommendation that Interim Suspension of Mr. Donziger's*
     *License to Practice Law, Based Solely on Judge Kaplan's Judgment, Be Lifted*

On December 2, 2016, the District's Grievance Committee referred Mr. Donziger

to the First Department's Grievance Committee, expressing the "sincere hope" that the First

Department's Committee would impose professional discipline on Mr. Donziger based on Judge

Kaplan's judgment against him in Chevron's civil suit, and, *sua sponte*, advising the First

Department that the doctrine of collateral estoppel would likely apply. After the Appellate

Division entered an order of suspension based on the District's referral, Mr. Donziger requested a

post-suspension hearing pursuant to 22 NYCRR Section 1240.9(c) and successfully requested

that the hearing be public and not subject to the usual protocols for confidentiality. While Judge

Kaplan's criminal contempt charges have been pending in this Court, Referee Horan presided

over a four-day fact-finding hearing at which Mr. Donziger testified.

Referee Horan recommended to the Appellate Division that Mr. Donziger's

"interim suspension should be ended, and . . . he should be allowed to resume the practice of

law" [Exhibit A at 33]:  "In his testimony before me, [Mr. Donziger] was candid and clear and

showed no sign of dissembling or evasiveness." *Id.* at 12. Referee Horan afforded Judge

Kaplan's judgment "considerable," but not "decisive" weight, noting that "[t]he extent of [Mr.

Donziger's] pursuit by Chevron is so extravagant, and at this point so unnecessary and punitive" [*Id.* at 34]:  "Lawyers with Mr. Donziger's] endurance for the difficult case, one which is constantly financially risky and usually opposed by the best paid national firm lawyers available, are not available often."  *Id.*

Referee Horan rejected the First Department Grievance Committee's recommendation that Mr. Donziger be disbarred, based on "the totality of the evidence presented at the hearing, and particularly in mitigation" [*Id.* at 36]:

> Assessment of character is not an exact science, but we can all agree that the essential components are honesty, integrity, and credibility.  It is far from clear that [Mr. Donziger] is lacking in those qualities as the Committee argues.  We are here engaged in a prediction that despite his flaws noted herein, [Mr. Donziger] has such character and is essentially working for the public interest and not against it, his desire to make a large fee notwithstanding.  None of those who testified for these qualities of [Mr. Donziger] are the sort who would carelessly toss off an opinion about character or misrepresent his reputation in the world community. They are inherently credible as witnesses, in my opinion.  If his interest in earning a large fee makes his character suspect, the entire bar is suspect.

*Id.* at 35.

Referee Horan described this case as "decidedly unusual and "unprecedented (findings criminal in nature in a civil RICO case)" [*Id.* at 5], noting that the United States Attorney had declined to prosecute Mr. Donziger for what Judge Kaplan found at a bench trial was a plain and pervasive fraud.  *Id.* at 10.

2.   *Chevron's Claims of Alleged Fraud in Ecuador Were Reviewed and Rejected in Ecuador by the Ecuadorian Courts*

The high courts of Ecuador, reviewing the trial record *de novo,* carefully considered and categorically rejected Chevron's claims that the judgment against it should be nullified.  The Sole Chamber of the Provincial Court of Sucumbios, in an opinion issued January

10

13, 2012, examined what it called Chevron's "secret assistance" theory (that plaintiffs' legal team "ghostwrote" the judgment) and concluded that the allegation "does not lead anywhere without a good dose of imaginative representation."  The Court stated: "In relation to the seventh request (by Chevron) for clarification regarding whether or not [Chevron's] accusations with respect to irregularities in the preparation of the trial court judgment had been considered, it is clarified that, yes, such allegations have been considered but no reliable evidence of any crime have been found."

Two years later, the National Court of Justice (the highest layer of direct appeal in the Ecuadorian system), also reviewed the record and concluded in a 220-page opinion that [t]here is no legal ground or basis to annul the case as [Chevron] has requested time and again.  It is sufficient to point out that [Chevron] has "never demonstrated fraud, which it has been claiming without any legal support.  We reiterate that it has not proven any omission or violation of procedure that would give rise to the nullity sought. [Chevron's] incessant harping in this regard departs from procedural good faith." These judicial opinions were filed as PX 431 and PX 8095 in the civil case.

> 3.     *Before a Bench Trial, Judge Kaplan Expressed Allegiance with Chevron and Suggested the Cause of Action that Judge Kaplan Later Sustained*

Years before Chevron initiated its civil suit against Mr. Donziger in this District, it expressly resolved to implement a strategy to "demonize" him as part of a campaign of disinformation in the media, with government officials and in the courts, to make "[w]hat appears to be real [to be] in fact a front for something else."  As an internal Chevron memorandum says, "Why should we let [Amazon Watch, Donziger and others] write history when we can write it ourselves?"  Chevron's counsel of choice for its massive disinformation campaign was Gibson Dunn, a law firm known for advocacy that crosses the line. *See, e.g.*,

*"Gibson Dunn Used 'Legal Thuggery,' Say Montana Supremes,"* Wall Street Journal Law Blog, March 13, 2007[3]; *Seltzer v. Morton*, 2007 MT 62 (2007); *Boreh v. Republic of Djibouti*, 2015 EWHC 769 (Comm), High Court of Justice, Queen's Bench Division, Commercial Division (March 23, 2015) (finding that a Gibson Dunn partner had "lost his moral compass").[4]

Four months before Chevron initiated the civil lawsuit from which the criminal contempt charges arise, Chevron appeared before Judge Kaplan in a proceeding initiated by Chevron under 28 U.S.C. §1782.  At a hearing on September 23, 2010, Judge Kaplan provided his view of the dispute between Chevron and Mr. Donziger:

> The object of the whole game, according to [Mr.] Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it . . . So the name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money.

Judge Kaplan asked, rhetorically, "Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?"  *In re Chevron*, 10-MC-002, Hearing Transcript of Sept. 23, 2010, at 24, 78.

Four months later, a week after Chevron filed its RICO complaint against Mr. Donziger and others and years before trial, Judge Kaplan expressed dismay that Mr. Donziger might succeed in enforcing the Ecuadorian judgment and impairing the business of Chevron,

> a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day.  I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [Ecuadorians] have attached it in

---

[3]   Available at *https://blogs.wsj.com/law/2007/03/13/gibson-dunn-used-legal-thuggery-say-montana-supremes/*.

