SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST JUDICIAL DEPARTMENT
-----------------------------------------------------------------------X

In the Matter of Stephen R. Donziger,
(admitted as Stephen Robert Donziger),                    RP  No. 2018.7008
a suspended attorney:

       Attorney Grievance Committee                      Before:  Referee
       For the First Judicial Department,                 John R. Horan

                 Petitioner,

       Stephen R. Donziger,
       (OCA Atty. Reg. No. 2856052),

                Respondent.
-----------------------------------------------------------------------X

## REPORT AND RECOMMENDATION

### Preliminary Statement

By order of the Supreme Court of the State of New York, Appellate

Division, First Department, the undersigned was appointed Referee on August 9,

2018, to hold a hearing on the appropriate sanction for Respondent.  The same

Court had entered an Order of Suspension on July 10, 2018, finding Respondent

guilty of professional misconduct in violation of former Disciplinary Rules 1-102

(A)(4), 1-102 (A)(5), 1-102 (A)(7), 7-102 (A)(6), 7-105, 7-110 (A), and 7-110 (B),

and the New York Rules of Professional Conduct 3.4(a) (5), 3.5 (a) (1), 8.4 (c), and

8.4 (d).  The Order of Suspension is based upon his actions as found in *Chevron*

*Corp. v. Donziger, et al.*, 974 F. Supp. 2d 362 (S.D.N.Y. 2015), aff'd, 833 F.3d 74 (2d Cir. 2016), cert. denied, 137 S. Ct. 2268 (2017).  The District Court's decision is referred to hereinafter as the "Kaplan Decision."

On August 16, 2018, the Court entered a further order supporting its previous Order of Suspension, citing 22 NYCRR Section 1240.9 (a) "upon a finding there was uncontroverted evidence that Respondent engaged in serious professional misconduct immediately threatening the public interest," noting that Respondent had filed a written request for a post-suspension hearing pursuant to Section 1290.9 (c), and granting Respondent's application for a post-suspension hearing.  The undersigned was appointed to hear this matter and to report his findings to the Attorney Grievance Committee (hereinafter referred to as the "Committee").

Thereafter, Respondent moved for an order permitting the hearings to be public and to lift the confidentiality normally covering these proceedings.  The court granted Respondent's motion by Order of November 29, 2018.

The ordered hearings under Section 1240.9 had been convened under the usual confidentiality, on September 26, 2018, at the Committee's Hearing Room, 61 Broadway, New York, N.Y.  At this hearing Naomi Goldstein, of Counsel to the Committee, and George A. Davidson, as Special Pro Bono Counsel to the

Committee appeared for the Committee; and Richard Friedman and Aaron Page, admitted *pro hac vice*, and Martin Garbus, a member of the New York bar, appeared for Respondent, who also appeared pro se.

At this opening session, there developed a discussion of the appropriate limits of proof for the parties, under the applicable doctrine of collateral estoppel. The court, in referring the matter for sanction hearings – both on the order of temporary suspension and for ultimate sanction – had applied that doctrine to the factual basis for sanctions.

On October 30, 2018, as Referee, I proposed a procedure for hearing the matter of the interim sanction pursuant to 22 NYCRR 1240.9 (a) and (c), and ultimate sanction, by allowing some latitude in the proof available to Respondent with respect to findings to which collateral estoppel would be applied, and scheduled a resumption of the hearing on December 4 and 5, 2018.  Attached as Appendix A to this report is a copy of the proposal made to counsel (without exhibits).  Counsel for the Committee objected to the proposal, and moved to stay proceedings and appealed to the Court to rule on the limits of proof as to evidentiary matters barred under collateral estoppel.  The proceeding scheduled for December 4 and 5 was stayed pending the Court's decision.

On January 17, 2019, the Court ruled that "…the Referee may not reexamine this Court's determination, based on the doctrine of collateral estoppel, that Respondent committed professional misconduct (M-5635), and the post-suspension hearing is limited to whether the professional misconduct Respondent committed warranted his interim suspension pursuant to 22 NYCRR 1240.9 (a)."

The requested hearing under Section 1240.9 (c) reconvened on September 16, 2019, and continued on September 17, and 18; it further reconvened, by consent of the parties, on October 18, and it concluded on that date.  The parties requested until December 11, 2019, to submit final briefs.  On October 18, 2019, I again noted on the record that I had ruled the two sanction hearings were to be consolidated, as the mitigation proof to be offered by Respondent in opposition to interim suspension, and aggravation evidence, if any, in respect of any final sanction determination, were conceded, after discussion, to be the same.  R. 626 and preceding pages.  Accordingly, it is unnecessary to make a separate report and recommendation for a separate post-suspension hearing as earlier requested by Respondent under Section 1240.9 (c).  I note in this connection that Respondent continues to insist there is not an "uncontested" factual basis for the interim suspension, nor a threat to the public interest and argued that there should be a separate sanction hearing.  The premise of Respondent's continued argument that he is due a full and separate hearing on the interim suspension is that he could

4

show facts to dispute Judge Kaplan's findings and that therefore there are not uncontested facts as a basis for interim suspension.  But this argument runs into the doctrine of collateral estoppel, held by the Court to apply in this case.  The doctrine, in effect, means there are not any contested facts present and that a hearing under 1290.9 (a) would not be meaningful; furthermore, that proof of any threat to the public interest would be the same in either case.  For that reason I ruled that the two hearings were to be merged into one final sanction hearing.

## HEARING AS TO SANCTION

We begin with the well understood view of New York's statutes concerning the sanctioning of attorneys who have been found to have violated the Rules of Professional Conduct ("RPC"), and pre-2009, the Code of Professional Conduct, that the point of enforcement is not punishment but rather bringing accountability for unprofessional conduct to the attention of the Court, and the consideration of whether a Respondent, under the circumstances of each case, is in any sense a threat to the public interest, or to actual or potential clients of Respondent.  *Matter of Levy*, 37 N.Y.2d 279, 372 N.Y.S.2d 41 (1975).

In considering what sanction to propose in this decidedly unusual case, which is unprecedented (findings criminal in nature in a civil RICO case) and bears none of the characteristics of a typical attorney grievance matter (although the

Committee raises questions about Respondent's professional accounting practices),
some background to the charges brought by the Committee is useful and
instructive.  The original litigation upon which the Kaplan Decision is constructed
began in October 2003, in Ecuador, after several years of efforts to bring the case
in the United States.  Chevron had agreed, finally, to litigate the case in Ecuador if
it were sent there by our own United States District Court in New York.  It became
known as "the Aguinda" litigation; there was Aguinda I and Aguinda II, and
resulted in the Lago Agrio judgment issued in Ecuador.  We are concerned with the
second case and its aftermath beginning in 2003.

