UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,

v.

STEVEN DONZIGER,

          Defendant.

--------------------------------------------------------x

19 Cr. 561 (LAP)
11 Civ. 691 (LAK)

DECLARATION OF
PROFESSOR ELLEN YAROSHEFSKY

I, ELLEN YAROSHEFSKY, hereby declare and state as follows:

1. I am the Howard Lichtenstein Professor of Legal Ethics and the Director of the Monroe H. Freedman Institute for the Study of Legal Ethics at the Maurice A. Deane School of Law at Hofstra University in New York.

2. I was retained by Andrew Frisch, counsel for Steven Donziger, to provide my opinion in this matter based on my expertise in legal ethics. Specifically, I was asked to provide my expert opinion on the issue of whether or not Seward & Kissel LLP's (hereinafter "Seward") counsel have a conflict of interest that disqualifies them as special prosecutors in the criminal contempt matter referred by the Hon. Lewis Kaplan to this Court pursuant to F.R. Crim. P. 42.

3. My qualifications to serve as an expert witness on legal ethics are set forth more fully in my curriculum vitae, attached as Exhibit A. It describes my educational background, legal experience, bar admissions, academic affiliations, professional activities, bar committee memberships, publications and participation as a lecturer at bar seminars, CLE panels and at other organizations on matters related to legal ethics.

4. I have provided expert opinions on legal ethics to courts in the past and I am aware that other of my academic colleagues have done so as well. This tradition of legal ethics expert opinions developed initially because the interpretation of professional conduct rules relies on understandings prevailing in the legal profession and not simply on the "drafters' intent," decisional law, treatises or ethics opinions. I understand that courts consider such opinions to varying extents, and there is precedent in this Circuit and elsewhere for courts to take them into account. *See, e.g.,* Doe v. Fed. Grievance Comm., 847 F.2d 57, 62 (2d Cir. 1988).

5. Briefly, I have taught courses in the field of lawyer regulation for the past twenty-five years and was named to my current position in 2016. Before that, from 1994-2016, I was the

Director of the Jacob Burns Ethics Center at the Benjamin N. Cardozo School of Law School. I have published numerous articles in the field and have produced materials for the American Bar Association and other organizations. In the past ten years, I have authored twenty-seven articles in books, law reviews and other journals as indicated in Exhibit A. Many of these articles focus upon the role of prosecutors and prosecutorial accountability.

6. I have spoken widely on legal ethics in continuing legal education programs before numerous bar associations, lawyer associations, and law schools.

7. I serve on the New York State Bar Association Committee on Standards for Attorney Conduct as well as the Committee for Professional Responsibility of the Association of the Bar of the City of New York. I served as co-chair of the ethics committee of the Criminal Justice Section of the American Bar Association. I was on the Executive Session of the Institute for the Innovation of Prosecution Executive Session at John Jay College of Criminal Justice.

8. I regularly consult with lawyers and law firms on a wide range of matters related to legal ethics.

9. I have served as an ethics expert in litigation. I have authored expert reports and provided affidavits on a wide range of legal ethics issues including duties of confidentiality, conflicts of interest, duties of diligence, competence, and candor, protective orders, and prosecutorial misconduct, among other issues. I have consulted with hundreds of lawyers throughout my career on a wide range of legal ethics and malpractice issues.

10. I have no personal knowledge of the facts of this case. In rendering my opinion, I rely upon the facts set forth below provided by counsel along with the court filings referenced herein.

11. My opinion is predicated upon the standards of care and governing standards of professional conduct set forth in the New York Rules of Professional Conduct, as well as related ethics opinions and case law. I have also relied upon standard treatises in the area of legal ethics. The ethical duties identified below are firmly established. My opinion is expressed to a reasonable degree of professional certainty.

I. **Factual Basis**

A. **Background**

12. I rely upon the facts provided to me by counsel, Andrew Frisch, set forth in this Section and in Sections B and C. I have assumed those facts to be true for purposes of my opinion.

13. The only available facts regarding Seward and its relationship to Chevron-related entities in the oil and gas industry, the shipping industry, investment funds and related financial investments and businesses are publicly available documents referenced throughout these Sections.

14. The Court did not require Seward to provide information about its financial or personal interests in Chevron or Chevron related-entities, thus the particular relationships between Seward and Chevron-related entities, investment funds, shipping entities and oil and gas industry entities interwoven with Chevron are not available to counsel.

