UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

STEVEN DONZIGER,

                Defendant.

19 Cr. 561 (LAP); 11 Civ. 691 (LAK)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S PRE-TRIAL MOTIONS**

Rita M. Glavin
Brian P. Maloney
Sareen K. Armani

*Special Prosecutors on behalf of the
United States of America*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES .................................................................................................... ii

BACKGROUND ...................................................................................................................... 2

    A.    The Civil Case and the RICO and Money Judgments ................................. 2

    B.    Post-Judgment Discovery Proceedings ........................................................ 4

    C.    Civil Contempt and Violations of Court Orders .......................................... 8

ARGUMENT ......................................................................................................................... 13

I.     THE JUDICIAL DISQUALIFICATION MOTIONS ...................................... 13

    A.    Defendant's Motion to Disqualify the Entire S.D.N.Y. Bench Should be Denied ......................................................................................................... 13

    B.    There is No Basis for the Court to Disqualify Itself .................................. 18

    C.    A Defendant Charged with Criminal Contempt Is Only Entitled to A Jury Trial If the Punishment to Be Imposed Exceeds 6 Months' Imprisonment .............. 20

II.    THE MOTION TO DISQUALIFY THE SPECIAL PROSECUTORS SHOULD BE DENIED ..................................................................................................... 22

    A.    Applicable Law .......................................................................................... 23

    B.    There is No Vuitton Issue .......................................................................... 23

    C.    The Collateral Arguments for Disqualification are Meritless .................... 25

III.   THE MOTION TO DISMISS THE CRIMINAL CONTEMPT CHARGES SHOULD BE DENIED ................................................................................... 27

    A.    The Defendant's Intent is a Question for the Trier of Fact ....................... 27

    B.    The Defendant Was Properly Charged with Criminal Contempt .............. 29

IV.   THE MOTION FOR THE DISCLOSURE OF ALL GIBSON DUNN COMMUNICATIONS SHOULD BE DENIED ............................................. 33

CONCLUSION ..................................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

Brady v. Maryland,
   373 U.S. 83 (1963)..................................................................................................... 32

Chevron Corp. v. Donziger,
   974 F. Supp. 2d 362 (S.D.N.Y. 2014)..................................................................... 3, 4

Chevron Corp. v. Donziger,
   833 F.3d 74 (2d Cir. 2016)...................................................................................... 3, 4

Chevron Corp. v. Donziger,
   137 S. Ct. 2268 (2017)............................................................................................ 3, 4

Cheney v. United States District Court,
   541 U.S. 913 (2004)................................................................................................. 16

Frank v. United States,
   395 U.S. 147 (1969)................................................................................................. 32

Goldfine v. United States,
   268 F.2d 941 (1st Cir. 1959).............................................................................. 15, 19

Gompers v. Bucks Stove & Range Co.,
   221 U.S. 418 (1911)................................................................................................. 30

In re Chevron Corp.,
   749 F. Supp.2d 170 (S.D.N.Y. 2010)........................................................................ 6

In re de Kleinman,
   923 F. Supp. 24 (S.D.N.Y. 1996)............................................................................. 21

In Re Drexel Burnham Lambert, Inc.,
   861 F.2d 1307 (2d Cir. 1988)................................................................................... 14

In re Levine,
   27 F.3d 594 (D.C. Cir. 1994).................................................................................... 31

In re McConnell,
   370 U.S. 230, 236 (1962).......................................................................................... 27

In re Pollack,
   No. 07-MC-347, 2008 U.S. Dist. LEXIS 73047 (E.D.N.Y. Sept. 22, 2008)............ 20

International Union v. Bagwell,
   512 U.S. 821 (1994)............................................................................................ 30, 32

Lago Agrio Plaintiffs v. Chevron Corp.,
    409 Fed. App'x 393 (2d Cir. 2010) ........................................................................ 6

Lewis v. United States,
    518 U.S. 322 (1996) .............................................................................................. 20

Liteky v. United States,
    510 U.S. 540 (1994) .............................................................................................. 16

Maness v. Meyers,
    419 U.S. 449 (1975) .............................................................................................. 30

Matter of Chevron Corp. v. Republic of Ecuador,
    PCA Case No. 2009-23, Second Partial Award on Track II (Aug. 30, 2018), ......... 4

Michaelson v. United States,
    266 U.S. 42 (1924) ............................................................................................... 22

Morissette v. United States,
    342 U.S. 246 (1952) .............................................................................................. 27

Nilva v. United States,
    352 U.S. 385 (1957) .............................................................................................. 15

Rojas v. United States,
    55 F.3d 61 (2d Cir. 1995) ................................................................................. 15, 19

Shillitani v. United States,
    384 U.S. 364 (1966) .............................................................................................. 30

Skilling v. United States,
    561 U.S. 358 (2010) .............................................................................................. 18

United States v. Agajanian,
    852 F.2d 56 (2d Cir. 1988) ............................................................................... 15, 20

United States v. Baldeo,
    No. 13 Cr. 125, 2013 U.S. Dist. LEXIS 142722 (S.D.N.Y. Oct. 2, 2013) .............. 28

United States v. Berardelli,
    565 F.2d. 24 (2d Cir. 1977) .................................................................................. 27

United States v. Brennerman,
    No. 17-cr-0155, 2017 U.S. Dist. LEXIS 125505 (S.D.N.Y. 2017) ......................... 29

United States v. Carpenter,
    91 F.3d 1282 (9th Cir. 1996) ................................................................................ 32

United States v. Crawford,
    329 F.3d 131 (2d. Cir. 2003).................................................................................... 15, 30, 32

United States v. Cutler,
    58 F.3d 825 (2d Cir. 1995).................................................................................... 21, 27, 29, 30

United States v. Cutler,
    796 F. Supp. 710 (E.D.N.Y. 1992) ................................................................................. 15, 21

United States v. Cutler,
    815 F. Supp. 599 (E.D.N.Y. 1993) ................................................................................. 28

United States v. Fallas,
    No. 09 Cr. 342 (LAP), 2010 U.S. Dist. LEXIS 88889 (S.D.N.Y. Aug. 19, 2010).................. 33

United States v. Gallo,
    No. 98 Cr. 338 (JGK), 1999 U.S. Dist. LEXIS 103 (S.D.N.Y. Jan. 6, 1999)......................... 33

United States v. Lovaglia,
    954 F.2d 811 (2d Cir. 1992)................................................................................... 13, 14

United States v. Lynch,
    162 F.3d 732 (2d Cir. 1998)................................................................................... 21

United States v. McVeigh,
    153 F.3d 1166 (10th Cir. 1998) ............................................................................. 18

United States v. Ogoke,
    860 F.3d 924 (7th Cir. 2017) ................................................................................. 29

United States v. Powell,
    No. 18 Cr. 287 (AT), 2019 U.S. Dist. LEXIS 214465 (S.D.N.Y. Dec. 12, 2019)................... 33

United States v. Souza,
    2008 U.S. Dist. LEXIS 21772, (E.D.N.Y. 2008)....................................................... 33

United States v. Sampson,
    898 F.3d 270 (2d Cir. 2018)................................................................................. 27, 28

United States v. Speare,
    297 F.2d 408 (2d Cir. 1962)................................................................................. 28

United States v. Sullivan,
    98 F.2d 79 (2d Cir. 1938) ..................................................................................... 28

United States v. Terry,
    17 F.3d 575 (2d Cir. 1994)................................................................................... 15, 23, 29

United States v. Terry,
    802 F. Supp. 1094 (S.D.N.Y. 1992) .......................................................... 19

United States v. Terry,
    815 F. Supp. 728 (S.D.N.Y. 1993) ............................................................ 21

United States v. Turner,
    812 F.2d 1552 (11th Cir. 1987) ................................................................ 28

United States v. Twentieth Century Fox Film Corp.,
    882 F.2d 656 (2d Cir. 1989) ..................................................................... 20

United States v. United Mine Workers,
    330 U.S. 258 (1947) ................................................................................. 30

United States v. Weslin,
    204 F. Supp. 2d 547 (W.D.N.Y. 2001) ............................................... 15, 20

United States v. Weslin,
    34 F.App'x 815 (2d Cir. 2002) ............................................................ 15, 20

United States v. Zuber,
    118 F.3d 101 (2d Cir. 1997) ..................................................................... 21

Williams v. Illinois,
    567 U.S. 50 (2012) ................................................................................... 21

Wright v. United States,
    732 F.2d 1048 (2d Cir. 1984) ............................................................. 25, 26

Young v. United States ex rel. Vuitton Et Fils S. A.,
    481 U.S. 787 (1987) ........................................................................ *passim*

## Statutory Authorities

18 U.S.C. § 401 ............................................................................... *passim*

18 U.S.C. § 3500 ..................................................................................... 33

28 U.S.C. § 455(a) .............................................................................. 13, 20

## Rules and Regulations

Fed. R. Civ. P. 26(b)(5) ............................................................................. 6

Fed. R. Crim. P. 42 ......................................................................... *passim*

Fed. R. Crim. P. 16 ................................................................................. 33

Fed. R. Crim. P. 21(a) ................................................................................................ 12

S.D.N.Y. Civ. R. 26.2 ................................................................................................. 6

S.D.N.Y. Loc. R. ........................................................................................................ 19

N.Y. C.P.L.R. § 5222 ................................................................................................. 9

**Additional Authorities**

Jack Fowler*, Steven Donziger and the Plot against Chevron*, National Review
  (October 10, 2019) (available at https://www.nationalreview.com/magazine/2019/
  10/28/steven-donziger-and-the-plot-against-chevron/) ........................................... 17

Linda Greenhouse, *Recuse Me*, N.Y. Times (May 4, 2011)…………………………............1

Defendant Steven Donziger is charged with six counts of criminal contempt following his pattern of repeatedly disobeying court orders in Chevron v. Donziger, 11 Civ. 691 (LAK) ("Civil Case"), which were not stayed and for which he did not seek appellate relief.

