KA5KDONH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          11 CV 691 (LAP)
                                           19 CR 561 (LAP)
5    STEVEN DONZIGER,

6              Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           October 5, 2020
9                                          11:46 a.m.

10   Before:

11              HON. LORETTA A. PRESKA,

12                                         District Judge

13                        APPEARANCES

14

15   SEWARD & KISSEL LLP
          Attorneys for The United States of America
16   BY:  RITA M. GLAVIN
          BRIAN P. MALONEY
17        SAREEN K. ARMANI

18   FRIEDMAN RUBIN
          Attorneys for Defendant
19   BY:  MARTIN GARBUS
          -and-
20   CIVIL LIBERTIES DEFENSE CENTER
     BY:  LAUREN REGAN

21

22

23

24

25

KA5KDONH

1          THE COURT:  United States against Steven Donziger.

2          Is the government ready?

3          MS. GLAVIN:  Yes, your Honor.

4          Rita Glavin, Brian Maloney, and Sareen Armani, for the

5    government.

6          THE COURT:  Good morning.

7          Is the defense ready?

8          MS. REGAN:  Good morning, your Honor.

9          Lauren Regan and I believe Martin Garbus are on the

10   line, and it's our understanding that Mr. Donziger is present

11   in the courtroom.

12         THE COURT:  Yes, ma'am.  Good morning.

13         Good morning, Mr. Donziger.

14         THE DEFENDANT:  Good morning, your Honor.

15         THE COURT:  All right, counsel.  You saw that I wanted

16   to discuss representation issues.  I note that no additional

17   lawyers have filed notices of appearance for you, Mr. Donziger.

18   You also declined to waive the potential conflicts with respect

19   to Mr. Friedman and Ms. Littlepage, a potential conflict you've

20   known about since May.  You've also declined to fill out a CJA

21   financial affidavit.

22         Now, as a person trained in the law, you know that

23   it's better for any criminal defendant to have experienced

24   criminal defense counsel representing him or her, counsel who's

25   familiar with the Federal Rules of Criminal Procedure, the

KA5KDONH

federal sentencing guidelines, and the like.  On the other hand, you have the right to represent yourself if you want to, particularly because you are a trained lawyer.

I remind you again, Mr. Donziger that, when the trial was adjourned on September 4, the adjourned date was 70 days out, a presumptively adequate time to prepare for trial, particularly because the order to show cause filed in the civil case was filed on July 31 of 2019, and in the criminal case, was filed on August 5 of 2019.

So I'm informing you again, Mr. Donziger, that the trial will not be further adjourned.  You will not be permitted to manipulate the proceedings by your choice or nonchoice of counsel.  So the November 4 trial date is a firm date.

The second issue I wanted to discuss today was witnesses appearing by video.  Ms. Regan, thank you, you filed a document on September 4 discussing a variety of witnesses whom you say would like to appear remotely for the trial.

Is there any objection to the remote appearance from the prosecutors?

MS. GLAVIN:  Your Honor, with respect to a number of the witnesses in the September 4th, '20 submission by the defense, particularly the five witnesses in Ecuador, I think that we may have objection to that, depending on the procedures by which the defense would propose to admit the remote testimony.  So, for example, where would they be testifying

KA5KDONH

1    from?  The idea being that if remote testimony is approved by

2    the Court, there have to be procedures that ensure the sanctity

3    and the integrity of the proceeding, such that the penalties of

4    perjury can apply.  The concerns that I have with respect to

5    the witnesses from Ecuador is that I'm not sure that any

6    procedures have been proposed to ensure that the oath would

7    mean anything.  So that would be the first objection.

8          I do note, with respect to one of the five witnesses

9    from Ecuador, Luis Yanza, he has never appeared in the United

10   States in connection with this litigation, and, in fact, is a

11   defaulted defendant in the civil proceeding.  So we would have

12   concerns about the integrity of that testimony, particularly

13   given some of the findings of his involvement in the conduct in

14   the civil case in Ecuador that led to the injunction being

15   issued and affirmed by the Second Circuit.  So we have concerns

16   with that respect.

17         In addition, absent some proffer from the defense

18   about the subject matter of the testimony -- in principle, I

19   don't object to remote testimony -- but it has to get to the

20   meat of the matter.  Are they fact witnesses or are they

21   character witnesses?  If they are fact witnesses, what is the

22   materiality of the testimony?

23         If the testimony is such, that we think

24   cross-examination in person may be necessary, we want the

25   ability to be heard.  So where I'm getting at is, certainly,

KA5KDONH

with respect to the Ecuadorian witnesses, we have objections
along the lines that I've stated.  With respect to the other
witnesses, I don't necessarily object in principle, but I'd
like to hear more from the defense about the subject matter of
that testimony.

THE COURT:  Thank you.

Ms. Regan?

MS. REGAN:  Thank you, your Honor.

First, as to the first matter that the Court
addressed, I would like to put on the record that Mr. Friedman
and Ms. Littlepage became attorneys of record in approximately
May of 2020 until August 28th of 2020.  When they first entered
their appearance, Mr. Frisch was also the attorney of record as
the lead trial counsel, and Mr. Friedman's role was to assist
him with that case.

Shortly after Mr. Friedman entered his formal
appearance, he spoke on the phone with Ms. Glavin, the
appointed prosecutor.  During the course of that conversation,
she told him that there might be a Curcio issue because his
name appeared on some documents that might come into evidence.
He explained to her that he was not familiar with a Curcio
issue because he solely handles civil matters, most of his law
practice.  Ms. Glavin then explained the term, gave a short
explanation of what she considered the potential conflict, and
basically Mr. Friedman finished the conversation with her, and

KA5KDONH

Ms. Glavin said she was going to continue evaluating the issue
and might revisit it in the future.

