UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     -against-<br><br>STEVEN DONZIGER,<br><br>            Defendant. | 19-CR-0561 (LAP)<br>[11-civ-0691 (LAK)] |

**MOTION TO ADJOURN ON BEHALF OF STEVEN DONZIGER**

**CIVIL LIBERTIES DEFENSE CENTER**
**Lauren Regan, Attorney At Law**
**On Behalf Of Mr. Donziger**

**PRELIMINARY STATEMENT IN SUPPORT OF MOTION TO ADJOURN**

The planet is in the middle of a pandemic the likes of which have not been seen in over a century. In less than a year, over one million people have died from COVID-19, with nearly a quarter million dead from the virus in the United States alone. On the date of this writing, the U.S. logged a recent high of over seventy thousand new cases and nine hundred new deaths,[1] signaling not a return to normal, but a resurgence of the virus in numbers not seen since July.[2] Public health experts have said that they themselves would not feel comfortable going to an indoor dinner party, let alone a multi-day trial. The experts have further noted that the most important factor of concern in avoiding infection and the too often grave consequences of the virus is the rate of "community transmission:" how many new cases of COVID-19 there are in one's immediate area.[3] Relatedly, a multi-hour trial in a small courtroom with approximately 10 people is considered a "high-risk activity", *even if all parties are wearing masks*.[4] Current statistical trends predict

---

[1] *Covid in the U.S.: Latest Map and Case* Count, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited, Oct. 19, 2020).

[2] *U.S. Records 70,000 New Cases in a Day for the First Time Since July* N.Y. TIMES, https://www.nytimes.com/live/2020/10/17/world/covid-coronavirus (last visited, Oct. 19, 2020)

[3] Olga Khazan, How to Tell If Socializing Indoors Is Safe, THE ATLANTIC, Oct. 12, 2020, https://www.theatlantic.com/politics/archive/2020/10/it-safe-have-dinner-together-inside/616568/.

[4] Calculation done using the MyCovidRiskApp, an application developed by the Warren Alpert Medical School of Brown University. The app uses data from the New York Times to calculate the various risk levels of activities in certain areas. *MyCOVIDRiskApp*, WARREN ALPERT MED. SCH. BROWN UNIV., https://mycovidrisk.app/ (last visited Oct. 19, 2020).

that between 210,000 and 420,000 new cases of COVID-19 in the U.S. will likely be reported during the week ending November 7th, 2020,[5] the week this Court has set for trial. Dkt. 168; 172. The infection numbers in other countries, particularly those from which witnesses and trial observers will fly to New York, are even worse than the city's numbers.[6] While witnesses and attendees will assumedly exercise the utmost caution, due care can reduce, but not eliminate, the risk that holding this trial in November, in a small courtroom, could create a so-called "super-spreader event." In sum, the ramifications of attempting to try this case in the Southern District of New York on November 4th are too significant for this Court to ignore.

Beyond the actual risks to the health and safety of all involved, salutary actions taken by sovereigns the world over, as well as medically-dictated precautions taken by individuals, will significantly curtail Mr. Donziger's rights if this case goes to trial on November 4th. Specifically, a trial held in two weeks' time—just as the pandemic is headed for new peaks[7]—would seriously infringe upon Mr. Donziger's

---

[5] COVID-19 Forecasts: Cases, CTR. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/forecasts-cases.html (last visited, Oct. 19, 2020).
[6] Tracking COVID-19 excess death across countries, THE ECONOMIST, https://www.economist.com/graphic-detail/2020/07/15/tracking-covid-19-excess-deaths-across-countries (last visited, Oct. 19, 2020).
[7] N.Y.'s New Virus Cases Exceed 2,000 for First Time Since May (1), BLOOMBERG LAW, Oct. 21, 2020, https://news.bloomberglaw.com/pharma-and-life-sciences/new-york-new-covid-19-cases-above-2-000-first-time-since-may.

rights to be confronted with the witnesses against him, to have the use of compulsory process in presenting a defense, and to be assisted effectively by counsel.

