UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES,<br><br>      Plaintiff,<br><br>  v.<br><br>STEVEN DONZIGER,<br><br>      Defendant. | 11 Cr. 0691 (LAP) |

**RESPONSE IN OPPOSITION
TO GIBSON DUNN'S MOTION TO QUASH**

  Corporate law firm and litigation behemoth Gibson Dunn & Crutcher (GDC) has made many millions of dollars in the last decade attacking and demonizing renowned human rights lawyer Steven Donziger. GDC lawyers have used virtually every dirty trick in the book: threats and intimidation, paid "fact" witnesses, corporate espionage, blitzkrieg litigation, crushing discovery demands, invasion of the attorney-client privilege, corrupt experts, fake journalists, and more. And while they did all this per marching orders from their client, Chevron, to "strateg[ically] demonize Donziger," they have now developed it all into an independent business model. Gibson Dunn sells itself as "not just a law firm, but a rescue squad," "willing[] to work beyond the courts," to think "aggressively" and "innovatively"—"like plaintiffs lawyers"—and to "tireless[ly] unearth evidence to try to discredit" its clients' critics, even when those critics are the client's own human rights victims (such as the Indigenous Ecuadorian victims of Chevron's pollution, in this case).[1]

---

[1]  *See* Amy Kolz, *The Complete Game*, The American Lawyer (Jan. 2012), at http://www.gibsondunn.com/publications/Documents/GDC-LDOYLitigationWinner.pdf (as

The attack on Mr. Donziger is the brightest feather in the grotesque professional plumage that Gibson Dunn now appears to be wagging in front of other potential corporate clients faced with the "problem" of human rights victims and vocal human rights defenders. *See, e.g.*, Ex. A. The firm is very highly motivated to make sure its Donziger "demonization" narrative stays on track. The private prosecutors have confirmed that Gibson Dunn is sending four of its partners—all of whom list their involvement in the RICO case against Mr. Donziger prominently in their publicity bios—to testify against Mr. Donziger and try to help the private prosecutors secure a long-awaited and much-desired criminal conviction. Indeed, this week we learned just how long-awaited: Gibson Dunn attorneys first started lobbying the U.S. Attorney's Office for criminal prosecution of Mr. Donziger *in 2010*, long before any RICO judgment or contempt allegations.[2] It would be naïve to think this lobbying effort was the last.

The private prosecutors are planning on offering the Gibson Dunn partners who have enriched themselves by targeting Mr. Donziger as essentially neutral observers, incidental participants in the process leading up to the alleged acts of criminal contempt. They may seek to offer select "facts" going to Mr. Donziger's motivations or willfulness. The extent of these

---

featured on Gibson Dunn's website); David Bario, *Game Changers*, The American Lawyer (Jan. 2010), at http://www.gibsondunn.com/news/documents/gibsondunn-amlawlitdeptoftheyear2010.pdf (as featured on Gibson Dunn's website). Gibson Dunn has persisted in its "unique" approach to the practice of law despite being repeatedly called out by judicial authorities ranging from this Court, *see, e.g.*, *Family Archives, Ltd. v. CMG Worldwide, Inc.*, 589 F. Supp.2d 331, 341 (S.D.N.Y. 2008) ("unacceptable shenanigans"), the Montana Supreme Court, *Seltzer v. Morton*, 154 P.3d 561, 608 (Mont. 2007) ("legal thuggery"), the High Court of Justice in the UK, *Abdourahman Boreh v. Republic of Djibouti*, [2015] EWHC 769 ("'deliberately' misled the court"), and many others.

[2] *See* Sara Randazzo, *Litigation Without End: Chevron Battles On in 28-year-old Ecuador Lawsuit*, Wall St. J., May 2, 2021, at https://www.wsj.com/articles/litigation-without-end-chevron-battles-on-in-28-year-old-ecuador-lawsuit-11619975500 ("In a conference room in lower Manhattan in 2010, Gibson Dunn pitched federal prosecutors on the idea of criminally prosecuting Mr. Donziger. [The prosecutors] declined.").

partners' profiteering from their attacks on Mr. Donziger, and the details of their scheming with the private prosecutors and others to help keep the Donziger "demonization" narrative in place, is all patently relevant and necessary evidence going to the credibility and potential bias of these witnesses.

