# EXHIBIT A



ZUCKERMAN
S P A E D E R

William W. Taylor. III
PARTNER
Zuckerman Spaeder LLP
wtaylor@zuckerman.com
(202) 778-1810

April 2, 2021

**VIA HAND DELIVERY AND E-MAIL**
john.carlin@usdoj.gov

The Honorable John P. Carlin
Acting Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

      Re:    *United States v. Steven Donziger,* No. 19-cr-561 (S.D.N.Y.)
                 *Chevron Corp. v. Steven Donziger,* No. 11-cv-691 (S.D.N.Y.)

Dear Mr. Carlin:

I write to request that the Department of Justice review the criminal contempt prosecution of Steven Donziger being conducted in the Southern District of New York by a special prosecutor appointed by Judge Lewis Kaplan of that court. The order to show cause alleges willful violations of orders entered in civil RICO litigation brought by Chevron against Mr. Donziger and others, litigation by which Chevron has blocked enforcement in the United States of an Ecuadorian $8.6 billion judgment against it for environmental pollution in the Lago Agrio region of Ecuador.

This prosecution merits your consideration because, in this instance, a private company's agenda is driving the enforcement of federal criminal law. The attorney implementing that enforcement identifies herself as representing the United States but acknowledges no responsibility to or control by the Department of Justice. By virtue of the judicial appointment, she, and the judge who appointed her, consider that she enjoys independence from the supervision to which every other federal prosecutor is subject. She is free to ignore the fact that she is implementing the agenda of a private litigant in the name of the United States by seeking to convict the litigant's adversary of a crime.

The charges against Mr. Donziger and the procedures by which they arose and are being conducted now can only be described as bizarre at best, vindictive and cruel at worse. Mr. Donziger has been subjected to home confinement for over

nineteen months, an extraordinary restraint for a petty offense. The case has received international attention. For example, 55 Nobel laureates have issued a statement in support of Mr. Donziger and demanded his release.[1] The need for review and supervision is more critical because of the involvement of the district judge who inspired and then presided over Chevron's civil RICO case against Mr. Donziger, and who, after appointing the special prosecutor and hand-picking another judge to preside over the criminal contempt trial, declined to recuse himself from the prosecution. The same judge forced Mr. Donziger to defend simultaneously civil contempt for the same offenses for which the Special Prosecutor now seeks his conviction.

I will describe the history of the underlying litigation later, and I think you will see in that history a pattern of procedural unfairness and personal animus that warrants review of the criminal contempt prosecution by a dispassionate third party. The special prosecutor's refusal to forego any communications with Chevron's counsel and the district judge and her refusal to disclose the contents of those communications precludes confidence that this is a prosecution that properly invokes the name and sovereign authority of the United States.

The United States Attorney for the Southern District of New York declined to pursue the district court's order to show cause, citing resource constraints. As discussed more fully below, the special prosecutor appointed by the court pursuant to Fed. R. Crim. P. 42(a)(2) is nonetheless an inferior officer wielding authority of the executive branch who must therefore be subject to the oversight of principal officers in the executive branch, not to the direction of the appointing judge (or to no direction from anyone). I urge the Department to review both the prosecutorial merits of the contempt charges and the continued pursuit of those charges after Mr. Donziger has already spent nineteen months in home detention before trial, more than three times the maximum home detention penalty for a concededly petty offense authorized under the Sentencing Guidelines. U.S.S.G. § 5F1.2. Three of the allegedly willful contempts arise from production-related orders Mr. Donziger was required to disobey in order to challenge them on appeal (negating willfulness), and the Second Circuit has recognized that at least one of the remaining counts is invalid because of an ambiguity the district court created in a stay ruling. *United States v. Donziger*, No. 20-1710-cr, slip op. at 2 n.2 (2d Cir. March 29, 2021) (citing *Chevron Corp. v. Donziger*, 2021 WL 821456 (2d Cir. Mar. 4, 2021)).

---

[1] https://www.makechevroncleanup.com/press-releases/2020/11/5/full-statement-of-55-nobel-laureates-in-support-of-us-human-rights-lawyer-steven-donziger.

Mr. Donziger has already paid an enormous price for his role in the litigation against Chevron.  The district court ordered him to disgorge any interest in the Ecuadorian judgment, and imposed liability for over $800,000 in court costs.  An appellate court has ordered his disbarment, subject to a pending request for review by the New York Court of Appeals.  All of those consequences stem from factual findings Judge Kaplan made in the non-jury civil RICO trial.   I assume the Department will take those findings into consideration in deciding our request, but it will also understand that this judge has taken an unprecedented personal role in Chevron's campaign against Mr. Donziger. It is not necessary to conclude Mr. Donziger is blameless for all that has occurred to conclude that this criminal prosecution is an abuse and one which requires executive branch control to assure basic separation of powers.

"While a court has the authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that only [t]he least possible power adequate to the end proposed should be used in contempt cases." *Young v. United States ex rel. Vuitton et fils SA*, 481 U.S. 787, 801 (1987) (cleaned up).  Just as the judicial branch imposes a necessary constitutional check on prosecutions by the executive branch, executive branch oversight—here in the form of a review by the Department—is a necessary constitutional check on a judicially-initiated prosecution that is disproportionate to the end of compliance with the post-judgment orders issued in the civil RICO case.

## BACKGROUND OF THE *CHEVRON* LITIGATION

The full background of the litigation out of which this criminal contempt prosecution arises extends over more than two decades and hundreds of pages of judicial opinions.[2]   The earliest relevant decision is *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998), which conditioned *forum non conveniens* dismissal of a civil action filed in 1993 in the Southern District of New York by residents of the Lago Agrio region of Ecuador alleging environmental damage by Texaco on Texaco's submission to jurisdiction in Ecuador.  In 2002, the Second Circuit affirmed dismissal of the Southern District of New York action in favor of litigation in Ecuador.  *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).  The Lago Agrio residents filed suit in Ecuador in 2003 and ultimately obtained a judgement against Chevron, Texaco's successor.

