UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 CR 561 (LAP)
11 CR 691 (LAK)

STEVEN DONZIGER,

Defendant. BENCH TRIAL

------------------------------x

New York, N.Y.
May 10, 2021
9:50 a.m.

Before:

HON. LORETTA A. PRESKA,

District Judge

APPEARANCES

RITA M. GLAVIN
SAREEN K. ARMANI
BRIAN P. MALONEY
Special Assistant United States Attorneys

LAW OFFICE OF RONALD L. KUBY
Attorneys for Defendant
BY: RONALD L. KUBY
RHIDAYA S. TRIVEDI
-AND-
OFFIT KURMAN PA
BY: MARTIN GARBUS

GIBSON DUNN & CRUTCHER
Attorneys for Interested Parties
BY: REED M. BRODSKY

ALSO PRESENT: GRACE GILL, Paralegal

(In open court)

THE COURT: Counsel, thank you for coming in early to talk about logistics. My view though is in light of Mr. Brodsky's motion of last night, we probably ought to get that finished so his people can do whatever kind of work they need to do.

Mr. Brodsky, are you here?

MR. BRODSKY: Yes, your Honor.

THE COURT: Yes, sir.

I have your motion. Why don't you make yourself comfortable perhaps up here in the jury box, since there's no one else sitting there.

MR. KUBY: Good morning, Judge. I'm sorry to interrupt your agenda with the first words out of my mouth. I just want to make sure Mr. Donziger has actually managed to get in. And I'm not seeing him. Okay.

MS. TRIVEDI: It's my understanding that he's coming through security right now, your Honor.

THE COURT: All right. We're not really in the trial right now; we're doing other matters. So we're going to get going so that we can move on to the substance of the case.

MR. KUBY: That's the Court's ruling.

I would note that I would like Mr. Donziger to be present for the argument on the subpoenas, which just kind of arose --

THE COURT: Mr. Kuby, everybody was on notice it was 9:45. It's now ten of ten.

We'll call down and see if he's there --

MR. KUBY: That would be great. Thank you, Judge.

THE COURT: -- and have him sent up.

MR. KUBY: Thank you.

THE COURT: But this will not continue, you either arrive on time or too bad.

MR. KUBY: Judge, he has made every court appearance on time --

THE COURT: Counsel. This is the trial.

MR. KUBY: -- since the history of this case.

It's not a matter of this continuing or not continuing. These are COVID times. There's problems at the door. This is not a pattern; this is not a practice. This is one issue today that the Court --

THE COURT: All right. But, counsel, people take care to get here on time. All these other people are here on time.

MR. KUBY: They get paid a lot more, Judge.

THE COURT: I'm sorry, counsel.

Mr. Kuby, did you want to be heard on the subpoena issue, the clarification issue?

MR. KUBY: I'd rather respond to whatever argument the movant is making, if the movant intends to argue.

THE COURT: Mr. Brodsky, do you want to add anything

to your papers or what?

MR. BRODSKY: I'm happy to answer any questions, your Honor with respect to --

THE COURT: If you're going to speak, would you be kind enough to speak in the box. And if you are in counsel's box, you are permitted to take off your masks.

And counsel, one of the things I was going to go over with you all is that in counsel's booth and in the witness box, the occupant need not wear his or her mask. When you are finished speaking, change the microphone cover. We have spares. We don't have to spray documents anymore, so you can keep that in mind.

Mr. Brodsky, do you want to just summarize for counsel what the papers said.

MR. BRODSKY: Yes, your Honor.

On behalf of Gibson, Dunn & Crutcher, with respect to your Honor's order issued yesterday, we had requests for a modification and clarification.

With respect to the subpoena document request number 13, which asks for all -- which your Honor ruled, based on a modification of the request for all quarterly billing -- billings in terms of, excuse me, the amount of fees and the hours to be provided on a quarterly basis from April 15th, 2019 through the present, through the date of the subpoena.

We requested, your Honor, in light of the

confidentiality of the detailed information of the precise numbers, that we would be willing to stipulate that over the last -- since April 15th, 2019, Gibson, Dunn & Crutcher has represented Chevron on dozens of matters; that Chevron is a major client of Gibson, Dunn & Crutcher; and that Gibson, Dunn & Crutcher has billed millions of dollars in fees to Chevron since on or about April 15th, 2019.

In our view, the witnesses who have been called by -- subpoenaed by the prosecutors, our understanding is they do not know these aggregated quarterly numbers; they are not aware of all the matters that Gibson, Dunn & Crutcher handles on behalf of Chevron. Some of those matters are public, some of those matters are very confidential.

And to the extent that Mr. Kuby wants to cross-examine a Gibson, Dunn & Crutcher partner -- who I understand will be called today as one of the first witnesses, Ms. Anne Champion. To the extent Mr. Kuby wants to cross-examine her about bias or prejudice, she is aware of all those facts. She is also aware that she represented Chevron herself. She filed, along with others --

THE COURT: In connection with the underlying civil matter.

MR. BRODSKY: Correct, your Honor, in connection with the underlying civil matter. Ms. Champion herself billed time to Chevron on that matter and is aware of that. She's aware of

the general fact of the millions of dollars in legal fees. And she also is aware that she and others on behalf of the client Chevron moved for civil contempt on many of the same allegations alleged in the criminal contempt. So to the extent Mr. Kuby wants to allege bias, he has all of that to cross-examine Ms. Champion or Mr. Thomson or Mr. Mastro or Ms. Neuman about.

And our second request, your Honor, was to clarify. Your Honor's order was very clear with respect to request number one, which we are -- are the email communications or any written communications related to this case between Gibson, Dunn & Crutcher and the special prosecutors. We are collecting and preparing that. There are about 300 or so, give or take, communications which we will be prepared to provide to the defense and the special prosecutors at the time Ms. Champion testifies today.

We also have been able to prepare a log of the meetings that any of the Gibson Dunn partners met with the special prosecutors. We prepared dates and the amount -- approximate amounts of time.

But we are asking for clarification with respect to requests two and three, which it may be the Court's intention that, as you modified request one, it supplanted request two and three. Request two also asks for a list of every contact by phone or otherwise between Gibson Dunn and the special

prosecutors. And that would require, your Honor, us obtaining all the hardline telephone records of the firm for some partners.

As of yesterday, when we received the order, we did start pulling what mobile cell phone records were available during the pandemic, myself and Mr. Baumgardner, Shane Baumgardner, my colleague. When we had conversations with the special prosecutors, we did so by mobile phone because we were out of the office. That would require pulling the mobile records. We were able to pull some, but not all. We did contact Verizon, and we haven't heard from Verizon yet as of last night to try to pull those records.

With respect to request number three, all of the information -- it asks for all information reflecting the existence of any of the meetings between the special prosecutors and Gibson, Dunn & Crutcher partners, the witnesses.

There will be emails, your Honor, between, for example, myself and/or Shane Baumgardner, two other partners in the firm, such as the Office of the General Counsel, with respect to those meetings. There will be internal communications. It is our position that all of those communications that reflect the existence of these meetings of privilege, their request would also sweep in any notes that were taken by us representing the witnesses during the meetings

with the special prosecutors. It's our position those are privileged, and we would have to log all of those internal communications.

We ask your Honor for clarification if your Honor's modification, request number one, supplanted requests two and three; or if not, if your Honor would consider extending the period of time or modifying it in some way, given these difficulties of producing those --

THE COURT: May I ask you for clarification?

If there is a log of meetings, then would it not be redundant to have documents regarding the existence of meetings?

MR. BRODSKY: It would be redundant, your Honor.

Their request number three though calls for all documents.

THE COURT: Okay. And I wasn't sure that I understood request number three to pertain to Gibson Dunn/Gibson Dunn meetings, but only to Gibson Dunn/private prosecutor meetings.

Am I wrong in that?

MR. BRODSKY: Well, I would be happy with that reading. Another way to read number three would be all information reflecting any such communications.

THE COURT: I see. All right.

MR. BRODSKY: And that could include an internal communication that reflects the existence of a meeting.

THE COURT: Okay. Let me ask Mr. Kuby, maybe going for the easiest first. Is number three meant to address internal Gibson Dunn meetings?

MR. KUBY: It is, to the extent that those internal Gibson Dunn Crutcher meetings reflect matters related to the private prosecutor, yes.

THE COURT: May I ask you this question.

MR. KUBY: Sure.

THE COURT: Would the listing of the log of meetings be sufficient? It seems to me that counsel's point about internal Gibson Dunn meetings is that most of that is not going to be admissible information. But the fact of the meeting, if it is demonstrated in a log, would at least let you know that there was such a meeting.

MR. KUBY: The Court is certainly correct about the latter part. As to the content of the communications, however, the short answer is we don't know what we don't know. We do know that there have been extensive numerous meetings with the special prosecutor; dozens, hundreds of hours of meetings.

How Gibson Dunn Crutcher approached the issue of the prosecution, as well as approached the issue of how they were preparing their partners, four of whom are named on the witness list -- although I suspect, in light of the Court's comments last night, we may see fewer of them than we originally planned. But to the extent that those witnesses are involved

in some discussion as to what to say or not say to the special prosecutor, I think to the extent that a privilege exists, it's easily overcome. And I'm not quite sure what that privilege is. Is there some sort of witness prep to talk to the private prosecutor privilege? I just -- I legitimately don't know.

THE COURT: Mr. Brodsky.

MR. BRODSKY: Yes, your Honor.

I, myself, and Shane Baumgardner, an associate working with me, represented Gibson, Dunn & Crutcher, as well as each of the witnesses who were subpoenaed to testify by the special prosecutors. So my communications with the Office of General Counsel regarding any meetings with the special prosecutors would be privileged. I'm communicating or I was communicating confidential information for the purpose of conveying to the Office of General Counsel and obtaining their advice about how to handle the -- this matter in which Gibson, Dunn & Crutcher partners are witnesses, were not a party to the proceeding. So those communications fall within the attorney-client privilege.

And my thoughts and impressions of any meetings with the special prosecutors would fall within the attorney work product doctrine. None of this is relevant at all, and Mr. Kuby has not made any showing in meeting his burden how any of that information could possibly be relevant to the charges against Mr. Donziger in this case.

THE COURT: I assume that some communications between

Gibson Dunn partners and the special prosecutor is included in the 3500 material.

MR. BRODSKY: Your Honor, we've never seen the 3500 --

THE COURT: I'm asking the wrong person.

Ms. Glavin.

MS. GLAVIN: Yes, your Honor.

For each of the interviews that the special prosecutors had --

THE COURT: May I ask you, you're entitled to remain seated, if you want. You too, Mr. Kuby, you're probably even further up.

MR. KUBY: Oh, thank you, Judge.

THE COURT: So that you can speak into the microphone so the court reporter can hear us.

MS. GLAVIN: Your Honor, for each of the meetings that the special prosecutors had with the Gibson Dunn witnesses that we intend to call at trial, there was an FBI agent present. And notes were taken and a 302 was prepared. So the defense has been provided with an FBI 302 and/or their notes during each of the meetings. I think there was one meeting in November with Gibson Dunn partners.

THE COURT: Doesn't matter.

MS. GLAVIN: But they have the information; they know how many meetings we had with each of the witnesses that were called, and they have notes or FBI 302s of what was prepared

from those meetings.

THE COURT: Okay.

Mr. Kuby, what are you looking for in addition to that?

MR. KUBY: Well -- sorry, have to get used to that.

THE COURT: Whatever makes you comfortable; we both need to be able to hear you.

MR. KUBY: Right. I understand.

We have received numerous 302s and well-indexed 3500 materials. The Court is in receipt of those as well.

THE COURT: I have them all memorized, Mr. Kuby.

MR. KUBY: Nor do I, Judge.

And I haven't counted them all, but I suspect they are substantially less than 300 communications or 300-plus that Mr. Brodsky, I believe, represented exist.

Number two, one 302, for example -- can you get it up on the screen, Grace? If you'll just give me a second, Judge, to illustrate what I'm trying to talk about here.

We'll work out the bugs. I'll make a representation.

The representation is that at one of these meetings, which I believe included Mr. Maloney, Ms. Armani, Ms. Glavin, Reed Brodsky, and Shane I believe by telephone, Agent Iorio, I think Agent Eckstut was there.

THE COURT: Spell those for the court reporter please, sir. Agent?

MR. KUBY: I'm going to ask Sister Glavin if she would not mind doing that.

MS. GLAVIN: It's Agent Emily Eckstut, E-C-K-S-T-U-T; and Agent Nicholas Iorio, I-O-R-I-O.

THE COURT: Thank you.

MR. KUBY: And that 302 contains exactly nothing about anything that was said at that meeting.

Now, presumably this was just not, like, Let's all get together and hang out at Chevron's and the taxpayers' expenses. There is another very similar 302, where the one thing that is recorded by the FBI is being done at that meeting, is that the witness, Ms. Champion, provided a cell phone number to Agent Iorio so he could contact her to coordinate trial matters. That's the entire contents of that conversation.

So again, I'm just going to guess that this was just not an in-person exercise in billing lots of hours; that, in fact, other things happened at that meeting that the FBI agents, for whatever reason, elected not to write down or were instructed not to write down.

So no, the fact that we've received a lot of 3500 material -- and I am not faulting Ms. Glavin. Obviously there's a lot of documents in this case. But we have not received the things that, in fact, we're looking for.

THE COURT: Well, but the question is, first of all, are you entitled to it; and second of all, is it privileged?

And I'm not sure there's a showing, but let me -- does anyone wish to comment so far?

MR. BRODSKY: Your Honor, I would just note to clarify for Mr. Kuby's benefit, the 300-plus communications that we will be producing are communications between Reed Brodsky, Shane Baumgardner, perhaps Randy Brown, an associate of mine, and the special prosecutors, nearly all of which were to coordinate scheduling a call or scheduling a meeting between the Gibson Dunn witnesses and the special prosecutors. None of these written communications are between the witnesses and the special prosecutors, because they don't exist.

THE COURT: All right.

MR. KUBY: Judge, to the extent --

THE COURT: Yes, sir.

MR. KUBY: May I?

THE COURT: Yes, sir.

MR. KUBY: To the extent that any of these documents that Mr. Brodsky is talking about, whether writ large or writ small, were sent to the special prosecutor, obviously there's no question of privilege. I mean, unless --

THE COURT: I don't hear him arguing privilege as to those -- I'm sorry, only one of us can speak at a time.

I don't hear Mr. Brodsky arguing any privilege as to those 300 emails. Indeed, I think he says that they are mostly scheduling emails.

MR. BRODSKY: Correct, your Honor.

MR. KUBY: Okay. Then that's fine. That's an easy one then. We get all of those, right, Judge?

THE COURT: I believe Mr. Brodsky just offered them to you.

MR. KUBY: And in addition, I mean, to be told that they are willing to stipulate that they have billed millions of dollars to Chevron within the time frame we requested, millions is a starting point; it's not an ending point. So is it a million, is it 10 million? I mean, we do know from admittedly quotes -- extrajudicial sources quoting judicial sources that Chevron has billed the Ecuadorian government for $800 million in the underlying litigation.

So are we talking about a million dollars? Are we talking about 10 million, 50 million, 100 million? I mean, it would be nice to have an order of magnitude at least.

THE COURT: What do you say to counsel's suggestion that beyond knowing that Chevron is a major client of the firm to which the firm bills millions of dollars a year, for any additional showing of bias on the part of the individuals, they have to have some idea of the number. Counsel's representing anyway -- and obviously you can cross-examine -- that they don't have that number.

MR. KUBY: All right, Judge. If they don't have that number, then they, as individuals, cannot produce that

information. I agree.

THE COURT: That's not counsel's argument.

I believe his argument is that for -- let's just use your number. For the $800 million number to produce any bias on the part of the partner, the partner would have to know that the number was $800 million.

MR. KUBY: Yes. That's correct.

I will note, however, that the partner who's scheduled to testify today was, in fact, the partner who submitted the detailed fee requests to Judge Kaplan, covering the post-judgment litigation from January 8th, 2018, to more or less June of 2019, a little over $3 million billed. So it does seem like Ms. Champion has some sort of duties besides simply logging her time.

THE COURT: Okay. And number one, I guess obviously you have those post-judgment fee requests because they were litigated.

MR. KUBY: Correct.

THE COURT: Okay.

And so then you can ask her, What else do you know?

MR. KUBY: I could.

THE COURT: All right.

MR. KUBY: But, Judge, I just want to be clear, because there were, I believe, well over a dozen meetings that I know of between the special prosecutor and her team, their

team, and the Chevron team represented by Gibson Dunn Crutcher.

THE COURT: I think counsel told you he's going to give you a lot of those meetings; is that right, Mr. Brodsky?

MR. BRODSKY: Yes, your Honor.

And just to be clear, to clarify for Mr. Kuby's benefit, the Gibson, Dunn & Crutcher partners who went to meet with Ms. Glavin and her special prosecution team, did not bill for their time when they met with Ms. Glavin and the special prosecution team, and they were not there to represent Chevron. They were there to answer questions that the special prosecutors asked when they testify. They are not testifying as lawyers on the stand for Chevron; they are testifying because they've been subpoenaed, and they will answer the questions truthfully.

MR. KUBY: Well, I do very much appreciate that piece of information that, in fact, Gibson Dunn Crutcher indeed donated millions of dollars worth of time to --

THE COURT: Counsel, Mr. Kuby, Mr. Kuby --

MR. KUBY: Judge.

THE COURT: -- the rally was outside --

MR. KUBY: Judge, I'm not rallying. I'm trying to make a legal point.

THE COURT: Which is what?

MR. KUBY: Which is if they are billing for their time, their animus is purchased. If they are simply donating

their time because they think it's the right thing to do, to try to criminalize Mr. Donziger in this proceeding --

THE COURT: Counsel, counsel, counsel, we live in a country where the rule of law prevails.

MR. KUBY: Right.

THE COURT: You get a subpoena from a prosecutor, you have to answer it. You don't do it because it's a nice time of day to do it. So don't talk to me about that.

MR. KUBY: Excuse me, Judge, if I can say one more thing.

I don't know of any subpoena that requires a potential witness not before a grand jury and not in a deposition to sit down and meet for hundreds of hours with the special prosecutor.

THE COURT: Okay. Then you can make that argument.

MR. KUBY: I intend to.

THE COURT: Okay. But today is not the day.

MR. KUBY: Okay. Well, maybe this afternoon.

But I just want to be clear, and I appreciate Mr. Brodsky's clarification, that this was all a donation by GDC. And so therefore, I don't really need those records, because they don't exist.

THE COURT: All right. That helps us then.

MR. KUBY: We're making great progress, Judge.

THE COURT: We are making great progress.

So I agree with Mr. Kuby that in order for the individual partner to have been influenced by approximate total number of billings -- and we're using as a fictional number Mr. Kuby's number of $800 million, he or she would have to know about it. So as Mr. Brodsky suggests, Mr. Kuby is completely free to cross-examine those partners about that.

The one thing that I would suggest is that the total annual billing number for the relevant time period be disclosed under seal to the Court so I can use it in evaluating bias.

Mr. Brodsky says he's going to produce the 300 emails and a log of the meetings. With respect to internal meetings, it seems to me that they are likely to be privileged, and counsel has not made a showing of why they won't be. And the burden of producing a privilege log is a mess, so I will not require that to be done.

Is there anything else on the telephone calls, Mr. Kuby?

MR. KUBY: No, Judge.

But let me heartily concur with the Court's notion of the burdensomeness of producing privilege logs. I understand the Court's ruling and I fully agree.

THE COURT: All right.

With respect to the telephone logs, I will not require that either, in light of the burdensome nature of it and the shortness of the time.

Have we finished with two and three?

MR. BRODSKY: I believe so, your Honor.

THE COURT: Okay. Is there anything else?

MR. BRODSKY: Just to clarify, your Honor, the $800 million is a complete fictional number and would not be responsive --

THE COURT: That's fine. I think I made it very clear, and I think Mr. Kuby made it very clear, that we've considered that to be not God's Holy Grail.

MR. BRODSKY: In terms of, your Honor, the privilege logs, the reason why we are asking for that is they are all privileged, and we received the order yesterday and the witness is going on today. So the burden is really based on the amount of time; it is not based on the fact that we been given two weeks or four weeks, we would have been able to pull together a privilege log and happily done so.

THE COURT: Okay. But here's the deal: Rule 17(c) discovery is not civil discovery. And as we pointed out in the order yesterday, the burden is on the subpoenaing party to demonstrate what's there; that it will be admissible, among other things.

I agree with Mr. Kuby, we don't know what we don't know and, therefore, the subpoenaing party has not made the requisite showing under Rule 17(c).

Is there anything else?

MR. BRODSKY: Nothing further, your Honor.

THE COURT: Thank you.

Yes, sir.

MR. KUBY: Yes, Judge. Just a couple of quick things.

We did file these subpoenas a number of days ago; obviously could have been done sooner. But Mr. Brodsky, you know, has been on notice of the existence of these -- he hasn't been on notice of the existence of your ruling, it came down last night, but some of this could not legitimately have come as a surprise to him.

Nonetheless, out of professional courtesy, when Ms. Champion finishes her direct examination, we will review documents that are produced by that time. I have no time frame for Mr. Brodsky's production, and I don't know that he does either, but just so we can move things along, I'd like to know the projection.

MR. BRODSKY: Your Honor, we are aiming to produce them, per the Court's order, at the time Ms. Champion takes the witness stand. So we are preparing them this morning, and we have the log ready of the meetings with the special prosecutors, and we are preparing the production which we identified over the weekend, the responsive 300, plus or minus, email communications. We will produce that at the time Ms. Champion testifies, per the Court order, on direct examination.

THE COURT: All right. Thank you.

MR. KUBY: Last Judge, Mr. Brodsky said the $800 million is a "total fiction."

THE COURT: I don't care.

MR. KUBY: I do. Would he provide the real number?

THE COURT: Counsel, we've just been there and done that.

MR. KUBY: No, no, no --

THE COURT: He's going to provide the real number to the Court under seal.

Anything else?

MR. BRODSKY: No, your Honor.

You asked for the real number. Was it by quarter or just biannually?

THE COURT: Biannual. And I think the time period -- Mr. Kuby, correct me if I'm wrong. I think the time period is maybe 18 months or something, is that right, the relevant time period on the subpoena?

MR. BRODSKY: About 24 months, your Honor.

THE COURT: 24 months. Okay.

So whatever years are involved, year one, year two, year three.

MR. BRODSKY: Thank you, your Honor.

THE COURT: Thank you.

All right, counsel. How long does the prosecution

project that its direct case will be?

MS. GLAVIN: Your Honor, again, subject to cross-examination, I think we'll finish in three days, perhaps rest on Thursday morning. That is aspirational.

THE COURT: Does anything about that strike you as unreal, Mr. Kuby? And only you know what you're going to cross on, so --

MR. KUBY: I think close of -- I think Thursday-ish is completely reasonable, might be a little earlier, might be a little later. We will be asking -- I mean, at the close of the prosecution's case obviously we need to make some very basic fundamental decisions about going forward with a defense. And so if we finish in a timely work human-like fashion, I would probably ask for the weekend to make those decisions and come back on Monday.

I've actually spoken to the private prosecutor about it, and she preliminarily expressed no objections, subject to how things roll out.

THE COURT: All right.

If you were to go full bore on a defense case, how long do you anticipate that to take?

MR. KUBY: Subject to cross-examination?

THE COURT: Yes, sir.

MR. KUBY: I think two days would be the maximum I could imagine; although, in fairness -- and I don't mean this

in a snarky way --

THE COURT: I'm smiling.

MR. KUBY: -- there are many, many things that have happened in this case that I could not have imagined. But my best estimate is two days.

THE COURT: All right.

I suspect you're not alone in that, sir.

All right. Counsel, do you want to take a break to go to the rest room and then start with openings?

MR. KUBY: Well, we do have a variety of preliminary matters to address with the Court. I would love to take a bathroom break before addressing those.

THE COURT: Give me a hint.

MR. KUBY: It's bigger than a bread box.

THE COURT: Come on, come on, come on. Topics.

MR. KUBY: We want to talk about, for example, Mr. Donziger playing a direct role in his own trial, other than --

THE COURT: What does that mean?

MR. KUBY: At this point -- and I have alerted the private prosecutor to this.

THE COURT: Just go down the topics. Let me hear the topics, Mr. Kuby.

