L5BVDON1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4               v.                        19 CR 561 (LAP)
                                          11 CR 691 (LAK)
5  STEVEN DONZIGER,

6               Defendant.                BENCH TRIAL

7  ------------------------------x

8                                         New York, N.Y.
                                          May 11, 2021
9                                         10:00 a.m.

10

   Before:
11
                     HON. LORETTA A. PRESKA,
12
                                          District Judge
13

14                        APPEARANCES

15 RITA M. GLAVIN
   SAREEN K. ARMANI
16 BRIAN P. MALONEY
        Special Assistant United States Attorneys
17
   LAW OFFICE OF RONALD L. KUBY
18      Attorneys for Defendant
   BY:  RONALD L. KUBY
19      RHIDAYA S. TRIVEDI
        -AND-
20 OFFIT KURMAN PA
   BY:  MARTIN GARBUS
21

22 ALSO PRESENT:  GRACE GILL, Paralegal

23

24

25

L5BVDON1

```
1                (In open court)

2                (Trial resumed)

3            THE COURT:  All right.  Before we get started,

4    Mr. Garbus, we have your motion based on the U.S. Department of

5    Justice's notification.  But the motion doesn't have the

6    notification on it.

7            MR. GARBUS:  I believe we sent since then, I think,

8    the documents late yesterday.  And I think what the document

9    is, is a letter from a lawyer in Washington to the U.S.

10   Attorney.  And then I believe there's a phone conversation.

11           THE COURT:  There is no letter from DOJ in the

12   package.  So I can't rule on it until I see what they say.

13           MR. GARBUS:  I understand that.

14           THE COURT:  All right.  So this is being put aside

15   until I receive whatever other documents you have.

16           MR. GARBUS:  Thank you.

17           THE COURT:  Yes, sir.

18           Is there anything else you want to discuss, counsel,

19   before we -- do we have a witness?

20           Ms. Champion, are you hiding?

21           MS. GLAVIN:  No, no, no.  She's in the witness box.

22   The FBI agent is getting her.

23           THE COURT:  Yes, sir.

24           MR. KUBY:  Very briefly, Judge.

25           In the course of the day's proceedings, I know we take
```

L5BVDON1

1    a mid-morning and mid-afternoon break; sometimes that's not

2    entirely sufficient.  So at no time will Mr. Donziger be

3    unrepresented by an attorney admitted to practice who's filed a

4    notice of appearance in this Court, but one or the other of us

5    may duck out, if that's okay with the Court, without announcing

6    it, disrupting everything.  And that's true of Mr. Donziger as

7    well.

8            THE COURT:  Yes, sir.

9            MR. KUBY:  Thank you.

10           THE DEFENDANT:  Your Honor?

11           THE COURT:  Yes, sir.

12           THE DEFENDANT:  I just want to confer with my lawyer

13   real quick.  I got held up downstairs.  I apologize for being

14   late.  Can we just have one minute?

15           THE COURT:  Yes, sir.

16           (Pause)

17           THE COURT:  All right.  Are we ready to begin?

18           MR. KUBY:  We are not, Judge.

19           THE COURT:  Sir.

20           MR. KUBY:  Yesterday or the day before yesterday, the

21   Court granted access to Mr. Donziger for his telephone, for his

22   device.

23           THE COURT:  Actually, the Court didn't.  The order

24   that the Court actually signed had deleted his name.

25           MR. KUBY:  Okay.  Well, in that case, he had phone

L5BVDON1

1   access yesterday, as I know the Court observed.  I would

2   request he have phone access today, at least so he can

3   communicate effectively electronically with the rest of the

4   team.  If he chooses to do other things rather than pay

5   attention to what's happening, I think that's kind of on him,

6   Judge, not on you.

7            THE COURT:  I don't believe Mr. Donziger is entitled

8   under the rules of the court to have his phone.  And I

9   understand -- not that I tweet, but I do understand he was

10   tweeting from the courtroom yesterday.

11            MR. KUBY:  Would you say "tweeting" again?  I just

12   love the way you say it.

13            THE COURT:  Ha.

14            So in any event, he's not entitled.  If there was a

15   snafu yesterday, there was a snafu yesterday.

16            MR. KUBY:  Well, I wouldn't call yesterday a snafu; I

17   would call yesterday situation normal, all fine up.

18            And I understand you have discretion to grant him

19   access to his phone, especially in COVID times, so he can

20   communicate with his team.  I get it that you don't like him

21   sitting here tweeting.  I recognize that.  But he has a right

22   to tweet.

23            Look, what you are doing is silencing him from

24   tweeting what's going on in this courtroom.

25            The reporters tweet.

L5BVDON1

| | |
|---|---|
| 1 | THE COURT:  There is a separate rule for Southern |
| 2 | District reporters.  He's not included in that rule. |
| 3 | MR. KUBY:  I don't know that there is -- there's an |
| 4 | official Southern District press? |
| 5 | THE COURT:  There is, actually. |
| 6 | MR. KUBY:  Really? |
| 7 | THE COURT:  Yes, sir. |
| 8 | MR. KUBY:  And they get different treatment than |
| 9 | others? |
| 10 | THE COURT:  Yes, they do. |
| 11 | MR. KUBY:  So Judge Preska can pick the press? |
| 12 | THE COURT:  No, the court picks the press. |
| 13 | MR. KUBY:  The court picks the press? |
| 14 | THE COURT:  The court grants access to certain |
| 15 | reporters.  There are requirements and the like, which I am not |
| 16 | going to discuss with you now.  But I will say that there are |
| 17 | separate rules for Southern District in-house press which allow |
| 18 | them to keep their devices. |
| 19 | MR. KUBY:  As to that issue, which I recognize is a |
| 20 | tangent that I went on, just note my objection on First |
| 21 | Amendment grounds.  The Court is not entitled to pick the press |
| 22 | it chooses to cover it. |
| 23 | THE COURT:  Thank you for that. |
| 24 | MR. KUBY:  Second, back to Mr. Donziger's cell phone. |
| 25 | You have discretion to grant it.  I'm requesting that you grant |

L5BVDON1

```
 1    it.  It is useful for the legal team.  Put aside his tweets

 2    because I'm not even on Twitter; I find myself accessible

 3    enough.  So I don't know what he's doing, but I do know when

 4    he's communicating with us.

 5              THE COURT:  Okay.  But I observed Mr. Donziger

 6    throughout the day yesterday conferring in person, whispering

 7    into the ears of the defense team.  So he can confer with you

 8    all he wants.  But I'm not exercising my discretion to make an

 9    exception to the court-wide rule to allow him to have his

10    phone.

11              MR. KUBY:  The Court does recognize -- or I will ask

12    the Court to recognize that Mr. Donziger whispering into my ear

13    is not the way that the CDC suggests that people who are not in

14    the same pod communicate with each other.

15              THE COURT:  Thank you.

16              MR. KUBY:  You're welcome.

17              THE COURT:  If you want to inspect the order which the

18    Court signed, you're welcome to do that.

19              MR. KUBY:  I need another meet-and-confer with my

20    client, Judge.  I'm sorry.  We're going to engage in unsafe

21    practice.

22              MS. TRIVEDI:  He didn't mean that in the way it

23    sounded, Judge.

24              (Pause)

25              MR. KUBY:  Judge?
```

L5BVDON1

1                    THE COURT:  Yes, sir.

2                    MR. KUBY:  I'm sorry.  Cara Salvatore, she is a

3       reporter with a group called Law 360.  I don't read it much

4       because it's behind a pay wall, but I do know that she's been

5       covering this case for quite some period of time.  And

6       yesterday she was seated in the jury box in the rear right

7       closest to the benches.  I don't know if she's part of the

8       Southern District --

9                    THE COURT:  Mr. Kuby, what are you asking me?

10                   MR. KUBY:  Could she come in, please, because she's

11      being stopped.  Can she come in and sit in the jury box?

12                   THE COURT:  Does she have her credentials?

13                   COURT SECURITY OFFICER:  Yes, your Honor.  She has

14      court reporter credentials, your Honor.

15                   THE COURT:  Bring her in please, Mr. CSO.  Thank you.

16                   Your client's on her way in now, Mr. Kuby.  I hope

17      you're not going to charge her much.

18                   Are we ready to begin?

19                   MR. KUBY:  Number two -- at least I won something,

20      Judge.

21                   MS. SALVATORE:  Thank you.

22                   THE COURT:  Yes, ma'am.

23                   MR. KUBY:  Number two.  With respect to computer

24      access for Aaron Marr Page.

25                   THE COURT:  Say it again.

L5BVDON1

```
 1            MR. KUBY:  Aaron, A-A-R-O-N; M-A-R-R; last name,
 2     P-A-G-E.
 3            THE COURT:  Was that one of the people on the proposed
 4     order?
 5            MR. KUBY:  Yes.
 6            THE COURT:  We left a message asking who these people
 7     are, because they were not identified; they were not counsel of
 8     record, so we had no idea and we got no response.
 9            THE DEPUTY CLERK:  We got the response; it was because
10     he's not on the docket sheet.
11            THE COURT:  Okay.  The person was not on the docket
12     sheet as counsel of record.
13            MR. KUBY:  Yes.
14            THE COURT:  It's counsel of record who may bring in
15     their devices.  That's why it was rejected.
16            MR. KUBY:  Aaron Page is the defense equivalent of our
17     case agent; that is to say, he's been involved in this case
18     since 2009.
19            THE COURT:  Okay.  But we could have done this not on
20     court time.
21            MR. KUBY:  I recognize that, Judge.
22            THE COURT:  All right.
23            Can we do it at the first break?
24            MR. KUBY:  Sure.
25            THE COURT:  Good.  Are we ready?
```

1           MS. GLAVIN:  Yes, your Honor.

2           THE COURT:  Ms. Glavin, go.

3    ANNE CHAMPION,

4         called as a witness by the Government,

5         having been previously duly sworn, testified as follows:

6    DIRECT EXAMINATION (continued)

7    BY MS. GLAVIN:

8    Q.  Ms. Champion, good morning.

9    A.  Good morning.

10   Q.  During your direct yesterday, you testified about a 2011

11   retainer agreement with a contingent fee that Mr. Donziger had.

12   Do you remember that?

13   A.  Yes.

14   Q.  During the course of the post-judgment discovery

15   proceedings in the civil case, did you come to learn that

16   Mr. Donziger had another agreement with a contingent fee

17   provision?

18   A.  Yes, we learned at his June 25th deposition that he had a

19   more recent retainer agreement with the FDA.

20           MR. KUBY:  May I just ask that the witness clarify the

21   year.

22           THE WITNESS:  The year of what, the deposition?  2018.

23           MR. KUBY:  Thank you.

24   Q.  Let me show you what is Government Exhibit 201.

25           Do you remember testifying about this yesterday?

1    A.   Yes.

2    Q.   And it is that deposition transcript?

3    A.   Yes.

4    Q.   We could go to page 28, at line 19.

5            And Ms. Champion, I will read the question.  And if

6    you could read Mr. Donziger's answers to the deposition.  So

7    we're going to start at page 28, line 19 and read through page

8    29, line 20:

9    "Q.   I'm going to hand the witness a document previously marked

10   as Plaintiff's Exhibit 558.  Are you familiar with that

11   document, Mr. Donziger?  Your retainer agreement from January

12   5th of 2011.

13   "A.   Yes.

14   "Q.   Is this agreement still operative?

15   "A.   I think there has been a subsequent agreement.

16   "Q.   What is the date of the subsequent agreement?

17   "A.   I don't know, but it was after this date.

18   "Q.   Do you have a copy of the subsequent agreement?

19   "A.   I do.

20   "Q.   And who are the parties to the subsequent agreement?

21   "A.   I believe it is the FDA and myself.

22   "Q.   Has Exhibit 558 been terminated?

23   "A.   I think it's been superseded by the subsequent agreement."

24   Q.   We could go to page 57 of Mr. Donziger's deposition,

25   starting at line 10.  And if we could continue the same

1    exercise, Ms. Champion, to page 60, line 18:

2    "Q.  Other than Exhibit 558, which is the January 2011 retainer

3    agreement, have you signed any other agreements that give you a

4    percentage interest in the judgment?

5    "A.  Look, I already testified to that.  There is a subsequent

6    agreement.

7    "Q.  What are the terms of the subsequent agreement --

8    "A.  I believe the terms of compensation --

9    "Q.  You need to let me finish my question.

10   "A.  Go ahead.  I'm sorry.

11   "Q.  What are the terms of the subsequent retainer that you

12   have exclusively with the FDA?

13   "A.  In terms of compensation?  Legal fees?

14   "Q.  In terms of your compensation.

15   "A.  My legal fees -- my fees for service, is that what you are

16   talking about?

17   "Q.  I don't know what the terms are.  I'm asking you.

18   "A.  Well, you've got to be specific.  You want the terms of my

19   legal fee, my contingency fee interest?  Is that what you are

20   asking about?

21   "Q.  Okay.  Let's try this:  You had entered into an agreement

22   with the FDA?

23   "A.  Yes.

24   "Q.  Several years ago; correct?

25   "A.  Well, two, three years ago, to my best recollection.

1    "Q.  And you can't narrow it down any more than that?

2    "A.  Not as I sit here today.  I mean, it has happened

3    relatively in that -- I believe in that time frame.

4    "Q.  Does this agreement -- is it a retainer agreement?

5    "A.  Yes.

6    "Q.  Is it governed by New York law?

7    "A.  I can't answer that as I sit here today.  Obviously if I

8    signed it, New York would be governed by New York ethical rules

9    and what have you.  But I don't know what the retainer

10   agreement says.  I don't have it in front of me right now.

11   "Q.  Does the agreement that you signed with the FDA in the

12   last couple of years, the retainer agreement, give you a

13   percentage interest in the judgment, the Ecuadorian judgment?

14   "A.  Yes.

15   "Q.  What is that percentage interest in the FDA retainer?

16   "A.  It's the same percentage interest that I have always had,

17   to the best of my knowledge, 6.3 percent.

18   "Q.  And is that 6.3 percent of the total amount recovered or

19   some other?  What is it 6.3 percent of?

20   "A.  It is a contingent fee interest in the recovery, any

21   recovery.

22   "Q.  The total recovery?

23   "A.  Yeah.  Obviously subject to court orders, like the

24   constructive trust.  So right now, for all practical purposes,

25   it is a nullity.  But that is my interest according to my

1   contract.

2   "Q.  The contract you signed with the FDA, in addition to

3   granting you the contingency fee interest of 6.3 percent, does

4   it provide for any other types of payments to you?

5   "A.  I don't know.  To be clear though, I have an agreement

6   with my clients, that is, the FDA, to be paid a monthly

7   retainer."

8           MS. GLAVIN:  Could we go to page 84 of the deposition

9   transcript, starting at line 13, read to page 185, line 17.

10  "Q.  And your interest, which was in the retainer agreement

11  from January of 2011, that continues to be governed by New York

12  law?  You haven't signed an agreement agreeing that it would be

13  governed by some other law?

14  "A.  Well, I told you, there is a superseding agreement.  So I

15  don't know if it is New York or some other place.  I'm going to

16  try and get you that document.

17  "Q.  The superseding agreement?

18  "A.  Yeah.

19  "Q.  And is there only one superseding agreement or have there

20  been multiple?

21  "A.  I think there is only one.

22  "Q.  And in the superseding agreement, did it change your

23  interest in any way from the 2011 retainer?

24  "A.  No.

25  "Q.  So it is exactly the same as it was?

L5BVDON1                          Champion - direct

1     "A.  I believe it is, yeah.

2     "Q.  The 2011 retainer provides that there is going to be

3     prorated reductions in percentages if additional funders come

4     on.  Does the new retainer contain a similar provision?

5     "A.  I don't believe so."

6     Q.  Ms. Champion, this was Mr. Donziger's deposition on June

7     25th of 2018; is that correct?

8     A.  Yes.

9     Q.  Following that deposition, did Mr. Donziger eventually

10    produce the retainer agreement with the FDA that he referred to

11    in his deposition?

12    A.  Yes, he produced it after a hearing on June 28th, a few

13    days later.  I think it was June 28.

14    Q.  Showing you what is Government Exhibit No. 120, is this an

15    email exchange that you were copied on with Mr. Donziger?

16    A.  Yes.

17            MS. GLAVIN:  I move for admission, your Honor.

18            MR. KUBY:  No objection, Judge.

19            THE COURT:  Received.

20            (Government's Exhibit 120 received in evidence)

21    Q.  Ms. Champion, starting at the bottom, there is an email

22    from you to Randy Mastro of Gibson Dunn, do you see that?

23    A.  Mm-hmm.

24    Q.  And did that email attach some documents?

25    A.  Yes.  I believe that after Mr. Donziger gave us the

L5BVDON1                    Champion - direct

1    agreement, it was in Spanish, so we sent it out for

2    translation.  And I believe what I was sending Mr. Mastro was a

3    copy of the agreement with the translation attached to it.

4            MS. GLAVIN:  Okay.  And if we could go to -- on

5    Government Exhibit 120, if we could go to the pages starting

6    with Bates 107420.

7    Q.  Is this the --

8            MS. GLAVIN:  Go to the next page.  Go to the next

9    page, 40722 and 40723.

10   Q.  Is that the Spanish agreement that was provided to you by

11   Mr. Donziger after the hearing?

12   A.  Yes.

13   Q.  And you had a -- Gibson Dunn had this translated?

14   A.  Yes.

15           MS. GLAVIN:  And if we could go to, attached to this

16   email, Bates 107415 to 107418.

17   Q.  Is that the English translation of that agreement?

18   A.  Yes.

19   Q.  Now, going back to the cover page of this email, was the

20   Spanish agreement -- the Spanish language retainer agreement

21   and the English translation that Gibson Dunn had prepared, were

22   those provided to Mr. Donziger in this email?

23   A.  Yes.

24   Q.  And Mr. Mastro, on June 29th, 2018 at 2 p.m., states:

25   Steve, please confirm that this is the agreement you gave me

L5BVDON1                          Champion - direct

1    after court, as well as an English translation of it.  All

2    pages Bates stamped to reflect the agreement's production by

3    you, and that it is the document that you represented to the

4    Court after yesterday's hearing is your latest retention

5    agreement with the Frente.

6              Also, please confirm whether you have the same

7    document actually signed by both parties and notarized.  If so,

8    you should immediately produce the document signed by both

9    parties notarized.

10             Finally, this document is dated less than eight months

11   ago.  You stated at your deposition that you entered into such

12   an agreement two, three years ago.  Please confirm whether

13   there are any other such agreements you have entered into with

14   the Frente since the one previously produced from 2011.  And if

15   so, please produce them immediately as well, as time is of the

16   essence.

17             We will expect your written response before close of

18   business today.

19             Now, if we could go to, Ms. Champion, Bates 107415,

20   Government Exhibit 120, and if we could just go to the very top

21   of the agreement starting with:  Durable power-of-attorney, an

22   agreement for the continuance investment of professional

23   services.  If you could just read that first paragraph.

24   A.  This agreement is entered into on the dates below, signed

25   in October 2017, between the Amazon Defense Front, the FDA, and

L5BVDON1                       Champion - direct

1    Steven R. Donziger, Esquire, Mr. Donziger.

2              Through this agreement, the FDA grants a paramount,

3    durable, international, legal power-of-attorney to

4    Mr. Donziger.  And in consideration of his historical

5    leadership and professional services rendered, both in the past

6    and in the future, the FDA irrevocably acknowledges, confirms,

7    and undertakes to support Mr. Donziger's existing contractual

8    interest as set forth below and/or hereby grants Mr. Donziger

9    an interest in his own right equal to his existing contractual

10   interest.

11             MS. GLAVIN:  And if we could turn to the page Bates

12   107417 of the agreement.

13   Q.  And if you could read out loud:  Compensation in

14   recognition of valid interest.  If you could read the sentence

15   up to where it says "Funds recovered."

16   A.  Compensation in recognition of valid interest.  In

17   consideration of Mr. Donziger's leadership, investment,

18   professional and collection services as set forth above, both

19   in the past and in the future, the FDA hereby acknowledges,

20   confirms, and undertakes to support Mr. Donziger's existing

21   contractual interest or, alternatively, to the extent it is

22   necessary or useful, hereby grants Mr. Donziger an interest in

23   his own right equal to Mr. Donziger's existing contractual

24   interest.  Such interest, in any case, shall be understood to

25   entitle Mr. Donziger to 6.3 percent of any funds recovered.

L5BVDON1                          Champion - direct

1   Q.   Now, Ms. Champion, if you could go to government exhibit --

2   or if we could pull up Government Exhibit 121.

3           Is this Mr. Donziger's response to Mr. Mastro's email?

4   A.   Yes.

5           MS. GLAVIN:   Your Honor, if we could move for

6   admission Exhibit 121.

7           MR. KUBY:   I don't object.

8           Do we have to have it read out loud?

9           THE COURT:   I'm with you on that.

10          Certainly admitted.

11          (Government's Exhibit 121 received in evidence)

12          THE COURT:   And let's do what we can to minimize the

13   reading.

14          MS. GLAVIN:   Got it, your Honor.

15   BY MS. GLAVIN:

16   Q.   Ms. Champion, did Mr. Donziger confirm that this was the

17   agreement?

18   A.   Yes.

19   Q.   Did Mr. Donziger -- withdrawn.

20          Do you know if Mr. Donziger speaks Spanish?

21   A.   He does.

22   Q.   And do you know if he can read and write in Spanish?

23   A.   Yes, he can.

24   Q.   How do you know that?

25   A.   Because I have reviewed emails in which he's corresponded

1    with people in Spanish.

2    Q.  And were you present for Mr. Donziger's -- for his

3    testimony at the RICO trial in 2013?

4    A.  Yes.

5    Q.  And during the RICO trial, did Mr. Donziger submit an

6    affidavit as part of his direct testimony?

7    A.  He did.

8    Q.  And in that affidavit, did he indicate that he was fluent

9    in Spanish?

10   A.  He did.

11   Q.  Did Mr. Donziger, to your knowledge, ever contest the

12   English translation of the 2011 retainer agreement that Chevron

13   provided to him in Government Exhibit 120?

14   A.  Do you mean the 2017 retainer agreement?

15   Q.  I'm sorry, yes.  Withdrawn.

16          Did he ever contest the English translation of that

17   2017 retainer agreement which is in Government Exhibit 120?

18   A.  No, not to us, in any event.

19   Q.  Following Mr. Donziger's production of the retainer

20   agreement, did Mr.  -- did Chevron inform -- file a letter with

21   the Court informing Judge Kaplan of the existence of that

22   agreement?

23   A.  I believe we did, yes.

24          MS. GLAVIN:  We can go to Government Exhibit 2050.

25          Your Honor, this is a July 5th, 2018 letter which is

1     on the docket of the court from Gibson Dunn to Judge Kaplan.

2              Move for admission.

3              THE COURT:  Received.

4              (Government's Exhibit 2050 received in evidence)

5     Q.  And showing you what is Government Exhibit 2051 --

6              MS. GLAVIN:  Which is also filed on the docket sheet.

7     I move for admission.

8              THE COURT:  Received.

9              (Government's Exhibit 2051 received in evidence)

10    Q.  Is this Mr. Donziger's response to Gibson Dunn's letter?

11    A.  Yes, it appears to be, based on the date and the content.

12    Q.  Did Gibson Dunn in its July 2018 letter take the position

13    that Mr. Donziger's 2011 retainer agreement violated the RICO

14    judgment?

15    A.  Again, do you mean the 2017 retainer?

16    Q.  Sorry, the 2017 agreement.

17    A.  Yeah, I'd have to look at the letter to see exactly what we

18    said, but I believe, based on what I saw a minute ago, yes, we

19    did, we contended that it violated the injunction.

20    Q.  Did Mr. Donziger discuss that 2017 retainer agreement in

21    this letter, Government Exhibit 2051?

22    A.  Yes, he refers in the first paragraph to his more recent

23    retainer agreement.

24    Q.  And going to the bottom of Mr. Donziger's letter, tell me

25    if I'm reading this correctly.  Mr. Donziger states:

L5BVDON1                          Champion - direct

1              It does seek to maintain the status quo of my client's

2      obligations to me following an organizational adjustment

3      involving the FDA and the UDAPT, where the groups decided not

4      to work together.  The terms reflect the existing uncertainty

5      about the exact operation and significance of this Court's

6      judgment in light of an ongoing litigation effort that has

7      encompassed four jurisdictions outside the United States.

8              Holding the status quo seeks to prevent forfeiture,

9      dissipation of my interest entirely, a result that Chevron

10     itself should be wary of, given that it claims ownership of my

11     interest through this Court's judgment.

12             If I could show you what is Government Exhibit 2057.

13             MS. GLAVIN:  Your Honor, this is on the docket at

14     2057.  Move for admission.

15             THE COURT:  Received.

16             (Government's Exhibit 2057 received in evidence)

17     Q.  Ms. Champion, if we could go to -- this document is

18     entitled "Chevron Corporation Supplemental Brief Regarding the

19     Contempt Implications of Steven Donziger's Retention Agreements

20     and Other Agreements Among Entities with Interest in the

21     Ecuadorian Judgment."  If we could go to ECF page 10.

22             Did Chevron take the position with Judge Kaplan that

23     Mr. Donziger's 2010 FDA retainer warranted contempt sanctions?

24     A.  Yes, as you can see from the first paragraph, we allege

25     that executing the November 2017 retainer, Donziger committed

L5BVDON1                    Champion - direct

1    two different acts of contempt in doing so.

2    Q.  If we go to the bottom of that document, where Gibson

3    Dunn -- or Chevron alleges, quote, by recommitting to

4    Donziger's enforcement efforts and granting him a new valuable

5    interest in the Ecuadorian judgment, separate from his

6    contingent fee, the 2011 retainer facilitates Donziger's

7    avoiding the effect of the constructive trust.

8    A.  You said 2011 instead of 2017 again.

9    Q.  Now, Ms. Champion, did -- showing you what's Government

10   Exhibit 2061.

11        MS. GLAVIN:  Your Honor, this is on the docket at

12   2061.  Move for admission.

13        THE COURT:  Received.

14        (Government's Exhibit 2061 received in evidence)

15   Q.  Is this Mr. Donziger's response on August 3rd of 2018,

16   opposing Chevron's brief regarding the contempt implications of

17   the 2017 retainer?

18   A.  Yes.

19        MS. GLAVIN:  If we could go to ECF page 4.

20   Q.  And Ms. Champion --

21        MS. GLAVIN:  Defer, your Honor, but we would read out

22   loud what Mr. Donziger stated about the November 2017 retainer.

23   But if your Honor wants me to move on, I'll move on.

24        MR. KUBY:  Judge, just to be clear, I have no

25   objection to specific operative passages being read, I really

1    don't, and I understand the difficulty of this.  It's just all

2    I'm asking for, when it's possible, to characterize rather than

3    read out loud, please try to do it, just because --

4                THE COURT:  Yes, sir.

5                And I think you were out of the room, but I did ask

6    Ms. Glavin if she was on track for finishing the case -- for

7    resting at the time she indicated, and she told me that she

8    was.

9                I'm with you.  Anything that can be shortened, we

10   should be doing it.

11               MR. KUBY:  And I recognize that -- because I've been

12   dealing with Ms. Glavin offline, so to speak.  And I think

13   Thursday-ish is still a realistic estimate for their case.

14               THE COURT:  I hope that that's what you two think.

15               MR. KUBY:  Do we think this, Ms. Glavin?

16               THE COURT:  Ron, you don't get to chat with her on the

17   record.

