L5CVDON1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                    19 CR 561 (LAP)
                              11 CR 691 (LAK)

STEVEN DONZIGER,

           Defendant.          BENCH TRIAL

------------------------------x

                           New York, N.Y.
                           May 12, 2021
                           9:43 a.m.

Before:

                HON. LORETTA A. PRESKA,

                           District Judge

                    APPEARANCES

RITA M. GLAVIN
SAREEN K. ARMANI
BRIAN P. MALONEY
    Special Assistant United States Attorneys

LAW OFFICE OF RONALD L. KUBY
    Attorneys for Defendant
BY:  RONALD L. KUBY
    RHIDAYA S. TRIVEDI
    -AND-
OFFIT KURMAN PA
BY:  MARTIN GARBUS

ALSO PRESENT:  GRACE GILL, Paralegal

L5CVDON1

1          (In open court)

2          (Trial resumed)

3          THE COURT:  I guess we drove the witness out, huh?

4          MR. KUBY:  I have one tiny preliminary matter.

5          THE COURT:  Yes, sir.

6          MR. KUBY:  Based upon the Court's rulings over the

7     past two days -- well, based upon yesterday's court ruling with

8     respect to Mr. Donziger and his devices --

9          THE COURT:  Yes, sir.

10         MR. KUBY:  -- I fully discussed that ruling with

11    Mr. Donziger.  And based upon the representations that he is

12    going to make to the Court, because I think he is the one who

13    has to make them, at the end I will ask you to reconsider your

14    ruling.  You'll just hear from Mr. Donziger for just a moment

15    please.

16         THE COURT:  Okay.  By the way, I told you yesterday --

17    and I know the courtroom wasn't opened -- if you had

18    preliminary matters, to let us know so we didn't waste

19    everybody's time.  But in the future, both of you, if there are

20    preliminary matters, call us and we'll start early.

21         MR. KUBY:  Fair.  Sorry.

22         THE DEFENDANT:  Thank you, Judge.  Good morning.

23         THE COURT:  Good morning.

24         THE DEFENDANT:  I just want to -- I realize --

25         THE COURT:  You're welcome to sit so that you can be

L5CVDON1

1    close to the microphone.

2          THE DEFENDANT:  I realized yesterday after you ruled

3    on my devices exactly, sort of, the implications of it.  I am

4    not the normal accused person; I am actually part of the

5    defense team with a lot of knowledge.  And part of what I do

6    during the day is help prepare our defense case that we plan to

7    present.

8          And I would ask respectfully that you reconsider your

9    decision so I can have my computer here on the condition that I

10   do not communicate with the outside -- I mean, tweet or

11   whatever, which I know irritated you.

12         THE COURT:  Sir, it's not whether I'm irritated or

13   not, it's what the rules provide.

14         MR. KUBY:  Mr. Donziger, we will represent, will not

15   tweet, livestream --

16         THE COURT:  I'm sorry.  Communicate at all with the

17   outside world, broadcast, record, take photos.

18         MR. KUBY:  Right.

19         THE COURT:  Or use it for anything other than

20   communicating with the people sitting at the back table.

21         MR. KUBY:  With one exception, Judge.  There are other

22   counsel who are not present here, there are also potential

23   witnesses, and he is in communication with them.

24         THE COURT:  Okay.  But they don't need to be done

25   during the trial.

L5CVDON1

1              MR. KUBY:  Well --

2              THE DEFENDANT:  Well, first off, thank you for that.

3         Let me just explain briefly.

4         I'm preparing a -- in the event I testify, I am

5    preparing with someone not part of this team here -- I'm sorry,

6    another lawyer not part of the people in the court, that work.

7    And with that person, for example, I need to be in touch with

8    via email, if possible.  So it's just that kind of a person who

9    is a lawyer related to giving advice, although the person --

10             THE COURT:  Okay.  But you can do that not on court

11   time.

12             THE DEFENDANT:  That's fine.

13             THE COURT:  All right.

14        With those stipulations, you may have your device.

15             THE DEFENDANT:  Thank you, your Honor.

16             THE COURT:  We'll get an order up when we can.

17             THE DEFENDANT:  Okay.

18             MR. KUBY:  Thank you, Judge.

19             THE COURT:  Yes.

20        Good morning, ma'am.

21        Are we ready to start?

22             MR. KUBY:  I am.

23             THE COURT:  Okay.  We are continuing the

24   cross-examination of Ms. Champion.

25        Mr. Kuby.

L5CVDON1                    Champion - cross

1    ANNE CHAMPION,

2         called as a witness by the Government,

3         having been previously duly sworn, testified as follows:

4    CROSS-EXAMINATION (continued)

5    BY MR. KUBY:

6    Q.  Good morning, Ms. Champion.

7    A.  Good morning.

8    Q.  I believe when we left off yesterday, you had testified

9    that based upon the May 8th, 2018 hearing, that you decided to

10   ask Steven Donziger to execute a form transferring both the

11   Amazonia shares in one form, and a transfer and assignment of

12   judgment interests in another form; is that correct?

13   A.  Yes.  Although, again, it wasn't me deciding --

14   Q.  You can stop at "yes."  It will be faster.

15            THE COURT:  It will be better for the court reporter

16   if you don't talk over each other.

17            MR. KUBY:  Judge, may I have, sort of -- and I

18   recognize, because we're all lawyers here, so we tend to

19   over-argue things.  If the answer to the question is yes, no,

20   or I don't know, and the witness answers yes, no, or I don't

21   know, that's kind of the end of the answer.

22            Obviously Ms. Glavin will have an opportunity, as we

23   know, on redirect to ask for the explanations.  But I would

24   really like to get through this, and yes is a perfectly fine

25   answer.

L5CVDON1                    Champion - cross

1          THE COURT:  I got it.

2          The witness is encouraged to answer yes, no, I don't

3    know, if possible.

4    A.  I'm not trying to be difficult, but if you're --

5          THE COURT:  You don't get to comment.

6          You don't talk over the witness.  It's really hard for

7    the court reporter to take two people at once.

8          Question.

9    BY MR. KUBY:

10   Q.  Question --

11   A.  The answer to your last question then is no because of the

12   way the question was phrased.

13   Q.  I thought it was yes.

14   A.  You didn't let me finish my answer.  As you phrased it, the

15   answer is no.  You can rephrase it.

16   Q.  Tell me about the "yes" part.

17   A.  After the hearing, Gibson Dunn sent the assignment forms

18   for the shares to Mr. Donziger, along with an assignment form

19   for his judgment interest.

20   Q.  Thank you.

21         The assignment form for the judgment interests

22   included his 6.3 percent contingency fee from the 2011

23   retainer, plus other things too; is that correct?

24   A.  Yes.

25   Q.  Now, was there any specific reason why you asked for such a

1    broad assignment of his judgment interests?

2    A.  I trust that my attorney will object if I'm wading into

3    privileged territory.  But, you know, we were operating on the

4    facts that were known to us, which was that he had a 2011

5    retainer agreement, but there might be other things we were not

6    aware of, given what he stated about Amazonia being defunct and

7    irrelevant.

8    Q.  It's fair to say out of an abundance of caution, you folded

9    in all judgment interest, not just the 2011 retainer interests,

10   is that a fair characterization?

11   A.  I can't speak for an entire legal team or a client; I can

12   only speak for myself.

13   Q.  Okay.

14   A.  And I don't know that I know the answer to that.

15   Q.  Okay.  In any case, that's what you did, right?

16   A.  Correct.

17   Q.  And Mr. Donziger objected; correct?

18   A.  In some form.  He didn't execute the forms; he objected.

19   Q.  And then you made a motion to compel; is that right?

20   A.  Eventually, yes.

21   Q.  And that was June 27th, does that sound about right?  It

22   would be docket 2046, if you want to look it up, I think.

23   A.  It was definitely the summer of 2018.  I'm happy to look up

24   the exact date.

25   Q.  No, summer of 2018 is fine.

1          And on August 15, 2018, Judge Kaplan ruled; correct?

2    A.  August 15th sounds correct to me.  But again, you know,

3    with the caveat that I'm not looking at the docket sheet.

4          MR. KUBY:  Okay.  Grace, could you pull up Government

5    2072.  And if you could go to page 8 please.

6          We're having technical difficulties.  We'll be with

7    you in a moment.  You're old enough to remember that.

8          THE COURT:  Be careful with that old stuff.

9          MR. KUBY:  Just said "old enough."

10          THE COURT:  You have a second career as a TV

11    announcer.

12          MR. KUBY:  Not quite finished with this one yet.

13          (Pause)

14          MR. KUBY:  Judge, this is Government Exhibit 2072

15    already in evidence.

16          THE COURT:  Yes, sir.

17    BY MR. KUBY:

18    Q.  Ms. Champion, as to the request for the motion to compel

19    the transfer of Amazonia shares, Judge Kaplan granted that; is

20    that correct?

21    A.  Yes.

22    Q.  And he indicated that that transfer should be made through

23    a specific form?

24    A.  The Amazonia shares, I don't know that he said it should

25    be -- I don't recall him saying it should be a specific form;

1     but he did change our form for the transfer of the judgment

2     interest.

3     Q.   When you say he changed your form, he then affixed a form

4     that should be used?

5     A.   Correct.

6     Q.   Okay.  And with respect to the judgment interest, he said:

7              The situation stands somewhat differently, to the

8     extent that the form of assignment Chevron seeks, if executed,

9     would transfer not only Donziger's existing, identified, and

10    contractual rights to a contingency fee, but also unspecified

11    property said to be traceable to the Ecuador judgment or its

12    collections....  That's me.

13             To the extent that such property can be identified and

14    specifically described, Donziger will be compelled, if

15    necessary, to comply with the obligation.  But the Court does

16    not see what purpose would be served by now requiring Donziger

17    to execute a form of transfer and assignment with respect to

18    unidentified, undescribed property, as such an instrument would

19    leave entirely unclear what had been transferred and assigned.

20             Accordingly, in the exercise of discretion, it

21    declines now to require the execution of an instrument so

22    broad.

23             That was his ruling; is that correct?

24    A.   Well, you didn't change pages, at least my screen didn't.

25    I'm assuming you read it correctly, but that sounds like what

1   he ruled.

2   Q.  Would you like to read the document?

3   A.  I mean, I'm just saying I can't warrant the accuracy of

4   your quotation, but that sounds like what he ruled, yes.

5   Q.  Okay.  If at any point you question or have a question

6   about the accuracy of what I've read, feel free to ask that the

7   document be put in front of you, and you can review it or you

8   can have you read it.

9   A.  No, I appreciate that.  It seems like the monitor is frozen

10  right now, actually.  I don't know if it's happening to

11  everybody or just me.

12  Q.  It seems like a what, I'm sorry?

13  A.  It seems like the monitor is frozen; it's got a little

14  spinning dial.

15          MR. KUBY:  Oh, could we get that adjusted, your Honor?

16          THE COURT:  You're not asking old me, are you?

17          MS. TRIVEDI:  Judge, if it weren't already clear,

18  we're pro bono, and our computer is very cheap.  We are the

19  ones controlling the document, Kuby.  I know you don't get how

20  it works.  Grace is working on it, Judge.

21          THE COURT:  Off the record.

22          (Off record)

23          THE COURT:  Okay.  Are we ready to go here?

24          MS. TRIVEDI:  Not technologically, no, Judge.

25          MR. KUBY:  I'll try to persevere till the next

L5CVDON1                          Champion - cross

1   document.

2               THE COURT:  Yes, sir.

3               Excuse me.  Off the record.

4               (Off record)

5               THE COURT:  The younger tech man expert tells me that

6   it's defense's computer.  I suspect that the prosecution will

7   call up any documents you want if you ask them nicely.

8               MR. KUBY:  Okay.  Well, I appreciate that courtesy

9   then in the interest of moving --

10              THE COURT:  I made them do it.

11  BY MR. KUBY:

12  Q.  But he also did order Steven Donziger to execute his -- to

13  transfer his 6.3 percent contingency fee interest; is that

14  correct?

15  A.  Yes, the one embodied in the 2011 retainer agreement.

16  Q.  That's correct.

17              So while he disagreed -- he ruled against you with

18  respect to the form that you used; correct?

19  A.  I think that's a fair characterization.

20  Q.  He said, nonetheless, Mr. Donziger is ordered to execute a

21  different form; is that correct?

22  A.  Yes.

23  Q.  And he attached a copy of the form that Mr. Donziger was to

24  use to execute his shares?

25  A.  Yes.

L5CVDON1                      Champion - cross

1    Q.  And this was the first time in the long history of this

2    litigation that Judge Kaplan, by order, separated the Amazonia

3    shares on one hand and the contingency fee interest on the

4    other; is that correct?

5    A.  I don't know the answer to that.  This litigation went on a

6    long time.

7    Q.  Well, are you aware of any other time where those two

8    things were treated by Judge Kaplan as separate entities by

9    order?

10   A.  I can't think of one off the top of my head, but my

11   understanding is that Amazonia did not come into existence

12   until 2012, so after the 2011 retainer.

13          So, you know, it's possible that there were rulings

14   concerning the 2011 retainer before Amazonia was even known

15   about.  So I just don't know the answer to your question.

16   Q.  Okay.  So you can think of no specific order by Judge

17   Kaplan directing Mr. Donziger to specifically turn over the 6.3

18   percent contingency fee from the 2011 agreement before the

19   August 15th order?

20   A.  I mean, I think the RICO injunction does that.

21   Q.  Right.  And that was your interpretation of the RICO

22   injunction, I understand that.

23          But in terms of a specific order saying, Mr. Donziger,

24   hand over your 2011 retainer agreement 6.3 percent shares, you

25   are ordered to do this, he did that for the first time, to the

1    best of your knowledge, on August 15th, 2018?

2    A.  I'm not sure I agree with that, because I think paragraph 1

3    of the RICO injunction does say that -- it does mention the

4    retainer agreement specifically.  It requires him to assign to

5    Chevron forthwith all property traceable to the judgment.  So,

6    I mean, is there a separate paragraph in that injunction that

7    specifically says execute a document --

8    Q.  Right.

9    A.  -- relating to that?  Again, you'd have to pull it up for

10   me to be sure.  I don't think that there is, but I do think

11   paragraph 1 encompasses that obligation.

12   Q.  Right.

13          And it was based on your interpretation of paragraph 1

14   that you wrote the much broader order asking for all judgment

15   interests, right, based on paragraph 1 of the RICO injunction?

16   A.  Again, I quibble with the use of "your," because it's -- I

17   can tell you what actions we took.  I'm not comfortable saying

18   that they were, you know, me deciding or my actions.  We took

19   action to have Mr. Donziger assigned to us all interest

20   traceable to the judgment, including the 2011 retainer.

21   Q.  Let's try this:  The action that was taken with respect to

22   the broad judgment transfer order, that action was based on

23   paragraph 1 of the RICO injunction; correct?

24   A.  Again, I don't want to quibble too much with your phrasing,

25   but I think that if you look at the transfer form itself, it

1   references paragraph 1, so you can draw your conclusions from

2   there.  But that's the action that we took.  And we quoted

3   paragraph 1 in that form.

4   Q.  Right.  And Judge Kaplan rejected that; is that correct?

5   He said it's too broad.

6   A.  Again, I don't know if you want to pull up the order, but I

7   think what he said was, I decline in the exercise of my

8   discretion to require that now.

9   Q.  I read you the portion of his decision just a few minutes

10  ago.  The Court does not see what purpose would be served by

11  now requiring Donziger to execute a form of transfer and

12  assignment with respect to unidentified, undescribed property,

13  number one.  And he said that it was also unspecified property.

14  I am paraphrasing that to say Judge Kaplan, in essence, said

15  your form was too broad.

16          Do you quibble with that characterization?

17  A.  I prefer to look at the language that the Court used.

18  Again, I think that what the Court said was I decline -- you

19  know, something about in the exercise of discretion, he was not

20  going to require that now.

21  Q.  Right.  Because.  There was a "because" there.

22  A.  Again, I don't have the order in front of me.  You're

23  welcome to read from it.

24  Q.  You know what?  Do we have our tech back up?  Let's try it.

25          2072, page 9, beginning with "But."

1              My question, you said in the exercise of discretion,

2     the Court declines now to require the execution.  He provided a

3     reason for that.  Could you tell us the reason that he

4     provided?

5     A.  As the Court states, the Court does not see what purpose

6     would be served by now requiring Donziger to execute a form of

7     transfer and assignment with respect to unidentified,

8     undescribed property, as such an instrument would leave

9     entirely unclear what had been transferred and assigned.

10    Q.  Thank you.  And that order was August 15th of 2018?

11    A.  Yes.

12    Q.  And he gave Mr. Donziger six days until August 21st, 2018,

13    to comply with his August 15th order; correct?

14    A.  It was either the 21st or 22nd.  That sounds right, more or

15    less.

16    Q.  Fair.

17             On August 20th, Mr. Donziger wrote a letter saying,

18    I'm out of the country.  Correct?

19    A.  Yes.

20    Q.  And asked for a time extension.

21             I'm sorry, you just have to say yes.

22    A.  Oh, yes.

23    Q.  And then Judge Kaplan issues another order, and this would

24    be docket number 2079.  I'm going to try to summarize it.

25             It's a number of things, but one of the things it said

L5CVDON1                    Champion - cross

1    was Donziger must send two sets of signed originals by August

2    22nd by overnight courier and, in addition, the notarized

3    versions no later than September 3rd.

4    A.  I think it was August 29th he had to place the notarized

5    versions into the hands of a courier.  I think he said

6    September 3rd, right?

7    Q.  Yes, September 3rd were the notarized versions.  But August

8    29th, the notarized versions in the hands of the courier;

9    August 22nd, two signed originals.  Right?

10   A.  Yes.  But I don't know where you're getting the September

11   3rd date.  It might be in this order.  You can show me.

12   Q.  Withdrawn.  I'm getting it from the date of the contempt.

13              THE COURT:  Children, children, slowly.

14              THE WITNESS:  Sorry.

15              MR. KUBY:  We're trying to get through it as fast as

16   possible.

17              THE COURT:  You will have no transcript.

18              MR. KUBY:  I don't want one.  So that could be good

19   for us, Judge.

20              THE COURT:  The court reporter will die.

21   BY MR. KUBY:

22   Q.  Ms. Champion, I'm going to show you what the defense has

23   marked as Exhibit DD.  It's in evidence, I believe, as docket

24   2081.  And on August 30th -- do you have it in front of you?

25   A.  I do.

1   Q.   Okay.  In response to Mr. Donziger's --

2             THE COURT:  Mr. Kuby, speak into the microphone.

3             MS. GLAVIN:  If we could stop a moment.  We don't have

4   anything on our screens.  Our screens are down.

5             THE COURT:  Oh, dear.  Thank God you're here, William.

6             (Pause)

7             MS. GLAVIN:  Your Honor, if it's okay, I can sit in

8   the jury box and look at one of the monitors there.

9             MS. TRIVEDI:  You can come sit with me.

10            MS. GLAVIN:  Sorry?

11            MS. TRIVEDI:  You can come sit here, too.  You are a

12   defense lawyer.

13            MS. GLAVIN:  I think I will sit in the jury box.  I

14   don't want my work product infringed upon.  But thank you,

15   Ms. Trivedi.

16            MS. TRIVEDI:  You're welcome, Ms. Glavin.

17            THE COURT:  August 30th, 2018.

18   BY MR. KUBY:

19   Q.   And that was a letter from Randy Mastro; correct?

20   A.   Yes.

21   Q.   And it was in response to Mr. Donziger's, sort of,

22   statement that he would comply with this when he returned?

23   A.   Yes.  If you see the reference in the third paragraph of

24   the letter, Donziger has indicated in correspondence that he

25   does not intend to comply with the deadline set by the Court.

1     Instead, Donziger says that notarized versions and originals

2     will be provided as soon as practicable, etc.

3     Q.  Now, to the best of your knowledge, he was out of the

4     country at the time?

5     A.  That's what he stated.

6     Q.  Did you -- you, the corporate you, not specifically Anne

7     Champion -- make any investigative effort to find out if that

8     was true?

9     A.  I believe that would be work product.

10              MS. GLAVIN:  Yes, your Honor, I object.

11              THE COURT:  Sustained.

12              MS. GLAVIN:  Form and relevance.

13     Q.  Did you know where he was?

14     A.  Again, I think that infringes on work product.  I knew what

15     Mr. Donziger told us, which is that he was out of the country.

16              MR. KUBY:  Judge, in what world does that question

17     infringe upon work product, asking her whether she knew where

18     he was?  Didn't ask the source, didn't ask from whom, may not

19     get to do that, but that's a simple yes or no.

20              THE COURT:  Oh, if she knew, yes or no?

21              MR. KUBY:  Yes.

22              THE COURT:  Did you know, yes or no?

23     A.  Assuming that's not considered a waiver of work product,

24     no, I did not know.

25     Q.  Did you make any efforts to find out?

1   A.  In terms of asking Mr. Donziger, I don't recall.

2   Q.  Did you make any other efforts to find out?

3   A.  Again, I think you're infringing on work product.

4           MR. KUBY:  I'm asking whether she asked questions is

5   not work product and is not privileged.

6           THE COURT:  Counsel is not asking for what you did or

7   what you found out, but if you did.

8   A.  Again, without waiving any work product or privilege, I am

9   not aware of any steps taken.

10          MR. KUBY:  And if it would speed things along, I would

11  ask the Court to enter a standing order, which is simply that

12  at no point in response to any questions does Ms. Champion

13  waive any of her privileges.

14          THE COURT:  That's okay with you, Ms. Glavin, isn't

15  it?

16          MS. GLAVIN:  Well, if Mr. Kuby and the defense team

17  would stipulate that they will not assert that there has been

18  any waiver whatsoever by attorney-client or work product by

19  answers she gives, I'm on board.

20          THE COURT:  I think another -- sorry, would you be

21  kind enough to come to a microphone.

22          MR. BRODSKY:  Sure, your Honor.

23          THE COURT:  You better change the cover or I'm going

24  to be excommunicated or something.

25          MR. BRODSKY:  Your Honor, regardless of whether

L5CVDON1                    Champion - cross

1    Mr. Kuby or Ms. Glavin stipulates that anything Ms. Champion

2    says does not waive work product or the attorney-client

3    privilege, unfortunately, they can't do that for the rest of

4    the world.

5              Anything Ms. Champion says, she is under a duty not to

6    disclose communications with respect to legal advice with her

7    client.  She's under a duty of work product with respect to

8    opinion work product most especially, but fact work product as

9    well.  And it is a difficult position, because if she says

10   anything, regardless of what Mr. Kuby stipulates to, she would

11   be violating her obligations to her client and to Gibson Dunn's

12   work product and the client's work product, regardless of any

13   stipulation.  And there are collateral consequences to that.

14             MR. KUBY:  I'm going to withdraw my -- I thought it

15   might be a way of shortening things.  Like so many things I try

16   to make shorter, I just made it longer.  Forget I said anything

17   and let's continue.

18             THE COURT:  Thank you.  Thank you both.

19             MR. KUBY:  If we could stay on Exhibit DD, please, on

20   our screen.

21   BY MR. KUBY:

22   Q.  Now, with that letter that Mr. Mastro sent, he attached an

23   Exhibit A to that letter; is that right?

24   A.  There's a citation to an exhibit in the third paragraph;

25   but if you want to pull up the exhibit --

1    Q.   Yup.  I direct your attention to the letter from

2    Mr. Donziger dated August 22nd, 2018, docketed as 2081.  And

3    that letter was docketed at least by Randy Mastro as part of

4    his submission; is that correct?

5    A.   What do you mean by that?  I don't understand the question.

6    Q.   Okay.  When Randy Mastro submitted his letter, which is

7    docket 2081, he included this letter from Mr. Donziger as well,

8    and it has a docket number 2081.  That's all.

9    A.   They were submitted together.

10            Just to be clear, I doubt Randy Mastro knows how to

11   file anything on ECF.  I think it was probably done by a

12   paralegal.  But, yes, filed under his name.

13   Q.   Randy and I have something in common.  I never thought that

14   day would come.

15            THE COURT:  Me, too.

16            MR. KUBY:  You too?

17            Thank you.  Thank you, Ms. Champion.

18   BY MR. KUBY:

19   Q.   And that letter was on Mr. Donziger's letterhead; is that

20   correct?

21   A.   Yes.

22   Q.   And that letter made a number of assertions.  Mr. Donziger

23   made a number of assertions in that letter; is that correct?

24   A.   Yes.

25   Q.   And mostly they are in the form of protests, fair?

L5CVDON1                      Champion - cross

1   A.  Your characterization.

2   Q.  Okay.

3          MR. KUBY:  If you could highlight bullet point one,

4   please.

5   Q.  I sign each of these agreements under duress and under

6   threat of contempt of court based on a RICO judgment that is

7   contradicted by the findings of four layers of courts in

8   Ecuador and 17 appellate judges in that country.

9          THE COURT:  Keep the microphone near you.

10  Q.  Ecuador is the venue in which your client, Chevron,

11  insisted this matter be resolved, and where it had accepted

12  jurisdiction.

13         That's what Mr. Donziger wrote?

14  A.  Yes.

15  Q.  And you had heard that argument before, correct, from

16  Mr. Donziger?

17  A.  Yes, he often references the appellate courts in Ecuador

18  and the prior dismissal of the *Aguinda* action.

19  Q.  And that statement, as far as it goes, is truthful;

20  correct?

21         MS. GLAVIN:  Objection.  Hearsay.

22         THE COURT:  That's probably right, right, Mr. Kuby?

23         MR. KUBY:  I'm sorry, Judge?

24         THE COURT:  That's probably right?

25         MR. KUBY:  No, I mean --

1           MS. GLAVIN:  Mr. Donziger can take the stand.

2           MR. KUBY:  Ms. Glavin asked Ms. Champion questions

3      about whether things were true or not true, and I'm -- well,

4      withdrawn.  Let's try it this way.

5      Q.  Mr. Donziger was indeed proceeding under threat of contempt

6      of court; correct?

7           MS. GLAVIN:  Objection to form.

8           MR. KUBY:  Oh, please.

9           THE COURT:  Basis.

10          MS. GLAVIN:  How Mr. Donziger was proceeding goes

11     to --

12          THE COURT:  His state of mind.

13          MS. GLAVIN:  -- what Mr. Donziger's state of mind was.

14          THE COURT:  Sustained.

15     BY MR. KUBY:

16     Q.  You had threatened Mr. Donziger with contempt of court; is

17     that correct?

18     A.  We don't have the power to impose contempt; we could move

19     for contempt.

20     Q.  You moved for contempt; correct?

21     A.  Was that a motion to compel or a motion for contempt?  I

22     don't recall.

23     Q.  There's been so many, but correct me if I'm wrong.

24     A.  It will take me a second to look at the docket.

25     Q.  Sure.

1   A.   Yes.   What did you say the date of our motion was?

2   Q.   I did not.

3   A.   I thought you said the motion that Judge Kaplan was ruling

4   on was, I think you said, June 25th.   Is that --

5   Q.   No, the motion that separated -- I shouldn't be answering

6   questions, but the motion that separated the Amazonia shares

7   from the contingency fee interest was in August 15th.

8   A.   That was the date of the Court's order.

9   Q.   Right.

10  A.   So what do you mean by the motion was August 15th?

11  Q.   I'm simply asking whether you had moved for contempt of

12  court when Mr. -- when Mr. Donziger says he's doing this under

13  duress and under threat of contempt, had you made a threat of

14  contempt?

15  A.   We had filed a motion to compel; that's docket 2046.

16  That's the motion that the Court was ruling on, on August 15th.

17  Q.   How many prior motions for contempt of court had you made

18  by August 22nd?   A range will be fine.

19  A.   I think just one at that point.   But, again, if you really

20  want me to answer that with competence, I'd have to look

21  through the docket.

22  Q.   You think it was just one at that point?

23  A.   I think it was just the Elliott motion at that point.   And

24  then there were additional motions filed with respect to

25  Mr. Zelman, the 20 -- well, I don't know if that was a

1    contempt.  I'd have to look through the docket.  I think it was

2    one, but again, a couple years ago.

3    Q.  You had made one.  Had Mr. Donziger been adjudicated in

4    contempt yet on that one?

5    A.  The full opinion was not released until later, but there

6    were some interim decisions by the Court.  I don't think that

7    they held him in contempt, but there were some interim issues

8    resolved.

9    Q.  When he says, Based on a RICO judgment, it is contradicted

10   by the findings of four layers of courts in Ecuador and 17

11   appellate judges in that country, you were familiar with that

12   from reviewing the four layers of court decisions in Ecuador

13   and appellate decisions that were part of a public record; is

14   that correct?

15   A.  I have some familiarity with the Ecuadorian appellate

16   decisions, but it's certainly not perfect and nor do I know off

17   the top of my head how many judges were involved in those

18   decisions.

19   Q.  But you have no reason as you sit here to quibble with

20   Mr. Donziger's characterization; you just simply can't say

21   whether it's completely accurate or not, right?

22   A.  I do have reason to quibble with it.

23   Q.  Then quibble.

24   A.  I do recall -- and it's set forth in the Second Circuit

25   decision in some detail, but to my recollection, the Ecuadorian

1    appellate court specifically stated that they were not ruling

2    on the fraud; that the RICO case was pending in the U.S., and

3    the courts there would decide those issues; and that those

4    courts were not going to rule on the accusations of fraud.

5    Q.  Right.  But I'm not asking what the courts in Ecuador did

6    not do.  I'm asking about Mr. Donziger's assertion of what the

7    Ecuadorian courts did do.

8    A.  Again --

9              MS. GLAVIN:  Objection, your Honor.

10             The witness asked the question -- or the witness

11   answered the question.  Mr. Kuby has up on the screen, I sign

12   each of these agreements under duress and under threat of

13   contempt based on a RICO judgment that is contradicted by the

14   findings of four layers of courts in Ecuador and 17 appellate

15   judges in that country.

16             The witness just answered the question when Mr. Kuby

17   asked, What do you quibble about?

18             And the witness just said, The Second Circuit decision

19   contradicts what Mr. Donziger wrote here, which that the RICO

20   judgment was not contradicted by four layers of courts in

21   Ecuador, because the courts in Ecuador would not consider the

22   fraud that was used to engage in the Ecuadorian cases to get

23   the judgment.  So the witness answered the question.

24   BY MR. KUBY:

25   Q.  The Ecuadorian courts ruled against Chevron and in

1   Mr. Donziger's favor originally; is that correct?

2   A.   Mr. Donziger was not a party to the proceedings in Ecuador.

3   Q.   I'm sorry, the *Lago Agrio* case, Chevron lost it, the

4   plaintiffs won it in Ecuador, right?

5   A.   Yes.

6   Q.   Then it was appealed; correct?

7   A.   Yes.

8   Q.   And Chevron appealed?

9   A.   Yes.

10   Q.   And the appellate court affirmed; is that correct?

11   A.   I don't want to get into too many details, but it's safe to

12   say Chevron lost at every level in Ecuador.

13   Q.   In Ecuador.

14         And Ecuador was the venue that Chevron insisted this

15   matter be resolved; correct?

