L5DAADON1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          19 CR 561 (LAP)
                                        11 CV 691 (LAK)
STEVEN DONZIGER,

                Defendant.              BENCH TRIAL

------------------------------x

                                        New York, N.Y.
                                        May 13, 2021
                                        9:30 a.m.


Before:

                    HON. LORETTA A. PRESKA,

                                        District Judge


                        APPEARANCES

RITA M. GLAVIN
SAREEN K. ARMANI
BRIAN P. MALONEY
    Special Assistant United States Attorneys

LAW OFFICE OF RONALD L. KUBY
    Attorneys for Defendant
BY:  RONALD L. KUBY
     RHIDAYA S. TRIVEDI
     -AND-
OFFIT KURMAN PA
BY:  MARTIN GARBUS


ALSO PRESENT:  GRACE GILL, Paralegal
```

L5DAADON1

```
 1              (Case called)
 2              THE COURT:  Good morning, ladies and gentlemen.
 3         Won't you be seated.
 4              MR. KUBY:  Good morning, judge.
 5              THE COURT:  Ms. Glavin, I hear tell you have an issue.
 6              MS. GLAVIN:  Yes, judge.  There's one scheduling
 7    request that I would make this morning.  I have an issue that
 8    has come up in another matter in connection with a filing that
 9    has to be done by noon today and what I would request is if the
10    Court is willing for our midmorning break which is usually
11    about five or ten minutes, if we could extend it to an hour so
12    I could attend to that and then shorten our lunch break equally
13    so that I could attend to this matter but that it won't cut
14    into our trial time today.
15              I've discussed this with Mr. Kuby and he does not have
16    an objection to proceeding that way.
17              MR. KUBY:  I'm sorry.  I have absolutely no objection
18    to the prosecutor taking the necessary time she needs to attend
19    to another urgent matter.  I have a huge problem with cutting
20    the lunch hour short maybe ten minutes but not a half an
21    hour --
22              THE COURT:  We'll take care of your lunch needs,
23    Mr. Kuby.  Do not worry.
24              MR. KUBY:  Thank you, judge.
25              What are we having?
```

1        THE COURT:  I don't know.  I was thinking of roast

2    suckling pig.  What do you want?

3        MR. KUBY:  I was thinking of justice tempered with

4    mercy.

5        THE COURT:  Yes, ma'am.  What do you need?

6        MS. GLAVIN:  Thank you, your Honor.

7        THE COURT:  Do we have a witness?

8        MS. GLAVIN:  Mr. Zelman.

9        THE COURT:  Thank you.

10       MS. GLAVIN:  Your Honor, in terms of timing of that --

11       THE COURT:  What time do you want?

12       MS. GLAVIN:  If we could do it for 11 o'clock.

13       THE COURT:  Yes, ma'am.

14       (Witness present)

15       THE COURT:  Good morning, Mr. Zelman.

16       I remind you, sir, you are still under oath.  I will

17   remind you again to put a microphone cover on that microphone

18   and I will remind you to try to stay as close to the microphone

19   as you can please.

20   DAVID ZELMAN, resumed.

21   CROSS-EXAMINATION

22   BY MS. TRIVEDI:

23   Q.  Good morning, Mr. Zelman.

24   A.  Good morning.

25   Q.  Mr. Zelman, have we ever met before?

1   A.  I don't -- I can't say we have.  I don't recognize you.

2   Q.  Spoken on the phone?

3   A.  I don't think so.

4   Q.  Mr. Zelman, you testified on direct that your agreement

5   with Mr. Donziger pertained to a nine and a half billion dollar

6   judgment against the Chevron Corporation, correct?

7   A.  Yes.

8   Q.  When was the first time you learned of that judgment?

9   A.  When was the first time?  Prior to speaking to

10  Mr. Donziger.  So, it would have been sometime in the fall of

11  2016.

12  Q.  And how did you learn of it?

13  A.  We have a mutual friend, John Van Merkenstejn, and John is

14  a supporter of Steven's and introduced us.

15  Q.  Mr. Zelman, you've described the litigation between the

16  Ecuadorian people and Chevron as "thrilling", correct?

17  A.  Sorry.  Say again.

18  Q.  Do you remember describing the litigation between the

19  Ecuadorian people and Chevron Corporation as "thrilling"?

20  A.  No.

21  Q.  Is there anything that might refresh your recollection as

22  to whether you have?

23  A.  I'm sorry.  I'm not sure what the question is.  It sounds

24  like you are asking me about my saying it was thrilling.

25  Q.  Um-hmm.

1  A.  That doesn't register with me in my way.

2  Q.  Okay.  Well, I'd like to show you a document.  It's been

3  premarked Defense I-18.

4  A.  Sure.

5  Q.  It's an the e-mail from you.  Could you take a look at

6  that, Mr. Zelman.

7  A.  Yes.

8  Q.  What is this document, Mr. Zelman?

9          THE COURT:  No.  No.  You already know how to do it.

10  After reading it, does that refresh your recollection, right?

11          MR. KUBY:  Those who can't teach judge.

12          MS. TRIVEDI:  Sure.  I apologize, your Honor.  Good

13  behavior has not been modeled for me.

14          Just kidding, Kuby.

15  Q.  Mr. Zelman, does this refresh your recollection?

16  A.  It does not but of course it appears that I sent this

17  e-mail.

18  Q.  And what is this e-mail, Mr. Zelman?

19          THE COURT:  Ma'am, if you want it on the record use

20  your on-the-record voice.

21          MS. TRIVEDI:  Got it, judge.

22  A.  The subject matter is calling Chevron's bluff.

23  Q.  Is this an update as to the progress of the litigation

24  against Chevron, Mr. Zelman?

25  A.  I wouldn't have any idea without reading the content of it.

L5DAADON1                        Zelman - Cross

1   Q.  Do you want to read the second page?

2   A.  OK.

3              MS. GLAVIN:  Your Honor, objection as to relevance.

4              THE COURT:  Yes, ma'am.

5              MS. TRIVEDI:  Mr. Zelman's motivation for entering

6   into this agreement with Mr. Donziger is relevant to the terms

7   of that agreement, how it worked, what his understanding was.

8              THE COURT:  Why is that relevant to any of the issues

9   on trial here?

10             MS. TRIVEDI:  Your Honor, if I have a chance to

11  actually elicit testimony from this witness it will demonstrate

12  that Mr. Zelman understood the specific contingencies that were

13  described in the e-mail.

14             THE COURT:  Why is that relevant?

15             MS. TRIVEDI:  Your Honor, I believe --

16             THE COURT:  The issuance of an order, defendant's

17  disobedience or disregard of the order, defendant's knowledge

18  and willfulness in disobeying the order.

19             MS. TRIVEDI:  Your Honor, I'm not hesitating because I

20  don't want to answer your question.  I do.  I am hesitating --

21  and I do this -- I don't totally know how to handle this but I

22  think it's on Ms. Glavin to ask that the witness be excused

23  before I say something that could affect his testimony.  So, I

24  just wanted to create some space for that.

25             THE COURT:  Is that all right with you?

L5DAADON1                    Zelman - Cross

1              MS. GLAVIN:  Fine, your Honor.

2              THE COURT:  Mr. Zelman, I am going to ask you to step

3       out of the courtroom for a minute and we'll come and get you

4       when we need you back.  It shouldn't be too long.

5              Thank you, sir.

6              (Witness not present)

7              THE COURT:  Thank you, Mr. Marshal.

8              Yes, ma'am.

9              MS. TRIVEDI:  Couple things, your Honor.  The first,

10      there is a very good argument that when Mr. Donziger referenced

11      the words "if I recover my personal fees" in the e-mail

12      exchange with Mr. Zelman, he was referring to the future

13      possibility of the RICO judgment being set aside in the United

14      States pursuant to Rule 60B, which is a motion that

15      Mr. Donziger has always intended to file against Chevron based

16      on fraud on the court and that the Rule 60B contemplates can be

17      filed at any time subsequent to the judgment.  And when he

18      wrote the words "if I recover my fees" and if in fact that does

19      reference a world in which the RICO judgment has been set

20      aside, Mr. Donziger is actually free to negotiate and enter in

21      the agreement that he did.  It does not violate the RICO

22      judgment.  And Mr. Zelman's understanding of the risk that he

23      was taking on when he entered into this agreement and what it

24      meant, what the words "if I recover" meant, what the risk was

25      to him, what the nature of the contingency was is relevant in

L5DAADON1                      Zelman - Cross

1   addition to the fact --

2              THE COURT:  To what?  Why is Mr. Zelman's

3   understanding relevant to Mr. Donziger's state of mind?

4              MS. TRIVEDI:  It's not a state of mind question, your

5   Honor.  It's about the terms of the agreement they entered into

6   and what the parties understanding was.

7              THE COURT:  I'm not understanding why Mr. Zelman's

8   understanding of the word "contingent" in the parties' e-mails

9   is relevant to anything here.

10             MS. TRIVEDI:  Your Honor, the risk that he believed he

11  was taking on, his willingness to enter into this agreement

12  regardless or not remember regardless, but as separate from the

13  risk that he might never recover because of his commitment to

14  Rain Forest Conversation, the Amazon people of Ecuador is

15  relevant because if in fact Mr. Donziger was fledging to him, a

16  portion of his fees in the universe where the RICO judgment

17  didn't exist he is innocent of Count Six.

18             THE COURT:  Ms. Glavin.

19             MS. GLAVIN:  Your Honor, I have no objection to the

20  defense questioning Mr. Zelman about the terms of the agreement

21  he entered into with Mr. Donziger and that it was contingent.

22  What I do object to is putting up Amazon Watch press releases

23  to go through the commitment to Amazon and the Rainforest as

24  that is entirely irrelevant to the issues of the case.  But to

25  the extent that the defense wants to ask about what the terms

L5DAADON1                     Zelman - Cross

1     of the agreement were, I don't have an objection to that.  The

2     specific terms of the agreement as written, if they want to

3     ask, you know, I believe he testified on direct-examination

4     that if he understood there was some risk involved in this but

5     he accepted that risk.  He had -- question of the fees.

6               MS. TRIVEDI:  Your Honor, lest Mr. Donziger be accused

7     of pleasing Mr. Zelman, I would like to complete the narrative

8     that Mr. Zelman was a sophisticated person.  That he was

9     committed to this cause separate and apart from his

10    relationship with Mr. Donziger that he cared about the Amazon.

11              THE COURT:  Why does that matter?  Who cares?

12              MS. TRIVEDI:  Your Honor, it goes to the intelligence

13    with which he entered into this agreement.

14              THE COURT:  Why do we care?

15              MS. TRIVEDI:  As I previously mentioned like the

16    possibility that Mr. Donziger will be accused of in some ways

17    misleading or misrepresenting himself to Mr. Zelman.  You know

18    that possibility remains all around us.  And so --

19              THE COURT:  I'm not sure that's true.

20              MS. TRIVEDI:  Well, I appreciate the -- Mr. Kuby

21    assures me that it also goes to the credibility of Mr. Zelman

22    as to why he would forfeit his services for nothing in return.

23              THE COURT:  I don't understand that either.  What you

24    just said to me at the beginning of this exchange was that the

25    question was.

1    "Q.   Is this an update as to the progress of the litigation

2    against Chevron?

3    "A.   I wouldn't have any idea without reading the contents of

4    it.

5              What is the relevance of that?

6              MS. TRIVEDI:   Your Honor, it's a foundational question

7    with respect to the fact that Mr. Zelman responded to

8    Mr. Donziger's subpoena that this was quote, thrilling, end

9    quote.

10             THE COURT:   What it actually sounds like is an effort

11   to get in Mr. Donziger's unsworn testimony about how someone

12   might think that if the RICO judgment were reversed then maybe

13   some day he wouldn't be in contempt.   We're not doing that

14   here.   This witness is not going to talk about whatever or

15   listen to questions about that.

16             MS. TRIVEDI:   Understood, judge.

17             THE COURT:   So, if you want to talk to him about what

18   he thought contingent meant go right ahead but we're not going

19   to have unsworn testimony by Mr. Donziger coming in by way of

20   your questions.

21             MS. TRIVEDI:   To be clear, there was an e-mail from

22   Mr. Donziger but I understand your Honor's ruling.

23             THE COURT:   I am responding to what your argument was.

24   Your argument about some hypothetical time when, perhaps, the

25   RICO judgment was reversed and then maybe that meant

1   Mr. Donziger wasn't in contempt.  That's on sworn testimony

2   about his state of mind.  I'm not having that.

3           MS. TRIVEDI:  Understood, judge.

4           THE COURT:  Yes, ma'am.

5           Would you bring the witness in, please, ma'am.

6           (Witness is present)

7           THE COURT:  Mr. Zelman, come right on in.

8           Ms. Trivedi.

9   Q.  Mr. Zelman, you began working with Mr. Donziger --

10  withdrawn.

11          You began providing your services to Mr. Donziger

12  prior to execution of your December 2016 agreement, correct?

13  A.  I actually am not certain of that.

14  Q.  OK.  I'd like to show you -- Well, it's already in

15  evidence, Government 130.

16          MS. GLAVIN:  I think you mean "103".

17          MS. TRIVEDI:  Sorry.  I can be dyslexic with numbers.

18  Yes.

19  Q.  Mr. Zelman, if you could read through this.

20  A.  Could you make it larger please.

21          (Pause)

22          THE WITNESS:  OK.  Got it.

23          MS. TRIVEDI:  Could I have the question read back?

24          THE COURT:  Yes, ma'am.

25  "Q.  Mr. Zelman, you began working with Mr. Donziger --

L5DAADON1                    Zelman - Cross

1     Withdrawn.

2              You began providing your services to Mr. Donziger

3     prior to execution of your December 2016 agreement, correct?

4     "A.  I actually am not certain of that.

5     Q.  Mr. Zelman, OK.  Let me just repeat the question.

6              Mr. Zelman, you began providing your services to

7     Mr. Donziger prior to execution of your December 2016

8     agreement, correct?

9     A.  December.

10    Q.  December 2016?

11    A.  Again, I'm not sure that this documents that.  I don't

12    remember exactly when we started.  Typically, I wouldn't start

13    an intervention or interaction with a client until we had an

14    agreement in place and I'm pretty sure that's the case in this

15    case too.  Even though I can't make -- this doesn't provide

16    certainty to me that I did anything other than that.

17    Q.  Do you remember meeting with Mr. Donziger on November 1st,

18    Mr. Zelman?

19    A.  I don't have specific recollection, no, when we met.  But

20    does the document suggest I did?  I'm asking a question because

21    I really don't.

22    Q.  Mr. Zelman, I am going to read to you from an email dated

23    November 2.  Hi, Steven.  Enjoyed our meeting yesterday.

24    A.  Then I definitely met with him on the first.

25    Q.  Was that the first model of the Transitional Institute,

1    Mr. Zelman?

2    A.  Probably not.  I don't know if that was my first meeting

3    with him.  My first meeting with him would have been for us to

4    explore together whether or not the process, how it would go,

5    et cetera, exchange.

6    Q.  But had you already sent him the welcome letter, correct,

7    Mr. Zelman, if you look at the subject line.

8            THE COURT:  Counsel, on-the-record voice into the

9    microphone.  You are dropping your voice a little bit as you go

10   and it's making it really hard.

11           MS. TRIVEDI:  Apologize.

12           THE COURT:  Sir, do you need the question again?

13           THE WITNESS:  Please.

14   "Q.  But had you already sent him the welcome letter,

15   Mr. Zelman, if you would look at the subject line.

16   A.  November 2nd there is a welcome letter.  So, if there's a

17   document that shows me when I sent that, then I could answer

18   that question.

19   Q.  I'm not asking you when you did it, Mr. Zelman.  I am

20   asking you if you in fact sent it before you met with

21   Mr. Donziger on November 1st?

22   A.  I am not trying to be difficult.  It's just that I do not

23   have recollection.  So, if there's documentation that suggests

24   I did, I did.  And otherwise, I really just don't know the

25   answer to the question.

1  Q.  No problem, Mr. Zelman.  You are not being difficult.  If I

2  could show you what's been marked as Defense I-20 perhaps, that

3  would refresh your recollection?

4  A.  OK.  October 25th welcome letter was sent on October 25th.

5  So, yes, I did on the 25th.  So, I did send it to him.

6        Thank you.

7  Q.  OK.  Mr. Zelman, moving on.

8        Mr. Zelman, you were not Mr. Donziger's psychologist,

9  psychotherapist or acting physician, correct?

10  A.  Correct.

11  Q.  And you've previously denied having a quote, intimate

12  relationship, end quote, with Mr. Donziger, correct?

13  A.  Yes.

14  Q.  Now, Mr. Zelman, isn't it true that the services you

15  provide Mr. Donziger were solely in furtherance of the

16  enforcement of the Ecuador judgment?

17  A.  Would you repeat that?

18  Q.  Isn't it true -- can I repeat it, judge, or do you want to

19  read it back?

20        THE COURT:  We can't hear you or understand you.  You

21  have to speak clearly into the microphone, ma'am.

22        MS. TRIVEDI:  Should I repeat the question, judge, or

23  would you like to read it back?

24        THE COURT:  Yes, ma'am.  The question, why don't you

25  go ahead and repeat it.

1    Q.  Mr. Zelman, isn't it true that the services you provided

2    Mr. Donziger were solely in furtherance of the enforcement of

3    the Ecuador judgment?

4    A.  The range of topics that we covered were many but I would

5    say that the intent was always to further his ability to

6    function in that way.

7    Q.  Isn't it also true that you, independent of your

8    conversations with Mr. Donziger, attempted to secure additional

9    investment in the enforcement litigation, Mr. Zelman?

10   A.  How would I have done that.

11   Q.  Do you remember introducing Mr. Donziger to an individual

12   named Tim Lappen, L-A-P-P-E-N?

13   A.  There was an exchange of emails between myself and Tim.  I

14   asked Tim whether he'd like to meet Mr. Donziger.  His response

15   was no.  So, nothing ever came of that.

16   Q.  What was your intention in attempting to introduce

17   Mr. Donziger to Mr. Lappen, Mr. Zelman?

18   A.  He is an attorney on the west coast.  I wanted to introduce

19   him to Steven personally.  I thought that would be something I

20   could do.  I do that with many of my clients.  I introduce them

21   because they all, they may have mutual interests and support

22   each other.

23   Q.  And when you forwarded a litigation financing presentation

24   to David --

25   A.  I'm sorry.  It's not very -- it's got to be louder or

L5DAADON1                    Zelman - Cross

1   something.

2   Q.  Sorry, Mr. Zelman.

3   A.  That's better.  Thank you.

4   Q.  Mr. Zelman, do you remember forwarding a litigation

5   financing presentation to an individual named David

6   Wallenstein, W-A-L-L-E-N-S-T-E-I-N?

7   A.  I do not -- what kind of document?

8   Q.  It was a presentation that had been prepared by other

9   individuals?

10  A.  I don't remember sending a document of that nature.  I do

11  vaguely remember that David was another person I wanted to

12  introduce to Steven.

13  Q.  Do you remember why?

14  A.  In David's case it probably would have been for a potential

15  investment.

16  Q.  So, Mr. Zelman, I am going to repeat a previous question.

17  Isn't it true that you had attempted to secure additional

18  investment for the enforcement litigation?

19  A.  I will say no, I didn't attempt do it.  I was introducing

20  people who might have an interest.

21  Q.  Mr. Zelman, do you remember introducing or -- withdrawn --

22  nominating Mr. Donziger for something called the Conscious

23  Capitalism CEO Summit?

24  A.  No.

25  Q.  Is there anything that would refresh your recollection?

L5DAADON1                          Zelman - Cross

A.   The connection might be with another gentleman Larry Leon

who is on the board there.

Q.   Did you ever exchange emails with that individual?

A.   Larry?  Yes, of course, on a daily basis.  About this or

about the Conscious capitalism, if you have such a document I

probably did, yeah.

Q.   OK.  Mr. Zelman, I'd like to show you what's been premarked

Defense Exhibit I-14.  If you could take a look at that.

A.   Which part?  The whole thing?

Q.   The whole thing, please.

A.   Okay.

Q.   Mr. Zelman, why did you nominate Mr. Donziger for the

Conscious Capitalism CEO Summit?

A.   The word "nominate" is a little strange to me.  In a

conversation with Larry Leon who would have made a request for

me, do I know anybody who might want to present or be present,

I find Steven to be someone who I would like lots of people to

know and I would like to make him available to many different

audiences.  So that there's -- so, that's not strange to me

that I would have put him forth to Larry who was on the board

to secure speakers or members or visitors to this Conscious

Capital Summit.

Q.   Mr. Zelman, isn't it true that you also provided editorial

coaching to support the enforcement effort?

A.   I believe I did.

1   Q.  Can you describe those activities in more detail?

2   A.  I believe that there were one or more occasions where

3   Steven was crafting a letter or part of a newsletter or

4   something and he asked me what I thought about it and ran it by

5   me and I would give him feedback.

6   Q.  Isn't it true, Mr. Zelman, that your feedback was directed

7   at the success of the enforcement effort?

8   A.  Do you want to repeat the question, please, into the mic.

9          THE COURT:  Question: isn't it true Mr. Zelman that

10  your feedback was directed at the success of the enforcement

11  effort?

12  "A.  I'm not trying to make split hairs in the background.

13  That's always the intent.  And in the foreground, it's just to

14  communicate for effectively.

15  Q.  You need not apologize about splitting hairs to an

16  attorney, Mr. Zelman.

17  A.  Well, this is a little unusual for me.  I haven't done this

18  before.

19  Q.  Me too.  Mr. Zelman, isn't true that you at times would

20  encourage Mr. Donziger to move away from a personal narrative

21  and more towards a more professional one?

22  A.  I actually don't remember the specifics of those

23  conversations but that would be the kind of thing I might

24  offer.

25  Q.  Mr. Zelman, the Transitions Institute was a standardized

1  program, correct?

2  A.  Yes.

3  Q.  It had fixed value as you testified to on direct?

4  A.  Yes.

5  Q.  You had administered it to other people?

6  A.  Many.

7  Q.  You referred to participants as clients?

8  A.  Yes.

9  Q.  Okay.  Mr. Zelman, I'd like to show you what's already been

10  admitted evidence as Government Exhibit 105.

11         Mr. Zelman, what is the subject line of this email?

12  A.  Draft agreement for professional services.

13  Q.  And the agreement was to develop Mr. Donziger's

14  professional capacities with regard to the Ecuador litigation

15  and other matters, correct?

16  A.  Sure.

17  Q.  Can you state in sum or substance what the other matters

18  were?

19  A.  Is that in this -- where is that?  Just so I am referring

20  to something.

21  Q.  Sorry, Mr. Zelman.  I was reading this first line of the

22  draft agreement was drawn as to matters.  It's other endeavors?

23  A.  And other endeavors.  My guess is that was thrown in there

24  as a blanket because this is prior to.  So, whatever came up he

25  was aware of the fact that the work that we would do together

1    might touch on other subjects.

2    Q.  Mr. Zelman, if you could take a look at this second

3    paragraph.  Just read to it to yourself and then I am going to

4    ask you some questions.

5    A.  Yes.

6              (Pause)

7              THE WITNESS:  Okay.

8    Q.  Mr. Zelman, the phrase "should they be collected" at the

9    end of the first sentence, what did that mean to you?

10   A.  It meant exactly what it says.  There was no certainty that

11   those fees would ever be collected.

12   Q.  This was a contingent agreement, correct?

13   A.  Exactly.

14   Q.  Based on a series of future events that you did or did not

15   understand, correct?

16   A.  Precisely.

17   Q.  Did you have any understanding of the risk, Mr. Zelman, the

18   probability that Mr. Donziger's fees would be collected?

19   A.  How about 14 out of 250.  In other words, very, very low.

20   Q.  Very, very.  Mr. Zelman, you were deposed by the Chevron

21   Corporation in this case, were you not?

22   A.  Yes.

23   Q.  Do you remember saying at your deposition quote, under some

24   circumstances Mr. Donziger would be compensated, end quote?

25   A.  I don't remember having said that.

L5DAADON1                    Zelman - Cross

1    Q.  Is there a document that would refresh your recollection?

2    A.  You'd have to show it to me.

3    Q.  And if I could show you what's been premarked Defense I-5,

4    page 82, please.

5            I am just going to read from the transcript, please.

6            THE COURT:  He reads it.

7            You are the one who taught us all this, right,

8    Mr. Kuby?

9            MS. TRIVEDI:  I apologize.

10           THE COURT:  All right, Mr. Zelman, counsel is going to

11   ask you to read whatever she just put in front of you and then

12   she will ask you whether that refreshes your recollection as to

13   X, Y, Z and what counsel means by that is does reading this

14   make you say oh, yes now I remember.

15           THE WITNESS:  Thank you.  So, should I read this?

16           THE COURT:  Yes, please, sir.

17           THE WITNESS:  I should read the part that's yellowed

18   out; is that correct?

19   Q.  If you could begin reading at line 15 through the end of

20   the page thank you?

21   A.  Line 15 --

22           THE COURT:  No, no.  Read it to yourself, sir.  It's

23   much easier that way.

24           THE WITNESS:  Oh, God, yes.  Thank you.

25   Q.  Does this document make you say ah-ha.  I remember,

1    Mr. Zelman?

2    A.   I remember this is consistent with something that I would

3    have said.  My memory, I don't know.

4    Q.   Thank you, Mr. Zelman.

5            Mr. Zelman, is it fair to say that you did not know

6    what the circumstances under which Mr. Donziger would be

7    compensated were?

8    A.   That would be very fair.

9    Q.   Fair to say that it wasn't crucial to you to get clarity as

10   to those circumstances before you entered into this agreement?

11   A.   Very fair.

12   Q.   Fair to say that you would have done it for free?

13   A.   Yes.

14   Q.   Fair to say that you hoped Mr. Donziger would be

15   compensated but that you knew it was a quote, remote

16   possibility, end quote?

17           THE COURT:  Slow down.

18   Q.   Fair to say that it was a long shot, Mr. Zelman?

19   A.   Absolutely.

20   Q.   Mr. Zelman, did there come a time when Mr. Donziger

21   informed you that he was barred by court order from collecting

22   fees on this matter?

23   A.   I saw an e-mail between himself and myself.  I don't know

24   what the date was but, yes.

25   Q.   But you knew that prior to that e-mail, didn't you,

L5DAADON1                          Zelman - Cross

