UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

STEVEN DONZIGER,

                Defendant.

19 Cr. 561 (LAP); 11 Civ. 691 (LAK)

## PROPOSED FINDINGS OF FACT
## <u>OF THE UNITED STATES OF AMERICA</u>

Rita M. Glavin
Sareen K. Armani
Brian P. Maloney

*Special Prosecutors on behalf of the*
*United States of America*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. FACTS PROVEN AT TRIAL ................................................................................. 1

   A. The Civil Lawsuit and RICO Judgment ........................................................ 1

   B. The Amazonia Shares, the Supplemental Judgment, and Chevron's March 19, 2019 Motion for Contempt and Post-Judgment Discovery ......................................... 6

   C. Donziger's Refusal to Transfer his Amazonia Shares and His 2011 Contingent Fee Interest in the Ecuadorian Judgment .................................................... 10

   D. Donziger's 2017 ADF Agreement Granting Him a Contingent Interest and Donziger's Refusal to Assign the Interest to Chevron.............................................. 19

   E. Post-Judgment Discovery Litigation........................................................ 25

   F. Donziger's Appeals........................................................................ 53

   G. The David Zelman Financial Agreement ................................................... 55

II. COUNTS ONE THROUGH SIX WERE PROVEN BEYOND A REASONABLE DOUBT ....................................................................................................... 64

   A. Count One:  Donziger's Disobedience of Paragraph Four of the Protocol............... 65

   B. Count Two: Donziger's Disobedience of Paragraph Five of the Protocol ............... 67

   C. Count Three: Donziger's Disobedience of the Passport Surrender Order................. 71

   D. Counts Four and Five: Donziger Failed and Refused to Transfer and Assign to Chevron his Contingent Fee interests Under the 2011 Retainer Agreement and the 2017 ADF Agreement ............................................................................. 72

   E. Count Six:  Donziger's Disobedience of Paragraph Five of the RICO Judgment By Pledging A Portion of His Personal Interest in the Ecuador Judgment in Exchange for Personal Services ......................................................... 78

III. CONCLUSION............................................................................................ 83

The Special Prosecutors respectfully submit the following facts proven at trial, which establish beyond a reasonable doubt defendant Steven Donziger's guilt on criminal contempt Counts One through Six of the July 31, 2019 Order to Show Cause.

## I.    FACTS PROVEN AT TRIAL

### A.    The Civil Lawsuit and RICO Judgment

1.    In 2011, Chevron Corporation ("Chevron") filed a complaint in the Southern District of New York ("Civil Case") against defendant Steven Donziger, his two law firms (Donziger & Associates PLLC and The Law Offices of Steven R. Donziger), 48 individual Lago Agrio Plaintiffs ("LAPs") and others, alleging that Donziger led a fraudulent and corrupt scheme to obtain an $8.5 billion judgment against Chevron in a lawsuit filed in Ecuador.   GX 1; Tr. at 76:2-78:23.  Chevron alleged that Donziger and his co-conspirators engaged in, among other things, fraud, fabrication of evidence, bribery, and extortion in connection with the LAPs Ecuadorian lawsuit against Chevron, and that Donziger had violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act.  *See* Tr. at 76:2-78:23.

2.    Donziger, a New York attorney and Harvard Law School graduate, represented the LAPs in connection with the Ecuadorian lawsuit against Chevron, which is also known as the Lago Agrio litigation.  GX 1874 at 13; Tr. at 76:2-77:15, 653:22-25.  Donziger also represented an organization known as the *Frente De Defensa de la Amazonia* a/k/a "Amazon Defense Front" (or "ADF") in the Lago Agrio litigation.   Tr. at 76:23-77:2,175:9-177:3, 653:22-25, 698:2-25. The ADF was the primary purported beneficiary of the Ecuadorian judgment, and was to receive any recovery money.  Tr. at 222:2-7.

3.    Donziger signed, on behalf of his law firm, Donziger & Associates PLLC, a

January 5, 2011 retainer agreement with the LAPs, the ADF, and the "Assembly" (or "UDAPT") that granted his firm a 6.3% contingent interest in the Ecuadorian judgment.  GX 1978-6 at 12; Tr. at 93:23-94:15.  If the Ecuadorian judgment was collected in full, Donziger stood to make approximately $560 million.  GX 1874 at 487-89, 1978-6; Tr. at 93:23-94:15.  The "Assembly" was a group of indigenous groups in the Ecuadorian Amazon who had an interest in the Lago Agrio case.  Tr. at 92:19-93:1.

4.      On May 13, 2013, Donziger entered a notice of appearance as counsel for himself and his two law firms in the Civil Case against him in the Southern District.  GX 1147.  By filing that notice, Donziger automatically received all filings in the Civil Case. Tr. at 80:19-81:23. The Honorable Lewis A. Kaplan presided over the Civil Case.  Tr. at 81:13-14.

5.      Following a seven-week trial, on March 4, 2014 Judge Kaplan issued a decision and judgment in Chevron's favor ("RICO Judgment").  GX 1874, 1875; Tr. at 81:18-82:9.

6.      Judge Kaplan found: (1) in connection with the Lago Agrio litigation, Donziger and those he worked with had engaged in numerous acts of fraud and corruption, as well as committed RICO violations, to obtain the $8.5 billion judgment; and (2) the Ecuadorian judgment was the "direct result of fraud by Donziger."  GX 1874 at 354-406, 488-89.  Judge Kaplan determined that Donziger should not profit from his fraud and RICO violations.  GX 1874 at 487-89.  To that end, Judge Kaplan imposed a constructive trust for the benefit of Chevron on "all property" Donziger has or may receive that is traceable to the Ecuadorian judgment, and directed that Donziger transfer any such property to Chevron "forthwith." GX 1875 ¶ 1.  Judge Kaplan prohibited Donziger from taking any acts to monetize or profit from that fraudulently procured judgment, and from enforcing the judgment in the United States. GX 1875

¶ 5, 1874 at 491, 497.

7.      Specifically, Paragraph One of the RICO Judgment established "a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent," that Donziger "has received, or hereafter may receive…or to which Donziger now has, or hereafter obtains, any right, title or interest" that is traceable to the Ecuadorian judgment, including "all rights to any contingent fee under the Retainer Agreement and all stock in Amazona."  GX 1875 ¶ 1.  Paragraph One further ordered: "Donziger shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain."  GX 1875.  The RICO Judgment defined the "Retainer Agreement" as the "agreement, dated as of January 5, 2011, between and among (a) each of the individual plaintiffs in the Lago Agrio Case, together with their respective successors and assigns, (b) the ADF, (c) the Assembly, and (d) Donziger & Associates, PLLC, together with its successors and assigns and all successors to and predecessors of the Retainer Agreement." GX 1875 ¶ 7.9, 1978-6.  The RICO Judgment defined "Amazonia" as "Amazonia Recovery Limited, an entity registered in Gibralt[a]r, together with its successors and assigns." GX 1875 ¶ 7.2.

8.      Paragraph Three of the RICO Judgment directed: "Donziger shall execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia, and Donziger and the LAP Representatives, and each of them, shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment." GX 1875.

9.      Paragraph Five of the RICO Judgment prohibited Donziger from undertaking acts to monetize or profit from the Ecuadorian judgment.  Specifically: "Donziger. . . is hereby

further enjoined and restrained from undertaking any acts to monetize or profit from the Judgment, . . . including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." GX 1875.  Judge Kaplan made the purpose of Paragraph Five clear in his decision accompanying the RICO Judgment:  "The decision in the Lago Agrio case was obtained by corrupt means.  The defendants here may not be allowed to benefit from that in any way.  The order entered today will prevent them from doing so."  GX  1874 at 497.

10.     With respect to the types of property Donziger must transfer to Chevron under Paragraph One, Judge Kaplan's decision specifically included Donziger's 6.3% contingent fee granted by his 2011 Retainer Agreement and determined: "[Donziger's] right to a contingent fee and the fee itself are property subject to execution and attachment and certainly to the imposition of a constructive trust."  GX 1874 at 489.  This determination is reflected in Paragraph One of the RICO Judgment, which directed Donziger to assign and transfer to Chevron "forthwith" his right to the contingent fee under the 2011 retainer agreement. GX 1875.

11.     Judge Kaplan's decision also specifically referred to Donziger's property interest in shares in Amazonia, the Gibraltar entity created for receipt and distribution of any funds collected on the Ecuadorian judgment. GX 1874 at 281 n. 1110, 489 n. 1821.   Donziger had testified at the RICO trial that the value of his Amazonia shares represented the equivalent of his 6.3% contingent fee interest in the judgment. Tr. at 95:20-96:9. Judge Kaplan stated that, like Donziger's right to 6.3% contingent fee, Donziger's Amazonia "shares too are subject to a constructive trust, as whatever value they now or hereafter may have is a direct function of the fraud perpetrated by Donziger." GX 1874 at 489.  Paragraph One and Three of the RICO judgment reflect Judge Kaplan's determination, directing that Donziger execute a stock power in favor of Chevron for his property interest in those Amazonia shares.  GX 1875.

4

12.    Donziger appealed the RICO Judgment to the Second Circuit and, on March 18, 2014, moved for a stay in the District Court of the RICO Judgment pending his appeal.  GX 1888.  In seeking the stay, Donziger acknowledged that the RICO Judgment required him to turn over to Chevron his Amazonia shares and any interest he had in the Ecuadorian judgment.  GX 1899 ¶ 3, 1888 at 18-19.  Donziger argued that he would suffer irreparable harm if he did so: "no damages could ever make up for the loss of [Donziger's] ability to exercise or sell his shares . . . during the pendency of the appeal".  GX 1888 at 19.  Donziger stated:  "If I am forced to turn over my shares in Amazonia and relinquish any interest I have in the Lago Agrio litigation, my law practice—my only means of earning a livelihood—will be effectively destroyed.  Even if I prevail on appeal, I will not be able to undo the damage to my practice suffered in the interim."  GX 1899 ¶ 3.

13.    On April 25, 2014, Judge Kaplan granted the stay, in part, but only as to the portion of the RICO Judgment that directed transfer of the Amazonia shares to Chevron.  GX 1901.  Instead Judge Kaplan directed that Donziger transfer those shares to the Clerk of the Court for the Southern District of New York during the pendency of the appeal.  *Id*. at 33.  Judge Kaplan explained: "Allowing the shares to remain in Donziger's hands pending appeal would enable him to benefit from his fraud prior to any collections by selling the shares and by hiding or dissipating the sale proceeds." *Id*. at 16.  Judge Kaplan directed as follows:

> The motion for a stay pending appeal [DI 1888] is granted to the extent that paragraph 3 of the [RICO] Judgment, solely pending the determination of the appeal in this case, is modified to read as follows:
>
> "Donziger shall execute in favor of the Clerk of this Court a stock power transferring to the Clerk all of his right, title and interest in his shares of Amazonia.  The Clerk shall hold the Amazonia shares thus transferred, and all proceeds thereof,

> pending the determination of the appeal in this case, for the benefit of Donziger and Chevron, as their interests then may appear. Upon request by Donziger, given on notice to Chevron at least ten days in advance of the date for the proposed vote, the Clerk shall vote, or direct the owner of record thereof such to vote, such shares as directed by Donziger unless otherwise ordered by the Court. Donziger and the LAP Representatives, and each of them, shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment."

GX 1901 at 33.

14.     On August 8, 2016, the Second Circuit affirmed the RICO Judgment and, on June 19, 2017, the Supreme Court denied certiorari.  GX 1914, 1922, 1923.

**B.     The Amazonia Shares, the Supplemental Judgment, and Chevron's March 19, 2019 Motion for Contempt and Post-Judgment Discovery**

15.     The RICO Judgment was not stayed while Donziger's appeal was pending, other than Judge Kaplan's April 25, 2014 order directing Donziger to transfer his Amazonia shares in favor of the Clerk of the Court rather than to Chevron during the pendency of his appeal.  Tr. at 108:20-24.  Donziger never sought any relief or a stay before Judge Kaplan or the Second Circuit of that order.  Tr. at 108:25-109:4, 693:4-7.   Nonetheless, Donziger did not execute a stock power in favor of the Clerk of the Court as directed by that order while Donziger's appeal was pending.  GX 1986-1; Tr. at 558:13-560:9.

16.     While Donziger's appeal was pending, on August 7, 2014, Chevron's attorneys at Gibson Dunn & Crutcher LLP ("Gibson Dunn") wrote to Donziger and his attorneys in the Civil Case (Richard Friedman and Zoe Littlepage), requesting that Donziger promptly comply with the Court's April 25, 2014 order and execute a stock power transferring his interest in Amazonia shares to the Clerk of the Court.  GX 100; Tr. at 683:6-688:20.  Chevron's attorneys wrote that

"Donziger, of course, should have also already complied with the other aspects of the Court's judgment, including the transfer to Chevron of any of Donziger's property that is traceable to the Ecuadorian judgment," and stated they were "willing to provide a form stock power agreement for Donziger's use." *Id*.

17.     That same day, on August 7, 2014, Mr. Friedman responded to Chevron's attorneys.  He copied Donziger and requested that Chevron send the form stock power agreement referenced in its letter.  GX 101; Tr. at 688:24-690:23.  The next day, Chevron's attorneys emailed Donziger and his attorneys a form stock power agreement for the assignment of Donziger's interests in Amazonia shares to the Clerk of the Court.  *Id*.

18.     On August 21, 2014, Donziger sent Chevron's attorneys a letter stating that he would not transfer his interest in the Amazonia shares to the Clerk of the Court.  GX 102. Donziger stated: "The upshot is that a simple transfer to the clerk's office of my Amazonia shares would in practice mean the complete divestiture—and potentially irretrievable loss—of more than two decades of labor on the part of me and some of my colleagues, before the Second Circuit even has a chance to decide our appeal from Judge Kaplan's judgment."  *Id*.  Donziger proposed that Chevron agree to a stipulation where Donziger would promise not to sell or transfer his shares pending his appeal.  GX 102; Tr. at 690:24-693:7. Chevron did not agree to Donziger's proposed stipulation.  Tr. at 693:2-7.

19.     The Clerk of the Court's office maintains records reflecting execution of stock powers to the Clerk of the Court.  Tr. at 556:18-558:22.  A search of the Clerk's office records in the Civil Case revealed no record indicating that a stock power was executed in favor of the

Clerk of the Court by Donziger for his Amazonia shares while Donziger's appeal was pending. Tr. at 559:14-560:9.

20.     After Donziger's petition to the Supreme Court for writ of certiorari was denied on June 19, 2017, Chevron's attorneys wrote Judge Kaplan and requested that the Court reactivate their motion for costs.  GX 1922.  They also informed Judge Kaplan that Donziger "appears never to have complied" with the Court's April 25, 2014 order directing Donziger to execute a stock power for his Amazonia shares to the Clerk of Court while his appeals were pending.  *Id.*  Chevron requested that, given the exhaustion of the appeals, the Court order Donziger "comply forthwith" with the RICO Judgment requiring Donziger to execute a stock power transferring his shares to Chevron.  *Id.*; Tr. at 110:4-112:9.  Donziger did not respond to Chevron's June 19, 2017 letter.  Tr. at 112:7-9.

21.     On July 17, 2017 Judge Kaplan denied without prejudice Chevron's letter application for an order directing Donziger to comply with Paragraph Three of the RICO Judgment, and permitting Chevron to make a formal motion for that relief.  GX 1923; Tr. at 112:10-13:20.  Donziger still did not execute a stock power transferring to Chevron his interest in the Amazonia shares in 2017.  Tr. at 113:21-25.  Nor did Donziger execute any transfer or assignment to Chevron of his right to a contingent fee under the 2011 Retainer Agreement as required by Paragraph One of the RICO Judgment.  Tr. at 114:1-12.

22.     Following a taxation of costs, on February 28, 2018, Judge Kaplan issued a Supplemental Judgment in Chevron's favor against Donziger in the amount of $813,602.71.  GX 1962, 1963.  In the opinion accompanying the Supplemental Judgment, Judge Kaplan specifically noted that Donziger's failure to transfer the Amazonia shares to Chevron as directed by the RICO Judgment put Donziger "arguably [] in contempt of the final judgment of

permanent injunction in this case." GX 1963 at 17. Donziger noticed an appeal of the

Supplemental Judgment to the Second Circuit, which became Second Circuit appeal number 18-

855. GX 1972, 7; Tr. at 632:23-633:22.

23.     On March 19, 2018, after Chevron obtained evidence indicating that Donziger

was in violation of Paragraph Five of the RICO Judgment by soliciting an investment in the

Ecuadorian judgment from hedge fund Elliott Management to finance litigation activities,

Chevron moved to hold Donziger in contempt. GX 1965, 1966. Chevron also moved for: (1) a

contempt finding due to Donziger's failure to execute a stock power in favor of Chevron for his

shares in Amazonia; (2) issuance of an order directing that Donziger preserve documents relating

to the RICO Judgment and his compliance therewith; and (3) leave to conduct post-discovery

relevant to enforcement of the judgment and Donziger's compliance with the RICO Judgment.

GX 1, 1965, 1966. On the issue of discovery, Chevron argued that discovery was "necessary to

determine the full extent of Donziger's violations of the [RICO] Judgment and ensure

compliance." GX 1966 at 20; *Id*. at 5 (requesting "leave to conduct post-judgment discovery of

Donziger and those acting in concert with him, . . . in order to uncover the full extent of

Donziger's violations [of the RICO Judgment]"). On the issue of the Paragraph Three of the

RICO Judgment, Chevron stated:

> It is beyond dispute that Donziger has not complied with this
> aspect of the Judgment. Donziger has not executed a stock transfer
> certificate transferring his shares to Chevron….Nor has he
> transferred any shares of Amazonia to the Clerk of Court….Rather
> than "diligently attempt[ing] to comply" with the Judgment in a
> reasonable manner, the evidence shows that Donziger has done the
> opposite. More than four years have elapsed since the entry of the
> Judgment, and Donziger has not complied—or even attempted to
> communicate with Chevron about complying—with it.

*Id.* at 17; Tr. at 120:6-17.  Given Donziger's "ongoing refusal to comply with the Judgment," Chevron argued that coercive sanctions were appropriate to ensure Donziger's compliance with the RICO Judgment.  GX 1966 at 23; Tr. at 121:2-5.

