**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES,

                Plaintiff,

     v.

STEVEN DONZIGER,

                Defendant.

11 Cr. 0691 (LAP)

**FINDINGS AND CONCLUSIONS**
**AND OFFER OF PROOF**

Martin Garbus, Esq.
OFFIT | KURMAN
590 Madison Ave., 6th Floor
New York, NY 10022
Tel. 347.589.8513
Fax. 212.545.1656
mgarbus@offitkurman.com
*Counsel for defendant*

**INTRODUCTION**

This case is extraordinary. For the first time in the history of the United States, a private law firm with substantial ties to the oil and gas industry has been granted the powers of the United States to prosecute an adverse party and human rights attorney. To make matters worse, Mr. Donziger has been denied a jury of his peers and the presiding judge (the Hon. Loretta Preska) was handpicked by the aggrieved party (the Hon. Lewis Kaplan) to preside over the case.[1] Even more disturbing is that this appears to be the nation's first corporate prosecution given that the oil company (Chevron) against whom Mr. Donziger won a large pollution judgement in Ecuador is a client of the very law firm (Seward & Kissel) now prosecuting him after the charges were declined by the U.S. attorney. In short, this case has all the trappings of a deeply troubled and conflicted prosecution run by an oil company.

As a threshold issue, this case has been riddled with such structural decay as to warrant immediate dismissal on all charges. Alternatively, the private prosecutor has simply not met the burden on any of the counts, requiring dismissal for lack of evidence of criminal contempt.

<u>First</u>, the appointment of the private law firm Seward & Kissel to prosecute Mr. Donziger violates the principles set forth in *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), which requires a disinterested prosecution.

<u>Second</u>, the lead private prosecutor, Rita Glavin, did not disclose her law firm's flagrant conflict of interest until pressed, eventually revealing that her firm had Chevron as a client as recently as 2018 and that the client relationship still exists. This revelation happened several months after the private prosecutor pushed for Mr. Donziger to be detained in his home as

---

[1]   In doing so, Judge Kaplan circumvented local rules and the ordinary random assignment process.

apparently the only misdemeanant in the U.S. in the federal system without a criminal record subject to pre-trial house arrest.

Third, Mr. Donziger is being held on an unprecedented and ongoing house arrest of more than 670 days' pre-adjudication for a misdemeanor charge with a maximum sentence of 180 days or 6 months, even though the longest sentence ever imposed for an attorney convicted of the crime of contempt in this district was subject to 90 days' home confinement. The only reasonable conclusion is that this detention asked for by the Chevron-linked private prosecutor is in and of itself *punishment*.

Fourth, the private prosecutors submit to no supervisory authority in the Department of Justice, or anywhere else, creating what appears to be for the first time a private prosecutor floating out in middle of nowhere billing hundreds of thousands of dollars to U.S. taxpayers.

Fifth, the private prosecutor has refused to disclose evidence of her unethical, secret, *ex parte* communications with the charging judge (Kaplan), saying only that they did not discuss prosecution strategy.

Sixth, the charging judge, the Hon. Lewis Kaplan, has expressed disdain for Mr. Donziger and praise for Chevron foregoing all pretense of disinterest. He also has refused to recuse himself from the case, and has refused to disclose his contacts with the presiding judge and his likely communications with her.

Seventh, the judge appointed by the Hon. Lewis Kaplan has denied **all** discovery requests for information related to the origins of the case as well as information pertaining to interactions between Judge Preska, Judge Kaplan, the private prosecutors, the law firm Gibson Dunn, and others — in effect covering up the obvious collusion that has taken place to convict Mr. Donziger without a jury of his peers or a fair trial.

Eighth, as evidence of the judicial hit orchestrated by Chevron in this court, Mr. Donziger is the only lawyer in U.S. history to be prosecuted for criminal contempt after inviting the court to impose a civil contempt so he could have a direct appeal of a discovery order (which covers counts I through III of Judge Kaplan's charging document). Hundreds, even thousands of lawyers, undertake this well-trodden path to seek judicial review of discovery orders each year in our country. It is extremely odd that nobody other than Mr. Donziger has been charged criminally for doing so. Might it have something to do with the fact he is the only environmental lawyer to have won a major judgment against Chevron — a judgement confirmed by six appellate courts, 28 appellate judges, and two Supreme Courts of the sovereign nations of Canada and Ecuador?

Ninth, as further evidence of the above, Mr. Donziger also appears to be the only lawyer in U.S. history to be charged with criminal contempt after completely complying with a civil order upon which it is based.

Even if the court chooses to ignore the structural inadequacies of the case and the obvious financing and overwhelming influence of Chevron over the proceedings, the private prosecutor has not met her burden and Mr. Donziger must be acquitted on all counts. Below is a summary of our findings of fact and conclusions of law on counts I, II, and III..

