

Martin Garbus, Esq.
590 Madison Ave., 6th Floor
New York, NY 10022
(347) 589-8513
mgarbus@offitkurman.com

June 25, 2021

**VIA ECF**

Honorable Loretta Preska
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

    RE:    *Chevron v. Donziger*, Case No. 19 Cr. 561 (LAP)
            Reply in Support of Motion to Dismiss (Dkt. 324)

Dear Judge Preska:

The hallmark of impunity is implacability. Platitudes or even silence in the face of even the most serious challenges. True impunity is knowing that no matter how obvious the truth is to anyone paying attention, it can just be ignored. Because there is no accountability.

The private Chevron-linked prosecutor in this extraordinary case has now provided a public filing in opposition to Mr. Donziger's motion to dismiss and for recusal. It reeks of impunity. The private prosecutor mechanically references prior statements (carefully crafted to leave out more information than they reveal), prior rulings by the Court that have also consistently dodged the substantive issues, and absurdly superficial responses to the profound issues of constitutional due process and procedural legitimacy that Mr. Donziger raised in his motion.

Last week, however, the private prosecutor provided a non-public response to Mr. Donziger's motion. It, too, avoids any substantive response. But it shows a very different side of impunity—an impunity enraged at being called out.

The private prosecutor sent this non-public response to the managing partner at undersigned's law firm. She accused undersigned of being in violation of the ethics rules and implicitly suggests the threat of defamation litigation. The tone and approach of the communication makes clear it is an attempt at intimidation and harassment—a psychological and economic pressure tactic. The same tactic that Chevron has used to target Mr. Donziger for over a decade. It seems that "demonization" is never far from the surface of any Chevron-financed, Ecuador-related litigation, including this criminal case.

This reply will briefly review the private prosecutor's public and private filings in opposition to motion to dismiss. It will then reiterate the plain and unrebutted reasons why dismissal or in the

Hon. Loretta A. Preska
June 25, 2021
Page 2 of 11

alternative recusal is necessary to protect the institution of justice and Mr. Donziger's constitutional rights.

A. **The public opposition**

In her public filing, the private prosecutor insists that this is not a "Chevron-orchestrated and Chevron-financed prosecution." *Why?* Because the provision of hundreds of hours of legal work and cooperation is being funded by Chevron's long-time law firm, Gibson Dunn & Crutcher, not by Chevron itself. See the difference?

Gibson Dunn has earned hundreds of millions in fees from Chevron largely by targeting, demonizing and trying to lock up Mr. Donziger over the last 11 years. It will likely earn many millions more in years to come. But Chevron, says the private prosecutor who hid the fact Chevron was a client of her law firm at the time of her appointment, is not involved. Yes, one of the Chevron lawyers who testified for the prosecution naively admitted during cross-examination that his travel expenses were being paid by Chevron. Quickly we were assured that this was a "mistake" and that Chevron was being "refunded" the relevant amounts by Gibson Dunn.

The frantic refund was unnecessary. No one takes seriously the difference between these two massively wealthy, Donziger-hating, corporate agenda-driven entities. Indeed, Gibson Dunn appears to have developed its "demonize Donziger" playbook into a whole new lucrative practice area, targeting human rights groups with allegations of fraud. It has as many reasons to finance a private corporate prosecution of Mr. Donziger as Chevron has.

The private prosecutor also insists this is not a Chevron-financed prosecution because she is being paid a relatively modest hourly rate by the Southern District of New York.[1] The private prosecutor's on-the-record billings are a healthy sum, but as already explained—in defense filings that the Court has entirely ignored in substance—the record billings are the tip of the iceberg. The decision of the private prosecutor and her prior and current law firm to pursue this private prosecution was most certainly a business decision. But the business has much more to do with potential future profits than the present billings. It has to do with positioning. Getting a piece of one of the most lucrative practices niches and one of the more spendthrifty clients in the Southern District.

As explained in a prior declaration:

> Chevron reportedly paid over a billion dollars in fees to prosecute the RICO case. A few more million here to try to put Mr. Donziger in jail is nothing for Chevron. The value in attacking Mr. Donziger goes well beyond Chevron's considerable vengefulness. Gibson Dunn, for example, has built a whole practice area often referred to as "the kill step":

---

[1] Even this "modest" rate has been parlayed into an extraordinary, indeed incomprehensible amount $1 million or more for a misdemeanor prosecution. Or at least the amount incomprehensible if viewed from the lens of the public interest, and the U.S. Attorney surely did when he refused to prosecute the case. It is quite comprehensible when viewed through the lens of Chevron's and Gibson Dunn's private interests.