[4]   Available at *http://www.bailii.org/ew/cases/EWHC/Comm/2015/769.html*.

Singapore or wherever else [as part of enforcing their judgment] . . . .

*Chevron Corp. v. Donziger*, 11 CV 691, Transcript of Hearing of Feb. 8, 2011, at 49-50.  After

sustaining Chevron's charges against Mr. Donziger at a bench trial, Judge Kaplan issued an

injunction barring enforcement of the Ecuadorian judgment anywhere in the world.  The Court of

Appeals reversed Judge Kaplan, limiting the injunction to just the United States.  *Chevron v*

*Naranjo*, 667 F.3d 232 (2d Cir. 2012).

As Judge Kaplan acknowledged, he had a predetermined view of Mr. Donziger

"from the beginning:"

> The imagination of American lawyers is just without parallel in the world.  It is our one
> absolutely overwhelming comparative advantage against the rest of the world, apart from
> medicine.  You know, we used to do a lot of things.  Now we cure people and we kill
> them with interrogatories.  It's a sad pass.  But that's where we are.  And Mr. Donziger
> [with the Ecuadorian judgment] is trying to become the next big thing in fixing the
> balance of payments deficit.  I got it from the beginning.

Before the bench trial, Mr. Donziger had petitioned the Court of Appeals for

Judge Kaplan's recusal based on multiple examples of Judge Kaplan's bias and partiality.  The

Court of Appeals declined to grant relief [Case No. 11-2259, Doc 75], quoting *Keith v. Barnhart*,

473 F.3d 782, 789 (7th Cir. 2007), that "[b]ias cannot be inferred from a mere pattern of rulings

by a judicial officer, but requires evidence that the officer had it in for the party for reasons

unrelated to the officer's view of the law[.]"  Today, nine years later, the nature and timing of

Judge Kaplan's charges of criminal contempt and the fact and manner of Judge Kaplan's

implementation of Rule 42 establish precisely why a Judge's power of criminal contempt must

be exercised delicately and with great care.  *See, e.g.*, Daniel L. Greenberg, *Judge Appointing an*

*Attorney To Pursue Steven Donziger Is Disconcerting*, The New York Law Journal (Letter to the

Editor), Aug. 21, 2019[5] ("There are many remedies available to judges when they feel attorneys have abused the system; criminal relief should be used sparingly. Regardless of the merits, to wield it in a matter where the acrimony between the judge and counsel has been front-page news for many years brings to mind the maxim that the appearance of justice is as important as justice itself"); Paul Barrett, *Chevron Looks to Its Home Court for a Comeback Win*, Bloomberg Businessweek, July 14, 2011[6] ("Kaplan has signaled strongly where his sympathies lie.  He doesn't disguise his disdain for the lead plaintiffs' attorney, Steven R. Donziger").

B.     *No Southern District Judge Should Preside Over this Case or Rule on Pretrial Motions*

A federal judge shall disqualify him or herself in any proceeding in which his or her impartiality might reasonably be questioned.  28 U.S.C. § 455(a).  The standard is whether a reasonable person, knowing all the facts, would conclude that the Court's impartiality might reasonably be questioned.  *Apple v. Jewish Hosp. and Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987).  This standard flows from the principle expressed in the Code of Conduct for United States Judges that "[a] judge must avoid all . . . appearance of impropriety and that a judge must . . . accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen.  *Id.* at Canon 2A, comm.

As of this writing, the Courthouse's lobby contains a gallery of courtroom sketches of notable cases in the District, each followed by a photograph of the presiding Judge and a biographical history.  On the wall of the lobby to the right of the jury assembly room is a

---

[5]  Available at *https://www.law.com/newyorklawjournal/2019/08/21/judge-appointing-an-attorney-to-pursue-steven-donziger-is-disconcerting/?slreturn=20200127164735.*

[6]  *Available at https://www.bloomberg.com/news/articles/2011-07-14/chevron-looks-to-its-home-court-for-a-comeback-win.*

courtroom sketch of a witness testifying in Chevron's underlying civil case against Mr. Donziger.

Above a photograph of Judge Kaplan and his biography is the following description of the

associated civil case :

> U.S. lawyer Steven Donziger represented a group of Ecuadorian natives, known as Lago Agrio plaintiffs (LAPs), alleging that the Chevron Corporation had, for decades, dumped crude oil into the Amazon rainforest during an oil-drilling operation.  The court found that Donziger and others obtained an $8.65 billion judgment against Chevron in Ecuador by corrupt means in violation of the federal Racketeer Influenced and Corrupt Organizations Act and state law.  The Honorable Lewis A. Kaplan issued a judgment prohibiting enforcement of the judgment in the United States and granting other relief.

Every invocation of criminal contempt should be exercised delicately, but this case arises from

an unusually long-running and contentious case with which the presiding Judge is so associated

that his photograph appears under a courtroom sketch describing his finding against the

defendant.  A randomly-selected Judge from outside the District, unacquainted with Judge

Kaplan, should be invited to preside over this criminal case, or, alternatively, venue should be

transferred outside this Circuit.  *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); Fed. R.

Cr. P. 21(a).

## C.    *This Court Should Not Preside Over this Case*

While the District's Rules for the Division of Business Among District Judges do

not vest rights in litigants, Rule 16 requires that the assignment committee transfer a case by lot

where a judge is disqualified.  This Rule, while part of internal Court protocols, reflects the

unassailable principle of law that a disqualified judge is disqualified for all purposes, including

selecting his replacement. Thus, the Supreme Court in *Cooke*, 267 U.S. at 539, remanded a

contempt case with instructions to the district judge to invite the senior circuit judge to assign

another judge to sit in the second hearing of the charge against the petitioner.

15

In invoking Rule 42, Judge Kaplan disqualified himself from presiding over this case presumably recognizing that he cannot fairly judge a prosecution that he initiated and organized.  *Cf. United States v. Brennan*, 629 F. Supp. 283, 305 (E.D.N.Y. 1986) (rejecting prosecutor's request for a heavy sentence to induce the defendant's cooperation because to do so would compromise the judge's neutrality); *United States v. Federico*, 732 F. Supp. 1008, 1012 (N.D. Cal. 1988) (identifying cases that address the separate roles of judges and prosecutors in sentencing decisions).