In Ecuador, the Respondent showed himself a master of publicity and
dramatization in his ability to engage journalists in a world- wide condemnation of
the practices of major oil companies like Texaco, and its successor, Chevron.  He
befriended Amazon Watch and likened the devastated Lago Agrio site in the
Amazon basin where the litigation was centered as similar to the catastrophic
aftermath of the nuclear explosion at Chernobyl.  At the same time, Respondent
respected the local nature of the problem and promoted an Ecuadorian lawyer,
Pablo Fajardo, as the plaintiffs' lead attorney in court and, generally, in public.
But, it appears from Judge Kaplan's detailed findings that Respondent hardly ever
let go of the principal levers of the case whether with the judges assigned to hear it,
or with the attendant public relations, press, and other sources of publicity.

In 1999, the Ecuador legislature had passed the Environmental Management Act; this statute authorized citizen action for reparations for environmental damages.  For the first time the Ecuadorian judiciary could entertain actions for social benefits by private parties.  A rough comparison would be to the Superfund legislation of the United States and the class action litigation that followed.

There were several years of litigation in Ecuador on behalf of the plaintiffs who were, initially, indigenous Americans of Ecuador whose land apparently had been  despoiled by Texaco, and not remediated by Chevron (who had purchased Texaco), and perhaps also despoiled by the Ecuadorian State petroleum company itself.  Plaintiffs, guided in part by Respondent Donziger, but aided by several American firms and Ecuadorian lawyers, obtained a judgment in favor of the Lago Agrio plaintiffs in the amount of $8.646 billion in compensatory damages and $8.646 billion in punitive damages against Chevron Corp. (to be assessed unless Chevron issued an apology, which it did not), for a total of $ 17,292 billion.  This has been referred to generally as the "Lago Agrio Judgment".  On appeal, to the Ecuador Courts of Appeal, the punitive damages were struck down, and a final judgment against Chevron in the amount of $8,646 billion was entered in 2011.  Throughout this hard fought litigation Respondent, always fronted by Ecuadorian counsel, was active in Ecuador as strategist and fundraiser for prosecuting the action.  All appearances in the action were made by Ecuadorian counsel.

Respondent himself has a contingent fee in the proceeds of the Lago Agrio judgment, although under an agreement of retainer dated in 2017 he has received in the interim substantial fees from funders and donors as well.

Chevron had made charges that the judgment was obtained corruptly in Ecuador as part of the appeal process. But none of their charges were upheld, and no court in Ecuador has found the judgment corrupt. However, well before the Lago Agrio judgment in Ecuador finally issued, in early 2011, Chevron began litigation in the United States and attacked Respondent personally, bringing a civil injunctive action for obtaining a corrupt judgment and other alleged wrongs, and seeking money damages against the Respondent, in the United States District Court for the Southern District of New York. Judge Lewis Kaplan was assigned to the case. Also, before the final judgment in Ecuador Chevron brought several separate discovery actions under 28 U.S.C. Sec. 1782, purportedly in aid of the Lago Agrio litigation. Chevron requested a world-wide injunction of the Ecuadorian judgment; Judge Kaplan granted this remedy, and was quickly reversed by the Second Circuit, and a preliminary injunction limited to the United States was allowed. See *Chevron v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), cert. denied, 133 S. Ct. 423.

Upon remand to the District Court, Chevron revised its attack on Donziger and abruptly waived its claims for damages, turning the case into an equity case for equitable relief on the ground that Donziger had procured a corrupt judgment in Ecuador, among other alleged wrongs.  The result was a trial alleging what would have been serious felonies in any jurisdiction to be tried before Judge Kaplan as a civil RICO case, without a jury.  Judge Kaplan apparently suggested that the case warranted a RICO civil proceeding and a trial before him without a jury. At the time Judge Kaplan did not hide his regard for Chevron and its predicament as a judgment debtor.  On the public record he stated: "We are dealing here with a company of considerable importance to our economy, that employs thousands all over the world, that supplies a group of commodities – gasoline, heating oil, other fuels, and lubricants – on which every one of us depends every single day."  These comments by Judge Kaplan are quoted from the official transcript by Bloomberg Business Week senior writer, Paul M. Barrett, in *Law of the Jungle*, p. 205, First Paperback edition, Broadway Books, 2014.

The result of this civil equity trial was the Kaplan Decision, as affirmed, which is the foundation of the charges against Respondent.  The decision is three hundred and forty three (343) pages in the Federal Supplement, 2d series, and exhaustively recounts the facts as found by the judge.  Upon petitioning the Appellate Division of the Supreme Court of the State of New York, First

Department, to suspend Respondent pending a hearing to determine a final

sanction, the Committee invoked the doctrine of collateral estoppel, which purports

to effectively deny Respondent the ability to dispute any of the underlying facts

constituting violations of the Rules of Professional Conduct found by Judge

Kaplan.  The Committee's motion to suspend Respondent was made nearly two

years after the Second Circuit's affirmance, and after the United States Attorney's

Office had declined Chevron's effort to persuade that Office to prosecute the case

against Respondent as a criminal matter.  The chronology of this matter and the

disinclination of the United States Attorney's Office to pursue Respondent are

facts that in the view of some observers mitigate the finding that Respondent is a

threat to the public interest.  Apparently, the Appellate Division in ordering his

interim suspension did not agree.

## EVIDENCE IN MITIGATION

### Respondent's Denial of the Charges

Both the District Judge and the Second Circuit Judges in their decisions

asserted that Respondents (there were other named defendants in addition to

Respondent Donziger) had not contested the underlying facts.  However,

Respondent and his counsel at the hearing testified that these statements were not

accurate and that the Respondents had not, in any way, allowed the facts presented

by Chevron to be treated as uncontested.  The testimony of Respondents' highly

qualified and experienced appellate counsel, Deepak Gupta, disputed the assertion

of both Courts that the facts were not contested.  R. 359.  He was very clear that

the appellate brief to the Second Circuit did contest every material finding of Judge

Kaplan.  He explained that to undertake a review of the facts of such length (over

500 pages of factual findings) on the only available ground on appeal that they

were "clearly erroneous" would have diverted necessary pages and analysis from

(in their view) the strong legal objections to the District Court's decision.  R. 360-

362.  However, he agreed to represent Respondent on his appeal from the Kaplan

decision because "I felt like a great injustice was being done."  R. 357.  "I have

never seen a judge whose disdain for one side of the case was as palpable on the

bench in ways that I think may not have always come through in the paper record.