15.     Judge Kaplan's charges of criminal contempt against Steven Donziger arise from a longstanding and contentious civil litigation between Chevron and Mr. Donziger, among others.

16.     Chevron initiated its lawsuit in the Southern District of New York when an Ecuadorian court was about to render a judgment against Chevron for contaminating the Amazon in an amount ultimately determined to be about $9 billion. Chevron withdrew its claim for money damages so it could proceed to trial before Judge Kaplan without a jury solely on equitable claims. In addition to defending itself in Ecuador and New York, Chevron has fought the case in more than two dozen United States federal courts, using hundreds of lawyers and producing what its own attorneys have called "an avalanche of paper."

17.     After Judge Kaplan ruled in favor of Chevron and against Mr. Donziger, Gibson Dunn, on behalf of Chevron, successfully moved Judge Kaplan to hold Mr. Donziger in civil contempt.

18.     On July 31, 2019, after the United States Attorney declined to prosecute Mr. Donziger for criminal contempt, Judge Kaplan charged Mr. Donziger with criminal contempt by order to show cause and, pursuant to F. R. Crim. P. 42, appointed three lawyers from Seward, including Rita Glavin, to prosecute the charges.

19.     At all relevant times, Chevron is and has been represented by Gibson Dunn, a global law firm of 1,300 lawyers in twenty offices around the world.

### B. Seward Involvement with Chevron-Related Entities

20.     Seward represents clients and works in the highly concentrated oil and gas industry for Chevron-related entities including shipping and finance.

21.     Seward is "particularly well-known" for its representation of "transportation companies (particularly in the shipping area)," related to offshore drilling and services sector. Seward is also known for its expertise in the financial services industry and in a substantial hedge-fund practice. The firm's clientele includes commercial banks, investment funds, institutional investors, and shipping and transport companies. Seward regularly participates in oil and gas industry conferences and its marketing reflects its involvement in the oil and gas industry.

22.     For example, Seward's "Maritime Practice 2018 Year in Review," dated February 12, 2019, asks "As we look forward and ponder what 2019 will hold for *us and our clients*, many of the questions we asked ourselves last year still seem salient . . . . *Will oil prices recover* enough to bring badly needed stability to the offshore drilling and services sectors?" (emphasis added).

23.     Chevron is one of the world's largest oil companies. It is active in more than 180 countries and engaged in every aspect of the oil, natural gas, and geothermal energy industries, including hydrocarbon exploration and production; refining, marketing and transport; chemicals manufacturing and sales; and power generation. Its annual revenue often tops two hundred billion dollars.

24.     Chevron and a few other oil companies, including ExxonMobil and Conoco Phillips, control the oil industry in the United States. These companies invest in research and development, exploration and production as well as transportation, refining, and retail marketing,

both in the United States and worldwide. These companies hold an overwhelming market share of the oil and gas companies in U.S.

25. A number of Seward's clients derive significant revenue from Chevron. For example, Euronav, reportedly the world's largest independent crude oil tanker operator, identified Seward as its counsel and its business as including chartering "[v]essels to leading international energy companies, such as Chevron." On June 18, 2018, Seward announced that it had "[a]dvised Euronav on its merger with Gener8 Maritime," a company whose annual report cites its "[s]trong relationships with high quality customers," including Chevron.

26. Another Seward client has been Dorian LPG a liquefied petroleum gas shipping company and a leading owner and operator of "very large gas carriers." On October 9, 2015, Dorian announced that it was in the process of clinching a five-year time-charter with Chevron.

27. According to Chambers USA, a service whose ranking of law firms is touted on Seward's website, Seward reported to Chambers that its main areas of practice include "maritime," and identifying one representative engagement: "represent[ing] Scorpio Tankers Inc. in connection with its merger with Navig8 Product Tankers Inc., . . . creating the largest U.S.-listed owner of petroleum product tankers...." An executive of Scorpio Tankers, the client identified by Seward in its profile for Chambers, said in 2018 that its merger with Navig8 Product Tankers Inc., in which Seward represented Scorpio, improved Scorpio's "[c]hances to gain contracts among customers like oil majors Total and Chevron."