Specifically, on July 31, 2019 and pursuant to Fed. R. Crim. P. 42, Judge Kaplan issued an "Order to Show Cause Why Steven Donziger Should Not Be Held in Criminal Contempt" ("OTSC") in violation of 18 U.S.C. § 401(3).  The OTSC cited six separate grounds for the criminal contempt:

1.    For the period March 8, 2019 to May 28, 2019, Donziger's willful violation of paragraph four of a March 5, 2019 Forensic Inspection Protocol order directing him to provide by March 8, 2019 a sworn list of all his electronic devices, communication and messaging accounts, and document management services accounts that he has used since March 4, 2012.

2.    For the period March 18, 2019 to at least May 28, 2019, Donziger's willful violation of paragraph five of a March 5, 2019 Forensic Inspection Protocol order directing him to surrender on March 18, 2019 to a Neutral Forensic Expert all of his electronic devices for purposes of imaging.

3.    For the period June 12, 2019 to at least July 31, 2019, Donziger's willful violation of a June 11, 2019 order directing him to surrender to the Clerk of Court by June 12, 2019 every passport issued to him.

4.    For the period March 4, 2014 to September 3, 2018, Donziger's willful failure and refusal to assign to Chevron his contractual rights to a contingent fee under a 2011 Retainer Agreement, as required by the RICO Judgment.

5.    For the period November 1, 2017 to May 27, 2019, Donziger's willful failure and refusal to assign to Chevron his contractual rights to a November 1, 2017 ADF Contingent Fee Grant, as required by the RICO Judgment.

6.    Donziger's December 23, 2016 willful violation of the RICO Judgment by assigning and pledging a portion of his own personal interest in the Ecuadorian judgment in exchange for personal services.

Dkt. 1; Civ. Dkt. 2276.[1]

Judge Kaplan appointed the undersigned counsel to prosecute the contempt on behalf of the United States, as is required by Fed. R. Crim. P. 42(a)(2), after the U.S. Attorney's Office for the S.D.N.Y. "respectfully decline[d] on the ground that the matter would require resources that we do not readily have available."  Civ. Dkt. 2277.  The criminal contempt case was transferred to this Court, pursuant to Rule 14 of the Southern District Rules for the Division of Business Among District Judges.  See 2d Cir. No. 20-464, Dkt. 28 at 48 (J. Kaplan Response to Petition for a Writ of Mandamus).

The defendant now moves for: (1) disqualification of the entire S.D.N.Y. bench from presiding over this case; (2) disqualification of this Court; (3) a jury trial if any S.D.N.Y. judge presides over this case; (4) disqualification of the prosecutors; (5) dismissal of the charges; and (6) disclosure of all communications between the Government and the law firm Gibson, Dunn & Crutcher LLP ("Gibson Dunn").

For the reasons set forth below, these motions are meritless and should be denied.

## BACKGROUND

### A.    The Civil Case and the RICO and Money Judgments

In 2011, Chevron Corporation ("Chevron") instituted civil action 11 Civ. 691 in this district ("Civil Case") against Donziger and others, alleging those defendants had fraudulently and corruptly obtained an $8.6 billion judgment in Ecuador against Chevron. Following a lengthy trial, on March 4, 2014, Judge Kaplan issued an opinion finding that Donziger and Ecuadorians with whom Donziger closely worked engaged in a pattern of

---

[1]    References to "Dkt." are to the docket entries in this criminal case.  References to "Civ. Dkt." are to docket entries in the underlying civil litigation, Chevron Corporation v. Donziger et al., 11 Civ. 691.

fraudulent and corrupt acts over many years to obtain the Ecuadorian judgment. <u>Chevron Corp.</u>

<u>v. Donziger</u>, 974 F. Supp. 2d 362, 383 (S.D.N.Y. 2014). Judge Kaplan determined from the well-

documented record:

> [Donziger] and the Ecuadorian lawyers he led corrupted the Lago
> Agrio case. They submitted fraudulent evidence. They coerced one
> judge, first to use a court-appointed, supposedly impartial, "global
> expert" to make an overall damages assessment and, then, to appoint
> to that important role a man whom Donziger hand-picked and paid
> to "totally play ball" with the LAPs. They then paid a Colorado
> consulting firm secretly to write all or most of the global expert's
> report, falsely presented the report as the work of the court-
> appointed and supposedly impartial expert, and told half-truths or
> worse to U.S. courts in attempts to prevent exposure of that and
> other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio
> court's Judgment themselves and promised $500,000 to the
> Ecuadorian judge to rule in their favor and sign their judgment.

<u>Id</u>. at 384.

As part of that March 4, 2014 decision, Judge Kaplan issued a judgment (the

"RICO Judgment") enjoining Donziger from enforcing the Ecuadorian judgment in the United

States or "undertaking any acts" to monetize or profit from it, such as by selling, pledging or

transferring any interest in that judgment. Civ. Dkt. 1875. The RICO Judgment also established

a constructive trust for the benefit of Chevron of any property that Donziger has received or may

receive "that is traceable to the [Ecuadorian] judgment or the enforcement of the Judgment

anywhere in the world including, without limitation, all rights to any contingent fee under the

Retainer Agreement and all stock in Amazonia." <u>Id</u>. (paragraph one). The RICO Judgment

specifically directed Donziger to "transfer and forthwith assign to Chevron all such property that

he now has or hereafter may obtain" that is traceable to the Ecuadorian judgment, which

included his rights to any contingent fee interest he had or may acquire with respect to the

Ecuadorian judgment. <u>Id</u>.

In 2016, the Second Circuit affirmed Judge Kaplan's decision and specifically noted the "absence of challenges to the district court's factual findings."  Chevron v. Donziger, 833 F.3d 74, 81 (2d Cir. 2016), cert. denied, 137 S. Ct. 2268 (2017).[2]  On February 28, 2018, Judge Kaplan issued a supplemental judgment of $813,602.71 ("Money Judgment") in Chevron's favor and against Donziger and other defendants in the Civil Case, which followed the taxation of costs by the Clerk of Court.  Civ. Dkt. 1962.

Judge Kaplan was not alone in his findings about the fraud and corruption Donziger and his co-conspirators used to obtain the Ecuadorian judgment.  In 2018, an international arbitration panel in The Hague issued a 500-plus page decision consistent with Judge Kaplan's findings of the fraud and corruption engaged in by Donziger and his cohorts to obtain that Ecuadorian judgment.  Matter of Chevron Corp. v. Republic of Ecuador, PCA Case No. 2009-23, Second Partial Award on Track II (Aug. 30, 2018), Civ. Dkt. 2082-1.  The international panel's decision noted the "overwhelming" evidence, and stated "[s]hort of a signed confession by the miscreants. . . the evidence establishing 'ghostwriting' in this arbitration 'must be the most thorough documentary, video, and testimonial proof of fraud ever put before an arbitral tribunal."  Civ. Dkt. 2082-1, ¶ 8.54.

B.     Post-Judgment Discovery Proceedings

In 2018, Chevron began to conduct post-judgment discovery of Donziger and various third parties on the issues of: (1) identifying assets to enforce the Money Judgment of $813,602.71 against Donziger; and (2) Donziger's compliance with the RICO Judgment, after

---

[2]     With respect to the fraud and corruption by Donziger and his Ecuadorian co-conspirators, the Second Circuit stated: "The record in the present case reveals a parade of corrupt actions by the LAPs' legal team [i.e., Donziger and his co-conspirators], including coercion, fraud, and bribery, culminating in the promise to [the Ecuadorian judge,] Judge Zambrano[,] of $500,000 from a judgment in favor of the LAPs."  Chevron, 833 F.3d at 126.