At that time, Mr. Friedman did not have the impression
that Ms. Glavin considered this a significant issue.  He
mentioned it to Mr. Frisch and to Mr. Donziger in their next
call, but gave the matter no further thought.

Then, after at least one other phone call where the
topic of a Curcio hearing was raised by Ms. Glavin, Mr. Frisch
asked to withdraw from the case on July 4th of 2020.  None of
the other members of the legal team knew that he was planning
to do that until about a day or so before he filed that motion.
And, at that point, the issues were with regard to financial
matters and not Curcio matters, which did not come up in our
conversations.

When Mr. Frisch withdrew from the case in early June,
Mr. Friedman was put in the position of lead counsel and
immediately attempted to start taking over the responsibilities
that Mr. Frisch had been handling prior to that time.  If,
prior to the time of Mr. Frisch's withdrawal, Ms. Glavin had
raised any serious concerns about the Curcio issue with
Mr. Friedman, he would have brought those to the Court's
attention at the time of Mr. Frisch's withdrawal.  However,
sometime after Mr. Friedman became lead counsel, Ms. Glavin
said she was considering asking for a Curcio hearing.
Ms. Glavin never told Mr. Friedman she would, in fact, be

KA5KDONH

1    requesting a Curcio hearing until a few days before she filed

2    her letter brief to that effect on August 11, 2020.  This, of

3    course, was just four weeks before the scheduled trial date and

4    almost a year from when the prosecution, Ms. Glavin, and the

5    two other attorneys, and her firm that have assisted her in

6    preparing the case for almost a year.  The first hearing on

7    this issue was held on August 24, just two weeks before the

8    scheduled trial date.  At that time, my two co-counsel were

9    removed from the case because of advice to Mr. Donziger that he

10   not waive any constitutional rights as a criminal defendant.

11        At that point, I was left as the only attorney of

12   record in the case.  I was originally retained and brought into

13   the case for one very specific part of the defense.  I'm

14   obviously based on the West Coast.  And at that time, I was one

15   of four attorneys representing Mr. Donziger.

16        I am not prepared to move forward with a trial on

17   November 4th, the day after Election Day.  Prior to the Court

18   issuing the trial date of November 4th, Mr. Kuby, who was

19   Mr. Donziger's selected replacement lead counsel, a criminal

20   defense lawyer who is based in New York City, he informed the

21   Court that, due to conflicts, he was unable to represent

22   Mr. Donziger or attend the trial until December 7th.  When the

23   matter was postponed for September, we assumed that the Court

24   would take into consideration Mr. Kuby's tight schedule and

25   would schedule the trial date either by conferring with the

attorneys or at least scheduling it on a date that the Court

was informed was the only date by which new pro bono criminal

defense counsel, based in New York City, could accommodate

Mr. Donziger's case.  Mr. Donziger is a human rights lawyer, he

is not a criminal defense lawyer, and as a federal criminal

defendant, no attorney would ever advise a person to represent

themselves in federal criminal court even if they did handle

criminal cases in their representation or in their practice.

The abuse of the Curcio matter, prosecutorial abuse, is

actually one of the few machinations that I've observed

throughout the short time that I've been involved in this case,

and that machination has resulted in unjustifiable deprivation

of rights to counsel and the right to a fair trial.

          The abuse is Ms. Glavin's failing to timely disclose

to the defense and the Court that the government had an

actionable basis for initiating a Curcio proceeding and to

timely initiate such proceeding with the intention --

retributive, vindictive, or otherwise -- knowledge, or reason

to know that this would deprive Mr. Donziger of his right to

effective assistance of counsel as to the scheduled

September 9th trial.

          The prosecutor's decision to delay, until virtually

the eve of trial, the disclosure and initiation of the Curcio

proceeding to disqualify Mr. Donziger's prepared lead trial

attorney, virtually on the eve of trial, had the effect of

1    basically rendering him with ineffective assistance of counsel

2    or the choice to forfeit his right to conflict-free assistance

3    of counsel.

4              That's as to the first matter.  I also would like to

5    add to that, though:  Since that scheduling of the court

6    hearing in our last court hearing with the Court, as the Court

7    may be aware, the West Coast has had to deal with massive wild

8    fires.  In fact, my own property burned on September 9th as a

9    result of the wild fires.  Many of my communities have been

10   completely destroyed and wiped off the map.

11             THE COURT:  I'm sorry to hear about your home,

12   Ms. Regan.

13             MS. REGAN:  Thank you.

14             My organization is a civil rights organization based

15   in a smaller community, Eugene, Oregon, and we immediately

16   stopped all of our legal work and began helping our neighbors

17   and community members evacuate and deal with the aftermath of

18   total destruction by fire.  That also interrupted my ability to

19   prepare the case for trial.  In fact, even as it stands now, my

20   staff and I continue to volunteer over 20 hours a week in order

21   to try to get people to safe places and animals to safe places

22   as well.  So that's been another interruption to the schedule.

23             And then, finally, the fact that the trial is

24   scheduled for November 4th, the day after a highly contested

25   election, and that for the first time, due to COVID, is

KA5KDONH

unlikely to be known, an outcome is not going to be known by

the 4th, as the executive director of a civil rights

organization, I had a number of commitments to my local

community in terms of the elections and to civic engagement

around the elections.  By having the trial date on

November 4th, I will have to fly to New York City in advance of

that and be completely unavailable to my own community with

regard to the federal elections.