This Court has broad, but not unfettered, discretion to determine its own calendar.[8] Respecting any defendant's fundamental constitutional rights and the safety of all participants must takes precedence over calendaring. Mr. Donziger therefore respectfully requests an adjournment of this matter, in furtherance of the preservation of his constitutional rights and the safety and well-being of all those likely to be affected by attempts to conduct a fair and public trial. In the absence of some compelling reason why a trial on these "petty offenses" must be held in the immediate future, the defense respectfully requests this matter be adjourned.

## ARGUMENT

### I.  COVID-19 RESTRICTIONS PRECLUDE THE ATTENDANCE OF DEFENSE WITNESSES

Mr. Donziger's defense requires the live testimony of multiple witnesses from around the world, all of which are ready and willing to testify at Mr. Donziger's request. Unfortunately, due to travel and health restrictions and the time constraints

---

[8] Morris v. Slappy, 461 U.S. 1, 11 (1983) (finding that broad discretion must be granted trial courts on matters of continuances); Lewis v. Rawson, 564 F.3d 569, 577 (2d Cir. 2009) (holding that precedent requires appellate courts to be particularly solicitous of a District Court's ruling on a motion to adjourn).

posed by a November 4th trial date, most, if not all, will not be able to provide live testimony unless this case is adjourned. Dkt. 180, at 2.

Several ready and willing witnesses are actually or virtually prohibited from traveling to New York due to travel restrictions and barriers erected by various governments to curb COVID-19. For example, one witness resides in the vicinity of Barcelona, Spain, where all non-essential travel is severely restricted. Testifying live at the currently scheduled trial would require him to quarantine for 14 days upon arriving in New York, and then for 14 more days upon returning home, if he were permitted to return home at all.[9] See Declaration of Simon Taylor.  Similarly, two witnesses reside in Canada and would also be required to quarantine for 14 days upon arriving in New York,[10] and another 14 days upon their return to Canada.  See Decl. John Phillips.

Ms. Glavin has suggested (see Dkt. 180), but not actually committed to, the idea that if these witnesses testified via live-video from within a United States Consulate, she would consider not objecting to such remote testimony. Although Mr. Donziger maintains that the "strong preference" for live testimony cautions against the virtual appearance of witnesses, defense counsel has nonetheless made inquiries to all relevant consulates. Every consulate contacted has responded that

---

[9] *COVID-19 Travel Advisory*, N.Y. STATE, https://coronavirus.health.ny.gov/covid-19-travel-advisory (last accessed Oct. 19, 2020).
[10] Id.

5

either such a service is not provided or that such a service is not currently provided due to COVID-19 restrictions. See Dkt. 180.

A number of necessary defense witnesses reside in states spread across the U.S. Some witnesses reside in states on New York's mandatory quarantine list and would therefore be forced to quarantine for 14 days upon arriving in the state and 14 upon their return home. Almost all, however, are high-risk for COVID-19 due to their age, underlying health conditions, and/or co-morbidities and have indicated to Mr. Donziger that, for those reasons, they will be unable to travel to New York in November. These witnesses have nonetheless been noticed and subpoenaed. Many will be submitting affidavits and letters to this Court explaining the health-related reasons that preclude them from complying with their appearance subpoenas.[11] E.g. Decl. S.Taylor; Decl. J. Phillips

### a. Proceeding to Trial on November 4, 2020 Would Preclude any of the Defense Witnesses Residing in Ecuador from Testifying

Mr. Donziger has noticed five witnesses who are Ecuadorian citizens currently residing in Ecuador. They are all willing to appear as witnesses at his trial. None are able to come to the United States at the present time because of travel restrictions imposed by both the United States Government and the Republic of

---

[11] For privacy reasons, these details have been omitted from this motion. However, at the Court's request, Mr. Donziger will provide the health details of his witnesses.