As an example of the bad faith that runs like a torrent throughout Gibson Dunn's motion to quash is that its lengthy analysis of the purported irrelevance of the subpoena requests doesn't even mention the words "bias" or "credibility." In a single sentence, GDC asserts that the use of trial subpoenas to obtain such impeachment material is contrary to "established authority." This is outright false. And the obstructionism doesn't end there. As detailed below, in a few short days GDC has repeatedly misled the Court, blatantly ignored inconvenient facts, misused the meet-and-confer process, wallowed in rank hypocrisy, and more.

The GDC partners coming to court to prosecute Mr. Donziger are expecting this Court to protect them in quashing this subpoena and to sharply limit, if not all but eliminate, cross-examination. They are expecting this Court to let them continue getting away with the kind of bad faith tactics mentioned above. They see no unfairness in being allowed to crush Mr. Donziger with unbelievably intrusive subpoenas for over a decade in the civil RICO matter but they demand absolute protection when asked to comply with a small number of narrowly-tailored requests necessary to Mr. Donziger's defense in a criminal case.

If the Court does protect Gibson Dunn, we will never know what the firm is hiding. But we do get some hints at the scope of it just from GDC's motion. GDC acknowledges that the number of potentially responsive documents pertaining to contacts between the firm and Your Honor, Judge Kaplan, and Seward & Kissel would be "staggering." Mot. at 15-16. It asserts that its "plans, ideas, methods, tactics, strategies, and approaches" in furtherance of the objective of

getting Mr. Donziger criminally prosecuted "are at the heart of the attorney-client relationship" the firm has with Chevron and "reflect work product" by the firm for Chevron, conceding once again that instigating this criminal prosecution was and is a key strategic goal for both Chevron and the firm—and that, as Mr. Donziger and outside groups have maintained, this case represents the nation's first corporate criminal prosecution. Mot. at 13-14. And while GDC does not appear to assert the privilege over its marketing and promotional materials pitching the firm's abusive targeting of Mr. Donziger as an "option" for other deep-pocketed corporate human rights abusers, its objections effectively concede the existence of such materials—after all, it would be far easier for GDC to simply say "no responsive documents" in response to these requests rather than dig in for a long fight on technicalities as it is doing.

Disclosure of the limited information sought by the subpoenas is absolutely necessary for the defense to properly cross-examine the GDC partners coming to trial and necessary to establish critically important context and perspective. The Court should deny the motion to quash and direct GDC to immediately comply with the subpoenas. GDC must stop hiding critical information necessary to Mr. Donziger's defense.

**I.    Relevance**

The subpoenas at issue are trial subpoenas, returnable the day of trial. Four of the five subpoenas are to individual GDC partners expected to testify at trial. As noted above, the information sought is critically necessary to understanding the bias and personal financial motivation these individuals have concerning this prosecution and the larger strategic campaign to "demonize" Mr. Donziger over the course of the last decade. GDC's motion to quash doesn't even mention the words "bias" or "credibility." Instead, it contains the utterly baseless claim that "[t]o the extent Donziger is attempting to use Rule 17(c) to obtain documents and information solely for impeachment purposes . . . that is contrary to established authority," with a citation to *United*

4

*States v. Binday*, 908 F. Supp. 2d 485, 492 (S.D.N.Y. 2012), which in turn cites *United States v. Nixon*, 418 U.S. 683 (1974). As Gibson Dunn likely knows, a party in a different case in this district recently tried this same misleading gambit and was remonstrated by Judge Ramos:

> Before analyzing the subpoena under *Nixon*, the parties raise a preliminary question of whether a Rule 17(c) subpoena may ever be used to obtain materials that can be used only for impeachment. . . . The Government points to language in *Nixon* to support its argument, noting the Supreme Court there stated that "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production." 418 U.S. at 701.
>
> However, in its argument, the Government omits a critical portion of the *Nixon* Court's analysis that is relevant here: "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production *in advance of trial*." *Id.* (emphasis added). Thus, the *Nixon* Court did not hold that subpoenas pursuant to Rule 17(c) could not be used to procure impeachment evidence at trial. Here, Cole propounded trial subpoenas, and at trial, impeachment evidence is certainly relevant to a witness's testimony. *See Skelos*, 2018 WL 2254538, at *2. Notably, several courts in this District have concluded that trial subpoenas seeking evidence for impeachment are permissible under Rule 17(c). [citing *United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2020 WL 508682, at *3 (S.D.N.Y. Jan. 31, 2020); *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2254538, at *1 (S.D.N.Y. May 17, 2018); *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2018 WL 9539131, at *2 (S.D.N.Y. June 14, 2018); and *United States v. Seabrook*, No. 16 Cr. 467 (ALC), 2017 WL 4838311, at *1 (S.D.N.Y. Oct. 23, 2017).]