---

[2] A Westlaw search for "Chevron & Ecuador & Donziger" in the Second Circuit and Southern District of New York returned 78 relevant opinions.

*Chevron's Ancillary Action under 28 U.S.C. § 1782*

The litigation returned to the Southern District of New York in 2010[3] when Chevron filed an action for discovery pursuant to 28 U.S.C. § 1782 on its own behalf and that of two lawyers working for Chevron threatened with criminal prosecution in Ecuador for allegedly falsifying documents connected to a 1995 settlement and release between Chevron and the Ecuadorian government. Chevron claimed the prosecution of the Chevron lawyers in Ecuador resulted from connivance between Mr. Donziger and the Ecuadorian government led by then-President Rafael Vicente Correa Delgado.  *In re Application of Chevron Corp.*, 709 F. Supp.2d 283 (S.D.N.Y. 2010).  The criminal charges against the Chevron attorneys played a crucial role in propelling forward what the District Court described as "a race" between discovery in the United States and the entry of judgment against Chevron in Ecuador and the prosecution of the lawyers.  749 F. Supp. 2d 170, 172–73 (S.D.N.Y.), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

The matter was assigned to Judge Kaplan, who authorized the issuance of subpoenas for "outtakes" of a documentary film, *Crude*, that portrayed the Lago Agrio residents' litigation against Chevron in Ecuador and Mr. Donziger's role in it. While an appeal of that order was pending, Chevron sought additional discovery from the filmmaker, and to compel production of certain disputed material.  The District Court rejected the filmmaker's charge that Chevron had violated the Second Circuit's partial stay order by improperly disclosing subpoenaed material to the National Association of Manufacturers.  736 F. Supp. 2d 773, 789 (S.D.N.Y. 2010) ("A newspaper clipping stating that Chevron provided transcripts of outtakes is not admissible to prove the truth of the statement and certainly not clear and convincing evidence," as would be required for civil contempt). The Second Circuit affirmed the original subpoena to the documentary filmmaker.  *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).

Next, in a separate § 1782 case assigned to Judge Kaplan as related to the first, the District Court granted a deposition of Mr. Donziger to gather information about his alleged role in reinstating criminal charges against the Chevron attorneys in Ecuador.  749 F. Supp.2d 135 (S.D.N.Y. 2010).  The District Court subsequently allowed Chevron to question and obtain privileged documents from Mr. Donziger after holding that he had waived the privilege by failing to timely produce a

---

[3] There was also litigation between Texaco and the Republic of Ecuador concerning the division of responsibility for harm between Texaco and Ecuador's state-owned oil company in the Southern District of New York and the Second Circuit that has no direct bearing on the criminal contempt case.

privilege log.  749 F. Supp.2d 141 (S.D.N.Y. 2010).  The waiver ruling was based on Mr. Donziger's failure to file the privilege log by the date the court had specified, even though the order had been stayed on that date, and even though Mr. Donziger had produced a 2,000-page log within hours after the Second Circuit denied his appeal and dissolved the stay and had already produced all non-privileged documents before the waiver ruling.  *See* Order, 10:MC-002, ECF 124 (S.D.N.Y. Nov. 30, 2010).  Chevron deposed Mr. Donziger for an extraordinary 15 days.

### Chevron's Suit Under the New York Recognition Act and Civil RICO

On February 1, 2011, Chevron filed a civil action under RICO and state law against Mr. Donziger, others associated with the Ecuadorian litigation, and representatives of the Lago Agrio plaintiffs, and a motion for a temporary restraining order and preliminary injunction under a New York statute governing recognition of foreign judgments.  *Chevron Corp. v. Donziger*, 768 F. Supp.2d 581 (S.D.N.Y. 2011).[4]  Chevron identified the new action as related to the earlier proceeding under 28 U.S.C. § 1782, and it was assigned to Judge Kaplan over Mr. Donziger's protests.  ECF 158 (letter requesting reassignment); ECF 160 (motion for transfer to the judge who handled the earliest-filed related matter).[5]  Chevron knew that Judge Kaplan would be receptive to its RICO claims because he had characterized Mr. Donziger's actions as a RICO violation in a September 23, 2010 hearing in one of the § 1782 actions.  ECF 161, Peters Decl. Ex. C, 9/23/2010 Hr'g Tr. 24:6-22 ("Now do the phrases Hobbs Act, extortion, RICO, have any bearing here?").

After granting Chevron's request for a TRO on February 8, 2011 (ECF 77), the District Court gave Mr. Donziger only until February 11 to file an opposition to the motion for a preliminary injunction supported by over 5000 exhibits, even though Mr. Donziger had notified the court that he did not yet have counsel.  ECF 158 (letter requesting time to respond to obtain counsel), ECF 161-12 (transcript). The Ecuadorian trial court entered its multi-billion-dollar judgment against Chevron on February 14, 2011. When Mr. Donziger's newly-retained counsel asked for more time to oppose the preliminary injunction on February 17, Judge Kaplan denied the request and later warned his lawyer (John Keker) against future "disobedience" for having filed a belated opposition to the preliminary injunction on February 24.  ECF 137 (opposition); ECF 192 (order).  On March 7, 2011, the

---

[4] Around the same time, the Second Circuit held that Ecuador had consented to international arbitration of its dispute with Chevron.  *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011).

[5] Except as otherwise indicated, "ECF" refers to entries on the civil RICO docket: No. 11-cv-691.

District Court granted the preliminary injunction and later denied a stay requested by the Lago Agrio plaintiffs. 2011 WL 1408386 (S.D.N.Y. April 11, 2011). The District Court then granted Chevron's motion for expedited discovery with respect to the equitable relief it sought against Mr. Donziger, continuing its "race" against the Ecuadorian proceedings, even though the Ecuadorian judgment was stayed pending appeal in Ecuador at the time. 800 F. Supp.2d 484 (S.D.N.Y. 2011). The Second Circuit vacated the preliminary injunction three days after argument, with opinion to follow. *Chevron Corp. v. Naranjo,* No. 11-1150-cv(L), 2011 WL 4375022 (2d Cir. Sept. 19, 2011).