MR. KUBY: Okay. Topics.

Maybe access, maybe not. I don't have any clear sense

of what access is like, because I've been sitting here.

I have an issue with Rule 14.

I want a document documented.

Mr. Donziger wants to address the Court.

I have a renewed request for a jury trial, which will be brief.

And I have a request for some relief with respect to communications between and among the private prosecutor and Judge Kaplan. And I really feel, having read all the papers on this and have written some of them and having read the Court's opinions, I really think we have been talking past each other, that's my impression, so I'd like to just take a few minutes.

THE COURT: All right. So that's the topic.

Anymore topics?

MR. KUBY: No.

THE COURT: All right.

Five minutes. Thank you, counsel.

MR. KUBY: Thank you, Judge.

(Recess)

THE COURT: Mr. Kuby, most of the items on your list, except for, I think, the first one, are items that are dealt with once, twice, or three times.

As to the first item, which is Mr. Donziger is playing a part, I received literally 30 seconds ago your memorandum on that. I haven't had a chance to read it. So I will reserve on

that until I have an opportunity to read your memo.

With respect to the other items, we can go down them, and I will ask you if you have something to say in addition to what has been said before. And we'll consider it an untimely motion for reconsideration.

So the first thing you had on your list was access. Is there anything to be said that you haven't said before, sir?

MR. KUBY: I actually have one half of an item. While you were out during our break --

THE COURT: Yes, sir.

MR. KUBY: -- Mr. Brodsky, of the very burdensome, has delivered four Red Wells of material for which I thank you very much. It's a stunning example of what can be done. We have not yet had a chance to look at them, but we'll try to straighten all that out. I just wanted to let the Court know --

THE COURT: Wonderful.

MR. KUBY: Pardon me?

THE COURT: Wonderful. Wonderful.

MR. KUBY: Wonderful.

I'm sorry. One thing that I just want to alert the Court to in advance is I wear hearing aids in both ears, have for many, many years. And sometimes when I'm talking and my own voice is booming in my head, it takes me a second to realize you're talking and I need to shut up. So if you

will --

THE COURT: Thank God.

MR. KUBY: Right. No, I know, right, Judge?

I just wanted to let you know it's not a matter of not listening, it's sometimes legitimately a matter of not hearing.

THE COURT: Yes, sir.

MR. KUBY: The access question --

THE COURT: Is there something that you want to say that you haven't said before?

MR. KUBY: Yes.

THE COURT: What's that?

MR. KUBY: I'm mindful of your admonition, and I'm also mindful of the time you're giving me.

So what I would like to say is it appears that there are some empty seats in the press gallery that are not occupied by press. Would it be possible to get a couple of people from the overthrow room -- the overflow room in here, subject to their being evicted if the pressure is up?

THE COURT: I think we, as a matter of policy in this court, give the press preferential access. And it has traditionally, in bench trials or other nonjury events, meant that the press gets the jury box.

So let's see how it goes. If it continues to be not full, I'll reconsider that.

MR. KUBY: Okay. Thank you, Judge.

THE COURT: All right.

Rule 14, sir.

MR. KUBY: Okay. As Mark Twain famously said, If I had more time, I would have written a shorter letter, so I'm going to try to keep this short.

In Rule 14, as the Court knows, the rules of doing business in the Southern District of New York, vests none of us with any substantive rights. I understand all that; you've ruled on that. It does provide that any judge, upon written advice to the assignment committee, may transfer directly --

THE COURT: Sir, do you have something to say you haven't said before?

MR. KUBY: Yes.

THE COURT: All right.

MR. KUBY: Well, I have something to say that you haven't ruled on before.

So Judge Kaplan, you know, said in one of his rulings that's exactly what transpired here. What I'm asking for, and I've asked Judge Kaplan this, I've asked you this, and if you ruled on it, then I didn't see it. All I want is a copy of the mandatory written advice that Judge Kaplan had to submit upon transferring the case to you on the public docket. Judge Kaplan would not address me on this when I filed -- addressed to him in this case, telling me that I had to file an appearance in the underlying civil case, which I would rather

set my hair on fire than do that.

THE COURT: Bet you there's a lot of people who join you in that.

MR. KUBY: About 50 of them who are no longer with us.

And I'm not suggesting that these rules confer some sort of substantive right on a litigant, but this is simply a ministerial document under the presumption that documents in the federal courts are public unless they are sealed or --

THE COURT: Unless they are internal court documents. The rule clearly says that it endows plaintiffs, litigants, all litigants, with no rights. You don't have a right to the document. Denied.

MR. KUBY: Okay. There is a general rule that documents in the court are -- there's a general rule of openness for a ministerial --

THE COURT: I know that.

What are you telling me you haven't told me before?

MR. KUBY: Okay. Have you actually seen it?

THE COURT: What?

MR. KUBY: The advice that Judge Kaplan undoubtedly filed because he is very punctilious --

THE COURT: Counsel, I'm not here to be questioned.

MR. KUBY: I'm just --

THE COURT: Anything else on Rule 14, sir?

MR. KUBY: Just asking. Just asking, Judge.

No, I think that's it.

THE COURT: Okay.

And on Mr. Donziger's addressing the Court, we'll worry about that after I read your memo.

Jury trial. Do you have anything to say you haven't said before, sir?

MR. KUBY: The only thing I have to say is this is the last opportunity before the Court begins this process to have this tried before a jury.

THE COURT: So would that be a no? No, I don't have anything else to say?

MR. KUBY: After what I just said, the answer is no.

THE COURT: Thank you.

I adhere to my prior rulings.

Communications between the prosecutors and Judge Kaplan, anything else to say that hasn't been said in the two or three times I've dealt with this?

MR. KUBY: I think so, Judge.

THE COURT: Yes, sir.

MR. KUBY: Okay.

And in the end, there's a request for relief.

THE COURT: In the end of what?

MR. KUBY: In the end of my very short and increasingly shorter presentation on this issue.

THE COURT: Okay. But really, is there something that

you want to say that you haven't yet said?

MR. KUBY: Yes.

THE COURT: Yes, sir.

MR. KUBY: But I need to provide a tiny bit of background.

We all recognize -- and we're not arguing this -- Judge Kaplan brought the charges; he appointed the private prosecutor to prosecute; designated this Court to try; and we've raised those objections, we are not rearguing those.

And if that were the only role that Judge Kaplan was playing in this case, we would not have the issue that I'm going to address. That is to say that if that were the configuration, the private prosecutor could well question Judge Kaplan as a witness in the case, not as a testimonial sense, but in the sense of somebody who actually knows this case as well or better than anybody else. He basically could occupy --

THE COURT: Counsel, let's get to it.

MR. KUBY: I am.

There would be a wide range of *ex parte* activities that he could engage in with the private prosecutor without any problem whatsoever.

The problem comes in after he declared that he is an unrecused judge in this case; not in the underlying litigation, in this criminal case. And as an unrecused judge who is playing whatever role the two of you decide he's going to be

playing in this case, he is not permitted to have any *ex parte* communications with the private prosecutor, except for very, very narrow matters like search warrants, grand juries, and the like.

So I know the prosecution says and this Court has said, Judge Kaplan is not advising on strategy or decisions; he's not deciding things. And we are not disputing that, although I think those terms are subjective. The issue is not what Judge Kaplan is not saying to the private prosecutor, the issue is, as an unrecused judge in this case, he should be not saying anything at all.

If he kept this case, let's say he exercised his right to actually keep it, which he has a right to do, there would be no question. He couldn't be dealing directly with the private prosecutor after appointment; those would be improper *ex parte* context.

So the relief I'm requesting -- and I know the Court's mind on this, so I'm not going to belabor it, but I am requesting two things: I'm requesting, number one, that this Court direct the private prosecutor to assemble and compile -- not today -- all communications, electronic and otherwise, that they have had concerning this --

THE COURT: Okay. This is the same request that you've made before; is it not?

MR. KUBY: No.

THE COURT: How is it different please, sir?

MR. KUBY: To assemble them all, file them with the Court, the Court will then place them under seal. And after Mr. Donziger is convicted and after he files his notice of appeal, those documents will go to the Second Circuit, so the Second Circuit at least can see the record that exists that we were not privy to. I'm past asking you to give those to us; you've said no three times.

(Continued on next page)

THE COURT: I got it. Thank you.

MR. KUBY: And second, I want all the communications that you have had with Judge Kaplan concerning this case to be summarily placed under seal, not given to the litigants but sent under seal to the United States Court of Appeals for the Second Circuit after Mr. Donziger is convicted and files his notice of appeal.

THE COURT: Thank you.

MR. KUBY: Thank you.

THE COURT: Ms. Glavin.

MS. GLAVIN: Your Honor, there's a fundamental issue with Mr --

THE COURT: Either one of you if you want, to stand at the booth when you speak. Obviously, that's fine.

MR. KUBY: Can I get not within six feet of Ms. Glavin so I can hear her better?

MS. GLAVIN: Could it be eight?

MR. KUBY: Yeah.

MS. GLAVIN: So, your Honor, one of the fundamental issues or misunderstandings that the defense has been raising about Judge Kaplan not being recused from this case, I am not aware of any other judge in this court house that has been recused from the case. The issue is who's presiding over this case. Your Honor is presiding over the case, not Judge Kaplan. And so in this particular criminal case there have not been

improper ex parte communications between the prosecutors. And the Court and with respect to the prosecutors' communications with Judge Kaplan to the extent they're interested in the discussions I had with Judge Kaplan with respect to being appointed to this case and any questions that I may have had with him about the case, there is just simply not entitled to that. I have said repeatedly, Judge Kaplan is not making the decisions for me. He is not sitting around strategizing with me. I can represent on the record, your Honor, that I haven't had a communication with Judge Kaplan about this case since, I think it's 2019. And so there is no, he is not part of our prosecution case. I don't get on the phone and consult with him about what I am doing, what I want to do or thinking about doing and he is not doing the same. You know there were discussions leading up to my appointment and I think there were some small discussions after that but these are not discussions about how I go about doing my jog job and I think that I have said enough on that point. He is not presiding over this case.

THE COURT: OK. Mr. Kuby.

MR. KUBY: Briefly, judge, again, what I continually hear is what Judge Kaplan is not doing. And it just reminds me of my own clients in blue collar cases or no collar cases where the defendant says, I didn't shoot the guy with the silver gun on Fifth Avenue while I was wearing a hat at eight o'clock at night, so I'm not guilty. Got it. But that's not how this

works.

Judge Kaplan is someone who submitted in an opposition through writ of mandamus his statement that he is not recused from this case makes him at least in some internal way a judge who may or may not be doing something on this case but certainly a judge who believes that he is capable of exercising Article III powers on this case when and if and whenever he chooses to do.

So, if that's Judge Kaplan's position and that's the position he is taking publicly, then any communications that the private prosecutor has had with Judge Kaplan, at least post appointment, unless they relate simply to the areas where you're permitted, you know, to have ex parte communications. Say, here, Judge Preska, I have an asthma attack. I have to use my albuterol or something like that, not true. Outside of those, they're all improper. Period. They shouldn't be taking place. They shouldn't be had.

And I think that the Second Circuit which could be the final arbiter of this, should at least have not the same as Judge Kaplan is not doing, but the things that Judge Kaplan is having, has had before them. And look, if it's nothing the circuit will have no problem saying this is a nonissue. I just think the circuit should have that in the record.

THE COURT: Thank you.

Anything else? I adhere to my prior rulings on this

issue.

Did you have anything else on your list, Mr. Kuby. I think we've exhausted it.

MR. KUBY: Give me one second.

(Pause)

THE COURT: Mr. Garbus, you look like you're ready. What motion do you want to make now.

MR. GARBUS: We learned something on Friday which I think changes the entire argument in this case and I have motion papers that we've prepared.

THE COURT: I can't hear you. Speak into the mic, please, sir.

MR. GARBUS: We have prepared brief motion papers now which we will serve if we can with the Court and --

THE COURT: What's the motion, sir?

MR. GARBUS: We have learned through a letter from the Department of Justice on Friday that it's declining, Department of Justice was declining to exercise any supervision over the prosecutor in this case. This lack of supervision means that the prosecutor is free floating --

THE COURT: Mr. Garbus, this is not something we have to do before trial. So, I will accept your papers when you're ready. Would you confer with the other side, get together a briefing schedule and I'm happy to do it when the briefs are in.

MR. GARBUS: May I suggest that we have heard the argument with respect to Rule 42 this new letter from the Department of Justice which we first got Friday --

THE COURT: Counsel, I've just told you I'm not going to rule without briefing. I don't even have your brief yet, much less the opposition. So, we're not going to do that now.

MR. GARBUS: I am now going to hand up if I can --

THE COURT: All right. But we're not doing it now. It's time for openings now.

Mr. Garbus, if you are going to walk around you've got to have a mask on. We're very serious around here. All right.

MR. KUBY: Judge, I'm sorry. We are getting there.

Mr. Donziger wishes to bring something to the Court's attention regarding access which I have no personal knowledge of because I have been sitting here with all of you. If he could just address the Court on that narrow issue.

THE COURT: So, he is a fact witness now; is that what it is?

MR. KUBY: No. No. He is not going to be under oath, judge.

THE COURT: Come on, folks. If you want to get this case tried we've got to get going.

What's the problem?

THE DEFENDANT: Your Honor, may I address the Court?

THE COURT: Certainly, if you are at a microphone.

THE DEFENDANT: There are people trying to get into court to attend this trial, who can't get in because they're being told the overflow rooms are full. So, I am asking you -- I know there's a lot of empty courtrooms here. I don't know if it's possible from a technical standpoint to open up additional spaces.

THE COURT: It is being done as we stand here. There are several overflows. The staff is working as quickly as they can to open overflows.

THE DEFENDANT: Can you please instruct them to tell the people waiting that they are trying to do that because the text I got --

THE COURT: Why don't you just text them back and tell them.

THE DEFENDANT: One other thing about accessing which has not been raised yet, if I may, this will take about a minute. I have clients in Ecuador who want to watch this trial. You have terminated Zoom access where they can't even listen to it, whereas in all the pretrial proceedings there was Zoom access.

THE COURT: Yes, sir, that is correct. In my prior order I have distinguished the rules for pretrial matters and trial matters. I am not permitted to broadcast a trial. I adhere to my prior rulings on that.

THE DEFENDANT: If I could just say this.

Embassador -- write you a letter. I don't know him by the way.

THE COURT: Mr. Donziger, the rules are the rules. I adhere to my prior findings.

THE DEFENDANT: The reality is you do have the discretion to open up zoom access and I would ask you to please reconsider.

THE COURT: OK. I've reconsidered and denied it.

MR. KUBY: Thank you, judge.

THE COURT: Mr. Garbus, would you like do your opening now? And I would remind you that I've allocated 45 minutes for each side.

MR. KUBY: You know, judge, it's been a while for me and I'm old.

THE COURT: You are not as old as I am, Mr. Kuby. Don't give me that old stuff.

MR. KUBY: I wasn't going to say that, judge.

THE COURT: Mr. Garbus, I have just demonstrated that I am older than Mr. Kuby by asking you to go first, while that was clearly a mistake.

MR. KUBY: -- not having a stroke, judge.

THE COURT: We old people have to stick together.

Mr. Garbus, I made a mistake by asking you because you were standing you looked like you were ready to roll.

MR. GARBUS: I was. But I would like and I know you have ruled --

THE COURT: To the microphone, please, sir. You are well welcome to sit.

MR. GARBUS: You have said that the recent information that we got from the government on Friday is something that you would want to see and rule on.

THE COURT: Counsel, I have ruled that I am not going to rule now and we are not going do discuss this now until I have had a chance to read your briefing, the opposition and any reply you might put in. So, now it is time for opening statements, sir.

Ms. Glavin.

MR. GARBUS: Judge Preska, may I make one more statement?

THE COURT: Yes, sir.

MR. GARBUS: One sentence.

THE COURT: Let's go.

MR. GARBUS: The information that we got on Friday invalidates this entire proceeding. So, to go through something which we now know must be set aside, entire process, seems to me foolish.

THE COURT: OK. Well, the Court of Appeals, either I'll decide that once I read your briefing or the Court of Appeal will tell me. We're not doing it --

MR. GARBUS: I --

THE COURT: Mr. Garbus, I am warning you, it is time

to sit down so we can have opening statements.

Ms. Glavin, I remind you too that opening statements are limited to 45 minutes.

MS. GLAVIN: Yes, your Honor.

THE COURT: Ms. Glavin.

MS. GLAVIN: Thank you.

Your Honor, Steven Donziger, the defendant in this case, has intentionally and repeatedly disobeyed court order after court order after court order, all of which were in full force and effect. And he did this for years, disobeying court orders that direct you to do something or to not do something is a crime and it's called criminal contempt and that is what Mr. Donziger is charged with.

Now, to convict the defendant of criminal contempt we the special prosecutors have to prove three things.

One is that there was the issuance of the court order.

Secondly, that the defendant, Mr. Donziger, disobeyed that order.

And third, that the defendant did it willfully and knowingly that he had the intent to consciously disregard the court order.

Now, the evidence will show that Steven Donziger has been committing the crime of criminal contempt since 2014. That is why we are here and that is what this case is about. Here is the background. The evidence will show that in 2011

the Chevron Corporation sued Steven Donziger, a New York City lawyer. They sued him in this district court, the Southern District of New York. And in that lawsuit Chevron claimed that Steven Donziger and others that he worked with engaged in fraud and they engaged in corruption to obtain a nine-billion-dollar judgment against Chevron in another country, in Ecuador. Mr. Donziger in that case in Ecuador was an attorney for the plaintiffs. That case was where that nine-million judgment was entered. And Mr. Donziger had an agreement with his client about how he was going to get aid for that Ecuadorian case. If they won their lawsuit in Ecuador, Steven Donziger would receive 6.3 percent of that multibillion dollar judgment. In other words, Steven Donziger stood to make approximately $550 million from the Ecuadorian judgment.

So, when Chevron sued Mr. Donziger here in New York after a lengthy trial on Chevron's allegations against Steven Donziger about his conduct in that Ecuadorian case on March 4th of 2014, Judge Lewis Kaplan of the Southern District of New York ruled in Chevron's favor.

Judge Kaplan issued a decision and a judgment that was specifically designed to prevent Steven Donziger from ever profiting from that Ecuadorian judgment because of the fraudulent and corrupt acts that he had engaged in during that case --

Now, the judgment in Chevron's favor that Judge Kaplan

issued is called a RICO judgment and that's what we will be calling it during the course of this trial, your Honor. Here is what it did.

Number one, it established a constructive trust for the benefit of Chevron on all property that Steven Donziger, personal or real, tangible or intangible, that Steven Donziger received or may receive in the future that was traceable to that multibillion dollar judgment. And that RICO judgment specifically mentioned that the property subject to that constructive trust included but what was not limited to all rights to that 6.3 percent contingent fee interest that Mr. Donziger had. And the RICO judgment directed, it ordered Steven Donziger to "transfer and forthwith assign to Chevron all such property that he now has or here and after may obtain.

The RICO judgment also directed Steven Donziger to execute in favor of Chevron stock power. Transferring to Chevron all of his right, his title and his interest and his shares of a gibraltar company known as Amazonia. And you will learn during the course of this trial that Amazonia was the gibraltar entity that was created to pay out the proceeds from the Ecuador judgment. And that Steven Donziger had sharers in Amazonia representing the amount of his 6.3 percent contingency fee interest. That RICO judgment also prohibited Steven Donziger from engaging in or undertaking any acts to monetize or profit from that Ecuadorian judgment including by selling,

assigning, transferring any interest in that judgment such as his own, like his shares in Amazonia and his 6.3 percent contingency fee interest for which he stood to get about $550 million.

Mr. Donziger appealed that judgment. The Second Circuit Court of Appeals confirmed it in its entirety and the Supreme Court denied -- The evidence will show that after Mr. Donziger's appeals were exhausted in 2018, four years later after the original RICO judgment was issued, Judge Kaplan issued a second judgment. He issued a second judgment against Steven Donziger, a monetary judgment for costs in the amount of $813,000. And that meant that Chevron had the right to obtain discovery from Mr. Donziger to enforce the judgment by learning about his assets, sources of income over the years and to go after those assets to satisfy the judgment.

So, when did Steven Donziger's disobedience of the court orders begin? The evidence will show that he began violating that RICO judgment as soon as it was issued on March 4th of 2014 by Judge Kaplan. He made the decision not to comply with the judgment right from the beginning.

The evidence will show that first, Steven Donziger did not execute a stock power assigning his interest in those Amazonia shares to Chevron as he was directed to do so on March 4, 2014. And what you will also learn during the course of the trial is that Mr. Donziger as so concerned about having to sign

over those Amazonia shares to Chevron that he specifically asked Judge Kaplan, please, stay that portion of the RICO judgment until at least my appeal is decided. Because you see those shares represented his contingency fee interest. It was the vehicle through which he could get the hundreds of millions of dollars from the Ecuadorian judgment. He didn't want to turn them over. So, when he asked Judge Kaplan to stay that order the evidence will show that Judge Kaplan met him halfway.

On April 25th of 2014, a month after the RICO judgment was entered, Judge Kaplan temporarily modified the judgment. He said, Mr. Donziger, you don't have to turnover your shares of Chevron. You don't have to turnover your shares of Amazonia to Chevron. Here's what we'll do. I'm going to order you to execute a stock power in favor of the clerk of this court for those shares while your appeal is pending because I don't want those sharers in your control because if they remain in your hands -- and Judge Kaplan said this to Mr. Donziger -- you might benefit from your fraud by selling those shares or hiding the proceeds.

Well, Steven Donziger did not execute the stock power in favor of the clerk's office. He didn't do it in 2014. He didn't do it in 2015. He didn't do it in 2016. And he didn't do it in 2017 while the appeal was pending and when the Supreme Court deny review. And we will call a representative from the clerk of court's office who will tell you when Steven Donziger

finally exhausted his appeals in 2017. He then did not assign the stock power for those shares to Chevron as he was initially directed to do back in 2014. And the evidence will show that Mr. Donziger openly admitted that he didn't do it. And we will show during the course of this trial Mr. Donziger's public statements on the record admitting this. It was only after Chevron moved in 2018 to hold Mr. Donziger in contempt for violating that provision of the RICO judgment four years later that Mr. Donziger executed that stock power.

The second way he violated the RICO judgment is that he did not, as he was directed to do, transfer to Chevron his interests in the 6.3 percent contingency fee granted to him by his clients. You see Mr. Donziger, the evidence will show, had a 2011 retainer with the plaintiffs in that Ecuadorian lawsuit and with an organization called the Amazonia Defense Fund. The Amazonia Defense Fund was the beneficiary of that Ecuador judgment. The 2011 retainer agreement granted to Steven Donziger and associates the 6.3 percent contingency fee. And just like the Amazonia shares, he did not assign them to Chevron as he was ordered to do on March 4th of 2014. He didn't do it in 2014. He didn't do it in 2515. He didn't do it in 2016 or 2017. And again, only after Chevron moved to compel Mr. Donziger -- that contingency fee granted by his 2011 retainer did it do it, 2018, four and a half years later.

Now, third, your Honor, the evidence will show that

not only did Mr. Donziger not surrender his 6.3 percent contingency fee interest that he had from his 2011 retainer with Chevron, the evidence will show that in 2017, three years after the RICO judgment was issued, Mr. Donziger quietly entered into another contingent fee agreement. He did it in 2017. And that new contingent fee agreement was not between Mr. Donziger's law office and the plaintiff's in the FDF. This new 2017 agreement was between the ADF, the Amazon Defense Fund and Mr. Donziger in this individual personal capacity.

And the ADF was the beneficiary of the judgment. So, Mr. Donziger didn't assign this new interest that he certainly wasn't going to tell the court about. And the existence of that agreement only came out during a June 25, 2018 deposition. And after that came to light in the deposition, Mr. Donziger refused to assign that contingency fee interest over to Chevron as he was directed to do. And it was only in 2019 after Chevron moved to hold him in contempt for not assigning that new 2017 interest and after Mr. Donziger was found in contempt did he assign it.