18               MR. KUBY:  I'm sorry.

19               THE COURT:  Let's go.

20               MR. KUBY:  That's what I think.

21   BY MS. GLAVIN:

22   Q.  Ms. Champion, tell me if I'm reading correctly what

23   Mr. Donziger stated about his November 2017 retainer.

24               The November 2017 retainer does not circumvent the

25   constructive trust; it does reflect the fact that the precise

L5BVDON1                        Champion - direct

1    operation in effect of that trust is still uncertain.  This is

2    because the constructive trust applies only to property that is

3    traceable to the *Lago Agrio* judgment.  When I objected based on

4    the potential expansiveness of the traceable concept mere days

5    after the issuance of the RICO judgment, the Court assured that

6    the Ecuadorian team could continue to raise funds and pay my

7    fees out of such funds as long as no collections are --

8              THE COURT:  Slowly.

9              MS. GLAVIN:  Oh, sorry.  Of the *Lago Agrio* judgment.

10             I perceived and still perceive no lack of clarity in

11   the Court's clarification in docket 1901.  Absent traceability

12   to a collection, my property, including my interest in the Lago

13   Agrio judgment, is presently unencumbered.  Of course, the

14   reality is more complicated because my interest will be

15   encumbered the moment any recovery is achieved.  Thus, its

16   legal and substantive status is unclear, to say the least.  The

17   November 2017 does not pretend to know the future.  It recites

18   and reaffirms my client's long-standing obligation to pay me a

19   contingency fee for my work on the case.

20             Now, Ms. Champion, after this briefing on the 2017

21   retainer agreement, did Judge Kaplan issue an order regarding

22   Chevron's request that Mr. Donziger be held in contempt?

23   A.  Yes.  My recollection is that he told us we needed to file

24   a new motion, because it was not included in our original

25   motion papers.

1  Q.  Showing what's Government Exhibit 2064 --

2          MS. GLAVIN:  Your Honor, this is on the docket sheet.

3      Move for admission.

4          THE COURT:  Received.

5          (Government's Exhibit 2064 received in evidence)

6          MS. GLAVIN:  This is filed August 7 of 2018.

7      We could go to ECF page 2.

8  Q.  At the top, Judge Kaplan states:

9          First, Chevron's memorandum and response to the leave

10  granted after the June 28 hearing has raised a new and

11  independent ground for holding Donziger in contempt, an alleged

12  violation of paragraph 1 of the judgment by virtue of his

13  alleged refusal to, quote, turn over his interest in the

14  Ecuadorian judgment to Chevron.

15          MS. GLAVIN:  If we could go to the bottom of Judge

16  Kaplan's order where it says "accordingly."

17  Q.  Judge Kaplan states:

18          Accordingly, the Court will not consider Chevron's

19  claim of a violation of paragraph 1 of the judgment in ruling

20  on the pending motion.  The only portion of which that remains

21  for decision is that relating to paragraph 5.  Chevron is at

22  liberty to file a new motion charging contempt of paragraph 1.

23          Ms. Champion, what did you understand Judge Kaplan to

24  mean in these two sentences?

25  A.  Well, again, referring back up to the first paragraph that

you read, he cites to docket 2057, which was our letter motion
that addressed Mr. Donziger's contempt based on his execution
of the 2017 retainer agreement.

        And so what Judge Kaplan is instructing here is that
he will not consider that claim a violation in a ruling on the
pending motion, but that Chevron would have to file a new
motion charging a new contempt.

Q.  And what was the pending motion that Judge Kaplan was
referring to?

A.  I believe that goes back to the -- does that go back to the
original Amazonia Elliott motion or is it the subsequent one
about the -- I'd have to look at the docket to confirm.

Q.  Okay.  We'll move on, because I think it's in the record.

        Now, after Judge Kaplan filed this August 7, 2018
order, did Mr. Donziger assign to Chevron his contingency
interest as granted in the 2017 FDA retainer agreement at that
time?

A.  No.

Q.  Ms. Champion, if we could put up Government Exhibit 120,
which is the 2017 ADF agreement; and also put up Government
Exhibit 1978-6, the 2011 retainer agreement.  Have you had an
opportunity to compare those two agreements?

A.  Yes.

Q.  Okay.  And what, if any, differences are there between the
two of them?

L5BVDON1                        Champion - direct

1    A.   The parties are different.   The 2017 retainer is between

2    only Mr. Donziger as an individual and the FDA.   The 2011

3    agreement has as parties the FDA, the Assembly, the Lago Agrio

4    plaintiffs, and Donziger & Associates PLLC.

5    Q.   With respect to Judge Kaplan's August 7, 2018 order, after

6    it was issued, did Chevron move to hold Mr. Donziger in

7    contempt for failure to assign his interest granted by the 2017

8    agreement?

9    A.   We did.

10   Q.   I show you what is Government Exhibit 2089.   And government

11   exhibit --

12          MS. GLAVIN:   Your Honor, we'd move for admission of

13   this, as this is on the docket sheet.

14          THE COURT:   Received.

15          (Government's Exhibit 2089 received in evidence)

16   Q.   Is this that notice of motion to hold Mr. Donziger in

17   contempt as it related to the 2017 agreement and for other

18   reasons?

19   A.   Yes.

20   Q.   And if we can show Government Exhibit 2113.

21          MS. GLAVIN:   Your Honor, move for admission of 2113,

22   which is on the docket sheet.

23          THE COURT:   Received.

24          (Government's Exhibit 2113 received in evidence)

25          MS. GLAVIN:   And if we could go to the first page.

L5BVDON1                        Champion - direct

1    Just go to the table of contents, Ms. Armani.  Go to page 24 of
2    the brief.  Not ECF, but the Gibson page.
3    Q.  In this motion to hold Mr. Donziger in contempt as it
4    related to the November 27 contingency interest, did Chevron
5    seek Mr. Donziger's transfer of that interest to Chevron?
6    A.  Yes.  As stated at the end of that section, Donziger is
7    obligated to transfer this interest to Chevron under paragraph
8    1 of the RICO judgment.
9                THE COURT:  Slowly.  Slowly.  Slowly.
10               THE WITNESS:  Sorry.
11   A.  But he has not.
12   Q.  And showing you what is Government Exhibit 2114-9.
13               MS. GLAVIN:  Your Honor, I move for admission, as this
14   is filed in the docket.
15               THE COURT:  Received.
16               (Government's Exhibit 2114-9 received in evidence)
17   Q.  As part of that motion, did Chevron provide a transfer and
18   assignment form --
19   A.  Yes.
20   Q.  -- for the 2017 retainer agreement?
21   A.  Yes.
22   Q.  And was this transfer and assignment form substantially the
23   same as the 2011 contingency fee interest assignment form?
24   A.  It was, similar to the one that Judge Kaplan modified and
25   issued with his order regarding the 2011 retainer agreement.

L5BVDON1                    Champion - direct

1   Q.  And if I could show you Government Exhibit 2122-1.  If we

2   go to -- this is a declaration by Mr. Donziger in connection

3   with Chevron's contempt motions from October of 2018.

4              MS. GLAVIN:  We could go to paragraph 21, Ms. Armani.

5              THE COURT:  It's on the docket; I assume you move.

6              MS. GLAVIN:  Your Honor, we're not going to move to

7   put it in, just read paragraph 21.

8   Q.  Ms. Champion, do you recognize this declaration that

9   Mr. Donziger filed?

10  A.  Yes.

11  Q.  And did Mr. Donziger state at paragraph 21:

12             The contingency interest stated in the updated

13  power-of-attorney signed by FDA leadership in November 2017 was

14  not intended to grant a new interest, but to recognize my

15  existing interest in any Aguinda recovery.

16             The Court has now coerced me into signing what I

17  understand to be the entirety of my contingency interest over

18  to Chevron.  I am not taking the position that the November

19  2017 contract is protected or separable from the Court's other

20  orders with respect to my contingency interest.  If Chevron

21  feels like it needs some additional documentation with respect

22  to the November 2017 power, it should just ask me rather than

23  rush to file for contempt.

24             Is that what Mr. Donziger stated with respect to the

25  November agreement?

L5BVDON1                      Champion - direct

1    A.  Yes.

2    Q.  Did Mr. Donziger assign his contingency interest in the

3    2017 retainer agreement to Chevron at that time?

4    A.  No.

5    Q.  Showing you what is Government Exhibit 2165, do you

6    recognize that document?

7              MS. GLAVIN:  Or, your Honor, this is on the docket;

8    move for admission.

9              THE COURT:  Received.

10             (Government's Exhibit 2165 received in evidence)

11   A.  Yes, I do.

12   Q.  Is this Judge Kaplan's order with respect to Chevron's

13   motion to hold Mr. Donziger in contempt for failure to transfer

14   his interest in the contingent fee from the 2017 agreement?

15   A.  Yes, it is.  He begins to address the 2017 retainer at the

16   bottom of the first page there.

17             MS. GLAVIN:  If you could pull this up, Sareen, where

18   it says "Donziger did not assign."  Go to page 1.

19   Q.  Where Judge Kaplan states:  Donziger did not assign his

20   rights under the retainer agreement for years, finally doing so

21   in September 2018, after extensive motion practice.

22             Did you understand, Ms. Champion, Judge Kaplan to be

23   referring to the 2011 retainer agreement?

24   A.  Yes, based on the text above that -- where it references

25   that agreement specifically.

L5BVDON1                    Champion - direct

Q.   And then Judge Kaplan addresses the 2017 agreement stating:

             In the meantime, Donziger, on or about November 1st,
2017, personally had entered into an agreement with the Amazon
Defense Front, which is said to be the exclusive beneficiary of
the Ecuadorian judgment pursuant to which the FDA granted to
Donziger an interest in his own right equal to Mr. Donziger's
existing contractual interest.

             Skipping to the sentence:  Donziger did not assign his
rights under the ADF agreement.  Indeed, he did not produce it
to Chevron until June 28 of 2018, despite the fact that it was
responsive to at least one Chevron document request with which
Donziger had been ordered to comply earlier.

             And skipping to the bottom of Judge Kaplan's order,
Judge Kaplan stating:  It was and remains Donziger's obligation
to comply with paragraph 1 of the RICO judgment, which, of
course, requires him to assign to Chevron all of his right,
title, and interest --

             THE COURT:  Slowly.

             MS. GLAVIN:  Sorry.

             Contingent fee under the ADF agreement.  After all,
the document by its terms granted him an interest equal to 6.3
percent of monies which, if any are collected, the ADF claims
to be the exclusive beneficiary.  It is not up to Chevron
constantly to police his actions and failures to act.  But in
the interest of efficiency and economy, it would appear that

L5BVDON1                       Champion - direct

1   the parties could resolve for the future any question of

2   noncompliance in this respect.

3           The parties, on or before February 28, 2019, shall

4   file an executed instrument of assignment, failing which, each

5   party shall file a letter not to exceed three double-spaced

6   pages explaining why no such instrument has been filed.

7           And that order is dated February 21st, 2019?

8   A.  Yes.

9   Q.  Now, did Judge Kaplan in this order grant Chevron's motion

10  from October to hold Mr. Donziger in contempt?

11  A.  I don't believe so.  Well, I'd have to read the whole

12  order, but basically what he's saying is Donziger can cure the

13  contempt by executing a -- I mean, he's basically saying he is

14  obligated to transfer it.  And he can cure that contempt by

15  executing the agreement.

16          MR. KUBY:  Judge, I'm going to move to strike that

17  answer.  I think the question was, did Judge Kaplan hold

18  Mr. Donziger in contempt.  And the witness said that she

19  actually needed --

20          THE COURT:  I got it.

21          No objection, right?

22          Granted.

23  A.  I mean, if you could move the caption off the screen, I

24  could see it better.

25          MS. GLAVIN:  You can move to the very top.  Keep

1    going.  Keep going.

2    A.  Sorry.  Can you go back to the prior page?

3    Q.  You can look at the bottom, Ms. Champion, where it states

4    that it would appear the parties could resolve for the future

5    any question of noncompliance in this respect.

6    A.  Yeah.  So I think he did not hold him in contempt.  He just

7    said, you can resolve whether or not he is in contempt on this

8    point by having him execute an assignment.  But he does

9    indicate that he is obligated to assign it.

10   Q.  And now, Ms. Champion, by the date Judge Kaplan gave,

11   February 28th of 2019, did Mr. Donziger execute an assignment

12   of his right to a contingent fee under that 2017 agreement?

13   A.  No, he did not.

14   Q.  I'm showing you what is Government Exhibit No. 2169.

15              MS. GLAVIN:  Your Honor, move for admission of this

16   docket entry, which is 2169, filed on March 1st, 2019.

17              THE COURT:  Received.

18              (Government's Exhibit 2169 received in evidence)

19   Q.  Ms. Champion, is this a letter filed by Mr. Donziger to

20   Judge Kaplan on March 1st of 2019?

21   A.  Yes.

22   Q.  I'm going to read the first few sentences.

23              Dear Judge Kaplan, I write in response to the Court's

24   order dated February 21st, 2019.  I respectfully take the

25   position that yet another forced assignment of my contingency

1    interested is unwarranted and, in fact, not possible.  The

2    power-of-attorney document under consideration was intended to

3    clarify in writing the scope of my authority as it has long

4    been conveyed to me by my clients, both orally and in writing.

5    At the end, the document recognizes the existence of my

6    long-standing contingency interest in a recovery in the *Aguinda*

7    case.

8            More importantly, the document observes that my

9    clients have the power to grant a new interest along the same

10   lines, to the extent that it "may be necessary or useful."

11   This conditional language does not vest in me any legal

12   interest that I am capable of assigning.

13           With respect, Ms. Champion, to Mr. Donziger's use of

14   the quote "may be necessary or useful," did that come from the

15   English translation of the 2017 retainer that Gibson Dunn had

16   prepared?

17   A.  I believe so.  He does not have a citation here, but that

18   language appears in the compensation provision of that

19   agreement, where his contingency interest is described.

20   Q.  If we go to page 2 of Mr. Donziger's letter, the sentence

21   at the end of the first paragraph, he states:  There is no need

22   for an additional assignment, as I already have executed two

23   such assignments under protest based on coercive orders of this

24   Court.

25           Now, Ms. Champion, did Mr. Donziger challenge the

L5BVDON1                    Champion - direct

1    translation in -- the English translation in any respect in

2    this letter?

3    A.  No.

4    Q.  Following Mr. Donziger's letter of March 1st, 2019, did

5    Judge Kaplan rule on Chevron's motion to hold Mr. Donziger in

6    contempt for not assigning his right to a contingent interest

7    under that 2017 agreement?

8    A.  Yes, I believe so.

9    Q.  Showing you what is Government Exhibit 2209, which is a May

10   23rd, 2019 memorandum opinion by Judge Kaplan.

11              MS. GLAVIN:  Move for admission, your Honor.

12              THE COURT:  Received.

13              (Government's Exhibit 2209 received in evidence)

14   Q.  Now, between Mr. Donziger's March 1st, 2019 letter, which

15   we just referred to, and this decision of May 23rd, 2019, did

16   Mr. Donziger execute an assignment of his interest granted by

17   the 2017 agreement?

18   A.  No.

19              MS. GLAVIN:  We could go to Government Exhibit 2209,

20   page 39 of the ECF.

21   Q.  Judge Kaplan states:  As set forth above, it is abundantly

22   clear that Donziger violated and continues to violate paragraph

23   1 of the RICO judgment by failing to transfer and assign his

24   contractual right from the ADF to a contingent fee of 6.3

25   percent of any monies obtained in respect of the Ecuador

1    judgment, whether by its enforcement or otherwise.

2            If you go to page 40 of that ECF, Judge Kaplan states:

3            Second, it is undisputed that Donziger has not

4    complied with his obligation to assign his rights under the

5    2011 retainer.

6            Finally, Donziger has made no attempt to comply with

7    paragraph 1 of the RICO judgment in this respect.  Rather than

8    do so, he failed to disclose the 2017 retainer, even when

9    ordered to produce documents that unmistakably required its

10   production, and now he continues in his refusal to comply.

11           MS. GLAVIN:  Go to page 41 of the ECF.  Sareen, if we

12   could move, yes, page 42 of the ECF, the bottom.

13   Q.  Judge Kaplan states:  In sum, Donziger's contingent fee

14   interest is property.  It is traceable to the Ecuador judgment

15   which "is the indispensable predicate of his right to collect

16   any contingent fee."

17           And perhaps most important of all, paragraph 1 of the

18   RICO judgment specifically required Donziger to transfer and

19   assign to Chevron his contingent fee interest under the 2011

20   retainer, making unmistakable the fact that the RICO judgment

21   regarded it and, therefore, any other instrument or

22   arrangement, giving Donziger a contingent fee interest as

23   traceable to the Ecuador judgment.  Clear and convincing

24   evidence establishes that Donziger is in civil contempt by

25   disobeying this command that he transfer all of his right,

L5BVDON1                          Champion - direct

1    title, and interest to a contingent fee under the 2017

2    retainer.

3              We can go to page ECF 72 of this opinion.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. GLAVIN:   Paragraphs 1A and 1B:

2              With respect to Chevron's October 1st, 2018, motion,

3     A, Donziger is in willful civil contempt, paragraph one of the

4     RICO judgment, by virtue of his failure to sign and transfer to

5     Chevron all rights to any contingent fee that he now has or

6     hereafter may obtain, including without limitation all such

7     rights under the 2017 retainer; b, unless Donziger previously

8     shall have executed, acknowledge, and delivered to Chevron's

9     counsel the form of assignment attached as Exhibit 88 to Docket

10    Entry 2091 without any editions, alterations, attachments, or

11    addenda other than to reflect accurately the year in which the

12    document was signed, he shall pay a coercive civil fine to the

13    Clerk of Court with respect to May 28th, 2019, and each

14    subsequent day from that day until the date of which fully

15    purges himself of this contempt by doing so.  The amount of

16    coercive fine shall begin at $2,000 from May 28, 2019, and

17    shall double for each subsequent day during which Donziger

18    fails fully to purge himself of this contempt.

19             Now, Ms. Champion I am going to show you what is

20    Government Exhibit 136.  If we can go to Mr. Donziger's email

21    on May 28th, 2019, at 12:35 p.m., do you recognize this email?

22    A.  Yes.

23    Q.  Between Mr. Donziger, yourself, and Andrea Neuman at Gibson

24    Dunn?

25    A.  Yes, and Jim Eisenberg.

1          MS. GLAVIN:  More for admission.

2          THE COURT:  Received.

3          (Government's Exhibit 136 received in evidence)

4    BY MS. GLAVIN:

5    Q.  Mr. Donziger states, I am executing the assignment and will

6    have it available for pickup by end of day.

7          What did you understand that to mean?

8    A.  That he was referring to the 2017 retainer agreement

9    assignment.

10         MS. GLAVIN:  Showing you what is Government

11   Exhibit 2216-1, which is on the docket, move for admission.

12         THE COURT:  Received.

13         (Government's Exhibit 2216-1 received in evidence)

14   BY MS. GLAVIN:

15   Q.  What is this document?

16   A.  This is an executed transfer form for the 2017 retainer

17   agreement contingency fee.

18   Q.  What is the date that Mr. Donziger signed the form?

19   A.  May 28th, 2019.

20   Q.  According to Judge Kaplan's civil contempt order, had the

21   coercive fines started as of May 28th, 2019?

22   A.  I believe they were supposed to start on May 28th, 2019.

23   Q.  Ms. Champion, I want to move on now to a new topic.

24         Yesterday you testified about Judge Kaplan's order,

25   which is Government Exhibit 1968 from March 19th, 2018.

L5BVDON1                          Champion - direct

1           Go to ECF page 4.

2           I believe you testified yesterday, Ms. Champion, that

3    Chevron had moved to conduct discovery with respect to

4    enforcing the judgment; is that correct?

5    A.  Yes.

6    Q.  And did Chevron engage in litigation with Mr. Donziger

7    regarding discovery in the post-judgment proceedings?

8    A.  Yes.

9    Q.  And at Judge Kaplan's order issued on March 19th of 2018,

10   what did Judge Kaplan say with respect to Chevron conducting

11   discovery regarding the money judgment, the $813,000 judgment?

12   A.  He said that leave of Court was not required for discovery

13   in aid of enforcing a money judgment.

14   Q.  Following that March 19th order by Judge Kaplan, did

15   Chevron serve discovery requests on Mr. Donziger?

16   A.  We did.

17   Q.  Showing you what is Government Exhibit 1989-1A and it will

18   be 1989-1B and 1989-1C.

19           MS. GLAVIN:  These are all on the docket.  Move for

20   admission.

21           THE COURT:  Received.

22           (Government's Exhibits 1989-1A, 1989-1B, 1989-1C

23   received in evidence)

24   BY MS. GLAVIN:

25   Q.  Ms. Champion, with respect to 1989-1A, what is this

L5BVDON1                       Champion - direct

1    document?

2    A.   Chevron Corporation's first set of requests for production

3    of documents in aid of the supplemental judgment to defendant

4    Steven Donziger, The Law Offices of Steven R. Donziger, and

5    Donziger and Associates, P.L.L.C.

6    Q.   And this request for production of documents, approximately

7    how many requests were there of Mr. Donziger for documents?

8    A.   I believe it was around 30.

9    Q.   Can you summarize the kinds of records Chevron was asking

10   Mr. Donziger to produce?

11   A.   Information about his bank accounts, assets, liabilities,

12   sources of income.

13            MS. GLAVIN:   With respect to these requests, if I

14   could just pull up and focus on RFP, request for production,

15   No. 26, which ECF page 15.

16            Your Honor turn your attention to RFP 26.

17            And then if we can go to RFP 29.

18            And if we can go to RFP 30.

19   Q.   Ms. Champion, does RFP 30 request all documents from

20   Mr. Donziger related to any attempted or completed sale,

21   assignment or transfer of rights, title, claims, or interests

22   of any proceeds or other interests held by you, whether

23   directly or indirectly, in the Ecuador judgment or the Ecuador

24   enforcement actions whether or not such attempt was successful?

25   A.   Yes.  That appears to be an accurate quote from the

L5BVDON1                          Champion - direct

1   request.

2   Q.  With respect to RFP 26, in your view, Ms. Champion, was

3   Mr. Donziger's November 1st, 2017, retainer agreement with the

4   ADF responsive to this document request?

5   A.  You are not asking for my attorney mental impressions, are

6   you?

7   Q.  I am not asking for your attorney mental impressions.

8         Did Request No. 26 call for the production of

9   agreements Mr. Donziger had that granted him an interest in the

10  judgment?

11  A.  Yes.  Because the request asks for all documents evidencing

12  or relating to any payment, proceeds, compensation, revenue, or

13  any other thing of value --

14        THE COURT:  Slowly.

15  A.  -- you have received, contracted to receive--

16        Skipping down.

17        -- related to any aspect of your involvement in the

18  Ecuador litigation, Ecuador judgment, and/or Ecuador

19  enforcement actions.

20  Q.  Ms. Champion, with respect to this request for documents

21  from Mr. Donziger, which is Government Exhibit 189-1A, were

22  there instructions provided with that request for documents?

23  A.  Yes.

24        MS. GLAVIN:  If we can turn to ECF page 6.

25        If we can blow up instruction number nine.

1   Q.   What did instruction number nine call for?

2   A.   A privilege log.

3   Q.   With respect to the privilege log, is Chevron's request for

4   the privilege log codified in any rules?

5   A.   Yes.  It's in the Southern District Local Rules.

6   Q.   I am going to show you what is Government Exhibit 601.

7        What do you recognize this to be?

8   A.   This looks like a copy of the local rules for the Southern

9   District of New York effective December 19th, 2016.

10  Q.   Did you understand these rules to be in effect at the time

11  you served your discovery requests on Mr. Donziger?

12  A.   I believe that's correct.  I think they were amended later

13  on in 2018.

14       MS. GLAVIN:   If we can go to page 31, the local civil

15  rules.  Local Rule Civil 26.2, Assertion of Claim of Privilege.

16  Q.   If you focus on 26.2 B and if you can read out loud what

17  local Southern District rule requires with respect to a

18  privilege log.

19  A.   Where the claim of privilege is asserted in response to

20  discovery or disclosure, other than a deposition, and

21  information is not provided on the basis of such assertion, the

22  information set forth in paragraph A above shall be furnished

23  in writing at the time of the response to such discovery or

24  disclosure unless otherwise ordered by the Court.

25  Q.   Now, with respect to Government Exhibit 189-1B, was this

1    discovery request also served on Mr. Donziger?

2    A.  Yes.

3    Q.  What is Chevron requesting here?

4    A.  This is Chevron Corporation's first information subpoena in

5    aid of the supplemental judgment and restraining notice.

6    Q.  If we can just go back for a moment to 189-1A, what was the

7    return date for Chevron's request for documents?

8    A.  I believe it was on or before April 27th, 2018.

9    Q.  Going to Government Exhibit 189-B, if you can summarize

10   what types of requests or information that Chevron was seeking

11   with this discovery request?

12   A.  It's similar to the document request but just in an

13   interrogatory form.  So information about his bank accounts,

14   assets, liabilities, sources of income.

15   Q.  Government Exhibit 189-1C, is this a subpoena for

16   Mr. Donziger's deposition?

17   A.  Yes.

18   Q.  Now, following the service of these discovery requests, did

19   you have discussions on email with Mr. Donziger about

20   responding to them?

21   A.  Yes.

22   Q.  Showing you what is Government Exhibit 1.

23            THE COURT:  Is this a convenient time for a

24   five-minute break?

25            MS. GLAVIN:  Yes, your Honor.

1            THE COURT:  Counsel, let's take five minutes.

2            (Recess)

3            THE COURT:  Thank you, counsel.  Won't you be seated.

4            MR. KUBY:  Judge, you had indicated earlier that we

5    were going to take up at our midmorning break Mr. Page's

6    computer access.  I realized the midmorning break is actually

7    an absence of anything happening.  So would you like to take it

8    up now?

9            THE COURT:  How about if you would remind me at

10   quarter to 1:00?  Would that be convenient for you?

11           MR. KUBY:  That would be lovely.  Thank you.

12           THE COURT:  Yes, sir.

13   BY STPHAO:

14   Q.  Ms. Champion, I am going to show you what is Government

15   Exhibit 150.

16           Is this email correspondence between Gibson Dunn and

17   Mr. Donziger on April 25th of 2018?

18   A.  Yes.

19           MS. GLAVIN:  Move for admission.

20           THE COURT:  Received.

21           (Government's Exhibit 150 received in evidence)

22   BY MS. GLAVIN:

23   Q.  In the discovery request that we just reviewed, were those

24   served on Mr. Donziger on or about April 16th, 2018?

25   A.  Yes.

1    Q.  Going to the bottom of this email, Mr. Donziger's email to

2    Randy Mastro on April 25th, is Mr. Donziger indicating that he

3    will be proceeding pro se on Chevron's motion of contempt?

4    A.  That is what he says in the first sentence of his email.

5    Q.  Ms. Champion, is this the March 19th, 2018, motion that you

6    testified about yesterday?

7    A.  Yes.

8    Q.  Mr. Donziger in his email states that he will need more

9    time to respond and object as necessary to the requests; is

10   that correct?

11   A.  Yes.

12   Q.  Go up to Mr. Master's response.

13          You are CC'd on this response?

14   A.  Yes.

15   Q.  Does Mr. Mastro agree or not agree to any extension on the

16   return date of those requests?

17   A.  No.  As he says, We are unable to agree to extend your time

18   to object or respond to these discovery requests because the

19   discovery needs to be completed before our upcoming hearing

20   date, which was on May 8th.