16   A.   Again, I don't agree with that statement.  Chevron was not

17   a party to the *Aguinda* case.  You know, so I believe -- again,

18   you'd have to -- I'm not best evidence on that.  You should

19   pull up the form nonagreement dismissal.  I'm not exactly sure

20   what it looked like, but I believe that it involved Texaco, not

21   Chevron.

22   Q.   Who ended up owning Texaco?

23   A.   Chevron acquired Texaco.

24   Q.   Fine.  Thank you.

25         When Mr. Donziger originally filed his lawsuit in the

1    Southern District in 1993, you're familiar that he filed it in

2    1993 in the Southern District of New York; correct?

3    A.  Again, my knowledge of that action is not very profound

4    because I did not litigate it; I was not a party to it.  There

5    was a prior action filed in this district that Mr. Donziger, I

6    believe, participated in as an attorney.

7          But my understanding -- and if you refer to the

8    decisions of the BIT Tribunal in the case between Chevron and

9    Republic of Ecuador, the claims that were asserted in that

10   prior *Aguinda* case were different than the claims asserted in

11   Ecuador.

12   Q.  Mr. Donziger, as an attorney, filed an action in the

13   Southern District of New York in 1993 against, *inter alia*,

14   Chevron Corporation?

15   A.  You'd have to ask Mr. Donziger.  I don't know when he came

16   into it.  I just don't know.

17   Q.  You are the person with institutional knowledge of the

18   facts of the case?

19   A.  Many of them, but --

20   Q.  But not these?

21   A.  Not really, no.  We didn't participate in it.

22   Q.  That's fine.

23          THE COURT:  Don't interrupt.  Don't speak over the

24   witness.  The poor court reporter is dying.

25          MR. KUBY:  Again, it's these lengthy explanations that

1   make this go longer -- redirect.

2           THE COURT:  I know.  But you still can't kill the

3   court reporter.

4           MR. KUBY:  Okay.  I mean, I understand the Court's

5   ruling and I'll abide by it.

6           THE COURT:  Okay.  But the witness is listening too

7   and she knows that she influences how long she sits in the

8   chair.

9   BY MR. KUBY:

10  Q.  And are you aware that Chevron Corporation made a motion --

11  filed a motion to transfer the case to Ecuador?

12  A.  No, I'm not aware of that.  That's not accurate.

13  Q.  Well, tell me the part that I'm close to, but not exactly

14  getting accurately?

15          MS. GLAVIN:  Your Honor, I'm going to object on

16  relevance to this entire line.  Mr. Donziger is on trial for

17  six counts of criminal contempt.  And so the relevance and the

18  scope, this is far beyond the scope of direct.  So I'm not

19  sure, is this impeachment or where are we going here?

20          THE COURT:  Mr. Kuby.

21          MR. KUBY:  Right now I'm just going through a letter

22  that Mr. Donziger wrote listing his various objections and

23  trying to ascertain the extent to which these are true.  And

24  the relevance is we've sat here in this courtroom for two days

25  listening to various iterations of both Judge Kaplan and

L5CVDON1                    Champion - cross

1   Chevron through GDC mocking Mr. Donziger's concerns about

2   persecution, laughing off his claims that he's been threatened

3   at every turn, and essentially making him out to be someone, I

4   think, as Judge Kaplan said, who the universe is conspiring

5   against him.

6           Well, even paranoids have real enemies.  And the

7   things that Mr. Donziger is saying here happen to be truthful.

8   And so to the extent that this case is brought about -- and

9   we've elicited testimony that Mr. Donziger is somehow an

10  insouciant defier of court orders based upon a paranoid

11  worldview that he has, the worldview isn't paranoid.

12          Yes, Chevron is out to get him.

13          THE COURT:  All right.  Perhaps so, perhaps not.

14          But the question is, what is the relevance of this

15  witness's knowledge as to the underlying motions to transfer or

16  not, how the case got to Ecuador?  Why do we care what this

17  witness knows?

18          MR. KUBY:  We care because this witness was asked at

19  least once, if not other times, whether Mr. Donziger was being

20  truthful in statements that he made.  Moreover, I suspect --

21          THE COURT:  But they were -- excuse me, sir.  My

22  recollection -- and, of course, I have memorized the entire

23  transcript.

24          MR. KUBY:  Me too.

25          THE COURT:  I know.

1              My recollection is that those were statements with

2      respect to whether he would comply or wouldn't comply or could

3      comply, blah, blah, blah.  Whether or not the statement about

4      four layers of courts in Ecuador and whether Ecuador is the

5      venue in which Chevron insisted this matter be resolved is of

6      lesser relevance.  And certainly this witness's knowledge about

7      that, as far as I could tell, is of no relevance.

8              Tell me why I'm wrong.

9              MR. KUBY:  Okay.  I expect the prosecutor, the private

10     prosecutor, at some point, either in summations, which I don't

11     know if we're having -- either in summations, which I don't

12     know whether or not we're having, or certainly conclusions of

13     law and findings of fact, is going to argue that Mr. Donziger

14     has been untruthful in many of his objections and many of his

15     complaints; that they were reprised, what Judge Kaplan has

16     said, this is nonsense, this is borderline irresponsible, this

17     is basically crazy stuff, and he's lying or being deliberately

18     inaccurate.  I suspect they will make that argument, because,

19     frankly, Chevron has been making that argument for over a

20     decade.

21             I would like the opportunity to prove -- to the extent

22     I can through this witness -- that Mr. Donziger's assertions

23     are, in fact, true or at least true-ish.  Truthy.

24             THE COURT:  The question is what about this witness's

25     knowledge and the fact that a document showing the motion to

1    transfer or something would be pretty easy to show her, if

2    that's what you want to do.  I'm not so sure why this witness's

3    agreeing that something Mr. Donziger wrote in a letter is or is

4    not true is of much relevance.

5           MR. KUBY:  To the extent she knows whether or not what

6    was done in this case was, in fact, done in this case, that

7    would be useful.  To the extent that we have to go back to the

8    docket of the original transfer and the motion that was made,

9    as we can do that, I'm not prepared to do that right now.  I'll

10   be happy to be prepared to do that over lunch and we can do

11   that.

12          It's just, again, it might be faster to do it this

13   way.  Although, again, it's not proving to be.

14          So can I try it a couple more times, and then we'll

15   move on?

16          THE COURT:  Let's give it a try.

17          MR. KUBY:  All right.

18   BY MR. KUBY:

19   Q.  Chevron moved to send the case to Ecuador; is that correct?

20   A.  Again, I don't believe Chevron Corporation was a party to

21   that case.  I don't really know much more than that.  I've

22   already told you, I don't know that much about that case.

23   Q.  Okay.  Were you aware that the -- it's your recollection

24   Texaco was the party?

25   A.  You certainly can get best evidence of that; it's not going

1    to come from me.  I believe the case was against Texaco.

2    Q.  Okay.  And are you aware -- who was representing Texaco at

3    the time?

4    A.  I'm not sure.

5    Q.  Not you guys?

6    A.  You mean Gibson Dunn?

7    Q.  Yeah.

8    A.  Not Gibson Dunn.  I was not even an attorney at that point.

9    Q.  Lucky you.

10   A.  Yeah.

11   Q.  Yeah.

12          And were you aware that Texaco had accepted

13   jurisdiction?

14          MS. GLAVIN:  Your Honor, objection to relevance.

15   We're talking about a criminal contempt trial.  If Mr. Kuby can

16   tie this up, I mean, it would appear that Mr. Donziger wants to

17   get in -- find a way around hearsay to get in statements he

18   makes with characterizations in for the truth, rather than the

19   fact that they had been said.  Mr. Donziger is free to take the

20   witness stand or not during the defense case and be subject to

21   cross-examination on these points.

22          THE COURT:  Mr. Kuby.

23          MR. KUBY:  Judge, I already outlined why I'm doing

24   this.  I shouldn't have to repeat it again.  I don't know if I

25   can repeat it again.

1           THE COURT:  Okay.  But I said to you, you had the

2     opportunity to try again.  And the question asked was, were you

3     aware that Texaco had accepted jurisdiction.

4           MR. KUBY:  That's my question.

5           THE COURT:  That's pretty far afield.

6           As we know, for criminal contempt, we have to talk

7     about the issuance of the order, the defendant's disobedience

8     of the order, and the defendant's knowledge and willfulness in

9     disobeying the order.  Whether Texaco accepted jurisdiction is

10    not in the least bit relevant to that.

11          MR. KUBY:  Well, it certainly is relevant to the fact

12    that when Mr. Donziger wrote that, what he was saying was true.

13    And if that's not relevant --

14          THE COURT:  But here's the deal.  Here's the deal:  If

15    you are putting it in for duress, only he can talk about that.

16    Only he can talk about his state of mind.

17          MR. KUBY:  No, no, but you see, that's -- I understand

18    that's typically how it's done.  But we don't have to do it

19    that way.  He makes an assertion in a letter that they have

20    introduced into evidence; correct?

21          MS. GLAVIN:  No, actually, it's not in evidence.

22          THE COURT:  No.

23          MS. GLAVIN:  2081 is not in evidence, Mr. Kuby.

24          MR. KUBY:  Okay.  Well, we move it into evidence.

25          MS. GLAVIN:  No objection, with the understanding that

L5CVDON1                        Champion - cross

1    the August 22nd, 2018 letter comes in for the fact that it was

2    said not for the truth.

3              MR. KUBY:  She got me, didn't she.

4              MS. GLAVIN:  Yup.

5              THE COURT:  She's older than she looks.

6    BY MR. KUBY:

7    Q.  Moving on.  Next paragraph --

8              THE COURT:  Is that a yes or a no?

9              MR. KUBY:  That she's older than she looks?

10             THE COURT:  No, sir.  Is that an agreement that it is

11   being offered --

12             MR. KUBY:  Yes.

13             THE COURT:  -- for the fact that --

14             MR. KUBY:  Yes, yes, yes.

15             THE COURT:  Mr. Kuby apologizes, Ms. Court Reporter.

16   He didn't mean to interrupt me when I was asking him whether he

17   agrees that the document is being offered for the fact that the

18   statements were made and not for their truth.

19             MR. KUBY:  Yes to the apology, and yes to your

20   characterization of my yes answer.

21             THE COURT:  Yes, sir.  Thank you.

22             MR. KUBY:  I'm a yes man.

23             THE COURT:  I should only believe that.

24             2081, specifically, Mr. Donziger's letter to Judge

25   Kaplan dated August 22, 2018, admitted for the fact that the

1    statements were made, not for the truth of the statements.

2              (Government's Exhibit 2081 received in evidence)

3    BY MR. KUBY:

4    Q.  My client in Ecuador, the Amazon Defense Coalition, FDA,

5    prevents any equity holder in the Ecuador judgment issued

6    against your client to transfer any interest in the judgment

7    without the permission of the organization.

8              THE COURT:  Slowly.

9    Q.  The FDA has ordered me not to transfer any interest, apart

10   from shares in Amazonia, which the FDA considers a defunct

11   organization to Chevron under the current coercive

12   circumstances or in any way that might enrich Chevron.  The FDA

13   also considers any share transfer by me or any other equity

14   holder to Chevron to be null and void from a legal standpoint,

15   with said interest reverting to the FDA.

16             Mr. Donziger made that assertion as well, correct?

17   A.  Yes.

18   Q.  Yesterday you were asked whether, to your knowledge,

19   Mr. Donziger had made any request to the board for permission.

20   Do you recall that question?

21   A.  I was asked whether he had made a request to the board of

22   the FDA, is that what you're asking me?

23   Q.  That's what I'm asking.

24   A.  I don't recall that particular question, but to the extent

25   that he did make such a request to the board, that information

was, I don't believe, filed with the Court or provided to us.

Q.  And it was your understanding from the document that indeed such permission had to be granted?

A.  What document?

Q.  The FDA coalition preventing any equity holder --

A.  What document?

Q.  Was that your understanding of the rules of the FDA?

A.  I am not aware what document Mr. Donziger, if any, is relying on here.  I don't know.

Q.  Okay.  Third paragraph.

My view is that the RICO judgment on which the Court's recent order is based is the product of false witness testimony from Alberto Guerra, resulting from a bribe paid to him by your client, with the cooperation and planning of yourself -- meaning Mr. Mastro -- and others at Gibson, Dunn & Crutcher.

As you are aware, you and several of your colleagues in the Gibson Dunn firm are the subject of a criminal referral letter to the U.S. Department of Justice for this abhorrent, shocking and, I believe, illegal behavior.  As a result of the false witness testimony and for other reasons, I personally consider the RICO judgment to be the product of your law firm's fraud; although as a U.S. lawyer and resident of New York, I am required to abide by its terms.  I reiterate that I do so under duress.

Mr. Donziger wrote that as well, is that correct?

1    A.  He did write that.

2    Q.  You met Alberto Guerra, didn't you?

3    A.  I met him just one time before trial that I recall, and

4    then I would have had passing contact with him on the day that

5    he testified, because I was in the courtroom every day.  But,

6    no, I don't really know him or anything like that.

7    Q.  You are aware, however, that he is a disgraced former judge

8    from Ecuador who had solicited bribes?

9            MS. GLAVIN:  Objection.

10   Q.  That's a yes or no.

11           MS. GLAVIN:  Your Honor, assumes the truth, compound,

12   former judge who accepted bribes.

13           THE COURT:  Sustained.

14           MR. KUBY:  I'll break it down.  I'll break it down.

15           Fine.

16   BY MR. KUBY:

17   Q.  You are aware that he was an ex-judge, a former judge in

18   Ecuador; is that correct?

19   A.  Yes.

20   Q.  And you are aware, are you not, that he solicited bribes;

21   is that correct?

22           MS. GLAVIN:  Objection as to whether or not she is

23   aware of it.  If she has personal knowledge of that fact, but

24   if it's based on hearsay, object.

25           MR. KUBY:  Well, but this is --

1          THE COURT:  Are you able to answer on personal
2     knowledge, ma'am?
3          THE WITNESS:  No.
4          THE COURT:  Sustained.
5     Q.  You've heard that allegation though, right?
6     A.  I've heard it from several people, including Mr. Donziger.
7     Q.  Right.  And are you aware from personal knowledge how much
8     money Gibson Dunn Crutcher paid Alberto Guerra?
9     A.  I don't believe Gibson Dunn paid Mr. Guerra any money.
10    Q.  Do you know how much money he was paid by Chevron
11    Corporation?
12    A.  No.
13    Q.  Do you know the instrumentality that Chevron Corporation
14    used to transfer money to him if it wasn't Gibson Dunn
15    Crutcher?
16    A.  I do not know.  And I also don't know whether Gibson Dunn
17    was the intermediary for anything in there.  All of it is, I
18    believe, on the court record in the RICO case, as well as
19    likely the BIT.  But I don't know the answers to these
20    questions.
21    Q.  You sat through the RICO trial, right?
22    A.  I did.
23    Q.  Every day?
24    A.  Yes.
25    Q.  You were paid for that, right?

L5CVDON1                        Champion - cross

1  A.  I am paid as an attorney for Gibson, Dunn & Crutcher.  I

2  was not specifically paid for the RICO trial or any other work

3  that I had performed as an attorney.  I'm paid as an employee,

4  as a lawyer at Gibson Dunn.

5  Q.  You sat through the RICO trial; correct?

6  A.  Yes.

7  Q.  And you were paid for that; correct?

8          Go ahead.

9          THE COURT:  The witness said, I was paid as an

10  attorney for Gibson, Dunn & Crutcher.

11          She was paid.

12          MR. KUBY:  Well, she said a few other things as well,

13  but I'll take the win there, Judge.  Thank you.

14  Q.  Are you aware of where Mr. Guerra resides today?

15  A.  No.

16  Q.  Are you aware of the fact that arrangements were made to

17  move him and his entire family to the United States of America?

18  A.  Do I have personal knowledge of that or have I seen

19  references of that in court pleadings and orders?

20  Q.  Well, let's try the latter first.

21  A.  I have seen references to that in court pleadings, filings,

22  orders.  But, no, I have no personal knowledge of that.

23  Q.  And after all of those statements in Mr. Donziger's letter,

24  he attached forms, did he not?

25  A.  I don't know.  You'll have to show me what he attached.

1   Q.  Sure.

2              MR. KUBY:  Grace, if you could pull up --

3   A.  Oh, this is the letter he emailed us on August 22nd.  Yeah,

4   I do recall this.  He attached the signed share transfer form

5   and the signed 2011 retainer form, not notarized, but signed.

6   Q.  Okay.  So if you look at the screen, which is Defendant's

7   Exhibit DD-0007, do you recognize that as the signed transfer

8   form that you received?

9   A.  I have no reason to doubt that it is.  It's got an August

10  14th date.  It looks like it to me.

11  Q.  Pardon me?

12  A.  I have no reason to doubt that it is.  It looks right to

13  me.  It's dated August 14th, 2018.

14  Q.  And you had no idea whether it was signed on August 14th or

15  not, right?

16  A.  Well, that's what Mr. Donziger dated it presumably, so I

17  have no reason to doubt it.

18  Q.  And it was transferred to Gibson Dunn, along with his

19  letter; correct?

20  A.  Yes.

21  Q.  Do you know when you received it?

22  A.  I believe he sent it by email.  I believe it was on the

23  22nd, but you could pull up the document if you want to confirm

24  that date.

25  Q.  And in just the actual time stamp that Gibson Dunn would

L5CVDON1                    Champion - cross

1    have on its form when it was received, would that be eastern

2    time?

3    A.   My understanding is that when those emails are produced,

4    the top time stamp, the one on the top email, is a live field

5    and somehow gets updated to this UTC time.  I'm not an expert

6    on this; it's some e-discovery thing.

7            So my understanding is that UTC is something like

8    Greenwich Mean Time.  I've been confused by this, so I've tried

9    to Google it.  But the point is that that top time is -- is off

10   by, I don't know what the exact number is, four or five hours.

11   So it may show that Mr. Donziger sent it at 9, it might have

12   really been sent at 5, something like that.

13   Q.   And in fact, if he sent it from a foreign country, in a

14   different time zone, it becomes one more layer of confusion?

15   A.   I have no idea.  I don't know if that affects it.

16   Q.   Okay.  You had no reason to doubt that the letter

17   Mr. Donziger sent was authentic, did you?

18   A.   What do you mean by that?

19   Q.   That he, in fact, was the person who actually wrote it.

20   A.   Did I have reason to doubt it?

21   Q.   Yeah.

22   A.   I can't think of one, but, you know, you can ask him.

23            MR. KUBY:  Could we strike the "but you could ask

24   him"?

25            THE COURT:  Why?  This is a bench trial.

1            MR. KUBY:  So you're immune.

2            THE COURT:  I have my helmet on.

3            MR. KUBY:  Double vaxed plus 14.  Got it.

4    BY MR. KUBY:

5    Q.  It sounded like stuff he had been saying for years, right?

6            MS. GLAVIN:  I'm sorry, when you say "stuff," could

7    you be --

8    Q.  His objections, his iterations, his protest, his

9    allegations of fraud, his allegations against Gibson Dunn

10   Crutcher, his allegations about the bribery of Judge Guerra,

11   these were all things that he had said many times before;

12   correct?

13   A.  I think in -- you know, as a sort of generalized matter,

14   yes, I would agree with that.

15   Q.  So it sounded familiar, right?

16   A.  Again, sure, it sounded familiar.  Yeah, it's the kind of

17   thing -- things that he says.

18   Q.  And the signature at the bottom, you'd seen Mr. Donziger's

19   signature many times; is that correct?

20   A.  Probably.  I don't -- I remember it's actually similar to

21   mine in that it's a scrawl, at least as shown here.  But I

22   can't -- you know, I don't have any views on his signature.

23   Q.  You had no reason to think it was inauthentic, did you?

24   A.  I mean, again, he emailed us the forms signed.  I had no

25   indication other than that.

1   Q.  Okay.  Are you familiar with 15 U.S. Code 7001?

2   A.  15 U.S. Code 7001?

3   Q.  Right.  Entitled The General Rule of Validity?

4   A.  No, I don't -- I don't think I am.

5        MR. KUBY:  Okay.  Could we get it?  Do we have it on

6   the screen?  While we are checking the reference to a

7   Mr. Google or Ms. Google, let me just ask a different question.

8   Q.  You are aware, are you not, that a signature cannot be

9   denied legal effect simply because it's in electronic form?

10  A.  I'm not an expert in this area.  I know that you can sign

11  documents in various ways, whether by hand, electronically,

12  exchange of correspondence, things of that nature.

13  Q.  And you do that yourself in your practice?

14  A.  Yeah, I think so.

15  Q.  And other lawyers with whom you deal do that in their

16  practice?  Right?

17  A.  Yeah.

18  Q.  So there is a reasonable view of this, that on August 22nd,

19  seven days after Judge Kaplan issued his order, and within the

20  time frame Judge Kaplan had allocated for compliance, that

21  Mr. Donziger did transfer his assignment of that interest?

22  A.  You're asking for my legal opinion?

23  Q.  I'm asking for you to answer the question.

24  A.  I believe that Mr. Donziger complied with the first part of

25  the Court's order to transmit us the signed forms.  You could

L5CVDON1                         Champion - cross

1    quibble about the effect of his letter, if any, but he did send

2    us signed forms on -- again, you'd have to pull up his email.

3    I believe it was the 22nd.

4    Q.  Fair.  Fair, fair, fair.

5            And look, he did not comply with Judge Kaplan's August

6    21st order as to form, method of delivery, and all those other

7    things, right?

8    A.  I think it was an August 15th order.

9    Q.  Okay.

10   A.  You'd have to pull up the requirements.  I think -- in

11   terms of form, what do you mean by that?

12   Q.  That is to say -- and again, I think it was an earlier

13   order, but I could be wrong.  He did not send originals by

14   overnight courier, right, as Judge Kaplan had said he should?

15   A.  I can tell you that we did not receive -- I did not

16   receive.  I don't think we received originals from him at this

17   point.  I think we eventually maybe did.  I honestly don't

18   recall.

19   Q.  And is it fair to say at the time Mr. Donziger executed

20   this transfer, he had not been held in contempt of court for

21   refusing to execute the transfer?

22   A.  I believe that's correct; but again, the docket is going to

23   be your best evidence of that.

24   Q.  And you did want this notarized, however; correct?

25   A.  The form has a notarization portion on it.  Again, this was

L5CVDON1                    Champion - cross

1    the form that Judge Kaplan affixed to his order.  So I mean

2    whether we wanted it notarized, I believe we had a notarization

3    section on it.  We submitted it to the Court with that.  The

4    Court issued it with that.

5    Q.  However, there's no notarization requirement for it to be a

6    valid transfer; is that right?

7    A.  I don't know.

8    Q.  Well, I mean let's ask you this:  Steven Donziger is in his

9    computer in Portugal.  He hits "send" with this thing, and then

10   tragically dies of a heart attack.  The last thing -- I know,

11   it's very sad.  And it's the last thing that he does.  You

12   would regard this as a valid transfer and defend it against

13   other people saying it's not valid, right?

14   A.  Again, you want me to answer legal hypotheticals?  You

15   know, we were not in that situation.

16   Q.  Okay.  Fair enough.

17            Mr. Donziger is alive and well and living among us.

18            Is it fair to say that notarization mattered because

19   it was a layer of protection against Donziger saying he did not

20   actually sign the document?

21   A.  Again, I believe it's hypothetical what you're asking me.

22   I think that is a purpose generally of notarization, that you

23   have to appear before the notary to sign a document.  You know,

24   and one purpose of that is so that you have a witness.  But,

25   you know, that's just my speculation.

L5CVDON1                        Champion - cross

1   Q.  Well, was that speculation that you shared with the FBI on

2   August 27, 2020?  Did you tell that to the FBI?

3   A.  I don't recall specifically, but it's possible that topic

4   was discussed.

5   Q.  All right.

6              MR. KUBY:  Well, if we could pull up 3501-14.

7   Q.  Is there a document that may refresh your recollection?

8   A.  Again, I have not previously seen these documents, so I

9   can't -- you're telling me there is.  I'm happy to look at it.

10              MR. KUBY:  Okay.  Pull up page 3 please, Grace.

11   Q.  Could you take a look at the last line -- actually, last

12   paragraph on page 3.  Read it to yourself please.

13   A.  Sure.  I read it.

14   Q.  So did you tell the FBI that the --

15              THE COURT:  Does that refresh your recollection.

16   Q.  Does that refresh your recollection as to what you told the

17   FBI on August 27th of 2020?

18   A.  Again, I'm not -- like, I may have said this.  I don't

19   recall any specific words that I used.  But I think it's

20   fair -- you know, I may have said that, yes.

21   Q.  Thank you.  And so essentially you wanted it notarized or

22   it was desirable for it to be notarized in case Mr. Donziger

23   later said, I didn't sign this.  This wasn't me.  I don't know

24   what you're talking about, right?

25   A.  Again, that's one purpose of notarization, is to have a

L5CVDON1                    Champion - cross

1   witness to the signature.  So to the extent that Mr. Donziger

2   contested his signature or the validity of it, that would be a

3   purpose of notarization.

4   Q.  And in the whole course of this litigation, did

5   Mr. Donziger ever contest that he had signed something?

6   A.  I can't recall.  I don't -- nothing pops to the top of my

7   mind.

8   Q.  Okay.

9           MR. KUBY:  If we could go to FF.

10  Q.  I want to turn your attention to Government Exhibit 2085-1,

11  Defendant's Exhibit FF.

12          MR. KUBY:  Is 2085 in evidence?  I should know that.

13  It's a docket entry.  I would move that into evidence.

14          MS. GLAVIN:  2085?

15          THE COURT:  2085-1.

16          MS. GLAVIN:  Oh, yeah, it's in evidence.

17          THE COURT:  Received.

18          MR. KUBY:  Lovely.  Received twice.

19          (Government's Exhibit 2085-1 received in evidence)

20  Q.  And can you turn to the next page please.

21          Ms. Champion, take a look at that document.  And it's

22  got two different docket numbers on it; is that correct?

23  A.  Yes.

24  Q.  And one is 2072; is that correct?

25  A.  Yes.

1    Q.  And that's the docket number Judge Kaplan assigned to the

2    form that he wanted Mr. Donziger to execute?

3    A.  That is the docket number of the order.  So since the order

4    was attached -- I mean since the form was attached to the

5    order, yes.

6    Q.  Right.  And that was on 8/15/2018?

7    A.  Yes.

8    Q.  And the 2085 in blue indicates when the larger document,

9    2085, plus exhibits, was filed; correct?

10   A.  Yes.

11   Q.  And that was filed on 9/17 of 2018; correct?

12   A.  Yes.

13   Q.  Okay.  This one is notarized; is that right?

14   A.  This one what?

15   Q.  This one is notarized; is that correct?

16   A.  Can you go to the next page?

17   Q.  Sure.

18   A.  Yes.

19   Q.  And it was notarized on September 4th; correct?

20   A.  According to the date on the document, yes.

21   Q.  Right.  Well, you've had this document in your possession

22   for quite some period of time; correct?

23   A.  Yeah.

24   Q.  Yeah.  And did you conduct any investigation of the notary

25   to see whether it was a valid notarization?

1   A.  Again, when you say "you," and I do worry about work

2   product there, I'm not aware of that.

3   Q.  Okay.  And did you have any reason -- did you, at the time

4   you received it, have any reason to doubt the validity of the

5   notarial affixation?

6   A.  Again, you're asking me personally?

7   Q.  Sure, since you're here.

8   A.  I don't recall having -- you know, I don't recall having a

9   reason to think that.

10   Q.  And subsequent to receiving this, as you sit here now, you

11   don't have any reason to think that the notarial affixation is

12   incorrect?

13   A.  Only to the extent you're asking me about it.

14   Q.  That's good.  We're doing so much better than yesterday.

15   A.  We are.  You haven't yelled at me yet.

16   Q.  You haven't yelled at me.

17   A.  Fair enough.

18   Q.  So as far as you're concerned, you, Anne Champion, Gibson

19   Dunn Crutcher, everybody, this was a valid execution in the

20   form that Judge Kaplan demanded, just not at the time he

21   demanded it?

22   A.  Yeah, I think that's correct, yeah.

23   Q.  He was requiring this be executed by September 3rd; is that

24   right?

25   A.  No.  Again, I don't know where you're getting that date.

1    If you could refresh my recollection.  I thought it was August

2    29th.

3    Q.  Okay.  We'll get back to it.

4         Turning to the day of September 3rd, 2018, do you

5    recall whether that was any special day in the sense, you know,

6    like a holiday?

7    A.  A holiday?

8    Q.  Yeah, like a federal holiday?

9    A.  Oh, was it Labor Day, is that what you're trying to tell

10   me?

11   Q.  Yeah.

12   A.  If that's what you're telling me, you know, I have no

13   reason to doubt you, if that's your representation.

14   Q.  Okay.  Were you in your office on Labor Day?

15   A.  I don't recall.  It's possible, unfortunately.

16   Q.  Oh, dear.  Oh, dear.

17        And it's a federal holiday, right?

18   A.  Yes.

19   Q.  And the courts are generally closed, except for emergencies

20   and other things?

21   A.  I think so.

22   Q.  Are you familiar with Rule 6 of the Federal Rules of Civil

23   Procedure regarding timing of filings?

24   A.  You'd have to put it up to refresh me, but do you mean like

25   counting of days, things like that?

L5CVDON1                    Champion - cross

1   Q.  Yeah, yeah, yeah, the date counting thing.

2   A.  It's been revised a couple times, but I think you start on

3   the next day and then you skip holidays or weekends.  But

4   sometimes it's continuous.  I can't recall.  You have to put it

5   up.

6   Q.  Okay.  But as a general matter, your understanding --

7   A.  Oh, it's like if the last day falls on a weekend, it skips

8   to the next business day or something like that.

9   Q.  Right.

10  A.  But you do include the weekends and the holidays when

11  counting I think is the way to do it, right?

12  Q.  Right.  So if something were to be due September 3rd, and

13  that was Labor Day, it would be due September 4th?

14  A.  That's my understanding, yes.  Although, again, the

15  Southern District of New York website will be a better resource

16  for that than my brain, off the top of my head.

17           THE COURT:  Mr. Garbus, you're sinning again.

18           MR. GARBUS:  Sorry.

19           MR. KUBY:  I'm going to move on to a different topic.

20  I know.  I know your heart.

21           (Counsel conferred)

22           MR. KUBY:  If we could go to Count V please, Grace.

23           Keep going.  Okay.  "At all times."

24  Q.  Ms. Champion, I'm showing you the charges against

25  Mr. Donziger.  This is Count V.

1          At all times from on or about November 1st, 2017, to

2     on or about May 27th, 2019, Donziger, in disobedience of

3     paragraph 1 of the RICO judgment, knowingly and willfully

4     failed and refused to transfer or assign to Chevron property

5     that he had, to wit, the ADF property right.

6          And by that -- well, what was the ADF property right,

7     if you know?

8     A.  You tell me.  I'm guessing it's based on the dates, that

9     it's the November 2017 retainer agreement.  But if you want to

10    verify that by looking at the definitions, that would be good.

11    Q.  Let's assume for purposes of the next line of examination

12    it indeed is the November 1st, 2017 retainer agreement.