```
 1   Mr. Zelman?
 2   A.   That -- sorry.  What did I know?
 3   Q.   That there had been a court order related to Mr. Donziger's
 4   ability to collect fees in this matter?
 5   A.   I don't think I knew that prior to that email.
 6   Q.   Do you remember saying in your deposition that it didn't
 7   matter?
 8   A.   I don't remember saying that.
 9   Q.   Is there a document that would refresh your recollection,
10   Mr. Zelman?
11   A.   I'm sure you have one.
12   Q.   I appreciate the confidence.  It's page 95.  Could you take
13   a look at what Grace has just highlighted Mr. Zelman and just
14   read it to yourself.
15   A.   Sure.
16           (Pause)
17           THE WITNESS:  I see that.  Okay.
18   Q.   Does this document make you say ah-ha, I remember,
19   Mr. Zelman?
20   A.   Remember.
21           THE COURT:  The question that counsel is asking you,
22   sir, is whether this says, yes, I remember saying in my
23   deposition that it didn't matter that there had been a court
24   order related to Mr. Donziger's ability to collect fees in this
25   matter.
```

1    A.  Yes.

2    Q.  And is it your testimony today, Mr. Zelman, that it didn't

3    matter to you?

4    A.  Absolutely.

5    Q.  Mr. Zelman, did there come a time when you emailed

6    Mr. Donziger that quote, due to all the complications regarding

7    our financial arrangement, I am canceling our deal, end quote?

8    A.  Yes.

9    Q.  Mr. Zelman, did the complications you referenced have

10   anything to do with the fact that Gibson Dunn had served you

11   with a subpoena?

12   A.  No.

13            THE COURT:  How are you holding up, sir?

14            THE WITNESS:  Fine.

15            MS. TRIVEDI:  No further questions, judge.

16            THE COURT:  Thank you.

17            Redirect, ma'am?

18            MS. GLAVIN:  Yes, your Honor.

19   REDIRECT EXAMINATION

20   BY MS. GLAVIN:

21   Q.  Good morning, Mr. Zelman.

22   A.  Good morning.

23   Q.  During cross-examination the defense counsel asked you if

24   you would have done this for free, services with Mr. Donziger.

25   Your answer was yes; is that correct?

1    A.   Yes.

2    Q.   Okay.  You did not do this services with Mr. Donziger for

3    free; isn't that correct?

4    A.   That's correct.

5    Q.   And isn't it true that you never offered to Mr. Donziger to

6    give him your services for free; isn't that correct?

7    A.   That is correct.

8    Q.   Your answer is that is correct?

9    A.   Yes.

10   Q.   And in fact, Mr. Zelman, part of your agreement with

11   Mr. Donziger was a cash component; is that correct?

12   A.   Yes.

13   Q.   And did Mr. Donziger pay you the cash?

14   A.   Yes.

15   Q.   And isn't it true, Mr. Zelman, that you were hoping that

16   Mr. Donziger would get paid his fees from the Ecuadorian

17   judgment so that you would get paid; isn't that true?

18   A.   Yes.

19   Q.   And since you were subpoenaed by Gibson Dunn -- withdrawn.

20           The defense counsel showed you portions of your

21   deposition transcript during cross; do you remember that?

22   A.   Yes.

23   Q.   Okay.  And do you remember the date that your deposition

24   was taken?

25   A.   You told me what it was yesterday but I'm not sure what it

L5DAADON1                          Zelman - Redirect

1    is today.

2    Q.  Well, I'm going to put up, show you what is Government

3    Exhibit 202?

4    A.  February 17?

5    Q.  Government Exhibit 202, if you could look at that document,

6    do you still have your exhibit binder in front of you?

7    A.  Yeah.

8    Q.  If you could look at your exhibit binder, the Government

9    Exhibit 202.  If you look at the cover page.

10   A.  Yeah.

11   Q.  And does that appear to be the deposition transcript of

12   your testimony?

13   A.  Yes, it is.

14   Q.  Okay.  And in looking at the cover page, does that help you

15   remember what the date of your deposition transcript was?

16   A.  Yes.

17   Q.  When was the date?

18   A.  February 27, 2019.

19   Q.  And before your deposition testimony, did you receive a

20   subpoena from Gibson Dunn for documents?

21   A.  Yes.

22   Q.  And with that subpoena did Gibson Dunn have a copy of the

23   RICO judgment with that subpoena?

24   A.  I'm sorry.  I'm not sure.

25   Q.  Before Gibson Dunn subpoenaed you, okay, were you aware or

L5DAADON1                          Zelman - Redirect

1    were you aware of the RICO judgment that had been entered

2    against Mr. Donziger?

3    A.  I think I was aware that there was such a thing.

4    Q.  Had you read it before you were subpoenaed in this case?

5    A.  If it was within those documents I would have read it.

6    Q.  In terms of within the Gibson Dunn subpoena documents --

7    A.  Yes.

8    Q.  -- and isn't it true that during your February 27, 2019

9    deposition -- withdrawn.

10          Isn't it true that the first time you actually saw the

11   RICO judgment was when you were subpoenaed by Gibson Dunn?

12          MS. TRIVEDI:  I would object, your Honor, as to

13   relevance.

14          THE COURT:  We have been a little loose on that and

15   with respect to the cross I'll permit it.

16          Do you have in mind the question, sir?

17          THE WITNESS:  Yes.

18          THE COURT:  Are you able to answer it?

19   A.  I don't recall having seen anything prior to that.

20   Q.  And that would have been after you entered into your

21   agreement with Mr. Donziger in December of 2016?

22   A.  Yes.

23   Q.  Mr. Zelman, if I could show you what is in evidence as

24   Government Exhibit 111 which I believe you remember seeing this

25   in your testimony yesterday?

1   A.  Yes.

2   Q.  If I could point you to the middle email.

3   A.  Yes.

4   Q.  This is an email from you to Mr. Donziger on March 26th of

5   2018; do you see that?

6   A.  Yes.

7   "Q.  And isn't it true that on March 26th of 2018 you wrote to

8   Mr. Donziger and informed him that you had delivered an

9   additional two thousand dollars worth of consulting services

10  which entitled you to more from what might be collected on the

11  claims; is that correct?

12  A.  Yes.

13  Q.  And you believed you had provided an additional two

14  thousand dollars worth of services to Mr. Donziger, right?

15  A.  Yes.

16  Q.  And with respect to your relationship with Mr. Donziger,

17  since you wrote that email that you testified about yesterday

18  in April of 2019 which stated that you were canceling your

19  agreement with Mr. Donziger?

20  A.  Yes.

21  Q.  Since that time you have had communications with

22  Mr. Donziger, correct?

23  A.  Yes.

24          MS. TRIVEDI:  Objection, your Honor.  It's outside the

25  scope.

1              THE COURT:  Counsel.

2              MS. GLAVIN:  Your Honor, it goes to bias in terms of

3      what Mr. Zelman testified to on cross-examination which

4      actually is contradicted by what he testified on yesterday

5      about having an agreement, a financial arrangement and then

6      it's he didn't care whether or not he'd get paid, then he would

7      have done it for free.  I am free to ask him about his

8      relationship with Mr. Donziger and whether he'd spoken with

9      Mr. Donziger in the last 24 hours or any member of his team.

10             MS. TRIVEDI:  Your Honor, my questions on cross were

11     as to Mr. Zelman's state of mind when he entered into the

12     agreement.  His communications with Mr. Donziger were fair game

13     for direct but it's beyond the scope of cross.

14             THE COURT:  What do you say to bias, ma'am?

15             MS. TRIVEDI:  Withdrawn.

16             THE COURT:  Yes, ma'am.

17             Sir, do you have in mind the question?

18             THE WITNESS:  No.  I have no idea what the question

19     is.

20     Q.  Since 2019 have you maintained a relationship with the

21     defendant, Steven Donziger?

22     A.  Yes.

23     Q.  And in the last weeks have you had any communications with

24     Mr. Donziger?

25     A.  No.

Q.  Have you had any communications in the last week with any

member of Mr. Donziger's defense team?

A.  No.

Q.  Following your testimony yesterday when you left the

courtroom, isn't it true that you hugged Mr. Donziger?

A.  I might have.

     MS. GLAVIN:  No further questions, your Honor.

     THE COURT:  Thank you.

     Recross, ma'am?

RECROSS-EXAMINATION

BY MS. TRIVEDI:

Q.  Mr. Zelman, why did you hug, Mr. Donziger?

A.  Thank you for this question.

Q.  You're welcome.

A.  I respect him.  I admire him.  We have a relationship I

value quite dearly.

Q.  Mr. Zelman, is there anything you read in the RICO judgment

that changed your opinion of Mr. Donziger?

A.  No.

Q.  And was it your understanding that the RICO judgment might

be set aside one day?

A.  Yes.

     MS. TRIVEDI:  Thank you.  Mr. Zelman, you have been

amazing.

     THE COURT:  Anything else on redirect?

L5DAADON1                         Zelman - Recross

 1              MS. GLAVIN:  No, your Honor.

 2              THE COURT:  You may step down, sir.  Thank you.

 3              MS. GLAVIN:  Your Honor, the government calls William

 4     Thomson.

 5              THE COURT:  Yes, ma'am.

 6              Come on up, sir.

 7      WILLIAM THOMSON,

 8           called as a witness by the Plaintiff,

 9           having been duly sworn, testified as follows:

10     BY MS. GLAVIN:

11     Q.  Good morning, Mr. Thompson.

12     A.  Good morning.

13     Q.  Have you stated your name and spelled it for the record?

14     A.  I don't believe so.

15     Q.  Okay.  If you could state your name and spell it for the

16     court reporter.

17     A.  William Thomson, W-I-L-L-I-A-M, last name T-H-O-M-S-O-N.

18     Q.  Mr. Thomson, what do you do for a living?

19     A.  I am a lawyer.

20     Q.  And do you practice with a firm?

21     A.  I am with Gibson Dunn & Crutcher.

22     Q.  How long have you been with Gibson Dunn & Crutcher?

23     A.  I think since fall of 1997.

24     Q.  Are you a partner there?

25     A.  I am.

L5DAADON1                         Zelman - Recross

1    Q.  And since when have you been a partner?

2    A.  Since January of 2010.

3    Q.  And what office of Gibson Dunn are you based in?

4    A.  I am in the Los Angeles office.

5    Q.  What group are you a lawyer practicing with at Gibson Dunn?

6    A.  I am one of the co-chairs of the Transnational Litigation

7    Practice Group and also a member of the Appellate Group.

8    Q.  I want to turn your attention to the case Chevron corp v.

9    Donziger, 11 CV 691, Southern District of New York.

10            Are you familiar with that case?

11   A.  Yes, I am.

12   Q.  How?

13   A.  I've worked on it for since its inception.

14   Q.  And what was your role in connection with the case, the

15   work that you would do?

16   A.  I was principally in charge of all the written products,

17   the court filings in the action.

18   Q.  What about with any appellate briefing did you have a role?

19   A.  The same role as appellate briefing.

20   Q.  And you were representing Chevron in your capacity as a

21   Gibson attorney in this case, correct?

22   A.  That's correct.

23   Q.  I want to turn your attention to Government Exhibit 1962.

24   Do you recognize that?

25   A.  Yes, I do.

L5DAADON1                        Zelman – Recross

1    Q.   Okay.   What is Exhibit 1962?

2    A.   This is the supplemental judgment that the district court

3    awarded Chevron with respect to the cost award.

4    Q.   When you say the "cost award", are you referring to the

5    $813,000 money judgment referenced in this exhibit?

6    A.   Yes, that's correct.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L5DVDON2                          Thomson - direct

BY MS. GLAVIN:

Q.  So for the purposes of your direct, I'll use your language,
the cost award, okay?

A.  Yes.

Q.  Now, following the issuance of the cost award, did you have
any involvement in the post-judgment proceedings in that case,
11 CV 691?

A.  Yes, I did.

Q.  Okay.  What was your involvement?

A.  The same as, you know, my general involvement in the case.
I was in charge of the briefing before the district court and
the Court of Appeals.

Q.  So Mr. Thomson, for the next number of questions, I want to
focus you on the time period February 28 of 2018 through
September 30th of 2019, okay?

A.  Okay.

Q.  Are you familiar with the appeals that Mr. Donziger sought
during that period of time in civil case 11 CV 691?

A.  Yes, I am.

Q.  Can you describe the appeals that Mr. Donziger pursued
during that period of time, February 28th of 2018, through
September 30th of 2019?

A.  During that period, there were three appeals.  The first
appeal was from the supplemental judgment, the cost award.  I
believe that was initiated the end of March 2018.

1        The second appeal was from two orders of Judge Kaplan

2    that disposed of four motions by Mr. Donziger.  I believe there

3    was a motion to dismiss Chevron's contempt motion, there's a

4    motion for a declaratory judgment, there was a motion for a

5    protective order, I believe there was also a motion to stay.

6    So that was the second appeal which I believe was initiated at

7    the end of July of 2018.

8        THE COURT:  Of '19?

9        THE WITNESS:  Of just '18.

10        THE COURT:  '18.  Thank you, sir.

11        THE WITNESS:  Certainly.

12   A.  The third appeal was from Judge Kaplan's contempt order.

13   And that would have been initiated, I think, May 27th, give or

14   take, 2019.

15   Q.  Mr. Thomson, I want to break each of those three appeals

16   that you've just testified about down and take the first appeal

17   from the cost award.  I'm going to show you what is Government

18   Exhibit 7.

19        MS. GLAVIN:  Your Honor, this is a certified copy of

20   the docket sheet for Second Circuit Appeal 18-855 that we move

21   into evidence.

22        MR. KUBY:  I have an objection not specifically to the

23   document on foundational grounds, I have an objection to this

24   line of questioning.  The objection is relevance.

25        As the Court has pointed out before, what the Second

1    Circuit did or did not do with respect to various appeals is

2    part of the fascinating jurisprudence that makes up the

3    *Donziger* case.  If the prosecution is trying to show that

4    Mr. Donziger was capable of filing an appeal and capable of

5    briefing one or not, that's perfectly fine.  But to go further

6    into this area is completely irrelevant.

7            THE COURT:  Ma'am.

8            MS. GLAVIN:  Your Honor, I don't intend to get into

9    what the Second Circuit did or did not do.  The purpose of this

10   testimony or the evidence that we seek to elicit from the

11   Mr. Thomson is that Mr. Donziger, contrary to what he told

12   Judge Kaplan, did not seek every avenue of appellate relief,

13   which is a very critical component to the case, and it's

14   something that Mr. Donziger has said that he did do.

15           So that is what I intend to get into with these three

16   appeals in Mr. Thomson's testimony.  It's not what the Second

17   Circuit decided, but what Mr. Donziger made a choice to do or

18   not do.  And it goes to his knowledge of what was available to

19   him.

20           THE COURT:  Counsel.

21           MR. KUBY:  My law human is going to take over, if you

22   don't mind.

23           MS. TRIVEDI:  Judge, in light of what Ms. Glavin is

24   representing, I'd ask that you reconsider the ruling on the

25   collateral bar.  Because if what Mr. Donziger did do in front

1    of the Second Circuit is becoming relevant -- rapidly relevant

2    in this case from what Ms. Glavin is representing, we would ask

3    your Honor's permission to argue the full scope of that, which

4    is Mr. Donziger's year of begging for clarification in front of

5    Judge Kaplan, year of begging for a civil contempt finding so

6    that he could go on appeal to the Second Circuit.

7             THE COURT:  Counsel, I suspect -- I don't really know,

8    but I suspect that much of this is going to demonstrate that

9    Mr. Donziger did not avail himself of the interlocutory appeal

10   protocols, that he did not seek a stay from the circuit, that

11   he did not seek to *mandamus* Judge Kaplan, and the like.

12            MS. TRIVEDI:  And your Honor, as I went through

13   yesterday, respectfully, there is no interlocutory appeal of

14   the orders in this case.  There is civil -- there is civil

15   contempt and there is appeal.  And there is an abundance of

16   case law to support that pathway.

17            THE COURT:  All right.

18            We have discussed that.  I have ruled.

19            Is there anything else you want to say, Ms. Glavin,

20   about this?

21            MS. GLAVIN:  No, your Honor.

22            THE COURT:  All right.  I will permit it.

23            MS. GLAVIN:  Moving into evidence Government Exhibit

24   7, which is a certified copy of the docket sheet for Second

25   Circuit Appeal 18-855.

1           THE COURT:  The objection is overruled.  Received.

2           (Government's Exhibit 7 received in evidence)

3    BY MS. GLAVIN:

4    Q.  Have you had an opportunity, Mr. Thomson, before today to

5    review that docket sheet?

6    A.  Yes, I have.

7    Q.  Okay.  And for which of the three appeals you mentioned,

8    the docket sheet for -- which is Government Exhibit 7, is for

9    which of those three appeals?

10   A.  That's for the cost award appeal, the supplemental

11   judgment.

12   Q.  With respect to Mr. Donziger's appeal from the cost award,

13   did Chevron -- withdrawn.

14           After Mr. Donziger appealed the cost award to the

15   Second Circuit, did discovery proceed of Mr. Donziger with

16   respect to aid and enforcing the cost award?

17   A.  Yes, it did.

18   Q.  Did Mr. Donziger seek a stay from the Second Circuit while

19   his cost award appeal was pending?

20   A.  No, he did not.

21   Q.  Could he have?

22   A.  Certainly.

23   Q.  And how would he have done that?

24   A.  He would have filed a motion pursuant to Federal Rule of

25   Appellate Procedure 8 asking the Court to impose a stay.

L5DVDON2                          Thomson - direct

1   Q.  And are you familiar with what is called a supersedeas

2   bond?

3   A.  A supersedeas bond, yes.

4   Q.  What is that?

5   A.  It's a bond that an appellant posts to stay execution of a

6   money judgment.

7   Q.  Based on your review of Government Exhibit 7, did

8   Mr. Donziger ever post or file a supersedeas bond?

9   A.  No, he did not.

10  Q.  Turning your attention to the next appeal that you

11  mentioned, Mr. Donziger's appeal from several motions, I'm

12  going to show you Government Exhibit 2060.

13          MS. GLAVIN:  And your Honor, this is from the docket

14  sheet 11 CV 691.  Move for admission.

15          THE COURT:  Received.

16          (Government's Exhibit 2060 received in evidence)

17          MR. KUBY:  I'm sorry, I said when -- if I had an

18  objection to the docket sheet, I would rise.

19          THE COURT:  Yes, sir.

20          MR. KUBY:  And this is my very first one.

21          THE COURT:  Yes, sir.

22          MR. KUBY:  I object to this document being introduced

23  into evidence.  I object to this line of examination.  I just

24  want to note, yesterday, before this testimony, this Court

25  imposed the collateral bar rule on the defense.  And I

1    believe -- although my hearing is not what it should be -- this

2    Court, in imposing that bar, informed my Sister Trivedi that

3    Mr. Donziger did not avail himself of opportunities that he had

4    to stay, to appeal, there were avenues that were still open to

5    him that he did not pursue; therefore, among other reasons, I

6    am imposing the collateral bar rule.  That's at least what I

7    understood your ruling to be.

8             Now, after that ruling or decision, if you will, now

9    we're taking evidence on it.  So I don't want to say verdict

10   first, then trial, but it kind of has that feel to it, Judge.

11   You already did this.  You already ruled on this.  We objected.

12   We complained.  And now we're trying it.  I don't get it.  I

13   legitimately don't, Judge.

14             THE COURT:  Thank you.

15             Ma'am.

16             MS. GLAVIN:  Your Honor, I'm eliciting precisely what

17   causes the collateral bar doctrine to apply, which is that

18   Mr. Donziger -- if the defense is willing to stipulate that

19   from February 28th of 2018, through September 30th of 2019,

20   Mr. Donziger never sought a stay in the Second Circuit of the

21   discovery, Mr. Donziger never availed himself of the avenue of

22   a *mandamus* in the Second Circuit, I think we may be there.

23             MR. KUBY:  Judge, I don't want to accuse the Court of

24   premature adjudication, but you ruled on this yesterday based

25   on facts that presumably had been put before you in the course

L5DVDON2                        Thomson - direct

 1    of this trial.  You imposed the collateral bar rule precisely

 2    because you found Mr. Donziger did not do the things that you

 3    found he could have done.

 4            And now, after you've ruled and after the witness who

 5    I wanted to question has left, because I did not get to do

 6    cross-examination that would have implicated the collateral bar

 7    rule, now Ms. Glavin is trying to elicit the very facts that

 8    she thinks are necessary for your ruling.  But obviously you

 9    didn't because you ruled already.  That was yesterday.

10            Could we get on with today?

11            THE COURT:  What do you say to counsel's offer of a

12    stip?

13            MS. TRIVEDI:  Your Honor, they produced a single case

14    where a defendant in the post-judgment discovery context

15    received any relief on *mandamus* from the Second Circuit.

16            We will so stip.

17            THE COURT:  All right.

18            MR. KUBY:  This is a legal -- I'm sorry, Judge.

19            This essentially is no longer a factual issue.  The

20    Court made a legal ruling based on the facts before it.  And

21    after Mr. Donziger is convicted and after he's packed off to

22    wherever he's going, we'll adjudicate this in front of the

23    Second Circuit.  You may be right, you may be wrong, or they

24    may not even care.  But this is not a legal issue, and it's

25    just not appropriate to take up more trial time eliciting facts

1   that had to have been elicited before the Court ruled

2   yesterday.

3              THE COURT:  Counsel, my ruling yesterday was based on

4   the briefing both sides submitted on the government's motion *in*

5   *limine* many, many months ago.

6              MR. KUBY:  Yeah.

7              THE COURT:  And which -- I don't recall, forgive me,

8   Mr. Kuby, if you were on the case or not --

9              MR. KUBY:  No, happily not.

10             THE COURT:  -- but defense side asked the Court to

11  stay ruling on that matter.

12             MR. KUBY:  Yes.

13             THE COURT:  So that's what it was based on, it was not

14  based on the evidence in this case.

15             MR. KUBY:  I know.  We did ask and we knew the day

16  would come when the Court made a ruling.

17             THE COURT:  Yes, ma'am -- yes, sir.

18             MR. KUBY:  It's okay, I'm trying to be more gender

19  nonbinary.  Not doing well.

20             And we knew the day would come when you would make a

21  ruling.  You made that ruling.  So if we're going to reopen it

22  factually, that is to say, the Court actually didn't have

23  sufficient facts when it imposed the collateral bar rule, then

24  we can get Ms. Champion back here and we can have a -- I won't

25  call it a rerun, I'll call it a sequel.

1              But, again, I'm not sure what it is -- I'm not sure

2    why the private prosecutor is being allowed to elicit facts to

3    support a ruling this Court made, after the Court made the

4    ruling.  I object.

5              THE COURT:  Counsel, all right.  I do not hear you

6    accepting the offer of a stipulation and, therefore, I will

7    allow it to complete the record.

8              MR. KUBY:  Okay.

9              THE COURT:  I can't remember what the question was.

10             MS. GLAVIN:  I will help refresh Mr. Thomson.

11   BY MS. GLAVIN:

12   Q.  So Mr. Thomson, I believe we were turning to the second

13   appeal you had discussed.  We had put on the screen what is

14   Government Exhibit 2060, which I understand is in evidence.

15             Is this a notice of appeal from Mr. Donziger?

16   A.  Yes, it is.

17   Q.  What's this notice of appeal of?

18   A.  This is a notice of appeal from two orders from Judge

19   Kaplan that disposed of four motions by Mr. Donziger.  As I

20   mentioned before, there was a motion to dismiss, a contempt

21   motion by Chevron, there was a motion for a declaratory

22   judgment, there was a motion for a protective order, and there

23   was a motion for -- to stay.

24   Q.  And I just want to focus, if we could -- Mr. Donziger cites

25   in this notice of appeal two docket entries, 2045 and 2056.  If

L5DVDON2                        Thomson - direct

1     we could go just to have you look at Government Exhibit 2045.

2              When you mentioned before that Mr. Donziger's notice

3     of appeal was from Judge Kaplan's decision denying his motions

4     for declaratory judgment, dismissal, protective order, and a

5     stay, is this what you were referring to?

6     A.  Yes, that's correct.

7     Q.  And going back to Government Exhibit 2060, there is another

8     order referenced, docket 2056.  Do you see that?

9     A.  I see the reference, yes.

10              MS. GLAVIN:  Okay.  And if we could pull up Government

11    Exhibit 2056, which is in evidence.  And go to the last page,

12    what Judge Kaplan's order was.

13    Q.  Do you see that?

14    A.  I do.

15    Q.  And what was Judge Kaplan directing Mr. Donziger to do?

16    A.  To produce documents pursuant to specific requests,

17    numbers, in documents request for production, as well as to

18    serve full and complete answers to certain paragraphs in

19    Chevron's information subpoena.

20    Q.  And by what date was Mr. Donziger to comply with that

21    order?

22    A.  By August 15, 2018.

23    Q.  I show you what is Government Exhibit No. 8.

24              MS. GLAVIN:  Your Honor, this is a certified copy of

25    the Second Circuit Court of Appeals docket sheet for docket

L5DVDON2                        Thomson - direct

1   18-2191, which we move into evidence.

2                MR. KUBY:  Same objection to document and line of

3   questioning.

4                THE COURT:  Same ruling.

5                Objection overruled.  Received.

6                (Government's Exhibit 8 received in evidence)

7   Q.  Mr. Thomson, have you had an opportunity before your

8   testimony today to review this docket sheet for Second Circuit

9   Appeal 18-2191?

10  A.  Yes, I have.

11  Q.  And what docket sheet is this for, as it relates to

12  Mr. Donziger's appeals between February 28 of 2018 and

13  September 30th of 2019?

14  A.  This is the docket sheet for the second appeal.

15  Q.  The appeal --

16  A.  From the four interlocutory orders.

17  Q.  Now, with respect to the second appeal, was there a

18  relationship between the second appeal and the first appeal in

19  the Second Circuit?

20               MR. KUBY:  Objection.  Leading.

21               THE COURT:  I'm sorry?

22               MR. KUBY:  Objection.  Leading.

23               THE COURT:  It calls for a yes or a no.

24               MS. GLAVIN:  Was there a relationship.

25               MR. KUBY:  I understand that.  This is her witness.  I

L5DVDON2                          Thomson - direct

 1   didn't think she was entitled to simply ask yes-or-no
 2   questions.  They are not foundational.
 3           I think the proper form of the question is:  What
 4   relationship, if any, was there between X and Y?  That's at
 5   least what I remember from evidence class, Judge.
 6           THE COURT:  If you insist, I will make her ask it that
 7   way.
 8           MS. GLAVIN:  I'll do it.
 9           THE COURT:  But I actually don't think there's
10   anything wrong with asking a question that does not signal the
11   answer.  The answer could be yes, it could be no.
12           MR. KUBY:  All right.  I'll take that in mind in
13   future objections and I withdraw this one.
14           THE COURT:  Yes, sir.  Thank you.
15   BY MS. GLAVIN:
16   Q.  Mr. Thomson, what relationship, if any, was there between
17   appeal 18-855 and appeal 18-2191?
18   A.  The two appeals were consolidated on Mr. Donziger's motion.
19   Q.  And what does that mean?
20   A.  It means they were to be considered at the same time as
21   part of the same proceeding.
22   Q.  And looking at Government Exhibit 8, if I could focus your
23   attention on Second Circuit docket entry 36-1.  It should say
24   36.  And what occurred on October 5th of 2018?
25   A.  Mr. Donziger filed a motion in the Second Circuit to

1   consolidate the appeals and to extend his time to file his

2   opening brief.

3            THE COURT:  Keep your voice up, sir, please.

4            THE WITNESS:  I'm sorry.

5            THE COURT:  Sorry.  I didn't look into the microphone

6   either.  Keep your voice up.

7            THE WITNESS:  Sorry, your Honor.

8   BY MS. GLAVIN:

9   Q.  And did you work on this appeal personally, Mr. Thomson, on

10  behalf of Chevron Corp.?

11  A.  Yes, I did.

12  Q.  And if I could focus your attention to Second Circuit

13  docket entry 40.  Could you explain to us what happened in this

14  docket entry.

15  A.  In this entry, the Second Circuit grants Mr. Donziger's

16  motion, consolidates the appeals, and grants his motion to

17  extend the time to file his opening brief.

18  Q.  In this appeal, was any request made for expedited

19  briefing?

20  A.  No.

21  Q.  And when I refer to a request made for expedited briefing,

22  can you explain what "expedited briefing" means?

23  A.  It would mean that in this case the appellant would ask the

24  Court to set a shorter time schedule for the briefing and

25  potentially for the oral argument to try to get the appeal

L5DVDON2                          Thomson - direct

1    resolved more quickly than would happen in the normal course.

2    Q.  And in connection with the consolidated appeals 18-855 and

3    18-2191, did Mr. Donziger ever make a request to the Second

4    Circuit for any type of emergency relief?

5    A.  No.

6    Q.  And when I say "emergency relief," what does that mean to

7    you in terms of Second Circuit parlance?

8    A.  Well, it could include a motion to expedite the appeal, it

9    could include other extraordinary relief, if there were

10   conditions to petition for writ of *mandamus*, for example, a

11   stay is also considered extraordinary relief.

12   Q.  Did Mr.  --

13              MR. KUBY:  Judge, I have an application to strike the

14   last -- am I not speaking loudly enough?

15              THE COURT:  No, no.  I'm greeting one of the CSOs at

16   the back.

17              MR. KUBY:  Cool.

18              It's nice to see everybody be back in court again.

19              THE COURT:  Isn't it?

20              MR. KUBY:  I have to say that.

21              THE COURT:  Application to strike the last --

22              MR. KUBY:  Right.  It was fabulously instructive to

23   me, as a lawyer, to listen to Mr. Thomson's discussion of the

24   nature of appellate litigation.

25              THE COURT:  He can teach all of us, right?

1              MR. KUBY:  Say what again, Judge?

2              THE COURT:  He can teach all of us.

3              MR. KUBY:  Yeah, yeah, yeah.

4              And I'm perfectly willing to listen to it, as long as

5    when I start asking him questions, we're not going to default

6    back to the Anne Champion, Are you asking me for my mental

7    impressions as an attorney mode.  I'm not seeing that problem

8    here, so I just want to flag it in advance, because I have some

9    questions too about Second Circuit practice, not just for my

10   own education, but relevant to this trial.

11             THE COURT:  I'm certain Mr. Thomson is looking forward

12   to them.

13             MR. KUBY:  Well, I am.  Thank you.

14             I mean, look, it's a CLE.

15             THE COURT:  Is this a convenient time to break?

16             MS. GLAVIN:  Oh, yes, your Honor.  Thank you.

17             THE COURT:  All right.  Half hour or so?

18             MS. GLAVIN:  Yes, I think maybe half hour, 45 minutes.

19             THE COURT:  All right.

20             MS. GLAVIN:  Oh, half hour for the break, yes, your

21   Honor.

22             THE COURT:  Okay.  11:30, friends.  Thank you.

23             (Recess)

24             THE COURT:  All right.  Are we ready to go.

25             On the record, Ms. Glavin.

1          MS. GLAVIN:  Yes, your Honor.

2     BY MS. GLAVIN:

3     Q.  Mr. Thomson, before the break, we were discussing the

4     consolidated appeals 18-2191, 18-855.  In that consolidated

5     appeal, did Mr. Donziger ever make a motion to the Second

6     Circuit seeking a stay of the district court proceedings while

7     the consolidated appeal was pending?

8     A.  No, he did not.

9     Q.  Did Mr. Donziger ever make a motion -- withdrawn.

10         Did Mr. Donziger ever file a petition for a writ of

11    *mandamus* in the Second Circuit in connection with the

12    consolidated appeal?

13    A.  No, he did not.

14    Q.  Mr. Thomson, you mentioned a third appeal that Mr. Donziger

15    filed or a third appeal that Mr. Donziger pursued with the

16    Second Circuit between February 28th of 2018 and September 30th

17    of 2019.  You mentioned that was from the May contempt

18    decision?

19    A.  Yes, that's correct.

20    Q.  I show you -- we could pull up what is in evidence as

21    Government Exhibit 2209.  Go to the second page.

22         Mr. Thomson, what do you recognize this as?

23    A.  This is Judge Kaplan's order holding Mr. Donziger in

24    contempt.

25    Q.  I show you what is Government Exhibit 2211.

1          MS. GLAVIN:  Your Honor, I move for admission of

2     Government Exhibit 2211, which is on the docket for 11 CV 691.

3          MR. KUBY:  Same objection to document and line of

4     questioning.

5          THE COURT:  Same ruling.  Objection overruled.

6          Received.

7          (Government's Exhibit 2211 received in evidence)

8     BY MS. GLAVIN:

9     Q.  And Mr. Thomson, what is this document?

10    A.  This is Mr. Donziger's notice of appeal from the contempt

11    order dated May 23rd, 2019, and its accompanying supplemental

12    judgment.

13    Q.  That was at docket entry 2210?

14    A.  Yes, that's correct.

15    Q.  I show you what is Government Exhibit No. 9.

16         MS. GLAVIN:  Your Honor, this is a certified copy of

17    the docket sheet for Second Circuit case 19-1584, which we

18    would move into evidence.

19         MR. KUBY:  Same objection.

20         THE COURT:  Same ruling.  Received.

21         (Government's Exhibit 9 received in evidence)

22    Q.  Mr. Thomson, what appeal is this docket sheet for?  We can

23    scroll through the second page, you can look at it.

24    A.  Well, it's the docket sheet for the appeal from the

25    district court's contempt order dated May 24, 2019.

1   Q.  Sir, did you say dated May 24th?

2   A.  I believe that's right, but I could be wrong.  The date of

3   the order.  The date of the appeal was May 28th.

4   Q.  If you could take a look at docket entry number 2.  Oh, let

5   me take a look.  I see.  You're looking at docket entry number

6   3.

7   A.  May 23.

8   Q.  The opinion was May 23rd.

9   A.  Correct.

10  Q.  Now, following Judge Kaplan's issuance of his -- of the

11  contempt decision on May 23rd of 2019, I'm going to show you

12  what is Government Exhibit 2219 which is in evidence.

13          Have you had an opportunity to review this order by

14  Judge Kaplan before today?

15  A.  Yes, I have.

16  Q.  Can you summarize what Judge Kaplan is finding or ordering

17  here?

18  A.  The Court says that it inadvertently failed to dispose

19  fully of Chevron's motion to hold Donziger in contempt.  In

20  particular, the Court now finds that Mr. Donziger was in

21  contempt of paragraph 5 of what's known as the forensic

22  inspection protocol.  That finding was not included, as the

23  order notes in the earlier May 23rd/May 24th order and

24  judgment.

25  Q.  And do you recall what paragraph 5 of the forensic protocol

1   directed?

2   A.  I do.

3   Q.  Okay.  What was that?

4   A.  That was for Mr. Donziger to turn over his electronic

5   devices to the neutral forensic expert appointed by the Court.

6   Q.  With respect to this order or civil contempt finding which

7   is in Government Exhibit 2219, following that finding, did

8   Mr. Donziger notice an appeal from that order?

9   A.  No, he did not.

10  Q.  When did Mr. Donziger file his brief -- well, withdrawn.

11          I'm going to show you what is Government Exhibit 317.

12  Do you recognize this?

13  A.  I do.

14  Q.  What is it?

15  A.  This is Mr. Donziger's opening brief and consolidated

16  appeal dated September 9th, 2019.

17  Q.  You mentioned Mr. Donziger's opening brief in the

18  consolidated appeal.  What relationship, if any, did case

19  number 19-154, which is reflected in docket sheet for

20  Government Exhibit 9, what relationship, if any, did that

21  appeal have with consolidated appeals 18-855 and 18-2191?

22  A.  Mr. Donziger moved in the Second Circuit to have the Court

23  of Appeals consolidate the appeals so they were all decided

24  together in the same proceeding.

25  Q.  So when you say "consolidated," are you referring to the

L5DVDON2                        Thomson - direct

1    three appeals that Mr. Donziger pursued in the circuit between

2    February 28th of 2018 and September 30th of 2019?

3    A.  Yes, that's correct.

4    Q.  So they were all going to be handled as one appeal?

5    A.  As one appeal by one panel, right.

6    Q.  And did Mr. Donziger file a brief in connection with appeal

7    19-1584 from the civil contempt findings?  Did he file a brief?

8    A.  Yes, he did.

9    Q.  Okay.  And what is Government Exhibit 317?

10   A.  That's the caption page for the brief.

11              MS. GLAVIN:  Your Honor --

12   Q.  And is this the brief?  We can go to the second page.

13   A.  I believe so.

14              MS. GLAVIN:  The government moves for admission of

15   Exhibit 317.

16              MR. KUBY:  Same objection to the line of questioning.

17              And also, I would note that yesterday the Court ruled,

18   as I understood it -- and again, if I'm wrong, I don't mean to

19   put words in the Court's mouth -- that what the Second Circuit

20   ruled on this has nothing to do with any of the issues in the

21   case.  That's what I thought I heard.  I'm not sure why the

22   brief does, but I'm sure I'll be enlightened.

23              THE COURT:  No doubt about it.

24              Overruled.  Received.

25              (Government's Exhibit 317 received in evidence)

L5DVDON2                    Thomson - direct

BY MS. GLAVIN:

Q.  If, Mr. Thomson, we could go to page 12, ECF page 12 of
Mr. Donziger's brief.  And I'll read out loud:

            Statement of the issues.

            One.  Whether the district court found appellant in
civil contempt for participating in litigation financing
efforts and paying his fees out of that financing; and where
appellant so acted in conformity with earlier assurances issued
by the district court itself; and where the district court
failed to reconcile its assurances with the radically different
interpretation of the applicable injunction it subsequently
used to find appellant in contempt, is the contempt finding
based on an unclear and ambiguous underlying order and, thus,
an abuse of discretion?

            Number two.  Where this Court affirmed the district
court's merits determination in the action based on the
confined nature of its injunction relief, which did not
invalidate or disturb an underlying Ecuadorian environmental
judgment being enforced in foreign jurisdictions, is the
district court's subsequent modification and expansion of the
injunctive relief an abuse of discretion and a violation of the
mandate rule of the law of the case doctrine?

            Mr. Thomson, did I read correctly what Mr. Donziger
said the issues were on appeal from Judge Kaplan's May 2019
contempt findings?

L5DVDON2                        Thomson - direct

1    A.  Yes.

2    Q.  Did Mr. Donziger, in his brief, challenge Judge Kaplan's

3    finding of civil contempt for failure to provide a list of his

4    messaging and document management accounts and devices as

5    ordered by Judge Kaplan on March 5th of 2019?

6    A.  No, he did not.

7    Q.  Did Mr. Donziger in his brief challenge Judge Kaplan's

8    finding of civil contempt for failure to surrender his devices

9    to the neutral forensic expert for imaging as directed by

10   paragraph 5 of the March 5th, 2019 forensic protocol?

11              MR. KUBY:  Judge, I object to the question and I

12   object as to form.

13              Mr. Thomson is one of the most superbly educated

14   humans I've ever seen in a courtroom.  And I would so much

15   rather hear his explanation of what was done and what was not

16   done rather than Ms. Glavin's questions.  So if she could just

17   ask him to explain what was done and what was not done with

18   respect to X, with respect to Y, that would be enlightening and

19   proper, I think.

20              THE COURT:  Okay.  On the other hand, this is a bench

21   trial, and this method of questioning does seek to shorten our

22   proceedings.

23              MR. KUBY:  Well, it does.  And I accept that.  But

24   still -- okay.  I'll sit.

25              THE COURT:  Yes, sir.

1           MR. KUBY:  I'll be good.  I'll sit.

2           THE COURT:  Do you have in mind the question, sir?

3           THE WITNESS:  No, I don't, your Honor.

4           THE COURT:  Did Mr. Donziger in his brief challenge

5    Judge Kaplan's finding of civil contempt for failure to

6    surrender his devices to the neutral forensic expert for

7    imaging as directed by paragraph 5 of the March 5th, 2019

8    forensic protocol?

9    A.  As Chevron pointed out in its appellee's brief, no, he did

10   not.

11   Q.  Did Mr. Donziger in his brief, which is Government Exhibit

12   317, challenge Judge Kaplan's finding of civil contempt for

13   failure to assign to Chevron the interest, the contingent

14   interest from the 2017 ADF agreement?

15   A.  As Chevron noted in its appellee's brief, no, he did not.

16   Q.  Did Mr. Donziger challenge Judge Kaplan's finding of civil

17   contempt for pledging or assigning a portion of his own

18   personal interest in the Ecuadorian judgment in exchange for

19   personal services rendered?

20   A.  As Chevron noted in its appellee's brief, no, he did not.

21   Q.  If we could go to ECF page 4 of Mr. Donziger's brief.  At

22   ECF page 8 of Mr. Donziger's brief, tell me if I'm reading what

23   Mr. Donziger wrote correctly:

24           Rather, as appellant testified repeatedly under oath

25   below, he thought it was clear and unquestionable that

1    continued litigation financing --

2              THE COURT:  Whoops, whoops.  Clear and unquestionable.

3    Q.  -- that continued litigation financing was allowed, that

4    the RICO injunction's "constructive trust" targeted only

5    property that might be received in a recovery on the Ecuador

6    judgment; and that the only "monetization" potentially

7    prohibited were acts seeking to monetize appellant's or

8    codefendant's personal contingency interests in the Ecuador

9    judgment.

10             Is that what Mr. Donziger wrote in his brief?

11   A.  Yes, it is.

12   Q.  If we could go to the cover page of the brief, page 1.

13             Who represented Mr. Donziger on this appeal?

14   A.  Well, he lists himself as *pro se*, as representing himself;

15   although I believe he has a footnote where he acknowledges that

16   he was assisted by an unnamed attorney.

17   Q.  And Mr. Thomson, in the course of the civil RICO

18   litigation, 11 CV 691, have you seen briefs or testimony by

19   Mr. Donziger indicating that he is an attorney?

20   A.  Yes, at one time.

21   Q.  And did Mr. Donziger indicate -- withdrawn.

22             Are you aware of statements by Mr. Donziger in his

23   briefs or testimony in connection with the civil litigation

24   that he is a graduate of Harvard Law School?

25   A.  I'm familiar with such statements, yes.

1   Q.  And if we could go back to docket sheet Government Exhibit

2   9.  Again, this is with respect to appeal 19-1584 from the May

3   23rd, 2019 contempt decision.

4        Did Mr. Donziger in this appeal, between May 23rd of

5   2019 and September 30th of 2019, did Mr. Donziger seek any stay

6   from the Second Circuit?

7   A.  No, he did not.

8   Q.  Did Mr. Donziger in that time period seek any *mandamus*

9   relief?

10  A.  No, he did not.

11  Q.  And in the time period that I had focused you on during the

12  course of your direct, which would be February 28th of 2018 to

13  September 30th of 2019, did Mr. Donziger ever seek a stay in

14  the Second Circuit?

15  A.  No, he did not.

16  Q.  Did he ever seek *mandamus* relief in that time period in the

17  Second Circuit?

18  A.  No, he did not.

19  Q.  Did he ever seek expedited briefing in the Second Circuit?

20  A.  No, he did not.

21  Q.  I'm going to show you what is Government Exhibit 2108 in

22  evidence.  We could go to Judge Kaplan's -- the portion of

23  Judge Kaplan's order.

24        Are you familiar with this order, Mr. Thomson?

25  A.  Yes.

L5DVDON2                        Thomson - direct

1   Q.  And what did Judge Kaplan direct Mr. Donziger to do in this

2   order?

3   A.  Judge Kaplan orders Mr. Donziger to comply with certain

4   discovery requests that Chevron had propounded.

5   Q.  And with respect to paragraph 1, did the Court make a

6   finding as to whether or not Mr. Donziger had waived privilege?

7   A.  Yes, the Court notes that both Donziger has waived or

8   forfeited any claim of privilege to responsive documents and

9   information that otherwise might have applied.

10  Q.  Did Mr. Donziger notice an appeal from this October 18,

11  2018 order?

12  A.  No, I don't believe so.

13  Q.  Did he seek *mandamus* relief?

14  A.  No, he did not.

15  Q.  Did he seek a stay?

16  A.  No, he did not.

17  Q.  Going to Government Exhibit 2172, do you recognize this

18  document, Mr. Thomson?

19  A.  Yes, I do.

20  Q.  What is this?

21  A.  This is the forensic inspection protocol that Judge Kaplan

22  entered.

23  Q.  And with respect to paragraph 4 of the protocol, can you

24  summarize what Judge Kaplan ordered Mr. Donziger to do?

25  A.  Within three business days, Mr. Donziger was ordered to

L5DVDON2                          Thomson - direct

1    provide the neutral forensic inspection expert that the Court

2    had appointed, to identify for that neutral all of his

3    electronic devices that he had used since March 4th, 2012, as

4    well as any online accounts that he had used during that

5    period.

6    Q.   And if you could go to paragraph 5 of that protocol.

7         What did Judge Kaplan order Mr. Donziger to do?

8    A.   Mr. Donziger was ordered to turn over the electronic

9    devices to the neutral forensic expert.

10   Q.   At what day and time?

11   A.   On March 18, 2019.  Is there a time?  I'm not sure.  At 12

12   p.m.

13   Q.   Did Mr. Donziger notice an appeal from this order which is

14   Government Exhibit 2172?

15   A.   No, he did not.

16   Q.   Did Mr. Donziger seek a stay of this order with the Second

17   Circuit?

18   A.   No, he did not.

19   Q.   Did he seek *mandamus* relief with the Second Circuit?

20   A.   No, he did not.

21   Q.   Showing you what is Government Exhibit 2232 in evidence, if

22   you go to Judge Kaplan's order on the last page.  Mr. Thomson,

23   what did Judge Kaplan direct Mr. Donziger to do in this order?

24   A.   That on or before June 12th, 2019 at 4 p.m., he was to

25   surrender to the Clerk of the Court each and every passport

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    issued to him by each and every nation to have issued a

2    passport to him.

3    Q.  Did Mr. Donziger notice an appeal of this order with the

4    Second Circuit?