24.     That same day, Judge Kaplan:  granted the preservation order; ruled that leave of court was not required for discovery in aid of enforcement of the monetary portion of the Supplemental Judgment; and provided Donziger an opportunity to respond with respect to Chevron's application for discovery on the "alleged and possible contempts."  GX 1968 at 2, 4, Tr. at 122:7-124:5.

25.     Following the filing of Chevron's March 19, 2018 motion, litigation ensued regarding:  (1)  Donziger's refusal to transfer to Chevron his Amazonia shares and his contingent fee interest in the Ecuador judgment; and (2) post-judgment discovery regarding the Supplemental Judgment and Donziger's compliance with the RICO Judgment. Tr. at 125:1-25.

### C.     Donziger's Refusal to Transfer his Amazonia Shares and His 2011 Contingent Fee Interest in the Ecuadorian Judgment

26.     On April 24, 2018, Donziger – who was representing himself *pro se* during the post-judgment proceedings in the time period February 28, 2018 through July 31, 2019 – opposed Chevron's application for contempt regarding the Amazonia shares.  GX 1986; Tr. at 126:5-24.  Donziger stated: "with respect to the 'Amazonia shares,' it is the understanding of undersigned that the 'Amazonia' entity in Gibraltar either no longer exists or is entirely owned by Chevron" because Chevron "forced it into receivership;"  "[a]ssuming the entity or any part of it has been taken over by Chevron, it is now, in undersigned's view, null and void;" Chevron never responded to Donziger August 2014 letter proposed a stipulation regarding the Amazonia shares; and "[t]o the extent undersigned was aware of the issue, undersigned presumed that the

Court, like undersigned, considered the whole issue obsolete and pointless given that Chevron now seems to hold all shares in Amazonia." GX 1986 at 1, 1 n.1, 2 n.2; Tr. at 126:25-128:25.

27.     At a May 8, 2018 hearing before Judge Kaplan, Donziger did not deny that he had not transferred his interest in the Amazonia shares to Chevron as directed four years earlier, and said "I will be more than happy to do whatever the Court instructs because I think this is a completely ridiculous issue." GX 2010 at 28. Donziger asserted that Chevron sued Amazonia, got a default judgment and put Amazonia in liquidation, and therefore "they have my shares already." *Id.* at 27:10-18. He further stated:

> This is a fake issue. And if they want me to sign my shares over, which they already have because this is a public relations exercise for them, I'm happy to do it. I am not going to sit here and be held in contempt over something that's completely meaningless, when I'm here today ready to do that. So tell me what you want me to do. He says he has something for me to sign. Well, why hasn't he presented that to me? Where is it? I'm sitting here. He sent me an email this morning looking for discovery. Why is he playing possum with me? To make me look foolish? Just give me the document you want me to sign.

*Id.* at 29:14-25. Gibson Dunn attorney Randy Mastro handed Donziger Amazonia share transfer forms at the May 8, 2018 hearing. GX 2010 at 36:14-22, 37:5-7; Tr. at 135:13-36:2.

28.     Following the hearing, Gibson Dunn attorney Anne Champion emailed Donziger: (1) the Amazonia share transfer forms handed to Donziger at the hearing; and (2) one general assignment form to transfer all property traceable to the Ecuadorian Judgment, including Donziger's contingent fee under the 2011 Retainer Agreement and the shares of Amazonia. GX 114.

29.     Donziger ultimately executed a form transferring Donziger & Associates PLLC's shares of Amazonia to Chevron, albeit with an accompanying addendum of understandings that sought to negate Donziger's transfer of the shares to Chevron.  GX 2003-3; Tr. at 139:17-42:23. Donziger's addendum stated that transfer of the Amazonia shares was in violation of Amazonia's Articles of Association, which provide that any transfer "in violation of these Articles shall be null and void." *Id*.  Donziger did not execute the transfer and assignment form for all of his property interest traceable to the Judgment.  *Id*.  The addendum completely undermined Donziger's claims that signing over his Amazonia shares to chevron was a "fake issue" and "I'm happy to do it."

30.     Following Donziger's delivery of the share transfer form with his addendum of understandings, Chevron filed a letter with Judge Kaplan on May 11, 2018, informing the Court that Donziger had failed to assign his property interests in the RICO Judgment to Chevron and sought contempt sanctions and discovery regarding Donziger's noncompliance.  GX 2003; Tr. at 142:24-145:12.  Chevron argued that Donziger's addendum of understandings accompanying the share transfer form "effectively nullifies the transfer of his shares in Amazonia, and that Donziger, "[by] his own admissions in the Addendum…is expressly continuing to refuse to transfer or forthwith assign to Chevron all property…traceable to the Judgment."  *Id*. (internal quotation marks omitted).

31.     On May 16, 2018, Judge Kaplan ruled on Chevron's pending contempt motion regarding the Amazonia shares.  Judge Kaplan found that Donziger was previously in civil contempt for failing to execute, as directed by Paragraph Three of the RICO Judgment, a stock power regarding his interest in the Amazonia shares from the date the RICO Judgment was entered on March 4, 2014 until May 8, 2018.  GX 2006; Tr. at 145:13-150:24.  Judge Kaplan

concluded that Donziger "made no effort to comply" with Paragraph Three of the RICO

Judgment during that period.  GX 2006 at 9.  Noting that the addendum that Donziger appended

to the stock power executed on May 9 sought to negate the transfer of shares, Judge Kaplan

found that while the RICO Judgment required the execution of a stock power agreement, the

Judgment did not prescribe a particular form for the stock power.  GX 2006 at 13.  Judge Kaplan

left open the possibility that Chevron could present an unqualified share transfer form to

Donziger and, if he refused to sign, Chevron could seek an order of the court requiring

compliance.  *Id.*  Notably, Judge Kaplan's decision put Donziger on notice that he would

consider a properly filed contempt motion directed at paragraph One of the RICO Judgment if

Donziger failed to transfer and assign all right, title, and interest in property traceable to the

Ecuadorian Judgment "including, without limitation, all rights to any contingent fee" under the

2011 Retainer Agreement.  *Id.* at 14-15.

32.     In the next five weeks after Judge Kaplan issued that May 16, 2018 opinion,

Donziger did not execute an assignment to Chevron of his right to the contingent fee as granted

by the 2011 Retainer Agreement.  Tr. at 150:25-151:2.

33.     On June 16, 2018, Chevron's attorneys emailed Donziger requesting that he

execute a transfer document for the Amazonia shares without any alteration or addition, return

the original to Chevron's attorneys on or before June 19, and that "[s]hould [Donziger] refuse to

do so, we will have no choice but to pursue additional contempt relief against [Donziger]."  GX

2035-1; Tr. at 151:3-152:19.  The attached Amazonia share transfer document was substantially

the same as the form Chevron had previously provided to Donziger, and for which he issued his

addendum.  *Id.*

34.     On Friday, June 22, 2018, Chevron attorney Anne Champion emailed Donziger, again asking him to execute the Amazona share transfer form by Monday "or we intend to seek relief from the Court.", GX 2035-1; Tr. at 152:20-153:20.  Donziger responded that same day, stating that he had already provided a signed transfer form, re-executing the form without his statement was "deeply repugnant to the First Amendment," and "I respectfully decline your request." *Id*.

35.     On June 25, 2018, Donziger appeared for a deposition in connection with the post-judgment proceedings.  At the deposition Chevron's attorneys again presented Donziger with a general assignment form, which would assign "any and all" of Donziger's interests in the Ecuadorian judgment to Chevron, including any right to a contingent fee under the 2011 Retainer Agreement, all stock in Amazona, and all property Donziger has or may receive that his traceable to the judgment. GX 114, 201 at 229:21-231:20, 201-1; Tr. at 153:21-56:25.

36.     Donziger refused to execute that document at or after his deposition.  GX 201 at 229:21-231:20; Tr. at 155:10-25.

37.     On June 27, 2018, Chevron moved to compel Donziger to execute: (1) an unqualified transfer of his Amazonia shares; and (2) a general transfer and assignment of any and all of his interests in the Ecuadorian Judgment, including rights to a contingent fee under the 2011 Retainer Agreement.  GX 2047; Tr. at 157:14-158:9.

38.     Donziger opposed Chevron's motion to compel on July 12, 2018, arguing that "the undersigned already executed a transfer of [the Amazonia] 'shares' that was without any legal reservation," "[t]he shares are utterly obsolete and meaningless," and "[s]hould any property subject to the terms of the RICO Judgment come into my possession or control, [he]

will comply with the terms of the Judgment.  GX 2054 at 1, 1 n.1, 3; Tr. at 158:10-160:10.

39.     By order dated August 15, 2018, Judge Kaplan directed Donziger to execute and acknowledge before a notary public, and deliver to Chevron's counsel by August 21, 2018: (1) a transfer document for the Amazonia shares in the form annexed as an exhibit to a declaration by Chevron's counsel, GX 2048-2; and (2) a modified transfer and assignment in a form annexed to the Order as Exhibit 1, which would assign Donziger's right to any contingent fee under the 2011 Retainer Agreement to Chevron.  GX 2072 at 9; Tr. at 160:11-168:6.  Judge Kaplan specifically noted his prior finding that Donziger's "right to a contingent fee and the fee itself are property," which are "subject to execution and attachment," and are "immediately assignable." GX 2072 at 7.  Judge Kaplan modified the general transfer and assignment form to limit it to Donziger's rights, title and interests to his contingent fee under the January 5, 2011 retainer agreement.  GX 2072 at 12; Tr. at 168:7-169:14.

40.     On August 21, 2018, Donziger did not deliver to Chevron executed and notarized forms as directed by Judge Kaplan's August 15, 2018 order.  Tr. at 169:15-21.

41.     On August 20, 2018, Donziger sought an extension of time through September 7, 2018 to "return from [foreign] travel and properly address the ethical issues raised by the ordered transfer," noting that he was seeking counsel "on the issue of transferring my contingency interest" because his "clients have forbidden [him]" to make such a transfer.  GX 2075; Tr. at 169:22-170:12.

42.     By order dated August 21, 2018, Judge Kaplan granted in part and denied in part Donziger's extension motion.  GX 2079; Tr. at 170:13-177:20.  The August 21 Order directed:

> Donziger shall execute two sets of originals of the required forms on or before August 22, 2018. He shall send one set, which need not have notarized acknowledgments, to Chevron's lead counsel no later than August 22, 2018 by overnight courier. In order to facilitate obtaining notarized acknowledgments at a U.S. Embassy or consulate, the Court will extend his time within which to do that and to deliver fully executed documents to Chevron. Donziger shall acknowledge his signatures on the two documents constituting the second set of originals before a consular official at a U.S. Embassy or consulate no later than August 28, 2018. No later than August 29, 2018, he shall place that fully executed, acknowledged, and notarized set of originals in the hands of an overnight courier for the speediest available delivery to Chevron's lead counsel.

GX 2079 at 5-6; Tr. at 170:13-177:20.

43.   On August 22, 2018,  the date by which Judge Kaplan directed Donziger to send a set of originals that need not be notarized to Chevron by overnight courier, Donziger emailed Chevron's attorneys attaching (1) an executed but unnotarized assignment of the contingent fee interested granted by the 2011 Retainer Agreement, (2) an executed but unnotarized share transfer form for his Amazonia shares, and (3) a letter indicating that "[n]otarized versions and originals will be provided as soon as practicable given my location and family obligations, but no later than September 4, 2018."  GX 123; Tr. at 177:21-180:9.

44.   On September 4, 2018, Chevron did not receive two notarized transfer forms that Mr. Donziger stated he would provide by that date.  Tr. at 180:10-14.   Donziger provided a notarized version of the assignment of his contingent fee under the 2011 Retainer Agreement, but not the notarized version of the share transfer form for his Amazonia shares.  GX 2085-1; Tr. at 180:15-181:6.

45.   On September 7, 2018, Anne Champion emailed Donziger, stating that Donziger needed to "execute and have notarized the share assignment agreement attached here to be in

compliance with the Court's orders.  The May version [with the addendum] will not suffice."
GX 126, 2003-3; Tr. at 181:7-183:23.

46.     On September 9, 2018, Ms. Champion emailed Donziger again following up on
her email and stating that "we will need this properly executed tomorrow or we will need to seek
relief from the court."  *Id*.  The next day, on September 10, 2018, Ms. Champion emailed
Donziger stating, "Steven: You said you would do this today – when can we pick up the
package?"  *Id*.  Donziger responded on September 10, 2018 stating, "Sorry, the arbitral ruling
and the holiday changed my sked.  I am leaving early in the morning. I will have it by close of
biz, Thursday or latest Friday."  *Id*.

47.     There had been no stay or modification of Judge Kaplan's August 21, 2018 order
directing Donziger to send to Chevron an executed and notarized version of the Amazonia share
transfer form, without any alterations or modifications, by overnight mail by August 29, 2018.
Tr. at 183:18-23.

48.     On September 13, 2018, Donziger emailed Champion asking for "your view of
the legal basis for your request that I re-execute the Amazonia transfer form and have it notarized
when I already did that several weeks ago."  GX 127; Tr. at 184:13-186:19.  Champion
responded the next day, stating that the "[c]ourt ordered you to execute and notarize the
Amazonia share transfer document on August 15…and again on August 21…dates that have
long passed…you are in contempt of the Court's orders, and if we do not receive the signed,
notarized document by 4 PM today, we will proceed to address this issue with the Court."  *Id*.

49.     Donziger responded that same day, stating that "[i]t appears the Court was
unaware I had already executed the order several weeks earlier when it issued the order you

cite…I am not going to execute the same document again unless ordered by the Court…[i]f your issue is with the addendum, I have given you a clean version of the transfer document per the court's order in May.." *Id*. Champion responded that the "share transfer form you executed in May…was held by the court to be insufficient to comply with the Judgment" and that the court "was indeed aware of this as it was filed with the Court in May," and, "I understand from your last email that you are refusing to provide a notarized version of the Amazonia share transfer as ordered, we will thus be seeking relief from the court.  If my understanding is not correct, please, let me know now." *Id*. Donziger did not indicate to Ms. Champion that her understanding was incorrect.  Tr. at 186:17-19.

50.     On September 17, 2018, Chevron moved to hold Donziger in contempt and to impose coercive sanctions for his failure to comply with the District Court's August 15 and August 21 orders directing him to provide to Chevron an executed and notarized Amazonia share transfer form, without any alteration or additional language. GX 2084 at 9; Tr. at 186:20-187:4. Chevron argued that given the brazen and years' long refusal by Donziger to properly execute a transfer of his Amazonia shares to Chevron, Chevron moved to impose monetary sanctions on Donziger until he provides Chevron's counsel a fully executed and acknowledged and notarized original of Dkt. 2048-2. *Id*. at 9; Tr. at 186:20-187:20.

51.     Only after Chevron's motion for contempt and coercive sanctions did Donziger, on October 5, 2018, provide to Chevron an executed and notarized transfer and assignment form of his Amazonia shares as directed.   GX 2104-1; Tr. at 187:13-20.  After Donziger executed and notarized the share transfer form, on October 12, 2018, Judge Kaplan ordered Chevron's motion to impose coercive sanctions to compel compliance with the orders as moot, given that Donziger recently, although belatedly, executed, notarized, and delivered the share transfer form.  GX

2105; Tr. at 187:24-188:9.

> **D.** **Donziger's 2017 ADF Agreement Granting Him a Contingent Interest and Donziger's Refusal to Assign the Interest to Chevron**

52.     At Donziger's June 25, 2018 deposition, in response to a question as to whether 2011 Retainer Agreement was still operative, Donziger testified he entered into a "subsequent agreement" with his client, the ADF, and this agreement "superseded" the 2011 Retainer Agreement.  GX 201 at 28-29; Tr. at 200:24-05:13.  Donziger testified that he entered into the new agreement "two, three years ago, to my best recollection."  *Id.* at 57:15-58:19.  He stated that his agreement with the ADF was a retainer agreement, and it gave him a percentage interest in the Ecuadorian judgment, which was the same percentage he always had—6.3 per cent. *Id.* at 59.  He said the agreement gave him a "contingent fee interest in the recovery," but did not change his contingent interest set forth in the 2011 Retainer Agreement.  *Id.* at 60.  He further indicated that the ADF was now his only client.  *Id.* at 14:8-10, 16:19-17:9.

53.     On June 28, 2018, Donziger produced to Chevron the new ADF Agreement-- despite that it was responsive to a specific discovery document request from Chevron that Judge Kaplan had directed Donziger to comply with by June 15, 2018, a date that had already passed. *See infra* at ¶ 188; GX 1989-1A (Document Request No. 26), 2009, 2165 at 2 n.3; Tr. at 205:9- 207:18.  The new ADF Agreement was dated November 1, 2017 ("2017 ADF Agreement").

54.     The 2017 ADF Agreement Donziger produced was in Spanish, and Donziger never contested the accuracy of an English translation Gibson Dunn had provided him of the original Spanish version.  GX 120, 121; Tr. at 210:5-18; 225:20-226:3; *see also* Tr. at 282:24- 287:10 (Testimony of Sonia Berah, a federally-certified court reporter, that the English translation of the original Spanish document was true and accurate in her opinion, with a few

minor changes).

55.     The parties to the 2017 ADF Agreement differed from the 2011 Retainer

Agreement.  Specifically, the 2017 ADF Agreement was between only Donziger in his personal

capacity and the ADF, whereas the 2011 Retainer Agreement was between Donziger's law firm

Donziger & Associates PLLC and the ADF, the Assembly, the LAPs.  GX 120; Tr. at 217:19-

18:4.  In other words, under the 2017 ADF Agreement, which Donziger testified "superseded"

the 2011 Retainer Agreement, the ADF was the only party contractually bound to Donziger.

56.     The 2017 ADF Agreement that Donziger personally entered into on or about

November 1, 2017, granted to Donziger a property right, and provided in pertinent part:

> In consideration of Mr. DONZIGER's leadership, investment,
> professional and collection services. . . both in the past and in the
> future, the FDA hereby acknowledges, confirms, and undertakes to
> support Mr. DONZIGER's existing contractual **INTEREST** or,
> alternatively, to the extent it is necessary or useful, hereby grants
> Mr. DONZIGER an **INTEREST** in his own right equal to Mr.
> DONZIGER's existing contractual **INTEREST**. Such INTEREST,
> in any case, shall be understood to entitle Mr. DONZIGER to
> **6.3%** of any **FUNDS RECOVERED**, which are defined as any
> funds recovered in connection with the *AGUINDA* [i.e.,
> Ecuadorian] CASE or the *AGUINDA* JUDGMENT, whether by
> court order or private out-of-court settlement, in Canada or in any
> other country…

GX 120 at 4 (underline added).