## FINDINGS & CONCLUSIONS

### GENERALLY

1. Underscoring the many questions surrounding this Chevron-funded attack, Mr. Donziger's case is the *first* criminal prosecution by a private prosecutor in the 232-year history of the Southern District of New York, which was founded in 1789 as our nation's first court. Apart from a single case in the Eastern District in 1994 involving well-known defense lawyer Bruce Cutler, in which a private prosecutor was appointed as a *protection* for

3

Cutler's due process rights given the famously antagonistic relationship between him and the federal prosecutor, there has been no other such case. This also is the first case in the country where a private corporate law firm is directly prosecuting in the name of the "public" the lawyer who helped win a historic civil pollution judgement against its own private client, Chevron; where a U.S. federal trial judge, Lewis A. Kaplan, charged the accused despite the charges being rejected based on the considered discretionary judgment of the public prosecutor[2]; and where the charging judge has refused to recuse himself consistent with rule of law requirements, creating a situation where one man (Judge Kaplan) is for all intents and purposes serving as the prosecutor, judge and jury in the same case — another violation of the rule of law. Even more disturbingly, this case is also the <u>first</u> case in the country of a private prosecution directed at a human rights defender. The

---

[2]   The Court, Judge Kaplan, and the private prosecutor cling desperately to the rationale and polite phrasing of the U.S. Attorney's Office (USAO) when it <u>refused</u> Judge Kaplan's request to prosecute Mr. Donziger for criminal contempt. Indeed, when defense counsel used the word "refused" during trial, the private prosecutor moved to strike the word and the Court granted the request, lecturing defense counsel that in fact the USAO "respectfully declined to prosecute." Tr. At 58-59. This kind of word policing by the court cannot hide the fundamental fact that this case was rejected by the public prosecutor. A request was made—by a federal judge, no less. The answer was "no." Respectful or not, refused or declined, the USAO <u>would not go forward</u>, despite very significant urging. The USAO's reference to a "lack of resources" obviously does not mean that the USAO, with an annual budget of $200 million, lacks capacity to prosecute this case. It rather reflects a considered judgment that the charges drafted by Judge Kaplan <u>are not worth</u> deployment of even the most minimal of public resources. It reflects a considered judgment as to whether the charges reflect an appropriate <u>prosecution priority</u>, and ultimately a considered decision <u>not to prosecute</u>. *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review."); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.") (citations omitted). This considered judgment animates the facts and legal arguments in favor of acquittal as noted throughout this brief, including the fact that much of the alleged contemptuous conduct has long been cured, was part of Mr. Donziger's zealous advocacy for his Indigenous clients poisoned by Chevron's pollution, could have been resolved in myriad other ways, and is utterly *de minimis*.

fact that Mr. Donziger has spent almost 30 years litigating successfully against Chevron, an American oil major that Judge Kaplan described as "a company of considerable importance to our economy", and is now being prosecuted for all intents and purposes by a Chevron law firm in a case financed to a large degree by Chevron itself, is a major stain on our federal judiciary and also noted for the record.[3]

2. Judge Kaplan, who initiated this proceeding after the regular Federal prosecutor refused to prosecute Mr. Donziger, has maintained a hostile attitude toward Mr. Donziger for years. Irrespective of whether the hostility is factually-grounded or derived from impressions internal or external to the legal matters over which he presided, Judge Kaplan's hostility itself is plain and has been evident to numerous independent observers.[4] In fact, more than

---

[3]  Judge Kaplan notoriously revealed his baseline understanding of and sympathy for the oil company, Chevron Corp., in a comment from the bench in the open days of the underlying civil case:

> [W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because [Mr. Donziger and his clients] have attached it in Singapore or wherever else [as part of enforcing their final Ecuadorian judgment].

11-cv-691, Tr. Feb. 8, 2011.

[4]  *See, e.g.*, Paul Barrett, *Chevron Looks to Its Home Court for a Comeback Win*, Bloomberg Businessweek, July 14, 2011, at https://www.bloomberg.com/news/articles/2011-07-14/chevron-looks-to-its-home-court-for-a-comeback-win (observing that Judge Kaplan did not bother to "disguise his disdain" for Mr. Donziger and repeatedly "suggested from the bench that [Mr. Donziger's] suit against Chevron was nothing more than a cynical con"); Daniel L. Greenberg, *Judge Appointing an Attorney To Pursue Steven Donziger Is Disconcerting*, The New York Law Journal (Letter to the Editor), Aug. 21, 2019, at https://www.law.com/newyorklawjournal/2019/08/21/judge-appointing-an-attorney-to-pursue-steven-donziger-is-disconcerting/?slreturn=20200127164735 ("the acrimony between the judge and [Mr. Donziger] has been front-page news for many years"); Motion to Withdraw by John W. Keker, Esq., 11-cv-691, Dkt. 1110 (May 6, 2013) ("It is with regret that undersigned is forced to make this motion to withdraw. This is an extraordinary case which has degenerated into a Dickensian farce… Encouraged by this Court's implacable hostility towards Donziger, Chevron will file

200 lawyers recently filed a judicial misconduct complaint against Judge Kaplan that documented in extraordinary fashion his 10-year targeting of Mr. Donziger at the behest of Chevron and its law firm Gibson Dunn — the law firm that provided the main witnesses against Mr. Donziger in his so-called contempt trial.[5]

3. Acting alone, Judge Kaplan made the decision to ignore local rules requiring the random assignment of criminal cases and instead personally transferred the case to a court presided over by a judge (Hon. Loretta Preska) with her own financial ties to Chevron, via her highly visible public leadership in the Chevron-funded Federalist Society. Judge Kaplan has refused to explain the basis of his decision-making in personally assigning the matter to Judge Preska or his decision to appoint a private law firm with financial ties to Chevron after the charges were rejected by the regular federal prosecutor.  Nor has he explained his own financial ties to Chevron as evidenced by his financial disclosure forms, which show investments in a mutual fund with holdings in Chevron and the oil and gas industry.

---

any motion, however meritless, in the hope the Court will use it to hurt Donziger."). *See also* Sworn testimony of Deepak Gupta, Esq.:

> I want to say this delicately because it's not my habit to say anything adverse about—I have the greatest respect for the federal bench. I clerked for a federal judge. I practice before the federal courts. I have never seen a judge whose disdain for one side of the case was as palpable on the bench in ways that I think may not have always come through in the paper record. But it was fairly obvious that Judge Kaplan had great personal animosity for Steven Donziger.