> going after human rights lawyers and advocates for victims with manufactured allegations of fraud and wrongdoing. This is a valuable service for thousands of wealthy businesses across industry sectors and around the globe. It is a lucrative business for Gibson Dunn and has been for many years. Now Seward is being invited into the "kill step" game. A golden-ticket invitation from the practice group leader. Seward is looking at tens or hundreds of millions of dollars in fees, stretching far, far into the future. This is the business of law. This is why this case is happening.

Dkt. 280 at ¶¶ 18-20. The Court's response, rooted in impunity, was simply to ignore this obvious reality about the true motivations behind the prosecution of this case. Dkt. 297 at 21. Ignoring the problem does not make it go away.

### B. The private attacks

Within one hour of the filing of Mr. Donziger's motion to dismiss, the private prosecutor sent an email in reference to the filing, raising the accusation that it represented unethical conduct, and effectively seeking to intimidate undersigned into withdrawing it.

The private prosecutor specifically cited Rules 3.3(a)(1), 3.3(f)(2), and 4.1, providing, respectively, that a lawyer "shall not knowingly . . .make a false statement of fact or law to a tribunal," "shall not . . . engage in undignified or discourteous conduct," and "shall not knowingly make a false statement of fact or law to a third person." Ex. A-1 at 3-4.

Undersigned immediately apologized for any potential inaccuracy and requested clarification on what the private prosecutor understood to be the "false statement" referenced in her accusation. *Id.* at 3. Apparently still in a fury, the private prosecutor declined to clarify and instead forwarded the email, with additional threatening language, to the managing partner at my law firm. *Id.* at 2.

Undersigned continued to seek clarification about the alleged false statement, assuring the private prosecutor that if a false statement was made, "I will immediately correct it." After being repeatedly pressed, the private prosecutor identified three statements in the motion that she claimed were "false":

- the claim that she was personally criticized for "withholding information critical to the defense" in her role as assistant U.S. Attorney assigned to the prosecution of Sen. Ted Stevens, which was famously dismissed because of egregious prosecutorial misconduct;

- the claim that Chevron has spent a "vast amount of money" on this prosecution; and

- that claim that she is effectively a "'Chevron' prosecutor."

Ex. A-2 at 1. Given these assertions, undersigned expected more substance in the public filing on why the claims in the motion are "false"—not just contentious, like so many issues in this case, but so plainly "false" as to justify the extraordinary step of the private prosecutor going to the

Hon. Loretta A. Preska
June 25, 2021
Page 4 of 11

managing partner of undersigned's law firm out of a purportedly legitimate "concern" about ethical impropriety.

In fact, the public filing says nothing at all. As described above, the private prosecutor offers at most the superficial and utterly unconvincing attempt to downplay Chevron's role in financing and driving this prosecution as noted above. She simply insists she is not a "Chevron prosecutor." But the defense has repeatedly explained how Chevron's private agenda is driving this entire case and private prosecutor has never responded with any substance.

The private prosecutor also offers no response whatsoever regarding her role in the prosecutorial misconduct found to have taken place in the Ted Stevens case, for which she was a supervisor at the Department of Justice. If the private prosecutor doesn't think she was "criticized," this reflects a woeful lack of accountability. Judge Sullivan threw out one of the most high profile federal convictions of the last several decades, seething in the process: "In nearly 25 years on the bench, I have never seen anything approaching the mishandling and misconduct I have seen in this case."[2] The private prosecutor was a key part of the prosecution team. If this doesn't count as "criticism," it is hard to imagine what would.

Moreover, while the full depth of the prosecutorial misconduct in that case may never be known, it appears quite clear that the private prosecutor's involvement was not peripheral. The heart of the misconduct was the prosecution team's intentional decision—on bogus, bad faith legal pretenses—not to turn over critical investigative reports (FBI 302s) to the defense. The detailed report prepared by Henry Scheulke at the request of Judge Sullivan traced the origins of that decision, and much of it emerged from an August 1, 2008, meeting, in which the private prosecutor was a key participant. At that meeting, she instructed her team to keep the critical investigative reports "close to the vest" and endorsed the bogus legal justification for non-disclosure. Another participant testified at deposition that he was "stunned" by the position the private prosecutor took at that meeting.[3]

The private prosecutor's deep involvement in one of the most notorious examples of prosecutorial misconduct in the last half century was not, actually, the focus of the motion to dismiss. It was mentioned once—a single reference in a single sentence. The private prosecutor herself has brought the issue to the fore with her self-righteous attack on undersigned. Nonetheless, it is a plainly relevant contextual fact that the person selected to serve as the first private criminal contempt prosecutor in the modern history of the Southern District[4] has this

---

[2]  James Oliphant, *Ted Stevens' charges dismissed as judge excoriates prosecutors*, Los Angeles Times, Apr. 8, 2009, at https://www.latimes.com/archives/la-xpm-2009-apr-08-na-stevens8-story.html.