Any decision by Judge Kaplan in this case after acknowledging his disqualification undermines the prophylactic purpose of the disqualification and is otherwise relevant in determining whether his power of criminal contempt was exercised with the delicacy and scrupulous care required by the United States Supreme Court.  More transparency, not less, is required when a Judge invokes the power of criminal contempt, assumes the status as complainant, acts as prosecutor in lieu of the Executive Branch, and is himself an actual witness to the charged conduct and potential witness at trial.

The Court should disclose how Judge Kaplan transferred Mr. Donziger's case and and what information was relayed in doing so to enable the defendant to marshal arguments in favor of disqualification, or make a record for potential appellate review, on the question of whether Judge Kaplan' power of criminal contempt was exercised with the required degree of delicacy and care.

D.      *If a Southern District Judge Presides Over Trial of Mr. Donziger's*
        *Petty Offense, A Jury Should Be Empaneled*

Noting the benefit of a jury "as a protection against the arbitrary exercise of official power," the Supreme Court has said that the power of a judge in the often-heated

contempt context [*see Lewis v. United States*, 518 U.S. 322, 328-29 (1996)] presented the "very likelihood of arbitrary action that the requirement of a jury trial was intended to avoid or alleviate." *See, e.g., Codispoti,* 418 U.S. at 515-16. Here, the prosecutor's view that this case is properly treated as a misdemeanor permits Judge Kaplan's charges of contempt to be resolved by a colleague in the same District without the benefit of a jury, after the underlying civil case was itself resolved against Mr. Donziger without a jury, and notwithstanding contrary findings reached in Ecuador. Based on the atypical history of this case, the Court should exercise its discretion and empanel a jury to hear evidence of Mr. Donziger's petty offense as long as a Judge from this District presides. At the least, as a matter of basic due process, Mr. Donziger is entitled to know the full range of penalties he is facing, including any financial penalty.

E.     *Seward is Not Disinterested and Should Be Disqualified*

While the Court to date has elected not to conduct any type of inquiry to determine if attorneys from Seward & Kissel LLP ("Seward") can properly serve as prosecutors in this case, limited publicly-available information by itself establishes that Seward has disqualifying direct and indirect ties to the highly concentrated oil and gas industry. Professor Ellen Y. Yaroshefsky, an accomplished and highly-regarded expert on professional ethics (*see curriculum vitae* appended to Professor Yaroshefsky's declaration) concludes that the "Seward appointed lawyers are not disinterested and these lawyers should be disqualified as special prosecutors in the criminal contempt proceeding against Mr. Donziger." Exhibit B at ¶62.

1.     *Summary of Publicly-Available Information*

Seward's website describes the firm as "particularly well known" for its representation of "transportation companies (particularly in the shipping area)," among other

17

practice areas.[7]  Seward's "Maritime Practice 2018 Year in Review," dated February 12, 2019,

asks

> As we look forward and ponder what 2019 will hold for *us and our clients*, many of the questions we asked ourselves last year still seem salient . . . . *Will oil prices recover* enough to bring badly needed stability to the offshore drilling and services sectors?

(emphasis added).[8]  Seward is known for its expertise in the financial services industry and

substantial hedge-fund practice.  The firm's clientele includes commercial banks, investment

funds, institutional investors, and shipping and transport companies.  Seward regularly

participates in oil and gas industry conferences.[9]

Chevron is one of the world's largest oil companies.  It is active in more than 180

countries and engaged in every aspect of the oil, natural gas, and geothermal energy industries,

including hydrocarbon exploration and production; refining, marketing and transport; chemicals

manufacturing and sales; and power generation.  Its products are sold in more than 7,800

Chevron and Texaco retail stations across the United States; its four United States refineries have

the combined capacity to process 932,000 barrels of oil per day.

According to Chambers USA, a service whose ranking of law firms is touted on

Seward's website, Seward itself reported to Chambers that its main areas of practice include

"maritime," and identified one representative engagement:  "represent[ing] Scorpio Tankers in its

merger with Navig8 Product Tankers Inc., creating the largest US-listed owner of petroleum

---

[7]  Available at *https://sewkis.com.*

[8]  Available at *https://www.sewkis.com/publications/maritime-practice-2018-year-in-review/.*

[9]  *See, e.g., http://forums.capitallink.com/shipping/2018newyork/index.html; http://forums.capitallink.com/shipping/2016newyork/index.html.*

product tankers."[10]  An executive of Scorpio Tankers, the client identified by Seward in its profile for Chambers, said in 2018 that its merger with Navig8 Product Tankers Inc., in which Seward represented Scorpio, improved Scorpio's "chances to gain contracts among customers like oil majors Total and Chevron."[11]

Other Seward clients with ties to Chevron include or have recently included Euronav, reportedly the world's largest independent crude oil tanker operator, which describes its business in public filings as including chartering "vessels to leading international energy companies, such as Chevron."[12]  On June 18, 2018, Seward announced that it had advised Euronav on its merger with Gener8 Maritime,"[13] a company whose annual report cites its "strong relationships with high quality customers" including Chevron.[14]   Another Seward client, Dorian LPG,[15] a liquefied petroleum gas shipping company and a leading owner and operator of "very large gas carriers," has reported efforts to secure "a five-year time-charter" with Chevron.[16]

---

[10]   Available at *https://chambers.com/law-firm/seward-kissel-llp-usa-5:3652.*

[11]   Available at *https://shippingwatch.com/carriers/Tanker/article10503373.ece.  See also http://sewkis.com* (Seward partner Bruce G. Paulsen's profile on Seward's website touts his successful representation in "an action seeking recovery of amounts due . . . under a complex sale and leaseback transaction involving a tanker leased to Chevron").