But it was fairly obvious that Judge Kaplan had great personal animosity for

Steven Donziger."  R. 357.

At the conclusion of Mr. Gupta's testimony, I made it clear that his

testimony had been allowed, against the Committee's objection, for the purpose of

exploring how Respondent's denial before me should be interpreted, and not to

contest the findings of the District Court as affirmed by the Second Circuit.  R.

364, 365.  Mr. Gupta also expressed his opinion about Respondent's honesty,

integrity and whether he posed a threat to the public interest.  He said: "To the

extent that I understand what the phrase means, I can't imagine how anyone would think that Mr. Donziger poses a threat to the public interest.  This is not someone who is taking the money of clients… This is someone who has pursued a single matter for decades. …I can't imagine how anyone could say that he poses some kind of ongoing threat to the public interest.  It's absurd."  R. 370, 371.

Respondent himself testified, in answer to detailed questions of his counsel, that he had not done any of the corrupt acts with which he has been charged by the Committee.  In view of this testimony, and of an appellate strategy that has had unintended consequences, I allowed Respondent to make his denials of the Charges, in the face of collateral estoppel, to allow him to explain why he has not shown any remorse in the circumstances of this case.

As noted above, there is nothing usual or customary about this case, and it is without precedent.  However, it is not my place to challenge Judge Kaplan's findings per se; but it is my place to allow Respondent facing the most serious sanction of disbarment to explain himself as fully as he can without encroaching unduly on the boundary of collateral estoppel.  I do not believe a fair hearing can be held otherwise.  Only then can a sufficient assessment of his character and fitness be made.  In his testimony before me, Respondent was candid and clear and showed no sign of dissembling or evasiveness.  He responded directly to his

counsel's questions, to counsel for the Committee, and to myself as referee.  His direct testimony is discussed further below.

## RESPONDENT'S CHARACTER AND REPUTATION

Several witnesses, all distinguished in their respective fields, testified as character witnesses.  Domingo Peas (Uyunkar Domingo Peas Nampichkai), an indigenous leader of the Achuar, an ethnic group within the Amazona people, spoke eloquently of Respondent's value to his community, and of the work he had done on their behalf.  There was no question in his mind of Respondent's reputation for integrity.  He regards Respondent as "counselor of my lawyers in Ecuador."  R. 299.  Furthermore, "…He is not a danger to the people…he is a man of respect, and he has earned the respect of my people.  For me there is no danger.  He has been the connection with my lawyers to be able to defend my people."  R. 299.  "He is super honest and this is the way that I know him.  Otherwise I would never have come."  R. 304.

Mr. Paz y Mino, an Associate Director of Amazon Watch, testified to the high degree of confidence he and others associated in advocating for the environment and human rights in that area, have for Respondent and credit his tenacity with keeping the case alive in the face of Chevron's aggression.  R. 236.  He believes Respondent has the highest integrity and he would not associate with

him if he thought otherwise.  Amazon Watch was not a party to the litigation.  In

his opinion the Chevron case is "…famous for being the largest oil-related disaster

in history, and not only that, caused deliberately."  R. 229.  He noted also that

Chevron has attacked Amazon Watch, and he characterized Chevron's attack as

"…demonizing Donziger … and going after the people waging the case."  R. 234.

He also testified at length about his knowledge of Chevron's tactics of intimidation

in environmental matters.  R. 232-250.

George Roger Waters, a professional musician, and leader of the group

called "Pink Floyd," testified that he had become a supporter of Respondent in

about 2016, and has made several donations to him, and once to his wife, but was

not an investor in the litigation arising from the Ecuadorian judgment.  R. 258-262.

He attested to Respondent's reputation world-wide for "great humanity" and

described him as "a man of integrity … who has devoted his entire career since he

left Harvard Law School to pursuing human rights issues, to defending people who

are largely powerless…"  Furthermore, "he is a huge help to the public interest,

and presents something of a threat to corporate America which is why he is being

demonized and vilified…" R. 257.  He was clear that, although he does not keep

careful financial records, Mr. Waters is not an investor in Respondent's causes,

including the Ecuadorian judgment; he is only a donor to the cause.  R. 263, 265.

Rex Weyler, a resident of Manson's Landing, British Columbia, Canada, a widely published journalist and environmental scientist, author of, among many books, *Blood of the Land*, and co-founder of the Greenpeace Environmental organization, testified about his knowledge of Respondent and his work. Beginning his investigation in 2016 into the story of the litigation in the Ecuadorian Amazon, he was introduced to Respondent.  He testified that "…the first thing I came upon, because Chevron and their lawyers appear to have been very thorough at getting the story out about Mr. Donziger that he somehow corrupted this process in Ecuador…stories about Mr. Donziger that were not very flattering.  I had to take these stories seriously."  R. 274.  He thereafter concluded that the stories were not true, and had been "fabricated."  As he continued his journalistic work he found Respondent to be "extremely honest", "straightforward" and a hard working lawyer.  Also, that Respondent has never "…told me anything that did not turn out to be true in my estimation and my research, and he has never led me astray." R. 275.  And further, he testified that "Every shred of evidence that I came across told me that Mr. Donziger was an honest man telling the truth."  R. 277.  Mr. Weyler received "modest" payments for his expenses and his research in Ecuador.  He concluded by stating that "Mr. Donziger is a hero in Ecuador.  He's a hero in my home."

Zoe Littlepage, one of the lawyers who defended Respondent before Judge Kaplan in the U. S. District Court, testified to Respondent's essential honesty and integrity, R. 311.  She admitted that his conduct was not always exemplary, and that initially she had reservations about the allegations against him.  She satisfied herself that he was innocent of the charges before signing on to defend him.  R. 310-314.  She stated further that her assignment was to deal with the critical witness against Respondent, Alberto Guera, on the issue of judicial bribery.  She came to believe that Respondent would not and did not participate in the bribery of a judge.  I note this not for the truth of her belief, but for her sincerity and willingness to continue to defend Respondent and to vouch for his character in this proceeding.  I declined to admit as evidence before me various records of the trial, both factual and legal, pertaining to the judicial bribery and in which she was involved before Judge Kaplan.  R. 315-317, 323 et seq.