28. Publicly available information does not provide the ability to understand Seward's direct intersection with Oaktree Capital Management ("Oaktree"), an American global asset management firm specializing in alternative investment strategies. However, Oaktree's direct connections to Chevron and Oaktree's intersection with at least four of Seward's clients and members of its Board of Directors demonstrate Seward's significant involvement with Oaktree and Chevron in this highly concentrated industry. Participation in conferences is also such an indication.

29. Seward has clients who are significantly funded by Oaktree:

Seward's website indicates that clients in whom Oaktree has invested include Kudu Investment Management, LLC, Eagle Bulk Shipping Inc., and TORM PLC. Oaktree has also invested in and owns a substantial interest in Star Bulk Carriers Corp, a global shipping company.

Star Bulk Carriers Corp., is a longstanding Seward client that Seward represented in acquiring vessels.

On January 26, 2018, Seward announced that it had advised TORM, then one of the world's largest product tanker companies, in a private placement. It was described on Seward's website as "[f]ully backstopped by TORM's majority shareholder, an entity affiliated with funds managed by Oaktree Capital Management, which purchased approximately $70 million of TORM's Class A common shares in the Private Placement."

30. Two of Oaktree's directors serve or have recently served on Chevron's Board of Directors. Robert Denham is a Director of Oaktree and was a member of Chevron's board until recently. Denham reportedly is or has recently been Chevron's second-largest individual

4

shareholder. Oaktree's website identifies John Frank as Director and Vice Chairman and a member of Chevron's board.

31. Seward's involvement in industry conferences is illustrative of Seward's relationships in finance and the oil and gas industry with Chevron, Oaktree and Gibson Dunn.

### C. Steven Donziger

32. Mr. Donziger has been described in the press as the "Scourge of Big Oil." In 2009, Chevron's lead public relations consultant said, "our L-T [long term] strategy is to demonize Donziger."

33. Mr. Donziger has "[m]aintained that Chevron is motivated not merely by fear of an adverse judgment but by a desire to destroy the very idea that indigenous people can bring an environmental lawsuit against an oil company." In 2008, a Chevron lobbyist in Washington told *Newsweek*, "we can't let little countries screw around with big companies like this." One Chevron spokesman has said, "We're going to fight this until Hell freezes over—and then we'll fight it out on the ice."

34. When Mr. Donziger's counsel raised the question in court whether Seward could serve in the shoes of the United States Department of Justice as a disinterested prosecutor of Mr. Donziger for criminal contempt where the underlying charges of civil contempt were initiated by Chevron in a case of such importance to the oil and gas industry, Seward's lawyers declined to provide any information about Seward's relevant relationships and blamed Mr. Donziger for "attacking lawyers, impugning their reputations, and attacking parties." Transcript of oral argument at 5-6, U.S. v. Donziger, (January 6, 2020) (No.19 Cr. 561 (LAP) 11 Civ. 691 (LAK) (hereinafter "Tr.).

## II. Opinion

35. Prosecutors, including special prosecutors, are subject to broad conflict of interest rules that reflect their fiduciary duty to the public and not to private interests. This fundamental concept of the prosecutor's duty to the public is reflected in ethics rules in all U.S. jurisdictions, including the New York Rules of Professional Conduct ("NYRPC"), in the American Bar Association Standards for the Prosecution Function, in the standards of the National District Attorneys Association, in federal and state statutes, and in case law.

36. To perform this public role, prosecutors are afforded vast discretion where their decision-making is rarely transparent or judicially reviewable. Consequently, prosecutors are required to act with impartiality, neutrality and disinterestedness. They must exercise balanced judgment independent of personal, financial or other interests. *See e.g.*, CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION §3-1.2 (AM. BAR. ASS'N 2017) (advising that prosecutors should act with "integrity and balanced judgment"). This is true whether or not a prosecutor is a full-time attorney employed by a local, state or federal entity, or whether that lawyer is private counsel appointed as a special prosecutor in a matter.