Chevron obtained evidence that Donziger had been seeking to sell interests in the Ecuadorian judgment.  See Civ. Dkt. 1966, 1968, 1987.  Judge Kaplan expressly permitted discovery on both issues, despite Donziger's objections regarding discovery about his efforts to monetize the judgment in violation of the RICO Judgment.  See Civ. Dkt. 2006, 2009, 2022.  Donziger appealed to the Circuit (1) the imposition of the Money Judgment, and (2) Judge Kaplan's refusal to dismiss Chevron's motion to hold him in contempt for attempting to sell non-enjoined interests in the Ecuadorian judgment.  See 2d Cir. No. 18-855 and 18-2191 (fully briefed and pending before Circuit).  However, post-judgment discovery on the issues of enforcing the Money Judgment and Donziger's compliance with the RICO Judgment was not stayed.

In connection with the post-judgment proceedings, Judge Kaplan ordered Donziger to produce to Chevron certain documents and information by June 15 (discovery relating to the Money Judgment) and August 15, 2018 (discovery regarding Donziger's compliance with the RICO Judgment).  Civ. Dkt. 2009, 2056.  On August 13, 2018, Donziger sought a stay of the post-judgment discovery regarding his compliance with the RICO Judgment pending his appeal in 2d Cir. No. 18-291, which Judge Kaplan denied on September 25, 2018. Civ. Dkt. 2067, 2088.  Donziger sought no stay in the Second Circuit.

On August 16, 2018, Chevron moved to compel Donziger to respond to post-judgment discovery requests and cited, among other things: (i) that in response to more than 30 requests, Donziger produced "a mere 22 pages worth of documents – relying on previously overruled scope and First Amendment objections, unsubstantiated privilege claims, and a supposed lack of resources;" (ii) Donziger's refusal to "answer dozens of questions at his June 25 deposition;" (iii) Donziger's failure to disclose a bank account from which hundreds of thousands of dollars were paid to him and his cohorts; (iv) Donziger's admission to having

withheld "a few hundred pages" of responsive documents on the basis of previously rejected First Amendment objections; (v) Donziger's failure to conduct even the most basic document searches; and (vi) Donziger's admission that he had responsive emails that he failed to produce. Civ. Dkt. 2073 at 1, 3.  To the extent Donziger was relying on unspecified privilege claims to avoid production, Chevron argued that Donziger's failure to produce a privilege log waived privilege.  Id.  Finally, Chevron requested that the Court direct Donziger to present his electronic devices for imaging, with the images to be lodged with the Court.  Id. at 3.

On October 18, 2018, Judge Kaplan observed that, given "Donziger's stonewalling of post-judgment discovery and the other circumstances" described in the motion to compel, it was "appropriate that Donziger's electronic devices be imaged and examined for any responsive documents that Donziger has not thus far produced under appropriate safeguards of the interests of all parties."  Civ. Dkt. 2108.  Judge Kaplan directed the parties to confer and agree by October 26, 2018—if possible—on a third party who could take custody of Donziger's devices for imaging.  Id.  Judge Kaplan also ruled that Donziger's failure to comply with Fed. R. Civ. P. 26(b)(5) and S.D.N.Y. Civ. R. 26.2 resulted in a waiver or forfeiture of any privilege claim to responsive documents and information that otherwise might have applied,[3] and further directed Donziger to "comply fully with the outstanding discovery requests forthwith without withholding any responsive documents or information on privilege grounds."  Id.  Judge Kaplan

---

[3]     In finding the privilege waiver, Judge Kaplan specifically noted: (1) Donziger had previously ignored those rules in the Chevron litigation, resulting in a privilege waiver; and (2) Donziger still failed to comply with those rules after being put on notice as of August 16 that Chevron was asserting that his failure to provide a log should result in a waiver. Id.; see In re Chevron Corp., 749 F. Supp. 2d 170 (S.D.N.Y. 2010), aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp., 409 Fed. App'x 393 (2d Cir. 2010).

noted that his order directing Donziger to respond to certain of Chevron's discovery requests by August 15, 2018 "remains in effect and has not been stayed."  Id.

On October 25, 2018, Donziger informed Judge Kaplan that he would not comply with the October 18 order requiring production of responsive documents, and invited Judge Kaplan to hold him in contempt.  Civ. Dkt. 2118.  Donziger did not challenge Judge Kaplan's October 18, 2018 order on appeal, nor did he seek a stay with the Circuit.

### 1.      The March 5, 2019 Forensic Inspection Protocol Order

After a conference with the parties and briefing, on March 5, 2019 Judge Kaplan issued a "Forensic Inspection Protocol" Order ("Protocol") to govern the collection, imaging and examination of Donziger's electronically stored information ("ESI").  Civ. Dkt. 2172.  In his Opinion explaining the need for the Protocol, Judge Kaplan observed: (1) "the imaging and examination of Donziger's electronic devices has been necessitated only by his obdurate refusal to make any serious, good faith effort to produce the documents he has been ordered to produce;" and (2) Donziger's opposition to Chevron's motion to compel "did not deny Chevron's assertions regarding his non-compliance."  Civ. Dkt. 2171 at 2-3.  Judge Kaplan also described a prior instance in the Chevron litigation in which Judge Kaplan directed forensic imaging and examination of Donziger's hard drives because of questions concerning Donziger's compliance with a subpoena and indications Donziger erased or withheld records.  Id. at 6-8. That prior court-ordered forensic imaging revealed: (1) Donziger's hard drives contained more than 151,000 documents containing the prescribed search terms in addition to the 90,000 documents Donziger had claimed were the products of his search using those same terms; and (2) a significant number of those additional documents should have been produced earlier.  Id. at 8.  Because of that history and Donziger's "refusal to make any good faith effort to comply with this Court's orders to produce documents in this post-judgment proceeding," Judge Kaplan

deemed outside examination of Donziger's ESI a reasonable, "and perhaps the only, way to obtain compliance without imposing sanctions that would be far more onerous." Id. at 8.

The Protocol, at paragraph four, directed Donziger to provide by March 8, 2019 to a court-appointed Neutral Forensic Expert a sworn list of all devices Donziger "has used to access or store information or for communication since March 4, 2012." Civ. Dkt. 2172 ¶ 4. The Protocol, at paragraph five, directed Donziger to surrender to the Neutral Forensic Expert on March 18, 2019 at 12:00 p.m. all of his devices so that the Neutral Forensic Expert could image them. Id. ¶ 5. The rest of the Protocol laid out the procedures for the examination of the device images for responsive documents.

Donziger did not comply with the directives of paragraphs four and five of the Protocol. Donziger made clear in a March 11, 2019 email to the Neutral Forensic Expert that he had no intention of complying with the Protocol: "I will voluntarily go into civil contempt of the legally unfounded orders in order to obtain proper appellate review. . . So I hope you have not cleared your schedule to work on this matter, because, as Chevron knows, I will not be producing documents until my due process rights are respected." Civ. Dkt. 2173-1.

## C.    Civil Contempt and Violations of Court Orders

During post-judgment discovery, Chevron developed evidence—primarily through discovery from third parties because of Donziger's stonewalling in producing information— that Donziger had been selling interests in and profiting from the Ecuadorian judgment in violation of the RICO Judgment.  In particular, records and testimony established that Donziger raised at least $2.3 million from January 2016 through the beginning of 2018 by selling interests in the RICO Judgment.  Dkt. 2209 at 29-30.  About $1.25 million of those investor/client-owned funds was deposited into Donziger's business and personal bank accounts. Id. at 28-31, 34, 53, 56.  Of that money, Donziger paid out: $347,000 to his wife; $83,368 to

payments on his home mortgage; $163,831.73 to pay his American Express bills; and $72,276.12 to pay his TD Bank credit card bills.  Id. at 30-31.  Notably, Chevron served a restraining notice on Donziger on April 16, 2018 in an effort to collect on the Money Judgment.  Id. at 31-32.  The N.Y. C.P.L.R. § 5222 restraining notice prohibited Donziger from assigning or transferring any property in which he has an interest until the Money Judgment is paid.  Thereafter, despite the notice and in violation of it, Donziger made numerous transfers of money in violation of the restraining notice.  Id. at 33-34, 61, 66.  In addition, soon after receiving the restraining notice, Donziger transferred funds to his wife by endorsing checks to her to presumably avoid discovery of those transfers by keeping them out of his bank accounts.  Id. at 34.

Chevron moved to hold Donziger in contempt for violating the provisions of the RICO Judgment, violating the April 16, 2018 restraining notice, and failing to comply with the Protocol.  See Civ. Dkt. 1968, 2089, 2112, 2175, 2179.  On May 23, 2019, Judge Kaplan found Donziger in civil contempt for: (1) Donziger's failure to comply with paragraph four of the March 5, 2019 Protocol; (2) Donziger's violation of paragraph one of the RICO Judgment requiring him to transfer to Chevron any property received by him traceable to the Ecuador judgment; (3) Donziger's violation of paragraph five of the RICO Judgment prohibiting him from undertaking acts to profit from the Ecuadorian judgment; and (4) Donziger's violation of the April 16, 2018 restraining notice.  Civ. Dkt. 2209.