So that date, in particular, although clearly a media

blackout date, which might be preferable to some part of this

court proceeding, is a real problem with regard to the civic

engagement and our federal elections.

Secondly, with regard to the disclosure of witnesses:

Your Honor, as I noted when I filed that, I did the best I

could to go through over 125,000 pages of discovery, over 125

deposition videos, a decade of litigation, in order to try to

come up with a witness list, of which that was not part of my

job when I was brought into the case.  But I scrambled to try

to put that list together, so that Mr. Donziger's rights to

call witnesses would not be waived.

Since that time, and also because of the fires, I have

reached out and prepared approximately eight of those witnesses

for trial.  I don't speak Spanish, so it's been a real issue

working with a lot of the witnesses that we want to bring that

do not speak English, but I'm doing the best I can to work with

KA5KDONH

1    interpreters to set up schedules with people, to prepare

2    witnesses for trial, to learn the other parts of the trial, the

3    other defenses that other lawyers were working on.  As I said,

4    Ms. Glavin has three lawyers working on this case for about a

5    year.  I am currently the only lawyer of record working on this

6    case.  Because of Mr. Garbus' health issues, he has really been

7    unable to assist from Massachusetts at this time.

8         I would ask the Court to reconsider its prior ruling,

9    to allow the trial date to be scheduled after December 7th, so

10   that Mr. Kuby can be physically present in the courtroom to

11   defend Mr. Donziger.

12        Thank you.

13        THE COURT:  Ms. Glavin?

14        MS. GLAVIN:  Yes, your Honor.

15        With respect to the first issue that Ms. Regan raised,

16   on the issue of the Curcio hearing, and which she characterized

17   as abuse by the government and, quote-unquote, machinations,

18   there are some facts that Ms. Regan has left out.  I don't

19   attribute bad faith to her, as she was not part of the

20   conversations or the back-and-forth that I had with

21   Mr. Friedman, including email correspondence.

22        I do want to note for the record that this was raised

23   not just with Mr. Friedman, but with Mr. Frisch back in May of

24   2020.  I was given no indication at that time -- I viewed this

25   as a potential conflict, at best, and I did not have any

KA5KDONH

1    indication at that time from the defense that Mr. Donziger

2    would not waive the potential conflict that he certainly was

3    aware of back in May of 2020, and much, much earlier, given

4    Ms. Littlepage's and Mr. Friedman's involvement in the case.

5    He specifically chose them to be his attorneys to represent him

6    in May and June of 2020, knowing what their involvement was in

7    the postjudgment proceedings.  No issue was raised by

8    Mr. Frisch or Mr. Friedman on the Curcio issue.

9            Secondly, with respect to the date of the Curcio

10   letter -- actually, hindsight is 20/20.  I never thought that

11   there would be an issue with Mr. Donziger.  The only hint I had

12   that there would be an issue that Mr. Donziger may not waive

13   was after his motions for a continuance were denied.

14           What occurred was I spoke with Mr. Friedman again and

15   said I would be doing the letter.  The letter took a fair

16   amount of work on our part reviewing the case law, but I fully

17   expected Mr. Donziger would waive that potential conflict, as

18   indeed, in my experience, most defendants do in that particular

19   circumstance.  So it was quite surprising to me.

20           In addition -- and at that time, when we filed it on

21   August 11th, there was the motion for a continuance pending,

22   and then, as of August 19th, when that motion was denied, then

23   there was another motion for a continuance pending.  That is

24   when the hearing took place, and then Mr. Donziger wanted to

25   think about this.

KA5KDONH

 1          I would note what Mr. Frisch put in his affidavit to

 2    this Court when he sought to be released as counsel in the

 3    case.  When he moved, in July of 2020, to withdraw in the case,

 4    the Court granted that conditionally, as long as it didn't

 5    impact the trial date.  And when it appeared that it may,

 6    because Mr. Donziger, after not getting the continuance he

 7    wanted -- and let me put on the record, the continuance

 8    Mr. Donziger asked for was an indefinite continuance, until

 9    COVID was over, in a sense, in New York City.  When it appeared

10    that was not going to happen is when Mr. Donziger didn't want

11    to waive.

12          Mr. Frisch, because the Court was calling him back

13    into the case, Mr. Frisch filed an affirmation and made clear

14    in that affirmation that he had no idea, despite Mr. Frisch

15    being on notice since May of 2020, of what was a potential

16    conflict -- not an actual conflict, but a potential conflict --

17    Mr. Frisch made clear that he had no idea that Mr. Donziger

18    would not waive despite having been aware of it.

19          So, to the extent it's characterized as some type of

20    machinations or abuse by the prosecution, if I had had any

21    idea, any idea, that that issue would have been used in the

22    manner in which it was used, to get a continuance, I wish I had

23    filed that in May of 2020.  But I was lulled by the defense

24    into believing that this would be waived.  That didn't happen,

25    as is Mr. Donziger's right, but I want to make clear for the

1    record that there was no abuse or intent to hurt Mr. Donziger

2    here.  And, again, Ms. Regan, with respect to her recitation,

3    she was not part of any of these discussions, so I do not

4    attribute any bad faith to the manner in which she laid out her

5    recitation of the facts.