6

Ecuador. The prosecution correctly notes that the Constitution of the Republic of Ecuador does not permit the extradition of its citizens.[12] Moreover, the treaty in place between the two countries does not permit persons within Ecuador to be extradited to the United States for the crimes of perjury or other forms of false swearing.[13]

As two cases relied upon by the Government make clear, state-mandated COVID-19 restrictions and the lack of an extradition treaty between the United States Government and Ecuador make the delivery of testimony by the Ecuadorian witnesses—either in-person or remotely—practically and legally infeasible, respectively. See United States v. Banki, No. 10 CR. 08 (JFK), 2010 WL 1063453 at *1–2 (S.D.N.Y. Mar. 23, 2010) (finding that testimony could not be take remotely where the witnesses would be "entirely beyond the reach of the United States Government" and therefore not susceptible to "the teeth of perjury . . ."); United States v. Buck, 271 F.Supp.3d 619, 624 (S.D.N.Y. 2017) (denying a defense motion to tele-conference witnesses in from Switzerland on the ground that the witnesses, Swiss citizens, could not be extradited for perjury). This Court has noted "the case law reflects a deep skepticism about the reliability of remote testimony from witnesses who cannot be extradited to the United States . . . ." Dkt 186, at 3.

---

[12] Extradition Treaty Between the United States of America and the Republic of Ecuador, MCNABB ASSOCIATES,
http://www.mcnabbassociates.com/Ecuador%20International%20Extradition%20Treaty%20with%20the%20United%20States.pdf (last accessed Oct. 19, 2020).
[13] Id.

But for COVID-19, all of the noticed witnesses from Ecuador would testify in New York. They cannot do so because of risks posed by a global pandemic and associated prohibitions put in place by their government and ours. Mr. Luis Yanza, as with the other witnesses from Ecuador, is willing to voluntarily come into the United States when health conditions and both governments permit safe travel without lengthy and burdensome quarantines. While we all welcome state actions taken to prevent the spread of COVID-19, those actions cannot be allowed to infringe upon a criminal defendant's rights when an adjournment would further the actions' very goals and would also leave the defendant's constitutional rights intact.

In sum and to be clear, Mr. Donziger is not requesting the Court allow the Ecuadorian witnesses to testify remotely, as asserted by the prosecution (see Dkt. 184, at 2), but is instead noting that holding the trial on November 4th would effectively foreclose him from presenting their testimony as part of his defense.

### b. Mandating Compliance with Rule 15 Requirements in order to Permit Defense Witnesses to Testify Virtually Would Require Donziger to Surrender Rights Guaranteed to Him Under the Sixth Amendment

As the Government has noted, *one* court in this Circuit has held the standards and procedures used for Federal Rule of Criminal Procedure 15 depositions are coterminous with the requirements of having defense witnesses testify through CCTV. Buck, 271 F.Supp.3d at 622–23. The Buck court applied a standard

announced in Gigante and later endorsed in United States v. Mostafa, 14 F.Supp.3d 515, 521 (S.D.N.Y. 2014). Both Gigante and Mostafa concerned analysis of whether *Government* witnesses could be permitted to testify via CCTV without violating the Confrontation Clause. Gigante, 166 F.3d at 81 ("Under the circumstances of this case, Judge Weinstein could have admitted Savino's testimony pursuant to Rule 15 without offending the confrontation clause."); Mostafa, 14 F. Supp. 3d at 518 ("The Court has held at the forefront of its analysis the defendant's Sixth Amendment right to confront witnesses against him."). In so doing, the Buck court erroneously (and by all appearances, inadvertently) extended Sixth Amendment protections to the prosecution. Rule 15's requirements are not coterminous with the requirements of allowing CCTV testimony for defense witnesses because defense witnesses, unlike the Government witnesses analyzed in Gigante and Mostafa, are not subject to the Confrontation Clause.