*United States v. Cole*, No. 19 CR. 869 (ER), 2021 WL 912425, at *3–4 (S.D.N.Y. Mar. 10, 2021). The fact that GDC thinks it can get away in this Court with such wildly misleading assertions about the limits of "established authority" speaks volumes.

Moreover, the information sought by Mr. Donziger is highly relevant for reasons beyond impeachment. The extent, ferocity, and venality of Gibson Dunn's attacks on Mr. Donziger over the last decade are highly relevant to understanding Mr. Donziger's good faith basis to pursue voluntary civil jurisdiction to secure direct appellate review before turning over reams of confidential and attorney-client privileged information for review by GDC. The defense also has consistently and legitimately challenged the exercise of discretion by Judge Kaplan and the private

5

prosecutors in characterizing and pursuing the alleged conduct as *criminal* contempt, in violation of strict guidance by the Second Circuit and the Supreme Court that the contempt power be used only as a "last resort" and that only the "least possible power adequate to the end" be deployed. *See, e.g.*, Dkt. 274. Information concerning Gibson Dunn's involvement in the initiation and prosecution of these overreaching and historically unprecedented criminal contempt charges will allow the defense to build a critical record on the fact that the exercise of discretion in this case was improperly infected with Gibson Dunn's (and Chevron's) private interests and vindictive motives.

## II. Admissibility

Gibson Dunn challenges the admissibility of the information sought by the subpoenas on two grounds: attorney-client privilege and alleged hearsay. Neither issue presents any legitimate rationale to justify quashing the subpoenas.

Addressing GDC's hearsay argument first, the GDC objections are speculative—valid hearsay objections can and will be raised by the private prosecutors at trial. The fact that "it is not apparent [to Gibson Dunn at present] how Donziger could overcome any hearsay exception," Mot. at 14, is not a basis for quashing the subpoenas. There is no shortage of non-hearsay uses (*e.g.* to establish facts other than the truth of whatever statements are in the material, such as dates of and participation at meetings, awareness of events, and so on) and hearsay exceptions (state of mind, present sense impressions, recorded recollections, business records, reputation concerning character, and more) that might apply depending on the statement and the intended use. The wildly speculative concern that some potential uses of some potential responsive documents might be challenged at trial on hearsay grounds is not a basis to quash.

Regarding attorney-client privilege, the hypocrisy and double-dealing by GDC here simply could not get any richer. In a case where Mr. Donziger is being charged criminally for doing his

best to abide by his ethical duties to protect his clients' privileged information,[3] GDC blithely celebrates its own refusal to comply with the subpoena because "Gibson Dunn and its partners are duty-bound to invoke privilege on behalf of their client Chevron." Mot. at 13 n.5. And in a context where Mr. Donziger and his clients have *twice* been savagely and in wholesale fashion stripped of the protections of the privilege on account of Mr. Donziger's supposed failure to comply with an unprecedented interpretation of SDNY Local Rule 26.2 as requiring a complete privilege log at the time any privilege objection is stated *on penalty of waiver*, Gibson Dunn fails to provide any such log along with its objections or even to offer to provide one. Accordingly, even though this hyper-aggressive interpretation of L.R. 26.2 was improper and abusive as applied by Judge Kaplan, in fairness the Court should apply it here and find a subject-matter waiver of privilege as to all of Gibson Dunn's communications with Chevron. Mr. Donziger should not be held to one interpretation of the rule while Gibson Dunn, a wealthy law firm with plenty of resources, gets the more lax interpretation.