After having previously rejected a motion to reassign the case to the District Judge who had presided over the original litigation between Texaco and the Lago Agrio plaintiffs, Judge Kaplan denied the Lago Agrio plaintiffs' motion for recusal. 783 F. Supp.2d 713 (S.D.N.Y. 2011). Discovery in what became separate civil actions against Mr. Donziger and the Lago Agrio plaintiffs continued.

 Meanwhile, back in Ecuador, "Chevron presented its alleged evidence of fraud to the Ecuadorian trial court, eventually convincing it to dismiss the Cabrera report's interpretations—but not its data—from the trial court's final decision." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 237 (2d Cir. 2012). On January 3, 2012, the appellate court in Ecuador upheld a judgment against Chevron after de novo review of the record. *Id.*

Soon after the Ecuadorian court's affirmance of the judgment, the  Second Circuit issued its *Naranjo* opinion explaining why it had reversed Judge Kaplan's preliminary injunction, holding that New York's judgment recognition statute did not authorize a preemptive suit to block enforcement and remanded with directions to dismiss the action based on the Recognition Act. *Id.* at 247.

On November 12, 2013, the Court of Cassation in Ecuador affirmed the appellate court's judgment but eliminated the award of $8.6 billion in punitive damages if Chevron refused to apologize for its actions. The Constitutional Court of Ecuador subsequently upheld the judgment on June 27, 2018.

After further contentious litigation over discovery (including third party discovery by Chevron from Patton Boggs which had been working with the Lago Agrio plaintiffs) and motions, the District Court scheduled the civil RICO trial against Mr. Donziger for October 2013.  Shortly before trial, after Judge Kaplan urged Chevron's lawyers to "get off the dime," (ECF 1424 at 11), Chevron opted to dismiss all of its claims for damages, avoiding a jury trial and allowing Judge Kaplan to act as fact-finder.  ECF 1469 (Chevron notice); *Chevron Corp. v. Donziger*,

No. 2013 WL 5548913, at *1 (S.D.N.Y. Oct. 7, 2013).  The District Court held "a seven-week bench trial at which the evidence included live testimony from more than 30 witnesses, 25 of whom were called by Chevron; deposition testimony of 22 witnesses, all presented by Chevron; and more than 4,000 documents."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 85 (2d Cir. 2016).

### The Civil RICO Judgment

On March 4, 2014, the District Court issued its 343-page opinion plus appendices on the civil RICO claims.  974 F. Supp.2d 362 (S.D.N.Y. 2014).  The District Court's findings included that that Mr. Donziger had committed serious acts of misconduct in Ecuador that would be crimes if they had been prosecuted by the Department and found by a jury.  The District Court's civil RICO judgment "(i) imposed a constructive trust for Chevron's benefit upon any proceeds 'traceable to the [Lago Agrio] Judgment' or its enforcement that Donziger or the LAP Representatives have received or might receive, (ii) required that Donziger "execute in favor of Chevron a stock power transferring" to the company 'all of his right, title and  interest in his shares of Amazonia,' a company organized to collect and distribute any proceeds of the Lago Agrio Judgment, (iii) enjoined Donziger and the LAP Representatives from '[f]iling or prosecuting any action for recognition or enforcement of the [Lago Agrio] Judgment' (or any new judgment based upon the Lago Agrio Judgment) 'in any court in the United States,' and (iv) prohibited Donziger and the LAP Representatives from attempting to 'monetize or profit from the [Lago Agrio] Judgment, ... including ... by selling, assigning, pledging, transferring or encumbering any interest therein.'" 37 F. Supp. 3d 653, 655–56 (S.D.N.Y. 2014).   The District Court denied a stay pending appeal.  *Id.* at 672.  The Court of Appeals affirmed the judgment.  833 F.3d 74 (2d Cir. 2016).[6]

### The Award of Costs to Chevron in the Civil RICO Case

The District Court subsequently awarded costs and interest to Chevron in the amount of $813,602.71, including a portion of the fees of special masters the Court

---

[6] Shortly before the Second Circuit decided Mr. Donziger's appeal, the Supreme Court held the private civil right of action under RICO was not extraterritorial and required proof of a "*domestic* injury to its business or property."  *RJR Nabisco v. European Community*, 130 S. Ct. 2090, 2106 (2016).  That decision overturned Second Circuit precedent at the time Mr. Donziger's counsel briefed his appeal from the civil RICO judgment.  However, the Second Circuit upheld the District Court's determination that, "Chevron's legal fees—those already expended to uncover Donziger's wrongful conduct and those being spent and soon-to-be-spent to defend against enforcement proceedings—constituted further injury to Chevron." 833 F.3d at 135.

had appointed to oversee discovery. *Chevron Corp. v. Donziger*, 2018 WL 1137119, at *21 (S.D.N.Y. Mar. 1, 2018). As part of its rationale for awarding costs to Chevron, the District Court described Mr. Donziger's "behavior in this litigation [as] outrageous and, in many respects, far beyond the bounds of propriety." *Id.* at *15. The District Court rejected Mr. Donziger's argument that costs could not be awarded to Chevron because of its own payments to a key witness (a judge who at one time claimed that he had ghost written the Ecuadorian judgment for a colleague), including payments for physical evidence and $10,000 per month in expenses plus health insurance and a car. *Id.* at *13-14. The Court of Appeals recently affirmed the award of costs. 2021 WL 821456, at *10, 17 (2d Cir. March 4, 2021).

### *Chevron Seeks Civil Contempt*

On March 19, 2018, Chevron moved to hold Mr. Donziger in civil contempt and sought post-judgment discovery. The District Court found Mr. Donziger had not timely complied with the order to transfer his interest in a corporation established to hold funds from the Ecuadoran judgment, but declined to impose civil contempt sanctions because he had executed a stock transfer, albeit with an addendum clarifying the legal basis for the transfer. 2018 WL 2247202, at *6 (S.D.N.Y. May 16, 2018). The Court granted Chevron's request for discovery concerning Mr. Donziger's compliance with the civil RICO judgment, and scheduled a hearing on whether he had violated the judgment by attempting to sell shares of the judgment to Elliott Management, a hedge fund. *Id.* at *7.