Now, how else did he violate the RICO judgment? Well, the evidence at trial will show that in December of 2016 Mr. Donziger assigned a portion of a 6.3 percent contingency fee, his personal portion of that fee in the Ecuadorian judgment to a life coach by the name of David Zelman. And he signed that portion in exchange for Mr. Zelman providing him

with approximately $11,000 of personal services. And oh, yeah, Mr. Donziger pledged it out of the 6.3 percent contingency fee interest that he was supposed to have assigned to Chevron back in 2014. Mr. Zelman will be a witness at this trial and he will testify about his agreement with Mr. Donziger which was memorialized in an e-mail between the two of them.

Now, the evidence will be that Mr. Donziger's deliberate disobedience of the RICO judgment in the four ways that I've described and the evidence will show, they weren't the only court orders he disobeyed. It wasn't the only criminal contempt he committed. You see there were a separate series of order. In 2018 and in 2019 he violated a series of court orders in connection with the ongoing civil litigation that was pending before Judge Kaplan with Chevron.

MR. KUBY: Judge, I hate do this. I really do. But if the prosecution could try to confine itself to the charges that the Court is trying. One of which by the way, is not Amazonia. That would be just helpful. I think or not.

THE COURT: Thank you, counsel. I will bear it in mind.

MR. KUBY: Thank you.

MS. GLAVIN: After the RICO judgment was affirmed in 2017 and the $813,000 money judgment was issued against Mr. Donziger in February of 2018, there was a second phase of the civil proceedings and that second face was post judgment

discovery.

During those proceedings Judge Kaplan issued specific orders directing that Chevron was entitled to discovery from Mr. Donziger on two issues. First, discovery in aid of enforcing that money judgment against him which meant that Chevron could get documents and information from Mr. Donziger to identify his assets sources of income and what he had been doing financially for the past number of years so that they could satisfy and collect on an $813,000 judgment against him.

And secondly, Judge Kaplan ordered discovery about Mr. Donziger's compliance with the RICO judgment because Chevron had collected evidence that Mr. Donziger was disobeying that RICO judgment. And the evidence at trial will be and we will show that he was.

So, in the post judgment discovery Judge Kaplan specifically ordered Steven Donziger to produce records on both of those issues. We will enter those orders into evidence at trial and the evidence will be that Mr. Donziger denied those orders. Mr. Donziger deliberately withheld hundreds of pages of documents. He withheld them on First Amendment grounds and he also withheld them on privilege grounds.

And on the First Amendment issue Judge Kaplan specifically ruled that there was no legal basis for Mr. Donziger to be withholding documents on First Amendment grounds and yet despite that ruling Mr. Donziger still refused

to produce them.

And on the privilege issue the evidence will be that Mr. Donziger was required by law by rule of this court that when you produce documents in response to a subpoena at the same time you have to produce a privilege log if you are withholding documents and you are claiming privilege. Mr. Donziger didn't do that, and he had a long time to do that the evidence will she. He didn't do that despite knowing he had to and claiming he would at times. The failure to produce that privilege log resulted in Judge Kaplan filing a privilege waiver and directing him to produce his records without regard to privilege.

And the evidence will show as no surprise, Mr. Donziger in this case because it had happened before this litigation the evidence will show that years earlier Mr. Donziger similarly did not produce privilege logs and Judge Kaplan similarly found a waiver.

So despite Judge Kaplan's unequivocal rulings directing Mr. Donziger to produce documents Mr. Donziger persisted in his refusal to comply with the court order and he did it for months. And during that period, the Court orders directing Mr. Donziger to produce records were still in full force and effect. They hadn't been stayed. They hadn't been modified and Mr. Donziger did not make any effort to go to the Second Circuit to seek a stay of those orders. He knew he

could have done it because the evidence will show he'd done it before in this litigation. The evidence will be that Mr. Donziger did not seek relief in the Second Circuit from his required compliance with those live orders.

Now, because of this continuing and continuing refusal to produce the records, on March 5th of 2019, Judge Kaplan appointed a neutral forensic expert to image and examine Mr. Donziger's devices to preserve relevant records and then to examine those devices or records responsive to the discovery requests that had been outstanding that he had been directed to produce for many months.

The same day that Judge Kaplan appointed that neutral forensic expert, he issued an order directing Mr. Donziger to do two things. First was to provide that expert with a sworn list. So, on March 59 he directed Steven Donziger to provide a sworn list in three days, by March 8th of 2019, listing all of his electronic documents and all of the accounts that he had used.

THE COURT: I think you meant "devices".

MS. GLAVIN: I'm sorry. "Electronic devices", as well as any accounts that he had been using for storing information for messaging.

The second thing he specifically directed Mr. Donziger to do was that he was to provide to the neutral forensic expert on March 18, 2019, at noon in his apartment building, he was to

produce all of his devices to the neutral expert for imaging.

Mr. Donziger, he didn't do either. In fact, the evidence will show that he e-mailed that neutral forensic expert and said, quote, I hope you have not cleared your schedule to work on this matter, end quote. Mr. Donziger in he is email correspondence and letters made clear that he intended to disobey their orders and that he was willing to be held in contempt.

And what is also notable and will be shown through the evidence at this trial is that Mr. Donziger did not seek any relief from compliance for those live orders with the Second Circuit. There were avenues available to him that he knew about such that he could go and appeal for emergency relief from the live orders which is a stay order mandamus. He didn't do it. He chose to violate the orders.

On May 23rd of 2019, Judge Kaplan found Mr. Donziger in civil contempt and Judge Kaplan then imposed coercive fines starting at two thousand dollars a day to induce Mr. Donziger to comply with the live orders that were in full force and effect.

On June 11th of 2019 because Mr. Donziger still refused to surrender his devices to the expert for imaging despite the coercive fines piling up, Judge Kaplan directed Mr. Donziger to surrender all of his passports to the clerk of this court the next day by four p.m. Judge Kaplan directed

this is a further coercive measure to try and get Mr. Donziger to comply with the court orders that had not to be stayed or modified and for which Mr. Donziger did not go to the Second Circuit and say, hey, please, get me out of compliance with those orders that are still outstanding.

After Judge Kaplan issued the passport surrender order, June 12 came and Mr. Donziger did not surrender his passports to the clerk of the court on that day or any day thereafter and Mr. Donziger made that clear in a letter to the Court which would be part of the evidence in this case.

Six weeks later after Mr. Donziger had still refused to surrender his devices, refused to surrender his passports, still had not produced documents that were responsive to discovery orders that Judge Kaplan had issued more than a year earlier. Mr. Donziger was charged with six counts of criminal contempt.

Number one, willfully disobeying the March 5, 2019 order directing Mr. Donziger to provide a sworn list of his devices and accounts to the neutral forensic expert by March 8.

Number two, willfully disobeying the March 5, 2019 order directing him to surrender his devices for imaging by noon on March 18th of 2019.

Three, willfully disobeying Judge Kaplan's June 11 court order directing him to surrender his passports to the clerk of the court the next day by four p.m.

Four, willfully disobeying the 2014 RICO judgments from March 14 through September 3, 2018 by failing to assign his interests in a contingency fee granted by his 2011 retainer agreement.

Fifth, disobeying the 2014 RICO judgment from November of 2017 through May 27th of 2019 by failing to assign to Chevron his interests in the contingency fee interests granted by his new 2017 agreement by the ADF.

And sixth, disobeying the RICO judgments prohibition against monetizing his interests in the judgment for his activities on December 23rd of 2016 by assigning a portion of his own personal interests the day of -- in exchange or personal services.

Now, the evidence in this case is primarily going to be Mr. Donziger's own words. He told Judge Kaplan in court hearings what he would do and what he was not going to do. And in the filings he made quite clear he would not comply with these written court records and issues.

The evidence will also be that there is no misunderstanding or mistake by Mr. Donziger. He made a very conscious decision not to comply with court orders that weren't stayed and were in full force and effect.

Choices have consequences. And when he made the choice over and over again to disobey he committed a crime. Criminal contempt. Our system depends upon a rule of law of

following the rules, following the court orders that aren't stayed or modified. And the evidence will be that Mr. Donziger decided he didn't want to follow certain court rules or orders because he disagreed with them. He objected to them. He didn't think they were fair. So, he wanted to do things his way. So, he disobeyed the rules and the orders very intentionally over and over. That is criminal contempt.

Now, at the end of this trial, your Honor, after hearing all of the evidence and, particularly, Mr. Donziger's own words and actions, the only conclusion supported by that evidence and the law that governs criminal contempt is that Mr. Donziger is guilty of all six counts.

THE COURT: Thank you.

Mr. Garbus, now it's your turn.

MR. KUBY: Could we have five, judge?

THE COURT: Certainly.

MR. KUBY: Thank you.

(Pause)

THE COURT: Ladies and gentlemen, won't you be seated.

Mr. Garbus.

MR. GARBUS: Thank you.

Every single fact that the prosecutor has stated, the Chevron prosecutor has stated was known to the U.S. Attorney when he refused to prosecute. He had the entire file, every single document, every single statement when he refused to

prosecute.

MS. GLAVIN: Objection as to relevance.

THE COURT: Sir, you only have 45 minutes. So, why don't we keep to the relevant matters.

MR. GARBUS: Thank you.

THE COURT: Yes, sir. Thank you.

MR. GARBUS: The prosecutor kept saying what Mr. Donziger said. She never showed you a word he said. She never put up on an instrument a word he said. You never heard one word of his testimony. All you heard was the word of a private prosecutor, the information we got on Friday which will be the subject of the motion --

THE COURT: Counsel. Counsel, you asked me for four hours. The prosecutor asked me for an hour. I gave you both 45 minutes. If you want to use your 45 minutes on things that are not relevant to the charges in the case, be my guest, but when the 45 minute mark comes I will ask you to sit down. So, don't tell me you don't have enough time.

MR. GARBUS: I will sit down after 45 minutes. You and I may have a different understanding at this point as to what's relevant to the charges and relevant to the prosecution.

The evidence will show that Judge Kaplan asked the prosecutor to prosecute the case. The U.S. Attorney with 260 attorneys in his office and a budget of $50 million, refused the prosecution. The evidence will show that a Rule 42

prosecution such as this is rare. The evidence will show you that Judge Kaplan could have then after the prosecutor turned this case down, he could have put it into the wheel and let there be --

MS. GLAVIN: Objection as to relevance. Move to strike.

THE COURT: Mr. Garbus, none of this has any relevance to the charge here. As you know, in order to convict the government must prove the issuance of the order. The defendant's disobedience or disregard of the order and the defendant's knowledge and willfulness in disobeying the order. All of this other stuff is not relevant. It's been the subject of motions and if I was wrong on a motion, the Court of appeals will tell me. Let's focus on the charges at issue, please, sir.

MR. GARBUS: I will now go through the statements in the case, the actual evidence of what Mr. Donziger said, not the characterizations of the evidence.

As we look for it, Mr. Donziger is innocent of every single charge that has been leveled by Ms. Glavin. We believe the U.S. Attorney understood that when he refused prosecution.

MS. GLAVIN: Objection; move to strike.

THE COURT: Counsel, the portion of Mr. Garbus' statement about refused to prosecute is stricken.

Mr. Garbus, you will recall I know that when Judge

Kaplan offered the case to the United States Attorney's Office, the United States Attorney's Office respectfully declined to prosecute because of a lack of resources. Characterizing it a hundred times as a refusal is not going to make it so and that is also irrelevant.

MR. GARBUS: We will also look into the reasons why the prosecutor chose not to prosecute.

THE COURT: That is not relevant to the charges at issue, sir.

MR. GARBUS: We believe it is.

In June 2018, Donziger said he saw what was happening in the case. There have now been two months of litigation on Chevron's contempt claims. Yet the Court refuses to provide even the most simple baseline guidance on the status of the stay order.

Oh, by the way, Ms. Glavin did not even mention the decision of the Second Circuit two months ago after this prosecution started when the Court dealt with the vagueness of the order that he was supposed to follow.

MS. GLAVIN: Objection; relevance.

THE COURT: Mr. Garbus, everybody in this courtroom I am certain has read and memorized the Court of Appeals decision. Let's just keep going to relevant material, please, sir.

MR. GARBUS: The court appears -- and this is Donziger

speaking -- a nondecision that intentionally withholds information about the applicable law while addressing Mr. Donziger to proceed with discovery and sworn testimony. He explained to the Court again and again the issues he was facing. In October 2018 he said -- and this is what the Second Circuit looked at -- I don't see how you can try a case without being aware that two months ago the Second Circuit rendered a decision. I'll go back. The Court has refused to address the key issue underlying Chevron's original contempt motion for over six months now.

Meanwhile the Court has green-lighted Chevron's outrageously intrusive discovery, intimidation and demonization campaign. All of which again has zero basis to proceed if there is no colorable contempt. He said again -- and this is again and again and again in his papers -- the Court has refused for over a year to rule substantively on the merits in the main contempt motion and instead held open the motion as a way of allowing Chevron to conduct a massive campaign of intrusive discovery of otherwise irrelevant topics targeting poor internal deliberation and a social activity of the team of human rights activists and funders seeking to hold Chevron accountable.

Mr. Donziger filed affidavit after affidavit. His lawyers came to court and they said the same thing. There are many quotes about their attempt to deal what they saw as an

ambiguous order. And the Second Circuit six weeks ago said that that order was ambiguous. How can that be relevant to this proceeding?

THE COURT: That the order that the Second Circuit, a portion of the order of the Second Circuit reversed as not an issue here, sir. That's why.

MR. GARBUS: We disagree.

Mr. Donziger saw that he was being asked to engage in a discovery proceeding aimed at determining whether he violated an injunction without being allowed to know what the injunction said, at the very least how the court interpreted that injunction. He tried very, very hard to get Judge Kaplan to recognize the importance of the stay order. He saw clarification. He filed a notion to dismiss. He filed a motion for declaratory judgment. He filed a motion for protective order. He filed a Hail Mary interlocutory appeal and he filed a motion for a stay. It was all denied. It was his attempt to get a clarification again, it was the Second Circuit the judge ruled on.

The evidence will show based on his statements, his statements under oath he was already respectful. Never contemptuous towards Judge Kaplan and at all times used the legal tools at his disposal to get clarity on issues from judge Kaplan which Chevron did not want clarity on.

We find it significant that Chevron in 2010 went to

the prosecutors to try and get a prosecution. The prosecutors turned it down. We know again that judge, Mr. Berman turned it down. We don't know how many other applications there were to get a prosecution of Mr. Berman.

The information that we got on Friday deals with the responsibilities of -- firm. And what that document indicates basically or what the conversation indicated is that the federal government was in no way supervising any of --

THE COURT: Counsel, I am just going to say to you again, if you want to waste your time talking about matters that are not related to the charges, be my guest. But don't tell me you didn't have enough time.

MR. GARBUS: I will not tell you I had enough time. I said that before. I said I will sit down at the 45 minute mark or before.

Mr. Donziger stated under oath were I to just comply Chevron was succeeded in gaining mere hold access for confidential privilege and protected documents without any legitimate basis. The same issues we were arguing this morning are the same issues that Donziger was raising.

Mr. Donziger looked at the law including the law cited to him by Chevron and by Judge Kaplan and he and his attorneys decided that as an ethical and legal matter the appropriate and necessary approach was to voluntarily and respectfully undertake, accept a civil contempt citation as it is sometimes

called in order to perfect the appellate jurisdiction and to ask the appeals court to consider his interpretation of the stay order as we know it did. There is a long line of law Supreme Court cases, Second Circuit cases, lower court cases saying this is exactly what she should do. Mr. Donziger relied on his own legal skills, plus the legal skills of the professors and law people who worked with him. He said, he was very clear, very clear that in order to protect his client about what he was doing and very clear that he was inviting citation. He was not being disrespectful. He said, his words, I am not ethically able to comply with the Court's orders to produce mountains of confidential and privileged material to Chevron under a wholly improper purported privilege waiver -- and before the Court has even ruled on the core issue.

(Continued on next page)

MR. GARBUS: He then said, based on the advice given to him by counsel: My only option, as I understand it, is to defy the Court's order and seek appellate review of any contempt sanction.

My understanding is that this process, while involving a contempt finding, can be conducted in a respectful and timely fashion. The prosecutor in her opening mentioned none of this.

Mr. Donziger repeatedly assured the Court that if he was unsuccessful on appeal, he would have no choice and would comply with the discovery orders.

He said on November 2018: If that appeal is decided adverse to me, and I am left with no choice but to produce the documents, I will.

On April 2019: I have never suggested that I would not ultimately comply with the Court's orders if my objections are rejected on appeal.

On June 2019, he said: I have committed to comply with this Court's orders, even in violation of my constitutional rights and the rights of others if I am unable to obtain relief on appeal.

Mr. Donziger takes his responsibility to his client, the people of Ecuador, the people who led very tragic finds because of Chevron's behavior, that he should do exactly what he did. He stayed within the law. The path of contempt jurisdiction, token contempt, or symbolic contempt, is a lawful

path and disgust in the cases, I must say not in the cases that you've dealt with, but it is there.

And Mr. Donziger fully intended to comply if he was not successful in the path, and repeatedly told the Court he would comply if he was not successful on appeal. There could be no question about that.

We have a video of Mr. Donziger, so you can hear his own words. He will be talking, and we would ask permission --

THE COURT: Openings aren't evidence. I don't know why you're putting this in.

MR. GARBUS: It is, what he has said, exactly what Chevron seeks to criminalize: A transparent, thoughtfully, respectful undertaking, a civil contempt citation as a means to obtain contempt jurisdiction.

The Second Circuit six weeks ago understood that, and get appellate review prior to producing discovery materials over an objection of privilege and constitutional protection. Such conduct has never been criminalized in any case that we have found or has been cited.

The Second Circuit decision says: We hold that the injunction previously affirmed by this Court, the injunction that he's being charged now for having violated, was insufficiently clear and unambiguous when read alongside the district court's explanation --

THE COURT: Mr. Garbus, I don't know why you're

reading the Second Circuit opinion, and particularly reading it in a very selective manner.

MR. GARBUS: I'll try and read it less selectively.

Because we find that the stay order created ambiguity as to what precisely Donziger could no longer do to assist his clients in raising funds, we agree that the contempt finding on that limited issue cannot stand.

The Court said: An injunction must leave no doubt in the minds of those to whom it is addressed precisely what acts are forbidden to support contempt finding. And the Court of Appeals said at page 42: The order injected ambiguity into an otherwise largely unambiguous injunction.

The private prosecution that we face today, what we heard is the extraordinary financial contribution apparently that Chevron has made to the contribution, to this prosecution. We also know the enormous contribution that Seward & Kissel has made to this prosecution.

MS. GLAVIN: Objection.

THE COURT: Sustained.

Mr. Garbus, this is not a press conference.

MR. GARBUS: Pardon me?

THE COURT: This is not a press conference. We are here to talk about the evidence in this case.

Openings are an opportunity for the lawyers to give the Court a preview of what the evidence will be or what they

expect it to be. That's not what you're doing.

MR. GARBUS: We believe the *Chevron* prosecution in this case will not offer any evidence on the following issues and, therefore, the prosecution must be dismissed:

Why Judge Kaplan refused to clarify his stay order for over a year, leaving Mr. Donziger to guess, relying on the best legal advice in the country, to guess because of that ambiguity.

Why did Judge Kaplan -- or did Judge Kaplan attempt to prevent appellate review of his stay order?

Why did Judge Kaplan, after the prosecutor said no, make his own decision to elevate a civil discovery dispute that could be resolved by appellate review into a criminal case?

MS. GLAVIN: Objection. Move to strike.

THE COURT: That's granted.

MR. GARBUS: Why did Judge Kaplan appoint your Honor --

MS. GLAVIN: Objection. Move to strike.

THE COURT: Granted.

Mr. Garbus, this has nothing to do with the charges. I read to you a few minutes ago the elements of criminal contempt. None of them includes the material you are covering.

MR. GARBUS: We disagree.

THE COURT: Well, I'm sorry to tell you, but I'm the guy who decides here.

MR. GARBUS: I'm very well aware of that.

THE COURT: All right.

MR. GARBUS: Very well.

No justice has been previously done to Mr. Donziger; no justice will be done here.

THE COURT: This is not a press conference, sir.

MR. GARBUS: Deprived of a jury of his peers, Donziger faces a near certain conviction by way of a private prosecutor responsible to no one, the first prosecutor that I know of in this country that this has ever happened. A prosecution with violations drafted by a judge whose role we don't know. What you said in the discussion with Mr. Kuby, We don't know this, we don't know that. The amount of information that we don't know as we walk into this prosecution, as this man faces jail time, the certainty of jail time, is awful.

The evidence will show that the government cannot sustain its burden of proof. First, that he had not been prohibited from raising and being paid from third-party litigation, financing with sufficient clarity, such that Chevron's discovery campaign was justified, or that failure to acquiesce it could be criminalized.

I am prepared today to go through what happened in that discovery. I was prepared to go through today the extraordinary amount of documents, the extraordinary amount of harassment that Mr. Donziger had over the course of all these

years; and that he did not run afoul of the prohibitions when he tried to advance the enforcement's efforts of his Ecuadorian clients.

At the end of this case -- and Judge, I'm going to finish very early.

THE COURT: Bless you, my son.

MR. GARBUS: We will ask you, but no, you will not return a verdict of not guilty on all counts.

I'm reminded, the Ecuadorians were denied -- I'm going to do three paragraphs. Their request to have a jury of American citizens decide their claims of horrendous damage and horrendous pain caused by Chevron.

MS. GLAVIN: Objection. Relevance.

THE COURT: Same thing. Mr. Garbus, absolutely.

MR. GARBUS: Steven Donziger was denied his request to have a jury of American citizens to decide this case.

MS. GLAVIN: Objection. Move to strike. Relevance.

MR. GARBUS: But Mr. Donziger now has a different jury. Some are seated in the press box.

THE COURT: That's totally apparent to me, Mr. Garbus.

MR. GARBUS: -- will tell children, men and women throughout the world of what has happened in this case. That may ultimately be the decision that survives the history of this case.

I've cut out everything else so that I could fit

easily within the time the Court seems to be insisting on and require. Thank you.

THE COURT: Yes, sir. Thank you.

Ms. Glavin.

MS. GLAVIN: Your Honor, the special prosecutors call Anne Champion.

THE COURT: Yes, ma'am.

MR. KUBY: Judge, before Ms. Champion takes the stand, could I just get a sense of the Court's view of today's schedule; break for lunch at one, resume at two, go till four?

THE COURT: Maybe five. I mean, this is a bench trial. We can go till five.

MR. KUBY: We're all in masks and stuff.

THE COURT: I know. I don't like it any more than you do, sir.

MR. KUBY: How about four-ish?

THE COURT: We'll see where we are, sir.

MR. KUBY: Okay. Thank you.

THE COURT: Ms. Champion, come right up please.

ANNE CHAMPION,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: State your name and spell it for the court reporter please.

THE COURT: Ma'am, would you be sure that you speak

into the microphone, please, for the benefit of the court reporter and the spectators.

THE WITNESS: Yes.

My name is Anne Champion; A-N-N-E, C-H-A-M-P-I-O-N.

MS. GLAVIN: Your Honor, just before we begin, could I just check the cart to see the binders, in case Ms. Champion has to refer to them?

THE COURT: Yes, ma'am.

MS. GLAVIN: Your Honor, I just want to have Ms. Champion look at these so she can familiarize --

THE COURT: Yes, ma'am. Thank you.

MS. GLAVIN: I'm going to provide her with a document that lists out what binder is what for purposes, to the extent she needs to refer to them.

Ms. Champion, do you want to pull the docket sheet while you're up here?

THE COURT: Maybe you want to have someone else help with that.

MS. GLAVIN: Yes. That would be great.

THE COURT: Okay. Let's go.

DIRECT EXAMINATION

BY MS. GLAVIN:

Q. Okay. Ms. Champion, could you please state your name and spell it for the record?

THE COURT: She already did that.

MS. GLAVIN: Oh, sorry, your Honor.

Q. Ms. Champion, where do you work?

A. Gibson, Dunn & Crutcher.

Q. And how long have you worked at Gibson, Dunn & Crutcher?

A. Since 2006.

Q. And is Gibson, Dunn & Crutcher a law firm?

A. Yes.

Q. Are you a partner at Gibson, Dunn & Crutcher?

A. Yes.

Q. I should say, you're an attorney; correct?

A. Yes.

Q. What is the practice group that you work in?

A. Litigation generally, and then I belong to some practice groups within that overarching practice group.

Q. And what office of Gibson Dunn do you work out of, Ms. Champion?

A. New York.

Q. And have you been subpoenaed to give testimony today?

A. I have.

Q. I want to turn your attention, Ms. Champion, to civil case number 11 CV 691, *Chevron Corp. v. Steven Donziger, et al.*

Are you familiar with that case?