21   Q.  I am going to show you what is Government Exhibit 144.

22          Is this a further email exchange between yourself and

23   Mr. Mastro and Mr. Donziger in April of 2018?

24   A.  Yes.

25          MS. GLAVIN:  Move for admission.

```
1              THE COURT:  Seeing Mr. Kuby's hand raise, admitted.

2              MR. KUBY:  That means yes.

3              THE COURT:  It's just not on the record.

4              MR. KUBY:  Thank you.

5              (Government's Exhibit 144 received in evidence)

6    BY MS. GLAVIN:

7    Q.  Now, Mr. Donziger's response to the discovery document

8    request was due April 27th; is that correct?

9    A.  Yes.

10   Q.  In the email exchange did Chevron agree to any extension of

11   that request?

12             You can look at the April 27 email at 11:55.

13   A.  Yes.  Mr. Mastro stated, If you agree to time today to meet

14   and confer, and then get on the phone with Anne today at that

15   time to meet and confer, we will agree to extend your time to

16   formally respond to our discovery demands, interrogatories, and

17   document requests to Monday, April 30th.

18   Q.  Did you have a meet and confer call, Ms. Champion, with

19   Mr. Donziger on April 27th?

20   A.  I did.

21   Q.  Do you recall what, if anything, Mr. Donziger said about

22   his position on discovery?

23   A.  He said that he was still reviewing the requests, that he

24   did not intend to appear for a deposition before the May 8th

25   hearing, and that he was not yet sure whether he would produce
```

1   documents in the absence of a court order.

2   Q.  Let me show you what is Government Exhibit 112.

3            Is this e-mail correspondence from Mr. Donziger to you

4   and Mr. Mastro?

5   A.  Yes.

6   Q.  On April 30th of 2018?

7   A.  Yes.  In which he attaches his objections and responses to

8   the discovery requests.

9            MS. GLAVIN:  Move for admission.

10           MR. KUBY:  Yes, Judge.

11           THE COURT:  Received.

12           (Government's Exhibit 112 received in evidence)

13   BY MS. GLAVIN:

14   Q.  We can go to Mr. Donziger's attached letter of April 30th.

15   RE:  Objections and responses to subpoena dated April 16th,

16   2018.

17           Did Mr. Donziger in his objections to the discovery

18   requests raise any First Amendment issue or objection?

19   A.  No.

20   Q.  In these objections to the discovery requests from Chevron,

21   did Mr. Donziger raise any Fifth Amendment objection?

22   A.  No.

23   Q.  Did he raise any constitutional objection at all?

24   A.  No.

25   Q.  If we go to Mr. Donziger's general objection, G1, with

1    respect to timing, what was Mr. Donziger's objection with

2    respect to the timing of discovery?

3    A.  As he states, Discovery at this time is not appropriate in

4    light of the fact that the supplemental judgment supposedly

5    justifying discovery is currently on appeal.

6    Q.  Does Mr. Donziger state here with respect to timing in the

7    last sentence or at the end of this objection, I have in good

8    faith taken a limited number of preliminary steps to collect,

9    review, and organize documents.  I provide such responsive

10   information as I am able in light of the objectionable nature

11   of essentially all of Chevron's requests and the timing of the

12   requests?

13   A.  Yes.

14   Q.  If we go to Mr. Donziger's general objection number two,

15   burdensome approach.  Mr. Donziger states, The approach taken

16   by Chevron with its requests is unduly burdensome.

17        What does Mr. Donziger propose to do in Government

18   Exhibit 2 under his burdensome approach?

19        If I can focus your attention on Mr. Donziger's

20   sentencing beginning presently.

21   A.  Presently, I have personal bank accounts, a contingency

22   interest in the Ecuador case, an apartment, a car, and some

23   property in Florida that I inherited.

24        THE COURT:  Ms. Glavin, stay close to the microphone.

25   You are fading out from us.

L5BVDON1                        Champion - direct

1    A.   Should I keep going?

2    Q.   Yes.

3    A.   Chevron is already aware of the latter as it sent a lawyer

4    to a legal proceeding relating to these properties.  As soon as

5    possible after preliminary objections are addressed, I am

6    prepared to provide Chevron with a short summary of my

7    financial condition and assets, backed up by supporting

8    documents.  I can prepare this summary within a reasonable time

9    taking into account I am operating pro se and have burdensome

10   responsibilities in my legal practice.

11           Keep going?

12   Q.   No.  You can stop right there.

13           If we can go to Mr. Donziger's general objection

14   number three, overbroad and irrelevant.  Mr. Donziger states

15   that Chevron's request sweep broadly past what is necessary to

16   establish a clear picture of my available assets and net worth

17   and instead reveal themselves to be a fishing expedition to

18   learn information about the financing of the process of

19   enforcing the Ecuadorian environmental judgment in Canada and

20   elsewhere, a process that the Second Circuit has recognized as

21   valid.

22           THE COURT:  Stay close to the mic.

23   Q.   Now, did Mr. Donziger produce any document or record to

24   Chevron in response to their discovery requests by April 30th

25   of 2018?

1    A.  No.

2    Q.  I want to turn your attention to May 4th of 2018.

3         Did Chevron move to compel Mr. Donziger to comply with

4    their discovery requests?

5    A.  Yes, we did.

6    Q.  I am going to show you what is Government Exhibit 1989.

7         MS. GLAVIN:  This is on the docket as 1989.  Move for

8    admission.

9         THE COURT:  Received.

10        (Government's Exhibit 1989 received in evidence)

11   BY MS. GLAVIN:

12   Q.  If you go to page 2 of this exhibit, before filing this

13   motion to compel, Ms. Champion, did you have a meet and confer

14   with Mr. Donziger?

15   A.  Yes.

16   Q.  Did the meet and confer occur on May 4th, the day Chevron

17   filed this motion?

18   A.  Yes.  Before we filed the motion.

19   Q.  Do you remember what Mr. Donziger said to you during that

20   meet and confer?

21   A.  He said that he would not produce documents without a court

22   order.

23   Q.  Did Mr. Donziger raise any First Amendment objection during

24   your meet and confer on May 4th?

25   A.  Not that I recall.

1    Q.  Did he raise any Fifth Amendment objection?

2    A.  Not that I recall.

3    Q.  Did he raise any constitutional objection?

4    A.  No.

5    Q.  If you go to ECF page 3 of Chevron's motion to compel, what

6    were the three areas that Chevron informed Judge Kaplan were

7    the issues between Mr. Donziger and Chevron on discovery?

8    A.  The appropriate scope of discovery; whether Chevron is

9    entitled to discovery now; and the requirement that Donziger

10   produce not just documents in his possession, but in his

11   possession, custody, or control, including documents in the

12   possession of his current and former agents.

13   Q.  Did Mr. Donziger oppose Chevron's motion to compel?

14   A.  He did.

15   Q.  Showing you Government Exhibit 2002.

16           MS. GLAVIN:  This is on the docket as 2002.  The

17   government moves for admission.

18           THE COURT:  Received.

19           (Government's Exhibit 2002 received in evidence)

20   BY MS. GLAVIN:

21   Q.  Is this Mr. Donziger's opposition to Chevron's motion to

22   compel?

23   A.  Yes.

24   Q.  Filed on May 10 of 2018?

25   A.  Yes.

Q.  Tell me if I am reading this correctly on page 1.

          While I address issues raised by Chevron in its motion

briefly below, my primary contention IS that the issues are

moot or potentially moot because I am preparing to post a

supersedeas bond that will stay all proceedings on the Court's

supplemental judgment pending resolution of my lodged appeal.

If I am unsuccessful in the appeal, the bond will be used to

satisfy the supplemental judgment.  Accordingly, Chevron will

soon be fully protected and there will remain no basis for

discovery to my assets or those of any other person in aid of

enforcement of the supplemental judgment.  Because Chevron's

discovery requests are now proceeding entirely and exclusively

on the aid of enforcement basis, those requests should be

suspended forthwith and withdrawn as soon as the bond is

posted.

          Go to page 2 of Mr. Donziger's opposition.

          Mr. Donziger states, To avoid inconvenience on the

court, I asked Chevron to agree to suspend its discovery

requests in light of my intention to post a bond and my

commitment to provide regular updates on the procedure.

Counsel for Chevron refused.

          If you go further down the page where Mr. Donziger

states, I have lodged individual relevance overbreadth and

undue burden objections to Chevron's various requests; should

discovery on the supplemental judgment ever proceed, the

L5BVDON1                        Champion - direct

1    parties should first seek resolution of these objections

2    through the meet-and-confer process rather than seek a

3    resolution from the Court in the abstract.

4            My proposal is to provide Chevron with a descriptive

5    summary or guidance as to my relatively simple financial

6    condition, backed up by documentation, should be seen in the

7    context of this process.  I submit that it would be a useful

8    tool for narrowing and obviating the need for many of Chevron's

9    requests.

10           If we can go to footnote one on page 3 of

11   Mr. Donziger's opposition, I could also begin a rolling

12   production of the most relevant, nonprivileged responsive

13   documents during this time period.  Though of course such

14   efforts would take time from the projects of preparing the

15   summary/guidance.  I submit that it would be most efficient to

16   focus on the summary first and then begin rolling production as

17   deemed necessary.

18           Did Judge Kaplan issue an order on Chevron's motion to

19   compel?

20   A.  Yes.  He granted it in part and denied -- and denied it in

21   part.

22   Q.  Showing you what is Government Exhibit 2009.

23           MS. GLAVIN:  Move for admission, your Honor, as this

24   is on the docket.

25           THE COURT:  Received.

1            (Government's Exhibit 2009 received in evidence)

2    BY MS. GLAVIN:

3    Q.   Is this Judge Kaplan's May 17, 2018, order on the motion to

4    compel post-judgment discovery?

5    A.   Yes.

6    Q.   Ms. Champion, can you summarize what Judge Kaplan directed

7    in this order?

8    A.   So he divided the requests into what he deemed money

9    judgment discovery requests if you look at footnotes number one

10   and two at the bottom of the page.  And requests that he deemed

11   to be paragraph five compliance requests.

12   Q.   So when you say he divided the requests up, were these

13   Chevron's requests for documents and requests for information?

14   A.   Exactly.  So he divided them into two categories.  Ordered

15   Donziger to comply with the money judgment discovery requests

16   some of which he modified in an attachment to this order.  And

17   he also deleted one of those requests.  And he overruled

18   Donziger's objections to the requests and his offer to provide

19   a summary of his financial condition in lieu of responsive

20   documents.

21   Q.   With respect to footnote number one, the Court laid out

22   what the Court deemed to be money judgment requests; is that

23   correct?

24   A.   Yes.

25   Q.   And in footnote 2, the Court separated out what the Court

1    deemed to be paragraph five compliance discovery; is that

2    correct?

3    A.  Yes.

4    Q.  In terms of paragraph five compliance discovery, what did

5    you understand that to mean, that discovery?

6    A.  That the Court considered that discovery to be aimed at the

7    contempt and it had not provided leave for discovery in

8    contempt.  So it did not order Mr. Donziger to respond to those

9    requests at this time.

10   Q.  When you say "the contempt," do you mean the pending motion

11   for contempt that Chevron had made with respect to

12   Mr. Donziger's attempt to sell interests in the judgment to

13   Elliott Management?

14   A.  Yes.

15   Q.  And was it Chevron's position that that violated paragraph

16   five of the RICO judgment?

17   A.  Yes.

18   Q.  If we can go it page 2 of Judge Kaplan's order at the very

19   top Judge Kaplan states, Donziger's objections to the money

20   judgment discovery are almost entirely without merit,

21   substantially for the reasons set out by Chevron, although the

22   Court has modified certain of the requests as set forth in

23   Schedule A and Schedule B.  The Court, however, emphasizes the

24   following points:

25              1.  Donziger's contention that Chevron should not be

permitted to conduct discovery for purpose of enforcing the

money judgment because he has appealed from it is frivolous.

He is entitled under Federal Rule of Civil Procedure 62(d) to a

stay of execution upon posting a supersedeas bond.  He has not

done so in the months since the money judgment was entered.

Nor has he attempted to demonstrate that a stay without a bond

or on different security should be granted as a matter of

discretion.  Accordingly execution on the judgment is not

stayed.  Discovery is entirely appropriate.

     2.  The contention that the discovery requests are

unduly burdensome is entirely unsubstantiated.  Moreover,

Donziger's suggestion that Chevron is entitled to nothing more

than "a short summary of his financial condition and assets,

backed up by supporting documents" is without merit.  As the

record in this case discloses, millions of dollars have passed

through Donziger's hands over the years.  Much of it is

unaccounted for.  He has had years in which to move assets

around.

     At the very bottom the Court states, the Court has

concluded also that Chevron is entitled to appropriate

paragraph five compliance discovery.  The Court however will

defer ruling on the specific discovery requests that constitute

the paragraph five compliance discovery for the time being in

the expectation that the hearing with respect to the Elliott

Management matter, which is scheduled to begin on May 22nd of

L5BVDON1                    Champion - direct

2018, will be completed swiftly.

         Moving further down the Court states:  Chevron's
motion to compel Donziger to comply is granted to the following
extent:  1.  The Donziger defendants, on or before June 15th,
2018, shall comply fully with all of the money judgment
discovery requests, as modified by this order, that are
contained in Chevron's first set of requests for production of
documents in aid of the supplemental judgment.

         Skip down to two.  Judge Kaplan's order states, The
Donziger defendants on or before June 15th, 2018, shall answer
fully all of the money judgment discovery requests, as modified
by this order, that are contained in Chevron's first
information subpoena in aid of the supplemental judgment.

         Now, Ms. Champion, following Judge Kaplan's May 17
order directing Mr. Donziger to produce records responsive to
the money judgment requests, did Judge Kaplan subsequently
issue an order allowing some paragraph five discovery?
A.  He did.  He allowed paragraph five discovery to the extent
it related to the solicitation of Elliott Management.  Later on
he allowed more fulsome paragraph five discovery.
Q.  Showing you what is Government 2020, which is on the docket
and move for admission.

         THE COURT:  Received.

         (Government's Exhibit 2020 received in evidence)
BY MS. GLAVIN:

1    Q.  Ms. Champion, if you could go and look at page 2 of this

2    order.  What did Judge Kaplan direct Mr. Donziger to produce on

3    or before June 15 of 2018 in addition to what had been directed

4    in the May 17, 2018, order?

5    A.  He ordered Mr. Donziger to produce the documents requested

6    by Request Nos. 21, 22, and 29 of Chevron's first set of

7    request for production and to answer fully Items 21, 22, 23 and

8    25 of Chevron's first information subpoena to the extent of

9    producing documents and providing information bearing on the

10   attempt to obtain funds from Elliott Management Company.

11   Q.  With respect to any further paragraph five compliance

12   discovery, what did Judge Kaplan rule?

13   A.  He noted that the Court continues to reserve judgment as to

14   whether and when to require compliance with these and other

15   parts of the RFP and the information subpoena that were defined

16   in its May 17th, 2018, order as paragraph five compliance

17   discovery.

18   Q.  If we can go to footnote one of Judge Kaplan's order, Judge

19   Kaplan states that on May 31st, 2018, Donziger moved for

20   declaratory relief and to dismiss the contempt motion.  Docket

21   2018.  The Court will deal with that motion in due course.

22   After chevron has responded and Donziger, should he wish to do

23   so, reply to any such response.  But the pendency of that

24   motion does not affect this ruling.

25              Ms. Champion, what did you understand this to mean?

1    What had occurred?

2    A.  I think -- I'd have to look back at Donziger's brief, but I

3    think he raised this as a reason not to allow discovery in that

4    brief, Docket 2018.

5    Q.  We'll move to that in a moment.

6              I will show you what is Government Exhibit 116.

7              Is this an email exchange between you and Mr. Donziger

8    with respect to the discovery requests?

9    A.  Yes.

10   Q.  If we can start at the bottom of the email on March 31st,

11   2018, Mr. Donziger to you and Mr. Mastro.

12             In the first paragraph of the last sentence, does

13   Mr. Donziger state, I am planning on filing a motion with

14   respect to the other requests tonight and a motion that may

15   impact the money judgment requests by next week; is that what

16   he states?

17   A.  Yes.

18   Q.  With respect to the next paragraph, does Mr. Donziger

19   state, In any event, as regards to the money judgment requests,

20   Judge Kaplan has given me at least until June 15th to comply.

21   I am working to meet that deadline.  The task is extremely

22   burdensome.  I hope to have a discussion with you in the coming

23   days about how to shift some of the burden of obtaining the

24   requested documentation onto Chevron as the requesting party.

25   I am currently using the time to review my files and prepare

L5BVDON1                          Champion - direct

1    them both for production, where non-objectionable, and to

2    prepare specific objections as necessary, including as to

3    privilege.  In my review, I am finding many materials, some of

4    which may be in Mr. Rizack's possession that are privileged or

5    otherwise protected.

6           Ms. Champion, if we can go to your email responding

7    which is on June 3rd, 2018, at 3:23 p.m.

8    A.  Yes.

9    Q.  You state to Mr. Donziger, Dear Steven, the Court made

10   clear your obligation to comply by June 15th, 2018, with

11   virtually all of the discovery requests Chevron served in its

12   orders of Friday, June 2, and May 17, 2018.  There is nothing

13   further to resolve "as to those requests."  Your compliance is

14   required.  As the Court stated in its order Friday, your

15   pending motion has no impact on that obligation, nor do your

16   vague references to burden shifting and a plan to serve

17   additional objections and file additional motions, which would,

18   in any event, be untimely.

19          THE COURT:  I am sorry.  Did you want 116 in?

20          MS. GLAVIN:  Yes.  Sorry, your Honor.  Move for the

21   admission 116.

22          MR. KUBY:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 116 received in evidence)

25   BY MS. GLAVIN:

L5BVDON1                    Champion - direct

1   Q.   If we can go to Mr. Donziger's response on June 7, 2018,

2   and if you go to the second paragraph, My view is that many of

3   the assertions in your email are false and are disingenuous.

4   As you know, Mr. Mastro wrote the Court on May 25 asking

5   specifically that the Court require Mr. Donziger to comply with

6   Chevron's judgment compliance discovery by June 15th.   In its

7   responsive order dated May 29, the Court specifically rejected

8   that request and instead ordered me to "comply with these

9   requests and item only to the extent of producing documents and

10  providing information bearing on the attempt to obtain funds

11  from Elliott Management Company."   That is the obligation I am

12  under with respect to the June 15 deadline, and I am working

13  diligently to meet it.

14          If we can go to the fourth paragraph of Mr. Donziger's

15  replying email he states, It also appears that even the

16  so-called money judgment requests may tread into privilege

17  material in some respects.   And with my objections, I have

18  specifically preserved my right to withhold privileged

19  documents, which I will do if necessary.   I will of course

20  provide an appropriate log and articulated bases for any such

21  assertion of privilege upon any such withholding that may be

22  necessary.

23          When Mr. Donziger referred to an appropriate log, what

24  did you understand him to mean?

25  A.   Privilege log.

L5BVDON1                          Champion - direct

```
1    Q.  Did Mr. Donziger and his June 7 email -- again, looking at

2    the fourth paragraph -- object to that the discovery requests

3    for "hopelessly overbroad and unduly burdensome"?

4    A.  That is what he states, yes.

5    Q.  If we can go to your response on this chain to Mr. Donziger

6    on June 8th at 1:32 a.m.

7              MR. KUBY:  Judge.

8              THE COURT:  Yes, sir.

9              MR. KUBY:  I just want to note for the record in case

10   anybody is lost here, Mr. Donziger is not charged with

11   violation of any discovery requests in Counts One, Two, Three,

12   Four, Five and Six.  I understand that as with everything

13   Donziger passed as prologue, but just to be clear he is not

14   charged with violating discovery requests.

15             MS. GLAVIN:  No dispute.

16             THE COURT:  Thank you.

17   BY MS. GLAVIN:

18   Q.  Ms. Champion, was your response to Mr. Donziger?

19   A.  Is that a question.

20   Q.  Yes.

21   A.  Yes.  This is my response.

22   Q.  Was this your response to Mr. Donziger?

23             You state, Unfortunately your description below of

24   your current discovery obligations is false and your attempt to

25   provide yourself with the unilateral stay of discovery
```

L5BVDON1                          Champion - direct

1      accepting one narrow issue is without merit.  The matter is

2      simple:  The Court expressly ordered you to respond to the vast

3      majority of Chevron's discovery requests, rejecting your

4      objections during the motion to compel process.  The deadline

5      for your responses to each of the 30 information subpoena

6      requests and the 28 requests for production is June 15th, per

7      court order.  If you do not comply, we will be forced to seek

8      appropriate relief from the Court, including possible contempt.

9               The next paragraph states, Mr. Donziger, you were

10     served with these discovery requests on April 16 of 2018,

11     nearly two months ago but you have yet to provide a single

12     substantive response.  Your assertion today that certain issues

13     may be "mooted" at the upcoming June evidentiary hearing is

14     fabricated and does not relieve you of your court-ordered

15     discovery obligations.  Your objections as to overbreadth and

16     overburden in particular have been rejected by the Court.

17              I want to turn your attention to June 15, 2018.  Did

18     Mr. Donziger provide Chevron with some documents in response to

19     the discovery requests that he had been ordered to comply with

20     on that day?

21     A.  He did provide about -- I think it was about 18 pages worth

22     of documents.

23     Q.  I am going to show you what is Government Exhibit 118.

24     Just go through the pages of this exhibit.

25              What is Government Exhibit 118?

1   A.   This is the production that Mr. Donziger made in the middle

2   of June.

3   Q.   In response to Chevron's discovery requests?

4   A.   Exactly.

5            MS. GLAVIN:   Move for admission, your Honor.

6            MR. KUBY:   Judge, I am going to object to the

7   admission of this just because it relates to private banking

8   records of Mr. Donziger.   I have no specific problem with the

9   Court seeing it to the extent the Court finds it relevant, but

10  I just don't think it should be public information.

11           MS. GLAVIN:   We can redact, your Honor, as

12  appropriate.

13           THE COURT:   Very well.

14           MR. DONZIGER:   There is something on the screen right

15  now about my bank.   Respectfully, can we just clear that out.

16  It is very personal.

17           THE COURT:   Take it down.   Thank you.

18           I will leave it to counsel to work out the redactions

19  and to provide a redacted copy, please.

20           MS. GLAVIN:   Thank you, Judge.

21           MR. KUBY:   Thank you, Judge.

22           MS. GLAVIN:   Yes, your Honor.

23  BY MS. GLAVIN:

24  Q.   Ms. Champion, can you summarize what is in the documents

25  that Mr. Donziger provided?

L5BVDON1                           Champion - direct

1   A.   As you saw there was a listing of some bank accounts at TD

2   Bank.   There were some documents that relate to properties that

3   he owns or has an interest in and there were a handful of

4   emails involving him and Elliott Management.

5   Q.   In addition to Mr. Donziger providing those documents, did

6   you receive a letter from Mr. Donziger on or about June 15,

7   2018?

8   A.   Yes.

9   Q.   Showing you what is Government Exhibit 119, do you

10  recognize this?

11  A.   Yes.   This is an email received from Mr. Donziger on

12  June 16th, 2018, attaching additional responses and objections

13  to the discovery requests.

14              MS. GLAVIN:   Move for admission, your Honor.

15              MR. KUBY:   No objection.

16              THE COURT:   Received.

17              (Government's Exhibit 119 received in evidence)

18  BY MS. GLAVIN:

19  Q.   If we can go to Mr. Donziger's attached letter dated

20  June 15, 2018, look at the bottom sentence.   Mr. Donziger

21  states, Please note that I am still collecting responsive

22  materials for some requests as noted below.   I will keep you

23  apprised and of course timely supplement these responses as

24  appropriate.

25              Ms. Champion, had Judge Kaplan's May 17, 2018, order

L5BVDON1                         Champion – direct

1    directing Mr. Donziger to comply with the money judgment

2    requests by June 15, 2018, been stayed or in any way modified?

3    A.  No.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. GLAVIN:

2    Q.  And had Judge Kaplan's June 1st order, which is Government

3    Exhibit 2020, directing some paragraph 5 compliance discovery

4    by June 15 of 2018, been stayed or in any way modified?

5    A.  No.

6    Q.  Did Mr. Donziger lodge additional objections in this June

7    15, 2018 letter?

8    A.  He did.

9          MS. GLAVIN:  We could go to page 2 of that letter.

10   General objections.

11   Q.  Mr. Donziger at G9 has a First Amendment objection; is that

12   correct?

13   A.  Yes.

14   Q.  And he states:  After careful review of materials

15   potentially responsive to your requests, I have concluded that

16   the forced production of any of these materials in this context

17   would violate First Amendment associational rights of me and

18   others.

19         Moving down further on this paragraph, where he

20   states:  I am stating these concerns in a motion for a

21   protective order that is being filed with the Court

22   simultaneously with these objections.  Without waiving any

23   objections, I nonetheless endeavor herein to provide as much

24   responsive information as I can, subject to these objections.

25   I may be able to provide additional information, depending on

1    the nature of the Court's resolution of the motion and/or

2    protection the Court offers.

3            Is this the first time that Mr. Donziger objected to

4    producing responsive documents on First Amendment grounds?

5    A.  Yes.

6    Q.  Going to Mr. Donziger's general objection G10, money

7    judgment relevance/undue burden.  We go to the middle of that

8    paragraph, the sentence beginning "thus."

9            Mr. Donziger states:  Thus, the only discovery

10   "relevant to the satisfaction of the judgment" is discovery

11   into the present whereabouts and extent of assets potentially

12   available to satisfy the judgment, which would be assets I

13   currently possess or in which I have a vested attachable legal

14   right or interest.  This is a relatively simple inquiry which

15   is essentially satisfied by response to RFP1 as stated below.

16           Now, with respect to Mr. Donziger's objections, did

17   Mr. Donziger in this letter also respond to some of the

18   discovery or information requests?

19   A.  He did.

20           MS. GLAVIN:  And if we could go to the page that is

21   Bates stamped 103460, and RFP26.

22   Q.  Mr. Donziger states:  The only statements I have received

23   potentially responsive to the request are in the nature of the

24   remuneration described in response to ROG3 *infra*.  To the

25   extent the request seeks detailed information on such payments,

I object on both First Amendment grounds, G9; and money

judgment relevance/undue burden grounds, G10, because past

payments are not relevant to the inquiry into what assets of

mine are presently available to satisfy the judgment.  Despite

and without waiving any objections, I further attest that the

only interest I have "been promised" as described in this

request is my contingency interest in the Ecuador judgment,

which is largely as described by the Court in its final RICO

judgment.

     To the extent the request seeks further details about

that interest, I object on both First Amendment and money

judgment relevance/undue burden grounds.

     We could go to Bates 103461 of Mr. Donziger's letter.

We go to his response at RFP30.

     This appears to be a compliance request.  Despite and

without waiving any objections, I hereby respond that I have

not attempted nor completed any sale or assignment of my

interest in the Ecuador judgment at any point since March 4,

2014, G7.  Is that what Mr. Donziger stated?

A.  Yes.

Q.  Had Judge Kaplan ruled on Mr. Donziger's objections as to

burden and relevance on the money judgment requests?

A.  Yes.

Q.  He had ruled on that in Government Exhibit 2009; is that

correct?

1   A.  Yes.

2   Q.  Now, Mr. Donziger refers to posting a bond on appeal.  Are

3   you familiar with what Mr. Donziger was referring to?

4   A.  Yes.

5   Q.  What is that?

6   A.  If you bond a money judgment while it's appealed, then you

7   can get a stay of enforcement.