13    A.  I'd prefer you just show me where it's defined in this

14    document.

15         MR. KUBY:  Okay.  Scroll up.  Paragraph 16.

16    Q.  On or about November 1st, 2017, the Frente de Defensa de la

17    Amazonia -- I don't speak Spanish and I've been instructed not

18    to try to do it with an accent.

19         "Amazon Defense Front" or "ADF," the sole beneficiary

20    of a judgment, in quotes, as that term is defined in the RICO

21    judgment, granted to Donziger a property right traceable to the

22    Ecuador judgment, to wit, an interest in his own right equal to

23    Mr. Donziger's existing contractual interest.  Such interest,

24    in any case, shall be understood to entitle Mr. Donziger to 6.3

25    percent of any funds recovered in connection with the *Lago*

1    *Agrio* case or the Ecuador judgment, "the ADF property right."

2    A.  Is that a question?

3    Q.  Yeah.  So, in fact, what the ADF property right refers to,

4    to your understanding, is the November 1st, 2017 retainer

5    agreement?

6    A.  Yes, the property right granted to Mr. Donziger therein.

7    Q.  And that was -- in terms of property, it was 6.3 percent of

8    the contingency fee; correct?

9    A.  6.3 percent of any funds recovered, not 6.3 percent of the

10   contingency fee.

11   Q.  Right.  I'm sorry.  His contingency fee was 6.3 percent of

12   any funds recovered?

13   A.  According to this agreement, yes.

14   Q.  Which was the same amount as the 2011 retainer agreement?

15   A.  I think that's at least roughly accurate.  I don't know if

16   the terms are defined exactly the same way.

17   Q.  I'll settle for rough accuracy.

18   A.  Okay.  Fair enough.

19   Q.  If I understood your testimony correctly yesterday, this

20   retainer agreement was made by Steven Donziger personally;

21   correct?

22   A.  I believe that's correct.  Again, if you want to pull up

23   the document to confirm, but I believe it was between

24   Mr. Donziger personally and the FDA.

25   Q.  And the FDA.

1          And the original retainer agreement, what I will call

2     the 2011 retainer agreement, one of the parties was Donziger

3     Associates?

4     A.  I think it's Donziger & Associates PLLC, if I'm not

5     mistaken.  It was a law firm, not Mr. Donziger personally.

6     Q.  Okay.  So in that sense, this agreement is a different

7     agreement than the 2011 retainer in the sense that it's made

8     between different parties; correct?

9     A.  Well, I mean, in the sense that it's a separate agreement,

10    it's a separate agreement.  Are you asking me is it different

11    from the 2011 agreement?

12    Q.  No, I'm actually going to just withdraw the question.

13    A.  Okay.

14    Q.  And another difference between the 2011 retainer agreement

15    and the 2017 retainer agreement, one of many, I'm just asking

16    you about one, is that the 2011 retainer agreement had many

17    different plaintiffs, is that fair to say?

18    A.  I'm a little -- if I can clarify your question in my

19    answer.

20    Q.  Sure.

21    A.  My understanding is that the individual *Lago Agrio*

22    plaintiffs were parties to that agreement; you know, that they

23    were -- I believe that Fajardo was their signatory.

24    Q.  And the ADF was also a party; is that correct?

25    A.  Yes.

L5CVDON1                        Champion - cross

1    Q.  And from now on, if possible, we're just going to refer to

2    it as the ADF.  Is that okay, Ms. Champion?

3    A.  That's fine.

4            MR. KUBY:  Now, I'd like to pull up the transfer form,

5    the notarized version of the transfer form.

6            THE COURT:  Is this a convenient time for the

7    five-minute break?

8            MR. KUBY:  Absolutely.

9            THE COURT:  All righty.  Let's do it.  Thank you.

10           (Recess)

11           MS. GLAVIN:  Your Honor, I want to confer with

12   Mr. Kuby on timing, because I do have a witness.

13           THE COURT:  Go ahead.  Go confer.

14           MS. GLAVIN:  Yes.  Okay.

15           (Counsel conferred)

16           MR. KUBY:  Thank you, Judge.

17           If we could go back to Exhibit F.

18           One of the problems with my hearing is I don't always

19   hear consonants properly.

20           THE COURT:  I'm just going to add 2085-1, reading off

21   the screen.

22   BY MR. KUBY:

23   Q.  If you would read the first paragraph out loud.

24   A.  This transfer and assignment, this agreement, is made

25   effective as of August 14th, 2018, by and among Steven

Donziger, The Law Offices of Steven R. Donziger, and Donziger &
Associates, PLLC, also known as Donziger Associates, PLLC,
collectively, assignor, on the one hand, and Chevron
Corporation, assignee, on the other hand.  Assignor and
assignee collectively referred to as "the parties."

Q.  I think we've covered the 2011 retainer agreement was only
between various plaintiffs and Steven Donziger & Associates;
correct?

A.  I think that's correct, yeah.

Q.  This transfer form, however, covers, dare I say it, every
Donziger entity with which you were familiar.

A.  I think that's correct.  I think that these were the ones
that we were aware of at the time.

Q.  And if you look at the assignment, is the ADF included in
that as well?

A.  What do you mean by "included"?  It's identifying the
agreement as the January 5th, 2011 agreement, and then
identifying the parties to that 2011 agreement.  So I don't
understand your question.

        MR. KUBY:  One of the parties to that agreement was
the ADF; correct?

A.  One of the parties to the 2011 retainer was the ADF.

        THE COURT:  I'm sorry, for some reason you're not
speaking into the microphone.  We're not hearing you.

        MR. KUBY:  I am.

```
 1              THE COURT:  That's better.
 2   A.  Can you make it closer to you?  I can't hear you at all if
 3   you're not speaking into it.
 4              MR. KUBY:  Did I hit a volume button by mistake?
 5              THE COURT:  Does someone have a book or two that
 6   perhaps you could put under that microphone to raise it up a
 7   little bit?
 8              MR. KUBY:  What are books?
 9              THE COURT:  Ha.  I'm old enough to know.
10              Thank you.
11              MR. KUBY:  Can you hear me now?
12              THE WITNESS:  Yes.
13   BY MR. KUBY:
14   Q.  And the 2017 retainer agreement was between the ADF and
15   Steven Donziger personally; correct?
16   A.  Yes.
17              MR. KUBY:  If you could scroll down.
18   Q.  And this transfer agreement covered successors and assigns
19   and all successors to and predecessors of the retainer
20   agreement, and assignee hereby accepts such assignment.
21   Correct?
22   A.  That's what it says.
23   Q.  And there certainly is a reasonable view, is there not,
24   that this transfer form also transferred the 2017 retainer as a
25   successor agreement?
```

A.   If you're asking me for my legal opinion, that would be

something I would need to research and, you know, I don't -- I

don't have an answer to your question.  I'm not the fact-finder

here.

Q.   Okay.  So the answer is you don't know?

A.   Yeah, I mean --

Q.   Kind of sounds like it could, but you want to research it.

A.   I don't know the answer to your question.  I have no

opinion on that.

Q.   And this transfer indisputably was effective as of

September 4th, 2018, when it was notarized; correct?

A.   Again, you're asking me for legal conclusions.

Q.   Withdrawn.

     You accepted it when it was given and did not ask for

any further document with respect to that assignment; is that

correct?

A.   I think that's safe to say.

Q.   Okay.  Turning to a different area, Ms. Champion.

     In a number of Mr. Donziger's filings -- and I can

pull those up for you if you need -- he made reference to

Chevron trying to "demonize" him.  Are you familiar with his

use of that word in his filings?

A.   I mean, if you're asking me has he made that allegation,

yes, I think he has.  I mean, you're asking me if I'm familiar

with it in his filings.  I'd have to look at the filings, but

1    he has used that, yes.

2    Q.   Right.  And so "demonize" is presented most often in

3    quotes; correct?

4    A.   I have no idea.

5    Q.   I'd like to show you what has been marked as Defense

6    Exhibit FFF for identification.  It is several pages.  Please

7    take a moment and review it.

8    A.   Can you go to the last page?  Is this the last page?

9    Q.   Yes.

10   A.   No.  The last page, and then scroll up.  So go back in

11   time.

12   Q.   Oh, I wish we could.

13               (Pause)

14   A.   I'm not done yet.

15   Q.   Oh, I'm sorry.

16               (Pause)

17   A.   Okay.  Keep going up.

18               (Pause)

19   A.   Keep going.  Okay.

20               (Continued on next page)

21

22

23

24

25

L5CADON2ps                      Champion - Cross

1    Q.  All right?

2    A.  Yes.

3    Q.  OK.  Have you seen this document before?

4    A.  I have.

5    Q.  A number -- it has letters and numbers on the bottom.

6    Could you just explain what those signify, if you know?

7    A.  I believe that this would be a Bates stamp used during the

8    RICO case, but I'm not the expert on that.  But that's what it

9    looks like to me.  If I saw this, that's what I would think.

10   Q.  OK.  And the CVX?  What does that stand for?

11   A.  I think that means it was a document produced by Chevron.

12   Q.  The author is someone named Chris Gidez.  Do you know who

13   he is?

14   A.  I met him once.  I'm not that familiar with him, no.  I met

15   him once.

16   Q.  Do you know what his relationship was to Chevron?

17   A.  I do not.

18   Q.  And he was a -- did you tell the FBI that --

19   A.  He's a PR consultant.  But I don't know the extent of his

20   relationship with Chevron.

21   Q.  "PR consultant" is fine.

22   A.  I believe that is what he is.

23   Q.  And when you say you met him, I'm assuming you met him

24   professionally, not socially.

25   A.  I met him -- I think that I met him -- you know, it may

L5CADON2ps                    Champion - Cross

1   have been more than once, but not -- you know what I mean, like

2   once or twice during the course of -- I think I -- I remember

3   sharing a car with him, like back to the office or something

4   after dinner, you know.  That's my main memory of him.  Nothing

5   more than superficial chitchat on the one or two occasions I

6   met him.

7   Q.  And who is, or who was at the time this document was

8   created William T. Irwin?

9   A.  I'm not sure.

10  Q.  Was he employed by the Chevron Corporation?

11  A.  Well, he's got a Chevron email address.  The name is

12  vaguely familiar.  I'm not sure who he is.

13  Q.  Manager of international affairs at Chevron now?

14  A.  I don't know.

15  Q.  Kent Robertson?

16  A.  Kent is in Chevron's public affairs group.  I don't know

17  his specific job title, then or now.

18  Q.  Adam Bromber, B-r-o-m-b-e-r?

19  A.  I'm not familiar with him either.

20  Q.  Greg Mueller, M-u-e-l-l-e-r?

21  A.  I don't think I'm familiar with him either.

22  Q.  J.B. Craig?

23  A.  You know, this is a Gmail account, but I'm pretty sure he

24  also worked at Chevron, I think.

25  Q.  And during the relatively recent prep session, the private

1   prosecutor asked you about the "demonize" allegation; is that

2   fair to say?

3   A.   I may have been asked about this.  I don't recall

4   specifically.

5   Q.   Is there a document that might refresh your recollection?

6   A.   Again, you seem to think so.  I haven't looked at those

7   notes.  You're welcome to show them to me if that's what you're

8   referring to.

9   Q.   I would, if we could put up 3501-37, and look at the third

10  paragraph.

11  A.   Yes.

12  Q.   Does that refresh your recollection that the private

13  prosecutor asked you about this?

14  A.   It's a -- again, I don't specifically remember this, but

15  this is consistent with my understanding of the email exchange,

16  that Mister -- Mr. Gidez was a PR professional.

17  Q.   Do you recall giving the private prosecutor an answer about

18  this?

19  A.   Again, I don't specifically recall this.  As you know, I

20  met with him many times, and so I don't specifically recall it.

21  I have no reason to doubt the FBI's notes in this regard.

22  Q.   And in fairness, this was a May 4th, 2021 meeting, right?

23  A.   It actually says it's May 10th.  I don't -- you tell me.

24         Oh, May 4th?

25  Q.   Yes.

L5CADON2ps                           Champion - Cross

1    A.  Sure.

2    Q.  And that was last Tuesday.

3    A.  OK.  Again, I don't specifically recall this exchange, but

4    I have no reason to doubt that it occurred.

5            MS. GLAVIN:  Your Honor, actually with respect to the

6    exhibit that Mr. Kuby has been showing the witness, could I do

7    a brief voir dire on that document being used to refresh her

8    recollection?

9            THE COURT:  On the --

10           MS. GLAVIN:  On the addendum.

11           THE COURT:  I49?

12           MS. GLAVIN:  Yes.

13           THE COURT:  Yes, ma'am.

14           Sir.

15           MR. KUBY:  I don't -- oh.  Sure.

16           THE WITNESS:  I don't think he used a -- he didn't say

17   that.  He just put it in front of me.

18           MS. GLAVIN:  Withdrawn.  I'll do it on redirect.

19           MR. KUBY:  No, let's let her --

20           MS. GLAVIN:  No, on redirect.

21           MR. KUBY:  No, I'm good.

22           MS. GLAVIN:  No, you go.

23           MR. KUBY:  After you.

24           MS. GLAVIN:  After you.

25   BY MR. KUBY:

1    Q.  Go back to "demonize."

2            And the date on that email is March 26, 2009, is that

3    correct?

4    A.  You could put the email down.  I think it was March 2009.

5    I don't know if all the emails were from that date, but --

6    Q.  March 2009 is fine.

7            And when did you first see this document?

8    A.  I don't know.  If I had to guess, it would be during the

9    course of the RICO case, but I honestly don't remember.  You

10   know, it is one that Mr. Donziger likes to reference a lot.

11   Q.  Right.  So -- and I understand the RICO case was long, lots

12   of documents.  But sometime during the RICO case, more or less,

13   is your recollection.

14   A.  Yes.

15   Q.  And it says, "Our L-T strategy is to demonize Donziger."

16   Correct?

17   A.  That's what it says.

18   Q.  What does "L-T" mean?

19   A.  I don't know.  I did not write the email.

20   Q.  Did you ever ask what does "L-T" mean?

21   A.  No.

22           MS. GLAVIN:  Your Honor, I'm going to object because

23   the defense has not offered this exhibit into evidence.  So

24   we're going through having a witness testify about it.  If the

25   defense wants to offer it into evidence, I would like to do

1    voir dire on this exhibit.

2          MR. KUBY:  Right now I just want to get an

3    understanding, if the witness has any, of "L-T."

4    Q.  That's not a phrase you've ever used.

5    A.  "L-T"?

6    Q.  Yes.

7    A.  I don't think so.  But, you know, I can tell you how

8    others, including maybe Mr. Donziger, I've certainly seen

9    references in pleadings to somebody saying "long-term" on this.

10   So I don't know if that was said in a deposition, if that was a

11   guess.  I don't recall.

12         MS. GLAVIN:  Again, Mr. Kuby is having the witness

13   testify about a document that's not in evidence.

14         THE COURT:  Are we moving it in or are we --

15         MR. KUBY:  No.

16         THE COURT:  I'm sorry.  Are we moving it in or are we

17   putting it aside?

18         MR. KUBY:  We're moving it in.

19         THE COURT:  All right.

20         MS. GLAVIN:  Your Honor, may I have a brief voir dire?

21         THE COURT:  Yes.

22   VOIR DIRE EXAMINATION

23   BY MS. GLAVIN:

24   Q.  Ms. Champion, this particular exhibit, FFF, are you on this

25   email exchange at any point?  Let's start from the bottom if we

1    could.

2              MS. GLAVIN:  All right.  If we could blow up and

3    highlight the first email addressees.

4    Q.  Are you on that email exchange?

5    A.  No.

6    Q.  Is there any from Gibson Dunn & Crutcher on that email

7    exchange?

8    A.  No.

9    Q.  Let's go to the next.

10             MS. GLAVIN:  If we could blow up the addressees, the

11   reply on March 26, 2009 at 9:34 a.m., Ms. Champion, are you on

12   that email exchange?

13   A.  No.

14   Q.  Is anyone from Gibson Dunn & Crutcher on that email

15   exchange?

16   A.  No.

17   Q.  Let's go to the next, the reply on Thursday, March 26th of

18   2009, at 11:16 a.m.  Are you on that email exchange,

19   Ms. Champion?

20   A.  No.

21   Q.  Is anyone --

22             MR. KUBY:  I want to stipulate that Ms. Champion is

23   not on the email exchange.

24   Q.  Is anyone from --

25             MR. KUBY:  I will also stipulate that there are no

L5CADON2ps                    Champion - Cross

1   Gibson Dunn & Crutcher partners or associates on that email

2   chain.

3           MS. GLAVIN:  Or employees?

4           MR. KUBY:  That I don't know.  I don't know who all

5   works for them, but -- I don't know how many employees they

6   have, but I have no reason to think that GDC was copied on this

7   email.

8   BY MS. GLAVIN:

9   Q.  And Ms. Champion, when did you personally begin

10  representing Chevron in connection with the lawsuit that

11  Chevron filed in 2011?

12  A.  I did a little bit of work at the, you know, beginning of

13  the representation, but then I just did not have time for it,

14  so I really did not work on the case extensively -- and by

15  "case" I really mean cases.  There were many 1782s, etc.  I did

16  not participate in those.  I really started working on the case

17  in mid February 2011.

18          MS. GLAVIN:  Your Honor, I'm going to object to

19  admission of this as to relevance.

20          THE COURT:  Sir.

21          MR. KUBY:  It is not being offered for its truth, but

22  in fact --

23          THE COURT:  But the question is the witness can't

24  identify it as authentic.  There's no one here to say that it

25  is what it is.

1           MR. KUBY:  It's an authenticity objection?

2           THE COURT:  I'm not sure what it is.

3           MR. KUBY:  It's relevance, it's not authenticity.

4           MS. GLAVIN:  It's relevance to the case.  It's the

5    fact that basically this is a hearsay document being offered

6    into evidence.

7           MR. KUBY:  OK.  So as to hearsay, it's not being

8    offered for the truth of the document, although it is true.

9           THE COURT:  That's your testimony, sir?

10          MR. KUBY:  Pardon me?

11          THE COURT:  That's your testimony that it's true?

12          MR. KUBY:  It is.

13          THE COURT:  Counsel, you know better than that, you

14   really do.

15          MR. KUBY:  I make that as an assertion -- I make that

16   as a legal argument.

17          THE COURT:  But you can't testify, sir.  You know

18   that.

19          MR. KUBY:  Well, I'm not under oath, so I'm obviously

20   not testifying.  Not under oath yet.  My time may come.

21          MS. GLAVIN:  Your Honor, I have no objection to

22   admission for the fact that this email exchange exists, for the

23   fact that it was sent.

24          THE COURT:  How's that?

25          MR. KUBY:  That seems pretty good.

1          THE COURT:  All right.  With that stipulation, the

2     document is received, FFF.

3          (Defendant's Exhibit FFF received in evidence)

4          MR. KUBY:  When you -- well, withdrawn.

5     CROSS EXAMINATION (Cont'd)

6     BY MR. KUBY:

7     Q.  You first saw the document during the RICO case, correct?

8     A.  To the best of my recollection.

9     Q.  And Mr. Donziger referenced it many, many times in his

10    various filings, pleadings, statements that you became aware

11    of, correct?

12    A.  Yes.  Press releases, tweets, what have you.

13    Q.  Tweets, interviews, blogs, everything else.  Right?

14    A.  Blogs, I'm not sure if people have blogs anymore.  The

15    president does, the former president.

16    Q.  Oh, that Floridean influencer?  OK.

17          Did you make any inquiries of your client as to

18    whether that was their long term strategy?

19          MS. GLAVIN:  Objection.

20    A.  It clearly calls for privilege.

21    Q.  No, no, no, no.  I --

22          THE COURT:  Kids, traditionally when someone says

23    "objection," the Court rules or asks counsel for a response.

24          No response out of you.

25          Ms. Glavin.

1            MS. GLAVIN:  Objection, your Honor, with respect to

2       form, and it also would elicit attorney-client communications

3       Ms. Champion has repeatedly brought up.

4            THE COURT:  Counsel.

5            MR. KUBY:  As to attorney-client communications, I

6       feel fairly comfortable asserting the fact that asking whether

7       the witness asked a question of her client, that is not

8       privileged.  And the witness can answer either yes or no.  And

9       that is not privileged.  That is, the fact of asking a question

10      and getting an answer is not privileged.

11           Now, the content of the answer, if the answer is yes,

12      that is privileged.

13           MS. GLAVIN:  Your Honor, I would also object on

14      relevance grounds.  What is the relevance to whether or not

15      Ms. Champion asked Chevron whether a long-term strategy was to

16      demonize Mr. Donziger as it goes to this trial.

17           MR. KUBY:  With all due respect, both to the Court and

18      to Ms. Champion, it does go to the question of the witness's

19      bias.  If the witness was participating in her client's

20      campaign to demonize Steven Donziger, that suggests conduct

21      arguably outside the scope of normal representation.  That is

22      to say, when I get hired to do a contract case, which I, you

23      know, am utterly unqualified -- which I'm utterly unqualified

24      to do, and I'm suing somebody on behalf of a client, and I come

25      across a document in the course of my document production that

1    says, "My real goal here," the client says, "My real goal here

2    is to destroy the defendant's marriage.  So, yeah, this is a

3    contract case.  But what I'm trying to do is to investigate

4    everything, everyone, in every fashion for the purpose of

5    destroying his marriage because he stole the man or woman that

6    I love."

7              Now, if the lawyer is participating -- if I go to the

8    client, go to the client and say, "Yo, I'm not here to destroy

9    somebody's marriage, I'm here to litigate a case, so you could

10   accept that or not, but I don't do marriage destruction, I

11   don't do demonization," that's one thing.  If I say, "Ah, don't

12   ask, don't tell, no problem, you say demonize, I'm just rolling

13   on ahead," that is relevant to my credibility as a witness --

14             THE COURT:  Counsel.

15             MR. KUBY:  -- as well as --

16             THE COURT:  I'm sorry, I'm sorry.  Did you finish?

17             MR. KUBY:  Yes.  I almost --

18             I'm sorry, Judge.  I have a better trained law human

19   here.

20             MS. TRIVEDI:  Judge, our preferred gender pronoun is

21   "we."

22             Judge, I think the core of Mr. Kuby's argument is that

23   the witness is using the attorney-client privilege to override

24   our client's Sixth Amendment confrontation right.  The

25   witness's bias and motive underlying these six contempt motions

1    leading to this trial is the fair scope of cross-examination.

2    And if the Court is going to use, or allow the attorney-client

3    privilege to be used as a shield, such that we can't assert our

4    client's confrontation right --

5          Sorry, am I yelling at you?  Oh, too fast.  Sorry.  I

6    get a little excited.

7          -- we would move to strike certain aspects of the

8    direct, if not the direct in its entirety, or ask that these

9    objections be taken up on a case-by-case basis.

10         MS. GLAVIN:  So, your Honor, I believe that the Court

11   had asked the defense yesterday to provide some case law on

12   this precise issue.  I am going to just -- I am actually not

13   going to do their work for them.  I think the case should cite

14   the case law on this issue.

15         I believe that the defense can very well get at what

16   they want to get at without going into attorney-client

17   communications.

18         To the extent the defense takes the position that

19   Ms. Champion, during her testimony yesterday, and the date

20   before, during the testimony in which she read, from public

21   filing after public filing, and the email after email contents,

22   if the defense position is that Ms. Champion was in some way

23   lying or shading that testimony as she went through those

24   documents yesterday, I think they can get at it without getting

25   at, what were your conversations with your client, which was,

you know, "Ms. Champion, you are a lawyer for Chevron, is that

correct?  Ms. Champion, how much money does Chevron pay your

law firm?  Ms. Champion, when you testified yesterday, were you

testifying -- you have a duty of loyalty to your client,

correct?"  They can get at this, through a very proper way,

that doesn't have to affect that privilege, and Mr. Donziger's

defense is not in any way impaired.

            MR. KUBY:  Judge, my last word on this, for now, is,

thank you very much, we will be doing that, but the fact that

an attorney asked a client a question and the fact that the

client answered that question, those two very narrow facts are

not covered by the attorney-client privilege.

            THE COURT:  What do you say on that narrow point?

            MS. GLAVIN:  I'm going to put it, what is the

relevance as to whether or not Ms. Champion asked Chevron, was

your long-term strategy to demonize Donziger?  The relevance

isn't whether she asked the question.  The relevance is whether

Ms. Champion was testifying on Monday or Tuesday or perhaps

even today with a bias or not telling the truth because she's

trying to demonize Donziger.  And I think they can get at it

another way.  The fact she asked a question is not relevant

whatsoever to whether or not she is trying to demonize Donziger

in her testimony.

            MR. KUBY:  Judge, with all respect to Ms. Champion,

she has spent virtually her entire professional life, with some

L5CADON2ps                    Champion - Cross

1   notable exceptions, working on the Donziger case.

2              THE WITNESS:  That's incorrect.

3              THE COURT:  No one asked you.

4              MR. KUBY:  OK.

5              THE COURT:  Maybe you should have said Chevron,

6   actually.  But go ahead.

7              MS. GLAVIN:  And that's exactly the point.

8              MR. KUBY:  You know what, I'm -- that's exactly the

9   point.  Thank you very much.  When I'm done, then you can tell

10  me --

11             THE COURT:  Counsel, counsel, the two of you don't get

12  to chitchat either.

13             Anything else I missed?

14             MR. KUBY:  Yes.  I mean, the relevance is that this

15  witness has spent the better part of a decade -- and if the

16  foundation is not laid for that, I will lay it -- has spent the

17  better part of a decade going after Steven Donziger in one

18  fashion or another.  And if this was just normal litigation, as

19  far as she is concerned, "this is just what I do, I'm not

20  demonizing anybody," fine.  If in fact she's well aware that

21  her client's long-term strategy is to demonize Steven Donziger

22  and she's like, "OK, you know, whatever, as long as the check

23  clears," that's something else.  That's why the relevance.

24             THE COURT:  Anything else?

25             MR. KUBY:  No.

L5CADON2ps                    Champion - Cross

1             THE COURT:  All right.

2             Anything else?

3             MS. GLAVIN:  No, your Honor.

4             THE COURT:  All right.

5             With respect to the privilege point, quote, the

6     accused does not have an unfettered right to offer testimony

7     that is incompetent, privileged, or otherwise inadmissible

8     under the standard rules of evidence, close quote.  *Taylor v.*

9     *Illinois*, 44 U.S. 400, 410 (1988).

10            Quote, it is within the court's discretion to limit

11    cross-examination to the extent that it would violate the

12    witness's attorney-client privilege, close quote.  *United*

13    *States v. Lin*, 225 F.3d 647 (2d Cir. 2000).

14            To the extent that this question calls for

15    attorney-client privilege, I will sustain the objection.

16            On the yes-no point, whether the witness asked or

17    didn't ask is irrelevant.

18            With respect to bias, to the extent that the

19    demonization mantle is being spread over this witness as a

20    result of these emails, try to attenuate it.

21            With respect to this witness's potential bias, we have

22    935 other ways to get at it.

23            So the objection is sustained.

24            MR. KUBY:  Thank you, Judge.

25            You certainly managed to speed things along, Judge.

1          THE COURT:  What's your next question?

2          MR. KUBY:  For I have sinned?

3          THE COURT:  Not today.

4          MR. KUBY:  It's not over.

5     BY MR. KUBY:

6     Q.  Ms. Champion, is it fair to say that you told the FBI that

7     Mr. Donziger saw everything as a persecution against him rather

8     than Chevron trying to overthrow a fraudulent judgment?

9     A.  Again, I don't recall specifically saying that, but it --

10    you know, I'm not -- I wouldn't be surprised if I said

11    something like that.

12    Q.  Is there anything that might refresh your recollection?

13    A.  I have a feeling you think there is.

14    Q.  I do, but it's not how we can do it here, although it's

15    fine.

16          THE COURT:  Well, no.  Here it is.  Ms. Trivedi has

17    explained to you that you have to ask that question.  Right?

18          MS. TRIVEDI:  He responds well to positive

19    reinforcement, Judge.  We just encourage him a little bit.

20          THE COURT:  Wonderful.  Show me how.

21          MS. TRIVEDI:  Good job, Kuby.

22    BY MR. KUBY:

23    Q.  Is there anything that might refresh your recollection of

24    that conversation, if it happened?

25    A.  Again, I don't know, but it appears that you have notes of

L5CADON2ps                 Champion - Cross

1   the conversation, so maybe.

2   Q.   Sure.

3        MR. KUBY:   Could you please put up 3501-37, last line.

4   A.   I don't think I would say "overthrow," just because it's

5   not really a legal term.   But would I have said something

6   consistent with this?   It doesn't surprise me.   I agree with

7   the statement.

8   Q.   But overthrow -- and the "overthrow" is something you do

9   take up with, not judgment?

10  A.   Yeah.   I would say something like "resist enforcement of."

11  Q.   OK.   Thank you.

12       Ms. Champion, are you familiar -- and this is a yes or

13  a no -- are you familiar with a *Wall Street Journal* article

14  that ran on May 2nd of 2021 referencing what I'll call the

15  Donziger case or the Lago Agrio case or the Ecuador case?   I'm

16  just calling it all "the Donziger case."

17  A.   I assume you're referring to Sara Randazzo's piece.   I did

18  read it.   I don't recall the specific date it was published.

19  Q.   OK.   So you're familiar with it.

20  A.   Again, you want to give me the title of the article so I

21  can confirm we're talking about the same article?

22  Q.   Sure.

23       MR. KUBY:   If you could just put it up on the screen.

24  Q.   "Litigation without end: Chevron battles on in 28-year-old

25  Ecuador lawsuit."   That's the article I'm talking about.

L5CADON2ps                    Champion - Cross

1    A.  I read the article, yes.

2    Q.  That's the article you're talking about.

3    A.  Yeah.

4    Q.  After reading that article, did you make any inquiries,

5    within your firm, as to whether the referenced December 10th,

6    2010 meeting with federal prosecutors took place?

7             MS. GLAVIN:  Objection, relevance.

8             MR. KUBY:  That in 2010, Gibson Dunn & Crutcher was

9    trying to get Mr. Donziger indicted.  And this is a

10   continuation.  Where we end up today is now the third time

11   they've attempted to put him in jail.  As we know, third time's

12   a charm and we're expecting that, but I can at least go through

13   briefly the history of this?  No?

14            MS. GLAVIN:  Objection as to relevance.

15            THE COURT:  Sustained.

16   BY MR. KUBY:

17   Q.  Now, yesterday you testified --

18            MR. KUBY:  I'm sorry, Judge.  The tiny little device

19   in my ear is saying the word "battery," so if you'll just let

20   me step aside for one second and get a new battery.

21            THE COURT:  Yes.

22            MR. KUBY:  Hearing better again, mask off, face next

23   to microphone.  Got it.

24   Q.  Yesterday you testified with respect to a motion that I

25   believe was filed on March 20th, 2019.  Correct?

L5CADON2ps                    Champion - Cross

1    A.  I think -- let me check the docket, but that sounds like a

2    date on which we filed some motions.  2020, did you say?

3    Q.  No, 2019.  And I'm referring to the documents on page 2177

4    and 2179.  And there is some interplay between the two.