5    A.  No, he did not.

6    Q.  Did he seek a stay of this order with the Second Circuit?

7    A.  No, he did not.

8    Q.  Did he seek *mandamus* relief with the circuit?

9    A.  No, he did not.

10   Q.  Mr. Thomson, prior to the -- withdrawn.

11          Prior to the post-judgment proceedings that occurred

12   after February 28, 2018, had Mr.  -- withdrawn.

13          Prior to the post-judgment proceedings that occurred

14   after February 28th of 2018, are you familiar with whether or

15   not Mr. Donziger had sought stays in the Second Circuit of

16   district court orders in connection with the civil litigation

17   that Chevron had against Mr. Donziger here in the Southern

18   District?

19   A.  Yes.

20   Q.  Do you have some examples?

21          MR. KUBY:  Judge, I'm going to object to the examples,

22   because this goes into the question of the 1782s which took

23   place in 2010.  And if Ms. Glavin wants to go there, we can go

24   there, but there's extensive cross-examination of this witness

25   about the things this witness did or did not do.

1            To the extent that Ms. Glavin wishes to prove that

2       Mr. Donziger had filed applications for a stay in the past back

3       in 2010, when he was represented by a legion of attorneys, I

4       think she just did that.  And I'll narrow my cross.

5            But to the extent that she intends to poundingly

6       recite things that were done by Mr. Donziger through counsel

7       back in 2010, I think it is unnecessary, irrelevant, and just,

8       you know, a waste of the time that the Court does not wish to

9       waste.

10           THE COURT:  Yes, ma'am.

11           MS. GLAVIN:  With respect, I think Mr. Kuby's

12      arguments fall into a couple of buckets, the first being that

13      Mr. Kuby is representing to me or I suppose he may be warning

14      me of some brutal cross-examination that he may be going into.

15      I accept that.

16           Number two.

17           THE COURT:  Easy for you to say; you're not the

18      witness.

19           MR. KUBY:  He seems like a nice guy, Judge.

20           MS. GLAVIN:  I think Mr. Thomson will answer

21      Mr. Kuby's questions truthfully, to the extent they are within

22      the rules of evidence and they don't infringe on

23      attorney-client privilege.  That's Mr. Kuby's first point.

24           To his second point about whether it is relevant,

25      Mr. Donziger was on notice in 2010 of the Southern District's

L5DVDON2                        Thomson - direct

Local Civil Rule 26.2, which required him to provide a
privilege log.  He did not do that.  And Judge Kaplan found a
waiver at that time.  Mr. Donziger then went to the circuit for
a stay.  He got a temporary stay; he didn't get the full stay.
It went back to Judge Kaplan.  Judge Kaplan then reiterated
that the waiver had occurred for failure to comply with Rule
26.2 and the privilege log.  Mr. Donziger, through his lawyers,
went back to the Second Circuit seeking a stay.  And that was
denied and the merits panel denied the appeal.

          That goes to Mr. Donziger's state of mind with respect
to his failure to produce a privilege log during the
post-judgment discovery proceedings and the waiver that occur.
Mr. Donziger made statements which are in evidence before the
Court that he was -- that this was an illegal order and he
could not ethically do this.  This goes to Mr. Donziger's state
of mind that he was on notice of what the rules were.  This had
happened before, and actually his devices had been imaged
before.  And Mr. Donziger chose the course that he did.

          We have heard argument that Mr. Donziger was going
into civil contempt so that he could appeal.  And Mr. Donziger
knew that he had other avenues.  So it goes to state of mind.
And I think we can go through that fairly quickly.

          There is also a second instance in which Mr. Donziger
in this litigation went to the Second Circuit with a
*mandamus* --

L5DVDON2                        Thomson – direct

1          MR. KUBY:  You know what?  I'm going to withdraw the

2     objection at this point.  I mean, this is just a gross

3     mischaracterization of the record.  But rather than hear

4     Ms. Glavin's version of it, I'll withdraw the objection.

5          I'll sit down, I'll shut up, and then when it's my

6     turn to talk, I'll talk again.

7          THE COURT:  Yes, sir.

8          MR. KUBY:  Right?

9     BY MS. GLAVIN:

10    Q.  Mr. Thomson, I think we had asked if you were aware of

11    instances in which Mr. Donziger in the litigation that Chevron

12    had against Mr. Donziger had sought stays in the Second

13    Circuit.

14    A.  Yes.

15    Q.  Do you have examples of that?

16    A.  Mr. Donziger sought stays from the Second Circuit in the

17    1782 litigation, as well as in the -- what was known as the

18    Count IX litigation in which he attempted to intervene as a

19    defendant.

20              (Continued on next page)

21

22

23

24

25

1   BY MS. GLAVIN:

2   Q.  I am going to show you 10MC-02.  This is Government Exhibit

3   3, certified copy of the docket sheet.

4           Move for admission.

5           (Government's Exhibit 3 received in evidence)

6           MR. KUBY:  I'm sorry.  I don't object to the document

7   being introduced outside of the grounds that this Court has

8   already ruled upon.  I think this is irrelevant.  I think the

9   Court has found it to be relevant and -- fine.  Go ahead.  It's

10  a bench trial, as you said.

11  BY MS. GLAVIN:

12  Q.  Mr. Thomson, do you recognize this docket sheet?

13  A.  Yes.

14  Q.  What case is this docket sheet from?

15  A.  This is from the 1782 litigation.

16  Q.  What particular 1782 litigation was this?

17  A.  This was the 1782 litigation directed to Mr. Donziger.

18  Q.  If you could just explain when you say "1782 litigation"

19  what you mean?

20  A.  Twenty U.S.C. Section 1782 revised a procedure for

21  litigants to take discovery in U.S. District courts for use in

22  foreign judicial proceedings.

23  Q.  And in connection with this 1782 proceeding what was

24  Chevron seeking from Mr. Donziger?

25  A.  Chevron sought issuance of document requests, subpoenas or

L5DAADON3                           Thomson - Direct

1   documents and a subpoena for a deposition.

2   Q.  I am going to show you what is Government Exhibit number

3   400.  And have you had an opportunity to review this document

4   before today?

5   A.  Yes.

6   Q.  What is this?

7   A.  This is Judge Kaplan's order denying Mr. Donziger's motion

8   to quash the subpoenas that Chevron and the individual

9   petitioners served them in.

10  Q.  And did Judge Kaplan make any finding with respect to

11  privilege waiver?

12  A.  Yes.

13  Q.  What was Judge Kaplan's finding?

14  A.  Judge Kaplan found that Mr. Donziger's failure to supply a

15  privilege log within the timing specified within the local

16  rules effected the waiver of his privileges that might

17  otherwise have applied.

18          MS. GLAVIN:  Move for admission of Government Exhibit

19  400.

20          MR. KUBY:  Sure.

21          THE COURT:  Received.

22          (Government's Exhibit 400 received in evidence)

23          MR. KUBY:  If we could go to ECF page seven.

24  Q.  Mr. Thomson, if you could read what Judge Kaplan wrote on

25  page seven under "forth" just the first sentence?

1    A.  Donziger's privilege claims have been waived are premature

2    or both.  Insofar as he claims privilege with respect to the

3    requested documents, the failure to file a privilege log is

4    required by Local Civil rule 26.2 and Federal Rule 26B5 waive

5    the objections.

6    Q.  Now, did Mr. Donziger pursue an appeal from Judge Kaplan's

7    decision here on October 20, 2010?

8    A.  Yes, he did.

9    Q.  I am going to show you what is Government Exhibit Four and

10   Government Exhibit Five.  Government Exhibit Four is the Second

11   Circuit document for 10-4341 and Government Exhibit Five is the

12   docket sheet for Second Circuit appeal 10-4405.

13          How are these two docket sheets related, if at all?

14   A.  These are the docket sheets related to appeals from the

15   Judge Kaplan's waiver order following Mr. Donziger and the Lago

16   Agrio plaintiffs.

17   Q.  So, did the Lago Agrio plaintiffs appeal Judge Kaplan's

18   order denying the motion to quash?

19   A.  Yes.

20   Q.  As well as Mr. Donziger?

21   A.  Yes.

22   Q.  I show you what is Government Exhibit Number 300.

23          MS. GLAVIN:  Your Honor, move in Government Exhibits

24   Four and Five.

25          MR. KUBY:  No objection, judge.

1          THE COURT:  Received.

2          (Government's Exhibits Four and Five received in

3   evidence)

4   Q.  I show you what is Government Exhibit 300.  Have you had an

5   opportunity to review this document before today?

6   A.  Yes.

7   Q.  And what is Government Exhibit 300?

8   A.  This is an emergency stay pending appeal that was filed by

9   the Lago Agrio plaintiffs and Mr. Donziger.

10  Q.  Okay.

11  A.  Moving to stay Judge Kaplan's order.

12  Q.  Is that the order which is Government Exhibit number 400

13  you just testified about?

14  A.  Yes.

15  Q.  And with respect to Mr. Donziger, was he represented by

16  counsel for purposes of this appeal?

17  A.  Yes, he was.

18          MS. GLAVIN:  Your Honor, move for admission of

19  Government Exhibit number 300 which is on the docket sheet from

20  Government Exhibit Number Four.

21          MR. KUBY:  Sure.

22          THE COURT:  Received.

23          (Government's Exhibit 300 received in evidence)

24  Q.  Could we go to ECF page three.

25          And Mr. Thomson, if you could just read the first

L5DAADON3                          Thomson - Direct

1  paragraph?

2  A.   Appellants, the plaintiffs in related civil action against

3  Chevron and Lago Agrio Ecuador, the Lago Agrio plaintiffs, and

4  Steven Donziger submit this memorandum in support of their

5  Federal Rule of Appellate Procedure 882 motion for Romanette

6  one, a stay of the order of Honorable Lewis A. Kaplan dated

7  October 20, 2010, the order pending this Court's determination

8  of the appeal and Romanette two, a temporary stay of the order

9  pending a hearing on the instant motion.

10  Q.   If I could turn your attention to ECF page 16 of Government

11  Exhibit 300, and if you could read out loud what Mr. Donziger

12  and the Lago Agrio plaintiffs stated in this paragraph which is

13  highlighted.

14  A.   The paragraph is captioned "The subpoenas are Absurdly

15  Broad".  As set forth in Section F of the facts supra, the

16  subpoenas are also absurdly broad and have almost nothing to do

17  with the allegations in the petitions.  It is inequitable and

18  highly burdensome to require Mr. Donziger to produce a

19  privilege log for 20 years of litigation without substantially

20  narrowing the subpoena which is clearly designed to harass and

21  burden adversarial counsel.

22         Citing Murphy v. Gorman.

23  Q.   Turn to ECF page 18 of the motion filed by Mr. Donziger and

24  the Lago Agrio plaintiffs.

25         If you could read the highlighted portion beginning

1   with "irreparable injury absent a stay".

2   A.  Absent a stay, Donziger and the Lago Agrio plaintiffs will

3   suffer irreparable injury because they stand to lose their

4   right to appeal, as the production and intended dissemination

5   of subpoenaed materials will likely deprive this Court of the

6   ability to provide the Lago Agrio plaintiffs with any effective

7   relief rendering moot any appeals from the order.

8   Q.  And going to show you what is Government Exhibit number

9   301.  Do you recognize this?

10  A.  Yes.

11  Q.  What is this?

12  A.  This is the Second Circuit's order granting Mr. Donziger

13  and the Lago Agrio plaintiffs request for a temporary stay and

14  setting down a briefing schedule.

15  Q.  And the date of this order is?

16  A.  Says October 27, 2010.

17  Q.  Turning to Government Exhibit 302.

18          MS. GLAVIN:  Move for admission of Government Exhibit

19  301.

20          MR. KUBY:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 302 received in evidence)

23  Q.  Turning to Government Exhibit 302, do you recognize this?

24  A.  Yes.

25  Q.  What is this?

1    A.   This is the order from the Second Circuit denying the

2    motion for a stay and also setting down an expedited briefing

3    schedule and calendaring the case for oral argument on an

4    expedited basis.

5              MS. GLAVIN:   More for admission of 302.

6              MR. KUBY:   No objection.

7              THE COURT:   Received.

8              (Government's Exhibit 302 received in evidence)

9    Q.   Mr. Thomson, do you see where the Second Circuit states it

10   is further ordered that appellant's motion to expedite the

11   appeal is granted?

12   A.   Yes.

13   Q.   Had the appellants filed a motion to expedite this appeal?

14   A.   Yes.

15   Q.   Now, while that appeal from Judge Kaplan's October 20, 2010

16   decision was pending, did Judge Kaplan again address the

17   privilege waiver that was discussed in the October 2010 order?

18   A.   Yes.

19   Q.   Showing you what is Government Exhibit number 401 just to

20   orient you, Mr. Thomson.

21             THE COURT:   For some reason we can't hear you.

22             MS. GLAVIN:   Can you hear me now?

23             THE COURT:   Yes.   Thank you.

24   Q.   Showing you what is Government Exhibit 401 just to orient

25   you, Mr. Thomson.

1      THE WITNESS:  Thank you, your Honor.

2   Q.  If you could just look at, have you looked at ECF page 20.

3   Do you recognize what that opinion by Judge Kaplan is?

4   A.  Yes.  This is Judge Kaplan's furthered order on the waiver

5   issue in particular responding to a motion to reconsider the

6   waiver finding.

7   Q.  And who filed the motion to reconsider the waiver finding?

8   A.  Mr. Donziger in the last.

9           MS. GLAVIN:  Move for admission of 401.

10          MR. KUBY:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 401 received in evidence)

13  Q.  Turning your attention to ECF page 20.  And if you could

14  read out loud, Mr. Thomson, starting with "in any a case" and

15  read to the bottom of the page.

16  A.  In any case having accepted Donziger's invitation to

17  reconsider the waiver issue, the Court considers itself free to

18  take into account all relevant factors.  The first of these

19  factors is the clarity of Rule 26.2C in Donziger's failure seek

20  relief from the Court.  These cut in favor of waiver "it should

21  be clear to all attorneys the Federal Rules of Civil Procedure

22  and the local civil rules are not starting points for

23  discussion concerning the handling of privilege documents, nor

24  are they merely suggested practice guidelines that attorneys

25  are free to disregard.  They are rules.  And in the absence of

1      the court order or stipulation providing otherwise, they must

2      be obeyed".  This view is supported by our circuit's holdings

3      that an attorney's failure to adhere to a clear rule of court

4      or a procedure rarely will be regarded that excusable neglect

5      or purposes granting relief under the Federal Rule 60B.

6              Second, Donziger's failure, even if the failure to

7      submit the log with the motion to quash or to seek an extension

8      of time initially was no more than inattention to the rule

9      quickly became something else.

10             Shall I continue?

11     Q.   Continue.

12     A.   The failure to provide the requisite privilege log was

13     called to Donziger's attention on September 1, 2010 when the

14     individual petitioners filed a brief in opposition to the

15     motion to quash and argued that the failure to produce a

16     privilege log or demonstrate that it would have been unduly

17     burdensome to have done so warranted rejection of the privilege

18     claims.  Even then however no privilege log was forthcoming and

19     no request for an extension was made.

20             In view of these considerations alone, this Court

21     holds that any claims of privilege with respect to the

22     documents sought by the subpoena were waived.

23     Q.   You can stop right there.

24             Go to ECF page 26 and if you could read aloud what

25     Judge Kaplan wrote.

A.  To be sure, the Court accepts that preparation of the

privilege log took a good deal of effort.  It does not doubt

that Donziger understandably wished to avoid doing it if you

could defeat the subpoenas without it but the proper course

would have been to apply to the Court for relief under Rule

26.2.  That would have given Chevron and the individual

petitioners an opportunity to resist.  Instead, Donziger and

the Lago Agrio plaintiffs took their chances that the Court

would not hold that their failure to provide that the privilege

log waived any privileges.  In all the circumstances that is a

bet that they should lose, regardless of whether there is any

per se rule of waiver.

Q.  You could stop right there.

     Mr. Thomson, did Mr. Donziger through his attorney at

that time file a motion in the Second Circuit in connection

with this November 29, 2010 decision by Judge Kaplan?

A.  Yes, they filed a motion to stay.

Q.  Showing you what is Government Exhibit 303, do you

recognize it?

A.  Yes.

Q.  What is it?

A.  This is the emergency motion to stay pending appeal.

Q.  And who were the moving parties to this motion?

A.  It's the Lago Agrio plaintiffs here identified as the

Ecuadorian plaintiffs and Steven Donziger.

1              MS. GLAVIN:  And move for admission of Government

2     Exhibit 303.

3              MR. KUBY:  Sure.

4              THE COURT:  Received.

5              (Government's Exhibit 303 received in evidence)

6     Q.  Go to ECF page two.

7              If you could read out loud, Mr. Thomson, the statement

8     that is highlighted under preliminary statement or statement

9     made by the Lago Agrio plaintiffs and Mr. Donziger?

10    A.  This urgent motion arises from a startling ruling last

11    evening compelling immediate production by an attorney of

12    thousands of privileged documents on a two thousand page

13    privilege log, essentially, his entire privileged case file.

14    This baseless, unfair and highly prejudicial order should be

15    stayed immediately.

16    Q.  Mr. Thomson, if I could turn you to Government Exhibit 304.

17    Do you recognize this document?

18    A.  Yes.

19    Q.  What is it?

20    A.  This is the Second Circuit's order denying the emergency

21    motion for a stay, November 29, 2010.

22             MS. GLAVIN:  Move for admission of 304?

23             MR. KUBY:  Yep.  No objection.

24             THE COURT:  Received.

25             (Government's Exhibit 304 received in evidence)

1    Q.  And going to Government Exhibit Number 305, take a look at

2    this, Mr. Thomson.  Have you had an opportunity to review this

3    before your testimony today?

4    A.  Yes, I have.

5    Q.  Go to page two.  And if could you look at page three and

6    look at ECF page four.

7           What did the Second Circuit rule with respect to the

8    consolidated appeal of the LAPs and Mr. Donziger from the

9    denial of the motion to quash?

10   A.  The Second Circuit affirmed Judge Kaplan's denial of the

11   motion to quash and the waiver findings and complemented the

12   quote, April district judge in the way he's discharged his

13   duties.

14   Q.  Mr. Thomson, you mentioned another incident in which

15   Mr. Donziger sought a stay.  You referred to Count Nine?

16   A.  Yes.

17   Q.  I want to turn your attention to --

18           MS. GLAVIN:  Move for admission of 305, your Honor?

19           MR. KUBY:  No objection.

20           THE COURT:  Received.

21           (Government's Exhibit 305 received in evidence)

22   Q.  Mr. Thomson, I want to focus now my questions with respect

23   to Count Nine litigation.  Showing you what is Government

24   Exhibit 1000-327.

25           MS. GLAVIN:  If we could go to the ECF page two so

1   that Mr. Thomson can orient himself and if we could go to the

2   last page so Mr. Thomson can orient himself to the document.

3   Q.  Do you recognize this exhibit?

4   A.  Yes.

5   Q.  What is it?

6   A.  This is Judge Kaplan's decision on Mr. Donziger's motion to

7   intervene in the Count Nine litigation.

8   Q.  And this is a civil case 11 CV 691?

9   A.  Yes.

10         MS. GLAVIN:  Move for admission, your Honor.  This is

11   on the docket sheet as well.

12         MS. TRIVEDI:  No objection, judge.

13         THE COURT:  Received.

14         (Government's Exhibit 1000-327 received in evidence)

15   Q.  Mr. Thomson, can you explain what Mr. Donziger was seeking

16   to intervene on and what Judge Kaplan ruled?

17   A.  Mr. Donziger was seeking to intervene as a defendant in the

18   Count Nine case which had been severed from the remainder of

19   the original case.  Judge Kaplan --

20   Q.  When you say "original case" let me stop you right there.

21   What do you mean?

22   A.  The case that Chevron initiated on February 1, 2011.

23   Q.  Is this the RICO case?

24   A.  That's the RICO case, yes.

25   Q.  And what was Count Nine?

1    A.   Count Nine was a claim for declaratory relief regarding the

2    un-enforceability of the Lago Agrio judgment.

3    Q.   And what happened with respect to Count Nine?

4    A.   It was severed from the rest of the litigation and was

5    going to proceed to trial while the remainder of the case was

6    stayed.

7    Q.   Was Mr. Donziger a defendant in Count Nine?

8    A.   No, he was not.

9    Q.   What, if any, relief did Mr. Donziger seek with respect to

10   Count Nine when Judge Kaplan severed it from the rest of the

11   RICO case?

12   A.   He sought to intervene as a defendant in the case.

13   Q.   And what did Judge Kaplan rule?

14   A.   Judge Kaplan granted the motion to intervene to a limited

15   extent on a limited basis.  In particular Mr. Donziger was able

16   to lodge objections and participate in depositions.

17   Q.   Did Mr. Donziger notice or pursue an appeal from Judge

18   Kaplan's order which is Government Exhibit 1000-327?

19   A.   Yes, he did.

20   Q.   Showing you what is Government Exhibit 302 or -- excuse

21   me -- 306.  Do you recognize that?

22   A.   Yes.

23   Q.   What is it?

24   A.   This is Mr. Donziger's notice of appeal from Judge Kaplan's

25   order on his motion to intervene.

1   Q.   Now, when Judge Kaplan issued his decision on

2   Mr. Donziger's motion to intervene did Mr. Donziger --

3   withdrawn.  Let me show you what is Government Exhibit 501.

4            Move for admission of Exhibit 306?

5            MR. KUBY:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibit 306 received in evidence)

8   Q.   Showing you what is Government Exhibit 501.  Do you

9   recognize this?

10  A.   Yes.

11  Q.   Okay.  What is this?

12  A.   This is Mr. Donziger's application in the district court to

13  stay all proceedings pending his appeal on the Court's order

14  regarding his application to intervene as a defendant in the

15  Count Nine action.

16  Q.   And could we go to page two, ECF page two and move for

17  admission of Government Exhibit 501?

18            MR. KUBY:  Fine, judge.

19            THE COURT:  Received.

20            (Government's Exhibit 501 received in evidence)

21  Q.   And if you could read out loud what Mr. Donziger stated

22  through his attorney in the highlighted portion on ECF page

23  two?

24  A.   A stay is necessary because Donziger will be irreparable

25  harm if discovery motion practice and other pretrial

1   preparations occur in this action without the full and vigorous

2   participation of Donziger and his counsel.  Absent a stay,

3   Donziger will be deprived of any meaningful opportunity to

4   defend his interests in this action.  Moreover, the public

5   interest will be disserved by automatic waste and duplication

6   that will occur if the intervention appeal succeeds and all

7   discovery and motion practice has to be reopened.

8   Q.  Turning your attention to Government Exhibit number 502,

9   and if you could go to ECF page six the last page so that

10  Mr. Thomson can orient himself with the exhibit.

11          Do you recognize Government Exhibit 502?

12  A.  Yes.

13  Q.  What is this?

14  A.  This is Mr. Donziger's motion before the district court to

15  stay the action pending the appeal order on the intervention.

16  Q.  Is this a court order or Mr. Donziger's motion?

17  A.  That's the court order.

18  Q.  And move for admission of Exhibit 502?

19          MR. KUBY:  No problem.

20          THE COURT:  Received.

21          (Government's Exhibit 502 received in evidence)

22  Q.  What was Judge Kaplan's ruling on Mr. Donziger's motion

23  with the statement appeal?

24  A.  The motion was denied.

25  Q.  Showing you what is Government Exhibit and the date of the

1    denial is what date?

2    A.  June 14, 2011.

3    Q.  If we could go to Government Exhibit number 307.  Do you

4    recognize this exhibit?

5    A.  Yes.

6    Q.  Okay.  What is this?

7    A.  This is Mr. Donziger's motion in the Second Circuit to stay

8    all district court proceedings pending appeal related to his

9    intervention motion and the denial by Judge Kaplan, the limited

10   grant, I should say.

11             MS. GLAVIN:  Move for admission of Government Exhibit

12   307.

13             MR. KUBY:  Yes, judge.  No objection.

14             THE COURT:  Received.

15             (Government's Exhibit 307 received in evidence)

16   Q.  And with respect to Government Exhibit 307, it refers to

17   Second Circuit docket number 11-2260.  Do you see that?

18   A.  Yes, I see the docket number.

19   Q.  I am going to show you what's Government Exhibit Number

20   Six.

21             MS. GLAVIN:  Your Honor, for the record, this is

22   certified copy of the docket sheet or Second Circuit case

23   number 11-2260 move for admission.

24             MR. KUBY:  Sure.

25             THE COURT:  Received.

1          (Government's Exhibit 11-2260 received in evidence)

2    Q.  Now, if we could go back to Government Exhibit 307, if we

3    could look up the top left.  Do you see that the motion form

4    states to set forth below precise complete statement of relief

5    sought; do you see that, Mr. Thomson?

6    A.  Yes.

7    Q.  And what did Mr. Donziger through his attorney say the

8    relief was that he was seeking?

9    A.  The appellate seeks a stay of all district court proceeding

10   appellants seek a stay of all district court proceedings

11   pending resolution of this appeal (or, alternatively, pending

12   resolution of this mandamus petition).

13   Q.  And if we could go to where it states "moving party"?

14   A.  Mr. Donziger and his law offices.

15   Q.  And if we turn your attention to ECF page five and if you

16   could read out loud the highlighted portion of Mr. Donziger's

17   brief?

18   A.  Appellant Steven Donziger and he lists his law offices.

19   Hereby move the Court for an order staying all district court

20   proceedings in Southern District of New York case number 11 CV

21   3718 (UA), until this court decides the merits of this matter

22   whether treated as an appeal or as a petition for writ of

23   mandamus.

24          As required by Federal Rule of appellate procedure

25   8A1-A Donziger moved first in the district court or stay

1   requested here.  The district court denied Donziger's motion.

2   Appellee Chevron Corporation opposes this motion.

3   Q.  And what was the date that Mr. Donziger filed this motion

4   to the circuit for a stay?

5   A.  It says June 29, 2011.

6   Q.  I am going to show you what is Government Exhibit 308.

7   Look at the date at the top Mr. Thomson.

8   A.  This is dated June 30, 2011.

9   Q.  Okay.  Do you recognize what that document is, Government

10  Exhibit 308?

11  A.  Yes.

12  Q.  What is this?

13  A.  This is Mr. Donziger's opening brief on appeal regarding

14  the motion.  I'm sorry.  The order on his motion to intervene.

15          MS. GLAVIN:  Move for admission of Government Exhibit

16  308, your Honor?

17          MR. KUBY:  Judge, I really with all due respect to

18  Ms. Glavin think that she is more than gilding this petroleum

19  slick lily here.  We have gone through this and through this

20  and through this.  Surely, I mean Judge Preska, not Shirley, I

21  mean certainly there is some Rule 404, 403 about redundancy and

22  we're redundantly redundant at this point as to what

23  Mr. Donziger did through counsel back in 2010.  Please, pull

24  the plug.

25          THE COURT:  How are we doing, Ms. Glavin?

1             MS. GLAVIN:  We're just about done.

2             THE COURT:  Cool.  Thank you.

3             MR. KUBY:  I should have objected earlier.

4             MS. GLAVIN:  You wouldn't have gotten the same answer

5     from me.

6             MR. KUBY:  I might have gotten -- never mind.  Moving

7     on.

8             MS. GLAVIN:  All right.  Move for admission of

9     Government Exhibit 308.

10            MR. KUBY:  Sure, subject to my --

11            THE COURT:  Received.

12            (Government's Exhibit 308 received in evidence)

13            MS. GLAVIN:  If we could go to ECF page 52 and if you

14    could go to the bottom of that page.  Could you read the

15    highlighted portion on ECF page 52.

16    A.  Alternatively, this matter satisfies the conditions for

17    issuing a writ of mandamus.  Chevron's motion to dismiss this

18    appeal for lack of appellate jurisdiction is pending.  If the

19    Court grants the motion Donziger asks that the Court treat this

20    brief either as a petition for writ of mandamus or as a

21    petition for leave to file a writ of mandamus.

22    Q.  If you could continue to the next page and read out loud

23    the highlighted portion.

24    A.  Mandamus relief is appropriate where inter alia a district

25    court's denial of intervention is "based on an erroneous legal

 1    principle", citing San Jose Mercury News.

 2                Three conditions must be satisfied before the writ may

 3    issue, "First the party seeking relief must have "no other

 4    adequate means to attain the relief he desires.  "

 5                Second, the petitioner must show that his right to the

 6    writ is "clear and undisputable".

 7                And third, the issuing Court must be satisfied that

 8    the writ is appropriate under the circumstances.  Citing the

 9    Stein case.

10                All three conditions are met here.

11    Q.  Mr. Thomson, did the Second Circuit rule on Mr. Donziger's

12    motion to stay in their petition?

13    A.  Yes.

14    Q.  Showing you what is Government Exhibit 309.  Go to the next

15    page to orient Mr. Thomson.

16                Do you recognize this?

17    A.  Yes.

18    Q.  What is it?

19    A.  This is the Second Circuit's order on Mr. Donziger's appeal

20    of Judge Kaplan's order on his motion to intervene in the

21    District Court Count Nine proceedings.

22                MS. GLAVIN:  I move for admission.

23                MR. KUBY:  Sure.

24                THE COURT:  Received.

25                (Government's Exhibit 309 received in evidence)

1    Q.   What did the Court of Appeals rule?

2    A.   The Court grants appellee Chevron's motion to dismiss the

3    appeal for lack of jurisdiction.  It also further orders that

4    Mr. Donziger's request for mandamus relief is denied.  It

5    therefore orders the motion to stay as moot as.

6    Q.   Following this denial or this decision by the Second

7    Circuit, did Mr. Donziger seek any further relief from the

8    Second Circuit on this issue?

9    A.   I believe he filed a motion for reconsideration.

10   Q.   If you could go to Government Exhibit Number Six which is

11   the docket sheet appeal 11-2260 and if you could look at Docket

12   Entry 97.

13            What does Docket Entry 97 reflect?

14   A.   A motion filed by Mr. Donziger to reconsider.

15   Q.   Now, Mr. Thomson, I want to move on to another topic.  I

16   want to focus your attention now on 2014.  I show you what is

17   Government Exhibit 1901 and if we could go to ECF page 32.

18            Do you recognize this document, Mr. Thomson?

19   A.   Yes.

20   Q.   And what is Judge Kaplan directing here?

21   A.   This Judge Kaplan's order granting in part the motion named

22   by Mr. Donziger to stay the judgment.  The part that is granted

23   is that rather than being required to transfer Mr. Donziger's

24   shares you can always call it Amazonia to Chevron that instead

25   Mr. Donziger was required to transfer those shares to the clerk

1   of the Court.

2   Q.  Now, subsequent to this order by Judge Kaplan on April 25,

3   2014, were you on e-mail correspondence with Mr. Donziger

4   relating to that order?

5   A.  Yes.

6   Q.  Show you what is Government Exhibit 100.  If you just go to

7   page two of this exhibit to orient Mr. Thomson.  Do you

8   recognize this exhibit, Mr. Thomson?

9   A.  Yes.

10  Q.  Okay.  What is it?

11  A.  This is an email transmitting correspondence from Randy

12  Mastro to Mr. Donziger and his lawyers.

13  Q.  And what's the date of the email to Mr. Donziger?

14  A.  This is August 7, 2014.

15  Q.  And you are CC'd on this, sir?

16  A.  I am.

17  Q.  And do you see in the "to" line it is to Zoe@littlepage

18  booth.com --

19  A.  Yes.

20  Q.  Who is Zoe and who is R. Friedman?

21  A.  The first Zoe Little Page and Rick Friedman, two of

22  Mr. Donziger's lawyers in the RICO trial.

23          MS. GLAVIN:  Okay.  If we could go to the attached

24  correspondence that was emailed.  Your Honor, I would have the

25  witness read out loud the letter in its full but I don't want

1    to delay things but I think this is worth reading into the

2    record.

3          MR. KUBY:  Well, that's delightful, judge.  And I have

4    a lot of things I would like to read into the record as well

5    that I think are worthwhile but this relates to the subject

6    matter of this letter relates to the transfer of Amazonia

7    shares, something that Mr. Donziger for whatever reason is not

8    charged with in this case.  We've spent an entire day with Anne

9    Champion with respect to Amazonia shares issue.  Now, I'm sure

10   there is some point here and I'm sure it's a point that I

11   believe I'm missing but surely, what ever it is, it has been

12   made already.

13         THE COURT:  Ms. Glavin.

14         MS. GLAVIN:  Your Honor, Mr. Donziger entered, filed

15   with Judge Kaplan a letter in 2018 after Chevron had moved to

16   hold him in contempt on two grounds.  One, failure to transfer

17   the Amazonia shares.  Two, violation of paragraph five of the

18   RICO judgment with respect to Elliot management.

19         Mr. Donziger pointed to Chevron and said I've tried to

20   come up with a common sense solution and they didn't tell you

21   that I offered to do this.  This goes to Chevron putting

22   Mr. Donziger on notice in August of 2014 that he needed to

23   comply with the April 25, 2014 order by Judge Kaplan directing

24   him to surrender to the Clerk of the Court, a stock power in

25   favor of the Clerk of the Court.  Mr. Donziger did not do that.

This goes to his state you mind, him being put on notice.

And with respect to Amazonia, Mr. Kuby has raised this over and over.  Defense has been on notice for over a year.  No, not over a year, about a year, that this would be put in as 404(b) evidence or as evidence inextricably intertwined to tell the story of Mr. Donziger's contempt with respect to Counts Four and Five which is his failure to assign his contingent interest from 2011 and from 2017 because those three acts or I should say the three interests he had, Amazonia, 2011 contingent fee and the 27 contingent fee are all related.  We think it goes directly to Mr. Donziger's state of mind.

And what essentially we will argue to the Court in summation is that Mr. Donziger throughout 2018 played a shell game.  My interest is here.  No, this isn't my interest.  Amazonia doesn't existed.  Well, it did back in 2014 and in Donziger didn't want to surrender shares and then it didn't exist and so now it's a contingent fee.  But the contingent fee doesn't mean anything -- 2017 contingent.  Now I'm not going to sign over the 2017 contingent fee because I signed over the 2011 contingent fee.

THE COURT:  Slowly.

MR. KUBY:  I thought that was a perfect delivery for the argument that they are making and I very much appreciated that inextricable intertwinement.  We went on for two hours about Amazonia on Monday in this case.  I objected.  The Court

L5DAADON3                          Thomson - Direct

1    overruled it.  We went through it.  We spent the whole day on

2    it.  During cross-examination we dealt with the issue of what

3    happened with Amazonia.  We dealt with compliance and

4    noncompliance.

5              We also addressed Counts Four and Counts Five as

6    things that kind of grew out of Amazonia but ultimately became

7    charges in this case unlike Amazonia.  You know, I understand

8    that the notion that to some extent you need to tell a back

9    story in a narrative to bring out the full story.  But now

10   Amazonia is a giant tail at this point wagging a very small

11   dog.  We have Counts Five and Four.  We are addressing those.

12   They're being litigated.  More Amazonia?  Really?  Thursday

13   afternoon at five minutes after we've been through this for a

14   day and a half.

15             I mean look, I don't know why Judge Kaplan didn't

16   charge Mr. Donziger with contempt of court on Amazonia.  He

17   seemed to be prolific enough.  Maybe he thought six counts was

18   enough.  Bastante, which means enough in my very bad Spanish.

19             THE COURT:  All right.  Overruled.

20   BY MS. GLAVIN:

21   Q.  Mr. Thomson, if you could read the letter that Gibson Dunn

22   e-mailed to Mr. Donziger and his attorneys on August 7 of 2014

23   into the record.

24   A.  Counsel, I write on behalf of Chevron Corporation to

25   request long overdue compliance with the Court's final judgment

L5DAADON3                         Thomson – Direct

against Steven Donziger and his law firms (together Donziger)
in the above captioned matter.

As you are aware, on March 4, 2014, the Court issued a
final judgment ordering Donziger, among other things, to
"execute in favor of Chevron a stock power transferring all of
his right, title and interest in his shares of Amazonia
recovery limited.  During the pendency of Donziger's motion to
stay enforcement of the Court's judgment Chevron did not
request that Donziger proceed with the transfer despite the
Court recognizing "there is no just reason for delay".

On April 25, 2014 the Court ruled on Donziger's motion
to stay the enforcement of the judgment and found his
"arguments lacked merit" and "an immediate transfer of
Donziger's Amazonia shares to Chevron would threaten Donziger
with no irreparable injury." Nevertheless, the Court found that
"the overriding concern of prevent Donziger from benefiting
from the fraud he committed may be achieved during the pendency
of appeal by taking the shares out of Donziger's hands without
placing them into Chevron's.

The Court therefore, amended its judgment to order
Donziger to "execute in favor of the Clerk of this Court a
stock power transferring to the clerk all of his right, title
and interest in his shares of Amazonia.  The Court denied
Donziger's request to stay enforcement of the judgment against
him in all other respects.

1     There is no reason for further delay.  We request that

2     Donziger promptly comply with the Court's judgment as amended

3     and transfer his interest in Amazonia to the Clerk of the

4     Court.  Indeed, it is now August 7, or more than five months

5     after the Court issued its judgment and three months after the

6     judgment was amended and Donziger already should have done so.

7     Donziger, of course should have also already complied with the

8     other aspects of Court's judgment including the transfer to

9     Chevron of any of Donziger's property that is traceable to the

10    Ecuadorian judgment.  Please tell us when Donziger will comply

11    with the judgment in full which should in no event be later

12    than August 21.  This provides you with an additional two weeks

13    of time to perform the relatively simple acts contemplated by

14    the judgment.  We are even willing to provide a form stock

15    power agreement for Donziger's use.  If Donziger does not

16    comply in full by August 21, we will be forced to seek the

17    Court's assistance including by an application to hold Donziger

18    in contempt.

19            MS. GLAVIN:  Your Honor, move into evidence Government

20    Exhibit 100.

21            MR. KUBY:  Just objection based on redundancy, judge.

22            THE COURT:  Overruled.  Received.

23            (Government's Exhibit 100 received in evidence)

24    Q.  Showing you Government Exhibit 101, Mr. Thomson.

25            Is this a further email exchange in connection with

1     Government Exhibit 100 which is in evidence?

2     A.  Yes.

3     Q.  So starting at the bottom, is Mr. Donziger on this e-mail

4     correspondence?

5     A.  Yes, he is.

6     Q.  And are you on this as well?

7     A.  Yes, I am.

8          MS. GLAVIN:  Move for admission of Government Exhibit

9     101.

10         MR. KUBY:  No objection.

11         THE COURT:  Received.

12         (Government's Exhibit 101 received in evidence)

13    Q.  Starting at the bottom, the email August 7, 2014 at 5:47

14    p.m. for Mr. Bell, is that the email that we just saw in

15    Government Exhibit 100?

16    A.  Yes.

17    Q.  Okay.  Going to the next email on that chain, who responded

18    to who and what did they say?

19    A.  Mr. Friedman responded looks like responded to all saying,

20    please, send the stock document you referenced in your letter.

21    Q.  When Mr. Friedman referred to the stock document you

22    reference in your letter, what did you understand Mr. Friedman

23    to be referring to?

24    A.  It looks like he's referring to the offer to send the form

25    of stock transfer.

L5DAADON3                         Thomson - Direct

1    Q.  And is Mr. Donziger CCed on this email?

2    A.  Yes.

3    Q.  Going up to the next email of this chain, this is an email

4    from Jefferson Bell to Richard Friedman with a CC to

5    Zoe@littlepagebooth, Steven R. Donziger.  On August 8, 2014 at

6    3:38 p.m. and the email states, please, find attached a form

7    stock power agreement.

8             And was there an attachment?

9    A.  Yes.

10   Q.  We're going to page three of this exhibit and what is on

11   page three of the exhibit?

12   A.  This is the formal stock form of stock power transmitted to

13   Mr. Friedman and the other CC.

14   Q.  And this stock power which was emailed to Mr. Donziger and

15   his attorneys, what does it assign?

16   A.  This assigns Mr. Donziger's interests in Amazonia Recovery

17   Limited.

18   Q.  Okay.  To who?  Look at the third line.

19   A.  To the Clerk of the US District Court for the Southern

20   District of New York.

21   Q.  And at this time as of August 8 of 2024 Mr. Thomson was

22   Mr. Donziger's appeal of the RICO judgment pending?

23   A.  I believe so, yes.

24   Q.  Showing you what is Government Exhibit 102.  If you look at

25   top of Government Exhibit 102 and the email addressees.

1    Mr. Thomson, you're not on this email; is that correct?

2    A.   That's correct.

3    Q.   Do you recall whether or not you saw this email even though

4    you were not CCed on it at or around August 22 of 2014?

5    A.   Yes.  It was forwarded to me the same day.

6    Q.   And who is this email from?

7    A.   It's from Mr. Donziger.

8             MS. GLAVIN:  Move for admission of Government Exhibit

9    102?

10            MR. KUBY:  No objection, judge, except I will note

11   it's after one which is typically our lunch break.  While it

12   was my certain hope we would conclude the proceedings today by

13   five o'clock, Ms. Glavin has chosen a litigation strategy that

14   I am fairly comfortable we'll preclude that.  So, we should

15   take our lunch and be prepared I think subject to the Court to

16   give up our Friday or at least or Friday morning.

17            MS. GLAVIN:  Your Honor, I actually can finish this.

18   Well, we can take the lunch.

19            THE COURT:  Finish the document, please.

20            MS. GLAVIN:  This is the last exhibit.

21            Mr. Thomson --

22            THE COURT:  Did you move?

23            MS. GLAVIN:  Move for admission.

24            MR. KUBY:  Sure.

25            THE COURT:  Received.

1          (Government's Exhibit 102 received in evidence)

2     Q.  Mr. Donziger says, please, see attached correspondence and

3     proposed stipulation.

4          Can we go to page two of Government Exhibit 102.  And

5     what is on page two, I guess three or four?

6     A.  This is Mr. Donziger's response to Mr. Mastro's letter.

7     Q.  If we could go to page two and if we could highlight in the

8     second paragraph beginning with "the upshot", and if you could

9     read that sentence by Mr. Donziger starting with "the upshot"?

10    A.  The upshot is that a simple transfer to the clerk's office

11    of my Amazonia shares would in practice mean the complete

12    divesture and potentially irretrievable loss of more than two

13    decades of labor on the part of me and some of my colleagues

14    before the Second Circuit even has a chance to decide on appeal

15    from Judge Kaplan's judgment.

16    Q.  And did Mr. Donziger provide a stipulation, a proposed

17    stipulation of this letter?

18    A.  He did.

19    Q.  And is that the stipulation regarding compliance which is

20    attached?

21    A.  I believe so, yes.

22    Q.  And in sum and substance can you tell us what

23    Mr. Donziger's proposed stipulation was?

24    A.  That he would not convey or transfer his interests in the

25    Amazonia shares to the clerk of the court but that he would

L5DAADON3                          Thomson - Cross

1   make certain promises not to do other things with those shares.

2   Q.  Did Chevron agree to that stipulation?

3   A.  No.

4   Q.  Did Mr. Donziger seek any relief from Judge Kaplan's

5   directive that he execute a stock power in favor of the clerk

6   of the court for Amazonia shares?

7   A.  No, he did not.

8          MS. GLAVIN:  Your Honor, I have no further questions.

9          MR. KUBY:  Judge, could I just take two minutes to get

10  the witness under cross before we break?

11         THE COURT:  Certainly.  Go right ahead.

12         MR. KUBY:  Thank you so much.

13         THE COURT:  I thought you were hungry.

14         MR. KUBY:  I am.  I am hungry for justice.

15  CROSS-EXAMINATION

16  BY MR. KUBY:

17  Q.  Good afternoon, Mr. Thomson.

18  A.  Good afternoon.

19  Q.  This will not be brutal.  I'd like to just ask you a couple

20  questions about your background.

21  A.  Sure.

22  Q.  You went to Princeton, correct?

23  A.  I did.

24  Q.  Then you went to UCLA Law; is that right?

25  A.  That's correct.

L5DAADON3                         Thomson - Cross

1    Q.  And then if that were not enough you went to the University

2    of Chicago, is a correct, for a masters degree?

3    A.  Your timing is a little off but yes, I did go to the

4    University of Chicago for a masters degree.

5    Q.  Then you went to the University of Chicago for a PhD; is

6    that correct?

7    A.  Yes.

8    Q.  In political science?

9    A.  Correct.

10   Q.  You're fluent in Spanish?

11   A.  French.

12   Q.  Are you familiar with the English version of the quote

13   "there is hardly any political question in the United States

14   that sooner or later does not turn into a judicial question"?

15   A.  I believe I've heard that, yes.

16   Q.  And who wrote that?

17   A.  I think that's a quote from Alexis de Tocqueville.

18   Q.  You did a dissertation on Alexis de Tocqueville, correct?

19   A.  Yes.

20   Q.  You thought that quote was true then?

21   A.  I believed that quote was accurate then.

22   Q.  And today too, right?

23   A.  Generally accurate today too.

24           MR. KUBY:  Thank you.

25           Break for lunch and we will move on to the substance.

1           Thank you.

2           THE COURT:  All right.  Five after two.

3           (Luncheon recess)

4           (Continued on next page)