57.     Following Donziger's production of the retainer agreement, Chevron filed a letter

with the Court on July 5, 2018 informing Judge Kaplan of the existence of the 2017 ADF

Agreement, and of its position that the 2017 ADF Agreement violated the RICO Judgment.  GX

2050; Tr. at 210:19-23; 211:10-19.

58.     Donziger responded to Chevron's July 5, 2018 letter on July 9, 2018, stating, in

pertinent part:

> It does seek to maintain the status quo on my client's obligations to me following an organizational adjustment involving the FDA and the UDAPT where the groups decided to not work together. The terms reflect the existing uncertainty about the exact operation and significance of this Court's Judgment in light of an ongoing litigation effort that has encompassed four jurisdictions outside the United States. Holding the status quo seeks to prevent forfeiture (dissipation) of my interest entirely—a result that Chevron itself should be wary of, given that it claims ownership of my interest through this Court's judgment.

GX 2051 at 1-2; Tr. at 211:24-212:11.

59.     Chevron, by supplemental brief dated July 24, 2018, argued that "[b]y re-committing to Donziger's enforcement efforts, and granting him a new, valuable interest in the Ecuadorean judgment separate from his contingent fee, the 2017 retainer agreement facilitates Donziger's 'avoiding the effect of the constructive trust;" and thereby warranted contempt sanctions.   GX 2057 at 10; Tr at 212:22-213:7.

60.     Donziger opposed Chevron's supplemental brief on August 3, 2018, stating that "the November 2017 retainer does not circumvent the constructive trust; it does reflect the fact that the precise operation in effect of that trust is still uncertain."   GX 2061 at 4; Tr. at 213:15-18; 214:22-215:1.

61.     Following briefing by the parties, Judge Kaplan on August 7, 2018, informed the parties that Chevron had raised a "new and independent ground for holding Donziger in contempt," i.e., Donziger's execution of and failure to assign to Chevron his interest in the 2017 ADF Agreement.  Given that it was not properly presented to the Court because it was not charged as part of a notice of motion or order to show cause as per S.D.N.Y. Civ. R. 83.6, Judge Kaplan noted that Chevron could file a new motion charging contempt of Paragraph 1 of the

RICO Judgment for Donziger's failure to assign the interest granted to him by the 2017 ADF

Agreement.  GX 2064 at 2; Tr. at 215:20-217:7.

62.     Donziger did not assign to Chevron his right to a contingency interest as granted

in the 2017 ADF Agreement after Judge Kaplan's August 7, 2018 order.  Tr. at 217:14-18.

63.     On October 1, 2018, Chevron moved to hold Donziger in contempt for violating

the RICO Judgment by failing to transfer and assign the 6.3% contingency interest granted to

him in the 2017 ADF Agreement, which Chevron argued was a property interest—just like the

2011 Retainer Agreement—subject to execution and attachment and immediately assignable.

GX 2089, 2113 at 2; Tr. at 218:5-9.

64.     As part of its contempt motion, Chevron provided a transfer and assignment form

for the 2017 ADF Agreement, which was similar to the form Judge Kaplan had modified and

issued with his order regarding the 2011 Retainer Agreement.  GX 2114-9; Tr. at 219:17-25.

65.      In an October 31, 2018 declaration in opposition to Chevron's contempt motion,

Donziger stated:

> The contingency interest stated in the updated power of attorney
> signed by [ADF] leadership in November 2017 was not intended to
> grant a new interest, but to recognize my existing interest in any
> *Aguinda* recovery. The Court has now coerced me into signing
> what I understand to be the entirety of my contingency interest
> over to Chevron. I am not taking the position that the November
> 2017 contract is protected or separable from the Court's other
> orders with respect to my contingency interest. If Chevron feels
> like it needs some additional documentation with respect to the
> November 2017 power, it should just ask me rather than rush to
> file for contempt.

Tr. at 220:12-22.  That said, Donziger still did not sign over to Chevron the contingent fee

interest granted to him by the 2017 ADF Agreement—even when faced with the contempt motion.

66.     On February 21, 2019, Judge Kaplan issued an order entitled "ORDER RE ASSIGNMENT OF CONTINGENT FEE," stating that "it would appear the parties could resolve for the future any question of noncompliance in this respect," and directing the parties to file an executed instrument of assignment of the 2017 ADF Agreement on or before February 28, 2019, "failing which each party shall file a letter. . .explaining why no such instrument has been filed." GX 2165 at 3; Tr. at 222:25-223:6.  The District Court stated:

> It was and remains Donziger's obligation to comply with paragraph 1 of the RICO Judgment, which of course requires him to assign to Chevron all of his right, title and interest to any contingent fee under the ADF agreement. After all, the [2017 ADF Agreement] by its terms granted him an "interest" equal to 6.3 percent of monies of which, if any are collected, the ADF claims to be the exclusive beneficiary.

GX 2165 at 2.

67.     Donziger did not execute an assignment of his right to a contingent fee under the 2017 ADF Agreement by February 28, 2019, the date prescribed in Judge Kaplan's order.  Tr. at 225:22-24.

68.     On March 1, 2019, Donziger continued to resist and took the position that "yet another forced assignment of my contingency interest[] is unwarranted and in fact not possible." GX 2169 at 1. Donziger took the position that "the document observes that my clients have the power to grant a new interest along the same lines to the extent 'it may be necessary or useful.' This conditional language does not vest in me any legal interest that I am capable of assigning." *Id*.  Notwithstanding Judge Kaplan's orders to the contrary, Donziger asserted that "[t]here is no

need for an additional assignment, as I already have executed two such assignments under protest based on coercive orders of this court." *Id.* at 2; Tr. at 225:22-24.

69.     On May 23, 2019, Judge Kaplan found Donziger in willful civil contempt for, among other things, his "failure to assign and transfer to Chevron all rights to any contingent fee that he now has or hereafter may obtain including without limitation all such rights under the 2017 Retainer."  GX 2209 at 69; Tr. at 226:4-229:18.  He stated:

> As set forth above, it is abundantly clear that Donziger violated and continues to violate paragraph 1 of the RICO Judgment by failing to transfer and assign his contractual right from the ADF to a contingent fee of 6.3 percent of any monies obtained in respect of the Ecuador Judgment, whether by its enforcement or otherwise….Finally, Donziger has made no attempt to comply with paragraph 1 of the RICO judgment in this respect. Rather than do so, he failed to disclose the 2017 retainer, even when ordered to produce documents that unmistakably required its production, and now he continues in his refusal to comply.

GX 2209 at 39-40.  Judge Kaplan imposed coercive sanctions that would begin at $2,000 for May 28, 2019, doubling "for each subsequent day during which Donziger fails fully to purge himself of this contempt." GX 2209; Tr. at 226:4-229:18.

70.     Between Donziger's March 1, 2019 letter (GX 2169) and Judge Kaplan's May 23, 2019 decision (GX 2209), Donziger did not execute an assignment of his interest granted by the 2017 ADF Agreement.  Tr. at 226:14-18.

71.     Following the civil contempt finding and imposition of coercive sanctions, on May 28, 2019, Donziger executed an assignment to Chevron of his interest in the 2017 ADF Agreement.  GX 136, 2216-1; Tr. at 229:19-230:9.

24

E.       **Post-Judgment Discovery Litigation**

72.       In connection with Chevron's March 19, 2019 post-judgment motion for discovery, Judge Kaplan issued an order stating that, "to the extent the discovery is sought in aid of enforcement of the monetary portion of the judgment, leave of court is not required." GX 1968.  As for discovery regarding enforcement of the non-monetary portions of the RICO Judgment, Judge Kaplan deferred ruling on that issue pending a response by Donziger.  *Id*.

73.       On April 16, 2018, Chevron served Donziger with:  (1) Requests for Production of  Documents in Aid of the Supplemental Judgment ("Document Production Requests"); (2) Information Subpoena in Aid of the Supplemental Judgment ("Information Subpoena"); and (3) a subpoena for testimony.  GX 1989-1A, 1B, 1C; Tr. at 231:14-235:17.  The Document Production Requests included an instruction requiring the production of a privilege log for any documents withheld on the basis of privilege.  GX 1989-1A at 6, ¶ 9.  Rule 26.2(b) of the Local Rules for the Southern and Eastern Districts of New York provides:  "Where a claim of privilege is asserted in response to discovery or disclosure other than a deposition, and information is not provided on the basis of such assertion, the [privilege log] shall be furnished in writing at the time of the response to such discovery or disclosure, unless otherwise ordered by the Court." GX 601; Tr. at 234:6-24.

74.       The Document Production Requests consisted of 38 specific requests, including the following:

> Request No. 26.   "All documents evidencing or relating to any payment, proceeds, compensation, revenue, or any thing of value you have received, contracted to received, or have been promised related to any aspect of your involvement in the Ecuador litigation, Ecuador judgment, and/or Ecuador enforcement actions.

> Request No. 29.  "All documents evidence or relating to any payment, compensation, revenue, or any thing of value you have delivered, contracted to deliver, or have promised to any person or entity from any proceeds that may be received from the Ecuador Judgment or the Ecuador enforcement actions.
>
> Request No. 30.   "All documents evidencing or relating to attempted or completed sale, assignment, or transfer of rights, title, claims, or interest of any proceeds or other interest held by you, whether directly or indirectly, in the Ecuador Judgment or the Ecuador enforcement actions, whether or not such attempt was successful.

GX 1989-1A.

75.     The Information Subpoena consisted of 31 separate interrogatory requests, including the following:

> Request No. 21.  "Identify and describe in detail any action that you, the Lago Agrio Plaintiffs, or any person acting on your behalf or on behalf of the Lago Agrio Plaintiffs, has undertaken to monetize or profit from the Ecuador Judgment, including by selling, assigning, pledging, transferring, or encumbering any interest therein."
>
> Request No. 25.  "Identify and describe in detail any asset, payment, proceeds, compensation, revenue, or any other thing of value you have delivered, contracted to deliver, or have promised to any person or entity from any proceeds received or that may be received from the Ecuador Judgment, enforcement of the Ecuador Judgment, or nay investment in the Ecuador Judgment.

GX 1989-1B.

76.     On April 30, 2018, the return date for the Document Requests and Information Subpoena, Donziger did not produce a single responsive document.  Tr. at 241:23-242:1. Nor did Donziger produce a privilege log. Tr. at 269:7-17, 296:4-6.  Instead, Donziger, who represented himself pro se in the post-judgment proceedings (GX 150, Tr. at 237:1-4), sent Chevron's attorneys an April 30, 2018 letter objecting to all of the Document Requests and Information Subpoena requests.  GX 112.  Among other things, Donziger's general objections included: (1)

that discovery was not appropriate at this time because "the supplemental judgment supposedly justifying discovery is currently on appeal"; (2) Chevron's requests were burdensome and Chevron was only entitled to a "clear picture of my available assets and net worth," and Donziger would "provided Chevron a short summary of my financial conditions and assets, backed up by supporting documents; (3)  Chevron's request were overbroad and irrelevant; and (4) the requests were objectionable because they call for production of information subject to various privileges.  *Id.*

77.     Following a meet-and-confer, at which Donziger informed Chevron attorneys that he "would not produce documents without a court order" or sit for a deposition, Chevron moved to compel Donziger's full compliance with the April 16, 2018 discovery requests.  Tr. at 242:19-22; GX 1989.

78.     Donziger opposed the motion, arguing among other things, that "the issues are moot or potentially moot because I am preparing to post a supersedeas bond that will stay all proceedings on the Court's supplemental judgment pending resolution of my lodged appeal. . . Because Chevron's discovery requests are now proceeding entirely and exclusively on the aid of enforcement basis, those requests should be suspected forthwith and withdrawn as soon as the bond is posted."  GX 2002.  Donziger proposed to provide Chevron with a "descriptive summary or guidance as to my relatively simply financial condition, backed up by documentation. . . ."  *Id.* Donziger offered: "I could begin a rolling production of the most relevant, nonprivileged responsive documents during this time period. Though of course such efforts would take time from the projects of preparing the summary/guidance."  *Id.* n. 3.  Donziger also noted his objections to the discovery requests on the grounds of overbreadth and undue burden.  *Id.* at 2.

1.    *May 17, 2018 and June 1, 2018 Orders Directing Donziger's Compliance*
*with Money Judgment Discovery Requests and Elliot Management-*
*Related Paragraph 5 Compliance Discovery Requests by June 15, 2018*

79.    On May 17, 2018, Judge Kaplan issued an order granting, in part, Chevron's

motion to compel.  GX 2009.  Judge Kaplan modified and divided up Chevron's April 16, 2018

discovery requests into two categories: (a) "Money Judgment Discovery Requests" and (b)

"Paragraph 5 Compliance Discovery."  *Id.*  Judge Kaplan directed that, on or before June 15,

2018, Donziger "shall comply fully with" and "answer fully" "all of the Money Judgment

Discovery Requests," including "production of all responsive documents within his possession

custody and control.  *Id.*  As for Paragraph 5 Compliance Discovery, Judge Kaplan deferred

ruling on that discovery for the time being.  *Id.*  Judge Kaplan further ordered Donziger to testify

at a deposition.  *Id.*

80.    In the May 17, 2018 order directing Donziger to comply with the Money

Judgment Discovery Requests, Judge Kaplan rejected Donziger's objections and found them to

be "almost entirely without merit," although Judge Kaplan modified certain of the discovery

requests.  *Id.*  Judge Kaplan ruled that Donziger's objection that Chevron should not be permitted

to conduct discovery for purposes of enforcing the money judgment because he appealed from it

was "frivolous" and discovery "is entirely appropriate." *Id.*  Judge Kaplan noted that Donziger

had neither attempted to post a supersedeas bond, nor sought to demonstrate that a stay of

discovery should be granted as a matter of discretion.  *Id.*  As for Donziger's claim that the April

16, 2018 discovery requests were overly burdensome, Judge Kaplan found that claim "entirely

unsubstantiated," rejected Donziger's proposal to provide Chevron with a short summary of his

financial condition, and pointed out that "millions of dollars have passed through Donziger's

hands over the years. Much of it is unaccounted for."  *Id.* Judge Kaplan observed that "there

already is a record of willingness on the part of Donziger to shift assets in which he has an interest into foreign locations to avoid what he may regard as judicial 'interference.'" *Id.*

81.     On May 31, 2018, Donziger filed a motion for declaratory relief and to dismiss Chevron's March 19, 2018 application to hold Donziger in contempt, arguing that Judge Kaplan's April 24, 2014 "stay" decision allowed him to raise funds to cover litigation fees by selling non-enjoined interests in the Ecuadorian judgment.  GX 2018.  In that motion, Donziger acknowledged that Paragraph Five of the RICO Judgment prevented him from pledging or collateralizing his own interest in the Ecuadorian judgment. *Id.* at 11 ("Paragraph 5 nonetheless can only apply to the specific interests of Mr. Donziger, Mr. Camacho, or Mr. Piaguaje. . . As long as any expense funding does not specifically assign, commit, or otherwise leverage interests specific to those three individuals, there is no violation of Paragraph 5.")

82.     On June 1, 2018, Judge Kaplan issued an order directing Donziger to produce additional discovery by June 15, 2018, which related to the Paragraph 5 Compliance Discovery. GX 2020.  Specifically, in anticipation of a June 28, 2018 evidentiary hearing on Chevron's motion to hold Donziger in contempt of the RICO Judgment for his actions in soliciting an investment in the Ecuadorian judgment from Elliott Management, Judge Kaplan directed Donziger to produce Paragraph 5 Compliance Discovery to the extent it related to the solicitation of Elliott Management. *Id.*  at 2.  Judge Kaplan stated that the Court was reserving judgment as to whether and when to require compliance with the Paragraph 5 Compliance Discovery that went beyond the attempt to obtain funding from Elliott Management. *Id.* at 2.  Finally, Judge Kaplan noted that Donziger's May 31, 2018 motion for declaratory relief and to dismiss the contempt motion "does not affect this ruling" regarding discovery compliance. *Id.* at 1 n.1.

83.     On June 15, 2018, Donziger produced to Chevron a total of 18 pages of documents—five of which were duplicates.  GX 118; Tr. at 255:17-22.  Those 18 pages consisted of a single 3-page email exchange, a one-page TD Bank record purportedly listing Donziger's accounts and balances as of June 13, 2018, and pages relating to two LLCs.  GX 118. That same day, Donziger emailed Chevron's attorneys a letter with "Supplemental Objections and Responses to Subpoena dated Apr. 16, 2018," which lodged two "General Objections" to the Money Judgment Discovery Requests that Donziger had been ordered to produce by June 15. First, he objected that production of "many of these materials in this context would violate First Amendment associational rights of me and others" because the discovery would allow "intrusion and infiltration" into practices of a targeted political advocacy group by an opponent of the group—Chevron.  GX 119.  Second, Donziger objected on undue burden grounds, arguing that the discovery sweeps "drastically beyond the legitimate scope of inquiry," that the money judgment is on appeal and Donziger is seeking to post a supersedeas bond, and the only relevant discovery was the present whereabouts and extent of assets available to satisfy the judgment. GX 119.

84.     In the June 15 letter, Donziger stated that he was "still collecting materials for some requests" and will "of course timely supplement these responses as appropriate." *Id.* at 1. Donziger also provided responses to the Documents Requests and Information Subpoena Requests.  With respect to Document Request No. 26, Donziger stated: "I further attest that the only interest I have 'been promised' as described in the Request is my contingency interest in the Ecuador Judgment, which is largely as described by the Court in its final RICO judgment. . . To the extent the Request seeks further details about that interest, I object on both First Amendment and Money Judgment Relevance/Undue Burden grounds." *Id.* at 5.

85.     As for Document Request No. 30, he stated: "I hereby respond that I have not attempted nor completed any sale or assignment of my interest in the Ecuador Judgment at any point since March 4, 2014." *Id.* at 6. In addition, despite Judge Kaplan's May 17, 2018 order specifying the Money Judgment Discovery Requests that Donziger must fully comply with by June 15, Donziger took the position in this letter that a number of what Judge Kaplan categorized as Money Judgment Discovery Requests were actually "a Compliance Request" and stated "No response required until further clarification provided." *Id.* at 6. Judge Kaplan had neither stayed nor modified his May 17, 2018 discovery order.