*See* Respondent's Post-Hearing Brief, Case No. 003839/2014, Sup. Ct of NY—App Div. 1st Dept., at https://bit.ly/3uXPFr2.

[5] *See, e.g.*, "More than 200 lawyers file judicial complaint against Judge Lewis A. Kaplan over abusive targeting of human rights advocate Steven Donziger," Statement, Sept. 1, 2020, International Association of Democratic Lawyers, at https://iadllaw.org/2020/09/more-than-200-lawyers-file-judicial-complaint-against-judge-lewis-a-kaplan-over-abusive-targeting-of-human-rights-advocate-steven-donziger.

4. We note for the record that the Seward law firm's relationship to Chevron was hidden for several months by Judge Kaplan and the Seward firm, all the while as the Seward firm successfully pushed for Mr. Donziger's extraordinary pre-trial detention, until disclosure was forced by Mr. Donziger's counsel. Judge Kaplan decided <u>not</u> to submit the case for random selection of a presiding judge as was done in *Cutler*. Without any notice to Mr. Donziger, Judge Kaplan invoked a far over-stretched technicality to claim that the strict rule requiring random selection in the Southern District Rules for the Division of Business Among District Judges ("RDB") Rule 6(b) did not apply,[6] and instead relied on the generic power of judges to transfer matters to a "any consenting judge" under RDB Rule 14. This rule is typically invoked to address scheduling conflicts and overcrowded dockets, not to run-around the critically important random selection procedure provided for in the same set of rules to protect due process of law in a case involving one the world's most celebrated environmental justice lawyers. Moreover, Rule 14 requires the transferring judge to provide "written advice to the assignment committee." The defense repeatedly requested the opportunity to review this written advice, if indeed it even exists. The request was first made by letter and ignored by the Court, then renewed at trial and denied. Tr. at 859.

5. There are thousands of practicing criminal law attorneys in the New York Metropolitan area, many of whom have significant federal prosecution experience. Judge Kaplan, acting alone, made the decision of who to appoint as private prosecutor for this case. Judge Kaplan

---

[6]  Judge Kaplan claimed that the terminology used by Rule limited it to "appl[y] only to criminal cases initiated by indictment or information," whereas Judge Kaplan initiated this case by Order to Show Cause. The use of the words "indictment" and "information" in the Rule could also be read as exemplary and indicating that the Rule should naturally apply to all instantiations of criminal process. Mr. Donziger was never allowed to make this argument because the decision was made by Judge Kaplan in secret.

again has refused to explain the basis of his decision-making. He selected an attorney and law firm that had an attorney-client relationship with Chevron. The law firm, Seward & Kissel, has a substantial oil and gas industry practice and, if Chevron views their performance in this lawsuit favorably, is poised to receive significant business in the future from Chevron. *See* Dkt. 60-2 (Declaration of Prof. Ellen Yaroshefsky); Dkt. 280 (Decl. of Martin Garbus) at ¶¶ 12-31. Judge Kaplan also selected an individual attorney from that firm, Rita Glavin, to lead the private prosecution. Glavin is known for playing a key role in one of the most notorious prosecutorial misconduct cases in recent decades.[7] She also serves on the board of a Fordham Law School alumni committee with none other than Judge Preska — yet another flagrant conflict of interest that, along with the many other biases in the proceeding including a lack of independent fact finder, will discredit in full Mr. Donziger's pre-ordained conviction.

6.   Shockingly, the client relationship between Seward & Kissel and Chevron was not disclosed at the outset of the case by the Glavin-led private prosecution team or by the Seward partnership, by the presiding judge in this case, or by Judge Kaplan. Despite the fact that the private prosecutors sneered at the notion of any potential conflict of interest, Mr. Donziger's counsel filed a motion seeking to disqualify Seward based on its extensive

---

[7]   *See In re Special Proceedings*, Notice of Filing of Report, Case 1:09-mc-00198-EGS, Dkt. 84 at 98 (D.D.C. Mar. 15, 2012) (Report of Henry F. Scheulke III, Esq.) ("Ms. Morris answered that she had researched the issue and would not disclose 302s under the Jencks Act, 18 U.S.C. § 3500, contrary to [] usual practice. Mr. Friedrich approved, ***as did Ms. Glavin who added that 'we have to play our cards close to the vest on this one.'***"). The prosecution's intentional decision to conceal the referenced 302s led the court to throw out the high profile conviction of Alaska Senator Ted Stevens. See James Oliphant, Ted Stevens' charges dismissed as judge excoriates prosecutors, Los Angeles Times, Apr. 8, 2009, at https://www.latimes.com/archives/la-xpm-2009-apr-08-na-stevens8-story.html ("'In nearly 25 years on the bench, I have never seen anything approaching the mishandling and misconduct I have seen in this case,' [Judge] Sullivan told a packed Washington courtroom.").

links to several Chevron-related entities in the oil and gas industry, including its ties to its client Oaktree Capitol, which had placed two executives on Chevron's Board of Directors. Dkt. 60. Only then, seven months into the case, was Glavin and her partners at the Seward firm forced to admit in a sworn affidavit that they had a full-blown attorney-client relationship with Chevron and were privately profiting from Chevron's business while "publicly" prosecuting the company's main critic. Dkt. 65. While Seward has aggressively sought to characterize the relationship as a "former client" relationship, it has never produced any information supporting this claim, such as a termination letter or a retainer letter limiting the representation to a single matter. In fact, Chevron retained Seward at least two times in the past and presumably did not terminate its relationship in between the two representations; it is thus unclear why the relationship would be deemed terminated at the end of the second representation. Most critically, Seward continues to this day to act on express Chevron instructions in asserting the attorney-client relationship to refuse to disclose details about the subject matter of the prior representations and the ongoing relationship. Dkt. 65-1. There is simply no doubt the Seward-Chevron relationship continues as Seward prosecutes and detains on misdemeanor charges Chevron's main critic, Mr. Donziger.