[3]  *See In re Special Proceedings*, Notice of Filing of Report, Case 1:09-mc-00198-EGS, Dkt. 84 at 98 (D.D.C. Mar. 15, 2012) ("Scheulke Report"), attached hereto as Ex. B.

[4]  The first private prosecutor since the archaic rule allowing interested private counsel to prosecute criminal contempts was thrown out as a fundamental, structural violation of constitutional due process. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987).

Hon. Loretta A. Preska
June 25, 2021
Page 5 of 11

particular history. The relevance is particularly pointed given that the defense has persistently objected to the massive lack of disclosure of key information, as detailed in the next section.

In short, none of the private prosecutor's identified points comes anywhere near any plausible understanding of "false statement" that would provide a basis for an independent ethical challenge to the lawyer arguing them. They are not only not false, they are in fact true. More relevantly, they are disfavored and highly uncomfortable to the private prosecutor personally. But it is the private prosecutor's decision to respond to the claims with an intimidation and suppression strategy that, if anything, raises ethical questions.

C. <u>The need for disclosure</u>

This obviously is an ill-conceived prosecution, driven by a private agenda rather than the public interest. Conflicts of interest and malicious corporate interests have been evident from its inception and guided—tainted—its every move. But underneath all the specific examples the defense has been able to highlight and challenge lies an origin problem: an "iceberg" of still secret key facts as to how this case came about; why the U.S. Attorney refused to prosecute; how and why a Chevron-linked private prosecutor was appointed; what the explicit and implicit terms of her assignment were; what degree of supervision and direction the private prosecutor is subject to and how she has been able to access U.S. Attorney and other Executive Branch resources notwithstanding the U.S. Attorney's refusal to participate; why this Court was selected to preside; and the extent of the Court's involvement in the prosecutorial decision-making generally; and the extent of communications between the two judges presiding over this case and the private prosecutor and between themselves.

The majority and concurring opinions in *Vuitton* made clear that the guarantee of a disinterested prosecutor lies at the heart of the procedural guarantees implicit in the very structure of due process in a criminal case. The appointment of an interested prosecutor is an "error [] so fundamental and pervasive that [it] requires reversal without regard to the facts or circumstances of the particular case." *Vuitton* at 810. More than any case in recent history, the Chevron-financed targeting of Mr. Donziger illustrates the critical importance of the guarantees protected by the Constitution and *Vuitton*. In this case, the private agenda of an exceptionally wealthy and influential fossil fuel company is driving the criminal prosecution of renowned human rights defender. This has led to a massive public outcry from human rights groups,[5] leading political

---

[5]  *See, e.g.*, *Joint Public Statement: Misuse of the Justice System Against Human Rights Lawyer Who Sued Chevron Must End*, AMNESTY INTERNATIONAL, ET AL., May 6, 2021, at https://www.amnesty.org/download/Documents/AMR5140902021ENGLISH.pdf (calling the case the United States' first "corporate prosecution" and a "misuse of the justice system"); James North, *A New Justice Movement Emerges to Defend Steven Donziger*, THE NATION, Sept. 10, 2020, at https://www.thenation.com/article/activism/a-new-justice-movement-emerges-to-defend-steven-donziger/.

figures and individuals of conscience, and even former federal judges,[6] objecting to the conduct of this Court and the federal courts generally as regards Mr. Donziger.[7] Tellingly, *Vuitton* itself emphasized the importance of disinterestedness on systemic legitimacy, noting that "appointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Id.* at 813.

As set forth herein, and in countless earlier filings, the fossil fuel industry agenda behind this prosecution is painfully obvious. It is clearly seen by the public. The court system and its elite participants, like the private prosecutors and Gibson Dunn lawyers engineering this process, fail to grasp this truth at their peril.