[12]   *See, e.g.,* Euronav NV, Form F-1 Registration Statement, 2014, available at *https://www.sec.gov.*

[13]    *https://www.sewkis.com/news/seward-kissel-advises-euronav-on-its-merger-with-gener8-maritime/.*

[14]   Available at *https://www.annualreports.com.*

[15]   *See, e.g., http://www.dorianlpg.com/news-and-media/press-release-details/2018/ Dorian-LPG-Confirms-Receipt-Of-Director-Nominations-From-BW-LPG/default.aspx.*

[16]   Available at *https://www.tradewindsnews.com/weekly/dorian-leans-towards-time-charters-with-latest-chevron-deal/1-1-367758.*

Oaktree Capital Management ("Oaktree") is an American global asset management firm specializing in alternative investment strategies.  It is the largest distressed securities investor in the world, and one of the largest credit investors in the world.  As of December 31, 2018, the company managed $120 billion for its clientele which includes 73 of the 100 largest U.S. pension plans, as well as public funds, foundations, corporate and insurance companies, endowments, and sovereign wealth funds.  Oaktree has 950 employees and 18 offices worldwide.  The company's co-chairman, Howard Marks, has been described as "one of the savviest investors in the world."[17]

Two directors of Oaktree currently serve or have recently served on Chevron's board of directors.  Oaktree's website identifies John Frank as Director and Vice Chairman and a member of Chevron's board.  Oaktree's website identifies Robert Denham as a Director of Oaktree and member of Chevron's board, though he appears to have stopped serving within the last two years.[18]  Denham reportedly is or has recently been Chevron's second-largest individual shareholder.

Seward has announced on its website[19] that clients in whom Oaktree has invested include Kudu Investment Management and Eagle Bulk Shipping.  Oaktree has also invested in

---

[17] *See https://www.oaktreecapital.com; https://en.wikipedia.org/wiki/Oaktree_ Capital_Management.*

[18] *See https://en.wikipedia.org/wiki/Robert_Denham; https://www.investopedia.com/ articles/insights/052216/top-3-chevron-shareholders-cvx.asp*

[19] *See https://sewkis.com.*

and owns a substantial interest in Star Bulk Carriers Corp.,[20] a longstanding Seward client.[21]  On January 26, 2018, Seward announced that it had advised TORM plc, then one of the world's largest product tanker companies, in a private placement, described on Seward's website as "fully backstopped by TORM's majority shareholder, an entity affiliated with funds managed by Oaktree Capital Management, which purchased approximately $70 million of TORM's Class A common shares in the Private Placement."[22]

      At all relevant times, Chevron is and has been represented by Gibson Dunn, a global law firm of 1,300 lawyers in twenty offices around the world.  According to Gibson Dunn's website, it is one of the law firms engaged by Oaktree.

      Meanwhile, Mr. Donziger has been described in the press as the "Scourge of Big Oil."  A Chevron spokesperson in 2009 said that Chevron would fight Mr. Donziger "until Hell freezes over, and then we'll fight it out on the ice."  When Mr. Donziger raised the issue of whether Seward could serve in the shoes of the United States Department of Justice as a disinterested prosecutor of Mr. Donziger for criminal contempt where the underlying charges of civil contempt were initiated by Chevron in a case of such importance to the oil and gas industry, Seward declined to respond.  When Mr. Donziger raised the issue before the Court, Seward's lawyers again stonewalled and declined to provide any information about Seward's relevant

---

[20] *See https://www.globenewswire.com/news-release/2018/06/28/1531418/0/ en/Star-Bulk-Carriers-Corp-Announces-Closing-of-Acquisition-of-3-Dry-Bulk-Vessels-From-Oceanbulk-Container-Carriers-LLC.html.*

[21] *See https://fintel.io/doc/sec/1386716/000114036119018067/ex5_1.htm; https://www.reuters.com/article/us-star-bulk-crirs-acquisition/star-bulk-expands-fleet-with-all-st ock-deal-for-oceanbulk-idUSKBN0ER1NX20140616; https://sewkis.com.*

[22] *See https://sewkis.com.*

relationships in the oil and gas industry.  Instead, Seward blamed Mr. Donziger for "attacking

lawyers, impugning their reputations, and attacking parties" [Transcript of Jan 6, 2019 at 5-6]:

"Let's get this case going.  No more delay, no more throwing mud."  *Id.* at 6.  When Mr.

Donziger's counsel reminded Seward of its obligation under *Brady v. Maryland*, 373 U.S. 83

(1963), to disclose any false and misleading information provided by Gibson Dunn, Seward said

that any allegation that Gibson Dunn might have provided false or misleading information was

itself "disturbing" [Transcript of Jan 6, 2019 at 14-15], despite a documented history of

Chevron's campaign against Mr. Donziger based on its avowed campaign to demonize him, as

discussed above, and Gibson Dunn's reputation for overzealous advocacy.  *See, e.g.*, *"Gibson

Dunn Used 'Legal Thuggery,' Say Montana Supremes,"* Wall Street Journal Law Blog, March

13, 2007; *Boreh v. Republic of Djibouti*, 2015 EWHC 769 (Comm), High Court of Justice,

Queen's Bench Division, Commercial Division (March 23, 2015) (finding that a Gibson Dunn

partner had "lost his moral compass").

     2.    *Seward Should Be Disqualified*

       Judge Kaplan's appointment of Seward to prosecute Mr. Donziger was not

grounded in the care and delicacy attendant proper invocation of the power of criminal contempt.

       As Professor Yaroshefsky explains in her opinion, prosecutors "are required to act

with impartiality, neutrality and disinterestedness" in part because they are "afforded vast

discretion where their decision-making is rarely transparent or judicially reviewable."

Yaroshefsky Declaration at ¶36.  It is thus "of utmost concern that the prosecutor meets the

objective standard of a disinterested lawyer, which is unbiased, neutral, nonpartisan, and not

prejudiced."  *Id.* at ¶40.

Professor Yaroshefsky concludes that Seward's "interests are so aligned with Chevron . . . as to create a financial conflict of interest:"

> In such a highly concentrated industry, the Seward firm's financial and business interests are dependent upon the good will of Chevron and its related entities and other giants in the oil industry.  Seward would not seek to act contrary to the interests of the few controlling large industry oil and gas companies and related entities.

*Id.* at ¶¶50 and 51.