Counsel for the Committee opened up the subject of Ms. Littlepage's closing before Judge Kaplan by summarizing her comments about Respondent's personality, as that of a "jerk or abusive to those around him or had disorganized finances but could not find that he was responsible for the acts with which he was charged."  R. 328.  In answering his question to confirm what she said, she responded: "It sounds like me… I thought that there were emails that put Steven in a bad light.  Made Steven look very energized, very much like an activist and not a

16

lawyer, like a jerk saying things in emails, like we all do, that may have been off the cuff.  But there was no credible evidence to support that Steven had bribed the judge."  R. 329.  On re-direct, she went on to elaborate other points she had made to Judge Kaplan. R. 330.  I noted that I allowed such testimony, again, to support testimony of others and that of Respondent himself that his denials of the Kaplan findings is based on his belief, and the expressed belief of others, in his own innocence.

Respondent called his former trial attorney in the case before Judge Kaplan, John Watkins Keker of the San Francisco firm Keker, Van Nest & Peters.  Mr. Keker, a Marine veteran and a widely admired trial lawyer with national experience, agreed to represent Respondent in February, 2011.  His representation lasted until May of that year.  When asked why he had moved to withdraw as trial counsel to Respondent Mr. Keker replied: "the handwriting was on the wall that this was a (indiscernible word) by Chevron.  Judge Kaplan made it clear that he was determined to see Mr. Donziger, I think, convicted of the charges Chevron was making.  Chevron was, through scorched earth tactics, running up huge bills.  They had 160 lawyers working on the case from Gibson Dunn.  They had 60 law firms working on the case that filed for summary judgment motions. It was simply economically impossible for us to keep up… It was not going to end well…I filed a motion in which I stated why we were withdrawing." R. 341.  He called the trial

proceedings a "farce."  R. 341.  In later testimony he expanded on his view of

Judge Kaplan's "unfair" procedural rulings, such as consistently and unfairly (in

his view) limiting Respondent's time and ability to be heard or to examine

documents.  R. 348, 349.  Mr. Keker offered his opinion of Respondent's character

and his truthfulness: "With me, Steven was straightforward and truthful."  R. 342.

When asked by Respondent's counsel whether in his opinion Respondent is a

threat to the public interest, he responded: "Quite to the contrary, it's ridiculous."

R. 347.  Further to that point he stated that during the period he has known

Respondent and known of his reputation, he has not been a threat to the public

interest.  R. 347.

Jennifer Wynn, an Associate Professor (tenured) of Criminal Justice at John

Jay College, testified that she has known Respondent for twenty years.  She is the

author of a well-regarded book: "Inside Riker's, Stories from the World's Largest

Penal Colony" (St. Martin's Press, 2001).  She met Respondent while writing that

book and, at the time, Respondent was working on legislation to improve attention

to mental health in the New York State jails and prisons.  R. 390-395.[1]

---

[1] At this point in the hearing I noted for the record that during the period of Ms.
Wynn's work about Rikers Island I was Acting Chair of the New York City Board
of Correction, and that I was familiar with her work at the time, and that although I
had heard of Respondent in connection with mental health issues, I had not had any
personal or professional contact with him.  R. 399.

According to Ms. Wynn: "Steven is an honest person; he has integrity, he's brave.  I'm baffled that he has an ankle bracelet on, baffled… his integrity is unquestionable…a person who is honest and doesn't lie…somebody who has a strong moral compass, who knows the difference between right and wrong…" R. 395.  In the professional world she lives in (the university and prison/jail system) there has never been a question about Respondent's integrity and honesty…aside from Judge Kaplan…"  When asked if she considered Respondent to be a threat to the public interest she stated: "It was almost hilarious, no, no, he's a Harvard trained lawyer, he's a man who has been dedicated to righting wrongs… It is so outrageous to me that Chevron Corporation which is a massive polluter and this man is on trial, I mean fighting for his freedom… and it's depressing frankly that I even have to be here."  R. 396-397.

William ("Bill") Twist was called to testify.  He has a business degree from Northwestern University and has worked in financial services and banking.  He has been working in Ecuador for the last twenty-five years and has known Respondent for over twenty years in connection with his work in Ecuador.  R. 403.  Mr. Twist assisted in setting up with John Perkins the "Pachamama Alliance", a non-profit with headquarters in San Francisco "…committed to preserve the Amazon and support indigenous people in that task." R. 404, 405.  When he first met Respondent, over twenty years ago, he had already been working in the Amazon

19

for five years.  He saw him every year thereafter in Ecuador and is fully familiar with the Aguinda case and its procedural history.  He regards Respondent as a man "… of great integrity, and honor, and skill, commitment, I respect him totally."  R. 409.  He does not believe Respondent is a threat to the public interest.  R. 412.

Mr. Twist posted a bond for Respondent in the contempt case now pending in the United States District Court.  "I have absolute trust in his integrity and his honor and his commitment to serve the rule of law and whatever he needs to do to clear his name."  R. 412.  Mr. Twist is not an investor in the judgment, and has no personal stake or interest in the case, and wants to use his resources to "… right the wrong to bring justice to this case."  R 413.  He addressed the question of whether Respondent is a threat to the public interest by stating: "… I want to say I'd like to bring a bigger perspective to this whole thing because I think this is a tragedy.  I think the threat to the public interest is from the way he is being punished…that he has to wear an ankle bracelet, that he's confined to his home for no reason at all other than punishment.  R. 414- 416.  He went on to say that "… Steven is the kind of person we are going to need in the future to resolve the kind of issues that we are going to be facing from an environmental standpoint, from a social justice standpoint."  R. 416.

Mr. Twist was followed by John Perkins.  Mr. Perkins has served as chief economist for a major consulting firm in Boston whose clients include The World Bank, the United Nations, and the IMF; his work was on loans for the development of infra-structure, including infra-structure benefiting major oil companies.  R. 426.  He is also one of the founders of Pachamamas Foundation.  His view of Respondent is that "he appears to be sacrificing his life… and not to be acting for personal gain… and is certainly not a threat to the public interest."  R. 436.  Mr. Perkins also said that he does not believe the claims made by Chevron that he bribed a judge: "… from knowing Steve he is incredibly honest and would not do anything like that whatsoever."  Although Mr. Perkins admitted that he had not read the Kaplan decision in full, but only in summaries.  R 437.  Mr. Perkins does not believe in the claims against Respondent because "…he is so committed to the cause of helping the people of Ecuador that he would never do anything that might in any way jeopardize that cause."  R. 438.