37. The Rules of Professional Conduct contain particular conflict of interest provisions for government lawyers. These rules regulate lawyers who move between private practice and government service. One of their goals is to ensure that a government lawyer is not in a position

where the "[b]enefit to the other client might affect performance of the lawyer's professional functions on behalf of the government." NYRPC 1.11, Comment 4 (Special Conflict of Interest for Former and Current Government Officers and Employees). Rule 1.11 is in addition to other conflict of interest Rules of Professional Conduct that apply to all lawyers and seek to protect client confidential information and client loyalty. NYRPC 1.7 (Concurrent Conflict of Interest) and Rule 1.9 (Successive Conflict of Interest) (protecting confidential information). Private lawyers can readily identify conflicts if they have an interest or relationship that may cause a lawyer to be disloyal to the client, but prosecutors do not have as clearly identified a client. Because those prosecutors themselves define what are the relevant public interests and objectives of a prosecution, the determination of whether an interest is likely to distort the prosecutor's judgment or conduct is the central concern expressed in ethics rules, standards and in case law. *See* Bruce A. Green & Rebecca Roiphe, *Rethinking Prosecutors' Conflicts of Interest,* 58 B.C. L. REV. 463, 465-67 (2017).

38. Thus, the conflict of interest rules for prosecutors require that the prosecutor exercises independent judgment on behalf of the government, free of other influences, including "personal, political financial, professional, business, property or other interests or relationships." CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION § 3-1.7(f) (AM. BAR. ASS'N 2017).

39. This is particularly important when a private lawyer is engaged as special prosecutor to serve the public interest. That lawyer has greater power over individual lives and entities and the goal of pursuit of the public interest must remain paramount. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 97 (AM. LAW INST. 2000) (identifying why representation of a government entity differs significantly from representation of a private client).

40. In a Rule 42 proceeding where a federal judge appoints a private attorney to be a special prosecutor, that special prosecutor has the responsibility to make significant discretionary decisions in the criminal contempt matter and has a fiduciary obligation to act in the public interest, and not in furtherance of private interests. Consequently, it is of utmost concern that the prosecutor meets the objective standard of a disinterested lawyer, which is unbiased, neutral, nonpartisan, and not prejudiced. (See Fed. R. Crim. P. 42 Rule 42 advisory committee notes on the 2002 amendment indicating that the private prosecutor must be disinterested).

41. The NYRPC does not explicitly define "disinterested lawyer," but the term is defined in statutes and referred to case law. The United States Code Services' Bankruptcy Code defines a "disinterested person" as one who "[d]oes not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any *direct or indirect* relationship to, connection with, or interest in, the debtor, or for any other reason" (emphasis added). *See* 11 U.S.C.S § 101(14) (C). This definition reflects the common understanding that disinterested means impartial, unprejudiced, unbiased, neutral, nonpartisan, whether directly or indirectly.

42. The Supreme Court, citing the then-existing Code of Professional Responsibility and 18 USC § 208 that prohibits a lawyer from representing the government in any matter in which they, their family, or their business associates have any interest, disqualified the appointed special prosecutor because the private lawyer was not disinterested and that interest could cause the

6

lawyers' independence and neutrality to reasonably be questioned. Young v. United States (ex rel. Vuitton Et Fils S.A.), 481 U.S. 787, 809-10 (1987) [hereinafter *Vuitton*].

43. Although *Vuitton* concerned a lawyer with a direct interest in the outcome of that case, that decision and subsequent cases make plain that disqualification is not confined solely to "direct interests." Instead, the interests include indirect interests that may undermine the public's confidence in the integrity of the legal profession. *See* Oswall v. Tekni-Plex, Inc., 691 A.2d 889, 894 (N.J. Super Ct. App. Div. 1997); Lovell v. Winchester, 941 S.W.2d 466, 469 (Ky. 1997). ("[T]he mere appearance of impropriety is just as egregious as any actual or real conflict").

44. *Vuitton* reaffirmed the government's interest in "[d]ispassionate assessment of the propriety of criminal charges for affronts to the judiciary" and held that the "[p]*otential* for private interests to influence the discharge of public duty" and the appointment of an interested party creates, at a minimum *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." *Vuitton*, 481 U.S. at 805 (emphasis in original). *Vuitton* did not require proof of an actual conflict. *Id.*

45. Notably, the *Vuitton* court adopted the well-known standard of the appearance of impropriety. Although that term is not included in the Rules of Professional Conduct that subjects lawyers to discipline, it is used in judicial recusal and disqualification case law, as well as in criminal contempt matters because the prosecutor performs a quasi-judicial role in cases prosecuted at the request of court. Schumer v. Holtzman, 454 N.E.2d 522, 524-26 (N.Y. 1983).