With respect to the civil contempt finding for disobeying paragraph one of the RICO Judgment, that finding was based upon, among other things, Donziger's failure to transfer his rights to a 6.3% contingent fee interest in the Ecuadorian judgment under a November 2017

9

retainer agreement.  Judge Kaplan imposed coercive fines until Donziger purged himself of that contempt.[4]  Civ. Dkt. 2209 at 36-40, 69.

With respect to the civil contempt findings regarding Donziger undertaking acts to profit from the Ecuadorian judgment, those findings were based upon, among other things, Donziger's December 2016 conduct in pledging to executive coach David Zelman an interest in personal fees Donziger might collect from the judgment based on Donziger's contingency fee arrangement in exchange for Zelman providing personal services to Donziger.[5]  Civ. Dkt. 2209 18-19, 70.

Donziger filed a notice of appeal of the May 23 decision holding him in contempt. Dkt. 2211.  On June 4, 2019, Judge Kaplan found Donziger in civil contempt for his failure to comply with paragraph five of the Protocol.  Dkt. 2222.  Donziger did not file a notice of appeal of this contempt finding.

---

[4]     In finding Donziger in civil contempt for his failing to transfer his rights to this 2017 Retainer agreement, Judge Kaplan specifically noted that Donziger had been previously ordered to assign his rights under a prior 2011 Retainer Agreement granting him a 6.3% interest in the Ecuadorian judgment, an order "with which [Donziger] grudgingly complied, albeit only years after compliance was required."  Civ. Dkt. 2209 at 40.  Specifically, the RICO Judgment directed Donziger to transfer his right to any contingent fee interest traceable to the Ecuadorian judgment, including his 2011 Retainer agreement.  Only years later, in September 2018, after motion practice and another court directive to assign that interest, did Donziger assign that 2011 interest as directed.  See Civ. Dkt. 2209, 2046, 2047, 2075, 2076, 2072.

Against this background, Donziger's failure to also promptly transfer his interest in his new 2017 Retainer agreement—which was discovered during the post-judgment discovery— was contumacious, and Chevron moved in October 2018 to hold Donziger in contempt for his failure to transfer his right to that new agreement. Civ. Dkt. 2089.  Thus, Count Four of the OTSC is based on Donziger's disobedience in failing to transfer the 2011 agreement as directed by the RICO Judgment, and Count Five of the OTSC is based on his further disobedience in failing to transfer the new 2017 agreement as required by the RICO Judgment.

[5]     Donziger's conduct in pledging part of his contingency fee interest to David Zelman forms the basis of Count Six of the OTSC.

With respect to Donziger's failure to comply with the Protocol, Judge Kaplan imposed escalating coercive fines.  <u>See</u> Civ. Dkt. 2209, 2222.  At a June 10, 2019 status conference, Donziger stated that all of his assets were frozen and he lacked the means to pay any of the fines. <u>See</u> Civ. Dkt. 2232.  While conceding that he had not complied with paragraph five of the Protocol, Donziger indicated he took steps to bring himself into compliance with paragraph four.  However, Donziger declined to take the witness stand to substantiate his claims of compliance. <u>See</u> Civ. Dkt. 2352.

On June 11, 2019, Judge Kaplan issued an Order directing Donziger to surrender all of his passports to the Clerk of the Court by June 12, 2019 at 4 p.m., as an additional coercive step to cause Donziger to fully comply with the Protocol.  Civ. Dkt. 2232.  On June 12, 2019, Donziger filed with the District Court an "Emergency Motion to Stay Fines and Sanctions Pending Appeal."  Civ. Dkt. 2234.

On June 28, 2019, Judge Kaplan suspended further accumulation of the coercive fines for Donziger's failure to comply with the Protocol.  <u>See</u> Dkt. 2252.  On July 2, 2019, Judge Kaplan granted Donziger's emergency motion for a stay pending appeal of the specific provisions of the Protocol that required or permitted disclosure to Chevron of information obtained from Donziger.  Dkt. 2254.  However, Judge Kaplan specifically conditioned that stay on Donziger filing his appellate brief to support his appeal from the May 23 contempt findings no later than July 31, 2019.  <u>Id.</u>  Judge Kaplan denied the stay with respect to paragraphs four and five of the Protocol, and expressly directed Donziger to comply with those Protocol provisions and to "surrender his passport(s) to the Clerk as previously directed."  <u>Id.</u>

Donziger did not file his appellate brief by July 31, did not produce his devices to the Neutral Forensic Expert for imaging, and did not surrender any passport to the Clerk of the

Court as directed.  Donziger also did not seek a stay from the Second Circuit at any point during the post-judgment proceedings described above.  When Donziger finally did file his appellate brief from the civil contempt findings on September 9, 2019, Donziger did not challenge Judge Kaplan's civil contempt findings stemming from his violations of paragraphs four and five of the Protocol.  See 2d Cir. No. 19-1584, Dkt. 48.

On July 31, 2019, Judge Kaplan ordered Donziger to show cause why he should not be held in criminal contempt, in violation of 18 U.S.C. § 403(1), citing six separate counts. Counts One through Three are based on Donziger's conduct in violating orders during post-judgment discovery: (1) from March 8, 2019 through May 28, 2019, failing to provide a list of his electronic devices, messaging accounts and document management accounts as directed by paragraph four of the Protocol; (2) from March 18, 2019 through at least May 28, 2019, failing to surrender his electronic devices for imaging as directed by paragraph five of the Protocol; and (3) from June 12, 2019 through at least July 31, 2019, failing to surrender his passports as directed by the June 11, 2019 order.

Counts Four and Five are based on Donziger's disobedience of paragraph one of the RICO Judgment: (4) from March 4, 2014 through September 3, 2018, Donziger's failure and refusal to assign to Chevron his right under a 2011 Retainer Agreement to a 6.3% contingent fee interest in the Ecuadorian judgment; and (5) from November 1, 2017 through May 27, 2019, Donziger's failure and refusal to assign to Chevron his right under a 2017 Retainer Agreement to a 6.3% contingent fee interest in Ecuadorian judgment.

Count Six is based on Donziger's disobedience of paragraph five of the RICO Judgment by, on December 23, 2016, pledging a portion of his contingent fee interest in the Ecuadorian judgment in exchange for personal services.

## ARGUMENT

## I.    THE JUDICIAL DISQUALIFICATION MOTIONS

### A.    Defendant's Motion to Disqualify the Entire S.D.N.Y. Bench Should be Denied

The defendant requests that a "randomly-selected Judge from outside the District, unacquainted with Judge Kaplan," preside over this criminal case and that no S.D.N.Y. judge rule on pretrial motions.  Dkt. 60 at 14-15.  The defense cites to 28 U.S.C. § 455(a), arguing that a reasonable person, knowing all the facts, would conclude that the impartiality of this District's entire bench "might be reasonably questioned" in this criminal contempt case.  Id.  The defense bases for this sweeping disqualification are: Judge Kaplan's alleged "demonstrable bias" against the defendant; a claim that Judge Kaplan is "so associated" with the Civil Case that a courtroom sketch from that case hangs in the lobby of the courthouse; and the manner by which Judge Kaplan instituted this criminal contempt proceeding.  Id. at 8-15.

The defense motion is meritless and must be denied for the reasons set forth below.

### 1.    Applicable Law

Section 455(a) provides that judges "shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned."  28 U.S.C. § 455(a).

In deciding a recusal motion, the Second Circuit has stated the following questions should be asked:

> Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could be reasonably questioned?  Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?

United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992) (internal citation omitted).  As the

Circuit has explained: "In deciding whether to recuse himself, the trial judge must carefully

weigh the policy of promoting public confidence in the judiciary against the possibility that those

questioning his impartiality might be seeking to avoid the adverse consequences of his presiding

over the case.  Litigants are entitled to an unbiased judge; not to a judge of their choosing."  In

Re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1312 (2d Cir. 1988).

   "[R]ecusal motions are committed to the sound discretion of the district court."

Lovaglia, 954 F.2d at 815.

### 2.    Argument

   An objective observer, fully informed of the underlying facts, would not

"entertain significant doubt that justice would be done" absent disqualification of the entire

S.D.N.Y. bench.  See Lovaglia, 954 F.2d at 815.

   The defendant proffers no specific facts upon which the impartiality of every

S.D.N.Y. judge might reasonably be questioned.  The defense argument is based on the

erroneous premise that an objective observer would question the impartiality of every S.D.N.Y.

judge because of some perceived loyalty to a fellow judge and colleague.  Even assuming

arguendo that Judge Kaplan is "so associated" with the Civil Case and/or had some inappropriate

bias against the defendant—and the record is clear that the Judge does not—that would not

warrant disqualification of every S.D.N.Y. judge in this criminal contempt case.   As Chief Judge

Thomas C. Platt determined when denying a similar motion to disqualify the entire E.D.N.Y.

bench in a high-profile criminal contempt case:

> [T]he reasonable person would [] know that the decision as to
> whether this Court should recuse itself is based upon whether there
> is a factual basis to support recusal and a reasonable basis to doubt
> this Court's impartiality, and is not based on "rumors, innuendos,
> and erroneous information published as fact in newspapers". . .