6         With respect to the characterization of the case or

7    the complexity of the case:  The case isn't complicated.  The

8    reason there's a lot of discovery in the case is the vast

9    amount of it is the underlying trial record, which really isn't

10   going to be relevant to this criminal contempt case.  We're

11   probably going to call eight to ten witnesses, of which two to

12   three will be lengthy witnesses, and it will be testimony about

13   the postjudgment proceedings.  There are court orders, and the

14   issue at trial is whether they were complied with or not – did

15   Mr. Donziger provide a list of all the devices that he had to a

16   neutral forensic expert on the date on which he was ordered to

17   do it? He didn't.  He doesn't dispute that.

18        Number two, did Mr. Donziger surrender his devices for

19   imaging to the neutral forensic expert by a date certain?  He

20   didn't do it.  He still hasn't done it to this day.

21   Mr. Donziger doesn't dispute that.

22        Number three, Mr. Donziger, in June of 2019, was

23   directed to surrender his passport to the clerk of this court

24   by a date certain.  Did he do it?  No, he didn't.  He hasn't

25   disputed it.

KA5KDONH

1          On those three issues, which Mr. Donziger did not

2     appeal to the Second Circuit, nor seek a stay to the Second

3     Circuit, it's going to be a relatively simple case.  This is

4     not about 160 video depositions, it is not about 200,000 pages

5     of discovery.  And the steps here have been outlined on more

6     than one occasion in the government motions in this case, and I

7     have cited to those, I'm happy to speak with Ms. Regan about

8     it.  Ms. Regan now has 3500 material, she now has the

9     government's exhibit list.

10         With respect to the last three counts of contempt,

11    it's whether Mr. Donziger surrendered, as required by the RICO

12    injunction, his interests in a contingency fee, a 2011

13    agreement, and a 2017 agreement.

14         And then the last count is whether or not Mr. Donziger

15    pledged a portion of his personal contingent interest to

16    another person to get services in violation of the RICO

17    injunction.

18         So this is not about hundreds of thousands of pages of

19    documents, it's not about lots of videos; it's a relatively

20    simple case that's been outlined over and over.  Ms. Regan has

21    our exhibits, she has the bulk of the 3500 material.  The

22    primary source of that 3500 material would be the FBI Form 302s

23    that the case agents -- that the FBI case agents, working with

24    us from the Justice Department, have created during the course

25    of witness interviews.  So this is not the complex case that

KA5KDONH

1    it's being made out to be.  I'm always available to speak with

2    Ms. Regan if she has questions about some of the exhibits,

3    because I don't think there is much surprise that's going to be

4    in this case.

5              Thank you, your Honor.

6              THE COURT:  Ms. Regan?

7              MS. REGAN:  Well, your Honor, I guess I would start

8    where Ms. Glavin left off, which is the Second Circuit is still

9    contemplating whether or not the civil contempt order was

10   lawful or not.  We still don't even have a ruling on that.

11             And I disagree with Ms. Glavin's idea that this is not

12   a complex or serious case.  It's not for the prosecutor to

13   determine what the defenses should or could be.

14             And I guess with regard to COVID, I think,

15   fundamentally, there is a problem with the inability of the

16   defendant, pursuant to the Sixth Amendment, to actually have a

17   fair trial, where witnesses must appear in person, where they

18   can be cross-examined in person, and all of that is extremely

19   problematic, if not dangerous, under the fact that we're in a

20   global pandemic right now.

21             With regard to our witnesses, what I would say is, we

22   want them to appear in person, we want them to be able to

23   travel safely, and to testify in open court along with the

24   general public, along with Mr. Donziger and his choice of

25   counsel.  But all of that is being circumvented by facts that

KA5KDONH

are not within Mr. Donziger's control, mainly a global

pandemic, and the fact that Mr. Kuby has informed the Court

that he cannot be present until December 7th of 2020.

I don't think that Ms. Glavin's reframing of the

criminal defense in this case or the complexity of the issues

is fair to the defendant.

And I think with regard to me trying to defend

Mr. Donziger via Jabber from across the country, that just does

not seem like effective assistance of counsel, and it would be

likely that even if a trial were forced through at the one-year

mark, as it is currently being done, it would likely end up

being retried down the road because the constitutional rights

of the defendant would not be upheld.

And I think Mr. Garbus may have something to add, too,

so I don't want to have the Court think that I'm his only

attorney of record at this point.

THE COURT:  Mr. Garbus, do you have anything you'd

like to add?

MR. GARBUS:  I do not.  I cannot participate in the

case, and I've made that clear.  I'm on the phone now from

Massachusetts.

THE COURT:  Anything else, Ms. Regan?  Anything else,

ma'am?

MS. REGAN:  I don't believe so.

THE COURT:  Thank you.

1          Anything else, Ms. Glavin?

2          MS. GLAVIN:  Your Honor, I just want to be heard on

3   one issue that Ms. Regan raised, which is her reference and her

4   characterization of the proceeding in front of the Second

5   Circuit, for which there was oral argument last month.  What

6   Ms. Regan said is that the contempt decision that Judge Kaplan

7   issued, that it is up on appeal.  I want to make very clear

8   what was on appeal, because this has been mischaracterized

9   repeatedly, not only in court papers here, but also -- it's

10  actually been mischaracterized repeatedly by the defense to the

11  press, and it's somewhat concerning, given that we have

12  officers of the court here.