However, even if this Court were to decide defense witnesses ought to be subjected to Confrontation Clause-level scrutiny, Rule 15's requirements should not apply to defense witnesses at a November 4th trial because their inability to appear is state-created. Rule 15, as it pertains to defense witnesses, **contemplates the defendant electing to utilize Rule 15 procedures.** The stringent requirements pointed to by the Government ought not be applied to impede the defense from calling witnesses who cannot practically appear because of unprecedented

Government restrictions put in place for reasons entirely independent of any alleged wrongdoing by the defendant. While Rule 15's stringent requirements may be sensible when the defense wishes to depose a witness in advance of trial despite the amenableness of the trial courtroom to live appearance, they do not make sense when defense witnesses are constructively barred by state action from otherwise testifying.

With respect to stringent requirements, this Court has already ordered Donziger to provide the names of witnesses in anticipation of a virtual or tele-trial. Donziger's judicially-promoted lead trial counsel has attempted to comply with the Court's order to the best of their abilities. However, the defense has no duty to make disclosure of the names of its witnesses prior to calling them.[14]

Second, while there is no requirement that the defendant pre-screen his witnesses by providing the "subject matter of the expected testimony," the Court's recent order has imposed that burden upon Mr. Donziger. Revealing the subject matter of a witness's expected testimony flips the burden of proof onto the defendant by presenting an aspect of the defense's case first and allowing the prosecution to plan their presentation around necessarily telegraphed defenses. In so doing, the defense's mere readiness to put on a case may create the need to do so, as the

---

[14] In jury trials, of course, names are submitted at the time of jury selection to ensure that none of the proposed witnesses are known to the prospective jurors. Even then, those names are often submitted as part of a list of "names" that may come up in the course of the trial.

10

prosecution gains the chance to prepare a clairvoyant counter to an argument that, but-for the preview, the defense may not have had to present at all.

Third, the legal standard cited by the prosecution, and adopted by this Court, Dkt. 186, at 4, requires the defense to prove that the proposed testimony is "material," defined as "highly relevant to the central issue in the case" or will "challenge central aspects of the government's allegations." Buck, 271 F.Supp.3d. at 623. This standard imposes upon the defense a much greater threshold burden to simply get his witnesses up on the witness stand.  However, defense witness testimony is presumptively admissible so long as it is "relevant" under Federal Rules of Evidence 401–02.[15] While a trial court has authority under Rule 403 to cabin or exclude even relevant evidence, it has no authority to do so *ab initio* on the basis that the evidence is not "highly relevant to the central issue in the case." Furthermore, the "materiality" of defense testimony cannot properly be determined until the prosecution has presented its case.

Thus, Mr. Donziger has been asked to surrender rights he does not wish to surrender, and to make showings that he is unwilling to make, all in order to have an online virtual trial that he adamantly opposes as fundamentally unfair and which can result in real, not virtual, imprisonment.

---

[15] Under the Federal Rules, "relevant" evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

11

## II. THE CONSTITUTIONALITY OF MR. ZELMAN TESTIFYING REMOTELY MUST BE REEVALUATED IN LIGHT OF CHANGING CIRCUMSTANCES

Mr. Zelman's desire not to travel to New York during a global pandemic is shared by the entire defense and witnesses, and underscores the untenable reality of conducting a trial at this time. Mr. Donziger has previously taken issue with the Government's desire to permit two-way video testimony from Government witness Zelman, Dkt. 140, at 7, and those objections are repeated as if set forth fully herein. However, permitting Mr. Zelman to testify at a trial commencing November 4th requires an updated analysis because this Court's decision was based on the circumstances surrounding a September 9th trial date.