In yet another bad faith citation to purported "established authority," GDC claims that "attorney billing statements are subject to the attorney-client privilege *to the extent that they reveal more than client identity and fee information*." Mot. at 13 (quoting *Ehrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 19-20 (N.D.N.Y. 2002). In fact, the cited portion of Erich references

In the alternative, and in the absence of a privilege log or indeed any specific information about the validity of any assertions of privilege regarding any specific communications, GDC and

---

[3] *See, e.g.*, Civ. Dkt. 2131 ("[M]y position is that I am not ethically able to comply with the Court's order to produce mountains of confidential and privileged material to Chevron under a wholly improper purported privilege waiver ruling and before the Court has even ruled on the core issue in Chevron's original contempt motion. If the Court is unwilling to rule on the legal basis of Chevron's motion and continues to refuse to allow me to assert any privilege whatsoever, I intend to openly and ethically refuse to comply with any production order and to take an immediate appeal of any resulting contempt finding the Court issues against me.").

the individual witnesses must, first, produce all responsive documents not specifically subject to a claim of privilege. For example, GDC broadly objects to producing *any* billing information by reference to the proposition that "attorney billing statements are subject to the attorney-client privilege *to the extent that they reveal more than client identity and fee information*." Mot. at 13 (quoting *Ehrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 19-20 (N.D.N.Y. 2002). GDC neglects to mention, of course, that *Ehrich* also concluded privilege protection for billing records in federal law was "less clear" and "less definitive" than in New York law, "render[ing] suspect a rigid rule that billing statements are uniformly protected by the attorney-client privilege." In any event, the asserted privilege would not apply to cover invoices showing amounts billed, which should be produced immediately. Other more detailed bills (and other responsive documents over which GDC claims privilege) should be produced or brought to trial in redacted form so that specific claims of privilege as to specific documents can be raised and litigated depending on what materials the defense decides to use. GDC and the individual witnesses should also bring unredacted copies of the documents for use should the Court not sustain their privilege claims. And of course, GDC and the individual subpoena recipients must bring with them

**III. Specificity**

The subpoenas, in 14/15 carefully-worded, layered requests, seek information on (a) GDC contacts with the Court and the private prosecutors regarding this case; (b) GDC's own efforts to stimulate or advance the criminal prosecution of Mr. Donziger; and (c) GDC's financial interest in the prosecution of Steven Donziger, including professional marketing and solicitation materials that advertise the firm's work in going after Mr. Donziger. That's it. Given the decades of relevant

history behind the charges in this case and the full decade of active litigation between GDC and the defendant, these are extraordinarily *limited* requests.[4]

To the extent that Gibson Dunn is legitimately concerned that the wording of some of the requests could be interpreted broadly so as to migrate into plainly irrelevant areas or unduly increase the burden of compliance, such objections are not for a motion to quash—they are for discussion in meet and confer, at least in the first instance. For example, GDC plays up the fact that while the requests for contacts with Your Honor expressly excluded docketed filings in this case, they did not expressly include docketed filings in other cases. That issue could have been easily raised on the meet-and-confer: the defense is not interested in docketed filings in other cases. But instead of engaging this issue in good faith, GDC saved it for "gotcha" effect in its motion, and instead used the meet-and-confer exclusively to try to coerce the defense into abandoning the subpoenas. *See* Mot. at 9.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to quash and direct GDC to comply with the subpoena requests fully, albeit subject to an appropriate privilege log unless the Court determines that GDC has waived privilege. For any redacted or withheld document, GDC and the individual witnesses should bring an unredacted copy to trial so that privilege objections may be raise and resolved in a timely fashion with interrupting the flow of trial. GDC may of

---

[4] Among the points that will be developed at trial is the stunning overbreadth of the subpoenas served by Gibson Dunn on Mr. Donziger, and even worse how GDC lawyers then translated those subpoenas into a list of hundreds of generic search terms that they could use to effectively and freely browse through any and all of Mr. Donziger's private files. As just one notable example in this context, one of the subpoenaed individuals, Mr. Mastro, had his name "Mastro" included as a search term, presumably as a vanity search so that he could determine what, if anything, Mr. Donziger says about him in private.

course reapproach defense counsel for guidance on the intended scope of any particular language in the requests that could give rise to specific overbreadth or undue burden concerns. Defense counsel, it bears mention, is motivated to streamline the process as much as possible in order to have the information fully available by trial.

DATED: May 5, 2021                                             Respectfully submitted,

_____/s/_____
Martin Garbus, Esq.
OFFIT | KURMAN
590 Madison Ave., 6th Floor
New York, NY 10022
Tel. 347.589.8513
Fax. 212.545.1656
mgarbus@offitkurman.com
*Counsel for defendant*