The District Court denied Mr. Donziger's motion for a protective order with regard to Chevron's discovery into both his assets (to satisfy the judgment for costs) and his alleged attempts to "monetize" the Ecuadorian judgment. 325 F. Supp.3d 371 (S.D.N.Y. 2018). It also ordered him to execute a stock transfer without the clarifying language he had added and to assign to Chevron an unqualified assignment of all assets traceable to the Ecuadorian judgment. 2018 WL 4360770, at *4 (S.D.N.Y. Aug. 15, 2018).

As the Court of Appeals recently recounted, "[b]etween September 2018 and May 2019, Chevron filed five motions to hold Donziger in contempt." 2018 WL 821456 at *4. On March 5, 2019, finding that Mr. Donziger had failed to comply with Chevron's discovery requests, the District Court also ordered Mr. Donziger to turn over electronic devices to a court-appointed expert to extract documents under a "Forensic Inspection Protocol" that would allow an expert retained by Chevron to search for responsive

documents.  425 F. Supp. 2d 397 (S.D.N.Y. 2019).  Then, on May 23, 2019, the
District Court held Mr. Donziger in civil contempt: (1) for failing to assign his
interest under a 2017 retainer agreement to Chevron pursuant to the civil
RICO injunction; (2) "monetizing" the Ecuadorian judgment by selling
interests in it to investors and then using the money to compensate himself
for legal work; (3) violating an order restraining money transfers to collect
the cost judgment; and (4) failing to surrender his devices as required by the
Forensic Inspection Protocol.  The District Court imposed fines to coerce
compliance.

        The Second Circuit recently decided Mr. Donziger's appeal of the civil
contempt orders.  The Court affirmed (as unchallenged on appeal) the civil
contempt findings other than those for "selling interests in the Ecuadorian
Judgment to finance the litigation."  2018 WL 821456, at *10.  Although the
Court of Appeals concluded that Mr. Donziger's conduct did violate the civil
RICO injunction as written, it reversed the contempt findings in light of the
District Court's order denying a stay of the injunction.  *Id.* at *11 ("Standing
alone, the Injunction was unambiguous and would support a contempt
finding if Donziger sold interests in the Ecuadorian Judgment to pay himself
retainer payments and arrears.").  The Court of Appeals found that the
reasons the District Court gave for denying Mr. Donziger's motion for a stay
of the civil RICO injunction pending appeal "injected considerable
uncertainty."  *Id.* at *12.  Although the District Court could not have actually
modified the civil RICO injunction by the stay ruling, the ruling created
doubt about the injunction's meaning.  As reasonably understood in light of
the stay ruling, the injunction was not "clear and unambiguous" enough to
permit a civil contempt finding for selling shares of the Ecuadorian judgment
belonging to others and using the funds to pay for his legal services.  *Id.* at
*16.

### The Criminal Contempt Prosecution

        On July 30, 2019, Judge Kaplan issued an order to show cause why
Mr. Donziger should not be held in criminal contempt pursuant to Fed. R.
Crim. P. 42.  ECF 2276.  The order alleged six contempt offenses.  The first
three offenses related to orders compelling Mr. Donziger to produce
information Chevron sought.  Count 1 alleged that Mr. Donziger had willfully
violated the Forensic Inspection Protocol ordered on March 5, by failing to list
all of his devices and accounts between March 8 and March 28, 2019.  Count
2 alleged that Mr. Donziger willfully violated the Forensic Inspection Protocol
by failing to turn over his devices to the court-appointed expert between May

18 and May 28, 2019.  Count 3 alleged that Mr. Donziger had willfully
violated a June 11, 2019 order to surrender his passport entered as a means
of compelling compliance with discovery orders.  Because each of the orders
stemmed from orders to produce information in response to Chevron's
requests, Mr. Donziger could appeal them only by refusing to comply and
appealing the resulting civil contempt finding.  *See Mohawk Indus. v.
Carpenter*, 585 U.S. 100 (2009).  Disobedience of a court order for the purpose
of invoking appellate review cannot be willful criminal contempt.

The remaining three counts related to orders compelling Mr. Donziger
to disgorge and turn over to Chevron any property traceable to the
Ecuadorian judgment.  Count 4 alleged that Mr. Donziger willfully failed to
transfer to Chevron a contingent fee interest under a 2011 retainer
agreement between March 4, 2014 and September 3, 2018.  Mr. Donziger
complied with this obligation long before the District Court even entered its
civil contempt order.  *Chevron Corp. v. Donziger*, 384 F. Supp.3d 465, 477
(S.D.N.Y. 2019) ("In September 2018, following extensive motion practice and
another explicit directive from this Court he finally did so.").  Count 5 alleged
that Mr. Donziger had willfully failed to transfer to Chevron a property
interest in the Ecuadorian judgment under a 2017 agreement between
November 1, 2017 and May 27, 2019.  The Second Circuit's recent March 29,
2021 decision in the home detention appeal indicates that the same
ambiguity that invalidated civil contempt orders in the March 4, 2021 appeal
also "applies to one of the six grounds for criminal contempt," referring in
context to Count 5.  *United States v. Donziger*, No. 20-1710-cr, slip op. 2 n.2.
Count 6 alleged that Mr. Donziger had willfully monetized the Ecuadorian
judgment on or about December 23, 2016, by trading a portion of his interest
for personal services.  *See Chevron Corp. v. Donziger*, 384 F. Supp.3d 465,
480-81 (S.D.N.Y. 2019) (civil contempt order describing alleged exchange of
an interest in the Ecuadorian judgment for services of an "executive coach").