A. Yes.

Q. What was your involvement?

A. I worked as an attorney on that case from early 2011

through the end of trial; and then I also did some work during the post-judgment proceedings before the district court.

THE COURT: Could I interrupt for just a minute?

My friends at the back table, you're permitted to have three people, not four. I think you were told that coming in. We had reserved a seat in the front row, I believe, for whoever the fourth was. But we can't run the courthouse if we don't take these precautions.

MR. KUBY: Okay.

THE COURT: Yes, sir. Thank you.

MR. KUBY: Yup, yup, yup, yup.

THE COURT: Forgive me. Ms. Glavin.

The question was: What was your involvement?

And had you completed your answer?

THE WITNESS: I think so, yes.

THE COURT: Thank you.

Ms. Glavin.

BY MS. GLAVIN:

Q. Ms. Champion, who was Gibson Dunn's client in that particular lawsuit?

A. Chevron Corporation.

Q. And so you were representing the Chevron Corporation?

A. That's correct.

Q. Now, Ms. Champion, during the course of your direct examination today, I'm going to be asking you a number of

questions about events that happened during the course of that lawsuit. My understanding is that Chevron has not waived any attorney-client privilege in connection with your testimony today?

MR. KUBY: Judge, I object to the private prosecutor articulating her view of Chevron's waivers. I mean, ask questions please; get answers, right? Isn't that how we do it?

THE COURT: I thought counsel was asking the witness to confirm her understanding.

MR. KUBY: Okay.

THE COURT: Thank you.

Ma'am, do you need the question again?

THE WITNESS: No, I don't think so.

A. Were you done with the question?

Q. Well, I was asking if my understanding is correct --

A. Yes.

Q. -- that the Chevron Corporation has not waived any attorney-client privilege with Gibson, Dunn & Crutcher with respect to the *Chevron* case; is that right?

A. That's correct, nor attorney work product.

Q. So in connection with your testimony today and my questions, my intent is not to elicit answers --

MR. KUBY: Judge, I'm sorry.

The private prosecutor's intent, a preamble to what she -- I mean, come on.

THE COURT: Mr. Kuby, let her get the question out. What she's going to tell her, no doubt, is, I don't want you to tell me any privileged information.

MR. KUBY: Okay.

THE COURT: Let her get it out.

MR. KUBY: All right.

THE COURT: Counsel.

MR. KUBY: Withdrawn.

THE COURT: Yes, sir.

Counsel.

BY MS. GLAVIN:

Q. So during my questioning today, my intent is not to ask you to elicit anything that might touch upon attorney-client or attorney work product. And so I would ask you to let me know if I tread upon that, because that is not my intent.

Okay, Ms. Champion?

A. Sure. Thank you.

Q. Now, Ms. Champion, with respect to that particular lawsuit, particular litigation, was there a lawsuit filed by Chevron Corp.?

A. Yes.

Q. When was that lawsuit filed?

A. February 1st, 2011.

Q. And was the complaint in that lawsuit amended at some point?

A. Yes, it was amended, I believe, in April of 2011.

Q. And at a high level, Ms. Champion, could you summarize what some of the allegations that Chevron alleged in that lawsuit?

MR. KUBY: I'm sorry, Judge, I don't know what "a high level" means.

THE COURT: Are you able to answer the question as phrased, ma'am?

THE WITNESS: Yes.

THE COURT: Go ahead.

Overruled.

A. Chevron alleged violations of the Racketeering Influence and Corrupt Organizations Act against Stephen Donziger, his law firms, two Ecuadorian organizations, Selva Viva and the FDA.

THE COURT: Would you spell the name of the first organization for the court reporter please?

THE WITNESS: S-E-L-V-A, V-I-V-A.

A. As well as Stratus Consulting, a Colorado consulting firm. And also alleged some torts against the Lago Agrio Plaintiffs, the 48 individual Lago Agrio Plaintiffs, as well as a declaratory judgment claim under the New York Recognition Act based on fraud and extortion in the underlying Ecuadorian proceedings against Chevron.

Q. Ms. Champion, I'd like to break that down, the defendants that were sued.

You mentioned an organization called the FDA. What is

that?

A. That's the Frente de Defensa de la Amazonia.

Q. And you also mentioned -- I think you said 47 or 48 plaintiffs. Could you explain who those plaintiffs were that Chevron was suing in this litigation in New York?

A. Yes. So in 2003, a lawsuit was brought against Chevron in Ecuador alleging claims for environmental damage in parts of the Ecuadorian Amazon. And the 48 named plaintiffs in that case were defendants in Chevron's lawsuit, essentially vicariously liable for the fraudulent acts of Mr. Donziger and his co-conspirators.

So Chevron had also sued a variety of Ecuadorian attorneys and representatives of those plaintiffs as well in that case. We call the Lago Agrio Plaintiffs the LAPs. Sometimes you may hear that used as well.

Q. And so Chevron was suing here in New York those defendants. And what was Chevron asking for in that lawsuit?

A. Well, it was asserting violations of RICO, as well as, as I said, some torts, unjust enrichment, fraud, and seeking a declaration that the Ecuadorian judgment was unenforceable, seeking injunctive relief and damages under RICO.

Q. And when you say "the Ecuadorian judgment," what do you mean by that?

A. Shortly after the RICO case was filed on February 14th, 2011, the Ecuadorian court issued a judgment against Chevron in

that underlying Ecuadorian proceeding.

Q. And what was the amount of that judgment that had been issued against Chevron in that Ecuadorian court?

A. It was around 8.5 billion. But the judgment also provided that it would double if Chevron did not apologize within a certain number of days. And so the amount did double after that time period expired.

Q. So the $8.6 billion judgment doubled. And was the doubling of that judgment the ultimate outcome in the Ecuadorian litigation?

MR. KUBY: I'm sorry, Judge. Assumes a fact not in evidence, the absence of the Chevron apology.

THE COURT: I think counsel is just asking the witness what the final number was.

MR. KUBY: Okay.

THE COURT: Are you able to answer that?

THE WITNESS: Yes.

A. So the amount did double.

And then on one of the appeals in Ecuador, the appellate court basically overruled that doubling, said that a penalty like that was not allowable under Ecuadorian law. So then the amount went back down to the original amount of the judgment which, again, was about $8.5 billion.

Q. Now, you mentioned that Steven Donziger and Steven Donziger's law offices were defendants in that litigation,

11 CV 691. What were the allegations that Chevron was making about Mr. Donziger himself?

A. Essentially, that he had masterminded an extortion and fraud scheme against Chevron Corporation and orchestrated that scheme from the U.S.

Q. You mentioned earlier in your testimony that there was a RICO claim made in that lawsuit. Can you explain what you mean by a RICO claim?

A. Sure. So RICO has both criminal and civil aspects to it. Chevron filed a civil RICO claim against Mr. Donziger and these other defendants, alleging that they had engaged in a variety of criminal acts related to the Ecuadorian litigation, including fabricating evidence, bribing a court-appointed special master, damages expert, bribing the judge, ghostwriting the special master's damages opinion, ghostwriting the ultimate judgment, as well as engaging in an extortion and pressure campaign here in the U.S. against Chevron, which included things like false criminal reports against the company, false publicity, and things of that nature.

Q. Now, in connection with the civil case that Chevron filed -- and forgive me if I already asked you this, that Chevron filed with the district court, what district court did they file this lawsuit in?

A. Right here in the Southern District of New York.

Q. And did Mr. Donziger in that civil case enter a notice of

appearance?
A. He did ultimately enter a notice of appearance, I believe, in 2013.
Q. I'm going to show you what's marked as Government Exhibit 1147. Do you recognize that exhibit?
A. Yes. This is Mr. Donziger's notice of appearance on behalf of himself as well as the Law Offices of Steven R. Donziger, and Donziger & Associates PLLC.
MS. GLAVIN: Move for admission of 1147.
MR. KUBY: No objection.
And because there are so many documents from the docket in this case, unless I do object to a specific one, why don't we just deem it admissible.
THE COURT: Great idea.
MR. KUBY: Admitted. Save us some time.
THE COURT: The court reporter thanks you.
(Government's Exhibit 1147 received in evidence)
BY MS. GLAVIN:
Q. Now, Ms. Champion, are you admitted to practice in the Southern District of New York?
A. I am.
Q. And when an attorney enters a notice of appearance on a docket in a case, what, if anything, does that mean in terms of an attorney receiving any filings in that case?
A. From that point, the attorney would receive ECF

notifications, electronic case filing system automatic notifications of anything that gets posted to the docket.

Q. Now, was there a trial held on the complaint that Chevron Corp. had filed against Steven Donziger and others?

A. Yes, in the fall of 2013.

Q. And where was that trial held?

A. Here in the Southern District of New York; I think on this floor, maybe one or two floors up or down.

Q. In this courthouse?

A. Yes.

Q. How long did the trial take?

A. It was about seven weeks.

Q. And what judge presided over that trial?

A. Judge Lewis Kaplan.

Q. And did Judge Kaplan preside over the entire lawsuit, 11 CV 691?

A. He did.

Q. Following that trial, did Judge Kaplan issue a judgment?

A. He did.

Q. In whose favor was that judgment?

A. Chevron Corporation.

Q. And when was that judgment issued?

A. March 4th, 2014.

Q. I'm going to show you what is Government Exhibits 1874 and 1875. I move for their admission.

(Government's Exhibits 1874, 1875 received in evidence)

Q. With respect to Government Exhibit 1875, do you have that on your screen?

A. Yes.

Q. Okay. What's that exhibit?

A. This is the judgment entered against the Donziger defendants and the defendants Camacho and Piaguaje following the RICO trial.

THE COURT: Spell it for the court reporter please, ma'am.

THE WITNESS: Sure. C-A-M-A-C-H-O, and P-I-A-G-U-A-J-E.

THE COURT: Mr. Kuby, is it okay with you, maybe I'll ask Ms. Glavin to say "on the docket sheet." If you say that, we will understand that unless you object, the exhibit is not objected to and is received. Is that all right with you?

MR. KUBY: Lovely.

THE COURT: Wonderful.

BY MS. GLAVIN:

Q. With respect to Government Exhibit 1875, the judgment was with respect to the Donziger defendants. So it reads: Steven Donziger, the Law Offices of Steven Donziger, and Donziger Associates, and also these two other defendants, Mr. Camacho and Mr. Piaguaje. What happened to all of the other

defendants?

A. They did not appear; they defaulted. So these were the two Lago Agrio plaintiffs that appeared in the case.

Q. And with respect to some of the other entities, Stratus Consulting, the Stratus defendants?

A. They had settled out prior to trial. And the remaining Ecuadorian defendants, to be clear also, so the FDA, Selva Viva, the other individuals in Ecuador that were sued also did not appear and defaulted.

Q. And just so the record is clear, Selva, S-E-L-V-A; Viva, V-I-V-A, what is that?

A. That entity was created in order to administer funds and basically receive and administer funds for the case in Ecuador.

THE COURT: Can I interrupt?

Receive and administer funds. Receive funds from whom?

THE WITNESS: Well, the case was originally funded by a Philadelphia contingency fee plaintiffs' attorney, Joseph Comb. So he would give money, and they would disburse it to the various consultants, assistants, lawyers that they had to pay in Ecuador.

THE COURT: Thank you.

THE WITNESS: No problem.

BY MS. GLAVIN:

Q. And Ms. Champion, the trial that took place in front of

Judge Kaplan in the fall of 2013, did you personally attend that trial?
A. I did.
Q. And did Steven Donziger testify in that trial?
A. He did.
Q. Were you present for his testimony?
A. I was.
Q. Okay. Do you see Mr. Donziger in the courtroom today?
A. Yes. He's sitting in, I think, the front row of the gallery with the "Free Donziger" mask on.
Q. The gray hair?
A. Yes.
MS. GLAVIN: Reflect the identification.
THE COURT: Yes, ma'am.
Q. Now, with respect to the RICO judgment that was issued, what was the relationship between that RICO judgment, which is Government Exhibit 1875, and Government Exhibit 1874?
MS. GLAVIN: If you could pull that up on the screen.
A. So 1874 is the Court's opinion which sets forth its findings of facts and conclusions of law supporting the judgment.
Q. And going back to 1875, if you could summarize, Ms. Champion, what Judge Kaplan ordered in Government Exhibit 1875.
A. Among other things, he imposed a constructive trust over --

for the benefit of Chevron over proceeds of the Ecuadorian judgment. He required Mr. Donziger to assign his interest in the Ecuadorian interest to Chevron. He also enjoined enforcement of the Ecuadorian judgment in the United States. And he enjoined Mr. Donziger in the LAPs from monetizing the Ecuadorian judgment in any way.

MS. GLAVIN: So if we could go to paragraph 1 of the RICO judgment.

And your Honor, for the record, if it's okay, can I read that out loud?

THE COURT: Yes, ma'am.

MS. GLAVIN: The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received or hereafter may receive, directly or indirectly, or to which Donziger now has or hereafter obtains any right, title, or interest, directly or indirectly, that is traceable to the judgment or the enforcement of the judgment anywhere in the world, including, without limitation, all rights to any contingent fee under the retainer agreement and all stock in Amazonia. Donziger shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain.

And Ms. Champion, with respect to Judge Kaplan's reference to judgment, if you could go to paragraph 7.6. What

did Judge Kaplan define the judgment to mean?

A. The judgment means the judgment entered in the *Lago Agrio* case on February 14th, 2011, as modified by subsequent proceedings.

Q. Was that the $8.6 billion judgment awarded against Chevron in Ecuador?

A. Yes.

Q. With respect to -- going back to Judge Kaplan's reference to Amazonia, if we could go to the definitions at 7.2, Judge Kaplan defines Amazonia as Amazonia Recovery Limited, an entity registered in Gibraltar, together with its successors and assigns. What was Amazonia?

A. Amazonia was an entity created, I believe, in 2012, to both receive funds related to the litigation in order to fund enforcement and other proceedings related to the Ecuadorian litigation, as well as to disburse proceeds of the Ecuadorian judgment.

Q. And if we could go back to paragraph 1, Judge Kaplan makes reference to all rights to any contingent fee under the retainer agreement. If we could go to 7.9 of the definition of the retainer agreement. It states: Retainer agreement means the agreement dated as of January 5th, 2011, between and among each of the individual plaintiffs in the *Lago Agrio* case, together with their respective successors and assigns; B, the ADF; C, The Assembly; and D, Donziger & Associates PLLC,

together with its successors and assigns and all successors to and predecessors of the retainer agreement.

With respect to Judge Kaplan's paragraph 1 of the RICO judgment, the imposition of the constructive trust, did Judge Kaplan discuss what he meant by that in Government Exhibit 1874?

A. Yes, he did.

MS. GLAVIN: If we could go to Government Exhibit 1874, and go to --

THE COURT: I'm not sure it was offered, but in any event, because it's on the docket sheet, it is received.

MS. GLAVIN: If we could go to page 487, which would be the ECF page on this document.

Q. And Ms. Champion, could you please read on page 487, that would be ECF 487, what Judge Kaplan stated in his opinion about this constructive trust, starting at the top.

A. Headline B. Chevron is entitled to equitable relief, preventing these three defendants from benefiting from the fraud on the Court, and Donziger from profiting from the RICO violations.

One, constructive trust.

Chief Judge, later Justice Cardozo, stated the governing principle years ago in words cited many times since.

THE COURT: Ma'am.

THE WITNESS: Slow down? Sorry.

THE COURT: When the court reporter's fingers are steaming, you know you have to slow down.

THE WITNESS: Okay.

A. A constructive trust is the formula through which the conscience of equity finds expression, when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

Among the circumstances in which a constructive trust may be imposed are those in which the defendant stands to receive a benefit by virtue of fraud. In this context, moreover, fraud may mean misrepresentation giving rise to a cause of action for deceit or it may imply the acquisition of property by some other type of wrongdoing or by any type of inequitable conduct.

Q. If you could continue on to the bottom, and we go on to page 488, starting with "The."

A. The imposition of a constructive trust on Donziger's right to a contingent fee among other property traceable to the judgment and the other defendants' rights to recovery fits this mold to a T. Donziger's retainer agreement with the LAPs and the ADF, which is governed by New York law, provides that Donziger is entitled to be paid, A, 6.3 percent of all amounts paid in respect of the litigation; plus B, any arrearages in his monthly retainer; plus reimbursement for expenses. His

contingent fee is payable only out of plaintiff collection monies which the retainer agreement defines as amounts paid whether from Chevron Corporation --

THE COURT: Slowly.

A. -- any other party listed as a defendant in respect of the litigation, or any other party added or joined to the litigation as a defendant. Thus, the judgment is the indispensable predicate of his right to collect a contingent fee with respect to the *Lago Agrio* case.

Q. If you could continue on.

A. That judgment is the direct result of fraud by Donziger.

Moreover, his right to a contingent fee and the fee itself are properties subject to execution and attachment, and certainly to the imposition of a constructive trust.

Q. If I could stop you right there.

Go back to the RICO judgment, 1875 in evidence.

If we could go to paragraph 3 of the RICO judgment.

Paragraph 3 states: Donziger shall execute in favor of Chevron a stock power transferring to Chevron all of his right, title, and interest in his shares of Amazonia. And Donziger and the LAP representatives, and each of them shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of the judgment.

Ms. Champion, with respect to paragraph 3,

Mr. Donziger's Amazonia shares, did Judge Kaplan discuss that in his opinion, which is Exhibit 1874?

A. Yes, he did.

MS. GLAVIN: We could go to Government Exhibit 1874 at ECF page 489.

Q. And if you could read on page 489, the last two sentences on that page starting with "Moreover."

A. Moreover, Donziger owns, directly or through a nominee, shares of a Gibraltar company, Amazonia, through which the property collected on the judgment is to be funneled. Those shares too are subject to a constructive trust as whatever value they now have -- excuse me, as whatever value they now or hereafter may have is a direct function of the fraud perpetrated by Donziger.

MS. GLAVIN: And if we could turn to page ECF 281, Government Exhibit 1874, and footnote 1110.

Q. If you could just read the first sentence beginning with "The defendants."

A. The defendants in May 2012 did create a Gibraltar company, Amazonia Recovery Limited, for receipt and distribution of any funds in consequence of the judgment.

Q. Now, with respect to Government Exhibit 1875, the RICO judgment, if you could go to paragraph 4 of that judgment.

You had mentioned in your testimony that the judgment prohibited Mr. Donziger from seeking enforcement of that

Ecuadorian judgment in the United States. Is that what's reflected here in paragraph 4?
A. Yes.
MS. GLAVIN: We could turn to paragraph 5 of the RICO judgment.
Q. And if you could read that aloud, Ms. Champion.
A. Donziger and the LAP representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the judgment, as modified or amended, or any new judgment, including, without limitation, by selling, assigning, pledging, transferring, or encumbering any interest therein.
Q. And if you could turn your attention, Ms. Champion, to paragraph 9 of the RICO judgment, where it says: Ordered, adjudged, and decreed as follows.
What did Judge Kaplan direct there?
A. The judgment provides that Chevron shall recover of Donziger and the LAP representatives, and each of them, jointly and severally, the cost of this action pursuant to Federal Rule of Civil Procedure 54(d)(1), and 28 U.S.C. 1920.
Q. And if you could go to paragraph 10 of the RICO judgment and read the last sentence.
A. This Court retains jurisdiction of this case and over these parties for purposes of enforcing and resolving any disputes concerning this partial judgment.

Q. With respect to the partial judgment, Ms. Champion, what did you understand that to mean?
A. I think that refers to the fact that costs had not been -- not yet been entered and awarded.
Q. Now, with respect to the 2011 retainer agreement, which is defined in paragraph 7.9 of the RICO judgment, Government Exhibit 1875, the January 5th, 2011 agreement, I want to show you what is Government Exhibit 1978-6.

MS. GLAVIN: This is on the docket. I'd move for admission.

THE COURT: Received.

MR. KUBY: Excellent.

(Government's Exhibit 1978-6 received in evidence)

Q. Do you recognize this document, Ms. Champion?
A. Yes. This is the 2011 retainer agreement that is referenced in the judgment.
Q. And with respect to the first paragraph of that retainer agreement, who are the parties to that agreement?
A. The individual Lago Agrio plaintiffs, the FDA, a group called the Asamblea or assembly of those affected by Texaco, and Donziger & Associates PLLC.
Q. And Ms. Champion, what is the Asamblea?
A. My understanding is that the assembly is a group of indigenous groups in the Ecuadorian Amazon who, although they were not named as plaintiffs, or not all of them were named as

plaintiffs, had an interest in the case.

MS. GLAVIN: And if we could turn -- with respect to Exhibit 1978-6, if we could turn to --

Q. Oh, before I get to that, the Asamblea de afectados por Texaco, did that particular organization maintain that name during the course of the litigation or take on a different name?

A. At some point it became UDAPT instead of ADAPT. So we often would say "ADAPT" for Asamblea de afectados por Texaco. And at some point it became the union instead of the assembly, and it became known as UDAPT. So everything the same, except Union de afectados por Texaco.

Q. When you say "UDAPT," could you spell that?

A. UDAPT, U-D-A-P-T.

Q. Ms. Champion, during the 2013 trial, did Mr. Donziger testify about this retainer agreement which is 1978-6?

A. Yes.

Q. And did he acknowledge that this was the retainer agreement that he had entered into?

A. Yes.

MS. GLAVIN: If we could go to paragraph -- page 4, paragraph 3A of that agreement.

Q. Do you see where it says fees and expenses, budget and billing?

A. Yes.

Q. It states: A, contingent fee. As compensation for its services hereunder, the firm shall be entitled to an active lawyer percentage of 31 and-one-half percent of the total contingency fee payment. The total contingency fee payment means an amount equal to 20 percent of all plaintiff collection monies.

Now, Ms. Champion, had you done the math as to what these percentages work out to with the RICO judgment?

A. Well, yes.

Q. I'm sorry, not with the RICO judgment, the Ecuadorian judgment.

A. Understood.

So 31.5 percent of 20 percent is 6.3 percent. And if the judgment were fully collected, Mr. Donziger's percentage would be on the order of $560 million.

Q. Now, I want to turn your attention to Mr. Donziger's testimony at the RICO trial. I'm going to show you what is marked as Government Exhibit 200. Just go to the second page.

Do you recognize this exhibit?

A. Yes. This is a transcript from the trial from November 18th, 2013.

Q. And have you had an opportunity before today to review this transcript?

A. Yes.

Q. And does this transcript include the testimony of

Mr. Donziger?

A. Yes.

MS. GLAVIN: If we could turn to the transcript page 2490, and focus on lines 23.

Q. And Ms. Champion, I'd like to read the transcript from page 2490, line 23, to 2491, line 11. And for purposes of reading that provision, I'll take on the role of asking the questions that were posed to Mr. Donziger; if you could read his answers. Okay?

(Reading)

"Q. Mr. Donziger, I want to ask you a few questions about Amazonia Recovery Limited. That's a Gibraltar company; correct, sir?

"A. Yes.

"Q. And you're a shareholder in that company; correct?

"A. That's correct."

THE COURT: Slowly, ladies.

"Q. That's because of your contingency fee interest; correct?

"A. Yes.

"Q. Can you tell me what percentage of the shares of Amazonia Recovery Limited you have, sir?

"A. The structure of the case was designed -- I mean, the structure of that entity was designed to reflect the contingency fee equity in the lawsuit, so it's roughly the equivalent."

MS. GLAVIN: If we could turn to page 2491 of the transcript. And we're going to read lines 19 to lines 24 in the same manner. So at line 19: (Reading)

"Q. You own shares in Amazonia Recovery Limited; correct?

"A. Yes.

"Q. You can't tell the Court what number of shares you own in Amazonia Recovery Limited?

"A. I don't know the number. It's the equivalent of what the contingency fee interest was before it was created."

Q. Now, Ms. Champion, after Judge Kaplan issued the RICO judgment, which is Government Exhibit 1875, did Mr. Donziger appeal Judge Kaplan's judgment to the Second Circuit?