8   Q.  And that's what's called a supersedeas bond?

9   A.  Yes.

10  Q.  Did Mr. Donziger ever post a supersedeas bond?

11  A.  He did not.

12  Q.  Between Judge Kaplan's March 17, 2018 order, which is

13  Government Exhibit 2009, and the June 15 deadline for

14  compliance with that order, did Mr. Donziger file any motions?

15  A.  What are the dates again?

16  Q.  March 17, 2018, and June 15, 2018.

17  A.  He filed his motion to dismiss and for declaratory

18  judgment.  He also filed a motion for a protective order on

19  June 15th.  The motion to dismiss was filed on, I think, May

20  31st.

21  Q.  I'm going to show you what's Government Exhibit 2018 and

22  Exhibit 2026.

23          MS. GLAVIN:  Your Honor, these are both docket entries

24  in the civil case and would move to admit.

25          THE COURT:  Received.

L5BVDON3                    Champion - direct

                    (Government's Exhibits 2018 and 2026 received in

evidence)

Q.  With respect to Government Exhibit 2018, is this

Mr. Donziger's motion to dismiss you referred to?

A.  Yes.

Q.  And this was filed on March 31st of 2018?

A.  Yes.

Q.  And with respect to Government Exhibit 2026, this is

Mr. Donziger's motion for a protective order to protect First

Amendment rights filed on June 15, 2018; is that right?

A.  Yes.

                    MS. GLAVIN:  We could go to, okay, the first page.

Actually, can we go to page 2, ECF page 2.

Q.  And I will read out loud a few sentences:

                    With this motion, Mr. Donziger seeks an order

precluding any discovery in these post-judgment proceedings,

including discovery sought from third parties that would tend

to reveal the identity of any funder or other material

supporter of the Ecuador litigation and/or the internal

operational, organizational, administrative, or financial

management practices of the teams of individuals and

organizations that directly and indirectly oppose Chevron in

the Ecuador litigation and/or more broadly engage in Ecuador

litigation-related activity.

                    If we could go to page 23 of Mr. Donziger's motion.

1          Mr. Donziger states:  Good cause having been shown in

2    the form of specific and significant threats of harm to

3    constitutionally protected First Amendment rights and

4    privileges, Mr. Donziger respectfully requests that the Court

5    must enter an order, Federal Rule of Civil Procedure 26(c)(1),

6    forbidding the disclosure of or any inquiry into matters that

7    would tend to reveal the identity of any funder or other

8    material supporter of the Ecuador litigation and/or the

9    internal operational, organizational, administrative, or

10   financial management practices of individuals and organizations

11   who directly or indirectly oppose Chevron Corporation as

12   regards the Ecuador litigation or who otherwise support the

13   Ecuador litigation and/or the Ecuador environmental cause, as

14   those terms are defined above.  Mr. Donziger requests that the

15   Court make clear that the order applies to all subpoenas issued

16   in these post-judgment proceedings, including subpoenas issued

17   to third parties.

18          With respect to Mr. Donziger's motion to dismiss that

19   was filed on May 31st, 2019, what was Mr. Donziger seeking to

20   dismiss?

21   A.  I think it was the contempt motion.

22   Q.  With respect to Elliott Management?

23   A.  Yes.

24   Q.  I want to turn your attention back again to Mr. Donziger's

25   June 25th, 2018 deposition.  So Mr. Donziger had lodged his

1   First Amendment objection on June 15 of 2018; is that right?

2   A.  Yes.

3   Q.  So you saw Mr. Donziger on June 25th, 2018; correct?

4   A.  Correct.

5   Q.  And during the deposition of Mr. Donziger, did he refer to

6   documents that he'd been withholding from production?

7   A.  He did.

8   Q.  We could go to page 43 of Mr. Donziger's deposition,

9   starting at line 18.  And if we could read as we have done

10  before, Ms. Champion, to page 44, line 8.

11          (Reading)

12  "Q.  In connection with preparing your responses to Chevron's

13  discovery, did you research and review any hard copy documents?

14  "A.  Yes.

15  "Q.  Where are those documents maintained?

16  "A.  In my office, which is in my home.

17  "Q.  What's the volume of the documents that you reviewed,

18  approximately?

19  "A.  There is a fair number of documents that I have withheld

20  from you guys on the basis of privilege or First Amendment

21  issues or of the pending motions."

22  Q.  And when Mr. Donziger stated "the pending motions," did you

23  understand those to mean the motion for a protective order,

24  motion to dismiss?

25  A.  Are you asking for my attorney --

L5BVDON3                          Champion - direct

1    Q.  Yes, what you understood him to mean.

2    A.  I can't guess what Mr. Donziger meant, but he references

3    the First Amendment.  His protective order motion was based on

4    the First Amendment.  And he had also filed the motion to

5    dismiss.  So as far as I know as of that time, those were the

6    only pending motions of his.

7              MR. KUBY:  Judge, I think the question was what did

8    she understand them to mean.  And if her answer is, That's what

9    I understood them to mean, then I have no objection.

10             THE COURT:  I believe that was what the witness was

11   answering.  Is that what you were answering, Ms. Champion?

12             THE WITNESS:  Based on the context of his statements

13   and the time that they were made, that's my understanding.

14             MR. KUBY:  Thank you.

15   BY MS. GLAVIN:

16   Q.  If we could turn to page 48, line 9 of Mr. Donziger's

17   deposition, and read to page 49, line 18.

18             So at page 47, line 9.  If you could read starting

19   with Mr. Donziger's answer.

20   "A.  So taking that into account, I did a fair amount of

21   searching and document gathering.  And I have more documents

22   that you are seeking that I don't believe is appropriate to

23   turn over at this point, given the, sort of, outstanding legal

24   issues that need to be resolved by the Court.

25   "Q.  And what's the volume of documents that you are

1   withholding?

2   "A.  Well, it is a few hundred pages.  But if Judge Kaplan were

3   to order me to produce everything that you are asking for, it

4   obviously would be a lot more than that.

5   "Q.  And so what is the difference between the "a lot more" and

6   the few hundred pages?  Because I'm not sure I'm following your

7   train of thought.

8   "A.  The difference is I have not searched for documents

9   responsive to every request in your subpoena.  I mean, some of

10  them, in my personal opinion, would be impossible to do.

11          "So what I thought was most reasonable, even though I

12  believe this stuff is privileged or, for whatever reason, is

13  intrusive and in violation of my constitutional rights, I have

14  gathered more documents.  If Judge Kaplan were to order me to

15  produce them, subject to my rights and whatever other recourse

16  I would have, obviously I would be able to do that.

17  "Q.  So these documents that you searched for, found, and are

18  withholding on the basis of privilege, you have not produced a

19  privilege log for those documents; correct?

20  "A.  That's correct.

21  "Q.  And you haven't produced them under the 502 we agreed to;

22  is that correct?

23  "A.  That's correct."

24  Q.  And if you could continue.

25  A.  Pardon me.

1          (Reading)

2     "A.  But just remember, the 502 -- well, my view of the whole

3     thing is a lot of this stuff is First Amendment protected,

4     implicates, you know, constitutional rights.  So it goes beyond

5     the normal, sort of, privilege issues; it goes well beyond

6     that.

7     "Q.  So you are withholding nonprivileged documents on the

8     basis of a First Amendment objection?

9     "A.  I didn't say that.

10    "Q.  I'm just asking if you are or you aren't.

11    "A.  I don't know.  I would have to give that a think.  I do

12    know that some of the documents, many of the documents, are

13    being withheld on First Amendment grounds."

14    Q.  Ms. Champion, there is a reference to a 502 in

15    Mr. Donziger's testimony.  Do you know what that is?

16    A.  We had entered into a stipulation with Mr. Donziger

17    pursuant to Federal Rule of Evidence 502, which allows parties

18    to agree that production of a potentially privileged document

19    does not constitute a waiver.

20    Q.  If we could turn to page 232 of Mr. Donziger's deposition.

21    And if you could read, Ms. Champion, Mr. Donziger's response at

22    lines 11 to line 21.

23    A.  (Reading)

24    "A.  I think with regard to my documents, I could provide a

25    log, but I think a lot of them are being withheld not on

1   privilege grounds, but on First Amendment grounds.

2             "But, you know, I described what I'm withholding to

3   some degree today, and I'm ready to produce more if I need to.

4   I don't want to because, again, I think it intrudes on my

5   constitutional right.  So I will produce more documents if I

6   have to."

7   Q.  Now, you had discussed earlier the Local Civil Rule 26.2.

8   Had Judge Kaplan relieved Mr. Donziger of his obligation to

9   produce a privilege log?

10  A.  No.

11  Q.  And had Mr. Donziger produced any privilege log to you at

12  least as of his deposition on June 25th, 2018?

13  A.  No.

14  Q.  Did Mr. Donziger ever produce a privilege log to Chevron

15  with respect to documents he was withholding on privilege

16  grounds?

17  A.  No.

18            MS. GLAVIN:  We could go to Government Exhibit 2037.

19            Your Honor, move for admission, as this is on the

20  docket.

21            THE COURT:  Received.

22            (Government's Exhibit 2037 received in evidence)

23  Q.  This is an order, Ms. Champion, entered by Judge Kaplan on

24  June 25th, 2018.  Yes?

25  A.  Yes.

1   Q.  And that was the same date as Mr. Donziger's deposition

2   that day; is that right?

3   A.  Yes.  Yes.

4   Q.  And what did Judge Kaplan rule?

5   A.  He denied Donziger's pending motions for a declaratory

6   judgment and to dismiss, docket 2018; the motion for a

7   protective order, docket 2026; and a motion that he also filed

8   for an emergency administrative stay, docket 2028.

9   Q.  Do you remember what the emergency administrative stay

10  related to?

11  A.  I think it related to third-party discovery from Katie

12  Sullivan.

13  Q.  With respect to -- after Judge Kaplan issued that order,

14  did you reach out to Mr. Donziger that same day on June 25th to

15  ask him to produce all of the documents he indicated he had

16  been withholding on First Amendment grounds?

17  A.  Yes, I think I sent him an email that evening.

18  Q.  I show you Government Exhibit 149A.  Is this the email you

19  sent Mr. Donziger?

20  A.  Yes.  Again, this has that UTC issue where the time shows

21  up as much later than it was, in fact, sent.  I sent it that

22  evening.

23  Q.  On June 25th?

24  A.  Yes.

25          MS. GLAVIN:  So move for admission of Government

1    Exhibit 149A.

2                MR. KUBY:  No objection.

3                THE COURT:  Received.

4                (Government's Exhibit 149A received in evidence)

5    Q.  So in this email, Ms. Champion, to Mr. Donziger -- you

6    requested him to produce all documents that he withheld from

7    production on the basis of the objections made in these motions

8    by noon tomorrow?

9    A.  Yes.

10               MS. GLAVIN:  And then if we could look at Government

11   Exhibit 149.  And if we could --

12   Q.  Is this another email exchange with Mr. Donziger related to

13   his production of documents he withheld?

14   A.  Yes.

15               MS. GLAVIN:  Move for admission.

16               MR. KUBY:  No objection.

17               THE COURT:  Received.

18               (Government's Exhibit 149 received in evidence)

19   Q.  We could focus on your email, June 26, 2018, at 8:04 a.m.

20   to Mr. Donziger.  The bottom -- the last line of the email asks

21   him to respond to your email of last night please.  Thanks.

22               Was that the email that you just testified about which

23   is Government Exhibit 149A?

24   A.  Based on the timing of this email, yes, I believe that it

25   was.

 1            MS. GLAVIN:  If we could go to Mr. Donziger's response

 2    above that, June 26, 2018, at 10:03 a.m.

 3    Q.  Mr. Donziger states:  Thank you.  I am getting organized in

 4    terms of your email from last night, as I have to take care of

 5    some other things at the moment.  I'll respond as soon as I

 6    can, but certainly no later than the end of the day.  I am

 7    gathering materials.  Please understand I work alone.  Steven.

 8            And then if we could go to your response on June 27,

 9    2018, you state:  Hi, Steven.  I don't believe you responded to

10    my email of Monday night, attached, which you said you would

11    respond to by the end of the day.  Can you please advise.

12            Did Mr. Donziger provide any additional documents to

13    Chevron in response to the discovery requests?  In June of 2018

14    did he provide anything?

15    A.  Only the 2017 retainer agreement, which he gave to us after

16    the hearing the following day.

17            MS. GLAVIN:  If we could turn to Government Exhibit

18    2045.  Move for admission, your Honor, as this is on the docket

19    sheet.

20            THE COURT:  Received.

21            (Government's Exhibit 2045 received in evidence)

22    Q.  Ms. Champion, this is a Judge Kaplan memorandum opinion on

23    Donziger's motions for declaratory judgment and dismissal, for

24    a protective order, and for a stay issued on June 27 of 2018.

25            Did Judge Kaplan address Mr. Donziger's First

L5BVDON3                         Champion - direct

Amendment arguments that he had made in his motion for a

protective order?

A.  Yes.

        MS. GLAVIN:  If we could go to ECF page 15 of Judge

Kaplan's opinion.

Q.  If you can read out loud what Judge Kaplan states at bullet

point 3 on page 15.

A.  Donziger now is liable to Chevron on an $811,670 costs

judgment.  He has not obtained any stay of enforcement.  The

judgment is enforceable now.  Chevron is entitled to try to

collect it.  It is entitled to conduct discovery in an effort

to locate assets subject to execution or other process.  It is

entitled to find out from where he derives any revenue that he

has received or is likely to receive, because it may well have

the right to execute on or otherwise reach that revenue, as

well as any money owed to him by others.  It is not obliged to

take Donziger's word that a simple statement by him as to his

financial position would suffice.

        MS. GLAVIN:  If we could turn to ECF page 21.

Q.  On page 21, does Judge Kaplan address Mr. Donziger's First

Amendment argument?

A.  Yes.

Q.  And could you summarize what Judge Kaplan ruled with

respect to that First Amendment argument which is on page 21?

A.  He says it was waived or forfeited.

Q.  And is that because, as he states, Donziger failed to

timely make the First Amendment argument motion he raises now?

A.  Yes.

          MS. GLAVIN:  If we could go to page 22.  If we could

go to the bottom of page 22.

Q.  Judge Kaplan states:  And even if Donziger's purported

assertion of First Amendment rights of that multitude had not

been waived or forfeited, Donziger lacks standing to assert

those interests, whatever they may be.  Footnote 52.

          Ms. Champion, could you read just the first paragraph

of Judge Kaplan's discussion about Mr. Donziger's First

Amendment argument?

A.  Moreover, Donziger's First Amendment argument, insofar as

it is asserted on behalf of the perhaps vast multitude of

unidentified funders, material supporters, appears in

significant part to be an attempt to assert First Amendment

rights on the behalf of noncitizens living outside the United

States, and so would fail on the merits even if he has

standing.

          In any case, Donziger certainly has not established

that all or even any of the persons or entities whose alleged

rights he purports to assert are citizens or residents of, or

have any material connection to the United States; nor has he

established any other practical considerations that indicate

that the First Amendment right to association applies

1    extraterritorially.

2              MS. GLAVIN:  And if you could scroll down, Ms. Armani,

3    to still on footnote 52.  "Accordingly."

4    Q.  If you could read that paragraph, Ms. Champion.

5    A.  Accordingly, Donziger's attempt to rest his protective

6    order argument on the purported First Amendment rights of

7    unidentified nonparties all over the world fails because he has

8    failed even to allege, let alone establish, that any of them is

9    "acting inside the borders, jurisdiction, and control of the

10   United States."  Such persons have no First Amendment rights to

11   assert.  And even assuming, as may be true, that some of those

12   whose purported rights Donziger seeks to assert do have First

13   Amendment rights, his motion would be grossly overbroad, as it

14   seeks to sweep within its ambit many of do not.

15             MS. GLAVIN:  Go to page 32 --

16             MR. KUBY:  Judge, I'm sorry, one more time -- well, at

17   least one more time before the lunch break.

18             As much as I enjoy listening to a rendition of Judge

19   Kaplan's First Amendment analysis, wouldn't it be a lot simpler

20   and more to the point to simply say, Judge Kaplan denied the

21   motion, overruled the First Amendment objections, and did

22   whatever, rather than this questionable rendition of First

23   Amendment constitutionalism?

24             THE COURT:  Ms. Glavin.

25             MS. GLAVIN:  Yes, I understand Mr. Kuby's objection.

1       But what Judge Kaplan stated and ruled with respect to

2   Mr. Donziger's First Amendment argument goes to Mr. Donziger's

3   state of mind.  As the evidence will come out, that over the

4   next few months after this was ordered, Mr. Donziger continues

5   to raise the exact same First Amendment arguments.

6   Mr. Donziger received this order.  Mr. Kuby knows I'm entitled

7   to put on my case.

8       I'm not here for delay or to do a four-corner stall

9   offense.  I'd like to move this along, but there are certain

10  things I want to get in.  And if I can move it along, I'm going

11  to move it along.

12      THE COURT:  Okay.  Let's move it along.

13  BY MS. GLAVIN:

14  Q.  With respect, Ms. Champion, to Judge Kaplan's order, go to

15  page 30, line 10.  Pull up the sentence.

16      Judge Kaplan states in the opinion that the

17  fundamental point is that Chevron is entitled to use the

18  justice system in an appropriate manner to assert claims and

19  seek discovery from such people and organizations.

20      Is that correct?

21  A.  Yes.

22      THE COURT:  Excuse me.

23      Mr. Garbus, as much as I love to see your smiling

24  face, you need to have a mask over it.

25      MR. GARBUS:  Thank you.

L5BVDON3                       Champion - direct

1              THE COURT:  Thank you, sir.

2              Over your nose, too.  I don't like it any more than

3     you do.

4              Sorry, counsel.

5     BY MS. GLAVIN:

6     Q.  Now, Ms. Champion, after Judge Kaplan issued this decision,

7     which explained his June 25th, 2018 denial of Mr. Donziger's

8     request for a protective order, I believe you stated a few

9     moments ago that Mr. Donziger provided the 2017 retainer

10    agreement with the ADF to Chevron; is that right?

11    A.  Yes.

12    Q.  Okay.  And did Mr. Donziger produce any other additional

13    documents to Chevron responsive to the discovery requests in

14    the year 2018?

15    A.  He produced another document that was called a *poder* or

16    power, that also related to his power to raise funds.

17             MS. GLAVIN:  If we can go to Government Exhibit 122.

18    Q.  Do you recognize this document?

19    A.  Yes.  This is an email from Mr. Donziger on July 5th, 2018,

20    in which he notes that he is attaching a document from his

21    clients, providing him with additional authority to engage in

22    fundraising to pay litigation expenses, in response to our

23    subpoena.

24             MS. GLAVIN:  Move for admission.

25             MR. KUBY:  No objection.

1              THE COURT:  Received.

2              (Government's Exhibit 122 received in evidence)

3   Q.  And was the attached document in Spanish?

4   A.  Yes.

5   Q.  Did Chevron get a translation of this document?

6   A.  We did.

7   Q.  Showing what's Government Exhibit 122-T.  Have you had an

8   opportunity to review this document before today?

9   A.  Yes.

10  Q.  Is this the translation to English of the document

11  Mr. Donziger had provided, which is in Government Exhibit 122?

12  A.  Yes.

13  Q.  I want to turn your attention -- withdrawn.

14             Did Mr. Donziger ever contest the translation that

15  Chevron obtained of this document, which is 122-T?

16  A.  No, not to us.

17  Q.  I'm showing you what's Government Exhibit 2056.

18             MS. GLAVIN:  Move for admission, your Honor.  This is

19  in the docket.

20             THE COURT:  Received.

21             (Government's Exhibit 2056 received in evidence)

22             MS. GLAVIN:  If we could go to page 2 of this

23  document.

24             What did Judge Kaplan order on this -- in this July

25  23rd, 2018 order?

1    A.  He ordered Mr. Donziger and his law firms to produce to

2    Chevron each document and thing described by requests 18, 21,

3    22, and 29 of Chevron's request for production of documents;

4    and to serve full and complete answers to paragraphs 21 through

5    25 of Chevron's information subpoena, on or before August 15th,

6    2018.

7    Q.  And with respect to the specific document requests and

8    information requests here, did you understand what those

9    specific requests were, based on Judge Kaplan's May 17, 2018

10   order?

11   A.  I would have to look back at that order to confirm, but I'm

12   pretty sure these are the paragraph 5 compliance requests.

13              THE COURT:  Is this a convenient time to break?

14              MS. GLAVIN:  Yes, your Honor.

15              THE COURT:  Thank you.  Off the record.

16              (Off record)

17              THE COURT:  You may step down, ma'am.

18              (Witness not present)

19              (Pause)

20              THE COURT:  Mr. Kuby, are you hiding behind your

21   computer?

22              MR. KUBY:  Yes, Judge.  Thank you very much.

23              THE COURT:  On the record.

24              Yes, sir.

25              MR. KUBY:  Aaron Marr Page is a needed member of the

1    defense team because of his encyclopedic knowledge of the facts

2    of the case.

3              Sit, stay, and be good.

4              THE COURT:  His encyclopedic knowledge of the?

5              MR. KUBY:  Of the facts of this case.

6              Just give you one example.  I just this morning

7    received new 3500 material with respect to Ms. Berah, who I

8    understand is going to be the interpreter who's going to be

9    testifying right after lunch, at least that was my

10   understanding; we were going to take a break from Ms. Champion.

11             I need to be able to send him the 3500 material; he

12   has to go print it out.  I need to communicate with him about

13   certain documents in actual real time.  And he is an asset that

14   I would ask the Court just grant him computer access, WiFi

15   access.

16             If you want to make him promise not to tweet, I guess

17   I could object to that on First Amendment grounds.  But if it's

18   no computer or if it's a computer and no tweeting, I'll take

19   the computer.

20             THE COURT:  Okay.  Ms. Glavin, you don't have anything

21   to say about this, do you?

22             MS. GLAVIN:  No, your Honor.

23             THE COURT:  All right.  Mr. Marr, you are granted

24   computer access with the no tweeting and no broadcasting and

25   photographing and no otherwise updates from the courtroom

1    constrictions.  Do you understand that, sir?

2              MR. PAGE:  Yes, I do.

3              THE COURT:  Thank you.

4              Off the record.

5              (Off record)

6              THE COURT:  Anything else on the record?

7              MR. KUBY:  Simply if we could return here at 2:15, so

8    I can have a little time to look over the additional 3500

9    material and compare it with the Spanish and English

10   translations, that would be lovely.

11             THE COURT:  You don't object to a longer lunch hour,

12   do you?

13             Yes, sir.

14             MR. KUBY:  Thank you, Judge.

15             THE COURT:  All right.  Thank you, counsel.

16             Did you have anything else?

17             MS. GLAVIN:  Yes.  With respect to our case, we would

18   like to put on the interpreter out of order right after the

19   lunch -- we'd like to put the interpreter on right after the

20   lunch break out of order.  Mr. Kuby is aware of it and

21   consents.

22             THE COURT:  Fine.

23             MR. KUBY:  I consent.

24             THE COURT:  Yes, sir.  Thank you.  Enjoy your lunch.

25             (Luncheon recess)

1                   A F T E R N O O N   S E S S I O N

2                            2:15 p.m.

3              THE COURT:  Thank you, counsel.  Won't you be seated.

4              Mr. Kuby, even without my glasses, I don't think I see

5     Mr. Donziger.

6              Don't look under the table.

7              MR. KUBY:  I was just hoping.  I don't see him either.

8              THE COURT:  What do you think we do?

9              MR. KUBY:  I think we should established the

10    principle, I hope we have, we should proceed.  Mr. Donziger

11    rather has chosen to briefly absent himself voluntarily,

12    knowingly and willingly and therefore we should proceed

13    undeterred in his absence unless I get some phone or other

14    notice that he is suffering a medical emergency or even a legal

15    emergency.

16             THE COURT:  Yes, sir.  So long as you are undeterred,

17    I am undeterred.

18             MR. KUBY:  If I am undeterred, are you deterred?

19             THE COURT:  No, sir.  Good try, though.

20             MR. KUBY:  Thank you.

21             THE COURT:  Ms. Glavin.

22             MS. GLAVIN:  Your Honor, the special prosecutors call

23    Sonia Berah.

24     SONIA BERAH,

25         called as a witness by the Government,

L5B6DON4                          Berah - direct

1          having been duly sworn, testified as follows:

2    DIRECT EXAMINATION

3    BY MS. GLAVIN:

4    Q.   Ms. Berah, what do you do for a living?

5    A.   I am an English/Spanish interpreter.

6    Q.   How long have you been an English/Spanish interpreter?

7    A.   Since 1991.

8    Q.   Did you go to college for interpretation and translation?

9    A.   Not to college, but I did a three-year -- yes, I did a

10   three year degree after college through a university in

11   Venezuela.

12   Q.   What was the three-year program that you completed?

13   A.   It's a certificate in interpretation and translation.

14   Q.   Spanish?

15   A.   Spanish and English.

16   Q.   Are you a federally certified court interpreter?

17   A.   Yes, I am.

18   Q.   For how long?

19   A.   Since 1995.

20   Q.   What do you have to do to be certified to be an interpreter

21   federally?

22   A.   You have to take an exam, which consists of two parts.  The

23   written examination which certifies that you master both

24   languages and the written form that you can read and write

25   proficiently and then the oral exam, which tests you in your

L5B6DON4                          Berah - direct

1  knowledge of judicial terms.

2  Q.  And have you provided interpretation, English to Spanish

3  and Spanish to English, in federal court?

4  A.  Yes.

5  Q.  Have you done it here in the Southern District of New York?

6  A.  Yes.

7  Q.  Have you done it in the Eastern District of New York?

8  A.  Yes.

9  Q.  For how many years?

10  A.  Since 1995.

11  Q.  Have you testified as an expert in trial regarding English

12  to Spanish and Spanish to English translations?

13  A.  Yes.

14  Q.  Ms. Berah, I am going to show you what is in evidence as

15  Government Exhibit 120.  I think you have it in your binder

16  there.  If you could look at the last three pages -- I should

17  say the last four pages of Government Exhibit 120.

18  A.  Yes.

19  Q.  Have you had an opportunity before your testimony today to

20  review this Spanish document?

21  A.  Yes.

22  Q.  If you could look at pages 2, 3, and 4 of that exhibit,

23  which for the record are Bates Nos. 107415 to 107417.  I should

24  say 107418 as well.

25  A.  Please repeat the numbers.

L5B6DON4                           Berah - direct

1   Q.   If you look at the bottom right-hand corner.

2   A.   Yes.

3   Q.   Looking at Bates No. Donziger, underscore, 107415 through

4   Donziger 107418.

5             THE COURT:  It's right here, ma'am.

6             THE WITNESS:  I am sorry.  I went to the last three

7   pages.

8   Q.   Have you had an opportunity before your testimony today to

9   review those four pages?

10  A.   Yes.

11  Q.   Are those four pages which are at Donziger 107415 to 107418

12  an English translation of the Spanish document which is at

13  Donziger, underscore, 107420 to 107423?

14  A.   Yes.

15  Q.   Is the English translation of that Spanish document true

16  and accurate in your opinion?

17  A.   Yes, it is, with a few exceptions.

18  Q.   Okay.

19  A.   A few details.

20  Q.   Okay.  Meaning on the translation -- the English

21  translation?

22  A.   Yes.

23  Q.   If we could go to Donziger 107415, the first page of the

24  translation.