5            THE COURT:  Give her a hint.  Even she probably

6    doesn't have it memorized.

7            MR. KUBY:  Sorry, Judge?

8            THE COURT:  Give her a hint.  Even she probably

9    doesn't have all those docket entries memorized.

10           MR. KUBY:  I know.  There were a lot of docket

11   entries.

12   A.  So it's the -- is it the -- there's a motion, the Zelman

13   motion, and then the failure to comply with the Court's March

14   5th, 2019 order?  Is that related to the November 2017

15   retainer?

16   Q.  Let me try to answer your question with a different

17   question?

18           THE COURT:  Ms. Champion, you didn't say *Daubert

19   motion,*" did you?  What did you say?

20           THE WITNESS:  No, I said Zelman, Zelman.

21           THE COURT:  Zelman, Z-e-l-m-a-n, capital Z.

22           MR. KUBY:  Does somebody want more batteries?

23   Q.  One of these was the motion where you requested that Judge

24   Kaplan incarcerate Mr. Donziger unless he complied.  Is that

25   correct?

1    A.   I believe it was -- that was included among other options

2    for coercive sanctions.

3    Q.   But you proposed incarceration as one option.

4    A.   You're going to have to show the pleading you were

5    referring to.  I believe it was included among a number of

6    options.

7    Q.   Right.  So a range.  That was one.  And that would be the

8    second time, to your knowledge, that Chevron attempted to put

9    Mr. Donziger behind bars.

10   A.   No.  I don't know what you mean by that.

11   Q.   You are aware that, today, this is a criminal prosecution.

12   Correct?

13   A.   Yes.

14   Q.   And from March 4th, 2020, up to and including May 8, is

15   it --

16          MR. KUBY:  Are you having a -- am I having trouble

17   being heard?

18          THE COURT:  When you are looking down and reading,

19   you're not close to the microphone.  That's all, sir.

20          "And from March 4th, 2020, up to and including

21   May 8" --

22   Q.   -- you sat down, either in person or through Zoom, for 20

23   meetings with Ms. Glavin, Ms. Armani, Mr. Maloney, and two FBI

24   agents.  Is that correct?

25   A.   I don't recall how many meetings I had.  It was on the

L5CADON2ps                    Champion - Cross

```
 1   order of 15 or 20.  So you'll have to refresh my recollection
 2   if you have the exact number.
 3           Also, the attendance at those meetings did vary
 4   sometimes, I mean, just to be precise about it.
 5   Q.  If I were to show you a document that had been prepared by
 6   your attorney, Mr. Brodsky, and submitted to the Court in
 7   compliance with the subpoena that contained those summaries,
 8   the participants, and the number of hours, might that refresh
 9   your recollection?
10   A.  Sounds like it would.  Thank you.
11   Q.  OK.  So what I'd like you to do first with this, in terms
12   of memory refreshment, is to just count the number of meetings
13   that you attended.
14   A.  You can go to the next page.
15           Keep going.
16           I count 20.
17   Q.  And in each of these meetings, there was at least one other
18   Gibson Dunn & Crutcher lawyer, sometimes two, sometimes three.
19   Is that correct?
20   A.  Sounds right.
21   Q.  And there were two FBI agents there as well?
22   A.  I don't know.  Again, sometimes people attended by phone.
23   So there were -- I believe there was an FBI, at least one,
24   present for every meeting, either in person or over the phone,
25   and perhaps both of them.  It's hard to remember.
```

L5CADON2ps                     Champion - Cross

1   Q.  And some of these meetings lasted seven hours, more or

2   less.  Correct?

3   A.  Yeah.  I believe the ones in the run-up to this trial date

4   as well as the last trial date were longer, because we thought

5   we were going to trial.

6   Q.  When you refer to "the last trial date," are you referring

7   to the January trial date?

8   A.  Fortunately I blocked the dates out of my memory.  But

9   there were at least three trial dates here that we -- you know,

10  that I did some preparation for.  Maybe one was January, I

11  think maybe in November, maybe?  I don't recall.

12  Q.  No, no, that's good.  And also one, I think, in April,

13  before I came along?

14  A.  That sounds right.  Again, I don't know the date.  You know

15  better than me.

16  Q.  Fair, fair.  And I'm not pinning you to any of these.

17          Six of these sessions were seven hours more or less,

18  correct?

19  A.  If you want me to verify, you could go to the next page.  I

20  Count Two on that page.

21          Yes.  Looks like six, on those two dates.

22  Q.  And have you tallied up the total number of hours that

23  you've spent just on these prep sessions with the private

24  prosecutor?

25  A.  No.

L5CADON2ps                    Champion - Cross

Q.  If I were to tell you they added up to 100 point -- 100 1/2

hours, does that sound right?

A.  It doesn't sound right or wrong.  It sounds, you know, I'm

sorry I had to spend that much time on it.  But yes, it

sounds -- I'm not going to quibble with it.

Q.  And if I were to tell you the total amount of time that

other Gibson Dunn Crutcher lawyers spent with you at these

meetings, and that total was an additional 185 hours, you would

not quibble with that either, would you?

          MS. GLAVIN:  I just want to object to the form of the

question.  Is he -- I think the question is asking about the

amount of time other Gibson Dunn --

          THE COURT:  I don't understand it either.

          MR. KUBY:  OK.  I'm sorry.

          THE COURT:  Is it other --

          MR. KUBY:  I will --

          THE COURT:  Excuse me.  Is it other Gibson Dunn people

at meetings Ms. Champion was not at, or was it other Gibson

Dunn people were present with Ms. Champion at her meetings?

          MR. KUBY:  The latter.

          THE COURT:  Or is it something else?

          MR. KUBY:  The latter.

          THE COURT:  Do you mind clarifying that, please, sir?

          MR. KUBY:  Sure.  I'm sorry, Judge.

BY MR. KUBY:

L5CADON2ps                     Champion - Cross

1   Q.  As we said, a number of GDC lawyers were present with you

2   at various times in your meetings, correct?

3   A.  Yes.

4   Q.  Does it seem accurate that the total number of their hours,

5   spent with you, at these meetings, with the private prosecution

6   team adds up to 185 hours?

7   A.  Sure.  Makes sense.

8   Q.  And that would come to a total of 286 1/2 hours, total

9   time.

10  A.  I'll trust your math.

11  Q.  OK.  And if by any chance it's wrong, I will correct the

12  record later.

13          Did you do any prep time about of these meetings?

14  A.  Sometimes I would review documents, just on my own, that,

15  you know, that we had previously discussed, so I could remember

16  what they were about and all of that sort of thing.

17  Q.  So we have now the 286 1/2 total.  How many hours, by order

18  of magnitude, would you say you spent reviewing other documents

19  in the course of this long process, starting from March 20th up

20  to and including May 8th?

21  A.  You mean outside of these meetings?

22  Q.  Yes.

23  A.  Oh, not that many.  Maybe 20 hours.

24  Q.  OK.  So that brings us up to 306 1/2 hours of GDC time just

25  dealing with this --

L5CADON2ps                     Champion - Cross

           THE COURT:  Your partner is correcting your math.

           MS. TRIVEDI:  It's 200.  300 is a big --

           THE COURT:  I think actually he's right.

           MS. TRIVEDI:  Withdrawn.  Withdrawn, then.  Sorry.

           MR. KUBY:  She's fired as the math demon.

           THE COURT:  Prior total is 286, plus 20 is 306.

           MR. KUBY:  And a half.

           THE COURT:  And a half.

BY MR. KUBY:

Q.  Are you aware that Gibson Dunn Crutcher is not billing

Chevron for any of this time?

A.  I know that I'm not billing my time.

Q.  And do you know if anybody is billing their time at these

meetings?

A.  I don't know.

Q.  Well, I'm going to ask you to assume for purposes of my

next question that nobody is billing their time.  On average --

and again I'm not looking for a precise figure; I'm just trying

to get an order of magnitude here.  I mean, for example, you

bill out -- you bill Chevron out at, it used to be a thousand

17 an hour.

A.  That sounds in the right range.  I'm not sure what the

current rate is, or if there is even a rate in place right now.

Q.  Right.  But that's like, OK, a thousand an hour.

A.  It sounds about right.

1    Q.  And some of the associates, some -- and Mr. Brodsky, I

2    assume, is a little less, or maybe a little more.

3    A.  I think he -- yeah, he's above my pay grade.

4    Q.  He is, really?  I guess that's what happens when you're a

5    former fed.  And I imagine some of the associates are less than

6    a thousand an hour.

7    A.  I think so.

8    Q.  So if I were to choose the number $800 per hour as an

9    average rate of everybody who participated, that would be a

10   reasonable guesstimate under the circumstances.

11   A.  You know, I -- without sitting down and doing the math,

12   sure.  I'm not going to quibble with it.

13   Q.  Right.  I mean, nobody was making 50 bucks an hour, right?

14   Nobody was making 2,000?

15   A.  What do you mean by "making"?  We don't get paid by hour.

16   Q.  No, I'm -- you're right.  I'm sorry.

17   A.  We bill by the hour.

18   Q.  I'm sorry.  I other forgot the --

19   A.  I wish I got paid by the hour.  That would be better.

20   Q.  Yeah.

21          MR. KUBY:  I just want to get a total here, if I

22   might.

23          MS. TRIVEDI:  I want to redeem my --

24          THE COURT:  If you're using your on-the-record voice,

25   it needs to be in the microphone.

1             MS. TRIVEDI:  This is my redemption math here, Judge.

2    BY MR. KUBY:

3    Q.  So at the instructions of my math human, $800 an hour times

4    306 hours works out roughly to $250,000.

5    A.  I think your math is roughly correct.

6    Q.  "Roughly correct" is what I aim for.  Thank you.

7             Since you're not billing for this, it essentially is a

8    donation, correct?

9    A.  I don't view it as a donation, no, to Chevron, or to

10   anybody.  I'm under federal subpoena.  I would meet with the

11   authorities regarding any crime that they wish to meet with me

12   on.  I don't view it as a donation.  It's more like paying

13   taxes.

14   Q.  OK.  Well, you say you're here under subpoena.  And that's

15   accurate.  Is that correct?

16   A.  Yes.

17   Q.  The 20 meetings that we previously referenced, were you

18   served with a subpoena for those?

19   A.  For, for each meeting?

20   Q.  For any of those meetings.

21   A.  No.  I don't think so.

22   Q.  Were you served with any sort of grand jury notice that you

23   must appear?

24   A.  No.

25   Q.  And without intruding into the attorney-client privilege,

1   you were and you are aware that these meetings on your part are

2   voluntary in the sense that you do not have to participate.

3   A.   Yeah, I agree with that, that, you know, the government

4   can't force me to prepare for -- to provide testimony in a

5   federal court.

6   Q.   Right.  So for these 180 hours, 180 1/2 hours of your time,

7   all of the 100-plus hours of your time was voluntary on your

8   part.

9   A.   I'm not going to quibble that it's voluntary in some sense.

10  But, again, I was subpoenaed to provide testimony.  I met with

11  the government in order to prepare to provide that testimony.

12  Q.   Now, when you said you met with the government, to whom

13  were you referring?

14  A.   The prosecutors in this action as well as the FBI agents.

15  Q.   Are you aware that the prosecutors in this action are not

16  members of the Department of Justice?

17  A.   I am.

18  Q.   Are you aware that they exercise no duly constituted

19  elected -- executive authority?

20            MS. GLAVIN:  Objection.

21            THE COURT:  Sustained.

22  Q.   You're private lawyers, right?

23  A.   My understanding is limited to the fact that they have been

24  appointed to handle this case on behalf of the government.

25  Q.   Appointed by whom?

1   A.  I view them as the government for the purposes of this case

2   and this subpoena.

3   Q.  Appointed by whom?

4   A.  I'm honestly not sure the mechanics of the rule.  The

5   court.

6   Q.  "The court"?  Is there a specific court human that you're

7   aware of who appointed you?

8   A.  Are you trying to get me to say Judge Kaplan?

9   Q.  Very good guess.

10  A.  My understanding is they were appointed pursuant to an

11  order of Judge Kaplan.

12  Q.  Now, when you say that you knew you didn't have to sit for

13  these 20 meetings and hundred-plus hours in one sense -- I

14  think you said that -- would you -- and that sense is they

15  can't compel you.  Right?

16  A.  I mean, maybe there is some way they could have.  You know,

17  they did not compel me.

18  Q.  Were you requested by Gibson Dunn Crutcher to do this?

19  A.  No.

20  Q.  This was entirely voluntary on your part.

21  A.  I was requested by the government.

22  Q.  To donate a hundred-plus hours voluntarily for the purpose

23  of convicting Steven Donziger.  Correct?

24  A.  I don't understand that to have been the purpose of the

25  meeting.  The purpose was to discuss with me what I knew.  I'm

1    not the one determining what they think is relevant, not

2    relevant to their case, nor the one determining, you know, what

3    sanction he should face, if any.  The purpose of the meeting

4    was so that they could understand what I knew, so that they

5    could introduce me to various documents.  That was the purpose

6    of the meeting.

7    Q.   And all of that was voluntary on your part.

8    A.   In a strict sense, yes, it was voluntary.

9    Q.   In what unstrict sense?  I understand what you mean by

10   "strict sense."  In what other sense was it not voluntary?

11   A.   In -- only in the sense that, again, if the government

12   called me because I was a witness to any crime, I would feel

13   some obligation as a citizen to talk to the government and to

14   cooperate with them to the extent that I would be useful to

15   them.

16            So I view it as sort of a civic duty.  But it is

17   voluntary.  I'm not going to argue with you there.

18   Q.   OK.  Do you consider these to be pro bono hours?

19   A.   No, I don't.

20   Q.   So --

21   A.   I could -- this is separate and apart from, you know, my

22   law practice, in that sense.  It concerns work that I have done

23   as a lawyer.

24   Q.   So you considered it part of your civic duty to help the

25   private prosecutors in any lawful fashion they required your

1   assistance?

2   A.  Not in any.  In the fashion in which I did, which was to

3   meet with them when they requested and answer their questions.

4   Q.  And go over all the documents with them that they wanted to

5   go over?  Right?

6   A.  I believe that I did.  I don't -- I don't think I said,

7   "no, I'm not talking about that document," if that's what

8   you're getting at.

9   Q.  Oh, yeah, there weren't any indications of attorney-client

10  privilege there?

11  A.  Oh, yes, there were.

12  Q.  And you answered all of the questions that Mr. Brodsky or

13  your other counsel deemed to be not privileged?

14  A.  Yeah, I believe so, to the best of my ability and within

15  the boundaries of my personal knowledge.

16  Q.  And you sat there day in and day out for as much as seven

17  hours out of your sense of civic obligation.

18  A.  Yes.

19          THE COURT:  Mr. Kuby, lest you think I haven't gotten

20  the point, I've gotten the point.

21          MR. KUBY:  I was just going to do that.

22  Q.  You do understand, however, that this is a criminal

23  prosecution.  Right?

24  A.  Yes, I do.

25  Q.  You understand Mr. Donziger is charged with committing

1    crimes.

2    A.   Yes.

3    Q.   Correct?

4    A.   Yes.

5    Q.   And you also understand, presumably, those crimes, if he is

6    convicted, carry a jail sentence.

7    A.   I don't know what the potential punishments for these

8    particular offenses are.

9    Q.   Right.  Are you aware that there is a term of jail that is

10   prescribed for them?

11   A.   I was not aware of that, no.

12   Q.   In these 20 meetings with the private prosecutor, the

13   private prosecutor never said, "By the way, you're assisting in

14   a process that can result in Mr. Donziger going to jail"?

15   A.   I don't believe so, no.

16   Q.   Would that have changed your sense of civic obligation?

17   A.   Again, I'm not the judge, the fact finder.  I, I didn't

18   enact the Federal Code provisions in question.  No, I don't

19   think it would have.

20   Q.   So it doesn't matter.

21   A.   That is not the case.  It's hard for me -- you're asking me

22   a hypothetical question.

23             THE COURT:  Slowly, friends.

24   Q.   You engage in charitable giving?

25   A.   I do.

L5CADON2ps                    Champion - Cross

1  Q.  Is what you view the government of the United States part

2  of your charitable giving?

3  A.  No.

4  Q.  And when you were meeting with the private prosecutors,

5  were you aware that they were being paid as well?

6  A.  I would say in a vague sense.  I am assuming that, like a

7  CJA, that there's some statutory rate for their work.  I don't

8  know.  That's just a guess.

9  Q.  OK.  Moving to another topic --

10            THE COURT:  Sir?

11            MR. KUBY:  Moving to another topic.

12 Q.  It's fair to say that Chevron is a sophisticated buyer of

13 legal services.  Correct?

14 A.  Yes.

15 Q.  And it's also fair to say that they regularly scrutinize

16 and carefully manage legal work performed by outside counsel.

17 A.  I can't guess.  You know, I can only speak from my personal

18 experience.  I don't know exactly what their processes are.

19 You'd have to ask them.

20 Q.  Well, if you say that --

21            MR. KUBY:  Pull up the billing records, 4, 5, Defense

22 Exhibit WW.

23            THE COURT:  Was that your on-the-record voice, "WW"?

24            MR. KUBY:  Yes, Defense WW, Government Exhibit or

25 docket entry 2245.

1            If you could scroll to the declaration of Anne
2   Champion, assuming I bothered to load it in.
3   Q.  Well, rather than try to dig this out of this document, do
4   you recall ever representing under oath that Chevron
5   regularly -- will regularly scrutinize and carefully manage
6   legal work performed by its outside counsel?
7   A.  I don't specifically remember this declaration, which was
8   filed more than a year ago, but, again, I can't -- this does
9   not surprise me.  They do scrutinize and they sometimes push
10  back.
11  Q.  If you would just take a look at paragraph 12.
12            MR. KUBY:  I will offer this into evidence.
13            THE COURT:  It's on the docket, therefore received.
14            (Defendant's Exhibit WW received in evidence)
15            MR. KUBY:  I'm sorry.
16            THE COURT:  It is on the docket and therefore
17  received.
18            MR. KUBY:  Thank you, thank you.
19  Q.  If you look at paragraph 12.  "For example, I understand
20  that it is the company's standard practice, and it is my
21  experience, having represented them on" --
22            THE COURT:  Slowly.
23  Q.  -- "on multiple matters, that they regularly scrutinize and
24  carefully manage legal work performed by outside counsel,
25  including, for example, by reviewing the nature, necessity, and

1   efficiency of any tasks undertaken."  You submitted that

2   statement under oath; is that correct?

3   A.  Yes.  And it's consistent with my experience.

4   Q.  And it was true at the time you said it.

5   A.  I'm assuming so, yes.  It seems -- it sounds consistent

6   with my experience.

7   Q.  Now, Mr. Donziger -- withdrawn.

8          You submitted this in support of an application for

9   fees incurred in the post -- in a portion of the post-judgment

10  period, correct?

11  A.  I'd, I'd prefer if I could see the title of it, but that's

12  not correct based on the timing of the declaration.

13          Yes.

14  Q.  And that total, just use rounding, was somewhat over $3

15  million in bills, correct?

16  A.  You'd have to show me.

17  Q.  OK.  We'll do that slightly later.

18  A.  I don't remember the number.

19  Q.  OK.  But Mr. Donziger owes Chevron money, right?

20  A.  Yes.  We have a money judgment against him.

21  Q.  $800,000?

22  A.  Approximately.  It's a cost judgment.

23  Q.  Rounding down.

24          Did it occur to you that it's harder for Mr. Donziger

25  to earn money if he is in jail?

L5CADON2ps                    Champion - Cross

1   A.  It did not.  I haven't thought about that.

2   Q.  Did it occur to you that it's harder for Mr. Donziger to

3   earn the money that he owes your client if he's a convicted

4   criminal?

5           MS. GLAVIN:  Objection, your Honor.

6           THE COURT:  Counsel, what are we doing?

7           MR. KUBY:  Well, I've been asking that question for

8   about a year.  OK?

9           THE COURT:  Try asking a more specific question.

10  BY MR. KUBY:

11  Q.  Well, criminal conviction makes employment more difficult,

12  right?

13  A.  As a general matter?

14  Q.  As a general matter.

15  A.  I would assume so.

16  Q.  And presumably the $800,000 is something you want to

17  collect for your client.

18  A.  We are trying to collect it.

19  Q.  Right.  And so there is a sense in which your civic duty

20  here is making your professional duty there more difficult.

21  Right?

22          MS. GLAVIN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Did you participate in the bar proceedings that were lodged

25  against Mr. Donziger?

1   A.  No.  Chevron is not a party to those proceedings.  I

2   attended some days of the hearing, but I -- I did not

3   participate.  We were not a party.  We were not called as

4   witnesses.

5   Q.  Did you sit with either the special pro bono counsel or the

6   attorney grievance committee general counsel to go over

7   documents?

8   A.  No.  I, I have met with Naomi Goldstein a couple of times,

9   but not to go over documents, no.

10  Q.  What were those meetings about --

11  A.  Um --

12  Q.  I'm assuming they relate to Mr. Donziger if they were of

13  social interest or personal.

14  A.  No.  They were related to the disciplinary proceedings, I

15  think to answer questions that they had.  I'm not sure, to

16  be -- I don't recall.

17  Q.  So it would make some sense from your recollection, they

18  had some questions, you answered those questions?

19  A.  Yes.

20  Q.  And that was part of -- were you billing for those hours?

21  A.  I'm sure those hours were billed for, yeah, probably.

22  Q.  So that wasn't part of your civic obligation.

23  A.  No.

24  Q.  That was part of your professional obligation.

25  A.  I mean, obligation, yes.  It was work that was performed in

L5CADON2ps                    Champion - Cross

1   the course of a representation.

2   Q.  And what client were you representing when you were doing

3   that?

4   A.  Chevron Corporation.  As you know, the disciplinary

5   proceedings against Mr. Donziger revolved around the collateral

6   estoppel effect of the RICO judgment.  Mr. Donziger largely

7   challenged the bar action by challenging the RICO judgment.

8   And so they, you know, Chevron's interests were implicated in

9   that case although it was not a party to the case.

10  Q.  So the answer is Chevron Corporation.

11  A.  Yeah.

12  Q.  And you were present for some of the hearings?

13  A.  Yeah.  I think I may have missed a day.  I don't recall if

14  I was there every day or just -- or I may have missed -- or

15  maybe, you know what, I think there was one set of hearings in

16  like September and another set a month or two later that I did

17  not go to, if I recall correctly.

18            THE COURT:  Slowly.

19            THE WITNESS:  Sorry.

20  Q.  And you know, do you not, that it's much harder for a

21  disbarred lawyer to find work than it is for a lawyer who sill

22  is admitted to practice.  Right?

23  A.  Well, my understanding is if you're disbarred you cannot

24  practice law.

25  Q.  And so you have to do something else: work a grill,

1    fertilizer plant, something, right, whatever.  But you're

2    trying to collect money for Chevron Corporation, correct?

3    A.  We are trying to enforce a money judgment against

4    Mr. Donziger.

5    Q.  $800,000.  And Chevron Corporation is paying you to assist

6    the attorney grievance committee in disbarring this guy, right?

7    A.  Again, I don't -- we were not a party to those proceedings.

8    The proceedings involved challenges to a RICO judgment that

9    included among other relief barring enforcement of a $9 billion

10   judgment against Chevron in the United States.  So, as you can

11   see, there is a significant monetary amount that relates to

12   that RICO judgment.  So --

13   Q.  Mr. Donziger, if he won his bar proceeding, was not going

14   to be paid $9 billion, right?  That wasn't the pot of gold at

15   the end of the rainbow.  All he would be able to do is continue

16   to practice law.  Right?

17            THE COURT:  Slowly.

18   A.  Again, I'm not an expert on bar proceedings.  I would

19   assume you're correct that, if he had won, whatever that means,

20   then he would not be disbarred.  I, you know, I'm not sure what

21   winning or losing means.  I think at that point the hearing was

22   about the sanction.

23            THE COURT:  Slow down.

24            THE WITNESS:  Sorry.

25   A.  The hearing was about the appropriate sanction.

L5CADON2ps                    Champion - Cross

Q.  And if the ultimate sanction is disbarment, it's harder for

him to make money.  Right?

A.  Harder for him to make money, this -- not allowable for him

to make money as an attorney.  I don't know if it's harder for

him to make money, you know.

Q.  He might have a whole other set of skills that you haven't

learned anything about in the past ten years, right?

A.  Right.

Q.  Public relations, journalism he used to do.  But it's not

contributing to Chevron's bottom line if he's not able to pay

the $800,000, right?

A.  Um, again, I -- correct, but I think there's other ways he

could make a living.  So I'm not going to accept the premise

that he can't make a living if he can't be a lawyer.

          THE COURT:  We've probably beaten this horse to death.

          MR. KUBY:  But this horse is dead.

          THE COURT:  All right.

          MR. KUBY:  This horse, we're moving on to an entirely

different horse.

          Your Honor, you do have a remarkable sense of my

timing, which is a little scary.

Q.  Ms. Champion, as a lawyer at Gibson Dunn Crutcher, you have

what I will refer to as a home page.  Is that correct?  Can I

call -- what is it actually called?

A.  I guess it would be my attorney profile or bio page.  Home

1   page doesn't sound right.

2   Q.  Right.  Bio page.

3   A.  Sounds like saying blog.

4   Q.  And that is one way that you, Anne Champion and GDC, have

5   as a way of introducing yourself to the world.

6   A.  Yes.  Yes.

7   Q.  OK.  So who is Anne Champion?  I saw her on Wednesday and

8   she is like a champion.  Who is she?  They're going to go to

9   your bio page, right?

10          And it's also consistent with the way that you wish to

11  be portrayed.  Is that right?

12  A.  I think that's fair, yes.

13  Q.  And the statements that you make in that are statements

14  that you want made.

15  A.  Yes.

16  Q.  And in some sense it's also a marketing device.  Is that

17  correct?

18  A.  Yes.  I think it was -- it constitutes some kind of

19  attorney advertising.

20  Q.  OK.  If we could put your home page up, please.  This is

21  Exhibit I-29 for identification.  Do you recognize it?

22  A.  It looks like a copy of my home page.

23          I've embraced it.

24  Q.  Would you take a look -- you said it looks like a copy, so

25  should I take you through the rest of it?

1   A.   Sure.

2          Looks accurate.  It's not entirely up to date, but

3   accurate.

4          MR. KUBY:  I offer this into evidence, Judge.

5          MS. GLAVIN:  No objection.

6          THE COURT:  Received.

7          (Defendant's Exhibit I-29 received in evidence)

8   Q.   One of the statements that you make in here is that you

9   represented Chevron against Steven Donziger.  Correct?

10  A.   Yes.

11  Q.   And is he the first specific person who you litigated

12  against who's name-checked in this?

13  A.   In -- you mean in the entire bio?

14  Q.   Yeah.  I see the first one.

15  A.   Like individual?

16  Q.   Yes.

17  A.   Possibly.  I also -- I should really add to this my Mary

18  Trump case, which is also against an individual, but --

19  Q.   Right.  We appreciate that.  You represented Mary Trump,

20  and that was lovely.  When did you do that?

21  A.   It would have been last summer.  Time has ceased to have

22  meaning, but it did involve Zoom hearings, so I'm assuming it

23  was summer of 2020.

24  Q.   And that involved sort of a complicated First Amendment

25  issue as well as a lot of other things?

L5CADON2ps                    Champion - Cross

A.  It wasn't that complicated.  It was prior restraint, which
is about as clearcut as it gets.

Q.  Fair.  And also, to tout the good things about your bio,
you represented Jim Acosta as well when the former Floridean
influencer yanked his press pass, right?

A.  Yeah.

Q.  And that involved First Amendment issues as well.

A.  Yes.

Q.  OK.  So you're also -- Steven Donziger is the first person
that you mentioned, by name.

A.  I mean, Jim Acosta is mentioned here by name.  Brian Keram
is mentioned here by name, so -- you know, some of my partners
are mentioned.  You mean litigated against as an individual?

Q.  Yes.  He's the first guy who gets name-checked in the list.

A.  I think in the specific way that you're mentioning as
having litigated against him, that's probably accurate.

Q.  And presumably you do that because it makes you marketable
to prospective buyers of legal services.

A.  It's really just because he was the defendant in the case.
The only RICO defendant the Stratus defendants settled out, the
other defendants defaulted.  The last were not defendants to
the RICO claim.

Q.  I'm sorry.  You've perfectly answered my very inaccurate
question.

          THE COURT:  But she answered it too quickly.  Slowly.

1    Q.  In that case -- this is the first named defendant that you

2    mentioned in litigation that you've conducted.

3    A.  In this bio?

4    Q.  Yes.

5    A.  Yeah.  It looks -- without reading through it word by word,

6    that looks right.

7    Q.  OK.  And you were named Next Generation Lawyer?

8    A.  Yes.

9    Q.  Has that generation come yet?

10   A.  I don't know.  I feel like Gen x were just cut out of

11   things.

12   Q.  Forever.  Yeah.

13          If we could go to the second-to-last bullet point and

14   highlight that.

15          You also say, "Chevron Corporation: representing

16   Chevron Corporation in over a dozen tort suits brought by

17   states, counties, and municipalities for alleged climate

18   change-related damages."  Yes?

19   A.  Yes.

20   Q.  And when you say "alleged climate change-related damages,"

21   are you saying that climate change is just an allegation?

22          MS. GLAVIN:  Objection.

23          THE COURT:  Sustained.

24          MR. KUBY:  I'm sorry.  What, Judge?

25          THE COURT:  Sustained.

1          MR. KUBY:  I would like to be heard.

2          THE COURT:  Counsel, there is no relevance to whether

3     or not climate change is real.

4          MR. KUBY:  Well --

5          THE COURT:  If you want to ask the witness if the

6     damages part is the alleged part, maybe you should.  But in any

7     event, we're not having a climate-change discussion here today.

8          THE WITNESS:  I don't dispute the reality of climate

9     change.

10         THE COURT:  Counsel --

11         MR. KUBY:  Thank you.

12         THE COURT:  Ms. Witness --

13         MR. KUBY:  Thank you.

14         THE COURT:  You know better.  You have been warned

15    several times about volunteering and chatting with counsel,

16    with no question.  Cut it out.

17         THE WITNESS:  Apologies.

18         THE COURT:  Counsel.

19         MR. KUBY:  Thank you.

20         THE COURT:  Now you're both conspiring against the

21    Court.

22         Next question.

23    BY MR. KUBY:

24    Q.  So, so, right, OK.  Why do you say "alleged," though?  You

25    know it's real.  Why do you say "alleged"?

L5CADON2ps

1   A.  Because the complaint alleged climate change-related

2   damages.

3   Q.  But they were real climate-change damages, right?

4   A.  I don't know.  They have not been proven yet.

5   Q.  How are we doing on those cases?

6   A.  I actually haven't been working on them for over a year, so

7   I -- the Second Circuit did issue a favorable decision recently

8   in the New York City one.

9   Q.  Favorable to, to --

10  A.  Affirming --

11  Q.  -- to your client or favorable to the planet?

12  A.  Affirming --

13          THE COURT:  Counsel, this is not a climate press

14  conference either.  Let's go.