```
 1                A F T E R N O O N   S E S S I O N

 2                           2:10 P.M.

 3           THE COURT:  Mr. Kuby.

 4           MR. KUBY:  Thank you, Judge.  May I proceed?

 5           THE COURT:  Yes, sir.

 6           MR. KUBY:  And once again, I just want to note for the

 7   Court that when I'm talking in this, like, booth, my voice

 8   booms out to me in an echo chamber.  And sometimes when the

 9   Court speaks, I don't hear you.  I see you doing speaking-like

10   things; so if I don't stop immediately, it is that.  And

11   there's no way I'm insouciant, if you will, to the requirement

12   that you talk and I stop.

13           THE COURT:  Yes, sir.

14           MR. KUBY:  Thank you.

15   WILLIAM THOMSON, resumed.

16   BY MR. KUBY:

17   Q.  Good afternoon again, Mr. Thomson.

18   A.  Good afternoon.

19   Q.  I want to direct your attention, preliminarily at least, to

20   the 1782 phase of the case.  And that was roughly 2010 into

21   2011?

22   A.  I believe that's correct, yes.

23   Q.  And there were many, many references to what Mr. Donziger

24   did during your direct testimony; correct?

25   A.  There were some references to what he did, yes.
```

1   Q.  Okay.  Some references to what he did.

2          And many, many references to what he did not do?

3   A.  There were some references to what he did not do.

4   Q.  And you knew at that time that he was represented by

5   counsel; correct?

6   A.  Yes, he had counsel who appeared on the record.

7   Q.  And I think at one point Bruce Kaplan?

8   A.  That sounds correct.

9   Q.  No relation to Judge Kaplan.

10  A.  Not as far as I know.

11  Q.  But not a solo practitioner, right?

12  A.  Correct.

13  Q.  It was an actual, you know, law firm.

14  A.  As I understand, yes.

15  Q.  It wasn't the size of Gibson Dunn Crutcher, but it wasn't a

16  little boutique, right?

17  A.  I couldn't speak to the size of the firm.

18  Q.  And with respect to all of your testimony about all of the

19  filings that Mr. Donziger made during the 1782 process, you

20  don't have any specific knowledge whether Mr. Donziger as a

21  person read any of those, do you?

22  A.  I have no personal knowledge of what Mr. Donziger

23  personally did; correct.

24  Q.  He was proceeding through counsel during that period,

25  right?

L5DVDON4                          Thomson - cross

1   A.  He had counsel of record at that point, yes.

2   Q.  And, of course, it's fair to say even if Mr. Donziger had

3   read those documents, you have no way of knowing whether he

4   actually understood what he was reading; correct?

5   A.  I have no personal knowledge of what Mr. Donziger read or

6   what he personally understood.

7   Q.  Right.  But you know he went to Harvard Law School, right?

8   A.  I've read that, yes.

9   Q.  And I imagine in your time as an appellate litigator,

10  you've met other Harvard Law School grads, right?

11  A.  Yes.

12  Q.  And some of them had been good lawyers?

13  A.  Yes.

14  Q.  And some of them really had no idea what they were talking

15  about?

16  A.  I'm not sure I could characterize any particular lawyers

17  like that, no.

18  Q.  How would you characterize it in a better way?

19  A.  Some Harvard Law graduates are probably better than others

20  as far as being lawyers are concerned, that's probably true.

21  Q.  And there's no -- I mean, outside of the cache of a Harvard

22  Law degree, that does not imbue anybody with a specific set of

23  legal skills, does it?

24  A.  I can't speak to what the Harvard Law degree specifically

25  conveys.  I didn't personally go to Harvard Law School.

L5DVDON4                          Thomson - cross

1    Q.  No, you went to UCLA; correct?

2    A.  Correct.

3    Q.  And you consider yourself a better appellate lawyer than

4    most, fair to say?

5    A.  I have a certain amount of experience in appellate law,

6    yes.

7    Q.  And that certain amount is a greater amount than most

8    people you're up against most of the time, right?

9    A.  It's hard to generalize, but certainly there are many very

10   accomplished appellate litigators who I've litigated against,

11   and there are some who are less experienced, that's true.

12   Q.  Now, did you notice that by 2018, the quality of the legal

13   papers being filed by Mr. Donziger had decreased markedly from

14   the quality that was apparent in 2010 and 2011?

15   A.  It sounds like you're asking me to give an opinion on

16   ongoing litigation, which I'm afraid is covered --

17   Q.  No, I'm asking your opinion on a piece of litigation that

18   had gone on during a specific time frame.  I'm not asking you

19   to characterize ongoing litigation, I'm just trying to get that

20   time frame.  And as George Bush said, We all agree, the past is

21   over.

22            THE COURT:  Is there a question?

23   Q.  Yeah.  Is it fair to say that from the time that

24   Mr. Donziger stopped being represented by counsel, 2010, 2011,

25   2012, maybe 2014, that was a counsel period.

L5DVDON4                          Thomson - cross

1                By 2018, the quality of the papers that he had -- was

2      filing declined significantly?

3      A.   I don't think I can comment on -- you're asking me to give

4      an opinion about an opponent's --

5      Q.   Yeah.

6      A.   -- briefs in an ongoing litigation.

7      Q.   I mean, are you citing a privilege?  Are you reluctant to

8      give your opinion?  Is there an objection being made by

9      somebody?  Are you making an objection?

10     A.   It sounds like you're asking me to give work product.

11     Q.   I'm sorry?

12     A.   It sounds like you're asking me to give a work product, an

13     opinion about the state of what is an ongoing litigation.

14     Q.   No, I'm not.

15                MR. KUBY:  And again, Judge, could you direct him to

16     answer the question?  There's no objection in place.  I don't

17     see Mr. Brodsky there jumping up, as he would if there was a

18     privilege issue.  Can I not have to litigate this with the

19     witness?

20                THE COURT:  Mr. Thomson, are you able to answer the

21     question as it's phrased to you, sir?

22                THE WITNESS:  I don't believe so, no.

23     Q.   Why not?

24     A.   It's not very specific.  I'd need to know which briefs you

25     are talking about.

1    Q.  As a general matter -- well, withdrawn.

2           Are you aware of Steven Donziger participating as an

3    attorney in any other case besides the *Lago Agrio* case?

4    A.  Not specifically, no.

5    Q.  Generally?

6    A.  I have read that he worked as a public defender at one

7    point, but I don't know the content of that and whether that

8    involved representing clients in court with cases, but --

9    Q.  So is it fair to say for the past quarter century the only

10   case which you are -- matter which you are familiar with him

11   handling is the *Lago Agrio* litigation and its many spin-offs?

12   A.  That's generally true, yes.

13   Q.  So at some point in the course of the -- and I'm going to

14   separate out in time periods, I'm going to talk about the

15   post-judgment period, and in this case it's after the RICO

16   judgment.  And I'm going to talk about prejudgment matters

17   which are at any time before the RICO judgment.

18          Prior to the RICO judgment, at one point the firm

19   Emery, Celli, Brinckerhoff & Abady was involved in the case; is

20   that correct?

21   A.  That's correct.

22   Q.  And who were they representing?

23   A.  They were representing the *Lago Agrio* plaintiffs.

24   Q.  And when you filed your RICO action, you sued them; is that

25   correct?

1  A.  We did not sue Emery Celli, no.

2  Q.  Did you sue any defendants from Emery Celli?

3  A.  I don't believe so.

4  Q.  What happened to Emery Celli, if you know?

5  A.  I'm sorry, I don't understand the question.

6  Q.  Withdrawn.

7       At some point Patton Boggs was representing who in

8  this litigation, if you know?

9  A.  They represented the *Lago Agrio* plaintiffs who appeared in

10  the Second Circuit.

11  Q.  And you're familiar with that law firm?

12  A.  Yes.

13  Q.  And did you file an action against them?

14  A.  I don't believe so, no.

15  Q.  Chevron did not file an action against Patton Boggs?

16  A.  I'd have to go back.  I haven't looked at this for a long

17  time.  I don't believe Chevron initiated a lawsuit against

18  Patton Boggs.

19  Q.  Did you file subpoenas -- excuse me, serve subpoenas?

20  A.  If you've got a document to show me, I'd be happy to look

21  at it, but this is quite a while ago, and I -- I don't know

22  whether we subpoenaed Patton Boggs.

23  Q.  Do you have a specific recollection of Patton Boggs

24  withdrawing from this case because they had been virtually

25  driven into bankruptcy by Gibson Crutcher?

1          MS. GLAVIN:  Objection.

2          THE COURT:  Sustained.

3   Q.  Are you aware that Patton Boggs withdrew from this action

4   based on the assertion that they had been driven -- virtually

5   driven into bankruptcy by Gibson Dunn Crutcher?

6          MS. GLAVIN:  Objection.

7          THE COURT:  Sustained.

8   Q.  Who's John Keker?

9   A.  John Keker is a lawyer in San Francisco.

10  Q.  I'm sorry, is a lawyer?

11  A.  In San Francisco, I believe.

12  Q.  Yeah.  Did he have any role in any of this litigation?

13  A.  He was Mr. Donziger's counsel for a period.

14  Q.  And he moved to withdraw; is that correct?

15  A.  He did.

16  Q.  And the reason he cited was that dealing with Gibson Dunn

17  Crutcher had run up about a million dollars worth of bills, and

18  he could simply no longer afford to do this.

19         MS. GLAVIN:  Objection.

20         THE COURT:  Sustained.

21         MR. KUBY:  What's the basis of the objection -- or the

22  sustenance?

23         THE COURT:  I'll let counsel go first.

24         MS. GLAVIN:  Relevance.  Hearsay.

25         MR. KUBY:  Well, it's relevant to show that

L5DVDON4                         Thomson - cross

1   Mr. Donziger's position in 2010, 2011, 2013, and 2014, as a

2   defendant who was well represented by many, many, many

3   attorneys, changed dramatically by 2018.  And so all of the

4   things that Mr. Donziger did or didn't do during the two hours

5   we spent on Count IX and the 1782, in my view, were always

6   irrelevant.  And they are even more -- and so the

7   cross-examination is designed to elicit -- these are all for

8   lawyers.  And all those lawyers ended up being chased out of

9   this case by Gibson Dunn Crutcher and their blitzkrieg-style

10  scorched earth cortege.

11              THE COURT:  Counsel, counsel --

12              MR. KUBY:  But it doesn't make this any less true.

13              MS. GLAVIN:  Move to strike.

14              THE COURT:  But that's not what we are here to talk

15  about, are we?  No press conferences.

16              MR. KUBY:  I don't -- Judge, just because I make a

17  point that may have some resonance outside this courtroom, with

18  due respect, I'm not making it to that audience, I'm making it

19  to this Court.

20              THE COURT:  I hear what you say, sir.  Perhaps the

21  adjectives and the adverbs could be dispensed with.

22              MR. KUBY:  I'm not quite sure I heard that, but --

23              THE COURT:  The adjectives and the adverbs could be

24  dispensed with.

25              MR. KUBY:  I thought "cortege" was pretty good.  I

1    mean, come on.

2              THE COURT:  All right.  Let's go ahead.

3    BY MR. KUBY:

4    Q.  By 2018, Mr. Donziger had represented that he was *pro se*;

5    is that correct?

6    A.  I'm not sure of the exact date, but certainly he did file

7    briefs where he said that he was *pro se*, yes.

8    Q.  In 2018.

9    A.  I don't remember the exact date, but he's filed briefs --

10   if you want to show me one, I'm happy to look at it, but --

11   Q.  You were dealing with Mr. Donziger directly in at least one

12   email exchange?

13   A.  Me personally?  Yes, I was on at least one email exchange

14   with Mr. Donziger.

15   Q.  And you saw other Gibson Dunn Crutcher lawyers dealing with

16   Mr. Donziger directly as well, is that correct?  On emails.

17   A.  Certainly other Gibson Dunn lawyers did have direct

18   dealings with Mr. Donziger, yes.

19             THE COURT:  Mr. Thomson, I'm just going to ask you to

20   try to speak into the microphone.  I know you want to look at

21   counsel.  It's going to help the reporter.

22             THE WITNESS:  Okay.

23   Q.  And without in any way intending to intrude upon your work

24   product in ongoing litigation, is it fair to say that you would

25   not have dealt with Mr. Donziger directly if he were

L5DVDON4                          Thomson − cross

1    represented by counsel, unless you had specific leave from

2    counsel to do that?

3    A.  That is generally true, yes.

4    Q.  And in your review of the docket and from your

5    institutional knowledge of the case, is it fair to say that

6    2018 was a very active year for Chevron in the Donziger

7    litigation as a general matter?

8    A.  As a general matter, yes, it was fairly active.

9    Q.  You issued many subpoenas; correct?

10   A.  Yes, there were a number of subpoenas issued.

11   Q.  Okay.  Well, "a number" can be one or it can be 100.  Can

12   you give me some sense of where the actual number might be?

13   A.  No, I don't know the number.

14   Q.  More than one though?

15   A.  It is more than one.

16   Q.  More than ten?

17   A.  I believe more than ten.

18   Q.  More than 50?

19   A.  I don't know the answer.

20   Q.  More than 100?

21   A.  I don't know the answer.

22   Q.  So somewhere between ten and 100?

23   A.  I don't know how many more than ten the subpoenas were

24   issued.

25   Q.  And some of these were so-called third-party subpoenas as

1   well; is that correct?

2   A.  They were subpoenas issued to third parties, yes.

3   Q.  And there were numerous depositions taking place during

4   2018; is that correct?

5   A.  There were some depositions taking place at that time, yes.

6   Q.  How many?

7   A.  I don't know the actual number.

8   Q.  Well, every post-judgment funder of the Ecuador litigation

9   was deposed; is that correct?

10  A.  I don't know whether that's true or not.

11  Q.  You don't know if that's true.

12          You made some -- a couple of references in your

13  testimony about the 1782s to a privilege log; is that correct?

14  A.  I read some portions of the orders that referenced a

15  privilege log, yes.

16  Q.  Isn't it true that, in fact, Mr. Donziger's attorneys

17  submitted a 2,000-page-plus privilege log?

18  A.  That's what Judge Kaplan's orders reflect, yes.

19  Q.  Is that true?

20  A.  I don't have personal knowledge of the size of the

21  privilege log.

22  Q.  I'm sorry?

23  A.  I'm sorry.  I don't have personal knowledge of the size of

24  the privilege log.

25  Q.  You were involved in litigation though?

1    A.  I was involved in litigation, yes.

2    Q.  Okay.  So Mr. Donziger indeed did -- through counsel, did

3    submit a privilege log, right?

4    A.  That's my understanding, yes.

5    Q.  And whether it was 2,000 pages or 2,010 pages is what you

6    don't have personal knowledge of; correct?

7    A.  I don't have personal knowledge of the size of the

8    privilege log, yes.

9    Q.  And Judge Kaplan ruled it untimely; is that correct?

10   A.  That's my understanding, yes.

11   Q.  Originally -- well, withdrawn.

12          The privilege log referenced thousands and thousands

13   of documents, did it not?

14   A.  I don't know how many documents it referenced.

15   Q.  Did you care?

16   A.  If you're asking me a work product question --

17   Q.  No, I'm asking you a question question.  Did you care how

18   many documents were in this belated, but submitted, privilege

19   log?

20   A.  I don't have any recollection whether I cared or not.

21   Q.  Because whatever you were doing, you were proceeding on

22   apace; correct?

23          THE COURT:  A case or on apace.

24          MR. KUBY:  I'm sorry, Judge, on apace.

25          THE COURT:  With a P, like "Peter"?

1           MR. KUBY:  Yeah.

2           THE COURT:  Okay.  I thought it was a C, like

3    "Charles."

4           MR. KUBY:  Oh, yeah, yeah, I could see how you would

5    think that, because cases and all.  No, no proceeding on apace.

6    A.  I don't understand the question.

7    Q.  Going along your appointed path in this litigation.

8    A.  I'm sorry, I don't understand what you're asking me.

9    Q.  The reason you don't recall caring or not caring about the

10   size of the privilege log was because it didn't affect war

11   strategy at all?

12   A.  It sounds like you're asking me about our litigation

13   strategy.  I'm sorry, I can't answer that.

14   Q.  I'm asking you a question.

15          THE COURT:  Please don't talk over the witness.

16          MR. KUBY:  Judge, I'm sorry.  We have three private

17   prosecutors sitting right here.  We have Reed Brodsky, Gibson

18   Dunn Crutcher partner, who's been sitting -- and former --

19   quite accomplished -- Assistant United States Attorney before

20   he started doing this, sitting there in order to interpose

21   objections, if necessary, on privilege grounds.  Do I really

22   have to indulge a lawyer witness acting like a lawyer instead

23   of a witness?  Do you?

24          THE COURT:  Counsel, I think he said he didn't

25   understand what you are asking.  That's not a very lawyerly

1    response.  It's kind of a witness-like response.

2          MR. KUBY:  I'm sorry, could we have his answer read

3    back, because maybe I didn't hear it correctly, which is

4    entirely possible.

5          THE COURT:  (Reading)

6    "A.  It sounds like you're asking me about our litigation

7    strategy.  I'm sorry, I can't answer that."

8          MR. KUBY:  That is not him saying that he doesn't

9    understand the question, that is him -- Mr. Brodsky has his

10   hand up, Judge.  Would you like to call on him?

11         THE COURT:  Only if you insist.

12         MR. KUBY:  I don't, but I'd hate to see him standing

13   there waving his hand.

14         THE COURT:  Mr. Brodsky, step into the microphone.

15         MR. BRODSKY:  Since Mr. Kuby invited me to point out

16   the objectionable basis of the question, Mr. Kuby was asking

17   for Mr. Thomson's strategy.  And asking a lawyer about his

18   strategy is classic work product.

19         The definition of "work product" is one's attorney's

20   strategic decisions and choices.  So the question is

21   objectionable based on work product.

22         MR. KUBY:  My question, I believe, was:  You were

23   going forward on your appointed course; correct?  I'm not

24   asking about what was going on in his head.  I really don't

25   care.  I was asking what he was doing.

L5DVDON4                          Thomson - cross

1           THE COURT:  In the prior answer, you said, in

2    clarifying your prior question:  (Reading)

3    "Q.  Because whatever you are doing, you were proceeding on

4    apace."

5           And then I asked you "case" with a Charles or "pace"

6    with a Peter.  You said no, proceeding on apace.

7    "A.  I don't understand the question.

8    "Q.  Going along your appointed path in this litigation.

9    "A.  I'm sorry, I don't understand what you're asking me."

10          And then we went on about the privilege log and all.

11          MR. KUBY:  All right, Judge.

12   BY MR. KUBY:

13   Q.  You're a partner with Gibson, Dunn & Crutcher?

14   A.  Yes, I am.

15   Q.  Are you -- I just heard this term today, are you an equity

16   partner?

17   A.  Yes.

18   Q.  So if Gibson, Dunn & Crutcher does well, you do well?  Can

19   you answer that without intruding into some mechanism?

20   A.  I, along with other people, prosper when the firm prospers,

21   yes.

22   Q.  I'm sorry, I didn't hear the last part of the answer.

23   A.  I said along with other people, I prosper when the firm

24   prospers, yes.

25   Q.  And when the firm does not prosper, you don't prosper as

1    much?

2    A.  That would be true.

3    Q.  But you prosper pretty well on an annual basis; is that

4    correct?

5    A.  The firm has done well, yes.

6    Q.  And in terms of client billing, to the best of your

7    knowledge, is Chevron one of the larger clients that you bill?

8    A.  I don't know exactly where Chevron --

9    Q.  I'm not asking exactly.

10   A.  I don't know exactly where it is, but it's one of the

11   larger clients, yes.

12   Q.  So when you say you don't know exactly, do you think it's

13   the largest client?

14   A.  I don't think it's the largest client, no.

15   Q.  Second largest?

16   A.  As I say, I don't really know where in the scheme of things

17   it ranks as a client.

18   Q.  Somewhere near the top though, right?  On a one to ten,

19   it's in the top ten?

20   A.  I couldn't put it one to ten or -- I can't -- I don't know

21   where numerically it falls.  It's not a small client.

22   Q.  It's a huge client, right?

23   A.  It's a large client.

24   Q.  Very large.

25   A.  It's a large client.

1    Q.  But not very large?

2    A.  I'm not sure what you're -- how you're drawing those

3    distinctions, so --

4    Q.  I don't know why you're resisting "very" and insisting on

5    "large," but there we are.

6            I'd like to show you --

7            MR. KUBY:  Judge, I think the prosecution and the

8    defense have reached a stipulation.  And the stipulation is

9    going to be that -- and Ms. Glavin will stop me if I'm wrong.

10           MS. GLAVIN:  I was going to say, which stipulation is

11   this?

12           MR. KUBY:  That we will agree that the breakdown of

13   time, hours, and associates, can be admitted into evidence as

14   to Ms. Champion, who's really already testified to it, and as

15   to Mr. Thomson, but not as to the other GDC partners.

16           MS. GLAVIN:  I think we can resolve this with another

17   chart that lays just that out.  So I'll be happy to --

18           MR. KUBY:  Yeah.

19           MS. GLAVIN:  That's fine.

20           MR. KUBY:  I'm going to use this exhibit now.

21           MS. GLAVIN:  Okay.

22           MR. KUBY:  But it will be amended later on.  And this

23   will be exhibit?  I offer I-51 into evidence.

24           THE COURT:  No objection, right?

25           MS. GLAVIN:  With the limitation.  With the

1   limitation.  And we will replace I-51 at some point.

2              THE COURT:  All right.  Received with that caveat.

3              (Defendant's Exhibit I-51 received in evidence)

4   BY MR. KUBY:

5   Q.  Mr. Thomson, have you ever seen that document before?

6   A.  No.

7   Q.  Take a minute or two and leaf through it.  Focus where your

8   name appears.

9              (Pause)

10  Q.  Have you had a chance to review it?

11  A.  Yes, although since the pages flip back and forth, I wasn't

12  able to study it, but I've looked at what you've shown me.

13  Q.  Okay.  Well, if that becomes an issue, we can address it in

14  a paper copy or something else.

15              Taking a look at that list, to the best of your

16  knowledge, is that a fair and accurate representation of the

17  times that you met with -- either in person or via Zoom -- the

18  private prosecution team, with the exception of May 8th, which

19  is not on there?

20  A.  I haven't really had a chance to -- it looks reasonably

21  close to the number of times, but I -- I haven't actually had a

22  chance to count them up or study the dates and that sort of

23  thing, but it looks reasonably accurate.

24  Q.  And at each of those meetings, there was another Gibson

25  Dunn Crutcher attorney present with you; correct?

L5DVDON4                         Thomson - cross

1    A.  Yes, that's correct.

2    Q.  On April 2nd, for example, there was Shane Baumgardner,

3    Reed Brodsky, Claudia Barrett, Randi Brown, right?

4    A.  Correct.

5    Q.  There was a May 11th meeting also, was there not?

6    A.  I don't recall.

7    Q.  What's today's date?  13th?  That would have been two days

8    ago.  You don't recall a meeting two days ago or --

9    A.  Oh, I'm sorry.  I didn't know what year you were talking

10   about.  I didn't know what calendar year you were talking

11   about.

12   Q.  I'm talking about this one.

13   A.  We met on Tuesday evening, yes.

14   Q.  And about how long did you spend at that meeting?

15   A.  About an hour.

16   Q.  Unless you wish to add these up yourself, I will represent

17   to you that these add up to 17 hours of your time.  Do you have

18   any reason to dispute that?

19   A.  I haven't done the math on the number of hours that they

20   add up to.  That doesn't sound unreasonable though.

21   Q.  So we can accept that subject to future modification as a

22   reasonable number?

23   A.  A working hypothesis, maybe.

24   Q.  Yeah, a working hypothesis.  Thank you very much.

25            And the associate hours, about 42 hours associate

1   hours all together?

2   A.   Without doing the math, I couldn't tell you.

3   Q.   Okay.  Well, you can either do the math or you can accept

4   the representation of 42 hours as a reasonable number?

5   A.   I'm happy to accept that as your representation, yes.

6   Q.   Would you like to do the math?  Go ahead.

7   A.   Not particularly.

8   Q.   Pardon me?

9   A.   I said I would not particularly like to do it.  I can't

10  even manipulate the pages here.

11  Q.   I don't want representations that you're not comfortable

12  accepting as some sort of reasonable number based on what

13  you've seen.  So if you want to just call it my representation,

14  and then we really can't move on from there.  I need you to

15  kind of either do the math or work with me a little here.

16          Your choice.

17  A.   I have no reason to think that's not the correct math for

18  the numbers that are put down here, if that's your question.

19  Q.   Okay.  So 17 hours for you and 42 hours for them.  We can

20  do that math, right?  That's 59 hours.

21  A.   Sounds about right.

22  Q.   About right?

23  A.   I believe that's correct.

24  Q.   Thank you.

25          How much do you bill out per hour?

1    A.   I think it's a little over $1300.

2    Q.   And I'm going to assume the associates bill out at less?

3    A.   That's generally correct, yes.

4    Q.   And Mr. Brodsky here, where does he fall between 1300 an

5    hour and less?

6    A.   I don't know.

7    Q.   You think he makes more than you?

8         Let's take a rough $800 an hour for everybody all

9    together.  And if you multiply that by the number of hours, you

10   get about $47,000 worth of time meeting with the private

11   prosecutors.  That fair to say?

12   A.   It sounds like a reasonable approximation.  Again, I

13   haven't done the math myself, but I'm willing to accept that as

14   your reasonable number.

15   Q.   Okay.  I'll take "reasonable approximation" as the answer.

16        Do you know if that time was billed?

17   A.   I have no knowledge other than my own time, which was not

18   client-billed, no.

19   Q.   Why not?  I'm sorry, do you understand the question?

20   A.   Yeah.  I'm just trying to make sure that there are no other

21   issues.

22   Q.   All right.  Well, I'll let you cogitate about that for a

23   second.

24        (Pause)

25   Q.   Ready?  Let me know when you're ready.  I'm sorry.

1              (Pause)

2    A.   It's not time that was devoted to pursuing the client's

3    litigation.

4    Q.   I'm sorry, could I have that answer read back or repeated?

5              THE COURT:   (Reading)

6    "A.   It's not time that was devoted to pursuing the client's

7    litigation."

8    Q.   Was it time devoted to pursuing the client's interests?

9    A.   It was time devoted to preparing to respond to a subpoena

10   that was served on me.

11   Q.   And that subpoena was served by the private prosecutor?

12   A.   Yes, by the special prosecutors.

13   Q.   And when were you required to appear in response to that

14   subpoena?

15   A.   I don't recall the exact date.  It changed over time as the

16   trial got continued.

17   Q.   Well, the subpoena that you're responding to now required

18   your appearance when?

19   A.   If memory serves, on Monday, this past Monday.

20   Q.   This past Monday.

21   A.   Mm-hmm.

22   Q.   So it did not require your appearance on March 4th, April

23   2nd, 2020, for example, right?

24   A.   No, but there were prior subpoenas.

25   Q.   Those are for your testimony at trial; correct?

L5DVDON4                          Thomson - cross

1    A.  Correct.

2    Q.  Were there any subpoenas that the private prosecutors

3    issued for you to appear in their office?

4    A.  No.

5    Q.  Were there any subpoenas that they issued for you to answer

6    questions in your office?

7    A.  No.

8    Q.  Did they issue any subpoenas requiring you to answer their

9    questions over the telephone?

10   A.  No.

11   Q.  Were there any grand jury subpoenas issued to you?

12   A.  Nope.

13   Q.  So you understand this is a criminal trial, right?

14   A.  I understand it's a criminal trial, yes.

15   Q.  That Mr. Donziger is charged with crimes; correct?

16   A.  Correct.

17   Q.  The prosecutor is in charge of proving those crimes;

18   correct?

19   A.  That's my understanding, yes.

20   Q.  Right.  I'm in charge of defending them; correct?

21   A.  That's my understanding.

22   Q.  And, of course, Judge Preska is in charge of verdict and

23   sentence, should there be one.  Right?

24   A.  That's my understanding.

25   Q.  Okay.  So this was a voluntary process on your part, with

L5DVDON4                    Thomson - cross

1   the exception of your required appearance at the beginning of a

2   criminal trial; correct?

3   A.   The trial testimony is the only compulsory subpoena

4   appearance, yes.

5   Q.   So everything else was voluntary; correct?

6   A.   In a sense it was voluntary, in a sense it was preparing

7   for an involuntary appearance in court.

8   Q.   I'm sorry, is there some sort of requirement that you

9   prepare for an involuntary appearance that you're familiar

10  with?  Not asking for your attorney work product, but is there

11  some requirement of doing that?

12  A.   I don't know that there's a requirement, no.

13  Q.   And you certainly never got a subpoena directing you to

14  review certain documents, right?

15  A.   Correct.

16  Q.   And you were never directed at a proceeding besides this

17  trial to review certain documents; correct?

18  A.   Correct.

19  Q.   So it is an entirely voluntary thing that you did in having

20  these meetings with the private prosecutor?

21  A.   It was not a compulsory appearance and preparation, no,

22  that's true.

23  Q.   It was voluntary; correct?  You said, I will do this,

24  though I don't have to.

25  A.   I wouldn't characterize it as necessarily voluntary, but I

1  would say it's -- it's preparation I wasn't legally required to

2  do, that's true.

3  Q.  Why did you do it?

4  A.  Well, if I'm going to give testimony, I wanted to make sure

5  that it's accurate and efficient.

6  Q.  And it mattered to you to be as prepared as possible to

7  testify at this trial; correct?

8  A.  Yes, I wanted to be prepared to testify accurately and

9  truthfully and efficiently.

10 Q.  Because -- is it fair to say it's because -- and let's

11 focus on efficiency.  You want this process to go on as

12 efficiently as possible; correct?

13 A.  Certainly my own testimony, yes.

14 Q.  And you understand where your efficiency in this process --

15 you understand what it's directed to; is that correct?  Do you

16 understand what I'm saying?

17 A.  I'm sorry, I don't understand.

18 Q.  You understand that your efficiency is directed toward

19 giving this guy a criminal conviction?

20         MS. GLAVIN:  Objection.

21         THE COURT:  Sustained.

22 Q.  You're out of the L.A. office, right?

23 A.  That's true.

24 Q.  How many times have you flown in to prepare for your

25 efficient, truthful, and accurate testimony?

 1   A.  This is the second time I've flown here.

 2   Q.  Who paid for that?

 3   A.  Chevron pays for that.

 4   Q.  Chevron paid for your flights here; correct?

 5   A.  Correct.

 6   Q.  To meet with the private prosecutor?

 7   A.  Correct.

 8   Q.  Is your flight coach?

 9   A.  No.

10   Q.  Business class?

11   A.  First class.

12   Q.  First class Chevron paid for.

13            And that was to make sure that you could be

14   well-rested when you prepared for your accurate, efficient, and

15   truthful testimony?

16   A.  That was to be as free of COVID as I could be on a plane.

17   Q.  Are you inoculated now?

18   A.  I am now, yes.

19   Q.  You're flying back?

20   A.  Yes.

21   Q.  Flying back coach?

22   A.  No.

23   Q.  Flying back business class?

24   A.  Nope.

25   Q.  Flying back first class?

1    A.  Yes.

2    Q.  Yeah.  Chevron paying for that too?

3    A.  Yes.

4    Q.  You get the sense that putting Mr. Donziger in jail is

5    something your client wants?

6           MS. GLAVIN:  Objection.

7           THE COURT:  Sustained.

8           MR. KUBY:  I know.  Mental state.  Work product.

9           Does that mean I should keep going or I should wrap it

10   up?

11          THE COURT:  If only.

12          MR. KUBY:  Pardon me, Judge?

13          THE COURT:  If only.  At least you should keep going.

14          MR. KUBY:  Okay.  To another area.

15   BY MR. KUBY:

16   Q.  Quick question:  Is an appeal proper from a denial of a

17   stay?  Can you take that to the Second Circuit?

18   A.  From a district court denial of a stay?  As a general

19   matter, I would think yes, you could file an appeal from --

20   well, if you're asking me -- I would need to know more to give

21   you an answer.

22   Q.  Okay.  Somebody files a motion for a stay before a district

23   judge.  The district judge denies the stay of a discovery

24   order.  Is that appealable as of right under a 1291 process?

25   A.  Again, I'm not here as an expert witness.

1    Q.  But you are such an expert, so help me here.

2    A.  As a general matter, that would likely; although I can't

3    say in all circumstances, but would likely be vulnerable as an

4    interlocutory order not subject to direct appeal.

5    Q.  Thank you.

6         I think earlier there was a discussion on direct about

7    a supersedeas bond.  Had Mr. Donziger posted such a bond, would

8    that have stopped the discovery process?

9    A.  No.

10   Q.  It simply would have provided for a mechanism for you to

11   collect that $813,000 at the end of the case in order to

12   actually stay collection activities, right?

13   A.  Well, a supersedeas bond would stay execution of the money

14   judgment.

15   Q.  And by "execution," it would stop efforts to collect money

16   from Mr. Donziger?

17   A.  It would -- yes, that's -- that's as far as the -- the

18   judgment at issue, yes.

19   Q.  At one point in this litigation, Chevron moved to take

20   Mr. Donziger's passports.  Are you familiar with that?

21   A.  I'm familiar with the proceedings about Mr. Donziger's

22   passport, yes.

23   Q.  And that was a request made by Chevron as an additional

24   coercive sanction; correct?

25   A.  Yes.

1  Q.  What was the purpose of that?

2  A.  I can't give you any confidential information about case

3  strategies.

4          MR. KUBY:  Judge, we did have one GDC partner who gave

5  an answer to that question in response to Ms. Glavin.  I'm just

6  curious to see whether the answer is the same for Mr. Thomson.

7  That seems reasonable enough.

8  Q.  Why did you do it?

9  A.  I can tell you based on the public filings that the

10  passport turnover order was designed as part of a series of

11  coercive sanctions attempting to compel compliance with Judge

12  Kaplan's orders.

13  Q.  It wasn't to prevent Mr. Donziger from leaving the country

14  with his computers, right?

15  A.  I believe -- I believe there was an argument made to that

16  effect, that it was, in fact -- that it would serve the purpose

17  also of potentially inhibiting the spiriting out of the country

18  electronic devices.

19  Q.  It would also prohibit Mr. Donziger from traveling to

20  places other than Canada, right?

21          MS. GLAVIN:  Objection.  Relevance.

22          THE COURT:  I'll allow it.

23          Are you able to answer that question, sir?

24  A.  I don't know whether there are any -- there are no other

25  places he could travel without a passport.  But generally one

1   needs a passport, is my understanding, to travel overseas.

2   Q.  Right.  But you don't need a passport to go to Canada,

3   right?

4   A.  I don't know.

5   Q.  So you weren't concerned specifically that he might spirit

6   his devices out to Canada; correct?

7   A.  I can't tell you what the litigation strategy was.  That's

8   work product.  I can tell you what --

9   Q.  Part of the litigation strategy was, in fact, to prevent

10  him from spiriting his devices out of the country, right?

11  A.  I believe that was argued in briefs filed on the public

12  record, yes.

13  Q.  Do you know which one, the brief?

14  A.  I can't tell you offhand now.

15  Q.  You do remember that from your knowledge of the public

16  record?

17  A.  That's my recollection.

18  Q.  You don't need a document to refresh your recollection

19  about that?

20  A.  If you want to show me a document --

21              (Indiscernible crosstalk)

22  Q.  Another quick pop quiz:  Are you aware of any case ever

23  where the United States Court of Appeals for the Second Circuit

24  granted relief on *mandamus* regarding post-judgment discovery?

25              MS. GLAVIN:  Objection.  Relevance.

1          THE COURT:  Why are we asking this?

2          It's a legal question, isn't it?

3          MR. KUBY:  I'm sorry.  We sat here for two hours

4     talking, eliciting facts in order for Ms. Glavin to make the

5     argument that Mr. Donziger had a gazillion different things

6     that he just could have done rather than violate the three

7     orders that he's charged with violating in Counts I, II, III.

8          I just want to know whether this witness is aware of

9     any case where that's actually happened in the Second Circuit.

10          THE COURT:  I'm aware that's the question.

11          What's the relevance?

12          MR. KUBY:  The relevance is, in fact, if the answer is

13     no, that would tend to suggest it would be futile for

14     Mr. Donziger to make that request.

15          MS. GLAVIN:  Your Honor, this is a question of law.

16     And if we want to have an argument over Mr. Donziger's ability

17     to get a *mandamus* such that he doesn't have to produce

18     discovery such as privileged materials, we can get into that.

19     We can go through, talk about *Dinler v. City of New York*, which

20     is on point on this precise issue.

21          So I think if we want to argue about what the law is