86.     Donziger did not provide a privilege log on June 15, 2018, despite having told Chevron's attorneys in a June 7, 2018 email that the Money Judgment Requests "may tread into privileged materials" and "I will of course provide an appropriate log and articulated basis for any such assertion of privilege upon any such withholding that may be necessary." GX 116.

87.     Also on June 15, 2018, Donziger filed a motion for a protective order

> precluding any discovery in these post-judgment proceedings (including discovery sought from third-parties) that would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the teams of individuals and organizations that directly and indirectly oppose Chevron in the Ecuador Litigation. . . and/or more broadly engage in Ecuador Litigation-related activity. . . .

GX 2026 at 2. Donziger argued that such a protective order was "necessary to protect his and his colleagues' First Amendment associational rights" and the discovery sought would intrude upon "First Amendment-protected political activities, associations, speech, operational practices, and strategic deliberations of Mr. Donziger and others." *Id.* at 1.

88.     On June 25, 2018, Chevron's attorneys took the deposition of Steven Donziger. At that deposition Donziger admitted that he withheld responsive documents on First Amendment grounds.   Donziger made the following statements:  "there is a fair number of documents that I have withheld from you guys on the basis of privilege or First Amendment issues or of the pending motions" (GX 201 at 44:3-8);  "I did a fair amount of searching and document gathering and I have more documents that you are seeking that I don't believe is appropriate to turn over at this point given the sort of outstanding legal issues that need to be resolved by the Court," (*Id.* at 47:9-15);  he is withholding "a few hundred pages, but if Judge Kaplan were to order me to produce everything that you are asking for, it obviously would be a lot more than that" (*Id.* 47:16-22); "I do know that some of the documents, many of the documents are being withheld on First Amendment grounds"  (*Id.* at 49:16-18).   Donziger also acknowledged withholding some documents on privilege grounds, but did not provide a privilege log.  He stated: "I think with regard to my documents, I could provide a log, but I think a lot of them are being withheld not on privilege grounds but on First Amendment grounds." *Id.* at 232:11-21.  Judge Kaplan had not relieved Donziger of his obligation to provide a privilege log, pursuant to Local Civil Rule 26.2(b), and Donziger had not provided a log as required.  Tr. at 269:7-17.   Donziger also refused to answer many questions on First Amendment grounds and scope. GX 201 at 16:19-17:18, 20:2-21:18, 30:13-24, 69:3-10, 76:4-77:17, 80:15-81:22, 137:3-8, 139:19-140:14, 180:14-24, 197:6-19.

89.     On June 25, 2018, Judge Kaplan denied Donziger's motions for a declaratory judgment and to dismiss the contempt motion (GX 2018), motion for a protective order (GX 2026), and a motion he had filed for an emergency administrative stay related to some third-party discovery (Dkt. 2028).  GX 2037.  In a decision accompanying the order denying those motions,

Judge Kaplan analyzed and rejected Donziger's First Amendment arguments for a protective order. GX 2045 at 21-23, 32-35. Judge Kaplan ruled: "Chevron is entitled to enforce the judgment in its favor through appropriate discovery requests and take appropriate legal action." *Id.* at 31.

90.     After Judge Kaplan denied Donziger's motions, Chevron's attorney, Gibson Dunn & Crutcher partner Anne Champion emailed him requesting that he produce all documents he had withheld on the bases of the objections made in those motions. GX 149A. Donziger replied on June 26, 2018 that he was "gathering materials." GX 149. On June 29, 2018, Champion again emailed Donziger: "Please confirm you will produce all other documents responsive to Chevron's request no later than Wednesday." GX 146; Tr. at 292:16-23.

> 2.     *July 23, 2018 Order Directing Donziger's Compliance with Paragraph 5
>        Compliance Requests by August 15, 2018*

91.     On July 23, 2018, after a June 28, 2018 hearing on Chevron's civil contempt application, Judge Kaplan issued an order directing Donziger and his law firms to produce to Chevron all of the Paragraph 5 Compliance Discovery by August 15, 2018. GX 2056; Tr. at 278:18-279:12. On July 24, 2018, Champion again emailed Donziger seeking the responsive documents he had withheld:

> I am writing to follow up on my June 29 email below requesting
> that you "produce all other documents responsive to Chevron's
> requests by no later than Wednesday," July 4. With the exception
> of the document you provided on July 5, we have not received any
> of the documents you agreed at your deposition to search for and
> produce. You have also failed to produce the "hundreds" of
> documents withheld on First Amendment grounds, despite the fact
> that Judge Kaplan has ruled that claim to be without merit.

GX 146. After Donziger's initial production of 22 pages of responsive documents to Chevron on

April 30, 2018, Donziger produced just two additional responsive documents during 2018:  (1)

his 2017 ADF Agreement, which he described at his June 25, 2018 deposition as having

"superseded" his 2011 Retainer Agreement and he produced to Chevron on June 28, 2018 (GX

120); and (2) a document from his client, the ADF, providing him additional authority to

fundraise and pay litigation expenses, which he produced to Chevron on July 5, 2018.  (GX 122,

122-T). Tr. at 277:6-278:16.

92.    On July 26, 2018, Donziger noticed an appeal from Judge Kaplan's June 27, 2018

decision and July 23, 2018 discovery order with the Second Circuit, and the appeal was docketed

as No. 18-2191.  GX 8, 2060; Tr. at 293:14-294:3.  On August 13, 2018—two days before his

deadline to comply with the July 23, 2018 discovery order—Donziger filed a motion in the

District Court seeking a stay of "all discovery" while his Second Circuit appeal No. 18-2191 was

pending.  GX 2067 at 3; Tr. at 294:10-295:21.  In that motion, Donziger again argued—as he had

in his previously denied motion for a protective order—that producing responsive documents

would "allow Chevron to infiltrate the activity of its opponents" and "chill if not freeze their

First Amendment associational rights." GX 2067 at 3.  He claimed that Chevron would engage in

"bad faith retaliatory litigation" if they received the responsive information.  *Id.*  Donziger then

stated that he was prepared to violate the discovery orders and risk contempt:

> Even if I am forced to go into contempt in order to protect against
> this outcome, the threat still remains regarding Chevron's ongoing
> attempts to obtain the discovery from non-parties; additionally, the
> harm of enduring a contempt citation from this Court is significant
> in its own right.  On the other side of the ledger, Chevron has no
> basis—zero—to claim irreparable injury if a stay is issued.

*Id.*

93.    When the August 15, 2018 discovery deadline came, Donziger did not produce

any additional responsive documents.  Tr. at 295:25-296:6.  Nor did Donziger produce any privilege log.  *Id.*

94.     On August 16, 2018, Chevron moved to compel Donziger to fully comply with the Money Judgment Discovery Request and the Paragraph 5 Compliance Requests.  GX 2073; Tr. at 296:7-298:9.  In that motion, Chevron pointed out, among other things: Donziger had produced only 22 pages of documents, and not produced a single financial account statement, tax return, or document related to his receipt of over a million dollars from post-RICO financing of the Ecuadorian judgment; and Donziger's admission at his deposition to having withheld "a few hundred pages" of responsive documents on the basis of First Amendment objections that had already been rejected.  GX 2073 at 4.  Chevron also requested a finding by Judge Kaplan that Donziger had waived privilege because of his failure to produce a privilege log, his failure to produce documents under the Fed. R. Evid. Rule 502(d) stipulation, and his unsubstantiated privilege claims. GX 2073 at 2, 5.  Chevron further requested that Donziger's electronic devices be imaged.  *Id.* at 4.  In response to the motion to compel, on August 26, 2018 Donziger filed a "Opposition to Chevron's Latest Motion to Compel And Reiterated Motion To Stay."  GX 2077; Tr. at 298:16-299:20.  Donziger did not dispute that he continued to withhold responsive documents. GX 2077.  As to a privilege log, Donziger stated:

> While we have not yet reached a stage where specific claims of privilege are necessary (including in this motion, which rests on the necessity of an overall stay of discovery pending appeal), undersigned maintains and preserves all applicable claims of privilege and protection—which claims are necessary of course, to protect not only undersigned's interests as an attorney but the interests of many clients who are not before the Court.

GX 2077 at 3.

95.     On September 25, 2018, Judge Kaplan issued an order denying Donziger's

motion for a stay "in all respects." GX 2088; Tr. at 300:10-302:7.  Judge Kaplan pointed that the

post-judgment discovery is aimed at: (1) discovering assets and sources of income to satisfy the

outstanding money judgment issued on February 28, 2018; and (2) determining whether

Donziger has complied with the RICO judgment.  GX 2088.  Judge Kaplan referred to his June

27, 2018 decision determining that Donziger's First Amendment arguments were "unsupportable

even if he had not forfeited those arguments and even if he had standing to raise them, which in

important or all respects he does not."  *Id.*  Judge Kaplan found Donziger's irreparable injury

claims to be "unsubstantiated" and further observed that "allowing [Donziger] to continue to

prevent enforcement of the money judgment against him and to frustrate efforts to determine

whether he is violating the injunction against him threaten Chevron with irreparable injury." *Id.*

Following the stay denial, Donziger did not produce any additional responsive documents during

2018.  Tr. at 301:24-302:3.  Donziger did not go to the Second Circuit to seek relief from this

order denying his application for a stay.  He did not seek a stay with the Second Circuit, nor did

he file a mandamus petition.  Tr. at 654:1-655:16.

> 3.    *October 18, 2018 Order Finding Donziger Waived or Forfeited Any*
> *Privilege Claims and Directing Full Compliance with Discovery Requests*
> *Forthwith Irrespective of Privilege*

96.    On October 18, 2018, Judge Kaplan issued an order granting Chevron's motion to

compel "in its entirety."  GX 2108 at 2; Tr. at 302:15-303:25 (discussing GX 2108), 842:11-24

(confirming admission of GX 2108).  Judge Kaplan noted that he ordered Donziger to respond to

certain of Chevron's discovery requests by August 15, 2018, and that "order remains in effect

and has not been stayed. Donziger is obliged to comply with it in each and every respect on pain

on contempt." GX 2108 at 2.  Judge Kaplan further found that Donziger waived or forfeited any

claim of privilege because of his failure to produce a privilege log as required by Fed. R. Civ. P.

26(b)(5) and S.D.N.Y. Civ. R. 26.2.  *Id.* Judge Kaplan ordered that Donziger "shall comply fully with the outstanding discovery requests forthwith without holding any responsive documents or information on privilege grounds." *Id.*  Judge Kaplan further ordered: "Given Donziger's stonewalling of post-judgment discovery and the other circumstances described in Chevron's memorandum, it is appropriate that Donziger's electronic devices be imaged and examined for any responsive documents that Donziger has not thus far produced under appropriate safeguards of the interests of all parties." *Id.* Judge Kaplan directed the parties to, on or before October 26, 2018, provide the District Court with a proposal for selection, compensation, and precise duties of a third party to whom Donziger must produce his computers and storage devices for forensic imaging. *Id.* at 2-3.

97.     With respect to finding that Donziger had waived or forfeited any privilege claim, Judge Kaplan specifically noted that: (a) Donziger was on notice about the need to provide such a log because he had previously ignored the requirements of the privilege log rules in the litigation with Chevron and he was deemed to have waived privilege as a result—citing to a November 29, 2010 decision in which Judge Kaplan found that Donziger had forfeited any privilege claim for failure to comply with the privilege log rules (GX 401) and the Second Circuit's December 15, 2010 affirmance of that decision (GX 305); and (b) Donziger failed to comply with the privilege log rules even after Chevron asserted in its August 16, 2018 motion to compel that his prior failure should result in waiver of any otherwise applicable privileges. *Id.* at 2.  Donziger did not go to the Second Circuit to seek relief from compliance with this October 18, 2018 order.  Tr. at 655:10-12.  He did not seek a stay, nor did he file a mandamus petition. *Id.* at 655:13-16.  Donziger also did not seek expedited briefing or review for his pending Second Circuit appeals. GX 7, 8; Tr. at 654:11-20.

37

98.     On October 25, 2018, Donziger emailed Chevron attorney Anne Champion to

"advise you of my anticipated course of action regarding Judge Kaplan's order regarding the

motion to compel that waived all of my privileges." GX 129; Tr. at 305:4-306:12.  Donziger

stated that he would not comply with Judge Kaplan's discovery orders, including the October 18,

2018 order:

> . . . I presently see no choice other than to go into contempt until I
> can get a ruling on the most basic issues that are driving what I
> believe to be your entirely inappropriate, over-broad, intrusive, and
> constitutionally infirm discovery rampage targeting financial
> supports and others of the Ecuadorians. . . .
>
> I don't want to go into contempt, but I genuinely feel that the court
> has given me no choice in light of its failure to rule [on the pending
> March 19, 2018 contempt motion], which is obviously designed to
> shield its many problematic decisions from appellate review.

*Id.*

99.     Also on October 25, 2018, Donziger filed a letter on the docket styled "motion to

expedite," advising Judge Kaplan that he will not comply with the October 18, 2018 order.  GX

2118; Tr. at 307:15-308:6.  Donziger stated: "I write to respectfully inform the Court that I will

be unable to comply with the order dated October 18, 2018 directing me to produce a potentially

massive quantity of confidential and privileged documents and communications to Chevron."  *Id.*

at 1; Tr. at 307:15-308:6.  He argued that the post-judgment discovery "has zero basis to

proceed" and said that compliance with the order would give Chevron "near wholesale access to

my confidential, privileged, and protected documents, without any legitimate basis."  *Id.* at 2-3.

He asked Judge Kaplan to rule on Chevron's pending March 19, 2018 contempt motion for

Donziger's solicitation of Elliott Management to invest in the Ecuadorian judgment, stating:

> If the Court really thinks that a prohibition on litigation finance
> was so clear after April 2014 that I can be held in contempt

> thereof, it should make such a finding directly, which would allow
> me to seek appellate review. Because the Court refuses to do this, I
> apparently must take a contempt sanction in this second-layer
> discovery context, try to consolidate it with the pending appeals,
> and trust that the Second Circuit will be able to appreciate it all in
> totality and in the larger and deeply disturbing context of these
> post-judgment proceedings generally. I would urge the Court to
> rule on these critical issues or hold me in contempt and thereby
> allow me to appeal to the Second Circuit.

*Id.* at 3; Tr. at 308:22-309:11.

100.    On October 30, 2018, Chevron submitted to Judge Kaplan a proposed forensic

protocol for the imaging and examination of Donziger's devices and accounts.  GX 2120; Tr. at

309:12-310:6.  On November 8, 2018, Donziger submitted another letter to Judge Kaplan

reiterating both his intention to refuse to comply with any production order, as well as his

complaint about Judge Kaplan not having ruled on the pending March 19, 2018 contempt motion

relating to Elliott Management. GX 2131; Tr. at 310:7-14.  Donziger once again expressed his

view that the post-judgment discovery was improper:

> As I have argued repeatedly, discovery in these post-judgment
> proceedings has been illegitimate from the start.  For six months, I
> have sought a basic explanation from the Court of how my
> litigation finance efforts can possibly be found in contempt of
> court given the assurances provided in the April 25, 2014 Opinion.
> Dkt. 1901. The Court has refused to rule for over six months,
> clearly boxed-in by its own words.  Five months ago I also sought
> a protective order 'to prevent discovery in this case from turning
> into a private "blank warrant" allowing Chevron to intrude and
> infiltrate itself into the First Amendment-protected political
> activities, associations, speech, operational practices, and strategic
> deliberations of [myself] and others.' Dkt. 2026. The Court refused
> to provide relief and what I feared would happen is precisely what
> has happened.

*Id.* at 1; Tr. at 310:15-311:6.  Donziger objected to Chevron's proposed forensic protocol and

said he would not comply with "any production order" if Judge Kaplan did not rule on Chevron's

pending contempt motion and adhered to his October 18, 20218 order finding that Donziger

forfeited or waived any privilege claim:

> While I could make countless other objections to the abusiveness and disingenuousness of Chevron's protocol and desired search (and attack) methodology, any and all objections are pointless or at least premature at this point in light of my intended course of action, as I openly informed the Court on October 25, 2018. Dkt. 2118.  There I indicated that my position is that I am not ethically able to comply with the Court's order to produce mountains of confidential and privileged material to Chevron under a wholly improper purported privilege waiver ruling and before the Court has even ruled on the core issue in Chevron's original contempt motion.  *If the Court is unwilling to rule on the legal basis of Chevron's motion and continues to refuse to allow me to assert any privilege whatsoever, I intend to openly and ethically refuse to comply with any production order and to take an immediate appeal of any resulting contempt finding the Court issues against me.*

*Id.* at 2 (emphasis added); Tr. at 311:7-25.

101.    On November 26, 2018, Judge Kaplan denied Donziger's October 25, 2018 letter application.  GX 2133. The order stated:

> Donziger's letter motion overlooks or ignores so much that already is of record in prior decisions by this Court and elsewhere that no purpose would be served by a point-by-point refutation, the preparation of which could serve only to delay that which he seeks to have expedited.  It suffices to say that the contempt motions now before the court will be decided in due course, bearing in mind that this is not the only case on the Court's docket.

*Id.*; Tr. at 312:9-14.

102.    On January 8, 2019, the parties appeared before Judge Kaplan to address a protocol for the forensic imaging and examination of Donziger's devices and accounts.  During that conference, Donziger repeatedly asserted—yet again—that he had a foundational objection to post-judgment discovery and Judge Kaplan repeatedly informed Donziger that he had already ruled on Donziger's "foundational objection" and that Donziger did not have a stay of discovery. GX 2149; Tr. at 312:15-317:2. The following exchange occurred:

Donziger:     I have a foundational objection, which I reiterate right now.  In terms of the specifics of the protocol, what I would ask this Court to do is to hold off until this issue can be decided by the appellate court.

The Court:    Denied.

Donziger:     OK.  Well, hold off at least until you can rule so we know what the precise scope of whatever the post-judgment RICO injunction is.

The Court:    Mr. Donziger, I'm not delaying it. I'm acting deliberately. It's taking some time. I'm doing that in an effort to be sensitive to concerns you've raised. I am not putting everything on hold. No way. No how. I've made that clear over and over again. Now, either address the protocol or don't.

Donziger:     Is there a sense from the Court as to when we might see a ruling in this?

The Court:    When it's ready, you'll be among the first to know.