7. The Court refused to disqualify the Seward & Kissel prosecutors, relying entirely on their unsubstantiated and utterly misleading assertions that the Chevron representations were of limited scope and "unrelated." Dkt. 68. The Court — working in conjunction with the charging judge who appointed her — has repeatedly rejected defense requests for information concerning the collusive and apparently unethical relationship between

Glavin, her partners, and Chevron. Dkts. 68, 150, 172, 297, 301. This is an obvious cover-up of basic information that Mr. Donziger needs to adequately assert his objections.

8. At trial, the defense established beyond any reasonable doubt that Chevron to a shocking degree is financing and largely driving the private prosecution of human rights attorney Steven Donziger. Although almost all the necessary substantiating and contextual information has been withheld by this court in decisions designed to "protect" the Glavin-led private prosecutorial team from further exposure of its conflict of interest, Chevron lawyers at the Gibson Dunn firm—who were the primary source of witness testimony at trial—have admitted to providing ***hundreds of hours*** of legal assistance to the private prosecutors to try to convict Mr. Donziger. Tr. at 463. Most of these hours were partner hours that would normally be billed out at rates in excess of $1200 per hour. Per typical law firm practice, each partner hour was likely supported by an unknown number of subordinate associate and staff hours, all of which have been withheld by Gibson Dunn. The private prosecution team deceptively tried to obscure the extent and significance of these prosecutorial "contributions" by well-heeled private actors viciously antagonistic to Mr. Donziger behind two fig leaves: (a) that the Gibson Dunn lawyers cooperated only pursuant to the obligations of subpoenas served on them, and (b) that they themselves provided the assistance and not at Chevron's behest. Both these fig leaves were swept away during cross examination as described below.

   a. The Chevron lawyers repeatedly claimed that the cooperation provided the Seward firm's private prosecutors was merely in compliance with the subpoena. *See, e.g.*, Tr. at 466 ([Champion]: "I don't view it as a donation, no, to Chevron, or to anybody. I'm under federal subpoena. I would meet with the authorities regarding

any crime that they wish to meet with me on. I don't view it as a donation. It's more like paying taxes."). But they later acknowledged that the subpoenas only required appearance at trial. *Id.* at 466-67 (". . . Q. You are aware that these meetings on your part are voluntary in the sense that you do not have to participate. [Champion]: Yeah, I agree with that . . ."); *id.* at 720 ("[Thomson]: The trial testimony is the only compulsory subpoena appearance, yes."); *id.* at 719-720 ("Q: "I'm sorry, is there some sort of requirement that you prepare for an involuntary appearance that you're familiar with?...' [Thomson]: 'I don't know that there's a requirement, no.' Q: 'And you certainly never got a subpoena directing you to review certain documents, right?' A: 'Correct.' Q: 'And you were never directed at a proceeding besides this trial to review certain documents; correct?' A: 'Correct.' Q: 'So it is an entirely voluntary thing that you did in having these meetings with the private prosecutor?' A: 'It was not compulsory appearance and preparation, no, that's true.'"). Again, it was admitted that Gibson Dunn lawyers, including those who were *not* even served with a trial subpoena, provided hundreds of hours of time to the private prosecutors, and in doing so channeled an unknown but potentially 10x larger amount of time and work product from associates and others, likely paid for by Chevron to the tune of $10 million or more in fees. *See, e.g.*, Ex. A (documents produced by Gibson Dunn showing Gibson Dunn lawyers initiating meetings, meeting at all hours of the day and night, and freewheeling sharing of questionably related information, such as tweets by Mr. Donziger and allies of the Ecuadorian environmental cause).

b. The Chevron lawyers repeatedly claimed that their involvement was independent of Chevron. But aside from being patently not credible, these claims were completely undercut by the admission by Chevron lawyer William Thomson's casual admission his first-class plane tickets from Los Angeles to New York were being billed to Chevron. In fact, they were. But in what appears to be a desperate scramble in the ensuing hours, Gibson Dunn refunded Chevron an amount for prior billed airfare that they claimed had been billed "mistakenly." Tr. at 722-723; Dkt. 305. Gibson Dunn then told the Court that the firm "is paying for all travel expenses" and that Mr. Thomson "mistakenly believed that Chevron would be paying," neatly omitting the fact that Chevron had in fact paid for the travel expenses until refunded in the wake of Mr. Thomson's revealing and embarrassing testimony. Dkt. 304. In any event, Chevron presumably paid the GDC attorneys to become "experts" on the facts of the case in the first place. Prosecution of Mr. Donziger is a long-term Chevron goal and Chevron has used Gibson Dunn for that purpose repeatedly; the firm has represented Chevron in this matter for over a decade, generating fees in excess of $1 billion. Driving the criminal prosecution of Mr. Donziger — the company's litigation adversary for almost 30 years — clearly serves Chevron's interest and GDC can expect to be generously rewarded for the work in the future. Finally, GDC has developed its own business model around "demonizing Donziger" and has its own improper interest in driving this prosecution independent of Chevron. *See generally* Dkt. 294 (describing a decade-long effort by Gibson Dunn attorneys, on Chevron's behalf, to get Mr. Donziger

12

criminally prosecuted, and the firm's overall profiteering from its work "demonizing Mr. Donziger).