If this case is to proceed even a day further—which it should not, for the reasons outlined in the instant motion and the other pending motion to dismiss for reasons of the unconstitutional appointment and lack of supervision and direction of the private prosecutor, Dkt. 330—much more information must be disclosed going to the issue of disinterestedness. The public, and of course Mr. Donziger, deserve to know the nature and essential facts of this unprecedented exercise of prosecutorial discretion to initiate and pursue this case, all of which was conducted by non-Executive Branch actors, albeit with Executive Branch resources and in service to an executive power vested exclusively by the Constitution in the Executive Branch.[8] The information must be produced to allow for a proper understanding of the foundation of this case to allow for a more fulsome motion to dismiss, and must be made available to fill out the record for defense challenges on appeal.

As noted, an "iceberg" of information about how this case came about and has proceeded lies underneath the selective crumbs of information that the defense has thus far forced the private prosecutors to produce. Among the many, many unanswered questions:

- Initial charging decision. Did Judge Kaplan seek consultation or approval from Executive Branch authorities before drafting the charges in this case? Were the charges ever reviewed by anyone outside of Judge Kaplan's office before they were submitted to the U.S. Attorney? Was Judge Preska ever consulted or given notice of the substance of the proposed charges prior to the charging decision?

- Chevron/Gibson Dunn and the charging decision. What were the full facts and circumstances surrounding the effort led by Gibson Dunn's Randy Mastro to convince the U.S. Attorney to prosecute Mr. Donziger in 2010? How many similar efforts by Gibson Dunn have there been, with the U.S. Attorney, with the Department of Justice, with the Manhattan District Attorney, and/or with any other criminal justice authority?

---

[6] *See* Hons. Nancy Gertner and Mark Bennett, *Criminal Contempt Charges In Donziger Case Are Excessive*, LAW360, July 13, 2020.

[7] *See* Letter to U.S. Attorney General Merrick Garland from Reps. Jim McGovern, Jamie Raskin, Alexandra Ocasio-Cortez, Cori Bush, and Rashida Tlaib, Apr. 27, 2021, at https://mcgovern.house.gov/uploadedfiles/donziger_042621.pdf.

[8] *See, e.g.*, *Vuitton*, *supra*, at 815 (Scalia, J., concurring).

How many similar efforts have there been led by other Chevron-linked law firms, consultants, lobbyists, allies, or other third-parties? Was the possibility of criminal prosecution of Mr. Donziger ever discussed with Rudy Giuliani, a long-time close associate of Rany Mastro and the personal attorney and adviser to Donald Trump?

- <u>U.S. Attorney decision not to prosecute</u>. Who at the U.S. Attorney's office reviewed and analyzed Judge Kaplan's request to prosecute, and what was the extent and degree of their respective involvement? To what extent was the basis and nature of the charges investigated? Were memoranda prepared? Was any person linked to Chevron or its law firms (especially Gibson Dunn and Stern & Kilcullen) contacted? Were any third-parties contacted? Specifically with respect to the decision not to prosecute, what determination was made with respect to the extent of resources that would be required, and what was the factual basis for that determination? What determination was made with respect to the prosecutorial "value" of the case and what was the basis for that determination? How much of the foregoing investigatory and/or analytical material was conveyed to Judge Kaplan or Judge Preska, if any?

- <u>Rule 42 appointment</u>. Was the constitutionality of a non-Executive Branch exercise of federal prosecutorial discretion under these circumstances considered prior to the appointment decision? Were any memoranda or legal analyses prepared? Specifically, was the question of private prosecutor's supervision and direction as an inferior officer wielding Executive Branch power considered and what resulting determinations were made, if any? Was Judge Preska's view with respect to the constitutional issues ever solicited or provided?

- <u>U.S. Attorney position re Rule 42 appointment</u>. Was the U.S. Attorney's office involved in or given advance notice of the Judge Kaplan's decision to appoint a private prosecutor under Rule 42? Was any legal consideration give not the constitutionality of the exercise of non-Executive Branch prosecutorial discretion under these circumstances? Specifically, was the question of the supervision and direction of the private prosecutor's exercise of Executive Branch powers considered and what resulting determinations were made, if any?