Professor Yaroshefsky explains that Seward's expressed view of its ability to assume the mantle of the Department of Justice does not satisfy the objective standard for resolving the issue in part because "lawyers, like all people, are subject to influences that affect their decision making:"

> Inevitably, one's perspective, bounded by their role and experience, results in rationalizations in favor of clients, even if unintentionally.  Even when people set out to make impartial judgments about a course of action, however, self-interest has a way of creeping in - unconsciously - to the decision process.  Somehow the information is processed in a way that makes the outcome more desirable to the decision maker.

*Id.* at ¶¶ 55 (citation and quotation marks omitted); *see id.* at ¶56 ("Cognitive biases are a chronic issue in all matters, but studies point to particularized cognitive biases for prosecutors because of the significant power they wield and their unreviewable discretion").

Thus, in Professor Yaroshefsky's view, "[i]t is an understatement to say that there is a potential and opportunity for bias by Seward lawyers:"

> It is equally an understatement to say that Seward counsel in the special prosecutor role undermines public trust and confidence in the perception of fairness of the legal system. The facts demonstrate a disqualifying conflict of interest under any objective standard.

*Id.* at ¶60.

The Seward lawyers are not the first prosecutors to use offense as the best defense, but the manner in which they have attempted to deflect the issue here is, to use their

word, "disturbing." The Seward lawyers were appointed to assume the mantle of the United States Department of Justice to intercede soberly and dispassionately in an especially contentious and longstanding case pitting one of the largest corporations ever to exist, a behemoth oil company, against a *pro se* advocate for undeniably poisoned Amazonians. As we litigate these motions and, if necessary, participate in a trial, we will determine whether Judge Kaplan exercised the requisite delicacy in invoking criminal contempt and implementing Rule 42. Meanwhile, Seward's tenor in response to this issue appears to support Professor Yaroshefsky's conclusions.

For all of these reasons, because Seward is not disinterested by any objective standard, Seward should be disqualified.

F.     *Judge Kaplan Improperly Invoked the Power of Criminal Contempt*

1.     *The Law Requires More than Alleged Violation of an Order*

Exercise of the criminal contempt power against Mr. Donziger is not "[t]he least possible power adequate to the end proposed." *Vuitton*, 481 U.S. at 801. Mr. Donziger's conduct was not a contumacious flouting of the Court's authority, but rather constituted persistent, ethically-grounded and strenuous advocacy as to some charges (Counts 1, 2 and 3); benign as to others (Counts 4 and 5); and either were too trivial to warrant extreme resort to criminal process and/or were purged before Judge Kaplan filed his charges (Counts 4, 5 and 6). Mr. Donziger was advocating as a sole practitioner for clients in a monumental David-versus-Goliath battle with one of history's largest corporations using virtually unlimited resources to back hundreds of lawyers from a law firm known for its aggressiveness to implement scorched-earth tactics, expressly vowing to battle "until Hell freezes over, and then we'll fight it out on the

ice."

   "To warrant a conviction in criminal contempt, the contemnor's conduct must constitute misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice, and it must be accompanied by the intention on the part of the contemnor to obstruct, disrupt or interfere with the administration of justice." *In re Williams*, 509 F.2d 949, 960 (2d Cir. 1975) (citing *Eaton v. City of Tulsa*, 415 U.S. 697 (1974); *In re Little*, 404 U.S. 553 (1972); *United States v. Seale*, 461 F.2d 345, 367-68 (7th Cir. 1972). Moreover, "[a]ssuming that an appropriately clear order has obviously not been complied with, a defendant should not be held in criminal contempt unless the noncompliance is found beyond a reasonable doubt to have been willful." *Powell v. Ward*, 643 F.2d 924, 933 n. 12 (2d Cir. 1981) (citing *United States v. Greyhound Corp.*, 508 F.2d 529, 531 (7th Cir. 1974)). "The willfulness element of the offense requires proof of 'a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful,'" though "willfulness 'may be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty,' *In re Levine*, 27 F.3d 594, 596 (D.C. Cir.1994) (internal quotation omitted); *Rojas v. United States*, 55 F.3d 61, 63 (2d Cir. 1995) (quoting *Greyhound Corp.*, 508 F.2d at 531-32); *accord United States v. Cunningham*, 599 F.2d 120, 128 (6th Cir. 1979); *United States v. Marx*, 553 F.2d 874, 876 (4th Cir. 1977).

   Mr. Donziger's conduct here was not "willful" and does not constitute reckless disregard of Judge Kaplan's orders. Rather, it was consistent with the conduct of attorney McConnell whose criminal contempt conviction was reversed. *See McConnell,* 370 U.S. at 236 ("The arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction

which blocks the judge in the performance of his judicial duty").  The facts of this case thus stand

in contrast to the usual circumstances in which criminal punishments have been imposed and

upheld by Courts in this Circuit, where the contemnors failed to testify before a grand jury or

refused to comply with a subpoena (typically in relation to contemnor's involvement in or

knowledge of serious criminal conduct), flouted an injunction, or exhibited contumacious

conduct in the Court's presence.  *See, e.g.*, *United States v. Papadakis*, 802 F.2d 618, 622 (2d

Cir. 1986) (affirming defendant's conviction for  criminal contempt for repeatedly refusing to

testify before grand jury about largest theft in United States history after remaining a fugitive for

six months and found with $10,000 in cash and casino chips in his pocket); *D. Musidor, B. V. v.*

*Great Am. Screen*, 658 F.2d 60, 62–63 (2d Cir. 1981) (affirming conviction for violating

preliminary injunction against dealing in goods bearing certain trademarks); *United States v.*

*Brennan*, 395 F.3d 59, 63–64 (2d Cir.), *as amended on denial of reconsideration*, 406 F.3d 113

(2d Cir. 2005) (affirming conviction for criminal contempt based on violation of freeze order

related to conviction for bankruptcy); *United States v. Cefalu*, 85 F.3d 964, 965 (2d Cir. 1996)

(affirming conviction for refusal to testify at multiple Gambino-related trials where contemnor

had knowledge of felonies); *United States v. Green*, 140 F. Supp. 117, 118-19 (S.D.N.Y. 1956),

*aff'd*, 241 F.2d 631 (2d Cir. 1957), *aff'd*, 356 U.S. 165 (1958) (affirming conviction for failing to

surrender to complete criminal sentence for conspiring to teach and advocate the overthrow of

the government by force and violence and being at large for four years).