Simon Taylor was the last of the several credible and accomplished witnesses to attest to Respondent's character and reputation for integrity.  Mr. Taylor runs an international investigative agency that investigates, among many subjects, illegal trafficking in the animal kingdom; e.g., trade in rhino horns, whales, ivory, and the like.  He is the co-founder of Global Witness, which won a Nobel Peace Prize in 2003 for exposing the business of "blood diamonds."  R. 446.

Mr. Taylor has concluded, after twenty years of investigations "… in many parts of the world, the operations of this sector (referring to the extractive industries), writ large, are corrupt…based on predatory deals that are illicitly obtained under the table through payments to people in a myriad of different maneuvers."  R. 448-450.  As a consequence he has established an initiative that requires companies to publish what is actually paid for their operations, aimed especially at these industries.  As to Respondent, Mr. Taylor stated: "I have met a lot of people over the last twenty five years involved in what I would consider to be an accountability struggle…and I would describe Steven Donziger as right up there as a first among equals of the kind of people in really tough places… I have enormous respect for what he has done… He is an honest person without any hesitation or doubt."  He does not believe Respondent capable of bribing a judge, or of being a threat to the public interest.  R. 455.  He has read all of the Kaplan Decision and holds to his opinion of Respondent.

## STEVEN DONZIGER

The final witness of the hearing was Respondent himself.  He addressed each Charge in responding to his counsel.  Again, in each instance he denied the Charge, and showed no remorse in doing so.  The Charges are, in each instance, as serious as any Charges by the Committee can be.  As already noted they are, in

substance, criminal in nature under the laws of the State of New York.  In the words of the Committee's counsel the Charges are: 1) coercion of a judge in Ecuador; 2) corruption of an expert in Ecuador; 3) ghostwriting an expert's report in Ecuador; 4) misrepresenting an expert's independence in Ecuador; 5) obstruction of justice (in the United States); 6) witness tampering (in the United States); 7) threatening criminal prosecution to influence a civil proceeding (in Ecuador); and 8) bribing a judge  (Judge Zambrano in Ecuador).  See the Committee's Notice of Motion to Grant Collateral Estoppel and to Suspend Respondent Immediately, dated October 30, 2017, which formed the basis for the First Department's Order of Interim Suspension dated July 10, 2018.

As is repeatedly made clear on the record, I allowed Respondent to testify in summary denial about the Charges, over the continuing objection of the Committee's counsel, in order to understand the basis for Respondent's consistent assertion that at no point did he, or his counsel, fail to deny these Charges before Judge Kaplan, or on appeal to the Second Circuit.  This assertion is supported by the testimony of his appellate counsel, Deepak Gupta, and by Respondent's Exhibit X in this hearing which I admitted over objection.  His Exhibit X is styled: "Final Direct Testimony of Steven Donziger" and is his statement of direct testimony before Judge Kaplan which Judge Kaplan took in written form in place of oral testimony on direct.  Exhibit X became part of the record on appeal from the

Kaplan Decision and undermines the comment in the opinion affirming Judge Kaplan that appellant did not contest the findings of fact by the trial judge.  See, for example, Exhibit X, pp 38, 39, in reference to Judge Zambrano.

Respondent testified about his education (Harvard Law School, class of '91), after a few years as an international journalist; his early years of practice with the Public Defender of Washington D.C.; his move to New York City; and becoming a member of the bar in 1997, admitted by the First Department.  From 1993 to 1995 he served as executive director of the National Criminal Justice Commission, editing a book published in 1996 called *The Real War on Crime*.  Thereafter he was associated with the New York firm Kostelanetz & Fink, and after two years with that firm he became associated with Gerald Lefcourt, a well-known criminal defense lawyer in New York City.  Beginning in 1999 he started a solo practice in New York City, aiming to concentrate on representing indigenous and other local communities in Ecuador.  His office has been during the last few years in his residence at 245 West 104th Street, New York, New York.  Respondent speaks Spanish and was first exposed to Ecuador and its Amazon population in 1993.  R. 470.  He thereafter joined a fact-finding mission to investigate the region affected by pollution and was an assistant to Christobal Bonifaz, an Ecuadorian citizen who had decided to bring an action against Chevron.

The first action was filed in the United States District Court in the Southern District of New York in 1993.  For approximately the next eight years until 2001, the action against Chevron proceeded in pre-trial status with appeals to the Second Circuit and back to the District Court until Chevron finally agreed to submit to the jurisdiction of Ecuador.  R. 473.  Respondent decided to join forces with a plaintiff's law firm in Philadelphia, Kohn Swift & Graf, and then to be present in Ecuador to assist local counsel in formulating the needed litigation.

This new phase of the case began in 2003.  Respondent acted primarily as an administrator, and using his competence in Spanish, serving as an intermediary between the indigenous nationalities and the Ecuadorian lawyers bringing the action.  The trial itself was held in the town of Lago Agrio; at the time it had a population of about ten thousand.  The courthouse was housed in rented space in a shopping center.  Plaintiffs in the class of affected people were both indigenous Amazon people and immigrants from other parts of Ecuador.  R. 485, 486.  He described the "waste pits" at the drilling site and the effects on streams and water sources.  R. 488.

Respondent testified briefly about the ruling by Judge Kaplan in the RICO case that he had waived any privilege he could assert as counsel by failing to produce a privilege log in response to a Chevron subpoena.  Respondent's waiver

was followed by nineteen days of deposition.  R. 495.  He continued with his experience in the RICO case by detailing Chevron's surveillance seven days a week, their use of the Kroll investigation firm, and their continued intimidation group presence at this hearing.  R. 500.