46. Just as a judge should err on the side of caution when her impartiality may reasonably be questioned, a special prosecutor appointed by a court that will ultimately be responsible for the exercise of discretion should be free of reasonable questions about her disinterestedness. Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1111 (5th Cir. 1980) ("[T]he new statute requires a judge to exercise his discretion in favor of disqualification if he has any question about the propriety of his sitting in a particular case.")

47. Thus, regardless of a good faith belief of an appointed special prosecutor that no conflict of interest exists, there must be a determination based upon an objective view of factual allegations that the special prosecutor is disinterested. Upon a showing of a prima facie case of conflict of interest, it is incumbent upon the appointed special prosecutor to overcome that conflict. Sinclair v. State, 363 A.2d 468, 477-78 (Md. 1976) (trial judge must hold factual inquiry into alleged prosecutor's conflict).

48. As the *Vuitton* court said: "[W]e must have assurance that those who would wield this power [special prosecutors] will be guided solely by their sense of public responsibility for the attainment of justice. A prosecutor of a contempt action who represents the private beneficiary of the court order allegedly violated cannot provide such assurance, for such an attorney is required by the very standards of the profession to serve two masters." *Vuitton,* 481 U.S. at 814.

49. Ms. Glavin, at the January 6, 2020 hearing, interpreted the *Vuitton* case in its most narrow sense. She said, "the issue is whether or not [she], Mr. Maloney, or Mr. Armani have conflicting loyalties in this case that could cause our independence and our impartiality to be questioned" and whether they represent a party with a "direct interest in the outcome of that proceeding.'" Tr. at 13-14. She did not address indirect or other interests. In this matter, the full extent of Seward's relationships with Chevron and Chevron-related entities is opaque but the

existing public records demonstrate that Seward has a financial interest in the Donziger contempt of court matter. Donziger is the scourge of the oil industry. ¶ 32. This refers to the highly concentrated oil industry and is not limited to Chevron but includes the few oil and gas controlling companies in the industry. This case has international implications for legal challenges to oil and gas industry and as reported, "Chevron would fight Mr. Donziger "until Hell freezes over, and then we'll fight it out on the ice." ¶ 33. It is in the oil and gas industry's interest to find Mr. Donziger guilty of contempt of court.

50. Seward's lawyers, appointed as the special prosecutor in the criminal contempt case, are far from disinterested. The firm's Chevron-related work and its lawyers' participation in the highly concentrated oil and gas industry are significant. ¶ 20-31. Most prominently is Seward's client base and work in shipping, transportation and financing aspects of the oil and gas industry. ¶ 20-27. The secondary issue of investments of Seward's clients with Oaktree and potentially other investors compounds the disinterest. ¶ 28-30. Although participation in industry conferences is not necessarily an indication of disinterest, it is part and parcel of the firm's financial and business interests in the oil and gas industry. ¶ 31. In such a highly concentrated industry, the Seward firm's financial and business interests are dependent upon the good will of Chevron and its related entities and other giants in the oil industry. Seward would not seek to act contrary to the interests of the few controlling large industry oil and gas companies and related entities.

51. The extent of Seward's involvement in Chevron's joint ventures, subsidiaries, ownership interests or in contractual relationships with Chevron entities, its interlocking ownership and/or directorship structures are not public. Even if Seward does not directly represent Chevron or even if the representation of any of Chevron-related subsidiaries are not deemed to be clients when Seward undertook its conflict of interest check, the firm's interests are so aligned with Chevron, such as to create a financial conflict of interest.

52. Governing ethical and legal standards require careful and objective scrutiny of the disinterest of private lawyers appointed as special prosecutors. As the *Vuitton* court said, "appointment of an interested prosecutor is a fundamental and pervasive error that requires reversal without regard for the facts and circumstances." *Vuitton*, 481 U.S. at 809-10.

Conflicts Check

53. Seward performed a conflict check and determined that there was no conflict of interest. (January 3, 2020 letter to the Hon. Loretta Preska from Rita Glavin; Tr. at 6). The precise inquiries in the conflicts check were not disclosed. Thus, it is not known whether the Chevron-related entities were part and parcel of that conflicts check, nor whether the role of Seward in Chevron-related entities was part of that determination.

54. Although this court did not find the January 2020 showing made by Andrew Frisch to be sufficient to enquire further, (Tr. at 18), the current submission with the facts presented in ¶ 20-31 is not only sufficient to demonstrate the need for additional enquiry, but sufficient to disqualify Seward as special counsel because of its financial conflicts of interest.