> [T]he reasonable person would know that one of the most important rules of judging is that all cases are decided based upon an application of the relevant law to the facts and that the identities of the parties must not be taken into consideration.

United States v. Cutler, 796 F. Supp. 710, 714 (E.D.N.Y. 1992).  The same is true here.  Indeed,

> All judges, whether trial or appellate, are called upon on an almost daily basis to review the decisions of other judges regardless of whether they sit on the same or another court; it is a routine part of their work and friendship or collegiality plays no part in their decisions.

Id. at 714.  Notably, in criminal contempt proceedings, the district judge whose order was disobeyed often presides over the criminal contempt proceeding stemming from that disobedience.  See, e.g., Nilva v. United States, 352 U.S. 385, 395-96 (1957); United States v. Crawford, 329 F.3d 131, 133 (2d. Cir. 2003); Rojas v. United States, 55 F.3d 61, 63 (2d Cir. 1995); United States v. Terry, 17 F.3d 575 (2d Cir.), cert. denied, 513 U.S. 946 (1994); United States v. Agajanian, 852 F.2d 56, 57 (2d Cir. 1988);  United States v. Weslin, 204 F. Supp. 2d 547 (W.D.N.Y. 2001), aff'd, 34 F.App'x 815 (2d Cir. 2002); Goldfine v. United States, 268 F.2d 941, 947 (1st Cir. 1959) (noting that judges "routine[ly]" oversee criminal contempt trials for disobedience of their own orders).

As for the defendant's claims about a "demonstrable bias" by Judge Kaplan, the defense relies primarily on events that occurred in 2010 and 2011, prior to the trial in the Civil Case, and which were previously raised in an unsuccessful recusal motion.  Specifically, all of the transcript quotes attributed to Judge Kaplan in the defense brief at pages 12-13 *were also cited in an April 20, 2011 recusal motion that Judge Kaplan denied and for which the Second Circuit denied mandamus.*  See Civ. Dkt. 285 at 2-5, 17-18; 2d Cir. Case No. 11-2259, Dkt. 75.  The defendant's "bias" complaint is nothing more than (1) recycled recusal arguments previously rejected by the District Court and the Circuit, and (2) unhappiness with Judge Kaplan's

decisions.  The Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).  Moreover, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  <u>Id.</u>

   With respect to the defense contention that Judge Kaplan is "so associated" with the "long-running and contentious" Civil Case that his photograph appears in the courthouse lobby under a courtroom sketch from the Civil Case with a description of his judicial findings, that does not support disqualification of the entire S.D.N.Y. bench.  The lobby contains dozens of other similar displays from other S.D.N.Y. cases.  An objective observer knowing all the facts would not question the entire S.D.N.Y. bench's impartiality in this criminal contempt case based on those displays.  Similarly, the opinion pieces published about the Civil Case and this criminal contempt case cited by the defense (Dkt. 60 at 13-14) have no bearing on this disqualification issue.  <u>See</u> <u>Cheney v. United States Dist. For D.C.</u> 541 U.S. 913, 924 (2004) (J. Scalia) ("largely inaccurate and uniformed opinion cannot determine the recusal question . . . [T]he recusal inquiry must be made from the perspective of a <u>reasonable</u> observer who is <u>informed of all the surrounding facts and circumstances</u>." (citations omitted and emphasis in original)).  Judges could otherwise be disqualified by determined litigants who wage public relations campaigns and lobby for opinion pieces.  <u>See</u> Linda Greenhouse, <u>Recuse Me</u>, N.Y. Times (May 4, 2011) ("The

effort to force or shame off a case a judge . . . is becoming the latest weapon in a litigator's arsenal—litigation by other means").[6]

As for the defense assertion of bias because of the "nature and timing" of the criminal contempt charges and the "fact and manner" of Judge Kaplan's "implementation of Rule 42," Dkt. 60 at 13, the reality is that Judge Kaplan instituted the criminal contempt proceeding after exhausting other options and then followed Fed. R. Crim. P. 42 in the usual course. Specifically, in April 2018, Donziger was served with post-judgment discovery requests and then stymied discovery for more than a year by disobeying court orders that were not stayed and for which Donziger sought no relief from the Second Circuit. See Dkt. 40 at 3-4; Civ. Dkt. 2088, 2108. In May of 2019, Judge Kaplan found Donziger in civil contempt and instituted coercive fines to induce compliance with the discovery orders. Civ. Dkt. 2209. After the coercive fines did not induce compliance, Judge Kaplan imposed an additional coercive sanction, i.e., a June 11, 2019 order to surrender his passports. Civ. Dkt. 2232. Donziger did not comply with that order. On July 31, 2019, after the defendant remained in disobedience of court orders that he did not appeal and were not stayed, Judge Kaplan instituted criminal contempt proceedings on notice as required by Fed. R. Crim. P. 42. Civ. Dkt. 2276. The fact that the U.S.

---

[6] The defense asserts, for example, that only "[t]hree fact-finders have reviewed circumstances relevant to this case at fact-finding trials or hearings," Dkt. 60 at 8 (emphasis added) and suggests that Judge Kaplan must harbor bias towards the defendant because he issued a decision including hundreds of pages of factual findings resulting in entry of the RICO Judgment against Donziger in the Civil Case, although the courts of Ecuador did not do so, and because Referee Horan declined to recommend Donziger's permanent disbarment. See id. The defense's carefully-phrased construction notably excludes that Judge Kaplan's decision was affirmed by the Second Circuit and appears to ignore at least one fact-finding body – the arbitral tribunal in The Hague – that the defendant previously touted as having taken "thorough and extensive testimony" on "a much more developed record" than the RICO trial before Judge Kaplan. See Dkt. 35 at 2, n.3 (noting that panel "ultimately made findings consistent with Judge Kaplan's findings of fraud and corruption" after which the defendant attacked that proceeding and its extensive findings).

Attorney's Office declined to handle this contempt prosecution "on the ground that the matter would require resources that we do not readily have available" is of no moment, because Rule 42(a)(2) explicitly requires the appointment of another attorney if the government declines.  Fed. R. Crim. P. 42(a)(2) ("If the government declines the request, the court must appoint another attorney to prosecute the contempt.").  Nothing about the manner in which this criminal contempt proceeding was instituted was improper or unusual.

   An objective observer knowing all of the facts and circumstances would not reasonably question the impartiality of the entire S.D.N.Y. bench.  The disqualification motion must be denied.[7]

  **B.**  **There is No Basis for the Court to Disqualify Itself**

   The defendant then argues that this Court should disqualify itself because Judge Kaplan, by initiating this criminal contempt case and then opting not to preside over it, "disqualified" himself from this case and therefore was "disqualified" from any role in having this case assigned this Court.  Dkt. 60 at 4-5, 14-15.

---

[7]  In his motion to disqualify the entire S.D.N.Y. bench, the defendant alternatively moved pursuant to Fed. R. Crim. P. 21(a) for a transfer of venue outside this Circuit.  Rule 21(a) provides that upon a defense motion, "court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Rule 21(a) contemplates prejudice in terms of a defendant's right a fair and impartial jury in the face of pretrial publicity or other extrajudicial influences.  See, e.g., Skilling v. United States, 561 U.S. 358, 377-85 (2010); United States v. McVeigh, 153 F.3d 1166, 1181-83 (10th Cir. 1998).  That is not what the defendant argues here.  The defendant asserts that no S.D.N.Y. judge should preside over this case because of an appearance of impartiality.  Dkt. 60 at 14 (citing § 455(a)).  Given that there is no basis to disqualify the S.D.N.Y. bench under § 455(a) for the reasons set forth supra, and the defendant makes no argument that he could not get a fair and impartial jury if there is a jury trial in this District, the motion for a change of venue under Rule 21(a) should be denied.

This defense argument is meritless because Judge Kaplan did not disqualify himself from this criminal contempt case by invoking Rule 42 and transferring the matter to this Court.  See 2d Cir. No. 20-464, Dkt. 28 at 18, n.4, 41-51 (J. Kaplan, Response to Petition for a Writ of Mandamus); Civ. Dkt. 2464 (J. Kaplan Mem. Op. on Recusal).  Judge Kaplan, consistent with other criminal contempt cases, could have properly presided over the criminal contempt case that he instituted.  See, e.g., United States v. Terry, 802 F. Supp. 1094, 1096-1100 (S.D.N.Y. 1992); Rojas v. United States, 55 F.3d 61, 63 (2d Cir. 1995); Goldfine, 268 F.2d at 947 (1st Cir. 1959) (judges "routine[ly]" oversee criminal contempt trials for disobedience of their own orders).  But here, Judge Kaplan transferred the case to this Court in accordance with Rule 14 of Southern District Rules for the Division of Business Among District Judges ("RDB").  See 2d Cir. No. 20-464, Dkt. 28 at 46.  Rule 14 provides: "Any judge, upon written advice to the assignment committee, may transfer directly any case or any part of any case on that judge's docket to any consenting judge."  There was no disqualification.