13          What is on appeal before the Second Circuit is that

14  Mr. Donziger did not appeal Judge Kaplan's contempt findings

15  for Mr. Donziger's failure to provide a list, just a list, of

16  the devices that he had, his failure to surrender his computer

17  for imaging.  And Judge Kaplan even offered to say, hey, I'll

18  stay any of that material being turned over or disclosed to

19  Chevron that's responsive if you just turn over the devices and

20  you get your appellate brief in on time.  Mr. Donziger didn't

21  appeal that, and he did not appeal the orders that directed him

22  to do that, nor the contempt findings.  He did not appeal Judge

23  Kaplan's finding of contempt that forms the basis of Counts

24  Four, Five, and Six.  He never mentioned in his appellate brief

25  or even contested that he pledged a portion of his personal

KA5KDONH

1    contingency interest to someone in order to get $14,000 worth

2    of personal services.

3            So when we hear again and again that this is all up on

4    appeal in the Second Circuit, that's not true.  It's false, it

5    is not true, and it has been a myth that has gone over, and

6    over, and over again.

7            The Second Circuit's decision should not in any way

8    impact whether this contempt trial goes forward.  The Second

9    Circuit's decision does not cover at least Counts Four, Five,

10   and Six and certainly Counts One, Two, and Three.  So this is a

11   myth that has gone on and on, and I wanted to make a record.

12           THE COURT:  Thank you.

13           THE DEFENDANT:  Your Honor, can I be heard, please?

14           THE COURT:  Yes, sir.

15           THE DEFENDANT:  Thank you.

16           First of all, I want to reaffirm what my counsel,

17   Ms. Regan, said.  I think two quick points about what

18   Ms. Glavin said:  She said that it's false to maintain that the

19   appeal before the Second Circuit doesn't affect some issues

20   that are happening in this criminal contempt case.  We

21   disagree.  The appeal was about Judge Kaplan's finding holding

22   me in contempt based on me raising money for my clients.  All

23   of the other contempts, the civil contempts, that are now --

24   some of which are now the subject of this proceeding flow from

25   that.

KA5KDONH

1          THE COURT:  That's not true, Mr. Donziger.

2          THE DEFENDANT:  Well, that is our position, and it's

3    not for this Court, respectfully, or Ms. Glavin to determine

4    what the Second Circuit appeal is; it's for the Second Circuit

5    to determine that.

6          THE COURT:  Even if it was about raising money, it had

7    nothing do with turning over a list of devices or surrendering

8    devices.

9          THE DEFENDANT:  All of the issues that Judge Kaplan

10   raised with me on the civil side flow from what we believe is a

11   fundamentally illegal finding to begin with, and we believe

12   those will be potentially washed away if we prevail on this

13   appeal.  And the prudent thing to do, respectfully, is to take

14   that into consideration when analyzing whether this trial

15   should go forward under these extraordinary circumstances.

16   That's number one.

17          Number two, on the issue of counsel, since I am the

18   person accused here, and these are my rights, and the Sixth

19   Amendment is designed to provide fairness for the defendant, I

20   don't understand -- and I would really ask for you to

21   explain -- what the difference is between November 4th and

22   December 7th, when November 4th is 15 months since I was first

23   in your court, which was August 6th of last year, and

24   December 7th is 16 months.  I need counsel that can do this

25   case that can actually be in court.  This is not machinations.

KA5KDONH

1      Okay?

2              If the Curcio hearing was real, and I chose not to

3      waive my right, that's my right, it has to be respected.  I

4      thought we were going to come in on September 17th, when this

5      proceeding was asked for by Ms. Glavin.  Your Honor postponed

6      that hearing, and we have spent a lot of time -- I thought we

7      were going to come in today and discuss a reasonable way to

8      proceed, so I could be properly represented, but you came in

9      today and made your decision before you heard argument.  And I

10     would ask again, please, to reconsider whether this is the

11     prudent way to proceed.  It would seem to be in everyone's

12     interests -- obviously, mine, but also yours, the Court's -- to

13     have a proceeding where I can be properly represented.

14             Ms. Regan is unsure if she can get here and, in any

15     event, can't do it alone.  Mr. Kuby is a New York lawyer; we

16     don't have the COVID issue with him because he's here.  He can

17     definitely do it on December 7th.  For him to do it on

18     December 7th, it would be -- it's imperative, I think, that the

19     Court make that determination today or this week, so he can

20     start working, because once we get closer to November 4th, and

21     it's going to be -- you know, if it becomes obvious I'm not

22     going to be properly represented, then that December 7th date

23     is at risk of being delayed.  So I would ask the Court to

24     please do the reasonable thing here and let me have the counsel

25     of my choice.

KA5KDONH

1          You know, I came in on August 27th, it was the second

2     day of the Curcio hearing, and in good faith, I had an

3     affidavit from Mr. Kuby.  In other words, between the Monday

4     and the Thursday of those two aspects of the hearing, when I

5     got my independent advice -- and it's unfair of Ms. Glavin to

6     blame me, I didn't understand what the Curcio, the significance

7     was, until I got independent advice that week.  When I came in

8     on the 27th in anticipation of potentially not waiving, I came

9     in with a reasonable alternative to have the trial on

10    December 7th.  It really doesn't make a huge difference to the

11    scheduling.  I'm still -- my conditions of pretrial release,

12    which are quite onerous.  I would ask that the Court please put

13    down a trial for December 7th, and Mr. Kuby can enter his

14    notice of appearance immediately or within a couple of days,

15    and Ms. Regan can do the case with him.  If she can't get here,

16    he at least can be here by my side, which I believe is

17    essential to protect my Sixth Amendment right to counsel.

18         Thank you.

19         THE COURT:  Anything else, counsel?

20         MS. GLAVIN:  No, your Honor.

21         By the way, my silence does not indicate agreement

22    with what Mr. Donziger just said.