In granting the Government's motion to permit Mr. Zelman to testify via two-way video, the Court relied upon the Second Circuit's decision in Gigante, in which the court allowed a Government witness to testify via two-way closed-circuit television "[u]pon a finding of exceptional circumstances[.]" 166 F.3d 75, 81 (2d Cir. 1999). While Gigante remains good law in this Circuit, its allowance of two-way video testimony in the face of a never-ending dearth of alternatives to virtual testimony does not extend to the instant matter. United States v. Banki, 2010 U.S. Dist. LEXIS 27116, at *5 (S.D.N.Y. Mar. 23, 2010), cited by the prosecution, also presented a permanent hurdle to having the witness at issue testify in person. In Gigante, the would-be witness was in the final stages of an

inoperable cancer and was under close medical supervision at the time of trial. In Banki, the witnesses could not enter the United States out of fear of arrest and could not complete Rule 15 depositions as doing so would reveal the locations of individuals protected under the federal witness protection. Mr. Zelman's circumstances do not qualify for the exception to the Sixth Amendment outlined in Gigante, as a recent case addressing a similar situation makes clear. In United States v. Pangelinan, the court distinguished its facts from Gigante and other, similar cases on the ground that those "cases involve[d] witnesses who had an indefinite inability to travel or were gravely ill." No. 19-10077-JWB, 2020 WL 5118550 at *3 (D. Kan. Aug. 31, 2020). As far as the defense has been informed, Mr. Zelman is neither gravely ill nor does he have an indefinite inability to travel. Dkt. 152. But for the pandemic, Mr. Zelman could presumably travel to New York with relative ease. His reasons for not travelling–presently shared by many millions of people, including the defendant, his counsel, and defense witnesses—will subside as soon as COVID is quelled and the courtrooms of SDNY are safe for all participants, those with medical pre-conditions included. The desire to clear the Court's calendar of a petty contempt does not justify holding an expedited and abridged criminal trial which may well break multiple Sixth Amendment guarantees to the defendant.

### III. SOCIAL DISTANCING AND OTHER SAFETY MEASURES MAY CREATE A VIOLATION OF MR. DONZIGER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

Jessica Roth, a professor at Cardozo Law School and co-director of the Jacob Burns Center for Ethics in the Practice of Law (and a former federal prosecutor in this district), has noted:

> [T]he Sixth Amendment provides defendants with the right to the "assistance of counsel" in their defense. In court, defense counsel and their clients might well have to practice social distancing and wear masks, limiting their ability to communicate privately. Outside court, defense counsel may be understandably concerned about the safety of visiting with their clients [. . .] Some lawyers undoubtedly will feel pressure to sacrifice safety in the name of professionalism. Is it fair to ask that of them? If they do not, will defendants be deprived of the effective assistance of counsel?[16]

The right to the effective assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments. Herring v. New York, 422 U.S. 853, 857 (1975). Currently, the sole attorney of record for Mr. Donziger faces a gravely serious choice either to defy her doctor's warning not to

---

[16] Jessica A. Roth, The Constitution is on Pause in America's Courtrooms, THE ATLANTIC, October 10, 2020, https://www.theatlantic.com/ideas/archive/2020/10/constitution-pause-americas-courtrooms/616633/.

14

travel on a plane from Oregon to New York in time for a November 4th trial, [17] or follow her doctor's advice and deprive Mr. Donziger of the assistance of counsel via a live lawyer.[18]

Even if defense counsel elects to put her health in jeopardy and chooses to travel to New York in order to defend Mr. Donziger in person, safety guidelines will still create a significant barrier to providing effective assistance of counsel within the meaning of the Sixth Amendment. The Centers for Disease Control and Prevention (CDC) advises that, when indoors, all individuals who do not cohabitate should wear masks and remain at least 6 feet apart from each other.[19] The inability to effectively confer confidentially with his lawyer due to being more than 6 feet away from each other while both wearing cloth masks in a small courtroom may amount to a violation of the right to counsel. A review of caselaw from various circuits demonstrates that, although the use of some nontraditional seating

---

[17] Lane County, where attorney Regan resides, was formally added to Oregon's COVID-19 watch list on October 16th. See, e.g., Jordyn Brown, Lane County Added to state COVID-19 County Watch List, THE REGISTER-GUARD, Oct. 16, 2020, https://www.registerguard.com/story/news/2020/10/16/covid-case-increase-lands-lane-county-oregons-county-watch-list/3683280001/.