In a separate order, Judge Kaplan appointed Rita M. Glavin to
prosecute Mr. Donziger on the criminal contempt charges alleged in the order
to show cause.  ECF 2277.  The order noted that the District Court had
tendered the order to show cause to the United States Attorney, who had
declined "on the ground that the matter would require resources that we do
not have readily available."  Judge Kaplan arranged for assignment of the
criminal contempt case to Judge Preska, who had previously handled
settlement of the suit by Chevron against Patton Boggs arising from the
Ecuadorian litigation.  ECF 2276.

7671325.1

At a scheduled arraignment on August 6, 2019, Judge Preska ordered home detention with electronic monitoring with strict conditions, a bond in the amount of $800,000 secured by property in that amount, with at least two co-signers. 19-cr-561, ECF 4.

Mr. Donziger moved to recuse Judge Kaplan's colleagues on the District Court or to transfer the criminal contempt case to another district. He also moved to recuse Judge Preska specifically on the ground that under the Southern District's procedures, the case should have been randomly assigned after Judge Kaplan's recusal. Judge Preska denied both grounds for recusal. She noted that Judge Kaplan had *not* recused himself in the criminal contempt case, also concluding that he had no obligation to recuse himself. Therefore, Judge Preska reasoned, even if the local case assignment procedures after recusal gave parties right with regard to judicial assignment, they had not been triggered by a recusal. 19-cr-561, ECF 40; *United States v. Donziger*, 2020 WL 2216556, at *4 (S.D.N.Y. May 7, 2020).

Judge Preska also denied Mr. Donziger's motion, supported by a declaration by a legal ethics expert, to disqualify the special prosecutor Judge Kaplan had appointed on the basis of her then-law firm Seward & Kissel's involvement with the oil industry, including ties to a hedge fund, Oaktree Capital Management, that includes a member of the Chevron board of directors. Seward & Kissel had also represented Chevron in a small matter that had concluded before the special prosecutor's appointment. *Id.* at *5-7. Judge Preska also denied Mr. Donziger's motion to dismiss the contempt charges. *Id.* at 8-9.

Finally, the Court denied Mr. Donziger's request for disclosure of communications between the special prosecutor and Chevron or its attorneys. *Id.* at *9. On January 10, 2021, Judge Preska also denied Mr. Donziger's motion to dismiss Counts 1-3 of the order to show cause (the failure to produce related counts), rejecting his argument that if a litigant must refuse to comply with an order (such as an order to produce) to appeal it, that refusal cannot be the basis for a criminal contempt charge.

Mr. Donziger appealed the home detention order. The Court of Appeals affirmed. No. 19-4155 (2d Cir. Feb. 18, 2020). Mr. Donziger appealed again after the special prosecutor subsequently confirmed her intention to try the case as a petty offense before Judge Preska without a jury with a maximum total sentence of six months. The Court of Appeals affirmed. *United States v. Donziger*, No. 20-1710-cr (2d Cir. March 29, 2021).

7671325.1

As one member of the panel that heard Mr. Donziger's home detention appeal noted, he has already served more than three times as long in home detention as the maximum term for a "Zone A" offense with a maximum guideline sentence of six months, if the Court were to substitute home detention for imprisonment.  U.S.S.G. § 5F1.2.[7]

After Judge Kaplan launched the criminal case, Mr. Donziger moved to adjourn a hearing in the civil RICO case into whether he had successfully purged himself of civil contempt.  Although the presiding magistrate judge initially adjourned the hearing, on December 9, 2019, Judge Kaplan stepped in, and ordered the hearing to proceed as scheduled.  Because such a hearing would necessarily involve facts relevant to the criminal charges, Mr. Donziger sought a writ of mandamus to preserve his Fifth Amendment privilege by stating the purge hearing.  Judge Kaplan personally submitted a pointedly adversary response to the petition.  No. 20-464, ECF 28.  The Court of Appeals denied the writ on the ground that Mr. Donziger had "not demonstrated that exceptional circumstances warrant the requested relief or that he lacks an adequate, alternative means of obtaining relief.  No. 20-464 (2d Cir. May 13, 2020)."

After continuances related to the COVID-19 pandemic, Mr. Donziger's non-jury trial is currently scheduled for May 10, 2021.  He remains in pretrial home detention.

## THE CRIMINAL CONTEMPT PROSECUTION OF MR. DONZIGER MUST BE REVIEWED BY THE DEPARTMENT OF JUSTICE

The contempt prosecution originates in Chevron's attack on the judicial system of Ecuador, after its success in avoiding having to litigate its environmental damage to Ecuadorian lands in the United States.  Chevron's initial efforts to gather information pursuant to 28 U.S.C. § 1782 sought information bearing on the Ecuadorian prosecution of two of its attorneys (for allegedly falsifying documents concerning a settlement and release) as well as on the legitimacy of an anticipated judgment in the Lago Agrio litigation (for purposes of an international arbitration).  Throughout the history of the litigation before Judge Kaplan, Chevron has repeatedly tied its specific charges of litigation misconduct to a broader indictment of the integrity of the

---

[7] The recording of the argument is available at https://www.ca2.uscourts.gov/decisions/isysquery/da11d0f8-8d92-47e2-99ac-b6f2961bbf92/32/doc/20-1710.mp3.

Ecuadorian judiciary and the Ecuadorian government at the time.  After fighting for a decade against litigating the Lago Agrio claims in the United States, Chevron has now succeeded in putting the claimants' lawyers and the Ecuadorian judiciary on trial in the United States, while avoiding any consideration by United States courts of the underlying merits of the claims.

Judge Kaplan's opinion after the civil RICO trial was clear that in adjudicating Chevron's claims against Mr. Donziger, he was not exonerating Chevron's predecessor Texaco from claims of contaminating the land and water of Ecuador.  *See Chevron Corp. v. Donziger*, 833 F.3d 74, 85 (2d Cir. 2016) (quoting the District Court) ("The Court assumes that there is pollution in the Orienté. On that assumption, Texaco and perhaps even Chevron — though it never drilled for oil in Ecuador — might bear some responsibility. In any case, improvement of conditions for the residents of the Orienté appears to be both desirable and overdue.")