A. He did.

Q. And did Mr. Donziger move for a stay from the district court of that RICO judgment?

A. He did.

Q. And did Judge Kaplan rule on the stay?

A. He did. He granted it in part.

Q. So with respect to Mr. Donziger's motion for a stay at the RICO judgment, I'm going to show you what's Government Exhibit 1888, which is on the docket sheet, I'd move it into evidence.

THE COURT: Received.

(Government's Exhibit 1888 received in evidence).

Q. Government 1888 is entitled "Defendant's Emergency Motion for a Stay Pending Appeal or in the Alternative for a Temporary

Administrative Stay." If you could go to page 22, ECF page 22 of that exhibit.

Did Mr. Donziger sign this motion?

A. He did.

Q. Now, did Mr. Donziger's motion for a stay discuss the Amazonia shares?

A. It did, yes.

Q. We could turn to page 15.

MR. KUBY: Judge, excuse me.

I have an objection --

THE COURT: Yes, sir.

MR. KUBY: -- to this whole line of questioning.

The audience, the noncognoscenti, might be forgiven for not understanding that Mr. Donziger is not charged with any count in criminal contempt from his failure to turn over the Amazonia shares.

Now, I do recognize that at one point they were being -- the contingency fee and the Amazonia shares were, in fact, being treated as one and the same. There came a time, however, where they branched off. And the Amazonia share issue became literally a nonentity, was out of the case.

Given the Court's concern that you articulated when Dear Brother Garbus opened about sticking to evidence that is relevant to the actual charges in this case, I would request that the Amazonia discussion be somewhat cabined, because we've

taken up, sort of, most of the testimony about it, and it's not one of the charges in the case.

THE COURT: Ms. Glavin.

MS. GLAVIN: Yes, your Honor.

The government provided the defense a year ago with notice that we intended to introduce this evidence with respect to Mr. Donziger's refusal to turn over the Amazonia shares for several reasons:

One, it completes the story with respect to his failure to turn over the contingency. It completes the story with respect to his failure and disobedience in turning over his contingency fee interest.

Second, it goes to Mr. Donziger's state of mind with respect to when he turned over the Amazonia shares finally in March of 2018; he delayed turning over the contingency fee interest.

Given the relationship which Mr. Donziger testified at trial about the Amazonia shares, as well as its relationship to his contingency fee interest, this does become relevant to Mr. Donziger's state of mind in disobeying the direction that he turn over the 2011 interest in the contingency fee, as well as his state of mind in the 2017 agreement.

THE COURT: Mr. Kuby.

MR. KUBY: Yes, Judge.

We're not claiming unfair surprise here.

THE COURT: I got it.

May I just go off the record for one second.

(Off record)

THE COURT: Sir, on the record.

MR. KUBY: So we're not claiming we're surprised in any way; in fact, we submitted a month or so ago saying, We'll defer this to time of trial. And I haven't been jumping up at first mention of this because, in fact, there is some groundwork that needs to be laid. That groundwork for Amazonia has been laid.

Judge Kaplan separates out the contingency fee interest issue and the documents that Steven Donziger was required to execute with respect to the contingency fee interest. Judge Kaplan asserts that Steven Donziger did not do them in a timely fashion. That, in fact, is Count Four and also Count Five, derivatively.

Amazonia falls out of the case years ago.

(Continued on next page)

THE COURT: I understand. What do you say to Ms. Glavin's suggestion that that goes to Mr. Donziger's state of mind?

MR. KUBY: What state of mind does it go to. I understand the phrase "state of mind". I understand it is sort of a stock kind of thing to say.

THE COURT: I took from her argument to mean the state of mind of not obeying court orders; am I wrong on that?

MS. GLAVIN: No, your Honor.

MR. KUBY: Well, I don't know that not obeying certain court orders is an actual state of mind that's at issue as a general matter. Steven Donziger's state of mind with which he either complied or did not comply with certain orders is very much.

THE COURT: Well, that's exactly correct because you well know the prosecutor has to prove that Mr. Donziger had the intent consciously to disregard a court order. And I think I understand Ms. Glavin to be saying that the material with respect to Amazonia evidences an intent consciously to disregard that court order even though it's not an order at issue in this case.

What do you say to that?

MR. KUBY: Well, I understand that that's sort of basically is a character assault which has been going on at the beginning of this case that Steven Donziger disobeys court

orders. But it doesn't -- we're not claiming absence of mistake. We're not claiming he didn't understand specific orders, although, he did request clarification repeatedly. What the prosecutor is actually doing is using "state of mind" as a substitute for an attack on Mr. Donziger's character which is totally appropriate when and if Mr. Donziger takes the stand and he can talk about all the orders he complied with and we can tally them up in some fashion but it's not relevant here.

THE COURT: Anything else?

MS. GLAVIN: The failure to -- the Amazonia shares, the story behind that and the actions he took to try not to do that is an inextricably intertwined in the indictment because he doesn't want to turnover those shares. And when that happens you will see that Chevron then moves to get his contingency fee interest because the evidence will be if I finish this portion of the draft, I don't enjoy spending a lot of time on Amazonia either but it gives the background for what happens with respect to Count Four.

MR. KUBY: All I will say in response, judge, is if this is going to be permitted which is within your discretion, I take it that when it comes time to cross-examine about the Amazonia issue the Court will grant similar -- your discretion will be exercised in a way commensurate to both sides because this is quite a lot to cross about the Amazonia stuff. I just don't think it's relevant but you are the guy that makes those

decisions, as you say.

THE COURT: Thank you, Mr. Kuby.

In order to complete the story, I'll permit it. And also in order to submit evidence of the intent consciously to disregard a court order, I will permit it.

Want to go to lunch friends? Five of one. I'll see you here at five of two.

Thank you, counsel.

Thank you, ladies and gentlemen.

(Luncheon Recess)

AFTERNOON SESSION

1:55 p.m.

THE COURT: Good afternoon, ladies and gentlemen. Won't you be seated.

BY MS. GLAVIN:

Q. Ms. Champion, before the lunch break we were on Government Exhibit 1888 of the stay motion and I was pointing you to page 15 of Mr. Donziger's stay motion where it says Roman numeral two, the defendants will suffer irreparable injury after a stay.

MS. GLAVIN: If we could turn to ECF page 18.

Q. Ms. Champion, if you could read aloud the point four.

A. The court's order requires the defendants to transfer and define all property whether personal or real, tangible or

intangible, vested or contingent that is traceable to the judgment or enforcement of the judgment anywhere in the world. Thus, unless a stay issued Mr. Donziger and the other defendants face a loss of real property, a loss that even if temporary is recognized as irreparable harm as a matter of law.

Q. And if you could turn to ECF page 19 and read out loud the point beginning at "fifth".

A. Fifth, absent a stay, this Court's order would require Mr. Donziger to transfer forthwith all of his rights, title and interest in his shares in Amazonia Recovery Limited. As a matter of law Mr. Donziger's immediate loss of his shares in Amazonia and all rights accompanying those shares constitutes irreparable harm both to him and his fellow shareholders. He might be able to recover his shares after an appeal if they were not automatically nullified as a result of the transfer or their value in dollars but no damages could ever make up for the loss of his ability to exercise or sell his shares or to participate in the entities affairs during the pendency of the appeal.

Nor as already discussed above, could later relief make up for the devastating impact of this forced transfer on Mr. Donziger's ability to earn a living.

Q. Now, Ms. Champion, in connection with Mr. Donziger's motion for a stay of the RICO judgment, did Mr. Donziger submit a declaration in support of his application for a stay?

A. Yes, he did.

MS. GLAVIN: If we could turn to Government Exhibit 1899 which is on the docket and move for admission.

THE COURT: Received.

(Government's Exhibit 1899 received in evidence)

MS. GLAVIN: And if we could go, title of this reads Declaration of Steven Donziger in support of Defendant's Motion for Stay Pending Appeal.

Q. If we could go to Paragraphs Three and Four of Mr. Donziger's declaration if you could read those aloud, Ms. Champion.

A. If I am forced to turnover my shares in Amazonia and relinquish any interests I have in the Lagro Agrio litigation, my law practice, my only means of earning a livelihood will be effectively destroyed. Even if I prevail on appeal, I will not be able to undue the damage to my practice suffered in the interim. Amazonia is a corporation that exists to enforce the Ecuadorian judgment against Chevron and to distribute any funds recovered from that enforcement. Its corporate documents entitled Shareholders to Vote on Various Corporate Matter. Allowing Chevron access to corporate strategies and communication while potentially vesting Chevron with voting rights in a company fundamentally opposed to Chevron's interests will irreparably harm Amazonia.

Q. Now, Ms. Champion, did Judge Kaplan issue an order on

Mr. Donziger's motion for a stay?

A. He did.

MS. GLAVIN: I'm showing you what is Government Exhibit 1901 which is in the docket and move into evidence.

THE COURT: Received.

(Government's Exhibit 1901 received in evidence)

Q. Ms. Champion, what is this document?

A. This is the court's opinion granting in part and denying in part defendant's motion for a stay pending appeal.

Q. When was it issued?

A. April 25, 2014.

Q. If we could go to ECF, page five. And if you could read the top starting with the third full sentence "as a result" to the bottom of that paragraph.

A. As a result this motion is denied in almost all respects. It is granted only to the limited extent that the court will modify pending appeal the requirement that Donziger transfer immediately to Chevron his rights, title and interest in Amazonia shares to ensure that Chevron does not succeed to ownership of those shares before the appeal is decided. In the interim, the Court orders that those shares which represent Donziger's right vis-a-vis his clients to a 6.3 percent share of any money collected on a fraudulently procured judgment and any proceeds of those shares will be held pending appeal by the clerk of court for the benefit of Chevron and Donziger as their

interests ultimately may appear and be voted after ten days prior notice and absent a contrary order of this Court as Donziger may direct.

Q. And if you could turn to page ECF 16 and go towards the bottom of the page and read the two sentences starting with "allowing".

A. Allowing the shares to rename in Donziger's hands pending appeal would enable him to benefit from his fraud prior to any collections by selling the shares and by hiding or dissipating the sales precedes.

Taking the shares out of his hands now would prevent such a result and cause no injury to Donziger that could not be undone.

Q. And you could continue to the next two sentences.

A. If Donziger prevailed on appeal, the shares and what ever economic benefit they may have yielded in the interim would be restored to him. If he did not prevail, that fact would reflect the Second Circuit's determination that Chevron, not Donziger is entitled to the shares and any proceeds of the shares. Putting the shares in Chevron's hands in the interim, the relief awarded by this Court would cause no irreparable injury to Donziger.

Q. If you could turn to ECF page 33 of Judge Kaplan's decision. And if you could read out loud the conclusion.

A. The motion for a stay pending appeal is granted to the

extent that paragraph three of the judgment solely pending the determination of the appeal in this case is modified to read as follows:

Donziger shall execute in favor of the clerk of this court a stock power transferring to the clerk all of his rights, title and interest in his shares of Amazonia. The clerk shall hold the Amazonia shares thus transferred and all proceeds thereof pending the determination of the appeal in this case for the benefit of Donziger and Chevron as their interest then may appear. Upon request by Donziger given on notice to Chevron at least ten days in advance of the date for the proposed vote the clerk shall vote or direct the owner of record thereof such to vote such shares as directed by Donziger unless otherwise ordered by the Court.

Donziger and the lab representatives and each of them shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this judgment.

Q. And the last sentence?

A. It is denied in all other respects. This opinion includes the court's findings of fact and conclusions of law.

Q. Now, Ms. Champion, following this order by Judge Kaplan on April 25, 2014, did Mr. Donziger ever inform you that he had executed a stock power as directed in favor of the clerk of the court for his Amazonia shares?

A. No.

Q. Did you ever see any entry in the docket of civil case 11 CV 6492 indicating such a stock power was executed?

A. No.

MS. GLAVIN: I show you what is Government Exhibit One and in Government Exhibit 1-A.

Your Honor, these are the docket sheets of 11 CV 61. Government Exhibit One is the docket sheet that covers the time period from February of 2011 when the first complaint was filed and it runs up through November of 2020.

Government Exhibit 1-A is pulled from Exhibit One and it covers the post judgment proceedings from February of 2018 through I believe July 31st of 2019.

THE COURT: Any objection, Mr. Kuby?

MR. KUBY: No, no, no.

THE COURT: OK. Thank you.

MR. KUBY: July 31st is my birthday.

THE COURT: Happy birthday.

MR. KUBY: We'll be gone by then.

Q. Now, Ms. Champion, other than what Judge Kaplan had ordered in this April 25, 2024 decision, was there any stay of that March 4, 2014 RICO judgment while Mr. Donziger's appeal was pending in the Second Circuit?

A. No.

Q. Did Mr. Donziger ever seek a stay before Judge Kaplan or

the Second Circuit of Judge Kaplan's April 25, 2014 order directing him to transfer his shares to the clerk of the court pending the determination of the appeal?

A. No.

Q. What was the result of Mr. Donziger's appeal to the Second Circuit of the March 2014 RICO judgment decision?

A. The Second Circuit affirmed in July.

Q. We show you what is Government Exhibit 1914 which is in the docket and move for admission.

Ms. Champion, what is --

THE COURT: Received.

(Government's Exhibit 1914 received in evidence)

Q. Ms. Champion, what is this document?

A. This is the mandate issued by the Second Circuit on November 3, 2016.

Q. And is this the affirmance of the RICO judgment?

A. Well, this is the mandate. They issued an opinion as well a few months before that.

Q. OK. And if you go to the first page I was going to say the date of the affirmance, the opinion by the Second Circuit was when?

A. August 8, 2016.

Q. Now, following the Second Circuit's affirmance of Judge Kaplan's decision and judgment did Donziger, did Mr. Donziger seek petition to certiorari, C-E-R-T-I-O-R-A-R-I?

A. He did.
Q. OK. And what was the result of his petition?
A. That was denied the following June 2017.
Q. I am going to show you what is marked as Government Exhibit 1923, which is on the docket and move for admission.

THE COURT: Received.

(Government's Exhibit 1923 received in evidence)

Q. On the first page of Government Exhibit 1923 is this a letter from Randy Mastro filed with Judge Kaplan?
A. Yes.
Q. And who's Randy Mastro?
A. My partner. He was one of the lead attorneys on the case for Chevron.
Q. OK. And with respect to Mr. Mastro's letter what was he asking Judge Kaplan to do in this letter dated June 19, 2017?
A. He was notifying the Court of the denial of the petition for certiorari and asking that the court require Donziger to comply with the district in the judgment to transfer his shares of Amazonia because he had not complied to that date. And then also asking the Court to reactivate a motion for attorney's fees that Chevron had filed and a bill of costs.

MR. KUBY: Judge, before we proceed, the special prosecutor asked the witness what Mr. Mastro intended by this document. And to me that's just fine because we're going to have this witness reading a lot of documents that were authored

by other people and she knows more about the case than anybody except possibly Judge Kaplan. I just want to make a note of that so when I start cross-examining her about what other people intended as well --

THE COURT: The record will reflect that.

MR. KUBY: Ms. Champion, do you have anything else you wish to add?

THE COURT: Excuse me. You two don't get to chat.

MR. KUBY: No, no.

THE COURT: She doesn't get to chat with you and you don't get to chat with her.

MR. KUBY: I'll be good.

THE COURT: Promise?

The record will reflect that the question was.

"Q. OK. And with respect to Mr. Mastro's letter what was he asking Judge Kaplan do in this letter dated June 19, 2017?

MR. KUBY: Point taken.

THE COURT: Yes, sir.

MR. KUBY: Withdrawn.

THE COURT: Yes, sir.

Ms. Glavin.

MS. GLAVIN:

"Q. Now, with respect to Mr. Mastro's request that Chevron is asking the Court to reactivate the motion for attorneys fees and bill of costs. I just want to ask what the bill of costs

was referring to?

A. That's referring to if you recall from the judgment where it awards Chevron costs pursuant to Federal Rule of Civil Procedure 54 and there's a statute, applicable statute as well. It's costs are awarded to the prevailing party in civil litigation. And that's what that's referring to.

Q. And did Mr. Donziger file a response with the Court to this June 19, 2017 letter to Mr. Mastro?

A. No.

Q. With respect to Government Exhibit 1923 do you see at the top this is memo endorsed; do you see that?

A. Yes.

Q. OK. And if we could go to page two of this exhibit. Is this an order by Judge Kaplan ruling on Mr. Mastro's request?

A. Yes.

Q. With respect to the taxing of costs at paragraph two, Judge Kaplan ordered that the clerk shall proceed to tax costs. What did that mean? What do you know that to mean?

A. Chevron would then have to submit a bill of costs for taxing by the clerk. Maybe we had submitted one previously. I don't recall but it would require the clerk to act on Chevron's bill of costs.

Q. What would that eventually result in after the court attaches costs?

A. That would result in a monetary amount that Mr. Donziger

and the lab technicians would be obligated to pay.

Q. What's the basis for that?

A. The form if you pull it off the SDNY website sets forth certain categories, covers things like transcripts, copies, things of that nature. It's limited.

Q. By guess what I'm getting at is was the fact that judgment was in Chevron's favor, did that have anything to do with the fact that there was going to be costs tax?

A. Yes, exactly. Again, the prevailing party is entitled to costs under the Federal Rules and Chevron corporation as prevailing party was entitled to its costs.

Q. And going to number three in Judge Kaplan's order, which is dated July 17 of 2017, Judge Kaplan states plaintiff requests that the court requires Steven Donziger to comply with the March 4, 2014 judgment. It complains also that Donziger did not comply with that judgment as temporarily modified by order dated April 25, 2014. Whether construed as request for a further order or for other relief this aspect of the application may not be made by letter motion. To that extent it is denied without prejudice to proceeding by formal motion.

Now, Ms. Champion, after Judge Kaplan issued this order on July 17 of 2017, in the year of 2017 did Mr. Donziger execute a stock power transfer to Chevron for his interest in the Amazonia shares?

A. If he did we did not receive it.

Q. Could you go back to the first page of government, this exhibit. With respect to Mr. Donziger's right to a contingent fee and the 2011 retainer agreement, during the year 2014, did Mr. Donziger execute a transfer or assignment to Chevron of his interests in that contingent fee?

A. No.

Q. Did he do it in 2015?

A. No.

Q. Did he do it in 2016?

A. No.

Q. Did he do it in 2017?

A. No.

Q. On the issue of a taxation of costs that is referenced in this exhibit, did that occur?

A. It did.

Q. I want to turn your attention now to February 28th of 2018. Was there a judgment issued that day?

A. I believe -- I can -- it was completely misleading, the docket but I believe that that's the date that the costs were taxed and it was a money judgment entered on those costs.

Q. I'll show you Government Exhibit 1962 on the docket?

MS. GLAVIN: Move for admission.

THE COURT: Received.

(Government's Exhibit 1962 received in evidence)

Q. Ms. Champion, do you recognize that?

A. Yes. This is the supplemental judgment as to Donziger defendants and defendant's Camacho and Piaguaje.

Q. If we could go to page two of this judgment. And if you could read what the order states with report to accordingly.

A. Accordingly, the judgment is supplemented and that it is hereby further ordered, adjudged and decreed that plaintiff shall recover of the Donziger defendants and the Lap representatives jointly and severally the sum of $813,602.71.

Q. And if I could show you what is Government Exhibit 1963. Do you recognize this exhibit?

A. Yes.

MS. GLAVIN: If we could go to the -- this is on the docket sheet in the special prosecutors and move for admission.

THE COURT: Received.

(Government's Exhibit 1963 received in evidence)

Q. If we could go to page two of this. And do you recognize what that opinion is in relation to?

A. I believe this is an opinion that the Court issued regarding the taxation of costs.

Q. And if we could go to ECF page 17 and if you could read the last sentence out loud starting with "moreover".

A. Moreover Donziger arguably is in contempt of the final judgment of permanent injunction in this case.

Q. And if you could read out loud Footnote Number 59 which comes after that sentence.

A. The judgment directs him to execute in favor of Chevron a stop power transferring to Chevron all of his rights, title and interests of his shares in Amazonia, a Gibraltar company set up to receive any proceeds of the enforcement of the Ecuadorian judgment. According to Chevron's uncontradicted assertion, he has not done so.

Q. And, Ms. Champion, the footnote cites to docket entry 1922, if we could pull up 1922 in the detective docket sheets or admission.

THE COURT: Received.

(Government's Exhibit 1922 received in evidence)

Q. What does that refer back to?

A. This is Mr. Mastro's June 19, 2017 letter to the Court.

Q. Now, after Judge Kaplan issued the judgment of $813,000 against Mr. Donziger, did Mr. Donziger file a notice of appeal of that decision?

A. He did.

Q. Showing you what is Government Exhibit 1972 which is in the docket sheet.

Move for admission?

THE COURT: Received.

(Government's Exhibit 1972 received in evidence)

Q. Is this that notice of appeal from the supplemental judgment?

A. Yes.

Q. Did Mr. Donziger ever seek a stay in the Second Circuit of enforcement of that money judgment to your knowledge?
A. Before the Second Circuit?
Q. Yes.
A. No.
Q. Did he ever seek a stay in the second circuit of discovery in aid of enforcement of the money judgment?
A. No.
Q. If I could show you what a Government Exhibit Seven.

MS. GLAVIN: Your Honor, this is a certified copy of a docket sheet of Court of Appeals case number 18-85 which could corresponds to the Court of Appeals 1972; move for admission.

THE COURT: Received.

(Government's Exhibit 1972 received in evidence)

Q. Now, Ms. Champion, I want to turn your attention to March 19, of 2019. Did Chevron move for relief in the district court before Judge Kaplan in civil case 11 CV 691?
A. Yes, on March 19, 2018 Chevron filed a motion by order to show cause for a preservation order discovery and for contempt.

MS. GLAVIN: I show what is Government Exhibit 1965 docket entry; move for admission?

THE COURT: Received.

(Government's Exhibit 1965 received in evidence)

Q. Is this the order to show you just referenced?
A. Yes.

Q. Chevron moved ex parte in this order to show cause and what was the basis presented for moving ex parte?
A. I would have to review the memo to remember exactly what it was but because we were asking for a reservation order essentially it was to get a preservation order in place so that documents wouldn't be destroyed.
Q. And with respect to you mentioned that the order to show cause was also alleging consent on the RICO judgment, what were the bases of contempt that Chevron was alleging?
A. Failure to assign the Amazonia shares to Chevron.
Q. And was there anything else with respect to the contempt?
A. Yes. A recent solicitation of Elliot Management for funding.
Q. And what was the allegation that Chevron was making about that solicitation?
A. That it violated the injunction preventing Donziger from monetizing the Ecuadorian judgment.
Q. I show you what is Government Exhibit 1966.

MS. GLAVIN: We move for admission?

THE COURT: Received.

(Government's Exhibit 1966 received in evidence)

Q. Ms. Champion, is this the brief that Chevron filed in connection with their motion for order to show cause --
A. Yes.
Q. If we could go to ECF, page five. At the very top where it

says "accordingly", what does that state that Chevron is seeking with respect to discovery?

A. Accordingly, Chevron here seeks leave to conduct post judgment discovery of Donziger and those acting in consent with him, as well as issuance of a document preservation order in order to uncover the full extent of Donziger's violations. Donziger's long record of obstruction and concealments.

Q. Let me stop you right there. Going to move on to, we go to ECF, page six, footnote one. Could you read out loud what Chevron alleged here in Footnote One in its brief?

A. The court's April 25, 2014 order amended the judgment solely pending the determination of the appeal in this case to require Donziger to transfer his Amazonia shares to the clerk of the court. Donziger did not transfer his shares to the clerk of the court as ordered and this amendment has become mute as there was no further right of appeal in this matter.

Q. And if you could go to page 16 of ECF. OK. And could you read out loud what Chevron was alleging under point one?

A. Donziger had violated the judgment's command that he transfer his Amazonia shares to Chevron, a clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed. Here, the judgment is clear and unambiguous in its decree that Donziger shall execute in favor of Chevron a stop power transferring to Chevron all of his rights, title and interests in his shares of Amazonia.

Donziger demonstrated his full understanding of this requirement in his emergency motion to stay filed in this court on March 18, 2014 which acknowledged that this court's order would require him to transfer forthwith all of his rights, title and interest in Amazonia Recovery Limited.