25  A.   Yes.

L5B6DON4                          Berah - direct

1   Q.  Is there looking at the title in the translation any word

2   that you would change or modify?

3   A.  Yes, there is.

4   Q.  What would that be?

5   A.  Where it says, Agreement for Continued Investment of

6   Professional Services.

7   Q.  Yes.

8   A.  I would use Agreement or the Continued use of Professional

9   Services.

10  Q.  So instead of using "investment," you would have translated

11  this to use the word use?

12  A.  Yes.

13  Q.  Going to the first paragraph of the English translation,

14  are there any changes that you would have made with respect to

15  that first paragraph?

16  A.  Yes.  In the third line where it says the FDA --

17          THE COURT:  Ma'am, irst get next to the microphone and

18  then clearly and slowly.  It's a little muffled because of the

19  sound situation.

20  A.  On third line after the comma, The FDA grants a paramount

21  durable international legal power of attorney.  I would have

22  replaced the word "paramount" with "superior."

23  Q.  Any other change?

24  A.  For both of the documents where it says Amazon Defense

25  Front.  I would have used Amazon Defense Coalition, because

L5B6DON4                          Berah - direct

1   that is what I found on the internet for the legal name for

2   this entity.  Even though it is referred to the Amazon defense

3   front --

4            THE COURT:  Slowly, slowly, slowly.

5   A.  Even though it says Amazon Defense Front, I would have used

6   Amazon Defense Coalition.

7   Q.  Other than those changes, Ms. Berah, is this English

8   translation of the Spanish document a true and accurate

9   translation in your opinion?

10  A.  Yes, it is.

11  Q.  If I could turn you to Government Exhibit 122 T, which is

12  in your binder.

13  A.  Yes.

14  Q.  Do you see that?

15           If you could go to the last three pages of this

16  exhibit, which would be Bates stamp DONZPJD 28 to 29 and 30.

17           Have you had an opportunity before your testimony

18  today to review this Spanish document?

19  A.  Yes.

20  Q.  If you could review on the same Exhibit 122 T the first

21  three pages, is that an English translation.

22  A.  Yes.  I have the English and the Spanish translation.

23  Sorry, I have the Spanish and English translation.

24  Q.  Have you had an opportunity to review the English

25  translation of that Spanish document before your testimony

L5B6DON4                          Berah – direct

1    today?

2    A.  Yes.

3    Q.  And is this English translation contained on the first

4    three pages of Government Exhibit 122 T a true and accurate

5    translation in your opinion?

6    A.  Yes.  With several minor details.

7    Q.  Okay.  If you could look at the top, the title, is there

8    anything that you would change or modify with respect to this

9    portion of the translation?

10   A.  Yes.

11   Q.  What is that?

12   A.  In the fourth line of the title where it says "Amount:

13   Indeterminate," I would have used "Scope: Indeterminate."

14   Q.  Any other change in this translation?

15   A.  Yes.  Where it states "occupation" on the fourth line of

16   the body of the translation itself, "occupation, agricultural,

17   livestock, and forestry professional," I would have used "high

18   school technician in agriculture, livestock, and forestry,"

19   because the Spanish states that he has a high school degree in

20   that capacity.  Professional is too broad a term and isn't

21   specific enough.

22          Thank you.

23   Q.  Any other change with respect to the translation that you

24   would have?

25   A.  No.

L5B6DON4                            Berah – direct

1  Q.  You have mentioned earlier about Amazon Defense Front?

2  A.  Yes.  I mentioned that for both documents.

3  Q.  When you said both documents, you meant 122 T as well as

4  120?

5  A.  That's correct.

6  Q.  So instead of Amazon Defense Front you would have used in

7  your translation Amazon Defense Coalition?

8  A.  That's correct.

9  Q.  Other than the changes you just testified that you would

10  have made, is this translation at 122 T in the first three

11  pages, a true and accurate translation of the Spanish document?

12  A.  Yes, it is.

13  Q.  Ms. Berah, are you receiving compensation for your services

14  as a Spanish interpreter in connection with this case?

15  A.  Yes.

16  Q.  Are you being compensated for your work today in connection

17  with your testimony with respect to your expertise?

18  A.  I am.

19  Q.  Approximately how much?

20  A.  A little bit under the full day rate for interpretations

21  services rendered for the U.S. Attorney's Office.

22  Q.  What is the full date rate for U.S. Attorney's Office

23  approximately?

24  A.  677 I believe.

25  Q.  With respect to the work that you did in reviewing these

L5B6DON4                          Berah – cross

1    documents before your testimony today, are you being

2    compensated for that as well?

3    A.  Yes, I am.

4    Q.  At what rate approximately?

5    A.  $100 per hour.

6              MS. GLAVIN:  If I may have a moment.

7              THE COURT:  Yes, ma'am.

8              MS. GLAVIN:  I move for the admission of Exhibit 122

9    T.

10             MR. KUBY:  No objection.

11             THE COURT:  Received.

12             (Government's Exhibit 122 T received in evidence)

13             MS. GLAVIN:  No further questions, your Honor.

14             THE COURT:  Thank you.

15             Mr. Kuby.

16             MR. KUBY:  Thank you, Judge.

17   CROSS-EXAMINATION

18   BY MR. KUBY:

19   Q.  Good afternoon, Ms. Berah.

20   A.  Good afternoon, Mr. Kuby.

21   Q.  The rate that you are being paid is a fixed rate; is that

22   correct?

23   A.  Well --

24   Q.  For today?

25   A.  No.  It's not a fixed rate.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L5B6DON4                         Berah - cross

1    Q.  How much are you being paid for your work today?

2    A.  I am being paid $500 for my testimony today.

3    Q.  And whether it's the rest of the day or we stop right now,

4    you get paid the same; is that correct?

5    A.  No.  That's the rate that I set.

6    Q.  Right.  What I am asking, though, is if I just sat right

7    down now without asking you anymore questions, you would still

8    make $500?

9    A.  That's correct.

10   Q.  Okay.  I am sitting down.  Thank you so much.

11   A.  Thank you.

12            THE COURT:  Any redirect?

13            MS. GLAVIN:  No, your Honor.

14            THE COURT:  Thank you, Ms. Berah.  You may step down.

15            (Witness excused)

16            THE COURT:  Ms. Glavin.

17            MS. GLAVIN:  I will bring back Ms. Champion.

18            THE COURT:  Yes, thank you.

19            Welcome back.

20            Ms. Glavin.

21   BY MS. GLAVIN:

22   Q.  Good afternoon, Ms. Champion.

23   A.  I am just going to get the docket binder.

24            THE COURT:  Somebody else will get it for you.

25   Q.  Ms. Champion, before the break, we had reviewed Government

L5B6DON4                          Berah - cross

Exhibit 2056, Judge Kaplan's July 23rd, 2018, order directing

certain discovery by August 15th, 2018.

          Do you recall that?

A.  Yes.

Q.  I will show you what is Government Exhibit 146.

          Do you recognize this email exchange?

A.  Yes.

Q.  Is this between yourself and Mr. Donziger?

A.  Yes.

          MS. GLAVIN:  Move for admission of Government Exhibit

146.

          MR. KUBY:  No objection, Judge.

          THE COURT:  Received.

          (Government's Exhibit 146 received in evidence)

BY MS. GLAVIN:

Q.  Ms. Champion, on June 29th, 2018, the bottom email, at

5:18 p.m., you write Steven:  Please confirm you will produce

all other documents responsive to Chevron's request by no later

than Wednesday.  Thank you.

          Ms. Champion, is this a reference to Judge Kaplan's

order which we have reviewed on June 25th and June 27th denying

Mr. Donziger's First Amendment arguments?

A.  Yes.

Q.  I am showing you if you go to the next email on July 24th

of 2018, you write, Dear Steven, I am writing to follow up on

L5B6DON4                        Berah - cross

my June 29th email below requesting that you "produce all other

documents responsive to Chevron's request no later than

Wednesday, July 4th."  With the exception of the documents you

provided on July 5, we have not received any of the documents

that you agreed at your deposition to search for and produce.

You have also failed to produce the "hundreds" of documents

withheld on First Amendment grounds, despite the fact that

Judge Kaplan has ruled that claim to be without merit.

          Ms. Champion, as of the date that you wrote this email

on July 20th, 2018, did Mr. Donziger produce to you hundreds of

documents withheld on First Amendment grounds that were

referred to in his deposition?

A.   No, he produced no further document.

Q.   I am going to show what you is Government Exhibit 2060 in

the docket sheet.

          MS. GLAVIN:  Move for admission, your Honor.

          THE COURT:  Received.

          (Government's Exhibit 2060 received in evidence)

BY MS. GLAVIN:

Q.   Did Mr. Donziger file a notice of appeal of Judge Kaplan's

decision on June 25th of 2018 denying his motion for dismissal

of protective order administrative stay?

A.   Yes.

Q.   With respect to this notice of appeal, he also notices an

appeal of Judge Kaplan's July 23rd, 2018, order, which is

L5B6DON4                          Berah - cross

1    Docket 2056, directing certain discovery to be produced by

2    August 15th; is that correct?

3    A.  Yes.

4    Q.  I will show you what is Government Exhibit 2067.

5             MS. GLAVIN:  Your Honor, move for admission of 2067 on

6    the docket sheet.

7             THE COURT:  Received.

8             (Government's Exhibit 2067 received in evidence)

9    BY MS. GLAVIN:

10   Q.  Ms. Champion, this document was filed on August 13th of

11   2018.

12            What is this motion?

13   A.  This is a motion by Mr. Donziger to stay discovery pending

14   appeal.

15   Q.  What was the date by which Mr. Donziger was to produce the

16   paragraph five compliance discovery request by?

17   A.  August 15th.

18   Q.  So this was filed two days before?

19   A.  Yes.

20   Q.  If we go to ECF page 3, summarize what Mr. Donziger is

21   seeking in this motion to Judge Kaplan?

22   A.  He is requesting a stay of all discovery directed at

23   himself as well as third-parties pending the resolution of his

24   interlocutory appeal of the Court's orders and implicit

25   modification of the RICO injunction as he states.

L5B6DON4                              Berah - cross

1   Q.  Is Mr. Donziger citing his First Amendment argument in this
2   motion for a stay?
3   A.  Yes.  In that previous paragraphs he goes into that.
4   Q.  If I could read what Mr. Donziger states on page 3.
5           "Even if I am forced to go into contempt in order to
6   protect against this outcome, the threat still remains
7   regarding Chevron's ongoing attempts to obtain the discovery
8   from nonparties; additionally, the harm of enduring a contempt
9   citation from this Court is significant in its own right.  On
10  the other side of the ledger, Chevron has no basis -- zero --
11  to claim irreparable injury if a stay is issued."
12          THE COURT:  A little more slowly as you go forward.
13  Q.  Just go to page 2.
14          Actually, the top of page 2 and if you look at the
15  very first and second line, do you see where Mr. Donziger
16  states, The discovery would inflict harm that would be
17  effectively unreviewable on appeal and imperil a substantial
18  public interest?
19          Is that the irreparable harm that Mr. Donziger was
20  claiming as reason for the stay?
21  A.  Yes, as stated in this motion.
22  Q.  Turning your attention to August 15 of 2018, did
23  Mr. Donziger on that date provide any response to the paragraph
24  five discovery compliance request -- withdrawn.
25          Did he provide any response to Chevron to the

1  compliance discovery request he had been ordered to produce by

2  that date?

3  A.  No.

4  Q.  Had Mr. Donziger produced any privilege log as of August 15

5  in 2018?

6  A.  No.

7  Q.  Turning your attention to August 16 of 2018, did Chevron

8  file a motion to compel?

9  A.  Yes.

10  Q.  I will show you what is Government Exhibit 2073.

11          MS. GLAVIN:  Move into evidence, your Honor as this is

12  a docket entry.

13          THE COURT:  Received.

14          (Government's Exhibit 2073 received in evidence)

15  BY MS. GLAVIN:

16  Q.  Ms. Champion, if we go to ECF page 2, what was Chevron

17  seeking in this motion?

18  A.  In this motion we sought I believe -- can I see the next

19  page?

20          Next page.

21          Next page.

22          We sought a determination that he had waived the

23  privilege.

24          And that if you turn to the prior page, I believe we

25  also sought an order that his devices be forensically imaged

L5B6DON4                          Berah - cross

1   with the images to be lodged with the Court.  We sought full

2   compliance with our discovery requests.  And if you look back

3   at the next page, we also ask for a deposition.

4   Q.  What was the basis for which Chevron's request in seeking a

5   privilege waiver?

6   A.  His failure to serve a privilege log.

7   Q.  In connection with the litigation over a number of years

8   between Chevron and Mr. Donziger, had Judge Kaplan previously

9   found a privilege waiver in connection with Mr. Donziger's

10  failure to produce a privilege log?

11  A.  There had been a prior finding of waiver during the

12  Donziger discovery proceeding under Section 1782 -- 28, U.S.C.,

13  1782 which took place prior to the filing of the RICO case.

14  Q.  Are you aware of what that privilege waiver -- the finding

15  of privilege waiver what it was based upon?

16  A.  It was also based on the failure to provide a privilege log

17  for which multiple opportunities had been given.  I wasn't

18  actually on the case at that time, but I have read the Court

19  orders.

20          Now, I have also litigated that waiver subsequently

21  because it became relevant during the course of discovery in

22  the RICO case as well.

23  Q.  Ms. Champion, as of August 16, 2018, at the time Chevron

24  had filed this motion to compel, were you aware of whether or

25  not Mr. Donziger had documents that were responsive to the

L5B6DON4                          Berah - cross

1     outstanding discovery request that Mr. Donziger had not produce

2     today Chevron?

3     A.  Yes.  We knew he had such documents because he testified

4     about it at his deposition.  He mentioned it in multiple pieces

5     of correspondence that he was gathering documents and had

6     documents.  Also, we had obtained discovery from many third

7     parties that included documents that should also have been in

8     Mr. Donziger's possession including emails that he was on, his

9     financial statements.  Things of that nature.

10    Q.  Turning your attention to Government Exhibit 2077.

11              MS. GLAVIN:  Your Honor, move for the admission of

12    2077 which is on the docket.

13              THE COURT:  Received.

14              (Government's Exhibit 2077 received in evidence)

15    BY MS. GLAVIN:

16    Q.  Ms. Champion, this opposition to Chevron's latest motion to

17    compel and reiterate motion to stay, this was filed on

18    August 21st of 2018; is that correct?

19    A.  Yes.

20    Q.  Is this a motion by Mr. Donziger?

21    A.  This is an opposition by Mr. Donziger and he reiterates his

22    motion to stay discovery.

23    Q.  If we go to page 3, at page 3 with respect to Chevron's

24    request for a privilege waiver, Mr. Donziger:  While we have

25    not yet reached a stage where specific claims of privilege are

L5B6DON4                              Berah - cross

1    necessary, including in this motion, which rests on the

2    necessity of the overall stay of discovery pending appeal,

3    undersigned maintains and preserves all applicable claims

4    privilege and protection -- which claims are necessary of

5    course to protect not only undersign's interest as an attorney

6    but the interests of many clients who are not before the Court.

7              Is that what Mr. Donziger stated?

8    A.  Yes.

9    Q.  Did Mr. Donziger dispute Chevron's arguments in its motion

10   to compel that he was continuing to withhold all responsive

11   documents?

12   A.  I would have to read the whole pleading to remember that.

13             Keep going.

14             Keep going.

15             Keep going.

16             I mean, he says here -- I don't think he disputes it

17   and he says, I have not and will not destroy or otherwise fail

18   to maintain any documents or materials in accordance with the

19   preservation order entered by the court implying there are such

20   materials to preserve.

21             MR. KUBY:  Objection, Judge, to the implication.

22             Okay, nevermind.

23             THE COURT:  It is clear that the witness is basing it

24   on the document and not other knowledge that she has.

25             THE WITNESS:  Yes, your Honor.

L5B6DON4                          Berah - cross

1            MR. KUBY:  If that is her interpretation, that's fine.

2            THE COURT:  Yes, sir.  Thank you.

3    BY MS. GLAVIN:

4    Q.  Ms. Champion, moving to Government Exhibit 2088.

5            MS. GLAVIN:  Your Honor, I move for admission of 2088

6    as this is in the docket.

7            THE COURT:  Received.

8            (Government's Exhibit 2088 received in evidence)

9    BY MS. GLAVIN:

10   Q.  Did Judge Kaplan issue an order on Mr. Donziger's motion on

11   a stay pending an interrogatory appeal?

12   A.  Yes, he did.

13   Q.  If you go to page 2, is that this order?

14   A.  Yes.

15   Q.  Filed on September 25th of 2018?

16   A.  Yes.

17   Q.  Go to the bottom of ECF page 2.

18           I will read this portion of the order.

19           Donziger's motion is frivolous --

20           THE COURT:  Excuse me, Ms. Glavin.  Mr. Garbus, I love

21   your face but cover it up.

22   Q.  Donziger's motion is frivolous for a host of reasons,

23   including these:  1.  Insofar as the post-judgment discovery is

24   directed at obtaining information relevant to enforcement of

25   the money judgment, I note that Donziger has neither posted a

1    supersedeas bond nor applied for a stay of enforcement on any

2    other basis.  The judgment creditor has every right to seek and

3    collect on that judgment notwithstanding the pendency of the

4    appeal and to conduct discovery for the purpose of doing so.

5            Go to ECF page 3 of Judge Kaplan's order.

6            At point three I am going to read the portion

7    beginning among other things.  Among other things, Donziger's

8    contention that otherwise appropriate discovery designed to

9    obtain information relevant to enforce the money judgment

10   and/or to determine whether Donziger is violating the Court's

11   injunction, which was affirmed by the Court of Appeals -- to

12   the extent that it might reveal the identity of any funder or

13   supporter of his efforts -- would violate the First Amendment

14   would be unsupportable even if he had not forfeited those

15   arguments and even if he had standing to raise them, which in

16   important or all respects he does not.

17           Skipping to point four Judge Kaplan states, Donziger's

18   claims of irrepairable injury are unsubstantiated.  Moreover,

19   allowing him to continue to prevent enforcement of the money

20   judgment against him and to frustrate efforts to determine

21   whether he is violating the injunction against him, threaten

22   Chevron with irrepairable injury.

23           Accordingly the motion is denied in all respects.

24           Ms. Champion, after Judge Kaplan issued this order

25   denying Mr. Donziger's request for a stay pending his appeal,

1    did Mr. Donziger produce any additional discovery to you in

2    2018?

3    A.  No.

4    Q.  At the time that Judge Kaplan denied Mr. Donziger's motion

5    for a stay, was Chevron's August 16, 2018, motion to compel

6    still pending?

7    A.  I believe so, yes.

8    Q.  Showing you what is Government Exhibit 2018, if we can go

9    to ECF page 2.

10             MS. GLAVIN:  Your Honor, this is in the docket.  Move

11   for admission.

12             THE COURT:  Received.

13             (Government's Exhibit 2018 received in evidence)

14   BY MS. GLAVIN:

15   Q.  Is this Judge Kaplan's decision on Chevron's motion to

16   compel from August 16th?

17   A.  Yes.

18   Q.  What does Judge Kaplan order?

19   A.  He ordered that Donziger shall comply fully with the

20   outstanding discovery requests forthwith without withholding

21   any responsive documents or information on privilege grounds.

22   That's point one.

23             Point two:  Donziger shall appear for and respond to

24   questions at further deposition.  That's point two.

25             Point three:  It is appropriate that Donziger

1    electronic devices be imaged and examined for any responsive

2    documents that Donziger has not thus far produced under

3    appropriate safeguards of the interest of all parties.

4            He further ordered the parties on or before

5    October 26, 2018, to agree upon or in default of an agreement

6    notice for settlement in order -- go to the next page --

7    providing for the selection, compensation and precise duties of

8    a third-party to whom Donziger will be obliged to produce for

9    forensic imaging all computers and electronic, optical and

10   magnetic storage devices and media within his possession,

11   custody or control.

12   Q.  If we can go back to page ECF page 2 at bullet point one,

13   Judge Kaplan notes that "This is not the first time that he has

14   ignored the requirements of those rules."  Judge Kaplan cites

15   to Southern District Rule 26.2.

16           A moment ago you talked about a prior instance in

17   Chevron's litigation of Mr. Donziger in which Judge Kaplan

18   found a privilege waiver.

19           What are these case citations in bullet point one a

20   reference to?

21   A.  Well, there were several orders in that 1782 proceeding.

22   This is likely the one in which the Court applied a privilege

23   waiver on similar grounds for failure to serve a privilege log

24   in a timely fashion and then this would and the Second Circuit

25   decision affirming that order.

L5B6DON4                          Berah - cross

1    Q.  After Judge Kaplan issued this order, did Donziger notice

2    an appeal of this October 18th order to the Second Circuit?

3    A.  I do not recall whether he appealed this.  I think he did

4    appeal the prior motion to compel order.  I would have to look

5    at the docket.

6            Should I check?

7    Q.  It's okay.  We'll move on.

8            Did Mr. Donziger seek a stay in the Second Circuit of

9    the discovery that was proceeding while his interlocutory

10   appeal was pending?

11   A.  No.

12   Q.  Now, after the October 18, 2018, order by Judge Kaplan, did

13   you confer with Mr. Donziger as directed in Judge Kaplan's

14   October 18 order?

15   A.  Yes.

16   Q.  I am going to show you what is Government Exhibit 129.

17           Do you recognize this email?

18   A.  Yes.  This is an email I sent Mr. Donziger on October 25th

19   following our attempt to meet and confer with him regarding the

20   forensic imaging order.

21   Q.  If we can start at the bottom, Mr. Armani, with

22   Mr. Donziger's email to Ms. Champion.

23           THE COURT:  Are you going to move that?

24           MS. GLAVIN:  Yes, move for admission.

25           MR. KUBY:  No objection.

L5B6DON4                          Berah - cross

1            THE COURT:  Received.

2            (Government's Exhibit 129 received in evidence)

3    BY MS. GLAVIN:

4    Q.  Mr. Donziger's email to you, Ms. Champion, and to Andrea

5    Neuman on October 25th, 2018, at 10:02 a.m.

6            Read the first paragraph.

7    A.  I write to advise you of my anticipated course of action

8    regarding Judge Kaplan's order regarding the motion to compel

9    that waives all of my privileges.  To be clear, I continue to

10   assert all of my privileges and my position is that I have not

11   waived any of my privileges.

12   Q.  Go to the third paragraph of Mr. Donziger's email to you

13   and read that aloud.

14   A.  As a result, I presently see no choice other than to go

15   into contempt until I can get a ruling on the most basic issues

16   that are driving what I believe to be your entirely

17   inappropriate, over-broad, intrusive, and constitutionally

18   infirm discovery rampage targeting financial supporters and

19   others of the Ecuadorians that is clearly designed to dry up

20   funding for the case and to intimidate those who support both

21   the litigation and the broader corporate accountability

22   campaign (what you call a "pressure campaign") against your

23   client Chevron.

24   Q.  Read the last paragraph of this email or the next

25   paragraph.

L5B6DON4                          Berah - cross

A.  I don't want to go into contempt, but I generally feel that
the Court has given me no choice in light of its failure to
rule, which is obviously designed to shield its many
problematic decisions from appellate review.  I will be
apprizing Judge Kaplan of my position as soon as I can.
Q.  Ms. Champion, at this point in time that Mr. Donziger sent
this email, was there a pending contempt motion before Judge
Kaplan?
A.  I think at this time there were multiple perhaps.
Q.  Was the contempt motion related to Elliott Management still
pending?
A.  I believe so.
Q.  If we can go, Ms. Champion, to your email response to
Mr. Donziger on October, 25, 2018 later that day.  If you could
read the first paragraph.
A.  This is to confirm that Ms. Neuman and I called you this
morning to meet and confer on the Court's resent forensic
imaging order and you refused to engage on any substantive
issue -- insisting instead that you would be sending us an
email.  I asked during our call that you discuss both a
mutually agreeable forensic expert and a deposition date.  You
refused to discuss either.  We are now in receipt of your email
below regarding the pending order that we were scheduled
(yesterday and this morning) to meet and confer on.
Q.  If you could read the first two sentences of the next

L5B6DON4                          Berah - cross

1    paragraph.  The first three sentences.

2    A.  In reference to the Court's October 18, 2018, order, you

3    state below that you are "going into contempt."  We understand

4    this to mean that you are (1) refusing to jointly recommend a

5    forensic expert to the court to conduct the imaging of your

6    devices and accounts, (2) refusing to discuss or agree to

7    protocols pursuant to which that imaging will take place, and

8    (3) refusing to produce your devices and accounts.  If this is

9    not correct, please inform us of which, if any, of these items

10   you are not refusing to do immediately.

11   Q.  Ms. Champion, after you sent this email to Mr. Donziger,

12   did Mr. Donziger indicate to you that your understanding as

13   reflected in this email was in any way incorrect?

14   A.  No.

15   Q.  I show you what is Government Exhibit 2118.

16          MS. GLAVIN:  Move for admission.

17          THE COURT:  Received.

18          (Government's Exhibit 2118 received in evidence)

19   BY MS. GLAVIN:

20   Q.  Is this a letter from Mr. Donziger to Judge Kaplan filed on

21   the docket?

22   A.  Yes.

23   Q.  Filed October 25th of 2018?

24   A.  Yes.

25   Q.  If you could read what Mr. Donziger states in the first

L5B6DON4                          Berah - cross

1  paragraph.

2  A.  I write to respectfully inform the Court that I will be

3  unable to comply with the order dated October 18th, 2018,

4  directing me to produce a potentially massive quantity of

5  confidential and privileged documents and communications to

6  Chevron.

7  Q.  If we go to page 3 of this letter, could you read what

8  Mr. Donziger states in the sentence "Were I to comply."

9  A.  Were I to comply with the Court's October 18th order

10  (including without any assurances as to the scope of the

11  individual requests, because the Court has refused to rule on

12  any individual scope and burden objections), Chevron would

13  succeed in gaining near wholesale access to my confidential,

14  privileged, and protected documents without any legitimate

15  basis.

16  Q.  Ms. Champion, with respect to Mr. Donziger's statement, the

17  Court had refused to rule on my individual scope and burden

18  objections, had Judge Kaplan issued an order in May of 2018

19  regarding the scope and burden objections that Mr. Donziger had

20  asserted?

21  A.  Yes.

22  Q.  Now, go to the next paragraph.  If you could read what

23  Mr. Donziger stated with respect to "If the Court really

24  thinks" to the end.

25  A.  If the Court really thinks that a prohibition on litigation

1   finance was so clear after April 2014 that I can be held in

2   contempt thereof, it should make such a finding directly which

3   would allow me to seek appellate review.  Because the Court

4   refuses to do this, I apparently must take a contempt sanction

5   in this second-layer discovery context, try to consolidate it

6   with the pending appeals, and trust that the Second Circuit

7   will be able to appreciate it all in totality and in the larger

8   and deeply disturbing context of these post-judgment

9   proceedings generally.  I would urge the Court to rule on these

10  critical issues or hold me in contempt and thereby allow me to

11  appeal to the Second Circuit.

12  Q.  I am going to show you what is Government Exhibit 2120.

13  Move for admission, your Honor.

14          THE COURT:  Received.

15          (Government's Exhibit 2120 received in evidence)

16  BY MS. GLAVIN:

17  Q.  Ms. Champion, what is this document filed on October 30th

18  of 2018?

19  A.  This is Chevron Corporation's brief in support of its

20  proposed forensic protocol.

21  Q.  What was Chevron laying out in this particular brief?

22  A.  The reason for the various provisions in the protocol that

23  we submitted.