15  Q.  This may actually be, in my view, a good time for me to

16  break, review my notes, to shorten some stuff up and come back

17  at ten minutes to 2 --

18          THE COURT:  Only if you promise to shorten.

19          MR. KUBY:  I promise to shorten.

20          THE COURT:  All right.

21          MR. KUBY:  I'm sorry, Judge.  We have one other small

22  matter that Mr. Garbus will take up.

23          MS. GARBUS:  Thank you.

24          THE COURT:  Technically you should be changing that

25  microphone cover.

L5CADON2ps

1          MS. GARBUS:  I'm going to rely on Mr. Kuby's health.

2     You asked me to report back to you --

3          THE COURT:  I'm sorry.

4          Ms. Champion, you may step down.

5          (Witness excused)

6          THE COURT:  Sir.

7          MS. GARBUS:  You asked me to report back to you on the

8     motion that we had filed on Friday.

9          THE COURT:  Yes, sir.

10          MS. GARBUS:  We have contacted the U.S. Attorney,

11     Mr. Berman, and we have asked him to come to court to testify

12     with respect to some of the matters that you asked me about,

13     including --

14          THE COURT:  Counsel, what I asked you about was the

15     document you said you received from the United States

16     Department of Justice in response to the very long inquiry that

17     has been attached to your notice.  If you have that document,

18     we're ready to go.

19          MS. GARBUS:  I have the document, furnished to me by

20     the attorney who spoke to the person at the Department of

21     Justice, and I will hand it up to you.

22          THE COURT:  Counsel, put it on your motion papers.

23     We're not doing this orally.  Put it on your motion papers.

24     I'll take a look at it.  And if it is sufficient in terms of

25     being the document, then we'll set a briefing schedule.

L5CADON2ps

1          MS. GARBUS:  I would like to at this point just quote

2     one thing --

3          THE COURT:  No.

4          MS. GARBUS:  -- from the case in court --

5          THE COURT:  Counsel, put it on your motion.

6          MS. GARBUS:  -- which deals specifically with the

7     dismissal that is now required.

8          THE COURT:  Sir, I am not doing it orally.  I am not

9     doing it without briefing.  Put it in your motion papers and I

10    will be happy to address it.

11         MS. GARBUS:  The prosecution --

12         THE COURT:  Ten of 2.

13         Sir, we are finished now.  Ten minutes to 2, friends.

14         (Luncheon recess)

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2                            1:54 P.M.

3            THE COURT:  Mr. Kuby.

4            MR. KUBY:  Thank you, Judge.

5        Mr. Donziger has waived his right to be here

6   knowingly, voluntarily, intelligently.  It's kind of sad,

7   because he's missing a good trial.  But we'll proceed.

8            I've really, really, really cut this down.

9   BY MR. KUBY:

10  Q.  Good afternoon, Ms. Champion.

11  A.  Good afternoon.

12  Q.  I want to ask you some questions with respect to Gibson,

13  Dunn & Crutcher billing during the post-judgment period.

14  A.  Okay.

15  Q.  And you filed a fee application with the district court to

16  recover the costs for a period of the post-judgment litigation;

17  is that correct?

18  A.  Yes.

19          MR. KUBY:  Could you put that up on the screen please?

20  Q.  While we're waiting for that, the lawyers who were working

21  only on the contempt -- well, for the contempt of court, the

22  lawyers who were working on that included William Thomson, yes?

23  A.  I need to see the declaration.  I don't recall.  But

24  definitely William Thomson would have been one of them.

25  Q.  Allison Kostecka?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  That I need to see a declaration on.  I don't -- I don't

2  recall.  I saw her name flash up on what you showed me

3  previously, I don't -- you know, but I'd need to see the

4  declaration.

5  Q.  Yeah, we're trying to get that up.  It's not on my screen.

6          Is it on your screen, Ms. Champion?

7  A.  Yeah.

8  Q.  Okay.  That's your declaration.  And there are many, many,

9  many pieces of paper attached to it that list lawyers and hours

10 and bills.

11 A.  Yeah.

12 Q.  Do you want to take a quick run-through on that?

13 A.  Yeah.

14          (Pause)

15 A.  Okay.

16 Q.  So the lawyers who are working on the contempt, William

17 Thomson, yes?  Allison Kostecka?

18 A.  Go to the next page please, and the next page, and the next

19 page.  There is a list of them.  I thought there was a list of

20 them in here.

21 Q.  Yeah.  Keep going.  I think they are on as exhibits.

22 A.  Oh, okay.  Oh, here we go.

23 Q.  Allison Kostecka?

24 A.  Yes.

25 Q.  Alejandro Herrera?

1  A.  Yes.  Just to be clear, this is based on a review of

2  billing records, not necessarily that I personally was familiar

3  with they were connected with it.  So I just want to be clear

4  about that.

5  Q.  But you personally submitted the declaration to the Court

6  to get these bills paid?

7  A.  Right, based on a review of billing records.

8  Q.  Andrea Neuman?

9  A.  Yes.

10  Q.  Randy Mastro?

11  A.  Yes.

12  Q.  Anne Champion?

13  A.  Yes.

14  Q.  Bradley Hamburger?

15  A.  Yes.

16  Q.  Vincent Eisinger?

17  A.  Can you go to the next page?  I don't actually see Brad,

18  but I know he worked on it.  There he is.

19          Okay.  And Vince, I don't see his name here either,

20  but he did work on some aspects of this.

21  Q.  Okay.

22          Laura Cole?

23          THE COURT:  A little more slowly.

24  A.  You can keep scrolling.

25          I see Vince, Laura.  Yeah.  Okay.

L5CVDON3                         Champion - cross

1    Q.  Claudia Barrett?

2    A.  Yes.

3    Q.  And lastly, Delyan Dimitrov?

4    A.  Yes.

5    Q.  Is he an attorney?

6    A.  Yes.

7    Q.  So that is one, two, three, four, five, six, seven, eight,

8    nine, ten, 11, 12 lawyers working on the contempt in the

9    post-judgment period; correct?

10   A.  Well, I see Steve Henrick listed here as well.

11   Q.  I thought I mentioned him.  I did?

12   A.  Oh, you did.  Okay.

13   Q.  And Gibson, Dunn & Crutcher billed $1,562,576 to Chevron

14   just for the contempt work; is that correct?

15   A.  I don't know the number off the top of my head.  If that's

16   what you're saying the declaration states, then I agree with

17   it.

18   Q.  Well, the declaration actually didn't have a number.  What

19   had a number was the bottom of each exhibit.

20   A.  Got it.

21   Q.  I don't think it ever gave a total.

22   A.  Got it.  So that total is down there.

23   Q.  Yeah, do you see that total at the very bottom?

24   A.  Yes.

25   Q.  $1,562,576, just working on the contempt.

1   A.  Yes.

2   Q.  Many of these lawyers also worked on other parts of the

3   post-judgment litigation as well, correct?

4   A.  I think that's fair to say, yes.

5   Q.  Discovery, for example, discovery compliance, etc.  And if

6   one were to add all of those billed hours for that period, is

7   it reasonable to suggest that the number that one would come to

8   is --

9             THE COURT:  Counsel, read it out.

10            MS. TRIVEDI:  Yes, Judge.  One second.

11            THE COURT:  Yes, ma'am.

12            MS. TRIVEDI:  It's $3,029,367.20.

13  A.  Again, I don't know where you're getting that number, but I

14  have not looked at this since it was filed, so you're going to

15  have to show me where you're pulling it from, but --

16  Q.  Okay.  Where we're pulling it from is at the end of each

17  exhibit for categories of work, there's a total.

18  A.  Mm-hmm.

19  Q.  And when you add all of those totals together, you

20  allegedly get the number that I just said.

21  A.  Okay.

22  Q.  So for purposes of moving this on, will you accept that,

23  subject to further clarification, as a reasonable number of the

24  billing for that period of time in the post-judgment work?

25  A.  Yes.  I mean, the award was on the order of three million,

1    so that must have been the number that we submitted.

2    Q.  And this was submitted on June 18, 2019; is that correct?

3    A.  Yes.

4    Q.  The post-judgment work has continued since then?

5    A.  Yes.

6    Q.  Any sense just as an order of magnitude, how much you have

7    billed since then?

8    A.  I really don't have a sense.  I don't review the bills for

9    this matter, so I don't have a day-to-day sense of how much

10   we're billing.

11   Q.  Now, you knew -- well, it was your understanding during

12   this time that from March 18 until May 29th, 2019, Mr. Donziger

13   was *pro se* during that time?

14   A.  Give me the dates again.

15   Q.  I'm going to say March 2018 through May 29th, 2019.

16   A.  I believe that's correct.

17   Q.  Actually still *pro se* now, right?

18   A.  Yes.

19   Q.  The litigation -- the underlying litigation continues on a

20   separate docket; correct?

21   A.  Correct.  Although it's been inactive for some period now.

22   Q.  Some of it got reactivated recently in light of the Second

23   Circuit decision, right?

24   A.  I would expect there would be some activity, but I'm not

25   sure.

Q.  Okay.  And because Mr. Donziger is *pro se*, that's why you

dealt with him directly; correct?

A.  Yes.

Q.  And it's fair to say that you took a lot of depositions in

the post-judgment period from February 2018 through July 2019?

A.  By "you," you mean we, Gibson Dunn?

Q.  Yeah.

A.  Yeah, we did.

Q.  And when I say "a lot," I'm asking for an order of

magnitude:  10, 100, 1,000.

A.  I would guess it's over 20.  I personally was only involved

in a few.  I don't know the number off the top of my head, but

I would guess that it was over 20.

Q.  And you served a lot of subpoenas during that period as

well, correct?

A.  Yes.

Q.  And approximately how many -- and again, by order of

magnitude -- subpoenas did you serve?

A.  Again, I don't know the answer to that.  I'm sure that it

was a lot.

Q.  More than ten?

A.  For sure.

Q.  More than 100?

A.  I don't know.  We had to subpoena a lot of people because

Mr. Donziger did not produce very many records.  And we had to

1    get them from third parties, where we would have expected in a

2    normal case to get them from the party.

3    Q.   There you go interjecting again.

4          Okay.  A lot.  We'll settle with a lot, all right?

5          And rather than going through all of this

6    document-by-document, which is going to be excruciatingly

7    boring and time-consuming, let me ask you if the following is a

8    fair summary of what you were doing with the subpoenas and

9    depositions.  Not everything you were doing, but one of the

10   things that you were doing:

11         You would learn through some source that someone, some

12   entity, was funding the Ecuador litigation, right?

13   A.   That occurred, yes.

14   Q.   Okay.  And then after you learned of that person or entity,

15   that person would be subpoenaed for pretty much every

16   conceivable document that was relevant to their funding

17   activities of the Ecuador litigation?

18   A.   We would subpoena them for materials that we believed were

19   relevant to the topics for which we were authorized to conduct

20   discovery.

21   Q.   And sometimes that person would -- or entity would sit for

22   a deposition?

23   A.   Sometimes, yes.

24   Q.   Right.  At the end of that process, as I've described it,

25   that person or entity would stop providing funding for the

1    Ecuador litigation?

2    A.  I don't know the answer to that.  You'll have to ask your

3    client.

4    Q.  Well, to the best of your knowledge, after you finished

5    this process, there was no more money that you were aware of

6    that they were contributing to the Ecuador litigation?

7    A.  Again, I don't know the answer to that.  I don't know.

8            MR. KUBY:  I feel like I'm in a small Plexiglas cage.

9    Q.  Ms. Champion, I want to turn back for hopefully a very

10   brief moment to Amazonia, which was the topic of extensive

11   testimony yesterday.

12   A.  Okay.

13   Q.  And I just want to -- I want to try to ask just a couple of

14   questions; we'll see how well this goes.

15           Is it fair to say that Amazonia was liquidated in some

16   way?

17   A.  My understanding is based on what's in our pleadings.  I

18   don't have any independent knowledge.

19           My understanding is that the entity that -- Chevron

20   acquired a judgment against the entity for fraud and tried to

21   enforce that judgment and, as a result of that, the entity was

22   placed into litigation.

23   Q.  Do you recall telling the FBI and the private prosecutors,

24   "Amazonia was liquidated in some way"?

25   A.  Yeah, that sounds consistent with what I would say and know

L5CVDON3                          Champion - cross

1    about the matter.

2    Q.   Second, is it fair to say that Chevron filed an action

3    against Amazonia in Gibraltar and, as a result, Amazonia was

4    dissolved so it was a nonissue?

5    A.   I don't know that -- I'm not a bankruptcy lawyer, nor am I

6    a Gibraltar lawyer.  I don't know that dissolution and

7    liquidation are the same thing.  I honestly don't know.

8            THE COURT:  Slowly and clearly please.

9    A.   All I can tell you is that, you know, that it was placed

10   into liquidation proceedings.  If that's the same thing as

11   dissolution, you know, I don't know the answer to that.

12   Q.   On August 27th, 2020, do you recall telling the FBI,

13   Chevron filed an action against Amazonia in Gibraltar and, as a

14   result, Amazonia was dissolved, so eventually it was a

15   nonissue?

16   A.   Again, that sounds consistent with my loose understanding

17   of what happened.  But I think if I did say that -- and I don't

18   know if those are my words -- I was conflating, I think, what

19   are two separate proceedings.  There was a fraud proceeding and

20   a judgment and then, subsequent to that, some kind of

21   liquidation proceeding.  But again, I didn't work on it; I

22   don't have personal knowledge of it.  If I was loose with my

23   language, I don't know what my exact words were.

24   Q.   I'm not suggesting you were loose with your language.  You

25   did say, words or substance, that as a result of all of the

1    stuff that Chevron was doing with Amazonia, it was a

2    "nonissue."

3                MS. GLAVIN:  Objection.

4                THE COURT:  Slowly, everybody.

5                MS. GLAVIN:  Objection.

6                First of all, defense counsel could just point to the

7    specific 302 he's referring to, which, again, your Honor, just

8    to make a record, I realize this is a bench trial, but these

9    302s are an FBI agent's summary; it's not a transcription of

10   what happened in the sessions with Ms. Champion.  She hasn't

11   seen them and these aren't her statements.

12               MR. KUBY:  I think we all know that at this point.

13               MS. GLAVIN:  Just want to make a record.

14   BY MR. KUBY:

15   Q.  Yeah.  Ms. Champion, you never reviewed the notes the

16   agents took; is that right?

17   A.  I did not.

18   Q.  And you never reviewed the final product of the notes in

19   the form of a typed form, did you?

20   A.  No.

21   Q.  You are familiar with the term "302"?

22   A.  No.

23   Q.  Oh, okay.  At any point during these 20 meetings, did you

24   ever ask the -- withdrawn.

25               You saw people taking notes when you were all

1   face-to-face, right?

2   A.  Yes.

3   Q.  You knew notes were being taken?

4   A.  I saw people taking notes.

5   Q.  At any point during these meetings, did you ask the private

6   prosecutor, Hey, while you're preparing me for trial, can I

7   take a look at my prior statements?

8   A.  No.

9   Q.  And did she ever offer?

10              MS. GLAVIN:  Objection as to form.

11              Did you ever ask the prosecutor if I can look at my

12   private statements?  Just objection as to form.  Mr. Kuby had

13   asked, did she see people taking notes.  To then jump to the

14   witness's private or prior statements --

15              MR. KUBY:  Prior, not private.  Nothing is private.

16              MS. GLAVIN:  They are not the witness's statements,

17   that's my objection.

18              THE COURT:  Are you asking about the notes?  Was she

19   ever asked to see the notes or the 302s?

20              MR. KUBY:  Yes.

21              THE COURT:  Okay.  So why don't you ask that.

22   BY MR. KUBY:

23   Q.  Did you ever ask to see the notes of the 302s?

24   A.  No, I did not.

25   Q.  And did Ms. Glavin ever offer to show you the notes of the

500

1   302s?

2   A.  I don't believe so.

3   Q.  Okay.

4   A.  To be clear, Mr. Donziger stated that Amazonia was a

5   nonissue.  I don't actually know.  My understanding is that the

6   stock of that company still exists and, therefore,

7   Mr. Donziger's shares still exist that he has assigned to us.

8   What the effect would ultimately be if any proceeds were

9   collected on the judgment, I have no insight into that.

10  Q.  I understand that's your testimony here.  I'm just trying

11  to pin down as best I can what it was you actually told the FBI

12  in one of these 20 meetings.

13  A.  Again --

14  Q.  So is there a document that might refresh your

15  recollection?

16  A.  I guess there might be a 302, whatever that is.

17  Q.  There might be.

18          MR. KUBY:  Can we have 3501-14 put up please, the

19  second full paragraph.  It's only two lines.  No, I'm sorry.

20  Q.  Just take a look at that one sentence.  Read it to

21  yourself.

22  A.  Yes.  So I don't know what exact words I used.  You know, I

23  don't know if I used correct legal terminology.  It is not my

24  understanding, as I sit here today, that Amazonia was

25  dissolved.  It's my understanding that it was placed into

1    liquidation.

2    Q.  And so eventually it was a nonissue, are those your words?

3    A.  According to Mr. Donziger, which is, as we discussed

4    yesterday, following Mr. Donziger's statements to that effect,

5    we sought assignment directly of the 2011 retainer interest.

6    Q.  In this 302 though, you weren't quoting Mr. Donziger?

7    A.  I don't know exactly what words I used or what references I

8    made.  This is not a verbatim transcript is my understanding.

9    I don't know what words I used.

10   Q.  Well, you recall saying "nonissue," right?

11   A.  No, I don't recall saying that.  I might have.

12   Mr. Donziger had made statements to that effect at a hearing

13   and in papers filed with the Court.

14   Q.  Now, in other 302, you did quote Mr. Donziger or paraphrase

15   Mr. Donziger at various times; correct?

16              MS. GLAVIN:  Objection as to form.  Objection as to

17   form.  The 302s are not her statement.

18              THE COURT:  That's right.

19              MR. KUBY:  What's the trouble now?

20              THE COURT:  Sir?

21              MR. KUBY:  I'm sorry, what's the -- you see I cannot

22   hear.

23              MS. GLAVIN:  Oh, I'm sorry.

24              Objection to form.  The 302s are not her statement.

25              If Mr. Kuby wants to ask were there occasions when you

1    met with the prosecutors and you paraphrased what Mr. Donziger

2    said, I wouldn't object to that question.

3    BY MR. KUBY:

4    Q.  Okay.  Just pretend that was my question please.

5    A.  Can you repeat it back, court reporter, or you, Mr. Kuby?

6             THE COURT:  Want me to read it?  Here we go.

7             Were there occasions when you met with the prosecutors

8    and you paraphrased what Mr. Donziger said?

9    A.  I'm sure I did that many times.

10   Q.  And in this thing that you are reading to refresh your

11   recollection, you don't have a recollection that you were,

12   quote/unquote, paraphrasing Mr. Donziger's position?

13   A.  I don't have a recollection, but the Amazonia is a

14   nonissue.  That is a paraphrase of Mr. Donziger's position.  So

15   to the extent I said that, it was based on Mr. Donziger's

16   representations.

17   Q.  To the extent that you said it was a nonissue, that was you

18   channeling Mr. Donziger, not your own view of it?

19   A.  Exactly.  It was me stating -- it was me paraphrasing what

20   Mr. Donziger's position is on this issue, which, again, I don't

21   think comports with the technical status of that entity as far

22   as I understand it, which is somewhat limited.

23   Q.  Okay.  Moving on.

24             Moving back to the March 2014 RICO injunction, there

25   was a judgment -- there was an injunction saying certain things

1   Mr. Donziger had to do, certain things he couldn't do, right?

2   Correct?

3   A.  Yes.

4   Q.  And one of the things that he was not permitted to do was

5   to undertake any action to monetize the judgment?

6   A.  That sounds like a good paraphrase.

7   Q.  Okay.  Is it fair to say that the position -- well,

8   withdrawn.

9         Your understanding of how the litigation had been

10  financed was outside investors would pay money and they would

11  receive some portion of a judgment if it ever was collected?

12  A.  Well, I think that it changed over time.  For the first

13  several years of the *Lago Agrio* case, my understanding is that

14  Mr. Cohen's law firm funded the case, and it was just a

15  standard contingency fee case.  So it didn't involve litigation

16  investment at all.

17        And then at some point there were litigation funders

18  that came in.  So they would fund the case in exchange for some

19  percentage interest in an ultimate recovery.

20  Q.  And these cases -- I mean this case, as litigation goes, is

21  kind of wildly expensive to both prosecute and defend, is that

22  a fair characterization?

23  A.  Which case are you referring to?

24  Q.  The *Lago Agrio* litigation, and all litigation spawned

25  therefrom.

1  A.  There have been a lot of cases.  I'm sure it's been

2  expensive on both sides.

3  Q.  And did Gibson Dunn Crutcher bill Chevron over $21 million

4  just for the RICO trial?

5  A.  I don't know.  Possibly.

6  Q.  Does it sound right to you?

7  A.  Again, I didn't review the bills in this matter.  I know we

8  did submit a fee motion; there may be numbers in there.  I

9  don't know the number.  That does sound like we probably did

10  bill that much.  It doesn't surprise me to hear that.  Not just

11  for the trial, but for the case, is that what you mean?

12  Q.  Yeah.

13          THE COURT:  Slowly.

14          THE WITNESS:  Sorry.

15  Q.  Yeah, sure.  We've got a *modus vivendi* going, Judge, which

16  is better than what we had yesterday afternoon.  Why are you --

17          THE COURT:  Because you're going to kill the court

18  reporter.

19          MR. KUBY:  Oh, I'm sorry.

20  Q.  So I want to turn your attention to at some point after the

21  injunction was issued, at some point, like, relatively soon

22  thereafter, within days or weeks, Mr. Donziger moved for a stay

23  pending appeal; is that correct?

24  A.  Yes.

25  Q.  And in support of that, again, in general terms, so we

don't have to reread every Donziger allegation, in support of

that, he basically argued, among other things, that the

injunction would prevent his clients from financing their

appeal; correct?

A.  Yes, I think he did argue that.

Q.  And it would prevent them from financing the way they had

always financed their case; correct?

A.  That sounds like something he said; but, again, he's your

best evidence of that or his pleading.

Q.  It would deprive him of the monthly retainer that he was

earning to fight for his clients?

A.  Yes, I think he did argue that.

Q.  And they would -- it would deprive the plaintiffs who were

now defendants of the funds they needed to continue the fight?

A.  That's what he argued, yes.

Q.  Okay.  Judge Kaplan ruled on that on April 25th, 2014.

        MR. KUBY:  Did we put that up?  It's docket number

1901, Exhibit DDD.

Q.  Do you recognize that, Ms. Champion?

A.  Yes.

Q.  And what do you recognize that to be?

A.  This is the Court's memorandum opinion granting in part and

denying in part defendants' motion for a stay pending appeal.

Q.  I want to go to certain highlighted portions of this.  And

I will read them to you.  And when I lose my voice, I may ask

you to read them to me.

MS. GLAVIN:  Just for the record, I do not have an objection to Mr. Kuby reading documents.

MR. KUBY:  Why thank you.

Q.  Chevron sought and mindful of the circuit's ruling in *Chevron Corp.*, this Court granted only narrow relief intended to preclude Donziger and the two LAP representatives from profiting from the misdeeds for which they were responsible.

Continuing... next page.

Significantly, the New York judgment did not restrict the other LAPs, who remain free to sell, assign, or transfer their interests, if any, in the *Lago Agrio* judgment, and to seek to enforce it anywhere in the world; nor did it restrict any of the other named defendants who did not participate in this trial from doing so.

Donziger claims that the New York judgment "threatens to destroy... Donziger's law practice" by precluding him from, quote, working on a case to which he has devoted the better part of his life the past two decades.  This argument is empty rhetoric.

Nothing in the New York judgment prevents Donziger from continuing to work on the *Lago Agrio* case, period.  The pertinent question is whether and to what extent it affects his compensation during the pendency of the appeal.

You read that, Ms. Champion?

L5CVDON3                          Champion - cross

1    A.   Yes.

2    Q.   Donziger's compensation is governed by a written retainer

3    agreement.   It provides that he is entitled to a monthly

4    retainer.

5             Skipping a bit.

6             While any payment of a contingent fee would be

7    "traceable to the *Lago Agrio* judgment," and, thus, subject to

8    the constructive trust imposed by paragraph 1, the same would

9    not be true of the monthly retainer payments, unless those

10   payments were traceable to the *Lago Agrio* judgment.  Thus, at

11   least as no collections --

12            THE COURT:  Excuse me.  Thus, at least as long as no

13   collections.

14   Q.   Thus, at least as long as no collections are made in

15   respect of the *Lago Agrio* judgment and funneled to Donziger as

16   retainer payments, the NY judgment would not prevent Donziger

17   from being paid, just as he has been paid at least $958,000,

18   and likely considerably more over the past nine or ten years.

19            You read that, is that correct?

20   A.   You read it, but yes.

21   Q.   But you read it when it came out.

22   A.   Yes.

23   Q.   I'm just -- right, you read the original version?

24   A.   Probably.

25   Q.   Haven't seen the movie yet, I get it.

L5CVDON3                          Champion - cross

1          First, Donziger has been litigating the case, making a

2     living, and conducting his professional and business activities

3     for years without receiving any contingent fee.

4          Page 10.

5          The point of paragraph 5 -- which is narrower than the

6     language that was proposed by Chevron in its post-trial

7     memorandum and not specifically objected to by movants in their

8     reply memoranda -- was to prevent Donziger and the LAP

9     representatives from avoiding the effect of the constructive

10    trust imposed on assets in their hands that otherwise would

11    have been direct proceeds of the judgment by selling,

12    assigning, or borrowing on their interests -- "their interests"

13    emphasized in the original -- in the *Lago Agrio* judgment and,

14    thus, at least confusing the issue of traceability.

15         You read that in the original?

16    A.   Likely, yes.

17    Q.   Continuing.

18         The practical effect of that, however, as we have

19    seen, is not to prevent him from working on the case, nor to

20    prevent him from being paid his monthly retainer for his

21    labors.

22         Continuing at the bottom.

23         The litigation against Chevron has been funded by

24    investors in exchange for any eventual recovery.

25         Next page.

1          Nothing in the NY judgment prevents the LAPs, other

2     than the two LAP representatives who are named in the New York

3     judgment and their allies, from continuing to raise money in

4     the same fashion.

5          Page 14.

6          This case has been financed on the movant's side by

7     outside investors, not the individual defendants.  There has

8     been no showing that the money to pay for the appeal is not

9     on --

10         THE COURT:  Slowly.

11    Q.  -- hand already or, in any case, could not be raised, just

12    as millions have been raised before.

13         And you read all that when it came out; correct?

14    A.  Yes, likely.

15    Q.  Okay.  So what I'm going to ask about next, and try to do

16    it in relatively abbreviated form, is to characterize the

17    parties' positions as they articulated it in their various

18    papers as to what this actually meant.  I'm going to try.  And

19    if I'm wrong, you'll correct me.

20    A.  Honestly, Chevron's positions are set forth in briefs

21    before the district court and before the Second Circuit, which

22    has rendered a decision on this issue.

23    Q.  Well aware.

24    A.  I'm not comfortable paraphrasing, agreeing with,

25    disagreeing with, I'm just not comfortable doing that

extemporaneously on the stand.  The opinion -- the Second

Circuit's opinion speaks for itself.  The briefs are in the

record.

Q.  As are all of the various motions that Chevron filed, all

of the various oppositions that Mr. Donziger filed, and all of

Judge Kaplan's subsequent orders.  They are all in the record,

I understand.

        Let me try though, rather than going through all of

those documents, which, of course, we can do.  But let me try.

        Is it fair to say that Mr. Donziger, based on his

public filings, took the position that this stay clarification

order -- can I call it that?  What do you call that order?

Let's work out a term for it.

A.  It's a stay order.

Q.  Okay.  How about interpretation order?

A.  You can call it whatever you like.

Q.  I'll call it interpretation order.

        That Judge Kaplan's -- it was Donziger's position,

Mr. Donziger's position, that this interpretation order allowed

him to continue to finance his litigation, or this litigation,

as he had in the past; that is, to take portions of the

judgments other than his own, other than the two LAP

representatives, and to sell the portions of that judgment to

investors in exchange for money to continue the litigation.

A.  Again, I defer to Mr. Donziger's own pleadings in this

L5CVDON3                        Champion - cross

1    regard.

2    Q.  Is that a fair characterization of them?

3    A.  I'm not comfortable doing extemporaneous legal analysis

4    here on the stand.  I can tell you that briefs were filed by

5    both sides.  The Second Circuit has rendered a decision.  I am

6    not the judge; I am not the Court.

7    Q.  When, if ever, did Chevron make a motion to Judge Kaplan to

8    strike that language from that 4/25/2014 decision?

9    A.  I don't believe that we filed such a motion.

10   Q.  Did Chevron ever attempt to clarify or modify the

11   interpretation order in 2014?

12   A.  I don't believe so, no.  I don't remember.

13              You want me to look at the docket?

14   Q.  No, "I don't believe so" is fine, if you want to leave it

15   there.

16   A.  But I don't recall.

17   Q.  Okay.  So I'm going to ask for 2014, 2015, 2016, and 2017,

18   did you ever file a motion to Judge Kaplan to strike that

19   language or modify it or clarify his interpretation?

20   A.  Again, I defer to what's in the docket.  I don't recall any

21   such motion off the top of my head.

22   Q.  Do you think you have time to go through the docket?  Do

23   you think that might yield a different result?

24   A.  Sure, if I walk through it and --

25   Q.  Take a walk, Ms. Champion.

A.  This seems unnecessary.  Can't you just put the docket in

evidence?

        MS. GLAVIN:  So if it helps, the docket is in

evidence, Government Exhibit 1.

A.  I don't see any motion to strike or motion for

clarification from the time the RICO judgment was issued until

at least mid 2017.  I don't know if you need me to go further,

but --

Q.  No, it's fine.

A.  It gets pretty dense after that.

Q.  I'm with you.  I'm trying.

        And you made reference to the Second Circuit decided

this issue.  I think you made that reference twice.

A.  I mean, the Second Circuit issued a decision pretty

recently, I don't recall the date of it, deciding some of

Mr. Donziger's appeals that relate to that order, the stay

order, or interpretation order, as you were calling it, and the

RICO judgment.  So --

Q.  Do you recall the Second Circuit --

        MR. KUBY:  You know what?  Just put up Defense Exhibit

MMM.

        MS. GLAVIN:  Your Honor, if this is the Second

Circuit's March 4th, 2021 decision, move to preclude on

relevance grounds.  This was issued in 2021, well after the

charged acts of contempt.

1             THE COURT:  Sir.

2             MR. KUBY:  The Second Circuit ruled -- the Second

3    Circuit ruled that Mr. Donziger's belief as to what this stay

4    order meant was a reasonable belief.  And to the extent that

5    there is some requirement of reasonable notice and some degree

6    of particularity as to what the order that ultimately is being

7    violated contains, I would simply try to quote the language

8    from the Second Circuit saying that indeed a reasonable person

9    could read it the way Donziger read it.

10            Now, I know I haven't yet elicited how Donziger read

11   it, but the Court summarizes that.