22     and what Second Circuit holdings are, we can.  I don't see how

23     it's relevant, unless it goes to Mr. Donziger's state of mind.

24     And if it goes to Mr. Donziger's state of mind without -- it's

25     Mr. Donziger's choice whether or not to take the stand.  And if

1    he doesn't take the stand, there will be no adverse inference

2    against him.  But Mr. Donziger is free to take the stand and

3    say what he believed.

4            THE COURT:  The real question is why are we asking

5    this guy for his encyclopedic knowledge of case law?

6            I couldn't do that.  Probably you couldn't.

7            MR. KUBY:  Because he's here and he's really, really

8    smart.  And it's a relevant fact, so I'd just as soon get it

9    from him.

10           THE COURT:  Sustained.

11           Actually, I'm not sure it is relevant, because I am

12   not aware in the case law of any exception to the collateral

13   bar rule where the requested interlocutory relief from the

14   circuit would be futile.  I'm not sure it's relevant.

15           MR. KUBY:  You thought that's where I was going, huh,

16   Judge?

17           THE COURT:  Yeah.

18           MR. KUBY:  Yeah.

19           THE COURT:  Was I wrong?

20           MR. KUBY:  Moving on.

21           If we could turn to an entirely different area.

22   BY MR. KUBY:

23   Q.  Okay.  I'd like to show you document number 1901, also

24   counter-designated Defense DDDD.  You saw that earlier in your

25   direct examination; is that correct?

1    A.   Yes, that's correct.

2    Q.   May I assume your familiarity with the contents of that?

3    A.   I'm generally familiar with the contents of this, yes.

4    Q.   I'm sorry?

5    A.   I'm generally familiar with the contents of the documents,

6    yes.

7              (Continued on next page)

1   BY MR. KUBY:

2   Q.  Okay.  In prior proceedings I referred to is as an

3   interpretation order, and when I asked about the interpretation

4   order this is the document I am referring to.  Okay?

5   A.  Okay.  1986-1 in the record --

6           MS. GLAVIN:  No, Mr. Kuby.  I would like to show you

7   document 1986-1.

8   Q.  Do you recognize that document?

9   A.  Yes.

10          MR. KUBY:  I'd offer it into evidence.

11          MS. GLAVIN:  My mistake.  This is in evidence.  I was

12   incorrect.  This is in evidence, Exhibit 1986-1.

13          MR. KUBY:  If you could just repeat the "I'm sorry,

14   Mr. Kuby".

15          Thank you, Ms. Glavin.

16          MS. GLAVIN:  You're welcome, Mr. Kuby.

17   Q.  Earlier you read out loud a letter from Randy Mastro; is

18   that correct?

19   A.  That's correct.

20   Q.  And it was worth reading in its entirety at least according

21   to the prior prosecutor?

22   A.  I was asked to read the whole letter, yes.

23   Q.  So, I'd like you to read paragraph three out loud?

24   A.  The district court's original judgment directed me to

25   "execute in favor of Chevron a stock power and such other and

1    further documents as Chevron reasonably may request or as the

2    Court here after may order".  The onus was thus on Chevron to

3    propose and request the form of stock power and any other

4    transactional documents deemed necessary to ensure compliance.

5    Chevron never did so.  Indeed, Chevron never communicated with

6    me or my counsel about compliance in any respect until now.

7    Q.  And if we could then turn to the penultimate paragraph on

8    page three, the one before the last.  Could you read that out

9    loud too, please?

10   A.  Given my ongoing compliance with the district court's order

11   that I neither sell nor transfer my shares in Amazonia, I do

12   not see any reason to force the issue of the execution of the

13   stock power unless your client insists.

14            THE COURT:  A little more slowly, please, sir.

15            THE WITNESS:  I'm sorry, your Honor.

16            I do not see any --

17            THE COURT:  Go to "but I want".

18   A.  But I want to assure you that I take my obligations to

19   comply with all court orders seriously.  To that end, I am

20   willing to enter into a stipulation with Chevron and during the

21   pendency of the appeal regarding the disposition of the ARL

22   shares or the proceeds from such shares should I ever receive

23   any.

24            I have drafted such a stipulation for Chevron's

25   consideration and have attached it to this letter.

L5DAADON5                           Thomson - Cross

1   Q.  And to be clear, the stipulation that Mr. Donziger appears

2   to be referring to in this letter is the stipulation that you

3   testified about earlier on direct-examination?

4   A.  The stipulation that is attached to this letter, yes.

5   Q.  So, cause I don't have it here.  So it's the same thing.

6   And you rejected that stipulation, correct?

7   A.  My understanding is that Chevron did not accept the

8   stipulation, yes.

9   Q.  And when was the -- withdrawn.

10          Did you, did Chevron through you or through others to

11  your knowledge prepare a stipulation from Mr. Donziger to

12  execute into 2014?

13  A.  Not that I know of.

14  Q.  2015?

15  A.  A stipulation for what?  Maybe I'm not understanding your

16  question.

17  Q.  A form of stock transfer power.  I'm sorry.  Did you

18  prepare one of those for him in 2014?

19  A.  I don't believe that we sent him one in 2014, no, or 2015

20  rather.  I'm sorry.  I may not be understanding.  Are you

21  asking me -- please, repeat the question.

22  Q.  Let me just try to get this in a simpler way.  Randy Mastro

23  complains about Mr. Donziger long overdue compliance in

24  transferring the Amazonia shares.  Is that a fair

25  characterization?

1    A.   Randy Mastro sent Mr. Donziger a letter asking him to

2    transfer the shares, yes.

3    Q.   Transfer the shares.  Mr. Donziger writes back with this

4    letter saying I offer this stipulation to make sure that your

5    interests are protected in essence, correct?

6    A.   Mr. Donziger wrote back to Mr. Mastro with this letter

7    proposing a stipulation, yes.

8    Q.   And Chevron said no?

9    A.   Chevron did not accept the stipulation, yes.

10   Q.   Is there a difference between Chevron saying no and Chevron

11   did not accept the stipulation, yes.  Are we just kind of

12   talking past each other here or are we really saying the same

13   thing?

14   A.   They could be different.  I don't know what you're actually

15   attempting to get at.

16   Q.   With that question?

17   A.   It you're asking me was there a correspondence from Randy

18   Mastro to Mr. Donziger --

19   Q.   Chevron said no, right?

20        I know, judge, but this constant rephrasing of my

21   answer, of a yes or no answer is again, something lawyer

22   witnesses do but they shouldn't.  They should just answer yes

23   or no or I can't answer yes or no.

24        THE COURT:  I'll beat him with a wet noodle later.

25        MR. KUBY:  I could suggest a little more -- never

1   mind.

2   Q.  Okay.  Having your client Chevron said, nope, we don't

3   accept this, did you then send Mr. Donziger a stock transfer

4   document?

5   A.  Yes.  The form of stock transfer was transmitted to

6   Mr. Donziger and his counsel.

7   Q.  In what year?

8   A.  I believe it was contemporaneous with, it preceded the

9   letter to which Mr. Donziger -- the letter Mr. Donziger sent

10  that you just had up on the screen responds to it's in between

11  that correspondence and the original letter from Mr. Mastro.

12  Q.  So, subsequent to Mr. Donziger proposing the stipulation to

13  which Chevron said no, did you again try to send an Amazonia

14  share stock power transfer to Mr. Donziger in 2014?

15  A.  I just want to make sure that I've got the chronology.  I'm

16  sorry.

17  Q.  Don't be sorry.  It's complicated and there's a lot here.

18  I get it.

19  A.  I testified on direct with the exhibit on the screen

20  Mr. Bell sent Mr. Friedman and others a form of stock transfer.

21  If you are asking me other than that one in 2014 did Chevron

22  send Mr. Donziger another form of stock transfer, no, I don't

23  believe so.

24  Q.  Okay.  Well, the attorneys for Mr. Donziger did not have

25  Mr. Donziger execute that, right?  You never got that executed

1    stock transfer from counsel, did you?

2    A.  I don't believe Chevron ever got the executed stock

3    transfer from anyone, no.

4    Q.  Okay.  But I want to try to keep the chronology tight here

5    if we can.  Did Mr. Friedman, Ms. Littlepage, other attorneys

6    object to the form?

7    A.  Not that I know of.

8    Q.  And would you know that?

9    A.  I at one time would have known that but I haven't gone back

10   to check.

11   Q.  In any case, they don't respond or they say no --

12           MS. GLAVIN:  Objection to form and he is testifying as

13   to what they said.

14           MR. KUBY:  He said he doesn't know.

15           MS. GLAVIN:  But you just asked a question that said

16   "and they said no".

17           THE COURT:  Let's move it, kids.  Come on.

18           MR. KUBY:  I'm really trying, judge.

19   Q.  Subsequent to Chevron's rejection of Mr. Donziger's

20   stipulation, when was the next time you presented him with a

21   stock transfer power to execute?

22   A.  I'm not sure when the next time was.

23   Q.  Okay.  Give me -- do you know the year?

24   A.  I would be speculating.  I'm not sure when that was, no.

25   Q.  2014, maybe?

1   A.  If you'd like to show me a document, I'm happy to look at

2   it.

3   Q.  2015?  You don't know?

4   A.  Not that I know of.

5   Q.  But this was something that you wanted to get, right?

6   A.  It was something the Court ordered him to provide, yes.

7   Q.  And you wanted it?

8   A.  It was ordered by the Court as part of the RICO judgment,

9   yes.

10  Q.  It was ordered by the Court in response to demands that

11  Chevron made in the underlying litigation, right?

12  A.  It was part of the relief that the Court was ordering, yes.

13  Q.  You wanted it, correct?  Not so hard.  Yeah, we wanted it.

14  A.  Yes, Chevron wanted the stock transfer.

15  Q.  So, is it fair to assume that you moved with alacrity after

16  rejecting Mr. Donziger's proposed stipulation?

17  A.  Chevron, asked Mr. Donziger.

18  Q.  That's not my question.  My question is:

19          After Chevron said no to Mr. Donziger's proposed

20  stipulation, did you then move with alacrity to get this stock

21  power executed?

22  A.  Chevron moved with alacrity after the RICO judgment was

23  handed down to get Mr. Donziger to execute the stock transfer.

24  Q.  You're not understanding my question or are you

25  deliberating answering the question that I'm not asking?  Do

1    you understand that question?

2    A.  No.

3    Q.  I'll break it up.  Are you deliberately not understanding

4    my question?

5    A.  No.

6    Q.  Are you not understanding my question?

7    A.  Yes, I don't understand your question.

8    Q.  Okay.  Let's try this.  When I say, after Chevron refused

9    to accept Mr. Donziger's stipulation, you understand that; is

10   that correct?

11   A.  I understand those words, yes.

12   Q.  And "after" means post Chevron refusal right?  We're good

13   on that?

14   A.  Yes, that's what those words mean.

15   Q.  Okay.  After Chevron refused to accept Mr. Donziger's

16   stipulation, did you move with alacrity -- do you understand

17   "move", yes?

18   A.  Yes.

19   Q.  You understand "alacrity"?

20   A.  Yes.

21   Q.  Did you move with alacrity to obtain a stock transfer

22   power?

23   A.  Chevron just finished demanding him to execute a stock

24   transfer power.  You are asking me did Chevron move --

25   Q.  Did you go back to Judge Kaplan saying -- I'm sorry.  After

1   Chevron said no to Mr. Donziger's offer, did you go running

2   back to Judge Kaplan with alacrity saying judge, judge, we need

3   this, in more legal form?

4   A.  Chevron did not immediately go back to Judge Kaplan and

5   seek to have further court orders.  That's true.

6   Q.  Moving on Government Exhibit 1986, if that's not in I'll

7   offer it.  If it is in, it doesn't matter.

8        Let me show you document 1986 on the docket.  Have you

9   seen that before?

10  A.  I believe so, yes.

11  Q.  Most critically Chevron completely fails to cite on this

12  point the applicable order of the Court, namely, its order

13  dated April 25, 2014.  Do you know what Mr. Donziger was

14  referring to?

15  A.  I believe he's referring to Judge Kaplan's stay order.

16  Q.  What I am calling the interpretation order; is that

17  correct?

18  A.  I believe those are the same things, yes.

19  Q.  And in this document Mr. Donziger is arguing against, among

20  other things, he is arguing against discovery because Judge

21  Kaplan according to Mr. Donziger had ruled that he could

22  continue to finance his litigation the way it had always been

23  financed.  That was Mr. Donziger's argument any away.  I'm not

24  asking you to accept it.

25  A.  That sounds like a paraphrase of Mr. Donziger's argument,

1   yes.

2   Q.  Fair.  Moving to document 2018, do you recognize that?

3   A.  Yes.

4   Q.  What do you recognize it to be?

5   A.  This appears to be Mr. Donziger's motion for declaratory

6   relief motion to dismiss Chevron's contempt motion.

7   Q.  Again, I am going to paraphrase rather than anybody reading

8   the thing out loud, but is it fair to say in essence

9   Mr. Donziger is asking the Court, judge, you said I could

10  continue to finance the litigation the way I always had and now

11  I am being forced to provide discovery about how I am financing

12  the litigation.  Would you please make a ruling on this?  Can I

13  or can't I do this?

14          Is that a fair characterization?

15  A.  It's not a complete characterization.  It's kind of summary

16  form of aspects of what his argument here is, yes.

17  Q.  Thank you.

18          Turn to docket 2118, please.  You've seen this before,

19  Mr. Thomson?

20  A.  Yes, I believe so.

21  Q.  Let's get to the next page.  This brings us to the real

22  issue, the elephant in the room that I have been trying to draw

23  attention to for over six months.  I have repeatedly pleaded

24  with the Court to explain to me how it can even pretend that it

25  was contemptuous of me to continue to raise funds through

L5DAADON5                    Thomson - Cross

1    pre-collection litigation finance when this Court itself

2    acknowledged in its April 2014 opinion on my stay motion that,

3    quote, this case always has been financed on the movement's

4    side by outside investors, closed quote.  And assured me that

5    the RICO judgment will, quote, would not prevent Donziger from

6    being paid just as he has been paid at least $958,000 and

7    considerably more over the past nine or ten years.  In the same

8    opinion the Court explained that the RICO judgment's

9    constructive trust and monetization provisions impacted only,

10   quote, proceeds, closed quote, of a "collection" on the

11   Ecuadorian judgment.  And when I worried --

12              THE COURT:  Slowly.

13              MR. KUBY:  And when I worried that the RICO judgment

14   would freeze up financing for my appeal and for ongoing

15   Canadian litigation the Court dismissed my concerns as so

16   "fanciful" and "farfetched" as to "border on the

17   irresponsible."

18              Do you remember reading that, yes?

19   A.  Yes.

20   Q.  I am going to continue, last paragraph.

21              Instead, apparently trapped by its own words the Court

22   has responded to this grave violation of my Constitutional

23   rights and those of my clients with a transparently abusive

24   strategy of silence and nonaction, it has refused to address

25   the key issue underlying Chevron's original contempt motion for

1    over six months now.  Meanwhile, the Court has green lighted it

2    Chevron's outrageously intrusive discovery and intimidation and

3    demonization, et cetera.  You read that too, right?

4    A.  I read this before, yes.

5    Q.  And you understood that Mr. Donziger was again referring to

6    the April 25, 2014 interpretation order, correct?

7    A.  Yes.  He's referring to his interpretation of Judge

8    Kaplan's stay order, yes.

9    Q.  I am going to pause there.  You characterized what

10    Mr. Donziger was saying as his interpretation of Judge Kaplan's

11    interpretation order, correct?

12    A.  Yes.

13    Q.  Okay.  And it's fair to say that Chevron had a different

14    view of it as articulated in your legal papers?

15    A.  That's correct.

16    Q.  And summaries are always dangerous in this but I am going

17    to try.  Mr. Donziger's position was, Judge Kaplan, you said I

18    could continue to do what I was doing.  I am doing it.  There's

19    no basis for discovery.  We'll call that the Donziger position

20    right; is that fair?

21    A.  That's your summary of --

22    Q.  That's what his position was but in far, far fewer words?

23    A.  Right.  It's not a complete expression but --

24    Q.  And I am going to give an incomplete view of Chevron's

25    position as well as I understand it.

L5DAADON5                    Thomson - Cross

1        One position Chevron had is that after Judge Kaplan

2   issued the injunction and a notice of appeal was filed, Judge

3   Kaplan had no jurisdiction to in any way modify that order,

4   right?

5   A.   Yeah, Chevron argued that.

6   Q.   And another position that Chevron took in the course of the

7   litigation was that whatever the order may or may not mean, it

8   expires on its own terms after certiorari was denied by the

9   Supreme Court, right?

10  A.   Not sure I understand your question.

11  Q.   Judge Kaplan styled this as a stay motion, correct, the

12  April 25th order?

13  A.   I believe that's how the motion was styled by the moving

14  party.

15  Q.   And it was a stay pending appeal, correct?

16  A.   I'd have to go back and look at the motion but that sounds

17  correct.

18  Q.   Okay.  And once the appeal had been finally and completely

19  denied by the Second Circuit and the Supreme Court refused

20  review, Chevron took the position that the stay was gone,

21  correct?

22  A.   I don't recall that being expressed that way.  So, if

23  there's a document you'd like to show me I'd be happy to look

24  at it.

25  Q.   Did you ever convey to Judge Kaplan in response to the

L5DAADON5                    Thomson - Cross

 1    August 25 interpretation order that he lacked jurisdiction to

 2    modify the injunction?

 3    A.   I believe in response to Mr. Donziger's arguments that

 4    Judge Kaplan had modified the injunction that the Court, Judge

 5    Kaplan, would have been without jurisdiction to modify the

 6    injunction, yes.

 7    Q.   And when did you file that?

 8    A.   I'm not sure what the earliest time that would have been

 9    maybe but --

10    Q.   Years?

11    A.   If I could finish.  It was certainly part of the appellate

12    briefs that Chevron filed in opposition to Mr. Donziger's

13    appeal from the contempt motion.

14    Q.   2017?

15    A.   No, that would have been later.

16    Q.   2018?

17    A.   Yeah.

18    Q.   So, the first time you told Judge Kaplan that he lacked

19    jurisdiction was when you told the second circuit that he

20    lacked jurisdiction?

21              MS. GLAVIN:  Objection as to relevance.

22              MR. KUBY:  You know we sat all through the briefing

23    process.

24              THE COURT:  What is the relevance of the question and

25    timing of whatever filing was made to say that Chevron believed

L5DAADON5                          Thomson - Cross

1    Judge Kaplan had no jurisdiction.

2              MR. KUBY:  I will tell you relevance, judge.

3              THE COURT:  Oh, I can't wait.

4              MR. KUBY:  I think you can probably guess.

5    Mr. Donziger for over a year was trying to get clarification

6    from Judge Kaplan as to whether he could or could not do the

7    things that the April 25 order reasonably suggested he could

8    do.  And if Chevron were litigating in good faith here they

9    would have said to Judge Kaplan excuse me, Judge Kaplan, you

10   had no right to issue the April 25 order as it's being

11   interpreted because of lack of jurisdiction.  So, either

12   clarify your order or we will then go running up to the circuit

13   on mandamus because you have issued an order that lacked

14   jurisdiction and this whole mess would have been resolved.

15             THE COURT:  So, say you.  But in any event, the real

16   question is how is it relevant to any of the facts at issue

17   here, the issuance of the --

18             MR. KUBY:  -- to circumvent your collateral bar rule

19   with a different line of questioning.

20             THE COURT:  The timing of Chevron's filing a piece of

21   paper with respect to Judge Kaplan's jurisdiction or lack

22   thereof is in my view as far as I can tell not relevant to

23   whether there was an issuance of an order to Mr. Donziger

24   whether he disobeyed it and his knowledge and willfulness in

25   doing so.

1            MR. KUBY:  I understand, judge.

2            THE COURT:  That's my question.

3            MR. KUBY:  As phrased, not a bit.

4            THE COURT:  All right.  Then let's move on.

5            MR. KUBY:  So, you're sustaining.  Yeah?

6            THE COURT:  I think you sound like you are agreeing

7    with me.

8            MR. KUBY:  Okay.  I am going to shift to another area

9    which I also don't expect to get very far with.

10           THE COURT:  Have your break now, sure.  Let's go.

11           (Recess)

12           THE COURT:  Thank you, ladies and gentlemen.  Won't

13   you be seated.

14           Sir.

15           MR. KUBY:  Thank you, judge.

16           Mr. Thomson, just to briefly toggle back to another

17   subject.  I know during the meetings you had during the

18   meetings you had with the private prosecutors they had you

19   review I am going to say numerous documents involved in this

20   litigation, is that fair to say?

21   A.  Yeah, there were a number of documents, right.

22   Q.  And you reviewed them with them, correct?

23   A.  Yes.

24   Q.  They would ask you questions.  You'd explain what this was.

25   You'd explain the significance in terms of public record,

1   right?

2   A.  In a manner of speaking, yes.

3   Q.  And that's my manner of speaking.

4          Because you've affirmed that you want to be efficient

5   and you want to be accurate and you want to be truthful, did

6   you do any work preparing to speak to the private prosecutors

7   before you met with them?

8   A.  You mean the first time I met with them.

9   Q.  At any point in meeting with them?

10  A.  Yes, I've done some reviewing of some of the documents on

11  my own.

12  Q.  And when the document would come up at a particular meeting

13  you might like I don't want to call it homework but kind of

14  what it was, right?  Did you do a little homework?  I know they

15  are going to ask you about this at the next meeting so I want

16  to be prepared so I want to be efficient?

17  A.  Just kind of familiarize myself with the documents I

18  thought I would be asked about.

19  Q.  Do you have any sense of how many hours you spent on that?

20  A.  I haven't really tallied it up.

21  Q.  Were those donated hours as well or did Chevron get billed

22  for those?

23  A.  I have not billed my time for that, no.

24  Q.  So, that was another contribution to the process, right?

25  A.  Well, I wouldn't characterize it that way but I didn't bill

1   the client for that time no.

2   Q.  Why not?

3   A.  It didn't seem like it was something that was part of the

4   client's litigation.

5   Q.  Is flying you out here first class part of the litigation

6   of Chevron's --

7   A.  No, it is not part of Chevron's litigation.

8   Q.  But they look, they're a good client and they do you a

9   solid, right?

10  A.  I don't know what that means to do me a solid but --

11  Q.  You don't get out much, do you, Mr. Thomson?  I'm sorry.

12  A.  I read a lot.

13  Q.  I'm sorry.  Moving on, you have testified a bit about your

14  activities.  Well, with respect to the 1782s; is that correct?

15  A.  That's correct.

16  Q.  And so just to make sure I understand the chronology

17  correctly and I will freely admit prior to becoming defense

18  counsel in this case, I had never heard of a 1782.  So, excuse

19  my ignorance and feel free to correct me.  Mr. Donziger files a

20  lawsuit in the Southern District of New York back in 1993

21  alleging damage done by, I think it was then Texaco to the Lago

22  Agrio region, right?

23  A.  Something like that.

24  Q.  And there's about eight years of litigation more or less

25  about whether this case should be tried in the Southern

1   District or tried in Ecuador, correct?

2   A.   More or less, yes.

3   Q.   Chevron's position that it should be tried in Ecuador?

4   A.   That was Texaco's position.

5   Q.   And Chevron brought Texaco, right?

6   A.   A subsidiary merged with Texaco, right.

7   Q.   Is that like adjacent to buying something?  Is it like

8   adjacent to buying something, they absorbed them, right?

9   A.   It's a more accurate description of the corporate

10  transactions but Texaco became a subsidiary of Chevron.

11  Q.   Got it.  And Mr. Donziger's action was originally assigned

12  to Judge Broderick, correct?

13  A.   I don't know who the original judge was.

14          MS. GLAVIN:  Objection to relevance.

15          THE COURT:  What are you doing?

16          MR. KUBY:  Trying to get through the process here.

17  And then Judge Rakoff had it, right?

18          MS. GLAVIN:  Objection to relevance.

19          THE COURT:  What are you going to ask the witness?

20          MR. KUBY:  I am just trying to briefly, a brief

21  history of the 1782 so I can ask some questions about the

22  1782s.  This is just a tiny bit of background so far.

23  Everybody will know the point where you are going to tell me

24  stop.  We're not quite there yet but trust me, I am getting

25  there.

1          MS. GLAVIN:  And the objection is that the build up to

2     a point where he has to stop is objectionable as well.  It is

3     irrelevant that Judge Rakoff had the proceeding at one point.

4     It is irrelevant that Judge Broderick had it at one point.

5     Three elements.  Relevance, was there a court order clear and

6     unambiguous?  Did the defendant violate it?  Did the defendant

7     knowingly violate it?  What relevance is it that Judge

8     Broderick or Judge Rakoff had portions of this proceeding in

9     the 1990s.

10         MR. KUBY:  Now, I believe I can establish through this

11    witness that this witness and others with whom he was acting in

12    concert manipulated the 1782 process, the post judgment process

13    to first get his case in front of Judge Kaplan instead of Judge

14    Rakoff to whom it had should gone.  Number two, let me just

15    we'll make a record here.  The press has even left except for

16    Tara who wouldn't even be here except for me.

17         UNIDENTIFIED FEMALE:  "Cara".

18         THE COURT:  Is he chopped liver?

19         UNIDENTIFIED MALE:  Come on.

20         MS. GLAVIN:  I am sure that Ryan is here for Mr. Kuby

21    as well.

22         MR. KUBY:  Number two, I would be able to demonstrate

23    that after manipulating the 1782 process to end up in front of

24    Judge Kaplan, they exploited that manipulation to make sure

25    that the RICO case was filed in front of the judge that they

1    had developed a deep and abiding love for and it has stayed

2    with him unto this very day.  It goes --

3           THE COURT:  You know, judges --

4           MR. KUBY:  -- in evading.

5           THE COURT:  Judges are generally not manipulated and

6    pushed around by litigants.  If you have a question for him,

7    ask the question.

8           MR. KUBY:  I'm not suggesting that Judge Kaplan was

9    either manipulated or pushed around.

10          THE COURT:  Counsel --

11          MR. KUBY:  I think Judge Kaplan was a willing

12   participant.

13          THE COURT:  Counsel, enough of your testimony, please.

14          MR. KUBY:  I am making an offer of proof and that's

15   what I would intend to establish through a line of questioning.

16          THE COURT:  So, we all know where you're going.  Ask

17   the questions that you want but let's not do any more build up.

18   You've oriented us as to time and space.

19   BY MR. KUBY:

20   Q.  So you went to, the case was moved to Ecuador, correct?

21   A.  There was a case filed in Ecuador, yes.  It was not the

22   same case as the one that was filed --

23   Q.  Well, nothing is the same as anything else?

24          THE COURT:  Counsel, counsel, question.

25          MR. KUBY:  Nothing is the same as anything else, is

1    it, Mr. Thomson?  Look, you've got a doctorate in philosophy.

2              THE COURT:  Counsel, really, now you are wasting my

3    time.

4    Q.  And you lost in Ecuador, right?

5    A.  I'm sorry.

6    Q.  The Ecuadorian court entered a judgment against the Chevron

7    Corporation?

8    A.  Yes, eventually, it did.

9    Q.  Right.  And after that happened you filed 10MC-0001; is

10   that correct?

11   A.  No, it's not correct.

12   Q.  You didn't do that after the -- did I miss a zero?

13   A.  No.

14   Q.  Tell me what's incorrect about it.

15   A.  The Ecuador judgment was issued February 14, 2011.

16   Q.  Okay.  Fair enough.  Back in April of 2010 you filed a

17   1782; is that correct?

18   A.  I don't have the date.  Which 1782?  There are a number of

19   them.

20   Q.  Let's show the witness Exhibit I.  Take a look at what

21   we've marked as Defense Exhibit I for identification.  Are you

22   familiar with that document?

23   A.  No.  I don't think so.

24   Q.  You're not aware that that was a -- well, if you look at

25   the front it was a 1782, correct?

1   A.  It appears to be an order referring to one, right.

2   Q.  And you were active in the 1782 litigation, correct?

3   A.  Correct.

4   Q.  So, did you file a motion pursuant to ex parte pursuant to

5   28 U.S.C. 1782 to conduct discovery?

6   A.  I believe so, yeah.

7   Q.  And this you filed it on April 10, 2010?

8   A.  That appears to be what this says, yeah, I don't personally

9   recollect that.

10  Q.  And you made it return -- and you proceeded by going to

11  Part One; is that correct?

12  A.  I've never personally been to Part One no, if it's what you

13  are you are asking.

14  Q.  Do you know where this was filed?

15  A.  No, I don't.

16  Q.  Do you know if it was filed in front of Judge Rakoff?

17  A.  I don't know.

18  Q.  Do you know if it was designated as a related case?

19  A.  I don't know.

20  Q.  Let me show you Exhibit I-1 for identification.

21          Do you recognize that?

22  A.  I don't recognize it, no.

23  Q.  Do you know what it is?

24  A.  I can read it but I don't recognize it, no.

25  Q.  I'm asking if you know what it is?

L5DAADON5                          Thomson - Cross

1   A.  It appears to be a civil coversheet.

2   Q.  You know what that is, right?

3   A.  In general, yes.

4   Q.  And the number on top 11 CV 06191 that, have you seen that

5   number before?

6   A.  Yes.

7   Q.  And what does that number relate to?

8   A.  That's at RICO litigation.

9   Q.  The RICO litigation you've been on more or less for the

10  past decade?

11  A.  Correct.

12  Q.  Okay.  If you look down there's, has this or a similar case

13  been filed in SDNY at any other time, yes or no?  What box is

14  checked on that?

15  A.  It says no.

16  Q.  And let's face it.  Similar is a subjective term, correct?

17  A.  Yes.

18  Q.  I mean one person's similarity is another person's -- this

19  has nothing do with that, correct?

20  A.  It would be open to some kind of interpretation.

21          THE COURT:  Counsel, let him finish.  All right.

22          It would be open to some kind of interpretation; is

23  that it?

24          THE WITNESS:  Yes, your Honor.

25  Q.  Is there a signature on this document or a name of the

1   filer?

2   A.   Yes.

3   Q.   And who would that person be?

4   A.   It looks like it's --

5   Q.   First letter looks like an "R", right?

6   A.   It's hard to read.

7   Q.   Okay.  We will work it through together.  The first letter

8   kind of looks like an "R"?

9   A.   Kind of.

10  Q.   The last letter kind of looks like a "Y"?

11  A.   Well, it is not much of a "Y".

12  Q.   Well, it's not a well done "Y" the middle initial is very

13  clear though.  It is an "M"?

14  A.   I would agree with that.

15  Q.   Yeah?

16  A.   Um-hmm.

17  Q.   And the first letter in the last name looks very much like

18  the earlier "M", correct?

19  A.   Yes.

20  Q.   And then there's a "T", some other letters and a "T"; is

21  that correct?

22  A.   That's how I would read it, yeah.

23  Q.   And then there's something that could be an "R" or could be

24  a hiccup.  It's unclear?

25  A.   I see that.

L5DAADON5                           Thomson – Cross

Q.  And then an "O"?

A.  Probably.

Q.  Does the name "Randy M. Mastro" ring a bell?

A.  Yes, the name "Randy Mastro" rings a bell.

Q.  And assuming this happens to be his signature, he's a
partner at Gibson Dunn & Crutcher, correct?

A.  That's right.  That's true.

Q.  He is one of the lead attorneys on this?

A.  That's true.

Q.  If we could go back up, there's a tiny little box at the
bottom if we could just highlight the tiny little box at the
bottom.  There is a request for damages, is that right, not a
numerical but there's a place for demand?

A.  Yeah, there's a demand.

Q.  It says "TBD at trial".  What does that mean?

A.  I assume that means to be decided or determined.

          THE COURT:  Mr. Thomson, I need you to keep your voice
up.

          THE WITNESS:  Sorry, your Honor.

          THE COURT:  Thank you.

Q.  So, you were prepared at trial to prove damages; is that
correct?

A.  It would seem to indicate that the amount of damages would
be determined at trial, yes.

Q.  And whatever that amount was because this was a RICO civil,

1    RICO case that would be triple; is that right?

2    A.  In a RICO case the damage award is trebled, correct.

3    Q.  And right below that there's a jury demand, yes or no,

4    correct?

5    A.  Correct.

6    Q.  And what did the human, we will for purposes of argument

7    call Randy M. Mastro indicate on the jury demand?

8    A.  The box for yes is checked.

9    Q.  There was a time however shortly before trial that you

10   dropped the jury demand, right?

11   A.  There is a trial or time, yes, that Chevron stipulated to

12   drop the demand for damages, yes.

13   Q.  Which also consequently meant that Mr. Donziger would not

14   be entitled to trial by jury, correct?

15   A.  Chevron waived its entitlement to trial by jury, yeah.

16   Q.  So, doing it waived three times whatever the damages

17   Mr. Donziger caused them?

18   A.  Yes, it stipulated to.

19   Q.  Right.  Now, also at this form to you there's language, do

20   you claim this case is related to a civil case now pending in

21   SDNY.  And in fact you answered and if so, state.  See that?

22   A.  I do.

23   Q.  And you listed Lewis A. Kaplan.  Is that correct?

24   A.  Yes.

25   Q.  And the case that it was pending at that time was your 1782

1    motion for discovery against Mr. Donziger; is that correct?

2    A.  And that's the case number, yes.

3    Q.  And that's what the case was, right?  You received

4    discovery of Mr. Donziger under 10MC00002, correct?

5    A.  Yes, that's correct.

6    Q.  And I guess the term related is also one of the subjective

7    terms; is that correct?

8    A.  I suppose it could have very -- implications, yes.

9    Q.  And you knew that once this was filed as a, quote/unquote,

10   related case, it would be Judge Kaplan who would make the

11   initial decision as to whether he wanted to keep it or whether

12   he just wanted to wheel it out to somebody else.  You are aware

13   of that, yes?

14   A.  I don't personally know the inner workings.

15   Q.  But you know he would --

16           THE COURT:  Let him finish.

17   Q.  And he kept it?

18   A.  Yes, he kept the case.

19   Q.  Still has it?

20   A.  Correct.

21           MR. KUBY:  I am happy to say, judge, I actually got

22   through that without much of an objection.  I'm sorry.  I may

23   not be done.

24           (Pause)

25           MR. KUBY:  I'm sorry.  My client who is actually

1   taking an active interest in this case asked me to ask you a

2   couple of extra questions and I think that his point is well

3   taken.

4            In addition to the time that you spent -- in addition

5   to the time that you donated to this case, in addition to the

6   time you donated to this case, were you aware that other Gibson

7   Dunn Crutcher partners were donating their time to the case?

8   A.  I wouldn't characterize it as donating time to the case but

9   if I could finish my answer, yeah, I was aware that there were

10  other partners who were involved in representing me as a

11  witness in this lawsuit, for example.

12  Q.  And I am talking about the meetings with the private

13  prosecutors preparing for those meetings and sitting for those

14  meetings unless I did not --

15           THE DEFENDANT:  -- what are you asking me.

16           THE COURT:  The two of you are talking over each

17  other.

18           Mr. Thomson, if you keep your voice up then Mr. Kuby

19  is going to be able to hear that you are talking and he

20  probably won't talk.  Probably.

21           Question?

22           THE WITNESS:  Thank you, your Honor.

23  Q.  You said you wouldn't characterize it as a donation and I

24  don't want to force you to characterize something in a manner

25  in which you are not comfortable, contribution?

L5DAADON5                     Thomson - Cross

A.  I wouldn't characterize it as a contribution.

Q.  How would you characterize it?  Give me a word "swag"?  I mean, help me here.

A.  It's a subpoena to testify at trial and devoting time to preparing to testify and devoting time to helping me get ready to testify.

Q.  All of which except your testimony is voluntary, right?  Can we voluntary, that is what you're not required to do by law, I will characterize as voluntary.  Will you accept that for purposes of the next few questions?

A.  If not compelled, right.

Q.  Okay.  So, are you aware that other Gibson Dunn Crutcher partners were providing not compelled time to prepare for this trial?

        MS. GLAVIN:  Your Honor, I'm going to object to the form of the question.  I think if Mr. Kuby phrased it as does he have personal non hearsay knowledge as to whether other Gibson Dunn partners does he have personal direct knowledge that is not based on hearsay?

        THE WITNESS:  No, I don't.

Q.  You don't have any personal non direct knowledge.  You don't have any personal direct knowledge of these non compelled meetings whether they existed or not; is that right?