Donziger:     Because while this issue has been pending decision, Chevron has subpoenaed many people, I'd say 20 people, I've lost track, and conducted a series of depositions that I think, as you know, I've made myself clear, are entirely inappropriate and are designed to dry up funding for legitimate advocacy and dry up our ability to advocate.  What I'm trying to point out is the fact the Court hasn't ruled – and I recognize you have whatever concerns you have and to the extent you're being careful, I appreciate it, but the fact the Court hasn't ruled –

The Court:    And surprising as this may be to you, Mr. Donziger, this isn't my only professional responsibility.

Donziger:     I know.  Well, I – let me just say this: For this team here, it's the majority of their work and they have been deposing dozens of people and damaging the case, and there's no – in my opinion, there's no legal basis because the Court has yet to rule –

The Court:    I know in your opinion there's no legal basis.  You are mistaken. That's my ruling.  I know you don't like it.

41

| Donziger: | Well, for there to be discovery in this context, I'm talking about the discovery that's going on as well as what I would call the big enchilada, which is asking me to turn over my entire digital life to them, there has to be a plausible basis, legal basis, from which the Court can hold me in contempt, and in light of the April 2014 order, the clarification order – |
|---|---|
| The Court: | There is no clarification order. |
| Donziger: | Well, whatever you want to call what you issued on April 25, 2014 which laid out the terms of fundraising for this case. |
| The Court: | I disagree with you. |
| Donziger: | There's no – in my opinion, there's no legitimate basis for which to find me in contempt.   Therefore, there's no legitimate basis for discovery. |
| The Court: | Mr. Donziger, I know your opinion. I know your opinion. I know. I've ruled on your opinion.   You lost. |
| Donziger: | Well, that's why I'm appealing. |
| The Court: | Well, it's a free country. |

*Id.* at 10:16 to 12:23; *see* Tr. at 313:15-315:22.  The following additional exchange occurred

regarding Donziger's "foundational objection" to the discovery and lack of a stay:

| Donziger: | Well, I have a foundational objection. |
|---|---|
| The Court: | I don't care about your foundational objection. You don't in this court.  The foundational objection I have ruled against.    They have a right to conduct appropriate discovery as far as I'm concerned.  *I know you have an appeal pending in the Second Circuit.  I know their brief is due sometime in March. That's the way it goes.  You don't have a stay.* |

*Id.* at 13:19 to 14:1 (emphasis added); *see* Tr. at 316:15-22.  Donziger still did not attempt to

seek relief from the Second Circuit from compliance with the outstanding discovery orders,

which were not stayed or modified and remained in full force and effect.  Tr. at 654:11-20; GX

7, 8.

103.     On March 5, 2019, Judge Kaplan issued orders:  (1) appointing Ondrej Krehel of

LIFARS LLC as the Neutral Forensic Expert to collect, image and examine Donziger's devices;

and (2) ordering a protocol for the collection, imaging, and examination of Donziger's devices

and accounts to identify information responsive to the discovery requests ("Protocol").  GX

2170, 2172; Tr. at 317:8-320:12.  Judge Kaplan also issued a decision explaining his reasoning

for entering the FIP.  GX 2171.

104.     Ondrej Krehel was to work at the direction of Judge Kaplan, and not Chevron,

Chevron's attorneys at Gibson Dunn, or Steven Donziger.  Tr. at 791:6-17.  Krehel's duties were

specified in the Protocol.  *Id.* at 791:18-20.

105.     Paragraph Four of the Protocol directed that Donziger, within three business days

of the entry of the Protocol, i.e., March 8, 2019:

> provide to both the Neutral and Chevron's Forensic Experts via
> email a representation listing under penalty of perjury all devices
> he has used to access or store information or for communication
> since March 4, 2012—including but not limited to, personal
> computers, tablets, phones, and external storage devices, such as
> external hard drives and thumb drives – (the "Devices), indicating
> for each of the Devices whether he has possession, custody or
> control of the Devices and, if not, stating the reasons why that is
> so, i.e., whether they were destroyed, lost, etc. and the present
> location of the Devices.

GX 2172; Tr. at 792:4-793:5.  Paragraph Four further directed Donziger to produce a list of all

messaging and document management accounts he used since March 4, 2012, indicating whether

he presently has the ability to access those accounts and, if not, stating the reasons why that is so.

*Id.*

106.     Paragraph Five of the Protocol directed that Donziger, on March 18, 2019 at 12:00 p.m., at 245 West 104th Street, #7D, New York, New York, "turn over all Devices in his possession custody, or control to the Neutral Forensic Expert" so those devices could be imaged. *Id.*; Tr. at 793:6-15.  Once Krehel collected and imaged the devices, Paragraph Five prohibited Krehel doing anything with those images absent further order from Judge Kaplan.  *Id.*; Tr. at 802:20-803:5.

107.     The Protocol did not permit Chevron to have access to Donziger's electronic devices.  Nor did the Protocol allow Chevron to have access to the full images of those devices. *Id.*; Tr. at 319:15-320:1, 803:19-22.  The Protocol issued by Judge Kaplan also did not accept all of Chevron's recommendations for a forensic protocol. Tr. at 320:6-12.  Judge Kaplan's Protocol gave more duties to the Neutral Forensic Expert and had greater privacy protections than the forensic protocol proposed by Chevron's attorneys.  *Id.*

108.     Donziger did not notice an appeal of the March 5, 2019 Protocol.  Tr. at 656:13-15.  Donziger did not seek a stay from Judge Kaplan or Second Circuit regarding compliance with the Protocol; nor did he seek mandamus relief from the Circuit.  *Id.* at 656:16-19.

109.     Donziger did not provide any list to Krehel of his devices and/or accounts by March 8, 2019 as directed by Paragraph Four of the Protocol.  Tr. at 792:22-793:5.  In a March 11, 2019 email, in response to an inquiry from Chevron's attorneys about whether Donziger provided the list as ordered, Krehel informed Chevron's attorneys and Donziger that he did not receive a list of Donziger's devices or accounts.  GX 132; Tr. at 794:23-795:9. In a subsequent March 11, 2019 email to Krehel and Chevron's attorneys, Donziger stated in pertinent part:

I clearly have stated that I will voluntarily go into civil contempt of

44

> the legally unfounded orders in order to obtain proper appellate review.  Judge Kaplan and Chevron have known this long before starting the pointless process of having you appointed and crafting a review protocol, etc.  So I hope you have not cleared your schedule to work on this matter, because, as Chevron knows, I will not be producing documents until my due process rights are respected.

GX 133 (emphasis omitted); Tr. at 795:18-796:7.

110.     Donziger never surrendered any of his devices to Krehel for imaging, despite acknowledging that he had devices.  Tr. at 803:6-804:6, 805:3-806:10; GX 138.  On March 18, 2019, at approximately 11:50 a.m. Krehel and two members of his team arrived at 245 West 104th Street—Donziger's residence—to collect Donziger's devices for imaging per Paragraph Five of the Protocol. Tr. at 796:8-797:5, 798:1-799:4.  Krehel asked the doorman in the lobby to call Donziger.  *Id.* The doorman called multiple times but no one answered.  *Id.*  Krehel emailed Donziger at 12:15 p.m. from the building lobby to state he was in the building lobby waiting for him and would wait until 12:30 p.m.  GX 134.  Krehel stayed in the lobby and, around 1:00 p.m., Donziger walked into the lobby with a coffee in his hand.  Tr. at 798:4-13.  Krehel spoke with Donziger, who informed Krehel that he would not be surrendering his devices that day.  *Id.* at 798:14-17.  Krehel asked him what devices he had, and Donziger said that he had an iPhone and MacBook Air, and potentially some storage devices.  *Id.* at 800:2-8. Krehel left around 1:00 p.m. or 1:15 p.m. *Id.*  Later that day, Krehel emailed Gibson Dunn and Donziger to report that Donziger did not provide any devices to him and that Donziger told Krehel that he had an iPhone and MacBook Air computer.  GX 134.

111.     On March 20, 2019, Chevron moved to hold Donziger in contempt for (1) disobeying Paragraph Four of the Protocol by failing to provide a list of devices and accounts, and (2) disobeying Paragraph Five of the Protocol by failing to surrender his devices to Krehel

for imaging.  GX 2175, 2176; Tr. at 324:3-23.

112.     On April 8, 2019, Donziger responded to Chevron's contempt motion and did not

dispute that he had disobeyed Paragraphs Four and Five of the Protocol. GX 2184. He stated that

"it is my intention to go into voluntary contempt as a matter of principle rather than submit to the

review process prior to achieving any appellate review."  GX 2184 at 4-5.  Donziger also said "I

honestly do feel that I am being deeply abused in these post-judgment proceedings. I have

*relentlessly sought appellate review and will continue to do so*.  But I acknowledge the authority

of the courts and have never suggested that I would not ultimately comply with the Court's

orders if my objections are rejected on appeal . . . ."  *Id.* at 11-12 (emphasis added).

113.     On May 23, 2019, Judge Kaplan issued an Opinion and Order finding Donziger in

civil contempt of Paragraph Four of the Protocol.  GX 2209 at 73.  Judge Kaplan ordered

Donziger to pay a coercive civil fine to the Clerk of the Court beginning on May 28, 2019

starting at $2,000 and doubling each day thereafter until purged himself of that contempt by

complying with Paragraph Four.  *Id.*  On May 28, 2019 Donziger noticed an appeal of Judge

Kaplan's May 23, 2019 decision, which became Second Circuit docket number 19-1584. GX 9,

2211; Tr. at 646:9-12.

114.     On May 29, 2019, Judge Kaplan issued an order finding Donziger in civil

contempt of Paragraph Five of the Protocol.  GX 2219, GX 2222 (corrected Order dated June 4,

2019).  Judge Kaplan noted that he had inadvertently failed to dispose of Chevron's Paragraph

Five contempt motion in the May 23, 2019 decision.  *Id.*  Kaplan directed that Donziger pay a

coercive civil fine to the Clerk of the Court commencing on June 3, 2019 and each subsequent

day after until he fully purges himself of contempt by complying with Paragraph Five of the

Protocol. *Id.*  The fine would begin at $2,000 and double for each day Donziger failed to purge the contempt by complying with Paragraph Five.  *Id.*  Once the fine reached $100,000, it would become $100,000 for each subsequent day Donziger failed to purge the contempt.  *Id.*  Donziger did not notice an appeal of this May 29, 2019 order.  Tr. at 647:10-648:9.

115.     On May 29, 2019, Donziger emailed Krehel a declaration dated May 29, 2019 stating that he had a MacBook computer he has used since 2012 and an iPhone.  GX 138, 2230-1; Tr at 804:19-806:10.  This was the first time Donziger sent Krehel an email purporting to list his devices or accounts.  Tr. at 806:2-10.  Donziger's affidavit said he used "other phones since 2012 that have been lost or damaged and replaced by new phones and ultimately by my current phone." GX 138 at ¶ 2.  Donziger also listed two email accounts he regularly uses and said "I may have set up other email accounts since 2012 but I have not used them on any sort of regular basis (or even at all) for years and I no longer have login or password information regarding them. One was set up specifically to received documents and correspondence during the RICO trial."  GX 138 at ¶ 4.  On June 5, 2019, Donziger emailed Krehel a revised declaration dated June 3, 2019 providing additional information about his devices and accounts.  GX 140, 2230-1; Tr. at 806:16-807:23.

116.     On June 5, 2019, Judge Kaplan issued an order directing the parties to appear on June 10, 2019 to resolve any disagreement as to whether Donziger purged himself of the May 29, 2019 civil contempt finding for his disobedience of Paragraph Five of the Protocol.  GX 2223. Judge Kaplan further stated that: "If he fully has purged or hereafter purges himself of the contempts . . . the coercive fines will be avoided." *Id.*  Prior to the June 10 hearing, Chevron filed a brief arguing that Donziger had not purged his contempts for disobeying Paragraph Four and Five of the Protocol, and proposed that the Court order Donziger to surrender any passports

until he complies with the Protocol.  GX 2229.  Chevron also suggested having the U.S.

Marshals seize Donziger's devices.  *Id.*  With respect to Donziger's declarations and whether

they complied with Paragraph Four, among other things, Chevron disputed Donziger's claim that

his only computer was a "MacBook that I have used since at least 2012," pointing to Apple

records reflecting: (a) Donziger registered that laptop with his Apple account only on September

8, 2015 and (b) Donziger purchased a different MacBook Air on January 2, 2011 and another on

February 1, 2012.  *Id.* at 2, 5.

117.    At the June 10, 2019 status hearing, Donziger informed Judge Kaplan that he did

not have the resources to pay the coercive fines.  GX 2352 at 14:20-21; Tr. at 338. Donziger did

not dispute that he had not complied with Paragraph Five of the Protocol, arguing that it

"implicates core constitutional rights for me and many people associated with this case."  GX

2352 at 7:25-9:3.  On the issue of his surrendering his passports, Donziger stated:  "I will

voluntarily surrender my passport until I can deal with it at the Second Circuit." GX 2352 at 16;

Tr. at 338:8-20.  Judge Kaplan told Donziger:

> You have the ability to get yourself out of whatever box you're in
> by complying with my orders. And the United States Supreme
> Court says, absent a stay, you have an obligation to do that, and if
> you do not discharge that obligation, you do it at your own risk.
> And that's been clear to you for a very long time.  And you
> disregard order after order.

GX 2352 at 16:24-17:5.  Donziger told Judge Kaplan that he had asked him to find him in

contempt for months so that he could "really get review" with the Circuit and also complained

that, in his view, Chevron was trying to "disable my advocacy" and that "implicates core First

Amendment rights." *id.* at 17:24-18:24, Judge Kapan responded:

> So  you  keep  saying.   I've  heard  that  record  played  many  times

> before.  Now, let's end it.  I'm not going to listen to it anymore.
> You've been fully heard on it.  You have briefed it.  I have issued
> an opinion on it. You appealed from that opinion.  You filed a brief
> in the Second Circuit.  It hasn't been calendared for argument. *You
> never sought a stay of it.*  There it is.  You're welcome to go on to
> the Second Circuit and see what happens.  But you take your
> chances in doing so.

*Id.* at 18:25-19:8 (emphasis added).  Towards the end of the hearing Judge Kaplan told Donziger:

> Look, Mr. Donziger, just so it's entirely clear, these coercive fines
> that I have imposed I have made clear will evaporate if, as, and
> when you are in full compliance.  They will be gone.  I'm not sure
> I had to do that, but I have made that commitment.  But every day
> that goes by – and indeed your statements here this morning
> suggest to me that they're a waste of time and that if these orders
> are to be enforced it's going to take more than I've done up to
> now.
>
> Now, you would be well advised, so far as paragraph 4 is
> concerned, to work out your problems with Chevron and take care
> of at least that part of it, which you don't seem to be as upset about
> as the rest.  And you did manage to finally comply with an order
> that's been outstanding for five years in respect of the assignment.
> We may come to a very hard place on paragraph 5 for you.  But
> that's where we are.  And I'm being totally straight with you.

*Id.* at 20:8-23.

118.    On June 11, 2019, Judge Kaplan issued an order directing Donziger to surrender

his passports to the Clerk of the Court by June 12, 2019 as a further measure to coerce

compliance with the Protocol:

> . . . Donziger, on or before June 12, 2019 at 4 p.m., shall surrender
> to the Clerk of the Court each and every passport issued to him by
> each and every nation to have issued a passport to him, the Clerk to
> retain possession thereof unless and until this Court determines
> that Donziger has complied fully with paragraphs 4 and 5 of the
> Protocol.

GX 2232 at 2; Tr. at 342:5-14.  That same day Judge Kaplan issued an order denying a motion

by Donziger to vacate the May 29, 2019 contempt finding regarding his disobedience of

Paragraph Five of the Protocol.  GX 2233.  Judge Kaplan rejected Donziger's argument that the Court lacked jurisdiction to making the Paragraph Five contempt finding because Donziger had already noticed an appeal of the May 23, 2019 contempt decision.  GX 2233.  In denying the motion to vacate, Judge Kaplan referred to Donziger's ability to seek a stay pending any appeal of the contempt finding:  "This is without prejudice to any application by Donziger for a stay pending appeal made in full compliance with the Federal Rules of Civil and Appellate Procedure and the Local Rules of this Court, including but not limited to Local Civ. R. 7.1."  *Id.* at 2.

119.    On June 12, 2019, Donziger filed an "Emergency Motion To Stay Fines And Sanctions Pending Appeal Or In The Alternative For An Administrative Stay." GX 2234.  In this motion, Donziger asked Judge Kaplan to stay the coercive fines and the June 11, 2019 passport order "pending resolution of my appeal of the Court's May 23, 2019 contempt opinion . . . and potentially resolution of any forthcoming appeal of the Court's one-page 'Paragraph 5' contempt finding (Dkt. 2219). . . or two-page Passport Order (Dkt. 2232), depending on the outcome of the motion to vacate and whether I need to separately notice appeals of those orders." *Id.* at 1. Donziger further requested an "immediate administrative stay of all fines and coercive orders to allow for resolution of the instant motion and if necessary an emergency stay motion to the Second  Circuit." *Id.* at 1.  In this motion, Donziger stated: "I am not able to comply with the Court's deadline of 4 p.m. today in the Passport Order on account of this pending motion for emergency relief and the severe and irreparable harm as articulated in this motion."  *Id.* at 15 n.6. Donziger informed the Court that he was "immediately turning to the task of preparing an emergency stay to the Circuit in the event Your Honor denies this motion."  *Id.*

120.    Donziger also filed a June 25, 2019 declaration in further support of his motion for a stay pending appeal.  GX 2250; Tr. at 345:23-347:4.  In his declaration, Donziger proposed

a compromise with respect to his compliance with Paragraph Five: "I agree to submit my devices to a neutral forensic expert for imaging so long as the expert is directed not to allow any access to the images by anyone until the appeal is decided." GX 2250 at 3-4.

121.    On June 28, 2019, Judge Kaplan issued an order suspending the accumulation of the coercive fines because "it does not appear that the further accumulation of monetary civil contempt sanctions for these violations is likely to have the desired effect." GX 2252; Tr. at 347:11-17.