9. As such, the evidence produced at trial robustly validates the *Vuitton* argument made by the defense 18 months ago seeking disqualification of the private prosecutors and at this point renders the entire proceeding a constitutional nullity. As the defense has argued repeatedly, *Vuitton* was clear that "the fact that the judge makes the initial decision that a contempt prosecution should proceed is not sufficient to quell concern that prosecution by an interested party may be influenced by improper motives."[8] "A scheme injecting a personal interest, financial or otherwise, into the enforcement process," which the defense has abundantly established here, brings "impermissible factors into the prosecutorial decision."[9] The resulting harm is not only to due process in the individual case but also "[p]ublic confidence in the disinterested conduct of [an] official" who has been "armed with expansive powers and wide-ranging discretion."[10] As such, "appointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general."[11] Because the Court refused to disqualify the deeply "interested" private prosecutors from a Chevron law firm before jeopardy attached, the only remedy available at this stage is to dismiss this case.[12]

---

[8]    *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987)

[9]    *Id.* at 808 (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–250 (1980)).

[10]    *Id.* at 813 (1987).

[11]    *Id.*

[12]    *See, e.g., Green v. United States*, 355 U.S. 184, 188 (1957) (jeopardy attaches a trial before verdict); *United States v. Dixon*, 509 U.S. 688, 696 (1993) (double jeopardy protections apply "in non-summary criminal contempt prosecutions just as they do in other criminal prosecutions.").

## COUNT I

10. In Count I, Judge Kaplan charges that Mr. Donziger "knowingly and willfully failed to fully comply with the requirements" of paragraph 4, specifically and individually, of an Order dated March 5, 2019, Civ. Dkt. 2172 ("March 5 Order"), for a three-week period in which he did thereafter comply with the order. As described below, Mr. Donziger, while complying with the order, also voluntarily elected to undertake a civil contempt citation as to different paragraph (paragraph 5) of that same Order in order to secure appellate review before complying in full. Paragraphs 4 and 5 of the March 5 Order are parts of a single order of the court. There is no evidence suggesting that Mr. Donziger (or even Chevron) knew that it was possible to voluntarily undertake a civil contempt citation as to one paragraph of the order while complying with another paragraph of the order. Indeed, when Chevron sought civil contempt sanctions for Mr. Donziger's non-compliance with the order, it requested a finding as to the order as a whole, not the individual paragraphs. 691 Dkts. 2176, 2186; Tr. at 324. This is significant because Chevron and the private prosecutors from Chevron law firm Seward now claim Mr. Donziger sought voluntarily civil contempt for one paragraph of the order but not for another. The first time Mr. Donziger have clearly and unambiguously made aware that Judge Kaplan expected compliance with the separate paragraphs of March 5 Order individually was upon issue of Judge Kaplan's Contempt Opinion on May 23, 2019. Dkt. 2209 ("Contempt Opinion"). Mr. Donziger at that time moved expeditiously to come into compliance with paragraph 4 of the March 5 Order—within the time allotted by Judge Kaplan in the Contempt Opinion. In light of all the circumstances, the private prosecutors have failed to prove beyond a reasonable doubt that (a) the March 5 Order was sufficiently clear and unambiguous (as required by law) as to leave no doubt in Mr. Donziger's mind that he was required to

comply with paragraph 4 independently even as he was lawfully sustaining resistance to paragraph 5 or the Order, and (b) that Mr. Donziger's failure to turn over the list for a brief period of time non-compliance with paragraph 4 of the March 5 Order between March 5 and May 28, 2019, was "willfully disobedient" given that he was seeking appellate review of the lawfulness of the entire order at the time. Seeking appellate review of a civil discovery order is part of the "well-trodden" path laid out in the law of every Circuit of this country; the private prosecutor can cite no other case where a lawyer has been charged with criminal contempt for seeking more judicial review of a discovery order via this "well-trodden" path. Mr. Donziger clearly is innocent of this count.

### COUNT II

11. In Count II, Judge Kaplan charges Mr. Donziger with failing to comply with paragraph 5, specifically and individually, of the March 5 Order—a charge that again was rejected by the federal prosecutor before Judge Kaplan appointed a Chevron law firm to pursue it. Paragraph 5 was an extraordinary order directing Mr. Donziger to turn over all his phones, computers, and online account passwords (that is, virtually all of privileged and confidential case information) to a Chevron-nominated digital forensics expert. Under the March 5 Order, the expert was to have completely unfettered access to confidential and privileged information held by Mr. Donziger. He was to be allowed to copy all data on the devices/accounts and then search the data with a near-endless list of over 800 broad search terms such as "Chevron" "Gibson Dunn" "Indigenous" "Interest" "Trust" "Confidential" "Sell" "Collect" "Fund" "Budget" "Table" and so on— terms that would have allowed Chevron access to almost anything on Mr. Donziger's computer. 691 Dkt. 2172; Tr. at 318, 655. The expert would also search for any document associated with hundreds of names

central to the attorney-client privilege, including the names of all of Mr. Donziger's personal attorneys and all of his clients as an attorney— the people who would be discussing the most sensitive parts of the team's litigation strategy. Prior to his issuance of the March 5 Order, Judge Kaplan had issued another extraordinary order waiving all of Mr. Donziger's potential claims of attorney-client privilege as both an attorney and a client, as well as any and all claims to attorney opinion work product. 691 Dkt. 2108; Tr. at 654-655. Essentially, Judge Kaplan had stripped Mr. Donziger of most of his Constitutional rights based on the pretext of a discovery "sanction".