- <u>Identity and operation of the private prosecutor</u>. By what process did Judge Kaplan select the private prosecutor? Was the private prosecutor selected from a list of eligible individuals? Was Judge Preska given any opportunity for input regarding the identity of the private prosecutor? Were preliminary discussions or interviews undertaken? Did the private prosecutor have any prior relationship to either Judge Kaplan or Judge Preska? What understandings were reached between Judge Kaplan (or Judge Preska) and the private prosecutor during the appointment process? How much opportunity was the private prosecutor given to investigate the background of the case and the details of the charges? Was the private prosecutor given any opportunity to revise or consult concerning the charges she would be pursuing? Were the constitutional issues of supervision and direction presented to or discussed with the private prosecutor? Were there (are there) any understandings or agreements committing the private prosecutor to

Hon. Loretta A. Preska
June 25, 2021
Page 8 of 11

abide by the protocols of the U.S. Attorney Manual or any similar guidance, rules, or regulations? How did the private prosecutor come to use Executive Branch resources such as the investigatory resources of the FBI?

- <u>U.S. Attorney position re identity and operations of the private prosecutor</u>. Was any person at the U.S. Attorney's office involved in or consulted regarding the identity of the private prosecutor prior to her appointment? Were questions regarding how the private prosecutor would operate—including what guidance or regulation the private prosecutor would be subject to and what federal resources would be made available—ever raised with the U.S. Attorney for approval or consultation? Was any calculation made with respect to the level of resources that would be made available to the private prosecutor, and was any such resource commitment considered in light of the original decision that the prosecution of Mr. Donziger implied an unwarranted commitment of U.S. Attorney resources? Has the U.S. Attorney continued to monitor the progress of this case, and specifically the details of the private prosecutor's exercise of Executive power and use of Executive Branch resources? What memoranda and communication reflect this monitoring, if any? Has the U.S. Attorney ever formulated objections, suggestions, or requests regarding the private prosecutor's operations, and if so have they been communicated to Judge Kaplan, the private prosecutor, or anyone else?

- <u>Disinterestedness of the private prosecutor</u>. Was Judge Kaplan aware that Seward & Kissel had represented Chevron multiple times when he made the decision to appoint the private prosecutor? What conflicts checks were run by the private prosecutor, when were they run, and what were their scope and terms? Who specifically at Seward & Kissel considered the question of whether to inform Judge Kaplan and Judge Preska of the conflict? When the conflict was disclosed, seven months into the prosecution in response to a motion to dismiss, what was the basis of the decision to disclose the conflict at that time? What was the timing, number, and substance of conversations between Seward and Chevron or its law firms (especially Gibson Dunn and Stern & Kilcullen) about Seward's involvement in the private prosecution? How did Seward obtain Chevron as a client in the first place? What was the nature of Seward's representations of Chevron and did they relate to the Ecuador matter or Mr. Donziger? Did Seward or any Seward-linked person, at any time previous to the appointment, solicit a broader scope of representation or otherwise offer to do more work for Chevron? Have any such broader pitch or offer been made subsequent to the appointment and/or subsequent to the private prosecutor's individual departure from Seward? To what extent was the private prosecutor's involvement in this prosecution a factor in her departure? To what extent was the departure motivated by Seward and to what extent was it motivated by the private prosecutor herself? What was involved in the determination that Ms. Armani would also leave Seward but Mr. Mahoney would stay? Have any protocols been established regarding what information Mr. Mahoney is allowed to share regarding Seward matters and affairs?

- <u>Gibson Dunn and the private prosecutor</u>. What contacts has the private prosecutor had with which Gibson Dunn attorneys, of what nature and over what period of time? When

Hon. Loretta A. Preska
June 25, 2021
Page 9 of 11

      was assistance offered and what were the terms? Was the strategy of having Gibson Dunn cover all expenses relating to prosecutorial assistance—even though Gibson Dunn had a legitimate rationale to bill the expenses through to the client, as acknowledged by Mr. Thomson's testimony—discussed with the private prosecutor? Were associate level contacts maintained between the Gibson Dunn team and the private prosecutor's team? What protocols were used between the two teams as far as research into case background and the civil case record? What protocols were used for the drafting of private prosecutor pleadings? Apart from FBI interviews, what protocols were used for having Gibson Dunn answer questions, or "fact check" material, or otherwise lend their expertise? Why were Gibson Dunn attorneys emailing Twitter posts at random hours to the private prosecutor? Has the private prosecutor ever been recruited to work at Gibson Dunn?

- <u>Selection of the presiding judge</u>. Was the question of the necessity for random or wheel assignment of a presiding judge to this matter under RDB 6(b) considered? Was the question of the necessity of random assignment under constitutional due process requirements and/or international human rights-based fair trial principles considered? Was the assignment committee consulted prior to Judge Kaplan's use of RDB 14 for the assignment of this matter? Were any objections or approvals provided? What was the substance of the notification provided to the assignment committee per the requirements of RDB 14? How many conversations occurred between Judges Kaplan and Preska prior to the RDB 14 assignment? What agreements or understandings were reached? Were any other judges or officials from the SDNY or the U.S. Attorney's Office involved? What was Judge Preska's exposure to and familiarity with the Chevron litigation against Mr. Donziger and others prior to these conversations? Was Judge Preska given an opportunity to investigate the basis and details of specific charges prior to accepting the appointment?