   2.   *Mr. Donziger's Conduct Did Not Warrant Criminal Contempt*

       Mr. Donziger was conscientious in litigating his positions before Judge Kaplan,

pressing his positions in innumerable motions, briefs, and letters, and expressly advising Judge

Kaplan that he would voluntarily accept civil contempt as to some of his positions in order to ensure his right to appeal to the Court of Appeals.  Mr. Donziger's innumerable *pro se* submissions to Judge Kaplan include: opposition to Chevron's motion for civil contempt in March 2018 [Dkt 1986]; a motion to dismiss the contempt claim for failure to state a claim [Dkts 2018, 2032], a motion for declaratory relief [Dkts 2018, 2034]; a motion for a protective order [Dkt 2026]; a second, third, and fourth opposition to a supplemental contempt motion [Dkts 2061, 2125, 2184]; multiple oppositions to Judge Kaplan's "forensic inspection protocol" explaining why the protocol was neither "neutral" nor proper [Dkts 2131, 2151, 2162]; oppositions to motions to compel [*see, e.g.,* Dkts 2002, 2077, 2197]; motions to quash [*see, e.g.,* Dkts 2203, 2206]; and stay motions [*see, e.g.,* Dkts 2067, 2077, 2234, 2250].  Mr. Donziger appeared for evidentiary hearings and argument on Chevron's motions on at least May 8, 2018, June 28, 2018, January 8, 2019, and June 10, 2019.

   The foundation for Judge Kaplan's finding of civil contempt was his injunction, following his bench trial of Mr. Donziger, that Mr. Donziger and others could not monetize the Ecuadorian judgment.  In so ruling, Judge Kaplan repeatedly emphasized that they were not otherwise enjoined from "filing or prosecuting any action for recognition or enforcement of the [Ecuador] Judgment . . . in courts outside the United States." 11-cv-691 Dkt. 1875 at 5-6.

   Immediately upon issuance of Judge Kaplan's injunction, Mr. Donziger - again acting conscientiously - moved for its stay, expressing concern that prohibited monetization of the Ecuadorian judgment might serve to block its beneficiaries from raising money needed to fund their continuing efforts to enforce the judgment, including legal fees for Mr. Donziger. 11-cv-691 Dkt. 1888. Judge Kaplan denied the requested stay, but assured Mr. Donziger and his

co-defendants that (a) "as long as no collections are made in respect of the [Ecuador] Judgment," the injunction "would not prevent Donziger from being paid;" (b) the injunction applied only to Mr. Donziger's and his co-defendants' specific individual interests in the judgment; and (c) they were "virtually unconstrained by the [Judgment] in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay." 11-cv-691 Dkt. 1901 at 36.  Relying on Judge Kaplan' s assurances, Mr. Donziger, in 2016 and 2017, assisted his clients in raising third-party funds to pay lawyers, including himself, litigating an enforcement action against Chevron in Canada and engaging in other activities on their behalf.  When Mr. Donziger' s clients began to make significant progress towards enforcing the judgment against Chevron in Canada, Chevron filed a motion claiming that Mr. Donziger was in contempt of Judge Kaplan' s injunction for monetizing the Ecuadorian judgment, citing the language of the injunction, but ignoring - literally not even citing - Judge Kaplan's assurances that raising money to fund efforts at enforcing the Ecuadorian judgment would not violate the injunction. 11-cv-691 Dkt. 1966.

Mr. Donziger in response repeatedly protested that he had relied on Judge Kaplan's express assurances that raising money to fund ongoing efforts to enforce the judgment did not violate the injunction, much less constitute such flagrant violation of a "clear and unambiguous" order as plausibly to warrant a finding of contempt. *See, e.g., Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989) (contempt requires an order so clear and unambiguous that it leaves "no doubt in the minds of those to whom it was addressed [as to] precisely what acts are forbidden"). *See, e.g.*, 11-cv-691 Dkt. 2018 (motion to dismiss).  Mr. Donziger repeatedly requested that Judge Kaplan explain how a finding of even civil contempt

was plausible under the circumstances, filing a motion to dismiss, a motion for a protective order

on constitutional grounds, and a motion for declaratory relief.  Judge Kaplan refused to dismiss

Chevron' s motion for contempt, without addressing the merits of Mr. Donziger's reliance on the

assurances.  11-cv-691 Dkt. 2045.

      While declining meaningfully to address Mr. Donziger' s multiple submissions,

Judge Kaplan invited Chevron to submit a proposal for the seizure of Mr. Donziger's

computers, phones, and online social media and communications accounts so they could be

analyzed by a purportedly neutral forensic analyst selected by Chevron to establish Mr.

Donziger' s violation of the injunction.  11-cv-691 Dkt. 2108.  We have found no other case

where a judge has ordered an attorney to turn over so much information that could be properly

withheld as privileged, confidential or constitutionally protected.  Mr. Donziger expressly

informed Judge Kaplan that he would be in violation of his ethical obligations if he complied

with the protocol.  11-cv-691 Dkt. 2118, 2151 at 17.  He went so far as to invite a finding a civil

contempt to ensure a jurisdictional basis for his appeal to the Court of Appeals.  *Id.*

      Judge Kaplan's reliance on the language of the injunction and refusal to

acknowledge his post-injunction assurances was in essence a bait-and-switch, inviting Mr.

Donziger to act in a certain way and then finding him in fault for so acting.  On May 23, 2019,

Judge Kaplan issued an opinion holding Mr. Donziger in civil contempt and imposing coercive

monetary fines. 11-cv-691 Dkts. 2209, 2219.  Mr. Donziger promptly noticed an appeal and

moved Judge Kaplan for an emergency motion to stay the order of civil contempt pending

resolution of his appeal. 11-cv-691 Dkts. 2235, 2250.  In so moving, Mr. Donziger expressly

explained that Judge Kaplan's order would compel "disclosure of privileged, confidential,

sensitive, and First-Amendment protected information to Chevron" that neither the Court of Appeals nor a district judge could force Chevron to unlearn.  11-cv-69 1 Dkt. 2250 at 2.  *See Maness v. Meyers*, 419 U.S. 449, 460 (1975) (a person may resist an order and not be guilty of contempt if compliance would reveal information that would cause irreparable injury);  *In re Grand Jury Proceedings*, 601 F.2d 162 (5th Cir. 1979) (contempt is not necessarily proper when an order is resisted to preserve constitutional rights and attorney privileges); *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007).