Respondent, when asked why he continues his practice as he does, stated that to him the Lagro Agrio case was about cleaning up pollution that is harming people and the environment, and about "corporate accountability."  As for the financing of the case Respondent described it as "…traditional plaintiff's side funding model where clients in Ecuador made available a certain percentage of their claim for payment of legal fees, out of pocket expenses and that from 1993 to 2007 the costs of the case were funded by the Kohn firm; in about 2009, Mr. Kohn decided his firm could no longer continue with the case.  R. 508.  Thereafter, to finance the continuation of the case Respondent brought in "investors" who received a right to receive a certain percentage of the recovery.  R. 508.

Respondent's testimony about where the funds of investors went and how they were accounted for was general, somewhat vague, and on the whole not satisfactory as evidence of compliance with the Rules of Professional Responsibility.  R. 508, 510.  See Rule 1.15.  Respondent's casual use of his personal account and his failure to set up a proper attorney trust account are noted,

and not denied by him.  However, there was no evidence before me that any

investor had questioned or complained about the accounting for their investment or

that any of the named plaintiffs or their representatives have complained.  There

were forty-seven individual plaintiffs in the Lago Agrio case, indigenous to the

Amazon region.  Apparently there is also a non-profit entity called "FDA" through

which Respondent has been paid fees and other costs of the litigation, although he

has also referred to his fees as a "cost" of the litigation. R. 738-742.

Respondent testified that after the Kohn firm dropped the case, he took on

the responsibility of funding the case.  R. 512.  The Kohn firm had been running

the financial side of the case for several years, but Respondent and Kohn, a very

experienced class action plaintiffs' lawyer, disagreed about settlement strategy and

about the continuing cost of the case.  At that point Kohn unhitched himself from

the case.  Respondent since then has not kept the kind of accounting records he

should have.  Respondent apparently rests upon an Agreement dated November 11,

2017, which he claims supersedes his original retainer agreement.  Rule 1.5 (b)

provides that the financial terms of a retainer should set form the terms in detail.

The present agreement does not specify detailed terms such as monthly retainer

payments to which Respondent has maintained he is entitled.  Respondent's

testimony on this subject raises questions about his accountability to his clients for

funds raised, fees taken, and costs incurred.  Respondent confidently brushed these

questions off, and perhaps he is correct, but better accounting procedures should be instituted.  R. 685, 686, 738 et seq.

As to his role in the litigation in Ecuador, Respondent said that Pablo Fajardo became the lead trial lawyer, working with two other lawyers "full time for the most part."  R. 515.  More specifically, Respondent said: "…day to day I wasn't very involved.  All the pleadings were written by local counsel…  I did on occasion review pleadings or discuss them with local counsel when they wanted my opinion."  R. 515.  Respondent offered some context around various facts found by the District Court: "I was, frankly, shocked at some of the activities I watched Chevron's lawyers engage in.  Without being hyperbolic… I perceived it to be akin to cheating… trying everything they could to minimize evidence of the harm that they had caused.  I saw Chevron's lawyers threatening to put judges in jail if they did not rule in favor of the company."  R. 522.  Also, " … when I first saw or became aware that there were ex parte meetings with judges, I was very surprised.  I was even a little bit affronted.  I didn't understand that this was permissible in Ecuador but I saw Chevron's lawyers doing it on a regular basis."  R. 522.  He also cited an instance of Chevron planting a false media release (in 2009) about a "scandal" with a judge that never happened but which led to an article in The New York Times.  R. 523.  "We were up against something very dark, and as a lawyer I had never seen that before… I felt fundamentally their

strategy was since they could not win on the evidence they had to win through

other ways." R. 523. Respondent offered this viewpoint not to suggest that he and

his local counsel had to adopt similar tactics, but to color his attitude about the case

and why he feels so passionately in the right.

The last judge assigned to the trial, after a succession of several judges, was

Judge Zambrano. I allowed counsel to ask if Respondent had bribed any judges in

Ecuador, over counsel for the Committee's objection. R. 526. Counsel argued that

"A direct denial of Judge Kaplan's findings is contrary to the collateral estoppel

rule with which this tribunal is bound." R. 527. I disagreed with counsel and

stated on the record that a fair application of the collateral estoppel rule, in these

unique circumstances, would allow Respondent at least to continue a denial also

asserted before the District Court to maintain his innocence in the face of what are

tantamount to criminal charges. R. 527. I also took note that the record before the

District Court and the Second Circuit appears to show (according to his appellate

counsel and Exhibit X) that Respondent did contest the findings of fact, however

unsuccessfully. Respondent went on to again deny that neither he, nor any of the

lawyers associated with him "… in any way" were involved in bribing judges, or in

"ghost writing" the ultimate judgment. R. 527.

THE COURTS OF ECUADOR

Of equal importance in consideration of the appropriate sanction for Respondent are the records of appeals taken by Chevron in Ecuador from the judgment of the trial court.  R. 532-534, Exhibits L and O. These show (Exhibit L, R. 533) that Chevron claims of corruption in obtaining the judgment, were considered on appeal at the first level.  R. 533, 534.  The Court stated: "In relation to the seventh request (by Chevron) for clarification regarding whether or not the defendant's accusations with respect to irregularities in the preparation of the trial court judgment had been considered, it is clarified that, yes, such allegations have been considered but no reliable evidence of any crime have been found.  The division concluded that the evidence provided by Chevron Corporation does not lead anywhere without a good dose of imaginative representation.  Therefore, it has not been given any merit."  R. 535.

Later, in the Ecuadorian highest court for civil appeals, the Court noted (Exhibit O, R. 535):  "There is no legal ground or basis to annul the case as Appellant has requested time and again.  It is sufficient to point out that the company never demonstrated fraud which it has been claiming without any legal support…the Appellant's incessant harping in this regard departs from procedural good faith."  R. 539.  According to Respondent the Ecuadorian courts had access to

the full evidentiary record "…and rejected the same Chevron complaints that were brought before Judge Kaplan." R. 542.

A total of fifteen to seventeen judges reviewed the Chevron charges of fraud and concluded "…contrary to Judge Kaplan." R. 543. Respondent also testified that lost, to his prejudice in Judge Kaplan's control of the procedures of the RICO case, were counterclaims that he was not allowed to present. R. 543.

OTHER CHARGES

Concerning other charges against him for cancelling inspections and ex parte meetings, Respondent did what he observed was permissible in Ecuador and what his local counsel advised. R. 545. Inspections were played as a game for delays, and were taking place within the trial. His goal was to move the trial forward, not to delay, and he commented that it was fairly common to threaten to report a judge for inaction. R. 550. In response to Charges 37 to 40 he admitted that "…based on advice of local counsel both what Chevron was doing and what we were doing, was generally paying experts directly and not through the court." R. 557. But he denied that the expert Cabrera (on "global damages") was ever "…paid under the table." R. 558.