55. Notwithstanding the presumed good faith belief of Ms. Glavin and Seward that no conflict exists, significant research demonstrates that factors such as cognitive biases have a profound impact upon a lawyer's evaluation of conflicts of interest. Despite a good faith belief in their own ability to exercise their independent professional judgment and approach a matter in

disinterested fashion, lawyers, like all people, are subject to influences that affect their decision making. Lawyers may be unaware of their cognitive bias because of the financial conflict of interest. In the post-Enron literature as well in other areas of law practice, studies demonstrate the impact of such unconscious biases. Erica Beecher-Monas, *Corporate Governance in the Wake of Enron: An Examination of the Audit Committee Solution to Corporate Fraud,* 55 ADMIN. L. REV. 357 (2003) (examining cognitive biases in post-Enron compliance programs). Inevitably, one's perspective, bounded by their role and experience, results in rationalizations in favor of clients, even if unintentionally. "Even when people set out to make impartial judgments about a course of action, however, self-interest has a way of creeping in--unconsciously--to the decision process. Somehow the information is processed in a way that makes the outcome more desirable to the decision maker." *Id.*

56. Cognitive biases are a chronic issue in all matters, but studies point to particularized cognitive biases for prosecutors because of the significant power they wield and their unreviewable discretion. *See generally* Tigran Eldred, *The Psychology of Conflicts of Interest in Criminal Cases,* 58 U. KAN. L. REV. 43 (2009); Alafair Burke, *Improving Prosecutorial Decision Making: Some Lessons of Cognitive Science,* 47 WM. & MARY L. REV. 1587 (2006) (discussing prosecutorial implicit bias as distorting the exercise of discretion).

57. In any case, Ms. Glavin's statement that the firm's conflict check did not determine the existence of such a conflict of interest is not dispositive of the issue. Court have disqualified lawyers after determining that a conflicts check was inadequate or that the firm's analysis of no conflict was erroneous. *See e.g.*, Altana Pharma AG v. Teva Pharm. USA Inc., 2006 WL 8440776, at 2-5 (D.N.J. Feb. 16, 2006) (court reverses the firm's initial view that a conflict did not exist). In re MF Glob. Inc., 464 B.R. 594 (Bankr. S.D.N.Y. 2011) (ordering additional disclosures to court to determine disinterestedness and conflict of interest stating that boilerplate disclosure of prospective connections is rarely satisfactory.)

58. Although it is not known whether or not any of the three appointed special prosecutors at Seward have personally performed legal services on behalf of any Chevron-related entities, the entire firm should be disqualified because of its financial interests in Chevron-related work. Thus, unlike ethics rules governing lawyers who move from government to private practice and vice versa, where screening of individual lawyers is permissible in particularized matters, no such screening prevents disqualification of the Seward firm here. *See* NYRPC 1.11 (discussing screening for government lawyers). The firm's financial interest is disqualifying for the entire firm.

59. This longstanding, highly publicized, contentious case is the subject of ongoing controversy of international dimension with wide-ranging consequences including public perception of the fairness of the system of justice in the United States.

60. There is certainly an appearance of impropriety in the Seward firm prosecuting the criminal contempt charge against the publicly identified person who is the "scourge of the oil industry." It is an understatement to say that there is a potential and opportunity for bias by Seward lawyers. It is equally an understatement to say that Seward counsel in the special prosecutor role undermines public trust and confidence in the perception of fairness of the legal system. The facts demonstrate a disqualifying conflict of interest under any objective standard.

61.     To the extent that the court maintains questions as to disqualification, it is fair to conclude that one should not tack too close to the wind in permitting lawyers whose disinterest is reasonably questioned to serve as special prosecutor. Otherwise a prosecutor's ability to serve public interest is threatened and the legitimacy of the Rule 42 process and ultimately, the criminal justice system may be undermined.

Conclusion

62.     Even based solely on the limited public record of Seward's financial interest in Chevron-related entities, there exists a disqualifying conflict of interest. The Seward appointed lawyers are not disinterested and these lawyers should be disqualified as special prosecutors in the criminal contempt proceeding against Mr. Donziger.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 22, 2020

_____
Ellen Yaroshefsky
February 22, 2020