The defense contention that Judge Kaplan "arranged for a colleague to preside in lieu of the District's usual protocols for judicial assignment" (Dkt. 60 at 7) is also meritless.  There are no "usual protocols" in the Southern District for the assignment of criminal contempt cases initiated by notice pursuant to Fed. R. Crim. P. 42.  Further, to the extent the defense is relying upon the RDB for this argument, the RDB do not vest rights in litigants.  See S.D.N.Y. Loc. R. at 104 ("[the RDB] are adopted for the internal management of the case load of the court and shall not be deemed to vest any rights in litigants").  Nonetheless, Judge Kaplan complied with the RDB.

Finally, the defense suggestion that Judge Kaplan would be a witness at the criminal contempt trial is incorrect.  The charged criminal contempt occurred outside the

presence of the Court.  The Government is not calling Judge Kaplan as a witness, and the

defendant cites no instance in which a judge testified as a witness in a criminal contempt trial

where the charged conduct occurred outside the presence of the court.[8]

### C.    A Defendant Charged with Criminal Contempt Is Only Entitled to A Jury Trial If the Punishment to Be Imposed Exceeds 6 Months' Imprisonment

The defendant argues that, if a judge from this District presides over this case, he

should receive a jury trial because of the "atypical history of this case" and "as a protection

against the arbitrary exercise of official power."  Dkt. 60 at 16-17.  Given that there is no basis

for disqualification of this Court—let alone the entire S.D.N.Y. bench—this criminal contempt

case should proceed in the normal course.  That means, if this Court were to determine before

trial that it would not impose a sentence greater than six months' imprisonment or a $5,000 fine

upon conviction, the Court may proceed with a bench trial.

The defense does not challenge the well-established rule that a defendant charged

with criminal contempt in violation of 18 U.S.C. § 401 is not entitled to a jury trial if the

punishment to be imposed does not exceed six months' imprisonment or a $5,000 fine.  Lewis v.

United States, 518 U.S. 322, 327 (1996); United States v. Twentieth Century Fox Film Corp.,

882 F.2d 656, 658, 661-663, 666 (2d Cir. 1989); United States v. Agajanian, 852 F.2d 56, 58 (2d

Cir. 1988); In re Pollack, 2008 U.S. Dist. LEXIS 73047, *3 (E.D.N.Y. 2008).  See also United

States v. Weslin, 204 F. Supp. 2d 547 (W.D.N.Y. 2001), aff'd, 34 F.App'x 815 (2d Cir. 2002)

---

[8]      The defendant also seeks disclosure from the Court about how this criminal contempt case was transferred to this Court and "what information was relayed in doing so to enable the defendant to marshal arguments in favor of disqualification."  Given that (1) Judge Kaplan's March 11, 2020 "Response To Petition For a Writ of Mandamus" addresses the manner of transfer, and (2) there is no basis for this Court to disqualify itself under 28 U.S.C. § 455(a), the defense disclosure request must be denied.

(bench trial); United States v. Cutler, 58 F.3d 825 (2d Cir. 1995) (bench trial); United States v. Lynch, 162 F.3d 732 (2d Cir. 1998) (bench trial); In re de Kleinman, 923 F. Supp. 24 (S.D.N.Y. 1996) (bench trial).

Further, as discussed supra at Section I. A. 2., the district judge whose order was disobeyed routinely presides over the criminal contempt proceeding stemming from that disobedience.  That would not be the case here.  But the very fact that it is often the same judge goes to a core principle of judging cited by Chief Judge Platt in United States v. Cutler, that "all cases are decided based upon an application of the relevant law to the facts and that the identities of the parties must not be taken into consideration."  Cutler, 796 F. Supp. at 714; see Williams v. Illinois, 567 U.S. 50, 69-70 (2012) ("[I]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions…there is a well-established presumption that the judge has adhered to basic rules of procedure when the judge is acting as a factfinder.") (quotations and citations omitted); United States v. Zuber, 118 F.3d 101, 104 (2d Cir. 1997) ("We traditionally assume that judges, unlike juries, are not prejudiced by impermissible factors").  Indeed, in United States v. Terry, Judge Ward convicted the defendant on one count of criminal contempt and acquitted the defendant on the second count.  United States v. Terry, 815 F. Supp. 728, 729 (S.D.N.Y. 1993), aff'd 17 F.3d 575 (2d Cir. 1994), cert. denied, 513 U.S. 946 (1994).

Nothing about the history of the Civil Case—whether it be "atypical" or not— warrants treating this defendant differently than anyone else charged with criminal contempt in a proceeding properly brought under Rule 42.

21

## II.     THE MOTION TO DISQUALIFY THE SPECIAL PROSECUTORS SHOULD BE DENIED

The defendant moves to disqualify the Special Prosecutors, contending that Seward & Kissel LLP ("Seward") clients in the shipping industry do business with and therefore have "ties" to Chevron, or, as previously argued to this Court, one current and one former member of Chevron's Board of Directors work at asset management firm Oaktree Capital Management ("Oaktree"), and that Oaktree has made investments in Seward clients.  See id. at 18-21.

The defendant also offers the report of Professor Ellen Yaroshefsky, who relies on an unsourced press report that Donziger is the "Scourge of Big Oil,"[9] and contends that Seward's representation of clients in the shipping industry, whose business includes the purchase or transport of oil or gas, somehow make the Special Prosecutors "far from disinterested." Dkt. 60-2 at ¶ 50.  Professor Yaroshefsky acknowledges that Vuitton "concerned a lawyer with a direct interest in the outcome" of the underlying civil case, but nonetheless sweepingly asserts that "the entire [Seward] firm should be disqualified because of its financial interests in Chevron-related work."  Id. at ¶¶ 43, 58 (citing Young v. United States ex rel. Vuitton Et Fils S. A., 481 U.S. 787, (1987)).

The defense motion is meritless.

---

[9]     Both the defense brief and the Yaroshefsky Declaration place much weight on an unsourced press report describing Donziger as the "Scourge of Big Oil" Dkt. 60 at 21; Dkt. 60-2 ¶¶ 32, 49.  That unsourced press report was an October 2019 opinion piece in The National Review, and it is a satirical reference to Mr. Donziger and what that commentator perceived to be Donziger's inflated sense of self-importance.  Jack Fowler, Steven Donziger and the Plot against Chevron, National Review (October 10, 2019) (available at https://www.nationalreview.com/magazine/2019/10/28/steven-donziger-and-the-plot-against-chevron/).

A.      **Applicable Law**

"The initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function." Vuitton, 481 U.S. at 795; see also Michaelson v. United States, 266 U.S. 42 (1924) ("the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice."). In Vuitton, the Supreme Court held that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." Id. at 809. "Vuitton focused on the danger of entrusting the coercive powers of the state to counsel for a private litigant, and held that counsel for a party that is the beneficiary of a court order may not be appointed as a prosecutor in a contempt action alleging violation of that order." United States v. Terry, 17 F.3d 575, 577 (2d Cir. 1994).

Because "[t]he prosecutor is appointed solely to pursue the public interest in vindication of the court's authority," the Supreme Court in Vuitton counseled that "[a] private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution" and that, aside from "any concern for the standards to which prosecutors are held, the attorney for an interested party who prosecutes a contempt action must reckon with the proscriptions on conflicts of interest applicable to all lawyers." Vuitton, 481 U.S. at 804 and n.15.

B.      **There is No Vuitton Issue**

Neither the Special Prosecutors nor Seward represented Chevron in the Civil Case, and neither the Special Prosecutors nor Seward have a current attorney-client relationship with Chevron. No more is necessary to conclude that the standards set forth in Vuitton have been satisfied.

23

For the avoidance of doubt, the facts set forth in the accompanying declaration of Seward's co-General Counsel (Exhibit A) confirm that there is no disqualifying interest that might preclude the appointment of the Special Prosecutors.  Exhibit A sets forth that prior to the July 31, 2019 appointment:

- The conflict checks conducted by the Firm included:

  - running the term "Chevron" through the Firm's conflicts database,

  - sending an email to all partners, and

  - follow-up discussions with various partners (the "Conflict Check").

- The Conflict Check found that:

  - The Special Prosecutors have not appeared or acted for or on behalf of Chevron;

  - The Firm did not have a current attorney-client relationship with Chevron;

  - The Firm did not have a financial stake in the outcome of this criminal contempt case;

  - The Firm did not have a financial stake in the outcome of the underlying civil proceeding, <u>Chevron Corp v. Donziger</u> (No 11 Civ. 691).

Exhibit A at ¶¶ 3-4.