23         THE COURT:  Anything else, Ms. Regan?

24         MR. GARBUS:  This is Martin Garbus.

25         I always thought of myself lately as being totally out

KA5KDONH

1    of it as a result of some of your previous rulings.  If that's

2    not so, maybe you want me to speak further to the issues, I'm

3    glad to do it.

4             In addition to the COVID issue, I had a medical issue

5    about six weeks ago, which required doctors in New York and in

6    Provincetown.  I don't care to -- it certainly affects my

7    ability to do anything, but I don't think it's appropriate --

8    the Court has already indicated its awareness of my situation

9    and that I'm out of the case as far as possible trial work.

10            THE COURT:  Mr. Garbus, let me just clarify something

11   for you.  You email sometimes, you just said now you're out of

12   the case.  For as long as you have a notice of appearance on

13   the court docket, and it's not withdrawn, you are in the case.

14            So it's totally up to you what you want to do.

15            MR. GARBUS:  I am out of the case.  You and I had

16   previous correspondence about that.  I told you I could not be

17   in the case.  I said to you, I withdraw.  You indicated it was

18   not necessary for me to withdraw.

19            THE COURT:  No, I'm sorry, sir.

20            MR. GARBUS:  No, no.

21            THE COURT:  You can't just email.

22            MR. GARBUS:  Judge Preska, excuse me, if there's any

23   misunderstanding about this, I will resolve it as soon as we

24   get off the phone call.

25            THE COURT:  Yes, sir.

KA5KDONH

1          MR. GARBUS:  That contradicts -- Judge Preska, please,

2     that contradicts what you previously said.

3          THE COURT:  Let me be very clear, sir --

4          MR. GARBUS:  If you want additional information about

5     a medical problem which occurred requiring me to see physicians

6     in Provincetown and discuss with my physicians in New York

7     something that happened six week ago, which I don't care to get

8     into, it's personal, I'm certainly glad to do that.

9          THE COURT:  Mr. Garbus, I have no -- Mr. Garbus,

10    Mr. Garbus, Mr. Garbus --

11         MR. GARBUS:  Judge Preska, please.

12         THE COURT:  I have no interest in your medical

13    condition.  I am only responding to your discussion of whether

14    you're in or out of the case, as I have said previously.

15         MR. GARBUS:  I withdraw from the case.  You and I were

16    involved in motion practice, and you made it very clear.  I

17    said I would offer to withdraw from the case if there's any

18    lack of clarity about my involvement.  You said, and I don't

19    have the documents before me, and I wasn't prepared to argue it

20    once here, but you were perfectly clear.

21         THE COURT:  Anything else, Mr. Garbus?

22         MR. GARBUS:  So I formally withdraw from the case

23    now --

24         THE COURT:  Yes, sir.

25         MR. GARBUS:  -- if there's any lack of clarity.

KA5KDONH

```
 1              THE COURT:  Thank you, sir.

 2              MR. GARBUS:  If there's a lack of clarity, Judge

 3   Preska, with respect to your interpretation of the previous

 4   events.

 5              THE COURT:  Sir, we will instruct the Clerk of the

 6   Court that you have withdrawn your notice of appearance.

 7              MR. GARBUS:  Yes, ma'am.

 8              THE COURT:  Thank you.

 9              THE DEFENDANT:  Your Honor?

10              THE COURT:  Yes, sir.

11              THE DEFENDANT:  I apologize.  Can I make the record

12   clear about something Ms. Glavin said really quick?

13              Ms. Glavin said this case is simple.  To us, it's not

14   simple.  There are six counts that relate to many, many, many

15   documents and events that took place over a period of years.

16   It's probably the most complex civil case in the history of

17   this district.  It has 3,000 docket entries.

18              Ms. Glavin herself, if I remember correctly, said last

19   August, when Mr. Frisch was representing me, that she needed

20   months, she needed months to get up to speed.  Suddenly,

21   Ms. Glavin is trying to rush me to trial without counsel, it's

22   a very simple case, but if it was so simple, why are there

23   125,000 pages of documents?  That's number one.

24              Number two, she acts like I don't dispute any of this,

25   okay?  There are certain facts she's correct, I don't dispute,
```

KA5KDONH

but that's not the legal question in this trial.  The legal question is whether the actions by me rise to a level of such willful disobedience, a court orders that they are criminal as opposed to a standard civil discovery dispute.

So she can't say, oh, he doesn't dispute it as if this is going to be a quick trial.  I mean, I have strong defenses, in my opinion, in the opinion of my able counsels, two of whom have been removed, to all of these counts.  We intend to try this case robustly.  I believe I am innocent of these six charges, and I believe before a fair factfinder, I would be found -- I would be acquitted.  I don't mean to cast aspersions on the Court.  You know I've sought a jury for this trial, and I've been denied, I get that.  But I just want to be clear that this is (a) not a simple case, and (b) I have strong defenses to all six counts.

Thank you.

THE COURT:  Thank you.

All right, counsel.  First of all, Mr. Friedman, Ms. Littlepage, and Mr. Donziger all knew the facts which arose out of the underlying civil case.  When the criminal contempt charges were brought, Mr. Donziger chose Mr. Friedman and Ms. Littlepage, knowing of their involvement in the underlying facts.  The specific issue was explicitly raised in May.  There was no indication that Mr. Donziger would decline to waive the potential conflict.  Indeed, Mr. Frisch himself said in his

KA5KDONH

affidavit that he did not foresee that Mr. Donziger would
refuse to waive the potential conflict, and he only did so
after the Court declined to adjourn the trial date.