[18] "At in-person court proceedings . . . [i]f a client has a question or concern during the court proceeding, the client can consult with the attorney at counsel table or, if necessary, request a brief recess for a more private and thorough consultation. Replicating this level of communication and consultation in virtual or remote court proceedings is difficult." American Bar Association HOD Resolution 117, August 3–4 2020, available at: https://www.americanbar.org/content/dam/aba/directories/policy/annual-2020/117-annual-2020.pdf.

[19] Social Distancing: Keep a Safe Distance to Slow the Spread, CTR. FOR DISEASE PREVENTION AND CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited, Oct. 19, 2020).

arrangements have been found to comply with the Sixth Amendment, a November 4th trial in this case would lack the saving grace of nontraditional arrangements which have been judicially condoned.

In United States v. Jones, 766 F.2d 994, 1004 (6th Cir. 1985), a case involving eighteen defendants, the Sixth Circuit found no Sixth Amendment violation where defendants "were seated in two rows immediately behind counsel table" because defendants were permitted to pass notes to their attorneys, counsel could get up and discuss matters with their clients, and no restrictions were placed on communications during recesses. By contrast, Mr. Donziger may be limited in his ability to pass notes to his attorney in a timely fashion or at all, or to discuss matters easily and freely with his attorney as the trial is unfolding. Furthermore, given how recently the sole attorney of record became his only trial attorney, and with so little time to prepare to perform that role, she will no doubt need to consult frequently with Mr. Donziger, a lawyer by training, on matters of legal strategy throughout the trial.

In United States v. Balsam, 203 F.3d 72, 82 (1st Cir. 2000), the First Circuit found no abuse of discretion where defendants were "seated in the front row of the spectator section . . . only four to five feet from defense table", in part because the defendants could "freely communicate with their attorneys as they wished, either by walking the short distance to the defense table, or by passing written notes." Unlike the defendants in Balsam, Mr. Donziger would not be able to "freely communicate"

16

with his attorney during a trial beginning on November 4th. His inability to freely communicate will manifest whether he and counsel are in the courtroom together six feet apart with masks on, or are thousands of miles away communicating via the Jabber application only.[20]

Finally, the defense has taken the steps that it can to address, at least, Mr. Donziger's right to the counsel of his choice. Counsel of record has recently communicated with Ronald L. Kuby, and he has again confirmed that he will be available to participate in this trial non-virtually if it commences on December 7, 2020 or later. There is simply no rational basis to force Mr. Donziger to trial without the assistance of live counsel of his choice when a short delay would solve this issue. If an adjournment to December 7 or later were granted, Mr. Donziger would at least be assured of having an attorney that he has met in person by his side, even if his other rights must be infringed upon as part of our "new normal."

## **CONCLUSION**

As this Court has aptly stated, "there is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure are critically important public policies." Dkt. 152, at 5. In United States v. Pangelinan, *supra*, the

---

20 "It is unlikely that any virtual procedure can effectively mimic the communication opportunities provided by in-person hearings." American Bar Association HOD Resolution 117, *supra* note 23.

court acknowledged that it "could also continue this matter until the transmission rate of the virus improves." This Court has that same choice. The defense therefore respectfully requests the Court exercise its option to adjourn in order to permit the holding of a fair and safe trial for all involved.[21] If the Court finds, despite the many compelling reasons for not so concluding, that it *must* try the petty charges against Mr. Donziger on November 4, the defense respectfully requests that the Court utilize the largest courtroom available in order to minimize the risk that trying a crime with a six month maximum sentence will cost a participant his or her life.

Dated October 22, 2020.

Respectfully submitted,

/s/ Lauren C. Regan
Lauren C. Regan, *Pro Hac Vice*
Civil Liberties Defense Center
1430 Willamette St. #359
Eugene, Oregon 97401
541.687.9180 phone
Email: lregan@cldc.org
*Counsel for Steven Donziger*