From the perspective of an international community deeply concerned by evidence independent of the Ecuadorian judgment that Texaco contributed to the environmental devastation of the Lago Agrio region, the prosecution of Mr. Donziger creates an appearance that the judicial system in the United States is stacked against the claimants and in favor of Chevron.[8]  That perception alone warrants the Department's intervention to review the prosecution.

An additional reason for the Department to review the prosecution is the danger that other large corporations will emulate Chevron's playbook in this case to crush opposing litigants.  Another law firm, Kasowitz Torres Benson LLP, has filed similar civil RICO litigation on behalf of a lumber company and an oil pipeline company.  *Resolute Forest Products v. Greenpeace Int'l*, No. 17-cv-02824 (N.D. Ca.); *Energy Transfer Equity L.P. v. Greenpeace Int'l*, No. 17-cv-173 (D.N.D.).   On January 22, 2019, the district court dismissed the civil RICO claims (other claims survived dismissal) in the *Resolute Forest Products* case and awarded fees under the California anti-SLAPP statute. On February 14, 2019, the district court dismissed the civil RICO claims in the *Energy Transfer* case.

---

[8] For example, an independent consulting firm retained by U.S. lawyers representing the Republic of Ecuador issued a report documenting continued environmental damage traceable to Texaco. https://chevroninecuador.org/assets/docs/2014-11-07-lbg-expert-report.pdf

The failure of those efforts to deploy civil RICO against environmental groups may not deter future attempts if Chevron's efforts lead to Mr. Donziger's imprisonment for criminal contempt on top of the civil RICO disgorgement order, the judgment for hundreds of thousands of dollars of Chevron's costs for litigating the civil RICO case and disbarment. The risks from bringing such civil RICO actions are asymmetrical. For the corporations and their lawyers bringing the civil RICO claims, the only thing lost is money spent in litigation (and in the *Resolute Forest Products* case some additional money to reimburse the other side's legal fees), while the risk for environmental advocates is financial ruin and possible incarceration.

The Department has recognized that certain kinds of criminal investigations need closer oversight, such as cases involving attorneys and journalists. *See* Department of Justice Report on Review of News Media Policies (July 12, 2013); 28 C.F.R. § 50.10 (regulation on investigation of journalists); Justice Manual § 9-13.400 (guidelines on investigation of journalists); Justice Manual § 9-13.410 (guidelines for subpoenas to attorneys related to representation of clients); Justice Manual § 9-13.420 (guidelines for searches of offices of subject attorneys). For similar reasons, the Department of Justice should closely monitor criminal contempt prosecutions of attorneys that stem from litigation concerning their representation of clients—at least when they pose the risk of intimidating advocates against environmental harm by large corporations.

A disinterested observer (a former SDNY Assistant United States Attorney)[9] who looked at the record came away with reservations. The referee appointed by the state court to hold a hearing on whether Mr. Donziger should be disbarred, concluded that "it is open to question * * * whether [Mr. Donziger] did receive a full and fair hearing before Judge Kaplan notwithstanding the length of the proceeding and the volume of evidence." Decision on the Procedure for the Post-Suspension Hearing, In the Matter of Steven R. Donziger (N.Y. App. Div. 1st Dept. Nov. 8, 2018). After receiving evidence about Mr. Donziger's conduct and the proceedings before

---

[9] https://foxhorancamerini.com/partners/john-r-horan-2/

the District Court in the civil RICO case, the referee recommended that Mr. Donziger's suspension terminate and that he should be allowed to resume the practice of law:

> While Respondent is often his own worst enemy and has made numerous misjudgments due to self-confidence that may border on arrogance, and perhaps too much zeal for his cause, his field of practice is not the usual one. Lawyers with his endurance for the difficult case, one which is constantly financially risky and usually opposed by the best paid national firm lawyers available, are not available often. The extent of his pursuit by Chevron is so extravagant, and at this point so unnecessary and punitive, while not a factor in my recommendation, is nonetheless background to it. He has lost the Lago Agrio Judgment, his fee as well, and is besieged with litigation by Chevron and faces severe financial burdens.
>
> ***
>
> Assessment of character is not an exact science, but we can all agree that the essential components are honesty, integrity, and credibility. It is far from clear that Respondent is lacking in those qualities as the Committee argues. We are here engaged in a prediction that despite his flaws noted herein, Respondent has such character and is essentially working for the public interest and not against it, his desire to make a large fee notwithstanding. None of those who testified for these qualities of Respondent are the sort who would carelessly toss off an opinion about character or misrepresent his reputation in the world community. They are inherently credible as witnesses, in my opinion. If his interest in earning a large fee makes his character suspect, the entire bar is suspect.

While the state intermediate appellate court later rejected the referee's recommendation and ordered disbarment, concluding that Mr. Donziger was collaterally estopped to contest the District Court's findings in the civil RICO case, *Matter of Donziger*, 186 A.D.3d 27, 28, 128 N.Y.S.3d 212, 213 (2020) ("pursuant to the doctrine of collateral estoppel, this Court found respondent guilty of professional misconduct"), the findings of the referee support the perception that by steering the civil RICO case to Judge Kaplan after the

7671325.1

completion of ancillary proceedings, Chevron succeeded in finding and then exploiting an hospitable forum.

During the bar disciplinary hearing, John Keker, one of the lawyers who represented Mr. Donziger in the civil RICO litigation described the proceedings as "a farce." "Mr. Keker, a Marine veteran and a widely admired trial lawyer with national experience, agreed to represent Respondent in February, 2011. His representation lasted until May of that year. When asked why he had moved to withdraw as trial counsel to Respondent Mr. Keker replied: 'the handwriting was on the wall that this was a (indiscernible word) by Chevron. Judge Kaplan made it clear that he was determined to see Mr. Donziger, I think, convicted of the charges Chevron was making. Chevron was, through scorched earth tactics, running up huge bills. They had 160 lawyers working on the case from Gibson Dunn. They had 60 law firms working on the case that filed for summary judgment motions. It was simply economically impossible for us to keep up... It was not going to end well...I filed a motion in which I stated why we were withdrawing." R. 341.' Deepak Gupta, "agreed to represent Respondent on his appeal from the Kaplan decision because "I felt like a great injustice was being done." R. 357. "I have never seen a judge whose disdain for one side of the case was as palpable on the bench in ways that I think may not have always come through in the paper record. But it was fairly obvious that Judge Kaplan had great personal animosity for Steven Donziger." R. 357."