Q. Then if you could read the second paragraph what Chevron was alleging in this brief and only docket?

A. It is beyond dispute that Donziger has not complied with this aspect of the judgment. Donziger has not executed a stock transfer certificate transferring his shares to Chevron. Nor has he transferred any shares of Amazonia to the Clerk of Court. Rather than diligently attempting to comply with the judgment in a reasonable manner, the evidence shows that Donziger has done the opposite. More than four years have elapsed since the entry of the judgment and Donziger has not complied or even attempted to communicate with Chevron about complying with it.

Q. If you could turn to ECF page 20. It states here at "C", a preservation order and post judgment discovery are necessary to determine the full extent of Donziger's violations of the judgment and ensure compliance. In light of the already established violations of the judgment and indications that other violations likely exist post judgment discovery is necessary to uncover the full extent of Donziger and his co-conspirators ongoing violation of this Court's orders.

And if we could go to page 22 of this ECF brief.

Did Chevron indicate that coercive sanctions were appropriate?

A. Yes, Chevron argued here coercive sanctions are appropriate to ensure compliance with the judgment. That's a quote.

Q. And if we go to page 23. And if you could read the last two sentences before the conclusion.

A. Donziger's ongoing refusal to comply with the judgment four years after it was entered warrants imposing coercive sanctions. Chevron will pursue these sanctions as well as any other relief deemed just and proper in the briefing and hearing to determine the extent of Donziger's contempt.

Q. Go to the conclusion. And at the end of the brief, what specifically did Chevron request from Judge Kaplan?

A. Chevron requests that the court one, grant ex parte and order requiring Donziger, as well as any other person or entity it acting at his direction or in concert with him to preserve and maintain within the U.S. any and all documents or evidence relating to the judgment or compliance there with to authorize Chevron ex parte to serve post judgment discovery requests on Donziger and any other person or entity reasonably calculated to possess information relevance to enforcement of the judgment and three, set a prompt briefing schedule and hearing date to adjudicate Donziger's contempt and determine the appropriate remedy to compel Donziger's compliance with the judgment

following and appropriate period of time for Chevron to conduct the requested discovery.

Q. Now, with respect to Chevron's motion made by order to show cause, let me show you Government Exhibit 1968 which is in the docket and we would move for admission?

THE COURT: Received.

(Government's Exhibit 1968 received in evidence)

Q. With respect to 1968, if we could turn to page three -- actually, page four, is this Judge Kaplan's order on the order to show cause?

A. Yes.

Q. With respect to Chevron's request to proceed ex parte, how did you Judge Kaplan rule? You want it to go to the page before. Did Judge Kaplan order at the top that Chevron serve on Mr. Donziger the order to show cause on all papers by the next day?

A. Yes.

Q. And did Chevron do that?

A. Yes.

Q. Going to the last page Judge Kaplan's order March 19, 2018 with respect to point one the attached order grants in somewhat modified form is so much of the application that seeks preservation order.

Did you understand that mean to Judge Kaplan was directing preservation of documents?

A. Correct, as set forth in the ordinary to show cause as modified by him.

Q. With respect to point two in Judge Kaplan's order, Judge Kaplan notes that the Court has stricken out the language that it signed would have authorized post judgment discovery for the purpose of enforcing the judgment but solely on the grounds that it is superfluous in part. In other words, that the Court will grant ex parte on the front showing. If you turn to paragraph 2.1 of Judge Kaplan's order, what did Judge Kaplan find here at 2.1?

A. He notes that insofar as the judgment is for the payment of money, enforcements proceedings and governed by Federal Rule of Civil Procedure 69A. That rule provides in relevant part and in substance that the procedural applicable to enforcement of a money judgment rendered by a federal court is governed by procedure of the state where the court is located except where a federal statute otherwise provides.

Thus, proceedings to enforce a money judgment of this court generally are governed by the New York CPLR.

Q. If you could just read then the last line by Judge Kaplan under 2.1?

A. Accordingly, to the extent the discovery is sought in aid of enforcement of the monetary portion of the judgment leave of court is not required.

Q. What did you understand Judge Kaplan to mean in stating

that?

A. That we had a judgment that had injunctive relief and we have a monetary judgment due to the taxation of costs and to the extent discovery was sought in aid of enforcing the money judgment leave of court was not required for that discovery.

Q. And with respect to paragraph 2.3 it states:

Judge Kaplan states in one respect Chevron's current motion is for contempt of a portion of the judgment that directed the performance of a specific act. In another it contends that Donziger has violated a prohibitory portion of the judgment by virtue of its approach to one possible investor and it seeks discovery in part to prove up those contentions and in part to obtain evidence of any other such alleged violations.

Continuing to 2.4 in all the circumstances the Court concludes that there is no need for determination with respect to discovery with respect to enforcement of the non monetary portion of the judgments that is so immediate that Donziger should not be afforded an opportunity to respond to so much the application as seeks discovery with respect to the alleged impossible contempts.

Now, Ms. Champion, after Chevron filed this motion, OK, seeking to hold Mr. Donziger in contempt for failure to execute the stock power and to address contempt with Elliot Management was there litigation on their -- withdrawn.

After this motion was filed by March 19, 2018, was there litigation regarding Chevron's motion seeking to hold Mr. Donziger in contempt for failure to execute his stock power in favor of Chevron from Amazonia shares?

A. Yes.

Q. And after Chevron filed this motion, was there also litigation regarding the discovery sought by the motion?

A. Yes.

Q. So, for purposes of your direct-examination I want to separate out those two topics, OK, and I want to focus first on the litigation seeking to hold Mr. Donziger in contempt as it relates to the failure to execute a stock power in favor of Chevron or Amazonia shares, OK, and then --

MR. KUBY: I just again want to note that Mr. Donziger is not charged with contempt with respect to Amazonia shares, nor is he charged with contempt for failure to abide by the money judgment. It's 2:49 in the afternoon and we've yet to get to what he is charged with. Just noting it for the record.

THE COURT: Thank you, Mr. Kuby.

BY MS. GLAVIN:

Q. OK. Ms. Champion, focusing now on the post judgment proceedings with respect to Amazonia. Did Mr. Donziger oppose the motion to hold him in contempt for failure to transfer the Amazonia shares to Chevron?

A. He did.

Q. I am going to show you what is Government Exhibit 1986. It is also on the docket sheet.

Move for admission?

THE COURT: Received.

(Government's Exhibit 1986 received in evidence)

Q. With respect to page one and incidentally, if we could go to the last page and who signed this?

A. Mr. Donziger.

Q. Himself?

A. Yes.

Q. With respect to the post judgment proceedings in the time period of February 28 of 2018 through July 31st of 2019, did Mr. Donziger have a lawyer of record for the proceedings during that period?

A. Can you give me the dates again?

Q. Yes. February 18th of 2018, the day of the supplemental judgment to July 31st of 2019?

A. I do not believe so. I do recall that Mr. Frisch appeared at one civil proceeding in front of Magistrate Lehrburger but I don't remember the date or whether it was within that range.

THE COURT: F-R-I-S-C-H.

Q. This indicates that Mr. Donziger is representing himself per se; is that correct?

A. Yes.

Q. If we could go back to the first page of Mr. Donziger's

opposition?

A. Mr. Donziger states with respect to the Amazonia shares it is the understanding of the undersigned that the Amazonia entity in Gibraltar either no longer exists or is entirely owned by Chevron after Chevron forced into receivership as part of its -- of global collateral obliteration in or around 2014. To the best of undersigned's knowledge the entity of public interest vehicle as explained below never received sufficient funds due to Chevron's litigation assault and thus, was considered irrelevant and ignored by the plaintiffs for years. Undersigned is uncertain whether Amazonia still exists and if so, in what status, what for?

If we could read the first sentence of Footnote One. Assuming the entity or any part of it has been taken over by Chevron it is now in undersign's view, null and void.

Turn to page two of Mr. Donziger's submission. Go back to page one at the bottom.

OK. If you could read out loud, Ms. Champion, the sentence starting with "in 2014" and continue to the end of that paragraph.

A. In 2014 undersigned contacted Chevron seeking in common sense resolution to the relevant parts of the court's 2014 judgment. In an obvious sign of bad faith, Chevron never responded to this letter and failed to include it in among its multitude of exhibits offered in support of its contempt

application.

Indeed, before filing its contempt application, Chevron never even contacted the undersigned to clearly state what it needed in regards to these imagined shares.

Q. And Footnote Two to that sentence if you could read aloud what Mr. Donziger stated in Footnote Two?

A. Chevron asserts as relevant that it requested that the court ordered Donziger to comply forthwith with the share transfer request and that Donziger did not respond to that request. But of course Chevron's letter was to the courts not to undersigned and Chevron puts a lot of nonsense in its various letters and motions.

Keep going?

Chevron fails to note that the Court did not respond or otherwise appear to take any note of the mention of the share requests. To the extent undersigned was aware of the issue, undersigned presumed that the court, like undersigned, considers the whole issue obsolete and pointless given that Chevron now seems to hold all shares in Amazonia.

Q. I show you there was a reference to Exhibits One in Mr. Donziger's opposition at 1986. I show you what is 1986-1 in the docket.

Move for admission.

THE COURT: Received.

(Government's Exhibit 1986 received in evidence)

Q. Is this the letter Mr. Donziger attached to his opposition papers?
A. Yes.
Q. And the date of this letter?
A. August 21, 2014.
Q. And Ms. Champion, in or about that date August 21, 2014, would you have seen this letter?
A. Yes.
Q. Then if you could read the first, the letters addressed to who?
A. To Mr. Mastro.
Q. And it's from who?
A. Mr. Donziger.
Q. And if you could read the first three paragraphs of Mr. Donziger's letter from August 21, 2014?
A. I write in response to your letter of August 7, 2014 in which you raised for the first time the issue of what you describe as long overdue compliance with the district court's judgment in this matter. To be clear, I have not and will not sell or otherwise transfer any of my shares in Amazonia consistent with the district court's judgment unless and until that judgment is modified by the district court or reversed or stayed by the U.S. Court of Appeals for the Second Circuit. And despite your reference to long overdue compliance, the reality is that nearly a full six months have passed since the

district court's original judgment and Chevron has said nothing about the matter until now. The district court's original judgment directed me to execute in favor of Chevron a stock power and such other and further documents that Chevron reasonably may request or as the court hereafter may order. The onus was thus on Chevron to propose and request the form of the stock power and any other transactional documents deemed necessary to ensure compliance.

Chevron never did so. Indeed, Chevron never communicated with me or my counsel about compliance in any respect until now.

Q. Go to the next page. If you could read out loud what Mr. Donziger stated in the paragraph "I must also advise you".

A. I must also advise you of an important new development that has arisen since the district court issued its judgment that affects the issues outlined in your correspondence. My clients have informed me via the directors of Amazonia that if any transfer of stock is effectuated by me to any entity, those shares will be divested immediately under the by-laws of the entity that holds the shares. As you know, my clients do not recognize Judge Kaplan's assertion of jurisdiction in this matter. The upshot is that a simple transfer to the clerk's office of my Amazonia shares would in practice mean the complete vestiture and potentially irretrievable loss of more than two decades of labor on the part of me and some of my

colleagues before the Second Circuit even has a chance to decide or appeal from Judge Kaplan's judgment.

Q. In Mr. Donziger's opposition papers Government Exhibit 1986 which were filed on April 24 of 2018, did Mr. Donziger dispute he had not executed a stock power in favor of Chevron for the clerk of the court?

A. Yes.

Q. Did he dispute it?

A. Oh, he did not dispute it. I'm sorry. He stated that he had not and would not.

Q. I want to turn your attention to May 8 of 2018. Did you appear in court that day?

A. I did.

Q. Did Mr. Donziger appear in court that day?

A. Yes.

Q. In this courthouse?

A. Yes.

Q. I am going to show you what Government Exhibit number 2010 which is on the docket sheet and move for admission?

THE COURT: Received.

(Government's Exhibit 2010 received in evidence)

Q. OK. Do you recognize this?

A. I do. This is a transcript of the May 8th hearing.

Q. You were present for that hearing?

A. Yes.

Q. You had an opportunities to review this before today?

A. Yes.

Q. And at this hearing did Mr. Donziger address Chevron's contempt motion or failure to transfer his Amazonia shares?

A. Yes, he did.

Q. And if we could go to page 27 of this transcript starting at line 12. And we're going to continue to page 30, line five. If you could read the portion of Mr. Donziger's statements and I'll read the portion of "The Court" and "Mr. Mastro" starting at line 12.

A. Go ahead.

"They sued Amazonia in Gibraltar as I understand it. And the people who run Amazonia there's a board of directors. There was an initial attempt to defend and ultimately they just gave up for whatever reason lack of resources. And they got a default judgment against Amazonia and then the entity as I understand it was put into liquidation. When I filed my opposition to the contempt motion I mentioned that I wasn't sure of the status of it because they have never disclosed the status of it. And I assumed Mr. Mastro had three banker boxes of stuff from that case delivered to my apartment by nine a.m. the next morning. So, somewhere in this massive amount of material I assume is the answer to that question. But I don't think we should play possum here. I think you should ask the Chevron lawyers do they own my shares because I don't as far as

I know have a document that has shares on it. However, I will be more than happy to do whatever the court instructs because I think this is a completely ridiculous issue."

Q. "I instructed in 2014. We are all waiting."

A. "Why didn't they pursue it for four years".

Q. "The Court: I asked a question. That's neither here nor there."

A. "Just so you know."

Q. "The Court: Your a lawyer who says he complies with court orders. There is a court order outstanding since 2014 that compels you to deliver an executed stock power. I am told this never happened. You did not deny that."

A. "Well, that's not the end of the story sir, OK? In 2014 this was the problem in 2014. I sent them a letter saying I would be more than happy to negotiate something that could work for both of us."

(Continued on next page)

BY MS. GLAVIN:

(Reading)

"The Court: I read the letter, Mr. Donziger.

"The Defendant: Okay. They never responded.

"The Court: So what?

"The Defendant: I acted in good faith.

"The Court: So what?

The Defendant: So why are they here now four years later, because we're winning in Canada?

"The Court: They won. They got a judgment. You made them an offer. They blew it off. Not the first time in legal history, not the last.

"The Defendant: Well, I'm representing to you today that I do not believe I have violated the order. I have looked for a way to do it, because had I done that, there would have been all sorts of other problems with divestment, had I won the case on appeal, number one; number two, I ran into problems with my clients because I was not allowed to transfer shares absent an agreement by the board of directors in Amazonia.

"But I will say this: It doesn't matter, because they own it, okay? This is a fake issue. And if they want me to sign my shares over, which they already have, because this would be a public relations exercise for them, I'm happy to do it. I'm not going to sit here and be held in contempt over something that's completely meaningless, when I'm here today

ready to do that.

"So tell me what you want me to do. He says he has something for me to sign. Well, why hasn't he presented that to me? Where is it? I'm sitting here. He sent me an email this morning looking for discovery. Why is he playing possum with me, to make me look foolish? Just give me the document you want me to sign. Do you have it, sir? I mean, come on.

"Mr. Mastro: I do have an assignment here, and I asked you to bring the shares to court today.

"The Defendant: I don't have the shares, sir. I told you that. And beyond that, excuse me, they filed a motion to compel discovery."

MS. GLAVIN: Moving to page 36 of this transcript, we could start and read out loud lines 14 to line 22.

"The Court: Do you have the stock power you want him to sign?

"Your Honor, we do have a share transfer form and assignment ready to present to Mr. Donziger right now.

"The Court: Well, you can give it to him. I'm not going to insist that he sign it; he is a free actor. Your motion is outstanding. I imagine I'll rule on it soon, and you can let me know, both of you, whether it's, in that regard, moot."

MS. GLAVIN: We can go to page 37, at lines 5 to 6.

"Mr. Mastro: Let the record reflect that I just

handed Mr. Donziger the two forms that are share transfer forms related to Amazonia."

BY MS. GLAVIN:

Q. Ms. Champion, after this May 8th hearing, did you follow up with Mr. Donziger about signing a stock transfer form?

A. I did.

Q. Showing you what is Government Exhibit No. 114, do you recognize this?

A. Yes. This is an email that I sent to Mr. Donziger on May -- it's actually sent on May 8th, even though the date at the top is May 9th. There's some weird thing that happens when you produce these emails where it goes to UTC time, whatever that is; but it's four or five hours later than New York time.

So this actually was sent on the evening of May 8th.

And in this email I state to Mr. Donziger:

In accordance with your representations to the Court today, attached for your execution please find forms transferring your shares in Amazonia, hard copies of which we provided to you in court today, and your interest in the Ecuadorian judgment pursuant to paragraphs 1 and 3 in the judgment. We request that you execute these forms within the next 24 hours.

Q. And Ms. Champion, if you could go to the first -- or the share transfer forms, the three forms attached to your email.

A. Yes.

Q. Or not the three share transfer forms, the three assignment forms.

A. Exactly. Two share transfer forms, one general assignment.

Q. Okay. With respect to what is Bates Donziger 104210, what is this, a share transfer form?

A. This is a share transfer form for the FDA's shares in Amazonia.

Q. Is that the Class C participation shares?

A. Yes.

Q. If you could go to the next page, this is Bates Donziger 104211. What is this share transfer form?

A. This is a share transfer form for Donziger & Associates PLLCs, what we understood to be its shares in Amazonia.

Q. And are those Class B1 participation shares?

A. Yes.

Q. And if you could go to the third form, and this is Bates number Donziger 104212, what is this transfer in assignment of judgment interests?

A. So as you can see from the first paragraph, it states: This assignment of judgment interest, this agreement is made effective as of blank 2018, by and amongst Steven Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates PLLC, on the one hand; and Chevron Corporation on the other hand.

So it's a transfer and assignment of judgment interest

from Donziger and his law firms to Chevron, which specifically references the Court's order requiring him to transfer such interest to Chevron.

Q. And if you could go to the third paragraph, where it says: On April 3rd of 2014, the U.S. District Court entered an order requiring signer to transfer and assign to assignee all property --

THE COURT: Slowly.

Use your on-the-record voice.

MS. GLAVIN: Sorry.

Q. Ms. Champion, there's a date here in the third paragraph, whereas on April 3rd, 2014. Is that date incorrect?

A. I think so, yes. It should be March 4th.

Q. And March 4th was when?

A. That's the date the RICO judgment was entered.

Q. And what was -- let me read this.

States: Whereas, on April 3rd, 2014, the United States District Court for the Southern District of New York entered an order requiring assignor to transfer and assign to assignee all property, whether personal or real, tangible or intangible, vested or contingent, that assignor has received or hereafter may receive, directly or indirectly, or to which assignor now has or hereafter obtains any right, title, or interest, directly or indirectly, that is traceable to the judgment or the enforcement of the judgment anywhere in the

world, including, without limitation, all stock in Amazonia Recovery Limited, and all rights to any contingent fee under that certain retainer agreement dated as of January 5th, 2011, between and among each of the individual plaintiffs in the *Lago Agrio* case, Frente de Defensa de la Amazonia; C Asamblea de afectados por Texaco; and D, Donziger Associates PLLC, together with its successors and assigns and all successors to and predecessors of the retainer agreement, collectively the judgment interest.

And if you could go to the next page or go back to the page. What assignment was Chevron seeking in this document?

A. As stated in the paragraph that you just read, all property, whether personal or real, tangible or intangible, etc., traceable to the judgment, including Mr. Donziger's contingency fee under his 2011 retainer agreement and the shares of Amazonia.

Q. Now, after you sent this email to Mr. Donziger with those three forms, did Mr. Donziger execute any of those three forms?

A. Not immediately, no. He did ultimately execute the transfer form of his shares of Amazonia, but with an addendum.

Q. So he didn't execute the transfer and assignment form for all of his property interest traceable to the judgment?

A. No.

Q. I'm going to show you what is Government Exhibit 2000 -- one moment.

MS. GLAVIN: Oh, your Honor, move for admission of Government Exhibit 114, the email with attachments.

THE COURT: Any objection, sir? Yes, sir.

MR. KUBY: All good.

THE COURT: Yes, sir. Received.

(Government's Exhibit 114 received in evidence)

Q. Ms. Champion, if we could go to Government Exhibit 2003-3, which is on the docket.

MS. GLAVIN: We move for admission.

THE COURT: Received.

(Government's Exhibit 2003-3 received in evidence)

MS. GLAVIN: If we could go to page 2.

Q. Ms. Champion, what is this form on page 2?

A. Well, this is a modified version of the share transfer form that we had sent him. He added, you know, a reference to the accompanying addendum of understandings, which was shown on the prior page.

Q. So he signed the share transfer form for his class, the Class B1 shares in Amazonia?

A. Yes.

Q. Okay. And on the second paragraph in bold, "hereby with this form and accompanying addendum of understandings, transfer to Chevron," is that the language he added?

A. Yes, I believe so. I mean, there may be other stuff, but that's what jumps out at me.

Q. Okay. And if you could go to the first page, the addendum of understandings.

A. Yes. So this, Mr. Donziger added this and they arrived together as one document.

Q. And if you could read the first paragraph of this addendum that Mr. Donziger added.

A. This share transfer form is being executed pursuant to an express order of judgment of the U.S. District Court for the Southern District of New York in *Chevron Corp. v. Donziger* -- pardon me, in *The Chevron Corp. v. Donziger* civil RICO case, case number 1:11-CV-0691, docket 1875, Kaplan J. And furthermore, upon the specific threat of imposition of contempt of court sanctions if transferor fails to execute this form.

Q. If you go to paragraph 2 on the addendum Mr. Donziger added, read that out loud.

A. Chevron Corp. has previously represented to transferor that the Amazonia Recovery Limited entity has been placed into liquidation in Gibraltar after the entity failed to participate in the Gibraltar, and subsequently failed to pay a default judgment entered by the Gibraltar court against it.

Q. And if you go to paragraph 3.

A. Transferor acknowledges that this form is being executed notwithstanding the terms and restrictions of paragraphs 37 to 38 of the articles of association of Amazonia Recovery Limited, which provide *inter alia* that no transfer of any shares shall

be made or registered without the prior written consent of a majority of the directors, each acting in his or her absolute discretion; and that any purported transfer in violation of these articles shall be null and void.

Q. And if you go to paragraph 4.

A. Transferor continues to take the position, which has been communicated in writing to Chevron Corp. and to the U.S. District Court, that the Amazonia Recovery Limited entity is null and void for several reasons, including the fact that it has been taken over and is now being manipulated by an adverse party to serve purposes frustration of prompt relief to the affected peoples of Ecuador that are wholly contrary and opposite to the entity's fundamental purposes, as expressed in its memorandum of association and other foundational documents.

Q. Ms. Champion, did Mr. Donziger ever indicate to you or in a court filing that he had made any effort to get written consent of a majority of the directors of Amazonia Recovery Limited to make transfer?

A. No.

Q. Following Mr. Donziger's delivery of the share transfer form with his addendum of understandings, did Chevron file a letter with Judge Kaplan?

A. Yes.

Q. I'm going to show you what is Government Exhibit 2003, which is on the docket sheet, and move into evidence.

THE COURT: Received.

(Government's Exhibit 2003 received in evidence)

Q. What was the position that Chevron took with respect to Mr. Donziger's signing the share transfer form, along with the addendum of understandings?

A. If you look at the third paragraph of the letter, you'll see that it states: The addendum of understandings that Donziger drafted and attached to the share transfer form effectively nullifies the transfer of his shares in Amazonia and establishes his contempt in multiple ways.

Q. And if you go to the next page of the letter, if you could read starting at -- on the paragraph starting with "By his own admissions in the addendum."

A. By his own admissions in the addendum then, Donziger is expressly continuing to refuse to transfer or forthwith assign to Chevron all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received or hereafter may receive, directly or indirectly, or that he now has or hereafter obtains, directly or indirectly, that is traceable to the judgment or enforceable to the judgment as required by the RICO judgment.

Keep going?

Q. Yes.

A. After Donziger testified during trial that his interest in the judgment was held as shares of Amazonia, this Court ordered

him to assign those shares and, thus, his interest in the judgment to Chevron. Yet Donziger has once again refused to effectuate the transfers of his shares in Amazonia by modifying the form presented to him by adding language that seeks to nullify the transfer.

Donziger now contends that Amazonia is irrelevant, a fake issue, and completely meaningless, and fails to specify in what form he holds his contingency interest in the Ecuadorian judgment. Following his statements in this regard at the contempt hearing, Chevron provided Donziger with a general assignment for any interest he has in the judgment, however held, which provided, in pertinent part, that Donziger does hereby irrevocably assign, send over, and transfer to assignee any and all judgment interest, the judgment interest defined in accordance with paragraph 1 of the RICO judgment. Donziger refused to execute the general assignment.