24  Q.  I should also show you what is Government Exhibit 2119.

25  This is in the docket.  We move for admission.

L5B6DON4                        Berah - cross

1                THE COURT:  Received.

2                (Government's Exhibit 2119 received in evidence)

3     BY MS. GLAVIN:

4     Q.  So Chevron had proposed a protocol for a forensic expert to

5     examine Mr. Donziger's devices?

6     A.  Yes.

7     Q.  Showing you what is Government Exhibit 2131.

8                MS. GLAVIN:  Move for admission.  It is in the docket.

9                THE COURT:  Received.

10                (Government's Exhibit 2131 received in evidence)

11    BY MS. GLAVIN:

12    Q.  This is a November 8, 2018, letter from Mr. Donziger to

13    Judge Kaplan filed on the docket?

14    A.  Yes.

15    Q.  If you could read what Mr. Donziger stated in the second

16    full paragraph?

17    A.  As I have argued repeatedly, discovery in these

18    post-judgment proceedings has been illegitimate from the start.

19    For six months I have sought a basic explanation from the Court

20    of how my litigation finance efforts can possibly be found in

21    contempt of court given the assurances provided in the

22    April 25th, 2014, opinion.  Docket 1901.  The Court has refused

23    to rule for over six months, clearly boxed-in by its own words.

24    Five months ago, I also sought a protective order "to prevent

25    discovery in this case from turning into a private 'blank

1   warrant' allowing Chevron to interviewed and infiltrate itself

2   into the First Amendment protected political activities,

3   associations, speech, operational practices, and strategic

4   deliberations of myself and others."  Docket 2026.  The Court

5   refused to provide relief and what I feared would happen is

6   precisely what has happened.

7   Q.  Go to ECF page 2 of Mr. Donziger's letter.  If could you

8   read allowed the paragraph "while I could."

9   A.   While I could make countless other objections to the

10  abusiveness and disingenuousness of Chevron's protocol and

11  desire searched and attack methodology, any and all objections

12  are pointless or at least premature at this point in light of

13  my intended course of action as I openly informed the Court on

14  October 25th, 2018.  Docket 2118.  There I indicated that my

15  position is that I am not ethically able to comply with the

16  Court's order to produce mountains of confidential and

17  privileged material to Chevron under a wholly improper

18  purported privilege waiver ruling and before the Court has even

19  ruled on the core issue in Chevron's original contempt motion.

20  If the Court is unwilling to rule on the legal basis of

21  Chevron's motion and continues to refuse to allow me to assert

22  any privilege whatsoever, I intend to openly and ethically

23  refuse to comply with any production order and to take an

24  immediate appeal of any resulting contempt finding the Court

25  issues against me.

L5B6DON4                          Berah - cross

```
 1   Q.  I will show you what is Government Exhibit 2118.
 2              MS. GLAVIN:  Your Honor, my error.  It is Government
 3   Exhibit 2133.
 4              THE COURT:  Thank you.  I take it you move?
 5              MS. GLAVIN:  Yes, your Honor.
 6              THE COURT:  Received.
 7              (Government's Exhibit 2133 received in evidence)
 8   BY MS. GLAVIN:
 9   Q.  If we can move to the second page, this is an order from
10   Judge Kaplan on November 26 of 2018 addressing Mr. Donziger's
11   November 8th letter?
12   A.  Yes.
13   Q.  What does Judge Kaplan rule here?
14   A.  He denies it.
15   Q.  I want to turn your attention to January 8th of 2019.  Was
16   there a conference before the Court on that day?
17   A.  Yes.  We had a conference before the Court regarding the
18   forensic examination protocol.
19   Q.  Did you attend that conference?
20   A.  I did.
21   Q.  Did Mr. Donziger attend that conference?
22   A.  Yes.
23   Q.  Showing you what is Government Exhibit 2149, is this a
24   transcript of the conference?
25   A.  Yes.
```

L5B6DON4                              Berah - cross

1    Q.  Have you had an opportunity to review that before your

2    testimony?

3    A.  Yes.

4    Q.  Is it accurate?

5    A.  Yes.

6              MS. GLAVIN:  Move for admission of 2149.

7              MR. KUBY:  No objection.

8              THE COURT:  Received.

9              (Government's Exhibit 2149 received in evidence)

10   BY MS. GLAVIN:

11   Q.  Ms. Champion, if we could read allowed the portions of this

12   transcript starting at page 10, line 16 to page 14, line 1.  If

13   you could read the portion attributed to Mr. Donziger, I will

14   read the portion attributed to the Court.

15   A.  I have a foundational objection, which I can reiterate

16   right now.  In terms of the specifics of the protocol, what I

17   would ask this Court to do is to hold off until this issue can

18   be decided by the appellate court.

19   Q.  THE COURT:  Denied.

20   A.  Okay.  Well, hold off at least until you can rule so we

21   know what is the precise scope of whatever the post judgment

22   RICO injunction is.

23   Q.  THE COURT:  Mr. Donziger, I am not delaying it.  I am

24   acting deliberately.  It's taking some time.  I'm doing that in

25   an effort to be sensitive to concerns you've raised.  I am not

1    putting everything on hold.  No way.  No how.  I've made that

2    clear over and over again.  Now either address the protocol or

3    don't.

4    A.  Is there a sense from the Court as to when we might see a

5    ruling in this.

6    Q.  THE COURT:  When it is ready, you'll be among the first to

7    know?

8    A.  Because while this issue has been pending decision -- are

9    we still going?

10   Q.  Yes.

11   A.  -- Chevron has subpoenaed many people -- I would say 20

12   people.  I lost track -- and conducted a series of depositions

13   which I think as you know I made myself clear are entirely

14   inappropriate and are designed to dry up funding for legitimate

15   advocacy and dry up our ability to advocate.

16        What I'm trying to point out is the fact the Court

17   hasn't ruled -- and I recognize you have whatever concerns you

18   have and to the extent you're being careful, I appreciate it,

19   but the fact the Court hasn't ruled --

20   Q.  THE COURT:  And surprising as this may be to you,

21   Mr. Donziger, this doesn't my only professional responsibility.

22   A.  I know.  Well, I -- let me just say this:  For this team

23   here, it's the majority of their work and they have been

24   deposing dozens of people and damaging the case, and there's

25   no -- in my opinion, there's no legal basis because the Court

1   has yet to rule --

2   Q.   THE COURT:  I know in your opinion there's no legal basis.

3   You are mistaken.  That's my ruling.  I know you don't like it.

4   A.   Well, for there to be discovery in this context, I'm

5   talking about the discovery that's going on as well as what I

6   would call the big enchilada, which is asking me to turn over

7   my entire digital life to them, there has to be a plausible

8   basis, legal basis, from which the Court can hold me in

9   contempt, and in light of the April 2014 order, the

10  clarification order --

11  Q.   THE COURT:  There is no clarification order?

12  A.   Well, whatever you want to call what you issued on

13  April 25th, 2014, which laid out the terms of fundraising for

14  case.

15  Q.   THE COURT:  I disagree with you.

16  A.   There's no -- in my opinion, there's no legitimate basis

17  for which to find me in contempt.  Therefore, there is no

18  legitimate basis for discovery.

19  Q.   THE COURT:  Mr. Donziger, I know your opinion.  I know your

20  opinion.  I know.  I've ruled on your opinion.  You lost.

21  A.   Well, that's why I am appealing.

22  Q.   Well, it's a free country.

23  A.   In terms of the specifics of the protocol, I have numerous

24  objections.  My main objection is foundational.  In terms of

25  specifics, the time -- can I state my specific objection?

L5B6DON4                         Berah - cross

```
 1   Q.  Look, Mr. Donziger, I understand that -- well, I won't even
 2   say what I understand.  I am not here to provide a forum to you
 3   except on the point that I want to hear about actually in your
 4   interest.  Now, if you don't really want to address that,
 5   that's okay.  I will decide it without anything coherent you
 6   have to say.
 7   A.  In terms of this specifics of protocol, may I?
 8   Q.  So the extent you have not raised it before, yes.
 9   A.  So I refer you to a letter I wrote November 8 of last year,
10   Docket 2131.  It outlines some of my position.  My main
11   concerns are the search terms are way overbroad.  You know,
12   there's a certain issue --
13   Q.  THE COURT:  You were supposed to have met and conferred
14   about search terms, were you not?
15   A.  Well, I have a foundational objection.
16   Q.  THE COURT:  I don't care about your foundational objection.
17   You don't in this Court.  The foundational objection I have
18   ruled against.  They have a right to conduct appropriate
19   discovery as far as I'm concerned.
20          I know you have an appeal pending the Second Circuit.
21   I know their brief is due some time in March.  That's the way
22   it goes.  You don't have a stay.
23   A.  Do you want know articulate some of my concerns about the
24   protocol, or just let it rest on the letter?
25   Q.  THE COURT:  It's up to you, but I don't want to hear about
```

L5B6DON4                          Berah - cross

1     this foundational objection anymore.

2               We can stop there.

3               Ms. Champion, I want to turn your attention to

4     March 5th of 2019.  Did Judge Kaplan issue some orders that

5     day?

6     A.  Yes.  He issued an order regarding the forensic inspection

7     protocol and entered a particular protocol.

8               MS. GLAVIN:  Your Honor putting into evidence

9     Government Exhibit 2170, 2171 and 2172 which are all on the

10    docket.

11              THE COURT:  Received.

12              (Government's Exhibit 2170, 2171, 2172 received in

13    evidence)

14    BY MS. GLAVIN:

15    Q.  With respect to Government Exhibit 2170, this order of

16    appointed issued by Judge Kaplan, what does this do?

17    A.  This appoints Ondrej Krehel Of Liefars to serve as the

18    neutral forensic expert to perform the functions designated in

19    the protocol for the neutral forensic expert.

20              (Continued on next page)

21

22

23

24

25

L5BVDON5                           Champion - direct

1    BY MS. GLAVIN:

2    Q.  And with respect to Government Exhibit 2171, the

3    memorandum, Re:  Forensic inspection protocol, what is this

4    opinion, Ms. Champion?

5    A.  This is an opinion regarding the forensic inspection

6    protocol issued by the Court.

7    Q.  And if we could go to Government Exhibit 2172.

8             And what is this, Ms. Champion?

9    A.  This is the forensic inspection protocol that the Court

10   entered.

11   Q.  With respect to the forensic inspection protocol,

12   Ms. Champion, did Judge -- if I could turn you to the forensic

13   protocol at paragraph 4.  What did Judge Kaplan direct in

14   paragraph 4?

15   A.  He directed that Donziger, within three business days of

16   entry of this protocol, provide to both the neutral and

17   Chevron's forensic experts via email a representation listing

18   under penalty of perjury all devices he has used to access or

19   store information or for communication since March 4th, 2012.

20            Should I keep going?

21   Q.  Yes.  You know, summarize what Judge Kaplan directed here.

22   A.  So this includes, as the Court lists, personal computers,

23   tablets, phones, and external storage devices, as well as a

24   list of all accounts, including web-based email accounts, web

25   or cloud-based document management services such as Dropbox;

1    messaging services such as WhatsApp, Facebook Messenger,

2    instant messages, etc., that Donziger has used since March 4,

3    2012.

4    Q.  And if you could turn to paragraph 5 of the protocol.  What

5    did Judge Kaplan direct Mr. Donziger to do here?  You can

6    summarize it.

7    A.  He directed Mr. Donziger to surrender his devices and media

8    to the neutral forensic expert at his home so that the neutral

9    forensic expert could take possession of them in order to

10   conduct the imaging described in the protocol.

11   Q.  And what was the date by which the devices -- or date on

12   which the devices were to be surrendered to the neutral

13   forensic expert?

14   A.  March 18th, 2019.

15   Q.  And if you could read the last sentence.

16   A.  At no time shall Chevron's forensic expert have access to

17   the original devices or to live media accounts absent further

18   court order.

19   Q.  Now, Ms. Champion, did Judge Kaplan's forensic protocol,

20   which is Government Exhibit 2172, allow Chevron to get control

21   of Mr. Donziger's electronic devices in any way or at any

22   point?

23   A.  No.

24   Q.  Did the forensic protocol allow Chevron to have full access

25   to the images taken of Mr. Donziger's electronic devices?

L5BVDON5                    Champion - direct

1    A.  No.

2    Q.  And did the forensic protocol list out the procedure by

3    which the neutral forensic expert would examine Mr. Donziger's

4    devices for responsive information?

5    A.  Yes.

6    Q.  Did the forensic protocol which Judge Kaplan issued on

7    20 -- at Government Exhibit 2172, did it -- did Judge Kaplan

8    accept Chevron's recommendations for what it wanted the

9    forensic protocol to be?

10   A.  No.  The Court altered the protocol; gave more duties to

11   the neutral forensic expert, and introduced certain privacy

12   protections for Mr. Donziger.

13   Q.  Turn your attention to Government Exhibit 133.

14          Are you cc'd on this email, Ms. Champion?

15   A.  I am, yes.

16   Q.  Is this an email from Mr. Donziger on March 11th?

17   A.  Yes.

18   Q.  And what was the date by which Mr. Donziger was to provide

19   a sworn list of his devices to the neutral expert, the Chevron

20   expert?

21   A.  I'm sure I should remember this, but I think it was March

22   4th, or was it the 11th?

23   Q.  The date of the protocol was what day, March 5th?

24   A.  Good point.  Must have been the 11th.

25   Q.  Well, if you look at paragraph 4, if we could pull this up

L5BVDON5                         Champion - direct

1    again on 2172.

2    A.   Oh, that's why I'm remembering March 4th, because it's

3    since March 4th.  Within three business days, so by March 8.

4              MS. GLAVIN:  Going back to 133, I move for admission,

5    your Honor.

6              MR. KUBY:  No objection, Judge.

7              THE COURT:  Received.

8              (Government's Exhibit 133 received in evidence)

9    Q.   This is an email from Mr. Donziger to Mr. Krehel, the

10   forensic expert; is that correct?

11   A.   Yes.

12   Q.   If you could read starting with the second paragraph,

13   "Judge Kaplan."  The second and third paragraph.

14   A.   Judge Kaplan for the last year has been allowing largely

15   unfettered post-judgment discovery targeting 25 or more people

16   connected to me or the Ecuador case under the auspices of a

17   motion that should have been resolved many months ago.  Until

18   it is resolved, I have very limited options to seek appellate

19   review.

20             While I naturally think the motion should be decided

21   in my favor, even that is beside the point:  It must be

22   decided, period, before I can ethically release confidential

23   and constitutionally protected personal and client documents to

24   Chevron, and certainly before I can allow my entire hard drive

25   and online accounts to be effectively seized and mirrored.

1          I have explained this to Judge Kaplan on repeated

2     occasions beginning almost one year ago.  Some of the

3     background can be understood by reading some of my

4     correspondence with the Court, per the attached.  I clearly

5     have stated that I will voluntarily go into civil contempt of

6     the legally unfounded orders in order to obtain proper

7     appellate review.

8          Judge Kaplan and Chevron have known this long before

9     starting the pointless process of having you appointed and

10    crafting a review protocol, etc.  So I hope you have not

11    cleared your schedule to work on this matter because, as

12    Chevron knows, I will not be producing documents until my due

13    process rights are respected.

14    Q.  I show you Government Exhibit 2173.

15         MS. GLAVIN:  Move for admission, your Honor.

16         THE COURT:  Received.

17         (Government's Exhibit 2173 received in evidence)

18    Q.  Is this a letter that Chevron filed with the Court on March

19    12th of 2019?

20    A.  Yes.

21    Q.  If you could just read the paragraph beginning with the

22    word "Based."

23    A.  Based on this correspondence from Donziger, Chevron expects

24    that when the Court's neutral forensic expert, Mr. Krehel, goes

25    to Donziger's address on March 18, as ordered by the Court,

L5BVDON5                         Champion - direct

1    Donziger will refuse to obey the Court's order to turn over all

2    of his devices.  At that point, Chevron will immediately bring

3    a motion for contempt.

4    Q.  Showing you what is Government Exhibit 134, if you go to

5    the top of this email exchange, is this an email from Ondrej

6    Krehel on March 18, 2019, that you were copied on,

7    Ms. Champion?

8    A.  Yes.

9    Q.  And if you could read what Mr. Krehel reported at 7:42 p.m.

10   A.  He reported that he -- the LIFARS forensic team arrived at

11   Mr. Donziger's residence at about 11:50 a.m.  Mr. Donziger met

12   them in the lobby.  He did not provide the forensic team with

13   any devices.  And then he says verbally, when asked,

14   Mr. Donziger provided list of devices:  One iPhone and one

15   MacBook Air System.

16   Q.  And is Mr. Donziger cc'd on this email?

17   A.  He is.

18   Q.  Showing you what is Government Exhibit 2175 --

19          MS. GLAVIN:  Your Honor, move for admission of

20   Government Exhibit 133 and 134.

21          MR. KUBY:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibits 133 and 134 received in

24   evidence)

25          MS. GLAVIN:  And move for admission of 2175.

1          THE COURT:  Received.

2          (Government's Exhibit 2175 received in evidence)

3   Q.  Ms. Champion, what is this document that Chevron filed on

4   March 20th of 2019?

5   A.  It's a motion to hold Donziger in contempt of court for his

6   failure to comply with the Court's March 5th, 2019 order

7   relating to the forensic imaging protocol.

8   Q.  And if you go to page 2 -- do you see page 2 of the motion?

9   Does Chevron suggest that the Court should impose sanctions for

10  Mr. Donziger's failure to comply with the forensic protocol

11  March 5th order?

12  A.  Yes.  Chevron asked the Court to impose monetary sanctions

13  that increase each day until Donziger is in full compliance;

14  and if noncompliance continues, his arrest and imprisonment

15  until such time as he fully complies with the March 5th, 2019

16  order.

17  Q.  And showing you what is Government Exhibit 2176 --

18          MS. GLAVIN:  Move for admission, your Honor.

19          THE COURT:  Received.

20          (Government's Exhibit 2176 received in evidence)

21  Q.  Ms. Champion, is this the brief in support of that notice

22  of motion?

23  A.  Yes.

24  Q.  And did Mr. Donziger respond or oppose, respond or oppose?

25  A.  He did.

1    Q.  I show you what is Government Exhibit 2184.

2              MS. GLAVIN:  Move for admission, your Honor.

3              THE COURT:  Received.

4              (Government's Exhibit 2184 received in evidence)

5    Q.  Is this Mr. Donziger's response to Chevron's motion to hold

6    him in contempt for not complying with the March 5th, 2019

7    order?

8    A.  It looks like it responds to two motions.  So 2176.

9    Q.  And are you familiar with the motion 2179?

10             MS. GLAVIN:  We can pull that up, government Exhibit

11   2979.

12   Q.  What was 2979?

13   A.  That relates to contempt based on transactions with David

14   Zelman.  So Mr. Donziger's responses to both motions.

15             MS. GLAVIN:  So move for admission of Government

16   Exhibit 2179.

17             THE COURT:  Received.

18             (Government's Exhibit 2179 received in evidence)

19             MS. GLAVIN:  And 2176.

20             THE COURT:  Received.

21   Q.  So there were two motions that Chevron filed to hold

22   Mr. Donziger in contempt; is that right?

23   A.  Yes.

24   Q.  Okay.  The motion to hold Mr. Donziger in contempt with

25   respect to David Zelman, was that for a violation of the RICO

L5BVDON5                          Champion - direct

1   judgment?

2   A.  Yes.

3   Q.  And what was the basis that Chevron moved to hold

4   Mr. Donziger in contempt with respect to David Zelman?

5   A.  His use of his personal interest in the RICO judgment, to

6   pay for personal services for himself and his wife.

7   Q.  And in connection -- before that motion was filed,

8   Ms. Champion, did you attend a deposition of David Zelman on

9   this particular issue?

10  A.  I did.

11  Q.  And before Chevron filed this particular motion, had David

12  Zelman provided documents to Chevron in response to a subpoena?

13  A.  Mr. Zelman did provide documents, but we also obtained

14  relevant documents from John Van Merkenstejn.

15  Q.  Now, moving back to Mr. Donziger's response, which is

16  Government Exhibit 2184 --

17          THE COURT:  Could I interrupt for a minute?

18          Van Merkenstejn?

19          THE WITNESS:  Yes.  So it's M-E-R-K-E-N-S-T-E-J-N, I

20  believe.

21          THE COURT:  Thank you.

22          MS. GLAVIN:  If we could go to page -- ECF page 4 of

23  Mr. Donziger's response.

24  Q.  If you could read where it says:  One, review protocol.  If

25  you could read the first sentence under that.

1    A.   This has already been briefed to some extent; although, as

2    I have made clear, my responses have been limited by the fact

3    that it is my intention to go into voluntary contempt as a

4    matter of principle, rather than submit to the review process

5    prior to achieving any appellate review.

6    Q.   And if you could turn to page 8, at footnote 3, and read

7    the first sentence.

8    A.   The situation is unusual, of course, given that I am

9    seeking a contempt finding in order to fully appeal the Court's

10   reinterpretation of its April 2014 opinion.

11   Q.   With respect to Mr. Donziger's response, if we could turn

12   to ECF page 10, the last sentence before the conclusion,

13   Mr. Donziger states:  Chevron has never agreed to simply sit

14   down and narrow the requests to information tailored to the few

15   legitimate topics at issue in these proceedings.

16          Ms. Champion, in your view, is that statement by

17   Mr. Donziger accurate?

18   A.   No.  I tried to go through the requests in our discovery

19   with him on one of our meet-and-confers, and he refused to

20   engage in that process with me.

21   Q.   Do you remember when that was?

22   A.   It was -- I think it was probably the May 4th

23   meet-and-confer, 2018.  It could have been the April 27th, 2018

24   one, but I did try to do that, and he did not -- he was not

25   interested in doing that.

1   Q.  And with respect to -- go to page 1 of this motion --

2   actually, page 2.  So if we could go to page 6 of

3   Mr. Donziger's response.  Go to page 7.  I'm sorry.  My error.

4            MR. KUBY:  Judge, might this be a good time for a

5   short five-minute break?

6            THE COURT:  Sure.

7            Is that all right with you, Ms. Glavin?

8            MS. GLAVIN:  Yes.

9            THE COURT:  All righty.  Let's do it.  Thank you.

10           MR. KUBY:  Thank you.

11           (Recess)

12           THE COURT:  Have we lost the witness?

13           MR. KUBY:  I hope so.

14           THE COURT:  No such luck.  She probably ran away.

15           MS. GLAVIN:  Your Honor, I do have one issue to raise.

16           THE COURT:  Sure.  Do you want to do it now?

17           MS. GLAVIN:  Sure.

18           My understanding is that when the witness left the

19   witness stand, a member of the audience -- I think it was the

20   woman wearing the light blue with the "Free Donziger" mask --

21   approached the witness, asked her how she could sleep at night,

22   told, Shame on you, shame on Chevron.

23           I understand people have free speech.  But when a

24   witness has been subpoenaed to testify and is in the courtroom

25   to be harassed by a spectator while they are doing what they

1    are required to do by law, I think it's problematic.

2            THE COURT:  All right.

3            Ma'am, all right.  None of that kind of activity.

4    This lady was subpoenaed.  Do you think she's happy to be here?

5    No.  All right.  Leave her alone.

6            MR. KUBY:  Okay.  Judge, she did volunteer for about

7    100 hours, however, of free, like, time, so --

8            THE COURT:  Thank you.  Thank you.

9            This is not a press conference.

10           Okay.  Ms. Glavin, let's get moving here.

11   BY MS. GLAVIN:

12   Q.  Ms. Champion, with respect, going back to Government

13   Exhibit 2182, if we could go to page 9 of that exhibit.

14           MS. GLAVIN:  Page 9.  Okay.  I'm sorry, page 8.

15   Apologize.

16           THE COURT:  You don't have it memorized?

17   Q.  Page 8 of that exhibit.  Just want to read out loud

18   Mr. Donziger's statement with respect to the Zelman matter.

19           Quote:  The Zelman issue is obviously *de minimis*.

20   Rather than waste additional resources litigating the propriety

21   of the agreement, especially in the context of the reigning

22   uncertainty of the scope of RICO injunction, I believe the

23   wiser course of action is to remove the issue for purposes of

24   the contempt motions by way of an agreement with Mr. Zelman

25   that will make clear that he never had and/or forfeits and

1    relinquishes any right, interest, or entitlement he might have

2    in the Ecuador judgment.  This agreement is being prepared, and

3    I believe it will be filed with the Court today.

4              We could go to page -- ECF page 11 -- ECF page 12.

5              Can I just have a moment.

6              (Pause)

7              THE COURT:  Off the record.

8              (Off record)

9              THE COURT:  On the record.

10             MS. GLAVIN:  With respect to -- back to ECF page 11 --

11   withdrawn.  Page 10, docket entry 2184.

12             THE COURT:  84 or 82?

13             MS. GLAVIN:  2184, your Honor.

14             THE COURT:  I'm sorry.  Thank you.

15   BY MS. GLAVIN:

16   Q.  Ms. Champion, if you could read the first paragraph of the

17   conclusion of Mr. Donziger's opposition.

18   A.  The reality is that my maintenance of principled positions

19   regarding the legitimate scope of discovery and the

20   associational rights at stake here does not amount to contempt

21   of this Court's authority.

22             Keep going?

23   Q.  Yes.

24   A.  Obviously I object to the Court's approach, and I honestly

25   do feel that I am being deeply abused in these post-judgment

proceedings.  I have relentlessly sought appellate review and

will continue to do so.  But I acknowledge the authority of the

courts and have never suggested that I would not ultimately

comply with the Court's orders if my objections are rejected on

appeal, just as I have sincerely sought to respect the

authority and limits of the Court's RICO decision and

injunction, even while expressing my views on the illegitimacy

and false foundations of the decision, in exercise of my First

Amendment rights.

Q.  Ms. Champion, I want to turn your attention to Government

Exhibit 2209, which I move for admission.  It's on the docket

sheet.

            THE COURT:  Received.

            (Government's Exhibit 2209 received in evidence)

Q.  Do you recognize this, Ms. Champion?

A.  Yes.

            MS. GLAVIN:  Go to the next page, Ms. Armani.

Q.  What is this decision issued by Judge Kaplan?

A.  This is the Court's contempt ruling which covers several

issues.

Q.  If we could go to ECF page 73.  And if you could read out

loud paragraphs 2A and 2B, Ms. Champion.

A.  With respect to the first of Chevron's two motions filed

March 20th, 2019, DI 2175:  Donziger is in willful civil

contempt of paragraph 4 of the March 5th, 2019 order, DI 2172.

1        Unless Donziger previously shall have complied fully

2   with each duty imposed upon him by paragraph 4 of the March

3   5th, 2019 order, he shall pay a coercive civil fine to the

4   Clerk of Court with respect to May 28, 2019, and each

5   subsequent day from that date, until the date on which he fully

6   purges himself of this contempt by doing so.  The amount of the

7   coercive fine shall begin at 2,000 for May 28th, 2019, and

8   shall double for each subsequent day during which Donziger

9   fails fully to purge himself of this contempt.

10  Q.  And Ms. Champion, in this particular decision and order,

11  did Judge Kaplan resolve Chevron's motion for contempt for

12  Mr. Donziger's disobedience of paragraph 5 of the forensic

13  protocol, meaning the surrender of his devices?

14  A.  No.

15       MS. GLAVIN:  Go to Government Exhibit 2219.

16       Move for admission.

17       THE COURT:  Received.

18       (Government's Exhibit 2219 received in evidence)

19  Q.  And what is this order from Judge Kaplan issued on May 29th

20  of 2019?