12            THE COURT:  I don't think that the opinion is

13   relevant, in that the opinion differentiates between

14   Mr. Donziger's own interests and other people's interests in

15   the Ecuadorian judgment.

16            MR. KUBY:  Absolutely.

17            THE COURT:  So I don't understand why it's relevant

18   here.

19            MR. KUBY:  It's relevant here because what Gibson,

20   Dunn & Crutcher did was to pretend that that clarification

21   order never really existed.  And what they proceeded to do was

22   to conduct very broad and very intrusive discovery not as to

23   whether Mr. Donziger was monetizing his own interests in the

24   case, but whether he was doing precisely what he reasonably

25   believed Judge Kaplan allowed him to do.

1          And there's about a year of litigation where

2    Mr. Donziger is saying over and over again, Judge, you said I

3    could do this.  And now you're granting them discovery, at

4    least in part, on an improper basis.  Please tell me whether I

5    can do this or not.

6          And there were, I would say, dozens of different

7    documents where Mr. Donziger articulated that position, asked

8    for a further clarification, asked to stop the discovery that

9    was based on him doing what the Second Circuit said a

10   reasonable person would believe.  That's why --

11              THE COURT:  I have no idea what all of that meant.

12              MR. KUBY:  Well, unfortunately --

13              THE COURT:  The Second Circuit said the district

14   court's judgment finding Donziger in contempt of its orders, in

15   all respects, other than his participation in the sale of

16   interests in the Ecuadorian judgment (as distinct from interest

17   in his own right to a portion of that judgment as a contingent

18   fee) is therefore affirmed.

19              MR. KUBY:  That's correct.

20          But what happened in practice was that Gibson Dunn

21   Crutcher decided to engage in broad and intrusive discovery

22   with respect to the very thing that Steven Donziger believed he

23   was permitted to do, that is, to sell portions of the judgment

24   to outside investors, not his own portion, not the two named

25   LAPs, but other people, to continue to fund the litigation, as

1   Judge Kaplan said, just as it had always been funded.  And

2   while Judge Kaplan said that, what he permitted Gibson Dunn

3   Crutcher to do, which ultimately generated the orders for which

4   he's been found in contempt, was to conduct discovery aimed at

5   uncovering things that Donziger was permitted to do or at least

6   reasonably believed he was permitted to do.

7           MS. GLAVIN:  So, your Honor, I would make two points

8   on this.

9           The first is this:  None of the six counts in the

10  order to show cause, the crimes with which Mr. Donziger has

11  been charged for criminal contempt, have to do with selling

12  other people's interests, nonenjoined interests in the

13  judgment.  Mr. Donziger hasn't been charged in contempt for

14  that.  So it is irrelevant that Mr. Donziger was doing that or

15  what he believed about that.  That's the first point.

16          The second is that Mr. Kuby misstates what the record

17  is in the post-judgment proceedings.  Judge Kaplan authorized

18  discovery, and it is in the orders, and I can go through them

19  while Mr. Kuby is up there.  But Judge Kaplan authorized

20  discovery on two issues:

21          One, he authorized discovery with respect to

22  post-judgment discovery in aid of enforcement of the money

23  judgment.

24          Second, Judge Kaplan authorized discovery with respect

25  to paragraph 5 compliance discovery.  The discovery was not

L5CVDON3                        Champion - cross

limited to whether or not Mr. Donziger was selling other

people's interests, but it was also permitted with respect to

whether he was selling his own, which ultimately is what was

discovered during the discovery, and that forms the basis for

Count VI.

          MR. KUBY:  But there was no basis initially for Judge

Kaplan to grant discovery into what Mr. Donziger was doing with

other people's interests.  Let's put aside the $14,000 or so

they ultimately uncovered with Zelman, that's another count for

another day.  There was no basis to do that, given Judge

Kaplan's interpretation order.

          THE COURT:  Let us assume you are correct.

          MR. KUBY:  Okay.  I like that.

          THE COURT:  Let's just assume that's true.

Mr. Donziger was still under an obligation to follow Judge

Kaplan's orders, even if the Court of Appeals totally reversed

Judge Kaplan, which it didn't.  Even if it ultimately did,

Mr. Donziger was under a legal obligation to follow the rules

and to follow the orders of Judge Kaplan.

          MR. KUBY:  At this point, I believe, if I have

understood you correctly -- and I would not put words in the

Court's mouth -- but it sounds like you are precluding this

entire line of inquiry based on collateral bar.

          THE COURT:  That's what I understand you to be asking,

sir.

1              MR. KUBY:  Would you like to hear argument on

2     collateral bar?

3              THE COURT:  Sure.  Go right ahead.

4              MR. KUBY:  Okay.  Well, that won't be me, because I'm

5     not the law human here, that should be obvious enough.

6              MS. GLAVIN:  Your Honor, with respect to the -- should

7     the witness still remain?  I'm fine.

8              THE COURT:  If you would like to step down, ma'am,

9     you're welcome to.

10             MR. KUBY:  I have no objection.

11             MS. TRIVEDI:  Let me see if I understand this

12    correctly.  So our position, the defense position is that

13    Mr. Donziger has a valid multi-pronged attack on the orders

14    that he is charged with violating; and that he is -- he should

15    be permitted to mount that attack at this trial because the

16    collateral bar should not be imposed.

17             THE COURT:  Why?  Why should it not be imposed?  Which

18    exception do you think you're under?

19             MS. TRIVEDI:  The collateral bar was imposed in *Walker*

20    because the injunction imposed in that case was appealable as a

21    matter of right.  The defendants in that case could have sought

22    modification or dissolution of that injunction.

23             THE COURT:  Or a stay, any other -- *mandamus*, any of

24    those things.

25             MS. TRIVEDI:  There is no basis for a direct appeal of

1    the forensic protocol underlying Counts I and II, the passport

2    order.  I would argue here that Mr. Donziger's attack on Judge

3    Kaplan's orders have to do with Counts I, II, and III, and I'm

4    going to limit, at least at this juncture in time, my argument

5    to that.

6              THE COURT:  I'm sorry.  Forgive me.

7              The questions I thought Mr. Kuby was asking related to

8    Counts V, -- IV, V, and VI.

9              MS. TRIVEDI:  No, Judge.  In this case, if we're

10   talking about the significance of the Second Circuit's March

11   4th decision, we're talking about the relevance of the Second

12   Circuit's determination that for the time period in question,

13   Mr. Donziger was not committing civil contempt by engaging in

14   third-party litigation financing.

15             And the significance of the Second Circuit's ruling

16   that he was not in civil contempt, that he was not violating

17   the RICO judgment for that period in time goes to --

18             THE COURT:  Mr. Kuby, put your mask on.

19             MR. KUBY:  Oh, geez.  I'm sorry, Judge.

20             MS. TRIVEDI:  Goes directly to Chevron's entitlement

21   to paragraph 5 discovery.  So where Mr.  --

22             THE COURT:  Counsel, you have really lost me.

23             MS. TRIVEDI:  Okay.

24             THE COURT:  You started talking about *Walker v.*

25   *Birmingham*, and you said that the collateral bar rule was

1    imposed there because those folks had, I think it was, two days

2    in which they could have sought some sort of appellate relief.

3          Then you talked to me about whether or not the

4    forensic protocol order was immediately appealable.  That is

5    not the collateral bar test.  It isn't just immediately

6    appealable; the contemptor has to have sought some kind of

7    appellate relief.  It doesn't have to be appealed as a right,

8    it can be stay from the Court of Appeals, it can be a *mandamus*,

9    any of the above.

10         MS. TRIVEDI:  I'll address those arguments, Judge.  I

11   just want to be clear about what we're talking about, which is

12   that Mr. Donziger has a valid defense to Counts I, II, and III,

13   that the forensic protocol and the derivative passport order

14   were invalid as a matter of law.  What we are asking is that

15   your Honor not preclude him from mounting that defense.

16         THE COURT:  Tell me why the collateral bar rule should

17   not apply.  Which exception are you saying is applicable here?

18         MS. TRIVEDI:  Your Honor, he could not have sought a

19   direct appeal of the forensic protocol.  The Second Circuit

20   never would have issued a stay.  A stay pending --

21         THE COURT:  What do you mean the Second Circuit would

22   have never have issued a stay?  If you don't ask, you don't

23   get.

24         MS. TRIVEDI:  Your Honor, Mr. Donziger specifically

25   sought a finding of civil contempt specifically for this issue,

1    which is that the forensic protocol was not a final order that

2    was directly appealable.

3            THE COURT:  Counsel, do you want this taken down?

4            MS. TRIVEDI:  Yes, yes.

5            THE COURT:  All right.  Then you better slow down.

6            MS. TRIVEDI:  Okay.

7            Judge, if Mr. Donziger had run to the Second Circuit

8    to stay post-judgment discovery, I think the question that

9    follows from that is pending what?  Who is reviewing what?  And

10   on the subject of *mandamus* --

11           THE COURT:  I have no idea what you just said to me.

12           MS. TRIVEDI:  There is this repeated allegation that

13   Mr. Donziger should have sought a stay from the Second Circuit

14   as to compliance with the forensic protocol.  But there was no

15   appeal in the Second Circuit of that as a matter of --

16           THE COURT:  There doesn't have to be.

17           MS. TRIVEDI:  But, your Honor, *Walker* is about review;

18   it is about seeking review of the orders that have been imposed

19   on you by a judge.

20           Mr. Donziger sought review of the forensic protocol

21   and of Chevron's right to paragraph 5 compliance in the only

22   way he could, which was to secure a post-judgment civil

23   contempt finding.  Judge Kaplan declined to hold him in civil

24   contempt for an entire year, while refusing to issue the

25   ultimate word on what he meant in the stay clarification order.

1          THE COURT:  Counsel, I have no idea what you are

2     arguing.  The collateral bar rule applies to say that a

3     defendant, a party, must follow a judge's order unless he or

4     she has sought some sort of relief.  It doesn't have to be a

5     direct appeal as of right.

6          MS. TRIVEDI:  Your Honor, I've only been an attorney

7     for four years, I may have misunderstood this, but my

8     understanding is that the collateral bar bars you from

9     challenging in your criminal contempt proceedings the validity

10    of the orders that you are accused of violating because you

11    could have sought review.

12         THE COURT:  That's right.

13         And there are exceptions to that.

14         MS. TRIVEDI:  Yes.

15         THE COURT:  I think that we all agree that as at least

16    as to these six charges, there was no attempt to go to the

17    circuit for interlocutory relief.

18         MS. TRIVEDI:  Your Honor, respectfully, Mr. Donziger

19    did everything he could to secure merits review of Chevron's

20    entitlement --

21         THE COURT:  Did he go to the circuit and ask for a

22    stay of Judge Kaplan's order after Judge Kaplan denied it?  No.

23         MS. TRIVEDI:  Your Honor, there's nothing that

24    obligates this Court to define what review was available of

25    these post-judgment discovery orders as narrowly as a stay.

1          THE COURT:  I'm sorry, counsel, I'm just reading the

2     cases.  The cases talk about a request to the circuit for a

3     stay, a request to the circuit to modify, a request to the

4     circuit to *mandamus*.

5          MS. TRIVEDI:  In the injunction context, I agree with

6     you.  And with respect to *mandamus* in the First Amendment

7     context, your Honor is absolutely right.

8          THE COURT:  Do you want this taken down?

9          MS. TRIVEDI:  Sorry.

10          With respect to a stay in the injunction context, your

11     Honor, you are absolutely right.  And with respect to *mandamus*

12     in the First Amendment context, your Honor is also correct.

13     But this is neither of those contexts; this is post-judgment --

14          THE COURT:  You are interpreting it too narrow.

15          MS. TRIVEDI:  Your Honor, if I could just finish.

16          THE COURT:  It is not a matter of limited to

17     injunctions, it is limited to orders in general.  Because

18     Mr. Donziger did not seek any relief from the circuit with

19     respect to these various orders, he cannot -- he may not come

20     in here now and say, Oh, dear, Judge Kaplan's orders were

21     wrong.

22          MS. TRIVEDI:  Your Honor, respectfully, there is no

23     basis to find that Mr. Donziger did not seek relief from the

24     circuit.  The forensic --

25          THE COURT:  Show me where he did it.  Show me, show

1    me, show me.  Docket number.

2              MS. TRIVEDI:  The appeal that was decided on March 4th

3    of this year ruled that the injunction -- the RICO injunction

4    as it pertained to paragraph 5 was ambiguous as a matter of

5    law.

6              THE COURT:  Counsel, counsel, the cases applying the

7    collateral bar rule state that even if the order is found on

8    appeal to be unconstitutional or otherwise incorrect, the party

9    is obligated to follow the Court's order unless and until he or

10   she gets some relief from the Court of Appeals.

11             MS. TRIVEDI:  Your Honor, I think we're talking past

12   each other.  Mr. Donziger sought review of the forensic

13   protocol when he argued to the Second Circuit on appeal of the

14   civil contempt order --

15             THE COURT:  Counsel, counsel, he was obligated to

16   follow Judge Kaplan's orders, unless and until he had relief

17   from the circuit.  Relief from the circuit in the context of

18   these cases does not mean a pending appeal.

19             MS. TRIVEDI:  Your Honor, with respect to the case law

20   cited in the January motion to dismiss filed -- December motion

21   to dismiss filed in this case, if I say --

22             THE COURT:  Do you want this taken down?

23             MS. TRIVEDI:  Sorry.

24             In December, the defense filed a motion to dismiss

25   Counts I, II, and III, based exactly on the case law that is

1    relevant to your Honor's inquiry, which are cases that deal

2    specifically with the obligations on a litigant in the

3    post-judgment discovery context.

4            And those cases -- your Honor may disagree with the

5    legal argument we made for dismissal at that time, but I do not

6    think your Honor can disagree that those cases say that in the

7    post-judgment discovery context, if a litigant wishes not to

8    ring an unringable bell -- and disclosure is an unringable

9    bell -- that they should seek a contempt finding that is

10   reviewable on appeal.  That is exactly the thing that

11   Mr. Donziger sought.

12           THE COURT:  However, those cases say it may be civil

13   or criminal contempt.  You pays your money, you takes your

14   chances.

15           MS. TRIVEDI:  Understood, your Honor.

16           THE COURT:  Well, that's why we're here.

17           MS. TRIVEDI:  We're confusing all of the issues now.

18           Correct me if I'm wrong, but you are telling me that

19   Mr. Donziger did not seek review from the Second Circuit.  And

20   what I am telling you is that he did.

21           THE COURT:  Counsel, for the third time, seeking

22   review in order to be excused from following an order of the

23   court does not mean filing an appeal.  It means seeking some

24   kind of interlocutory review from the circuit.  That was not

25   done here.

L5CVDON3                     Champion - cross

1            MS. TRIVEDI:  Your Honor, because of the specific

2     cases that deal with --

3            THE COURT:  Which one do you want to talk about?

4            MS. TRIVEDI:  I want to talk about the entire line of

5     cases cited in the motion to dismiss.  It's --

6            THE COURT:  Counsel, you have really got to stop.

7            MS. TRIVEDI:  Sorry, Judge.

8            THE COURT:  The court reporter is not able to take

9     down what you're saying.  If you want it for the Court of

10    Appeals, you better slow down.

11           MS. TRIVEDI:  Understood, Judge.

12           Let me just reference them as the cases cited in our

13    December motion to dismiss, because those are the exact --

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Counsel, give me an example -- by the way,

2       is it your position that the collateral -- that Mr. Donziger

3       was excused from following Judge Kaplan's orders because he had

4       filed a notice of appeal and had an appeal pending?  Is that

5       your position?

6            MS. TRIVEDI:  In addition --

7            THE COURT:  Is that your position?

8            MS. TRIVEDI:  Yes.

9            THE COURT:  OK.  Denied.  That is insufficient to

10      avoid the obligation to follow the orders.

11           MS. TRIVEDI:  Understood, Judge.  We would add, as an

12      argument, to prevent this Court from applying the collateral

13      bar, which is to say to allow Mr. Donziger to rely in part on

14      the Second Circuit's decision in March and in part on the

15      extensive record where he begged Judge Kaplan for a year to not

16      only clarify what he meant in the stay clarification order --

17           THE COURT:  And what does that have to do with

18      Mr. Donziger's obligation to follow a court order?

19           MS. TRIVEDI:  Your Honor, if the entire discovery

20      campaign was based on an invalid theory of filing the RICO

21      judgment, which the Second Circuit has --

22           THE COURT:  Let's just say, I think you're arguing the

23      transparently invalid exception, which of course was talked

24      about in *Teran* and in the *Providence Journal* case.  And that of

25      course is an exception for a transparently invalid order that

is so far in excess of the court's authority that it has no

right to compliance.  And the example the courts give, for

example, is a prior restraint on the press.

          Even if that's what Mr. Donziger is arguing, the

Second Circuit in the *Cutler* case says that a defendant may not

avail himself of the transparently invalid exception without

some, quote, good-faith effort to seek emergency relief from

the appellate court, close quote.  That did not happen here, so

he is not entitled to rely on the transparently invalid

exception.

          MS. GARBUS:  Your Honor, I am arguing that we are

relying on cases not in the injunction context where

injunctions are universally recognized as appealable for

interlocutory purposes.  Nobody recognizes post-judgment

discovery orders in the same docket.

          THE COURT:  First of all, you're racing.  And second

of all, there is no exception for discovery orders, and the

test is not immediate appeal.  That is not the test.  It is

clear that the mere pendency of an appeal does not excuse

compliance with an order.  You're relying on a pendency of

appeal.  Denied.

          MS. TRIVEDI:  Do you want me to sit down now.

          THE COURT:  If you have something else to say on this

topic, go ahead and say it.

          MS. TRIVEDI:  All I add is that there is a factual

1    component to this record, which is that Chevron's initial

2    discovery request, which Mr. Kuby hasn't yet questioned

3    Ms. Champion about but he was getting there, was based solely

4    on a theory of violating the RICO injunction in exactly the

5    manner that the Second Circuit just said was permissible.  This

6    entire thing --

7              THE COURT:  That is insufficient.  The cases hold that

8    even if the order that the contemptor disobeyed is fully

9    reversed on appeal, that does not excuse compliance.  And the

10   fact maybe it was, in your view, maybe not entirely sufficient,

11   is insufficient to avoid the collateral bar doctrine.

12             MS. TRIVEDI:  And I understand, your Honor, I would

13   also just ask that given -- I won't ask your Honor to concede

14   that what's happening there is extraordinary.  I will simply

15   offer it as extraordinary.  That is extraordinary.  With

16   unlimited --

17             THE COURT:  Can I just ask the question?  The only

18   person who gets to interrupt around here is the Court.  And

19   generally lawyers listen because if something is bothering the

20   Court, you better straighten me out.  What is it you mean when

21   you say "what's happening here"?

22             MS. TRIVEDI:  Your Honor, I'm talking about a litigant

23   with unlimited resources, running to Judge Kaplan and saying,

24   he's violating the RICO injunction, based on a theory that the

25   Second Circuit has just reversed and Mr. Donziger, a pro se

L5CADON4ps                     Champion - Cross

litigant, asking that very judge to say, am I prohibited from

doing what I am doing or am I not, and that judge refusing for

one year and during that year issuing multiple orders, not just

the forensic protocol but then the -- not just the forensic

protocol but then -- sorry -- in that year, not only refusing

to clarify as to the prohibitions on Mr. Donziger but, in that

time, issuing the forensic protocol, which your Honor will see,

the evidence will show, was a shockingly corrupt way of

examining Mr. Donziger's devices.

         THE COURT:  Counsel, this is not a correct conference

today.  The facts that you set forth do not sit within any of

the exceptions that have been recognized to the collateral bar

doctrine, and I do not find them to be extraordinary in the

least.

         (Discussion held off the record)

         (Recess)

         THE COURT:  Ms. Trivedi, I was going to ask you what

other exception to the collateral bar rule you are relying on.

         MS. TRIVEDI:  Judge, I'm not relying on any others at

this time.

         If I could just say one more thing that is relevant to

this discussion.

         THE COURT:  Yes, ma'am.

         MS. TRIVEDI:  Thank you.

         (Discussion held off the record)

1           MS. TRIVEDI:  Judge, there have been multiple

2      recitations both by the Court and by the private prosecutors as

3      to the elements here.  I just want to point out that --

4           THE COURT:  The elements?

5           MS. TRIVEDI:  Of criminal contempt.

6           THE COURT:  Yes, ma'am.

7           MS. TRIVEDI:  And I guess, just in Mr. Donziger's

8      right to mount a full defense, to establish criminal contempt,

9      the government, in this case the private prosecutor, must prove

10     beyond a reasonable doubt that there was a clear and

11     unambiguous order.  And I have case cites that I will read very

12     slowly and methodically to the reporter in a second.  But there

13     is an abundance of reason to believe that the clarity and

14     unambiguousness of the orders as to Counts One, Two, and

15     Three -- and Mr. Krehel's testimony will show this -- are so

16     inextricably linked to paragraph 5 compliance that --

17          THE COURT:  I'm sorry.  I'm sorry.  How can an order,

18     ordering someone to give a list of devices, be found to be

19     not -- I'm sorry -- be found to be ambiguous?  It just can't

20     be.

21          MS. TRIVEDI:  Your Honor broadly defines the clarity

22     and validity of the forensic protocol -- I'll just start the

23     collateral bar argument --

24          THE COURT:  Take your mask off, first of all, so we

25     can hear you.

1          MS. TRIVEDI:  I'll sit down, Judge.  I need to learn

2     how to take a loss.

3          THE COURT:  All right.  I just want to be sure that

4     you've exhausted all your arguments.

5          MS. TRIVEDI:  Mr. Donziger never taught me, as I'm

6     sure you can imagine.

7          THE COURT:  I want to be sure you've exhausted all

8     your arguments.

9          MS. TRIVEDI:  I'm good, Judge.  Thanks.  I'm done.

10         THE COURT:  OK.  You've exhausted all your arguments

11    on the collateral bar rule?

12         MS. TRIVEDI:  At this time, yes.

13         THE COURT:  All right.

14         MR. KUBY:  If we come up with different ones before

15    the trial is over, then we'll make them.

16         THE COURT:  Well, we'll see where we are.  I did ask

17    you where the brief that was promised months ago was, and it

18    was not forthcoming, so that's why I'm being sure that I

19    understand every argument Ms. Trivedi has made.

20         MR. KUBY:  OK.  Well, one of the collateral effects of

21    your collateral bar ruling is to render about two hours of

22    cross-examination objectionable and irrelevant.

23         THE COURT:  All right.  Fair enough.  I wish you'd

24    told me this sooner.  We could have done a lot more.

25         Thank you, Mr. Kuby.

L5CADON4ps                    Champion - Cross

1          MR. KUBY:  I have a little more.  Then I will be done.

2          THE COURT:  Finished.

3          MR. KUBY:  Toast.

4          THE COURT:  Toast is done.

5          MR. KUBY:  Right.

6          THE COURT:  Finished is just completed.

7          MR. KUBY:  I'll be finished.

8     CROSS EXAMINATION (Cont'd)

9     BY MR. KUBY:

10    Q.  Ms. Champion, part of the discovery and motions and Gibson

11    Dunn Crutcher's post-judgment litigation was designed to

12    collect the $813,000 Mr. Donziger owes to Chevron.  Is that

13    correct?

14    A.  Yes.

15    Q.  And while you did a number of -- Gibson Dunn Crutcher did a

16    number of things in that litigation, you ultimately, for a

17    period of time, I think we established, billed $3,029,367.20.

18    A.  I'll accept your representation that that was the number

19    submitted.

20    Q.  And did you find it odd that Chevron was authorizing so

21    many hours to recover $813,000?

22    A.  To the degree that I can answer that without treading on

23    the privilege or work product, Chevron was enforcing its right

24    to collect a money judgment, as well as to enforce the

25    injunction issued after the RICO trial.

Q.  Right.  But much of -- and those two things are -- and I
recognize those two things are separate in terms of the
discovery demands that you made, orders that you sought, and
the like.  I recognize that.  But is it fair to say that
Chevron has spent far in excess of $813,000 just in GDC legal
bills in order to collect $813,000?

A.  Again, we were seeking to enforce the RICO injunction as
well as to collect a money judgment.

Q.  Right.  But I'm talking just about the money judgment
portion, which is separate from, in some respects, the RICO
enforcement.  Right?

A.  I'm not aware of any breakdown of numbers that would
address the question that you're asking.

Q.  OK.  Did you at any point wonder aloud why so much money is
being spent on an hourly basis to collect $813,000?

A.  Again, to the extent I can answer that without treading on
attorney work product or the attorney-client privilege, we were
seeking to enforce an injunction that in part prohibited
Mr. Donziger from enforcing a $9 billion judgment against
Chevron in U.S. courts.

Q.  Did Chevron ever put a cap on the billing?

A.  I did not deal with the billing through these -- this
matter.  I'm not equipped to answer that.

Q.  Were you ever told in words or substance, you know,
Ms. Champion, just sort of lay off on the hours on this?

1    A.  To the extent I can answer that without treading on

2    attorney-client communication -- can I?  Do I have a privilege

3    objection or not?  I just want to make sure I'm not treading on

4    anything.

5         I was not given instruction to bill a certain amount

6    or not to bill a certain amount.

7    Q.  So you did the work that you felt needed to be done?

8    Correct?

9    A.  I think it's safer to say it wasn't -- you know, the --

10   again, without treading on the attorney's work product or

11   attorney-client communication, there was work that was done.  I

12   was part of that work.

13   Q.  And nobody told you you were being excessive.

14   A.  Again, without waiving the attorney-client privilege or

15   work product, I was not instructed that I -- you know, to bill

16   less, or bill more.  I was not instructed to do either of those

17   things.

18   Q.  I want to briefly address -- Ms. Champion, I want to direct

19   your attention to what's been marked as Defendant's Exhibit K

20   for identification.  It's docket entry 1967.  And I will move

21   it in.

22        THE COURT:  Received.

23        (Defendant's Exhibit K received in evidence)

24   BY MR. KUBY:

25   Q.  Take a look at that.

L5CADON4ps                    Champion - Cross

1   A.  You want to page through it, or -- you want to ask me

2   about --

3   Q.  Do you recognize this document?

4   A.  Yes.  This is the declaration of Randy M. Mastro,

5   M-a-s-t-r-o, in support of Chevron Corporation's ex parte

6   application by order to show cause for discovery and a

7   preservation order in furtherance of this Court's March 4th,

8   2014 judgment and to set a hearing date subsequent to that

9   discovery on Chevron's application to have Steven Donziger held

10  in contempt."

11  Q.  And that was filed March 19th, 2018.  Correct?

12  A.  Yes.

13  Q.  And this represents, if I'm characterizing it correctly, as

14  Chevron's sort of -- as one of Chevron's efforts to enforce the

15  RICO injunction and collect the money judgment.

16  A.  This is the -- this relates to the contempt, I believe, the

17  Amazonia share contempt and the Elliott Management contempt.

18  So I don't think this relates to money judgment unless you want

19  to refresh my recollection as --

20  Q.  No, no, I absolutely don't.

21          THE COURT:  Children, children, you can't talk over

22  each other.

23          MR. KUBY:  I'm sorry.

24          THE COURT:  Slowly.

25  Q.  So this did not relate to the money judgment, to the best

1    of your recollection.

2    A.  To the best of my recollection, this sought discovery in

3    aid of enforcing the injunction.  It sought leave to take

4    discovery.  It sought a preservation order related to an

5    underlying motion for contempt.  It was not a motion to enforce

6    the money judgment per se.

7    Q.  Or to obtain discovery with respect to the money judgment.

8    A.  You don't need leave of court to take discovery in aid of

9    enforcing a money judgment.

10   Q.  That's right.

11          And Judge Kaplan made that clear the very next day,

12   where he volunteered that you were perfectly free to conduct

13   discovery on the money judgment.  Correct?

14   A.  Judge Kaplan did note that in his modification and entry of

15   the order to show cause.

16   Q.  It wasn't something that you had sought, correct?

17   A.  I don't recall.  I don't think so.

18   Q.  But it was something that he offered.

19   A.  Again, you don't need leave of court.  I wouldn't

20   characterize it that way.

21   Q.  Well, he was the one who specifically said, you don't need

22   leave of court to conduct money judgment discovery that you had

23   not asked for.

24          MS. GLAVIN:  Objection, relevance.

25          THE COURT:  Counsel, how is this relevant to the

1    elements of the criminal --

2            MR. KUBY:  Yes.  You know, I think I just ran into the

3    collateral bar ruling, Judge.  Yes.

4    BY MR. KUBY:

5    Q.  Ms. Champion, when did you start working on what I'll call

6    the Donziger case?

7    A.  I did some work on related matters.  To the best of my

8    recollection, we were hired in late 2009 and then I did just a

9    small amount of work in 2009 and 2010.  And then I went on

10   maternity leave.  When I came back, my cases had been -- they

11   had disappeared in some fashion, so I had time.  But that's

12   when I began working on the RICO case, after it was filed.

13   Q.  And is it fair to say that from about 2011 you retained --

14   until at least May of 2020, that you worked on the Donziger

15   case full-time?

16   A.  No, not at all.

17           THE COURT:  Are you referring to the RICO case, sir?

18           MR. KUBY:  I'm referring to the RICO case, the post-

19   judgment litigation.

20           THE COURT:  That's fine.  That's fine.

21           MR. KUBY:  Everything that has the name Steven

22   Donziger on it.

23           THE COURT:  OK.

24   Q.  Did you tell the FBI, on March 4th of 2020, that you worked

25   on this case, quote, full time, close quote, since 2011?

A.  No, there's no way I said that, because it's not remotely
accurate.  I worked on it not even full time.  I actually did
an entire patent case during the course of the RICO case.  I
worked on it an awful lot from 2011 through the end of trial.
And then I was only involved as needed with respect to all of
the appellate proceedings.  It did not become a significant,
you know, I did not work on it in a significant capacity.
There may have been little spells because, for example, there
were hearings and the bit.  We may have had to provide some
assistance to the law firms handling that.  So there may have
been some little spells.  But I didn't work on it in a
significant way until the post-judgment proceedings.
Q.  So unlike some of my other questions where I showed you a
302, you have a firm memory that you never told the FBI you had
worked on the case, quote, full time, close quote, since 2011.
A.  I am positive I never said that, because it's not remotely
accurate.
Q.  You do understand, those are two different things
conceptually.
A.  I'm just telling you I would never have said that, because
I would never say that, because it's not true.  They may have
misunderstood me.  You know, who knows.  But I'm telling you
that I wouldn't have said that.
Q.  And in any event, it is not an accurate statement.
A.  It is not accurate.

1   Q.  Do you have any estimate of how many hours you've funneled

2   down the Donziger case?

3   A.  I do not.  I worked extremely hard on this case from 2011

4   through trial, probably the hardest I've worked.  But then

5   again it really -- I didn't work on it a lot in the post-

6   judgment period.  Honestly, I was quite busy on other matters.

7   It was a little bit of a stretch that I worked on it, but I

8   did.  And how many hours?  I really couldn't guess.