A.  I am not entirely sure what you are asking but, no, I think the answer is no.

1   Q.  It's a hearsay objection.  So, I guess my question is when

2   you like strolled down the corridors or giant edifice that is

3   Gibson Dunn Crutcher, would you be happy to see, for example,

4   Randy Mastro sitting down with Ms. Glavin, Ms. Armani Mr.

5   Maloney, two FBI agents, Reed Brodsky and bunch of other folks

6   say I wonder if he is doing the same thing I am doing?

7   A.  No, I haven't been to my office in over a year and a half

8   and I haven't been to New York other than for this trial.

9   Q.  Lucky you.

10  A.  I'm not complaining.  I'm just remarking.

11             MR. KUBY:  Thank you, judge.

12             THE COURT:  Thank you, sir.

13             Previous redirect.

14  REDIRECT EXAMINATION

15  BY MS. GLAVIN:

16  Q.  Good afternoon, Mr. Thomson.

17  A.  Hello.

18  Q.  Mr. Kuby asked you a series of questions on

19  cross-examination about your meetings with me; is that correct?

20  A.  That's correct.

21  Q.  If we could pull up the Defense Exhibit which is the chart.

22             (Pause)

23             THE COURT:  Who's phone is talking?

24             MR. KUBY:  Ms. Glavin, is apparently questioning

25  Mr. Aaron Mark Page who is not represented by counsel and --

1              THE COURT:  All right.  Mr. Kuby, I can hear some kind

2      of phone noise whether it's a phone on speaker or a broadcast

3      from where I am sitting.

4              MR. KUBY:  Okay.  If the --

5              THE COURT:  I want to know what it is.

6              MR. KUBY:  If the Court wants to make inquiries

7      obviously that's the Court's prerogative but Ms. Glavin has not

8      yet been given a roving commission --

9              THE COURT:  I'm asking the question.

10             Sir, what is the noise I am hearing?

11             MR. PAGE:  It was a preloaded video that as I was

12     scrolling through apps it just started playing automatically.

13             THE COURT:  Counsel, do me a favor this much to

14     serious to be watching videos and looking at apps.

15             MR. PAGE:  I was not watching.  It was preloaded.

16             THE COURT:  All right.  Unfair.  And besides that at

17     my age I don't know what it means.  Cut it out.

18             MR. KUBY:  It's not bad.

19             THE COURT:  So says you.

20             MR. KUBY:  So says me.

21             THE COURT:  All right.  Question.  Can we get that

22     chart back up.

23     BY MS. GLAVIN:

24     Q.  Mr. Thomson, you were asked a number of questions by

25     Mr. Kuby about your meetings with me; do you recall that?

L5DAADON5                          Thomson - Redirect

1    A.   Yes.

2    Q.   And Mr. Kuby showed you this chart which summarizes the

3    dates, the meetings and in approximate length; is that correct?

4    A.   That appears to be correct, yes.

5    Q.   And the chart indicates that your first meeting with me was

6    on April 2nd of 2020; is that right?

7    A.   That's what it says, yes.

8    Q.   Were you aware that there was a June trial date in this

9    matter that had been scheduled for 2020?

10   A.   In April, yes, I was aware of that.

11   Q.   I'm sorry.  Yes.  Were you aware that the first trial date

12   in 2020 scheduled for this criminal contempt trial was for

13   June 15?

14   A.   Yes, that sounds correct.

15   Q.   Okay.  So, you had a meeting with me on April 2nd; is that

16   correct?

17   A.   I believe so, yes.

18   Q.   Okay.  And then did you have another meeting with me on

19   June 10; is that correct?

20   A.   I don't recall the exact date.  That sounds right.

21   Q.   If we could go to the next page.

22   A.   It seems correct.  I just don't know precisely what day in

23   June we had a call.

24             (Continued on next page)

25

L5DVDON6                          Thomson – redirect

1   BY MS. GLAVIN:

2   Q.  And had you received a subpoena for your testimony for the

3   June 15th trial?

4   A.  I believe so, yes.

5   Q.  And in your meetings with me, what happened?  As in these

6   two meetings in the run up to the June 15th trial, what

7   happened in those meetings?

8           MR. KUBY:  Judge, just a cautionary note, because I'm

9   looking at the clock.  What happened at X number of hours

10  meeting just opens things up.  If that's the way she wants to

11  ask the question, she's the mistress of the question, but there

12  will be more.

13          THE COURT:  If the witness goes on for four hours,

14  like the meeting indicates, we won't be having that, so you

15  need not worry.

16          MS. GLAVIN:  No, I'm happy to lead him through it.

17  BY MS. GLAVIN:

18  Q.  But Mr. Thomson, did you review documents with us?

19  A.  I believe so, yes.

20  Q.  Then was the June 15th trial date adjourned?

21  A.  At some point, yes, it was.

22  Q.  Do you recall if it was adjourned to a date in September?

23  A.  Yes, it was.

24  Q.  Did you receive a subpoena for your testimony?

25  A.  Yes, I did.

1    Q.  And did you travel to New York for that trial date?

2    A.  Yes, I did.

3    Q.  And at that period of time, did you travel -- withdrawn.

4          Were there any quarantine rules at that time?

5    A.  Yes, there were.

6    Q.  And how far in advance of your testimony did you travel to

7    New York?

8    A.  I got there more than 14 days in advance of my testimony so

9    that I could do the 14-day quarantine.

10   Q.  And then was the September trial date adjourned while you

11   were quarantining?

12   A.  Yes, I believe it was, about day ten of my quarantine.

13   Q.  And then was there another trial date in November?

14   A.  Yes, there was.

15   Q.  And in connection with the November trial date, did you

16   have a subpoena?

17   A.  I believe so, yes.

18   Q.  And did you meet with myself, my colleagues, and the FBI

19   agent again in connection with the June trial date?

20   A.  You mean the November trial date?

21   Q.  Sorry, the November trial date.

22   A.  I don't recall.  I just don't recall the dates for the

23   meetings, sorry.

24   Q.  Then, Mr. Thomson, there is this trial date, is that

25   correct, the May 10th trial date?

1   A.   Yes.

2   Q.   How many months were there between the November trial date

3   and this May trial date?

4   A.   Well, December, January, February, March, April.  Almost

5   seven months.

6   Q.   And did you have meetings with us again in the weeks before

7   this May 10th trial date?

8   A.   Yes.

9   Q.   Mr. Thomson, you were asked a number of questions about

10  whether your meetings with myself and my colleagues, special

11  prosecutors and the FBI agent, were voluntary; is that right?

12  A.   Yes, I believe so.

13  Q.   Were you looking forward to those meetings, sir?

14         MR. KUBY:  Judge, I object.  I mean I -- really.  I'm

15  sure everybody would rather be doing something other than what

16  we are doing, with the possible exception of the Court.

17         THE COURT:  You're so correct.

18         Do we care if he had looked forward to them?

19         MS. GLAVIN:  No.

20  Q.   Mr. Thomson, why did you meet with us ahead of your

21  testimony?

22  A.   In order to make sure that I was able to give accurate,

23  truthful, and hopefully efficiently-gone-through testimony.

24  Q.   Now, you were asked a number of questions about Government

25  Exhibit 1986-1.

L5DVDON6                        Thomson - redirect

1            MS. GLAVIN:  If we could pull that up.

2   Q.  This is the October 21st letter from Mr. Donziger replying

3   to Mr. Mastro; is that right?

4   A.  This is the August 21 --

5   Q.  2014.

6   A.  Right.

7   Q.  And this is the letter in which Mr. Donziger attaches a

8   stipulation that he wanted Chevron to enter into; is that

9   right?

10  A.  That's correct.

11  Q.  And Mr. Kuby asked you a number of questions about this on

12  cross; is that correct?

13  A.  Yes, I believe so.

14  Q.  If we could go to Judge Kaplan's order, which is Government

15  Exhibit 1901.  We could go to the last page.  This is what I

16  believe Mr. Kuby referred to as the interpretation order during

17  your cross-examination.

18  A.  Yes, that's correct.

19  Q.  Does this order direct Mr. Donziger to enter into a

20  stipulation with Chevron?

21  A.  No, it does not.

22  Q.  Does this order direct Chevron to do anything?

23  A.  No, it does not.

24  Q.  Who, if anyone, does this order -- is this -- withdrawn.

25            Who, if anyone, is this order directed to?

1    A.  To Mr. Donziger.

2    Q.  And what does it direct Mr. Donziger to do?

3    A.  To execute in favor of the clerk the stock power,

4    transferring to the clerk his interest in the shares of

5    Amazonia.

6    Q.  If we could go to the RICO judgment, which is Government

7    Exhibit 1875.  With respect to paragraph 1 of the RICO

8    judgment, does paragraph 1 direct Chevron to do anything?

9    A.  No, I don't believe so.

10   Q.  Who is paragraph 1 directed to?

11   A.  To Mr. Donziger and the other judgment debtors.

12   Q.  And what does the last sentence of paragraph 1 direct

13   Mr. Donziger to do?

14   A.  Donziger shall transfer and forthwith assign to Chevron all

15   such property that he now has or hereafter may obtain.

16          MS. GLAVIN:  If we could go to paragraph 3 of the RICO

17   judgment.

18   Q.  Does paragraph 3 of the RICO judgment direct Chevron to do

19   anything?

20   A.  No, it does not.

21   Q.  To whom, if anyone, does paragraph -- is paragraph 3

22   directed to?

23   A.  To Mr. Donziger.

24   Q.  What does it direct Mr. Donziger to do?

25   A.  To execute in favor of Chevron a stock power transfer into

L5DVDON6                          Thomson - redirect

1    Chevron all his interest in Amazonia.

2    Q.   With the exception -- now focus on paragraph 3.   With the

3    exception of Judge Kaplan's April 25th, 2014 order, which is

4    Government Exhibit 1901, did Judge Kaplan in any way modify

5    Mr. Donziger's obligations with respect to paragraph 3?

6    A.   No.

7    Q.   Going back to Government Exhibit 1901, go to the last page.

8    With respect to the order directing Mr. Donziger to execute in

9    favor of the Clerk of the Court a stock power, did Mr. Donziger

10   apply to Judge Kaplan for relief or modification from that

11   order?

12   A.   I don't believe so, no.

13   Q.   Did Mr. Donziger send to Judge Kaplan the stipulation

14   attached to Government Exhibit 1986-1 and propose that as an

15   alternative to what Judge Kaplan directed him to do at

16   Government Exhibit 1901?

17   A.   I don't believe so, no.

18   Q.   You were asked some questions on cross-examination about

19   Mr. Donziger -- withdrawn.

20        You were asked questions on cross-examination about

21   Judge Kaplan having found that Mr. Donziger had waived

22   privilege for failure to provide a privilege log.

23        Do you remember that?

24   A.   Yes.

25   Q.   And during the course of that cross-examination, do you

1    remember Mr. Kuby asking you about whether or not Mr. Donziger

2    had filed --

3            MR. KUBY:  I'm sorry, Rita, you hit the wrong button

4    there.

5            MS. GLAVIN:  I did.  That's it.

6            THE COURT:  (Reading)

7    "Q.  And during the course of that cross-examination, do you

8    remember Mr. Kuby asking you about whether or not Mr. Donziger

9    had filed -- "

10   Q.  Had filed a privilege log?

11   A.  Yes, I remember generally.

12   Q.  If I could turn your attention to Government Exhibit 401.

13           MS. GLAVIN:  And if we could go to ECF page 17.  If we

14   could go to --

15   Q.  This is Judge Kaplan's November 29th, 2010 opinion; is that

16   right?

17   A.  Yes.

18   Q.  Now, Judge Kaplan -- and please correct me if I'm wrong,

19   you had testified during direct examination that in an October

20   20th, 2010 opinion, Judge Kaplan had determined there was a

21   waiver for failure to produce a privilege log; is that right?

22   A.  Yes, I believe that's correct.

23   Q.  This is a subsequent opinion by Judge Kaplan, November 29

24   of 2010 on that same issue; correct?

25   A.  Yes.

L5DVDON6                          Thomson – redirect

Q.  We could go to paragraph -- Section C, the appropriate

course of action.  And if you could read out loud what Judge

Kaplan stated here.

A.  Donziger argues that no privilege log was required before

the Court ruled on Donziger's motion to quash; and that his

failure to have supplied such a log therefore should not have

resulted in waiver.  While the Court already has ruled on that

question, it accepts his invitation to reconsider the waiver

issue.

        Both Federal Rule 26(b)(5) and 45(c) and S.D.N.Y.

Local Rule 26.2 require the submission of a privilege log where

a person served with a document request or subpoena objects to

the production of requested documents on the ground of

privilege.  Rule 26(b)(5) does not explicitly state exactly

when the privilege log must be provided.  Rule 45 is more

precise, requiring that a person, in objecting to a subpoena,

must serve either written objections --

        THE COURT:  Slowly, slowly.

        THE WITNESS:  Sorry, your Honor.

A.  -- must serve either written objections or move to quash

within the earlier of the time fixed for compliance or 14 days

after service and, if withholding subpoenaed materials on the

grounds of privilege, must provide a privilege log.  It thus

suggests strongly that the privilege log, absent judicial

relief, must accompany any objections or motion to quash.

1            But Local Rule 26.2 is even more explicit.

2            Paragraph C states:

3            Where a claim of privilege is asserted in response to

4    discovery or disclosure other than a deposition, and

5    information is not provided on the basis of such assertion, the

6    information set forth in paragraph (a) above shall be furnished

7    in writing at the time of the response to such discovery or

8    disclosure, unless otherwise ordered by the Court.

9    Q.  Now, if I can stop you right there.  And if we could go

10   down to the last line on ECF page 18, starting with

11   "Accordingly."  If you could read that sentence.

12   A.  Accordingly, the starting position is that the privilege

13   log must be served with the objections or motion to quash, and

14   that the failure to do so may result in a waiver of the

15   privilege claims.

16   Q.  If we could now turn to ECF page 20.  If you could go to

17   the bottom where it begins -- it says "Second."  And read out

18   loud this paragraph.

19   A.  Second, Donziger's failure -- even if the failure to submit

20   the log with the motion to quash or to seek an extension of

21   time initially was no more than inattention to the rule --

22   quickly became something else.  The failure to provide the

23   requisite privilege log was called to Donziger's attention on

24   September 1st, 2010, when the individual petitioners filed a

25   brief in opposition to the motion to quash --

1          THE COURT:  Slowly.

2          THE WITNESS:  Sorry, your Honor.

3   A.   -- and argued that the failure to produce a privilege log

4   or demonstrate that it would have been unduly burdensome to

5   have done so warranted rejection of the privilege claims.  Even

6   then, however, no privilege log was forthcoming and no request

7   for an extension was made.

8   Q.   That's enough.  Thank you, Mr. Thomson.

9          (Counsel conferred)

10          MS. GLAVIN:  Your Honor, I have nothing further.

11          THE COURT:  Thank you.

12          Redirect, counsel.

13          MR. KUBY:  Thank you, Judge.

14   RECROSS EXAMINATION

15   BY MR. KUBY:

16   Q.   Mr. Thomson, from listening to your answers on redirect, it

17   appears -- well, withdrawn.

18          You made four trips from L.A. out here to prepare for

19   this proceeding?

20   A.   No.

21   Q.   To prepare for the June 15th trial date, did you come out

22   here?

23   A.   No.

24   Q.   Okay.  The September trial?

25   A.   Yes.

1   Q.   The November trial?

2   A.   No.

3   Q.   This trial?

4   A.   Yes.

5   Q.   And did you ever get a subpoena for the January 15th trial

6   date?

7   A.   I don't recall getting a subpoena for a January 15th --

8   Q.   Do you remember a January 15th trial date?

9   A.   I don't recall one, no.

10  Q.   Do you recall that the country was in the middle of an

11  escalating COVID spike at that time?

12  A.   That sounds correct, yes.

13  Q.   And we talked a lot about Mr. Donziger not transferring the

14  stock power.  I just want to ask you as a general matter, when

15  you have sought documents -- has Mr. Donziger ever in the

16  history of this litigation created a document that was

17  satisfactory to you?

18            MS. GLAVIN:  Objection to the form.

19            THE COURT:  Sustained.

20            MR. KUBY:  What's wrong with the form?

21            THE COURT:  It's not a litigation matter to have

22  documents acceptable to one's adversary.  If you want to ask

23  about the stock power or one of those things, sure.  But that's

24  really pretty open-ended and encompasses lots of irrelevant

25  material.

1          MR. KUBY:  It's not an open-ended question, Judge;

2     it's a very specific, close-ended question.  If the answer is

3     yes, then we might easily get into irrelevancy.  If the answer

4     is no, then I'm done with that.

5          THE COURT:  Okay.  Well, the objection to the question

6     is sustained.

7     BY MR. KUBY:

8     Q.  When you were reading from Judge Kaplan's order on the

9     privilege log with respect to the 1782s -- the 1782, there is

10    reference made to Donziger's failure, Donziger this, Donziger

11    that; is that correct?

12    A.  I believe that's correct, yes.

13    Q.  And at that time Donziger was, in fact, represented by

14    counsel, right?

15    A.  That's my understanding, yes.

16    Q.  And to say Donziger in that context simply references the

17    party to the litigation, not what the individual actually did

18    or did not do, right?

19    A.  It doesn't necessarily mean that the individual --

20    Q.  Right, because they are acting through counsel?

21    A.  Correct.

22    Q.  So if I understand this correctly, there was a privilege

23    log submitted, but it was submitted late, is that fair to say?

24    A.  Yes, eventually there was a log that was submitted.  It

25    was -- it was late.

1   Q.  How late was it?

2   A.  Well, I think, as Judge Kaplan's order goes through the

3   whole chronology, there are a couple different dates that

4   Mr. Donziger missed.

5   Q.  From the time -- from the time the last date it was due

6   until it was supplied, about how much time passed?

7   A.  I don't recall exactly.  I think it was close to a month.

8   Q.  Close to a month?

9   A.  But I'm not sure.

10  Q.  But not a year?  Not two years?

11  A.  No, this was a more compressed time frame.

12  Q.  I'm sorry?

13  A.  It was a more compressed time frame.

14  Q.  Right.  So less than a month, was a few weeks late.

15  A.  A few weeks after that -- that additional deadline was set,

16  yes.

17  Q.  And you are well aware, are you not, that a judge has

18  discretion to waive that requirement, that rigid adherence to a

19  time frame if the judge chooses to do so?

20  A.  I believe Judge Kaplan's order actually says that, yes.

21  Q.  Right.  And he did not choose to do so?

22  A.  That's correct.

23  Q.  And you were just fine with that; correct?

24  A.  Chevron's position was that the waiver should be continued

25  in effect, yes.

1    Q.  And that waiver, that privilege waiver, because that log

2    was submitted three weeks late, is it fair to say has

3    reverberated through this litigation for the past decade?

4    A.  I don't think that's an accurate summary of the

5    untimeliness of the log; but yes, obviously the waiver ruling

6    was significant.

7    Q.  A couple more here.

8              MR. KUBY:  Sorry, Judge.  I mislaid a piece of paper.

9    I don't see how that could have happened.

10   Q.  You were asked some questions about the time that you spent

11   that was not being compelled on redirect.  We'll call it

12   noncompelled time.

13   A.  If you're referring to the preparation time, yes.

14   Q.  Yeah, yeah.  Did any of this noncompelled time involved

15   drafting pleadings for Seward & Kissel?

16   A.  I don't believe so, no.

17   Q.  Editing Seward & Kissel drafts?

18   A.  I don't believe so, no.

19   Q.  Giving them ideas for pleadings?

20   A.  Not to my knowledge.

21   Q.  Thank you.

22             MR. KUBY:  And now I think we really are done.

23             Although -- although --

24             MS. GLAVIN:  You opened the door, Mr. Kuby.

25             THE COURT:  Re-redirect.

1    REDIRECT EXAMINATION

2    BY MS. GLAVIN:

3    Q.  Mr. Thomson, do you recall Mr. Kuby just asking you whether

4    or not you received a subpoena for a January 21, 2021 trial

5    date in this matter?

6    A.  I remember the question, yes.

7    Q.  I'm going to show you what is Government Exhibit 1000-20.

8    Can you take a look at this document, sir.

9            Who was the subpoena to?

10   A.  It's directed to me.

11   Q.  What is it directing you to do on January 19th of 2021?

12   A.  To report to testify in the trial.

13   Q.  If we could go to the bottom of the subpoena.  Subpoena

14   stamp date.

15   A.  November 10, 2020.

16   Q.  Do you recall being given a copy of this subpoena?

17   A.  I have a vague recollection of seeing it.  I mean, frankly,

18   they all kind of look very similar, so --

19   Q.  Okay.  Moving on.

20           Mr. Kuby asked you a question on recross about Judge

21   Kaplan determining that Mr. Donziger had waived privilege

22   simply because his privilege log was late.

23           MR. KUBY:  Objection.  That was not what I -- I never

24   used the word "simply."  I never used the word "simply" in this

25   case.

L5DVDON6                          Thomson - redirect

1              THE COURT:  You're right.  But go ahead.

2     Q.  In the order of --

3              MR. KUBY:  Mischaracterizing.

4     Q.  -- completeness -- in the spirit of completeness, let's go

5     to Government Exhibit 123.  We could go -- sorry.  Let's go to

6     government exhibit -- yes.  Sorry.  Government Exhibit 401.

7     And if we could go to ECF page 23.  And if we could go to the

8     bottom.  And if you could read out loud, "Accordingly."

9     A.  Accordingly, even if the failure to comply with Rule

10    26.2(c) or to seek an extension of time for compliance in the

11    face of the individual petitioners pointing out the failure on

12    September 1, were not alone sufficient to find waiver, the

13    Court nevertheless would hold that Donziger and the *Lago Agrio*

14    plaintiffs waived all privileges and protections that might

15    have been asserted in response to the subpoenas.

16             THE COURT:  Slowly.

17             THE WITNESS:  Sorry, your Honor.

18    A.  Including those with respect to the 8,652 documents

19    belatedly enumerated in the log, on the basis of all of the

20    considerations referred to above.  It would decline to exercise

21    its discretion to relieve them of that waiver.

22    Q.  And if you could look at page -- ECF page 22, and just read

23    to yourself the first and the second.

24             (Pause)

25    A.  Okay.

1    Q.  Moving to ECF page 23 and just continue reading.

2              (Pause)

3    Q.  Can you summarize what Judge Kaplan stated here at ECF page

4    22 and 23 as his reasoning or additional reasoning for why

5    Judge Kaplan found a waiver of the privilege?

6    A.  Judge Kaplan essentially finds that Donziger and the LAPs

7    had obtained a tactical or strategic advantage by delaying the

8    production of the log; and that allowing them to get the

9    benefits of their delay would redound to the detriment of here

10   the individual petitioners who are two Chevron lawyers, one an

11   in-house lawyer and one an outside counsel, who were under

12   indictment in Ecuador, which Judge Kaplan found that the

13   evidence showed that that was as a result of Mr. Donziger and

14   the LAPs intercessions with the Ecuador government.

15   Q.  If you could turn to ECF page 24.  If you could read

16   starting at "Finally."

17   A.  Finally, even if all of the foregoing were not sufficient

18   to warrant that result, there is an additional ground as well.

19   This Court is satisfied also that the tactical advantage that

20   Donziger and the *Lago Agrio* plaintiffs have gained and the

21   disadvantage to which they have put their adversaries was not

22   simply a consequence of errors made and positions taken for

23   benign reasons.

24             The Court finds and concludes that they have intended,

25   at least since September 1, to achieve that tactical advantage

L5DVDON6                          Thomson - redirect

at their adversaries' expense, based, among other things, on

the following.

Q.   Continue.

A.   The eleventh-hour attempt by the GOE -- which is the

government of Ecuador -- to intervene after the Court ruled

that Donziger and his clients were obliged to produce the

documents, and the Court of Appeals had denied a stay pending

appeal to assert a supposed common interest in the *Lago Agrio*

plaintiffs' privilege, supports that view.

          The GOE has been working closely with Donziger for

years and stands to gain billions for Ecuador if the *Lago Agrio*

plaintiffs prevail against Chevron.  Its belated attempt to get

into this case has all the hallmarks of an attempt to pull

Donziger's chestnuts out of the fire.

          Some of the assertions of privilege in the 8,652-item

privilege log, including over 2500 items being documents sent

or disclosed to a public relations person, the founder of the

Amazon Defense Front or La Frente, Amazon Watch, and a host of

newspapers and magazines, further suggest that Donziger and the

*Lago Agrio* plaintiffs are not operating in entire good faith,

although the Court does not now rule on the merits of those

privilege claims.

          The attempt to --

Q.   Next bullet point.

A.   I'm sorry?

L5DVDON6                          Thomson – redirect

Q.   The next bullet point.

A.   The attempt to gain the benefit of withdrawing Donziger's

motion for reconsideration of the waiver holding in an attempt

to convince the Court of Appeals that the order appealed from

is "final," while then asking this Court in substance to grant

the "withdrawn" motion, is yet another example of attempting to

gain tactical advantage by procedural maneuvering.  The

inconsistency between what the *Lago Agrio* plaintiffs told the

Court of Appeals about the effect of the summary order and

their present arguments here reinforce that impression.

        Moreover, as noted above, the repeated refusal of

Donziger and his clients to stay the Ecuadorian civil

litigation and –– now joined by the GOE –– to seek a stay of

the criminal prosecution make their objectives clear.  If they

truly eschewed any desire to gain a tactical advantage by

delaying production of their privilege log, the right course of

action would be to offer a stay in Ecuador in exchange for

belated consideration of their privilege objections.  The fact

that they refused that simple exchange speaks volumes.

Q.   If you could read the next three sentences.

A.   In the last analysis, resolution of "reciprocal claims of

gamesmanship advanced by all parties in this situation is

precisely the type of evaluation that is entrusted to the

district court."  This Court finds that the failure to submit a

privilege log, at least from September 1, 2010, when the

1   individual petitioners made an issue of it in their papers in

2   opposition to the motions to quash and possibly earlier, was a

3   deliberate attempt to structure the response to the subpoenas

4   in a way that would create the maximum possibility for delay.

5   The advances warrant the conclusion that the goal was to force

6   the individual petitioners to proceed to trial in the

7   Ecuadorian criminal case and to obtain a judgment against

8   Chevron before any of them could get any, or at least the most

9   important documents responsive to the subpoenas.

10  Q.  Turn to ECF page 27.

11          If you could just read the sentence beginning with

12  "Accordingly."

13  A.  Accordingly, having accepted Donziger's invitation to

14  reconsider the waiver holding, this Court again holds -- on the

15  law, on the facts, and in the exercise of discretion -- that

16  each and every privilege claim with respect to the documents

17  sought by the subpoenas has been waived.  It declines to

18  exercise its discretion in their favor.

19  Q.  You can stop right there.

20          MS. GLAVIN:  I have no further questions, your Honor.

21          THE COURT:  Thank you.

22          MR. KUBY:  Just give me one second please, Judge.

23          THE COURT:  Yes, sir.

24          (Pause)

25          MR. KUBY:  Judge, at this point I'm going to -- at

L5DVDON6                          Thomson - recross

1    this point I'm going to show the witness document 160 from the

2    underlying docket, which will be deemed in evidence, yes,

3    Ms. Glavin?

4            MS. GLAVIN:  No.  I think this is beyond the scope.

5            MR. KUBY:  Well, okay.  We have no problem with the

6    entry -- with the admission of this document as a docket entry;

7    correct?

8            MS. GLAVIN:  What is this?

9            MR. KUBY:  What's that, Judge?

10           THE COURT:  I didn't say --

11           MS. GLAVIN:  I don't know what this is.

12   RECROSS EXAMINATION

13   BY MR. KUBY:

14   Q.  All right.  Well, let's do it this way:  Take a look at

15   what I've put up on the screen as document number 160.

16           THE COURT:  May I just ask you, I don't see anything

17   about the transfer of the case in my notes on Ms. Glavin's last

18   redirect.

19           MR. KUBY:  Well, that's right.  But you heard a great

20   deal about the government of Ecuador and their intervention,

21   and as well as privilege logs and other matters.  And in fact,

22   this document addresses those at great length.

23           And I just want to --

24           THE COURT:  While I do have all of the docket entries

25   memorized, I'll wait to hear from you.

1              MR. KUBY:  Okay.  Thank you.

2       BY MR. KUBY:

3       Q.  Have you seen this before, Mr. Thomson?

4       A.  I probably saw it at one time, but I haven't seen this

5       recently, no.

6       Q.  All right.  Well, so Judge Kaplan found that there was some

7       prejudice because of the intervention by the government of

8       Ecuador in this case; is that correct?

9       A.  I believe what he said was that he -- he found that the

10      timing of their attempt to intervene was an attempt to

11      prejudice the ability of the individual petitioners in

12      particular, as well as Chevron, to timely obtain the documents

13      that were responsive to the subpoenas.

14      Q.  Didn't you guys -- meaning whoever the "you" is behind the

15      Chevron litigation -- work for eight years to get this

16      transferred to Ecuador?

17      A.  I'm not sure who you're referring to, so --

18      Q.  Well, there was eight year -- after Mr. Donziger files his

19      case in the Southern District, there was about eight years of

20      litigation to get it transferred to Ecuador; is that correct?

21      A.  If you're asking if I was personally involved in that, no.

22      Q.  No, I'm just asking you to tell me what happened.

23              THE COURT:  You have to wait till he finishes talking.

24              But you should talk more loudly.

25              THE WITNESS:  Sorry, your Honor.

1    A.  If you're asking me whether I was personally involved, the

2    answer is no.

3    Q.  I'm not asking that.  I'm asking you to recite a portion of

4    that history, which I think you testified earlier -- withdrawn.

5          You testified earlier on cross or re-redirect or

6    whatever it was that after Mr. Donziger filed in the Southern

7    District, Texaco/Chevron moved to send the case to Ecuador;

8    correct?

9    A.  I testified that Texaco moved to send the case to Ecuador,

10   yeah.

11   Q.  Right.  And when did Chevron --

12         THE COURT:  Okay.  Just remember, that was not in the

13   most recent redirect.  So if that's where you are, you're

14   beyond the scope.

15         MR. KUBY:  No, I understand.

16   Q.  I'm just trying to establish that Chevron, which absorbed

17   Texaco, was fine with the case in Ecuador, and that's where

18   they wanted to be, right?

19   A.  No, that's not correct.

20   Q.  Not correct.

21         Isn't it true that at the time the case was

22   transferred, there was a corporatus government in Ecuador?

23   A.  I'm not sure what you mean by a corporatus government.

24   Q.  One that's very, very friendly to American business

25   interests at the expense --

L5DVDON6

| | |
|---|---|
| 1 | THE COURT:  If we're talking -- Mr. Kuby, if we are |
| 2 | talking about the transfer back in -- whoops, I lost it.  The |
| 3 | transfer from this Court to Ecuador, that is beyond the scope. |
| 4 | It was not mentioned in Ms. Glavin's last redirect. |
| 5 | Q.  When you were reading from one of the documents, you made |
| 6 | reference to a privilege log that contained 8,625 documents; is |
| 7 | that correct? |
| 8 | A.  I believe that's what Judge Kaplan's order says, yes. |
| 9 | Q.  Right.  And you have no reason to deny they served a |
| 10 | privilege log for 8,625 documents? |
| 11 | A.  I would assume that's accurate.  I don't have personal |
| 12 | knowledge of that number. |
| 13 | MR. KUBY:  At grave risk, I'm going to say I'm done. |
| 14 | THE COURT:  Yes, sir. |
| 15 | Re-re-redirect. |
| 16 | MS. GLAVIN:  No, your Honor. |
| 17 | THE COURT:  Bless you, my children. |
| 18 | You may step down, sir. |
| 19 | THE WITNESS:  Thank you, your Honor. |
| 20 | (Witness excused) |
| 21 | THE COURT:  Ms. Glavin. |
| 22 | MS. GLAVIN:  Special prosecutors call Ondrej Krehel. |
| 23 | THE COURT:  Yes indeedy. |
| 24 | MR. KUBY:  Judge, before the witness takes the stand, |
| 25 | I'd like to address something. |

L5DVDON6

| | |
|---|---|
| 1 | THE COURT:  Yes, sir. |
| 2 | MR. KUBY:  And I think I'll do it from there. |
| 3 | And I say this without any personal difficulty with |
| 4 | Ms. Glavin.  I think, given the high conflict nature of this |
| 5 | litigation, we've been playing and working together remarkably |
| 6 | well. |
| 7 | To the extent that any member of the defense team in |
| 8 | the well engages in any activity that Ms. Glavin finds |
| 9 | improper, distasteful, uncomfortable, whatever, I would request |
| 10 | it either be taken up with me or taken up with the Court, and |
| 11 | we will then address it. |
| 12 | Ms. Glavin spent a lot of time as a federal |
| 13 | prosecutor, and I understand -- and she has government power |
| 14 | here, but her government power here extends only to the |
| 15 | prosecution of this case and not to confronting members of the |
| 16 | defense team.  And I would request that that conduct, which I |
| 17 | understand was spontaneous, simply not be repeated.  Thank you. |
| 18 | THE COURT:  I think that's fair enough, right? |
| 19 | MS. GLAVIN:  Oh, yes, happy to do that. |
| 20 | And Mr. Kuby, just as much as you could go up there, |
| 21 | you could easily have walked over here and -- |
| 22 | MR. KUBY:  I'm sorry? |
| 23 | MS. GLAVIN:  You could have asked me kindly and I |
| 24 | would have said, I agree, Ron. |
| 25 | THE COURT:  All right, children. |

L5DVDON6                          Krehel - direct

1           MR. KUBY:  Unfortunately --

2           THE COURT:  Let's get finished here.

3           MR. KUBY:  -- rolling approach.

4           THE COURT:  Come on, kids.  Let's go.

5           Please bring the witness in, sir.

6           Ms. Glavin, you call --

7           MS. GLAVIN:  Ondrej Krehel.  And I can have him state

8    his name and spell it for our court reporter.

9           THE COURT:  Sure.  In a minute.

10          Let's swear him in first.

11    ONDREJ KREHEL,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14          THE COURT:  Thank you.  Ms. Glavin.

15    DIRECT EXAMINATION

16    BY MS. GLAVIN:

17    Q.  Mr. Krehel, where do you work?

18    A.  LIFARS, LLC.

19    Q.  You could spell that for the court reporter.

20    A.  L-I-F-A-R-S, LLC.

21    Q.  What is LIFARS?

22    A.  Digital forensics and incident response firm.

23    Q.  And what is your role with LIFARS?

24    A.  I am a digital forensic lead and I'm also COO and founder.

25    Q.  What does it mean to be the digital forensics lead?

L5DVDON6                              Krehel - direct

1    A.   I usually assist victims of a cyber crime or appliance who

2    need digital forensic services.

3    Q.   Do you have any degrees related to forensic services?

4    A.   I do.

5    Q.   When I say "forensic services," what do you understand that

6    to mean?

7    A.   Digital forensic science.

8    Q.   What is that?

9    A.   It's a science that pertains how the evidence is collected,

10   called electronically stored information, and how that evidence

11   digitally analyzed and interpreted usually in legal matters.

12   Q.   And what degrees do you have related to digital forensic

13   science?

14   A.   A Ph.D. in computer forensics.

15   Q.   How long have you been in this field?

16   A.   Two decades.

17   Q.   I want to turn your attention to civil case 11 CV 691,

18   *Chevron Corp. v. Donziger*.  Are you familiar with that case?

19   A.   Yes.

20   Q.   How?

21   A.   I was appointed by the Court as a neutral forensic expert.

22   Q.   And showing you what is Government Exhibit 2170 in

23   evidence.  You have a binder there.

24   A.   One more time, exhibit please.

25   Q.   2170.

L5DVDON6                          Krehel - direct

1    A.  I'm on the page.

2    Q.  It's Exhibit 2170.

3    A.  Yes.

4    Q.  Okay.  Look at the first page.

5    A.  Okay.

6    Q.  You see that that states order of appointment?

7    A.  That is correct.

8    Q.  Okay.  How does this relate to you, if at all?

9    A.  This is my appointment as a neutral forensic expert.

10   Q.  Who appointed you?

11   A.  The Honorable Judge Kaplan.

12   Q.  And at who's -- withdrawn.

13          If you look at paragraph 2 of Judge Kaplan's order on

14   page 1, it states that the neutral forensic expert shall

15   perform the functions described in the protocol.

16   A.  Correct.

17   Q.  What did you understand the protocol to be?

18   A.  Usually in a forensic examination there is a protocol that

19   defines the cause of action for the forensic expert.

20   Q.  I'm going to show you what is Government Exhibit 2172 in

21   evidence.  You recognize this?

22   A.  Yes.

23   Q.  Okay.  And what is this?

24   A.  This is forensic inspection protocol.

25   Q.  Issued by who?

L5DVDON6                         Krehel - direct