122.    On July 2, 2019, with respect to Donziger's motion for an emergency stay pending appeal, Judge Kaplan issued an order granting a conditional, partial stay. GX 2254; Tr. at 347:23-25.  Specifically, Judge Kaplan agreed to stay pending appeal the portions of the Protocol that "require or permit disclosure to Chevron of information obtained from Donziger" on the conditions that:  (1) Donziger file his appellate brief from the decision of May 23, 2019 no later than July 31, 2019 and his reply brief no later than 14 days after the filing of Chevron's brief; and (2) Donziger does not oppose any motion for the Second Circuit to expedite that or any related appeal. *Id.* at 3 (ECF p. 4); Tr. at 347:23-348:18.  Judge Kaplan denied Donziger's stay motion "in all other respects" and noted that Donziger "remains obligated to comply fully with paragraphs 4 and 5 of the Protocol and to surrender his passport(s) to the Clerk as previously directed."  *Id.*; Tr. at 348:19-23.

123.    Donziger did not file his appellate brief in support of his appeal from the contempt decision by July 31, 2019.  Tr. at 349:11-14; GX 9.  Donziger did not apply to Judge Kaplan for any extension of the time of file his appellate brief so that he could obtain the benefit of the partial stay.  Tr. at 349:15-18; GX 9.  Moreover, despite claiming in his June 12, 2019

motion for a stay that he was "immediately turning to the task of preparing an emergency stay to the Circuit in the event Your Honor denies this motion," GX 2234 at 15 n.6,  Donziger sought no stay with the Circuit.  GX 9.

124.    On September 9, 2019, Donziger filed his opening brief appealing from Judge Kaplan's May 23, 2019 contempt findings.  GX 9, 317; Tr. at 648:1-16. Donziger's brief did not challenge Judge Kaplan's May 23, 2019 finding of civil contempt for his failure to provide a list of his Devices and accounts in disobedience of Paragraph Four of the Protocol.  GX 317 at 12 (Donziger's statement of the issues); Tr. at 651:2-6.  Nor did Donziger's brief challenge Judge Kaplan's May 29, 2019 civil contempt finding for his failure to surrender his Devices for imaging in disobedience of Paragraph Five of the Protocol. GX 317; Tr. at 651:7-652:10. Indeed, Donziger's brief made no argument that the Protocol was illegitimate or legally unfounded, and Donziger did not challenge Judge Kaplan's October 18, 2018 ruling finding a waiver of any privilege and directing Donziger to produce documents irrespective of privilege. GX 317.

125.    Donziger did not surrender any passport to the Clerk of the Court by June 12, 2019 or any date thereafter.  The Clerk of Court maintains records to reflect the surrender of physical items such as a passport.  Tr at 563:21-25.  David Ng of the S.D.N.Y. Clerk's office reviewed their records and found no record reflecting that the Clerk's office ever received a passport from Mr. Donziger as directed by the June 11, 2019 order.  Tr. at 564:13-20; 566-8-12.

126.    On August 6, 2019, at Donziger's initial appearance on the criminal contempt charges, Donziger asked the Court to "allow me to keep my passport" and proposed that when he wanted to travel, he would inform pretrial services, get permission to travel and then return. Tr.

52

at 831:17-832:3.

### F.    Donziger's Appeals

127.    Between February 28, 2018 (when the Supplemental Judgment was issued) and September 30, 2019 (after Donziger was charged with six counts of criminal contempt), Donziger had three appeals pending with the Second Circuit.  Tr. at 629:20-630:7; 630:12-14.

128.    First, Donziger appealed from the February 28, 2018 Supplemental Judgment award approximately $813,000 in costs to Chevron against Donziger, which is Second Circuit docket number 18-855.  GX 7; Tr. at 632-34.   Second, Donziger appealed from Judge Kaplan's June 25, 2018 order and June 27, 2018 decision denying four motions by Donziger: (1) motion to dismiss Chevron's March 19, 2018 contempt motion; (2) motion for a declaratory judgment; (3) motion for a protective order; and (4) motion for a stay of certain third-party discovery.  GX 2060; Tr. at 630:1-7; 630:12-14, 638:12-640:1; 640:7-16.  This second appeal is Second Circuit docket number 18-2191.  GX 8; Tr. at 639:24-640:1.  Upon an October 5, 2018 motion of Donziger to consolidate those two appeals and extend his time to file his brief, the Second Circuit granted the motions. GX 7, 8; Tr. at 641:16-642:2.  This second appeal was consolidated with the first appeal and, on December 12, 2018, Donziger filed a single brief with the Second Circuit for those two appeals.  Tr. at 641:24-642:2; 642:18-20.   Donziger made no request for expedited briefing, and he did not file a reply brief.  GX 7, 8; Tr. at 642:18-20.

129.    Donziger's third appeal between February 28, 2018 and September 30, 2019 was his appeal from Judge Kaplan's May 23, 2019 civil contempt decision and its accompanying supplemental judgment.  GX 9, GX 2211; Tr. at 645:14-19; 646:10-14.  This appeal was consolidated with the first and second appeals.  GX 7, 8, 9; Tr. at 648:17-649:5.

130.     During the time period February 28, 2018 to September 30, 2019:  Donziger

never sought a stay in the Second Circuit; Donziger never sought mandamus relief in the Second

Circuit; and Donziger never sought expedited briefing in the Second Circuit.  Tr. at 654:11-20.

131.     In earlier litigation with Chevron, when Donziger was represented by counsel,

Donziger had sought stays with the Second Circuit in response to rulings by Judge Kaplan. Tr. at

657:13-19.  For example, in an October 20, 2010 decision denying a motion to quash a Chevron

subpoena to Donziger for records, Judge Kaplan found that Donziger waived or forfeited any

privilege claim for failure to comply with the privilege log requirements of S.D.N.Y. Local Civil

Rule 26.2 and Fed. R. Civ. Pro. 26.  GX 3 (S.D.N.Y. Docket Sheet 10-MC-0002 (28 U.S.C.

§ 1782 subpoena)); GX 400; Tr. at 661:23-663:5.  Donziger and the LAPs appealed that ruling

and, upon a stay application by Donziger and the LAPs, on October 27, 2010 the Second Circuit

granted a temporary stay of that ruling.  GX 4, 5, 300, 301; Tr. at 666:11-16.  After further

briefing, on November 15, 2010, the Second Circuit denied the motion for a stay pending appeal

but granted appellants' motion to expedite the appeal. GX 302; Tr. at 666:25-667:4. On

November 29, 2010, Judge Kaplan issued a further decision with respect to his privilege waiver

ruling, which adhered to the October 20, 2010 waiver ruling and directed Donziger to produce

"forthwith" all documents responsive to the subpoenas irrespective of privilege. GX 401.

Donziger and the LAPs filed with the Circuit an emergency motion to stay the November 29

order pending appeal, arguing: "This urgent motion arises from a startling ruling last evening

compelling immediate production by an attorney of thousands of privileged documents on a two

thousand page privilege log, essentially, entire privileged case file.  This baseless, unfair and

highly prejudicial order should be stayed immediately." *Id.* The Second Circuit denied the

emergency stay motion, and later affirmed Judge Kaplan's denial of the motion to quash and his

privilege waiver findings.  GX 304, 305; Tr. at 671:19-21; 672:7-13.

132.     In another example, Donziger sought a stay and mandamus relief from the Second Circuit in response to a May 31, 2011 ruling by Judge Kaplan that partially granted Donziger's motion to intervene as a defendant in the "Count Nine Litigation" in the Civil Case.  Tr. at 672:22-679:5.  Specifically, Judge Kaplan severed Count Nine from the remainder of the Civil Case, which was a claim for declaratory relief and Donziger was not a named defendant. Tr. at 674:1-16; GX 1000-327.  Donziger moved to intervene in the Count Nine action, and Judge Kaplan granted his motion to a limited extent such that Donziger could lodge objections and participate in depositions. Tr. at 674:12-16; GX 1000-327 at 15-16.  Donziger sought a stay in the District Court pending his appeal of the intervention decision, which Judge Kaplan denied. GX 501, 502; Tr. at 675:11-15; 676:13-18; 676:22-24.  Donziger applied to the Second Circuit for a "stay of all district court proceedings pending resolution of this appeal (or, alternatively, pending resolution of this mandamus petition). GX 6, 307; Tr. at 677:6-10; 678:7-12.  When Chevron moved to dismiss his appeal for lack of appellate jurisdiction, Donziger filed a brief with the Circuit asking that the brief be considered as a mandamus petition.  GX 308; Tr. at 680:14-21.  Donziger argued that he met the conditions for mandamus relief under the caselaw. *Id.*  On July 1, 2011, the Second Circuit granted Chevron's motion to dismiss, denied Donziger's request for mandamus relief, and ruled Donziger's motion to stay was moot.  GX. 309; Tr. at 681:11-682:5.

### G.     The David Zelman Financial Agreement

133.     David Zelman is an executive coach based in Dallas, who has worked in that field for approximately 30 years.  Tr. at 569:17-22.  He offers a program to clients called "The

Transitions Process."  Tr. at 569:25. This program consists of four, four-hour sessions that take place approximately a month apart, which is a dialogue between Zelman and the client.  Tr. at 570:7-11.  The program is a way for Zelman to support his clients in "designing their future, consistent with their intentions."  Tr. at 570:1-2.

134.    Zelman's clients in The Transitions Process include organizations such as American Airlines, Bank One, Texas Instruments, hospital chains and medical practices.  Tr. at 570:15-20.  Zelman's clients are also individuals such as: people "who either have suffered some sort of setback and they want to recover themselves;" "people who have lost their way, their mojo, their excitement, and they are trying to recover that;" "people who are trying to completely transition to a new profession, a new direction in life;" "people who are at the top of their game, performers, executives who want to go to the next level." Tr. at 570:21-571:2. During 2016-2017, Zelman charged clients approximately $15,000 for providing The Transitions Process program, although that amount could vary.  Tr. at 571:8-15.  On occasion, Zelman would accept a contingent payment agreement in exchange for providing his program to clients.  Tr. at 571:16-20.

135.    Zelman met Steven Donziger in late 2016 and discussed Donziger's participation in The Transitions Process Program.  Tr. at 571:5-8.  In a December 21, 2016 email to Zelman, Donziger proposed terms for compensating Mr. Zelman for The Transitions Process that included pledging a portion of his personal contingency fee from the Ecuadorian judgment.  GX 105.  The email's subject line read "draft agreement for professional services" and the body of the email stated:

David:

Let me know if the language below is acceptable.  If so, I will send as a formal letter on letterhead that you can countersign.  If you have any questions, let me know and we can talk it though [sic].  Under this agreement, if there is a full recovery, and I collect my fees in full, you will be entitled to 700,000.  You're a pretty good negotiator.  Any chance I can fold another person (thinking my wife) into the same deal?

Thanks much, Steven


David,

I write to confirm our agreement regarding consulting services you are providing to me to develop my professional capacities with regard to the Ecuador litigation matter against Chevron, and other endeavors.

In exchange for you providing me with $14,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected.  The amount pledged is based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron.  Your interest thus will be valued equally with this round based on an investment of $14,000.  The actual amount that will be paid to you will be based on the total amount collected.  To be more specific, your amount under this agreement will be 14/250 of an eighth of a point of whatever is recovered of the total claim.

Note that I am pledging this amount out of my personal fees from this litigation.  Should my personal fees not be recovered from the Ecuador case, you will not be entitled to any recovery of the $14,000.  Should a proportion of my fees be recovered, but not the full amount, your recovery will be decrease [sic] on a pro rata basis equal to the overall decrease affecting my fees.

If this is acceptable to you, please send me back an email so confirming.

Thanks so much.

Steven

GX 105.

136.    On December 23, 2016, Donziger sent another email to Zelman with the subject line "Agreement," and the body of the email read precisely the same as the draft compensation proposal.  GX 106; Tr. at 576:15-17.  Zelman replied: "Steven, Thank you for this agreement. I confirm that it is acceptable to me. David Zelman." *Id.*  In addition to Donziger pledging a portion of his contingency interest in the Ecuadorian judgment to Zelman as compensation for The Transitions Process program, Donziger also paid Zelman $2,000 cash towards the $14,000 for the program.  Tr. at 576:6-8.  Donziger participated in The Transitions Process in 2016 and 2017, and completed the program by doing the first three modules in four-hour sessions and then completed the fourth module over a number of smaller sessions.  Tr. at 577:5-9.

137.    On March 26, 2018, Zelman sent Donziger an email stating:

> Steve,
>
> You and I agree that consistent with the terms below, I have delivered an additional $2000 worth of consulting services which entitles me to a 2/250 of an eighth of a point of whatever is collected of the total claim.
>
> It is noted that you are pledging this amount out of your personal fees from the litigation.  If you do not recover your personal fees, I will not be entitled to any recovery.
>
> Please respond back that this is correct and that you agree.
>
> Thanks,
>
> David Zelman

GX 110.  The "terms below," referred to an email Zelman had sent to himself on February 27, 2017 with the subject line "Agreement (rev.)" that stated:

> David:
>
> I write to confirm our agreement regarding consulting services you

are providing to me to develop my professional capacities with regard to the Ecuador litigation matter against Chevron, and other endeavors.

In exchange for you providing me with $11,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected.  The amount pledged is based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron.  Your interest thus will be valued equally with this round based on an investment of $11,000.  The actual amount that will be paid to you will be based on the total amount collected.  To be more specific, your amount under this agreement will be 11/250 of an eighth of a point of whatever is recovered of the total claim.

Note that I am pledging this amount out of my personal fees from this litigation.  Should my personal fees not be recovered from the Ecuador case, you will not be entitled to any recovery of the $11,000.  Should a proportion of my fees be recovered, but not the full amount, your recovery will be decreased on a pro rata basis equal to the overall decrease affecting my fees.

If this is acceptable to you, please send me back an email so confirming.

Thanks so much.

Steven Donziger

*Id.*

138.    Mr. Zelman sent the March 26, 2018 email to Donziger because he had "several meetings" with Donziger that extended beyond the four hours that the fourth module of The Transitions Process had been "contracted for," and therefore he wanted additional compensation. Tr. at 581:12-15.  Donziger replied that same day, stating: "Let me confirm the calculation. Agree in concept.  Thanks!" GX 110.

139.    On March 27, 2018, Donziger again replied to Mr. Zelman's March 26 email, stating:

Just to be clear, I am barred by court order in the U.S. from collecting fees on the matter.

It is possible that the situation in that respect could change in a settlement context, but you need to be aware of the risk to you which is high.

We can discuss when we see each other – I hope soon.  Are u available Friday of this week?

Thanks much

GX 111.  Prior to Donziger sending that email, he had not told Zelman that a court order prevented him from collecting his fees.  Tr. at 587:16-23, 617:20-618:5.

140.    Zelman understood that there was a $9.5 billion judgment as part of the Ecuador litigation against Chevron, that Donziger was attempting to collect on that judgment, and that under their financial agreement if Donziger collected his fees from that judgment then Mr. Zelman would receive compensation.  Tr. 573:20-575:24, 589:3-19, 599:4-7, 615:8-11, 617:5-16; 617:18-618:20; 619:1-12.

141.    Zelman and Donziger discussed Donziger's wife participating in The Transitions Process program, and that Zelman's compensation would similarly involve Donziger pledging a portion of his fee interest in the Ecuadorian judgment.  Tr. at 574:17-575:24, 578:5-579:14; GX 105, GX 109.   Donziger's wife completed the program, but Mr. Zelman's compensation did not ultimately involve receiving a portion of Donziger's interest in the judgment.  Tr. at 579:15-25.

142.    Donziger knew that the RICO Judgment prohibited him from monetizing his own interest in the Ecuadorian Judgment, and he made numerous statements demonstrating that understanding:

a.    "Chevron has not presented *any* specific claim that the interest offered for investment is specific to the undersigned or Mssrs. Camacho/Piaguaje . . . Absent

such specificity, the notion that the undersigned's fund-raising efforts are in violation of the Court's RICO Judgment are baseless." GX 1986 at 8-9 (Donziger's April 24, 2018 Opposition to motion for contempt and discovery).

b. "I am not selling my own shares, because that obviously is prohibited by your Honor's RICO judgment." GX 2010 at 18:24-19:1 (May 8, 2018 Hearing).

c. "So long as the litigation finance agreements do not involve Mr. Donziger pledging, assigning, committing, or otherwise collateralizing his specific contingency interest. . . the [RICO] Judgment does not have any impact." GX 2018 (Donziger's May 31, 2018 motion to dismiss).

d. "It remains that Chevron has not presented even a scintilla of evidence that I have sold any of my interests in the Ecuador judgment—the *only operative factual question* at issue that could provide a basis for a contempt finding on the judgment compliance issue." GX 2051 at 2 (Donziger July 9, 2018 letter).

143.    At a May 8, 2018 hearing on Chevron's motion for discovery regarding

Donziger's compliance with Paragraph Five of the RICO Judgment, Donziger repeatedly

represented to Judge Kaplan that he had not monetized his interest in the Ecuadorian judgment:

a.    "I'm selling, as an intermediary, the points or the aspects of the judgment that are held by my clients.  I am not selling my own shares, because that obviously is prohibited by your Honor's RICO judgment." GX 2010 at 18:23-19:1.

b.    "What evidence have they presented to show I have sold a single piece of my interest?  Zero.  And it hasn't happened. I'll make that representation right now." *Id.* at 21:5-7.

c.    "I'm not selling my shares; I'm selling my clients' shares." *Id.* at 26:3-4.

d.    "Well, I'm a lawyer and I'm representing to you as an officer of the court right now I have not sold my own shares." *Id.* at 31:5-7.

e.    "I'm not selling my shares, I'm selling their shares." *Id.* at 31:13-14.

f.    "If there is a legitimate part, legitimate information that they are seeking in discovery, this has to be severely, severely narrowed.  And to me, if there's anything—I think this whole thing should be shut down.  That's what I'm

> asking you for.  But if there's anything that might be
> arguably legit about what they're seeking, it's something
> related to the narrow issue of am I selling my own shares.
> And if you're not going to accept my representation, I can
> prove to you that I have not sold my own shares, and that's
> what it should be limited to."  *Id.* at 32:14-23.

144.    On February 27, 2019, Mr. Zelman's deposition was taken by Chevron's

attorneys in connection with the post-judgment litigation in the Civil Case.  Tr. at 615:23-616:5,

620:20-621:18.  Prior to his deposition, Mr. Zelman received a document subpoena from

Chevron's attorneys and produced documents, including the emails between Mr. Zelman and Mr.