12. Prior to and following the March 5 Order, Mr. Donziger repeatedly and transparently explained that it was his understanding of the law and his obligations as an attorney that he was lawfully permitted and ethically required to temporarily withhold compliance in order to generate a civil contempt citation that could be used to obtain appellate review of a critical underlying issue in the post-judgment litigation. Mr. Donziger repeatedly assured the district court that he would fully and completely comply with the March 5 Order if his challenges were rejected on appeal. 691 Dkts. 2184 ("have never suggested that I would not ultimately comply with the Court's orders if my objections are rejected on appeal"), 2250 ("I have committed to complying with this Court's orders even in violation of my constitutional rights and the rights of others if I am unable to obtain relief on appeal."); Tr. at 64, 331. Mr. Donziger was always transparent about his intended course of action and his understanding of the legal and ethical bases thereto, citing to clear guidance in Supreme Court and federal court case law. 691 Dkt. 2018, 2131, 2151, 2184, 2234; Tr. at 62-64.

13. Irrespective of whether Mr. Donziger's beliefs and understandings about the requirements of lawful compliance were correct as a matter of law—and it is our view based on case law

from every Circuit that they were — they were held sincerely and in good faith, and were plausible under the circumstances in which Mr. Donziger was working (including representing himself *pro se* in the post-judgment proceedings at that time). The evidence shows that Mr. Donziger was not defying judicial authority but doing just the opposite in seeking further judicial review. In light of all the circumstances, the private prosecutors have failed to prove beyond a reasonable doubt that any of Mr. Donziger's resistance to the March 5 Order was willful disobedience as opposed to an effort to comply via a legally available pathway that included appellate review. Mr. Donziger's conduct was "consistent with a reasonable interpretation of the court's order (albeit an interpretation different from the one applied by the court imposing the contempt)"[13] or at worst "a good faith pursuit of a plausible though mistaken alternative."[14] The prosecutors also failed to prove beyond a reasonable doubt that Mr. Donziger's conduct under the unique and fraught circumstances

---

[13] *Doral Produce Corp. v. Paul Steinberg Assoc., Inc.*, 347 F.3d 36, 38–39 (2d Cir. 2003) ("Thus, if the defendant's alleged disobedience is consistent with a reasonable interpretation of the court's order (albeit an interpretation different from the one applied by the court imposing the contempt), and there is no other evidence of willfulness, we would be unable to affirm the conviction."); *United States v. Crowe*, 77 F.3d 471 (4th Cir. 1996) ("If the defendant makes a good faith effort to comply with a court order, he may not be convicted of criminal contempt.").

[14] *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 62 B.R. 723, 731 (S.D.N.Y. 1986) ("There being a reasonable doubt as to the willfulness of the allegedly violating behavior of all the asserted contemnors, a citation for criminal contempt should certainly not issue. . . . at the worst, [the evidence shows] a '[g]ood faith pursuit of a plausible though mistaken alternative.' Thus, the Court declines to find at this time that respondents acted either in civil or criminal contempt of the Order.") (quoting *In re Brown*, 454 F.2d 999, 1007 (D.C. Cir. 1971)); *Waste Conversion, Inc. v. Rollins Env't Servs. (NJ), Inc.*, 893 F.2d 605, 609, 611 (3d Cir. 1990) ("counsel's unorthodox methods were intended to comply with the spirit, however far they strayed from the letter of the rules. It cannot be said that the alternative action pursued by [counsel], albeit mistaken, was implausible or unreasonable. Their reliance on an unwritten, unadopted practice, and their obliviousness to the possibility of using a quash motion do not amount to evidence of wrongful intent or choice between proper and contumacious means."; also emphasizing that "counsel did not conceal facts from the court.").

of the case was wrongful, contumacious, or criminal in nature as required to justify a

court's exercise of discretion to impose criminal contempt.[15]

14. The permissibility of Mr. Donziger seeking appellate review of discovery orders in a post-

judgment context by way of "contempt jurisdiction" (or token or symbolic contempt)

without incurring <u>criminal</u> contempt liability is clear as a matter of law. In addition,

however, Mr. Donziger's decision to pursue appellate review was further supported by

substantial facts as to which the Court blocked cross-examination and presentation of

evidence by way of its erroneous imposition of the doctrine of collateral bar. Had the

evidence not been blocked, it would have shown at least the following:

    a.  The evidence would have shown that it was clear at the time the March 5 Order

        issued that it was not a lawful order, a key element of criminal contempt.

        i.  The Order was expressly designed to force the production of documents

            relevant to what Judge Kaplan called the "judgment compliance" claims

            (alleged non-compliance with Judge Kaplan's 2014 RICO Injunction)

            raised by Chevron on March 18, 2018. 691 Dkt. 2009; Tr. at 245-49. Mr.

            Donziger had immediately opposed these claims—and additionally moved

---

[15] *See, e.g.*, *Rojas v. United States*, 55 F.3d 61, 63 (2d Cir. 1995) (per curiam) (wilfulness requires proof of "'a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful'") (quoting *United States v. Greyhound Corp.*, 508 F.2d 529, 531-32 (7th Cir. 1974); *Doral Produce Corp. v. Paul Steinberg Assoc., Inc.*, 347 F.3d 36, 38–39 (2d Cir. 2003) (a contempt is willful where it is "committed with a specific intent to consciously disregard an order of the court, or where the defendant knows or should reasonably be aware he or she is in the wrong."); *United States v. Crowe*, 77 F.3d 471 (4th Cir. 1996) ("the government must establish beyond a reasonable doubt that the defendant 'willfully, contumaciously, intentionally, with a wrongful state of mind, violated a decree') (quoting *Richmond Black Police Officers Ass'n v. City of Richmond*, 548 F.2d 123, 129 (4th Cir. 1977) ; *United States v. West*, 21 F.3d 607, 608 (5th Cir. 1994) ("For a criminal contempt conviction to stand, the evidence . . . must show both a contemptuous act and a willful, contumacious, or reckless state of mind.").