- <u>Home confinement of Mr. Donziger</u>. The imposition of home confinement of Mr. Donziger on a misdemeanor charges is unprecedented, has raised alarm and outcry from legal experts and human rights groups around the world, and was identified as a matter of concern by the Second Circuit. Yet the decision was reached almost immediately at the first hearing in this matter, in a coordinated fashion between Judge Preska and the private prosecutor, with minimal on-the-record analysis. Was any analysis of the possibility and propriety of home confinement under these circumstances conducted by Judge Kaplan, Judge Preska, or the private prosecutor prior to the initial hearing in this matter? Were there any conversations and were any agreements or understandings reached prior to Mr. Donziger's initial appearance? Was the U.S. Attorney consulted regarding the possibility and propriety of the imposition of home confinement on these misdemeanor charges? Were there any conversations or communications between the private prosecutor and Chevron or Chevron attorneys at its two law firms about this?

While the above paragraphs set forth broad questions designed to illustrate the "iceberg" of unknown information regarding this unprecedented case, the defense ultimately will seek a scope of documents and deposition testimony more targeted to the critical issues of disinterestedness and apparently unconstitutionality presented by the pending motions.

Hon. Loretta A. Preska
June 25, 2021
Page 10 of 11

**D. <u>The need for disqualification</u>**

If the Court is not willing to dismiss this case in its entirety at the moment, the defense reiterates its request that the Court recuse itself pursuant to its inherent discretion and 28 U.S.C. § 455, which requires a judge to "disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned." It is entirely reasonable, to say the least, to question this Court's ability to proceed over the necessary discovery measures and legal issues remaining in this case, *supra*, which directly target the secret, behind-the-scenes life of this case in which the Court appears to have been an active participant. The defense would also highlight in this regard the Court's decision regarding home confinement—a decision which, again, is largely unprecedented with respect to the misdemeanor nature of this federal case and has been excoriated by human rights groups all over the world as unwarranted and transparently punitive. This decision was reached in the opening days of the case, suggesting that the animus that motivated it emerged from an extrajudicial source.[9]

\*   \*   \*

For all the foregoing reasons, this unconstitutional and conflict-ridden prosecution, effectively financed by Chevron and in service of Chevron's private agenda, must be dismissed immediately. In the alternative, Mr. Donziger must be released from home confinement forthwith pending the final resolution of the issues presented herein; the Court must authorize appropriate, targeted discovery into the areas identified above; and the Court should promptly disqualify itself and allow for, finally, the random assignment of a new presiding judge.

The complexity and multiplicity of issues raised by the pending motion and the related motion to dismiss filed June 22, 2021, Dkt. 330, clearly warrant an evidentiary hearing. If the Court does not immediately dismiss the case, the defense requests that the two motions be joined and that a hearing be held at the earliest possible date. At the hearing the defense will present sufficient evidence, to the extent the Court maintains is it not already in the record, to establish the need for further discovery into the issues and concerns identified in the motion.

---

[9] Notable in this highly unusual context, the defense submits that "extrajudicial source" in this context would necessarily include information and impressions conveyed to the Court from Judge Kaplan. The defense is aware of no exception to the rule that would allow judges to demonize litigants amongst themselves and yet enjoy the protections of the extrajudicial source doctrine. It is also worth emphasizing that extrajudicial nature is an important element of the analysis but not an absolute requirement. even where the judge's bias or partiality is based solely on information learned during the course of judicial proceedings, recusal is warranted where the court "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Sentis Group v. Shell Oil Co.*, 559 F.3d 888, 904-05 (8th Cir. 2009) (holding that district judge had exhibited enough antagonism to require reassignment under 28 U.S.C. § 455(a) standard, given the court's "apparent distrust of Plaintiffs as manifested early in the litigation").

Hon. Loretta A. Preska
June 25, 2021
Page 11 of 11

        Respectfully,

        /s

        Martin Garbus, Esq.
        OFFIT | KURMAN
        590 Madison Ave., 6th Floor
        New York, NY 10022
        Tel. 347.589.8513
        mgarbus@offitkurman.com
        *Counsel for defendant*