As for whether the "neutral" forensic expert was truly "neutral," Mr. Donziger explained to Judge Kaplan that the ordered protocol, among other defects, permitted Chevron' s attorneys unfettered discretion in reviewing ten percent of the disclosures to determine how the "neutral" protocol should program an automated search of the universe of disclosures.  11-cv-691 Dkt. 2151; 2184 at 4-6; cf 2230-4 at 4-5.  Mr. Donziger proposed, as an alternative, that he submit his devices to a forensic expert, as long as the expert was directed not to allow any access at all to Chevron, for search-programming purposes or otherwise, pending resolution of the pending appeal.  Mr. Donziger told Judge Kaplan that, even if his application were denied, he intended to "retain an expert to perform the imaging anyway in order to demonstrate my willingness to comply with any and all Court orders once my appellate rights have been respected." 11-cv-691 Dkt. 2250 at 2-4.

Judge Kaplan denied the requested stay.  11-cv-691 Dkt. 2254.  Judge Kaplan conceded only that he would consider modifying the protocol to withhold the final step of turning materials over to Chevron if Mr. Donziger surrendered his devices to the purportedly neutral forensic expert, allowed them to be fully scanned and searched, and only if Mr. Donziger

perfected his pending appeal to this Court within two weeks (a deadline not set by the Court of

Appeals).  *Id.*  Judge Kaplan ignored Mr. Donziger's arguments that he could not ethically

disclose the devices nor be held even in civil contempt for failure to do so.  *See, e.g., Maness v.

Meyers*, 419 U.S. at 460; *In re Grand Jury Proceedings*, 601 F.2d at 162; *United States v.

Straub*, 508 F.3d at 1011.

Judge Kaplan's deadline for filing the appellate brief (as opposed to the

actual deadline set by the Court of Appeals) did not afford Mr. Donziger, a *pro se* attorney,

adequate time to properly prepare his appeal.  Literally one day after Judge Kaplan's artificial

deadline, Judge Kaplan resorted to criminal process, which had plainly been weeks or at least

many days in the making: by the time of their filing, the United States Attorney had already

reviewed and rejected Judge Kaplan's request that the charges be prosecuted in the usual course.

On this record, it is hard to resist the conclusion, to paraphrase *Keith v. Barnhart*, 473 F.3d at

789, that Judge Kaplan "had it in" for Mr. Donziger, arising from the very animus that Judge

Kaplan began to express years ago even before Chevron filed its civil suit.  Meanwhile, Mr.

Donziger's appeals from Judge Kaplan's orders of civil contempt are pending and awaiting

argument and decision.

More, the facts underlying Counts 4 through 6 had been known to Judge Kaplan

and already resolved before he filed criminal charges, and all arose from Chevron's scorched-

earth pursuit of Mr. Donziger (described by Referee Horan as "extravagant" and unduly punitive)

supported by Judge Kaplan.  No purported violation of those already-resolved orders had been

the subject of any criminal charge until after Mr. Donziger failed to comply with Judge Kaplan's

artificial deadline (not a deadline set by the Court of Appeals) for a brief in support of the above-

discussed appeal that Mr. Donziger had noticed from an order for which he had at least a good

faith belief that he could resist without pain of contempt, civil or criminal.

Thus, by the time of Judge Kaplan's criminal charges, over a year had passed

since Mr. Donziger, expressly on pain of civil contempt, executed and submitted the very transfer

of rights for which Count 4 and 5 allege criminal contempt.  Exhibit C.   By early 2019, Mr.

Donziger had already executed transfers of his interests in the judgment as demanded by

Chevron, albeit with language noting his objection to Chevron's tactics, and not specifically

identifying a supplemental retainer agreement, which in Mr. Donziger's view did not create a

new interest not already covered by his earlier transfer.  After Mr. Donziger complied with

Gibson Dunn's claimed deficiencies in the transfer by executing a new transfer, Gibson Dunn

reported to Judge Kaplan that Mr. Donziger had purged the contempt.  See Dkt 2216 at ¶4.

Similarly as to Count 6, by the time of Judge Kaplan's criminal charges, Mr.

Donziger had explained his view of the underlying conduct in a letter filed on April 8, 2019 [Dkt.

2184 at 6-8] and resolved the alleged violation.  The alleged contempt in Count 6 was Mr.

Donziger's effort to engage for himself and his wife the services of David Zelman, PhD, author

of "If I Can, You Can: Transformation Made Easy," and founder of the Transitions Institute.  As

Dr. Zelman's website explains:

> The Transitions Programs are based on a simple truth – no matter how hard you try, you
> cannot change the past. Therefore, the only way to accomplish change is to focus on the
> future.
>
>  . . . .
>
> For most of us, our lives are "works-in-progress".  The question is not IF, but WHEN will
> you experience your next transition.  We at the Transitions Institute think you should
> have the best professional support available to navigate change in your life. We are
> prepared to help you begin your journey as well as accomplish the goals you have

established.

> Career Transitions are a beautiful thing! . . . . They better be, because most of us will go through them several times in our lives. While the uncertainty surrounding change is uncomfortable, most of us have to admit that change often inspires creativity, growth, and learning. The loss of a job may be particularly unsettling – fear, loss, embarrassment and a sense of failure are all common reactions. The trick here is to recover yourself, your confidence and power as quickly as possible.[23]

As Mr. Donziger explained to Judge Kaplan, the only thing that Gibson Dunn could find after its relentless scrutiny of Mr. Donziger's finances was an agreement that Dr. Zelman would assist Mr. Donziger and his wife with their lives and waive his usual fee in exchange for later compensation if Mr. Donziger ever obtained a monetary recovery from his lifelong work on the Ecuador case.  Mr. Donziger expressed his view that he did not believe that his arrangement with Dr. Zelman ran afoul of Judge Kaplan's injunction, but took every required step to avoid even the appearance of a violation precisely to "remove this single shred of arguable non-compliance with the RICO Judgment - the only shred, again, that Chevron has after a years of aggressive discovery - and defeat the motion for contempt on this particular ground." Dkt. 2184 at 8.  Thus, any contempt in Mr. Donziger's arrangement with Dr. Zelman was purged.