Again, this testimony was taken over objection of counsel for the Committee. In the end, I ruled that I should hear why Respondent showed no

remorse and that counsel's objections although dictated by his view of collateral estoppel, constituted a restraint on my task of evaluating Respondent's character. R. 559-560.

As to other charges against Respondent, Charge 45 and 46, witness tampering (in another litigation), and calling for criminal charges against Chevron, these are hard to evaluate without going into the detail of Judge Kaplan's decision. Accepting his findings on these charges, in considering a sanction overall, I have subsumed them into the more serious charges of bribery, coercion, and ghostwriting fraud, rather than deal with them separately. The same could be said about his accounting practices with other people's money. During his cross-examination he was shown to be in apparent violation of the professional rules for holding clients' funds and those on which he may have a claim for his services. R. 738 et seq. His failure to file tax returns may be the result of his distracted life recently; however, it is hard to understand why three years of not filing is excusable with someone so able. But that question should be left to the Internal Revenue Service which is better equipped to judge such matters than the Committee. However, some supervision by the Committee is recommended below even though no complaints have been filed against him by his clients or investors. The Committee is empowered to do this in any event. Of course, his practice is highly specialized and he does not maintain an ordinary practice with a roster of

clients; but he should nonetheless follow the Rules in accounting for his professional practice.

## RECOMMENDED SANCTION

Counsel for Respondent in his post-hearing submission "Proposed Findings, Conclusions and Recommendations of Referee," made an effort, much appreciated, to treat each charge separately and suggest the appropriate sanction for each, summarizing the evidence from Respondent's viewpoint about each charge. Normally, I would do the same in reporting and recommending to the Court. The Committee also addressed the several violations of the Rules of Professional Conduct in great detail and with persuasive force, suggesting sanctions for each. Nonetheless, I would view the issue of sanction in these unprecedented circumstances, and addressing the several Charges collectively, as needing to answer one broad question:  taking in all the evidence before me, both in mitigation and aggravation, and bound by the findings of the District Court, and conceding that the interim suspension was warranted under 22 NYCRR 1290 (a) on the Committee's presentation at the time, should Respondent's suspension be ended and should he be allowed to continue to practice law in the State of New York?  My recommendation is that his interim suspension should be ended, and that he should be allowed to resume the practice of law.

After hearing the evidence in mitigation and aggravation, the sanction of disbarment, while clearly and well-argued by the Committee, impresses me as too extreme.  Nor do I think there are precedents which control.  There appears to be no case like this.  While Respondent is often his own worst enemy and has made numerous misjudgments due to self-confidence that may border on arrogance, and perhaps too much zeal for his cause, his field of practice is not the usual one. Lawyers with his endurance for the difficult case, one which is constantly financially risky and usually opposed by the best paid national firm lawyers available, are not available often.  The extent of his pursuit by Chevron is so extravagant, and at this point so unnecessary and punitive, while not a factor in my recommendation, is nonetheless background to it.  He has lost the Lago Agrio Judgment, his fee as well, and is besieged with litigation by Chevron and faces severe financial burdens.

Sanctions for an attorney's misconduct are not imposed for punishment but when the Court believes it necessary to "protect the public, maintain the honor and integrity of the profession, or to deter others from committing similar misconduct." 22 NYCRR 1240.8 (b)(2).  Respondent's conduct in this unique matter, all arising from one unusually lengthy and difficult environmental pollution case conducted in Ecuador against the most vigorous and oppressive defense money can buy, leads inexorably to a severe sanction but should be judged in its entire context; the

34

Kaplan decision is entitled to considerable weight but not necessarily, in these unique circumstances, decisive weight.

My recommendation is that Respondent's suspension be continued until the Court reviews this report and accepts it, and if the Court does accept this recommendation, that Respondent's suspension immediately be ended and that he be restored to the bar of this State; but I also recommend that Respondent be subject to an accounting to the Committee for his treatment of client funds, donations, costs of litigation, and personal funds.

Assessment of character is not an exact science, but we can all agree that the essential components are honesty, integrity, and credibility.  It is far from clear that Respondent is lacking in those qualities as the Committee argues. We are here engaged in a prediction that despite his flaws noted herein, Respondent has such character and is essentially working for the public interest and not against it, his desire to make a large fee notwithstanding.  None of those who testified for these qualities of Respondent are the sort who would carelessly toss off an opinion about character or misrepresent his reputation in the world community.  They are inherently credible as witnesses, in my opinion.  If his interest in earning a large fee makes his character suspect, the entire bar is suspect.

There is now no real question about whether Respondent is a threat to the public interest, and he does not appear to be a threat to his own clients not withstanding his deficient accounting practices. He does not need to be deterred from repeating the offending conduct and neither do the lawyers at the bar generally; all of us know that such conduct cannot be condoned. The Committee argues that he should be disbarred but I cannot recommend this sanction in view of the totality of the evidence presented at the hearing, and particularly in mitigation; in my view, it would not be just in these circumstances.

Dated:      February 24, 2020
            New York, New York


                                        John R. Horan, Referee

To:   Jorge Dopico (via email: jdopico@nycourts.gov)
      Chief Attorney
      *Attorney for Petitioner*
      Attorney Grievance Committee
      for the First Judicial Department
      61 Broadway, 2nd Floor
      New York, NY 10006
      Tel. (212) 401-0800

      Naomi F. Goldstein (via email: nfgoldst@nycourts.gov)
      Of Counsel, Attorney Grievance Committee
      *Attorney for Petitioner*

      George A. Davidson (via email: George.davidson@hugheshubbard.com)
      Pro Bono Special Counsel
      *Attorney for Petitioner*

Richard H. Friedman, Esq. (via email: rfriedman@friedmanrubin.com)
Friedman Rubin PLLP
1126 Highland Avenue
Bremerton, WA 98337
*Attorney for Respondent*

Aaron Page (via email: aaron@forumnobis.org)
Martin Garbus, Esq. (via email: mgarbus@offitkurman.com)
Offit Kurman
10 East 40th Street, 25th Floor
New York, NY 10016
*Attorneys for Respondent*

Steven R. Donziger (via email: sdonziger@donzigerandassociates.com)
Respondent, *Pro Se*
245 West 104th Street
New York, NY 10025

# Appendix A

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISON : FIRST JUDICIAL DEPARTMENT**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In the Matter of Steven R. Donziger,
(admitted as Steven Robert Donziger),
an attorney and counselor-at-law:

        Attorney Grievance Committee
        For the First Judicial Department,

                    Petitioner,

        Steven R. Donziger, Esq.,
        (OCA Atty. Reg. No. 2856052),

                    Respondent.