The only work that Seward performed for Chevron in the last 10 years was corporate work involving the preparation of corporate forms and issuance of related legal opinions for two Chevron foreign affiliates. <u>Id.</u> at ¶ 4(g)-(i).  The work took place in late 2016 and in early 2018, concluding in March 2018.  The total fees and disbursements relating to that work was $30,403.73.  Given that the Special Prosecutors were not involved in that work, the fees generated from that work were an immaterial portion of Seward's revenues, and Seward has no current attorney-client relationship with Chevron, <u>id</u>. at 4(e)-(i), the <u>Vuitton</u> "disinterested" standard is met.

This is not a criminal contempt case where the appointed "prosecutors will be subject to extraneous influence" or where "the ethics of the legal profession require that an interest other than the Government's be taken into account."  Vuitton, 481 U.S. at 808.

C.    **The Collateral Arguments for Disqualification are Meritless**

The defendant presents several additional arguments for disqualification, which are similarly unavailing.

First, the defendant claims that because Seward clients receive income from Chevron and/or have business transactions with Chevron, that creates some disqualifying interest for Special Prosecutors.  Those purported client "ties" to Chevron have nothing to do with the concerns identified in Vuitton regarding an attorney serving "two masters" in a criminal contempt proceeding.  Vuitton, 481 U.S. at 814.  Even if the outcome of the Donziger prosecution had some material impact on a Seward client that has a relationship with Chevron, Vuitton is not implicated.  In any event, it is hard to fathom how any impact might occur in a manner that would impact the Special Prosecutors in this case.  The "ties" the defendant refers to are speculative, attenuated, and irrelevant to this criminal contempt case.

Second, the defendant argues that because Seward clients receive funding from an entity (Oaktree), whose Vice Chairman happens to be on the Chevron Board of Directors and a director of which is one of Chevron's largest shareholders, the Special Prosecutors have conflict precluding them from prosecuting this criminal contempt case.  As the Court already determined when this issue was raised in January, this "tie" is too attenuated.  Jan. 6, 2020 Tr. at 18.  Once again, even if the outcome of the Donziger prosecution had some material impact on a Seward client that receives funding from Oaktree, Vuitton is not implicated.  In any event, it is hard to fathom how any impact might occur in a manner that would impact the Special Prosecutors in this case.

25

The speculation that Seward's interests are in some way "aligned" with Chevron does not address, or even call into any serious question, whether the Special Prosecutors appointed in this case have any disqualifying interest that would make them "interested" in the outcome of this criminal contempt case. <u>Vuitton</u>, 481 U.S. at 809-810; <u>see also</u> <u>Wright v. United States</u>, 732 F.2d 1048, 1056 n.7 (2d Cir. 1984) (suggesting that disinterestedness should focus on whether there is an alleged "additional and impermissible reason in forwarding the prosecution."). It is not grounds for disqualification to be "interested" in achieving a just result on behalf of the United States. <u>Wright</u>, 732 F.2d at 1056 ("Of course, a prosecutor need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged. If honestly convinced of the defendant's guilt, the prosecutor is free, indeed obliged, to be deeply interested in urging that view by any fair means.").

Third, the defendant cites to the broad "disinterested person" definition in the U.S. Bankruptcy Code—which governs how to distribute estates that involve a debtor and perhaps hundreds of interested claimants—to argue that this "disinterested" standard should somehow apply to the appointment of a prosecutor in the criminal contempt context. Dkt. 60-2 ¶ 41, 57. But nowhere does the defense point to a criminal case where this bankruptcy concept has ever been applied to a prosecutor in a criminal case. Regarding the "requirement of a disinterested prosecutor," the <u>Vuitton</u> Court stated, "prosecutors may not necessarily be held to as stringent a standard of disinterest as judges . . . We have thus declined to find a conflict of interest in situations where the potential for a conflict on the part of a judge might have been intolerable." <u>Vuitton</u>, 481 U.S. at 807.

Finally, as for the defense's suggestion of an alleged "appearance of impropriety" based on "indirect interests that may undermine the public's confidence in the integrity of the

profession," Dkt. 60-2 ¶ 43, the defendant points to nothing but attenuated and speculative interests that do not create any disqualifying "appearance of impropriety" for the Special Prosecutors to prosecute this criminal contempt case on behalf of the United States.

## III.   THE MOTION TO DISMISS THE CRIMINAL CONTEMPT CHARGES SHOULD BE DENIED

### A.   The Defendant's Intent is a Question for the Trier of Fact

The defendant seeks dismissal of the criminal contempt charges by arguing his conduct was "not 'willful' and does not constitute reckless disregard of Judge Kaplan's orders." Dkt. 60 at 25.  Specifically, the defendant contends that his conduct was "consistent with the conduct of attorney McConnell whose criminal contempt conviction was reversed" Dkt. 60 at 25 (citing In re McConnell, 370 U.S. 230, 236 (1962)), and that "the facts of this case thus stand in contrast to the usual circumstances in which criminal punishments have been imposed." Id. at 26.  The defendant's motion to dismiss is meritless and should be denied.

#### 1.   Applicable Law

The criminal contempt statute provides, in pertinent part, that "a court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as… [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."  18 § U.S.C. 401(3).  To establish criminal contempt, the following elements must be proven: (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) the defendant acted willfully and knowingly in violating that order.  Cutler, 58 F.3d at 834 (2d Cir. 1995).  Criminal contempt "requires a specific intent to consciously disregard an order of the court."  Cutler, 58 F.3d at 837 (2d Cir. 1995) (quoting United States v. Berardelli, 565 F.2d 24, 30 (2d Cir. 1977)).

27

Where intent of the accused is an element of the crime, its existence is a question of fact to be resolved by the trier of fact.  United States v. Sampson, 898 F.3d 270, 281 (2d Cir. 2018) (citing Morissette v. United States, 342 U.S. 246, 274 (1952); United States v. Speare, 297 F. 2d 408, 410 (2d Cir. 1962).  Similarly, whether an order is reasonably specific is also a question of fact, resolved according to a reasonableness standard, in the context in which it was entered and the audience to which it was addressed.  United States v. Cutler, 815 F. Supp. 599, 607 (E.D.N.Y. 1993) (citing United States v. Turner, 812 F.2d 1552, 1565 (11th Cir. 1987).

### 2.    Argument

Whether the defendant's conduct was "willful" in disobeying court orders is a question of fact that must be resolved at trial.  See United States v. Sampson, 898 F.3d 270, 281 (2d Cir. 2018); United States v. Speare, 297 F.2d 408, 410 (2d Cir. 1962) ("The question of whether criminal intent is inferable from the facts proved is a question for the jury."); United States v. Sullivan, 98 F.2d 79, 80 (2d Cir. 1938) ("Plainly the issue of criminal intent was for the jury."); United States v. Baldeo, 2013 U.S. Dist. LEXIS 142722, at *5 (S.D.N.Y. Oct. 2, 2013) ("The question of whether [the Defendant] committed the alleged acts with the requisite mental state is for the jury to decide.").  Likewise, to the extent the defendant argues that any of the orders were not reasonably specific or that his conduct "did not…r[u]n afoul" of Judge Kaplan's court orders (Dkt. 60 at 33), that too, is a question of fact that must be resolved at trial. See Cutler, 815 F. Supp. at 610 (E.D.N.Y. 1993) ("Notwithstanding the possibility of such an interpretation, whether these extrajudicial statements really were the result of defendant's willful violation of a clear and definite order is a question of fact that must await a trial on the merits.").

Further, to the extent the defendant relies on McConnell in support of his motion to dismiss, that reliance is unfounded.  McConnell involved an attorney's summary contempt under 18 U.S.C. § 401(1) for obstruction of justice arising from his conduct in the presence of

the court, rather than what is at issue here:  the defendant's out-of-court contempt under § 401(3) for the willful disobedience of court orders.  Thus, the defendant's reliance on the proposition from McConnell—i.e., "the arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of a judicial duty"—has no applicability here.  See United States v. Ogoke, 860 F.3d 924, 930 (7th Cir. 2017) ("[a] violation of § 401(3) requires only willful disobedience of a court order, whereas § 401(1) requires both subjective intent and objective obstruction of justice") (internal citation omitted).

Finally, while the defendant argues that "the facts of this case thus stand in contrast to the usual circumstances in which criminal punishments have been imposed," Dkt. 60 at 26, 18 U.S.C. § 401(3) serves to punish exactly the type of behavior charged here.  See, e.g., United States v. Cutler, 58 F.3d 825 (2d Cir. 1995) (repeated violation of local rule on extrajudicial statements); United States v. Terry, 17 F.3d 575 (2d Cir. 1994) (violation of injunction); United States v. Brennerman, 2017 U.S. Dist. LEXIS 125505 (S.D.N.Y. 2017) (disobedience of orders to comply with discovery requests).