In any event, once Mr. Friedman and Ms. Littlepage
were disqualified as a result of Mr. Donziger's failure to
waive the potential conflict, Mr. Donziger has still had 70
days to prepare for trial and/or to retain new counsel, a
presumptively adequate time.

With respect to Ms. Regan's discussions of November 4,
volunteer activities, whether relating to animals or elections,
do not overcome counsel's duty to represent a client zealously.

Finally, counsel do not get to determine when a case
is tried.  It is the Court's determination when a case is to be
tried.  Indeed, this Court has already conducted jury trials
last week and is choosing a jury again today.  So the motion to
reconsider is denied.

With respect to the witness list, while Ms. Regan said
that she did her best with respect to the September 4
document -- and I have absolutely no reason to doubt her word
on that -- one would have thought that Mr. Friedman and
Ms. Littlepage had already been at work on that list since it
was due at or about the time Ms. Regan submitted the
September 4 document.  So this is not a surprise either.

Now, Ms. Regan, Ms. Glavin has asked for a proffer on
the subject matter of the testimony of these witnesses, so that

1       she can determine whether or not the prosecution objects to

2       their appearing remotely.

3               What do you say to that, ma'am?

4               MS. REGAN:  There is no legal authority to force the

5       defense to disclose its case before the law requires, and COVID

6       does not change that.  If the trial is to go forward in the

7       middle of a pandemic, it does not mean that the traditional,

8       quote, trial by ambush, a basic principle of federal criminal

9       law, does not still apply.

10              We do not intend to disclose a proffer of our witness

11      testimony in advance of this criminal trial.

12              THE COURT:  Ms. Glavin?

13              MS. GLAVIN:  Yes, your Honor.

14              What I'd like to do is see if I can work with

15      Ms. Regan and if we could have a conversation about this this

16      week.  I just ask Ms. Regan take a look our letter – it's

17      September 1st, 2020, it's Docket No. 156.  I cite –– the

18      government cites to some cases in that letter about when a

19      defense makes an application to present trial testimony

20      remotely, about some of the standards, including whether the

21      testimony is material.  I think let's you and I try to work

22      this out, if we can, and if we can't, we can raise it with

23      Judge Preska.

24              I will say, your Honor, I am going to have difficulty

25      on the issue of witnesses from Ecuador if the defense doesn't

KA5KDONH

propose circumstances in which their testimony can be taken to
preserve the sanctimony of the proceedings.  For instance, how
will we know who they are, who they say they are?  Where would
the testimony take place?  Who would administer the oath?  I
don't believe there's any extradition from Ecuador for perjury
in a U.S. criminal case, so I will want to take a look on the
case law on that, but, Ms. Regan, just so you know some of the
things that I'm thinking about, but I'm willing to work with
you here.  What I'm concerned about with some of the witnesses
on the list, and Mr. Donziger absolutely has a right to present
a defense, and, in principle, I don't have a problem with
videoconference testimony, just as long as the sanctity of the
proceedings can be preserved.

     I think, at a minimum, you could be able to let us
know if some of these are character witnesses versus fact
witnesses -- you're not hiding the ball there -- and then maybe
if you can even tell me what counts they relate to, but let's
have a conversation about it.

     THE COURT:  All right.  Ms. Regan, would you be kind
enough to confer with Ms. Glavin this week and let me know
where we are, if you can, by the end of the week?

     MS. REGAN:  Your Honor, I will do that.  But just for
the record, we are being forced into a situation where we must
have witnesses appear by video.  It is not our preference.  We
would want them there in person.

1          And so, to the extent that Ms. Glavin has prepared

2     witnesses to appear by video, there was not a question as to

3     how the oath would be administered or whether that person would

4     be able to be identified.  It seems slightly, perhaps, racist

5     that she is bringing that up with regard to Ecuadorians.  We

6     have other witnesses from Barcelona and other countries that

7     are also anticipating to give witness testimony, so I'm not

8     sure why the issue of oath and identifying --

9          THE COURT:  Counsel, counsel, counsel, it is

10    traditional -- counsel, it's traditional that when testimony is

11    given out of the country, even in a civil deposition, that it

12    be given in the United States embassy, with various other

13    safeguards.

14         MS. GLAVIN:  And, your Honor, if I just might be

15    heard, after having been called racist, that would be a first

16    for me.

17         And, again, Ms. Regan, I'm trying not to attribute bad

18    motives; you're an officer of the court.

19         The issues that I'm raising, particularly Ms. Regan is

20    well aware of the one witness for which the government sought

21    to admit the testimony by videoconference.  We filed a motion

22    with that witness.  That witness is represented by counsel in

23    Texas.  That witness had their deposition taken, at which

24    Mr. Donziger participated remotely.  That same witness is

25    someone Mr. Donziger knows well and is very much friendly with

1    Mr. Donziger.  So I don't think there would be an issue of

2    identity, given that I dealt with that witness' attorney who's

3    an officer of the court, and so I'm not concerned about that,

4    and I'm able to track all of that.

5           With respect to Mr. Donziger's witnesses, a witness

6    list of 33 people was proposed, to be testifying remotely, nine

7    of whom reside in New York, so I don't understand why they

8    can't show up at the trial.  And so I just don't -- there's a

9    lot of mischaracterizations, and I think accusations, which are

10   inflammatory that are being tossed out, particularly racism.

11          So, Ms. Regan, I would just ask, let's try to work

12   this out like officers of the court.

13          MS. REGAN:  I'm happy to do that, but I will also note

14   that one of those Ecuadorian witnesses themselves is a lawyer,

15   so it just seems strange that there's concerns there, but we

16   will work it out.