The record of the civil RICO case, beginning with Judge Kaplan's reference to RICO during the § 1782 litigation, bears out that assessment. By repeatedly setting deadlines that exploited the huge imbalance between Mr. Donziger's resources and those that Chevron was willing to commit, Judge Kaplan stripped Mr. Donziger of the attorney-client privilege, his opportunity to oppose the preliminary injunction in the civil RICO case, and opportunities to contest post-judgment orders.  Whether or not that personal animosity should have required Judge Kaplan to step aside in the civil RICO case, it does mean that Judge Kaplan—even if he could supervise an inferior officer wielding executive power as a constitutional matter—is not an appropriate principal officer to assure a disinterested and just criminal prosecution in a separate case

Against the background of requests to reassign the civil RICO case and later to disqualify himself based on the manner in which he had conducted the litigation and negative statements regarding Mr. Donziger, Judge Kaplan chose both the special prosecutor and the judge who would preside over the

contempt trial and serve as the fact-finder on the criminal contempt charges. And both Judge Preska, in her order denying a motion for her own recusal, and Judge Kaplan, in his personal response to Mr. Donziger's mandamus petition, have stated that Judge Kaplan did not recuse himself from the criminal contempt case.  The stated decision not to recuse, despite the long prior history of requests by Mr. Donziger and the Lago Agrio plaintiffs that Jude Kaplan disqualify himself and necessarily provokes the question: what does not recusing mean when the case has already been assigned to another judge?

The extent and content of any communications regarding the criminal contempt case between Judge Kaplan and Judge Preska, on the one hand, and Judge Kaplan and the special prosecutor on the other, remains unknown. At a January 6, 2020 hearing before Judge Preska, the prosecutor denied the "claim that Judge Kaplan is in any way coordinating with the prosecution team or seeking to influence the prosecution team in its decision making, in its strategy."  ECF 52 at 4.  She stated that, "[t]he prosecution team, as we prosecute this case, does not seek Judge Kaplan's input in our decisions and the steps that we take, and Judge Kaplan does not offer it or seek to provide it. Period, full stop."  *Id.*   But that is a less-than-complete denial (bordering on an admission) of communications between the special prosecutor and Judge Kaplan.  The special prosecutor opposed any further disclosure of communications with Judge Kaplan or with Chevron's counsel.  *Id.* at 5, 15-16, 17.  Judge Kaplan's insistence on going forward with the hearing to determine whether Mr. Donziger had purged himself of civil contempt over Mr. Donziger's objection that he could be forced to present testimony that could be used against him in the criminal contempt case—in effect an opportunity to depose the defendant before trial—suggests that information-sharing short of explicit coordination or strategy discussions could be unfair to Mr. Donziger.

Judge Kaplan's choice of special prosecutor also presents a concern because the prosecutor did not immediately disclose that her firm had previously been retained by Chevron in an unrelated and closed matter, and that a partner in the firm has a close business relationship to Oaktree Capital Management, a principal of which sits on the Chevron board.  Even if those known connections would not require disqualification under the supervisory power ruling in *Young*, they do raise questions that could have been avoided by the selection of one of hundreds of available former federal prosecutors without such ties to Chevron.

The criminal contempt charges, and the manner in which Judge Kaplan issued the order to show cause alleging them, also raise concerns. The first three counts involve alleged criminal violations of orders related to discovery that Mr. Donziger had to disobey to obtain an appealable final judgment.  We know of no case in which a party's refusal to comply with such an order triggered criminal contempt charges as to which review of the validity of the underlying order would be barred.  And the viability of Count 5 is in question in light of the Second Circuit's March 4, 2021 decision holding that Judge Kaplan's stay decision injected ambiguity into provisions of the civil RICO injunction, as the Second Circuit noted in its March 29 home detention ruling.  An ambiguity that precludes civil contempt liability surely also precludes finding willful criminal contempt.   Each of the six counts also alleges violations of the District Court's orders over a period ending at the latest on May 27, 2019, two months before the court issued the order to show cause, meaning that Judge Kaplan seemingly filed criminal charges even if Mr. Donziger had already purged himself of civil contempt.   Prosecution for criminal contempt after a person has already complied with an order is, at the very least, in tension with the principle that the "exercise of that authority must be restrained by the principle that only [t]he least possible power adequate to the end proposed should be used in contempt cases." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (cleaned up).

Because the prosecution is being conducted in the name and under the authority of the United States, the questions raised should be answered in the first instance by supervisory officials in the Department of Justice.

## THE JUSTICE DEPARTMENT HAS SUPERVISORY RESPONSIBILITY OVER CRIMINAL CONTEMPT PROSECUTIONS IN THE NAME AND BY THE AUTHORITY OF THE UNITED STATES EVEN IF THE PROSECUTOR WAS APPOINTED BY A COURT

"Private attorneys appointed to prosecute a criminal contempt action *represent the United States . . . .*" *Young* v. *United States ex rel. Vuitton et fils S. A.,* 481 U. S. 385, 804 (1987) (emphasis added); *see also Robertson v. United States*, 560 U.S. 272 (2010) (Roberts, Ch. J., dissenting from dismissal as improvidently granted).  The case against Mr. Donziger is captioned *United States v. Donziger*, and the special prosecutor speaks in court in the name of "the government." (Indeed, the official court docket entry for the special prosecutor includes: "Designation: Assistant United States Attorney"). Moreover, the prosecution, as opposed to the adjudication of a criminal

contempt, is an inherently executive function.  *See Young v. United States ex rel. Vuitton,* 481 U.S. at 816-17 (1987) (Scalia, J., concurring in the judgment.) "Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968).  The actions of a special prosecutor wielding the name and authority of the United States in a contempt case can also impinge directly on executive enforcement of ordinary criminal law, such as by precluding a prosecution as a violation of the Double Jeopardy Clause or a plea agreement.  *See United States v. Dixon*, 509 U.S. 688 (1993); *Robertson v. United States*, 560 U.S. 272 (2010) (Roberts, Ch. J., dissenting from dismissal as improvidently granted).