Q. And if you could turn to the bottom and read the last paragraph.

A. There can thus be no doubt that Donziger has not complied with the Court's judgment to transfer and forthwith assign to Chevron all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received or hereafter may receive, directly or indirectly, or that he now has or hereafter obtains, directly or indirectly, that is traceable to the Ecuadorian judgment or the enforcement of the

Ecuadorian judgment, including all of his rights, title, and interest in his shares of Amazonia.

Such interest includes not just the 6.3 percent contingency interest he asserted ownership of to Elliot, but any retainer payments or other fees paid to Donziger since the entry of the RICO judgment whose source is traceable to the fraudulent Ecuadorian judgment, including funds provided by investors in exchange for an interest in that judgment.

Q. Now, Ms. Champion, with respect to Chevron's pending motion to hold Mr. Donziger in contempt for failure to transfer his Amazonia shares to Chevron, did Judge Kaplan issue a decision?

A. He did, yes.

Q. Let me show you what's Government Exhibit 2006; it's on the docket and move for admission.

THE COURT: Received.

(Government's Exhibit 2006 received in evidence)

Q. Is this that decision? You can go to the next page.

A. Yes.

Q. Go to ECF page 6. Read what Judge Kaplan wrote beginning with "First."

A. First, he says that he wrote Chevron a letter seeking what Donziger calls a common sense resolution of that part of the injunction, and that Chevron never responded. But the injunction was a judgment of this Court that Chevron obtained after trial and that now has been affirmed on appeal. It had

no obligation to parlay with Donziger about its terms and was fully entitled to stand on its rights. No attempt to work out some alternate arrangement -- let alone an attempt spurned by the adversary -- altered Donziger's obligation to comply with this Court's judgment.

Q. Continue reading to paragraph 2 of Judge Kaplan's opinion.

A. Second, Donziger asserted -- albeit not under oath -- that he is uncertain whether Amazonia still exists and in what form. But it is impossible to see what difference that would make, even if one were to credit Donziger's entirely unsubstantiated speculation.

He is obliged to convey all of his right, title, and interest in the shares, whatever that right, title, and interest may be, and regardless of whether it has any economic value. If the company no longer exists, then the conveyance by Donziger of all of his right, title, and interest in the shares -- "in shares," sorry, not "in the shares," perhaps would be of no practical significance, but that is not for Donziger to decide and it does not appear to be the case.

Chevron asserts that Amazonia and its share capital remain very much in existence. "Donziger is wrong that Amazonia is defunct. Chevron sued Amazonia in Gibraltar for fraud relating to the pursuit of the *Lago Agrio* litigation and resulting judgments. After filing a defense, Amazonia failed to participate in the Gibraltar proceedings and defaulted.

"On December 9th, 2015, Chevron obtained judgment against Amazonia for damages of approximately 28 million in equitable relief. Amazonia failed to pay this judgment debt, and the Gibraltar court granted Chevron's application on July 11th, 2016, placing Amazonia into liquidation. But as a matter of Gibraltar/English law, Amazonia still exists, as does its issued share capital."

Finally, Donziger contended that the onus was on Chevron to propose a form of stock power, and that it had not done so. But he was wrong. Paragraph 3 of the judgment unambiguously required Donziger to execute and deliver the stock power. It did not require Chevron to do anything at all.

Moreover, Donziger made abundantly clear to Chevron in his August 2014 letter that he would not comply with paragraph 3 of the judgment, and he made his reason very clear: "My clients have informed me via the directors of Amazonia that if any transfer of stock is effectuated by me to any entity, those shares will be divested immediately under the bylaws of the entity that holds the shares. The upshot is that a simple transfer of my Amazonia shares would, in practice, mean the complete divestiture and potentially irretrievable loss of more than two decades of labor on the part of me and some of my colleagues."

In other words, it appears that Amazonia, whether it is in liquidation or not, still exists. Donziger shares are

the vehicles through which he seeks to be compensated in the millions or hundreds of millions of dollars in the event that the Ecuadorian judgment ever is enforced anywhere or the matter is settled.

He refused to part with his shares, the judgment of this Court notwithstanding, because he believes that doing so would mean the complete divestiture and potentially irretrievable loss of the massive contingent fee he hopes to collect. The fact, however, is that the judgment in this case forbids him from benefiting in any way from the Ecuadorian judgment that he obtained by fraud.

His surrender of his right, title, and interest in the Amazonia shares is but one of several specific means by which the judgment seeks to ensure that result. Donziger simply may not defy this Court's judgment, affirmed by the Court of Appeals, by holding on to the Amazonia shares in the hope -- however faint -- of a rich payday down the road.

Q. You could turn to page 13, ECF page 13, and read what Judge Kaplan stated in these two paragraphs.

A. Paragraph 3 of the judgment required him to execute a stock power. It did not prescribe a particular form. He now has executed a purported stock power, albeit in a form to which Chevron understandably objects. In consequence, although there is no doubt whatever that Donziger was in contempt of paragraph 3 from the date the judgment was entered, on March 3rd --

sorry, March 4th, 2014, until May 9th, 2018, the date on which he executed the form with the addendum, at this moment he arguably no longer is in civil contempt based on the failure to comply with paragraph 3 because he ultimately signed a stock power.

As the purpose of civil contempt is to coerce compliance with a judgment or order, imposition of civil contempt sanctions on the basis of the complete and absolute failure to comply with paragraph 3 from March 4th, 2014, until May 9th, 2018, would be inappropriate.

Q. You can continue to the next paragraph.

A. That, of course, is not to say that Chevron is without recourse. It is free to request that Donziger execute a specific form of stock power without amendment or qualification and, should he fail to promptly do so, to seek an order of this Court requiring that he comply. Any failure to comply with any such order would be an appropriate subject of a new civil contempt motion.

Q. You could turn to ECF page 14 of the opinion. It's Section 5, where it says "Judge Kaplan states additional contempt claim." Could you read that section?

A. In a letter dated May 11th, 2018, prompted in part by Donziger's actions with respect to the required transfer of his Amazonia shares, Chevron asserts that Donziger is in contempt also of paragraph 1 of the judgment, which requires him to

transfer and assign to Chevron all right, title, and interest that he now or hereafter obtains that is traceable to the Ecuadorian judgment, including, without limitation, all rights to any contingent fee under his retainer agreement.

The claim that Donziger is in contempt of paragraph 1 of the judgment was not made in the motion that now is before the Court. The Court, therefore, will not address it unless and until Chevron files an appropriate motion.

Q. Now, Ms. Champion, after Judge Kaplan --

THE COURT: May I interrupt you?

Is this a convenient time for a five-minute break?

MS. GLAVIN: Yes, your Honor.

THE COURT: Thank you.

(Recess)

THE COURT: Ms. Glavin.

BY MS. GLAVIN:

Q. Ms. Champion, before the break, we had just finished discussing Judge Kaplan's May 16, 2018 opinion and order, Government Exhibit 2006.

And after Judge Kaplan issued that opinion, that May 16th opinion, did Mr. Donziger execute an assignment to Chevron of his right to the contingent fee as granted in the 2011 retainer agreement?

A. Not immediately, no.

Q. And in the next four or five weeks after that opinion, did

he execute an assignment of his contingent fee interest?

A. No.

Q. I'm going to show you what is Government Exhibit 2035-1, which is on the docket.

MS. GLAVIN: Move for admission.

THE COURT: Received.

(Government's Exhibit 2035-1 received in evidence)

Q. If we could start at the -- let's start at the bottom of the exhibit. This is an email at the very bottom, on June 16, 2018, 12:02 a.m., from Alejandro Herrera to Mr. Donziger, in which you are cc'd.

Who is Alejandro Herrera?

A. He was an associate at Gibson Dunn at this time.

Q. My bad. He writes: Steven, I'm writing to confirm that we have received your package. Please also see the attached.

We could go to the attachment. Letter dated June 18, 2018. And Mr. Herrera -- well, he sends a letter from Randy Mastro to Mr. Donziger. And it states: Dear Steven, the Court has adjudicated you to be in civil contempt based on your failure to transfer the Amazonia shares. The Court also ruled that your attempt to undermine the effectiveness of Chevron's prior attempt to complete that transfer through your attachment of an addendum was improper.

Accordingly, pursuant to the judgment which provides, in pertinent part, "Donziger shall execute in favor of Chevron

a stock power, transferring to Chevron --

THE COURT: Slowly.

Q. -- to Chevron all of his right, title, and interest in his shares in Amazonia."

We request that you execute the attached transfer document for the Amazonia shares without any alteration or addition, and return the original to us on or before June 19th. We will provide you with a copy of the finalized form. Should you refuse to do so, we will have no choice but to pursue additional contempt relief against you.

And if you could go to the attached form.

Ms. Champion, is this the same share transfer form for Mr. Donziger's shares in Amazonia Recovery Limited that had previously been provided to Mr. Donziger, but for which he issued his addendum?

A. I think in substance it's the same. I think there's a minor change in that it specifies Chevron Corporation as the transferee. I think maybe that had been blank in the last version. But yes, it's substantially similar.

Q. And if we can go back to the email exchange.

So you write to Mr. Donziger on Friday, June 22nd of 2018, Ms. Champion, at 6:52 p.m., you write: Steven, in view of your failure to execute these assignment forms by the date we requested, please provide them by Monday morning or we intend to seek relief from the Court.

If we go to the next email in the chain from Mr. Donziger to you, Ms. Champion, June 22nd of 2018, 7:18 p.m.

Anne, regarding the share transfer form, I executed a form that Chevron provided to me. I did not restrict, reserve, or withhold any part of the transfer. I simply stated certain truths about the underlying context that you would naturally prefer remain hidden.

Your attempt to get me to re-execute the form without an accompanying statement of my understanding of the content -- of the context is deeply repugnant to the First Amendment, as you are essentially seeking a gag order that, if allowed, would just as easily prevent me from declaring my understanding regarding the document to the press or to my colleagues. So I respectfully decline your request.

As regards to the deposition, I propose we commence at 10 a.m. Please indicate where the deposition is taking place.

When Mr. Donziger referred to the deposition, what was he referring to?

A. I believe he was referring to the deposition of himself that took place on June 25th, 2018, so a few days later.

Q. Okay. I want to turn your attention to June 25th of 2018 in that deposition.

Did you attend Mr. Donziger's deposition that day?

A. I did.

Q. And at that deposition of Mr. Donziger, did the issue of

Mr. Donziger assigning his interest in the Ecuadorian judgment to Chevron come up?

A. Yes.

MS. GLAVIN: We could go to Government Exhibit 201, which I believe is in evidence, Mr. Maloney.

A. I don't think so. Not yet.

Q. It's not. Okay.

With respect to Government Exhibit 201, is this the deposition transcript of Mr. Donziger's deposition you attended?

A. Yes.

Q. And have you had an opportunity to review that transcript before today?

A. Yes.

Q. If we could go to page 229 of that deposition, starting at line 21. And read out loud to page 231, at line 20. And I will read the questions, Ms. Champion, if you read Mr. Donziger's replies.

(Reading)

"Q. You understand the Court's injunction of assigning your retainer interest to Chevron, yes? That the injunction orders you to do that?

"A. My Amazonia shares.

"Q. No, your interest in the judgment.

"A. Okay. Whatever. What are you trying to do here? Can you

ask me a question? I don't know if we agree on this.
"Q. Paragraph 1 of the injunction says: 'The Court hereby imposes a constructive trust for the benefit of Chevron, all property, whether personal or real, tangible, traceable to the judgment' blah, blah, blah, 'including, without limitation, all rights to any contingent fee under the retainer agreement and all stock in Amazonia. Donziger shall transfer and forthwith assign to Chevron all such property he has now or hereafter may obtain.' That's what I'm talking about.
"A. So why are you asking me that question in this deposition? I know you tried to get me to do an assignment separate from the Amazonia. If that's what you want me to do, then take action with the Court. I mean, I don't -- I don't know why you are asking in this deposition.
"Q. Well, I'm going to provide you with the transfer while we're on the record, which I have marked as Exhibit 5323.
"A. Okay. I will take it. Do you want me to take this or is this an exhibit?
"Q. This is an exhibit. I will give you another copy. If you want to execute the exhibit copy, that's fine. I take it you are not willing to execute this document today.
"A. This is a whole other thing I need to look at, consider, and think about. So no, I'm not willing to execute this document today. And if you are asking me to execute it, I need some time and I will get back to you."

Q. Let me show you what is marked for identification as Government Exhibit 201-1. Do you see at the bottom of the page it states Plaintiff's Exhibit 5323?

A. Yes.

Q. Okay. What do you recognize this to be?

A. This looks virtually the same as the general assignment form that we had provided to him previously and asked him to sign in early May.

THE COURT: Provided to Mr. Donziger, right?

THE WITNESS: Correct.

Q. In Plaintiff's Exhibit 5323, which is Government Exhibit 201-1, is this the transfer and assignment of judgment interest that was presented to Mr. Donziger at his deposition?

A. Yes.

Q. Okay. And is this, I think you said, the same general assignment form, which is included in Government Exhibit 114 -- if you could pull that up -- which was provided to Mr. Donziger after the hearing.

A. Yes, it even has the same wrong date.

Q. April 3rd, 2014.

A. Yes.

Q. After that deposition of Mr. Donziger on June 25th, did Chevron seek Judge Kaplan's intervention regarding this assignment form?

A. Yes, as well as with the Amazonia share transfer.

Q. Let me show you what is government exhibit -- one moment.

MS. GLAVIN: Move into evidence Government Exhibit 201-1.

THE COURT: That's the transcript, Mr. Kuby.

Are you okay on that?

MS. GLAVIN: It's not the transcript, your Honor.

THE COURT: Oh, 1. I'm sorry. Forgive me. It's the form. Mr. Kuby, are you good on that?

MR. KUBY: I am, Judge.

THE COURT: I'm sorry. Thank you.

MR. KUBY: Do you want me to drive?

THE COURT: No, that's fine. Thank you.

(Government's Exhibit 201-1 received in evidence)

Q. If I can show you what is Government Exhibit No. 2047, which is on the docket sheet.

MS. GLAVIN: We would move for admission.

THE COURT: Received.

(Government's Exhibit 2047 received in evidence)

Q. All right. And what is this, Ms. Champion?

A. This is a memorandum of law in support of Chevron Corporation's motion to compel Donziger to execute an unqualified transfer of Amazonia shares and a general transfer and assignment of all judgment interest.

Q. And if we could go to ECF page 5 of Chevron's motion. And if you could read what Chevron requested the Court to do.

A. Pursuant to the Court's March 4th, 2014 judgment, and May 16th memorandum opinion, Chevron respectfully requests that the Court issue an order requiring Donziger to execute both the share transfer form and the transfer and assignment of judgment interest without modification or qualification by a date certain.

Q. Ms. Champion, did Mr. Donziger oppose this motion to compel?

A. Yes.

Q. I'm going to show you what is Government Exhibit No. 2054, which is in the docket.

MS. GLAVIN: Your Honor, move for admission.

THE COURT: Received.

(Government's Exhibit 2054 received in evidence)

Q. And if you could read the first four sentences of Mr. Donziger's opposition.

A. The undersigned hereby opposes Chevron's motion to compel. While Chevron claims its motion is to compel Donziger to execute an unqualified transfer of Amazonia shares, the fact remains that the undersigned already executed a transfer of these shares that was without any legal reservation.

What seems to perturb Chevron and the Court is the expression of my views and background understanding of certain facts simultaneously with the transfer in an accompanying addendum of understandings. These understandings, which did

not constrain the transfer or reserve any legal rights, are expressions of my views, positions, mental impressions, opinions, and awareness of certain objective facts. As such, they cannot be forcibly changed or suppressed by court order without directly violating the First Amendment.

Q. Let me stop you right there.

There is a footnote 1. Could you read what Mr. Donziger stated in footnote 1?

A. The shares are utterly obsolete and meaningless, as already explained in prior briefing, only deepening the absurdity of the continued litigation on this point.

Q. If you could go to ECF page 3 of Mr. Donziger's opposition filed July 12th, 2018. Start with "Finally," and read to the bottom.

A. Finally, Chevron uses its motion to advance a whole new demand on me that is unconnected from the specific instruction from the Court regarding the Amazonia shares that I have been attempting to comply with.

In the second part of its motion, Chevron demands execution, presumably in gag order fashion as well, of a general transfer and assignment of judgment interest form based on language in the original RICO judgment that directed me to transfer to Chevron all property in my possession that is traceable to the *Lago Agrio* judgment. The language in the original judgment is wildly uncertain in scope and, for that

reason, it was more carefully interpreted by the Court itself in what I have taken as the clarification order at docket 1901, where the Court made clear that property was traceable to the *Lago Agrio* judgment if it flowed from a collection of proceeds on the *Lago Agrio* judgment.

Because there has been no such collection, there is no property to be assigned to Chevron at this time. Should any property subject to the terms of the RICO judgment come into my possession or control, I will comply with the terms of the judgment, as I have repeatedly assured the Court.

Q. Ms. Champion, I want to turn your attention to August 15 of 2018. Did Judge Kaplan rule on Chevron's motion to compel Mr. Donziger to execute an unqualified transfer of his stock in Amazonia, as well as to compel Mr. Donziger to execute an assignment to transfer of a general assignment of all of his property?

A. Yes, he did.

Q. Property traceable to the Ecuadorian judgment. Okay.

Showing what's Government Exhibit No. 2072, which is on the docket.

MS. GLAVIN: Move for admission?

THE COURT: Received.

(Government's Exhibit 2072 received in evidence)

Q. If we could go to ECF page 4 of this opinion and order by Judge Kaplan. And if you could read what Judge Kaplan stated

with respect to A, the unqualified Amazonia transfer.

A. Donziger resists Chevron's request for an order requiring him to sign an unqualified stock power, transferring and assigning all of his right, title, and interest in the Amazonia shares in the form sought by Chevron essentially on a single ground. He contends that the addenda that he added to the stock power he previously executed are expressions of his views, positions, mental impressions, opinions, and awareness of certain objective facts. As such, they cannot be forcibly changed or suppressed by court order without directly violating the First Amendment.

An order requiring him to execute a specific form of stock power without amendment or qualification, he asserts, would be a pure gag order directing me not to speak inconvenient truths and, therefore, would be repugnant to the First Amendment. Unsurprisingly, he cites no legal authority for this argument, which is entirely without merit.

The order that Chevron requests would not force Donziger to change his views or to utter any words at all, whether inconvenient truths or anything else. It would require him only to execute and deliver a simple form of stock power, without any qualification or addition of anything beyond the necessary signatures to carry out a provision of a judgment. And Donziger is grievously mistaken in thinking that the Court cannot constitutionally require him to do so.

Among other considerations, the requested order would not limit Donziger in expressing himself when, as, and where -- save for the stock power -- he wishes. The prohibition on adding anything other than his signature to this legal instrument would be entirely content neutral. It would prohibit any and all additions or commentary, regardless of context. The requested order would not violate the First Amendment.

Q. If you could turn to ECF page 6.

With respect to -- actually, go back to page 5 for a moment.

Looking at section B of Judge Kaplan's opinion, the "judgment interest" assignment. And Judge Kaplan states that Donziger resists this also. He asserts that the "language in the original judgment is wildly uncertain in scope," though he points to no particular uncertainty.

And he goes on to claim that the Court in its opinion, largely denying Donziger's motion for a stay of that judgment pending appeal, therefore subsequently limited its scope to money or other property collected on the Ecuadorian judgment.

Now, if you could read, Ms. Champion, the next paragraph of Judge Kaplan discussing Mr. Donziger's arguments.

A. As an initial matter, there is no uncertainty in the language of paragraph 1 of the judgment or, consequently, in the language of the form of assignment that Chevron seeks to

require Donziger to execute. The phrase "property," whether personal or real, tangible or intangible, vested or contingent, is perfectly clear. Nor is there any uncertainty inherent in the limitation of the operation of paragraph 1 to property traceable to the Ecuadorian judgment or the enforcement of the judgment.

The concept of traceability of property to particular sources, events, or activity is extremely well-established in the law. Money or other property is traceable to a given source, event, or activity if its acquisition is attributable to that source, event, or activity. To put it another way, proof that the proceeds of the event or activity in the quoted case money laundering enabled the defendant to acquire the property, makes that property traceable to the event or activity.

So any property, one, that Donziger, A, had as of the date of the judgment in this case or, B, acquired from the date of the judgment until now, or C, hereafter may acquire and, two, that Donziger was enabled to acquire by the Ecuadorian judgment or its enforcement is traceable to that judgment. It therefore is or upon acquisition subsequent to the date of the judgment, became or will become, depending on the timing of the acquisition, subject to the constructive trust imposed by the judgment in this case.

Paragraph 1 of that judgment requires Donziger to

transfer and assign such property to Chevron forthwith. But that does not necessarily require that Chevron's motion in this respect be granted in every detail.

Keep going?

Q. Yes.

A. Donziger, as of the date of the judgment in this case, owned certain property that he clearly and indisputably had obtained that is traceable to the Ecuadorian judgment. His professional limited liability company, Donziger Associates PLLC, a defendant in this case and one of the parties to the judgment here, pursuant to its January 5th, 2011 retainer agreement, owned a contract right to a contingency fee and other monies.

As this Court previously held in a ruling that Donziger did not challenge on appeal, that right to a contingent fee and the fee itself are property; they are subject to execution and attachment. And they were and remain immediately assignable.

Keep going?

Q. Yes.

A. Prior to the entry of the Ecuadorian judgment, Donziger's retainer agreement was an executory contract for the payment of his retainer and reimbursement of his expenses, plus a transfer of a future fund, i.e., his share of the collections on the judgment upon which specific performance would be granted when

the fund came into existence. The fund came into existence when there was a judgment, i.e., on February 14th, 2011. His rights to payments when the fund came into existence, i.e., when judgment was entered, as well as his rights against that fund, once it came into being, were and are respectively assignable.

Accordingly, his claims to the contingent fee, to his monthly retainer, and to expense reimbursements at all relevant times, were, and remain property subject to execution and attachment under New York law.

(Continued on next page)

BY MS. GLAVIN:

Q. Continue on with the next page starting with "accordingly"?

A. Accordingly, it is entirely plain that this particular set of contract rights have been subject since March 4, 2014, to Donziger's express obligation to transfer and assign them forthwith to Chevron and obligation that he has disregarded for over four years. The court will order Donziger to execute an unqualified, un-supplemented document that conforms in substance to the requested document insofar as it relates to Donziger's rights to a contingent fee.

Q. Stop you right there. Footnote number 18, could you read Footnote Number 18 which Judge Kaplan wrote?

A. Nor is there anything in the court's April 25, 2014 order largely denying Donziger's motion for a stay pending appeal that even remotely excused Donziger either pending appeal or otherwise from complying with that direction. Donziger's contention with respect to the stay decision is that the stay decision limited to the judgment's impact on property traceable to the Lago Agrio judgment to property that flowed from a collection of proceeds on the Lago Agrio judgment.

Whatever the merits of that contention with respect to other property which the court will address in due course in connection with another pending motion, it has none at all with respect to paragraph one specific requirement that Donziger transfer and forthwith assign to Chevron all rights to any

contingent fee under the retainer agreement and all stock in Amazonia. Indeed, the fact that Donziger acknowledges that he is obliged to assign to Chevron the Amazonia stock though he quibbles with the form of the stock power evidences precisely that fact as the rights under the retainer agreement to a contingent fee and the Amazonia stock are treated in precisely the same way.

Q. Turn to ECF page nine and read the two sentences starting with "but the court does not see".

A. But the court does not see what purpose would be served by now requiring Donziger to execute a form of transfer and assignment with respect to unidentified undescribed property as such an instrument would leave entirely unclear what has been transferred and assigned. Accordingly, in the exercise of discretion it declines now to require the execution of an instrument so broad.

Q. Ms. Champion, if you could go to Judge Kaplan's conclusion with respect to what he ruled in ordered.

A. Accordingly, Chevron's motion is granted to the extent that Steven Donziger shall execute acknowledge before a notary public and deliver to Chevron's counsel of record in this case on or before August 21, 2018 the following documents:

A transfer document for the Amazonia shares in the form annexed as Exhibit Two to the declaration of Anne Champion saved at the correct date shall be included the executed

document rather than blank, June 2018, a transfer and assignment in the form annexed to this order as Exhibit One.