21  A.  This Court addresses the contempt of paragraph 5 of the

22  forensic inspection protocol.

23  Q.  And what did Judge Kaplan find?

24  A.  He finds that Donziger is in willful contempt of paragraph

25  5 of the March 5th, 2019 order, the forensic inspection

L5BVDON5                          Champion - direct

1    protocol.

2    Q.  And what did Judge Kaplan order as a coercive measure with

3    respect to Mr. Donziger's contempt at paragraph 5?

4    A.  The order states:  Unless Donziger previously shall have

5    complied fully with each duty imposed upon him by paragraph 5

6    of the March 5th, 2019 order, he shall pay a coercive civil

7    fine to the Clerk of Court with respect to June 3rd, 2019, and

8    each subsequent day from that date, until the date on which he

9    fully purges himself of this contempt by doing so.  The amount

10   of the coercive fine shall begin at $2,000 for June 3rd, 2019.

11   It shall --

12   Q.  You can stop there.

13               I show you what is Government Exhibit 2222.

14               MS. GLAVIN:  Move for admission.

15               THE COURT:  Received.

16               (Government's Exhibit 2222 received in evidence)

17   Q.  Ms. Champion, what is this order by Judge Kaplan?

18   A.  Oh, this is a corrected version of that order.

19   Q.  Meaning the order we just looked at, which was 2219?

20   A.  Yeah.

21   Q.  Okay.  Go to the last sentence.

22   A.  The Court notes nothing herein forecloses the possibility

23   of the Court granting additional coercive relief, including

24   increased fines and other issues, in the event the civil

25   contempt herein is not fully purged.

Q.  Showing you what is Government Exhibit 2223.

        Do you recognize that?

        MS. GLAVIN:  Move for admission, your Honor.

        THE COURT:  Received.

        (Government's Exhibit 2223 received in evidence)

Q.  Is this an order by Judge Kaplan filed on June 5th of 2019?

A.  Yes.

Q.  Can you read aloud paragraph 1.

A.  Unless the parties file a stipulation on or before June
7th, 2019, stating that they are in agreement that Donziger has
purged himself of the contempt as to which coercive fines were
imposed by the May 29th, 2019 order, as corrected, the Court
will hold a hearing at 10 a.m. on June 10th, 2019, to resolve
any remaining disagreement.

        As previously noted, Donziger holds the keys in his
pocket, figuratively speaking, with respect to any coercive
fines imposed upon him.  If he fully has purged or hereafter
purges himself of the contempts to which they apply, the
coercive fines will be avoided.

Q.  And if you go to paragraph 2 of Judge Kaplan's order, Judge
Kaplan refers to Mr. Donziger filing a motion to vacate.  Did
you recall what that was?

A.  I don't, no.  I mean, I can look at the docket.

Q.  Yes, why don't you take a look at that.  It would be docket
2221.

1    A.  So it's a motion to vacate, order 2219.  Oh, I recall that.

2    Q.  Okay.  What was it?

3    A.  It was basically saying the Court did not have jurisdiction

4    to rule on the paragraph 5 contempt, because he had appealed

5    already.

6    Q.  Meaning that Mr. Donziger had appealed Judge Kaplan's

7    decision of May 23rd, 2019?

8    A.  Exactly.

9           MS. GLAVIN:  For the sake of completeness, your Honor,

10   we'll move into evidence Government Exhibit 2221, that motion

11   to vacate.

12          THE COURT:  Thank you.  Received.

13          (Government's Exhibit 2221 received in evidence)

14   Q.  I'm showing you what is Government Exhibit 2229.

15          MS. GLAVIN:  Move for admission, as this is on the

16   docket.

17          THE COURT:  Received.

18          (Government's Exhibit 2229 received in evidence)

19          MS. GLAVIN:  We can go to page 1, or ECF page 2.

20   Q.  This is a brief filed by Chevron in advance of the June

21   10th hearing; is that correct?

22   A.  Yes.

23   Q.  And what was the purpose of this brief?  Withdrawn.  I

24   don't want to ask privileged information.

25          What did Chevron state in this motion that they were

1   doing with this brief?

2   A.  Essentially, as you can see from the top paragraph, we were

3   updating the Court in advance of the hearing scheduled for June

4   10th regarding Donziger's failure to purge his contempt at

5   paragraphs 4 and 5 of the Court's forensic protocol.

6   Q.  With respect to Mr.  -- withdrawn.

7        With respect to Judge Kaplan's finding Mr. Donziger in

8   contempt of paragraph 4, which required Mr. Donziger to provide

9   a sworn list of his devices, what was Chevron's position as to

10  whether or not he had purged that contempt?

11  A.  Chevron did not -- took the position that he had not purged

12  that contempt.

13  Q.  Had Mr. Donziger provided Chevron with declarations prior

14  to the filing of this brief on June 7, 2019, relevant to the

15  paragraph 4 order?

16  A.  Yes, he provided a declaration, and then he updated it

17  subsequently; so two versions of the declaration.

18        MS. GLAVIN:  If we could go to Government Exhibit

19  2230-1.  If you go to the second page.

20        Move for admission, as this was on the docket.

21        THE COURT:  Received.

22        (Government's Exhibit 2230-1 received in evidence)

23  Q.  This is dated May 29 -- Mr. Donziger's declaration is dated

24  May 29th of 2019.  Is that the first declaration that he filed?

25  A.  Yes, I believe so.  I believe the second one was in June.

Q.   Showing you what is Government Exhibit 2230-2.  If you go
to the second page -- the third page.

            MS. GLAVIN:  Move for admission of 2230-2.

            THE COURT:  Received.

            (Government's Exhibit 2230-2 received in evidence)

Q.   And Ms. Champion, what is the date of this declaration from
Mr. Donziger?

A.   June 3rd, 2019.

Q.   And what is the relationship to this declaration -- for
this declaration to 2230-1?

A.   This is the second -- the updated declaration that he
provided.

Q.   And what was Chevron's position as of June 7th, 2019, with
respect to Mr. Donziger's compliance with paragraph 5 of the
protocol, which is surrendering devices, had he complied?

A.   Chevron has maintained that he still has not complied.

Q.   Turning your attention to Government Exhibit 2352 --
actually, before I get to that, going back to Government
Exhibit 2229, go to the last page of this exhibit, page 9.  It
starts on ECF page 8.

            Did Chevron request that the Court direct Mr. Donziger
to surrender any passports he had until he complied?

A.   Yes.  Chevron requested that the Court order Donziger to
surrender any passports he has until he complies with the
forensic inspection protocol order so as to ensure that he does

1    not take his electronic devices beyond the jurisdiction of the

2    United States.

3    Q.   Okay.  Going back to Government Exhibit 2352.

4              MS. GLAVIN:  Move for admission, your Honor.

5              This is on the docket.

6              THE COURT:  Received.

7              (Government's Exhibit 2352 received in evidence)

8    Q.   Do you recognize this, Ms. Champion?

9    A.   Yes.  This is a transcript of the June 10th, 2019 hearing

10   before Judge Kaplan.

11   Q.   And did you attend that hearing, Ms. Champion?

12   A.   I did.

13   Q.   Have you had an opportunity to review this transcript

14   before today?

15   A.   Yes.

16   Q.   If we could start -- go to page 14 of this exhibit.  And if

17   you could read what -- go to lines 20 to 21, read what

18   Mr. Donziger stated with respect to the course of fines.

19   A.   Sir, no.  I don't have resources, sir, to pay fines.  My

20   bank accounts are frozen by them.

21   Q.   If you go to page 16 of this transcript and read what

22   Mr. Donziger stated at lines 8 to 9 with respect to his

23   passport?

24   A.   I will voluntarily surrender my passport until I can deal

25   with it at the Second Circuit.

L5BVDON5                          Champion - direct

1   Q.   Again on page 16, I'm going to read starting at line 24, to

2   page 17, line 5.  If you could read what Judge Kaplan stated to

3   Mr. Donziger.

4   A.   You have the ability to get yourself out of whatever box

5   you're in by complying with my orders.  And the United States

6   Supreme Court says, absent a stay, you have an obligation to do

7   that.  And if you do not discharge that obligation, you do it

8   at your own risk.  And that's been clear to you for a very long

9   time.  And you disregard order after order.

10  Q.   Turning to page 17, starting at line 19, and if you could

11  read what Mr. Donziger states starting with, "But my research."

12  A.   But my research -- and I can give you a couple cases on

13  this -- indicates that in post-judgment proceedings, when the

14  decision is already over -- there's been an appellate decision

15  affirming your Honor's RICO judgment -- the litigant has a

16  right to take a contempt finding up as a final appeal.  It is

17  really the only way to appeal it without being -- you know,

18  without -- the only way to really get review is to go into

19  contempt, which is why, based on that law, I have asked for you

20  to hold me in contempt for several months.

21  Q.   If you could turn to page 18 of the transcript, and go to

22  line 21.  And if you could read what Mr. Donziger states,

23  starting with "And I just think," and I will read what the

24  Court stated.

25  A.   And I just think that to render me a nullity, which is what

1    I think they're trying to do, and disable my advocacy,

2    implicates core First Amendment rights, and to turn over those

3    devices --

4    Q.  The Court:  So you keep saying.  I've heard that record

5    played many times before.

6              MR. KUBY:  Judge, at this point, I'm going to object.

7              We understand that Judge Kaplan really, really grew to

8    dislike Steven Donziger, and took every opportunity in the

9    record to say ugly things about him.  I don't know what this is

10   relevant to other than simply was it granted, was it denied.

11             THE COURT:  Ms. Glavin.

12             MS. GLAVIN:  I'm going to continue on, your Honor,

13   because it goes to Judge Kaplan pointing out that Mr. Donziger

14   did not have a stay, and he needed to seek a stay.  And it goes

15   to Mr. Donziger's state of mind, given the fact that he said he

16   relentlessly sought appellate review.

17             THE COURT:  Anything on that, Mr. Kuby?

18             MR. KUBY:  No, Judge.

19             THE COURT:  Overruled.  Go ahead.

20   BY MS. GLAVIN:

21   Q.  Now, let's end it.  I'm not going to listen to it anymore.

22   You've been fully heard on it.  You have briefed it.  I have

23   issued an opinion on it.  You appealed from that opinion.  You

24   filed a brief in the Second Circuit.  It hasn't been calendared

25   for argument.  You never sought a stay of it.  There it is.

L5BVDON5                      Champion - direct

1              You're welcome to go on to the Second Circuit and see

2      what happens.  But you take your chances in doing so.

3              If you go to page 20, line 8, and if you could read

4      what Judge Kaplan stated to Mr. Donziger, Ms. Champion, at

5      lines 8 to lines 23.

6      A.  Look, Mr. Donziger, just so it's entirely clear, these

7      coercive fines that I have imposed I have made clear will

8      evaporate if, as, and when you are in full compliance.  They

9      will be gone.  I'm not sure I had to do that, but I have made

10     that commitment.  And every day that goes by -- and indeed,

11     your statements here this morning suggest to me that they're a

12     waste of time; and that if these orders are to be enforced,

13     it's going to take more than I've done up to now.

14             Now, you would be well advised, so far as paragraph 4

15     is concerned, to work out your problems with Chevron and take

16     care of at least that part of it, which you don't seem to be as

17     upset about as the rest.  And you did manage to finally comply

18     with an order that's been outstanding for five years in respect

19     of the assignment.  We may come to a very hard place on

20     paragraph 5 for you, but that's where we are.  And I'm being

21     totally straight with you.

22     Q.  Following that June 10 conference, Ms. Champion, did Judge

23     Kaplan issue -- withdrawn.  Did Judge Kaplan issue an order

24     regarding Mr. Donziger's passport?

25     A.  He did.

1    Q.  Showing you what is Government Exhibit 2232.

2                MS. GLAVIN:  Move for admission.

3                THE COURT:  Received.

4                (Government's Exhibit 2232 received in evidence)

5                MS. GLAVIN:  We could go to page 2.

6    Q.  And Ms. Champion, if you could read what Judge Kaplan

7    ordered on June 11th of 2019.

8    A.  Accordingly, it is hereby ordered that Donziger, on or

9    before June 12, 2019, at 4 p.m., shall surrender to the Clerk

10   of Court each and every passport issued to him by each and

11   every nation to have issued a passport to him; the clerk to

12   retain possession thereof, unless and until this Court

13   determines that Donziger has complied fully with paragraphs 4

14   and 5 of the protocol.

15   Q.  Showing what is Government Exhibit 2233.

16               MS. GLAVIN:  And move for admission.

17               THE COURT:  Received.

18               (Government's Exhibit 2233 received in evidence)

19   Q.  What is this order, Ms. Champion?

20   A.  This is an order denying Donziger's motion to vacate the

21   Court's order relating to his paragraph 5 contempt.

22   Q.  If we could go to the next page.  If you could read the

23   last sentence, "This is without prejudice."

24   A.  This is without prejudice to any application by Donziger

25   for a stay pending appeal, made in full compliance with the

L5BVDON5                          Champion – direct

1   Federal Rules of Civil and Appellate Procedure, and the local

2   rules of this court, including, but not limited, to Local Civil

3   Rule 7.1.

4   Q.  Showing you what is Government Exhibit 2234, Ms. Champion.

5            MS. GLAVIN:  Move for admission, your Honor.

6            THE COURT:  Received.

7            (Government's Exhibit 2234 received in evidence)

8   Q.  What is this June 12th, 2019 filing by Mr. Donziger?

9   A.  This is an emergency motion to stay fines and sanctions

10  pending appeal or, in the alternative, for an administrative

11  stay.  And it relates to the passport order.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. GLAVIN:

2    Q.  If you look on page 1, you see where Mr. Donziger states, I

3    asked for a stay pending resolution of my appeal of the Court's

4    May 23, 2019, contempt opinion?

5    A.  Uh-huh.

6    Q.  And potentially resolution of any forthcoming appeal of the

7    first one-page paragraph contempt finding or two-page passport

8    order depending on the outcome of the motion to vacate and

9    whether I need to separately notice appeals of those orders?

10   A.  Yes.

11   Q.  He also states, I further request an immediate

12   administrative stay of all fines and coercive orders to allow

13   for resolution of the instant motion and if necessary an

14   emergency stay motion to the Second Circuit.

15          Is that what Mr. Donziger stated?

16   A.  Yes.

17   Q.  If we can go to ECF page 15.

18          If you could read out loud the last sentence of

19   Mr. Donziger's motion for a stay.

20   A.  In the alternative if the Court is unwilling to issue the

21   full stay, undersigned requests that the Court administratively

22   stay of all fines and coercive orders until the Second Circuit

23   is able to resolve a forthcoming emergency motion to stay under

24   Rule 8 of the Federal Rules of Appellate Procedure.

25   Q.  If you could go footnote six, Ms. Champion.  If you could

1  read the first two sentences of footnote six.

2  A.  I am not able to comply with the Court's deadline of

3  4:00 p.m. today in the passport order on account of this

4  pending motion for emergency relief and the severe and

5  irrepairable harm as articulated in this motion.

6  Q.  If you go down and read out loud the sentence towards the

7  end, "In the last 24 hours."

8  A.  In the last 24 hours, I have prepared this emergency stay

9  motion to your Honor, and I am immediately turning to the task

10  of preparing an emergency stay to the circuit in the event your

11  Honor denies this motion.  I will also continue to try to

12  understand the present situation I am in and make considered

13  decisions about the necessary next steps.

14  Q.  Showing you what is Government Exhibit 2250 and move for

15  admission?

16            THE COURT:  Received.

17            (Government's Exhibit 2250 received in evidence)

18            MS. GLAVIN:  Your Honor, I move admission of 2234 to

19  the extent I did not.

20            THE COURT:  Received.

21            (Government's Exhibit 2234 received in evidence)

22  BY MS. GLAVIN:

23  Q.  The title of this is Reply Declaration of Steve Donziger in

24  Support of Motion to Stay Pending Appeal.

25            If we can go to ECF page 3.

L5BVDON5                          Champion - direct

1          Read what Mr. Donziger stated here, Ms. Champion,

2     beginning with "To protect."

3     A.   To protect against the irrepairable harm of disclosure of

4     information for which I am claiming protection in my pending

5     appeal, I propose an alternative resolution to this motion that

6     should address Chevron's reasonable concerns.  I represent that

7     I agree to submit my devices to a neutral forensic expert

8     forensic imaging so long as the expert is directed not to allow

9     any access to the images by anyone until the appeal is decided.

10         This approach protects Chevron against the only

11    concrete "risk" of harm it was able to articulation (that I

12    might lose a device) and demonstrates my longstanding assurance

13    to the Court that I recognize I must comply with the Court's

14    disclosure orders, even in violation of my rights and the

15    rights of others, if I am unable to achieve any relief on

16    appeal.  Following this approach would also effectively resolve

17    the need for stay relief, because there would be no remaining

18    need for the "coercion" behind the Court's ordered seizure of

19    my passport, and as described below, I have already complied

20    with the Court's "paragraph four" order.

21    Q.   If you could go to ECF page 4, footnote three, what did Mr.

22    Donziger state in footnote three?

23    A.   This can be accomplished by court order, or independently

24    by me and I will inform the Court and Chevron under oath when

25    the imaging is complete.  In fact, if the Court rejects the

1    approach, I currently plan to retain an expert to perform the

2    imaging any way in order to demonstrate my willingness to

3    comply with any and all court orders once my appellate rights

4    have been respected.

5    Q.  Ms. Champion, if I could show you what is Government

6    Exhibit 2252.

7              MS. GLAVIN:  Move for admission.

8              THE COURT:  Received.

9              (Government's Exhibit 2252 received in evidence)

10   BY MS. GLAVIN:

11   Q.  In this June 28th, 2019, order, Ms. Champion, what does

12   Judge Kaplan direct?

13   A.  He directs that the accumulation of monetary sanctions be

14   suspended subject to further order of the Court because "it

15   does not appear that the further accumulation of monetary civil

16   contempt sanctions for these violations is likely to have the

17   desired effect."

18   Q.  If we turn to Government Exhibit 2254.

19             MS. GLAVIN:  The government move for its admission.

20             THE COURT:  Received.

21             (Government's Exhibit 2254 received in evidence)

22   BY MS. GLAVIN:

23   Q.  Go to page 3 of this order.  Is this a memo endorsed order

24   by Judge Kaplan?

25   A.  Yes.

1    Q.  Mr. Donziger's emergency motion for a stay?

2    A.  Yes.

3    Q.  Going to ECF page 3, if you could read what Judge Kaplan

4    ordered beginning with "in all the circumstances."

5    A.   In all the circumstances, Donziger's motion for a stay

6    pending appeal of certain relief granted in the Court's

7    contempt ruling (DI2234) is granted to the extent that those

8    portions of the protocol as require or permit disclosure to

9    Chevron of information obtained from Donziger -- specifically

10   paragraphs 7 B, 7 D-F, and 8 through 10 -- are stayed pending

11   appeal.  In order to avoid unnecessary additional delay, this

12   stay is conditioned explicitly on the following conditions:

13        Donziger shall file his appellate brief and appendix

14   in support of his appeal from the decision of May 23rd, 2019,

15   no later than July 31, 2019, and his reply brief no later than

16   14 days after the filing of Chevron's brief.

17        Donziger shall not oppose any motion for the Second

18   Circuit to expedite that or any related appeal.

19   Q.  Would you read the last few sentences?

20   A.  Donziger's motion is denied in all other respects.  Without

21   limiting the forgoing, he remains obligated to comply fully

22   with paragraphs four and five of the protocol and to surrender

23   his passports to the clerk as previously directed.

24   Q.  With respect to Judge Kaplan's stay with respect to

25   paragraphs 7 B, 7 D-F and 8 through 10 of the forensic

1    protocol, can you summarize what those provisions of the

2    protocol allowed for?

3    A.  I would really have to look at the protocol to do so.  The

4    Court here says those portions of the protocol as require or

5    permit disclosure to Chevron of information obtained from

6    Donziger.  The protocol provided a procedure for identifying

7    relevant documents from Donziger's devices, which would then be

8    produced to Chevron after various steps had been taken, etc.

9    So given what the Court states here, it is probably the

10   provisions that allow for that provision of documents.

11   Q.  Ms. Champion, did Mr. Donziger file his appellate brief and

12   appendix in support of his appeal from the May 23rd, 2019,

13   decision by July 31st, 2019?

14   A.  No.

15   Q.  Did Mr. Donziger apply to Judge Kaplan asking for an

16   extension on this condition that he file his appellate brief by

17   July 31st of 2019?

18   A.  No.

19   Q.  I want to turn your attention, Ms. Champion, to

20   Mr. Donziger's interest in the Ecuadorian judgment.

21          During the course of the post-judgment discovery

22   proceedings, did Mr. Donziger make any representations to Judge

23   Kaplan that he had not sold his personal interest in the

24   Ecuadorian judgment?

25   A.  During the course of the post-judgment proceedings?

1   Q.  Yes.

2   A.  Yes.  He represented that on several occasions that I

3   recall.

4   Q.  Turning to Government Exhibit 1986.

5           MS. GLAVIN:  Move for admission.

6           THE COURT:  Received.

7           (Government's Exhibit 1986 received in evidence)

8   BY MS. GLAVIN:

9   Q.  This is April 24th, 2018.  Go to ECF page 7.  This is a

10  filing by Mr. Donziger opposing Chevron's motion for contempt

11  in discovery on compliance with the RICO judgment?

12  A.  Yes.

13  Q.  Does Mr. Donziger state here on page 7 of that filing "It

14  is further devoid of any allegation that the interests

15  supposedly being monetized for specifically Donziger's or

16  Messrs. Camacho or Piaguaje's interests as opposed to the

17  majority outstanding interest in the case that the Court

18  recognized it would legitimately allow the Ecuadorian

19  plaintiffs to continue to raise money in the same fashion as

20  they have been doing.

21          Did I read that correctly?

22  A.  Yes.

23  Q.  If we can go to page 8 of that same filing at the bottom.

24  Tell me if I am reading this direct correctly:  Again, Chevron

25  has not presented any specific claim that the interest offered

L5BVDON5                          Champion - direct

1    for investment is specific to the undersigned or Messrs.

2    Camacho Piaguaje; is that correct?

3    A.  Yes.

4    Q.  Turning to the hearing on May 8th of 2018, Government 2010

5    in evidence.  If we can go to page 18 of this transcript.  If

6    you could read what Mr. Donziger stated at page 18 from line 23

7    starting at the bottom.

8    A.  I am selling as an intermediary the points or the aspects

9    of the judgment that are held by my clients.  I am not selling

10   my own shares, because that obviously is prohibited by your

11   Honor's RICO judgment.

12   Q.  If we can go to page 21 and if you could read

13   Mr. Donziger's statement at this hearing at lines five to

14   seven.

15   A.  What evidence have they presented to show I have sold a

16   single piece of my interest?  Zero.  And it hasn't happened.

17   I'll make that representation right now.

18   Q.  If we can go to page 26 at lines three to four and if you

19   could read what Mr. Donziger stated.

20   A.  I am not selling my shares; I am selling my clients'

21   shares.

22   Q.  Go to page 31 at lines five to seven and state what

23   Mr. Donziger told the Court.

24   A.  How do we know he hasn't sold his shares?  Well, I'm a

25   lawyer and I'm representing to you as an officer of the Court

1    right now I have not sold my own shares.

2    Q.  If we can go to page 31 at lines 13 to 14.

3    A.  Again, I am not selling my shares.  I am selling their

4    shares.

5    Q.  If we can go to page 32 at line 18 to line 22 and if you

6    read Mr. Donziger's statement to the Court.

7    A.  But if there's anything that might be arguably legit about

8    what they're seeking, it's something related to the narrow

9    issue of am I selling my own shares.  And if you're not going

10   to accept my representation, I can prove to you that I have not

11   sold my own shares, and that's what it should be limited to.

12   Q.  If you could go to Government Exhibit 2051.

13           MS. GLAVIN:  To the extent this is not in evidence, we

14   move for admission.

15           THE COURT:  Received.

16           (Government's Exhibit 2051 received in evidence)

17   BY MS. GLAVIN:

18   Q.  If we can go to ECF page 2 at the bottom.  If you could

19   read out loud Mr. Donziger's statement to the Court the first

20   sentence, last paragraph.

21   A.  It remains that Chevron has not presented even a scintilla

22   of evidence that I have sold any of my interests in the Ecuador

23   judgment -- the only operative factual question at issue that

24   could provide a basis for a contempt finding on the judgment

25   compliance issue.

Q.  Ms. Champion, if we can go to Government Exhibit 2184 in

evidence, Mr. Donziger's April 8th, 2019 contempt response.  Go

to ECF page 7.  If you could read the first two sentences of

the last paragraph.

A.  I understand how the agreement with Mr. Zelman can be seen

as a monetization of my interests in the Ecuador judgment

arguably in conflict with the Court's interpretation of the

terms of the RICO judgment.  Although, to be clear, I do not

concede that it is in conflict.  I did not fully appreciate

this at the time these services were provided, for reasons I do

not specifically recall -- although I assume it was because I

thought the restrictions of the RICO injunction were linked,

per the April 2014 opinion, to the context of a collection or

recovery.

Q.  Can you read the next sentence as well.

A.  Additionally, my recollection and understanding is that

neither Mr. Zelman nor I ever understood the agreement to be

legally binding, but rather an expression of the sentiment that

his generosity in providing services to me pro bono at a

critical transition point in my professional life would be

matched with generosity by me in the event I received a

significant monetary recovery.

Q.  Stop there.

        I am going to show you, Ms. champion, Government

Exhibits 105.  Take a look at that.

1              Do you see this email between Mr. Donziger and David

2     Zelman?

3     A.   Yes.

4     Q.   December 21st, 2016.

5              I will also show you Government Exhibit 106.  This

6     is -- at the bottom it's Steven Donziger to David Zelman on

7     December 23rd of 2016.

8              THE COURT:  Loudly, please.

9     Q.   Steven Donziger to David Zelman on December 23rd of 2016

10    and Mr. Zelman's response.

11             I also show you Government Exhibit 109.  If we can

12    blow this up.  This is an email exchange between David Zelman

13    and -- an email from David Zelman to Steven Donziger on

14    March 2nd, 2017.

15             If you go to Government Exhibit 110.  Blow this up.

16             MR. KUBY:  I do appreciate the expedited fashion in

17    which these documents are coming in, if there could be a

18    question or just throw them all in en masse that will be great.

19             MS. GLAVIN:  If you don't have a problem putting them

20    in, I will put them all.

21             MR. KUBY:  Fine.

22             MS. GLAVIN:  105, 106, 109, 110 and 111.

23             THE COURT:  Received.

24             (Government's Exhibits 105, 106, 109, 110, 111

25    received in evidence)

BY MS. GLAVIN:

Q.  Showing you 110 and 111 so you can see what is the substance is.

          111.

          Ms. Champion, have you seen these exhibits before the criminal contempt charges were filed?

A.  Yes.

Q.  These exhibits -- 105, 106, 109, 110, 111 -- were they provided to you at any point by Steve Donziger in the discovery process?

A.  No.

Q.  Did you receive these exhibits during the post-judgment discovery proceedings?  Did Chevron receive them?

A.  Yes.  They were produced by David Zelman.

          MS. GLAVIN:  Your Honor, if I may have a moment?

          THE COURT:  Yes, ma'am.

          MS. GLAVIN:  Your Honor, subject to Mr. Kuby not having an objection so that I can conclude my direct of Ms. Champion, we would like to take time after the court proceeding today to see if there are any exhibits that we failed to admit.