9   Q.  Order of magnitude, a thousand?

10  A.  No, more than that.

11  Q.  2,000?

12  A.  More than 2,000 hours in 2011.  I mean -- well, my time was

13  annualized because I was on maternity leave for part of that

14  year, so -- I don't have to guess.  But I'm telling you, from

15  2011 through 2013 --

16          THE COURT:  Counsel, slow it down.

17  A.  -- it probably would have been more than 2,000 hours per

18  year, at least on an annualized basis, because I had two

19  maternity leaves during that time as well.

20  Q.  So that would be about 4,000 hours just during that period?

21  A.  Probably, yeah.

22  Q.  And subsequently?

23  A.  It's really hard to guess because, again, it's been

24  episodic.  It hasn't been a significant -- there was a period

25  during 2018-19 when all the stuff was going on where I worked

1    on it quite a bit.  Since then, again, it's been just spots.

2    Q.  Say another thousand hours total?

3    A.  I really -- I honestly am not comfortable guessing.  I

4    don't know.  I've never looked at it.

5    Q.  Somewhere in excess of 4,000 hours?

6    A.  Total, on the RICO case --

7    Q.  Yes.

8    A.  1782s, third-party discovery proceedings.  Yes, I think

9    that's probably a safe guess.  But you have to understand that

10   some of those years I billed over 3,000 hours.  So I was also

11   working on other matters.  I don't ever want to do that again,

12   by the way, but --

13   Q.  You billed 3,000 --

14   A.  It was horrible.

15   Q.  -- hours in a year?

16   A.  It was horrible.  I'll never do it again.

17   Q.  Yes.

18   A.  But I'm just telling you, I'm a hard worker.

19   Q.  No, I know.

20   A.  This was, you know, except for really that discovery and

21   trial period, this was never my only matter.

22   Q.  So 400 -- 4,000 hours times roughly $1,000 an hour,

23   $400,000?

24   A.  I'm not comfortable guessing on that either.  Again, I was

25   an associate when I started working on this case.  Certainly my

1     billing rate has increased over that time.  I doubt that I was

2     that expensive in 20 -- I was a bargain in 2011.

3     Q.  Ms. Champion, back when you were in -- were you at George

4     Washington?

5     A.  Yes.

6     Q.  You went to George Washington, correct?

7     A.  For law school, yes.

8     Q.  And part of your work was representing indigent criminal

9     defendants.

10    A.  In D.C. Superior Court.

11    Q.  D.C. Superior Court.

12              OK.  I'm done.  Thank you, Judge.

13              THE COURT:  Thank you.

14              Redirect.

15              MR. KUBY:  Excuse me.  I have to correct the record.

16              I have been instructed that 4,000 times a thousand is

17    4 million, not 400,000.  It's a good thing I did not go into

18    anything that needed numbers.

19              Thank you.

20              THE COURT:  There we are.  Good enough.

21              Redirect, please.

22    REDIRECT EXAMINATION

23    BY MS. GLAVIN:

24    Q.  Ms. Champion, do you recall on cross-examination being

25    asked a series of questions -- do you recall being asked a

1    series of questions by Mr. Kuby about the number of times that

2    you met with myself, the other special prosecutors, and the FBI

3    agents?

4    A.  Yes.

5    Q.  Do you recall Mr. Kuby indicating to you that records

6    reflected that you met with the special prosecutors and the FBI

7    agents approximately 20 times before your testimony today?

8    A.  I do.

9    Q.  Ms. Champion, in terms of the topics that were covered in

10   these approximate 20 meetings with myself and others, did you

11   review with us the docket sheet, which is Government Exhibit

12   No. 1?

13   A.  Yes.

14   Q.  And if we could go to Government Exhibit No. 1, if you

15   could go to the last docket entry on Government Exhibit

16   No. 1 --

17            (Pause)

18            MR. KUBY:  We'll get this cleared up in just a second,

19   Judge.

20            THE COURT:  Thank you.

21   Q.  Ms. Champion, do you have a copy of the docket sheet in

22   your binder?

23   A.  I do, yes.

24   Q.  If you could take a look at docket sheet, I think it's

25   Government No. 1.  I think it's up against the plexiglass right

1    there.

2    A.  I'm looking at the page right now.

3    Q.  How many docket entries were in the docket sheet Government

4    Exhibit No. 1?

5    A.  From up until October 28, 2020, which is that date it runs

6    to, 2,580.

7    Q.  And is that the docket sheet for 11-cv-691?

8    A.  Yes.

9    Q.  And that would be the civil case Chevron Corp. v. Donziger;

10   is that correct?

11   A.  Yes.

12   Q.  Now if you could go to Government Exhibit No. 1A.  And

13   Government Exhibit 1A, that's a subset of Government Exhibit

14   No. 1.  Is that correct?

15   A.  Yes.

16           MR. KUBY:  I have to ask for just a pause here because

17   I'm not getting this on my screen.

18           THE COURT:  I don't think anyone is.

19           MR. KUBY:  Should we?

20           THE WITNESS:  It is a docket sheet.  Do you want to

21   borrow my binder?

22           MR. KUBY:  No, no.  Let's proceed until we move to

23   something that I need to look at.

24   BY MS. GLAVIN:

25   Q.  For Government Exhibit No. 1A, if you could go to docket

1    no. 1959.

2    A.   Yes.

3    Q.   Is docket entry 1959 the supplemental judgment entered --

4    or the opinion for the supplemental judgment entered on

5    February 28, 2018?

6    A.   Yes.

7    Q.   And that is no. -- if you go to page 2 of Exhibit 1A --

8    A.   Docket 1959.

9    Q.   Yes.  Do you see docket no. 1959?  Then go to the very last

10   docket entry, Government Exhibit 1A.  Actually, if we could

11   stop at the order of appointment, July 31, 2019.

12   A.   Docket 22 -- sorry.

13   Q.   Docket entry 2277.  Do you see that?  That's the order of

14   appointment of special prosecutors.

15   A.   Yes.

16   Q.   So approximately how many docket entries were there in the

17   case between 1959, which is Judge Kaplan's memorandum opinion

18   for the supplemental judgment entered on February 28th of 2018,

19   to the order of appointment of the special prosecutors, which

20   is docket entry 2277 on July 31st of 2019?

21   A.   It's about 300, right?  If I'm doing my math correctly.

22   22 --

23   Q.   No, I don't --

24   A.   2277 minus 1959?

25   Q.   That's correct.

1             And Ms. Champion, if we could break up the 20 minutes

2      that you had with the prosecutors, I believe you testified

3      during cross-examination that there were a number of

4      adjournments of this trial.  Is that right?

5      A.  Yes.

6      Q.  Do you know approximately how many adjournments there were?

7      A.  I'm going to guess three, but there may have been more.

8      Q.  And in connection with each trial date, did you meet with

9      the prosecutors a number of times before that trial date?

10     A.  Yes.

11     Q.  And during those meetings, did you talk about what the

12     primary topics were that you covered?

13     A.  I mean, literally it was all of the filings and orders that

14     we've discussed here, likely others that were not used at

15     trial, but it was the public filings in this action, the

16     correspondence with Mr. Donziger, a tremendous amount of

17     documents.

18     Q.  When you would prepare with us and then the trial date was

19     adjourned, did you meet with us immediately after the trial

20     date was adjourned, or did some period of time go before you

21     met with us again?

22     A.  Yes, some period of time sufficient for me to forget,

23     forget everything.

24     Q.  Did that pattern repeat itself approximately at least three

25     times?

1    A.  Yes.

2    Q.  Ms. Champion, you were asked a series of questions on

3    cross-examination about the amount of time that you have spent

4    on Donziger-related matters.  Since the post-judgment

5    proceedings began in approximately February, March 2018, have

6    you worked on other matters while you've been an attorney for

7    Gibson Dunn?

8    A.  Yes.  A lot of other matters.

9    Q.  And has this matter, the post-judgment matter, been your

10   primary -- withdrawn.

11           Has it been the majority of the time that you've spent

12   since 2018?

13   A.  No way.  It's not possible.

14   Q.  Ms. Champion, are you here testifying today as a lawyer for

15   Chevron?

16   A.  No.

17           MR. KUBY:  Objection.  I don't know -- I legitimately

18   don't know what that means.

19           MS. GLAVIN:  OK.  I'll withdraw and ask another

20   question.

21   Q.  Ms. Champion, since you testified today, you took an oath.

22   Correct?

23   A.  Yes.

24   Q.  And how long have you been admitted to the bar in the State

25   of New York?

1   A.   Since 2000 -- I graduated from law school in 2005.  I think

2   I was admitted in late 2005, maybe 2006.  I think it was 2006.

3   Q.   In connection with your representation of my client,

4   Ms. Champion, do you make an effort to follow the rules of

5   professional responsibility?

6   A.   Yes, always.

7   Q.   Ms. Champion, you were asked some questions during

8   cross-examination about -- give me a moment -- about Government

9   Exhibit 2085-1.  We will pull that up.

10              MR. KUBY:  I'm not seeing it yet.

11              MS. GLAVIN:  Neither am I.

12              MR. KUBY:  OK, good.

13  A.   2085?

14  Q.   Dash 1.

15  A.   OK.

16              MR. KUBY:  I'm not seeing it on my screen.  I don't

17  know why.  And I don't think your colleagues are either.  So

18  let's just take -- yes.  There we go.

19  Q.   All right.  We can go to the next page.  Do you recognize

20  this document, right?  This is the notarized assignment of the

21  2011 retainer.  Is that correct?

22  A.   Yes.

23  Q.   And Judge Kaplan had directed Mr. Donziger to provide

24  Chevron with a signed and notarized copy.  Is that correct?

25  A.   Yes.

1   Q.  And Mr. Kuby asked you a number of questions during

2   cross-examination about, wouldn't it be enough -- I'm

3   paraphrasing -- for Mr. Donziger just to sign this without

4   having it notarized?  Do you recall the series of questions?

5   A.  I do.

6            MR. KUBY:  I did not ask whether it would be enough.

7   And if I tried I was told that it was the mental impressions

8   and conclusions of an attorney.  So I object to the question.

9            MS. GLAVIN:  I'll rephrase.  We can agree to disagree

10  about that, Mr. Kuby.

11           THE COURT:  Mr. Garbus.

12  BY MS. GLAVIN:

13  Q.  Ms. Champion, in the course of the litigation with

14  Mr. Donziger that you have been involved in since 2009, 2010,

15  has Mr. Donziger filed, would you say, a lot of motions?

16  A.  Yes.

17  Q.  Does Mr. Donziger, in your experience, sometimes relitigate

18  issues that a judge has already decided?  During the course of

19  this case has that happened?

20  A.  Yes, many times.

21  Q.  And in connection with the post-judgment discovery

22  proceedings -- and when I say post judgment -- withdrawn.

23           In connection with the post-judgment proceedings --

24  and, Ms. Champion, as I refer to that, I'm referring to the

25  time period from February 28th of 2018 through July 31st of

1    2019.

2    A.   OK.

3    Q.   During that period of time, did Mr. Donziger, in the post

4    judgment, relitigate issues that had already been decided?

5    A.   I think that's safe to say.  I'd have to spend time looking

6    at specific pleadings in order to give you, you know, on-point

7    examples, but he did repeatedly relitigate whether, for

8    example, it was necessary for him to transfer Amazonia shares,

9    whether we were entitled to a notarized version of the transfer

10   form without an addendum attached to it.  You know, those are

11   just a couple of examples off the top of my head.

12   Q.   And you were asked a series of questions about -- I'm going

13   to switch topics now.  You were asked a series of questions

14   about an August 22nd, 2018 letter that Mr. Donziger sent to

15   Randy Mastro.

16   A.   What was the date again?  I'm sorry.

17   Q.   August 22nd of 2018.

18   A.   OK.  That's the letter that he sent along with the signed

19   transfer forms?  Is that -- am I guessing correctly?

20   Remembering correctly?

21   Q.   Correctly -- I can find it.

22   A.   I've got the spinning disc again, for whatever that's

23   worth.

24           MR. KUBY:  I think we're the ones sabotaging the

25   system, although I'd like to claim credit.

1            THE COURT:  No.  We've got the spinning disc up here

2       too.

3            MS. GLAVIN:  OK.  I'll move on, your Honor.

4       Q.  Ms. Champion, with respect to the post-judgment

5       discovery -- and I'm focused now on paragraph 5, compliance

6       discovery -- as defined by Judge Kaplan's May 17, 2018 order,

7       which is in evidence --

8       A.  Yes.

9       Q.  -- was the paragraph 5 compliance discovery limited, did

10      Judge Kaplan limit it to discovery related to Mr. Donziger

11      assisting or selling non-enjoined, other people's interest in

12      the Ecuadorian judgment?

13           MR. KUBY:  Judge, I think I have an objection, if I'm

14      understanding the question correctly.  You sort of shut me down

15      when I was going there.  And so I'm not sure where this is

16      going, but I'll object.  If we want to get into the various

17      steps in the post-judgment litigation where Mr. Donziger was

18      making filings challenging the underlying April 25th -- or

19      asserting the April 25th, 2014 order as a reason, over and over

20      again, for resisting discovery, which he maintained has not

21      been authorized, I'm happy to go there.  But I thought you shut

22      that down.

23           THE COURT:  Ms. Glavin.

24           MS. GLAVIN:  Withdrawn.

25      BY MS. GLAVIN:

Q.  Ms. Champion, did the paragraph 5 compliance discovery

authorize Chevron to conduct discovery into whether or not

Mr. Donziger was monetizing his own interest in the Ecuadorian

judgment?

A.  As ultimately allowed by the court, no.  I mean, meaning it

wasn't allowed in the May 17th order.  When we were allowed to

take paragraph 5 discovery it was not limited to that.

Q.  No.  Let me rephrase the question.

        When Judge Kaplan authorized paragraph 5 compliance

discovery, did that authorization include discovery with

respect to whether or not Mr. Donziger was selling or

monetizing his own, his personal interest in the judgment?

A.  Yes.

        MS. GLAVIN:  No further questions, your Honor.

        THE COURT:  Recross.

RECROSS EXAMINATION

BY MR. KUBY:

Q.  Good afternoon, Ms. Champion.

A.  Hello.

Q.  Hello.  You were just asked questions on redirect

examination about Mr. Donziger repeating prior objections in

the course of this litigation, correct?

A.  Yes.

Q.  And he was, in some cases, challenging things that had

already been ruled on, correct?

L5CADON4ps                      Champion - Recross

1   A.  I think so, yes.

2   Q.  OK.

3          THE COURT:  Do me a favor and put a mike -- sir, do me

4   a favor and put a microphone cover on that thing.  There should

5   be a little packet of them.

6          Yes, sir.  Thank you.

7          MR. KUBY:  I'm perfectly fine with picking it up off

8   the floor, following the 30-second rule.

9   BY MR. KUBY:

10  Q.  And one of the things that Mr. Donziger was saying in his

11  pleadings over and over and over again was, "Judge Kaplan," in

12  words or substance, "Judge Kaplan, you said that I could

13  monetize the interests of other people who are not enjoined.

14  I've been doing that, and so please rule on whether I can or

15  cannot."

16  A.  Yes.

17  Q.  And he did that for about a year, over and over and over

18  again.

19  A.  He did do it over and over and over again.

20  Q.  And did Judge Kaplan ultimately rule on that?

21  A.  I think that, yes, I think it's safe to say that his

22  contempt order resolved that issue.

23  Q.  Right.  The criminal contempt.

24  A.  No, the civil contempt.  You know, related to Elliott and

25  all that.

L5CADON4ps

1    Q.   Good-bye, Ms. Champion.

2    A.   Good-bye.

3             THE COURT:  Redirect.

4             MS. GLAVIN:  Nothing further, your Honor.

5             THE COURT:  Very well.  You may step down, ma'am.

6             THE WITNESS:  I'll change the microphone cover.

7             THE COURT:  Bless you, my friend.

8             (Witness excused)

9             MS. ARMANI:  The special prosecutors call

10   Mr. Decasseres.

11            THE COURT:  Yes, ma'am.

12            MS. TRIVEDI:  Your Honor, if I could, since it's my

13   witness, may I make objections from here, or do you want me and

14   Mr. Kuby to switch.

15            THE COURT:  I take it someone has gone and fetched the

16   witness.

17            MS. ARMANI:  Yes.

18            THE COURT:  Thank you.

19            (Discussion held off the record)

20            MS. GLAVIN:  Your Honor, we're trying to reach someone

21   in the Clerk's Office.

22            THE COURT:  Yes.  Good luck to you.

23            Off the record.

24            (Discussion held off the record)

25            THE COURT:  Step right up, sir.  Ms. Armani, who do

L5CADON4ps                    Decasseres - Direct

1   you call?

2          MS. ARMANI:  Mr. Courtney Decasseres.

3          THE COURT:  Thank you.

4          Please remain standing, sir.  And give your attention.

5   COURTNEY DECASSERES,

6       called as a witness by the plaintiffs,

7       having been duly sworn, testified as follows:

8          THE COURT:  Ms. Armani direct examination.

9   DIRECT EXAMINATION

10  BY MS. ARMANI:

11  Q.  Where do you work, Mr. Decasseres?

12  A.  I work in the finance office of the Clerk's.

13  Q.  In the Southern District of New York?

14  A.  Yes.

15         THE COURT:  Hold on.  Would you give this to the

16  witness.

17         You're going to have to keep the microphone close to

18  your face, sir, because otherwise you won't be heard.  See if

19  that helps.  Thank you.

20         Take the mask off and try to stay near the microphone,

21  please, sir.

22         THE WITNESS:  OK.

23         THE COURT:  Ma'am.

24  BY MS. ARMANI:

25  Q.  So you work in the Southern District of New York?

L5CADON4ps                         Decasseres – Direct

1   A.  Yes, I do.

2   Q.  And what is your title in the Clerk's Office of the

3   Southern District of New York?

4   A.  Finance manager.

5   Q.  How long have you been worked in the Clerk's Office?

6   A.  22 years.

7   Q.  And how long have you worked as a finance manager?

8   A.  As finance manager, as active finance manager for a year

9   and as finance manager for a year.

10          THE COURT:  You have to keep your voice up, sir.

11  Q.  What are your duties as finance manager?

12  A.  I am in charge of the day-to-day, of financial intake, of

13  all currency and financial exchanges.  I'm also in charge of

14  maintaining the accurate records of all deposits made to the

15  court.

16  Q.  Would your responsibilities include managing noncash

17  collateral?

18  A.  Yes, they would.

19  Q.  Turning your attention to the case Chevron Corporation v.

20  Steven Donziger and others, 11-cv-691, have you had an

21  opportunity to review the docket sheet and the Clerk's Office

22  records relating to that case --

23  A.  Yes.

24  Q.  -- before you came to court today?

25  A.  Yes, I have.

1  Q.  What records did you review?

2  A.  I reviewed a copy of the docket sheet and the order

3  instructing order of deposit of a -- I believe it was stock

4  power of Amazonia.

5  Q.  I'm going to show you what is in evidence as Government's

6  Exhibit 1901.  This is an April 25th, 2014 memorandum opinion

7  by Judge Kaplan.  And I'm directing you to page 33, ECF page 33

8  of this opinion.  Please tell me if I'm reading this correctly.

9  It's a portion, the first two sentences: "Donziger shall

10  execute in favor of the Clerk of this Court a stock power

11  transferring to the Clerk all of his right, title, and interest

12  in his shares of Amazonia.  The Clerk shall hold the Amazonia

13  shares thus transferred, and all proceeds thereof, pending the

14  determination of the appeal in this case, for the benefit of

15  the Donziger and Chevron, as their interests then may appear."

16          Did I read that correctly, Mr. Decasseres?

17  A.  Yes, you did.

18  Q.  What is the process for a person to execute a stock power

19  in favor of the Clerk of the Court?

20  A.  Well, a stock power in favor of the Clerk of the Court

21  would require the owner of the stock to -- and a member

22  representative of the Clerk's Office -- to, in the presence of

23  a third party, to issue a UCC-1 certificate, which would

24  effectively transfer all right and title to said stock to the

25  other party.

L5CADON4ps                    Decasseres - Direct

Q.  And what would be the process?  Would the party come into
the court with the judge's order and the certificate or the
stock power?

A.  If they're coming in with the certificate, then, yes, they
would come into the court, or the UCC -- the issued UCC-1
certificate and bring it to the finance office.

Q.  And would the Clerk's Office keep any sort of record to
that effect?

A.  Absolutely.  We would take the document, or the
certificates along with the copy of the order, and would issue
a receipt in triplicate, and one copy would go to the party.
The other two would be maintained with the Court until such
time as the case is over.

          THE COURT:  I'm sorry.  Keep your voice up at the end
of the answer too, please.

          THE WITNESS:  OK.

Q.  And where would the stock filing be kept in the Clerk's
Office?

A.  It would be kept in the finance office in the safe.

Q.  OK.  How would you determine whether the Clerk's Office
received a stock filing?

A.  We keep meticulous records on that.  We have effectively a
ledger that maintains all items that are in the vault, which is
audited twice a year.

Q.  And what are the records that would be -- that you would

1    have?

2    A.   It is -- every item that has been deposited with the Court,

3    so ordered -- that has been so ordered deposited with the Court

4    would be listed by case number, the party that dropped it off,

5    and a description of what the item is.

6    Q.   So that would include a ledger and a receipt, a triplicate

7    receipt?

8    A.   Correct.

9    Q.   And the records in the ledger, are they kept by dates and

10   case numbers?

11   A.   They are kept by case number and case caption, and the date

12   that we received the items.

13   Q.   Would the Clerk's Office have a record if someone else had

14   dropped off a stock power on behalf of the executing party of

15   the stock power?

16   A.   Yes, because it would be listed under the case number.

17   Q.   And are these particular ledgers kept in the regular course

18   of the Clerk's Office business?

19   A.   Yes.

20   Q.   And is it the regular practice of the Clerk's Office keep

21   these particular types of ledgers?

22   A.   Yes.

23   Q.   Separate from the ledgers, would there be any notation on

24   the docket sheet if someone had executed a stock power in favor

25   of the Clerk of the Court?

1    A.  Normally the deposit of those types of items are not put on

2    the docket.

3    Q.  If Mr. Donziger had executed the stock power under this

4    order, Government Exhibit 1901, would there be a record in the

5    ledger of that in the Clerk's Office?

6    A.  Yes, it would.

7    Q.  In connection with your testimony today, Mr. Decasseres--

8          THE COURT:  Can I just ask you something.  When you

9    said, if Mr. Donziger had executed the stock power, executed

10   and delivered it?  Or just executed it in his house?

11         MS. ARMANI:  Executed and delivered it to the court.

12         THE COURT:  Thank you.

13   BY MS. ARMANI:

14   Q.  In connection with your testimony today, did you do a

15   search of that ledger in the Clerk's Office?

16   A.  Yes, I did.

17   Q.  And what were the results of your search?

18   A.  We have no items under this case number attributed to

19   Mr. Donziger or any other party in this matter.

20   Q.  And does the Clerk's Office have any other records of any

21   stock power or any transfer of shares of Amazonia, or any other

22   company, from Mr. Donziger?

23   A.  No.

24   Q.  Was that true in April of 2014?

25   A.  It had -- we -- the records don't -- we don't -- the

L5CADON4ps                    Ng - Direct

1    records, there has never been any deposits under this matter.

2    Q.  So it was true in April of 2015?

3    A.  Yes.

4    Q.  And 2016?

5    A.  Correct.

6    Q.  And 2016?

7    A.  Correct.

8    Q.  And 2017?

9    A.  Correct.

10           MS. ARMANI:  No further questions.

11           THE COURT:  Thank you.

12           Cross-examination, please.

13           MS. TRIVEDI:  There will be none, Judge.  Thank you.

14           THE COURT:  Thank you.

15           You may step down, sir.

16           (Witness excused)

17           THE COURT:  Ms. Armani.

18           MS. ARMANI:  The special prosecutors call

19   Mr. David Ng.

20           THE COURT:  Thank you.

21           Come right on up.

22           Mr. Ng, come on up.  Mr. Maloney is being kind enough

23   to change the microphone cover for you.

24           Mr. Ng.

25           Please remain standing.  Give your attention.

1          THE COURT:  Sir, I'm sorry.  I'm going to ask you to

2     speak into that microphone, but you may take your mask off

3     while you're in the booth.

4          THE WITNESS:  Thank you, your Honor.

5     DAVID NG,

6          called as a witness by the plaintiffs,

7          having been duly sworn, testified as follows:

8          THE COURT:  Thank you.  Ms. Armani.

9     DIRECT EXAMINATION

10    BY MS. ARMANI:

11    Q.  Good afternoon, Mr. Ng.  Where do you work?

12    A.  I work for the Clerk's Office.

13          I'm sorry.  I work for the Clerk's Office for the

14    United States District Court for the Southern District of New

15    York.

16    Q.  And what is your title there?

17    A.  I'm the supervisor of records management.

18    Q.  How long have you worked in the Clerk's Office?

19    A.  A little bit over 37 years.

20    Q.  And how long have you worked as a supervisor of records

21    management?

22    A.  That I don't recall.

23    Q.  And what are your job duties as a supervisor of records

24    management?

25    A.  My department oversees the opened and closed records,

L5CADON4ps                        Ng - Direct

1    sealed records, subpoena records, and also the electronic

2    transcripts.

3    Q.  Is that for both civil and criminal cases?

4    A.  Yes.

5            THE COURT:  A little closer.  If you're able to move

6    the microphone.  Otherwise move yourself, please.

7            Yes, sir.

8    BY MS. ARMANI:

9    Q.  What types of records do you keep?

10   A.  We keep records for civil cases, criminal cases, and also

11   miscellaneous cases, and magistrate criminal cases.

12   Q.  Turning your attention to Chevron Corporation v. Steven

13   Donziger, 11-cv-691, have you reviewed the docket sheet and the

14   Clerk's Office records relating to that case before you came to

15   court today?

16   A.  Yes.  I reviewed some of them, yes.

17   Q.  And what records did you review?

18   A.  Documents that have been filed in that case for a specific

19   time period.

20   Q.  I'm going to show you what is in evidence as Government

21   Exhibit 2232.  This is a June 11th of 2019 order by Judge

22   Kaplan.  And I'm directing you to page 2 of that order, which

23   states, "Ordered, that Donziger, on or before June 12th of

24   2019, at 4 p.m., shall surrender to the Clerk of the Court each

25   and every passport issued to him by each and every nation to

 1   have issued a passport to him, the Clerk to retain possession

 2   thereof unless and until this Court determines that Donziger

 3   has complied fully with paragraphs 4 and 5 of the protocol."

 4             Did I read that correctly?

 5   A.  Yes.

 6   Q.  Does the Clerk's Office take possession of physical items

 7   such as passports?

 8   A.  Yes, they do.

 9   Q.  And what is the process for a person directed by a court's

10   order to surrender a passport to the Clerk's Office?

11   A.  They would come in, whether -- depending on where they go,

12   sometimes they would come in to the Clerk of the Court's office

13   to surrender the passports.  In that instance, they would --

14   the chief deputy of administration would escort the parties up

15   to my department, where they would fill out a sealed and

16   impounded envelope, and then the passport is placed in the

17   sealed envelope and given to us for to us process.

18   Q.  And how does the Clerk's Office maintain records to reflect

19   that surrender of a physical item such as a passport?

20   A.  Can you repeat that question again?

21   Q.  How does the Clerk's Office maintain records to reflect the

22   surrender of a physical item such as a passport?

23   A.  It's placed in the sealed envelope, and once we receive it,

24   we'll place a notation on the docket that's "one sealed

25   document placed in vault."

L5CADON4ps                          Ng - Direct

1  Q.  And would that notation on the docket indicate the date it

2  was received?

3  A.  Yes.

4  Q.  Is it regular practice of the Clerk's Office to make a

5  record of that type?

6  A.  Yes.

7  Q.  I'm showing you what is in evidence as Government Exhibit

8  1A.  This is an excerpt of the docket sheet for that case,

9  11-cv-691, for the time period February 28th of 2018 through

10 July 31st of 2019.  Have you had an opportunity to review the

11 docket sheet before your testimony today?

12 A.  Yes, I have.

13 Q.  And turning your attention to page 517 of that docket

14 sheet, following Judge Kaplan's June 11th, 2019 passport

15 surrender order, which we just read, does this docket sheet

16 reflect that Mr. Donziger surrendered his passport to the Clerk

17 of the Court on June 11th of 2019?

18 A.  No, it does not.

19 Q.  And what about June 12th of 2009?

20 A.  No, it does not.

21 Q.  Other than a notation on the docket sheet, would there be

22 any record, any other record indicating a surrender of a

23 passport in response to a court order?

24 A.  No.

25 Q.  If someone surrenders a passport in response to a court

L5CADON4ps                        Ng – Direct

1   order, would you have any records reflecting that?

2   A.  It would be reflected on the docket sheet.

3   Q.  And how would it be reflected on the docket sheet?

4   A.  It would reflected as one sealed document placed in vault.

5   Q.  With the date of the entry?

6   A.  Correct.

7           THE COURT:  When you say "with the date of entry," do

8   you mean with the date of surrender?

9   BY MS. ARMANI:

10  Q.  Does the docket sheet show the date of surrender, Mr. Ng?

11  A.  It would reflect the date that we -- the Clerk's Office

12  received that passport, or that document.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

L5CVDON5                      Ng - direct

1    BY MS. ARMANI:

2    Q.  On the docket sheet, the notation for 2235 sealed document

3    placed in vault on June 13th of 2019, do you see that entry?

4    A.  Yes, I do.

5    Q.  And does that indicate that a passport was surrendered on

6    that date?

7    A.  No, it does not.

8    Q.  And what did your search -- did you conduct a search of

9    your records?

10   A.  Yes, I did.  I conducted a search about sealed records

11   tracking database, and it does not reflect that a passport was

12   in that sealed document.

13   Q.  So your records indicate that a passport was not

14   surrendered --

15   A.  Was not surrendered on June 13th, no.

16   Q.  Was there any other record indicating that Mr. Donziger had

17   ever surrendered his passport to the Clerk of the Court at any

18   point in time after June 11th of 2019, as directed by the court

19   order?

20   A.  After June 13th or --

21   Q.  After June 11th, the date of the order, at any point in

22   time?

23   A.  I did not see any indication that a passport was received

24   by the clerk's office.

25   Q.  Thank you.

L5CVDON5                          Ng - cross

1        MS. ARMANI:  No further questions.

2        THE COURT:  Cross-examination please.

3   CROSS-EXAMINATION

4   BY MS. TRIVEDI:

5   Q.  Good afternoon, Mr. Ng.

6   A.  Good afternoon.

7   Q.  I'd like to clarify a couple things.

8        You testified on direct that the only records

9   maintained by the clerk's office when a sealed document is

10  deposited is on the docket sheet; correct?

11  A.  Correct.  There is a notation that it's indicated on the

12  docket sheet that's one sealed document placed in vault.  And

13  then we also keep an internal tracking system indicating what

14  documents are within that envelope that was filed when the

15  judge ordered the document to be filed under seal.

16  Q.  Got it.  So when you said you reviewed the records as to

17  the June 13th notation, what exactly did you review?

18  A.  I reviewed our sealed records tracking database.

19  Q.  And it was your testimony on direct that that sealed

20  document was not a passport?