```
 1   A.  By Honorable Judge Kaplan.
 2   Q.  And how does this relate to you and what you were to do?
 3   A.  These are directions for me how I perform my forensic
 4   evidence preservation and analysis.
 5   Q.  Now, with respect to the forensic -- well, withdrawn.
 6          Going back to Government Exhibit 2170, your
 7   appointment as the neutral forensic expert, at whose direction
 8   did you understand you were working as the neutral forensic
 9   expert?
10   A.  I work under direction of a court and Honorable Judge
11   Kaplan.
12   Q.  Did you work at Chevron's direction?
13   A.  No.
14   Q.  Did you work at Steven Donziger's direction?
15   A.  No.
16   Q.  Did you work at Gibson Dunn's direction?
17   A.  No.
18   Q.  And what duties were you to perform as the neutral forensic
19   expert?
20   A.  My duties were described in the protocol.
21   Q.  If we could go to Government Exhibit 2172.  If you can just
22   summarize what your duties were.
23   A.  My duties were to collect what we call electronically
24   stored information, meaning create a forensic preservation of
25   electronic devices in the possession of Mr. Donziger; and then
```

L5DVDON6                         Krehel - direct

following the protocol, describe what kind of analysis me as a

neutral forensic expert I would perform on those collected

forensic copies.

Q.   I want to turn your attention to paragraph 4 of the

protocol.  What was Mr. Donziger directed to do -- or

withdrawn.

          What was Mr. Donziger directed to provide you within

three business days of the protocol?

A.   Mr. Donziger would provide a listing of his electronic

devices that he used to access or store information or for

communication since March 4, 2012.

Q.   And if you could go down to -- if I could have you look at

the sentence beginning, "Additionally, Donziger shall produce

under penalty of perjury a list of all accounts."

A.   Correct.  So that will also include not only devices, but

web-based email accounts, including, for example, some

potentially storage devices as a Dropbox, what we call cloud

devices, also communication applications such as WhatsApp,

Facebook Messenger, Instant Messenger.  These would be

applications and storage devices that we would also have access

to.

Q.   And Mr. Krehel, with respect to this list that Mr. Donziger

was directed to provide to you of his devices and accounts

within three business days of entry of this protocol, did that

occur?

L5DVDON6                         Krehel - direct

1   A.  No.

2   Q.  You did not receive a list from Mr. Donziger of his devices

3   and/or his accounts within three days of the business days of

4   entry of the protocol?

5   A.  That is correct, I did not.

6   Q.  If I could turn your attention to paragraph 5 of the

7   protocol.  What was Mr. Donziger directed to do in paragraph 5

8   of the protocol?

9   A.  Mr. Donziger would surrender his devices to me as a neutral

10  forensic expert at his resident address, 245 West 104th Street,

11  Apartment 7D in New York, and I would take possession of these

12  devices, custody, and transfer them to our digital forensic

13  laboratory here in New York.

14  Q.  And at what time were the devices to be surrendered to you?

15  A.  12 p.m. on New York time, on March 18, 2019.

16  Q.  I want to show you what is in evidence as Government

17  Exhibit 132.  You can start at the bottom email.

18          Is this an email exchange -- withdrawn.

19          Is this an email from someone at Gibson Dunn to you,

20  Mr. Krehel, in which Mr. Donziger is cc'd?

21  A.  That is correct.

22  Q.  And this is March 11th, 2019, at 11 a.m.?

23  A.  That is correct.

24  Q.  And what was Gibson Dunn asking you here?

25  A.  They are asking in the listing of the devices and the

1    accounts was provided to me from Mr. Donziger.

2              MS. GLAVIN:  We could go up to the next email in this

3    exchange.

4    Q.  Is this your response on March 11 --

5    A.  That is correct.

6    Q.  -- 2019?

7              And are you responding to Matthew Burke, with a cc to

8    Steven Donziger and Andrea Neuman?

9    A.  Correct.

10   Q.  And what did you inform them on March 11?

11   A.  I inform them that per Court's order that I was instructed

12   under, myself or LIFARS' general email mailbox did not receive

13   the listing in the questions in paragraph 1 or paragraph 2 from

14   Mr. Donziger.

15   Q.  And did paragraph 4 of the forensic protocol direct the

16   manner in which Mr. Donziger was to deliver the list to you?

17   If you want to look at --

18   A.  Yes.

19   Q.  -- the protocol, which is 2172.  And if you could --

20             MS. GLAVIN:  Sareen, if we could blow up the last four

21   lines of ECF page 1.

22   A.  Yes, it was directed that it will be provided via email.

23   Q.  And going back to Government Exhibit 132, so when you said

24   the LIFARS general mailbox did not receive the listing, what is

25   the LIFARS general mailbox?

L5DVDON6                          Krehel - direct

1     A.  We do have various general mailboxes for internal response

2     or for legal matters that we worked on; and also -- and

3     administrative -- field administrative functions and evidence

4     technician had mailboxes where they received evidence.  So I

5     cross-check at the company that no one receive that listing

6     from Mr. Donziger.

7     Q.  And you had not received an email to your individual email

8     address from Mr. Donziger with the list; is that right?

9     A.  That is correct.

10              MS. GLAVIN:  If we could go to Government Exhibit 133,

11    which is --

12              THE COURT:  I'm not sure, did we move 132?

13              MS. GLAVIN:  No, I don't think we did.  I move 132

14    into evidence.

15              MS. TRIVEDI:  No objection, Judge.

16              THE COURT:  Received.

17              (Government's Exhibit 132 received in evidence)

18    Q.  Now, turning to Government Exhibit 133, which is in

19    evidence, if we could go to the top, Mr. Krehel.  Is this an

20    email from Mr. Donziger to you on March 11, 2019?

21    A.  Correct.

22    Q.  And if we could go down to paragraph 3.  And -- go up one

23    more.  And if you could read out loud the last sentence

24    beginning "So."

25    A.  So I hope you have not cleared your schedule to work on

 1   this matter, because as Chevron knows, I will not be producing

 2   documents until my due process rights are respected.

 3   Q.  And if you could read the sentence two sentences above

 4   that, "I have clearly stated."

 5   A.  I clearly have stated that I will voluntarily go into civil

 6   contempt of the legally unfounded orders in order to obtain

 7   proper appellate review.

 8   Q.  Now, Mr. Krehel, I want to turn your attention to March 18

 9   of 2019.  Did you see Mr. Donziger on that day?

10   A.  Yes.

11   Q.  Can you describe, sort of, the circumstances leading up to

12   your seeing Mr. Donziger that day?

13   A.  According to protocol and -- we were at the residence.

14   Q.  When you say "we," who is we?

15   A.  Myself and two forensic technicians.

16   Q.  When you say we were at the residence, what do you mean?

17   A.  At the address that was specified in the forensic protocol.

18   Q.  Would that be 245 West 104th Street?

19   A.  Correct.

20   Q.  And so you went to that address?

21   A.  That is correct.

22   Q.  Tell us what happened.

23   A.  We entered the lobby of the building, asked the doorman to

24   call Mr. Donziger.  Doorman called multiple times Mr. Donziger

25   phone, and no one answer.

L5DVDON6                         Krehel - direct

1   Q.  Now, approximately what time did you arrive at the

2   building, 245 West 104th Street, that day?

3   A.  On or around 11:50.

4   Q.  11:50 a.m.?  P.m.?

5   A.  A.m.

6   Q.  So I'm going to show you what is Government Exhibit 134.

7   Do you recognize this exhibit?

8   A.  Yes.

9           MS. GLAVIN:  Your Honor, this is in evidence.

10  Q.  If I could turn your attention to the email you wrote on

11  March 18, at 12:15 p.m.

12  A.  Okay.

13  Q.  At the time you wrote this email, were you at the apartment

14  building?

15  A.  Yes, we were in the lobby.

16  Q.  And can you read what you wrote in this email.

17  A.  Dear Mr. Donziger, we have been in the lobby since 11:55

18  a.m.  Doorman called you and no one answered.  We will wait

19  till 12:30.  Kind regards, Ondrej Krehel.

20  Q.  And who did you send that email to?

21  A.  I sent this email to Mr. Donziger, and I believe attorneys

22  were cc'd as well.

23  Q.  When you say "attorneys," do you mean the attorneys of

24  Gibson Dunn or someone else?

25  A.  Correct, Gibson Dunn.

1   Q.  After you sent this email around 12:15 p.m., what did you

2   do?

3   A.  I stayed in lobby.

4   Q.  Did you eventually see Mr. Donziger?

5   A.  Yes.

6   Q.  Approximately what time did you see Mr. Donziger?

7   A.  Around 1 p.m.

8   Q.  And can you tell us what happened?

9   A.  Mr. Donziger walked into the building with coffee in his

10  hand.

11  Q.  I'm sorry, he had what in his hand?

12  A.  Coffee.  Recognize us that we are waiting for him, and we

13  had a little conversation.

14  Q.  Can you tell us what he said to you and you said to him.

15  A.  From my recollection, Mr. Donziger told me that he will not

16  surrender any devices, and that basically we will not receive

17  any devices that day from him.

18  Q.  Did you ask him about any devices that he had?

19  A.  Yes, I did.

20  Q.  Okay.  Could you tell us what you asked him and what he

21  said to you.

22  A.  Because we had to bring our equipment for forensic

23  preservation, we wanted to understand what devices Mr. Donziger

24  has so we can be more precise in preservation about trying to

25  get evidence because we were also ready to preserve

L5DVDON6                       Krehel – direct

1    Mr. Donziger devices at his residence.  And I asked him

2    specifically what devices he has, what kind of model or

3    manufacturer, so we could actually bring -- we would not have

4    to bring as much equipment next time.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. GLAVIN:

2    Q.  And did Mr. Donziger give you a response?

3    A.  Yes, he did.

4    Q.  What do you recall him saying to you?

5    A.  To my recollection he mentioned that he has an iPhone and

6    MacBook Air and potentially he might have had some other

7    devices but he mentioned that they would not be related matter.

8    They would be more like a storage devices.

9    Q.  I am going to show you what is Government Exhibit 134.

10   Okay.  And you go to the next email on the chain from Andrea

11   Newman to you at approximately 2:56 p.m. with the CC to

12   Mr. Donziger.  She states:

13            Dear Mr. Krehel, can you, please, let us know if

14   Mr. Donziger provided you his devices for imaging today.

15            do you see that?

16   A.  Yes.

17   Q.  Now, approximately what time did you leave the apartment

18   building, the 245 West 104?

19   A.  Most likely on or around one p.m. or 1:15 p.m.

20   Q.  After you spoke with Mr. Donziger?

21   A.  Correct.

22   Q.  Okay.  Did Mr. Donziger provide you with any devices at all

23   that day?

24   A.  No.

25   Q.  And when Ms. Newman sent you this email -- if we go to the

1   next email in the chain you respond to her; is that right?

2   A.  That is correct.

3   Q.  Okay.  And you CC'd Mr. Donziger; is that right?

4   A.  That is correct.

5   Q.  And could you read what you reported back?

6   A.  Dear Mr -- life arrived today March 18, 2019 and

7   Mr. Donziger residence at address 245 West 104 Street,

8   apartment 17, New York, New York 10225 on or around 11:50 a.m.

9   Mr. Donziger met forensic team in the building lobby.  I did

10  not provide -- forensic team any devices verbally.  When asked,

11  Mr. Donziger provide a list of devices, one iPhone and one

12  MacBook Air System.

13          Thank you Ondreg Krehel.

14  Q.  Mr. Krehel, if you saw Mr. Donziger again do you think

15  you'd recognize him?

16  A.  Potentially.

17  Q.  Do you see him in the courtroom today?

18  A.  The might be the gentleman.  I would say the gentleman

19  right behind the lady that's typing right onto the computer.

20  Q.  Do you see the man with the ponytail?

21  A.  Yes.

22  Q.  Is the person that you're identifying is you believe to be

23  Mr. Donziger seated near the man with the ponytail?

24  A.  That is correct.

25  Q.  Okay.  Where is he seated in relation to the man with the

1  ponytail?

2  A.  On his left side.

3  Q.  Yeah.

4          THE COURT:  What color mask does he have on?

5          THE WITNESS:  Looks blue.

6          THE COURT:  So identified.

7  Q.  Now, Mr. Krehel, with respect to your duties with imaging

8  of Mr. Donziger's devices, if we could go to paragraph five of

9  the forensic protocol.  And if we could go to the sentence "at

10 no time shall Chevron's forensic expert have access to the

11 original devices or live media accounts absent court order".

12          Do you see that?

13 A.  Yes.

14 Q.  Okay.  Did you have the ability to share with Chevron

15 Mr. Donziger's devices?

16 A.  No.

17 Q.  And did you understand that if you could look at paragraphs

18 six, seven and eight of the protocol take a look at this.

19 A.  Okay.

20 Q.  And just back to paragraph five.  I am looking at paragraph

21 5F and if you could look at the sentence which states:  "The

22 neutral forensic expert shall maintain the set of images

23 created from Donziger's original devices and media unexamined

24 and unaltered until further order of the Court."  What did you

25 understand that to mean?

1   A.  It means for me as a neutral forensic expert that my order

2   is to preserve electronic evidence and un-touch it until

3   further direction from the Court.

4   Q.  And would that be Judge Kaplan?

5   A.  That is correct.

6   Q.  Okay.  And with respect to paragraph six, did you ever get

7   to the stage where you would perform the duties set forth in

8   paragraph six?

9   A.  No.

10  Q.  With respect to paragraph seven did you ever get to the

11  stage where you would perform the duties set forth in paragraph

12  seven?

13  A.  No.

14  Q.  With respect to paragraph seven of the protocol --

15  withdrawn.

16          You have had an opportunity to look at this protocol

17  before your testimony today, correct?

18  A.  Correct.

19  Q.  Anywhere in this protocol did Judge Kaplan direct that

20  Chevron would have unfettered access to the mirror copy or the

21  mirror image taken of Mr. Donziger's device?

22  A.  Chevron would not have access.

23  Q.  Did Mr. Donziger ever surrender any devices to you,

24  Mr. Krehel, for imaging?

25  A.  No.

1    Q.   He didn't do it in June?

2    A.   No.

3    Q.   Didn't do it in July?

4    A.   Correct.

5    Q.   And as you sit here today, has that happened?

6    A.   Did not happen.

7    Q.   I want to turn your attention to Government Exhibit 137.

8    Do you recognize this document?

9    A.   Yes.

10   Q.   Is this an email exchange that you were on that

11   Mr. Donziger is copied on?

12   A.   Yes.

13   Q.   Starting at the --

14             MS. GLAVIN:  Move for admission your Honor, 137.

15             THE COURT:  137?

16             MS. TRIVEDI:  No objection, judge.

17             THE COURT:  Received.

18             (Government's Exhibit 137 received in evidence)

19   Q.   Starting at the bottom of Government Exhibit 137, this is

20   an email from Vince Eisinger, E-I-S-I-N-G-E-R, of Gibson Dunn

21   to you with the CC to Mr. Donziger on May 29th of 2019.  And

22   what are you being asked here Mr. Krehel?

23   A.   I am being asked and Mr. Donziger has complied in paragraph

24   four of forensic parole protocol order which was attached to

25   that email if whether or not Mr. Donziger as contacted me since

1    May 23 regarding the forensic protocol order and just he

2    contacted me since May 23.

3    Q.  If we go up to your response on this email you respond on

4    May 29, 2019 at 11:38 a.m. could you read what you responded?

5    A.  Dear Esquire Eisinger, Mr. Donziger did not comply with

6    paragraph four off the forensic protocol order and has not

7    contacted me since May 23, 2019 regarding forensic protocol

8    order.  Kind regards, Ondrej Krehel.

9    Q.  And if we go up to Mr. Donziger's response.

10   A.  I will be sending a statement regarding this issue

11   momentarily, Steven Donziger.

12   Q.  I am going to show you what is Government Exhibit 138.  Is

13   this an email from Mr. Donziger to you, Mr. Krehel?

14   A.  Yes.

15          MS. GLAVIN:  Move for admission of exhibit 138.

16          MS. TRIVEDI:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 138 received in evidence)

19   Q.  This an email sent May 29, 2019?

20   A.  That is correct.

21   Q.  And if you can look at email and the attachment.  Go to the

22   next page.  What is this affidavit from Mr. Donziger is dated

23   what day?

24   A.  Dated May 29, 2019.

25   Q.  Okay.  Before you received this email from Mr. Donziger on

1    May 29th of 2019 have you gotten from -- Withdrawn.

2              Before you received this email from Mr. Donziger on

3    May 29, of 2019, had you received from Mr. Donziger any list of

4    his electronic devices or accounts?

5    A.  No.

6    Q.  Was the only information that you received from

7    Mr. Donziger prior to this May 29, 2019 email about

8    Mr. Donziger's devices, what Mr. Donziger told you in the lobby

9    of the apartment building on March 18 of 2019?

10   A.  That is correct.

11   Q.  I want to turn your attention --

12             MS. GLAVIN:  One moment, your Honor.

13             I am going to show you, Mr. Krehel, what is Government

14   Exhibit 140-A.  Go to page two of this declaration.  Go to page

15   three.  I am going to show you what is Government Exhibit 140.

16   Is this an email you received from Mr. Donziger on June 5th of

17   2019?

18   A.  Yes.

19             MS. GLAVIN:  Move for admission, your Honor?

20             MS. TRIVEDI:  No objection.

21             THE COURT:  Received.

22             (Government's Exhibit 140 received in evidence)

23   Q.  Government Exhibit 140 is an email from Mr. Donziger to you

24   on June 5th.  States subject correspondence from Steven

25   Donziger.  It reads:

1          Mr. Krehel, please note the attached correspondence

2     and revised declaration from Steven Donziger.  Given the

3     possibility of a court hearing on June 10 that will be based in

4     part on some of the issues raised in my correspondence, please,

5     respond as soon as possible.  Thank you.  Steven Donziger.

6          Were there two attachments to this email?

7     A.  Yes.

8     Q.  Let's go to the first attachment declaration.

9          Now, between you receiving the declaration on May 29,

10    2019 in an email and your receiving this email from

11    Mr. Donziger on June 5th of 2019, had Mr. Donziger provided you

12    with any other list or declaration relating to his devices?

13    A.  No.

14    Q.  So, this would be the second list or declaration you

15    received from Mr. Donziger regarding his devices?

16    A.  That is correct.

17    Q.  And if we could go to page two and if we could go to page

18    three.  Now the second attachment to this is it a letter to

19    you, Mr. Krehel?

20    A.  Yes.

21    Q.  And this is from Mr. Donziger on June 5th of 2019; is that

22    right?

23    A.  That is correct.

24    Q.  If we could just have you take a look at this letter first

25    page and scroll to the second page.  (Pause)

1              Go to the third page. (Pause)

2              Go to the fourth page. (Pause)

3              Go to the you fifth page.(Pause)

4              Go to the sixth page? (Pause)

5    A.   Okay.

6    Q.   Did you ever respond to Mr. Donziger's email?

7    A.   No.

8              MS. GLAVIN:   Your Honor, no further questions.

9              THE COURT:   Thank you.

10             Cross-examination, counsel?

11   CROSS-EXAMINATION

12   BY MS. TRIVEDI:

13   Q.   Mr. Krehel, good evening.

14   A.   Good evening.

15   Q.   Mr. Krehel, Mr. Donziger sent you a list OF his devices on

16   May 29, 2019, correct?

17   A.   That is correct.

18   Q.   And in doing so he had complied with paragraph four of the

19   forensic protocol, correct?

20             MS. GLAVIN:   Objection.

21             THE COURT:   Sustained.

22   Q.   What's the basis of the objection?

23             MS. GLAVIN:   Mr. Krehel isn't in a position to

24   determine whether or not he had complied with what he was

25   directed.

1            MS. TRIVEDI:  Judge, we just spent I think the better

2    part of 35 minutes learning that he is the person administering

3    the forensic protocol.

4            THE COURT:  You are asking me questions now?

5            MS. TRIVEDI:  Withdrawn.  And his view of what

6    satisfied paragraph four is relevant in this trial.

7            THE COURT:  Judge Kaplan's view is what's relevant in

8    this trial.

9    Q.  Mr. Krehel, do you remember telling the FBI on May 5, 2020

10   that Mr. Donziger had complied with paragraph four of the

11   forensic protocol?

12   A.  One more time?

13   Q.  Do you remember telling the FBI and in the presence of the

14   private prosecutor on May 5, 2020, that Mr. Donziger had

15   complied with the forensic protocol when he sent you the May 29

16   list?

17           MS. GLAVIN:  Again, objection.  It doesn't matter

18   whether Mr. Krehel told us that or not, whether Mr. Donziger

19   complied with a list you have all of his devices.  Only

20   Mr. Donziger would know and that's subject to a determination

21   by the Court.

22           THE COURT:  Sustained.

23           Counsel, I am going to can you to remember to talk a

24   little more slowly.  It is late in the day and the court

25   reporters have been working very hard.

L5DAADON7                      Krehel - Cross

1           MS. TRIVEDI:  Got it.

2   Q.  Okay.  Mr. Krehel, turning to paragraph six of the forensic

3   protocol.  Can I get Government Exhibit 2172?

4           THE COURT:  This is 71 I believe.

5           MS. TRIVEDI:  Go to paragraph six.

6   Q.  Mr. Krehel, if you could just read the first sentence of

7   paragraph six.

8   A.  The neutral forensic expert shall create person entity

9   report listing in the fist column and in alphabetical order

10  persons or entity identified by the neutral forensic expert on

11  the Donziger images.

12          THE COURT:  Slowly, sir.  Thank you.

13  A.  You're welcome.

14          Neutral forensic expert on Donziger imaging as

15  authors, recipients, senders or persons who last modified,

16  saved or printed any document as reflected in the metadata of

17  those documents or communications.

18  Q.  Mr. Krehel, does that list any person or entity

19  identifiably as an author, recipient, sender or person last

20  modified, saved or printed any document, does that list exclude

21  any type of person who would otherwise be involved on a

22  computer on a document found on a computer?

23  A.  Well, I will respectfully, if you also recall section, I

24  believe 4F of the protocol, I will be instructed by the Court

25  to proceed further to actually never conducted the paragraph

1    six and therefore, in my view they could potentially a court

2    order that would more clarify the section of the paragraph six.

3    Q.  I'm sorry.  Mr. Krehel, is it your testimony that you were

4    waiting for clarification as to what that list indicated?

5    A.  No.  But it's in my professional experience is to wait for

6    another court order that I can proceed the examination would be

7    logical next step.

8            MS. TRIVEDI:  Judge, I would move to strike that

9    testimony.  It's non responsive to the question.

10           MS. GLAVIN:  I defer to the Court because the question

11   was very difficult for me to understand.

12           MS. TRIVEDI:  I can ask it again.

13           THE COURT:  Why don't you do that?  Go ahead.

14   Truthfully, I wasn't so sure what you were asking.  So, would

15   you ask it again please, counsel?

16           MS. TRIVEDI:  Sure.

17   Q.  Mr. Krehel, my question is does the list, authors,

18   recipients, senders or persons who last modified saved or

19   printed any document, does that list, that group of

20   individuals, if you were to take a computer and the look at all

21   of the documents on a computer, would there be anyone other

22   than authors, recipients, senders or persons who last modified

23   saved or printed any document, would there be any other kind of

24   person?  That is my question.

25   A.  I'm not sure I am following.  What do you mean any other

L5DAADON7                         Krehel - Cross

1    kind of person?  These are very standard metadata in

2    electronically stored information and this is something that we

3    call E-discovery process.  So, basically, I am a neutral

4    forensic expert looks at a forensic image and tried to

5    determine based on the electronic evidence who are the authors,

6    recipients, senders or person who has modified saved or printed

7    any document.  As I pointed in here as reflected, metadata,

8    you've those documents or communications this is established on

9    reflection of metadata in those documents.

10   Q.  I understand, Mr. Krehel, but I am asking you in your

11   experience your extensive experience as a forensic expert are

12   there any other does this list exclude any type of person who

13   is otherwise found the identity is located on a computer.  So,

14   the question -- I'm sorry?

15          THE COURT:  Counsel, to the uninitiated found on the

16   computer might be a problem.  I'm not understanding what you're

17   saying either I'm sure the expert might be but you're certainly

18   not asking for persons to whom let's say carbon copies were

19   sent.  I don't know.  But the found on the computer is

20   something that is not meaningful to me.

21          MS. TRIVEDI:  Okay.  Withdrawn.

22   Q.  Mr. Krehel, this list includes everybody who would be found

23   on a computer, correct?

24   A.  Not necessarily.  Again, forensic examination here is very

25   specific to certain metadata filed.  So, if you read more

1   carefully it means that authors, recipients, senders or person

2   who has last modified saved or printed a document as reflected

3   in metadata of those documents or communications.  There's very

4   specific instruction on which metadata fields that report

5   should be created from.

6   Q.   That's very helpful.  Mr. Krehel, what metadata fields are

7   excluded by this list?

8   A.   For example, creation or --

9   Q.   "Creator" is different than "author"?

10  A.   No.  It's the last modified reference I would call

11  timestamp and there's also a timestamp for creation of the

12  document and for the access of the document.

13  Q.   But would those be excluded by this list?

14  A.   No.  The forensic analysis you usually pick one timestamp

15  that you render analysis on and in this protocol it was that

16  the timestamps that we should go and perform this analysis is

17  "last modified".

18  Q.   I see.  So, any modification prior to the last modification

19  other than saving or printing, correct, because it's who last

20  modified, saved or printed any document would be excluded from

21  your list?

22  A.   I am not sure if I'm following you why --

23  Q.   Sorry, Mr. Krehel.  I'm just trying to understand.  It

24  says:  Persons who last modified saved or printed any document.

25  So, it's not just the person who last modified it, is it?  It's

1    also the people who saved at any time or printed at any time

2    any document, correct?

3    A.  Not necessarily because what if the person who last

4    modified the document also saved and printed the document?

5    It's the same person.

6    Q.  I understand that a person would be included in the list

7    but so would anyone who had ever saved a document or ever

8    printed a document, correct?

9    A.  But if someone saved document, last modified timestamp

10   would be updated to the last -- it would have to be examined

11   virtual --

12            THE COURT:  Slowly, slowly.  The court reporter is

13   trying to take you down.

14            It would have to be examined --

15   A.  It would have to be examined if there is actually

16   in-authorization it saving of the documents without the last

17   modified timestamps being updated.

18   Q.  Okay.  Mr. Krehel, you've lost me.  So, I'll just move on.

19   A.  Apologies.

20   Q.  It is not your fault.  I think I am not smart enough for

21   you but it's a good experience for me to have.

22            Can we go to paragraph seven, please.

23            Mr. Krehel, turning to paragraph search.  So, first

24   would you like to review this or can I ask you some questions

25   about it?

1   A.  Sure.  Ask questions and I will read as you ask questions.

2   Q.  So, paragraph A, first you would run the search terms on

3   the images taken from Mr. Donziger's devices, correct?

4   A.  That is correct.

5   Q.  And, Mr. Krehel, how many search terms were you authorized

6   to run in this case?

7   A.  I will have to preview that Exhibit B in terms of what the

8   search terms actually were.

9   Q.  Okay.  Could we get Exhibit B for Mr. Krehel?  Just scroll.

10  Can you see that?

11  A.  Yes, I can see that.

12  Q.  So, just to repeat the question.  How many search term

13  terms were you authorized to search?

14  A.  These are the certain terms basically on the list right so

15  these are all search terms authorized Exhibit B.

16  Q.  Do you know how many there are?

17  A.  I did not count them.

18  Q.  Would you like to go ahead and count them or if the

19  government would like to stipulate that there are 870, I am

20  fine either way?

21  A.  I would respectful, usually, the way you work in following

22  forensic protocol and I did not even get to the collection of

23  devices.  So, for me to follow something that I don't even have

24  any conduct to go was not truly relevant at that period of

25  time.

1          MS. TRIVEDI:  I'm going to move to strike that, judge.

2     I am simply asking about how this all was going to go down.

3     A.   I apologize.  But this protocol is entered by the Honorable

4     Judge Kaplan and my understanding was if there were any

5     objections from Mr. Donziger, when I was instructed at a point

6     in time --

7          MS. TRIVEDI:  Judge, I move to strike.  I'm not asking

8     a question at this time.

9          THE COURT:  All right.

10    Q.   Mr. Krehel, I completely understand.  I don't have a

11    problem with you.  I'm just trying to do my job.  So, the

12    question as it stood is how many search terms in Exhibit B and

13    I would repeat my invitation for the private prosecutor to

14    stipulate that there are 870?

15         MS. GLAVIN:  I'm sorry.

16         MS. TRIVEDI:  Or we can sit here while he counts them.

17         THE COURT:  Children, children, children.  It's very

18    late in the day.  Cut it out.

19         MS. GLAVIN:  I'm sorry.  I did not mean to be -- I

20    didn't hear you.  I was reading something.  To the extent you

21    want a stipulation that there are more than 800 search terms, I

22    take your word for it and I am willing to go with that.

23         MS. TRIVEDI:  Thank you.

24         Okay.  Mr. Krehel, you don't need to count those.

25    A.   Thank you.  Having degree a in mathematical physics, we

L5DAADON7                          Krehel - Cross

1    stop counting.

2    Q.  Okay.  So, you would run the search terms, all 870 of them

3    and then there were -- can I get paragraph seven again and then

4    there were procedures for removing the highly confidential and

5    personal designations, we don't need to go through it.

6                 THE COURT:  Slowly, counsel.

7    Q.  Sorry, judge.  So, that paragraph B is taking out the

8    highly confidential and personal designations.

9                 And then could you read paragraph C for me to

10   yourself, Mr. Krehel?

11   A.  Sure.  Chevron's forensic expert would provide a neutral

12   forensic expert if copies or for access post judgment third

13   party productions made to Chevron in this matter.

14                THE COURT:  Slowly.

15   A.  The neutral forensic expert will remove any duplicates from

16   the universe of documents from the devices and media that are

17   responsive to the search terms and subject to production

18   pending further review.  The neutral forensic expert then will

19   return or crease to have access to the post judgment

20   third-party productions.

21   Q.  Mr. Krehel, if I've understood this correctly you would

22   remove any redundancies from what Chevron had already received

23   in litigation; is that correct?

24   A.  Correct.

25   Q.  So, this whole thing was really designed for Chevron's

1    screens, correct?

2              MS. GLAVIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  So, going to paragraph D, can you highlight paragraph D,

5    please.

6              So, then, Mr. Krehel, you would analyze the documents

7    that are responsive to the search terms and subject to possible

8    production and then... that's me to determine if there are any

9    significant categories of irrelevant materials that properly

10   can be excluded; is that correct?

11   A.  The section you are reading?

12   Q.  Where I jumped to was to determine if there are any

13   significant categories?

14             THE COURT:  Is that your on-the-record voice or

15   off-the-record?

16             MS. TRIVEDI:  That's my off-the-record voice, judge.

17   Q.  Let's just do this again.  I'll just do it from the screen.

18             Mr. Krehel, if I could bring your attention to --

19   well, let me just read.

20             you would analyze the documents that are responsive to

21   the search terms and subject to possible production?

22             THE COURT:  Slowly, counsel.

23   Q.  Pending further review to determine if there are any

24   significant categories of the relevant materials that properly

25   can be excluded.

1           So, Mr. Krehel, if I'm understanding this correctly,

2      you would analyze the documents to determine what was relevant

3      and what was irrelevant, correct?

4      A.   That was correct.

5      Q.   Mr. Krehel, you are not an attorney, correct?

6      A.   That is correct.

7      Q.   But your job was to decide what was relevant and what was

8      irrelevant to what Chevron had demanded from Mr. Donziger,

9      correct?

10          MS. GLAVIN:  Objection as to form.

11          THE COURT:  Sustained.

12          MS. TRIVEDI:  I'm sorry.  What form?  This is a

13     forensic protocol designed to enforce anti-monetization

14     prohibition, discovery and money judgment discovery.  So,

15     Mr. Krehel is in charge of determining what is relevant and

16     what is irrelevant to that.  And my question to him was whether

17     he understood that to be his responsibility and how.

18          THE COURT:  Ms. Glavin.

19          MS. GLAVIN:  That wasn't the question she posed to

20     Mr. Krehel.

21          MS. TRIVEDI:  Could I have a read back?

22          THE COURT:  Certainly.

23          Question:

24          But your job was to decide what was relevant and what

25     was irrelevant to what Chevron had demanded from Mr. Donziger,

1   correct?

2   A.  Not correct.  His protocol is entered by Honorable Judge

3   Kaplan.  So, this protocol should be what the Court would

4   ordered to me to do, not what the Chevron would order me to do.

5   Q.  Understood, Mr. Krehel.

6           What was the difference in your mind between what is

7   relevant and what is irrelevant?

8   A.  When you read that paragraph he says search terms and

9   subject to possible production pending further review to

10  determine if there are any significant categories or irrelevant

11  material that properly can be excluded.  Let me give you an

12  example of relevant materials that properly can be excluded.

13  On the computer we have temporary files created to let's say

14  word documents.  Those documents do not contain a value meaning

15  they have no data in them.  They are only metadata about

16  certain actions that happen in the computer.  You could be

17  producing hundreds thousands of documents, potentially

18  documents that really not documents because they don't have any

19  data in them and they are truly would be called more of a

20  system data.

21          So, therefore the forensic process and forensic

22  science tried to eliminate irrelevant materials that can be

23  properly excluded.  So, this paragraph I respectfully in my

24  view actually protects Mr. Donziger in terms of how it's

25  conducted and also exclude electronically stored information

1   that would be irrelevant because they do not contain data in

2   them.

3   Q.  Understood.  Mr. Krehel, could you read the second sentence

4   of this paragraph out loud, please?

5   A.  These would include for example from online merchant, but

6   is not necessarily to determined payment methods or Donziger's

7   assets.

8   Q.  Mr. Krehel, correct me if I'm wrong but that sentence isn't

9   about excluding documents that contain no data.  It references

10  you deciding what is relevant to, quote, determine payment

11  methods or Donziger's assets, end quote, correct?

12  A.  That's not how I am reading this.

13  Q.  How do you read that sentence?

14  A.  I read the sentence that for example correspondence from

15  online merchants too that respond to search terms if I render

16  search terms account in Amazon and its responsive and it's part

17  of the possible production pending for review something that

18  it's consideration for a possible production.  This is the

19  standard forensic process.  And again, I want to reiterate that

20  the protocol is to design actually to protect Mr. Donziger from

21  disclosure.

22  Q.  Understood, Mr. Krehel.  I'm sorry.  Maybe this is like

23  when he did paragraph six but I understand this sentence to

24  authorize you to take out things from online merchants like

25  Amazon.com that is, quote, not necessary to determine payment

1    methods or Donziger's assets, end quote.  And I'm wondering how

2    is it that you read it any different again.

3    A.  You might have a document or metadata that do not have a

4    value just because, for example, a search term or certain

5    component in a computer is responsive to the term actually does

6    not have a data that would be meaningful for examination.  I do

7    believe we are focusing on wrong aspect of this because this

8    truly tried to establish that the forensics examiner should

9    focus on relevant material and not producing, for example,

10   binary data.

11   Q.  So, Mr. Krehel, am I understanding correctly that your

12   definition of what was relevant was anything that contained any

13   data?

14   A.  That would be -- so, look at the possible production.

15   Q.  Mr. Krehel, it's a yes or no question.  If you could answer

16   yes or no or I can't answer yes or no, I would appreciate it.

17   A.  Could you kindly repeat the question.

18   Q.  Mr. Krehel, is it your opinion that the definition of

19   relevant in this forensic protocol in administering this

20   forensic protocol was any document that contained any data?

21   A.  No.  I think you're twisting this a little bit.  I

22   apologize.  This is not a question of the protocol.  In the

23   forensic science if you follow standard procedures for

24   production.  And in that production we don't include, for

25   example, binary data.  I think you are twisting this a little

L5DAADON7                        Krehel - Cross

1    bit and mixing the data that I should have some content with

2    something that's not meaningful.  And with these two sentences

3    are trying to establish is, please, do not copy hundred

4    thousand documents that have no value document in it because it

5    might not be relevant.

6    Q.  Mr. Krehel, I understand that documents that contain no

7    data are irrelevant.  I have followed you that far.  But I am

8    asking you when you take everything that is left which is to

9    say every document on a device that contains data, what within

10   that according to you was relevant to this production?

11   A.  Well, the protocol specified the key words that would be

12   used as a certain term for production.

13   Q.  So, is it your position that anything that contained any of

14   the search terms was relevant?

15   A.  Not everything that contains a search term because you

16   still have to.

17            THE COURT:  Slowly.

18   Q.  Okay.  So, let's say we take all of the documents on the

19   device and then within that we take all of documents that

20   contain search terms, right?  Because that was your first step

21   was to run the search terms.

22   A.  Any electronically stored information that contained the

23   search terms they might not be just documents.

24   Q.  Understood.  And then within the electronically stored

25   information that contains search terms you were going to

1  exclude as irrelevant material that did not contain any data,

2  correct?

3  A.  For example, or their system data or they were created by

4  system by as a reflection of some user actions.

5  Q.  I understand, Mr. Krehel.  But that leaves let's say we've

6  done all of that left in your possession is every document from

7  Mr. Donziger's devices that contains any data as an ordinary

8  human being would know it and also the search terms, correct?

9  A.  Correct.

10 Q.  And my question to you is is it your position that that

11 entire universe of documents was relevant pursuant to this

12 forensic protocol that's where you would stop and say this is

13 what is relevant?

14 A.  No.  You would continue with the protocol, right.  So,

15 there would be, they would be subject to possible production

16 adding for still further review.

17 Q.  So, what would you your next step according to the forensic

18 protocol?

19          MS. GLAVIN:  I am going to object on relevance

20 grounds.

21          MS. TRIVEDI:  Judge --

22          THE COURT:  I think we can read the protocol and we

23 can see what the steps are.

24          MS. TRIVEDI:  Judge?

25          THE COURT:  And -- excuse me.

1        And the witness has already testified that he didn't
2   get this far.  So, what was his understanding of what he didn't
3   get to do have to do with anything?
4        MS. TRIVEDI:  Judge, Ms. Champion testified on direct
5   that the forensic protocol was designed such that Chevron would
6   never acquire Mr. Donziger's information devices data.
7        THE COURT:  This witness has confirmed that.
8        MS. TRIVEDI:  And I will -- I can make an offer of
9   proof that that is patently untrue.  But given the way this
10  forensic protocol worked.  I understand it's taking me time and
11  I apologize.  I am a layperson in these regard but I can make
12  an offer of proof that I will prove to Mr. Krehel that that is
13  false.
14       THE COURT:  All right.  Let me hear it.  I am a
15  layperson too.  So, let's hear the offer of prove.
16       MS. TRIVEDI:  Thank you, judge.
17       Can I just hear you say "overruled" just for fun?  It
18  doesn't happen to me very often.
19       THE COURT:  I'm not there yet.  I'm waiting for your
20  offer of proof.
21       MS. TRIVEDI:  Missed that.  See, I'm so eager to win.
22       Judge, let me read for a second to you from this.  So,
23  the second sentence of paragraph D says this would include for
24  example correspondence from online merchants that respond to
25  the search terms account or Amazon but is not necessary to

L5DAADON7                    Krehel - Cross

1    determine payment methods or Donziger's assets.  Mr. Krehel was

2    responsible for taking out things like Mr. Donziger's

3    Amazon.com purchase of things for his son and leaving in place

4    things related to Amazon a/k/a The Rain Forrest that Chevron

5    has destroyed.

6              MS. GLAVIN:  Objection.

7              THE COURT:  Counsel, you know better than that.  You

8    know better than that.  You do it again you're sitting down.

9              MS. TRIVEDI:  Got it, judge.

10             So, Mr. Krehel would sort what he considered to be

11   relevant to quote, determine payment methods or Donziger's

12   assets, end quote, from what was irrelevant like Amazon.com

13   purchasers.  I have a series of questions for him about how he

14   intended to do that with --

15             THE COURT:  Slowly, slowly, slowly.

16             MS. TRIVEDI:  I intend to ask him about how he

17   intended do that with 870 search terms.  Of course, I will not

18   ask about each and every one but there are a few I am

19   particularly curious about.  So --

20             THE COURT:  Counsel, that has nothing do with

21   Mr. Donziger's information going to Chevron.  I don't care

22   about the search terms.

23             MS. TRIVEDI:  Again, judge, I am making an offer of

24   proof as to how Ms. Champion testified in ways that's patently

25   false.

1          MS. GLAVIN:  Objection.

2          MS. TRIVEDI:  I am making an offer of proffer.  She

3   testified --

4          THE COURT:  No.  No.  You said to me.  I can't locate

5   it but I understood you to say to me that you were going to

6   make an offer of proof to demonstrate that if the protocol were

7   followed it would result in Mr. Donziger's information being

8   handed over to Chevron.

9          Am I wrong that that's what you offered?

10          MS. TRIVEDI:  That's correct, judge.

11          THE COURT:  All right. let me hear it.

12          MS. TRIVEDI:  So, Mr. Krehel would separate out -- I

13   am reading -- these potential irrelevant materials from the

14   universe of documents that are responsive to the search terms

15   and subject to possible production pending further review

16   right.  So, he would have a bucket that was irrelevant and he

17   would have a bucket that was deemed relevant by him and I

18   believe his employees.  And then Mr. Krehel would take

19   25 percent of what he had deemed irrelevant and provide them to

20   Chevron's forensic expert.  Is your Honor following me thus

21   far?

22          THE COURT:  I see it.

23          MS. TRIVEDI:  Chevron's forensic expert would then

24   confirm whether the sample was in fact irrelevant and would go

25   through what was deemed irrelevant and identify any documents

that are relevant so they were there to back stop Mr. Krehel is
my understanding.  If any document is identified as relevant
then Chevron's forensic expert may review the remaining
75 percent of the materials for relevance under the supervision
of Mr. Krehel.

          So, my understanding, judge, is that if Chevron's
forensic expert found that Mr. Krehel had made even one
mischaracterization of something as irrelevant when it was in
fact relevant that they may gain permission to review the
remaining 75 percent of what was deemed irrelevant which
renders irrelevant Mr. Krehel's role because then everything
that he has sorted has been turned over to Chevron's forensic
expert and that was where I was going with him, judge.

          THE COURT:  Okay.  But I don't know what the terms are
with respect to Chevron's forensic expert by turning it over to
Chevron at that?  I didn't think so.

          MS. TRIVEDI:  Let's keep going.

          So, with respect to things that Mr. Krehel had deemed
relevant or responsive is the word used in this paragraph,
Mr. Krehel was to turnover 10 percent of what he had deemed
relevant to Chevron's forensic expert, Chevron's forensic
expert was then going to provide the sample set of documents
and communications to Gibson Dunn & Crutcher for coding as
relevant or not relevant.

          Then later in the paragraph the coding produced by

L5DAADON7                          Krehel - Cross

Gibson & Dunn was going to be run by Chevron's forensic expert

on the hundred percent of things that had previously been

deemed relevant by Mr. Krehel.  And it's profoundly unclear

from this document whether the 25 percent that had been deemed

irrelevant but then turned over in its entirety to Chevron's

forensic expert was going to be part of what Chevron's forensic

expert deemed relevant was going to turnover to Gibson Dunn &

Crutcher.

          THE COURT:  Let me ask the more basic question.  You

are correct at least from my layperson's view that this is less

than crystal clear.  But the problem is that there was no

attempt to modify to seek any relief in the Court of Appeals.

So, what ever it was that seemed off about this doesn't seem

like there was any steps taken, there were any steps taken to

remedy whatever problems were perceived.  And what this witness

understood about something he never got to do seems to me to be

pretty irrelevant.

          MS. TRIVEDI:  Your Honor, if the Court is taking

notice of the extent to which the forensic protocol was

designed at least in part in a manner that turned over.

          THE COURT:  The Court is not taking notice of any such

thing but let's assume Mr. Donziger thought that was true.  His

remedy was to seek legal relief.

          MS. TRIVEDI:  Judge, I feel like you locked in the

collateral bar.  You didn't just impose it.  It's just like a

L5DAADON7                    Krehel - Cross

1   door I keep revolving around in.  I understand your Honor's

2   rulings.  My response is that the prosecution opened the door

3   to this line of questioning when they asked Mr. Krehel about

4   paragraph six and seven and that Ms. Champion opened it further

5   when she testified that it was designed specifically to

6   prohibit the exact thing that I believe it does.  But I

7   understand your Honor's ruling and I can move on.

8               THE COURT:  Yes, ma'am.

9               THE WITNESS:  Can I just --

10              THE COURT:  No.  No.  The good part about being a

11   witness is you only have to answer the questions they ask you.

12   Q.  Mr. Krehel, one second I just want to try to figure out how

13   to torture you less than I have.

14              MR. KUBY:  That is my suggestion, judge.

15              THE COURT:  You are a merciful soul.

16   Q.  Mr. Krehel, you took this assignment because of the public

17   interest element; is that correct?

18   A.  Being appointed as a neutral forensic expert by the

19   Honorable Judge Kaplan or by the Court is a high prestige, that

20   is correct.

21   Q.  I will tell you you may be one of most earnest people I've

22   ever met, Mr. Krehel.  I have no further questions at this

23   time?

24              THE COURT:  Thank you.  Redirect.

25              MS. GLAVIN:  No, your Honor.  Bless you.  You may step

1    down, sir.

2              All right.  Counsel, are refinished for the day?

3              MR. KUBY:  Can Mr. Krehel leave?  I told him he could

4    step down.

5              MS. GLAVIN:  Your Honor, before we rest I do have,

6    there is a portion of a transcript.

7              THE COURT:  Why don't you sit down so that you could

8    be heard.

9              MS. GLAVIN:  There is a portion of a transcript from

10   this criminal case 19 CR 561 from Mr. Donziger's initial

11   appearance on August 6 of 2019.  There are ten lines from where

12   Mr. Donziger makes a statement that I'd like to read into

13   evidence.  It's docket 18.  I can show it to Mr. Kuby to see if

14   he has any objection.

15             MR. KUBY:  If it's only ten lines, I don't care what

16   it is.

17             MS. GLAVIN:  All right, your Honor.  It's docket entry

18   18 in the criminal docket of Mr. Donziger's statement to the

19   Court.  This is at ECF page 19 lines nine through 18.

20             What I would propose, if I may, is you say normal

21   course.  This is unfamiliar to me except, obviously, I'm

22   learning about it today being here.  But what I would propose,

23   because I don't think this is a normal kind of case, given the

24   long history of my particular role in this case, is to allow me

25   to keep my passport for me to propose when I want to travel to

1    another place that I would inform the Court or inform pretrial

2    services or whatever the process is, get permission to go for a

3    certain period of time and be allowed to return.

4              That's it, your Honor.

5              MR. KUBY:  That's fine, judge.

6              THE COURT:  Anything else?

7              MS. GLAVIN:  No, your Honor.  And the special

8    prosecutors rest with the caveat we have some exhibits that

9    we'd like to confer with Mr. Kuby about what is in evidence and

10   what is not in evidence.  So, we can do that when we return.

11             THE COURT:  Very well.  And thus with that caveat, you

12   rest.

13             MS. GLAVIN:  Yes, your Honor.

14             THE COURT:  All right.  Nine o'clock Monday.

15             MR. KUBY:  Sure, judge.  So, we will.

16             THE COURT:  9:30.

17             MS. GLAVIN:  I do think this is important with respect

18   to Anne Champion who testified and I don't in saying that this

19   does attribute any bad faith to Ms. Trivedi, she did make a

20   comment that Ms. Champion's testimony was patently false.  It's

21   a very serious comment to make about another member of the bar.

22             MR. KUBY:  I'm sorry, judge.

23             MS. GLAVIN:  I need to make -- please, let me finish.

24             MR. KUBY:  I object to the speech at this time.

25             THE COURT:  All right.  Let me hear what the wherefore

1    is.

2            MR. KUBY:  Okay.  The wherefore would be great.

3            MS. GLAVIN:  So, your Honor, I just want to put on the

4    record that we, the special prosecutors do not believe in any

5    way, shape or form that Ms. Champion gave false testimony and I

6    just wanted to put that on the record because I don't think

7    that is fair to Ms. Champion to have another lawyer in this

8    courtroom attribute false, patently false testimony to another

9    officer of the court.  So, I do want to make that record.

10           MR. KUBY:  So, there was no wherefore clause.

11           THE COURT:  Your point?

12           MR. KUBY:  You asked, you wanted to get to the

13   wherefore.  I objected.  You wanted to get to the wherefore.

14   We heard the speech.  There was no wherefore and I think we're

15   done with this.

16           THE COURT:  No.  I'm going to ask Ms. Trivedi if she

17   wants to say anything.  She is the one who made the allegation.

18   Don't you think she ought to be asked if she has something to

19   say?

20           MS. TRIVEDI:  Judge, Ms. Champion testified to facts.

21   When the facts are not true, the testimony is false.  And it

22   was not true that the forensic protocol was designed the way

23   she describe scribed it.  If she didn't know that, if she

24   hadn't read the forensic protocol which I would completely

25   understand it is shockingly boring.  I understand that.

L5DAADON7                          Krehel - Cross

1          THE COURT:  All right.  If you are not taking it back,
2     I don't need a speech.  9:30.  I had hoped to talk to
3     Mr. Garbus tonight about his motion, but he seems to have fled
4     the jurisdiction.
5          MR. KUBY:  He left.
6          THE COURT:  All right.  We'll take it up with him on
7     Monday.
8          Thank you, counsel.
9          MS. GLAVIN:  With respect to Monday, if the defense is
10    not putting on a case or if they do --
11         THE COURT:  Do you want this on the record?
12         MS. GLAVIN:  Yes.  How would you propose to proceed,
13    Mr. Kuby?  The defense puts on a case, I think you've indicated
14    it would be two days.  How would you propose to proceed if
15    there is no case come Monday?
16         MR. KUBY:  Well, I so seldom get to be in the driver's
17    seat, but to the extent you have suggested I go there, I would
18    propose that if there is no defense case we be prepared to make
19    a Rule 29 motion should we find it relevant.  The prosecution
20    will respond if they choose.  The Court will rule or defer
21    ruling and then we will submit another giant stack of papers in
22    the form of what are they called again.
23         MS. TRIVEDI:  Findings of fact and conclusions of law.
24         THE COURT:  All right.  What would be really helpful
25    for everyone around here is if you would give us an indication

L5DAADON7                     Krehel - Cross

1   over the weekend of where you are.  Makes a big difference if

2   there's going to be a case or if there's not going to be a case

3   how we all sleep over the weekend.

4            MR. KUBY:  And what I will promise you as an officer

5   of the court as a generally human, the second I know, within 15

6   minutes, I will notify the prosecution and I think I will

7   notify Scott because I have his email.  I don't think I have

8   yours yet.

9            THE COURT:  That would be great.

10           All right.  Is there anything else on the record,

11  friends?

12           MS. GLAVIN:  No, your Honor.

13           Thank you.

14           THE COURT:  Nothing else?

15           MR. KUBY:  No.

16           THE COURT:  All right.

17           (Adjourned to Monday, May 17, 2021, at 9:30 a.m.)

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

DAVID ZELMAN

Cross By Ms. Trivedi . . . . . . . . . . . . 598

Redirect By Ms. Glavin . . . . . . . . . . . 619

Cross By Ms. Trivedi . . . . . . . . . . . . 625

 WILLIAM THOMSON

Cross By Mr. Kuby  . . . . . . . . . . . . . 693

Redirect By Ms. Glavin . . . . . . . . . . . 760

Recross By Mr. Kuby  . . . . . . . . . . . . 772

Redirect By Ms. Glavin . . . . . . . . . . . 777

Recross By Mr. Kuby  . . . . . . . . . . . . 783

 ONDREJ KREHEL

Direct By Ms. Glavin . . . . . . . . . . . . 788

Cross By Ms. Trivedi . . . . . . . . . . . . 808