Donziger admitted as Government Exhibits 105, 106, 109, 110, and 111.  Tr. at 355:2-14, 583:1-

22, 621:19-21.  Mr. Donziger did not produce those emails in the post-judgment discovery,

although those emails were responsive to Money Judgment Discovery Request No. 30 that

Donziger had been directed to comply with by June 15, 2018.  Tr. at 355:2-14; GX 1989-1A; GX

2009.

145.    On March 20, 2019, after receiving documents from Zelman and taking his

deposition, Chevron moved to hold Donziger in contempt for violating Paragraph 5 of the RICO

Judgment by monetizing his personal interest in the Ecuadorian judgment by pledging a portion

of his personal interest to David Zelman in exchange for receiving personal services in the form

of The Transitions Process program.  Tr. at 325:18-326:14; GX 2179.

146.    In his April 8, 2019 opposition to Chevron's motion for contempt regarding his

transaction with Zelman, Donziger stated:

> I understand how the agreement with Mr. Zelman can be seen as a
> monetization of my interest in the Ecuador Judgment arguable in
> conflict with the Court's interpretation of the terms of the RICO
> Judgment, although to be clear I do not concede that it is in
> conflict.  I did not fully appreciate this at the time these services

were provided, for reasons I do not specifically recall—although I assume it was because I thought the restrictions of the RICO Injunction were linked, per the April 2014 Opinion, to the context of a collection or recovery. Additionally, my recollection and understanding is that neither Mr. Zelman nor I ever understood the agreement to be legally binding, but rather an expression of the sentiment that his generosity in providing services to me pro bono at a critical transition point in my professional life would be matched with generosity by me in the event I received a significant monetary recovery.

GX 2184 at 7-8.

147.    While Chevron's motion for contempt regarding Donziger's financial arrangement with Zelman was pending, on April 21, 2019, Zelman sent an email to Donziger with the subject line "Our Deal", which terminated their financial agreement related to the Ecuadorian judgment and stated:

> Steven,
>
> Due to all the complications regarding our financial arrangement, I am cancelling our deal. Therefore, we have NO agreement going forward from this date.
>
> David Zelman

GX 135; Tr. at 590:1-591:23. Zelman was referring to his arrangement with Donziger to be compensated for his services with a portion of Mr. Donziger's interest in the Ecuadorian judgment. *Id.* He sent the email to Donziger after having a conversation with Donziger in which he told Mr. Zelman that their financial arrangement "was problematic." Tr. at 590:20-24. Mr. Donziger told Zelman that there was a "problem that might result in something like this," i.e., litigation or a legal issue. Tr. at 591:3-4. Up to the time that Mr. Zelman sent his April 21, 2019 email to Mr. Donziger cancelling the financial arrangement, Mr. Zelman understood that his financial agreement to receive a portion of Mr. Donziger's fees if collected was still intact. Tr. at 591:17-23.

148.     Mr. Zelman was aware that Donziger's chances of recovering his fees from a collection on the Ecuadorian judgment were "very, very low," but he still hoped there would be a recovery.  Tr. at 615:8-19, 617:5-19, 620.  Zelman never offered to provide his services to Donziger for free.  Tr. at 620:2-18.

## II.     COUNTS ONE THROUGH SIX WERE PROVEN BEYOND A REASONABLE DOUBT

Counts One through Six of the July 31, 2019 Order to Show Cause each charge Donziger with criminal contempt in violation of 18 U.S.C. § 401(3).  Dkt. 1.  To prove criminal contempt, the following three elements must be proven beyond a reasonable doubt:  (1) the court entered an order; (2) the defendant disobeyed or disregarded the order; and (3) the defendant acted willfully and knowingly in disobeying the order.  *United States v. Vezina*, 165 F.3d 176, 178 (2d Cir. 1999); Sand et al., 1 Modern Federal Jury Instructions, No. 20-12.  Criminal contempt "requires a specific intent to consciously disregard an order of the court."  *United States v. Cutler*, 58 F.2d 825, 837 (2d Cir. 1995) (citation omitted); Sand et al., 1 Modern Federal Jury Instructions, No. 20-15 ("In order to be guilty of criminal contempt, therefore, it is essential that the defendant acted knowingly and with the specific intent to disobey or disregard the order of the court.").

Court orders must be precisely and promptly obeyed.  *Maness v. Meyers*, 419 U.S. 449, 458 (1975).  An order or judgment of a court that is not stayed or modified must be obeyed even if set aside on appeal.  *Id.* ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.  Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.").

"The appropriate method for challenging the validity of a court order is to petition to

have the order vacated or amended." *United States v. Terry*, 17 F.3d 575, 579 (2d Cir. 1994).

"[A] party may not challenge a district court's order by violating it.  Instead, he must move to

vacate or modify the order, or seek relief in [the Second Circuit]. If he fails to do either, ignores

the order, and is held in contempt, he may not challenge the order unless it was transparently

invalid or exceeded the district court's jurisdiction." *Cutler*, 58 F. 3d at 832 (citations omitted).

## A.    Count One:  Donziger's Disobedience of Paragraph Four of the Protocol

149.    Count One charges Donziger with willfully failing to comply with Paragraph Four

of the Protocol during the period March 8, 2019 up to and including May 28, 2019, by failing to

provide via email a sworn list to the Neutral Forensic Expert of all of his electronic devices and

accounts he has used since March 4, 2012.  Dkt. 1.  The evidence demonstrates that Donziger,

knowing full well his obligations under Paragraph Four of the Protocol, deliberately chose not to

provide the required list to the Ondrej Krehel by March 8, 2019, and did not dispute his

disobedience as charged.  The first time Donziger emailed any list to Ondrej Krehel purporting to

list his electronic devices and accounts was on May 29, 2019—after Judge Kaplan found

Donziger in civil contempt and coercive fines commenced on May 28, 2019. GX 138, 2230-1,

2209 at 73; Tr. at 804:19—806:10.

150.    The March 5, 2019 Protocol, at Paragraph Four, states in relevant part that:

> within three (3) business days of entry of this Protocol, defendant
> Steven Donziger ("Donziger") shall provide to both the Neutral
> and Chevron's Forensic Experts via email a representation listing
> under penalty of perjury all devices he has used to access or store
> information or for communication since March 4, 2012…

GX 2172.  Paragraph Four further required Donziger to provide the Neutral Forensic Expert a

sworn listing of all of the messaging and document management accounts he used since March 4,

2012.  *Id.*  Krehel testified that Donziger provided no such listing by March 8, 2019, and the first

sworn list he received from Donziger was on May 29, 2019. Tr. at 792:22-793:5; 806:2-10.

151.    Donziger admittedly disobeyed Paragraph Four of the Protocol. When Krehel informed Chevron's attorneys and Donziger, via a March 11, 2019 email, that he did not receive any listing of devices or accounts from Donziger, Donziger did not dispute this assertion. GX 132.  Indeed, in a March 11, 2019 email responding to Krehel, Donziger stated he had no intention of complying with the Protocol: "I clearly have stated that I will voluntarily go into civil contempt of the legally unfounded orders in order to obtain proper appellate review." GX 133.  Donziger further told Krehel that appointing him and issuing the Protocol was a "pointless process" and that "I hope you have not cleared your schedule to work on this matter, because, as Chevron knows, I will not be producing documents until my due process rights are respected." GX 133.

152.    When Chevron moved on March 20, 2019 to hold Donziger in civil contempt for disobeying Paragraph Four of the Protocol (GX 2175, 2176), Donziger's April 8, 2019 response did not dispute that he did not comply with Paragraph Four. GX 2184.  He stated: "it is my intention to go into voluntary contempt as a matter of principle rather than submit to the review process prior to achieving any appellate review."  GX 2184 at 4-5.  Donziger understood what the Protocol directed and broadcast his intent to disobey the Protocol.

153.    Although Donziger claimed in his April 8, 2019 contempt response that he had "relentlessly sought appellate review and will continue to do so," that was not true. GX 2184 at 11-12.  Donziger sought no stay from the Circuit of the post-judgment discovery pending his appeals, nor did he seek any mandamus relief.  Tr. at 654:11-20.  Donziger never challenged on appeal the October 18, 2018 order finding that he waived any privilege claims for failure to produce a privilege log and comply with Fed. R. Civ. P. 26 and Local Civ. Rule 26.2; nor did he

challenge on appeal the March 5, 2019 Protocol.  Tr. at 654:21-656:20, GX 7, 8, 9, 317.

Donziger knew full well that there were appellate options available to him—such as applications

for a stay, mandamus, and/or expedited appeal—based on his years of litigation with Chevron

and his previous filings with the Second Circuit seeking precisely that kind of relief from orders

with which he disagreed and did not want to comply. GX 3, 4, 5, 300, 301, 302, 304, 305, 400,

401, 1000-327, 501, 502;  Tr. at 661:2-682:9.   Donziger strategically and deliberately chose not

to seek appellate relief that was available to him, and instead chose to disobey court orders.

### B.      Count Two: Donziger's Disobedience of Paragraph Five of the Protocol

154.    Count Two charges Donziger with willfully failing to comply with Paragraph

Five of the Protocol, by failing to surrender to the Neutral Forensic Expert his electronic devices

for imaging from March 18, 2019 to at least on or about May 28, 2019.   The evidence

establishes that Donziger, knowing full well his obligations under Paragraph Five of the

Protocol, never surrendered his devices to Ondrej Krehel for imaging and publicly refused to do

so.

155.    Paragraph Five of the Protocol provided in relevant part:

> The Neutral Forensic Expert shall take possession of Donziger's
> Devices and have access to his Media for the purposes of making a
> mirror image of those Devices and Media.  The Devices shall be
> surrendered to the Neutral Forensic Expert at Donziger's address at
> 245 W 104 St #7D, New York, NY 10025…[t]he devices shall be
> surrendered to the Neutral Forensic Expert at 12:00 pm at [that
> address] on March 18, 2019.  At no time shall Chevron's Forensic
> Expert have access to the original Devices or to live Media
> accounts absent further Court order . . . On the date and time
> specified per the above, Donziger shall turn over all Devices in his
> possession, custody, or control to the Neutral Forensic Expert.

GX 2172.

156.    Donziger never surrendered any devices to Krehel for imaging, despite

acknowledging that he had devices.  Tr. at 803:6-804:6, 805:19-806:10; GX 138.  On March 18, 2019, when Krehel arrived at Donziger's address to collect the devices for imaging, Donziger was not there at 12:00 p.m. Tr. at 796:8-799:4.  Krehel stayed in the building lobby and Donziger walked in around 1:00 p.m.  Tr. at 798:1-19.  Donziger told Krehel that he would not be surrendering his devices for imaging.  *Id.*  Donziger told Krehel that he did have a MacBook Air and an iPhone.  *Id.* at 800:2-8.

157.    As noted *supra* at ¶ 151, in a March 11, 2019 email, Donziger made clear to Krehel that he would not comply with the Protocol and would go into civil contempt to obtain appellate review. GX 133.

158.    For months leading up to the entry of the Protocol, Donziger openly refused to comply with orders directing him to produce documents and continued to withhold documents on First Amendment grounds that had previously been rejected in rulings by Judge Kaplan.  GX 201 at 48:17-49:18 (Donziger's June 25, 2018 deposition in which he admitted to withholding hundreds of pages of documents on First Amendment and privilege grounds, and still had not produced a privilege log), GX 2067 at 3 (Donziger's motion for a stay of Judge Kaplan's July 23, 2018 discovery order and stating that he would "go into contempt" to avoid producing certain information to Chevron).  After Judge Kaplan denied his motion for a stay, and then granted Chevron's motion to compel his compliance and found Donziger waived privilege claims, on October 25, 2018 Donziger told Judge Kaplan that he would not comply with the order:  "I will be unable to comply with the order dated October 18, 2018 directing me to produce a potentially massive quantity of confidential and privileged documents and communications to Chevron." GX 2118.  Donziger again told Judge Kaplan on November 8, 2018 that he would not comply with the Court's order to produce documents:

> . . . I am not ethically able to comply with the Court's order to produce mountains of confidential and privileged material to Chevron under a wholly improper purported privilege waiver ruling and before the Court has even ruled on the core issue in Chevron's original contempt motion.  If the Court is unwilling to rule on the legal basis of Chevron's motion [for contempt relating to Elliott Management] and continues to refuse to allow me to assert any privilege whatsoever, I intend to openly and ethically refuse to comply with any production order and to take an immediate appeal of any resulting contempt finding the Court issues against me.

GX 2131 at 2.

159.     In broadcasting that he would not comply with Judge Kaplan's orders, Donziger also misrepresented the bases for the post-judgment discovery.  Specifically, Donziger claimed that the post-judgment discovery was based primarily on Chevron's March 19, 2018 motion for contempt related to Elliott Management and his sale of non-enjoined interests in the Ecuadorian judgment, and that the discovery "has zero basis to proceed if there is no colorable contempt case against me." GX 2118 at 2-3; *see* GX 2149 at 10:16-12:18 (Donziger arguing "there's no legitimate basis for discovery" because "there no legitimate basis for which to find me in contempt" for selling non-enjoined interests in the Ecuadorian judgment).  What Donziger conveniently ignored was that Judge Kaplan also authorized discovery on the broader question of whether Donziger had monetized his *own* interest in the judgment in violation of Paragraph Five of the RICO judgment, and also authorized discovery for purposes of identifying his assets and sources of income to satisfy the money judgment against him.  GX 2009, 2056, 2088.

160.     As discussed *supra* at ¶¶ 130, 153, Donziger did not seek appellate relief from compliance with the May 17, 2018 discovery order, July 23, 2018 discovery order, October 18, 2018 discovery and waiver order, or the March 5, 2019 Protocol—he made no application to the Circuit for a stay of or mandamus relief from those orders that were in full force and effect.  Tr.

at 654:11-20.  During a January 8, 2019 conference to discuss the forensic protocol to image and examine Donziger's devices, Judge Kaplan specifically told Donziger that he did not have stay of discovery despite his pending appeal: "I know you have an appeal pending the Second Circuit. I know their brief is due sometime in March. That's the way it goes. You don't have a stay."  GX 2149 at 13:19-14:1.

161.    After Chevron moved to hold Donziger in contempt on March 20, 2019 for his disobedience of Paragraph Five of the Protocol, Donziger's response did not dispute that he had not surrendered his devices for imaging. GX 2184.  He said: "it is my intention to go into voluntary contempt as a matter of principle rather than submit to the review process prior to achieving any appellate review." *Id.* at 4-5.

162.    Even after Judge Kaplan found Donziger in civil contempt on May 29, 2019 for failing to surrender his devices as directed by the Protocol and imposed coercive fines to induce compliance, Donziger still refused to comply.  During a June 10, 2019 status hearing, Donziger acknowledged his noncompliance and stated that "it implicates core constitutional rights for me and many people associated with this case" and if he complied "Chevron will get access to all sorts of privileged information."  GX 2352 at 8:2-3, 6-7.  Judge Kaplan warned Donziger that with respect to his compliance with Paragraph Five of the Protocol, "We may come to a very hard place on paragraph 5 for you.  But that's where we are."  *Id.* at 20:6-23.

163.    Notably, despite Donziger's claims that he planned to appeal the order directing him to surrender his devices for imaging and the civil contempt finding for his deliberate disobedience of that order, he did not challenge the order or that contempt finding in his appeal. GX 317; Tr. at 651:2-652:20.

164.    The evidence that Donziger knew of the order directing him to surrender his devices, and that he deliberately disobeyed that order, is beyond dispute.

### C.    Count Three: Donziger's Disobedience of the Passport Surrender Order

165.    Count Three charges Donziger with willfully disobeying the June 11, 2019 order directing him to surrender all of his passports to the Clerk of the Court by June 12, 2019 at 4 p.m.   The evidence establishes that Donziger did not do so then, nor at any time thereafter, and that Donziger made clear he would not comply with that order.   Indeed, Donziger acknowledged that he still had his passport at the time of his initial appearance in this criminal contempt case on August 6, 2019. Tr. at 831:9-832:4.

166.    The June 11, 2019 order directed Donziger, "on or before June 12, 2019 at 4 p.m." to "surrender to the Clerk of the Court each and every passport issued to him by each and every nation to have issued a passport to him, the Clerk to retain possession thereof unless and until this Court determined that Donziger has complied fully with paragraphs 4 and 5 of the Protocol"  GX 2232 at 2.

167.    Donziger knew on June 10, 2019 that Chevron was seeking an order directing that he surrender his passports as a further measure to coerce his compliance with Paragraph Five of the Protocol given that the coercive fines had not induced compliance.  GX 2229.  At the June 10, 2019 hearing, Donziger told Judge Kaplan: "I will voluntarily surrender my passport until I can deal with it at the Second Circuit." GX 2352 at 16:8-9; Tr. at 338:8-25.  However, the very next day, when Judge Kaplan issued the June 11, 2019 order directing Donziger to surrender his passports to the Clerk of the Court by June 12—Donziger decided not to comply.

168.    On June 12, instead of complying with the passport order, Donziger moved for an "emergency stay" of the coercive fines and passport order pending his appeal. GX 2234.

Donziger told Judge Kaplan: "I am not able to comply with the Court's deadline of 4 p.m. today in the Passport Order on account of this pending motion for emergency relief and the severe and irreparable harm as articulated in this motion." *Id.* at 15 n.6.   Donziger also told Judge Kaplan that he was "immediately turning to the task of preparing an emergency stay to the Circuit in the event Your Honor denies this motion." *Id.*

169.    Judge Kaplan denied Donziger's request for a stay and stated that he remains "obligated" to surrender his passports to the Clerk as previously directed.  GX 2254 at 4. Contrary to what Donziger stated, he sought no stay with the Circuit after Judge Kaplan denied his motion. GX 9; Tr. at 657:6-7.  Nor did Donziger notice an appeal of that Passport Order or seek mandamus relief. Tr. at 657:3-5, 657:8-9.

170.    Donziger never surrendered his passports to the Clerk of the Court as directed. The Clerk of the Court maintains records of physical items directed to be surrendered to the Clerk's Office. Tr. at 563:6-564:6.  Mr. Ng reviewed those records and did not find a record reflecting the Clerk's office ever received a passport from Mr. Donziger as directed.  Tr. at 563:6-566:24. That is no surprise because Donziger told Judge Kaplan he would not comply with the order, and Donziger asked to keep his passport when he appeared in this criminal case.