to dismiss them, sought a declaratory judgment, and sought interlocutory appeal—on the basic point that Chevron had utterly failed to take into account the limited interpretation of the RICO Injunction that Judge Kaplan himself issued in an April 2014 Stay Order. Judge Kaplan ignored Mr. Donziger's arguments on this point for over a year and then wholly rejected the relevance of the Stay Order in the May 2019 Contempt Opinion. *See, e.g.*, 691 Dkts. 2151 ("A simple order from the Court explaining what fundraising it thinks is or is not allowed would cure the issue and address Chevron's concerns to the maximum extent justified by its claims. The Court has declined to issue such an order, leading to a Kafkaesque situation where the undersigned has no idea what is or is not permissible as regards fundraising while Chevron is authorized to engage in a discovery rampage clearly designed to thwart the advocacy of me and my clients in enforcing the Ecuador judgment in other jurisdictions. . . . There is no plausible basis for the sole claim that serves as the foundation for this entire discovery misadventure."), 2184 ("[T]he Court has refused for over a year to rule substantively on the merits of the main contempt motion and instead 'held open' the motion as a way of allowing Chevron to conduct a massive campaign of intrusive discovery on an array of otherwise irrelevant topics targeting core internal deliberations and associational activity of the team of human rights activists and funders seeking to hold Chevron accountable for its contamination in Ecuador."); Tr. at 61, 262, 294, 302, 310, 332, 631. On March 4, 2021, the Second Circuit reversed, agreeing with Mr. Donziger

that the Stay Order appeared to authorize exactly the kind of litigation financing that Mr. Donziger had subsequently engaged in, and more fundamentally that the Stay Order created an ambiguity as to the RICO Injunction that made any finding of contempt an outright abuse of the court's otherwise substantial discretion. Mr. Donziger had been making this precise argument <u>for nearly three years</u>.

ii. Because Judge Kaplan's contempt finding regarding "judgment compliance" was unlawful as a matter law, discovery orders in furtherance of that finding were also unlawful. The fact that Judge Kaplan dismissed Mr. Donziger's numerous requests for relief and structured the post-judgment proceedings to "leave open" his ultimately unlawful decision on the judgment compliance claims until *after* he had coaxed Mr. Donziger into voluntarily civil contempt of the March 5 Order should not be allowed to insulate the March 5 Order from the unlawfulness of the claims that served as the foundation to the Order. Unlike injunctions, where appellate review is available under 28 U.S.C. § 1292, alleged violations of production orders, especially in a post-judgment context, must proceed through "contempt jurisdiction" where the party's challenge to the lawfulness of the underlying order is not only permissible but indeed the entire purpose of the exercise. Dkt. 225-1. Mr. Donziger should have been allowed to establish the unlawfulness of the March 5 Order and would have done so with substantial evidence.

b.   The evidence would have showed that implementation of the "Forensic Inspection Protocol" would have resulted in severe prejudice and irreparable harm to Mr. Donziger and countless others.[16]

i.   *First*, implementation of the Protocol would have granted Chevron essentially unlimited access to Mr. Donziger's documents. Among other examples, paragraph 7(d) of the Protocol would have resulted in all documents responsive to the 800+ search terms, even those deemed "potentially irrelevant" by the expert, from being turned over to Chevron. 691 Dkt. 2172; Tr. at 827-829. (This resulted is triggered by a *single* document being misclassified by the expert as "potentially irrelevant," according to Chevron's interpretation of relevancy.) Paragraph 7(e) would have granted Chevron lawyers immediate access to 10% of "raw" responsive documents, without any protections as to privilege, and would

---

[16] Irreparable harm, however, is not necessary to the availability and permissibility of the contempt jurisdiction pathway to Mr. Donziger in the post-judgment context of the underlying civil case. As noted *supra* and in other filings, *see, e.g.*, Dkt. 225, Supreme Court and Second Circuit case law do not suggest any required showing of harm to justify a litigant's choice to lawfully pursue the relief. Nor, in fact, does the case law articulate a particularized requirement as to the unavailability of alternative avenues of relief, although that unavailability does appear to act as the motivating factor in the relevant decisions. *See, e.g.*, Dkt. 225; Dkt. 110 at 12-14. The lack of alternative avenues of relief is established in a post-judgment context because there is no possibility of review on direct appeal. Mandamus does not provide an alternative avenue: rather mandamus is the last available form of relief that itself only becomes available when no alternative relief is possible. The case law makes clear that a contempt jurisdiction appeal is an avenue of relief that precludes mandamus, especially in a post-judgment context. The single case cited by the private prosecutors in opposition to this point is *In re City of New York*, 607 F.3d 923 (2d Cir. 2010), which did not arise from the post-judgment context and focused on uniquely pointed allegations of irreparable harm rather than the unavailability of review. *See Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 591 F.2d 174, 181 (2d Cir. 1979) (denying mandamus and reversing stay because appeal of a contempt citation was an available means of review); *id.* At 182 ("this is not one of those 'really extraordinary causes' for which mandamus is reserved").

have further allowed Chevron lawyers to expand the scope of produced documents by marking documents within the 10% as relevant without any oversight by the expert or opportunity for Mr. Donziger to object. *Id.* The resulting "relevant" documents would have been turned over to Chevron, again without any opportunity for Mr. Donziger to make objections or review the documents prior to production. These objections were raised repeatedly to Judge Kaplan and never addressed. *See, e.g.*, 691 Dkts. 2131, 2151, 2184.