Thus, Judge Kaplan's charges are based on Mr. Donziger's failure to comply with the forensic inspection protocol which Mr. Donziger resisted in good faith, the basis for which is the subject of a pending appeal in the Court of Appeals; and any true civil contempt associated with other charges was purged.

G.     *Seward Has A Duty to Disclose its Communications with Gibson Dunn*

On December 19, 2019, in advance of a scheduled call with the Seward attorneys,

---

[23]  *See http://www.transitionsinstitute.com/*

Mr. Donziger's counsel provided a "heads-up" about his concern "about Gibson Dunn.  The

firm's conduct over the years in my view has crossed the line, advancing positions, perhaps even

to you, that are false and misleading."  Counsel's concerns were not imagined, but stemmed from

Chevron's express disinformation and demonization campaigns against Mr. Donziger, Gibson

Dunn's reputation in the legal community (and the press) for often crossing the line on behalf of

clients, and an especially aggressive scorched-earth legal strategy in this case.  *See* 11-cv-691 Dkt

1100 at 1-2.  Chevron and Gibson Dunn, of course, are not bystanders in this case.  Instead, they

were proponents of the underlying civil claim for fraud, a claim rejected by the courts of Ecuador

but sustained by Judge Kaplan, and pressed the various petitions to hold Mr. Donziger in civil

contempt as part of their extravagant and unduly punitive pursuit of Mr. Donziger, which led to

the criminal charges.

        An objective prosecutor would presumably understand a defense lawyer's concern

about Gibson Dunn's advocacy on behalf of Chevron, but the prosecutors here, with an

indignation not captured in the transcript, claimed at the most recent status conference in the case

that defense counsel's concern was "disturbing," and that counsel had an obligation to "support

very serious allegations against lawyers and members of the bar, to bring those issues to [the

prosecutors'] attention."  Transcript of Jan, 6, 2020 at 14-15.  After counsel cited the

prosecutors' reaction to the issue in the Court of Appeals to show the bias of the prosecutors'

position, the prosecutors again declined to acknowledge the validity of the concern and, again

using offense as the best defense, wrote to counsel noting his failure to provide details about any

false and misleading information that Gibson Dunn provided to the prosecutors.

        A prosecutor's obligation to comply with *Brady v. Maryland*, 373 U.S. 83 (1963),

is vested in his or her judgment, which is vast and unreviewable, as Professor Yaroshefsky unremarkably notes.  Defendants typically are not privy to prosecutors' interviews and conversations with other counsel and must rely on the unbiased judgments of disinterested prosecutors to comply with their obligations.  This case, of course, is highly atypical, initiated by Judge Kaplan after the United States Attorney declined to prosecute and prosecuted by private attorneys selected by the complainant.  As a result, Mr. Donziger has a reasonably heightened concern about Seward's exercise of prosecutorial power.  While exercise of prosecutorial power is typically entitled to great deference, a reasonable lawyer would be skeptical that Gibson Dunn tempers its scorched-earth advocacy against Mr. Donziger when communicating with the Seward prosecutors, or that Gibson Dunn's representations to the prosecutors are so inherently reliable as to leave no room for the type of vigilance commanded by *Brady*'s principles.

If it remains the prosecutors' view that they have no favorable material bearing on Mr. Donziger's defense required to be produced well before commencement of trial [*see, e.g.*, *Grant v. Alldredge*, 498 F.2d 376, 382 (2d Cir. 1974) (quotation omitted); *see also Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) (citing *Grant*, 498 F.2d at 382), we will submit a subpoena pursuant to Rule 17(c) addressed to Gibson Dunn, requiring it and Chevron to produce any all documents evidencing communications with Seward.  Even if Chevron or Gibson Dunn are witnesses at trial, the Brady rules requires immediate disclosure of favorable material.  *See United States v. Binday*, 908 F. Supp. 2d 485, 498 (S.D.N.Y. 2012) ("[T]imeliness" with "respect to Brady disclosure means immediate disclosure upon discovery"); *United States v. D'Amico*, 734 F. Supp. 2d 321, 367 (S.D.N.Y. 2010) (the prosecutor has a pre-trial obligation "to disclose *Brady* material in sufficient time for the defense to make effective use of it at trial").

A failure to make timely disclosures is especially egregious, as here, where the prosecutors know that the defense would consider the information to be significant. *United States v. Thomas*, 981 F. Supp. 2d 229, 240 (S.D.N.Y. 2013) ("[T]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption") (quoting *United States v. Bagley*, 473 U.S. 667, 682-83 (1985)).  For this reason, "the prudent prosecutor will resolve doubtful questions in favor of disclosure," *United States v. Agurs*, 427 U.S. 97, 108 (1976), in an effort to ensure that "criminal defendants are acquitted or convicted on the basis of all the evidence which exposes the truth."  *United States v. Leon*, 468 U.S. 897, 900-01 (1984) (citation and internal quotation marks omitted).

*Brady* does not permit the government to make a determination as to the reliability, admissibility, or usefulness of evidence as a pre-requisite to its disclosure.  Such an exception would swallow the rule.  *See, e.g.*, *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed - with the benefit of hindsight - as affecting the outcome of the trial.").  Instead, *Brady* requires disclosure of any material that "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise" and requires disclosure of items so long as they "could lead to admissible evidence." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *see also United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (reaffirming the principles set forth in *Gil* where government's failure to disclose transcripts of SEC

testimony containing both exculpatory and impeaching material constituted *Brady* violation).

Where evidence "could lead to admissible evidence," including to witnesses that the defense

might wish to "interview and possibly subpoena" at trial, it constitutes material *Brady*

information.  *Mahaffy*, 693 F.3d at 131.

February 27, 2020

Respectfully submitted,

/s/
Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000
afrisch@andrewfrisch.com

*Attorneys for Steven Donziger*