               DECISION ON
               PROCEDURE FOR
               THE POST-SUSPENSION
               HEARING UNDER
               22 NYCRR 1240.9(c)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        In its August 16, 2018 order granting respondent's request for a Post-Suspension

hearing, but reaffirming its Order of July 10, 2018, suspending respondent upon a finding that

there was "uncontroverted evidence that respondent engaged in serious professional misconduct

immediately threatening the public interest," the court appointed the undersigned to hold "the (22

NYCRR) 1240.9 hearing and to report his finding to the Committee."

        With the consent of the Attorney Grievance Committee (AGC) and the Referee,

the parties have proposed procedures with respect to the Post-Suspension Hearing allowed by 22

NYCRR 1240.9 (c), and requested by respondent.

        Respondent Donziger has, by one of his counsel, Martin Garbus, made a proposal

in two parts:  first he requests the opportunity "… to present evidence and argument as to why

collateral estoppel is inappropriate in the post-suspension hearings."  If respondent is

"…successful in convincing the Referee that collateral estoppel is inappropriate, there would be

a second hearing at which the … Committee would present evidence against him, and he would

have the opportunity to confront and cross-examine the witnesses against him and present evidence of his own."

As an "alternative" respondent argues that due process allow him the "… opportunity to contest the factual findings made by Judge Kaplan that form the basis of the allegations against him here. This would include the right to present evidence refuting those findings and cross-examining any witnesses against him." See letter dated October 19, 2018, submitted by Martin Garbus, and made a part of the record, Exhibit A.

The AGC has presented a proposal which argues that in this case the doctrine of collateral estoppel should preclude any hearing at which the findings of Judge Kaplan, as affirmed by the Second Circuit, are contested. It argues that in this case the Post-Suspension Hearing becomes merged with the Sanctions hearing as the Appellate Division has already found that suspension is warranted pending a sanctions hearing, and a separate Post-Suspension Hearing is not required to serve due process, respondent having already had due process before Judge Kaplan. See letter dated October 22, 2018, by George A. Davidson, Pro Bono Special Counsel, and Naomi F. Goldstein, Of Counsel to the Attorney Grievance Committee, also made a part of the record. The AGC also submitted a memorandum of law as to what evidence is admissible at a Section 1240.9(c) hearing, both documents are attached as Exhibit B.

Having reviewed the record in this case, the decision of District Judge Kaplan, the affirmance of the Second Circuit, the per curiam decision of the Appellate Division, and the submissions of the parties and their citations of law, it is not clear to me that there is an easy answer to the position of respondent. However, as Referee, it is my responsibility to rule on the application of collateral estoppel, and on any other procedural or evidentiary matter before me.

*In re Abady*, 22 A.D3d 71.  To argue that respondent has already had his due process in the trial before Judge Kaplan and is entitled to nothing more in this proceeding to sanction him as a lawyer, is to overlook the substantial differences in the proceedings.  There is an obvious asymmetry in the case before Judge Kaplan and the case now underway to sanction respondent notwithstanding similarity or even identity of factual issues.

In particular, in the U.S. District Court, respondent was faced with an equity case without a jury to invalidate a foreign judgment brought against him and others in which the District Judge, in so many words, but in the guise of Civil RICO charges, created a criminal indictment against respondent and found the facts to support it by a preponderance of the evidence in reaching his equity judgment in favor of Chevron.  It is doubtful that if an indictment in the same terms had been brought by the United States Attorney, respondent would have elected to have a trial by a single judge and would have waived his right to a trial by jury.  Furthermore, in the case before Judge Kaplan the standard of "beyond a reasonable doubt" was not applied to the facts presented.  Judge Kaplan applied the civil standard of a preponderance of the evidence as the law requires.  Other material differences can be noted, such as the lack of notice to respondent that his status as a lawyer was in jeopardy before Judge Kaplan, or for that matter, notice that he was, in substance, facing potential criminal charges regarding the judgment at issue.  For reasons not readily apparent, on appeal to the Second Circuit respondent did not appear to contest the sufficiency of the evidence supporting any of the factual findings of the District Court.  Instead, respondent raised jurisdictional defenses to no avail.

Finally, it is open to question, at least initially in this Post-Suspension hearing whether respondent did receive a full and fair hearing before Judge Kaplan, notwithstanding the length of the proceeding and the volume of evidence.

3

However, I am inclined to allow respondent latitude in his defense to the Charges against him in this proceeding, and to reserve my decision as to whether collateral estoppel should be applied in these circumstances. This leads me to accept both the second part of respondent's First Proposal, *i.e.*, that part stated as "Alternatively, due process requires…" (Garbus letter, page 3) and the Second Proposal, as stated in the Garbus letter. It is not my intention to allow respondent to re-try the case against him before Judge Kaplan, but rather to allow him a hearing to address some or all of those findings in a way that is reasonably fair and practical. Counsel states that he needs two days for this, "approximately." There can be no discernible harm to the "public interest" by this approach. The time to be allowed will be flexible and not restrictive, but not expandable without good cause.

The intention is to have an actual "hearing" pursuant to 22 NYCRR 1240.9(c), where respondent can address the Charges against him as he sees fit, even to the point of disagreeing with, or providing context to the facts in the first instance found by the District Court, and affirmed as found by the Second Circuit, on the ground that a strict application of the collateral estoppel doctrine, in the circumstances before me, may place respondent in an unfair position, and one he likely could not have foreseen as he set out in the Southern District Court to defend the judgment he obtained in Ecuador.

All parties will meet as re-scheduled on December 4; the DDC will be assumed to continue its position that no further hearing is required post-suspension, in this case. The respondent will be prepared to proceed with his evidence, following the guidelines of this

4

decision.  As agreed, the hearing will continue to December 5, and future hearings including the

Sanction hearing will be scheduled at the convenience of the parties.


Dated: New York, New York
        November 8, 2018



John R. Horan, Referee