### B.    The Defendant Was Properly Charged with Criminal Contempt

The defendant asserts that his conduct did not warrant criminal contempt and, therefore, the charges should be dismissed.  Specifically, he argues that his conduct was not "a contumacious flouting of the Court's authority," but "persistent, ethically grounded and strenuous advocacy" for Counts One through Three; "benign as to others" for Counts Four and Five; and "too trivial to warrant extreme resort to criminal process, and/or were purged before Judge Kaplan filed [the] charges" for Counts Four through Six. Dkt. 60 at 24.  The defendant claims that resorting to criminal contempt was improper because it was not "the least possible power adequate to the end proposed."  Id. (quoting Vuitton, 481 U.S. at 801).

29

None of these arguments have merit.

## 1.      Applicable Law

Criminal contempt serves to vindicate the authority of the court and to punish "retrospectively for a completed act of disobedience."  See Int'l Union v. Bagwell, 512 U.S. 821, 828-29 (1994) (citing Gompers v. Bucks Stove and Range Co., 221 U.S. 418, 442-43 (1911)); Shillitani v. United States, 384 U.S. 364, 368-70 (1966).  Civil contempt, on the other hand, is remedial rather than punitive, intended to coerce future compliance with a court order.  Id.  A civil contempt contemnor thus "carries the key[] of his prison in his own pocket," while a criminal contempt contemnor has, in effect, thrown away that key.  Id.

"[A] party many not challenge a district court's order by violating it.  Instead, he must move to vacate or modify the order, or seek relief in [the Second Circuit].  If he fails to do either, ignores the order, and is held in contempt, he may not challenge the order unless it was transparently invalid or exceeded the district court's jurisdiction." Cutler, 58 F.3d at 832.  Further, "it is equally well established that an order that is set aside on appeal may give rise to a charge of criminal contempt."  Crawford, 329 F.3d at 138-39 (citing United States v. United Mine Workers, 330 U.S. 258, 294-95 (1947)).  "Consequently, the fact that an order might have been subject to reversal is not a defense to a criminal contempt charge."  Id. (citing Maness v. Meyers, 419 U.S. 449, 458-59 (1975).

## 2.      Argument

Judge Kaplan instituted criminal contempt proceedings only after a finding of civil contempt and imposition of coercive sanctions did not bring about the defendant's compliance with specific orders that were neither stayed nor challenged on appeal.  Thus, in arguing that Judge Kaplan did not use the "least possible power adequate to the end proposed," the defendant ignores critical, undisputed facts:

30

- The defendant did not produce documents as directed by June 15, 2018 and August 15, 2018 (and still has not), and continued to withhold documents on previously rejected First Amendment objections and unspecified privilege assertions.

- The defendant did not provide by March 8, 2019, as directed, a sworn list of all his electronic devices, communication and messaging accounts, and document management services accounts.[10]

- The defendant did not surrender his electronic devices for imaging by March 18, 2019 at 12:00 p.m. as directed (and still has not).

- On March 11, 2019, the defendant stated that he would go into civil contempt rather than comply with the March 5,2019 Protocol order. Civ. Dkt. 2173-1.

- On May 23 and June 4, 2019, Judge Kaplan found the defendant in civil contempt and imposed coercive fines.

- The defendant did not surrender his passport by June 12, 2019 at 4p.m. as directed by the June 11 order, nor at any point thereafter.[11]

- No stay was in effect for any of the above-referenced orders, and the defendant did not challenge any of those orders on appeal.

On July 31, 2019, Judge Kaplan properly commenced this Rule 42 criminal contempt proceeding only after exhausting other civil remedies, thus following the Supreme Court's suggestion in Vuitton that a court consider the imposition of civil contempt before resorting to criminal sanctions.  Id. at 801; see In re Levine, 27 F.3d 594, 595 (D.C. Cir. 1994) ("when the presiding judge makes serious and repeated efforts to require a lawyer to abide by the judge's orders, it is difficult to discern what lesser remedy the judge could reasonably have employed" (internal quotations and citation omitted)).

---

[10]     Subsequent to being found in civil contempt and the imposition of coercive fines, the defendant produced several declarations regarding his electronic devices and accounts, but there has been no determination that Donziger has purged that civil contempt.

[11]     The defendant surrendered his passports to Pretrial Services in August 2019 as a condition of his release in this criminal contempt case.  Dkt. 12.

On Counts One through Three, the defendant's argument that his refusal to comply with court orders was "persistent, ethically grounded and strenuous advocacy" is not a defense.  Under the collateral bar doctrine, "a party may not challenge a court's order by violating it." Crawford, 329 F.3d at 138.  Having failed to seek appellate relief of those orders, the defendant has no "advocacy" defense and is collaterally barred from challenging those orders.

On Counts Four through Six, the defendant's argument that his conduct was "benign" and/or "too trivial" to warrant criminal sanction is meritless.  Criminal contempt involves a "broad range of conduct," and where in that range the defendant's conduct falls is irrelevant for purposes of a motion to dismiss.  United States v. Carpenter, 91 F.3d 1282, 1284 (9th Cir. 1996) ("Criminal contempts. . .include a broad range of conduct, from trivial to severe."); Frank v. United States, 395 U.S. 147, 149 (1969) (failure to establish maximum sentence for contempt may reflect Congress's "recognition of the scope of criminal contempt").

The defendant's claim that he "purged" any contempt on Counts Four through Six prior to the filing of the criminal charges is also not a ground for dismissal.  Criminal contempt serves to punish "retrospectively for a 'completed act of disobedience.'" Int'l Union v. Bagwell, 512 U.S. 821, 828 (1994) ("Punishment for criminal contempt…is punitive and imposed to vindicate the authority of the court…The criminal contemnor's disobedience is past, a completed act… a deed no sanction can undo.") (internal citations omitted).  Thus, whether or not a defendant ultimately "purged" is not a defense to the charged disobedience, which were all completed acts.

**IV.     THE MOTION FOR THE DISCLOSURE OF ALL GIBSON DUNN
         <u>COMMUNICATIONS SHOULD BE DENIED</u>**

   The defendant, citing <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), requests disclosure

of all communications between the Government and anyone with the law firm Gibson Dunn &

Crutcher LLP ("Gibson Dunn").  The defense argues that the Government has a "duty" to

disclose all such communications due to: (1) the defense's alleged concerns that Gibson Dunn

has "advance[ed] positions, [] even to [the prosecution], that are false and misleading," citing

Chevron's alleged "express disinformation and demonization campaigns against Mr. Donziger";

and (2) an alleged "heightened concern" regarding the Government's "exercise of prosecutorial

power," in an "atypical" case where any "reasonable lawyer would be skeptical that Gibson

Dunn tempers its scorched-earth advocacy against Mr. Donziger."  Dkt 60. at 34-35.

   The defendant is not entitled to communications the Government has had with

anyone at Gibson Dunn, unless those communications constitute discoverable material pursuant

to Rule 16, <u>Brady</u>, <u>Giglio</u>, or the <u>Jencks</u> Act (18 U.S.C. § 3500).  <u>See</u> <u>United States v. Souza</u>,

2008 U.S. Dist. LEXIS 21772, at *4-5 (E.D.N.Y. 2008) (denying defendant's motion for

statements of persons the government does not intend to call at trial and stating "[a] defendant is

only entitled to disclosure of statements expressly authorized by Rule 16 or otherwise

discoverable as exculpatory under <u>Brady</u>, or as impeaching under 18 U.S.C. § 3500").

   The Government is making Rule 16 productions on a rolling basis.  As stated at

the January 6, 2020 conference, the Government recognizes and will timely comply with its

<u>Brady</u> obligations.  <u>See</u> <u>United States v. Fallas</u>, 2010 U.S. Dist. LEXIS 88889, at *4-5 (S.D.N.Y.

Aug. 19, 2010) (denying defendant's motion for <u>Brady</u> disclosure order upon Government's

representation that it will produce any <u>Brady</u> material promptly after learning of its existence)

(citing <u>United States v. Gallo</u>, 1999 U.S. Dist. LEXIS 103, at *27 (S.D.N.Y. Jan. 6, 1999));

<div align="center">33</div>

United States v. Powell, 2019 U.S. Dist. LEXIS 214465, at *18 (S.D.N.Y. Dec. 12, 2019)

(denying motion for disclosure of Brady material and accepting Government's representation

that it will provide timely disclosure if any Brady material comes to light).  With respect to

Jencks Act and Giglio material, the Government will produce that material on a timely basis in

advance of trial.

Accordingly, the defense motion requesting the disclosure of the Government's

communications with Gibson Dunn should be denied.

## CONCLUSION

For the foregoing reasons, the Defendant's motions should be denied in their

entirety.

Dated: March 23, 2020
New York, New York

Respectfully submitted,

s/      Rita M. Glavin
Rita M. Glavin
Brian P. Maloney
Sareen K. Armani

*Special Prosecutors*

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Tel: (212) 574-1448
Fax: (212) 480-8421
glavin@sewkis.com
maloney@sewkis.com
armani@sewkis.com