17          MS. GLAVIN:  I appreciate that.  I didn't know that.

18   Thank you for telling me.  This is why I think our discussions

19   would be really helpful offline as officers of the court

20   together.  Thanks, Ms. Regan.

21          THE COURT:  And, Ms. Regan, am I correct that only the

22   witnesses that you have set out in your September 4 letter are

23   the ones that you request be permitted to testify remotely?

24          MS. REGAN:  Your Honor, at the time that I was forced

25   to produce that list under deadline, I wanted to err on the

KA5KDONH

1    side of caution, because of the pandemic, to ensure that even

2    the New York individuals had the option if they were a

3    vulnerable status.  So I am not 100 percent certain that all of

4    them will need to appear remotely, but I wanted that ability in

5    case it was necessary.

6             THE COURT:  Well, all I'm saying, ma'am, is there

7    are -- I see nine witnesses named on this document.  I know

8    that the witness list for the trial was much lengthier than

9    that.  My question to you is:  Are the names on your

10   September 4 document the only persons with respect to whom you

11   wish to testify remotely?  In other words, I don't have to

12   worry about the rest of them, the others are going to come in?

13            MS. REGAN:  No, that's not the case, particularly --

14            THE COURT:  Well, then, you better update your list

15   and talk with Ms. Glavin this week.

16            MS. REGAN:  Yes, your Honor.  And, of course,

17   additional people are falling ill from COVID.  There are a

18   constant changing set of circumstances with regard to the

19   pandemic.

20            THE COURT:  Okay, wonderful.  So you'll talk with

21   Ms. Glavin this week and let me know where we are at the end of

22   the week.

23            MR. GARBUS:  Judge Preska, can I make one last

24   comment, even though -- I don't see why we're doing this.  Why

25   are we going through this kind of process?

KA5KDONH

1            THE COURT:  Mr. Garbus, thank you for your comment.

2            MR. GARBUS:  By the way, you owe the lawyers in the

3    case who -- you used the word machinations, I think you owe

4    those lawyers an apology.

5            THE COURT:  Thank you for your thoughts, sir.

6            Anything else today, counsel?

7            THE DEFENDANT:  Your Honor, I have one issue.

8            THE COURT:  Yes, sir.

9            THE DEFENDANT:  I'd rather Ms. Regan raise it.  She

10   might have slipped her mind, I can call and tell her, but I'll

11   just raise it myself in the interests of time.

12           Ms. Glavin -- first of all, my position, our position

13   is we want all of our witnesses to appear physically, if

14   possible.  The Ecuador witnesses, due to COVID, can't travel

15   right now, and they almost certainly won't be able to travel to

16   a trial on November 4th, they might be able to at a later date,

17   but our intention, if we can make it happen, is to get

18   witnesses into court to the extent possible.  So I want to make

19   that clear.

20           Number two, as to the extent that witnesses have to

21   appear remotely, the question of technology has been raised by

22   us, by Ms. Glavin, and Ms. Glavin's position, as I understand

23   it, is that, to the extent that the Southern District of New

24   York system, this video system, cannot accommodate the

25   witnesses we need, the cross-examination, and the documents,

KA5KDONH

1    and all that kind of stuff, we need to pay for the upgrade of

2    technology from a private vendor.  And my question is:  If that

3    becomes necessary, such that witnesses need to appear remotely

4    and in an adequate way consistent with the ability to confront

5    witnesses both for the prosecution and for us to confront

6    Mr. Zelman and whoever else might appear remotely, who will pay

7    for that?

8         I don't have the funds to pay for that.  All of my

9    counsel is pro bono.  I don't think it would be fair for me to

10   pay for the cost of the criminal trial that Ms. Glavin, and the

11   government, and Judge Kaplan have initiated against me.

12        So my question is:  Do you have a way to resolve that,

13   such that if it has to happen, I don't have to bear those

14   costs, please?

15        THE COURT:  I don't know the answer to that.  I

16   suggest that counsel confer with respect to the witnesses,

17   particularly as to from where they will testify.  For example,

18   it's entirely likely that a U.S. Embassy would have the ability

19   to tap into the Court's system, but until we have specificity

20   on that, there's no way to know.  So the sooner you get it

21   done, the better.

22        MS. GLAVIN:  And one thing I would like to put on the

23   record with respect to that, your Honor, is that the government

24   has worked with the Court's in-house videoconference system - I

25   think the short-term name of it is Jabber.  I was unaware that

KA5KDONH

```
1   the Court actually had that capability until this issue came

2   up, and I thought that we, the government, would have to go

3   with an outside vendor.  But once I was able to see what the

4   Court is able to do, in terms of accommodating remote testimony

5   with the in-house system that doesn't cost anybody money, it

6   was my view that was the way to go, and that it is adequate,

7   certainly, from the government's perspective.  And I think it

8   can be from the defense perspective.

9            I can confer with Ms. Regan, but, again, the

10  government takes the view that the Court has the

11  videoconference system, which people can come into remotely, is

12  adequate for purposes of the Sixth Amendment.

13           THE COURT:  All right.  I will await your word,

14  counsel, preferably by the end of the week.

15           Anything else today?

16           Thank you, ladies and gentlemen.

17           One more time, Mr. Donziger, the November 4th trial

18  date is a firm date.  Make no mistake about it.

19           Thank you, counsel.

20           Good morning.

21           Mr. Reporter, do you need anything?

22           (Pause)

23           THE COURT:  Ms. Regan, good morning.

24                          *  *  *

25
```