Congress did not, and could not, shift a category of criminal prosecutors into the judicial branch by vesting the power to appoint a prosecutor in the court in Rule 42.  The Appointments Clause allows judicial appointments of "inferior officers," but the exercise by a court of that appointing authority does not, for example, shift an interim United States Attorney into the judicial branch by virtue of a judicial appointment pursuant to 28 U.S.C. § 546(d).

The Supreme Court thought it "evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010). Supervisory authority over a special prosecutor must therefore come either from the executive branch and the Department of Justice or from the appointing court. But judges do not have the constitutional authority to oversee the conduct of criminal prosecutions, especially, as is commonly the case (although not here) when the judge who appointed the special prosecutor will also preside over the contempt trial.  Presiding over a criminal contempt trial is not the kind of supervision of an inferior officer contemplated by the Appointments Clause. *See Edmond*, 520 U.S. at 664-65 ("What is significant is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers.").

Federal law confers oversight over litigation in which the United States has an interest on the Attorney General. 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under

the direction of the Attorney General.").   Rule 42 authorizes judicial
appointment of a special prosecutor, but it does not thereby create an
exception to the Attorney General's authority, notwithstanding some *dicta* in
*Young*, 481 U.S. at 800, and *United States v. Providence Journal Co.*, 485
U.S. 693, 704-5 (1988), that imprecisely seems to equate judicial appointment
power with judicial branch prosecution.  In *Providence Journal*, the Court
distinguished the Solicitor General's control over litigation by the United
States in the Supreme Court pursuant to 28 U.S.C. § 518 from the Attorney
General's control (subject to exceptions) over litigation by the United States
generally. But the more sensible reading of 28 U.S.C. § 516 in light of the
court's express authority to appoint a special prosecutor in Rule 42 is that the
special prosecutor is—like a court-appointed interim United States
Attorney—an "officer of the Department of Justice under the direction of the
Attorney General." Cf.  *Morrison v. Olson*, 487 U.S. 654, 671 (1988) (court-
appointed independent counsel is "subject to removal by a higher Executive
Branch official."); *id.* at 673-674 (discussing the validity of "interbranch"
appointments, i.e., placing the authority to appoint an officer of one branch in
another).  Indeed, it would be quite anomalous for a United States Attorney's
declination of a request to prosecute a criminal contempt to have the effect of
shifting the prosecution function from one constitutional branch to another.
And, in any event, there is nothing irrevocable about a declination; if need be,
the Department could accept the appointment in order to determine whether
and how the prosecution should proceed.

There is also no reason why the judicial branch must control criminal
contempt prosecutions (as opposed to initiating a prosecution by issuing an
order to show cause or appointing a prosecutor) in order to assure its own
authority.  To be sure, there may be a category of criminal contempt
prosecutions—such as the prosecution of Justice Department officers or
employees—that would require giving the special prosecutor a degree of
independence comparable to that exercised by a special counsel appointed
under the Department's regulations.  *See* 28 C.F.R. Part 600.  But the power
essential to effectuate a court's orders and judgments by coercing prospective
compliance or by awarding compensation is the *civil* contempt power.  The
purpose of retrospective punishment for violation of a court order to deter
future violations and to instill respect for the law is no different in principle
from the purpose of any other criminal prosecution, including prosecution for
contempt of Congress.  Yet no one would argue that Congress could enact a
law placing the authority to *prosecute* congressional contempt in the
legislative branch.

At the time of the Supreme Court's decision in *Young*, the line between civil and criminal contempt remained blurry, which may account for the Court's statement that, "[t]he ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches. *Young*, 481 U.S. at 796. Both civil and criminal contempt may involve the imposition of fines or imprisonment. But the Court subsequently clarified the distinction between civil and criminal contempt in *Hicks v. Feiock*, 485 U.S. 624 (1988), and *United Mine Workers v. Bagwell,* 512 U.S. 821 (1994).  Setting aside summary contempt for the purpose of immediately restoring order in the courtroom, civil contempt sanctions coerce compliance with a court order or compensate those injured by a violation, while criminal contempt sanctions punish violations.

The distinction between punishment and coercion is expressed by the adage that the contemnor has the keys to the cell, because compliance ends the confinement. *Hicks*, 485 U.S. at 632-33. A party who has been held in criminal contempt, by contrast, can do nothing to lessen the penalty by complying. Coercive civil contempt power is inherent in the adjudication of cases or controversies as authorized by Article III because a court's orders cannot be rendered toothless by disobedience. But that does not mean the judicial branch itself must also exercise the quintessentially executive branch function of prosecuting crimes. Assigning supervision of the investigation and prosecution of criminal charges would give judges power in, "an area in which they have no special knowledge or expertise" as judges, although a judge may, of course, have relevant prior experience. *Mistretta v. United States*, 488 U.S. 361, 396 (1989) (quoting *Morrison v. Olson*, 487 U.S. at 676, n. 13 (no incongruity in judicial *appointment* of prosecutorial officers).

The constitutionally-required oversight of the special prosecutor in Mr. Donziger's case must come from the Department of Justice. We therefore respectfully ask that you order a review of the prosecution and, if necessary

direct the special prosecutor to seek an indefinite adjournment of the scheduled May 10, 2021 trial until the review can be completed.


Sincerely,

William W. Taylor. III


cc:    Rita M. Glavin
       Glavin PLLC
       2585 Broadway
       Suite 211
       New York, NY  10025
       rglavin@glavinpllc.com

7671325.1