Donziger shall not qualify, affix or add anything to either document except that he shall, A, sign his name his signature is required and, B, procure certificates of notaries public to Donziger's acknowledgment as required.

Q. Now, Ms. Champion, the transfer document for the Amazonia shares that Judge Kaplan directed Mr. Donziger sign, was that the same transfer document that that had been provided by you to Mr. Donziger months earlier which is -- pull up Government Exhibit 2048-2 in the record.

Move for admission?

THE COURT: Received.

(Government's Exhibit 2048-2 received in evidence)

A. Yes. Substantially the same I think, again, the transferee was left blank in the original form.

Q. And with respect to what Judge Kaplan directed at paragraph number two, a transfer and assignment in the form of annexed to his order as Exhibit One --

Can we pull up Exhibit One to Judge Kaplan's August 15, order.

Exhibit One, how did Judge Kaplan modify this transfer and assignment form that he directed Mr. Donziger to sign and notarize?

A. He limited it in paragraph one to the January 5, 2011

retainer agreement.

Q. So, in other words, it only was a transferred assignment form limited to Mr. Donziger's rights, title and interests to a contingent fee under the retainer agreement dated January 5, 2011?

A. Yes.

Q. Now, Judge Kaplan's order directing Mr. Donziger to execute and acknowledge before a notary public and deliver to Chevron on August 21, 2018, those two documents on August 21st of 2018 did Mr. Donziger execute those two documents, have them notarized and delivered to Chevron?

A. What was the date you said?

Q. August 21, 2018.

A. No.

Q. I show you what is a Government Exhibit 2075, the docket entry in the case.

Move for admission into evidence?

THE COURT: Received.

(Government's Exhibit 2075 received in evidence)

Q. Is this a August 20, 2018 letter from Mr. Donziger?

A. Yes.

Q. Mr. Donziger states, Judge Kaplan, I write in regard to the court's recent order dated August 15, 2018, docket 2072, that I execute documents transferring certain property interests to Chevron Corporation. I am currently out of the country through

Labor Day with no way to access a U.S. qualified notary. And I am not sure if a foreign notary would meet the court's requirement. Additionally, I am seeking adequate counsel on the issue of transferring my contingent fee interests. My clients have forbidden me to make such a transfer and made it clear that despite the court's order, a transfer would be considered an act of cooperation with an enrichment of Chevron in violation of my fiduciary duties toward them that could result in my termination. I respectfully of request a modest extension of time through the end of the week after Labor Day, i.e. to September 7, to return from travel and properly address the ethical issues raised by the ordered transfer.

I am going to show you what is Government Exhibit 2079 which is a docket entry.

Move for admission.

THE COURT: Received.

(Government's Exhibit 2079 received in evidence)

Q. And, Ms. Champion, could you read Judge Kaplan's order on Mr. Donziger's motion seeking to extend time.

A. The judgment in this case entered March 4, 2014 required Donziger to execute instruments transferring and assigning certain property to Chevron. Donziger failed to comply. Finally, on August 15, 2018 after extensive prior proceedings the court ordered Steven Donziger to execute, acknowledge before a notary public and deliver to Chevron's counsel of

record on or before August 21, 2018 two particular legal instruments giving partial effect those affects of the 2014 judgments.

Donziger still had not complied, waiting until the last moment as he has often done. Donziger late yesterday filed a letter motion seeking an extension of time until September 7, 2018. He says that he is out of the country and that he might not be able to get a notary where ever he is.

He rehashes moreover an argument previously made and rejected, and he does not even say that he will comply with the order with the benefits of the extension he seeks. Indeed, he at least arguably implies that he has no intention of doing so.

Q. OK. Stop you right there and go to the next page.

A. Keep reading?

Q. Yes?

A. Donziger's first argument for an extension is that he is out of this country, has no way to access a U.S. notary and is unsure that foreign notary would meet the court's requirement. That asserted problem is readily solved. According to the U.S. State Department, U.S. consular's officers at U.S. embassies and consulates abroad provide notarial services, including acknowledgments for U.S. citizens.

Accordingly, Donziger may sign the required documents, take them to any U.S. Embassy or consolate and have the requisite acknowledgments affixed.

If he is in Ecuador, as perhaps is the case, that can be accomplished in Quito where he regularly has had an office in the past or in Guayaquil, G-U-A-Y-A-Q-U-I-L. Indeed, the website of U.S. Embassy in Ecuador states "notarial services are available to U.S. citizens and foreign nationals for documents to be used in the United States. Notary services are executed by consular officers and may include documents to be signed before them, statements made under oath, powers of attorney, certified translations, affidavits, acknowledgments, among others, closed quote.

Donziger next contends that his clients have forbidden me to make such a transfer and made it clear that despite the court's order a transfer would be considered an act of cooperation with an enrichment of Chevron in violation of my fiduciary duties toward them that could result in his termination.

He claims that he therefore, is seeking counsel to advise him in this situation. But this ship sailed long ago. And in any case the assertion that his clients could terminate him if he complies with the court's order is of extremely dubious voracity.

The judgment in this case required Donziger to make the two transfers that are the subject of the court's recent order. Indeed, the recent order was occasioned primarily by Donziger's long defiance of the relevant provisions of the

judgment.

Donziger had every opportunity to challenge those provisions of the judgment on appeal but he did not. Under established law a district court legal decision made at one stage of litigation unchallenged in a subsequent appeal when the opportunity to do so existed becomes the law of the case for future stages of the same limitation and parties are deemed to have waived the right to challenge that decision at a later time.

Accordingly, Donziger is obliged to comply with the judgment and the court's order even if doing so would be objectionable to Donziger's clients and even if they would terminate him for doing so which for reasons discussed below is highly unlikely.

Keep going?

Q. Yes.

A. Moreover, all of this relates back to events during the course of and following Chevron's motion to hold Donziger in contempt by reason in part of his failure to transfer his Amazonia shares. The vehicle through which he hopes to be paid contingent fee based on any recovery in the Ecuadorian litigation.

Those events would be highly instructed in considering whether there would be any genuine need for further consultation even if Donziger's obligation to comply with the

order were open to debate. The fact of the matter is that he intermittently has made substantially this argument which the Court has rejected while he intermittently has claimed also that he would sign whatever the court required or that there is no point in ordering the transfer of the Amazonia shares either because the company is defunct, because Chevron already owns the shares or because the transfer of the shares would cause him grave and irreparable loss.

To wit, August 14, 2014, in response to Chevron's letter demanding transfer Donziger wrote "my clients have informed me via the directors of Amazonia that if any transfer of stock is effectuated by me to any entity, those shares will be divested immediately under the bylaws of the entity that holds the shares. As you know my clients do not recognize Judge Kaplan's assertion of jurisdiction in this matter.

The upshot is that a simple transfer to the clerk's office of my Amazonia shares would in practice mean the complete divestiture and potentially irretrievable loss of more than two decades of labor on the part of me and some of my colleagues". Thus, at that writing Donziger was taking the position that the required share transfer would have catastrophic consequences for him.

March 25, 2018, Donziger asserted what he claimed was his understanding that the Amazonia entity in Gibraltar either no longer exists or is entirely owned by Chevron after Chevron

forced it into receivership and then added that a transfer of shares were the entity functions and/or before Chevron took it over would have prejudiced his clients.

His point at that time thus was that he could not be found in contempt for failing to transfer the shares because the company in question had passed out of existence or entirely into Chevron's hands.

May 8, 2018 argument on contempt motion.

Donziger asserted that Chevron has my shares already and that however, I will be more than happy to do whatever the court instructs because I think this is a complete and ridiculous issue. Note that there was no mention of the bylaw transfer restrictions or his client's supposed views. Of course, as is clear from the Court's August 15, 2018 memorandum and order, docket 2072, Donziger was not happy to do as instructed.

It became necessary to issue the order that is the subject of this present application for an extension. The point for present purposes is that Donziger has asserted for over four years, albeit on and off, that there is a transfer restriction in the corporate documents that might have an affect on the required transfer of Amazonia shares and suggested that his clients would not be happy with such a transfer. So, he knew when Chevron moved on June 27, 2018 to compel him to execute under qualified transfers that the bylaw

restriction and his client's reported views could be issues in his eyes.

He had plenty of time to consult and does not deny having consulted and does not deny in having consulted other counsel in that connection in responding to Chevron's motion to compel execution of the transfer documents.

Presumably his opposing papers said whatever he had to say on that subject and the court ruled on Chevron's motion. Donziger now is under a clear definitive and unequivocal obligation to execute certain documents.

He may do so and thereby comply with the order or disobey the order and deal with any consequences.

Finally, the court notes in passing there is no realistic chance that Donziger would be terminated if he complied with the court's order.

Donziger has been at pains recently to say that he has only one client at this point, the Amazon Defense Fund. As the court found at trial the ADF is an entity formed by Donziger with his best friend in Ecuador, Luis, L-U-I-S, Yanza, Y-A-N-Z-A and perhaps others. Yanza is the executive director and is intimately involved with Donziger in this ongoing saga. As far as the record discloses, they control the ADF. In the circumstances and bearing in mind Donziger's lack of credibility in the past and failure to submit affidavits or declarations substantiating his factual contentions here, I

decline credit his contentions that the ADF actually would fire him if he complies with the court's order, not that it would alter the result if that really were likely.

Conclusion. Donziger's letter motion for an extension of time is granted only to the following extent:

Donziger shall execute two sets of originals of the required forms on or before August 22, 2018. He shall send one set which need not have notarized acknowledgments to Chevron's lead counsel no later than August 22, 2018 by overnight courier. In order to facilitate obtaining notarized acknowledgments at the U.S. Embassy or Consolate, the Court will extend its time within which to do that and to deliver fully executed documents to Chevron.

Donziger shall acknowledge his signatures on the two documents constituting the second set of originals before a consular official at a U.S. Embassy or Consolate no later than August 28, 2018. No later than August 29, 2018 he shall place that fully executed acknowledged and notarize set of originals in the hands of an overnight courier for the speediest available delivery to Chevron's lead counsel.

Q. Ms. Champion, I want to turn your attention to August 22, the date by which Judge Kaplan directed Mr. Donziger to send a set of originals that don't need to have a notarized acknowledgment to Chevron's lead counsel by overnight courier.

I am showing you what is Government Exhibit 123, this

particular e-mail Ms. Champion is from Mr. Donziger to Mr. Mastro. You are not on this e-mail; is that right?
A. Correct.
Q. But did you receive a copy of that e-mail on or about August 22, 2018?
A. I did.
MS. GLAVIN: Move for admission of Government Exhibit 123.
MR. KUBY: Without objection.
THE COURT: Received.
(Government's Exhibit 123 received in evidence)
Q. Ms. Champion, this August 22, e-mail from Mr. Donziger to Mr. Mastro attaches executed transfers in a letter. Let's go to the first transfer form. This is the assignment of the contingent fee interest granted by the January 5, 2011 letter agreement.
Did Mr. Donziger sign this?
A. He did.
Q. Was the form notarized?
A. It was not.
Q. But he wasn't required to notarize it as of August 22; is that correct?
A. Correct.
Q. Let's go to the second form. Is this the shared transfer form for his Amazonia shares?

A. Yes.
Q. And again, did he sign this?
A. He did.
Q. But was the form notarized?
A. No.
Q. And if you go to the third attachment to this e-mail the August 22, 2018 letter addressed to Mr. Mastro, Mr. Donziger writes Mr. Mastro, I attached forthwith via e-mail two executed transfer agreements related to my contingent interests in the Ecuador judgment that I signed under order from the district court and under threat of contempt notarized versions and originals will be provided as soon as practicable given my location and family obligations but no later than September 4, 2018.

Mr. Donziger then states he wishes, I also wish to make the following points about my first amendment protected view of the transfer agreements. I sign each of these agreements under duress and under threat of contempt based on a RICO judgment that contradicted findings of four lawyers of courts in Ecuador and 17 appellate judges in the country, Ecuador is the general view under which your client Chevron insisted this matter be resolved and -- intercepted jurisdiction.

With respect to the other bullet points, is Mr. Donziger conveying his view with respect to the validity of

the RICO judgment?

A. I can't guess what's in Donziger's mind but you know his statements are that he is signing the agreements under duress and under threat of contempt of court.

Q. Can we go to the next page. Very bottom he states, that said, I hereby transfer clean copies of both transfer documents consistent with the order of the district court. Again, notarized versions ands will be provided as soon as practicable but no later than September 4 of 2018.

So, turning your attention, Ms. Champion, to September 4 of 2018, did Mr. Donziger -- did you receive the two notarized transfer forms that Mr. Donziger said he would provide to you?

A. No.

Q. What did you get?

A. I think we got an e-mail saying he would try to get it to us within a few days.

Q. I am going to show you what is Government Exhibit 2085-1 which is in the docket and move for admission?

THE COURT: Received.

(Government's Exhibit 2085-1 received in evidence)

A. We got the assignment. He gave us a notarized version of the assignment of the retainer interests eventually within that time period but not the notarized version of that shared transfer form.

Q. Meaning the share transfer form for the Amazonia shares?
A. Correct.
Q. So, you did not receive the notarized?
A. No, not until later.
Q. Did you follow-up on that with Mr. Donziger?
A. Yes.
Q. Going to turn your attention to Government Exhibit number 126. Go to the next page.

Ms. Champion, do you recognize this e-mail exchange with Mr. Donziger?
A. Yes.

MS. GLAVIN: Move it into evidence, your Honor?

THE COURT: Received.

MS. TRIVEDI: We have no objection, judge.

THE COURT: Thank you, counsel.

Q. Start with your e-mail to Donziger on September 7, 2018 at 11:33 p.m. Dear Steven, following up on our discussion earlier today you do need to execute and have notarized the share assignment agreement attached here to be in compliance with the court's orders. The May version will not suffice. Can we arrange to have to picked up by messenger on Monday? Please confirm. Thank you.

What was the discussion that you had with Mr. Donziger earlier that day on September 7?
A. I called him to ask whether he had inadvertently omitted a

notarize share transfer form and told him that we did need a notarized version of that form.

MR. KUBY: Judge, excuse me. Mr. Donziger will voluntarily waive his right to be presents if it's OK with the Court for about three minutes?

THE COURT: Yes, sir.

MR. KUBY: And we will continue in his absence.

THE COURT: Yet. Thank you.

MR. KUBY: Thank you, judge.

Q. Anything else on that conversation with Mr. Donziger or what he said to you?

A. I don't recall anything else.

Q. Did he say anything about -- you mentioned in your e-mail the May version will not suffice.

A. Yeah.

Q. Come up on the call?

A. Yeah. I think he mentioned I already notarized that form a few months ago.

Q. OK. When you say "the May version would not suffice", can we go to Government Exhibit 2003-3 which is in evidence, is this the May version you were referring to?

A. Correct, the one with the attached addendum of understanding.

Q. Go back to Government Exhibit 126.

You then e-mail Mr. Donziger again on September 9 of

2018 at 11:44 a.m. You state: Dear Steven, following up on this we will need this properly executed tomorrow or we will need to seek relief from the court. Please, let me know as soon as when you expect to get it to me. Turning to the next e-mail in that chain, this response from Mr. Donziger to you on September 9. I can do there tomorrow and you can pick it up. I'll let you know when ready. Please send another copy of the form you want signed and notarized. As I said, I believe I already executed what you are requesting.

Go to the next e-mail on this chain.

On September 10, 2018, you wrote:

Steven, you said you would do this today. When can we pick up the package. Thanks.

The next e-mail in the chain is from Mr. Donziger.

Sorry. The arbitral ruling and the holiday changed my sked, S-K-E-D. I am leaving early in the morning. I will have it by close of biz, Thursday or latest Friday. Thanks.

Now, Ms. Champion, had Mr. Donziger gotten any relief from Judge Kaplan's August 21, 2018 order directing him to send a notarized version, signed and notarized version of his Amazonia shared transfer agreement without any alterations or modifications by overnight mail on August 29?

A. No.

Q. If we could go to Government Exhibit 127. Do you recognize this, Ms. Champion?

A. Yes. This looks like a further email exchange between me, Mr. Donziger and others regarding his refusal to provide us with a notarized version of the Amazonia shared transfer form.
Q. If we could start at your e-mail on September 13 of 2018 at 7:11 p.m.?

THE COURT: Do you want to move it into evidence?

MS. GLAVIN: I'm sorry, your Honor.

MR. KUBY: We're good.

MS. GLAVIN: Move into evidence.

THE COURT: Received.

(Government's Exhibit 127 received in evidence)

Q. So we are at for Bates number purposes Donziger 103030.

Go to Steven Donziger's e-mail to you on Thursday September 13 at 2018 at 7:11p.m.?

THE COURT: Can you please indicate your view of the legal basis for your request that I re-execute the Amazonia transfer form and have it notarized when I already did that several weeks ago. Thanks. Steven.

Go up to the next e-mail in this chain. Sent e-mail from you, Ms. Champion to Steven Donziger, September 14 of 2018 at 2:27 p.m.

Dear Steven, the court ordered you to execute and notarized the Amazonia share transfer document on August 15 docket 2072 at nine. And again on August 21, docket 2079 at 5. Dates that have long passed. You're in contempt of court's

orders. If we do not receive the signed notarized documents by four p.m. today we will proceed to address this issue with the court. Thank you.

Go to the next e-mail in the chain. Mr. Donziger responding to you on September 14, 2018 at 5:07 p.m. And it appears the Court was unaware I had already executed the order several weeks earlier when it issued the order you cite. Since the order had previously been complied with, I am not going to execute the same document again unless ordered by the court. If your issue is with the addendum I had given you a clean version of the transfer document per the court's order in May. Although, to be clear, I stand by the addendum from them from then in the more recent one I submitted with the other transfer form as is my First Amendment right. Thanks.

We go up to your response, Ms. Champion. You respond later that day, September 14 at 2018, 11:22 p.m. Dear Steven, the transfer form, the shared transfer form you executed in May reflected your quote, addendum, end quote. And was held by the court to be insufficient to comply with the judgment. The court was indeed aware of this as it was filed with the court in May. Docket 2003-3 attached and is quoted in the court's May 16 order, docket 2006 attached. This share transfer form you executed in August also attached is not notarized. Accordingly, you have not complied with the court's order of August 15, docket 2072 at nine attached requiring you to,

quote, execute, acknowledge before a notary public and deliver to Chevron's counsel of record in this case on or before August 21, 2018, end quote, the shared transfer form docket 2048 docket two attached without, quote, affixing or adding anything to either document, end quote, 2072 at nine.

You have also not complied with the court's order of August 21, requiring you, quote, no later than August 29, 2018, end quote, to transmit a quote wholly executed acknowledged and notarized version of the shared transfer form to, quote, Chevron as lead counsel, end quote, docket 279, 2079 at five to six attached.

I understand from your last e-mail that you are refusing to provide a notarized version of the Amazonian shared transfer as ordered. We will thus be seeking relief from the court. If my understanding is not correct, please, let me know now.

Did Mr. Donziger indicate to you that your understanding was not correct?

A. No.

Q. Showing what you is Government Exhibit 2084. This is on the docket.

Your Honor, move for admission?

THE COURT: Received.

(Government's Exhibit 2084 received in evidence)

Q. Ms. Champion, this is a memo of law filed by Chevron on

September 17th of 2018. What was Chevron seeking in this?
A. This is a motion to hold Steven Donziger in contempt of court for his failure to comply with the court's August 15 and 21, 2018 orders.
Q. If you could go to ECF page seven of that order. Actually, ECF page eight. My mistake.

In this brief states that given the brazen and years' long refusal by Donziger to properly execute a transfer of this Amazonia shares to Chevron, Chevron submits that the court should impose monetary sanctions on Donziger until he provides Chevron's counsel a fully executed acknowledged and notarized original of docket 2048-2.

Now, after Chevron ruled to hold Mr. Donziger in contempt did Mr. Donziger note, execute and notarized shared Amazonia shares that were at issue you --
A. He ultimately did at the beginning of October I believe.
Q. Showing you what is Government Exhibit 2104-1, do you recognize this document?
A. Yes. This is the share transfer form for Mr. Donziger's Amazonia shares dated October 5, 2018 and it is notarized.

MS. GLAVIN: Move into evidence, your Honor?

THE COURT: Received.

(Government's Exhibit 2105 received in evidence)

Q. Show you what is a Government Exhibit 2105 also on the docket go to page two. Is this an order by Judge Kaplan on

October 12, 2018?

A. Yes.

Q. What did Judge Kaplan rule on contempt motion?

A. He states that it meaning Chevron now acknowledges that Donziger recently executed, acknowledged before a notary and an delivered the document that was the subject of the orders although, he did so very belatedly. In the circumstances to impose coercive sanctions to compel compliance with the orders is denied as mute.

Q. Now, Ms. Champion, did you come to learn that Mr. Donziger had entered into another agreement that had a --

THE COURT: Are we changing topics now?

MS. GLAVIN: Yes.

THE COURT: Is this a convenient time to break?

MS. GLAVIN: Yes, your Honor.

THE COURT: All right. The witness may step down.

Ms. Glavin, I'm not sure we need to have all of this read to us. Is there a better way to do it quicker?

MS. GLAVIN: I'll regroup over the night.

THE COURT: I don't think you need to read the whole thing. I can read it. You can point out to me what you want me to read but I think we can go more quickly here.

MS. GLAVIN: OK.

THE COURT: Is there anything else counsels wishes to discuss?

MR. KUBY: Start time tomorrow, judge?

THE COURT: What do you want? You want ten? I'll give you 9:30.

MR. KUBY: OK then, I want 10:30.

THE COURT: You don't get that.

MR. KUBY: 10:15?

THE COURT: No.

MR. KUBY: 9:55.

THE COURT: OK. 9:55.

Good evening, folks.

(Adjourned to May 11, 2021, at 9:55 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ANNE CHAMPION

Direct By Ms. Glavin . . . . . . . . . . . . . . .73

GOVERNMENT EXHIBITS

Exhibit No. Received

1147 . . . . . . . . . . . . . . . . . . . . .82

1874, 1875 . . . . . . . . . . . . . . . . . .84

1978-6 . . . . . . . . . . . . . . . . . . . .94

1888 . . . . . . . . . . . . . . . . . . . . .98

1899 . . . . . . . . . . . . . . . . . . . . 106

1901 . . . . . . . . . . . . . . . . . . . . 107

1914 . . . . . . . . . . . . . . . . . . . . 111

1923 . . . . . . . . . . . . . . . . . . . . 112

1962 . . . . . . . . . . . . . . . . . . . . 116

1963 . . . . . . . . . . . . . . . . . . . . 117

1922 . . . . . . . . . . . . . . . . . . . . 118

1972 . . . . . . . . . . . . . . . . . . . . 118

1972 . . . . . . . . . . . . . . . . . . . . 119

1965 . . . . . . . . . . . . . . . . . . . . 119

1966 . . . . . . . . . . . . . . . . . . . . 120

1968 . . . . . . . . . . . . . . . . . . . . 124

1986 . . . . . . . . . . . . . . . . . . . . 128

1986 . . . . . . . . . . . . . . . . . . . . 130

2010 . . . . . . . . . . . . . . . . . . . . 133

114 . . . . . . . . . . . . . . . . . . . . 142
2003-3 . . . . . . . . . . . . . . . . . . 142
2003 . . . . . . . . . . . . . . . . . . . 145
2006 . . . . . . . . . . . . . . . . . . . 147
2035-1 . . . . . . . . . . . . . . . . . . 153
201-1 . . . . . . . . . . . . . . . . . . . 159
2047 . . . . . . . . . . . . . . . . . . . 159
2054 . . . . . . . . . . . . . . . . . . . 160
2072 . . . . . . . . . . . . . . . . . . . 162
2048-2 . . . . . . . . . . . . . . . . . . 170
2075 . . . . . . . . . . . . . . . . . . . 171
2079 . . . . . . . . . . . . . . . . . . . 172
123 . . . . . . . . . . . . . . . . . . . . 180
2085-1 . . . . . . . . . . . . . . . . . . 182
127 . . . . . . . . . . . . . . . . . . . . 186
2084 . . . . . . . . . . . . . . . . . . . 188
2105 . . . . . . . . . . . . . . . . . . . 189