          MR. KUBY:  Anything after we're gone is fine with me.

          THE COURT:  Excellent.

          MR. KUBY:  Thank you.

          THE COURT:  All right.  Famous last words, cross-examination.

1    CROSS-EXAMINATION

2    BY MR. KUBY:

3    Q.  Good afternoon, Ms. Champion.

4    A.  Good afternoon.

5    Q.  Are you familiar with the actual criminal charges that have

6    been lodged in this case?

7    A.  I have reviewed the indictment, but it has been a long

8    time.  Generally, yes.

9    Q.  And those were filed on the civil docket of this case, is

10   that correct, by show cause order?

11   A.  You would have to let me look at the civil docket but that

12   sounds right.

13   Q.  If we can put SSS up on the screen, please.

14        Take a look at that for a moment, Ms. Champion.

15   A.  Okay.

16   Q.  Have you seen that before?

17   A.  Yes.  I have seen it before.

18   Q.  If we can turn to paragraph 14 on page 8., I will do a

19   little reading if you don't mind.

20        At all times from March 4, 2014, to and including

21   September 3, 2018, Donziger, in disobedience of paragraph one

22   of the RICO judgment, knowingly and willfully failed and

23   refused to transfer or assign to Chevron property that he had,

24   directly or indirectly, traceable to the Ecuador judgment, to

25   wit, contractual rights to a contingent fee under the retainer

1  agreement as that term is defined in the RICO judgment, and

2  knowingly and willfully caused Donziger and Associates to fail

3  and refuse to transfer said property.

4        You are familiar with that allegation; correct?

5  A.  Yes.

6  Q.  I am going to try to do a lot more summarizing than

7  reading.  So if I am summarizing in a way that you disagree

8  with, you please let me know.

9        That reference to the best of your understanding is in

10  reference to the 2011 retainer fee; is that correct?

11  A.  I believe so.

12  Q.  And that was Mr. Donziger's 6.3 percent interest in the

13  judgment?

14  A.  It is his 6.3 percent contingent fee.

15  Q.  It's contingent upon what?

16  A.  It's a contingency fee in the Ecuadorian judgment.

17  Q.  In order for him to receive any portion of that, the

18  judgment has to be paid in whole or in part; is that correct?

19  A.  I believe so, yes.

20  Q.  And how much has Chevron paid on that judgment?

21  A.  Nothing.

22  Q.  How much does Chevron intend to pay on that judgment?

23  A.  Are you asking me to reveal attorney mental impressions or

24  discussions with my client?

25  Q.  Maybe.  This is a criminal trial, Ms. Champion.  You're

1   testifying as a fact witness.

2   A.  I am not going to waive any privilege.

3   Q.  I am not asking you to waive privilege.  I am asking you

4   whether Chevron intends to pay any portion of that judgment?

5            MS. GLAVIN:  Your Honor --

6   A.  I am going to waive attorney-client privilege or

7   attorney-work-product protection.

8            MR. KUBY:  In that case, Judge, I would ask that you

9   direct the witness to answer the question, or if she wants to

10  hide behind the attorney-client privilege, strike the past two

11  days of testimony.

12           THE COURT:  What basis do you claim for my ordering

13  the witness to answer the question as a waiver of the --

14           MR. KUBY:  That.

15           THE COURT:  I am sorry.

16           -- of her clients privilege.

17           MR. KUBY:  Mr. Donziger's due process rights to

18  question a witness, to testify of the credibility of the

19  witness and the underlying allegations supersede in an

20  appropriate case an invocation of attorney-client privilege.

21           THE COURT:  I am not familiar with cases holding that,

22  sir.

23           MR. KUBY:  Okay.  We'll try to get you some by

24  tomorrow.

25           THE COURT:  Yes, sir.

L5B6don6                    Champion - cross

1    BY MR. KUBY:

2    Q.  In any case, there has been no collection on that judgment

3    to date, is that correct, Ms. Champion?

4    A.  I don't believe so.

5    Q.  And how long has that judgment been in existence?

6    A.  It was issued on February 14th, 2011.

7    Q.  This is the underlying Ecuador judgment?

8    A.  Correct.

9    Q.  And so it's been about a little over 10 years; correct?

10   A.  Sounds right.

11   Q.  Okay.  You -- and by you I mean Chevron -- believed that

12   Mr. Donziger's interests in the judgment was subsumed in the

13   Amazonia shares; is that correct?

14           MS. GLAVIN:  Objection as to what Chevron believed.

15           MR. KUBY:  I am sorry.

16           MS. GLAVIN:  Objection to the form.

17           THE COURT:  Would you speak into the microphone.

18           MS. GLAVIN:  Objection to form.

19           THE COURT:  As to what Chevron believed, Mr. Kuby.

20           MR. KUBY:  Okay.

21   Q.  Well, you believed on behalf of Chevron that Mr. Donziger's

22   interest in the judgment was subsumed under the Amazonia

23   shares; is that correct?

24           MS. GLAVIN:  Objection as to form.

25           THE COURT:  Sir, how does a witness believe on behalf

L5B6don6                          Champion - cross

1   of a client X Y Z?

2   Q.  You believed that Steven Donziger's interest in the

3   judgment was subsumed under the Amazonia shares; is that

4   correct?

5   A.  Mr. Kuby, I am not going to answer your question about my

6   mental impressions, but I will refer you to your client's

7   testimony during the RICO trial in which he stated that he held

8   shares in Amazonia corresponding to his contingency interest in

9   the judgment.

10  Q.  Did recall meeting with the FBI on April 20th, 2020?

11  A.  It's hard to remember every meeting I had.  I had many in

12  part because the trial date here was delayed multiple times.

13  Q.  It's a simple question.  Do you recall it or not?

14  A.  A specific date, no, I don't.  I met with them many times.

15          THE COURT:  One at a time, children.  One at a time.

16          MR. KUBY:  These are yes and no questions.

17          THE COURT:  Okay.  You have to for the court

18  reporter's benefit allow the witness to stop talking before you

19  start again.

20          Same for you, ma'am.

21  Q.  Did you tell the FBI Chevron saw Donziger's contingency

22  interests and his interests in the Amazonia Recovery Limited

23  Amazonia shares as one in the same at this time?

24          Did you tell that to the FBI?

25  A.  I don't recall any specific utterances that I said on

L5B6don6                         Champion - cross

1   April 8th, 2020.

2   Q.   April.   Okay.

3        MR. KUBY:   Put up 3501-05.   Focus on page 2 of 7 and

4   highlight the first full paragraph.

5        MS. GLAVIN:   Your Honor, with respect to this line of

6   inquiry, I believe that Mr. Kuby needs to first ask the witness

7   if something might refresh her recollection of her testimony.

8   She did not recall.   So therefor the proper way to proceed is

9   for Mr. Kuby to ask if there is something that would refresh

10  her recollection.

11       MR. KUBY:   Your Honor, with respect I sat here for two

12  days listening to leading question after leading question after

13  improper format after improper form and I did not jump up and

14  make objections even though I could have even though they were

15  completely well founded because I had some interest in getting

16  through this process.   If this is how the private prosecutor is

17  going to deal with my cross-examination, that's fine and we'll

18  play by those rules henceforth.

19       THE COURT:   The problem, however, is that that method

20  of proceeding is to allow the witness to take a look at

21  something that might refresh her recollection and say, oh, yes,

22  now I remember.

23  BY MR. KUBY:

24  Q.   All right.   Ms. Champion, do you think if you took a look

25  at the FBI 302 which memorializes the notes of that

L5B6don6                          Champion - cross

1    conversation that might refresh your recollection of what you

2    said to the FBI?

3    A.  It might refresh my recollection as to the general topics

4    discussed, but I don't -- again, I can't confirm that I used

5    specific words or did not.

6    Q.  Let's give it a trial, shall we?

7    A.  Sure.

8            MR. KUBY:  Back up on the screen, please.  Take a look

9    at page 2.

10           THE COURT:  3501-05?

11           MR. KUBY:  That's right, Judge.

12   Q.  Page 2 on the first full paragraph where it says --

13           MR. KUBY:  Go ahead and highlight that.

14   Q.  Where it says Chevron sought --

15           THE COURT:  The problem is you have to let the witness

16   look at it.

17           MR. KUBY:  Yes, I am directing her.

18           THE COURT:  I know you are directing her.  The method

19   is not to read it.  The proper method is to let her read it

20   silently and then say, Does that refresh your recollection.

21           Counsel has referred you, Ms. Champion, to the first

22   full paragraph on that page.  Is that on your machine?

23           THE WITNESS:  Sure.  Yes.

24           THE COURT:  Thank you.

25           Let counsel know when you have finished reading it.

1         (Pause)

2    A.   Okay.

3    Q.   Does that refresh your recollection as to what you said to

4    the FBI on May 20th of 2020?

5    A.   Again, it does not refresh my recollection as to any

6    specific words that it I might have used, but I believe I was

7    explaining why the RICO judgment required the assignment

8    specifically of the Amazonia shares and the RICO opinion sets

9    forth what those Amazonia shares represent based on

10   Mr. Donziger's trial testimony and other things.  So I think I

11   was explaining we did not -- at that point, we were seeking to

12   enforce the provision of the judgment to assign the Amazonia

13   shares until Mr. Donziger said he didn't think those shares had

14   any meaning at which point we also sought the retainer

15   agreement as set forth in our motions to the Court.

16   Q.   When you say "we," you mean Chevron; is that correct?

17   A.   I mean we Gibson Dunn acting as counsel for Chevron in

18   motions, etc., before the Court.

19   Q.   The use of the word Chevron in this statement does that

20   refresh your recollection that you told the FBI Chevron?

21   A.   Mr. Kuby, again, I already said I don't remember.

22        MR. KUBY:  Excuse me, Judge.  I am sorry.  It's a yes

23   or it's a no.  If it's no, it's no.  I will ask more questions.

24   I don't need -- I mean, I heard a lot from Mr. Ms. Champion the

25   last two days and it has been delightful, but I don't need more

1    unless this trial is going to go on forever.

2            THE COURT:  The witness is in charge of how long she

3    sits in the chair.  If it is no, it's no.  If it is no but, it

4    is what it is.

5    Q.  Does that refresh your recollection that when you sat down

6    and you met with the FBI -- withdrawn.

7            Who else was in the room with the FBI?

8    A.  Again, it's hard for me to remember specific meetings, but

9    Ms. Glavin was always present.  The two FBI agents in the

10   courtroom today Emily and Nick were there.  I believe sometimes

11   by telephone especially after the pandemic.  Ms. Glavin's

12   associates, Ms. Armani and Mr. Mahoney were generally present.

13   Not always all three of them.  It is hard for me to remember

14   who was present at every meeting.  I usually had my attorney

15   with me as well.  Well, always.  Either in person or Zoom or

16   whatever we were using for the meeting.  Who was at this

17   particular meeting, I can't remember off the top of my head.

18   Generally all or many of those people were in the meetings.

19   Q.  Do you recall that you referred to Chevron's beliefs?

20   A.  I don't recall that.  I am sorry.  But I think it is common

21   for attorneys to say "we," meaning the client when they are

22   talking about a particular matter.  So it's entirely possible.

23   Just as you would probably done it as well.

24   Q.  Right.  Interchangeable when it comes to interviews?

25   A.  I am not going to agree to that as a general matter, but

1   sometimes, yes.

2   Q.  So we is either Gibson Dunn Crutcher or we is either Gibson

3   Dunn Crutcher and Chevron?

4   A.  Yeah.

5   Q.  So when you use the word Chevron, is it fair to say that

6   you probably mean Chevron?

7   A.  It really depends on the context.

8   Q.  Could be anything.

9          Is it true that Chevron saw Donziger's contingency

10  interest and his interest in Amazonia Recovery Limited shares

11  in one in the same?

12  A.  Mr. Kuby as set forth in our 34 filings and correspondence

13  to the court --

14  Q.  It's a yes or no.

15         MR. KUBY:  I am sorry, Judge.  If you're ruling is the

16  witness can answer the question any way she wants to answer the

17  question, I will stop doing this and listen and we'll go back.

18  It's entirely up to the Court.

19         THE COURT:  Are you able to answer the question as it

20  is phrased, ma'am?

21         THE WITNESS:  As it's phrased, no.

22  Q.  Do you recall saying it.

23  A.  I don't recall saying it.  It was over a year ago.

24  Q.  A lot of the things that happen in this case happened years

25  and years ago 'right?

1   A.   Sure.

2   Q.   And you have a pretty good memory for those; right?

3   A.   Honestly, I have litigation brain.  I remember when I need

4   to and then I forget it.  I am sure you do the same.

5   Q.   Ms. Champion, you were the lead associate on the fact side

6   of the case back when you were an associate?

7   A.   That's pretty much true.

8   Q.   You knew more about the case than almost anyone else?

9   A.   At that time I think that was a safe bet.

10  Q.   And your role from February 28, 2018, up until May of 2019

11  was to have institutional knowledge about the case; is that

12  correct?

13  A.   I think it's fair to say that I was brought onto work on

14  aspects of those proceedings because of my institutional

15  knowledge of the case given that it was focused on contempt of

16  the RICO judgment, yes.

17  Q.   So that's a yes?

18  A.   Yeah, I think so.  It's fair.

19          MR. KUBY:  I have been making notes as I go along

20  here, Judge.  Can we get ready with 3501, please.  Don't put it

21  up yet.  3501-3.

22  Q.   Is it fair to say that Donziger's interest in the judgment

23  was subsumed in Amazonia shares?

24  A.   What time period are you referring to?

25  Q.   April 3rd, 2020?

1    A.  Are you asking for my attorney mental impressions regarding

2    the litigation of these issues?

3    Q.  I am asking you a question.  I don't know what your mental

4    impressions are different from your nonmental impressions.  I

5    am asking you a question.

6    A.  I think that you would be better off directing that

7    question to Mr. Donziger.  He is the only one who knows how his

8    interest in the Ecuadorian judgment is documented and embodied.

9    We only know what he has produced to us.

10   Q.  On April 3rd, 2020, at a meeting with the FBI, did you tell

11   them Donziger's interest in the judgment was subsumed in

12   Amazonia shares?

13   A.  Again, I am not going to recall specific words I used.  Was

14   that topic discussed, I will credit your question in that

15   regard.

16   Q.  Does that mean yes?

17   A.  Again, I don't know what specific words were used.  If you

18   would like to refresh my recollection again, you could do that.

19   Q.  Sure.

20        MR. KUBY:  Put up 3501-3, please.

21   Q.  My associate who is in law school more recently than I, my

22   lawsuit reminded me is there a document that might refresh your

23   recollection?

24   A.  I forgot the question.  What is the question?

25   Q.  Whether you told the FBI Donziger's interest in the

1   judgment was subsumed in Amazonia shares?

2   A.   Well, I am assuming -- I am not aware of a document, but

3   you apparently have one so you are welcome to show me.  I have

4   not looked at the FBI's notes of our meeting.

5   Q.   Can we put up 3501-3 first page, last line.

6        Read that last line to yourself, please.

7   A.   Okay.

8   Q.   Does that refresh your recollection that you told the FBI

9   Donziger's interests in the judgment was subsumed in Amazonia

10  shares?

11  A.   Again, I don't know what specific words that I used, but

12  certainly it was our -- based on the RICO decision and

13  Mr. Donziger's testimony, his interests in the judgment was

14  subsumed in his Amazonia shareholdings.

15  Q.   Okay.  Thank you.  Thank you.  Thank you.  I think we

16  actually got to a great place.

17       Judge, the time has come, your Honor?  I have hours

18  and hours and hours to go.

19  A.   Let's keep going.  I have a job.

20       THE COURT:  You want to do a little bit more?

21       THE WITNESS:  Yeah.

22       MR. KUBY:  It's after 5:00.  You gave me an extra 15

23  minutes.  You did.  You got.

24  A.   I am only trying to protect your Friday.

25  Q.   My wife would be happy about that.

L5B6don6                          Champion - cross

1           I want to turn to the May 8th, 2018 hearing.

2           Is it fair to say that that hearing was to address the

3    issues revolving around the Amazonia share transfer, among

4    other things?

5    A.  It was related to the motion for contempt that Chevron

6    filed regarding the Elliott solicitation as well as the failure

7    to assign the Amazonia shares.

8    Q.  To the sort answer to my question would have been yes,

9    correct?

10   A.  I gave you my absence.

11          MR. KUBY:  Could you read the original question back.

12          THE COURT:  Certainly.

13          (Record read)

14   Q.  The answer to that question is yes, is that correct, Ms.

15   Champion?

16   A.  I think so, yes.

17   Q.  It was at that meeting that hearing where Mr. Donziger said

18   in words or substance that the Amazonia is a nonissue; correct?

19   A.  Again, you will have to look at the transcript if you want

20   his exact words, but he said something to that effect at that

21   hearing.

22   Q.  Okay.  That was also the hearing -- we went over this

23   yesterday -- where he said just give me something to sign and I

24   will sign it in words or substance; right?

25   A.  I believe so.  Again, you'd have to show me the transcript

1    to confirm; but I think that was at the May 10th or May 8th

2    hearing.

3    Q.   When I am asking you questions about what other people said

4    generally, a general answer is fine.  When I ask you specific

5    questions about words you spoke, I mean those words.

6             So in words or substance Steven said I don't think

7    Amazonia exists anymore; correct?

8    A.   I am uncomfortable answering questions about what

9    Mr. Donziger said or didn't say without a transcript in front

10   of me.  If you have that in the record, you can refer to it.  I

11   mean, he said the Amazonia was a nonissue more less.

12   Q.   Because it no longer existed, right, that's what he said?

13   A.   I am not going to put words in his mouth.

14   Q.   I am asking you to recall the May 8th transcript which you

15   read yesterday aloud?

16   A.   Pieces of it, yes.

17   Q.   Did you recall reading that piece?

18   A.   Again, his exact words I don't recall.

19   Q.   I didn't say exact words.

20   A.   He did indicate that he did not believe that the Amazonia

21   issue was a significant issue and that he believed the entity

22   had been taken over by Chevron.

23             Thank you.

24   Q.   It was at that point Mr. Mastro gave him a share transfer

25   form on the spot; right?

1    A.  Again, you would have to consult the transcript because

2    there were a lot of hearings, but believe it was at that

3    hearing, yes.

4    Q.  That form contained, among other things, a transfer of

5    Mr. Donziger's Amazonia shares; correct?

6    A.  Yes.

7    Q.  But it also contained a transfer of all of Mr. Donziger's

8    so-called judgment interests; correct?

9    A.  I would have to look at the form.  I thought the form given

10   to him is that hearing related only to the Amazonia shares.

11   And then after the hearing, we sent him a more general

12   assignment form based on his statements at the hearing.

13   Q.  Fair.  So the form that you ultimately sent him asks for

14   him so sign over Amazonia shares, number one; right?

15   A.  Yes.

16   Q.  And number two to sign over judgment interests as you

17   define them in that form?

18   A.  It was the second form.  A separate form.

19   Q.  Ultimately Judge Kaplan refused to order him to sign

20   anything that day on May 8th; right?

21   A.  I believe he said he is a free man or something of that

22   nature.  I am not going to make him sign it here.

23   Q.  Is it fair to say that the reason Chevron demanded Donziger

24   directly turn over his contingency interest in the judgment in

25   whatever form was because Donziger contended that Amazonia as

1     an entity was irrelevant?

2     A.   Again, I think it stated in a letter to the Court but, yes,

3     we understood from his statements that his interest was held in

4     some other way.

5     Q.   It was at that point, more less within days or so, that

6     your specific interest turned to the contingency interests of

7     Mr. Donziger in whatever form; correct?

8     A.   Are you asking me to reveal attorney-client communications?

9     Q.   I am asking you to answer the question, Ms. Champion.

10    A.   I am not sure I understand the question.  My specific

11    interests.

12              MR. KUBY:  Can we read the question back?

13              (Record read)

14    A.   I am not sure I understand the question.  We continued to

15    pursue assignment of both the Amazonia shares and the 2011

16    retainer agreement and then subsequent to that the 2017

17    retainer agreement once we learned about it.

18    Q.   When did you start pursuing the 6.3 percent contingency fee

19    interest separate from the Amazonia shares?

20    A.   Again, as you've already asked me about after the hearing,

21    we sent Mr. Donziger the general assignment form as well as the

22    Amazonia share transfer forms.

23    Q.   So that would have been around more less May 8th, May 9,

24    May 10th-ish?

25    A.   I think it was the same day as the hearing.

1   Q.  May 8th?

2   A.  Yes.

3           MR. KUBY:  Do you want to break now, Judge, or do you

4   want to go on.

5           THE COURT:  I think the witness is happy to sit here.

6   It's up to you.

7           MR. KUBY:  I am sure she is.

8           I think I am going to call it.

9           THE COURT:  You want to call it?

10          MR. KUBY:  Yes.  There's a lot here.

11          THE COURT:  Okay.

12          MS. GLAVIN:  If there is a lot here, I would rather

13  continue.  I have professional obligation and children.

14          MR. KUBY:  With all due respect, Ms. Champion, I am

15  not the one who brought you here.  I was not the one who met

16  with you.  I was not the one who asked you to be here.  So

17  frankly I don't care.

18          THE COURT:  Counsel, counsel.  You know better than

19  that.

20          MR. KUBY:  You know what, Judge, it kind of is.  This

21  is why lawyers make bad witnesses.

22          THE COURT:  What time do you want to begin in the

23  morning, ladies and gentlemen.

24          MS. GLAVIN:  9:00.

25          THE COURT:  Why don't you two confer off the record

1    and let me know what you would like.

2              MS. GLAVIN:  9:40.

3              MR. KUBY:  9:40.

4              THE COURT:  Okay.  9:40, children.  If you have any

5    issues call us and we can do it before 9:40.

6              Thank you, ladies and gentlemen.  Good evening.

7              MR. KUBY:  I forgot one thing.  Will you remind Ms.

8    Champion --

9              THE COURT:  Ms. Champion.

10             MR. KUBY:  I don't know that she is used to

11   witnessing, would you remind her she is under cross-examination

12   and she is not to discuss her testimony with anybody.

13             THE COURT:  You are aware of that, aren't you, ma'am?

14             THE WITNESS:  I am, your Honor.

15             THE COURT:  Thank you.

16             Okay, friends.  Good night.

17             (Adjourned to May 12, 2021, at 9:40 a.m.)

18

19

20

21

22

23

24

25

```
 1                           INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     ANNE CHAMPION

 4    Direct By Ms. Glavin . . . . . . . . . . . . 200

 5    SONIA BERAH

 6    Direct By Ms. Glavin . . . . . . . . . . . . 283

 7    Cross By Mr. Kuby  . . . . . . . . . . . . . 290

 8    Cross By Mr. Kuby  . . . . . . . . . . . . . 356

 9                         GOVERNMENT EXHIBITS

10    Exhibit No.                              Received

11     120    . . . . . . . . . . . . . . . . . . 205

12     121    . . . . . . . . . . . . . . . . . . 209

13     2050   . . . . . . . . . . . . . . . . . . 211

14     2051   . . . . . . . . . . . . . . . . . . 211

15     2057   . . . . . . . . . . . . . . . . . . 212

16     2061   . . . . . . . . . . . . . . . . . . 213

17     2064   . . . . . . . . . . . . . . . . . . 216

18     2089   . . . . . . . . . . . . . . . . . . 218

19     2113   . . . . . . . . . . . . . . . . . . 218

20     2114-9  . . . . . . . . . . . . . . . . . . 219

21     2165   . . . . . . . . . . . . . . . . . . 221

22     2169   . . . . . . . . . . . . . . . . . . 224

23     2209   . . . . . . . . . . . . . . . . . . 226

24     136    . . . . . . . . . . . . . . . . . . 230

25     2216-1  . . . . . . . . . . . . . . . . . . 230
```

 1    1989-1A, 1989-1B, 1989-1C  . . . . . . . . . 231

 2    150  . . . . . . . . . . . . . . . . . . 236

 3    144  . . . . . . . . . . . . . . . . . . 238

 4    112  . . . . . . . . . . . . . . . . . . 239

 5    1989  . . . . . . . . . . . . . . . . . . 242

 6    2002  . . . . . . . . . . . . . . . . . . 243

 7    2009  . . . . . . . . . . . . . . . . . . 246

 8    2020  . . . . . . . . . . . . . . . . . . 249

 9    116  . . . . . . . . . . . . . . . . . . 252

10    119  . . . . . . . . . . . . . . . . . . 257

11    2018 and 2026  . . . . . . . . . . . . . . 263

12    2037  . . . . . . . . . . . . . . . . . . 269

13    149A  . . . . . . . . . . . . . . . . . . 271

14    149  . . . . . . . . . . . . . . . . . . 271

15    2045  . . . . . . . . . . . . . . . . . . 272

16    122  . . . . . . . . . . . . . . . . . . 278

17    2056  . . . . . . . . . . . . . . . . . . 278

18    122 T  . . . . . . . . . . . . . . . . . . 290

19    146  . . . . . . . . . . . . . . . . . . 292

20    2060  . . . . . . . . . . . . . . . . . . 293

21    2067  . . . . . . . . . . . . . . . . . . 294

22    2073  . . . . . . . . . . . . . . . . . . 296

23    2077  . . . . . . . . . . . . . . . . . . 298

24    2088  . . . . . . . . . . . . . . . . . . 300

25    2018  . . . . . . . . . . . . . . . . . . 302

1   129 . . . . . . . . . . . . . . . . . . 305

2   2118 . . . . . . . . . . . . . . . . . 307

3   2120 . . . . . . . . . . . . . . . . . 309

4   2119 . . . . . . . . . . . . . . . . . 310

5   2131 . . . . . . . . . . . . . . . . . 310

6   2133 . . . . . . . . . . . . . . . . . 312

7   2149 . . . . . . . . . . . . . . . . . 313

8   2170, 2171, 2172 . . . . . . . . . . . 317

9   133 . . . . . . . . . . . . . . . . . . 321

10  2173 . . . . . . . . . . . . . . . . . 322

11  133 and 134 . . . . . . . . . . . . . . 323

12  2175 . . . . . . . . . . . . . . . . . 324

13  2176 . . . . . . . . . . . . . . . . . 324

14  2184 . . . . . . . . . . . . . . . . . 325

15  2179 . . . . . . . . . . . . . . . . . 325

16  2209 . . . . . . . . . . . . . . . . . 331

17  2219 . . . . . . . . . . . . . . . . . 332

18  2222 . . . . . . . . . . . . . . . . . 333

19  2223 . . . . . . . . . . . . . . . . . 334

20  2221 . . . . . . . . . . . . . . . . . 335

21  2229 . . . . . . . . . . . . . . . . . 335

22  2230-1 . . . . . . . . . . . . . . . . 336

23  2230-2 . . . . . . . . . . . . . . . . 337

24  2352 . . . . . . . . . . . . . . . . . 338

25  2232 . . . . . . . . . . . . . . . . . 342

1    2233    . . . . . . . . . . . . . . . . . 342

2    2234    . . . . . . . . . . . . . . . . . 343

3    2250    . . . . . . . . . . . . . . . . . 345

4    2234    . . . . . . . . . . . . . . . . . 345

5    2252    . . . . . . . . . . . . . . . . . 347

6    2254    . . . . . . . . . . . . . . . . . 347

7    1986    . . . . . . . . . . . . . . . . . 350

8    2051    . . . . . . . . . . . . . . . . . 352

9    105, 106, 109, 110, 111    . . . . . . . . . 354

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25