21  A.  Correct.

22  Q.  What was it?

23  A.  It was a memo.

24  Q.  Mr. Ng, you also testified on direct that I believe

25  Ms. Armani asked you for the procedures as to how a person

L5CVDON5                         Ng - cross

1   would surrender their passport to the Clerk of Court.  And I

2   believe you said sometimes they would come to the clerk's

3   office, and there is further testimony.

4          Is there any other way to do it?

5   A.  Yes, they would come directly to my department.

6   Q.  Is there any way to do it when the courthouse isn't open,

7   Mr. Ng?  Is there a night depository?

8   A.  Yes, there is.

9   Q.  And hypothetically, could an individual place their

10  envelope in the night depository -- I mean their passports,

11  sorry.  Withdrawn as to -- I don't know why I said envelope.

12          THE COURT:  Counsel, counsel.  Slowly.

13          MS. TRIVEDI:  Sorry.

14  Q.  As a theoretical matter, could an individual have placed

15  their passport in the night depository and addressed it to the

16  clerk's office?

17  A.  Yes, it's possible.

18  Q.  Has that ever happened, Mr. Ng?

19  A.  That sealed documents are placed in the night depository?

20  Q.  Mm-hmm.

21  A.  Yes.

22          MS. TRIVEDI:  I have no further questions.

23          Thank you, Judge.

24          THE COURT:  Thank you.

25          Redirect, counsel.

L5CVDON5                         Zelman - direct

1              MS. ARMANI:  No further questions, your Honor.

2              THE COURT:  Thank you.  You may step down, Mr. Ng.

3              (Witness excused)

4              THE COURT:  Ms. Glavin.

5              MS. GLAVIN:  Yes.  Special prosecutors call David

6    Zelman.

7              THE COURT:  Come right on in, sir.  Step right up,

8    sir.  You get the front row seat.

9     DAVID ZELMAN,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12             THE COURT:  Thank you.  Ms. Glavin.

13   DIRECT EXAMINATION

14   BY MS. GLAVIN:

15   Q.  Good afternoon, Mr. Zelman.

16   A.  Hi.

17   Q.  Mr. Zelman, what do you do for a living?

18   A.  Say it again.

19   Q.  What do you do for a living?

20   A.  I'm an executive coach.

21   Q.  And how long have you been an executive coach?

22   A.  About 30 years.

23   Q.  Could you explain what an executive coach is.

24   A.  There are many different types, I suppose.  I have a very

25   narrow focus.  I have a process called The Transitions Process

L5CVDON5                        Zelman - direct

1    that I offer clients.  And it's a way for me to support them in

2    designing their future, consistent with their intentions.

3    Q.  And when you said you have a -- I believe you said a

4    program called The Transitions Process?

5    A.  Yes.

6    Q.  And The Transitions Process -- withdrawn.

7          What does The Transitions Process consist of that you

8    offer?

9    A.  Typically, it's four sessions, each approximately a month

10   apart.  Each session consists of approximately four hours of

11   dialogue between myself and the client.

12   Q.  And how long have you been offering the transition --

13   Transitions Process to individuals or entities?

14   A.  Probably around 25, 30 years.

15   Q.  Who do you offer The Transitions Process program to?  Who

16   are the people that take on your services?

17   A.  There are a number of different types of people.

18   Organizations, whether it's American Airlines, Bank One, Texas

19   Instruments.  I'm in Dallas, so a lot of companies launch

20   companies there.  Hospital chains, clinics, medical practices,

21   as well as individuals who either have suffered some sort of

22   setback and they want to recover themselves, or people who've

23   lost their way, their mojo, their excitement, and they are

24   trying to recover that.  People who are trying to completely

25   transition to a new profession, a new direction in life.  And

1   then people who are at the top of their game, performers,

2   executives who want to go to the next level.

3   Q.  And Mr. Zelman, the entities that you just named, American

4   Airlines, Texas Instruments, are those some of the entities

5   that have availed themselves of the services of The Transitions

6   Process program?

7   A.  Yes.

8   Q.  Now, in the time period 2016 to 2017, when you were

9   offering The Transitions Process program, approximately how

10  much did you charge for the full program that you've described?

11  A.  The four sessions would cost $15,000.

12  Q.  Approximately?

13  A.  Typically.

14  Q.  That could vary?

15  A.  Yes, it could.

16  Q.  And have you had occasion, Mr. Zelman, to accept a

17  contingent payment in exchange for you providing the

18  transitions program or Transitions Process program that you've

19  described?

20  A.  Yes, I have.

21  Q.  Do you know a man named Steven Donziger?

22  A.  I do.

23  Q.  Do you see him in the courtroom today?

24  A.  Yes, I do.

25  Q.  Okay.  And if you could identify him by where he's seated?

1    A.  Right there.  Second row.

2            MS. GLAVIN:  Do you stipulate to the identification,

3    Mr. Kuby?

4            MR. KUBY:  Yes.

5    Q.  And when did you meet Mr. Donziger approximately?

6    A.  When?

7    Q.  Yes.

8    A.  I believe it was the end of 2016.

9    Q.  And did you communicate with Steven Donziger about

10   Mr. Donziger doing your Transitions Process program?

11   A.  Yes.

12   Q.  I'm going to show you what is marked as Government Exhibit

13   No. 103.  Are you able to see that?  There's also a hard copy

14   in your binder, Mr. Zelman, as well.

15   A.  Right.  There's a lot of data on this page.  What part of

16   the page do you want me to look at?

17   Q.  I was going to have you look at the whole page.  Is this an

18   email exchange between you and Mr. Donziger?

19           MS. GLAVIN:  If we could pull some of this out so he

20   could see better.

21   A.  Okay.  That looks like an exchange between us.  Yes.

22           MS. GLAVIN:  Move for admission of Exhibit 103.

23           MS. TRIVEDI:  No objection.

24           THE COURT:  Received.

25           (Government's Exhibit 103 received in evidence)

L5CVDON5                          Zelman – direct

1   Q.  And Mr. Zelman, if we could go to the portion of this

2   exchange email from David Zelman to Steven Donziger, October

3   25th, 2016, at 3:48 p.m.

4   A.  Okay.

5   Q.  Okay.  You state:  Hi, Steven.  I'm looking forward to our

6   meeting next Tuesday.  Prior to the first session, I usually

7   send out the attached questions for consideration.  Some of the

8   answers are all too obvious.  But rather than not send it at

9   all, I will leave it to you to determine if there is any value

10  in giving additional thought to these questions.  Best, David.

11  A.  Right.

12  Q.  Mr. Zelman, when you referred to the first session in this

13  email, what were you referring to?

14  A.  That would have been the first time that Steven and I were

15  scheduled -- would schedule to spend four hours today on The

16  Transitions Process.

17  Q.  So it would have been the first four-hour module of the

18  transition process; is that right?

19  A.  Exactly.

20  Q.  And did you discuss with Mr. Donziger how you would be paid

21  for your work with him?

22  A.  Yes.

23  Q.  And did you come to an agreement with how you would be

24  paid?

25  A.  Yes.

1    Q.   I'm going to show you -- well, if you could describe or

2    summarize what that agreement was.

3    A.   Better if you could put it in front of me so I could have

4    something to respond to.

5    Q.   Sure.  I'm going to show you what is Government Exhibit

6    105.

7    A.   Okay.

8    Q.   This document is in evidence.

9         Is this an email from Steven Donziger to you, David

10   Zelman?

11   A.   Yes.

12   Q.   Dated December 21st, 2016 at 5:42 p.m.?

13   A.   Correct.

14        MS. GLAVIN:  Okay.  I'm going to read through this,

15   your Honor, for the record.

16        THE COURT:  Yes, ma'am.

17   Q.   David:  Let me know if the language below is acceptable.

18   If so, I will send as a formal letter on letterhead that you

19   can countersign.  If you have any question, let me know and we

20   can talk it through.  Under this agreement, if there is a full

21   recovery, and I collect my fees in full, you will be entitled

22   to 700,000.  You're a pretty good negotiator.  Any chance I can

23   fold another person, thinking my wife, into the same deal?

24   Thanks much, Steven.

25        David, I write to confirm our agreement regarding

consulting services you are providing to me to develop my

professional capacities with regard to the Ecuador litigation

matter against Chevron and other endeavors.  In exchange for

you providing me with $14,000 worth of services, I pledge to

you an interest in the Ecuador judgment from my fees, should

they be collected.  The amount pledged is based on a pro rata

proportion of the latest investment round in the case, which

values a $250,000 investment as one-eighth of a point in the

total claim won by villagers against Chevron.

        Your interest, thus, will be valued equally with this

round based on an investment of 14,000.  The actual amount that

will be paid to you will be based on the total amount

collected.  To be more specific, your amount under this

agreement will be 14/250 of an eighth of a point of whatever is

recovered on the total claim.

        Note that I am pledging this amount out of my personal

fees from this litigation.  Should my personal fees not be

recovered from the Ecuador case, you will not be entitled to

any recovery of the 14,000.  Should a proportion of my fees be

recovered, but not the full amount, your recovery will be

decreased on a pro rata basis equal to the overall decrease

affecting my fees.

        If this is acceptable to you, please send me back an

email so confirming.  Thanks much -- thanks so much, Steven.

        Mr. Zelman, is this the agreement that you had with

1   Mr. Donziger for payment of your services provided by The

2   Transitions Process program?

3   A.   I believe so.

4   Q.   Was there a cash component of your agreement as well?

5   A.   Yes.

6   Q.   What was that, the cash component of your agreement with

7   Mr. Donziger?

8   A.   Steven paid me 2,000 cash of the $14,000.

9   Q.   Let me show you what is Government Exhibit 106, which is

10  also in evidence.

11         MS. GLAVIN:   If we could enlarge this for Mr. Zelman.

12  Q.   Mr. Zelman, starting at the bottom, is this an email from

13  Steven Donziger to you on Friday, December 23rd, 2016?

14  A.   It appears to be so.

15  Q.   And does this email state substantially or the same as what

16  was just in the email we showed you at Government Exhibit 105?

17  A.   I believe it is.

18  Q.   And if we could go up to your response to Mr. Donziger,

19  your response, David Zelman, to Steven Donziger, Friday,

20  December 23rd, 11:37 a.m.  And

21  dzelman@transitionsinstitute.com, is that your email address,

22  sir?

23  A.   Yes.

24  Q.   You write:  Steven, thank you for this agreement.  I

25  confirm that it is acceptable to me.  David Zelman.

1          Is that your acceptance of Mr. Donziger's payment

2    agreement -- payment arrangement?

3    A.  Yes.

4    Q.  Now, did you have any discussions with Mr. -- withdrawn.

5          Did Mr. Donziger complete other modules of the

6    transitions program?  I think you referred to the first module.

7    A.  He completed sessions one through three in the four-hour

8    segments.  And the fourth session was sort of spread out over a

9    number of smaller sessions.

10   Q.  And did this occur in the time period 2016 to 2017?

11   A.  I believe so.

12   Q.  Now, did you have any discussions with Mr. Donziger about

13   his wife also doing The Transitions Process program?

14   A.  Yes.

15   Q.  And did you discuss a potential payment arrangement for

16   Mr. Donziger's wife to do the program?

17   A.  Yes.

18   Q.  Let me show you what is Government Exhibit 109.

19         Is this an email exchange -- or an email from you,

20   David Zelman, to Steven Donziger, on March 2nd, 2017?

21   A.  Yes, this is an email I created for Steven.

22   Q.  And did you send this to Mr. Donziger?

23   A.  It appears that I did.

24         MS. GLAVIN:  Move for admission of Government Exhibit

25   109.

1              MS. TRIVEDI:  No objection, Judge.

2              THE COURT:  Received.

3              (Government's Exhibit 109 received in evidence).

4    Q.  And with respect to -- withdrawn.

5              You write:  Steven, what do you think regarding the

6    following?  And then you have language about a proposed

7    agreement for Mr. Donziger's wife to do the program.

8              Did Mr. Donziger's wife ultimately do the program?

9    A.  Yes.

10   Q.  And with respect to -- and Mr. Donziger's wife, is her name

11   Laura Miller?

12   A.  Yes.

13   Q.  And you write here -- or you drafted language for

14   Mr. Donziger to send to you; is that correct?

15   A.  That's correct.

16   Q.  So you drafted:  David:  I write to confirm our agreement

17   regarding consulting services you are providing to Laura Miller

18   to develop her professional capacities.  In exchange for you

19   providing me with $11,000 worth of services, I pledge to you an

20   interest in the Ecuador judgment from my fees, should they be

21   collected.  The amount pledged is based on a pro rata

22   proportion of the latest investment round in the case, which

23   values a $250,000 investment as one-eighth of a point in the

24   total claim won by villagers against Chevron.  Your interest

25   thus will be valued equally with this round based on an

investment of $11,000.  The actual amount that will be paid to

you will be based on the total amount collected.  To be more

specific, your amount under this agreement will be 11/250 of an

eighth of a point of whatever is recovered of the total claim.

Note that I am pledging this amount out of my personal

fees from this litigation.  Should my personal fees not be

recovered from the Ecuador case, you will not be entitled to

any recovery of the 11,000.  Should a proportion of my fees be

recovered, but not the full amount, your recovery will be

decreased on a pro rata basis equal to the overall decrease

affecting my fees.

If this is acceptable to you, please send me back an

email so confirming.

Thanks so much.  Steven Donziger.

Mr. Zelman, did this agreement that you proposed and

sent to Mr. Donziger, did this agreement -- was it ever -- did

it ever come to fruition?

A.  I don't think so.

Q.  Okay.  How were you ultimately compensated, if at all, for

your services in providing The Transitions Process program to

Mr. Donziger's wife?

A.  Laura Miller is a very talented woman, and I accepted

$2,000 cash, plus an exchange of services with her.  She was

teaching me and supporting me in developing a TED talk for the

balance.

1    Q.  Now, Mr. Zelman, I'm going to show you what is in evidence

2    as Government Exhibit No. 110.

3              MS. GLAVIN:  Sareen, if we can actually blow up the

4    middle and the top.

5    Q.  Is this an email exchange between you and Mr. Donziger,

6    Mr. Zelman?

7    A.  It appears to be so, yes.

8    Q.  And Mr. Zelman, is your email address david@dzelman.com?

9    Is that an email address for you?

10   A.  That's another one, yes.

11   Q.  And you can start at the bottom.  There is an email that

12   you send from yourself -- withdrawn.  When I say start at the

13   bottom, I mean start at the very bottom email on Government

14   Exhibit 110.  There is an email from yourself,

15   davidzelman@dzelman.com, to

16   davidzelman@transitionsinstitute.com on February 27th of 2017.

17   Okay.  And this is an email in which you write -- it's an email

18   that you've drafted to yourself, signed by Steven Donziger; is

19   that right?

20   A.  Yes.

21   Q.  If you go to the next email, you then send an email to

22   Mr. Donziger, you see this on March 26, 2018, at 11:18 p.m.

23   And you write:  Steve, you and I agree that consistent with the

24   terms below, I have delivered an additional $2,000 worth of

25   consulting services which entitles me to 2/250 of an eighth of

a point of whatever is collected of the total claim.

          It is noted that you are pledging this amount out of
your personal fees from the litigation.  If you do not recover
your personal fees, I will not be entitled to any recovery.
Please respond back that this is correct and that you agree.
Thanks, David Zelman.

          Mr. Zelman, in this email, what are you referring to
when you say, I've delivered an additional $2,000 worth of
consulting services which entitles you -- what appears to say
it entitles you to some more than what you had agreed with
Mr. Donziger on December 23rd of 2016?
A.  Yeah.  So over the period of several months, we had several
meetings which would have extended past the four hours that the
fourth session was already contracted for.  So that's what was
being represented in this email.

          MS. GLAVIN:  And if we could go up to Mr. Donziger's
response.
A.  Yes.

          MS. TRIVEDI:  Your Honor, I'm going to object at this
point, only because there is no proof in this document that
what was in the middle was sent to Mr. Donziger.

          THE COURT:  Ma'am, ma'am, first of all, slow down.

          Second of all, at the mic, looking at Ms. Glavin is
distracting from your ability to be heard.

          MS. TRIVEDI:  Understood, Judge.

L5CVDON5                        Zelman - direct

1          Judge, the email at the bottom of this document was

2     sent from Mr. Zelman to Mr. Zelman.  And the email at the top

3     was sent from Mr. Donziger to Mr. Zelman.  The email in the

4     middle, as I see it, might have been from Mr. Zelman to

5     Mr. Zelman or from Mr. Zelman to Steven Donziger, I can't tell.

6     And the private prosecutor is asking questions as if it's for

7     its truth, and so I object to it being received.

8          THE COURT:  I'm sorry.  I believe I heard the

9     question.  And I won't go and look for it, but I think as to

10    the top email the question was, was this an email from

11    Mr. Zelman -- from Zelman to Donziger.  I believe the witness

12    said yes.  And as to the bottom one, I am certain that the

13    witness was asked whether this was from him at one email

14    address to him at another email address.

15         MS. TRIVEDI:  Okay, Judge.

16         THE COURT:  Am I wrong on that?

17         MS. GLAVIN:  No, your Honor.

18         MS. TRIVEDI:  Okay.  Withdrawn.

19         THE COURT:  Thank you.

20    A.  Can I make a comment?

21    Q.  Yes, that's fine.

22    A.  In looking at this, this is problematic to me because the

23    top email looks like it's at 6:59 p.m., and the one that I'm

24    supposed to have sent to Steve actually follows that at 11:18

25    p.m.  So I don't get the sequencing of time.

1    Q.  So Mr. Zelman, this particular email, you received a

2    subpoena from Gibson Dunn for some documents; correct?

3    A.  Yeah.

4    Q.  And this is one of the documents that you produced; is that

5    correct?

6    A.  I would suppose so.

7    Q.  And when you collected documents to provide to Gibson Dunn,

8    did you review your emails and print them out?

9    A.  Yes.

10   Q.  Okay.  And this would have been one of the emails that

11   you've printed out or viewed; correct?

12   A.  Yes.

13   Q.  And provided to Gibson Dunn; correct?

14   A.  Correct.

15   Q.  With respect to the times that you referred to on the

16   emails, okay, do you have any understanding as to why those

17   time stamps are the way they are on these emails?

18   A.  I don't, I'm sorry.

19   Q.  But when you retrieved this document to provide to Gibson

20   Dunn in response to their subpoena, you went into your email

21   and you pulled this email and printed it out; is that right?

22   A.  That's correct.

23           MS. TRIVEDI:  Objection as to form, Judge.

24           The private prosecutor is leading the witness.  I

25   don't totally understand the underlying point, but maybe she

L5CVDON5                     Zelman – direct

1    can rephrase.

2    Q.  Mr. Zelman, where did this email come from, this document

3    that is D. Zelman PJD0000424?  Where did it come from, this

4    document?

5    A.  From the pile of emails that I sent prior to the

6    deposition.

7    Q.  So this was your document, right?

8    A.  Yes.

9            MS. GLAVIN:  Now, if we can go up to the very top of

10   this email exchange.

11   Q.  Is this an email from Mr. Donziger at sdonziger@donzigerand

12   associates.com to you on Monday, March 26, 2018 at 6:59 p.m.?

13   Is that's what's stamped on here?

14   A.  That would be so.

15   Q.  And did Mr. Donziger write:  Let me confirm the

16   calculation.  Agree in concept.  Thanks.

17   A.  Yes.

18   Q.  Did you locate this email within your email account or some

19   other email account?

20   A.  Within mine.

21   Q.  And do you have any reason to doubt that Mr. Donziger was

22   the one who sent you this email that you located on your email

23   account?

24   A.  No.

25   Q.  Now, Mr. Zelman, if you could look at what is Government

1    Exhibit 111, which is in evidence.

2              MS. GLAVIN:  And Ms. Armani, if we could put up both

3    Government Exhibit 111 and then Government Exhibit 110 for

4    comparison purposes.

5    Q.  Now, looking at Government Exhibit 111, which is in

6    evidence, first let me ask you this:  Is Government Exhibit 111

7    an email exchange between you and Mr. Donziger?

8    A.  Yes.

9    Q.  Now, if you could compare on Government Exhibit 111, if we

10   could pull up the -- there are three email communications.  If

11   we could pull up the bottom two of Government Exhibit 111.

12   Just take a look at that for a moment, Mr. Zelman.

13   A.  Okay.

14   Q.  And if you see the date of the email exchange, David Zelman

15   to Steven Donziger, Monday, March 26, 2018, at 6:18 p.m.,

16   that's the time stamp.

17   A.  Yeah.

18   Q.  If you look at that email exchange, okay, and then let's

19   compare it to Government Exhibit 110, again, the bottom two

20   email communications, do they appear to be the same email

21   communications?

22   A.  Yes.

23   Q.  But Government Exhibit 110, the time stamp is 11:18 p.m.;

24   is that correct?

25   A.  Yeah.

L5CVDON5                          Zelman - direct

1   Q.  And if you look at Government Exhibit 111, that middle

2   email exchange, we'll call it the second communication, has a

3   time stamp of 6:18 p.m., a five-hour time difference; correct?

4   From Government Exhibit 110.

5   A.  Okay.

6   Q.  You provided -- withdrawn.

7          MS. GLAVIN:  Government Exhibit 111, if you could blow

8   this up, Sareen, the whole exhibit, if you can.

9   Q.  This is an email that you provided to Gibson Dunn; correct?

10  A.  Yes.

11  Q.  And did this come from your email account or some other?

12  A.  Mine.

13  Q.  All right.  If we could go to the very top, there is an

14  email from Mr. Donziger to you on March 27 of 2018 at 5:39 a.m.

15  Do you see that?

16  A.  Yes.

17  Q.  And Mr. Donziger states:  Just to be clear, I am barred by

18  court order in the U.S. from collecting fees on the matter.  It

19  is possible that the situation in that respect could change in

20  a settlement context, but you need to be aware of the risk to

21  you, which is high.  We can discuss when we see each other, I

22  hope soon.  Are you available Friday of this week?

23          Thanks much.

24  Q.  So Mr. Zelman, with respect to Government Exhibit 110, if

25  you go back to that, and that top email from Mr. Donziger to

L5CVDON5                       Zelman - direct

1   you that was on March 26, 2018 at 6:59 p.m., Mr. Donziger was

2   responding to your email, go to the second communication,

3   stating:  Steve, you and I agree that consistent with the terms

4   below, I've delivered an additional $2,000 worth of consulting

5   services, okay.

6           He responds to that:  Let me confirm the calculation.

7   Agree in concept.  Thanks.

8           And then the next day, if we could go to Government

9   Exhibit 111, Mr. Donziger sends you another email responding to

10  your email about the $2,000 worth of additional consulting

11  services; is that right?

12  A.  Yes.

13  Q.  And he then says to you that he is barred by court order

14  from -- in the U.S. from collecting fees, right?

15  A.  Yes.

16  Q.  Prior to Mr. Donziger sending you this email on March 27,

17  2018, had Mr. Donziger told you that he was barred by court

18  order from collecting fees on the matter?

19  A.  I don't think he ever used that language.

20  Q.  And when you say you don't think he ever used that

21  language, had he ever indicated to you that a court order

22  prevented him from collecting the fees, his fees?

23  A.  I don't believe so.  I don't believe so.

24  Q.  And with respect to when Mr. Donziger refers in this

25  email -- on March 27th, 2018, when Mr. Donziger refers to "on

1    the matter," do you see that in the first line?  What matter

2    did you understand that he was referring to, when he said, I'm

3    barred by court order in the U.S. from collecting fees on the

4    matter?

5    A.   The Chevron settlement.

6    Q.   Mr. Donziger referred to fees that he would get from an

7    Ecuador judgment, okay, in your agreement on December 23rd,

8    2016; is that right?

9    A.   Yeah.

10   Q.   What did Mr. Donziger indicate to you that Ecuadorian

11   judgment was or the Ecuador judgment was?

12   A.   I'm sorry, I don't understand the question.

13   Q.   Okay.  You understood that there was an Ecuador judgment

14   that Mr. Donziger had some interest in; correct?

15   A.   Yes.

16            MS. TRIVEDI:  Objection, Judge.

17            It assumes a fact not in evidence.  If you want to ask

18   open-ended questions, this is direct.

19            THE COURT:  You want to confer off the record or do

20   you want to be on the record?

21            MS. TRIVEDI:  I believe Mr. Zelman never testified as

22   to awareness of an Ecuador judgment, so I'm asking for this to

23   be direct.

24   BY MS. GLAVIN:

25   Q.   Let's go to Government Exhibit 105.

1          In this email from Mr. Donziger to you -- actually,

2   let's go to Government Exhibit 106 instead.

3          In this December 23rd email to you from Mr. -- or to

4   you from Mr. Donziger, Mr. Donziger, if you look at the third

5   line, he states:  I pledge to you an interest in the Ecuador

6   judgment from my fees, should they be collected.

7          What did you understand him to mean here?

8   A.  What did I understand him to mean.  There was a judgment

9   for, I don't know, $9.5 billion, that I know that he was

10  attempting to collect that.  And if so, then there would be

11  some fees that he would receive as part of that, but that was

12  just my understanding.

13  Q.  And then how would you get paid?  What was your

14  understanding about how you would get paid if he collected on

15  his fees?

16  A.  I think he said -- there's several times in these exchanges

17  where he says that if he collects a fee, then I would be

18  compensated.  If he didn't collect a fee, then there could be

19  no compensation.

20  Q.  Now, Mr. Zelman, I'm going to show you what is Government

21  Exhibit 135.

22  A.  Yes.

23  Q.  Is this an email exchange between -- or an email from you

24  to Mr. Donziger?

25  A.  It is.

1          MS. GLAVIN:  Your Honor, I'll move Government Exhibit

2     135 into evidence.

3          MS. TRIVEDI:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibit 135 received in evidence)

6     Q.  This is an agreement you sent to Steven Donziger on April

7     21st of 2019; is that correct?

8     A.  Yes.

9     Q.  Okay.  And the subject is "Our Deal"; is that correct?

10    A.  Yes.

11    Q.  Okay.  When you said "Our Deal," what were you referring

12    to, Mr. Zelman?

13    A.  The agreement that we've been discussing this whole time.

14    Q.  And you wrote:  Steven, due to all the complications

15    regarding our financial arrangement, I am canceling our deal.

16    Therefore, we have no agreement going forward from this date.

17    David Zelman.

18         Is that what you wrote to Mr. Donziger?

19    A.  Yes.

20    Q.  And Mr. Zelman, can you explain the circumstances which

21    prompted you to send this email to Mr. Donziger on April 21st

22    of 2019?

23    A.  During a conversation with Steven, he let me know that the

24    arrangement that we had was problematic and -- I'm sorry,

25    what's the question again?

L5CVDON5                      Zelman - direct

1    Q.  So what were the -- I've asked you to explain what prompted
2    you to send this email.
3    A.  He told me there was a problem that might result in
4    something like this.  And I said that was never the intent, and
5    let's just cancel the agreement.
6    Q.  And you meant that was -- when you just said that was never
7    the intent, what did you mean by that?
8    A.  I don't think either one of us had an idea that the
9    agreement that we entered into somehow would create a problem
10   of this nature.
11             MS. GLAVIN:  I might have a moment, your Honor.
12             THE COURT:  Yes, ma'am.
13             (Counsel conferred)
14             THE COURT:  Off the record.
15             (Off record)
16   BY MS. GLAVIN:
17   Q.  Mr. Zelman, with respect to your last answer, before you
18   sent this email to Mr. Donziger on April 21st of 2019, did you
19   understand that your financial agreement with Mr. Donziger was
20   still intact?
21   A.  Prior to sending this?
22   Q.  Yes.
23   A.  Yes.
24             MS. GLAVIN:  No further questions, your Honor.
25             THE COURT:  All right.  It seems like we should break,

1    because we are not going to finish at a reasonable hour

2    tonight.

3             Is there anything else you people want to talk about

4    on the record?

5             MR. KUBY:  Just as sort of an update as to how fast

6    we're going.

7             THE COURT:  Yes, sir.

8             MR. KUBY:  I think there is a world in which we could

9    finish by the close of business tomorrow, but I'm not promising

10   us that we're all going to be living in that world, but we are

11   going to try.  And if not, it will be into Friday.

12            THE COURT:  You want to start at 9:15?

13            MR. KUBY:  No, no, no, Judge.

14            THE COURT:  I mean, Ms. Trivedi is going to do it.

15            MS. TRIVEDI:  You can just sit there and look pretty.

16            THE COURT:  You can nurse your coffee from 9:15 to

17   10:15, it sounds like.

18            MR. KUBY:  Could we do 9:30?

19            THE COURT:  Well, all right.

20            MR. KUBY:  Thank you.

21            THE COURT:  9:30.

22            MR. KUBY:  I won one.

23            MS. GLAVIN:  And your Honor, with respect to

24   Mr. Zelman, I just want to speak to him about scheduling.  And

25   if you can inform him of the rule now that I've finished

1    direct.

2                THE COURT:  Yes, thank you.

3                Sir, you're about to be on cross-examination and,

4    therefore, you shouldn't talk with anyone about anything

5    substantive about your testimony or about the case.

6                THE WITNESS:  Right.

7                THE COURT:  Counsel is allowed to talk to you about

8    scheduling or getting you a cab or whatever, whatever, but

9    nothing substantive.

10                THE WITNESS:  Got it.

11                THE COURT:  Yes, sir.  Good evening.

12                Thank you, counsel.

13                THE COURT:  Ms. Reporter, do you need anything else

14    from the lawyers?

15                THE COURT REPORTER:  No, Judge.

16                MS. TRIVEDI:  An apology.

17                THE COURT:  There is that.  Thank you, ma'am.

18                (Adjourned to May 13, 2021 at 9:30 a.m.)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

 ANNE CHAMPION

Cross By Mr. Kuby  . . . . . . . . . . . . . 383

Cross By Mr. Kuby  . . . . . . . . . . . . . 448

Cross By Mr. Kuby  . . . . . . . . . . . . . 532

Redirect By Ms. Glavin . . . . . . . . . . . 541

Recross By Mr. Kuby  . . . . . . . . . . . . 551

COURTNEY DECASSERES

Direct By Ms. Armani . . . . . . . . . . . . 554

DAVID NG

Direct By Ms. Armani . . . . . . . . . . . . 561

Cross By Ms. Trivedi . . . . . . . . . . . . 567

 DAVID ZELMAN

Direct By Ms. Glavin . . . . . . . . . . . . 569

```
 1                      GOVERNMENT EXHIBITS
 2   Exhibit No.                             Received
 3    2081    . . . . . . . . . . . . . . . 414
 4    2085-1   . . . . . . . . . . . . . . . 426
 5    103   . . . . . . . . . . . . . . . . 572
 6    109   . . . . . . . . . . . . . . . . 578
 7    135   . . . . . . . . . . . . . . . . 590
 8                       DEFENDANT EXHIBITS
 9   Exhibit No.                             Received
10    FFF   . . . . . . . . . . . . . . . . 448
11    WW   . . . . . . . . . . . . . . . . 473
12    I-29   . . . . . . . . . . . . . . . 481
13    K   . . . . . . . . . . . . . . . . 534
14
15
16
17
18
19
20
21
22
23
24
25
```