```
 1                       GOVERNMENT EXHIBITS

 2      Exhibit No.                              Received

 3      7    . . . . . . . . . . . . . . . . . 633

 4      2060   . . . . . . . . . . . . . . . . 634

 5      8    . . . . . . . . . . . . . . . . . 640

 6      2211   . . . . . . . . . . . . . . . . 646

 7      9    . . . . . . . . . . . . . . . . . 646

 8      317  . . . . . . . . . . . . . . . . . 649

 9      3    . . . . . . . . . . . . . . . . . 661

10      400  . . . . . . . . . . . . . . . . . 662

11      Four and Five   . . . . . . . . . . . . 664

12      300  . . . . . . . . . . . . . . . . . 664

13      302  . . . . . . . . . . . . . . . . . 666

14      302  . . . . . . . . . . . . . . . . . 667

15      401  . . . . . . . . . . . . . . . . . 668

16      303  . . . . . . . . . . . . . . . . . 671

17      304  . . . . . . . . . . . . . . . . . 671

18      305  . . . . . . . . . . . . . . . . . 672

19      1000-327   . . . . . . . . . . . . . . 673

20      306  . . . . . . . . . . . . . . . . . 675

21      501  . . . . . . . . . . . . . . . . . 675

22      502  . . . . . . . . . . . . . . . . . 676

23      307  . . . . . . . . . . . . . . . . . 677

24      11-2260   . . . . . . . . . . . . . . . 678

25      308  . . . . . . . . . . . . . . . . . 680
```

1    309    . . . . . . . . . . . . . . . . . . . 681

2    100    . . . . . . . . . . . . . . . . . . . 688

3    101    . . . . . . . . . . . . . . . . . . . 689

4    102    . . . . . . . . . . . . . . . . . . . 692

5    132    . . . . . . . . . . . . . . . . . . . 795

6    137    . . . . . . . . . . . . . . . . . . . 804

7    138    . . . . . . . . . . . . . . . . . . . 805

8    140    . . . . . . . . . . . . . . . . . . . 806

9                          DEFENDANT EXHIBITS

10   Exhibit No.                                Received

11   I-51    . . . . . . . . . . . . . . . . . 714

12

13

14

15

16

17

18

19

20

21

22

23

24

25