D.    **Counts Four and Five: Donziger Failed and Refused to Transfer and Assign to Chevron his Contingent Fee interests Under the 2011 Retainer Agreement and the 2017 ADF Agreement**

171.    Count Four charges Donziger with violating Paragraph One of the RICO Judgment, at all times from March 4, 2014 to and including September 3, 2018, by knowingly and willfully failing and refusing to "transfer or assign to Chevron property that he then had, directly or indirectly, traceable to the Ecuador Judgment, to wit, contractual rights to a contingent fee under the [2011] Retainer Agreement as that term is defined in the RICO

judgment, and knowingly and wilfully caused Donziger & Associates to fail and refuse to transfer said property."  Dkt. 1.

172.   Count Five charges Donziger with violating Paragraph One of the RICO Judgment, at all times from on or about November 1, 2017 to on or about May 27, 2019, by knowingly and wilfully failing and refusing to transfer or assign to Chevron the following property right granted to Donziger personally in the November 1, 2017 ADF Agreement:  "an INTEREST in his own right equal to Mr. DONZIGER's existing contractual INTEREST.  Such INTEREST, in any case, shall be understood to entitle Mr. DONZIGER to 6.3% of any FUNDS RECOVERED" in connection with the Ecuadorian judgment. Dkt. 1.

173.   The evidence at trial establishes unequivocally that Donziger understood the plain terms of Paragraph One of the RICO Judgment, but knowingly chose not to transfer and assign his firm's contingent fee interest under the 2011 Retainer Agreement from March 4, 2014 to and including September 3, 2018.  Moreover, even after the RICO Judgment was affirmed, Donziger secretly entered into a November 1, 2017 agreement with the ADF that granted Donziger personally an "interest" equal to 6.3% of any funds recovered as part of the Ecuador judgment. Donziger chose not to assign that interest to Chevron.

174.   Donziger transferred to Chevron, pursuant to Paragraph One: (1) his property right to his law firm's contingent right interest under the 2011 Retainer Agreement on September 4, 2018, only after motion practice; and (2) the property right granted to him personally under the 2017 ADF Agreement on May 28, 2019, only after civil contempt findings and sanctions.  GX 136, 2085-1, 2216-1.

175.   Paragraph One of the RICO Judgment provides, in relevant part:

> "the Court hereby imposes a constructive trust for the benefit of
> Chevron on all property, whether personal or real, tangible or
> intangible, vested or contingent, that Donziger has received, or
> hereafter may receive, directly or indirectly, or to which Donziger
> now has, or hereafter obtains, any right, title or interest, directly or
> indirectly, that is traceable to the Judgment or the enforcement of
> the Judgment anywhere in the world including, without limitation,
> *all rights to any contingent fee under the Retainer Agreement* and
> all stock in Amazonia. *Donziger shall transfer and forthwith
> assign to Chevron all such property that he now has or hereafter
> may obtain.*"

GX 1875 ¶ 1.  Paragraph One made clear that the right to a 6.3 % contingent fee in the

Ecuadorian judgment granted to Donziger's law firm, Donziger & Associates, PLLC, by

the 2011 Retainer Agreement with the ADF, the LAPs, and the "Assembly" or UDAPT,

was a "property" subject to the constructive trust and "Donziger shall transfer and

forthwith assign to Chevron all such property that he now has or thereafter may obtain."

176.     Judge Kaplan explained in his RICO decision that Paragraph One served to bar

Donziger from profiting from the Ecuadorian judgment that he had obtained by fraud, and that

Donziger's right to collect a contingent fee was "property subject to execution and attachment

and certainly to the imposition of a constructive trust."  GX 1874 at 489; *id.* at 487-89 ("The

imposition of a constructive trust on Donziger's right to a contingent fee, among other property

traceable to the Judgment…fits this mold to a tee…the Judgment is the indispensable predicate

of his right to collect a contingent fee with respect to the Lago Agrio case.  That Judgment is the

direct result of fraud by Donziger.").

177.     Donziger acted willfully and knowingly when he did not transfer "forthwith" and

assign his property rights to any contingent fee under the 2011 Retainer Agreement or the 2017

ADF Agreement (as well as his stock in Amazonia), and instead played a shell game regarding

his property rights, refusing to timely, completely, and properly transfer his interests in the Ecuadorian judgment in whichever form they existed.

178.     The evidence established that Donziger had no intention of complying with the provisions of Paragraph One of the RICO Judgment--which required him to transfer his property right to the Amazonia shares and his property right to the 6.3% contingent fee--because he did not want to relinquish his valuable interest in the fraudulently obtained Ecuadorian judgment. The Amazonia shares and his right to the contingent fee were the means through which Donziger expected to be paid up to $560 million from that judgment.  Tr. at 95-96.  Donziger's disobedience began soon after the RICO Judgment issued when: (a) Donziger did not assign to Chevron "forthwith" his law firm's property right to the contingent fee granted by the 2011 Retainer Agreement; and (b) he did not execute a stock power for his Amazonia shares to the Clerk of the Court—rather than Chevron—pending his appeal, as directed by Judge Kaplan's April 25, 2014 order granting a partial stay.

179.     When Chevron demanded that Donziger comply with the April 25, 2014 order directing execution of a stock power in favor of the Clerk of the Court, Donziger openly refused to transfer his interest because he claimed that the "simple transfer…would in practice mean the complete divestiture…of more than two decades of labor."  GX 102; Tr. at 690:23-693:7.  Nor did Donziger, once he had exhausted his appeals, execute a stock power in favor of Chevron in compliance with the RICO Judgment, after the Second Circuit affirmed Judge Kaplan's RICO Judgment on August 8, 2016, and after the Supreme Court denied Donziger's petition for certiorari on June 19, 2017.  GX 1914, 1922, 1923, 1966; Tr. at 109:23-110:3, 119:8-16..

180.     Instead, only after Chevron moved to hold Donziger in contempt on March 19,

2018 for his ongoing failure and refusal to transfer his shares of Amazonia to Chevron, did

Donziger execute that stock power, albeit with an addendum of understandings with the intent of

making – the transfer "null and void." GX 101, 102, 2010, 2003-3. Donziger's need to include

the addendum was curious, given that Donziger had previously contended that the Amazonia

shares were a "fake issue" because Chevron had forced Amazonia into liquidation and Chevron

essentially owned the shares, and he would be "happy" to sign over the shares. GX 2010 at 27-

30.

181.     With respect to Donziger's right to a 6.3% contingent fee granted by the 2011

Retainer Agreement, Donziger never disputed that from 2014 to 2018 he did not comply with

Paragraph One's direction that he "transfer and forthwith assign to Chevron" that right. Indeed,

even after Judge Kaplan put Donziger on notice on May 16, 2018 that the Court would consider

a motion to hold him in contempt for failure to transfer his right to the contingent fee under the

2011 Retainer Agreement as ordered by Paragraph One, Donziger still did not execute a transfer

to Chevron. GX 2006; Tr. at 150:25-151:2. In September 2018, only following motion practice

(GX 2046, 2047, 2075), did Donziger finally execute a notarized assigned on that property right

granted by the 2011 Retainer Agreement. GX 2085-1; Tr. at 180-181.

182.     Not only did Donziger refuse for years to surrender his property right to the 6.3%

contingent fee granted to his law firm by the 2011 Retainer Agreement, but the existence of new

agreement that Donziger testified "superseded" the 2011 Retainer Agreement came to light in

response to questions at his June 25, 2018 deposition. GX 201; Tr. at 200:24-205:13. Soon

thereafter, Donziger produced the agreement—the 2017 ADF Agreement –to Chevron. Tr. at

205-206; GX 120. The 2017 ADF Agreement was between Donziger in his personal capacity

(not his PLLC) and with the ADF (not the LAPs or UDAPT), and it granted Donziger personally a property right stating that the FDA "hereby grants Mr. DONZIGER an INTEREST in his own right equal to Mr. DONZIGER's existing contractual INTEREST. Such INTEREST, in any case, shall be understood to entitle Mr. DONZIGER to 6.3% of any FUNDS recovered" in connection with the Ecuadorian judgment. GX 120.  Notably, Donziger did not produce this document to Chevron by June 15, 2018--as directed by Judge Kaplan's May 17, 2018 discovery order— despite the fact that the 2017 ADF Agreement was responsive to Money Judgment Discovery Request No. 26. GX 1989-1A, 2009, 118.

183.    Even after Donziger's 2017 Retainer Agreement came to light and he produced the agreement to Chevron, he still did not assign the property right to a contingent fee granted to him by the ADF in that agreement over to Chevron, as required by Paragraph One.  On October 1, 2018, Chevron had to move to hold Donziger in contempt disobeying the RICO Judgement by failing to assign to Chevron the contingent interest granted to him by the ADF in the 2017 Agreement.  GX 2089; Tr. at 218:5-9.  Yet, Donziger still did not assign that property right to Chevron. On February 21, 2019, Judge Kaplan made clear that the 2017 ADF Agreement "by its terms granted [Donziger] an 'interest' equal to 6.3 percent of monies of which, if any are collected, the ADF claims to be the exclusive beneficiary," and direct.  Donziger still did not assign the property right to Chevron.

184.    On May 28, 2018—only after Judge Kaplan found Donziger in civil contempt for failing to assign to Chevron the property interest granted to him by the 2017 ADF Agreement and imposed coercive fines to compel compliance—did Donziger finally assign to Chevron the interest granted to him by the ADF.  GX 136, 2216-1; Tr at 229-30.

185.    Despite being on notice that his right to a contingent fee was "property" subject to the constructive trust and included in Paragraph One of the RICO Judgment, Donziger did not assign his 2011 Retainer Agreement contingent interest to Chevron for years and only after motion practice.  Donziger behaved similarly with respect assigning the interest granted to him by the 2017 ADF Agreement.  Donziger intentionally disobeyed Paragraph One of the RICO Judgment simply because he did not want to give up his chance of a large payout from the Ecuadorian judgment he obtained by fraud.  Donziger made that clear back in August of 2014 when he refused to sign over his Amazonia shares to the Clerk of Court because it would "mean the complete divestiture—and potentially irretrievable loss—of more than two decades of labor on the part of me and some of my colleagues. . . ."  GX 102.

**E.    Count Six:  Donziger's Disobedience of Paragraph Five of the RICO Judgment By Pledging A Portion of His Personal Interest in the Ecuador Judgment in Exchange for Personal Services**

186.    Count Six charges Donziger with willfully disobeying the Paragraph Five provision of the RICO Judgment prohibiting him from monetizing his interest in the Ecuadorian judgment by, on or about December 23, 2016, pledging to David Zelman a portion of his personal contingency interest in the Ecuadorian judgment as compensation for personal services that Zelman rendered to Donziger.  The evidence at trial established that Donziger entered into a financial agreement with Zelman on December 23, 2016, under which Donziger agreed to compensate Zelman for The Transitions Process program by pledging a portion of his personal interest in the Ecuadorian Judgment.

187.    Paragraph Five of the March 4, 2014 RICO Judgment provides, in relevant part:

> Donziger . . . is hereby further enjoined and restrained *from undertaking any acts to monetize or profit from the Judgment*, as modified or amended, or any New Judgment, *including without*

*limitation by selling, assigning, pledging*, transferring or encumbering *any interest therein.*

GX 1875 ¶ 5 (emphasis added). Judge Kaplan made clear the purpose of Paragraph Five in his decision accompanying the RICO Judgment: "The decision in the Lago Agrio case was obtained by corrupt means. The defendants here may not be allowed to benefit from that in any way. The order entered today will prevent them from doing so." GX 1874 at 497.

188.    Donziger specifically acknowledged that Paragraph Five prohibited him from monetizing the Ecuadorian judgment by selling or pledging his own interest in that judgment. *See supra* at ¶ 142. On May 8, 2018: "I am not selling my own shares, because that is obviously prohibited by Your Honor's RICO judgment." GX 2010 at 18:23 to 19:1. On July 9, 2018: "It remains that Chevron has not presented even a scintilla of evidence that I have sold any of my interests in the Ecuador judgment—the *only operative factual question* at issue that could provide a basis for a contempt finding on the judgment compliance issue." GX 2051 at 2.

189.    In an effort to stave off Chevron's application for post-judgment discovery on his compliance with the RICO Judgment, Donziger repeatedly represented that he had not sold his interest in the Ecuadorian judgment. *See supra* at ¶¶ 142, 143.

190.    Nonetheless, on December 23, 2016, Donziger had entered into financial arrangement with executive coach David Zelman to compensate him for providing Donziger with the Transitions Process Program by pledging to Zelman a portion of Donziger's personal contingency interest in the Ecuadorian judgment. GX 105, 106; Tr. at 574:17-575:24; 576:12-25. Zelman charged clients approximately $15,000 at that time for the program. Tr. at 571:8-11.

191.    Donziger proposed the financial arrangement with a pledge of his interest via a

December 21, 2016 email to Zelman, and Zelman accepted the arrangement via a December 23, 2016 email to Donziger.  GX 105, 106.  Donziger made clear to Zelman that the interest he pledged to him from the Ecuador judgment was "out of my own personal fees in this litigation . . . Should a proportion of my fees recovered, but not the full amount your recovery will be decrease on a pro rata basis equal to the overall decrease affecting my fees."  GX 105 ("In exchange for you providing me with $14,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected).  In addition to pledging a portion of his interest in the judgment to Zelman, Donziger also paid Zelman $2000 cash towards the cost of the program.  Tr. at 576:8. Donziger completed the program with Zelman over 2016 and 2017.  Tr. at 577:7-9.

192.    Donziger also emailed with Zelman about having his wife complete the same program with a pledge of his interest in the Ecuadorian judgment as compensation, however this financial arrangement never came to fruition. Tr. 574:17-575:24, 579:15-18; GX 105, 109. While his wife completed the program, Zelman received compensation with cash and consulting services provided by Donziger's wife. Tr. at 579:19-25.

193.    On March 26, 2018, Zelman emailed Donziger seeking a further pledge from him out of his personal interest in the Ecuadorian judgment.  GX 110.  Specifically, Zelman had provided additional consulting services to Donziger, beyond the hours of The Transitions Process program that they had "contracted for." Tr. at 581:12-15.  Zelman wanted compensation for an additional $2000 worth of his services, which Zelman proposed would come from Donziger pledging more of his personal interest in the Ecuadorian judgment.  Donziger replied that same day: "Let me confirm the calculation.  Agree in concept.  Thanks!"  GX 110.

194.    Notably, Zelman made this request—and Donziger agreed "in concept"—just seven days after Chevron had filed its March 19, 2018 motion to hold Donziger in contempt for disobeying Paragraph Five and acting to monetize the Ecuadorian judgment by soliciting Elliott Management for an investment in that judgment. GX 1965, 1966.  Chevron also sought discovery on Donziger's compliance with the RICO Judgment "to determine the full extent of Donziger's violations of the [RICO] Judgment and ensure compliance." GX 1966 at 20.   This likely explains why, on March 27, 2018, Donziger again responded to Zelman's March 26, 2018 and said:  "Just to be clear, I am barred by court order in the U.S. from collecting fees on the matter." GX 111.  Zelman did not know—prior to receiving that email from Donziger—that Donziger had been barred from collecting fees on the Ecuador judgment.  Tr at 587:16-23, 618:3-5.

195.    Donziger knew that his financial agreement with Zelman violated the RICO Judgment, which is why he made no disclosure of that arrangement during the post-judgment discovery process.  He did not produce his emails with Zelman in response to the discovery he had been ordered to produce.  Tr. at 355:8-11 (Champion). Those emails were responsive to Document Request No. 30, which Judge Kaplan ordered Donziger to produce by June 15, 2018. GX 1989-1A at 15 ("All documents evidencing or relating to any attempted or completed sale, assignment, or transfer of rights, titles, claims or interest of any proceeds or other interest held by you, whether directly or indirectly, in the Ecuador Judgment or the Ecuador enforcement actions, whether or not such attempt was successful."); GX 2009 at 3.  In his June 15, 2018 response to Document Request No. 30, Donziger stated in pertinent part: "I hereby respond that I have not attempted nor completed any sale or assignment of my interest in the Ecuador Judgment at any point since March 4, 2014." GX 119 at 6.  That was not true.

196.    Chevron obtained Donziger's emails with Zelman only after Zelman produced

them in response to a subpoena.  Tr. at 355:8-14 (Champion), 583:1-584:20 (Zelman).  After

Chevron took Zelman's deposition in February 2019, on March 20, 2019 Chevron moved to hold

Donziger in contempt for his financial arrangement with Zelman.  GX 2179.  Donziger

responded to the contempt motion and acknowledging:  "I understand how the agreement with

Mr. Zelman can be seen as a monetization of my interest in the Ecuador Judgment arguably in

conflict with the Court's interpretation of the terms of the RICO Judgment, although to be clear I

do not concede that it is in conflict."  GX 2184 at 7.

197.    Donziger spoke with Zelman about how their arrangement had become

problematic, which prompted Zelman to send Donziger an email on April 21, 2019 "canceling

our deal" due to "all the complications regarding our financial arrangement."  GX 135; Tr. at

590:6-24.  Up until the time Zelman sent that email, Zelman understood he had a viable

agreement with Donziger to receive a portion of Donziger's interest in the judgment if Donziger

collected his fees. Tr. at 591:17-23.  While Zelman understood the probability was very low that

Donziger would collect his fees, Zelman hoped that Donziger would collect so that he would also

be paid.  Tr. at 615:8-19; 620:15-18.

198.    By undertaking the act of pledging a portion of his own interest in the Ecuadorian

judgment to Zelman in exchange for receiving personal consulting services from Zelman,

Donziger disobeyed the plain terms of Paragraph Five of the RICO Judgment.

### III.    <u>**CONCLUSION**</u>

Based on the evidence at trial, this Court should find Steven Donziger guilty on all six counts of criminal contempt.

Dated: June 8, 2021
        New York, New York

                                              Respectfully submitted,

                                               <u>*s/Rita M. Glavin*</u>
                                              Rita M. Glavin
                                              Sareen K. Armani
                                              Glavin PLLC
                                              2585 Broadway #211
                                              New York, NY 10025
                                              Tel: (646) 693-5505
                                              rglavin@glavinpllc.com
                                              sarmani@glavinpllc.com

                                              Brian P. Maloney
                                              Seward & Kissel LLP
                                              One Battery Park Plaza
                                              New York, New York 10004
                                              Tel: (212) 574-1200
                                              Fax: (212) 480-8421
                                              maloney@sewkis.com

                                              *Special Prosecutors on behalf of the*
                                              *United States*