ii. *Second*, the evidence would have shown that production of Mr. Donziger's documents and information to Chevron threatened severe harm to attorney-client privilege and constitutional rights of Mr. Donziger and countless others. As outlined in Mr. Donziger's motion for a protective order dated June 15, 2018, Chevron and its lead law firm Gibson Dunn had already repeatedly demonstrated a tendency to use information taken in discovery to harass, intimidate, and publicly malign Mr. Donziger and allies and supporters of the cause of environmental justice in the Ecuadorian Amazon. 691 Dkt. 2026. In particular, Chevron and Gibson Dunn had a history of using distorted and decontextualized information from discovery to pursue third-parties with "blitzkrieg" style litigation strategically designed to impose massive expense and reputational harm on those parties and forcing them into a settlement posture. *Id.*; Tr. at 704. As part of the settlement, Gibson Dunn lawyers would "ghostwrite" denunciations of Mr. Donziger

and the Ecuadorian cause and force the third-party to sign the denunciation as part of the settlement, regardless of the party's actual beliefs. *Id.*

    iii. Tellingly, *after* Judge Kaplan denied Mr. Donziger's motion for a protective order, Gibson Dunn engaged in exactly this course of conduct with third-party Katie Sullivan and others. Even though Ms. Sullivan immediately agreed to comply with all of Chevron's discovery requests, Gibson Dunn lawyers engaged in repeated public attacks on her character and continuously generated litigation until Ms. Sullivan had spent over $170,000 in legal fees and agreed to do whatever Chevron wanted in order for "this to be over as quickly as possible," as she acknowledged at deposition. Gibson Dunn lawyers ghostwrote a declaration denouncing Mr. Donziger that Ms. Sullivan signed. At deposition, however, Ms. Sullivan acknowledged that she had no personal knowledge of numerous points stated in the declaration, and that she outright disagreed with other points. *See, e.g.*, 691 Dkt. 2125 at 2-8. Chevron and Gibson Dunn engaged in similar abusive litigation tactics against numerous other third parties as well.

15. The district court could have simply stayed proceedings and sought Mr. Donziger's compliance, if appropriate, upon conclusion of the appeal. Mr. Donziger repeatedly represented that he would comply with the March 5 Order if his appeal was rejected, and the private prosecutors presented no basis to doubt this representation. The private prosecutors presented no evidence suggesting that Chevron or any other party would have suffered ay harm or prejudice from any delay occasioned by waiting for Mr. Donziger's

appeal to conclude. In light of all the circumstances, Mr. Donziger's conduct did not "rise[]

to the level of an obstruction of and an imminent threat to the administration of justice" nor

evince any intent "to obstruct, disrupt or interfere with the administration of justice."[17] The

Court should exercise its discretion to decline to impose criminal contempt.

### COUNT III

16. In Count III, Judge Kaplan charges Mr. Donziger with failing to comply with an order that

he turn over his passport that was dated June 11, 2019, Civ. Dkt. 2232 ("Passport Order").

This count was also rejected for prosecution by the U.S. attorney's office. The Passport

Order was intended, expressly and exclusively, to coerce compliance with paragraph 5 of

the March 5 Order prior to completion of the appellate review that Mr. Donziger

permissibly sought by way of voluntary civil contempt. Because Mr. Donziger's decision

to seek this review was not unlawful or contemptuous, *supra* ¶ 6, the effort to coerce

compliance was inappropriate and/or unlawful.

17. The private prosecutors failed to prove that Mr. Donziger's failure to turn over his passport

caused any harm or obstructed, disrupted or interfered with the administration of justice in

---

17   *In re Williams*, 509 F.2d 949, 960 (2d Cir. 1975). *Cf. In re Kirk*, 641 F.2d 684, 687 (9th Cir. 1981):

> Although the precise nature of [the required] intent [for criminal contempt] is subject to controversy, *see United States v. Smith*, 555 F.2d 249, 251 (9th Cir. 1977), we recently adopted the Seventh Circuit's position that "[a]n attorney possesses the requisite intent only if he knows or reasonably should be aware in view of all the circumstances, especially the heat of the controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth." *Hawk v. Cardoza*, 575 F.2d 732, 734-35 (9th Cir. 1978), *quoting In re Dellinger*, 461 F.2d 389, 400 (7th Cir. 1972). Moreover, there can be no conviction for criminal contempt . . . unless there has been such a "[m]isbehavior . . . as to obstruct the administration of justice"[], a "material disruption or obstruction" of justice, *United States v. Seale*, 461 F.2d 345, 369 (7th Cir. 1972).

any way. *See supra* note 5. Accordingly, Mr. Donziger's conduct did not rise to the level of criminal contempt and he is innocent.

18. In any event, Mr. Donziger's alleged non-compliance with the Passport Order was fully rectified by August 7, 2018. Exercise of the criminal contempt power at this point in time would not be consistent with "the principle that only the least possible power adequate to the end proposed should be used in contempt cases." *Vuitton, supra*. Accordingly, the Court should decline to impose criminal contempt.

DATED: June 8, 2021                              Respectfully submitted,

                                                 _____/s_____

                                                 Martin Garbus, Esq.
                                                 OFFIT | KURMAN
                                                 590 Madison Ave., 6th Floor
                                                 New York, NY 10022
                                                 Tel. 347.589.8513
                                                 Fax. 212.545.1656
                                                 mgarbus@offitkurman.com
                                                 *Counsel for defendant*