# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE SPECIAL PROCEEDINGS | ) ) ) ) ) | Misc. No. 09-0198 (EGS) |

## NOTICE OF FILING OF REPORT TO HON. EMMET G. SULLIVAN

Pursuant to the Court's Order, dated February 8, 2012, the undersigned hereby files

the Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order,

dated April 7, 2009, and an Addendum containing comments and objections to the Report which

were provided to the undersigned by the subjects of the investigation, Joseph W. Bottini, James

A. Goeke, Nicholas A. Marsh, Brenda K. Morris, Edward P. Sullivan and William W. Welch III,

on March 8, 2012.

Respectfully submitted,

Henry F. Schuelke III (D.C. Bar no. 91579)
Special Counsel

William Shields (D.C. Bar no. 451036)
Janis, Schuelke & Wechsler

Washington, D.C.
Dated: March 15, 2012

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE SPECIAL PROCEEDINGS | ) ) ) | Misc. No. 09-0198 (EGS) |

Report to Hon. Emmet G. Sullivan of Investigation Conducted
Pursuant to the Court's Order, dated April 7, 2009

Henry F. Schuelke III
Special Counsel
D.C. Bar no. 91579

William Shields
D.C. Bar no. 451036
Janis, Schuelke & Wechsler

Washington, D.C.
Dated: November 14, 2011

# TABLE OF CONTENTS

Executive Summary.................................................................................1

Introduction.................................................................................32

Summary of Findings.................................................................37

The Polar Pen Investigation.......................................................39

Indictment, Arraignment and Senator Stevens's
Demand for a Speedy Trial.........................................................46

Pre-Trial Discovery and the Court's *Brady* and *Giglio*
Disclosure Orders.......................................................................50

The Prosecutors did not Conduct or Supervise the Review
    for *Brady* Material...............................................................64
a.    FBI and IRS Agents conducted the pre-trial *Brady* review...............64
b.    The prosecutors did not supervise the *Brady* review and
    employed other PIN prosecutors, not assigned to *Stevens*
    or to the Polar Pen investigation, to conduct *Brady* reviews..............74

Pre-trial Discovery: Jencks Act Material and Electronic Discovery............98
a.    Decision not to treat FBI 302s as Jencks Act material......................98
b.    There is evidence that the government manipulated
    the electronic discovery in an attempt to make
    Williams & Connolly's review more difficult.................................103

Statement of Investigative Findings............................................106
A.    Rocky Williams
    Summary...........................................................................106
    Background........................................................................108
1.    Trial Preparation Interviews in Alaska, August 2008......................111
<u>August 15</u>:  Mr. Williams is "very focused and his recall is good";
    No 302 is written..................................................................111

August 20:   Mr. Goeke's notes reflect that Mr. Williams stated
             that his time and David Anderson's time on the
             renovation of Senator Stevens's home were supposed
             to be added to the Christensen Builders' bills, and
             Mr. Bottini's notes reflect the opposite;
             No 302 is written...................................................................113

August 22:
a.    Mr. Bottini and Mr. Goeke receive an email message from
      Mr. E. Sullivan regarding documents received from
      Williams & Connolly which make it "fairly apparent" that
      the defense will be that "VECO costs were rolled into
      the large Christensen bills" and that "they [will] try
      to squeeze this point out of Rocky on cross"...................................127
b.    Mr. Bottini and Mr. Goeke interview Mr. Williams
      the same day and their notes reflect that he told them
      again that VECO expenses were supposed to be added
      to the Christensen Builders' bills....................................................130
c.    Mr. Goeke and/or Mr. Bottini dictate a 302 to Agent Joy
      which omits the *Brady* information provided by Mr. Williams.......150

August 31:   Mr Williams reiterates that VECO expenses were
             supposed to be included in Christensen Builders' bills;
             No 302 is written...................................................................169

2.    Prosecutors Anticipated since April 2007, that Senator Stevens's
      Defense Would Be that He and His Wife Believed that VECO's
      Costs were Included in the Christensen Builders' Bills..................170

3.    On the Eve of Trial, Prosecutors Decide not to Call
      Mr. Williams as a Witness and He Returns to Alaska
      for Medical Attention.......................................................................177
      a.    Trial Preparation Interviews in Washington, Sept. 2008
      September 20:   Mr. Williams reiterates that VECO expenses
                      were to be included in Christensen Builders'
                      bills.................................................................177
      September 21:   Mock cross-examination of Mr. Williams.........180

     b.     Mr. Williams Returned to Alaska and Never
Testified at Trial.......................................................................188

4.    *In absentia*, Rocky Williams Remained a Key Figure
Throughout the Trial...............................................................193

B.    Bambi Tyree.................................................................................198
    Summary.......................................................................................198

1. July 2004    Interview of Bambi Tyree by Agent Eckstein and
AUSA Frank Russo, and AUSA Russo's and
Mr. Goeke's Motion *in limine* in
*United States v. Boehm*.................................................199

2. March 2007    Mr. Goeke Raises a *Franks* Disclosure Issue
Regarding Mr. Allen's Solicitation of
Ms. Tyree's False Statement; Mr. Allen is interviewed
and Agent Kepner writes a one-sentence 302
that he "never encouraged others to make a false
statement under oath": No Disclosure..........................203

3. Sept. 2007    *Unites States v. Kott*, Mid-trial Sealed Proceeding:
No Disclosure..............................................................205

4. October 2007    After the *Kott* Trial and Before the *Kohring* Trial,
Mr. Goeke Obtains Agent Eckstein's 302 and the
Handwritten Notes of Agent Eckstein and AUSA
Russo, Ms. Tyree is Reinterviewed and DOJ's
Professional Responsibility Advisory Office
("PRAO") is Consulted: No Disclosure......................212
    a.     Agent Eckstein's notes and 302, and
AUSA Russo's Notes............................................212
    b.     Oct. 10, 2007    Mr. Bottini and Agent Kepner interview
Ms. Tyree and the four-sentence 302
states that she "came up with an idea
to sign a document to prevent further
extortions [of Mr. Allen] . . . The content
of the document was created solely by
TYREE with the help of the attorney
[for Mr. Allen]."......................................220

     c.     Oct. 12, 2007     First of Two PRAO Consultations...........225

5. Oct. 25, 2007     *United States v. Kohring*, Sealed Proceeding:
     No Disclosure.................................................................235

6. Dec. 20, 2007     After the *Kohring* trial, Second PRAO Consultation:
     No Disclosure.....................................................237
     a.     PRAO's Advice is Again Based on Inaccurate and
     Incomplete Information...........................................237
     b.     Significant Factual Errors in PRAO's Report:
     Not Detected or Corrected.......................................243
     c.     Post PRAO, Disclosure Discussions "Die on the Vine"........252

7. *Kott* and *Kohring* Postscript, Ninth Circuit, 2009-2010:
     Some Disclosure.................................................................256

8. April 11, 2008     Prosecution Memo in *Stevens*:   No Disclosure............263

9. July 14, 2008     Prosecutors Meet with AAG M. Friedrich: Accounts
     Differ on Disclosures Made to the AAG......................265

10. August 14, 2008     Sealed Government Motion *in Limine*
     to Limit Cross-Examination of Mr. Allen:
     No Disclosure...................................................270
     a.     "rumored procurement of the false statement
     from Bambi by Bill"............................................272
     b.     "rumor that the [government] played some role in
     an earlier investigation of Allen being suspended"...............275
     c.     "rumored personal vices such as excessive alcohol
     consumption"....................................................281
     d.     Sealed Hearing and Rulings on Government's
     Motions: *Kott* and *Kohring* Hearings Redux.......................282

11. August 25, 2008     Government's *Giglio* Letter: No Disclosure......286
     a.     Drafts: Some Disclosure.....................................286
     b.     Final: No Disclosure............................................289

12. Sept. 9, 2008    Government's *Brady* Letter: No Disclosure,
                     Misrepresentations and Omissions...............................299

        a.    Documents evidencing Mr. Allen's subornation of
              perjury circulated among the prosecutors as they
              drafted the *Brady* letter.........................................300
              i.    Agent Eckstein's 302 and notes....................................300
              ii.   AUSA Russo's and AUSA Goeke's
                    pleadings in *Boehm*..........................................308
              iii.  PRAO opinions.............................................312
        b.    Prosecutors re-interview Mr. Allen and obtain more
              denials and self-serving statements.......................................313
        c.    None of the drafts of the *Brady* letter disclosed Agent
              Eckstein's 302, the government's pleadings in *Boehm*,
              or the information contained in those documents.................316
              i.    Initial drafts disclose additional allegations
                    of sexual misconduct by Mr. Allen but no
                    information about his subornation of perjury.............316
              ii.   Mr. Welch, Ms. Morris, Mr. Marsh and
                    Mr. E. Sullivan meet and determine
                    the *Brady* disclosure regarding Mr. Allen
                    and Ms. Tyree.................................................321
        d.    Final draft: written by Mr. Marsh, approved
              by Mr. Goeke, and "skimmed" by Mr. Bottini,
              with Mr. E. Sullivan as "scrivener".......................................329
        e.    Oct. 14-16, 2008: Mr. Welch discovered Agent
              Eckstein's 302 in the APD file, read it for the first
              time and provided it to Williams & Connolly........................344

13. Sept. 30-Oct. 7, 2008      Mr. Allen was not questioned at
                               trial about Ms. Tyree or the APD
                               investigations...........................................351

C.      The Torricelli Note, the Interviews of Mr. Allen
        on April 15 & 18 and Sept. 9 & 14, 2008, and
        Mr. Allen's CYA Testimony.................................................351

        Summary.............................................................................351

1.      April 2007-March 2008  Prosecutors believe that Senator
                               Stevens's oral requests for invoices
                               from Mr. Allen are "pretextual" and
                               that "ALLEN has stated as much"...........354

2.      April 8, 2008          Prosecutors receive the Torricelli note
                               from Williams & Connolly...............................356

3.      April 11, 2008         Torricelli notes featured in memorandum
                               to AAG Fisher, "troubling irregularities"
                               identified...............................................359

4.      April 15, 2008         Mr. Allen tells Mr. Bottini, Mr. Goeke,
                               Mr. Marsh, Mr. E. Sullivan and
                               Agent Kepner that he does not remember
                               speaking with Bob Persons about
                               the Torricelli note, interview notes are
                               taken, but no 302 is written because "the
                               debriefing … did not go well"..........................362

5.      April 15 & 18, 2008    The Value of VECO's Work on
                               Senator Stevens's Home..........................380
        a.      Mr. Allen told Mr. Bottini, Mr. Goeke, Mr. Marsh and
                Agent Kepner that the value of VECO's work on Senator
                Stevens's home was approximately $80,000 and not
                $250,000, the amount later alleged in the indictment............380
        b.      Although the prosecutors anticipated that Senator
                Stevens would assert as part of his defense that
                "the $250K value of VECO's work is over-inflated",
                they never disclosed Mr. Allen's statements that the
                value of VECO's work was $80,000......................................387

c.   The value of VECO's work and the cost of the
      renovation were significant, contested issues
      throughout the trial................................................394
      i.    Opening statements.........................................394
      ii.   Mr. Allen's Testimony, the Pluta 302 and the
            Redaction of VECO's Cost Report (GX 177).............395
      iii.  Summations.................................................. 399

6.   April 24, 2008:   William Arthur, Senator Stevens's archivist,
                       is interviewed......................................401

7.   May 1, 2008       Prosecutors interview Barbara Flanders,
                       Senator Stevens's assistant, who exchanged
                       emails with Senator Stevens in December
                       2002 about Bob Persons "riding herd"
                       on getting bills for the work on the
                       Girdwood residence; no 302 is written..............402

8.   May 8, 2008       Bob Persons is interviewed, but not about
                       the Torricelli note................................410

9.   May 15, 2008      A revised prosecution memo addresses the
                       Torricelli notes, the emails between
                       Ms. Flanders and Senator Stevens, and
                       Senator Stevens's "cover story".........................414

10.  July 25, 2008     During its next to last meeting before voting
                       to indict, the grand jury hears testimony about
                       the Torricelli note and Senator Stevens's
                       request to Mr. Allen for a boiler repair bill
                       in 2006 because "it fits TS's m.o. of asking
                       for invoices from BA only when it looks
                       like he can't hide it"...........................417

11.  Sept. 9, 2008     As the *Brady* letter is drafted, Mr. Allen is
                       questioned again about Senator Stevens's
                       requests for bills and why none was sent...........420

12.  Sept. 14, 2008        Mr. Allen is questioned again about the
                           Torricelli note and remembers his CYA
                           conversation with Mr. Persons in 2002; Mr.
                           Bottini, Mr. Goeke, Mr. E. Sullivan,
                           Mr. Marsh and Agent Kepner forget their
                           interview of Mr. Allen in April, 2008,
                           Ms. Morris remembers it, and no one
                           checks their notes.................................................424

13.  Sept. 25, 2008       Brendan Sullivan features the Torricelli note
                           prominently in his opening statement...............462

14.  Oct. 1, 2008          On direct, Mr. Allen testifies that Mr. Persons
                           told him in 2002 that "Ted is just covering
                           his ass" with the Torricelli note........................463

15.  Oct. 6, 2008          On cross, Mr. Allen testifies that he did not
                           tell the government "just recently" about his
                           CYA conversation with Mr. Persons and the
                           prosecutors do not correct his false
                           testimony............................................................469

Discussion and Conclusion........................................................497
1.   Favorable Evidence was Concealed From Senator Stevens
     which would have Directly Corroborated His Defense and
     Significantly Impeached the Credibility of the Government's
     Key Witness.......................................................................497
     a.   *Brady* and *Giglio*.................................................497
     b.   *Napue*..................................................................503

2.   The Essential Elements of Criminal Contempt.................507

**Addendum**      **Subject Attorneys' Comments and/or Objections to the Report Pursuant to the Court's Order, dated February 8, 2012**

Exhibit 1        Joseph W. Bottini

Exhibit 2        James A. Goeke

Exhibit 3        Nicholas A. Marsh

Exhibit 4        Brenda K. Morris

Exhibit 5        Edward P. Sullivan

Exhibit 6        William M. Welch III

# Executive Summary

The investigation and prosecution of U.S. Senator Ted Stevens were permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated Senator Stevens's defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness. Months after the trial, when a new team of prosecutors discovered, in short order, *some* of the exculpatory information that had been withheld, the Department of Justice ("DOJ") moved to set aside the verdict and to dismiss the indictment with prejudice. New prosecutors were assigned after U.S. District Judge Emmet G. Sullivan held two of the previous prosecutors in contempt for failing to comply with the Court's order to disclose information to Senator Stevens's attorneys and to the Court regarding allegations of prosecutorial misconduct which were made after trial by an FBI agent who had worked on the case.

Judge Sullivan granted the government's motion and dismissed the indictment with prejudice on April 7, 2009, finding that "There was never a judgment of conviction in this case. The jury's verdict is being set aside and has no legal effect." On the same day, Judge Sullivan appointed Henry F. Schuelke III, the undersigned, "to investigate and prosecute such criminal contempt proceedings as may be appropriate" against the six prosecutors who conducted the investigation and trial of Senator Stevens. The investigation lasted two years and required the examination and analysis of well over 128,000 pages of documents, including the trial record, prosecutors' and agents' emails, FBI 302s and handwritten notes, and depositions of prosecutors, agents and others involved in the investigation and trial.

As a direct consequence of the dismissal of the indictment against Senator Stevens, the convictions of Peter Kott and Victor Kohring, Alaskan state legislators, were reversed and new trials ordered because significant exculpatory information in those cases was concealed from the defense, including the same impeachment information about the same government key witness which had been concealed from Senator Stevens. *See United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 Fed. Appx. 736 (9th Cir. 2011). The Court of Appeals rejected the government's argument that the prosecutors' "discovery missteps" were harmless and that Mr. Kott and Mr. Kohring had nevertheless received fair trials.

The seven-count, false statements indictment filed against Senator Stevens on July 29, 2008 alleged that, during the period from May 1999 to August 2007, he received benefits and other things of value from VECO Corporation, Bill Allen, VECO's chief executive officer and principal owner, and two other individuals. By far the largest and most significant benefit allegedly received was more than $250,000 worth of renovation and repair work performed in 2000 to 2002 by VECO on a house in Girdwood, Alaska, which was owned, and occasionally used, by Senator Stevens and his wife, Catherine Stevens; their primary residence was in Washington, D.C. Mr. Allen, a friend of Senator Stevens, arranged for work to be performed by VECO employees, including David Anderson (Mr. Allen's nephew) and Robert "Rocky" Williams, who supervised the VECO employees. Rocky Williams also supervised Christensen Builders, a contracting company which was hired and paid by Senator Stevens and Catherine Stevens to perform the renovations. The indictment alleged that Senator Stevens concealed his receipt of free renovation and repair services provided by VECO's employees, and violated the false statements statute, 18 U.S.C. § 1001, by failing to disclose them on Financial Disclosure Forms which he filed annually with the Senate.

In 2003, the government began a large-scale investigation into public corruption in Alaska state politics known as the Polar Pen investigation. Mr. Allen began cooperating with DOJ's "Polar Pen" investigation of official corruption in Alaska on Aug. 30, 2006, and pursuant to a plea and cooperation agreement with the government, testified as the government's key witness against Mr. Kott and Mr. Kohring in 2007 and against Senator Stevens in 2008. Rocky Williams, the foreman of the Girdwood renovation and "Bill [Allen]'s eyes", was expected to be an important government witness against Senator Stevens, but the prosecutors returned him to Alaska for medical attention on the day opening statements were given. He never returned to testify and died in Alaska on December 30, 2008.

Senator Stevens was arraigned on July 31, 2008, and his attorney, Brendan Sullivan, requested an October trial date so that Senator Stevens, who was running for re-election, could clear his name before the November election. Brenda Morris, the lead prosecutor, acceded to the request and suggested an earlier trial date, Sept. 24, 2008, which was accepted by the Court and Mr. Sullivan. That date was later advanced and jury selection began on Sept. 22, 2008. The prosecutors had anticipated the possibility of a speedy trial request by the defense, decided in advance to consent if one was made, but they were unprepared for a speedy trial.

During the arraignment, Ms. Morris agreed to expedited discovery and informed the Court that the "the bulk" of the government's discovery would be provided to Williams & Connolly, Senator Stevens's lawyers, the following week. That didn't happen. Rule 16 discovery was delayed for weeks while files and electronic data were transferred from the offices of the U.S. Attorney and FBI in Anchorage, Alaska (where the government's investigation was based), to Washington, D.C. The government's review of its files for *Brady/Giglio* material had only begun on or around the date the indictment was filed.[1] That review was "completed" on Sept. 9, 2008, less than two weeks before jury selection began, when the prosecutors made their second and last voluntary disclosure of *Brady* information to the defense.

But the prosecutors never conducted or supervised a comprehensive and effective review for exculpatory information. The review of the government's files for *Brady* information was conducted by FBI and IRS agents, some of whom were unfamiliar with the facts or with Brady/Giglio requirements, unassisted and unsupervised by the prosecutors. The prosecutors also failed to review their own notes of witness interviews, including notes of their interviews of Mr. Allen which contained significant *Brady* information that was never disclosed to the defense.

Not only was the *Brady* review unsupervised, the prosecutors themselves were unsupervised. At the request of Matthew Friedrich, the Assistant Attorney General for the Criminal Division, Ms. Morris, the Principal Deputy Chief of DOJ's Public Integrity Section ("PIN"), became the lead prosecutor a few days before the indictment was filed. Joseph Bottini, an AUSA in the Alaska U.S. Attorney's Office, and Nicholas Marsh, a PIN attorney, became second and third chairs respectively. James Goeke, an Alaskan AUSA, and Edward Sullivan, a PIN attorney, who had both worked on the Polar Pen investigation for years and had participated in the trials of Mr. Kott and Mr. Kohring in 2007, were removed from the in-court trial team and performed back office work during the trial. Ms. Morris had intermittently supervised the Polar Pen investigation and had a general, but not a detailed knowledge of the years-long investigation of Senator Stevens. Her four displaced colleagues resented her appointment, and Ms. Morris, in an attempt to avoid making the situation worse, "tr[ied] to make herself as little as possible", and did not supervise the prosecution.

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

Ms. Morris developed a direct reporting relationship with A.A.G. Friedrich and Rita Glavin, his Principal Deputy, which interfered with the ability of William Welch, the Chief of PIN, to supervise Ms. Morris and the conduct of the prosecution, including the government's approach to pre-trial discovery. For example, during a meeting with Mr. Friedrich, Ms. Glavin and Mr. Welch, Ms. Morris recommended, without prior consultation with Mr. Welch, that FBI 302s of witness interviews not be disclosed as Jencks Act (18 U.S.C. § 3500) material, a position contrary to Mr. Welch's preferred practice. Mr. Friedrich and Ms. Glavin endorsed Ms. Morris's recommendation and 302s were not disclosed to the defense until a week before trial when, on Sept. 16, 2008 and in response to Senator Stevens' motion to compel, Judge Sullivan ordered the government to disclose all 302s containing *Brady* information the next day. The prosecutors delivered 302s to the defense with all non-*Brady* information redacted.

Mr. Allen took the witness stand on Sept. 30, 2008. Near midnight on October 1, 2008, Ms. Morris informed the Court and Williams & Connolly that *Brady* information had been inadvertently redacted from a 302 of an interview of Mr. Allen. The next day, October 2, Judge Sullivan suspended Mr. Allen's direct testimony and ordered the prosecutors to disclose "forthwith" unredacted 302s and grand jury testimony for all their witnesses. The resulting mid-trial disclosure of the grand jury testimony of David Anderson led to the immediate discovery by Williams & Connolly of more undisclosed *Brady* material which significantly contradicted VECO business records, already admitted into evidence, which purported to detail the value of the work performed by VECO's employees on the Girdwood residence.

Despite Judge Sullivan's orders on Sept. 16 and Oct. 2, 2008, the prosecutors never disclosed all the 302s for their witnesses or all the *Brady* information in their possession. But had the prosecutors disclosed every 302 in the case, they would still not have fulfilled their *Brady* obligation. FBI Agent Mary Beth Kepner, the case agent for the Polar Pen investigation and Mr. Allen's handler, did not write 302s for all interviews of Mr. Allen. Handwritten notes taken by the prosecutors, Agent Kepner and Agent Chad Joy during interviews of Mr. Allen and Rocky Williams contained significant exculpatory information which was not contained in any 302 and was never disclosed to Senator Stevens's attorneys.

4

Opening statements were given on Sept. 25, 2008. Ms. Morris told the jury that VECO kept track of its costs on the renovation, $188,000, "down to the penny", but admitted in the same breath that this figure could be "little high" or a "little low":

> whether it's $188,000 or whether it's $240,000 or whether it's $120,000, the defendant still got it for nothing. He had to disclose it, was obligated to disclose it, but instead he chose not to.

*United States v. Stevens*, Trial Transcript, Sept. 25, 2008 A.M., at 42.

In his opening, Brendan Sullivan explained that Senator Stevens did not file intentionally false Financial Disclosure Forms because he and his wife believed that they had paid for the entire cost of the renovation in their payments to Christensen Builders and that, to their knowledge, they had not received any free services or benefits from Mr. Allen or VECO. Using personal funds and a mortgage loan of $100,000, they paid $160,000 for the renovation, including over $130,000 to Christensen Builders, a contractor recommended to them by Mr. Allen. Mr. Sullivan also told the jury that Rocky Williams and Mr. Allen reviewed the Christensen Builders' bills before they were sent to the Stevenses and that Senator Stevens and his wife paid the Christensen bills in full, with the understanding and belief that those payments covered the entire cost of the renovation, including any services provided by VECO's employees.

Mr. Sullivan was not aware when he gave his opening statement, and never learned during or after the trial, that the prosecutors possessed evidence that directly corroborated Senator Stevens's defense. At trial, Senator Stevens and his wife were the only witnesses who testified that the Christensen Builders' bills included any VECO charges for the renovation. The prosecutors never disclosed that Rocky Williams, the foreman of the renovation who reported directly to Mr. Allen, had the same understanding and belief as Senator Stevens and his wife, that VECO's costs for its employees' work on the renovation were included in the Christensen Builders' bills.

5

**Rocky Williams**

Mr. Williams was interviewed for trial preparation purposes by Mr. Bottini, Mr. Marsh, Mr. Goeke, FBI Agents Kepner, Joy and Craig Howland on August 20, 2008, by Mr. Bottini, Mr. Goeke and Agent Joy on August 22 and 31, and by Mr. Bottini, Mr. Marsh and Agent Joy on September 20. According to the prosecutors' handwritten notes of those interviews, Mr. Williams repeatedly told them that after he reviewed the Christensen Builders' bills, he sent them to Mr. Allen, and that it was his belief and understanding, based on statements made by Mr. Allen and Senator Stevens, that Mr. Allen would add to the Christensen Builders' bills the charges for his time, David Anderson's time, and the time of other VECO employees who worked on the renovation.

Rocky Williams's statements corroborated a defense which the prosecutors had anticipated for over a year. A prosecution memorandum written in April, 2007, predicted that Senator Stevens might assert as a defense that he paid for all the costs of the renovation, and did not intentionally file false Financial Disclosure Forms, because he paid the Christensen Builders' bills in full believing that any VECO expenses for the renovation "were somehow rolled into [Christensen Builders'] invoices." Every subsequent prosecution memorandum identified that same defense, and in a memorandum to AAG Alice Fisher in April, 2008, the prosecutors described it as Senator Stevens's "primary defense":

> TS [Ted Stevens] thought he and CAS [Catherine A. Stevens] paid for all the work. We anticipate this to be TS' primary defense. Here, TS will say that CAS was in charge of finances; CAS paid $138K to Christensen; CAS thus thought she paid for everything in connection with the house; and thus neither TS nor CAS knew about VECO's unreimbursed contributions to the home renovation.
>
> Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, Exh. A, "Attacks", at 1 (emphasis in original).

On August 22, 2008, the same day Rocky Williams reiterated to Mr. Bottini, Mr. Goeke and Agent Joy that his understanding was that the Christensen Builders' bills included VECO's expenses, Mr. E. Sullivan informed Mr. Bottini, Mr. Goeke and the other members of the trial team that documents recently received from

Williams & Connolly showed that Rocky Williams's testimony on that issue would
be crucial:

> … Based on the cancelled checks and the handwritten note from Rocky to
> CAS [Catherine A. Stevens], it's fairly apparent that "TS [Ted Stevens] will
> say that CAS handled the bills, CAS coordinated with Rocky, and TS didn't
> know VECO wasn't paid b/c CAS never told him. To further insulate TS,
> CAS will likely testify that Rocky told her the VECO costs were rolled into
> the large Christensen bills. Alternatively, if CAS doesn't testify, then they try
> to squeeze this point out of Rocky on cross. If they make this point, TS can
> then argue that CAS didn't tell him about the VECO costs b/c she thought
> the VECO costs were included in the Christensen bills. …
>
> Email from E. Sullivan, dated Aug. 22, 2008, to J. Goeke, J. Bottini, N.
> Marsh, B. Morris, W. Welch, Agent Kepner, Agent Joy, J. Bradison
> (USAAK) and K. Walker (USAAK).

None of the *Brady* information provided to the prosecutors during their four
interviews of Rocky Williams in August and September, 2008, was memorialized
in any FBI 302. Instead, only one, two-sentence 302 was written which was
dictated to Agent Joy by Mr. Goeke and/or Mr. Bottini after the interview on
August 22, 2008. The only statements by Rocky Williams reported in that 302 were
two that were helpful to the prosecution and gave a misimpression of the substance
of what Mr. Williams had said during the interviews:

> WILLIAMS advised he never had any conversations with TED
> STEVENS or CATHERINE STEVENS in which WILLIAMS made any
> representations that VECO expenses were placed on CHRISTIANSON [sic]
> BUILDERS invoices. WILLIAMS further stated that neither TED
> STEVENS nor CATHERINE STEVENS ever asked WILLIAMS whether
> any of the VECO expenses, labor or materials, were included in the
> CHRISTIANSON [sic] bills.
>
> FBI SA Chad Joy's 302 of interview of R. Williams on August 22, 2008, date
> of transcription, Aug. 23, 2008.

Agent Joy circulated that 302 by email to the entire prosecution team, including Mr. Bottini and Mr. Goeke, on August 23 and again on August 25 with the subject line, "Important Rocky Williams Statement".

Three days after that interview, on August 25, Mr. Bottini wrote the government's first *Brady* letter to Williams & Connolly disclosing "potential impeachment information relating to certain potential government witnesses", Mr. Allen, Richard Smith (a VECO executive who did not testify at trial), David Anderson and Rocky Williams (misidentified in the letter as "Richard B. Williams"). Regarding Mr. Williams, Mr. Bottini provided his criminal history and added that "[t]he government is also aware of rumors concerning excessive alcohol use by Williams and it is possible that Williams may have an alcohol dependency issue." In fact, Mr. Bottini and the other prosecutors well knew that Mr. Williams was an alcoholic. Mr. Bottini did not disclose in that *Brady* letter any of the information provided to him by Rocky Williams just days earlier, on August 20 and 22, which corroborated Senator's Stevens "primary defense".

The prosecutors' second and last *Brady* letter, dated Sept. 9, 2008, also did not disclose the exculpatory information provided by Rocky Williams on August 20, 22 and 31, 2008, that he reviewed the Christensen Builders' bills and gave them to Mr. Allen to add any VECO renovation expenses. Instead, they told Williams & Connolly that Rocky Williams "did *not* deal with the expenses [of the renovation] and did *not* recall reviewing Christensen Builders invoices". Letter from B. Morris, dated Sept. 9, 2008, to A. Romain, ¶ 15 (emphasis added).

A few days before the trial began, and after Mr. Williams did poorly on a mock cross-examination conducted by Mr. Goeke, the prosecutors determined that Mr. Williams was in poor health and needed medical attention in Alaska, and they returned him to Alaska on Sept. 25, 2008, the day opening statements were given. The prosecutors did not inform Judge Sullivan or Williams & Connolly of Mr. Williams's return to Alaska, though they knew he'd been listed as a trial witness and knew he was under a defense subpoena to testify on Oct. 6. Instead, they instructed him to call Williams & Connolly when he got back to Alaska. Williams & Connolly lawyers interviewed Mr. Williams by phone in Alaska on Sunday, Sept. 28, 2008, and he told them that he did not work full time on the renovation. This information contradicted VECO's time and billing records which the government had just introduced into evidence. Williams & Connolly filed a motion

8

to dismiss the indictment the same day and, after a hearing on Sept. 29, 2008, Judge Sullivan denied the motion and took curative measures, including the recall of VECO's records custodian for further cross-examination.

But Mr. Bottini and Mr. Goeke never disclosed, and Williams & Connolly never learned, that Rocky Williams told the prosecutors repeatedly in August and September 2008 that he had the same understanding as Senator Stevens and his wife, that VECO's expenses were supposed to be added to, and included in, the Christensen Builders' bills. Mr. Bottini, a career prosecutor with the Department of Justice since 1985, testified in this investigation that, despite the fact that prosecution memos in 2007 and 2008, and Mr. E. Sullivan's email on Aug. 22, 2008 identified that defense, it never "crossed [his] mind" that Rocky Williams's "assumption", that VECO expenses were included in the Christensen Builders' bills, was *Brady* information. Mr. Goeke, an AUSA since 2003, testified that he never considered whether *Brady* required its disclosure and he did not know if that information was disclosed to the defense.

### Bambi Tyree

Bambi Tyree was a child prostitute who had a sexual relationship with Mr. Allen when she was 15 years-old. In 2004, at age 23, she was indicted with Josef Boehm and others by the U.S. Attorney's Office in Alaska on drug conspiracy and child sex trafficking charges and became a cooperating witness against Mr. Boehm. AUSA Frank Russo was in charge of the prosecution, assisted by Mr. Goeke; the FBI case agent was John Eckstein. On July 22, 2004, AUSA Russo and Agent Eckstein conducted a trial preparation interview of Ms. Tyree, and the first subject they questioned her about was her relationship with Mr. Allen.

Agent Eckstein's 302 of that interview reported in its first paragraph:

TYREE had sex with BILL ALLEN when she was 15 years old. TYREE previously signed a sworn affidavit claiming she did not have sex with ALLEN. TYREE was given the affidavit by ALLEN's attorney, and she signed it at ALLEN's request. TYREE provided false information on the affidavit because she cared for ALLEN and did not want him to get into trouble with the law.

FBI SA John Eckstein's 302 of Interview of Bambi Tyree, dated Oct. 28, 2004, at 1 (DOJ Bates nos. CRM043377-378).

Four days later, on July 26, 2004, AUSA Russo filed a sealed motion *in limine* in *United States v. Boehm* to limit the cross-examination of Ms. Tyree. AUSA Russo stated in the motion that when Mr. Allen was blackmailed with threatened public disclosure of his sexual relationship with Ms. Tyree, he asked Ms. Tyree to sign an affidavit in which she falsely stated that she and Mr. Allen never had sex. In his sealed Reply Brief, AUSA Russo asserted that "Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action." In a sealed decision, District Judge John Sedwick granted the motion. Mr. Goeke signed the government's sealed opposition to the defendant's motion for reconsideration which described Ms. Tyree's agreement to give a statement under oath to Mr. Allen's lawyer falsely denying that she had sex with Mr. Allen. These government pleadings and Judge Sedwick's decision in *Boehm* remained under seal and inaccessible to Williams & Connolly during the investigation and trial of Senator Stevens, and they remain under seal today.[2]

In March, 2007, as prosecutors drafted an application for a warrant to search Senator Stevens's house in Alaska, which was based in large part on information provided by Mr. Allen, Mr. Goeke and Mr. Bottini became concerned that Judge Sedwick, who would review the application, might question Mr. Allen's credibility in light of AUSA Russo's disclosures in *Boehm* that Mr. Allen had suborned perjury by Ms. Tyree. Mr. Goeke and Mr. Bottini obtained copies of the *in limine* motion in *Boehm* from AUSA Russo, and Mr. Goeke emailed a summary and excerpts of the motion to Mr. E. Sullivan and Mr. Bottini. Mr. Goeke pointed out that Mr. Allen had never been questioned in the Polar Pen investigation about his relationship with Ms. Tyree and his role in her false sworn statement. A few days

---

[2]In November 2004, Mr. Boehm pled guilty to conspiracy to commit sex trafficking of children and conspiracy to distribute controlled substances to persons under 21-years old. He "specifically admitted the truth of the allegations contained in the factual basis for his pleas, including the following: Beginning in late 2001 and continuing until December 22, 2003, BOEHM conspired with BOLLING, WILLIAMS, and TYREE to recruit persons under 18 ('juveniles') to engage in sexual acts. The juveniles were recruited by offering them cocaine . . . These juveniles had sex with one or more of the defendants, and received money and/or controlled substances from the defendants." *Ditullio v. Boehm*, No. 10-36012, 2011 U.S. App. LEXIS 22510, *4-5 (9th Cir. Nov. 7, 2011).

later, Agent Kepner interviewed Mr. Allen and wrote a one-sentence 302 of his general denial: "[Mr. Allen] has never made a statement under oath that he knew was false or misleading nor has [he] encouraged others to make a false statement under oath." The prosecutors did not disclose Mr. Allen's subornation of perjury in the search warrant application signed by Agent Kepner and the issue was not raised by Judge Sedwick, who signed the warrant on July 27, 2007.[3]

Nor was any disclosure made to the attorneys for Mr. Kott during his trial in September, 2007. Mr. Goeke and Mr. Marsh were the trial prosecutors and Mr. Allen was their key witness. During a sealed hearing before Judge Sedwick, Mr. Goeke raised the issue of possible cross-examination of Mr. Allen regarding his relationship with Ms. Tyree and stated that the relationship had no relevance to the case "whatsoever". The attorneys for Mr. Kott responded that they did not know who Bambi Tyree was and questioned whether she had something to do with Mr. Allen and Mr. Boehm. Mr. Goeke and Mr. Marsh provided no additional information about Ms. Tyree and Mr. Allen to the defense attorneys or the court, and the hearing concluded with Judge Sedwick's statement that he was aware of the *Boehm* case and that there was nothing "that connects that case to this case in any way that has any relevance here."

After Mr. Kott's trial ended and before Mr. Kohring's started, Mr. Goeke obtained a copy of Agent Eckstein's 302 and notes of the interview of Ms. Tyree on July 22, 2004, which he immediately provided to Mr. Bottini and Mr. Marsh. He also obtained a copy of AUSA Russo's notes of that interview which originally reflected that Ms. Tyree signed an affidavit, falsely denying that she had sex with Mr. Allen, "at the request of Bill". However, that notation was altered, "Bill" was crossed out and "Bambi's idea" was added. AUSA Russo testified in this investigation that he remembered in 2009, that he might have made those changes in 2005, during a witness preparation session with Ms. Tyree.

Conflicting memories and accounts by, or attributed to, AUSA Russo and Agent Eckstein, led to a decision to interview Ms. Tyree about what she told them in July 2004. Mr. Bottini and Agent Kepner interviewed her on Oct. 10, 2007, and Agent Kepner's one-paragraph 302 of that interview reflects the following statement by Ms. Tyree:

---

[3]Our investigation focused on the information that was in the possession of the prosecutors. Whether Ms. Tyree had a sexual relationship with Mr. Allen when she was 15 years-old and whether Mr. Allen asked Ms. Tyree to sign a false affidavit are matters beyond the scope of our investigative mandate. Thus, references throughout this Report regarding these matters do not reflect a conclusion that such conduct occurred.

Lisa LNU (last name unknown) was extorting BILL ALLEN regarding an alleged relationship between BAMBI TYREE and ALLEN. TYREE came up with an idea to sign a document to prevent further extortions by LISA. Tyree met with an attorney in a downtown office building close to Phil Weidner's office. The content of the document was created solely by TYREE with the help of the attorney.

Agent Kepner's 302 of Interview of Bambi Tyree on Oct. 10, 2007, dated October 11, 2007 (parenthetical in original).

The prosecutors also consulted with DOJ's Professional Responsibility Advisory Office ("PRAO") about whether *Brady* required disclosure of information regarding Mr. Allen's subornation of perjury by Ms. Tyree. Mr. Marsh spoke on the telephone with PRAO attorney Ruth Plagenhoef on Oct. 12, 2007. Ms. Plagenhoef's record of her conversation with Mr. Marsh reflects that he provided her with materially inaccurate and incomplete information. In short, he told Ms. Plagenhoef that the *Brady* disclosure issue arose entirely from AUSA Russo's "possible recollection" that Ms. Tyree told him that Mr. Allen had once asked her to lie, that there was no evidence to corroborate that recollection, and that all available evidence contradicted it. Mr. Marsh did not inform Ms. Plagenhoef of the statement in the government's sealed motion *in limine* in *Boehm* that "Mr. Allen convinced Ms. Tyree to give a false statement", and he incorrectly described Agent Eckstein's 302 as "not clear, stating simply that she lied" and AUSA Russo's notes as reflecting that "Bambi denied that B[ill]A[llen] asked her to lie". Based on that and other misinformation, Ms. Plagenhoef agreed with Mr. Marsh that *Brady* did not require disclosure of AUSA Russo's recollection to the defense in *Kott* or *Kohring*.

Mr. Bottini and Mr. E. Sullivan, the trial prosecutors in *Kohring*, did not disclose any information about Mr. Allen's subornation of Ms. Tree's perjury to the defense. During a sealed hearing, Mr. Bottini questioned whether Mr. Kohring's attorney planned to cross-examine Mr. Allen about his relationship with Ms. Tyree, and the attorney, unaware of any information regarding Mr. Allen's subornation of perjury by Ms. Tyree, responded that he did not plan to question Mr. Allen about his "juvenile relationships … whether that's true or not I have no idea, and, two, it's amazingly tacky and I would not do that." Judge Sedwick agreed that "it would [not] advance Mr. Kohring's interests in any event."

12

After Mr. Kohring's trial, the prosecutors learned that a newspaper planned to publish an article about Mr. Allen's relationship with Ms. Tyree and his gifts to her and her family, and they consulted with PRAO again. Mr. Marsh spoke with another PRAO attorney, Patricia Weiss, on December 20, 2007, and he again provided PRAO with incomplete, inaccurate and misleading information. Ms. Weiss's report of her conversation with Mr. Marsh contains no indication that he disclosed the statements in AUSA Russo's *in limine* motion or the contents of Agent Eckstein's 302 or notes. Ms. Weiss concluded that the upcoming news story about Mr. Allen's gifts to Ms. Tyree and her family did not cause her to change the advice given by PRAO in October 2007, that disclosure of AUSA Russo's "recollection" was not required where the prosecutors had conducted an investigation and found "no evidence to support the notion that [Mr. Allen] had pressed [Ms. Tyree] to lie".

On December 21, 2007, Ms. Weiss sent an email to Mr. Marsh and Mr. E. Sullivan which recapitulated the advice she gave Mr. Marsh during their telephone conversation, the information he provided to her, and the information which he provided to Ms. Plagenhoef on Oct. 12, 2007. The factual errors, misstatements and omissions in that email are evident to anyone familiar with AUSA Russo's *in limine* motion in *Boehm*, his notes of the interview of Ms. Tyree on July 22, 2004, and Agent Eckstein's 302 and notes of that interview. Mr. Marsh forwarded Ms. Weiss's email to Mr. Bottini and Mr. Goeke on Jan. 3, 2008. No one notified PRAO of any errors or omissions in that email.

The prosecutors never disclosed any information about Mr. Allen's subornation of perjury to Williams & Connolly, except to deny it ever happened. Mr. Bottini drafted a sealed motion *in limine*, dated Aug. 14, 2008, which disclosed that Mr. Allen had been investigated twice by the Anchorage Police Department ("APD") about a sexual relationship with "a juvenile female [Ms. Tyree] approximately ten years ago." In an earlier email to his colleagues, Mr. Bottini stated that he and Mr. Goeke discussed keeping the motion "pretty basic (i.e. no detailed info set out here re: Bambi allegations and rumors) to smoke out how much they [Williams & Connolly] know". Email from J. Bottini, dated August 10, 2008, to W. Welch, N. Marsh, B. Morris, E. Sullivan and J. Goeke. The sealed motion sought to preclude cross-examination of Mr. Allen about his relationship with Ms. Tyree because "allegations of sexual misconduct … are unrelated to a witness' character for truthfulness." Mr. Bottini pointed out in a footnote that the

13

same issue had been addressed in sealed hearings in *Kott* and *Kohring* and that in both cases the defense lawyers informed the court that they would not question Mr. Allen about his sexual relationship with Ms. Tyree.

At the Court's suggestion, the government withdrew its sealed motion *in limine* without prejudice on Sept. 5, 2008. In a ruling just before Mr. Allen began his testimony, Judge Sullivan allowed cross-examination about the APD investigations of Mr. Allen on the condition that the nature of the underlying offense not be disclosed. The Court found that, with that limitation, the investigations were "a fertile ground for inquiry about the witness' state of mind and what he would like the government to do in an effort to curry favor. I think that goes to his bias, his motivation to speak the truth or not." *United States v. Stevens*, Trial Transcript, Sept. 30, 2008 P.M., at 46-47.

On August. 25, 2008, Mr. Bottini sent Williams & Connolly the first *Brady* disclosure letter which stated that the government learned on Aug. 22, 2008, that there was another, pending APD investigation of Mr. Allen regarding allegations that he "engaged in a sexual relationship with a different juvenile female." Mr. Bottini also disclosed that the government "has learned that Allen has provided financial benefits to the individual who was the subject of the earlier investigation [Ms. Tyree] as well as to family members of the subject. … [and] to the subject of the pending investigation." Following the disclosures on August 14 and 25, 2008, Williams & Connolly made repeated requests for additional information about the APD investigations and the financial benefits provided by Mr. Allen to the "juvenile females". The prosecutors refused to provide any additional information until Sept. 9, 2008 when they made their last voluntary *Brady* disclosure.[4]

---

[4]By letters dated August 15 and 18, 2008, Williams & Connolly requested further information about Mr. Allen's sexual misconduct, personal vices and the APD investigation which were disclosed in Mr. Bottini's motion *in limine*. Mr. E. Sullivan rejected the request. Letter from E. Sullivan, dated Aug. 18, 2008, to A. Romain, at 3 (*United States v. Stevens*, Dkt. No. 63-1).

On August 21, 2008, Williams & Connolly requested all *Brady* and *Giglio* information regarding the APD investigation. Ms. Morris acknowledge the government's *Brady* and *Giglio* obligations but provided no information. Letter from B. Morris, dated Aug. 21, 2008, to R. Cary (DOJ Bates no. CRM035004).

On Sept. 5, 2008, Williams & Connolly requested details of the financial benefits provided by Mr. Allen to the two juvenile females referred to in Mr. Bottini's August 25-*Brady* letter. Ms. Morris provided no information and again recited that the government was aware of

On Sept. 9, 2008, the prosecutors sent Williams & Connolly their second and last *Brady* disclosure letter. Mr. Marsh, assisted by Mr. Bottini, Mr. Geeke and Mr. E. Sullivan, wrote its penultimate paragraph which falsely stated that "the government is aware of no evidence to support any suggestion that Allen asked [Ms. Tyree] to make a false statement":

> In 2007, the government became aware of a *suggestion* that, a number of years ago, Allen asked the "other female" [Ms. Tyree] to make a sworn, false statement concerning their relationship. After hearing that suggestion, the *government conducted a thorough investigation and was unable to find any evidence to support it*. The investigation included: (a) an inquiry to the "other female," [Ms. Tyree] who denied the suggestion; (b) an inquiry to Allen, who denied the suggestion; (c) a review of notes taken by a federal law enforcement agent [Agent Eckstein] during a 2004 interview of the "other female," [Ms. Tyree]; and (d) a review of notes taken by a federal prosecutor [AUSA Russo] during a 2004 interview of the "other female [Ms. Tyree]." Because *the government is aware of no evidence to support any suggestion that Allen asked the "other female" [Ms. Tyree] to make a false statement under oath*, neither Brady nor Giglio apply.

---

its *Brady* obligations. Letter from B. Morris, dated Sept. 5, 2008, to A. Romain (DOJ Bates no. CRM095739).

On Sept. 9, 2009, Williams & Connolly filed a motion for an order compelling the prosecutors to disclose, *inter alia*, "copies of all exculpatory grand jury testimony, FBI Form 302 witness interview memoranda, and all contemporaneous notes of witness interviews, including notes or memoranda reflecting false statements by the witnesses" and "further details" of APD's investigations of Mr. Allen. *United States v. Stevens*, Motion to Compel Discovery Pursuant to *Brady v. Maryland* and Fed. R. Crim. P. 16, dated Sept. 2, 2008, at 4 & 8 (Dkt. No. 60). On the same day, Williams & Connolly, referencing its letters dated August 15 and 18, again requested *Brady* information regarding the "rumored personal vices" of Mr. Allen, Rocky Williams and David Anderson. The prosecutors' last *Brady* disclosure letter was sent to Williams & Connolly that same day.

On September 12, 2008, 10 days before trial, Williams & Connolly filed an emergency motion for an order directing the government to produce all *Brady* material "in a useable format - i.e., FBI 302 memoranda, interview notes, and grand jury transcripts (whether redacted or unredacted) - by no later that Friday, September 12, 2008". *Id*., Motion to Compel Emergency Relief and Discovery, dated Sept. 12, 2008, at 1 ( Dkt. No. 65).

*United States v. Stevens*, Letter from B. Morris, dated Sept. 9, 2008, to A.
Romain, at 5 (Dkt. No. 126-2)(emphasis added).

These astonishing misstatements concealed the existence of documents and
information in Mr. Marsh's, Mr. Bottini's and Mr. Goeke's possession and well
known to them since at least October 2007, namely, Agent Eckstein's 302, his
notes and AUSA Russo's *in limine* motion in *Boehm*, which unequivocally
documented Ms. Tyree's admission that she lied under oath at Mr. Allen's request.

The government had every reason to want to avoid any cross-examination of
Bill Allen on these issues. Before the trial, Mr. Allen's lawyer, Robert Bundy, told
the prosecutors that if Mr. Allen was questioned about Ms. Tyree, he would assert
his Fifth Amendment privilege and refuse to answer. Agent Kepner told DOJ
investigators in 2009, that "ALLEN would become unglued whenever an article
would appear involving allegations related to the APD sexual investigation."
Deprived of the information that would have significantly impeached Mr. Allen's
credibility, Mr. Sullivan did not cross-examine him about APD's past and pending
sexual misconduct investigations or his relationship with Ms. Tyree.

### The Torricelli Note, the Interviews of Mr. Allen on April 15 and
### September 14, 2008, and Mr. Allen's CYA Testimony

In his opening statement, Brendan Sullivan told the jury that the evidence
would show that Senator Stevens had no intent to make any false statements on his
Senate Financial Disclosure Forms. Mr. Sullivan explained that, after Christensen
Builders completed the renovation, Mr. Allen arranged for repairs on the Girdwood
residence and that Senator Stevens pressed Mr. Allen to send him bills for that
work, but none was ever sent: "You cannot report what you don't know. You can't
fill out a form and say what's been kept from you by the deviousness of someone
like Bill Allen". *Stevens,* Trial Transcript, Sept. 25, 2008 A.M., at 74.

Mr. Sullivan focused the jury's attention on two handwritten notes sent by
Senator Stevens to Mr. Allen in 2002, the "Torricelli note(s)". The first note
referred to Bob Persons, a mutual friend of Senator Stevens and Mr. Allen and a
neighbor who informally monitored the work on Senator Stevens's house:

10/6/02

Dear Bill -

 When I think of the many ways in which you make my life easier and more enjoyable, I lose count!

 Thanks for all the work on the chalet. You owe me a bill - remember Torricelli, my friend. Friendship is one thing - compliance with these ethics rules entirely different. I asked Bob P[ersons] to talk to you about this so don't get P.O'd at him - it just has to be done right.

 Hope to see you soon.

My best,

Ted

• • •

11/8/02

Dear Bill:

Many thanks for all you've done to make our lives easier and our home more enjoyable. … (Don't forget we need a bill for what's been done out at the chalet) …

 My best
 Ted

*Id.,* Government Trial Exh. 495 & 509.[5]

Mr. Sullivan described the notes as evidence that "jumps off the page and grabs you by the throat to show you what the intent of Ted Stevens was." *Id.*, Trial Transcript, Sept. 25, 2008 A.M., at 73.

 One week later, Mr. Bottini used the Torricelli notes to turn the tables on the defense when he elicited dramatic testimony from Mr. Allen about why he never sent any bills to Senator Stevens for work performed by VECO's employees. On direct examination by Mr. Bottini, Mr. Allen testified that after he received the Torricelli note he spoke to Bob Persons who told him "don't worry about getting a

---

[5]*See* Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, at 14 (DOJ Bates no. CRM016390) ("We note that in July 2002, Senator Torricelli was publicly admonished by the United States Senate for accepting numerous gifts from a wealthy fundraiser, and that on September 30, 2002 – one week before STEVENS wrote the note to Allen – Senator Torricelli withdrew from his Senate re-election race.").

bill. He said, Ted is just covering his ass." *Id.,* Trial Transcript, Oct. 1, 2008 A.M., at 52 (the "CYA statement").

The defense was shocked by Mr. Allen's CYA testimony. None of the 55 FBI 302s of the government's interviews of Mr. Allen from Aug. 30, 2006, to Sept. 9, 2008, which were provided to him by the prosecutors, contained any reference by Mr. Allen to this CYA statement. During his cross-examination of Mr. Allen on Oct. 6, 2008 (six years to the day after the Torricelli note was written), Mr. Sullivan accused Mr. Allen of inventing that testimony recently:

Q.  Well, you came in here the other day on your direct examination, and you said, well, despite the fact that I saw this letter, I heard from Mr. Persons I shouldn't send a bill because this was just Ted covering his ass; do you remember that testimony?

A.  That's exactly right.

Q.  When did you first tell that story? When did you first say those words? Was it in the last -- since September 9th? Was it since September 9th?

A.  It's been so long that I can't tell you how many days before I talked to him, but I did, and I asked him, hey, I got to get something done. I've got to get some invoices. And he said, hell, don't worry about the invoices. Ted is just covering his ass. That's exactly what he said.

Q.  My question to you, sir, is when did you first tell the government that because on September 9th, 2008, you were giving them three other reasons why you didn't send the bill.

A.  I don't know.

Q.  When did it come to you, sir?

A.  What?

Q.  When did you first tell the government that Persons toll [sic] you Ted was covering his ass and these notes were meaningless? It was just recently, wasn't it?

A.  No. No.

Q.    On September 9th, you didn't tell them that, did you?

A.    Hell, I don't know whatever --

Q.    You gave them reasons why you didn't send a bill. You answered you simply wanted to do the work was one of them, and another was part of the reason was that the costs were higher than they needed to be. You didn't tell them then about Persons' conversation with you, did you?

A.    You know what, I don't know when I talked to them, but I did talk to him, and it's been quite aback, quite awhile back. Whether you like it or you don't.

Q.    When did you first come up with this, sir?

A.    When did I come up with it?

Q.    When did you first tell somebody?

A.    Huh?

Q.    When did you first tell a government agent?

A.    Hell, I don't know I don't know what day it was.

MR. SULLIVAN: Your Honor, is this a good time for a break?

*Id.,* Trial Transcript, Oct. 6, 2008 P.M., at 79-81.

Mr. Allen's denial was false. He told Mr. Bottini and Agent Kepner about the CYA statement by Mr. Persons for the first time on Sept. 14, 2008, a week before the trial began, during a trial preparation session for which no 302 was written.

Mr. Bottini knew the testimony was false and knew that he had an obligation under the Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264 (1959) to correct that testimony there and then, but he did not. He testified in this investigation that he understood that Mr. Sullivan was attempting to establish that Mr. Allen had recently fabricated his CYA testimony and that Mr. Allen's testimony on this point was "factually inaccurate". Deposition of J. Bottini, Dec. 17, 2008, at 650. At the time, Mr. Bottini did not believe that Mr. Allen's testimony was intentionally false because he thought that Mr. Allen was confused and

19

misunderstood the question. Mr. Bottini testified that he was familiar with a
prosecutor's obligations under *Napue* to correct false testimony, but he did not
"remember thinking at the time should I get up and say something to Judge
Sullivan." *Id*. at 652.

However, not only did he fail to correct the false statement as was required
by *Napue*, Mr. Bottini endorsed and capitalized on Mr. Allen's false denial during
his summation:

> [Senator Stevens] says I did ask for a bill for 2002 work. Government 495 is
> the note he sent on October 6th, 2002, the Torricelli note, and you remember
> what Bill Allen said after that? Bob Persons did pay him a visit, came by and
> he told him, look, he doesn't really want a bill. He's just – pardon my French
> -- covering his ass. Now the defendant says, well, Allen just made that up,
> that's a lie, that never happened. Again, you saw and you heard from Bill
> Allen and you saw and you heard from Bob Persons. You can judge yourself
> the credibility of those two individuals. Again, if that were so, if Allen just
> made that up, wouldn't the story be better about that?

> *Id.*, Trial Transcript, Oct. 21, 2008 A.M., at 54.[6]

Mr. Sullivan never learned during the trial that Mr. Allen told Mr. Bottini
about the CYA statement for the first time on Sept. 14, 2008. And he was also
never told about a prior inconsistent statement made by Mr. Allen to Mr. Bottini,
Mr. Goeke, Mr. E. Sullivan, Mr. Marsh and Agent Kepner which would have
supported his accusation on cross-examination that Mr. Allen's CYA testimony
was a recent fabrication, namely, that Mr. Allen had previously told them he didn't
remember any conversation with Mr. Persons about sending a bill.

When Mr. Allen told Mr. Bottini and Agent Kepner about the CYA
statement on Sept. 14, 2008, the prosecutors became obligated by *Brady* and *Giglio*
to disclose Mr. Allen's prior inconsistent statement to them during an interview on
April 15, 2008, that he did *not* remember speaking to Bob Persons about the

---

[6]Bob Persons testified as a defense witness at trial and denied telling Mr. Allen, "Bill,
don't worry about getting a bill, Ted is just covering his ass". *Id.*, Trial Transcript, Oct. 15, 2008
P.M., at 44.

Torricelli note. But Mr. Bottini and his colleagues never disclosed that
impeachment information to Williams & Connolly. They also never disclosed other
*Brady* information provided to them by Mr. Allen during his interviews on April 15
and April 18, 2008, that the value of VECO's work on the Girdwood residence was
about $80,000, and not more than $250,000 as alleged in the indictment.

Mr. Bottini, Mr. Goeke, Mr. Marsh, Mr. E. Sullivan and Agent Kepner
testified in this investigation that they forgot that they had shown the Torricelli
note to Mr. Allen on April 15, 2008, and that they forgot that he had then told them
that he did *not* remember speaking to Bob Persons about the note. Agent Kepner,
who conducted the *Brady* review of Mr. Allen's prior statements, also testified that
had she remembered Mr. Allen's prior inconsistent statement, she would not have
recognized its significance under *Brady* and *Giglio*.

Mr. Bottini's, Mr. Goeke's, Mr. E. Sullivan's and Agent Kepner's notes of
their meeting with Mr. Allen on April 15, 2008, all reflect his statement that he did
not remember speaking to Mr. Persons about the Torricelli note. However, Mr.
Goeke and Mr. E. Sullivan testified that they did not review any of their notes of
witness interviews for *Brady* material. Mr. Bottini testified that he did review his
notes of witness interviews for *Brady* material, except for his notes of Mr. Allen's
interviews on April 15 and 18, 2008, which he misfiled. Mr. Marsh testified that he
usually did not take notes, that he did not find any notes of the interview on April
15, 2008, and that he remembered reviewing only some of his notes for *Brady*
material. Agent Kepner did not write a 302 of the interview on April 15, 2008,
because, as she later told DOJ investigators, "the debriefing of Bill Allen did not go
well", and she could not find her notes of that interview. DOJ's Office of
Professional Responsibility ("OPR") found her notes on Jan. 14, 2010, and they
also contain Mr. Allen's statement that he did not remember speaking with Mr.
Persons about the Torricelli note.

The complete, simultaneous and long term memory failure by the entire
prosecution team, four prosecutors and the FBI case agent, of the same statement
about an important document made at the same meeting by their key witness in a
high profile case is extraordinary. Considering the galvanizing effect the Torricelli
notes had on the prosecutors during the weeks following its receipt, that memory
failure becomes astonishing. Add the fact that Ms. Morris, who did not attend the
meeting, remembered being told shortly after the Torricelli notes were received that

Mr. Allen said he didn't recall seeing the Torricelli note and/or speaking with Bob Persons about it, and that collective memory failure strains credulity. Ms. Morris testified that, when Mr. Marsh later told her about Mr. Allen's CYA statement, she remembered that Mr. Allen had been previously interviewed about the Torricelli note, but she didn't recall "there being a difference" in his statements.

The Torricelli notes worried the prosecutors and Agent Kepner, and captured their attention, in April and May, 2008, but no cure for the problem created by those notes for the government's case was found until the week before the trial began when Mr. Allen's memory suddenly improved, after prodding by Agent Kepner.

On April 8, 2008, Williams & Connolly produced the Torricelli notes and other documents to the prosecutors, who immediately recognized their significance. They made an appointment that same day to meet with Mr. Allen on April 15, 2008, to discuss them. Agent Kepner told her supervisor the same day that the notes might be fatal to the case: "Bill Welch did not seem to be too upset about the notes that were found related to Stevens asking Bill for invoices. I got ahold of Bundy and Bill Allen. We will debrief Bill on Tuesday regarding the new documents received from Stevens. Too early to tell if this issue will be fatal or not. I'm worried that this may give DOJ an out if they were looking for one." Email from Agent Kepner, dated April 8, 2008, to FBI SAC C. Seale.

On April 11, 2008, the prosecutors discussed the Torricelli notes in a memorandum to AAG Fisher and attached the notes as one of two exhibits. The memorandum explained how the Torricelli notes were "both helpful and harmful to STEVENS". Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, at 14. The prosecutors also noted "two troubling irregularities concerning the October 6, 2002, note", their "concerns about the document's authenticity", and their plan to interview Senator Stevens's archivist the following week "to explore the manner in which this document was located and produced." *Id*. at 15.

On Monday, April 15, 2008, the entire prosecution team, Mr. Bottini, Mr. Marsh (by phone), Mr. Goeke, Mr. E. Sullivan (by phone) and Agent Kepner, interviewed Mr. Allen in the presence of his attorney, Mr. Bundy, about the Torricelli notes and other documents produced by Williams & Connolly. During

the interview, the prosecutors exchanged emails evidencing dissatisfaction with Mr. Allen's answers to their questions:

> Email from Mr. E. Sullivan to Mr. Bottini, Mr. Goeke and Mr. Marsh
> Subject: RE: am I pushing too hard?":
>> We may want to talk to Bundy immediately afterwards and get him to push BA on this issue and get him to focus. BA's position makes no sense and is directly contradicted by his contemporaneous acts.
>>
>> I'd also like to push BA re: why TS is asking for a bill in 10/02 and 11/02. The timing is bothering me. Is it b/c the project is out of control? Only VECO guys are on the site? Neighbors are snooping around? Public is about to find out?
>
> Reply from Mr. Marsh to Mr. E. Sullivan, Mr. Bottini and Mr. Goeke:
>> Re: #2, do you think it's probably that his friend Torricelli withdrew from his reelection campaign a week before the 10/02 note?
>
> Reply from Mr. E. Sullivan to Mr. Bottini, Mr. Goeke and Mr. Marsh:
>> Could be. Could also be that it's a wink and a nod -- that he knows BA won't send him an invoice, but he can paper the file. Could be a lot of things. I was hoping BA might be able to shed some light on the timing/context.
>
> Reply from Mr. Marsh to Mr. E. Sullivan, Mr. Bottini and Mr. Goeke:
>> Sorry -- I thought we all believed it's a wink and a nod, and we're just trying to figure out why TS was nervous at that particular moment and decided to paper the file with something. Am I wrong?
>
> Emails between N. Marsh, J. Bottini, J. Goeke and E. Sullivan, dated April 15, 2008 (DOJ Bates nos. CRM16532).

Mr. Allen was also questioned that day about the value of VECO's work on the Girdwood residence, an issue which the prosecutors expected would be, and was, contested by the defense at trial. *See* Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, Exh. A, p. 3 ("Value of the work was not worth what VECO's billing records/other invoices reflect: Here,

TS would suggest that the $250K value of VECO's work is over-inflated.")
(emphasis in original). Mr. Bottini's, Mr. Goeke's and Mr. E. Sullivan's notes
reflect that Mr. Allen told them that the value of VECO's work was about $80,000,
not $250,000 as the prosecutors contended during the meeting. Mr. Bundy testified
in this investigation that Mr. Allen was "pretty vociferous" during the meeting in
maintaining that the value of VECO's services was not $250,000, and could not
have been more than $80,000. Deposition of R. Bundy, Nov. 4, 2009, at 63. Mr.
Bundy testified that the government's position was "more or less we have the
VECO books that show $250,000 was billed to this. And that was sort of the
impasse." *Id*. at 69.

Mr. Allen testified in this investigation that Agent Kepner told him after the
meeting on April 15, 2008, that he "didn't do very good" and that the prosecutors
"were upset … weren't very happy". Agent Kepner did not write a 302 for this
interview of Mr. Allen. She told DOJ investigators in 2009 that no 302 was written
because "the debriefing of Bill Allen did not go well".

On April 18, 2008, Mr. Bottini, Mr. Goeke, Mr. Marsh and Agent Kepner
interviewed Mr. Allen again in the presence of Mr. Bundy. Mr. Goeke's and Mr.
Bundy's notes of this meeting reflect that Mr. Allen reiterated that the value of
VECO's work on the Girdwood residence was approximately $80,000. Agent
Kepner did not write a 302 for this interview.

Mr. Allen was the principal owner of VECO and was familiar with the work
done on the Girdwood residence. His statements on April 15 and 18, 2008, that the
value of VECO's work on the Girdwood residence was $80,000, constituted
significant *Brady* information. However, that information was not recorded in any
302 and was not disclosed to Williams & Connolly until 2009, after the trial, when
the new team of prosecutors took over.

On April 24, 2008, William Arthur, Senator Stevens's archivist, was
interviewed in Washington by the entire prosecution team, Mr. Bottini, Mr. Marsh,
Mr. Goeke, Mr. E. Sullivan and Agent Kepner.

On May 1, 2008, Barbara Flanders was interviewed by Mr. Marsh, Mr.
Bottini, Mr. Goeke, and Mr. E. Sullivan; Agent Kepner testified that she might
have been present. Ms. Flanders was a staff assistant to Senator Stevens and they

exchanged emails in December 2002 about bills that were expected to be soon received for work on the Girdwood residence. In one email, Senator Stevens told Ms. Flanders that "Bob Persons is riding herd to make sure we get charged for what they have done." When Williams & Connolly produced these emails to the prosecutors on April 25, 2008, Mr. Marsh forwarded them to his colleagues the same day with the comment that "these emails are not good". Mr. Bottini replied, "I agree, not good, but obviously not fatal either." No 302 was written of the Flanders interview.

On May 8, 2008, Mr. Bottini, Mr. Marsh, Mr. Goeke and Mr. E. Sullivan interviewed Bob Persons. He was not asked any questions related to the Torricelli note.

On May 15, 2008, Mr. Marsh revised the prosecution memorandum and added a two-page discussion of the Torricelli notes and the email exchanges between Senator Stevens and Mrs. Flanders in December 2002, which he described as "both helpful and harmful to STEVENS".

The sum of that information remained the *status quo* until September, 2008. On Sept. 9, 2008, as the last *Brady* disclosure letter was drafted, Mr. Marsh directed Agent Kepner to call Mr. Allen, who was in Alaska, and to ask him whether he thought Senator Stevens would have paid a bill for VECO's work on the renovation. Agent Kepner questioned Mr. Allen and repeated his answers to Mr. Marsh who then and there wrote paragraph 17(c) of the government's *Brady* letter:

> Allen stated that on at least two occasions defendant asked Allen for invoices for VECO's work at the Girdwood residence. Allen stated he never sent an invoice to defendant or caused an invoice to be sent to defendant. Allen stated that he believed that defendant would not have paid the actual costs incurred by VECO, even if Allen had sent defendant an invoice, because defendant would not have wanted to pay that high of a bill. Allen stated that defendant probably would have paid a reduced invoice if he had received one from Allen or VECO. Allen did not want to give defendant a bill partly because he felt that VECO's costs were higher than they needed to be, and partly because he simply did not want defendant to have to pay.

Letter from B. Morris, dated Sept. 9, 2008, to A. Romain, ¶ 17(c).

On Sept. 16, 2008, Agent Kepner wrote a 302 of that interview of Mr. Allen, after Judge Sullivan ordered the prosecutors to produce all 302s containing *Brady* information to Williams & Connolly. Neither Agent Kepner's 302 nor paragraph 17(c) of the *Brady* letter contains any reference to the CYA conversation between Mr. Allen and Mr. Persons about the Torricelli note.

Mr. Allen testified in this investigation that the memory of the CYA statement came to him during his flight to Washington, D.C. for the trial, after some prodding by Agent Kepner. Shortly before the trip, Agent Kepner told him "that you better figure out or remember what you done with this Torricelli note from Ted. … You got to figure out what you done and when did you talk to Bob Persons." Deposition of B. Allen, March 6, 2010, at 21 & 42. Mr. Allen and Mr. Bundy arrived in Washington on Friday, Sept. 12, 2008, and they met with Mr. Bottini and Agent Kepner on Sept. 13 and 14 for trial preparation.

During the meeting on Sept. 14, 2008, Mr. Allen told Mr. Bottini and Agent Kepner that he remembered speaking with Mr. Persons after receiving the Torricelli note and that Mr. Persons told him that Senator Stevens was "covering his ass by asking for a bill." Mr. Bottini recognized immediately the significance of this conversation and he informed the entire team, except for Mr. Goeke who was still in Alaska. Agent Kepner testified in this investigation that she was not surprised by Mr. Allen's new recollection. She viewed the Torricelli note as "a cover your ass note" and "It fit. In my mind, it made sense." Deposition of Agent Kepner, Aug. 24, 2009, at 215-216; *see also id*. at 270-271 (she viewed the Torricelli notes as "pretextual") & at 307-308 (well in advance of this trial prep session, she believed that Senator Stevens was "covering his ass" with the Torricelli note).

Mr. Allen's statement on Sept. 14, 2008, which contradicted his testimony on cross-examination on Oct. 6, 2008, that he had not just recently told the prosecutors about the CYA statement, was not disclosed to Williams & Connolly until March, 2009, when the new team of prosecutors reviewed their predecessors' files and discovered some notes of the interview of Mr. Allen on April 15, 2008. Shortly after the discovery of those notes, DOJ moved to dismiss the indictment with prejudice:

26

In February 2009, the Acting Assistant Attorney General for the Criminal Division appointed undersigned counsel to conduct the post-trial litigation in this matter. In preparing to respond to defendant Theodore Stevens' various motions and in preparation for a possible evidentiary hearing, undersigned counsel began collecting and reviewing documents and interviewing potential witnesses. As the Court is aware, the Government has voluntarily provided to the defense documents and summaries of witness interviews.

The Government recently discovered that a witness interview of Bill Allen took place on April 15, 2008. While no memorandum of interview or agent notes exist for this interview, notes taken by two prosecutors who participated in the April 15 interview reflect that Bill Allen was asked about a note dated October 6, 2002, that was sent from the defendant to Bill Allen. The note was introduced at trial as Government Exhibit 495 and was referred to as the "Torricelli note." The notes of the April 15 interview indicate that Bill Allen said, among other things, in substance and in part, that he (Bill Allen) did not recall talking to Bob Persons regarding giving a bill to the defendant. This statement by Allen during the April 15 interview was inconsistent with Allen's recollection at trial, where he described a conversation with Persons about the Torricelli note. In addition, the April 15 interview notes indicate that Allen estimated that if his workers had performed efficiently, the fair market value of the work his corporation performed on defendant's Girdwood chalet would have been $80,000. Upon the discovery of the interview notes last week, the Government immediately provided a copy to defense counsel.

Defendant Stevens was not informed prior to or during trial of the statements by Bill Allen on April 15, 2008. This information could have been used by the defendant to cross-examine Bill Allen and in arguments to the jury. The Government also acknowledges that the Government's Opposition to Defendant's Motion for a New Trial provided an account of the Government's interviews of Bill Allen that is inaccurate. See Opposition at 42-43 (Dkt. No. 269).

Given the facts of this particular case, the Government believes that granting a new trial is in the interest of justice. See Fed. R. Crim. P. 33(a). The Government has further determined that, based on the totality of circumstances and in the interest of justice, it will not seek a new trial.

Accordingly, pursuant to Fed. R. Crim. P. 48(a), the Government moves to set aside the verdict and dismiss the indictment with prejudice.

*United States v. Stevens*, Motion of the United States to Set Aside the Verdict and Dismiss the Indictment with Prejudice, April 1, 2009, at 1-2 (Dkt. No. 324).

**Findings and Conclusions**

Although the simultaneous failure by Mr. Bottini, Mr. Marsh, Mr. Goeke and Mr. E. Sullivan to recall their interview of Mr. Allen on April 15, 2008, and his statement that he did not recall speaking with Mr. Persons about the Torricelli notes, is difficult to believe, there is no evidence that would establish beyond a reasonable doubt that any one or more of them did in fact recall that information and concealed it from Williams & Connolly and the Court.

However, our investigation found evidence which compels the conclusion, and would prove beyond a reasonable doubt, that other *Brady* information was intentionally withheld from the attorneys for Senator Stevens:

- Mr. Bottini and Mr. Goeke intentionally withheld and concealed significant exculpatory information which they obtained from Rocky Williams during pre-trial witness preparation interviews in August and September, 2008;

- Mr. Bottini and Mr. Goeke intentionally withheld and concealed significant impeachment information regarding Mr. Allen's subornation of perjury by Ms. Tyree; and

- Mr. Bottini withheld significant impeachment information by his intentional failure to correct materially false testimony given by Mr. Allen during his cross-examination, which Mr. Bottini knew at the time was false.[7]

---

[7]Mr. Marsh passed away on Sept. 26, 2010, and, for that reason, we express no conclusion regarding his conduct.

Although the evidence establishes that this misconduct was intentional, the evidence is insufficient to establish beyond a reasonable doubt that Mr. Bottini and Mr. Goeke violated the criminal contempt statute, 18 U.S.C. § 401, which requires the intentional violation of a clear and unambiguous order. Although a reading of the transcripts of numerous hearings and proceedings before and during the trial establish that Judge Sullivan intended that all *Brady* and *Giglio* material be produced, none of the orders issued by Judge Sullivan, before or during the trial, specifically directed the prosecutors to disclose all *Brady/Giglio* information in their possession. In large part, this was because of representations made by prosecutors to the Court that such an order was unnecessary.

The Court contemplated issuing such an order before trial but did not, accepting instead the prosecutors' representations during a hearing on Sept. 10, 2008, the day after their second *Brady* disclosure letter was sent, that they knew and had complied with their *Brady* and *Giglio* disclosure obligations:

| MR. E. SULLIVAN: | … Now, just jumping back over to the Brady-Giglio, just briefly, we fully understand what our obligation is, and I don't think we need to belabor the Court because the case law is clear on this issue. |
|---|---|
| THE COURT: | What should the Court do? |
| MR. E. SULLIVAN: | We don't think that there's anything for the Court to do. We have -- |
| THE COURT: | Should the Court just issue an order and say everyone recognizes what Marshall says, Safavian says, Poindexter says, and a litany of other cases say, and so the government is directed to immediately -- to forthwith provide to defense counsel any outstanding Brady material as defined by those cases and on an ongoing daily basis provide information as that information becomes in the possession, knowledge, control of the government, should the Court do that? |
| MR. E. SULLIVAN: | We don't think so, your Honor. We understand -- |

29

| THE COURT: | How are you prejudiced if I do it, though? |
| MR. E. SULLIVAN: | The Court can. If it wants to issue an order to that effect, we will comply with that order. |
| | |
| THE COURT: | The government's position should be, Judge, that's just surplus, because all of us know what the law is? |
| MR. E. SULLIVAN: | Absolutely, your Honor. |
| | |
| THE COURT: | I'll just issue an order as a general reminder to the government to remind it of its daily ongoing obligation to produce that material. |
| MR. E. SULLIVAN: | Fair enough. We just want to make -- |
| | |
| THE COURT: | What about impeachment material of government witnesses, though, is that *Brady* material? |
| MR. E. SULLIVAN: | We have produced both *Brady* and *Giglio*. We treated the terms interchangeably. We viewed it all as *Brady* material. |
| | |
| THE COURT: | I don't need to say anything more about *Brady*, at least today anyway? |
| MR. E. SULLIVAN: | That's true, your Honor. One thing we do want to clarify, though, a portion of our letter from last evening was read on the record giving the impression that we're still sitting on a treasure trove of *Brady*-*Giglio* material. That's simply not the case. … |

*Id.*, Transcript of Motions Hearing, Sept. 10, 2008 10:09 a.m., at 73-75.

At the conclusion of that hearing, Judge Sullivan decided that an order directing the prosecutors to disclose *Brady* information was unnecessary:

| THE COURT: | … The motion to compel, I think that every aspect of the motion [by Senator Stevens] to compel [Discovery Pursuant to *Brady v. Maryland* and Fed. R. Crim. P. 16] |

30

has been resolved, but I want to be clear about that. You know what, I'm not going to write an order that says "follow the law." We all know what the law is. The government -- I'm convinced that the government in its team of prosecutors is thoroughly familiar with the decisions from our Circuit and from my colleagues on this Court, and that they, in good faith, know that they have an obligation, on an ongoing basis to provide the relevant, appropriate information to defense counsel to be utilized in a usable format as that information becomes known or in the possession of the government, and I accept that. I'm not going to -- I don't have the time or the interest to draft another order saying, you know, follow *Marshall*, follow *Savavian* [sic], follow *Poindexter*, follow all the opinions that my colleagues have issued. Follow the law, and Hinson and Wise [probably should be "hints to the wise"] should be sufficient. …

*Id.*, Transcript of Pretrial Conference Proceedings, Sept. 10, 2008 P.M., at 14-15.

31

**Introduction**

The Department of Justice ("DOJ") moved to set aside the verdict and to dismiss the indictment with prejudice in *United States v. Theodore F. Stevens*, CR 08-231 (EGS) ("*Stevens*") on April 1, 2009, when DOJ attorneys Paul M. O'Brien (Chief, Narcotic and Dangerous Drug Section), David L. Jaffe (Deputy Chief, Domestic Security Section) and William J. Stuckwisch (Senior Trial Attorney, Fraud Section) ("O'Brien Team"), who were assigned in February 2009 to conduct the post-trial litigation, discovered significant, undisclosed *Brady/Giglio* information in prosecutors' notes of statements by the government's principal witness, Bill Allen. *Stevens*, Motion of the United States to Set Aside the Verdict and Dismiss the Indictment with Prejudice, April 1, 2009 (Dkt. No. 324).  The undisclosed information included statements made by Mr. Allen during a pre-indictment interview on April 15, 2008, which contradicted his testimony at trial that he recalled speaking to Bob Persons and that he ignored Senator Stevens's written requests for a bill for work done on his home in Alaska because he had been told by Bob Persons "not to worry about getting a bill. Ted is just covering his ass". *Stevens*, Trial Transcript, Oct.1, 2008 A.M., at 52 ("CYA testimony").

DOJ assigned a new team of prosecutors after District Judge Emmet G. Sullivan held William Welch, the Chief of the Public Integrity Section, Brenda Morris, his Principal Deputy Chief, and another senior DOJ attorney, in contempt on February 13, 2009, for failing to comply with the Court's order to provide certain information to Senator Stevens's attorneys, Williams & Connolly, and to the Court regarding a complaint filed by FBI Agent Chad Joy in December 2008 which "raised serious allegations of prosecutorial and governmental misconduct in the investigation and trial of Senator Stevens." *Stevens,* Memorandum Opinion, dated Oct. 12, 2010, at 2 (Dkt. No. 421); *see also id.*, Memorandum Opinion & Order, dated Dec. 19, 2008 (Dkt. No. 255); *id*., Order, dated Dec. 22, 2008 (Dkt. No. 256); *id*., Order, dated Jan. 14, 2009 (Dkt. No. 261); *id*., Opinion & Order, dated Jan. 21, 2009 (Dkt. No. 274). Appeals by Mr. Welch and Ms. Morris from the Court's contempt finding are pending.

On April 5, 2009, Judge Sullivan issued an order *sua sponte* directing DOJ, the FBI, the Internal Revenue Service, and any and all other government agencies involved in the investigation and/or prosecution of Senator Stevens to preserve any and all documents related to this matter, including but not limited to emails, notes,

32

memoranda, investigative files, audio recordings, and any and all electronically
stored information. *Stevens*, Minute Order, dated April 5, 2009.

On April 7, 2009, Judge Sullivan granted the government's motion, set aside
the verdict, dismissed the indictment with prejudice, and found that "There was
never a judgment of conviction in this case. The jury's verdict is being set aside
and has no legal effect." *Stevens*, Order, dated April 7, 2009 (Dkt. No. 372).

On the same day, Judge Sullivan appointed Henry F. Schuelke III, the
undersigned, "to investigate and prosecute such criminal contempt proceedings as
may be appropriate against William M. Welch, Brenda K. Morris, Nicholas A.
Marsh, Edward P. Sullivan, Joseph W. Bottini, and James A. Goeke", and ordered
the government to "cooperate with Mr. Schuelke, including providing him with
access to investigative files, witnesses, and other information as requested." *Id*.,
Order, dated April 7, 2010 (Dkt. No. 375). On Mr. Schuelke's application, Judge
Sullivan issued an Order authorizing the issuance of subpoenas for testimony and
documents. *In Re Special Proceedings*, Misc. No. 09-MC-0198-EGS, Order, dated
July 28, 2009 (Dkt. No. 8); *id*., *Ex Parte* Application of Henry F. Schuelke, III, for
Authorization to Issue Subpoenas *Ad Testificandum* and Subpoenas *Duces Tecum*,
dated July 28, 2009 (Dkt. No. 7).

During the pendency of the investigation, Senator Stevens died in a plane
crash in Alaska on August 9, 2010. He was 86 years-old.

Williams & Connolly, the attorneys for Senator Stevens, DOJ, IRS, and
DOJ's Office of Professional Responsibility ("OPR") cooperated fully with our
investigation and promptly provided all requested information, documents, and
other valuable assistance. OPR provided transcripts of its interviews and exhibits,
documents and other information obtained during its concurrent investigation of
the conduct of the prosecutors and FBI agents during the investigation and
prosecution of Senator Stevens. During our investigation, we provided OPR with
copies of our deposition transcripts and other information and we also allowed DOJ
to review those transcripts for the purpose of determining whether they contained
*Brady*/*Giglio* information that was required to be disclosed to the defendants, or the
court, in *United States v. Kott*, CR no. 3:07-cr-00056-JWS (D. Alaska)("*Kott*") and
*United States v. Kohring*, CR no. 3:07-cr-00055-JWS (D. Alaska)("*Kohring*"), in
any other pending case arising from DOJ's "Polar Pen" investigation, and in

33

connection with a then-pending investigation of Bill Allen.[8] Letter from Mary

---

[8]Peter Kott and Victor Kohring were Alaskan state legislators indicted during the Polar Pen investigation of political corruption in Alaska who were tried and convicted in 2007. Mr. Marsh and Mr. Goeke were the trial prosecutors in *Kott*, and Mr. Bottini and Mr. E. Sullivan tried *Kohring*. Mr. Allen was the government's key witness in both trials. The appeals were pending in the Court of Appeals for the Ninth Circuit when the verdict against Senator Stevens was set aside and the indictment dismissed. On the government's motion, the Ninth Circuit remanded both cases to the district court to determine "whether the government had breached its obligation of full disclosure under" *Brady* and *Giglio*. *United States v. Kott*, No. 07-30496 (9th Cir.), Order, dated June 10, 2009, at 3 (Dkt. Entry 59); *United States v. Kohring*, No. 08-30170 (9th Cir.), Order, dated June 10, 2009, at 6 (Dkt. Entry 41).

On remand in the district court, the government conceded that *Brady* violations had occurred and provided previously undisclosed *Brady* information. *Kott*, Order and Opinion, Jan. 13, 2010, at 4 & 6; *Kohring*, Order and Opinion, Aug. 11, 2010, at 4 & 9. The district court found that, despite the *Brady* violations, there was no reasonable probability that the verdicts would have been different, and denied the motions to dismiss, for a new trial and for an evidentiary hearing. *Kott*, *supra*, at 19; *Kohring*, *supra*, at 30.

The Ninth Circuit recently reversed the district court's decision and ordered new trials in both cases. *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 Fed. Appx. 736 (9th Cir. 2011).

Mr. Kott petitioned for panel rehearing on the ground that the Court:

misapprehended the facts when it stated that the record's lack of evidence was a reason to reject the remedy of dismissal. In fact . . . the government is the party in unilateral control of such evidence and the government is still withholding it. In this situation – where the government is still suppressing the facts relevant to the appropriate remedy – a remand for an evidentiary hearing on the question of the appropriate remedy is required, not just a remand for retrial.

*United States v. Kott*, No. 07-30496 (9th Cir.), Appellant's Petition for Panel Rehearing, dated April 6, 2011, at 3 (Dkt. Entry 88).

The Petition cited the government's letter to the Ninth Circuit, dated Oct. 22, 2010, in which "the government conceded that it 'ha[s] not … produced the full range of materials, either positive or negative, bearing on the decisionmaking and intent of the trial team'", and its letter to Mr. Kott's attorney, also dated Oct. 22, 2010, in which it acknowledged that "'We have not ... undertaken to produce all material bearing on the question of what remedy might be appropriate were the Court to conclude that there had been a *Brady* violation, including information concerning the motives and decisionmaking of the trial team.'" *Id*. at 4 (citations omitted; brackets and ellipses in original).

Mr. Kohring also petitioned for panel rehearing on the same grounds. *United States v. Kohring*, No. 08-30170 (9th Cir.), Petition for Rehearing, dated April 8, 2011 (Dkt. Entry 76).

(continued...)

Patrice Brown, OPR Acting Counsel, dated Jan. 27, 2010, to Henry F. Schuelke III; Letter from Mr. Schuelke, dated Jan. 27, 2010, to Ms. Brown.

We examined *inter alia* files and records of the Alaska U.S. Attorney's Office and the FBI, DOJ's Criminal Division and Public Integrity Unit ("PIN") including correspondence, motions, grand jury testimony, the trial and post-trial record (including sealed motions and transcripts) in *Stevens*, emails between and among the prosecutors during the period January 1, 2008 to April 7, 2009, their files and handwritten notes, FBI agents' files, 302s, emails, text messages and handwritten notes, OPR interview transcripts and related documents, and portions of the trial record (including sealed transcripts) and the record on appeal in *Kott* and *Kohring*.  DOJ gave us unrestricted access to, and copies of, more than 128,000 pages of documents. *See* Letter from K. Harris, Senior Counsel to the Assistant Attorney General, dated Feb. 4, 2010, to H. Schuelke; Letter from M. Axelrod, Senior Counsel to A.A.G., dated March 11, 2011, to H. Schuelke.

Two subpoenas were issued in the investigation, to Mr. Allen for testimony and to Robert Bundy, his attorney, for testimony and documents.  Mr. Allen and Mr. Bundy, after litigation over Mr. Bundy's claim of attorney work-product protection, were deposed and cooperated with the investigation. At the request of George Terwilliger, another attorney for Mr. Allen, and prior to Mr. Allen's sentencing, we informed Judge Sedwick of Mr. Allen's cooperation with this investigation by letter dated Oct. 23, 2009, with a copy to DOJ attorney James M. Trusty who was in charge of Mr. Allen's prosecution at the time.

Ms. Morris, Mr. Bottini, Mr. Marsh, Mr. Goeke, Mr. E. Sullivan, Mr. Welch, and FBI Agents Mary Beth Kepner and Chad Joy, were voluntarily deposed.  Mr. Marsh passed away on September 26, 2010.  Depositions and/or interviews were

---

[8](...continued)

The Court of Appeals, in a split vote, recently denied both petitions. *Id*., Order, dated May 20, 2011 (Dkt. Entry 77); *United States v. Kott*, No. 07-30496 (9th Cir.), Order, dated May 20, 2011 (Dkt. Entry 89).

On Oct. 21, 2011, Mr. Kott pled guilty to Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)1)(B), and was sentenced that same day by Hon. Ralph Beistline to time served and a fine of $10,000.  On Oct. 21, 2011, Mr. Kohring pled guilty to Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 371, and was sentenced that same day by Judge Beistline to time served.

conducted of others who participated, directly and indirectly, in the investigation and trial of Senator Stevens.

Each prosecutor denied that he or she intentionally withheld any exculpatory information and various explanations were provided for the repeated non-disclosure of significant *Brady*/*Giglio* information which indisputably occurred during the prosecution of Senator Stevens. The prosecutors' explanations included:

- unawareness of the existence of the *Brady*/*Giglio* information;
- denial that some information was exculpatory;
- forgetfulness;
- Agent Kepner's failure to write an FBI 302 of Mr. Allen's interview on April 15, 2008;
- failure to review their notes of that interview;
- failure to scrutinize important source documents;
- a rushed and unsupervised *Brady*/*Giglio* review;
- delegation of the *Brady*/*Giglio* review to FBI agents and to other prosecutors unfamiliar with the case;
- the compressed trial schedule: 52 days between arraignment (July 31) and the start of jury selection (Sept. 22);
- reliance on the judgment of others;
- failure to supervise;
- micro management of the trial by DOJ's "front office"; and
- inexperience and lack of *Brady*/*Giglio* training.

Individual responsibility for the government's repeated failure to disclose *Brady*/*Giglio* information varied. However, evidence gathered during this investigation compels the conclusion that Mr. Bottini and Mr. Goeke intentionally withheld and concealed material exculpatory information, which was required to be disclosed to Senator Stevens and Williams & Connolly by *Brady* and *Giglio*.

## Summary of Findings

Our investigation focused initially on the interview of Mr. Allen on April 15, 2008 by Mr. Bottini, Mr. Goeke, Mr. Marsh, Mr. E. Sullivan and Agent Kepner. The discovery by the O'Brien Team of statements made by Mr. Allen during that interview, which were inconsistent with his trial testimony and had not been disclosed to Williams & Connolly, led to the government's motion to set aside the verdict against Senator Stevens and to dismiss the indictment with prejudice:

> The Government recently discovered that a witness interview of Bill Allen took place on April 15, 2008. While no memorandum of interview or agent notes exist for this interview, notes taken by two prosecutors who participated in the April 15 interview reflect that Bill Allen was asked about a note dated October 6, 2002, that was sent from the defendant to Bill Allen. The note was introduced at trial as Government Exhibit 495 and was referred to as the "Torricelli note." The notes of the April 15 interview indicate that Bill Allen said, among other things, in substance and in part, that he (Bill Allen) did not recall talking to Bob Persons regarding giving a bill to the defendant. This statement by Allen during the April 15 interview was inconsistent with Allen's recollection at trial, where he described a conversation with Persons about the Torricelli note. In addition, the April 15 interview notes indicate that Allen estimated that if his workers had performed efficiently, the fair market value of the work his corporation performed on defendant's Girdwood chalet would have been $80,000. Upon the discovery of the interview notes last week, the Government immediately provided a copy to defense counsel.

> Defendant Stevens was not informed prior to or during trial of the statements by Bill Allen on April 15, 2008. This information could have been used by the defendant to cross-examine Bill Allen and in arguments to the jury. The Government also acknowledges that the Government's Opposition to Defendant's Motion for a New Trial provided an account of the Government's interviews of Bill Allen that is inaccurate. *See* Opposition at 42-43 (Dkt. No. 269).

*Stevens*, Motion of the United States to Set Aside the Verdict and Dismiss the Indictment with Prejudice, April 1, 2009, at 1-2 (Dkt. No. 324).

Our investigation revealed that, in addition to the failure to disclose Mr. Allen's statements on April 15, 2008, that he did not recall speaking with Mr. Persons about Senator Stevens's requests for bills and that the value of VECO's work on Senator Steven's home in Alaska was $80,000 (and not $250,000 as alleged in the indictment), other, significant *Brady/Giglio* information was intentionally withheld, including the following:

- Mr. Bottini and Mr. Goeke withheld and concealed significant exculpatory information which they obtained from Robert "Rocky" Williams, a prospective government witness, during pre-trial witness preparation interviews in August and September 2008;

- Mr. Bottini and Mr. Goeke withheld and concealed significant impeachment information regarding Mr. Allen, their key witness against Senator Stevens, which was obtained from Bambi Tyree by another federal prosecutor during an unrelated prosecution in July 2004; and

- Mr. Bottini failed to correct materially false testimony given by Mr. Allen during his cross-examination in *Stevens* which Mr. Bottini knew at the time was false.

The information withheld from the defense would have significantly corroborated the trial testimony of Senator Stevens and Catherine Stevens, his wife, on the central issue in the case, supported defense attempts to expose Mr. Allen's CYA testimony as a recent fabrication, and provided additional grounds to impeach his credibility and to question the integrity of the prosecution itself. *See United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995)("The gravity of the prosecutors' misconduct . . . may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted." (citations omitted); *United States v. Remington*, 191 F.2d 246, 251 (2d Cir. 1951)("Evidence of efforts to suppress testimony of evidence in any form like the spoilation of documents is affirmative evidence of the weakness of the prosecution's case.")(footnote omitted).

38

**The Polar Pen Investigation**

The investigation and indictment of Senator Stevens arose from DOJ's Polar Pen investigation of Alaskan political corruption which was commenced in 2003 by Agent Kepner. Deposition of Agent Kepner, Aug. 24, 2009, at 14.  Mr. Marsh, a PIN attorney, was assigned to Polar Pen in April, 2004. Deposition of N. Marsh, Feb. 2, 2010, at 11.  The Alaska U.S. Attorney's Office was recused from the investigation, with the exception of Mr. Bottini and Mr. Goeke, Assistant U.S. Attorneys in that office.  They were assigned to Polar Pen in September, 2004 and January, 2006, respectively, and they reported in that matter only to DOJ's Public Integrity Section ("PIN") which was in charge of the investigation and prosecutions. Deposition of J. Bottini, Dec. 16, 2009, at 24 & 315; Deposition of J. Goeke, Jan. 8, 2010, at 38.  Mr. E. Sullivan joined PIN from DOJ's civil division in March, 2006, and was immediately assigned to Polar Pen. Deposition of E. Sullivan, Jan. 6, 2010, at 12.  Ms. Morris, the Principal Deputy Chief of the Public Integrity Section, supervised the investigation intermittently in 2006 and 2007. Deposition of B. Morris, Jan. 15, 2010, at 34-35.  In 2007 and 2008, she and Mr. Welch, who became the Chief of the Public Integrity Section in March, 2007, shared supervisory responsibility for Polar Pen. *Id*. at 35; *see also* Deposition of N. Marsh, Feb. 2, 2010, at 36 ("[during the investigation] we would go to [Ms. Morris and Mr. Welch] interchangeably or collectively, depending on who was around or what was going on at the time.").  Ms. Morris became lead trial prosecutor in *Stevens* when the indictment was filed on July 29, 2008. Deposition of B. Morris, Jan. 15, 2010, at 35-36.

Mr. Welch and Ms. Morris were veteran prosecutors.  Ms. Morris had 20 years of experience, beginning in the New York County District Attorney's Office where she served as an Assistant District Attorney from 1986 until 1991, when she joined PIN.  In 2004, she became PIN's Deputy Chief for Litigation, and in 2007, Principal Deputy Chief. *Id*. at 8-9.

Mr. Welch began as a prosecutor in 1989 in DOJ's Tax Division, Criminal Section; in 1991 he accepted a position as an AUSA in the Nevada U.S. Attorney's Office and remained there until 1995.  From May, 1995 to March, 2007, he was an AUSA in the Massachusetts U.S. Attorney's Office and was detailed to PIN as Deputy Chief from August, 2006 until March, 2007, when he became Chief of PIN. He remained in that position until Oct. 31, 2009 when he returned to the

Massachusetts U.S. Attorney's Office. Deposition of W. Welch, Jan. 13, 2010, at 7-8.

Mr. Bottini began working as an Assistant U.S. Attorney in the Alaska U.S. Attorney's Office in 1985, where he held senior management positions, including Interim United States Attorney (1993-1994), First Assistant (1990-1992), and Criminal Division Chief (1990-1992 and 2002-2003). Email from W. Welch, dated July 28, 2008, to Assistant Attorney General Matthew Friedrich, Principal Deputy A.A.G., Rita Glavin, L. Sweeney (DOJ Public Affairs), Subject: "Bios of Trial Team" (DOJ Bates no. CRM107383). Mr. Bottini also served at various times as the "anti-terrorism coordinator; the project safe neighborhoods coordinator; the professional responsibility officer; the Henthorne coordinator, which is dealing with agent misconduct issues; the international security coordinator."[9] Deposition

---

[9]In *United States v. Henthorne*, 931 F.2d 29 (9th Cir. 1991), the Ninth Circuit held that prosecutors were obliged, on the defendant's demand, to review the personnel files of law enforcement witnesses for impeachment material and other information favorable to the defense. *See* United States Attorneys' Manual, Title 9, Section 5.100, §3 ("Each of the Department of Justice prosecuting offices shall designate an appropriate senior official(s) to serve as the point(s) of contact concerning potential impeachment information").

After the conviction of Senator Stevens was set aside and the indictment dismissed, AUSA Frank Russo, Deputy Criminal Chief of the Alaska U.S. Attorney's Office, conducted a *Henthorne* review of the conduct of Agents Kepner and Joy. Deposition of AUSA F. Russo, March 24, 2010, at 24 & 28-35. He concluded that Agent Joy was "responsible for inconsistent statements and material omissions that will necessitate disclosure of impeachment material to the defense in future hearings and trials in which he may be called to testify. . . . [and] that these disclosures may result in S/A Joy, as well as his investigation, being discredited". Letter from AUSA F. Russo, dated June 22, 2009, to FBI Special Agent-in-Charge ("SAC") K. Fryslie (Anchorage), at 2 (DOJ Bates nos. CRM 127800-803). AUSA Russo requested that "S/A Joy not participate in further investigative activities." *Id*. As a result of that request, Agent Joy was assigned "to non-criminal investigative duties" and "his pending criminal investigations [will be reassigned] to other agents." Letter from SAC K. Fryslie, dated June 25, 2009, to AUSA F. Russo, at 1 (DOJ Bates nos. CRM 127798-799). On Jan. 2, 2010, Agent Joy resigned from the FBI. Deposition of AUSA Russo, dated March 24, 2010, at 32; Deposition of Agent Joy, March 29, 2010, at 11.

With respect to Agent Kepner, AUSA Russo reviewed the allegation by Agent Joy in a complaint which he filed with the FBI in December, 2008, after Senator Stevens's trial, that she "failed to disclose a material fact in one of the Title III affidavits in the Polar Pen investigation." Letter from AUSA F. Russo, *supra*, at 4. AUSA Russo reviewed the affidavit and concluded there were no material omissions. *Id*. He deferred review of other allegations, that Agent Kepner

(continued...)

of J. Bottini, Dec. 16, 2009, at 10.  As the Professional Responsibility Officer, he
addressed questions and issues raised by AUSAs, including questions about
*Brady/Giglio* disclosure obligations by obtaining the facts and consulting with
DOJ's Professional Responsibility Advisory Office ("PRAO"); if there was no time
to contact PRAO, he and/or a supervisor would provide the answer. *Id.* at 10-11.

    Mr. Marsh clerked for the Hon. Andrew J. Kleinfeld, U.S. Court of Appeals
for the Ninth Circuit from 1998 to 1999.  He was an associate at Sullivan &
Cromwell in New York from 1999 to 2001, and from 2001 to 2003, he was an
associate, and then a junior partner, at Hale and Dorr in New York. *See* Email from
W. Welch, dated July 28, 2008, to A.A.G. M. Friedrich, Principal Deputy A.A.G.,
R. Glavin, L. Sweeney (DOJ Public Affairs), Subject: "Bios of Trial Team" (DOJ
Bates no. CRM107383). He joined PIN in 2003 and worked on the Polar Pen
investigation from its inception. *Id.*; Email from W. Welch, dated July 25, 2008,to
A.A.G. Friedrich (DOJ Bates no. CRM107310.

    Mr. E. Sullivan clerked for the Hon John A. Terry, District of Columbia
Court of Appeals, from 1995-96. After his clerkship, he worked at Wilmer, Cutler
and Pickering from 1996 until June, 1999, and in DOJ's Civil Division,
Commercial Litigation, from June, 1999 until February, 2006.  He joined PIN in
March 2006 and was assigned to the Polar Pen investigation. Email from W.
Welch, dated July 28, 2008, to A.A.G. M. Friedrich, Principal Deputy A.A.G., R.
Glavin, L. Sweeney (DOJ Public Affairs), Subject: "Bios of Trial Team" (DOJ
Bates no. CRM107383).  Mr. E. Sullivan had no previous experience prosecuting
criminal cases and neither training nor experience regarding a prosecutor's *Brady*
obligations. Deposition of E. Sullivan, Jan. 6, 2010, at 12-13 & 21.

--------------------------------

    [9](...continued)
failed to document "a potential inconsistent statement of Bill Allen, which precipitated the
dismissal of the *Stevens* case", and "exculpatory statements" in *Kott*, *Kohring* and in another
Polar Pen prosecution, *United States v. Anderson*, CR no. 06-00099-JWS (D. Alaska), pending
the completion of DOJ's *Brady/Giglio* review in those cases and OPR's investigation. Letter
from AUSA F. Russo, *supra*.  SAC Fryslie informed AUSA Russo that "As you may already
know, SA Kepner is no longer working on the Polar Pen investigation and was reassigned to
another investigative squad in February 2009." Letter from SAC K. Fryslie, dated June 25, 2009,
*supra*.

Mr. Goeke clerked for U.S. District Judge William Fremming Nielsen, Eastern District of Washington, from 1997 to 1999. He was in private practice in Seattle from 1999 until 2003, when he joined the Alaska U.S. Attorney's Office. He was the Acting First Assistant from January, 2006 through August, 2006. *Id.* In May, 2009, he joined the U.S. Attorney's Office for the Eastern District of Washington. Deposition of J. Goeke, Jan. 8, 2010, at 5 & 10. He was assigned to the Polar Pen investigation on or about December, 2005. *Id.* at 38.

Agent Kepner, the case agent in the Polar Pen investigation and in *Stevens*, joined the FBI in 1991 and worked in its Philadelphia office until 2002, when she transferred to the FBI's office in Juneau, Alaska; in August, 2006, she was assigned to the Anchorage office. Deposition of Agent Kepner, Aug. 24, 2009, at 10-13. While in Philadelphia, Agent Kepner assisted in the trial of a defendant charged with mail fraud conspiracy and related crimes, who was granted a new trial on account of a *Giglio* violation. *United States v. Patrick*, 985 F. Supp. 543, 561-562 (E.D. Pa. 1997), *aff'd without opinion*, 156 F.3d 1226 (3rd Cir. 1998); *see also* Deposition of Agent Kepner, Aug. 24, 2009, at 49-51. The docket sheet in that case reflects that, on Sept. 24, 1998, after jury selection commenced in a second trial, the district court dismissed the indictment with prejudice on the defendant's motion. *United States v. Leonard Patrick*, No. 2:97-CR-00015-CN (E.D. Pa.), Dkt. nos. 104-108.

DOJ summarized the results of the Polar Pen investigation in its press release announcing the indictment of Senator Stevens:

> To date, there have been seven criminal convictions arising out of the ongoing investigation. Thomas T. Anderson, a former elected member of the Alaska House of Representatives, was convicted in July 2007 and sentenced to five years in prison for extortion, conspiracy, bribery and money laundering for soliciting and receiving money from an FBI confidential source in exchange for agreeing to perform official acts to further a business interest represented by the source. Peter Kott, a former Speaker of the Alaska House of Representatives, was convicted in September 2007 and sentenced to six years in prison for extortion, bribery and conspiracy. Victor H. Kohring, a former elected member of the Alaska House of Representatives, was convicted at trial in November 2007 for attempted extortion, bribery and conspiracy, and was sentenced to three and a half years in prison. In March

42

2008, James A. Clark, chief of staff to the former governor of Alaska, pleaded guilty to conspiracy to commit honest services mail and wire fraud. In addition, former Anchorage lobbyist William Bobrick pleaded guilty in May 2007 to felony public corruption charges.

Former VECO Chief Executive Officer Bill J. Allen and former VECO Vice President of Community Affairs and Government Relations Richard L. Smith, pleaded guilty in May 2007 to providing more than $400,000 in corrupt payments to public officials from the state of Alaska.

DOJ Press Release, dated July 29, 2009 (http://www.justice.gov/opa/pr/2008/July/08-crm-668.html)(last visited November 14, 2011).

Mr. Allen began cooperating in the Polar Pen investigation on Aug. 30, 2006, when he was confronted by Agent Kepner and "advised of the nature of the investigation and the potential benefits of cooperation." *See* Agent Kepner's 302 of her interview of Mr. Allen on Aug. 30, 2006, at 1 (DOJ Bates nos. CRM005828-5832); Draft Prosecution Memorandum, dated April 30, 2007, at 3 ("The FBI approached ALLEN and SMITH on August 30, 2006, and confronted them with evidence concerning their illegal activities. ALLEN and SMITH have been cooperating with the government's investigation since then.") (DOJ Bates nos. CRM096333-394).

On May 7, 2007, Mr. Allen waived indictment and pleaded guilty to an information charging two counts of conspiracy (18 U.S.C. § 371) and one count of bribery (18 U.S.C. § 666). He was the key prosecution witness in Senator Stevens's trial and in the trials of Mr. Kott and Mr. Kohring in 2007. On Oct. 28, 2009, Mr. Allen (age 72) was sentenced by District Judge John W. Sedwick to three years in prison and a fine of $750,000; he began serving his sentence in January, 2010. By the time of Mr. Allen's guilty plea, Senator Stevens was a target of the investigation. *See* Draft Prosecution Memorandum, dated April 30, 2007, Subject: Recommendation to Prosecute THEODORE F. STEVENS, Current United States Senator, for False Statements (18 U.S.C. § 1001) (DOJ Bates nos. CRM096333-394).

Shortly before the indictment was filed against Senator Stevens on July 29, 2008, Ms. Morris was asked by Matthew Friedrich, Assistant Attorney General in charge of the Criminal Division, and by Rita Glavin, his Principal Deputy, to become the lead trial prosecutor in *Stevens*. Deposition of B. Morris, Jan. 15, 2010, at 40. Ms. Morris and Mr. Welch informed Mr. Friedrich and Ms. Glavin that changing the trial team, which was slated to be Mr. Bottini, Mr. Marsh, Mr. Goeke and Mr. E. Sullivan, was a bad idea, and Ms. Morris declined their request three times. Mr. Friedrich pressed and she finally agreed. *Id*. at 44-46.

Ms. Morris testified that she and Mr. Welch expected that Mr. Bottini, Mr. Marsh, Mr. Goeke, and Mr. E. Sullivan would be upset by the rearrangement of the trial team. *Id*. at 47. Contemporaneous emails indicate that they were correct. On July 28, 2008, when Ms. Morris's appointment was announced, Mr. Bottini emailed a colleague in the Alaska U.S. Attorney's Office who had inquired about the status of the case:

> Green light. Tumultuous day internally here. Front Office has mandated the trial team to be Brenda Morris, me and Nick. Everyone unhappy including me. Nick pissed as he considers addition of Brenda (now de facto lead attorney) to be slap in the face to him. He is considering quitting over this. Jim [Goeke] and I are exhausted.

> Email from J. Bottini, dated July 28, 2008, to K. Walker (DOJ Bates no. CRM072426);

Mr. Marsh expressed his dissatisfaction in emails to Ms. Morris the same day:

| | |
|---|---|
| Ms. Morris: | I know you're upset, and I wouldn't be taking it as well as you. Just let me know. |
| Mr. Marsh: | Thanks, but I'm not taking it very well. The section will lose people because of this. |
| Ms. Morris: | I understand. The offer's open. |
| Mr. Marsh: | I spoke to Bill [Welch], and frankly I'm so upset right now that nothing good will come of additional discussion. Given, though, that you have always said that this is a two-person trial, and that I'm clearly the third person on the team, I would appreciate it if you and Bill would |

44

break the news to me sooner (rather than later) that my role will be minimal.

Ms. Morris:       That's not true. I'm in a meeting right now and we need to discuss this further.

Email exchange between Ms. Morris and Mr. Marsh, dated July 28, 2008 (DOJ Bates nos. CRM064438-439

*See also* Email from N. Marsh, dated July 29, 2008, to M. Stennes ("Bill [Welch] conveniently failed to mention how Ed [Sullivan] and I were displaced yesterday by new lead trial counsel Brenda Morris. There is no joy in Mudville right now with Team Polar Pen, but thanks for the shoutout nonetheless.")(DOJ Bates no. CRM019873).

Ms. Morris testified that her assignment to trial team was the beginning of a "horrible experience":

So it's just from that moment on, it was a horrible, horrible, horrible experience. Nick did not take it well at all, and as a matter of fact at -- there was a press conference, and Matt Friederich spoke. The guys were telling me they were refusing to go to the press conference. . . . They stood in the back. They wouldn't talk to me.

* * *

Yes, they all expressed it in different ways. I mean, it was -- Nick was just livid. I mean, and you could just see. I mean, he wouldn't look at me or just look at me like he was seething . . .

* * *

Nick was kind of controlling everything so -- and I was trying to stay clear of Nick because he was very upset with me on the team, so.

Deposition of B. Morris, Jan. 15, 2010, at 47, 50 & 274.

Mr. Welch testified that decisions by the "front office", A.A.G. Friedrich and Ms. Glavin, his Principal Deputy, adversely affected the case, including their decision to assign Ms. Morris as lead trial prosecutor:

45

For example, I did not a [sic] agree with the decision to add Ms. Morris to the prosecution team. I didn't agree to it before I felt that the addition at such a late time, and given the nature of the case, and given the personalities as I understood and the cohesiveness of the team as I understood it, I thought that the addition would have a very detrimental and explosive impact on the team, and in fact that's exactly what happened.

So that decision essentially caused me to spend much more time than I wanted dealing with maintaining the chemistry of the team. At various times, decisions would get made by upper management that had a very negative impact on the morale of the team, and those decisions raised [probably should be "ranged'] from, for example, dictating who would stand up in court and speak on behalf of the government, dictating how many people could sit at counsel table dictating whether or not those who couldn't sit at counsel table had to sit in the gallery versus the front row.

Deposition of W. Welch, Feb. 5, 2010, at 278-279.

### Indictment, Arraignment and Senator Stevens's Demand for a Speedy Trial

Senator Stevens was indicted on July 29, 2008 on seven counts of false statements (18 U.S.C. § 1001). *Stevens*, Indictment, filed July 29, 2008 (Dkt. No. 1). Count 1 alleged that from May 1999 to August, 2007, he schemed to conceal his receipt of improvements to his home in Alaska and other benefits, provided by Mr. Allen and VECO and worth more than $250,000, by failing to report them on his annual Senate Financial Disclosure Forms. Counts 2 through 7 alleged separate false statements violations based on the Financial Disclosure Forms filed in 2002 through 2007. According to the final Prosecution Memorandum, "the largest and most significant [benefit] is the home renovation work and repair done by VECO" on Senator's Stevens's home in Alaska, which was valued at greater than $250,000:

> 2000: More than $80,000
> 2001: More than $120,000
> 2002: More than $73,000
> 2004: More than $500
> 2005: More than $500

Prosecution Memorandum, dated May 21, 2008, at 4 & 33 (DOJ Bates nos. CRM048387-465).

The seventh count, based on a $1080 boiler repair bill paid in 2006 by VECO and Mr. Allen, was added shortly before indictment. *See* Email from N. Marsh, dated July 17, 2008, to E. Sullivan, J. Bottini, J. Goeke and Agent Kepner ("Welch has asked us to (a) extend the scheme through 2006 to incorporate the boiler bill and (b) add a seventh count for the 2006 F[inancial] D[isclosure] form. Thoughts everyone? Nick/Ed") (DOJ Bates no. CRM019077).

The prosecutors had targeted Senator Stevens for these charges since at least April, 2007. *See* Draft Prosecution Memorandum, dated April 30, 2007, Subject: Recommendation to Prosecute THEODORE F. STEVENS, Current United States Senator, for False Statements (18 U.S.C. § 1001) (DOJ Bates nos. CRM096333-394). They had also long anticipated and correctly identified his defense, that he understood and believed that VECO expenses on the renovation were included in the bills sent to him by Christensen Builders, which he and Catherine Stevens paid in full:

> STEVENS may claim that, because of his busy schedule, he had asked Catherine Stevens to handle all of the expenses relating to the home renovation and, as such, he thought the VECO charges had been paid by her. This defense, if asserted, is meritless in our view. Although Catherine Stevens was directly involved with invoices from CBI [Christensen Builders] and various vendors – and she endorsed all of the checks to these entities – it is incredible for STEVENS to claim that he was unaware that VECO's costs had gone unpaid or that these costs were somehow rolled into CBI's invoices– particularly given the massive amounts at issue here.
>
> Draft Prosecution Memorandum, dated April 30, 2007, Legal Analysis And Potential Defenses, at 46-47 (DOJ Bates nos. CRM096333-394).

The prosecutors had also anticipated, long before they received the Torricelli note and Mr. Allen recalled his CYA conversation with Mr. Persons, that Senator Stevens might claim that he asked Mr. Allen for bills for VECO's work on the renovation, and they labeled any such claim as "simply pretextual":

47

Second, STEVENS may assert that, although he knew VECO was working on the project, he asked on at least two occasions to have invoices sent to him. We believe these [oral] requests were simply pretextual, and that STEVENS never had any intention to pay them. During interviews with the government, ALLEN has stated as much, indicating that STEVENS never followed-up on any of the requests that he made for invoices relating to the Girdwood Residence.

*Id*. at 47.

Senator Stevens was arraigned on Thursday, July 31, 2008. His attorney, Brendan Sullivan, requested a speedy trial and an October trial date, so that Senator Stevens, who was running for re-election, could clear his name before the general election on Nov. 4. *Stevens*, Trial Transcript, July 31, 2008, at 3. Ms. Morris proposed Sept. 22, and the Court and the parties agreed on a firm trial date of Sept. 24. *Id*. at 18-19. The Court later advanced that date to Sept. 22, 2008. *Id*., Trial Transcript, Aug. 7, 2008, at 17.

Mr. Sullivan also requested expedited discovery and the immediate production of *Brady* and Jencks material. *Id*. at 4-5. Ms. Morris stated that the government was ready to provide the "bulk" of the discovery the following week. *Id*. at 6. After the trial date was set, the Court confirmed that the government could provide the expedited discovery requested by the defense:

| | |
|---|---|
| THE COURT: | The government is prepared to give you everything that the government believes is discoverable at this time; is that right? |
| MS. MORRIS: | The bulk of it, your Honor, next week. There will be some other matters that we just don't have available to give at this point just because of the technical issues, but we will be able to give the bulk of it next week. |
| THE COURT: | All right. |

*Id*. at 20.

*See also* Email from E. Sullivan, dated July 31, 2008, to J. Bottini, J. Goeke, N. Marsh, Agents Kepner, Joy and Herrett, and Agent I. Brown (U.S. Department of

Interior, Inspector General's Office)("We are on a fast track for discovery in the Ted Stevens case. . . .")(DOJ Bates no. CRM091485).

Mr. Welch testified that he discussed with Ms. Morris, Mr. Marsh, Mr. Bottini, Mr. Goeke and Mr. E. Sullivan on July 14, 2008, whether they were ready for a speedy trial. Deposition of W. Welch, Feb. 5, 2010, at 287. Mr. Marsh told him that the Rule 16 discovery and the Title III (wiretap) information was "ready to go out the door", that the *Brady*/*Giglio* review was completed or ongoing and that they would be able to meet their obligations. *Id*. at 288. Mr. Welch tested their readiness to provide discovery by asking Mr. Marsh for a copy of all the 302s for Mr. Allen and, about an hour later, he received a CD containing what was represented to be all the Allen 302s. *Id*. at 288-289. Mr. Welch testified that he had several more conversations with Mr. Marsh about discovery prior to the return of the indictment on July 29, 2008, and that he was told each time that discovery was ready. *Id*. at 289. Mr. Marsh testified that he did not expect that Senator Stevens would demand a speedy trial. Deposition of N. Marsh, Feb, 2, 2010, at 77-78.

On the day after Senator Stevens was arraigned, Williams & Connolly made the first of many demands for discovery and *Brady*/*Giglio* information. *See Stevens*, Letter from R. Cary, dated Aug. 1, 2008, to B. Morris (Dkt. No. 60-1); (DOJ Bates nos. 079372-377). Mr. Welch testified that shortly after indictment he was told that much of an electronic data base of documents had been lost in a computer crash in June or July, no one had been notified of the crash and no backup had been created. Deposition of W. Welch, Feb. 5, 2010, at 289. Consequently, discovery was delayed in the first two weeks of August as the data base was reconstructed. *Id*. Mr. Marsh testified that the Rule 16 discovery was delayed because the scanning and collation of material which was supposed to have been done by the time of indictment had not been completed. Deposition of N. Marsh, Feb. 2, 2010, at 80.

The prosecutors were also not ready to disclose *Brady* information. Their review for *Brady* material only began on or about the date of indictment and the first of two *Brady* disclosure letters was not sent to Williams & Connolly until Aug. 25, 2008. Deposition of Agent Kepner, Aug. 24, 2009, at 24 ("But [the start of the *Brady* review] was certainly very close proximity, if not before or after the indictment."); Email from N. Marsh, dated Aug. 14, 2008, to J. Bottini, J. Goeke and E. Sullivan ("we probably need to get cranking on our omnibus Brady/Giglio letter to defense counsel, as well as identifying any GJ transcripts that we think

49

should be given over in toto under Brady/Giglio. Thoughts?")(DOJ Bates no.
CRM075555). The *Brady* review continued through Sept. 9, 2008, when the
second and last *Brady* disclosure letter was sent. Deposition of E. Sullivan, Jan. 6,
2010, at 436 ("Well, for purposes of that September 9th letter, it seemed like it was
right up to the very end. It was September 8th, September 9th. It seemed like they
were still doing review work[.]"); Email from Agent Kepner, dated Sept. 6, 2008,
to E. Sullivan ("Grand jury testimony done. I can send out the results when I get
back to my office. 302s should be complete on Monday [Sept. 8, 2008]. mbk")
(DOJ Bates no. CRM055512); Email from Agent Joy, dated Sept. 9, 2008, to N.
Marsh, J. Bottini and Agent Kepner, Subject: "302 review" ("I asked mary jo to
email you what we do have so far on the 302 review. This should be coming soon
and include my mess with dave anderson.")(DOJ Bates no. CRM081516).

### Pre-Trial Discovery and the Court's *Brady* and *Giglio* Disclosure Orders

In the course of the initial appearance on July 31, 2008, the Court set a
schedule for the filing of pre-trial motions and scheduled a hearing on
then-pending motions on September 10, 2008.

The stated expectations of the parties on July 31, 2008, concerning informal
discovery proved not to have been met by September 2, 2008, as, on that day,
counsel for Senator Stevens filed a Motion to Compel Discovery Pursuant to *Brady
v. Maryland* and Fed. R. Crim. P. 16 ("Motion to Compel"). The Motion to
Compel recited that, despite efforts to resolve discovery disputes informally, the
government had withheld material claimed to be discoverable under Fed. R. Crim.
P. 16 and *Brady*, including, *inter alia*, "impeachment materials related to several of
the Government's key witnesses." Motion to Compel, p. 2.

Among some six enumerated categories of impeachment material, the motion
sought "copies of all exculpatory grand jury testimony, FBI Form 302 witness
interview memoranda, and all contemporaneous notes of witness interviews,
including notes or memoranda reflecting false statements by the witnesses". Motion
to Compel, p. 4.

On September 5, 2008, the Government filed its Memorandum in Opposition
to Defendant's Motion to Compel Discovery ("Opposition"). The Government first
advised the Court that it "is aware of its obligations with respect to exculpatory

evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150, 108 (1972), and <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), and has provided and will continue to produce to defendant all such information properly falling within the scope of *Brady* and its progeny." Opposition, pp. 4-5. Notwithstanding that stated commitment, the Government was resistant from the start.  In specific relevant part, the Government's Opposition maintained that it was not obligated to produce grand jury transcripts in their entirety, relying on Fed. R. Crim. P. 16 (a)(3) and that the parties had agreed that the Government need only provide exculpatory information contained in a witness' grand jury testimony by means of a summary letter or a redacted transcript.  It further argued that such a practice was consistent with the law in this District, and committed to make such a disclosure following completion of grand jury testimony review.

With respect to FBI memoranda and interview notes, the Government argued that it was legally obligated to disclose only material impeachment evidence – as opposed to all potentially inconsistent witness statements, that rough notes of interviews are required to be produced only to the extent required by *Brady* or the Jencks Act, that, as with grand jury transcripts, the Government was in the process of "re-reviewing" all agent rough notes and formal interview memoranda to determine whether any contained "<u>Brady</u>-related" material and that, upon such discovery, the information would be produced either by summary letter or by redactions to the memoranda and/or rough notes. Opposition, p. 11.

On the eve of the previously scheduled September 10, 2008, Motions hearing, that is, on September 9, 2008, the Government sent to counsel for Senator Stevens the "summary letter" which it had forecast.  After noting that the Government had completed its review of agents' notes, formal memoranda and grand jury transcripts for *Brady*/*Giglio* material, the letter purported to summarize statements previously made by witnesses which were favorable to the defense or inconsistent, either internally or with anticipated trial testimony.  While not conceding that all of the information summarized met the legal standards requiring disclosure, the Government ". . . produce[d] this information nonetheless in the continued spirit of compromise and cooperation." *Stevens*, Letter from B. Morris, dated Sept. 9, 2008, to A. Romain ("*Brady"* letter), at 1 (Dkt. No. 126-2).

On the following morning, the Court summarized the contentions of the parties, as had been set out in their respective pleadings and invited them to

describe what had been produced since the pleadings had been filed and what, according to the defense, remained to be produced.

The Government advised the Court:

MR. E. SULLIVAN [counsel for the Government]: Okay.

With respect to the *Brady* evidence which involves the grand jury transcripts, the FBI formal memorandum, 302s, and the rough notes, last night we produced to defendant a very detailed letter that summarized the Brady-Giglio material that we located within the rough notes, as well as the 302s, so that in our view is a nonissue now.

We have also gone through all the grand jury transcripts. We've provided in summary format the Brady-Giglio related statements in the grand jury transcripts in the letter that we sent last evening, so again we believe that's a non-issue. September 10, 2008, Hrg. Tr., pp. 37-38.

The Court addressed counsel for Senator Stevens and the following colloquy ensued:

THE COURT: With respect to *Brady*, why shouldn't the Court just say everyone knows, everyone has read, and everyone is well versed with respect to opinions from this Circuit and opinions from my colleagues, including Judge Friedman in the Safavian case and other district court opinions that address *Brady* obligations and responsibilities. Everyone knows what the law is: Why shouldn't the Court just say to the government you know what the law is, follow the law?

MR. ROMAIN [counsel to Senator Stevens]: Well, there are two - -
THE COURT: Wait a minute.
And abide by your *Brady* obligations period, because there's no question as to what the law – what our Court of Appeals has said about *Brady* and the Government's responsibility. It's not just exculpatory evidence; we all know that. So the Government says we're aware of our *Brady* obligations, and I say fine, then comply with your *Brady* obligations, and why should I do more than that?

52

MR. ROMAIN: Your Honor, first it would be in fact helpful if you could do precisely that.

THE COURT: I just did it. I just did it.

MR. ROMAIN: And I appreciate it, and let me tell you where the record stands, your Honor.

THE COURT: Why do I have to do anything more than that? Everyone knows what their obligations are. I shouldn't have to. We've all read, we all know - -

MR. ROMAIN: I appreciate that, your Honor. It is absolutely true that the state of the law is clear.

THE COURT: Right.

MR. ROMAIN: But the state of production is not in a position where the government can say they have actually met their *Brady* obligations.

September 10, 2008, Hrg. Tr. pp. 59-60.

Counsel for Senator Stevens then addressed what he characterized as a "lingering issue" with respect to *Brady*, namely the form of production of information:

We have received of course a couple of letters that summarize some information, but it seems clear that that is not enough. For example, if we receive a letter, as we did last night, from the government that indicates that it essentially has produced all the *Brady* information for one of its primary witnesses in a total of eleven lines, eleven lines, when we have information that this witness has been interviewed multiple times, there are several problems with this. First, if there are additional documents that reflect that same *Brady* information we're entitled to it, but in addition, your Honor, a letter like this is not sufficient. We have never agreed to it because if that same witness comes on the stand and makes one statement, what kind of

53

impeachment can we actually do with a letter about so and so stated X, Y, and Z?  That actually and simply doesn't work.

    For example, if the FBI has Form 302s, which we understand its policy to maintain and to draft, then we should receive those Form 302s.  We should know what the witness said, when he said it, to whom he said it, so that we can use that information to effectively impeach the witnesses, so I think, I just want to make clear that we have issues of timing, we have issues of scope, and we also have issues of form, your Honor.

. . . My understanding of our agreement with the government is that the government would produce the *Brady* material, but we didn't – we never agreed that we could get it in an unusable form.  And the form that it's now been produced in, a letter, eleven lines, is not usable.

September 10, 2008, Hrg. Tr. pp. 65-66.

The Court then observed:

    THE COURT: I can sit here and craft an order and lift the language from Judge Friedman's excellent opinion in <u>Safavian</u>, and indeed there was an appeal and there was a reversal, but his *Brady* rulings weren't challenged in the Court of Appeals and it's good law.  I think it's an excellent opinion, and I totally agree with it, and all Judge Friedman did in that opinion – he had the time to do it.  I don't have the time right now – he repeated what Chief Judge Sentelle said in <u>Marshall</u>, in <u>Poindexter</u>, and all my other colleagues who read it, so everyone knows what the law is.

September 10, 2008, Hrg., Tr. p. 67.

    The Court invited the Government to respond and the following exchange between the Court and counsel for the Government occurred:

    MR. E. SULLIVAN: Now, just jumping back over to the <u>Brady-Giglio</u>, just briefly, we fully understand what our obligation is, and I don't think we need to belabor the Court because the case law is clear on this issue.

THE COURT:   What should the Court do?

MR. E. SULLIVAN: We don't think that there's anything for the Court to do.  We have – –

THE COURT: Should the Court just issue an order and say everyone recognizes what <u>Marshall</u> says, <u>Safavian</u> says, <u>Poindexter</u> says, and a litany of other cases say, and so the government is directed to immediately – to forthwith provide to defense counsel any outstanding *Brady* material as defined by those cases and on an ongoing daily basis provide information as that information becomes in the possession, knowledge, control of the government, should the Court do that?

MR. E. SULLIVAN: We don't think so, your Honor. We understand -

THE COURT: How are you prejudiced if I do it, though?

MR. E. SULLIVAN: The Court can.  If it wants to issue an order to that effect, we will comply with that order.

THE COURT: The government's position should be, Judge, that's just surplus, because all of us know what the law is?

MR. E. SULLIVAN: Absolutely, your Honor.

THE COURT: I'll just issue an order as a general reminder to the government to remind it of its daily ongoing obligation to produce that material.  September 10, 2008, Hrg. Tr., pp. 73-74.

The Court then inquired:

THE COURT: What about impeachment material of government witnesses, though, is that *Brady* material?

MR. E. SULLIVAN: We have produced both *Brady* and *Giglio*.  We treated the terms interchangeably.  We viewed it all as *Brady* material.

55

THE COURT: I don't need to say anything more about *Brady*, at least today anyway?

September 10, 2008, Hrg., Tr. p. 74.

The parties had more to say, however, as the Government argued that, with respect to prior statements of witnesses which may constitute bases for impeachment, its obligation was satisfied by a summary description of such statements – which, it maintained, it had provided in its summary letter. It also represented that such summary description had been the agreed-upon method of disclosure, citing written communications between the parties. Counsel for Senator Stevens countered:

MR. CARY [counsel to Senator Stevens]: Your Honor, Rob Cary.

If I may respond, because it was my e-mail back right afer this case was indicted that leads to this, what I think is a misunderstanding.

What I was trying to emphasize was even if they weren't going to produce a transcript because they said it was Jencks, we still wanted the *Brady* information, and I was never in a million years wanted to suggest that we weren't going to get it at a time when we could use it, in a form that we could use it for. For example, Form 302 you can use to refresh the witness' recollection. It will tell us who the agents were so that we will be able to ask – plan to ask the appropriate questions in order to refresh recollections and then call the agent to impeach. The letter that we have that Mr. Romain has that we received last night is simply insufficient in its form to be meaningful to us, and we did – 24 hours, by the way, was the best we could get the Government to agree to on Jencks, but it certainly seems like right now with twelve days away from trial, the trial would go a lot smoother if we had the Jencks now, and certainly if it's got Brady-Giglio material in it we need at least that portion of the transcript so that we can use it. I just wanted to stand up and clarify that initial discussion when we were trying to work out discovery in this case, your Honor.

September 10, 1008, Hrg., Tr., pp. 77-78.

At the conclusion of the hearing on September 10, 2008, after disposing of a number of motions unrelated to discovery, the Court returned to the Motion to Compel and said:

> The motion to compel, I think that every aspect of the motion to compel has been resolved, but I want to be clear about that. You know what, I'm not going to write an order that says "follow the law." We all know what the law is. The government – I'm convinced that the government in its team of prosecutors is thoroughly familiar with the decisions from our Circuit and from my colleagues on this Court, and that they, in good faith, know that they have an obligation, on an ongoing basis to provide the relevant, appropriate information to defense counsel to be utilized in a usable format as that information becomes known or in the possession of the government, and I accept that. I'm not going to – I don't have the time or the interest to draft another order saying, you know, follow *Marshall*, follow *Savavian* [sic], follow *Poindexter*, follow all the opinions that my colleagues have issued. Follow the law, and Hinson and Wise [probably should be "hints to the wise"] should be sufficient. I think I've resolved every aspect of the motion to compel. If someone's unclear about any aspect of that motion, you need to let me know now before you leave. All right. Well, we're all clear on that. We're all clear on what the law is and we're all clear on what the Court's rulings are.

September 10, 2008, Hrg., afternoon session, pp. 14-15.

Following the hearing, the Court issued a minute entry for the proceedings held on September 10, 2008. With respect to the Motion to Compel, the entry reads:

> [60] Motion to Compel **GRANTED IN PART** and **DENIED IN PART** and resolved in part, based on the Court's rulings in open court and the parties' representations that they have resolved a number of the discovery disputes raised in the motion.

During the evening of September 10, 2008, it appeared that the parties had differing views of the import of the Court's resolution of the Motion to Compel

earlier that day and the Government continued to resist. The parties exchanged terse letters. Counsel for Senator Stevens wrote to Government counsel:

> Pursuant to Judge Sullivan's oral ruling today on Senator Stevens' Motion to Compel, we request the immediate disclosure of all *Brady* and *Brady* material in a **"useable format"**. September 10, 2008, letter from Alex G. Romain to Brenda R. Morris (bold face type in original).

Government counsel replied:

> In reference to the letter that you sent to us today, please be advised that we have already provided you with *Brady*/*Giglio* material in a format consistent with our prior agreement and governing law. We will also continue to fulfill our obligations under *Brady* and its progeny.

> Letter from Brenda R. Morris to Alex G. Romain, September 10, 2008.

At the request of counsel for Senator Stevens, the Court convened for a further hearing on September 12, 2008.

As the parties had earlier argued, their differing views on the import of the Court's use of the term "useable format" crystallized during this hearing. The defense argued that in order effectively to cross-examine a government witness concerning a prior inconsistent statement made in the course of an FBI interview and memorialized in an FBI Form 302, the cross-examiner needs the 302 (or a redacted version that contains simply the prior statement) so that, in the event that the witness claims not to recall having made the statement, he can be confronted with the circumstantial details of the interview, e.g., "don't you recall meeting with Agent A on B date in the U.S. Attorney's Office in Anchorage, Alaska in the presence of C and D and saying, . . ."

Counsel for Senator Stevens argued that such an examination would not be possible if counsel were armed only with a summary of the prior statement contained in a letter authored by the prosecutor. The Government insisted that the summary sufficed and that it was not legally obligated to produce FBI Forms 302 except as may be required by the Jencks Act.

As the Court was not persuaded that it should order a "carte blanche" production of FBI 302's based on the record before it, it invited counsel to provide additional authority.

The parties did so by pleadings filed on September 15 and 16, 2008, and, on the 16th, the Court convened yet again.  After additional oral argument, the Court announced:

> All right.  I'm going to . . . direct that the Government produce the redacted 302's and do it by tomorrow.

On September 17, 2008, in response to the Court's Order of the previous day, the Government delivered to counsel for Senator Stevens a collection of redacted FBI Form 302's.  The defense was given to understand that witness statements memorialized in those 302's which constituted *Brady* or *Brady* material were left intact and the balance of the document was redacted.

The trial commenced with jury selection on September 22, 2008, and continued apace until the morning of October 2, 2008, when the proceedings came to an abrupt halt.

During the preceding two days, the direct examination of the Government's principal witness, Mr. Bill Allen, was begun and continued without conclusion until the luncheon recess on October 1, 2008.  During that testimony, the Government elicited from Allen the "Ted is just covering his ass" testimony which served to eviscerate Senator Stevens' defense – that, in good faith, he intended to pay VECO for its services on his Girdwood home renovation project.  Rather, the import of Allen's testimony was that Senator Stevens' expression of his good faith intent was pretextual – designed to create a false record even as he concealed his financial obligation to VECO and Allen.

Rather than proceed with Allen's direct examination during the afternoon session, the Court adjourned for the day in order to accommodate the needs of a juror with the expectation that Allen's direct examination would continue to conclusion on the morning of October 2, 2008, with cross-examination to follow.

Shortly before midnight on October 1, 2008, however, the Government disclosed to counsel for Senator Stevens and to the Court a redacted FBI report of an interview of Mr. Allen which had been conducted on February 28, 2007, and a redacted IRS memorandum of an interview of Mr. Allen conducted on December 11 and 12, 2006. A more heavily redacted version of the FBI report had been disclosed to the defense on September 17, 2008. In the letter covering the production, counsel for the Government represented that it had conducted a "re-review" of memoranda of interviews of Allen and had located the two simultaneously produced documents and further represented that they were being produced "out of an abundance of caution" since the "unredacted portions . . . could arguably constitute cumulative *Brady* material . . . and could arguably constitute *Brady* material concerning certain parts of Mr. Allen's trial testimony." Letter from Brenda K. Morris, dated October 1, 2008, to Robert M. Cary.

The substance of the newly-disclosed prior statements of Mr. Allen was that he believed that Senator Stevens would have paid a VECO invoice if he had received one. These prior statements would clearly impeach Allen's trial testimony that Senator Stevens made a written request for invoices only on a pretext, and that Allen had not sent such an invoice because he believed that Senator Stevens had no intention of paying.

When the Court convened on the morning of October 2, 2008, counsel for Senator Stevens moved, alternatively, for a dismissal of the indictment or for a mistrial on the basis of the previously withheld *Brady*/*Giglio* material contained in the midnight disclosure. He argued that the *Brady* violation was irremediable:

> [MR. B. SULLIVAN [counsel to Senator Stevens]]: I opened this case, and that material I should have had in my hand and I should have argued it to the jury. There's no question, and I so represent to this Honorable Court. The integrity of this process has been breached. It must stop.
>
> The testimony that was elicited from Mr. Allen with some flair at the break, like skillful lawyers do, to leave lingering in the minds of a juror the impact of the testimony. The testimony was elicited about the, quote, cover your ass, end of quote, an explanation apparently that this witness presented to this jury based on a statement Bob Persons made to him. Of course, we contend that that statement is an absolute lie.

Had we had this kind of exculpatory information, my opening would have addressed that kind of an issue, because I opened about intent, the Stevenses' intent, that they paid the bills, that they were honorable. I talked about the sixth bill that was hidden by Bill Allen.

But for the unusual circumstance of a continuance yesterday afternoon for a couple of hours, I would have been into my cross-examination an hour. I've never seen anything like it. I ask that the Court dismiss this case for *Brady* violations; in the alternative, that it grant a mistrial. There is no other remedy. We can't go back. You've tried, I've tried. I'm not even saying it's intentional on the part of the government. I don't know whether it's intentional. It doesn't matter whether it's intentional. The integrity of the proceedings have been breached and I ask for the Court to remedy this problem now with the power that it has to do justice. That's what we're here about. That's what you give our life to and that's what I've given my life to in these courts, but I can't do it under these circumstances.

October 2, 2008, Trial Tr., pp. 5-6, a.m. session.

In response to the Court's question, counsel for the Government initially responded, "Ms. Morris: Yes. We agree that it was *Brady*." October 2, 2008, Trial Tr. p. 6. While the Government conceded that the newly disclosed portions of the memoranda should have been disclosed pursuant to the Court's September 16, 2008, Order, it variously maintained that the substance of the newly disclosed information had been disclosed in the September 9, 2008, summary letter, or was cumulative of other Allen-related disclosures and did not therefore constitute *Brady* material.

The Court, expressing deep concern about the Government's conduct, directed:

THE COURT: I want all the 302's turned over to defense counsel.
MS. MORRIS: Okay.

THE COURT: Every last one.
MS. MORRIS: Got it.

61

THE COURT: Forthwith.
MS. MORRIS: Okay.

October 2, 2008, Trial Tr. p. 19, a.m. session.

And further directed:

THE COURT: Bottom line is, what they have, though, is the heavily-redacted material, correct?
MS. MORRIS: Yes.

THE COURT: What's the prejudice to the government if they get the unredacted material at this point for Allen?
MS. MORRIS: Before Allen?

THE COURT: For Allen.
MS. MORRIS: Oh, for Allen.  I don't think that there is, Judge.  I don't think that there is.

THE COURT: Turn it over.
MS. MORRIS:  Okay.

THE COURT: Unredacted.  The MOIs as well as the 302s.
MS. MORRIS: I understand.

THE COURT: What else do you want?
MR. B. SULLIVAN: Your Honor, my last word –

THE COURT: Wait a minute.  I just want to deal with any further requests before I focus on sanctions.  You're getting the unredacted version.  You're getting the 302s and MOIs for every witness in this case.  What else would you like.  I know you want the case dismissed, I understand that.  That's the ultimate sanction.

October 2, 2008, Trial Tr., p. 29, a.m. session.

62

The Court heard additional argument from the parties and ruled:

THE COURT: All right.  Although the Court is persuaded that there is a
*Brady* violation, the Court is not persuaded that a declaration of a mistrial or
dismissal of the charges are appropriate remedies.  I've directed the
government to produce the 302s that it has.  I'm also going to direct the
government to produce the MOIs for defense counsel because this Court has
no confidence in the ability of the government to discharge its *Brady*
obligations to either the defendant or the Court.  If I understand defense –
having ruled, what's your request now for further proceedings?

MR. B. SULLIVAN: Monday morning, Your Honor.

October 2, 2008 Trial Tr. p. 56, p.m. session.

Finally, in response to a request by counsel for Senator Stevens that, in
addition to 302's and MOI's, the grand jury testimony of Government witnesses be
turned over, the Court inquired of the Government:

THE COURT: What is your response?
MS. MORRIS: Judge, I don't think we're in a position to say no.  If you want
us to turn over the grand jury, we will.

THE COURT: Fine.  Turn it over.  Turn it over.

October 2, 2008, Trial Tr., p. 53, p.m. session.

With that, the record was complete with respect to the Court's rulings and
orders in response to Senator Stevens' Motion to Compel Discovery of *Brady*
material and the trial resumed.

63

### The Prosecutors did not Conduct or Supervise the Review for *Brady* Material

a.      FBI and IRS Agents conducted the pre-trial *Brady* review

Agent Kepner testified that she and other FBI agents were instructed to review the 302s and their notes of witnesses interviews for *Brady* information and that the IRS agents were responsible for reviewing their reports. Deposition of Agent Kepner, Aug. 24, 2009, at 25-28 & 34.  She testified that Mr. Marsh made the decision that the agents would conduct the *Brady* review. *Id*. at 45-46.

Prior to *Stevens*, Agent Kepner had never worked on a case in which agents had the primary responsibility for identifying *Brady* information. *Id*. at 60.  In her experience, agents gathered 302s and other material which the prosecutor reviewed for *Brady* purposes. *Id*. at 61.  In *Stevens*, she was instructed to review the 302 and the agents' notes for "material in the reports that was helpful to the Stevens defense team" and for inconsistencies between the notes and the 302 of the interview. *Id*. at 29-30.  Agent Kepner could not recall whether she received any instruction about what "helpful to the Stevens defense" meant, the specifics of any other instructions that were given to her, or whether the prosecutors instructed the other agents who did the *Brady* review. *Id*. at 30 & 43.  She could not recall asking for any specific *Brady* advice during the *Brady* review and she did not ask Mr. Marsh or any of the other prosecutors for any additional explanation of *Brady*. *Id*. at 43 & 47.

Agent Kepner testified that, at the time, she did not consider the question of whether she was qualified to identify *Brady* information, and that, in hindsight, she was probably not qualified. *Id*. at 62.  During her FBI career, she had no formal training in *Brady*, *Giglio* or the disclosure of exculpatory information to the defense. *Id*. at 16.  She had an understanding of the meaning of *Brady* information, "at least I thought I had an understanding" (*id*. at 43), based on her experience in other investigations and in preparing other cases for trial. *Id*. at 44-45.  Agent Kepner testified that in one of those cases the district court ordered a new trial because of a *Brady* violation. *Id*. at 49-53. *See United States v. Patrick*, 985 F. Supp. 543 (E.D. Pa. 1997), *aff'd without opinion*, 156 F.3d 1226 (3rd Cir. 1998). She never read the *Brady* or *Giglio* decisions except for "internet versions" of *Brady*, *Giglio* and Jencks. Deposition of Agent Kepner, Aug. 24, 2009, at 46.  She understood that *Giglio* was "a subset of *Brady*" which included information that

"reflect[ed] badly on a witness or the credibility of a witness". *Id*. at 44. Agent
Kepner instructed the agents who assisted in the *Brady* review that, if they had any
doubt whether information was *Brady* material, they should include it in the
spreadsheets that were created by her and the agents to record *Brady* information.
*Id*. at 47, 48-49 & 74-75.

Agent Kepner testified that she and the other agents did not look for
inconsistencies between the 302(s) of a witness's interview(s) and the witness's
grand jury testimony. *Id*. at 42. Nor did they look for inconsistencies between the
information provided by different witnesses. *Id*. at 42.

Emails exchanged between Agent Kepner, Mr. E. Sullivan, Special Agent-in-
Charge C. Seale, and Agent Joy show that the agents also reviewed the testimony
of witnesses in the Alaskan grand jury and created a *Brady*/grand jury spreadsheet:

- From:        Agent Kepner
  To:          SAC Seale; Agent Joy
  Sent:        Sept. 4, 2008
  Subject:     Review of grand testimony for brady and giglio

  Colton, jessica is reviewing 302's and notes for brady and giglio but
  we need someone else to do the same thing for gj testimony. Who can
  we use to do this? It will probably take two days. Mbk [Agent Kepner]
  _____
  From:        SAC Seale
  To:          Agent Kepner
  Sent:        Sept. 4, 2008
  Subject:     Review of grand testimony for brady and giglio

  How many Grand Jury witnesses/transcripts are there and against what
  notes would they be comparing the testimony?
  _____
  From:        Agent Kepner
  To:          SAC Seale; Agent Joy
  Sent:        Sept. 4, 2008
  Subject:     Review of grand testimony for brady and giglio

They wouldn't be comparing gj testimony to notes but reviewing for giglio and brady. There are approximately 40 transcripts. Mbk

DOJ Bates no. CRM063391.[10]

- From:      SAC C. Seale
  To:        Agents Herrett, Sparks and Howland
  Sent:      Sept. 4, 2008
  Subject:   GJ Review

  Could the three of you assist in reviewing Grand Jury trancripts in prep for Stevens trial? Need done soon. Review for Brady and Giglio stuff. I think if we get several people on it we can knock it out quickly. Let me know.

  DOJ Bates no. CRM063396.

- From: Agent Kepner
  To:     E. Sullivan
  Date:  Sept. 4, 2008
  Re:     The alaska gj testimony of witnesses is being reviewed by agents in alaska for brady-giglio.
          [no other message]
  _____

  From: E. Sullivan
  To:     Agent Kepner
  Date:  Sept. 4, 2008
  Re:     The alaska gj testimony of witnesses is being reviewed by agents in alaska for brady-giglio.

  Talk to Joe. We're trying to line up attorneys in our office to do the GJ transcript review. You should focus on all the FBI's 302s and notes.
  _____

_____

[10]The "jessica" referred to is Jessica Newton, an FBI Intelligence Analyst; she is not an FBI agent. Deposition of Agent Kepner, Aug. 24, 2009, at 66.

From: Agent Kepner
To:    E. Sullivan
Date: Sept. 4, 2008
Re:    The alaska gj testimony of witnesses is being reviewed by
       agents in alaska for brady-giglio.

Agents are already working on the review of the grand jury testimony
and the 302's. I can't call them off on the grand jury testimony without
getting them angry that we have wasted their time. Mbk

DOJ Bates no. CRM055500.

- From:        Agent Joy
  To:          Agent Kepner, E. Sullivan, B. Morris, J. Goeke, J. Bottini
               and N. Marsh
  Date:        Sept. 6, 2008
  Subject:     AK GJ Transcripts Review for Brady/Giglio
  Attach.:     grand jury testimony review.xls

  Attached is the spreadsheet review of the AK GJ Transcripts review
  for brady/giglio.
  MBK anticipates the 302 review to be done by COB Monday [Sept. 8]
  (Alaska time).

  DOJ Bates nos. CRM021717-720.

- From:        SAC C. Seale
  To:          Agent Joy
  Sent:        Oct. 2, 2008
  Attach.:     grand jury testimony review.xls
               [spreadsheet of *Brady* review of grand jury testimony]

  DOJ Bates no. CRM006843-46.

During Agent Kepner's deposition and before she was shown these emails,
she testified that, though she wasn't sure, she thought that the prosecutors reviewed
the grand jury testimony for *Brady* information. Deposition of Agent Kepner, Aug.

67

24, 2009, at 63.  When shown her email exchange with SAC Seale (above), she testified that her memory was refreshed and that the agents did <u>not</u> review the grand jury testimony for *Brady* information, that the review was done by the prosecutors, and that FBI Intelligence Analyst Jessica Newton did not do any *Brady* review. *Id*. at 64-67.  When shown her email exchange with Mr. E. Sullivan (above), Agent Kepner testified that she did not recall that the agents reviewed the grand jury testimony and that she did not know whether the agents were "called off" that assignment. *Id*. at 71-72.

However, another email exchange between Agent Kepner and Mr. E. Sullivan (that was not shown to her during the deposition) shows that the agents were not called off:

> From: E. Sullivan
> To:   IRS Agent L. Bateman; J. Bottini; J. Bradison [a paralegal in the
>        Alaska U.S. Attorney's Office]; J. Goeke; Agent Joy; Agent Kepner;
>        N. Nicholas; B. Morris; IRS Agent D. Roberts; E. Sullivan; K. Walker,
>        [a paralegal in the Alaska U.S. Attorney's Office]
> Sent:  Sept. 6, 2008
>
> Hey, MBK. I know you guys are busting hump over there re: the 302s and the interview notes, so please don't kill the messenger. If you get a chance, could you please give us an update re where we stand in the process, including the review of the Alaska GJ transcripts? Also, it would be useful to have an estimate of when you think the entire review process will be completed. We're getting raked in D's reply to the motion to compel as to why we didn't have all Brady ready to go before indictment. So, the quicker we get it to them, the better for us.
> _____
>
> From: Agent Kepner
> To:   E. Sullivan
> Sent:  Sept. 6, 2008
>
> Grand jury testimony done. I can send out the results when I get back to my office. 302s should be complete on monday.mbk
> _____

From: E. Sullivan
To:     Agent Kepner
Date: Sept. 06, 2008

You're the bomb! Thanks.

DOJ Bates nos. CRM05512-5513.

Agent Kepner also testified that she did not know whether a spreadsheet was created for the *Brady* review of the grand jury testimony. Deposition of Agent Kepner, Aug. 24, 2009, at 72.  When shown SAC Seale's email to Agent Joy (above), which attached a spreadsheet for the *Brady* review of the grand jury testimony, Agent Kepner testified that the agents "conducted a review, but that still doesn't mean that the attorneys didn't do a parallel review." *Id*. at 77.  Other than that a possible "parallel review", Agent Kepner could not recall that the prosecutors reviewed 302s, notes or other information for *Brady* material. *Id*. at 73.

Our investigation did not find any evidence that the prosecutors conducted a "parallel review" of the grand jury testimony for *Brady* information.  As described below, Mr. Goeke reviewed the Alaskan grand jury testimony of Augie Paone of Christensen Builders and the D.C. grand jury testimony of Mr. Persons, and copies of the transcripts of their grand jury, and only that testimony, were provided to Williams & Connolly prior to trial.

Mr. Bottini testified that, in the course of preparing witnesses assigned to him for trial, he examined notes of the witnesses' interviews and their grand jury testimony, and had he found any exculpatory material then it would have been disclosed to the defense. Deposition of J. Bottini, Dec. 16, 2009, at 37-38 & 62-63. He did not recall finding any exculpatory information in that process.[11] *Id*. at 38.

---

[11]As discussed below at pp. 439-452 and 459-462, Mr. Bottini was the only prosecutor in *Stevens* who testified that he reviewed his notes for *Brady* material, except for his notes of his interview of Mr. Allen about the Torricelli note on April 15, 2008.  Ms. Morris testified that it never crossed her mind to review her or any prosecutor's notes for *Brady* material. Deposition of B. Morris, Jan. 15, 2010, at 54.  Mr. Marsh testified that he did not know if the prosecutors' notes were reviewed for *Brady* information, that he had "a general memory of reviewing some of my notes", and that the prosecutors were not told to review their notes for *Brady* material. Deposition

(continued...)

Mr. Bottini was assigned the direct examination of "three of the big witnesses", Bill Allen, Rocky Williams and Dave Anderson. *Id*. at 28-29. Although Mr. Allen and Mr. Williams provided significant *Brady* information to Mr. Bottini during pre-trial interviews, and Mr. Anderson's grand jury testimony contained significant *Brady* information, none of those witnesses' *Brady* information was disclosed to Williams & Connolly.

Mr. Bottini had no grand jury testimony by Mr. Allen to review.  Mr. Allen never testified in any grand jury in *Stevens* or any other Polar Pen prosecution. Instead, Agent Kepner told the grand jury what Mr. Allen told her.  For example, in the next to last grand jury session before Senator Stevens was indicted, Agent Kepner testified about Mr. Allen's receipt of the Torricelli note:

Mr. Marsh:          . . . Based on the investigation to date have you become aware of any instances in which Senator Stevens has asked Bill Allen to prepare an invoice to send to Senator Stevens in connection with some of the renovations and other work done by Veco at Senator Stevens' house in Alaska?

Agent Kepner:     He has.

Q      And can you tell us a little bit about what you've learned concerning that?

A      Bill Allen had relayed that Senator Stevens had -- on occasion had asked him for an invoice for some of the work that was done by Veco Corporation. And I'm also aware of an e-mail or a handwritten note from Senator Stevens to Mr. Allen in which he is urging Bill Allen to provide him an invoice for some of the work.

---

[11](...continued)
of N. Marsh, Feb. 2, 2010, at 115-116.  Mr. Goeke did not review his notes for *Brady* material because he was never asked to and had no time. Deposition of J. Goeke, Jan. 8, 2010, at 19.  Mr. E. Sullivan testified that he did not review his notes for *Brady* material, that no one asked him to review his notes for *Brady* material, and that "I didn't receive any formal training on this, and nobody ever told me as part of the process that I should go back and look at prosecutor notes." Deposition of E. Sullivan, Jan. 6, 2010, at 157 & 158-159.

(Grand Jury Exhibit No. 209 [the Torricelli note] was marked for
identification.)

* * *

Q    Agent Kepner, are you aware of any circumstances in which Bill Allen
     did, in fact, send Senator Stevens an invoice for any of the work done
     at the Girdwood residence?

A    I am not aware of any circumstances. And according to Bill Allen, he
     has never done that.

* * *

Q    Finally, Agent Kepner -- one moment. Agent Kepner, there's a
     reference in Grand Jury Exhibit 209 to Torricelli. Do you recall that?

A    I do. And to be honest I don't know what it's in reference to.

Grand Jury testimony of Agent Kepner, July 25, 2008, at 31-33 (DOJ Bates
nos. CRM003950-3989).

Mr. Bottini did not review his notes of the interview of Mr. Allen on April 15 and
18, 2008, because he did not remember meeting with Mr. Allen in April 2008, or
"having any handwritten notes, quite frankly, related to Bill Allen and his
testimony", and because he never looked in his file which contained those notes.
Deposition of J. Bottini, Dec. 17, 2009, at 563, 560 & 575-576.

   In August, 2008, as Mr. Bottini drafted the first *Brady* disclosure letter to
Williams & Connolly, Mr. Williams told him several times that VECO employees'
time was supposed to be added by Mr. Allen to the Christensen Builders' bills to
Senator Stevens.  Mr. Bottini made notes of those statements, which supported
Senator Stevens's defense, but that *Brady* information was never disclosed to
Williams & Connolly.  Mr. Bottini testified that he "didn't think of [those
statements by Mr. Williams] as Brady material at the time." Deposition of J.
Bottini, Dec. 16, 2009, at 177.

   Mr. Anderson's grand jury testimony, that he did not work on the renovation
of Senator Stevens's home in Alaska for "a couple months" in 2000 (Grand Jury
testimony of D. Anderson, Dec. 6, 2006, at 78 & 82-83 (DOJ Bates nos.
CRM001035-1133)), significantly contradicted VECO's cost report for the
renovation, government trial exhibit ("GX") 177, and the allegations in the
indictment about the value of VECO's improvements to Senator Stevens's home in

71

2000-2001 (*see Stevens*, Indictment, ¶¶ 20-25 (Dkt. No. 1)). This *Brady* information was not disclosed to the defense. Williams & Connolly discovered that information on its own after Judge Sullivan issued a forthwith order on Oct. 2, 2008, directing the prosecutors to provide the defense with the grand jury testimony and 302s for all government witnesses. *Stevens*, Trial Transcript, Oct. 2, 2008 A.M., at 19 & 20 and Oct. 2, 2008 P.M., at 51-52; *Id.*, Senator Stevens's Motion to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct, dated Oct. 5, 2008 (Dkt. No. 130).

Mr. Bottini testified that he didn't disclose the *Brady* information in Mr. Anderson's grand jury testimony to the defense because he didn't know the details of that part of the case:

> It - - well, it wasn't my part of the case, you know. You know, it was just something I never got in the weeds on. I saw the cost report, I knew what the cost report reflected, but I never sat there and went through, you know, the time cards, and saw what exactly they were reporting for Dave [Anderson] or Rocky [Williams] or any of the other VECO employees.

> Deposition of J. Bottini, Dec. 16, 2009, at 258.

The FBI and IRS agents, who conducted the *Brady* review, didn't know those details either.

The FBI's *Brady* spreadsheet of the witnesses' grand jury testimony did not include Mr. Anderson's testimony that he did not work on the renovation for several months in 2000. The spreadsheet contained only two entries for Mr. Anderson which were unrelated to the renovation: "12/7/2006 . . . P. 28, line 4, Anderson fired from VECO; P. 39, line 20, through P. 40, line 25, Anderson paid $3800 by FBI for lodging, food, and gas expenses." *See* Email from Agent Joy, dated Sept. 6, 2008, to Agent Kepner, E. Sullivan, B. Morris, J. Goeke, J. Bottini and N. Marsh, Subject: "AK GJ Transcripts Review for Brady/Giglio" ("Attached is the spreadsheet review of the AK GJ Transcripts review for brady/giglio. . .") (DOJ Bates nos. CRM021717-720). The day after VECO accountant, Cheryl Boomershine, testified on Sept. 26, 2008, IRS SA L. Bateman reviewed Mr.

Anderson's grand jury testimony and 302s for *Brady* material.[12]  The *Brady* spreadsheet which he created from that review did not identify that information. *See* Email from IRS SA L. Bateman, dated Sept. 27, 2008, to J. Bottini and Agent Joy, Subject: "Dave"s (sic) GJ testimony reviewed", Attachments: [spreadsheet]; Email from IRS SA L. Bateman, dated Sept. 27, 2008, to J. Bottini and Agent Joy, Subject: "Dave Anderson GJ Testimony", Attachments: "David Anderson GJ Testimony.doc" [spreadsheet] ("halfway there in this batch, but going cross-eyed. Will finish tomorrow . . . and GOODNIGHT") (ellipsis in original) (DOJ Bates nos. CRM084009-015).

At trial, Mr. Marsh introduced the VECO cost report, GX 177, Mr. Anderson's time sheets (GX 1065), and related records through the testimony of Ms. Boomershine, and, though he was in the grand jury when Mr. Anderson testified, he told the Court that he did not review Mr. Anderson's grand jury testimony:

| | |
|---|---|
| THE COURT: | Is it significant or not? Again, I'm not being personal. I have a high regard for the attorneys, but is it significant or not that Mr. Marsh was the attorney in the grand jury proceeding? |
| MR. MARSH: | Your Honor, I – |

_____

[12]Ms. Boomershine began and completed her testimony on Friday, Sept. 26, 2008. *Stevens*, Trial Transcript, Sept. 26, 2008 P.M., at 6-57.  Through her testimony, Mr. Marsh introduced into evidence, without objection, VECO's cost report for the renovation on Senator Stevens's home in Alaska (GX 177) and time sheets for Mr. Williams (GX 1060) and Mr. Anderson (GX 1065). *Id*. at 14-15, 18 & 21, and 28.  On Sunday, Sept. 28, 2008, Williams & Connolly moved to dismiss the indictment and for a mistrial when Mr. Williams told them during a telephone interview that day from Alaska, that he did not work "8 hours per day, 6-7 days per week, on the Girdwood home renovation project – in direct contrast to the timesheets that the government has placed in evidence to support its central theory that the unpaid cost of the project to Veco was $188,000." *Stevens*, Senator Stevens's Motion to Dismiss the Indictment or for a Mistrial, filed Sept. 28, 2008, at 1 (Dkt. No. 103).  The government responded and after argument, the Court denied the motion and ordered that Ms. Boomershine be recalled for further cross-examination. *Id*. Trial Transcript, Sept. 29, 2008 A.M., at 38-41.  She returned to the witness stand that same day and was further cross-examined. *Id*. at 49-73.  There was no re-direct.

THE COURT: And also the attorney I believe my recollection is that attorney presenting the business records.

MR. MARSH: I did put on Ms. Boomershine. And Mr. Anderson's grand jury time was almost two years ago, and I can tell you that I was not one of the people who re-reviewed Mr. Anderson's grand jury. I did not have any intentional -- did not have any intent to do that. I did not have knowledge at the time.

     Certainly, I'm imputed to it, Your Honor, but I can tell you as an officer of the Court, when we put that on, I did not know that. . . .

*Stevens*, Trial Transcript, Oct. 8, 2008 P.M., at 76-77.

Mr. Marsh only reviewed the grand jury testimony of his trial witnesses and he did not know who reviewed Mr. Anderson's grand jury testimony:

Q Who reviewed the Grand Jury testimony of Dave Anderson?

A I don't know. The Alaska folks were -- at least my understanding was they were responsible for reviewing the Grand Jury testimony. Certainly with our witnesses, we reviewed -- with all my witnesses, if they were in the Grand Jury, I reviewed their Grand Jury transcripts.

Deposition of N. Marsh, Feb. 2, 2010, at 64.

b. The prosecutors did not supervise the *Brady* review and employed other PIN prosecutors, not assigned to *Stevens* or to the Polar Pen investigation, to conduct *Brady* reviews

None of the prosecutors supervised the identification and collection of *Brady* information in *Stevens*. Ms. Morris, the Principal Deputy Chief of PIN and lead prosecutor, testified that she did not supervise the prosecution in *Stevens*, that she "was trying to make herself as little as possible" on the trial team, and that she played no role in the *Brady* review or the composition of the *Brady* disclosure letters:

BY MR. SCHUELKE:

Q      Okay. So back to my original question which is describe, please, your
       supervisory role from the point at which you were assigned to the
       team.

A      It -- it wasn't really a supervisory role. My whole thing was trying my
       best to get up to speed to be a trial member, a trial team member. So it
       was a matter of divvying up what witnesses, me getting into the files.
       The main thing I offered is that, well, why don't you let me cross
       Catherine? We know she'll probably take the stand, and that would
       probably work better if a female is crossing another female. So Nick
       thought that was a great idea, so he would proceed to data dump me.
       He would bring in boxes of stuff and dump it. "Well, this is what you
       need, Brenda," as if he's helping me, but, you know, he wasn't helping.

                           *   *   *

Q      I'm not talking about gathering it. Did you play any role in managing
       decisions about what was to be produced to the defense?

A      No.

Q      Did you play any role in reviewing -- I should say supervising or
       setting policies for the review of evidence for possible Brady or Giglio
       material?

A      No. There -- there had already been, I know, a big Brady review, and
       that had already been in motion. And because the Stevens case was the
       first one we thought out the box, and then there were other -- there
       were trials where Bill Allen, he was our main concern. Bill Allen had
       been used as a witness. I really took it as a foregone conclusion that a
       lot of that had been done, a lot of the work had been done and these
       guys knew the case like the back of their hand.

Q      Yeah, but the record indicates that Brady disclosures were made as
       late as the 25th of August and the 9th of September of 2008 by means
       of these so-called Brady letters.

A      Right.

Q      Did you play a supervisory role in the composition of those letters,
       first?

A      Composition, no.

Q     Did you play a role in supervising efforts to identify the information that ought to be disclosed in those letters?

A     No.

Q     Did you have any idea who was doing what in that regard?

A     Yes. I mean, my understanding is that Ed Sullivan was working doing the yeoman's work of getting a lot of the stuff initially, the Brady review accomplished initially. We had attorneys in the section that were reviewing grand jury transcripts outside of the team just because it was too much for the team to do. Everybody was stretched pretty thin –

Q     Did you ever ask whether they were reviewing -- that is, the trial team were reviewing their own handwritten notes of witness interviews for possible Brady?

A     No, and to be quite honest, until all of this happened, that's something I would have never asked another trial attorney or a junior trial attorney, nothing. I mean, unless something would trigger that I was aware that there was some kind of meeting or interview that took place where something may have happened that someone may recollect something that someone else didn't recollect. So, no, that would never even cross my mind.

\*   \*   \*

Q     So what's the relevance of the practice [of using *Brady* summary letters] in Alaska?

A     Well, because there had been Brady letters done, and this was already in -- in progress. And, again, by August, by the time of this letter, I was trying -- I was not acting as a supervisor on this team. They begrudgingly had to have me there. They didn't want me there, and I was trying to make myself as little as possible. I was not trying to make any more waves. The team was totally disrupted with me coming onboard, and I was trying to -- to be an asset. I was trying to take the blows of the little snide remarks and the, you know, comments and the little snickering that was going on. It was a lot of crap going on at the time, and, to be quite honest, I -- this was the practice. I didn't buck the practice because this is what they were accustomed to, and I didn't want to make any more big waves for these guys because in all

76

honesty, I took the crap from them because I understood how they felt.
I felt bad for them, and I felt bad that I was a part of it. So, no, I
wouldn't have bucked their practice of doing this.

Deposition of B. Morris, Jan. 15, 2010, at 51, 52-54 & 161.

Ms. Morris testified that she did not know who was in charge of the *Brady*
review. *Id*. 274. She was not, nor was Mr. Welch. *Id*. at 275. She believed that Mr.
Marsh was in charge of the *Brady* review. *Id*. 276. She knew that Mr. E. Sullivan
participated in the *Brady* review as a "point of contact" for the agents, but he was
not in charge; he was the least experienced. *Id*. at 275-276. *See also* Email from B.
Morris, Sept. 7, 2008, to W. Welch ("Also, we had some Brady issues come down
the pike. Ed [Sullivan] was all over it and has drafted an all encompassing Brady
letter. He included all and then we can whittle it down. The team hasn't fully vetted
it yet. I want to do that before I send it to you, but I'll fill you in.") (DOJ Bates no.
CRM055642).

Ms. Morris testified that she believed that agents' notes of witness-
interviews were *not* reviewed for *Brady* information. Deposition of B. Morris, Jan.
15, 2010, at 273. She was told by Mr. E. Sullivan that the agents reviewed 302s
and IRS MOIs. *Id*. at 247. She testified that it was not unusual for agents to take a
"first crack" at "highlight[ing]" *Brady* information, but that attorneys should
always make the "final cut". *Id*. at 248. She only learned after the trial that the
prosecutors did not review the 302s for *Brady* material. *Id*. at 248-249. Ms. Morris
testified that she did not know who reviewed the testimony of the witnesses who
testified in the grand jury in Alaska and she never heard that the agents reviewed
that testimony for *Brady* information. *Id*. at 257.

She testified that PIN prosecutors, who were not assigned to the Polar Pen
investigation or to *Stevens*, reviewed grand jury transcripts for *Brady* and *Giglio*
information. *Id*. at 241. *See* Email from E. Sullivan, dated Sept. 6, 2008, to B.
Morris, IRS Agent L. Bateman, J. Bottini, J. Bradison, J. Goeke, Agents Joy and
Kepner, N. Nicholas, IRS Agent D. Roberts, E. Sullivan, K. Walker (". . . Brenda –
did you receive an update from Dan and Eileen re: how far they have gotten on the
DC GJ transcripts?")(DOJ Bates nos. CRM05512-5513). She did not know if
those attorneys were sufficiently familiar with the case to identify *Brady*
information, or how they were able to identify inconsistencies in a witness' account

77

since they were given only transcripts of witnesses' grand jury testimony to review and not the witnesses's 302s:

BY MR. SCHUELKE:

Q    Were these lawyers educated about the facts of the case?
A    Yes.

Q    How was that education accomplished?
A    I'm almost certain that Eileen and Dan may have been on the indictment review, and I don't know whether they were given the pros memo or anything like that. But my understanding is that Ed was kind of overseeing and --

Q    Ed Sullivan?
A    Ed Sullivan -- and giving information about the general case and following up with getting all the materials copied and prepared.

Q    So you think that Ed Sullivan was responsible for collecting documents that would be informative about the case like pros memos --
A    No, I don't think –

Q    -- and giving them to these lawyers so they could get educated about the case, is that --
A    I don't know that for a fact. Again, I know that Eileen -- I think Eileen was on the indictment review, so I guess I shouldn't surmise. My answer is I just don't know. I don't recall.

Q    And to your knowledge, were the lawyers who were tasked to do the grand jury review for Giglio --
A    Correct.

Q    -- as well as for Brady --
A    Correct.

78

Q       -- given on a witness by witness basis all of the 302s representing
        statements of those same witnesses whose grand jury testimony they
        were reviewing?
A       I don't believe so. I think they were just given the grand jury. I don't --

Q       So how were they supposed to find Giglio material in a grand jury
        transcript?
A       Well --

Q       You were thinking of saying good question, weren't you?
A       I'm -- I'm trying my best to think, period. I don't know.

BY MR. SHIELDS:
Q       It's impossible, isn't it?
A       I wouldn't say impossible, but it's --

Q       If you don't have the prior statements to compare the grand jury with,
        you can't find inconsistencies unless it's internal to the grand jury
        testimony itself, correct?
A       That's correct.

Deposition of B. Morris, Jan. 15, 2010, at 245-247.

    Dan Schwager was one of the five to seven PIN attorneys who reviewed the
transcripts of witnesses who testified in the District of Columbia grand jury.
Deposition of N. Marsh, Feb. 2, 2010, at 60.  He requested information for his
*Brady* review of the grand jury testimony of Justin Stiefel, a lawyer and former
legislative counsel on the staff of Senator Stevens (*see* D.C. Grand Jury testimony
of J. Stiefel, Jan. 23, 2008, at 5-10), from Mr. Marsh, Ms. Morris and Mr. E.
Sullivan:

        From:       D. Schwager
        Sent:       Sunday, September 07, 2008 12:45 AM
        To:         B. Morris; E. Sullivan; N. Marsh
        Subject:    Justin Steifel

You gave me Steifel to check for brady but since he's not a construction worker I don't have any instructions on what to look out for. Could someone let me know what to look for in Steifel? Thanks.

_____

From:       N. Marsh
Sent:       Sunday, September 07, 2008 10:25 AM
To:         D. Schwager; B. Morris; E. Sullivan
Subject:    RE: Justin Steifel

Schwaaag -- Stiefel is a former TS staffer who (a) heard TS mention on at least one occasion that Bill Allen/VECO were involved in the home renovations and (b) was involved in some of the official act requests that VECO sent to TS' office. Stiefel also has some Giglio issues in that our T3 [wiretap] picked him up doing some not-so-good things concerning Governor Murkowski's reelection campaign. If you need any more info, just holler.

_____

From:       E. Sullivan
Sent:       Sunday, September 07, 2008 11:19 AM
To:         D. Schwager; B. Morris; N. Marsh
Subject:    RE: Justin Steifel

Dan -- have you received guidance yet?

_____

From:       D. Schwager
Sent:       Sunday, September 07, 2008 11:20 AM
To:         E. Sullivan; B. Morris; N. Marsh
Subject:    RE: Justin Steifel

Yup. Marshmaster filled me in. Thanks.

_____

From:       E. Sullivan
Sent:       Sunday, September 07, 2008 11:48 AM
To:         D. Schwager; B. Morris; N. Marsh
Subject:    RE: Justin Steifel

Awesome. We can always rely on Grandmaster Marshmelle Mel. Thanks. The Furious Two.

DOJ Bates nos. CRM021724 & CRM055574.

Mr. Stiefel also testified in the Alaskan grand jury and that testimony was supposed to be reviewed by the agents in Alaska. *See* Email from E. Sullivan, dated Sept. 7, 2008, to Agent Joy, Agent Kepner, B. Morris, J. Goeke, J. Bottini and N. Marsh, Subject: "AK GJ Transcripts review for Brady/Giglio" ("Chad - thanks for putting this [spreadsheet review of the AK GJ Transcripts review for brady/giglio] together. I didn't see Justin Stiefel on this list. In addition to testifying in DC, he also testified in AK. Could you see if that one was reviewed. Thx.")(DOJ Bates no. CRM021926).

Ms. Morris testified that her many representations to the Court, that the government was aware of its *Brady* obligations and had met them, were based on her belief that everybody on the trial team was doing their job:

BY MR. SCHUELKE:
Q    Namely, the subject of the discovery and Brady review process that was employed. You have testified earlier today, I think, in response to one of Mr. Shields' questions that you did on more than one occasion represent to the Court in substance, Judge, the government is aware of its Brady obligations and has complied with them.
A    That's correct.

Q    My question is: Given the process that was employed that we've just discussed, having agents review their own 302s or MOIs, having lawyers with no familiarity with the case reviewing grand jury transcripts, perhaps having FBI agents review grand jury transcripts, and then having agents review the 302s for purposes of making redactions and so on, how could you possibly have reliably represented to the Court that the government met its Brady obligations?
A    I thoroughly believed that the members of the team were doing their job, and I believe that Mary Beth was one of the best agents and hardworking agents that I worked with at the time. And I thoroughly

believed that she was as smart as most lawyers, and I thoroughly believed that the team knew most of this evidence, again, because this wasn't the first trial. And they knew the evidence specifically about the Girdwood project better than the others because it was the first case prepared for trial.

Deposition of B. Morris, Jan. 15, 2010, at 267-268.

Mr. Marsh described the use of the other PIN attorneys to review grand jury testimony for *Brady* material as "not a procedure calculated to be successful":

Q    [The other PIN attorneys] were doing a review of the Grand Jury for Brady/Giglio purposes?
A    Yeah, that's what I understood.

Q    Were they familiar with the case sufficiently to do that kind of review?
A    In my opinion -- in hindsight, it was not a procedure calculated to be successful. I think -- I don't know if they were given the pros memo, maybe. I didn't give it to them. It could have been.
     It was a pretty fact intensive case, and in hindsight, I don't think it was a process that was calculated to make sure -- I think it would have been hard for them, like it would have been hard for me to walk into a case and review Grand Jury transcripts and find Brady or Giglio.
     On the one hand, if there were a sentence saying -- you know, obviously some Brady material, a prosecutor could find certain types of Brady material without knowing anything about the case, but in a case like this, in hindsight, it wasn't the best way to do it.

BY MR. SCHUELKE:
Q    Why does that require hindsight? Wasn't that evident?
A    I mean yeah, it probably should have been.

Q    Wasn't it evident to you?
A    You know, it seemed like -- there were so many things that were going on, I don't know -- I'm sure I thought if that was going to be the only review, it probably wasn't the best practice.

Q       Did you ever tell anybody this is stupid?

A       I don't remember talking to -- I remember -- I don't remember. You
        know, I just don't recall.

BY MR. SHIELDS:

Q       Did anyone ever raise a question about doing it that way?

A       Not that I'm aware of.

Deposition of N. Marsh, Feb. 2, 2010, at 60-61.

Mr. Bottini testified that, with respect to the *Brady* review, he was "not even
sure how that developed, that the agents were tasked with reviewing memoranda or
notes. . . . I don't remember being in the loop at all on any decision as to how a
Brady review is going to take place" Deposition of J. Bottini, Dec. 16, 2009, at 26
& 27.  During August and September 2008, he and Mr. Goeke "start[ed] the trial
prep with the witnesses who were in Alaska . . .formulat[ed] an exhibit list, pull[ed]
exhibits . . .  were also sort of tangentially involved in some of the motion practice.
I think I drafted one of the motions, for instance." *Id*. at 27.  He testified that no
one supervised the prosecution:

        THE WITNESS:   Well, one of the major problems in my view, with a lot of
                       what happened here, is we didn't have an intermeshing
                       gear.

BY MR. SHIELDS:

Q       Didn't have a what?

A       And [sic] intermeshing gear, and that thing, the issue with the [VECO]
        accounting records is the classic example of that.  We've got people
        over here going like this and people over here going like this.

Q       For the record, what does that mean?

A       I'm sorry.  You've got wheels turning on one side, wheels turning over
        here on another side, and there's no gear meshing those two wheels.
        We had way too much of that, getting ready for this trial and during
        the trial, in my view.

Q       And who was supposed to be doing that in this team?

83

A     Well, we had -- the lead attorney for the government was Brenda
      Morris.  I have a hard time faulting her for that, I really do, because
      she had her hands full.

Q     Well, I'm not asking you to assign blame.  I understand you said there
      was no intermeshing gear, no one checking to make sure the trains
      were running on time.  Was anyone supposed to be doing that?
A     I would have done it that way.

Q     No, I don't think you understand my question. Was anyone assigned to
      do that task, to make sure that the team was organized, exchanging
      information --
A     Not to my knowledge.

Q     -- consulting on important issues?
A     Not to my knowledge.  To my knowledge, there was no central
      clearinghouse, which is kind of what we needed here.

Q     And a lot of meetings, but not a lot of organization?
A     We would have team meetings from time to time, but there was no
      focal point for information.

Q     And Welch didn't fill that role?
A     I think he tried to some extent.  But for -- in my view, for a case like
      this, particularly when we were going pedal to the metal and had a
      very short time frame to collate a massive amount of information and
      try and coordinate it, it wasn't a constant hands-on thing, and he had
      his hands full I'm sure, running the rest of the section day to day
      operation.
      What we needed was someone cut loose to specifically to deal with a
      project manager type role for this thing, and we didn't have that.

Deposition of J. Bottini, Dec. 17, 2009, at 810-812.

Mr. Bottini testified that Mr. E. Sullivan was in charge of the *Brady* review, by
default:

84

Q . . . Who was in charge of the Brady review in U.S. v. Stevens?

A Well, it was the Public Integrity Section, but who at Public Integrity, I think it kind of defaulted to Ed Sullivan. But I don't remember, you know, any kind of a group decision as to who was going to be point person on marshaling that project.

Q Well, that's really what I'm trying to find out. Who was ultimately responsible in this team of prosecutors for marshaling the Brady material and making sure that everything that needed to be done got done?

A I think it was Ed Sullivan.

Q And do you know how it was divided up?

A I don't.

Deposition of J. Bottini, Dec. 17, 2009, at 786.

Mr. Goeke testified that he did not know who was in charge of the *Brady* review:

Q Who was in charge of this whole process?

A Which process?

Q The Brady review.

A I don't know. In my mind, PIN was in charge of the review process.

BY MR. SCHUELKE:

Q Anybody in particular?

BY MR. SHIELDS:

Q Can we use the name of a human being here?

A I saw a lot of the e-mails coming from Ed [Sullivan]. So -- about the Brady review process. I don't know that I would say that he was in charge or not, but he certainly seemed to be a clearing house or a focal point for it.

Q Well, who did you report to? Did you do a Brady review?

A    I did a Brady review of two grand jury transcripts, but I don't know if Ed tasked me to do that or Brenda tasked me to do that.

Q    Well, who did you -- did you find any Brady material?
A    Yeah, I found a lot of Brady material.

Q    Who did you give it to for disclosure?
A    I sent an e-mail to the group.

Deposition of J. Goeke, Jan. 8, 2010, at 441-442.

Mr. Goeke reviewed the grand jury testimony of Augie Paone of Christensen Builders and Mr. Persons. *See* Email from J. Goeke, dated Sept. 8, 2008, to B. Morris, J. Bottini, E. Sullivan, N. Marsh, Agent Kepner and Agent Joy (". . . [I will] finish the Brady/Giglio review of Persons's and Paone's GJ testimony first.") (DOJ Bates no. CRM062310); Email from J. Goeke, dated Sept. 8, 2008, to B. Morris, J. Bottini, E. Sullivan, N. Marsh, Agent Kepner and Agent Joy ("Here is the results of the Brady review of Persons GJ. I'm trying to be overly inclusive, so I know much of this stuff does not rise to Brady in the normal course: . . .") (DOJ Bates nos. CRM080926-927); Email from J. Goeke, dated Sept. 9, 2008, to B. Morris, J. Bottini, E. Sullivan, N. Marsh, and W. Welch ("Nick, here's an overly expansive, blunt first cut on Paone to add [to the *Brady* letter]" (DOJ Bates nos. CRM097708-711). A draft of the *Brady* letter contained Mr. Goeke's summaries. *See* draft *Brady* letter, dated Sept. 8, 2008, at 3-6 (DOJ Bates nos. CRM022405-413); Email from E. Sullivan, dated Sept. 8, 2008, to J. Goeke ("Jim - just a reminder to input the Paone stuff into the draft letter to Alex [Romain] that I sent around.") (DOJ Bates no. CRM081265). Those summaries were omitted from the *Brady* disclosure letter that was sent to Williams & Connolly, and the transcripts of Mr. Persons's and Mr. Paone's grand jury testimony were provided instead. *See Stevens*, *Brady* letter, ¶ 18 ("The grand jury transcripts for Robert Persons and Augie Paone will be provided by separate cover tomorrow.")(Dkt. No. 126-2); Letter from B. Morris, dated Sept. 10, 2008, to A. Romain (enclosing grand jury testimony of Mr. Persons and Mr. Paone)(*Stevens*, Dkt. No. 65-3). Those transcripts were the only *Brady* source documents provided by the prosecutors in conjunction with the *Brady* letter; all other *Brady* information was summarized.

86

Mr. Marsh testified that no "single person was in charge of discovery", that "it was a relatively ad hoc basis", and that he did "not remember anybody being specifically designated to be in charge of Brady review. My understanding was it was kind of done piecemeal." Deposition of N. Marsh, Feb. 2, 2010, at 39, 41 & 93; *see also* Email from J. Bottini, dated Sept. 4, 2008, to N. Marsh, E. Sullivan, J. Goeke, and B. Morris, Subject: "FW Anderson MOI" ("This makes me nervous – there is nothing in this MOI [of an interview of Dave Anderson on Sept. 1, 2006 by IRS agents] that is Brady/Giglio that I see. I'm nervous though because this is the first time that I recall seeing this.") (DOJ Bates nos. CRM021154-156).

Mr. Marsh testified that, as he was making the final edits to the *Brady* letter on Sept. 9, 2008, he "didn't have a tremendous familiarity with what had gone on in the Brady review process. . . . I didn't know what had gone on before. I didn't know what review had been conducted." *Id*. at 127-128. He was not "primarily responsible for pulling all the [*Brady*] information together and putting it in [the *Brady*] letter." *Id*. at 56. Mr. Marsh believed that was done by Mr. E. Sullivan. *Id*. Mr. Marsh testified that he did not write the *Brady* letter:

> A     . . . I didn't write the Brady letter. I was involved in the editing at the end on some parts. I wasn't the principal draftsman.
>
> Q     Thank you for that correction. You were the final editor on the Brady letter?
> A     On certain parts of the Brady letter.
>
> Q     At the tail end, the last few pages?
> A     And some of the stuff with Bill Allen, as we've discussed.

*Id*. at 313.

Mr. Marsh testified that the lack of time and resources made communication and coordination among the prosecutors difficult:

> Q     Were you aware of what your colleagues were doing in connection with discovery?
> A     I don't think I was aware of everything. Part of the difficulty was that we were doing so many different things. We were juggling so many

different balls and everybody had so many different responsibilities
that to some degree it was difficult for any of the line guys to be
absolutely 100 percent in the know as to what everyone else was
doing.

\* \* \*

A    . . . I think there was an effort to try to do the best we could. I think in
various places collectively we did some things that you wouldn't do in
a normal case just because we wanted to make sure -- collectively, we
wanted to make sure that things got done as best they could. We just
didn't have time. It was very difficult.

\* \* \*

A    . . . There was so much to do. There was so much going on that there
really wasn't an opportunity as you have in a normal case to be able to
sit down and discuss and reflect among people.

*Id.* at 44, 71 & 75.

During the trial, Ms. Morris concluded her and Mr. Marsh's arguments in
opposition to Senator Stevens's Motion to Dismiss the Indictment Due to the
Government's Intentional and Repeated Misconduct, dated Oct. 5, 2008 (Dkt. No.
130) by offering the accelerated pace of the prosecution as an "obvious" reason for
the government's *Brady* violations:

THE COURT:    It is troubling. It's troubling. Anything further, Ms.
Morris, or anyone else? Mr. Marsh?

MS. MORRIS:    No, Judge. Other than you understand I know and you
understand, as well, or more than anyone that this has
been an accelerated pace, and maybe these mistakes
would not have happened had we been on -- how these
cases kind of normally go, a year or so. We anticipated
that it may be fast, we just didn't realize that it was going
to be as fast with the motion --

THE COURT:    You knew how fast it was going to be, and the
government -- and I asked. I didn't just order it over the
government objection, I inquired, is this something that's
doable. I recognize what kind of a hardship it would be

88

|                 | on the Court, as well, and it's not been easy on this end either, not been easy at all. But the government didn't shirk its obligation, the government said we can do it. So you don't get any sympathy there about the fast-paced nature of the trial. |
| MS. MORRIS:     | That's right. |
|                 | |
| THE COURT:      | So you don't get any sympathy there about the fast-paced nature of this trial. |
| MS. MORRIS:     | It's not sympathy, Judge. It's just a matter of just stating the obvious that it has been an accelerated and with the accelerated pace given with all the production and pretrial, the production of everything -- |
|                 | |
| THE COURT:      | Stop. Counsel. The accelerated pace should never deprive someone of his fair day in court, though. It's not about the pace of litigation, it's about the fairness of the proceeding. You know, we don't sacrifice fairness for expediency sake. We don't do that. So you don't get the knowle[d]ge so – |
| MS. MORRIS:     | And that's not an excuse for it. It's just to state that for the obvious. |

*Stevens*, Trial Transcript, Oct. 8, 2008 P.M., at 88-89.

Mr. Marsh couldn't remember if the *Brady* review had been completed by the time the *Brady* letter was sent to Williams & Connolly; he assumed it was:

Q       My question is really posed to at the time the September 9 Brady letter was sent, was the Brady review concluded as of that date?

A       My understanding was that we were sending a letter that contained the results of the team's collective Brady review. Obviously, it's never over. I apologize for continuing to say that. Certainly, it was my understanding that we were -- we had done the first cut of everything by the time we sent that Brady letter.

Q    Was that completed on or about September 9, when the September 9
     letter was sent?
A    I would assume so.

Q    When I say that I mean was it completed on that day, September 9?
A    I don't remember; sorry.

BY MR. SCHUELKE:
Q    You have said a couple of times that you simply don't know whether
     or not Brady had been completed; correct?
A    Right.

Q    Did you do anything to satisfy yourself that it was?
A    I trusted in what was going on. I felt like -- I didn't feel like I was
     running point on the Brady issues. We were all responsible for Brady
     material. I reviewed a couple of Grand Jury transcripts. I reviewed the
     material that was from my witnesses.
     You know, it was other folks, and I trusted --

Q    "Other folks." You have observed a couple of times that the prosecutor
     has an obligation, you were obligated, were you not?
A    We're all obligated.

Q    Including you?
A    Absolutely.

Q    How do you fulfill that obligation if you don't make any effort to find
     out whether the material has been reviewed?
A    I view it differently. I think there would have been -- I don't think it
     would have been legitimate for every attorney on the case to have
     gone through and reviewed every single Grand Jury transcript
     independently.
     I trusted that my colleagues were doing the things that -- I didn't think
     I had to investigate it because I didn't have any concerns. I assumed --
     I knew there was a Brady review. I thought there were other people
     doing it. There was a document that was prepared. I knew there was a
     spreadsheet that had been gone through.

90

I just assumed all that was working the way it should. I got involved in the Brady stuff at least from my perspective on the night we were doing it, making some edits and putting in some changes. Ed Sullivan was stuck on a bunch of other stuff. I got involved. I was instrumental in some of those last changes.

I didn't know to be worried because at the time we had this product and things had been gone through. I didn't know there was an issue. There was a letter that contained Brady statements that had been pulled together and put in letter format that appeared to reflect the results of review of materials.

Deposition of N. Marsh, Feb. 2, 2010, at 85-87.

Mr. E. Sullivan testified that no one was in charge of the *Brady* review:

| MR. SHIELDS: | . . . But when it came time for the discovery and Brady disclosures, who was in charge of Brady disclosures on the Stevens group? |
| MR. SCHUELKE: | If anyone. |
| THE WITNESS: | Well, I think that's part of, you know, particularly looking at it in hindsight and based on the training I received. That's part of the problem. There was no clear delegation of who was working on this. I understood at least initially that a lot of this was being done in Alaska, hence the August 25th letter, hence the e-mails. Did you see where Joe says he's reviewed source files? I thought they were doing a lot of it, because the information was out there primarily. |

BY MR. SHIELDS:
Q    So no one was in charge?
A    That's probably fair to say.

Deposition of E. Sullivan, Jan. 6, 2010, at 416.

91

Mr. E. Sullivan testified that he did not know who supervised the agents' *Brady* review of the 302s/MOIs, interview notes or grand jury transcripts. *Id*. at 427. However, emails between Mr. E. Sullivan and the IRS agents during the *Brady* review reflect that they consulted with and viewed him, the most inexperienced of the prosecutors in *Stevens*, as the "POC [point of contact] on this issue by default":

- From:     IRS SA L. Bateman
  To:       E. Sullivan, Agent Kepner and IRS SA D. Roberts
  Date:     Sept. 2, 2008
  Subject:  Interview Notes

  To make sure we are all on the same page regarding review of notes . . . my understanding is we are reviewing notes for evidence of: Brady/Giglio Material - Specifically inculpatory/exculpatory statements re TS or impeachment material on the witness. We are also reviewing the notes versus the MOI to determine if there are any material differences between the two. If I'm missing anything let me know.
  (DOJ Bates no. CRM096733);

- From:     IRS SA L. Bateman
  To:       E. Sullivan, Agent Kepner and IRS SA D. Roberts
  Date:     Sept. 3, 2008
  Subject:  Book1 (2).xls

  We have tracked down all the IRS notes . . . In terms of summarizing the defense request is this spreadsheet ok Ed or did you have something else in mind? Also, do you want the original notes sent to DC or held in agent files? Brady/Giglio my thought is to be very liberal in interpretation subject to final cuts by the attorneys'. I've included one example on the spreadsheet. Let me know if this is what you had in mind.
  (DOJ Bates no. CRM096958);

- From:     IRS SA L. Bateman
  To:       E. Sullivan, Agent Kepner and IRS SA D. Roberts

Date:          Sept. 4, 2008
Subject:       Book1 (2).xls

Ed, I guess I've made you POC [point of contact] on this issue by
default. Here are the interviews [IRS SA] Dennis [Roberts] has notes
for. I will forward the same listing for mine today. Let us know if you
want original notes sent to DC.
(DOJ Bates no. CRM096958);

Reply from: E. Sullivan
To:            IRS SA L. Bateman Larry, IRS SA D. Roberts, Agent
               Kepner, J. Goeke, J. Bottini, N. Marsh, B. Morris, Agent
               Joy, *et al*.
Date:          Sept. 4, 2008
Subject:       Book1 (2).xls

Larry – Thanks. Please copy the rest of the team, too, so we can all
stay on top of this. We will need to see the notes for Rocky. The
spreadsheet also makes reference to 'possible Giglio #10 Hess.' I'm
not sure what that refers to, but if it's possible Giglio, then we'll need
to see it. Just a reminder that we should err on the side of caution and,
to the extent information it is potentially Giglio or Brady, we should
produce it.
(DOJ Bates no. CRM096958);

Reply from: IRS SA Bateman
To:            E. Sullivan, Larry, D. Roberts, Agent Kepner, J. Goeke, J.
               Bottini, N. Marsh, B. Morris, Agent Joy, *et al*.
Date:          Sept. 4, 2008
Subject:       Book1 (2).xls

will do. The Rocky issue was possible minor impeachment material. In
his interview he stated there were no formal plans drawn for the
remodel, just sketches. He credits himself for the plan. (See his MOI
#10). Minor exculpatory info as well as he states 99% of all work was
done by Christiansen Brothers (MOI #12). Broadly interpreted
Brady/Giglio so if the interpretation is too broad just say the word.

93

Also, the last set of notes re D Anderson (from the first e-mail in the string) have been found and are enroute to [IRS office in] Boise now. (DOJ Bates no. CRM096958);

- From:      E. Sullivan
  To:        J. Bottini, J. Goeke, N. Marsh, B. Morris, IRS Agents L. Bateman and D. Roberts, Agents Joy & Kepner, *et al*.
  Date:      Sept. 8, 2008
  Subject:   RE: Emailing: Croft, Linda MOI 12-14-2006, WILLIAMS ROBERT 9-01-2006 MOI, Leathard, Pete 8-31-06 MOI

  Guys - - I apologize in advance for having to be the task master on this one, but we need to get the Rocky notes so that we can try to disclose the letter tomorrow before Wednesday's hearing.
  MBK [Agent Kepner] - - how we looking on FBI 302s/notes?
  (DOJ Bates no. CRM062359).

*See also* Email from E. Sullivan, dated Sept. 3, 2008, to N. Marsh, J. Bottini, J. Goeke and B. Morris ("In light of defendant's motion to compel, we'll need to make double time of the redactions for Augie and Persons' GJ testimony. Are there any other grand jury transcripts that might have Brady/Giglio material in them?") (DOJ Bates no. CRM020909).

Mr. E. Sullivan denied that he was the *de facto* "*Brady* point man":

Q      And I have the documents in front of me. I'll show them to you if you need them to refresh your memory or give you context. But it seems like you got a lot of e-mails from agents asking Brady questions, and [IRS SA] Bateman, for example, says -- I think it's him -- says you've become the unofficial point of contact on this.

A      I recall seeing that e-mail.

Q      "Who do I contact? What do I do? What's this? You know, we're taking a liberal approach. Is that okay with you?" Did you become the de facto Brady point man?

A       I don't think that's a fair characterization. In fact, what I recall, is
        trying to tell the agents "Send everything to the team, because they all
        need, particularly the trial team, needs to be in the loop on this." So
        I'm not sure why he sent that information directly to me. Nobody said
        that I had been tasked, and I didn't understand that I had been tasked to
        do "Brady-Giglio" review.

*Id*. at 416-417.

   Mr. E. Sullivan sent the IRS MOIs, which the agents identified as containing
*Brady* material, to the trial team for further review. *See* Email from E. Sullivan,
dated Sept. 5, 2008, to J. Bottini, J. Goeke, Agents Joy and Kepner, N. Marsh, B.
Morris, *et al*. ("Team - - here are the three reports from the IRS that, in their view,
arguably have Brady/Giglio statements.  When the FBI has completed their review,
we should review all of this as a team for production purposes.") (DOJ Bates no.
CRM021411).  The product of the IRS agents' *Brady* review of MOIs and notes
was also sent to the entire trial team. *See* Email from IRS SA L. Bateman, dated
Sept. 4, 2008, to E. Sullivan, B. Morris, N. Marsh, J. Goeke, J. Bottini, Agents Joy
and Kepner, and IRS SA D. Roberts ("Finalized IRS interview/notes list for
Brady/Giglio/Note Review")(DOJ Bates nos. CRM080318-320).  The FBI agents'
final report of their *Brady* review of 302s and notes was sent to all prosecutors
except Ms. Morris. *See* Email from FBI Agent S. Forrest, dated Sept. 9, 2008, to
Agents Joy and Kepner, E. Sullivan, J. Bottini, N. Marsh, J. Goeke and K. Walker
("Attached is the final spreadsheet containing Brady/Giglio review of 302's. Also
included is the note review done by Bryn. The hard copies of the 302's and notes
attached will be sent out tomorrow.")(DOJ Bates nos. CRM097923-929).  The FBI
agents' *Brady* spreadsheet for their review of the grand jury testimony was sent to
all of the prosecutors. *See* Email from Agent Joy, dated Sept. 6, 2008, to Agent
Kepner, E. Sullivan, B. Morris, J. Goeke, J. Bottini and N. Marsh, Subject: "AK GJ
Transcripts Review for Brady/Giglio" ("Attached is the spreadsheet review of the
AK GJ Transcripts review for brady/giglio. . .") (DOJ Bates nos. CRM021717-
720).

   Mr. Welch testified that he learned after the trial that the agents had
conducted the *Brady* review:

Q     . . . did you ever learn that the Alaskan Grand Jury transcripts had been reviewed not by prosecutors but by FBI agents?

A     I learned in the middle of December of 2008 when I first saw the Joy complaint, by the middle of December of 2008, sort of backing up, one of the Joy complaint allegations has to do with, you know, agents doing the redaction to satisfy the September 16th order. I learned in the middle of December, because I was talking to Morris about, you know, this particular allegation, how this could have happened. Who does this? I mean --

Q     That the agents --

A     This was so foreign to me that agents would be doing a Brady review that I can tell you that it never crossed my mind that that would even enter into the calculus of anybody to have them do that. So in the middle of December, you know, I'm having this conversation with her about how did this happen? How did agents do the review of 302s and notes? And it was at that time she told me, her words were, "that was Joe's deal."

*Id*.

Mr. Welch had approved the use of other PIN attorneys to review the D.C. grand jury transcripts for *Brady* information:

Q     Did you ever learn that in connection with the D.C. Grand Jury transcripts in connection with the Stevens case that they were being reviewed by other PIN attorneys who were not directly involved with the Stevens prosecution?

A     Yes.

Q     Can you tell me what you've learned about that?

A     Yes. I can't recall whether or not I got copied on an e-mail that told me about that, meaning I learned it, or that the issue was fronted to me by Ms. Morris to discuss it, but I recall us having a conversation in the hallway right around Ray Hulser's office in which she had indicated that they wanted to have Mr. Schwager and Ms. Gleason do a review of the Grand Jury testimony of some of the D.C. witnesses.

My understanding it was not going to be all of them. And that Nick
and Ed had been in the Grand Juries with all of these witnesses, didn't
believe that there was any Brady or Giglio, but they essentially wanted
a second set of eyes to be sure that there was no sort of straggling
statement that they had forgotten that may qualify as Brady or Giglio.
And at that particular time, I did know that there were definitely, you
know, there was some press of time in the sense of getting ready for
trial, and that I wanted to be sure that they could sort of begin the
process of preparing witnesses and that sort of thing. So I had agreed
that it would be okay for Mr. Schwager and Ms. Gleason to look at the
D.C. Grand Jury testimony of some of the witnesses, and I did so for
several reasons. Number one, sort of globally I knew some of the
witnesses that had appeared before the D.C. Grand Jury and they dealt
with issues that didn't relate to the charge conduct. I believe, for
example, they had witnesses who were talking about the racehorse
partnership, the Florida condo deal. So I, one, felt comfortable that
from a substance level, these people weren't going to be people who
potentially could be in possession of Brady Giglio.
Two, at that time, I felt comfortable with Nick and Ed's judgment on
Brady issues, knew that they had been there for each session, and with
that, believed that most prosecutors should know whether someone
has Brady or Giglio or not. And then third, Mr. Schwager and Ms.
Gleason were very experienced. They had done the Confertino trial.
They knew what sort of bare knuckle litigation was like. So I felt that
they would know how to err on the side of caution in their review of
the testimony. So ultimately I said okay, understanding that it was not
all of them but just sort of some of them.

Q     And you were approached for permission to do it that way, or
      consulted?
A     Yes. And as I indicated, I can't recall whether I went to her because I
      had seen some e-mail chain that clued me in on it, or she came to me
      to say, you know, we're going to do this. Isn't this okay?

Q     And Mr. Gleason and Mr. Schwagel –
A     Schwager.

97

Q      Schwager, were they sufficiently familiar with the facts of and
       prosecution theory in the Stevens case –
A      Yeah. I under --

Q      -- to perform that kind of review?
A      Sorry. I didn't mean to interrupt. I understood that they were going to
       sit down and give them guidance, meaning sort of lay out, you know,
       what to look for.

Q      Someone on the prosecution team?
A      Exactly.

Deposition of W. Welch, Feb. 5, 2010, at 362-365.


**Pre-trial Discovery: Jencks Act Material and Electronic Discovery**

a.      Decision not to treat FBI 302s as Jencks Act material

On August 1, 2008, Ms. Morris and Mr. Welch met with A.A.G. M.
Friedrich and Principal Deputy A.A.G. R. Glavin to discuss *Stevens* and Mr.
Friedrich raised the question of how discovery would be conducted. Deposition of
W. Welch, Jan. 13, 2010, at 104.  According to Mr. Welch, Ms. Morris answered
that she had researched the issue and would not disclose 302s under the Jencks Act,
18 U.S.C. § 3500, contrary to PIN's usual practice.  Mr. Friedrich approved, as did
Ms. Glavin who added that "we have to play our cards close to the vest on this
one":

Mr. Welch   . . . Mr. Friederich raised the issue of how we intended to
            conduct discovery, which was the first time I had heard any
            AAG raise the issue of discovery.

Q      Meaning dissenting [should be "descending"] to that level of detail
       about the case?
A      Exactly.

Q    Did you understand the question about how we were going to conduct
     discovery to mean Rule 16 discovery or are we talking about
     Brady/Giglio or both?

A    I didn't know what it related to. It was the first time I had heard it. Ms.
     Morris then proceeded to say that with respect to Jencks, they were
     going to take the position that 302s were not Jencks, and that she had
     researched the law and that's what the law said.
     Mr. Friederich --

Q    Meaning -- you can tell me whether she articulated this or not -- did
     you understand her to mean they are not Jencks because they don't
     constitute a verbatim statement of a witness or a statement adopted by
     a witness?

A    Correct. That's what I understood her to be saying. Mr. Friederich said
     good, possible obstruction issues.

Q    What did you understand that to mean?

A    I didn't know. I was actually a little bit surprised when I heard him say
     that because I didn't know what obstruction issues he was conceivably
     talking about.
     I surmised that perhaps what he was talking about is that if 302s were
     disseminated, that investigators for Williams & Connolly would get to
     witnesses, and I surmised perhaps that's what he was talking about.
     Ms. Glavin said words to the effect of we'll have to play this one close
     to the vest or we have to play our cards close to the vest on this one. I
     was stunned.

Q    Did she elaborate at all on what she meant by "play it close to the
     vest?"

A    I believe she had said that Williams & Connolly will come after you
     hard, but beyond that, that was it. I understood that what she was
     saying was adopting/endorsing the position that we should not treat
     302s as Jencks unless substantially verbatim or adopted by the
     witness.

BY MR. SHIELDS:

Q    That is what stunned you?

A       That that position was being taken in this particular case.

BY MR. SCHUELKE:
Q       Was there a contrary practice in the Public Integrity Section on other
        cases?
A       My belief is that our practice was to turn them over, and in fact, we
        had a trial happening almost at the same time in Trenton, New Jersey,
        and the prosecutors in that case were turning over all 302s and they
        had done so, I believe, a month or two in advance of the trial. That's
        what I had counseled them to do.

Deposition of W. Welch, Jan. 13, 2010, at 104-107.

Mr. Welch disagreed with the approach but did not argue the point with Mr.
Friedrich. *Id.* at 112-113.  He testified that he had never experienced such "input"
by the AAG's office and that it altered the usual chain of command in the case:

> In addition, I had never prior to this case experienced such input on
> discovery issues. And those included the decision not to turn over 302s
> several days after the indictment came down. It included the decision not to
> reach out and obtain the Anchorage Police Department records . . . the
> decision to add Ms. Morris also caused me to step back in a management
> role. And what I mean by that is, I didn't abdicate my responsibilities, I didn't
> shirk them, but what I knew was that, unlike most cases, the prosecution
> team leader, Ms. Morris, now had a direct reporting relationship to the
> principal deputy and the Assistant Attorney General. So that altered the
> typical chain of command in these types of cases, number one. Number two,
> at the time, because Ms. Morris was now going to be the leader of the
> Stevens team, I assumed all of her duties and responsibilities. The other
> principal or the other deputy at the time Per Ainsworth, was getting ready to
> and then subsequently indicted Judge Kent, and so he was out of the office in
> Houston. And the final deputy was Ray Hulser, who is part time.

Deposition of W. Welch, Feb. 5, 2010, at 279-280.

Mr. Welch was surprised that Ms. Morris had not spoken with him about the
Jencks issue. Deposition of W. Welch, Jan. 13, 2010, at 107.  After the meeting,

Ms. Morris told him that she had researched the law in the D.C. Circuit and had
checked with two prosecutors in the U.S. Attorney's Office in Washington, D.C.
and was told that their practice was not to disclose the 302s. *Id*. at 109-110. Mr.
Welch asked her who were the prosecutors she spoke to and she would not "give
up [her] sources." *Id*. at 110.

Ms. Morris testified that she was not told by Mr. Friedrich and/or Ms. Glavin
to play disclosure close to the vest in *Stevens*. Deposition of B. Morris, Jan. 15,
2010, at 232. With respect to 302s and the Jencks Act, she followed local practice
after she was told by two AUSAs in Washington, one of whom had recently had a
trial before Judge Sullivan, that normally 302s are not provided to the defense. *Id*.
at 233-34. She testified that she would have preferred turning over the 302s. *Id*. at
234. However, the practice of the team, i.e., Mr. Marsh, Mr. Goeke, Mr. Bottini
and Mr. E. Sullivan, was not to disclose 302s and she "was not by any stretch of the
imagination of me wearing a supervisor's hat while I was on the team" and she
"wasn't going to do anything different to rock the boat." *Id*. at 235-236. Ms.
Morris testified that Mr. Welch may have expressed a view on the issue but she did
not recall. *Id*. at 237. The government's position at trial was that a 302 of an
interview of a witness was, for Jencks Act purposes, a statement of the agent who
wrote the 302 and was not a statement of the witness. *Stevens*, Transcript of
Hearing, Sept. 12, 2008 1:51 P.M., at 40.

Mr. Friedrich told us that he did not recall saying, or hearing anyone say, in
*Stevens* that it was good not to turn over the 302s because that raised obstruction
issues. Memorandum of Interview of Matthew Friedrich, dated April 2, 2010, at 9.
Nor did he recall hearing anyone say, in words or substance, that discovery in
*Stevens* should be conducted close to the vest. *Id*. Ms. Glavin stated that she
recalled having discussions with Mr. Welch and Ms. Morris about discovery
practices in D.C. and she had a vague recollection that Ms. Morris was going to
speak with individuals in the U.S. Attorney's Office about local discovery
practices. She was unable to recall the "upshot of that discussion" and could not
recall learning what the D.C. practice was regarding disclosure of 302s.
Memorandum of Interview of Rita Glavin, dated March 31, 2010, at 4.

Mr. Friedrich and Ms. Glavin participated directly in *Stevens* on issues
ranging from housing for Mr. Bottini and Mr. Goeke to motions, opening
statements and assignment of witnesses for cross-examination, but not discovery or

*Brady* issues.[13]  Ms. Glavin told us during an interview that she played no role in

---

[13]*see* Email from N. Marsh, dated Aug. 6, 2008, to B. Morris, Subject: "Housekeeping" ("... Also, fyi, I cannot overstate how much of a negative impact these front office decisions are having on the rest of the trial team. We were all quite terrified that they expressed a strong opinion on whether Joe and Jim should stay in an apartment or a hotel. Should we expect that they will continue to want to review our pleadings, like our 404b notice, our motions, the venue stuff, etc.?"), and Reply from B. Morris, dated Aug. 6, 2008 ("The short answer is I'm not sure how involved the front office will be. Clearly this isn't viewed as the average case. I do want to stay in front of the issue by informing the front office of some of our decisions, like the 404b which would have an impact in the press, before hand. . . .")(DOJ Bates no. CRM064575); Email from B. Morris, dated Aug. 11, 2008, to W. Welch, Subject: "Venue motion" ("Rita [Glavin]'s edits from Sunday.")(DOJ Bates no. CRM064638); Email from B. Morris, dated Aug. 13, 2008, to W. Welch, Subject: "Proposed 404(b) notice" ("Read over this first thing in the am before I flip to Rita. She asked me if you read it. I told her it contained our edits. She again asked if you read it. Matt has given strict instruction that you have to read all motions before she reads them. Sorry.")(DOJ Bates nos. CRM064759); Email from R. Glavin, dated Aug. 14, 2008, to B. Morris, Subject: "revised 404b" ("Where are changes to items 2 and 3 regarding adding language that proof of those activities will be offered to Steven's relationship with Allen/VECO?") (DOJ Bates nos. CRM064833); Email from W. Welch, dated Aug. 15, 2008, to N. Marsh, E. Sullivan, B. Morris, *et al*. Subject: "Stevens Motion Writers" ("Front office is looking for drafts by COB Wed., the 20th. Thanks for your help.")(DOJ Bates no. CRM064861); Email from N. Marsh, dated Aug. 31, 2008, to R. Glavin, B. Morris, W. Welch, J. Goeke, J. Bottini, E. Sullivan and R. Hulser, Subject: "US response to TS 404b cross-motion" ("Rita also attached for your review is a draft response to Stevens' Motion in Limine to exclude the evidence set forth in the 404(b) notice. We have also attached copies of the 404(b) notice and Stevens' Motion. Please let us know your comments and suggestions."), and Reply from W. Welch, dated Aug. 31, 2008, to N. Marsh ("Is there a reason these are now going directly to her?") (DOJ Bates no. CRM065007); Email from B. Morris, dated Sept. 19, 2008, to W. Welch, Subject: "Opening Statement" ("I spoke to Rita. She and Matt want to make changes to the opening. The only specific was that they want the first line changed. It's objectionable. . . .") (DOJ Bates no. CRM023913); Email from B. Morris, dated Sept. 20, 2008, to W. Welch, Subject: "Opening" ("Attached is the opening that the 'Team' came up with. . . . I'll take it home and I will work on what I can deal with, because Matt had Rita tell me that Matt wants whatever revisions I make by the morning. BTW, Matt and Rita think that it's too defensive. ...")(DOJ Bates no. CRM056712); Email from B. Morris, dated Oct. 5, 2008, to W. Welch, Subject: "FW: Draft Motion" ("Rita asked that I forward to her anything that came in from W&C.") (DOJ Bates. no. CRM065040); Email from W. Welch, dated Oct. 9, 2008, to R. Glavin ("Brenda and Joe do not like the idea of cutting Nick out. You are putting too much on them at the last minute. Please call.") (DOJ Bates no. CRM0109197); Email from B. Morris, dated Oct. 11, 2008, to M. Friedrich (". . . I spoke to Rita this morning, and she told me that she spoke with you. My concern was that we really need to have Nick cross more witnesses. . . . I just don't want to limit him to five. . . .")(DOJ Bates no.

(continued...)

the discovery disputes with Williams & Connolly and did not monitor the discovery litigation. Memorandum of Interview of Rita Glavin, dated March 31, 2010, at 4 & 21. *See also* Email from N. Marsh, dated Aug. 18, 2008, to J. Bottini, J. Goeke and E. Sullivan, Subject: "Welcome back, JAG!" ("Glad to have you back in the saddle. It's a shame the folks in the front office didn't decide to micromanage our Rule 16 productions, because if they had, they would have realized how indispensable you are to our team.")(DOJ Bates no. CRM077617).

Ms. Morris's decision not to disclose the 302s meant that none of the more than 55 FBI 302s of interviews of Mr. Allen, conducted from August, 2006, to September, 2008, was disclosed to Williams & Connolly prior to trial, except for nine heavily redacted 302s containing *Brady* material which were disclosed pursuant to the Court's order on Sept. 16, 2008. *See* Letter from S. Latcovich, Williams & Connolly, dated Nov. 19, 2009, to W. Shields, Janis, Schuelke & Wechsler ("Pursuant to your request . . . enclosed please find all Bill Allen FD-302s produced by the government in [*Stevens*]."); Letter from S. Latcovich, dated May 9, 2009, to W. Shields, ("Pursuant to your request . . . enclosed please (sic) the redacted FD-302s and grand jury transcripts produced by the government on September 17, 2008, in response to the Court's Order of the previous day."); *Stevens*, Trial Transcript, Sept. 16, 2008, at 30 (Order issued "directing that the government produce the redacted 302s and do it by tomorrow.").

      b.     There is evidence that the government manipulated the electronic discovery in an attempt to make Williams & Connolly's review more difficult

On Aug. 8, 2008, Williams & Connolly wrote to Mr. Marsh regarding his production of electronic documents without "load file[s]" which made the production "virtually unusable". Letter from R. Cary, dated Aug. 8, 2008, to N. Marsh, at 1 (*Stevens*, Dkt. No. 63-1). Mr. Marsh replied that "no 'load files' or other coding information has been intentionally withheld". Letter from N. Marsh,

---

[13](...continued)
CRM109198); Email from W. Welch, dated Oct. 13, 2008, to B. Morris and J. Bottini, Subject: "Cross" ("Have you guys divided up the witnesses amongst yourselves and Nick? I was supposed to email Matt and Rita with the line up") (DOJ Bates no. CRM065465).

dated Aug. 8, 2008, to R. Cary, at 1 (DOJ Bates nos. CRM030144-145).  Hard
copies of the documents were subsequently provided to Williams & Connolly at its
expense. Email from S. Latcovich, dated Aug. 8, 2008, to N. Marsh, J. Bottini, J.
Goeke, B. Morris and E. Sullivan ("We would like a hard-copy version of the
production. As per your letter, please deliver hard-copy materials to ACCESS
Litigation Support Services on Monday, August 11. I have included the contact
information below.")(DOJ Bates no. CRM074332).

        Jody Bradison, a litigation technologist/manager in the Alaska U.S.
Attorney's Office, who assisted in the electronic document production in Stevens,
told us that she prepared a hard drive containing the first, pre-trial document
production to Williams & Connolly which was to be delivered by Mr. Marsh
personally.  The production was voluminous, about 750 gigabytes.  She showed
Mr. Marsh how she had organized the documents in the hard drive into sub-folders
for each source.  Ms. Bradison stated that Mr. Marsh asked her to dump all the
documents into one directory with single-page tifs because he didn't want to make
it easy for them.  Mr. Marsh told Ms. Bradison that he had previous dealings with
Williams & Connolly that were "not amicable".[14]  Ms. Bradison stated that Mr.
Marsh's view was that producing the documents in single-page tifs would make
document review more difficult for Williams & Connolly.  She didn't think that it
made any difference and that changing the format was a waste of time.  She also
stated that Mr. Marsh had nothing to do with any issue involving load files.
Interview of Jody Bradison (by telephone), April 28, 2010.

        Ms. Morris testified in the OPR investigation that, when Williams &
Connolly complained about difficulty in reviewing electronic documents produced
by the government in discovery, she was told by Mr. Marsh that he had used a TIF
format for that production. In Re: Investigation of Misconduct Allegations, OPR
Interview of B. Morris, March 19, 2010, at 199-200.  Upon further inquiry, she

---

        [14]We do not know the "previous dealings" referred to by Ms. Bradison.  Limited research
revealed that Mr. Marsh was one of several DOJ attorneys who appeared for the government in, in
*United States v. Tobin*, No. 04-cr-216-01-SM, 2005 U.S. Dist. LEXIS 31116 (D.N.H. 2005)
(McAuliffe J.) and *United States v. Tobin*, 480 F.3d 52 (1st Cir. 2007); Williams & Connolly
represented the defendant in both cases.  A judgment of acquittal was entered in the first case,
*United States v. Tobin*, 545 F. Supp. 2d 189 (D.N.H. 2008), *aff'd* 552 F.3d 29 (1st Cir. 2009),
and the indictment was dismissed in the second, *United States v. Tobin*, 598 F. Supp. 2d 125
(D.Me. 2009).

learned that the TIF format made access to the documents more difficult (*id*. at 200-201), and she concluded that Mr. Marsh "had played games with the TIF stuff . . . thinking it was cute." *Id*. at 199-200.

Mr. Marsh was not questioned during his deposition in this investigation about electronic discovery, tif and load files or Williams & Connolly's complaint in its August 8, 2008, letter. In response to a general question about discovery, he said that he was involved in putting documents into a format for production to Williams & Connolly and that there were problems in the formatting. Deposition of N. Marsh, Feb. 2, 2010, at 39-40. He testified in the OPR investigation that the different ways the documents could be produced didn't matter because they were all searchable and that "I didn't want us to go make it easier for them. I don't remember wanting to make it harder for them." In Re: Investigation of Misconduct Allegations, OPR Interview of N. Marsh, March 25, 2010, at 198. He testified that he might have been in Alaska when material was placed onto a hard drive for Williams & Connolly and that "I may very well have made some comment about 'I don't want to make it easier for them' as more of a joke, but certainly, I didn't - - I don't remember trying to actively make it more difficult, nor do I think I could have. . . . and [I] certainly wouldn't have tried to make it more difficult in, like, a material sense." *Id*. at 199-201.

Mr. Marsh testified that he didn't know anything about load files until Williams & Connolly raised the issue, and he determined that the government had no load files for the documents that were provided to Williams & Connolly, that no load files had been removed and that the government could not view the documents any more efficiently than Williams & Connolly could. *Id*. at 203 & 205-207.

**Statement of Investigative Findings**

**A.    Rocky Williams**

Summary

Mr. Williams was an important witness for the government. The central allegation in the seven-count false statements indictment (18 U.S.C. § 1001) against Senator Stevens was that he failed to disclose on his Senate financial disclosure forms his receipt of more than $250,000 worth of renovations to his home in Alaska which was provided by Mr. Allen and his company, VECO Corp. Mr. Williams was a VECO employee and one of two foremen of the renovation; the other foreman was David Anderson, Mr. Allen's nephew.  Mr. Williams supervised the VECO employees, who worked on the renovation, and Christensen Builders, the contractor hired and paid by Senator Stevens and Catherine Stevens, to perform the renovation.  The owner of Christensen Builders, Augie Paone, testified at trial that his "understanding was that [Mr. Williams] was pretty much Bill [Allen]'s eyes" and that Mr. Williams was the primary point of contact for Senator and Mrs. Stevens during the renovation.

Mr. Williams was scheduled to testify early in the government's case and in August and September, 2008, Mr. Bottini, Mr. Goeke, Agent Joy, and other members of the trial team, met with him to prepare him to testify.  On August 22, 2008, the same day that Mr. Bottini, Mr. Goeke and Agent Joy conducted a witness preparation session with Mr. Williams, Mr. E. Sullivan emailed a report to Mr. Bottini, Mr. Goeke, Agent Joy and the other members of the trial team, on documents recently received from Williams & Connolly.

According to Mr. E. Sullivan's email, the documents made it plain that Catherine Stevens would likely testify that Mr. Williams told her that VECO's costs for its employees' work on the renovation were included in the Christensen Builders' bills that were sent to, and paid in full, by Senator Stevens and Catherine Stevens.  He further reported that, in the event Mrs. Stevens did not testify, the defense will "try to squeeze this point out of Rocky on cross."  Mr. E. Sullivan's email was a reminder of a defense that had been long known and anticipated by the prosecutors.  Prosecution memoranda written in 2007 and 2008 stated that Senator Stevens's primary defense and likely testimony at trial would be that he and

106

Catherine Stevens believed that the substantial bills which they received from Christensen Builders included charges for VECO employees' time and material on the renovation. It was undisputed that Senator Stevens and Mrs. Stevens paid in full every Christensen Builders' bill which they received.

Mr. Bottini's and Mr. Goeke's notes of their trial prep meeting with Mr. Williams on Aug. 22, 2008, reflect that Mr. Williams provided them with information which corroborated that defense. He told them that he reviewed the Christensen Builders' bills for accuracy and then brought them to Mr. Allen at VECO's main office. He also told them that, based on his conversations with Mr. Allen and Senator Stevens, he understood and believed that Mr. Allen added Mr. Williams's time, and the time of the other VECO employees who worked on the renovation, to the Christensen Builders' bills which were then sent to Senator Stevens and Catherine Stevens.

After that interview, Mr. Goeke and/or Mr. Bottini dictated a two-sentence 302 to Agent Joy which contained none of the *Brady* information provided by Mr. Williams which corroborated Senator Stevens's defense. The 302 reported only that Mr. Williams never told Senator Stevens or Catherine Stevens that VECO's expenses for labor and material were included in the Christensen Builders' bills and that they never asked him if VECO's expenses were included in those bills.

Agent Joy emailed that 302 the next day to Mr. Bottini, Mr. Goeke and the other prosecutors with the subject line "Important Rocky Williams Statement". At Agent Joy's request, the 302 was emailed to the prosecutors again on August 25, 2008.

Mr. Bottini and Mr. Marsh conducted additional trial preparation interviews of Mr. Williams in September, 2008, in Washington, D.C. and he reiterated his belief and understanding that his time and other VECO employees' time were included in the Christensen Builders' bills. He was subjected to a mock cross-examination by Mr. Goeke, was easily led and performed badly. Mr. Marsh told the O'Brien Team that after the mock cross-examination, the prosecutors began discussing Mr. Williams's health, which, by all accounts, was poor and deteriorating. Just before the trial began, prosecutors decided that he needed to return to Alaska for medical treatment. Mr. Williams left Washington on Sept. 25,

2008, the day opening statements were given, and he never returned to testify. He died in Alaska on Dec. 30, 2008.

Mr. Williams was interviewed in Alaska by phone on Sunday, Sept. 28, 2008, by Williams & Connolly, and he provided them with other *Brady* information which had also not been disclosed by the prosecutors, e.g., the amount of time he spent working on the renovation. He did not tell Williams & Connolly that his understanding was that Mr. Allen added VECO expenses on the renovation to the Christensen Builders' bills. However, the information provided by Mr. Williams during that phone call contradicted the VECO cost report which the government had just put into evidence through the testimony of Cheryl Boomershine, a VECO accountant. Based on the information provided by Mr. Williams, Williams & Connolly immediately filed a motion to dismiss the indictment or declare a mistrial.

On Sept. 29, 2008, Judge Sullivan heard argument, denied the motion to dismiss and took curative steps to remedy the government's failure to disclose *Brady* information. Later that same week, on Oct. 2, 2008, when prosecutors disclosed that other *Brady* information had been redacted from a 302 which had been provided to the defense pursuant to the Court's pre-trial order to provide 302s containing *Brady* information to Williams & Connolly, Judge Sullivan ordered the immediate disclosure of unredacted 302s and grand jury testimony for all government witnesses. Documents produced in response to that order led to the discovery by Williams & Connolly of additional undisclosed exculpatory information and additional motions to dismiss for *Brady* violations. Despite the Court's order on Oct. 2, 2008, the 302 of the interview of Mr. Williams on August 22, 2008, was never provided to Williams & Connolly. The *Brady* information provided to Mr. Bottini and Mr. Goeke by Mr. Williams in August and September 2008, which was omitted from that 302, was never disclosed to Williams & Connolly, during or after the trial.

Background

Robert "Rocky" Williams, a former VECO employee, was interviewed by agents assigned to the Public Integrity Unit's Polar Pen investigation of official corruption in Alaska for the first time on Sept. 1, 2006, two days after Mr. Allen

was confronted by Agent Kepner and agreed to cooperate with the investigation. *See* IRS Memorandum of Interview ("MOI") of R. Williams on Sept. 1, 2006, dated Sept. 8, 2006 (DOJ Bates nos. CROM014080-086). While employed by VECO, Mr. Williams acted as a foreman of the renovation of Senator Stevens's home in Girdwood, Alaska, and supervised Christensen Builders, a contracting company owned by Augie Paone, which was hired by Senator Stevens to perform the renovations:

> Although Christensen was tasked to perform certain renovation jobs at the Girdwood Residence, the entire project was managed by Rocky Williams and Dave Anderson. From July 2000 to May 2001, these two VECO employees spent most of their work time at the Girdwood Residence. Williams and Anderson were responsible for managing both the VECO crews and the Christensen crews. Many of the Christensen workers interviewed in this investigation told us that they took their orders from Williams, because Williams was the foreman and because Christensen's Paone was rarely on site at the project.

> Memorandum to W. Welch and B. Morris from N. Marsh, E. Sullivan, J. Bottini and J. Goeke, Recommendation to Prosecute THEODORE F. STEVENS, Current United States Senator, for False Statements (18 U.S.C. § 1001) ("Prosecution Memo"), dated May 21, 2008, at 13 (DOJ Bates nos. CRM048387-465).

*see also* Testimony of Agent Kepner before D.C. grand jury, dated April 27, 2007, at 8 ("Williams was the primary person overseeing the project")(DOJ Bates no. CRM003754).

Mr. Williams was "the liaison between the STEVENS family and the work being done, and Catherine Stevens frequently contacted Williams in connection with aspects of the renovations." *Id*. Mr. Paone testified that "[Mr. Williams] had a supervisory position. My understanding was that he was pretty much Bill [Allen]'s eyes" and he was the primary point of contact for Senator and Mrs. Stevens during the renovation. *Stevens*, Trial Transcript, Oct. 14, 2008 A.M., at 109, and Oct. 15, 2008 A.M., at 40.

Prosecutors planned to call Mr. Williams early in the trial to identify and describe the work performed on the home by him and other VECO employees. *See Stevens*, Government's Opposition to Defendant's Motion to Dismiss Indictment or for a Mistrial, dated Sept. 29, 2008, at 1 ("the government anticipated that [Mr. Williams] would be one of the first witnesses in the government's case-in-chief.") (Dkt. No. 105). The government's theory of the case was that Senator Stevens never paid for those services and that they constituted gifts or liabilities which he failed to disclose on his annual Senate Financial Disclosure forms. *See* Prosecution Memo, dated May 21, 2008 at 1; *Stevens*, Indictment, filed July 29, 2008, ¶ 27 ("STEVENS knew that VECO employees and contractors performed significant renovation tasks on the Girdwood Residence during calendar year 2002. Nonetheless, STEVENS never paid or reimbursed VECO at any time for the cost of materials provided and labor performed by VECO and its employees on the Girdwood Residence during calendar year 2002.").

Mr. Bottini, Mr. Goeke and FBI SA Joy conducted trial preparation interviews of Mr. Williams in August and September, 2008. According to Mr. Bottini's and Mr. Goeke's handwritten notes of those interviews, Mr. Williams stated repeatedly that he understood, based on conversations with Mr. Allen and Senator Stevens, that the costs for his and other VECO employees' time were to be added by Mr. Allen or his staff to the bills of Christensen Builders. Mr. Bottini and Mr. Goeke knew at the time these statements were made that Senator Stevens's primary defense at trial would be that he and Catherine Stevens believed that VECO's expenses for the renovation were included in the bills which they received from Christensen Builders and which they paid in full.

In August, 2008, when Mr. Bottini and Mr. Goeke obtained this information from Mr. Williams, Mr. Bottini, assisted by Mr. Goeke, Mr. Marsh and Mr. E. Sullivan, was drafting a *Brady* disclosure letter which he sent to Williams & Connolly on August 25, 2008. Deposition of J. Bottini, Dec. 16, 2008, at 43; Email from N. Marsh, dated Aug. 9, 2008, to J. Bottini, J. Goeke and E. Sullivan ("Guys – we probably need to get cranking on our omnibus Brady/Giglio letter to defense counsel, as well as identifying any GJ transcripts that we think should be given over in toto under Brady/Giglio. Thoughts?") (DOJ Bates no. CRM030998); Email from J. Bottini, dated Aug. 18, 2008, to E. Sullivan, B. Morris, N. Marsh, J. Goeke, Agent Kepner and Agent Joy, Re: "Draft Brady/Giglio letter" ("Attached is a more fleshed out version of the draft Brady/Giglio letter – replace the earlier one with

110

this one.")(DOJ Bates no. CRM034821); Email from J. Bottini, dated Aug. 22, 2008, to E. Sullivan, B. Morris, N. Marsh, J. Goeke, Agent Kepner, Agent Joy and IRS SA L. Bateman, RE: "Latest Draft of Brady/Giglio letter w/certain attachments" (DOJ Bates no. CRM036121); Email from J. Bottini, dated Aug. 25, 2008, to A. Romain (Williams & Connolly), *et al.* ("Attached is a letter (with a number of attachments) setting out potential impeachment information relating to a number of prospective witnesses.")(DOJ Bates no. CRM036475-612); Email from E. Sullivan, dated Aug. 28, 2008, to B. Morris, J. Bottini, Goeke and N. Marsh ("Brenda – Just a reminder that we need to respond to 2 W&C [Williams & Connolly] letters re: (1) their request for confirmation re: Brady/Giglio production and request for 302s and notes") (DOJ Bates no. CRM036708).

On August 27, 2008, Mr. Goeke helped draft the government's response to Williams & Connolly's request for copies of Christensen Builders' records. *See* Letter to from A. Romain, dated Aug. 26, 2008, to E. Sullivan, at 1 ("Please provide true and accurate copies of all [Christensen Builders] documents" (DOJ Bates no. CRM079527); Email from E. Sullivan, dated Aug. 27, 2008, to J. Bottini, J. Goeke, N. Marsh and B. Morris, Re: "Emailing: Romain 8-26-08 v.2" ("Draft letter that was written quickly, so please give it a read. Jim - can you fill in the blanks. Thx.") (DOJ Bates no. CRM036677); Letter from E. Sullivan, dated Aug. 27, 2008, to A. Romain, at 1 ("1. Pursuant to your request, we will provide you with a copy set of certain of the Christensen Builders documents.")(*Stevens*, Dkt. No. 60-5).

Despite knowing that Mr. Williams's statements, that VECO's expenses for the renovation of Senator Stevens's home were to be included in the Christensen Builders' bills that were sent to and paid by Senator Stevens and Mrs. Stevens, supported Senator Stevens's defense, Mr. Bottini and Mr. Goeke withheld that *Brady* information from Williams & Connolly.

1.    Trial Preparation Interviews in Alaska, August 2008

August 15:  Mr. Williams is "very focused and his recall is good"; No 302 is written

After the first trial preparation interview of Mr. Williams on Aug. 15, 2008, Mr. Bottini reported the results to the prosecution team:

> Would anyone like to hear the Rocky report? Yes? No?
>
> The Rock does appear gaunt and does have a very sallow/yellowish complexion and appears generally less healthy than when we last saw him around April '07 I wanna say.  Gotta be liver impairment.  He was also nervous (like always) and jittery at first.  He got more relaxed and was joking around somewhat by the time he left.
>
> Good news is that he is very focused and his recall is good. Granted, today's mission was to try and get him relaxed about what is coming and to just plow through some personal background stuff, but I think he will be fine.
>
> We chatted him up about TS attorneys may reach out to him.  He says he will probably tell them he doesn't want to talk (I believe him) and promises to let us know if and when they try to make contact.
>
> **Rocky II is playing next Wed. afternoon, August 20, 2008, at 2:00 pm at the USAO.**
>
> I told him that we'll give him about 45 minutes or however long he needs to review his GJ transcript and then we'll start covering Girdwood.

Email from J. Bottini, dated Aug. 15, 2008, to N. Marsh, E. Sullivan, J. Goeke, B. Morris, Agent Joy, Agent Kepner, et ano. (emphasis in original) (DOJ Bates no. CRM006938).

*See also* Notes of J. Bottini, dated Aug. 15, 2008, (DOJ Bates nos. CRM088691-708).

Agent Joy attended this and other trial preparation interviews of Mr. Williams. Deposition of J. Bottini, Dec. 16, 2009, at 56-57 ("I never met with Williams without having an agent there. And Chad was sort of the agent assigned to Rocky Williams. So Chad would have been here for this initial interview." ).  No 302 was written.  Agent Joy's and Agent Kepner's standard practice, subject to

exceptions, was to not write 302s for trial preparation interviews. Deposition of
Agent Joy, March 29, 2010, at 33 & 43; Deposition of Agent Kepner, August 24,
2009, at 179; *see also* Deposition of J. Bottini, Dec. 16, 2008, at 57 ("You know,
generally what I have learned from the Bureau is that if they understand it to be a
trial prep session, then they're not going to write up a 302"); Deposition of W.
Welch, Jan. 13, 2010, at 86 ("Post-indictment, for example, in a prep session, if
new subject matter comes up, the 302 should cover the new subject matter, but
beyond that, a 302, as I understand FBI policy, doesn't need to be generated.").
*Compare United States v. Houlihan*, 92 F.3d 1271, 1289 (1st Cir. 1996)
("Eschewing tape recordings and ordering law enforcement agents not to take notes
during pretrial interviews is risky business -- and not guaranteed to redound either
to the sovereign's credit or to its benefit. By adopting a 'what we don't create can't
come back to haunt us' approach, prosecutors demean their primary mission: to see
that justice is done."); *United States v. Rodriguez*, 496 F.3d 221, n. 3 (2d Cir. 2007)
("Further, although the Government has no obligation to make written notes for the
defendant's benefit, we do not reach here the issue of whether the Government, for
the purpose of avoiding the disclosure of the initial falsities and inconsistencies of
persons who may become Government trial witnesses, may permissibly instruct an
agent not to follow the customary practice of taking notes of witness interviews.").

> <u>August 20</u>:  Mr. Goeke's notes reflect that Mr. Williams stated that his time
> and David Anderson's time on the renovation of Senator
> Stevens's home were supposed to be added to the Christensen
> Builders' bills, and Mr. Bottini's notes reflect the opposite;
> No 302 is written

Mr. Williams was next interviewed on August 20, 2008 by Mr. Bottini, Mr.
Goeke, Mr. Marsh (who participated by phone), Agents Joy, Kepner and Howland.
Deposition of J. Goeke, Jan. 8, 2010, at 44.  Emails exchanged between Mr. Marsh
and Mr. E. Sullivan during the interview indicate that Mr. E. Sullivan also
participated by phone for at least part of the interview. *See* Email from N. Marsh,
dated Aug. 20, 2008, to B. Morris and E. Sullivan, Re: "Rocky debrief on line"
("Anyone else want to listen in?") (DOJ Bates no. CRM035769); Email from E.
Sullivan to N. Marsh and B. Morris, dated Aug. 20, 2008, Re: Rocky debrief on
line ("I can hang for awhile if you want to patch me in.") (DOJ Bates no.
CRM035770).

After the interview, Mr. Bottini reported that Mr. Williams has "pretty good recall":

> I know it was tough to follow the Rock-meister stuff today, but any general observations about his suitability as a witness?
> The stuff about "no generator there" concerns me a little bit. Other than that, I think he appears to have pretty good recall in general.

Email from J. Bottini, dated Aug. 20, 2008, to N. Marsh and E. Sullivan, (DOJ Bates no. CRM035852).

Mr. Goeke's notes (seven pages) reflect *inter alia* that Mr. Williams, Mr. Allen and Senator Stevens discussed renovations to the senator's home in 1999 and that Mr. Williams understood that his time, and the time of another VECO employee, David Anderson, would be included in the Christensen Builders' bills:

> 1999 -> first discussions ->
> -> All a matter of $$
> -> Bill had just stopped being a lobbyist and
>     had to be careful
>     \> TS said would pay the through his accts
> 1999 - Brighten it up
>        * * *
> -> Bill and Ted and Rocky discussions
>     \> Wanted as many independent contractors
> -> Bill always had a habit of taking a
>   bit in his teeth to run with it . . .
> -> VECO had few finish carpenters
> -> Stevens wanted to pay for it
> -> *RW was VECO time*
>     *\> RW supposed to go through Paone's bills ->*
>         *supposed to have RW's time and*
>         *Dave's time applied to the billing*
> -> wanted to keep within the budget
> -> A third <u>through</u> TS got a <u>loan</u>
> -> TS/Bill did not talk about budget
> How <u>know</u> - took Augie's bills <u>in</u> . . .

114

> \> Augie called - Augie.

Notes of J. Goeke, dated Aug. 20, 2008 (first four lines of emphasis added; ellipses at end of lines in original)(DOJ Bates nos. CRM089063-069).

*See also* Deposition of J. Goeke, Jan. 8, 2010, at 48-49 (Mr. Goeke read his notes into the record).

Mr. Bottini's notes (24 pages) are similar to Mr. Goeke's, except for one significant discrepancy. His notes reflect that Mr. Williams' said that his time was <u>not</u> added to the Christensen bills:

> – Discussions - <u>1999</u> –
> Rocky told them - all a matter
> of money - depends on what
> you want to do, etc.
> - Told Bill that need to be careful
>               \*   \*   \*
> Wanted to get Augie involved
> right from the beginning ->
>       \ Augie known by others @
>            VECO -
>            \ Christensen Builders. -
> - Wanted to get as many outside
>      k'ors [contractors] -
>           \ Ted wanted to pay himself.
>               \*   \*   \*
> - Ted - - He wanted to pay himself.
>      \make sure he paid for it, etc.
> - Don't know what Bill [Allen] did after that
> - TED KNEW THAT ROCKY
>   WORKED FOR VECO -
>
> - Rocky paid by VECO; etc.
> -> My time = VECO
>               \*   \*   \*

> *- Didn't add my time to Augie's bill -*
>
> - Rocky was assigned by Rex McKee
>    \>wasn't @the chalet everyday
>    \ when not there - Dave there, etc.
> -> Normally got the bill from Augie -
>    \ would review Augie's bills.
>    \ take them to main office
>     review to make sure that
>     Augie was doing the right thing
>    \ gave them to Bills Secty.

Notes of J. Bottini, dated Aug. 20, 2008 (last emphasis added)(DOJ Bates nos. CRM057288-311).

*See also* Deposition of J. Bottini, Dec. 16, 2010, at 84, 85, 93-95 (Mr. Bottini read his notes into the record).

Agent Joy's half-page of notes does not contain anything about adding Mr. Williams's time or Mr. Anderson's time to the Christensen Builders' bills. His notes reflect the following, in pertinent part:

> "• TS said he wanted to pay for everything - RW wanted Augie";
> "•TS wanted to keep it within his budget - later got loan";
> "* • RW took Augie bills - taken to VECO main office - sign off on them";
> " • RW wasn't working TS full time - when not there DA [Dave Anderson] was there";
> " • RW job included overseeing contractors".

Notes of Agent Joy, dated Aug. 20, 2008 (DOJ Bates no. CRM0006871).

*See also* Deposition of Agent Joy, March 29, 2010, at 36-37 (Agent Joy read his notes into the record).

Mr. Bottini, after reading Mr. Goeke's notes into the record, testified that he never heard Mr. Williams say, *during this or any other interview*, that his and Mr. Anderson's time was supposed to be added to the Christensen Builders' bills. He testified that the statement contradicted the government's theory of the prosecution and supported Senator Stevens's defense, and that he would have disclosed it, had he known about it:

> Q   Well, it says -- if I heard you correctly -- RW is supposed to go through Augie's bill, supposed to have RW's time and Dave's time applied to the bill?
>
> A   I think that's what that says.
>
> Q   Okay. Can you tell us what that means?
>
> A   I don't know what that means.
>
> Q   Have you ever heard anything like that before?
>
> A   No. I don't remember Williams ever saying that, that, you know, he was supposed to take his time and Dave Anderson's time, and put it into Paone's bill. I don't remember --
>
> Q   That's contrary to the whole theory of the prosecution, isn't it?
>
> A   Yes, because that's not what was happening. Nor did -- I don't -- I'm pretty sure Williams never said that while I was there.
>
> BY MR. SCHUELKE:
>
> Q   Well, not only was that contrary to what you thought the evidence showed, in answer to Mr. Shields's question, if that were the fact, that would be contrary to the government's theory of the case, would it not?
>
> A   It would be.
>
> Q   Because that would leave Stevens to have understood, consistent with these 1999 discussions, that he was paying for everything, if he was paying Christiansen's bills.
>
> A   Well, except that, you know, we had evidence --
>
> Q   At least for the time that Christiansen was on the job.

A     Sure. You know, the senator knew that there were more VECO people down there than just Rocky Williams and Dave Anderson. He was introduced to a number of other people as, you know, being VECO employees. You know, had people say that they were wearing their VECO gear when he was there, you know, so --

Q     But that wouldn't be relevant, if the understanding was, yes, VECO people are going to be working there, but their time is going to be included in the bills which I, Ted Stevens, am getting from Christiansen and am paying.

A     Well, yes, it would be inconsistent with the government's theory.

Q     And consistent with the defense theory.

A     Consistent with the defense theory.

Q     Yes?

A     But honestly, I don't know what that means. I don't --

BY MR. SHIELDS:

Q     Do you -- sorry, I didn't mean to cut you --

A     Yes -- no, no. I do not recall Williams ever saying anything like that. Like, he was supposed to go through –

MR. SCHUELKE:     Well, that's different than saying you don't know what it means.

THE WITNESS:     Well, I mean --

MR. SCHUELKE:     So I'm not sure I understand what you're saying. I hear you never heard him say that.

THE WITNESS:     Yes.

BY MR. SHIELDS:

Q     Can I ask a question? Did you ever hear him say anything like that?

A     I did not.

Q     Ever?

A     Ever.

Q     Not just at this meeting.

A     Ever, yes.

Q     Because this would be a memorable statement by one of the government's witnesses who was foreman on the job to tell you --

A     If he was saying that he was supposed to review Paone's bills and wrap his time and Dave's time into that bill? Absolutely.

Q     And why, absolutely? Can you elaborate?

A     Well, because it would be inconsistent, as Mr. Schuelke pointed out.

Q     Well, that's --

A     With our theory, and --

Q     -- inconsistent, to say the least.

A     Yes.

Q     It would be completely contradictory of the government's theory of the case.

A     Right.

Q     In fact, it would –

A     -- for their time, but you know --

Q     If it were true, it would mean there was no crime.

A     Well --

MR. WAINSTEIN:     If I could --
(attorney for Mr. Bottini)

MR. SHIELDS:     I don't like my question to be interrupted until after I get an answer.

BY MR. SHIELDS:

Q     If that were true, if Dave's time and Augie's time -- sorry -- Dave and Rocky's time were being wrapped into Christiansen bills, then at least insofar as Dave and Augie's costs and expenses were concerned, there

119

would be no crime. If that were all the VECO contribution to the
effort.

A    Right.

Q    For only those two guys.
A    For those two alone, that would be –

Q    There would be nothing wrong.
A    -- just for the time --

Q    Because Christiansen was fully paid by Senator Stevens.
A    Correct.

Q    Right. But you pointed out earlier it's not just Dave and Rocky.
A    Fully paid by Senator Stevens, with the exception that part of Augie's
cost on the last billing were actually paid by Bill Allen. They wrapped
it into his home remodel, rather than pass it on to Senator Stevens.

Q    But -- so what you're saying -- if it were all true, there might be a
remnant left of the government's case. It would be a small remnant.
A    Comparatively speaking, yes.

Q    Well, yes. A small fraction.
A    It was several thousand dollars, yes.

BY MR. SCHUELKE:
Q    And if you're talking about the defendant's state of mind which, after
all, is what the case was all about -- this was a specific intent crime
alleged, right -- whether there may have been remnants that weren't
paid through Christiansen, would it not have posed a significant
problem for the government, with respect to the senator's state of mind
about whether he was paying for this job?
A    If Dave's time and Rocky's time was being folded into Augie's bill?
Sure, I think that's fair.

BY MR. SHIELDS:
Q    Or even if that's what Rocky thought was happening?

A      (No response.)

Q      Let me make sure my question is clear.
A      Sure.

Q      When I say, "even if," even if the time was not being wrapped in, if
       Rocky thought it was being wrapped in, that would also be Brady
       material, wouldn't it?
A      It could be.
                              *   *   *
BY MR. SCHUELKE:
Q      No, let me just ask you one question about that. And I don't mean to
       argue with you --
A      Sure.

Q       -- but I just want to understand your position. If you had focused on
       that statement in Jim Goeke's notes, and you simply took it at face
       value and without understanding, perhaps, what he meant, but you just
       have what he says, and you understood it, as we have just been
       discussing, to be significant, simply on its face, would you have
       thought it necessary to disclose that report of what the witness said?
A      Yes. And what's throwing me is that my notes don't reflect that. And
       so I'm not sure -- you know, on its face it looks like that's what he is --
       what Goeke is memorializing. But the fact that my notes don't say it
       that way is what's throwing me off. So, I don't know if, you know,
       Jim's interpreting it this way. Maybe I interpreted -- you know, I don't
       know. But our notes are not consistent about this, and -- nor did we --
       you know, I'm certain that we didn't talk about this and go, "Oh, what"
       -- you know?

Q      I understand.
A      So --

BY MR. SHIELDS:
Q      One question. Did you -- have you reviewed these notes -- seen these
       notes before today?
A      I have not seen them until today.

Deposition of J. Bottini, Dec. 16, 2010, at 134-140 & 141-142.

The *Brady* information provided by Mr. Williams to the prosecutors during the interview on Aug. 20, 2008 and in subsequent interviews, that his time and David Anderson's time were supposed to be added to Christensen Builders' bills, was never provided to Williams & Connolly. However, prosecutors were diligent in disclosing information provided to them by Mr. Williams in September, 2008 which corrected and nullified other exculpatory information which Mr. Williams reported to them in 2006.

As the *Brady* letter was drafted in September, 2008, Mr. Williams was re-interviewed about a statement he made in September, 2006 that 99% of the work on Senator Stevens's home was done by Christensen Builders:

> The majority of the work on STEVEN's property in Girdwood was completed by Christensen Builders, which included AUGIE PEONE and at least one other individual working for PEONE, "MIKE" (LNU - Last Name Unknown). WILLIAMS estimated that "99%" of the construction was done by PEONE's company, with the balance handled by sub-contractors.

> IRS Memorandum of Interview of R. Williams on Sept. 1, 2006, at ¶ 12 (DOJ Bates nos. CRM014080-086).

A draft of the *Brady* letter contained that exculpatory information:

> On September 1, 2006, government agents interviewed Robert Williams. . . . Williams further stated the majority of the work on the property was completed by Christensen Builders, estimating that 99 percent of the work was done by Christensen Builders and the remaining portion performed by subcontractors[.]

> Draft *Brady* letter, dated Sept. 8, 2008, at 3 (attached to email from E. Sullivan, dated Sept. 8, 2008, to J. Goeke, J. Bottini, N. Marsh, Agent Kepner, Agent Joy and B. Morris (DOJ CRM022008-023).

Mr. Bottini testified that the 99% statement "was totally inconsistent with what -- everything we knew Rocky Williams had said in the grand jury or to the

government in interviews" and a decision was made to re-interview Mr. Williams. Deposition of J. Bottini, Dec. 16, 2008, at 41; *see also* Email from E. Sullivan, dated Sept. 7, 2008, to IRS SA Larry Bateman, IRS SA Dennis Roberts, Agent Kepner, Agent Joy, J. Bottini, J. Goeke, N. Marsh, B. Morris, *et al.* ("Larry, Dennis, Chad, and Mary Beth -- We need to gather up the notes of the interview of Rocky to check whether the report is consistent (or not) with the notes for both interviewing agents. This MOI doesn't make sense to us regarding the 99% of the work was done by CB and 1% by the subcontractors. It appears he's talking about CB's own subcontractors (not the VECO stuff), but we should check the notes to see if there's any clarity on this.") (DOJ Bates nos. CRM021917-918).

When Mr. Williams was reinterviewed he said the statement in the 2006-MOI, was wrong: "No, that's not what I said. What I said was that 99 percent of the work that VECO didn't do on the house was done by Christiansen Builders." Deposition of J. Bottini, Dec. 16, 2008, at 41-42. The final *Brady* letter added Mr. Williams's correction:

> On September 1, 2006 . . . In a memorandum of interview from the same meeting, a federal law enforcement agent noted that Williams estimated that 99 percent of the work was done by Christensen Builders. In a subsequent interview, Williams stated that he did not recall ever saying that Christensen Builders performed 99 percent of the work, and that such a figure was inconsistent with what he knows to have occurred.

> *Stevens*, Letter from B. Morris, dated Sept. 9, 2008, to A. Romain (*Brady* letter), ¶ 15 (Dkt. No. 126-2).

Mr. Bottini's notes also reflect that Mr. Williams said that he reviewed the Christensen Builders bills before they were sent to Senator Stevens:

> -> Normally got the bill from Augie -
> \ would review Augie's bills.
> \ take them to main office
>  review to make sure that
>  Augie was doing the right thing
> \ gave them to Bills Secty.

Notes of J. Bottini, dated Aug. 20, 2008 (DOJ Bates nos.
CRM057288-311).

However, the *Brady* letter sent to Williams & Connolly three weeks later stated that
Mr. Williams did *not* review those bills:

On September 1, 2006 . . . Williams also stated that, although he was the
general contractor on the project, he did not deal with the expenses and did
not recall reviewing Christensen Builders invoices. . . .

*Stevens*, Letter from B. Morris, dated Sept. 9, 2008, to A. Romain (*Brady*
letter), ¶ 15 (Dkt. No. 126-2).

Mr. Bottini did not know why Mr. Williams's statement on Aug. 20, 2008, that he
did review the Christensen Builders invoices, was not disclosed in the *Brady* letter.
Deposition of J. Bottini, Dec. 16, 2009, at 116.  He did not notice that error when
he reviewed the *Brady* letter. *Id*. at 118.

Mr. Bottini testified that he believed that the source of the erroneous
statement in the *Brady* letter was an IRS MOI or a 302 of an interview of Mr.
Williams on Sept. 1, 2006. *Id*. at 119.  He was correct. *See* IRS Memorandum of
Interview of R. Williams on Sept. 1, 2006, at ¶¶ 10-11 ("WILLIAMS stated
PEONE mailed the billing statements directly to STEVENS and WILLIAMS did
not see or review the statements before they were sent to STEVENS. . .
.WILLIAMS stated his role as the general contractor involved overseeing the
construction on STEVENS' property, however, WILLIAMS did not really deal with
the expenses associated with the project.")(DOJ Bates nos. CRM014080-086).  A
redacted version of that MOI, which *supported* the erroneous statement in the
*Brady* letter, was among the documents provided to Williams & Connolly on Sept.
17, 2008, pursuant to Judge Sullivan's Order on the previous day directing the
disclosure of *Brady* information to the defense in a useable format. *See Stevens*,
Trial Transcript, Sept. 16, 2008, at 30; *see also* Letter from S. Latcovich (Williams
& Connolly), dated May 9, 2009, to W. Shields (". . . enclosed please [sic] the
redacted FD-302s and grand jury transcripts produced by the government on
September 17, 2008, in response to the Court's Order of the previous day.").

Mr. Bottini also believed that Mr. Williams testified in the grand jury that he reviewed the Christensen Builders' bills. Deposition of J. Bottini, Dec. 16, 2010, at 115. He was correct again. Mr. Williams testified in the grand jury in 2006 that he reviewed the Christensen Builders' bills on a monthly basis and that he "would check to make sure that people were basically there, and that basically everything looked fine, and then I turned them in to Veco [to Mr. Allen or his secretary, Billie]". Grand Jury testimony of R. Williams, Nov. 7, 2006, at 45-47 (DOJ Bates nos. CRM005713-5789). However, Mr. Williams's grand jury testimony, which contradicted the MOI and the statement in the *Brady* letter, was *not* among the documents disclosed by the prosecutors on Sept. 17, 2008. Williams & Connolly did not obtain Mr. Williams's grand jury testimony until Sept. 28, 2008, after the trial had commenced and after Mr. Williams had returned to Alaska.

On Sept. 28, 2008, Williams & Connolly lawyers interviewed Mr. Williams by telephone and he provided them with information which established that he spent significantly less time working on Senator Stevens's home than was attributed to him in the VECO time sheets and cost report (GX 177), which the prosecutors had put into evidence on Sept. 26, 2008 through the testimony of Ms. Boomershine, a VECO accountant. *See Stevens*, Senator Stevens's Motion to Dismiss the Indictment or for a Mistrial, filed Sept. 28, 2008, at 1 ("In three telephone conversations today, Mr. Williams disclosed highly exculpatory information to defense counsel that apparently has been known to the government for years. Among other things, Mr. Williams informed defense counsel that he spent nowhere near 8 hours per day, 6-7 days per week, on the Girdwood home renovation project – in direct contrast to the timesheets that the government has placed in evidence to support its central theory that the unpaid cost of the project to Veco was $188,000.") (Dkt. No. 103). That same day, Williams & Connolly requested and received Mr. Williams's grand jury testimony. *See* Email from R. Cary, dated Sept. 28, 2008, to B. Morris, J. Bottini, N. Marsh, E. Sullivan and J. Goeke ("In conjunction with an emergency motion we are preparing, please provide the grand jury testimony and Forms 302 for Robert Williams"); Email from N. Marsh, dated Sept. 28, 2008, to R. Cary, *et al*. (". . . we are willing to provide you with a transcript of Mr. Williams' grand jury testimony for your review. Please call one of us at your earliest convenience to discuss.") (DOJ Bates nos. CRM025067-068). The grand jury testimony confirmed the information which Mr. Williams had provided to Williams & Connolly and contradicted the statements in the MOI and the *Brady* letter that he "did not deal

125

with the expenses and did not recall reviewing the Christensen Builders invoices." *Brady* letter, ¶ 15.

Mr. Goeke described his notes of the August 20, 2008, interview of Mr. Williams as reflecting that "Rocky had a belief that he thought Stevens was going to pay for" the renovation of his Alaskan home. Deposition of J. Goeke, Jan. 8, 2010, at 52. He did not know "where [that information] was disclosed to the defense or whether "a third party's impression of what someone's going to do that they don't know what they did or didn't do" is *Brady* information. *Id*. He assumed that others would decide whether Mr. Williams's statements would be disclosed to the defense:

> Q    Did you take any steps to alert anyone else of this information elicited from Rocky Williams so that somebody could consider disclosing it?
> A    No, but I was sitting there with the people who were going to do the testimony of Rocky Williams and I wasn't going to review his 302s and his grand jury testimony to prepare for that testimony.
> I would assume that people other than me are going to be in much better position to assess what has been disclosed, hasn't been disclosed and what should be disclosed.

> BY MR. SHIELDS:
> Q    And who was that?
> A    Whoever was going do him as a trial witness.

> BY MR. SCHUELKE:
> Q    Why were they in a better position than you?
> A    Because they were going to review all of the material that related to him and make a considered determination as to what is Brady and not Brady; what has been disclosed, what has not been disclosed.
> If I had been asked to review his grand jury testimony and his 302s and determine what was Brady, I'd be happy to do it. I was asked to do that with other witnesses and I did it.

*Id*. at 63-64.

Mr. Marsh testified that he could not remember whether he had ever heard that Mr. Williams's understanding was that his time, Mr. Anderson's time and the time of other VECO employees were to be added to the Christensen Builders' bills. Deposition of N. Marsh, Feb. 2, 2010, at 305-307.  If he had heard that, he would probably have remembered it. *Id*. at 307.  He testified that the information "would have to be construed as Brady". *Id*. at 309-310.

Mr. E. Sullivan testified that he never heard that Mr. Williams sent the Christensen Builders' bills to Mr. Allen or his secretary for purposes of adding his and Dave Anderson's time. Deposition of E. Sullivan, dated Jan. 8, 2010, at 401-402.  He testified that, if he had heard that, he probably wouldn't have remembered it because he wasn't "terribly focused on it". *Id*. at 404.

Agent Kepner testified that she attended at least one trial prep session of Mr. Williams in Alaska and that she never heard of any exculpatory information provided by him in any trial preparation interview. Deposition of Agent Kepner, Aug. 24, 2009, at 176 & 179.

<u>August 22</u>:

a)      Mr. Bottini and Mr. Goeke receive an email message from Mr. E. Sullivan regarding documents received from Williams & Connolly which make it "fairly apparent" that the defense will be that "VECO costs were rolled into the large Christensen bills" and that "they [will] try to squeeze this point out of Rocky on cross"

On August 22, 2008, Mr. E. Sullivan emailed to his colleagues documents recently produced by Williams & Connolly which made the testimony of Senator Stevens and Catherine Stevens, and the cross-examination of Mr. Williams, "fairly apparent":

The good news -- no bombshell in there for VECO or Allen.

Based on the cancelled checks and the handwritten note from Rocky to CAS [Catherine A. Stevens], it's fairly apparent that TS will say that CAS handled the bills, CAS coordinated with Rocky, and TS didn't know VECO

wasn't paid b/c CAS never told him. To further insulate TS, CAS will likely
testify that Rocky told her the VECO costs were rolled into the large
Christensen bills. Alternatively, if CAS doesn't testify, then they try to
squeeze this point out of Rocky on cross. If they make this point, TS can
then argue that CAS didn't tell him about the VECO costs b/c she thought
the VECO costs were included in the Christensen bills.

This argument doesn't get them off the hook for 2002, but TS will probably
shift his argument for that time period by contending that there were some
smaller items that VECO worked on and, for these items, TS repeatedly
asked BA for a bill. This doesn't explain why he didn't report the
outstanding bill as a liability, but I suspect he'll claim that he was unaware
[sic] the outstanding amounts and he didn't know the amounts were greater
than $10K.

Email from E. Sullivan, dated Aug. 22, 2008, to J. Goeke, J. Bottini, N.
Marsh, B. Morris, W. Welch, Agent Kepner, Agent Joy, J. Bradison
(USAAK) and K. Walker (USAAK), Subject: "W&C production re:
Girdwood invoices Part 1 of 2" (DOJ Bates nos. CRM036198-228).[15]

Mr. Bottini testified that he did not remember receiving this email from Mr.
E. Sullivan but he had no reason to doubt that he received it. Deposition of J.
Bottini, Dec. 16, 2009, at 148-149.  He testified that Mr. E. Sullivan's email
accurately forecasted a defense that had already been identified in the prosecution
memorandum:

A      It really doesn't [ring a bell]. You know, the defense -- Sullivan is, you
       know, speculating what the -- what a defense may be. That particular
       defense was identified as, you know, far back as the PROS memo.
       And the chart that -- well, the -- as I understand it, the front office or
       the criminal division requested a run-down of what are the strengths
       and the weaknesses of this case, what are the likely defenses.

_____

[15]Mr. E. Sullivan had predicted this defense on April 8, 2008, the day the Torricelli notes
were received from Williams & Connolly: "TS will likely contend that he knew VECO worked
on the site, thought the VECO costs were rolled into the CB invoices, and thought the $138K
[paid to Christensen Builders] covered everything given what the finished work product look
like." Email from E. Sullivan, dated April 8, 2008, to N. Marsh, J. Bottini and J. Goeke (DOJ
Bates no. CRM016162).

And so, the defense that, you know, this was Catherine's deal, that the senator was just, you know, peripherally involved in that, I mean, that was recognized and, you know, described back in April or March, whenever that memo went up to the criminal division.

BY MR. SCHUELKE:

Q     Well, whether this was the first time this was described or not, it accurately forecasted the defense, did it not?

A     It did, yes.

*Id*. at 150-151.

Mr. Goeke testified that he was sure he received Mr. E. Sullivan's email but did not remember receiving it (Deposition of J. Goeke, Jan. 8, 2010, at 80), or having it with him or in mind when Mr. Williams was interviewed on Aug. 22, 2010:

Q     Did you have in mind the points that were raised by Mr. Sullivan when you interviewed Mr. Williams?

A     I don't know if I did or didn't. I was not thinking about these when I sat in on these interviews. I was not thinking about what am I going to ask this guy at trial because I wasn't going to ask him anything at trial.

*Id*. at 82.

Mr. Goeke testified that his notes of the interview indicate that Mr. Williams was asked about the issues identified in Mr. E. Sullivan's email "by someone":

Q     And just reading a pertinent part, "Based on the canceled checks and the handwritten note from Rocky to CAS," that's Mrs. Stevens, correct?

A     Yes.

Q     Reading further on, "It's fairly apparent that TS will say that CAS handled the bills, CAS coordinated with Rocky and TS didn't know VECo [sic] wasn't paid because CAS never told him.

129

"To further insulate TS, CAS will likely testify that Rocky told her the VECO costs were rolled into the large Christensen bills. Alternatively, if CAS doesn't testify, then they try to squeeze the point out of Rocky on cross." That's in the e-mail.

A    Okay.

Q    And did you ask Mr. Williams about those subjects when you interviewed on that on [sic] day?

A    Well, looking at my notes, someone asked him that topic; those questions, yeah.

BY MR. SCHUELKE:

Q    I'm sorry. Looking at my notes, I didn't understand.

A    Looking at my notes, someone asked Rocky questions about whether he had any direct knowledge as to whether -- if he had ever told Senator Stevens or Catherine Stevens that Christensen invoices included his time.

Q    You said, "Someone," asked him. Is that what you said?

A    Yeah. It could have been me.

Q    That's what I didn't understand.

A    Yeah, could have been me. Could have been someone else that did the interview –

*Id*. at 82-84.

b)    Mr. Bottini and Mr. Goeke interview Mr. Williams the same day and their notes reflect that he told them again that VECO expenses were supposed to be added to the Christensen Builders' bills

Mr. Bottini's notes (12 pages) and Mr. Goeke's notes (four pages) of their interview of Mr. Williams on Aug. 22, 2008 reflect that Mr. Williams told them *inter alia* that VECO employees' time and labor on the renovation of Senator Stevens's home were supposed to be added by Mr. Allen to the Christensen Builders' bills. *See* Notes of J. Bottini, dated Aug. 22, 2008 (DOJ Bates nos. CRM

130

057312-57323); Notes of J. Goeke, dated Aug. 22, 2008 (DOJ Bates nos. CRM 057193-057196).

According to Mr. Bottini's notes, Mr. Williams stated that it was part of the "original agreement" that Mr. Allen would add "any VECO labor/time" for work on Senator Stevens's home to the Christensen Builders' bills:

> Augie's [Christensen Builders's] bills -
>     <u>HW note</u> 2/14/2001
> to Rocky first
> Signed off on Augie's
>     stuff -
> Verified that Vern and Mike were there
> -> check their time out
> 8-5 - 5x week -
>
> - After verified -
>     took to VECO main
>     office -
>     Showed to Bill
>
> - Left them w/Bill -
>     for him to add my time +
>     Dave's -
>      \>
> - If Bill was there -
>  If not - then left it there
>  w/secty or w/Billie -
>
> It was understood that we were
> down there -
>     and that any VECO time/labor
>      would be added in
>
> - Part of the original agreement -
>     \ as long as we got paid back

- Rocky assumed this based on what TS had said in <u>1999</u> -

- Never saw what BA forwarded to
  TS + CAS [Catherine A. Stevens]
      \ DON'T KNOW WHETHER HE ADDED IT OR
         NOT, ETC.

- Know that Bill was under a
  microscope - didn't think
  that he would do anything
  to hurt TS, etc.

Notes of J. Bottini, dated August 22, 2008 (emphasis in original)(at DOJ Bates nos. CRM057314-316).

*See also* Deposition of J. Bottini, Dec. 16, 2009, at 154 & 157-158 (Mr. Bottini read his notes into the record).

Earlier in the deposition, and as recounted above, Mr. Bottini testified that he never heard Mr. Williams say anything about VECO employees' time being included in the Christensen Builders' bills, that any such statement would be memorable because it would contradict the government's theory of prosecution and, if true, destroy all but a small remnant of the government's case against Senator Stevens. Deposition of J. Bottini, Dec. 16, 2010, at 134-140. When shown his own notes of those statements by Mr. Williams, that he left the Christensen Builders' bills with Mr. Allen "for him to add my time + Dave's . . . any VECO time/labor" to those bills, Mr. Bottini remembered that Mr. Williams said "he assumed, or he thought that was what was going on":

Q    And would you carry on to the next page that ends with [DOJ Bates no. CRM057]315?

A    Sure. "Left them with Bill for him to add my time and Dave's. If Bill was there. If not, then left it there with secretary or with Billie. It was understood that we were down there, and that any VECO time/labor would be added in. Part of the original" -- that could be "agreement" -- "as long as we got paid back. Rocky assumed this, based on what TS had said in 1999. Never saw what BA forwarded to TS and CAS.

Don't know whether he added it in or not. Know that Bill was under a microscope. Didn't think that he would do anything to hurt TS, et cetera."

Q    Why don't we stop there for the moment?
A    Sure.

Q    Does that ring a bell? Do you remember him telling you that, that as far as he knew, his and Dave's time was being added to the bill?
A    I don't remember him specifically saying that he knew that was the case. I think he said that he -- he just assumed it, is what I recall Williams saying.

Q    Which is similar to what we saw in Goeke's notes before the break, the concept of adding VECO employees' time, Dave and Rocky, to a bill. Whether it's a VECO bill or a Christiansen bill, I think it's a little unclear. So you do remember that?
A    I think I recall Rocky saying that, you know, basically he assumed, or he thought that was what was going on. But he didn't know for sure. He didn't have any basis -- I remember him saying it was just an assumption in [sic] his part.

*Id*. at 158-159.

Mr. Bottini testified that Mr. Williams's "assumption", that VECO employees' time was added to the Christensen Builders' bills, was not *Brady* information and was not disclosed to the defense because it never "crossed my mind" that it was *Brady* information, and that "today, out of an abundance of caution, I would probably err on the side of disclosure":

Q    And, therefore, because you construe this as an assumption on the witness's part, it is, therefore, not -- you are, therefore, not required to disclose it because, what, it's not admissible?
A    I don't know --

Q    Or what?
A    I don't know that that was --

Q  I don't follow.

A  Yes, I don't know that that was the calculus for this piece of information, you know? I think when we were getting this, to me it was clear this is just what Rocky assumed was happening. You know? He doesn't really have any foundation for it, other than, you know, he didn't think Bill would be so stupid as to do something like this. Is that admissible? He doesn't know. I mean, it's clear. I mean, he – you know, he has follow-up conversations.

* * *

BY MR. SCHUELKE:

Q  You recall my compound questions?

A  You're going to have to help me.

Q  Okay. In light of what the government anticipated about the Stevens defense, as reflected in the email of August the 22nd, and, as you pointed out, as reflected in earlier iterations of the PROS memo, in your judgement today, was the account that Rocky Williams gave you on August 22nd about his practice of reviewing the Christiansen bills and taking them to the VECO office so that his time and that of Anderson could be included in the Christiansen bill something that should have been disclosed?

A  Well, again, it was clear that it was an assumption on Williams's part. There was nothing that I was aware of to indicate that Williams was complicit in what was really Bill Allen's scheme to provide financial benefits to Senator Stevens. He didn't know. Williams didn't know whether, you know, his time or anybody else's time was getting wrapped into that Christiansen Builders bill. So, given that it was just an assumption on his part, and that he was not complicit in Allen's scheme, if you will, to provide financial benefits to Senator Stevens, I -- you know, I don't think that it was something that should have been disclosed.

Q  Did you think about whether or not it should be disclosed --

A  I don't remember --

Q  -- between August the 22nd and the commencement of the trial?

134

A     I don't remember. I don't remember thinking about that, or having conversations with anybody about it. And I don't -- you know, I'm not sure who all was present for this particular session. I don't think it was just myself there, as far as any of the other attorneys of record. But I don't remember having any conversations about this and saying, "Should we disclose it," or, "Do we have to disclose it?"
      You know, to me, given that Williams -- you know, that we had nothing to indicate that Williams was part of any plan to provide financial benefits to Senator Stevens, you know, his assumption that this was getting taken care of and being done correctly, I don't -- you know, I just -- I don't believe that that's something that should have been disclosed. And I don't remember thinking about it at the time, or having conversations with anybody about it at the time.

Q     And so, if the question were presented to you today, you would say, "No, we don't have to disclose this?"
A     You know, today, out of an abundance of caution, I would probably err on the side of disclosure.

BY MR. SHIELDS:
Q     But do I understand you correctly that, at the time you received this -- withdrawn.
      Was any of this information ever disclosed to the defense?
A     That Rocky assumed that his time was being folded into the -- or he and Dave's time was being folded into the bill?

Q     That, and what you have written here, that he took the bills up, believing that his and Dave's time were to be added in and paid. Was any of that disclosed to the defense in the Stevens case?
A     I don't think it was. I can't recall any other form of disclosure, other than the two letters, that would have encompassed that information.

Q     And do I understand you correctly that at the time it never crossed your mind that it could be Brady material?
A     I didn't think of this as Brady material at the time.

Q     Never --

135

BY MR. SCHUELKE:

Q    Well, that's -- wait. That's a different question. He asked you whether or not it crossed your mind that it may be Brady material. You said, "I didn't think it was." Does that mean it did cross your mind --

A    No, no.

Q    -- and you decided that it wasn't?

A    No, I don't think it crossed my mind and I made some calculated decision about whether -- should we or shouldn't we. I don't remember having that sort of, you know, debate with me or with anybody else.

BY MR. SHIELDS:

Q    Can you explain that, in light of the email you got from Sullivan telling you, "This will be the defense in the case, that Catherine will testify that she thought that Rocky and Dave's time were being rolled into the Christiansen bills?" This email tells you that's the defense. You're talking to the foreman of the job, who is not married to Ted Stevens. He works for VECO. He brings the bills to VECO. He brings them there for the purpose of having the time added in. How can you explain that that's not Brady material, in light of your colleague's email?

[colloquy between Mr. Wainstein, attorney for Mr. Bottini,
        and H. Schuelke and W. Shields]

MR. SHIELDS:              -- he doesn't think it was relevant to the defense. And my question is, "How do you explain that, in light of the email you got from Mr. Sullivan the same day, identifying this as a problem for the government?"

THE WITNESS:              Yes, again, it was an assumption on Williams's part. He never had any conversations with Bill Allen about, you know, "Make sure you wrap this in," you know. "Remember my time and Dave's time has got to go on Augie's tab."

136

He just assumed that, you know, based on his belief that Bill wouldn't do anything reckless like this to hurt Ted Stevens.

BY MR. SCHUELKE:

Q     But don't your notes reflect that this was consistent with the discussion that the 3 of them had in 1999?

A     I think what that indicates is that -- well, and the follow-up to it, I think, indicates -- that Rocky assumed this, based on what Ted Stevens had said in 1999. "I want to pay for everything."

MR. SHIELDS:     Ted and Bill and Rocky were in that discussion.
THE WITNESS:     It says this is what Senator Stevens said –

MR. SHIELDS:     Right. I'm sure he spoke during that meeting.
This is on page [CRM057]315. "It was understood that we were down there, and that any VECO time/labor would be added in, part of the original agreement." And that's referenced earlier in the notes. There was a meeting, and after the Kenai River Classic in 1999/2000, Ted, Bill, and Rocky were going to do some work and brainstorm about it, and "We want to do everything above board, and we want to have a contractor in there." That's the original agreement.
And per that original agreement, part of the original agreement, "As long as we got paid back."
THE WITNESS:     Well, I don't know that having a contractor in there was part of the original agreement. You know, the understanding was VECO was going to do the work.

MR. SHIELDS:     Part of the original agreement, Ted would pay for everything.
THE WITNESS:     That's what he recalled the senator saying.

MR. SHIELDS:     That's the original agreement.
THE WITNESS:     Right. And so --

137

MR. SHIELDS:     He is --
THE WITNESS:     Oh, go ahead. I'm sorry.

MR. SHIELDS:     No, I'm interrupting you. I lost track --
THE WITNESS:     You know, he is making an assumption -- and it was
clear, from the way we followed up with him about this --
he is making an assumption, based upon his belief that
Bill Allen wouldn't do something so reckless as to hurt
Ted Stevens and, I think in part, because he recalled
Senator Stevens saying he wanted to pay for it.
So -- but it's -- you know, it's just a raw assumption on
Williams's part. Williams is not complicit in Allen's plan
to just give financial benefits to Senator Stevens. To me,
it's no different from, you know, the Roy Dettmer, the
electrician who is doing work on there, you know? I
mean, he probably assumed that, you know, his labor was
being wrapped into some bill that was being paid by the
owners of the house. You know?

BY MR. SHIELDS:

Q     It seems determinative to you that it's an assumption on Rocky's part.
Is that making it inadmissible, and therefore, not Brady material?
A     Inadmissible, and therefore not Brady material?

Q     Because it doesn't have to be admissible.
A     It doesn't have to be admissible.

Q     It just can lead to admissible evidence. And if the foreman of the job
tells the defense attorney for Mr. Stevens that, "I was under the same
impression your client was under. I thought these costs were being
wrapped in and being paid for by Ted Stevens," don't you think that's
exculpatory material for the defense to learn, so they can find
admissible evidence? Don't you think that would be significant
information to the defense attorney for Mr. Stevens?
A     Again, I was looking at it in the vein of it's an assumption on
Williams's part, based upon his belief that, you know, Allen wouldn't
do something like this to hurt Senator Stevens.

You know, I didn't think of this at the time in the context of, "This is Brady information that should be disclosed." I didn't.

Q    Well, when you say you think of it as an assumption, you think now of it as an assumption. It's not the analysis you did at the time, is that correct?

A    You know, I don't remember some protracted debate internally, or with anybody else, about, you know, is that disclosable as Brady material. You know –

Q    Well, that's my question. Did you think about it at all?

A    I don't remember if I did or not. But I can tell you that, you know, at the time that wasn't something that jumped out and grabbed me, because Rocky Williams is assuming that this is what happened. I mean, if he would have said, "Bill Allen told me," you know, "that he was wrapping my time and Dave's time into Augie's bill," then absolutely, you know? That would be something that would have jumped out at me, and you know, we would have disclosed that. But this was something, you know -- Williams, you know, it was him assuming that something was happening, not knowing that it was happening, never had any conversations with -- go ahead.

Q    I don't mean to interrupt you, but it's based on, as you write, "the original agreement."

A    Well –

Q    The original agreement is a three-way agreement, a discussion between him, Ted, and -- Ted Stevens -- and Bill Allen. That's what you write, "part of the original agreement." What are you referring to there, if not a conversation with Bill Allen, with Ted Stevens, and Rocky Williams?

A    If that word is "agreement" -- and I think it probably is -- I think what that refers to is the initial discussion about what the senator wants done, you know, to expand the house, Allen telling him that VECO can do that, having Rocky out there to walk the site and figure out how they might be able to do that, and Rocky -- go ahead.

139

Q     No, don't take my gesture as an interruption. Please, carry on.

A     And Rocky recalling that the senator said he wanted to pay for it.

Q     Well, but in that regard, they're not -- in your notes at page [CRM057] 315, this part of the original agreement line is right in between two phrases. "It was understood we were down there," and that "Any VECO time/labor would be added in." "Part of the original agreement."
The reference there is not to the kind of renovation that was going to happen to the chalet. It's to VECO time being added in, "as long as we got paid." This is not a reference to, you know, whether we're going to add a bedroom or modernize the kitchen. This is the underlying financial arrangement.

A     But -- yes, but then he made it clear that that was an assumption on his part. He didn't know that that was going to happen.

Q     He thought it was going to happen because, as you wrote, it was part of the original agreement, i.e. the preceding sentence, "It was understood that we were down there, and that any VECO time/labor would be added in, part of the original agreement." There is no assumption there. He is telling you, "This is the agreement Ted, Bill, and I discussed."

A     But he then –

Q     Way back when –

A     I'm sorry. He then qualifies that right after that, and says it's an assumption on his part.

Q     "As long as we got paid." And then he writes, "Rocky assumes, based on what TS" --

A     Based on what Ted Stevens had said.

Q     -- "had said in 1999."

A     Right. Never saw what BA forwarded to Ted Stevens and Catherine Stevens. Don't know whether he added it in or not.

Q      But this is all -- this discussion now, and this thought process that you
       are going through about being an assumption, this is all post-hoc, after
       the fact, today. It's not a discussion or an analysis that you performed
       at the time.
       At the time, you took the notes, concluded the interview, moved on to
       your next task in the Stevens prosecution, never giving a second
       thought to the fact -- to the possibility that this could be exculpatory
       material that you had to disclose. Is that right?
A      To me, it was clear in this interview that he was telling us it was
       merely an assumption on his part.

Q      An assumption means not exculpatory, even though the person making
       the assumption works for VECO, works for Allen, brings the bills up
       to the office, and tells you this was part of the original understanding,
       that's what that translates into, assumption means not Brady?
A      At the time that, you know, we were getting this information from
       Williams, to me it was clear he is making an assumption. I think this is
       probably the product of a follow-up question, you know.

Q      But when you say assumption, you're equating assumption with not
       Brady. Where is that coming from? Where have you heard or learned
       that if a witness assumes something, that that means whatever follows
       can't be exculpatory material?
A      I can't cite the chapter or verse on that.

Q      Because -- you can't, because it's not there, because you know that
       what a witness says doesn't have to be admissible evidence to qualify
       as Brady if it leads to admissible evidence, correct?
A      Well, I think that's true. It doesn't have to be necessarily admissible.
       But again, you know, to me it was clear at this time, during this
       interview, that Williams is saying, "This is what I assumed, you know,
       I didn't know for sure."

Q      You're back on assumption. That's not a legal term. That's not
       synonymous with not exculpatory, is it?
A      Yes, we sit here and --

141

Q    Yes, I know, and --

A    -- and slice it all day. But at the time I just didn't think of this as something that should have been disclosed. That's the best I can do for you.

Q    All right. So let me pose the --

MR. SCHUELKE:      No, go ahead.

BY MR. SHIELDS:

Q    So, pardon me if it's repeating. Earlier, Hank asked you, well, if you had to decide today, would you disclose it, and you said, in an abundance of caution, you would. When I hear the phrase "abundance of caution" coming from a prosecutor, that means you're doing it out of charity.

A    I don't mean it that way.

Q    And my question is, today would you be -- feel obliged to disclose it, not out of an abundance of caution. Today, do you think you would be obliged to disclose it?

A    You know, looking at it in the rearview mirror and what's transpired, I would probably turn this over.

Q    Well, what's transpired is that because Rocky Williams never testified, and this information was never disclosed, the only person testifying to what he thought was happening, that the bills were being paid, was Ted Stevens, correct? Ted Stevens and his wife.

A    And his wife.

Q    Right, as opposed to a third witness, who would have been a government witness, who would have been the foreman for VECO, in charge of the construction, coming to the same conclusion, and not being a defendant in the criminal case, not being related to the defendant.

A    But making --

Q      That would have made a difference, don't you think?

A      But making an assumption based on, you know, a lot less than what
       Senator Stevens or Catherine Stevens would have been basing their
       assumption on.

*Id.* at 172 & 174-190.

When shown Mr. Bottini's longer and more detailed notes of the interview,
Mr. Goeke testified that they were similar to his notes and reflected Mr. Williams's
statements that VECO employees' time would be added to the Christensen
Builders' bills:

Q      And these are dated August 22, '08?

A      Yes.

Q      Do they appear to the be notes that Mr. Bottini took during that
       meeting?

A      Yeah, I think so.

Q      Take a moment and look at them if you'd like to satisfy yourself as to
       what they are.

A      Yeah, they appear to be. Joe's notes are like that, yeah.

Q      Same subject matter being covered here?

A      Mm-hmm.

Q      If I could direct your attention, for example, to the third page ending in
       Bates 314.

A      Mm-hmm.

Q      At the bottom of the page it reads, "After verified," he's referring to
       the -- Augie's bills at the top. Do you see, "Augie's bills?"

A      Yes.

Q      And then at the bottom, it says, "After verified, took to VECO main
       office. Showed to Bill." That corresponds with some of your notes,
       correct?

143

A       That's right.

Q       And then on the next page, "Left them with Bill." The Bill there is Bill
        Allen, correct?
A       I assume so, yeah.

Q       That's the key government witness in the Stevens case, correct?
A       Yes.

Q       "Left them with Bill for him to add my time and Dave's time."

MR. SCHUELKE: "Dave's."
BY MR. SHIELDS:
Q       "Dave's," sorry. Thank you.
A       Yeah, it could be -- it could be Billie, but I think it's -- yeah, if Bill
        was there, that's gotta be Bill Allen. If not, "Left it there with," yeah, if
        not, "Left it there with Billie," yeah. Mm-hmm.

BY MR. SCHUELKE:
Q       Because Billie was --
A       A receptionist, if I understood, at VECO, yeah.

BY MR. SHIELDS:
Q       And I think it's speaking of Billie. If you look midway down, "If Bill
        was there, if not, then left it there with secretary or with Billie."
A       Yeah, and that's what I was just referring to, yeah.

Q       That -- do you remember Rocky Williams telling you that they were
        left with Bill for him to add his time and Dave's time on the project?
A       Yeah.

Q       To add to the Christensen bills?
A       To add to the Christensen -- well, I didn't know how -- I didn't
        understand how -- I understood the bills were left there and then either
        an invoice was going to be generated from VECO where you add time
        to the -- I didn't know how that was going to happen, but, yeah, that
        concept, yeah. That's what I understood that concept to be.

144

BY MR. SCHUELKE:

Q    Well, continuing in this page, it reads, does it not, "It was understood that we were down there and that any VECO time slash labor would be added in."

A    Mm-hmm.

Q    "Part of the original agreement."

A    That's what Rocky understood the original agreement to be, yeah.

Q    And that's what Rocky told you that day?

A    Yeah, some iteration of that. Though, what I take away from that is that Rocky said his understanding was that the bills were going to be -- that VECO time would be billed in some form or capacity to Stevens.

*Id*. at 138-142.

Mr. Goeke's notes are similar to Mr. Bottini's: Mr. Williams's understanding was that Mr. Allen would add his and Mr. Anderson's time to the Christensen Builders bills and "TS was going to pay for everybody", including the VECO employees:

-> How Augie's bills handled
        (1) went to Rocky first - checked off
        materials that Rocky bought on
        Augie's account, checked Vern's and Luther's
        time . . .
        (2) Vern and Mike 8-5 every day and 5 days
            a week
        (3) then took to VECO main ofc ->
                Left with Bill to add whatever
                VECO time etc was left to add ->
                then sent down to TS

    Rocky Williams    8.22 08        p.1

    ->Usually on front would sign and put date

145

Would give to Bill to add time
   for Rocky and Dave
      \> understood that TS was going to pay
          for everybody
      \> charges for [illegible], etc - would
          come through VECO
             \> part of the original agreement
      -> As long as paid back then everything
          would be fine
      -> original <u>discussion</u>
      -> Assumption that was going on
      -> Subsequent conversations

Notes of J. Goeke, dated August 22, 2008 (emphasis and ellipsis in original)(at CRM057193-194).

*See also* Deposition of J. Goeke, Jan. 8, 2010, at 91-92 & 115-116 (Mr. Goeke read his notes into the record).

Mr. Goeke testified that he did not know whether this information was disclosed to Williams & Connolly or whether disclosure was required by *Brady*, and that arguments could be made both ways about whether "a third party['s] impression of . . . what he thought was going to happen" is *Brady* information:

Q    Is he -- did he tell you there that the VECO -- the time of the VECO employees was to be added to the Christensen bills?
A    He was clear that that was his impression of what was going to happen.

Q    That the -- that the VECO employees who were working on the Stevens Girdwood home, their time was to be added to the Christensen Builders bills.
A    He thought that was what was going to happen to the bills.

Q    But my question is, is that what he told you that --
A    He told us that he thought that was what was going to happen.

146

Q     That the VECO time -- employees' time to be added to the Christensen bills.

A     That was his impression of what was going to happen.

Q     Was that information ever provided to the attorneys for Senator Stevens?

A     I don't know, but that goes back to what we were talking about earlier. That's a third party impression of -- that's what he thought was going to happen. And the followup --

BY MR. SCHUELKE:

Q     Well, wait, wait, wait. Forgive the interruption. I'd like to have the answer to the question before we have an explanation for the answer. So the question was, was the information relayed by Rocky Williams on this day to your knowledge communicated to the defense?

A     I don't know.

BY MR. SHIELDS:

Q     And you didn't review these notes in connection with the preparation of the Brady letters?

A     No.

BY MR. SCHUELKE:

Q     I don't want to cut you off. I understood you also to be advancing an argument about why, perhaps, as a matter of law it would not be required to be disclosed because it was a third party's impression?

A     I'm not sure if a third party's impression about something he thought happened, that he was clear that he didn't know if it happened or not, Brady or not. You could make an argument that it is. You could make an argument that it's not.

Q     I understand, but just so I -- your testimony is clear, as I understand it, you [sic] testimony is, "I don't know whether the substance of this information was disclosed to the defense or not."

A     That's right.

147

Q    If it had not been, it's perhaps owing to an argument that it's not
     required to be disclosed because it's a third party's impression.
A    Oh, it could be.

Q    That's your --
A    Yeah, that could be. But it's not an analysis that I undertook at the
     time.

Q    I understand.

BY MR. SHIELDS:
Q    Not -- not an analysis that was taken at the time?
A    By me.

Q    By any -- was it -- did anyone analyze it in those terms?
A    I have no idea. I don't know what people thought when they
     considered what they'd heard and read grand jury testimonies and read
     302s and decided what to disclose with regard to Rocky -- I don't
     know [sic] process they went through. I don't know who did it.
                        *   *   *
Q    And was it ever discussed whether or not to provide that information
     to the defense?
A    Not by me. I wasn't party to any discussion and wasn't aware of any
     discussion.
                        *   *   *
Q    Well, if -- if, in your view, the issue is in equipoise, isn't it? It could go
     this way. It could go that way. Aren't you obliged to let somebody else
     make that judgment?
A    Yes, somebody else did, not me.

Q    No, no, no, no. I mean like the defense or the court. I don't know if I
     have to disclose this or not, you know? You could argue disclosure.
     You could argue nondisclosure.
A    I think that's a good –

Q    I'm obligated to do something about that. Am I not?

148

A       I think that's a good practice, but someone could also take that
        information and do research and decide that I don't have an obligation
        to disclose it. I didn't go through that analysis.

Deposition of J. Goeke, dated Jan. 8, 2010, at 93-96, 96-97 & 104-105.

Mr. Goeke testified that he did not think about whether Mr. Williams
statements were exculpatory information which was required to be disclosed to the
defense, and that he now realized it should have been disclosed:

MR. SCHUELKE:           But you had some questions.
MR. MENCHEL:            I did. I just want the record to be clear about this.
(attorney for Mr. Goeke) At the time, and I'm talking about in August and
                        September of 2008, did you consciously go through
                        the exercise of thinking about whether or not there
                        were portions of Mr. Williams' testimony that
                        ought to be disclosed one way or the other?
THE WITNESS:            No.

MR. MENCHEL:  Okay, and so the discussion that we're having now wasn't
              one that you -- about whether or not this is arguably
              Brady or not arguably Brady with respect to Mr.
              Williams' mental impression. Was that something that
              you undertook to think about at the time one way or the
              other?
THE WITNESS:  No, absolutely not.

MR. MENCHEL:  Okay. That's all I wanted to ask. Can you take a break
              because --
MR. SHIELDS:  Sure. Off the record.
(A brief recess was taken.)
MR. SHIELDS:  Back on the record. You had a followup, Mr. Menchel?

MR. MENCHEL:  Yeah. Just going through the same subject about your
              notes and the information regarding Mr. Williams'
              statements to you. Looking at these notes today, do you
              think you should have disclosed the areas that Mr.

>                   Schuelke and Mr. Shields have brought out to the
>                   defense?
> THE WITNESS:      Yes, I do.

BY MR. SCHUELKE:

Q      So I take -- I take it from Mr. Menchel's questions, that on[e] and the
       preceding one, that if that information was required to be disclosed
       and if you did not disclose it, it was not intentional on your part.

A      Yes, that's right. Absolutely.

*Id*. at 107-109.

c.     Mr. Goeke and/or Mr. Bottini dictate a 302 to Agent Joy which omits
       the *Brady* information provided by Mr. Williams

On the pages immediately following Mr. Bottini's and Mr. Goeke's notes of
Mr. Williams's statements that VECO employees' time was to be added by Mr.
Allen to the Christensen Builders' bills, there are notes of two questions put to Mr.
Williams about what he told Senator Stevens and Catherine Stevens regarding the
billing, and his answers:

Mr. Bottini's notes:
                * – No conversations w/ TS or CAS
                    re: whether VECO stuff was added
                    into Augie's bill -
                              *   *   *
                – No conversations w/ TS or CAS
                    re: does this cover everything?? - /
                       \ No

Notes of J. Bottini, dated August 22, 2008, (at CRM057317);

Mr. Goeke's notes:
                Any conversations with:
                       TS

150

<blockquote>
CAS
that bills were all inclusive?
- <u>NO</u>
</blockquote>

<blockquote>
Notes of J. Goeke, dated August 22, 2008 (emphasis in original)(at DOJ Bates no. CRM057195).
</blockquote>

*see also* Deposition of J. Bottini, Dec. 16, 2010, at 201 (Mr. Bottini read his notes into the record); Deposition of J. Goeke, Jan. 8, 2010, at 119-120 (Mr. Goeke read his notes into the record).

Those two items of information in Mr. Bottini's and Mr. Goeke's notes, and only those two items, were reported in a two-sentence 302 of that interview that was dictated the same day to Agent Joy:

<blockquote>
ROBERT BURNETTE WILLIAMS, a.k.a. ROCKY WILLIAMS, born August 15, 1950, social security account number 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, home address 1200 W. Dimond Boulevard, Space 203, Anchorage, Alaska, home telephone 907-522-3812, cellular telephone 907-244-6016, was interviewed at the United States Attorney's Office in Anchorage, Alaska. Present during the interview was Assistant United States Attorney's Joseph Bottini and James Goeke. After being advised of the identity of the interviewing agent and the nature of the interview, WILLIAMS provided the following information:
</blockquote>

<blockquote>
WILLIAMS advised he never had any conversations with TED STEVENS or CATHERINE STEVENS in which WILLIAMS made any representations that VECO expenses were placed on CHRISTIANSON [sic] BUILDERS invoices. WILLIAMS further stated that neither TED STEVENS nor CATHERINE STEVENS ever asked WILLIAMS whether any of the VECO expenses, labor or materials, were included in the CHRISTIANSON [sic] bills.
</blockquote>

FBI SA Chad Joy's 302 of interview of R. Williams on August 22, 2008, date of transcription, Aug. 23, 2008 (DOJ Bates no. CRM036413).[16]

When Agent Joy was interviewed by the O'Brien Team, he stated that he did not recall that any 302s were written for the trial preparation interviews of Mr. Williams or that he provided any exculpatory information:

> During the prep sessions in Alaska, it was Joy's belief that the prep sessions went well with Williams. Joy does not recall any specifics, but he remembers one instance that after one of the prep sessions, one of the attorney's expressed a concern that Williams was a supporter of Ted and that Williams liked him. Joy could not remember if it was Bottini or Goeke. Joy does not recall any exculpatory evidence that became apparent during the Alaska trial prep sessions with Williams. Joy indicated that no FD-302's were completed during any of the trial prep sessions with Williams in Alaska. Generally, the prosecutor would tell him to write down a key part if it came up during the interview. Joy does not recall doing any FD-302's on Williams.

FBI SA Brian Fazenbaker's 302 of interview of Agent C. Joy on Feb. 21, 2009, at 9 (DOJ Bates nos. CRM000621-641).

---

[16]The prosecutors never provided this 302 to Williams & Connolly, despite Judge Sullivan's Order on Oct. 2, 2008 which directed them forthwith to provide the defense with unredacted copies of all 302s, MOIs and grand jury testimony in the case, and despite the fact that this 302 was circulated that same day among Mr. Bottini, Mr. Goeke, Mr. E. Sullivan and Agent Kepner. *See* Email from S. Latcovich, Williams & Connolly, dated March 30, 2010, to W. Shields, Janis Schuelke & Wechsler ("I can confirm that we never received a 302 for an interview of Rocky Williams that was conducted on August 22, 2008 and transcribed on August 23, 2008."); *Stevens*, Trial Transcript, Oct. 2, 2008 A.M., at 19 & 20 and Oct. 2, 2008 P.M., at 51-52 (Orders); Email from Agent Kepner, dated Oct. 2, 2008, to Mr. E. Sullivan and Mr. Goeke, Subject: "FW: PDF version of latest Rocky Williams 302", Attachment: "RW 8 22 08" (no message) and email from Mr. Goeke, dated Oct. 2, 2008, to Mr. Bottini, Subject: "FW: PDF version of latest Rocky Williams 302", Attachment: "RW 8 22 08" (no message) (DOJ Bates nos. CRM084589-590). Mr. Bottini and Mr. Goeke testified that they did not know if this 302 was provided to Williams & Connolly. *See* Deposition of J. Bottini, Dec. 16, 2009, at 224; Deposition of J. Goeke, Jan. 6, 2010, at 172.

Agent Joy testified in this investigation that he was directed by Mr. Goeke and/or Mr. Bottini to write the 302 described above, which was dictated to him by Mr. Goeke and/or Mr. Bottini:

Q     Can you identify this document?
A     Yes. It's an e-mail to myself.

Q     And can you describe the circumstances under which you sent this e-mail to yourself?
A     I was directed to write a 302 that had those two points in it, after a prep session with Mr. Williams.

Q     Directed by whom?
A     Either Mr. Bottini, Mr. Goeke, or both.

Q     And when did the prep session occur?
A     I believe it was that same day, 8-22-08.

Q     Which is the date on this e-mail?
A     Yes.

BY MR. SCHUELKE:
Q     But why did you e-mail this to yourself?
A     I can't say with certainty; however, I believe I didn't have my notepad, and so I had to document it somehow, so I wouldn't forget.

Q     So you typed it into your BlackBerry?
A     Yes.

BY MR. SHIELDS:
Q     E-mailing it to you, so then you could then work on your computer with your e-mail?
A     Yes. So I could copy and paste it into a 302 format.

Q     And this was a prep session with Mr. Williams?
A     Yes.

Q     And why was a 302 created, then, if the general practice was, as you described, that 302s were not written for prep sessions?

A     Because I was directed to.

Q     Well, why?

A     Whoever -- which we covered -- directed me to do that said those two points needed to be documented in the 302.

Q     Memorialized?

A     Correct.

Q     And this was the product of a prep session with Rocky Williams?

A     Yes.

Q     On that date, August 22?

A     My best recollection, yes.

Q     Do you remember how long that prep session lasted?

A     No.

Q     Do you remember where it occurred?

A     I believe it was the U.S. Attorneys Office.

BY MR. SCHUELKE:

Q     In Anchorage?

A     Yes.

BY MR. SHIELDS:

Q     And the language in this Exhibit 6, this e-mail to yourself that you sent from your BlackBerry, was this language dictated to you?

A     Essentially, yes.

Q     By either Mr. Goeke or Mr. Bottini?

A     Yes. Or both.

Q     Or both being present when that occurred?

A     Correct.

154

BY MR. SCHUELKE:
Q    And what do you mean by "Essentially, yes"? The question was, was it
     dictated to you. And your answer was "Essentially, yes."
A    My recollection is that yes, they dictated it, but then I verified it. You
     know, it corresponded to my memory of what he said, that it was
     accurate.

BY MR. SHIELDS:
Q    But he said -- I think there are two sentences in this e-mail.
A    Yes.

Q    Mr. Williams said more than two sentences at this interview?
A    Yes.

Q    He said a lot more than two sentences, didn't he?
A    I don't have a specific recollection of the, you know, the details. But I
     believe so.

Q    But you took no notes?
A    Not that I'm aware of.

BY MR. SCHUELKE:
Q    Why would that be?
A    Like I said, as to why I typed this, I don't believe I had my notepad.
                              *   *   *
Q    Isn't the short and altogether accurate answer that you put in the 302
     just what the prosecutors told you to?
A    Correct.

Q    And no more?
A    Correct.

Deposition of Agent Joy, March 29, 2010, at 63-67 & 106.[17]

_____

[17]At the time of his deposition, Mr. Joy was no longer an FBI agent. He left the FBI on
Jan. 2, 2010. *Id*. at 11.

The next day, Agent Joy emailed the 302 to Mr. Bottini, Mr. Goeke and the other prosecutors on the trial team, with the subject line "Important Rocky Williams Statement". Email from Agent Joy, dated Aug. 23, 2008, to E. Sullivan, Agent Kepner, B. Morris, J. Goeke, J. Bottini and N. Marsh (DOJ Bates nos. CRM036412-413). At Agent Joy's request, a paralegal emailed the 302 to the prosecutors again on August 25, 2008. *See* Email from K. Walker to J. Bottini, J. Goeke, N. Marsh, E. Sullivan, B. Morris, Agent Kepner and Agent Joy, dated Aug. 25, 2008, "Subject: PDF version of latest Rocky Williams 302" ("Chad wanted me to forward this PDF version to you.")(DOJ Bates no. CRM079345).

Mr. Goeke testified that he told Agent Joy to write a 302 containing Mr. Williams's statement that he did not tell Senator Stevens or Catherine Stevens that VECO employees' time had been added to the Christensen Builders' bills. He did not know why Mr. Williams's other statements, that his understanding was that VECO employees' time was supposed to be added to the Christensen Builders' bills by Mr. Allen, were not included in the 302:

> Q    And we'll get to it in a minute. A 302 was written of this interview, correct?
> A    I think so, yeah. I think this is the interview, yeah.
>
> Q    And we'll see the 302 in a minute and I'm not trying to test your memory. If you need to look at it to answer the question, just say so. Was any of this information [about Mr. Williams's understanding of what was to be added to the Christensen Builders' bills] included in the 302?
> A    I don't believe so.
>
> Q    Why not?
> A    I don't know why not.
>
> Q    Well, you told Agent Joy what to put in the 302, didn't you?
> A    I told -- made a -- my recollections, I made a general statement, "Can you please put that concept in a 302 because I don't remember him saying that before."

156

Q       When you say, "That concept," it's not this concept that the VECO time would be added to the Christensen bill?

A       No the concept that he'd had a discussion with -- that he had no discussion with Ted and Catherine that led him -- led them -- he did not tell them all the VECO time was included in the Christensen bill on this invoice.

Deposition of J. Goeke, Jan. 8, 2010, at 111-112.

Mr. Goeke explained that Mr. Williams's statement, that he did not tell Senator or Mrs. Stevens that VECO employees' time had been added to the Christensen Builders' bills, was new information, and that his other statement, about adding VECO employees' time to the Christensen Builders' bills, was information which he thought he had heard before:

Q       And did you tell [Agent Joy] to only include that information [that Mr. Williams did not tell Senator and Mrs. Stevens that VECO employees' time was to be added to the Christensen bills] in the 302?

A       No, I said, "That -- that general topic is something I've not heard before." The other stuff I thought I had heard before or believed his testimony was going to be around those issues before. You know, his impression, I thought we'd heard that before.

Q       Who's we?

A       The government.

Q       Who's the government?

A       The trial team, the agents.

Q       Well, you -- you're saying we heard it before. I want -- I'm trying to find out who heard this before.

A       No, I had -- I had thought. I had an impression in my head that this was not new information.

Q       Is it -- is that information about Rocky Williams' understanding that the VECO time and expenses would be added to Christensen bills in any other document that you've seen?

157

A      I don't know if it --

Q      During the trial or since?
A      I don't believe so.

Q      So where did you get that impression from?
A      From my understanding of what was represented to me his testimony
       or expected testimony was going to be and from my recollection of the
       grand jury testimony. I could be mistaken in that, but that was -- the
       mental impression I had was that none of that stuff was new
       information.

Q      I'm trying to find out where you got that impression from.
A      I don't know where I got that impression from.

Q      Did someone tell you that?
A      It's possible.

Q      Do you know who?
A      No, I don't know who.

Q      And do you think that information about his belief that the time would
       be added to the Christensen bills is in his grand jury testimony?
A      I don't know.

                         *   *   *

Q      So you don't recall having told him what to put in it, having him do a
       draft and you approving the draft?
A      I recall asking him to do a 302 about the general topic of Rocky's
       recollections of his discussions with Ted and Catherine.
       And to be clear, the reason I was focused on that was because that's
       the part that I thought was new. The other stuff I didn't think -- I
       thought it was stuff we'd heard before existed elsewhere. If I had
       thought that stuff was new, I'd have said, "Do a 302, the whole thing."

*Id*. at 112-114 & 123.

158

*Compare* FBI 302 of Interview of J. Goeke on Feb. 24, 2009, at 7 ("GOEKE did not recall WILLIAMS really having any exculpatory evidence, but it was possible. . . . GOEKE did recall that during one of the trial preparation sessions in Alaska WILLIAMS had provided some new information. WILLIAMS had answered that he never stated to STEVENS that he worked for another contractor only that he was a VECO employee. GOEKE directed CHAD to memorialize this as WILLIAMS had not previously mentioned it.") (DOJ Bates no. CRM000697-708).

Our investigation found no evidence that Mr. Williams told any prosecutor or agent at any time prior to August 20, 2008 that VECO employees' time for work on Senator Stevens's home was supposed to be added by Mr. Allen/VECO to Christensen Builders invoices.[18]

Mr. Goeke testified that he wanted the 302 for use in impeaching Mr. Williams at trial:

Q    No, but you did elicit from [Mr. Williams], first, his practice and his understanding about the VECO time going into the Christensen Builders invoices?

A    Someone at the interview did, yes.

Q    Someone at the interview did and you faithfully recorded it in your notes.

A    Mm-hmm.

Q    Then you ascertained from him that he had never said as much to either of the Stevenses and it's that latter part only that he had never

---

[18] We reviewed all available documents related to statements and interviews of Mr. Williams, including emails by and between the prosecutors and agents during the period from January 2008 through April 2009, FBI 302s of interviews on Sept. 14, 2006 (DOJ Bates nos. CRM006607-09), Sept. 28, 2006 (DOJ Bates nos. CRM006610-16) and April 24, 2007 (DOJ Bates nos. CRM00660), an IRS MOI of an interview on Sept. 1, 2006 (DOJ Bates nos. CRM014080-086), a file containing Agent Joy's notes of various interviews and related documents (DOJ Bates nos. 006868-6919), prosecutors' notes of interviews on Oct. 26, 2006 and Nov. 6, 2006 (DOJ Bates nos. CRM58643-690), and the transcript of Mr. Williams's grand jury testimony on Nov. 7, 2006 (DOJ Bates nos. CRM005713-5789).

said as much to the Stevenses that you wanted in the 302 and that
appears in the 302.

A    Yeah, that's the part that I thought was new. And that's the part that if
we heard contrary testimony in the stand, I wanted to make sure there
was some memorialization of it somewhere so that you could -- he
could be impeached with his own statement. If I had thought that any
of these --

Q    So he could be impeached by it?
A    If he said that, "No, I didn't," and I told him -- I made a representation
of them that the bills were all inclusive. And I told them that.

Q    Oh, so then you mean so the government could impeach him in case
his story changed. Is that what you're saying?
A    Yeah, because he just said that I'm gonna go meet with the defense and
there's, you know, the way Alaska is, and there's a lot of witnesses
who expressed great fear of the power and reputation of the senator.
So that was always a consideration. At least in my mind.
That was always, you know, they tell the grand jury one thing, but
what would happen if, when they're looking across and there's a
senator there -- that's why they're all put in the grand jury.

Deposition of J. Goeke, Jan. 8, 2010, at 125-126.

    Mr. Bottini testified that he did not ask Agent Joy to write a 302 or dictate its
contents, that he did not know if Mr. Goeke told Agent Joy what to write in the
302, and that he did not think that Agent Joy decided on "his own initiative" to
write a 302 that contained only the two statements made by Mr. Williams during
the interview that were important to the government's case:

Q    So this [interview of Mr. Williams on Aug. 22, 2008] is a prep session.
So no 302 was written?
A    I don't think a 302 was generated for this.
                            *   *   *
BY MR. SCHUELKE:
Q    So your recollection expressed a moment ago that there was no 302
prepared of that interview was apparently incorrect.

A     It's incorrect. There obviously was one.

BY MR. SHIELDS:
Q     It's a pretty short 302, isn't it?
A     Relatively speaking, it is, yes.

Q     Two sentences, really.
A     It appears to be.

Q     Why is that?
A     I don't know. I didn't ask Chad to write this up.

Q     Who did?
A     I don't know.

Q     Do you know why he wrote that interview up by summarizing only
      those two statements?
A     I don't.

Q     Was he told to only write those two statements? That is, and the
      statements in the 302 are, "Williams advised he never had any
      conversations with Ted Stevens or Catherine Stevens in which
      Williams made any representation that VECO expenses were placed
      on Christiansen Builders invoices. Williams further stated that neither
      Ted Stevens nor Catherine Stevens ever asked Williams whether any
      of the VECO expenses, labor or materials, were included in the
      Christiansen bills."
      There was a lot more said during that meeting, wasn't there?
A     There was.

Q     Why isn't it in this 302?
A     I haven't got any idea.

Q     Did you dictate this 302 to Agent Joy?
A     I did not.

Q     Did Mr. Goeke dictate this email to -- this 302 to Mr. Joy?

161

A    Not to my knowledge.

Q    Is this the way Mr. Joy usually writes a 302?
A    I don't know that I have seen many Chad Joy 302s. I think --

Q    Have you ever seen any Chad Joy 302s?
A    Oh, I must have, yes, yes. I'm sure he wrote some up when he, you know, interviewed Dave Anderson.

Q    Is he usually so economical in his speech?
A    I don't know that I can say, one way or the other. But I would agree that this 302 here does not cover the entirety of the interview.

Q    Right. Everything we just spent the last half-hour talking about here, with a small exception, is not in this 302, right?
A    I think that's fair.

Q    There is nothing here about Rocky's assumption. There is nothing here about adding VECO time into Christiansen bills. There is nothing about the original discussion. Isn't that correct?
A    That's true.

Q    Which is reflected in your notes.
A    Correct.

Q    And reflected in Mr. Goeke's notes.
A    Correct.

Q    How is it that none of that information is in this 302?
A    I don't know.

BY MR. SCHUELKE:
Q    If you will look at the page 057317 of your notes of this interview, which is Bottini Exhibit No.5 --
A    I'm sorry, 317?

Q    317 --

162

MR. SHIELDS: Yes.

MR. SCHUELKE: The top of the page.

MR. SHIELDS: The one with the asterisk.

MR. SCHUELKE: With the asterisk.

THE WITNESS: Right.

BY MR. SCHUELKE:

Q    It appears that the first sentence in Joy's 302 is that very point, correct?

A    That would appear to be correct.

Q    And if you look at page 195 of Mr. Goeke's notes of the same interview, which is Bottini Exhibit No. 14, the 5 lines that appear between the first 2 long dashes on the page --

A    I see that.

Q    -- namely, "Any conversation with TS, CAS, those bills were all inclusive? No," would appear to be the basis for the second sentence in that 302, would it not?

MR. SHIELDS: -- second sentence.

BY MR. SCHUELKE:

Q    And, actually, as Bill points out to me, consistent with the last entry in your own notes on page 317, which read, "No conversations with TS or CAS re does this cover everything. Answer, No."

A    Correct.

BY MR. SHIELDS:

Q    So, someone made a conscious decision to exclude all the other information conveyed by Mr. Williams during this interview, to exclude it from this 302?

A    I don't know that. I mean, you could certainly come to that conclusion --

Q    Well, it's the only --

A    -- because the rest of it is not in there.

163

Q     Isn't it the only conclusion you can draw, Mr. Bottini?

A     I don't know who directed this, or why it was directed to be written this way.

Q     No, but my question is a 302 is supposed to be a summary of the interview. Not verbatim, sum and substance. There was a lot of sum and substance in your notes and Mr. Goeke's notes that didn't get into this 302. And that sum and substance all happened to be possibly, in your view -- definitely, in my view -- favorable information, as far as the Stevenses were concerned, Ted and Catherine. That's not in this 302.

A     It's not.

Q     Is that pure accident?

A     I don't know. I don't know how this 302 came to be written, who asked for him to write it, if he did it on his own. I don't know that.

Q     Did you ever see that 302 before today?

A     I must have.

Q     It was emailed to you.

MR. SCHUELKE:     Actually, it was emailed to you in draft form, it appears.

BY MR. SHIELDS:

Q     If you take the third page in this packet, it's to Joy on the very next day. The interview was on Friday, August 22. The very next day he emails this to you and to every other member of the team: Sullivan, Kepner, Morris, Goeke, Bottini, and Marsh. "Important Rocky Williams Statement." So you got it that day?

A     I must have.

Q     And this was a 302 of an interview you had conducted the previous day.

A     Correct.

164

Q    Did you inquire, "Why is this 302 so short?" How come -- did you ask him any questions about the brevity of the 302?

A    I don't remember if I did or didn't. You know, if I would have, I probably wouldn't remember it. I just don't remember this 302 being generated on the heels of that interview.

Q    Do you have any doubt that you got this email?

A    I don't. I mean, I have no reason to believe that that didn't hit my in-box.

Q    And it has an attention-grabbing subject line, an important Rocky Williams statement.

A    I see that.

Q    What made it important?

A    I don't know, other than what the content of the 302 is, which reports those 2 pieces of the interview.

Q    Oh –

BY MR. SCHUELKE:

Q    Mr. Bottini, I believe you testified, when we were discussing the interview with the benefit of your notes and those of Mr. Goeke, that the 2 points captured in that 302 were important to the government's case, because it didn't matter that Rocky Williams was making assumptions. The important thing, I think you told us, in essence, was that he never said any such thing to Ted or Catherine Stevens. Right?

A    Well, I mean, I think we did conclude that that was important, because he never provided any notice to them that this is what was happening, that his assumption was –

                              *   *   *

BY MR. SCHUELKE:

Q    So, in a nutshell, the only thing that appears in this 302 is what was important to the government's case from this interview?

A    That was an important part, yes, for the government.

Q    And that's the only --

A    And that's the only part that's in that 302.

165

Q    Do you suppose that it was Chad Joy, of his own initiative, who
     decided to draft a 302 which captured only 2 statements that you
     thought were important to the government's case?
A    I wouldn't think that Chad would do that on his own initiative.

Q    So that leaves two of you.
A    Or, you know -- I can't remember if the PIN guys were on the phone
     for this, or if we had reported it to them.
     I look at the first couple of pages here, and Chad is framing the
     statements in the 302 in the form of an email. But I do not see who
     that is going to, or –

BY MR. SHIELDS:
Q    What are you referring to, Mr. --
A    I'm sorry, the very first page, 006937. And the second page. Well, the
     second page looks like an email to himself.

Q    I think that's what they both are.
MR. SCHUELKE:       Well, I can tell you what I believe to have
                    transpired. And see if this might refresh your
                    recollection.
THE WITNESS:        Sure.

MR. SCHUELKE:       You and/or Mr. Goeke essentially dictated this 302
                    to him. He typed it right into his Blackberry, and he
                    forwarded a draft to you to make sure he got it
                    right. Then he put it in the form of a 302.

THE WITNESS:        I don't remember that. I don't think I directed Chad
                    to create this. I would remember that.

BY MR. SHIELDS:
Q    Did Goeke?
A    I don't know if Jim did or not, to be honest with you.
                         *   *   *
MR. WAINSTEIN:       Can I take a crack at this?
(attorney for Mr. Bottini)

                              166

MR. SHIELDS:          Sure.

MR. WAINSTEIN:      As a predicate, did you turn over 302s in this case to the defense?

THE WITNESS:        No.

MR. WAINSTEIN:      So, writing a 302 a certain way would not -- one would not assume that that was -- that the purpose for writing that -- crafting the 302 that way was to avoid disclosing other material -- keeping that other material out of that 302, which would then go to the defense, because you didn't disclose the 302s to the defense at all.

THE WITNESS:        Right.

MR. SCHUELKE:       Well, I will follow up on that predicate.

MR. WAINSTEIN:      Okay, but can I go through?

MR. SHIELDS:         No, but it's not -- listen, guys. We're not here to hear you two testify.

MR. WAINSTEIN:      I understand. But you're hitting my guy with stuff he hasn't thought about in a while, and I just want to make it clear, I just want to ask a few things here.

You received this email, as you all pointed out, from Ed Sullivan. And the focus of it is whether "To further insulate TS, CAS will likely testify that Rocky told her VECO costs were rolled into the large Christiansen bills," correct?

THE WITNESS:        Correct.

MR. WAINSTEIN:      Now, is it accurate to say that, had Rocky told Catherine that all the charges would be wrapped in, and they will have paid all those, that would have been quite damaging to the government's case?

THE WITNESS:        Correct.

167

MR. WAINSTEIN:    Is it fair to say that you would have taken note of that issue, and that that might well explain why you had an asterisk next to that juncture of your notes, where you say -- where Rocky says he did not talk to Ted or Catherine about that?

THE WITNESS:    That is true.

MR. WAINSTEIN:    Okay. In terms of -- sorry?

MR. SHIELDS:    No, go ahead. Sorry.

MR. WAINSTEIN:    You're saying you don't know who directed Chad to write that 302?

THE WITNESS:    I don't.

MR. WAINSTEIN:    But is it possible that Chad also recognized the importance of that particular issue, based in part on the fact that you received this email from Ed Sullivan and you queried Mr. Williams about this specific issue?

THE WITNESS:    I think it's possible.

MR. SCHUELKE:    It's possible that tomorrow's rainwater will be beer, and we can all get drunk for free.

MR. SHIELDS:    Yes. I think the accent that Mr. Bottini just gave to the word "possible" -- the follow-on that you admitted was possible, but extremely unlikely. Is that correct?

THE WITNESS:    I -- you know, I think that's -- I just --

BY MR. SHIELDS:

Q    Could you answer my question? Possible, but unlikely?

A    I think that's right.

MR. WAINSTEIN:    What's likely?

THE WITNESS:    I think it's unlikely that Chad did this on his own initiative. I think it's possible, but –

MR. WAINSTEIN:     Well, see, I want to make sure you have the
                   pronouns right. That's a different question than you
                   got.

MR. SCHUELKE:      Now, as to Mr. Wainstein's first point, it's true that
                   if you're not turning over 302s, from the defense
                   perspective, it doesn't matter what's in the 302,
                   unless the 302 includes exculpatory information,
                   which then you're required to turn over.
                   Correct?
THE WITNESS:       Or provide the information in some fashion.

MR. SCHUELKE:      Or disclose the information in some fashion.
THE WITNESS:       Right, right.

*Id*. at 206, 208-215 & 217-219, 220-224.


August 31:   Mr. Williams reiterates that VECO expenses were supposed to
             be included in Christensen Builders' bills; No 302 is written

On Aug. 31, 2008, Mr. Bottini and Mr. Goeke interviewed Mr. Williams
again and he reiterated his understanding that his and Mr. Anderson's time was to
be included in the Christensen Builders' bills sent to Senator Stevens:

CB [Christensen Builders] invoices
Augie's invoices
Rocky reviewed them
    \Assumed that my time/Dave's time added to it
    - Don't know whether that happened or nor. -
    \ Never saw them after I turned them in.
                        * * *
Rocky would pick the invoices up 1/month - @ Augie's office
        \ Discuss what was coming up
        \ Would bring them to VECO to either BA or
        leave w/Secty, etc.

169

Notes of J. Bottini, dated Aug. 31, 2008 (DOJ Bates nos. CRM057324-
057349, at CRM057327 & 057329).

*See also* Deposition of J. Bottini, Dec. 16, 2009, at 252-255; email from J. Bottini,
dated Aug. 31, 2008, to N. Marsh and E. Sullivan, Subject: "Rocky" ("No big
issues with Rocky yet but he is not looking good healthwise-worse than last
week.") (DOJ Bates no. CRM079807).

Mr. Bottini's notes include one to himself:

NOTHING ON THESE [Christensen Builders invoices] - SHOWS THAT
ROCKY OR DAVE'S TIME ACCOUNTED FOR, ETC.

Notes of J. Bottini, dated August 31, 2008, (DOJ Bates nos. CRM057324-
057349, at CRM057337).

*See also* Deposition of J. Bottini, Dec. 16, 2009, at 255-256.

Mr. Goeke's notes of this interview contain no reference to Mr. Williams's
statements about adding VECO employees' time to the Christensen Builders' bills.
He took only four pages of notes, compared with Mr. Bottini's 26 pages, and he
might not have been present for the entire interview. *See* Deposition of J. Bottini,
Dec. 16, 2010, at 160 & 166.  Agent Joy did not recall the interview (Deposition of
Agent Joy, March 29, 2010, at 32) and had no notes, other than a one-line entry,
"RW 8/31/08 11 am", on a page containing his notes of the August 20-interview.
*See* Notes of Agent C. Joy, dated Aug. 20, 2008 (DOJ Bates no. CRM006871).

2.      Prosecutors Anticipated since April 2007, that Senator Stevens's
        Defense Would Be that He and His Wife Believed that VECO's Costs
        Were Included in the Christensen Builders' Bills

The indictment alleged that Senator Stevens knew that VECO's costs were
not included in the Christensen Builders' bills and were never paid:

Beginning in or about May 1999, and continuing to in or about August,
2007, . . . STEVENS . . . knowingly and willfully engaged in a scheme to

170

conceal a material fact, that is, his continuing receipt of hundreds of
thousands of dollars' worth of things of value . . . provided by ALLEN and
VECO . . . includ[ing], among other things: home improvements to the
Girdwood Residence . . .

* * *

In or about the fall of 2000, VECO and STEVENS hired [Christensen
Builders] to perform a portion of the renovations on the Girdwood
Residence.  [Christensen Builders'] invoices were sent to STEVENS, which
STEVENS paid by personal check.  [Christensen Builders'] invoices,
however, did not include the labor costs of VECO employees and contractors
and did not include the costs of materials provided by VECO.

STEVENS knew that VECO employees and contractors performed
significant portions of the Girdwood Residence renovations during calendar
years 2000 and 2001.  Nonetheless, STEVENS never paid or reimbursed
VECO at any time for the cost of materials provided and labor performed by
VECO and its employees and contractors on the Girdwood Residence
renovations during 2000 or 2001.

* * *

STEVENS knew that VECO employees and contractors performed
significant renovations tasks on the Girdwood Residence renovations during
calendar year 2002.  Nonetheless, STEVENS never paid or reimbursed
VECO at any time for the cost of materials provided and labor performed by
VECO and its employees on the Girdwood Residence during calendar year
2002.

* * *

STEVENS knew that VECO employees and contractors performed tasks at
his request on the Girdwood Residence during calendar years 2004 and
2005.  STEVENS, however, never paid or reimbursed VECO at any time for
the cost of materials provided and labor performed by VECO and its
employees at the Girdwood Residence during those times.

*Stevens*, Indictment, filed July 29, 2008, ¶¶ 15, 21, 25, 27 & 30.

Long before the indictment was filed, Mr. Bottini, Mr. Goeke and the other
prosecutors had repeatedly concluded that Senator Stevens's likely defense would

171

be that he and his wife believed that VECO costs were included in the Christensen Builders' bills, which they paid in full.

The prosecutors identified that defense in prosecution memos at least as early as April, 2007, 15 months before indictment:

> STEVENS may claim that, because of his busy schedule, he had asked Catherine Stevens to handle all of the expenses relating to the home renovation and, as such, he thought the VECO charges had been paid by her. This defense, if asserted, is meritless in our view. Although Catherine Stevens was directly involved with invoices from CBI [Christensen Builders] and various vendors – and she endorsed all of the checks to these entities – it is incredible for STEVENS to claim that he was unaware that VECO's costs had gone unpaid or that these costs were somehow rolled into CBI's invoices– particularly given the massive amounts at issue here.

> Draft Prosecution Memorandum, dated April 30, 2007, Legal Analysis And Potential Defenses, at 46-47 (DOJ Bates nos. CRM096333-394).

Every prosecution memorandum written in 2008 identified that defense. *See* Prosecution Memo, dated March 14, 2008, "VIII. Potential Defenses, A. STEVENS Had No Idea That He Didn't Pay for VECO's Work", at 58 ("First, STEVENS may claim that he believed that he paid for VECO's work at the Girdwood Residence. As described above, many of Christensen Builders' invoices were sent to STEVENS by VECO employees. Although those invoices were specifically identified as Christensen invoices, STEVENS may nonetheless assert that he believed that, since the bills were coming from VECO, they contained billing for VECO's work as well.") (DOJ Bates no. CRM015495); Prosecution Memo, dated May 15, 2008, "IX. Potential Defenses, A. STEVENS Believed that He Paid for VECO's Work on the Chalet", at 66 (same) (DOJ Bates no. CRM017440); Prosecution Memo, dated May 21, 2008, "IX. Potential Defenses, A. STEVENS Believed that He Paid for VECO's Work on the Chalet", at 68 (same) (DOJ Bates no. CRM017922).

The last two prosecution memos written before indictment added that Senator Stevens's lawyers had produced documents which supported that defense and which referred to Mr. Williams:

STEVENS has produced one document that arguably could be construed to provide some support to this defense. In a January 13, 2001, email to STEVENS, Bob Persons referenced Rocky [Williams] and BILL ALLEN being involved in some of the billing associated with the renovation (all formatting and errors in original):

> I spoke to rocky by phone and he iis (sic) trying to round up special paint and a new wood stove that cas wants. the biggest holdup is materials for specialized portions of the construction. we have $30,000 in bills that rocky is trying to get bill [ALLEN] to look at and o.k. there is some concern on rocky's part that we have already paid some of the plumbing bill.

We believe that, at trial, STEVENS will attempt to rely on this email as evidence that he believed that VECO's costs were being incorporated into the bills that were being prepared by Christensen Builders – as evidenced by the fact that ALLEN was reviewing the bills before they were being sent to STEVENS.

Prosecution Memo, dated May 21, 2008, *supra*, at 69 (footnote omitted; brackets and parentheses in original)(DOJ Bates no. CRM017923).

*See also* Prosecution Memo, dated May 15, 2008, *supra*, at 67 (same).

In April, 2008, Alice S. Fisher, Assistant Attorney General in charge of the Criminal Division, requested a supplemental memorandum identifying and addressing, *inter alia*, Sen. Stevens's "best arguments at trial". *See* Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, at 1 (DOJ Bates no. CRM016377-395). In response, Mr. Marsh, assisted by Mr. Bottini, Mr. Goeke and Mr. E. Sullivan, drafted a memorandum with a chart of defense "Attacks" and government "Responses" which was attached as Exhibit A. *See* Email from E. Sullivan, dated April 8, 2008, to N. Marsh, J. Bottini and J. Goeke ("The chart looks good. . . . TS will likely contend that he knew VECO worked on the site, thought the VECO costs were rolled into the CB [Christensen Builders] invoices, and thought the $138K covered everything given what the finished work product look like.")(DOJ Bates no. CRM016162); email from J. Bottini, dated April 7, 2008, to N. Marsh and E. Sullivan ("[Chart] [l]ooks very

173

good Nick")(DOJ Bates no. CRM016136); email from N. Marsh, dated April 11, 2008, to E. Sullivan ("Ed – Joe just signed off on the memo. Any comments?") (DOJ Bates no. CRM016372). The memorandum and the chart were distributed to the entire prosecution team. *See* Email from N. Marsh, dated April 11, 2008, to W. Welch, B. Morris, J. Bottini, J. Goeke and E. Sullivan (DOJ Bates no. CRM016374).

The chart showed that Senator Stevens's "primary defense" would be that he and his wife believed that the Christensen Builders' bills covered all the costs of the renovation, including VECO's:

> TS [Ted Stevens] thought he and CAS [Catherine A. Stevens] paid for all the work. We anticipate this to be TS' primary defense. Here, TS will say that CAS was in charge of finances; CAS paid $138K to Christensen; CAS thus thought she paid for everything in connection with the house; and thus neither TS nor CAS knew about VECO's unreimbursed contributions to the home renovation.
>
> Memorandum to Alice S. Fisher, *supra*, Exh. A, "Attacks", at 1 (emphasis in original) (DOJ Bates no. CRM016369).

The memorandum explained that Williams & Connolly had recently produced two handwritten notes from Senator Stevens to Mr. Allen, dated October 6, 2002 and Nov. 8, 2002 (the "Torricelli note" and the "Torricelli notes"), which were attached to the memorandum as Exhibit B and in which Senator Stevens asked Mr. Allen to send him bills for the work done at his home; these notes "will make it difficult for STEVENS to claim that he believed the fall 2002 work [by VECO] was incorporated into Christensen Builders spring 2001 bills." *Id*. at 14-15 (DOJ Bates nos. CRM016390-391). Williams & Connolly produced the two notes to the prosecutors on April 8, 2008, three days before the memorandum was written. *Id*. at 13 (DOJ Bates no. CRM016389).

The last two prosecution memos written before indictment also assessed how the Torricelli note and related documents produced by Williams & Connolly were "both helpful and harmful" to that defense:

174

Taken together, these documents are both helpful and harmful to STEVENS. First, because they acknowledge VECO's work at that time, and because they acknowledge STEVENS' need to pay for the work, the notes will make it difficult for STEVENS to claim that he believed the fall 2002 work was incorporated into Christensen Builders' spring 2001 bills. . . .

Second, we acknowledge that, to some degree, these requests for invoices permit STEVENS to portray himself as someone who truly wanted to comply with the Senate ethics rules.

Prosecution Memorandum, dated May 15, 2008, "IX. Potential Defenses, B. STEVENS Never Received an Invoice for VECO's Work", at 69-70 (DOJ Bates nos. CRM017443-444).

*See also* Prosecution Memorandum, dated May 21, 2008, "IX Potential Defenses, B. STEVENS Never Received an Invoice for VECO's Work", at 71-72 (same) (DOJ Bates nos. CRM048457-458).

On June 24, 2008, little more than a month before indictment, Mr. E. Sullivan emailed, as an attachment, his "draft notes/thoughts for myself that are based on our discussions & some stuff in the pros memo", which included a section addressed to "TS's Fact Based Defenses". Email from E. Sullivan, dated June 24, 2008, to N. Marsh, B. Morris and W. Welch (DOJ Bates nos. CRM018053-058). The first defense identified was: "TS didn't know VECO work unpaid; CAS handled & paid $138K; TS thought VECO work included in CB invoices." DOJ Bates no. CRM018055.

On the same day that Mr. Williams told Mr. Bottini, Mr. Goeke and Agent Joy for the second time in three days that VECO expenses were supposed to be included in Christensen Builders' bills, Mr. E. Sullivan notified them that additional documents recently produced by Williams & Connolly made that defense even more likely and that Mr. Williams would be pressed about those bills on cross-examination. *See* Email from E. Sullivan, dated August 22, 2008, to J. Goeke, J. Bottini, N. Marsh, B. Morris, W. Welch, Agent Kepner, Agent Joy, *et al*. (DOJ Bates no. CRM036198).

When Mr. Williams reiterated information that directly corroborated that defense, a 302 was created which omitted that exculpatory information but which

could be used to impeach Mr. Williams if he testified that he did tell Senator
Stevens and Catherine Stevens that the VECO expenses were included in the
Christensen Builders' bills. *See* Deposition of J. Goeke, Jan. 8, 2010, at 125
("Yeah, that's the part that I thought was new. And that's the part that if we heard
contrary testimony in the stand, I wanted to make sure there was some
memorialization of it somewhere so that you could -- he could be impeached with
his own statement."). Mr. Bottini testified that the important part of the interview
was Mr. Williams's statement that he never told Senator Stevens or Catherine
Stevens that VECO costs were supposed to be added to the Christensen Builders'
bills; only that information, which was helpful to the government, was reported in
the 302. *See* Deposition of J. Bottini, Dec. 16, 2008, at 215 & 216-217.

The exculpatory information provided by Mr. Williams to Mr. Bottini and
Mr. Goeke on August 20, 22 and 31, that VECO expenses were supposed to be
included in the Christensen Builders' bills, was not disclosed in the *Brady* letter
which Mr. Bottini wrote and sent to Williams & Connolly on August 25, or in the
second *Brady* letter that was sent on September 9. That *Brady* information was
never provided to the defense, before, during or after the trial.

Nor was it likely that Senator Stevens's lawyers could discover that
information on their own, and they never did. Mr. Williams had assured Mr.
Bottini and Agent Kepner that he would not speak to the defense attorneys:

> Subject: Rocky report .....
> Hot off the press from MBK [Agent Kepner] .......
> Rocky was served about an hour ago. He did not look good – yellow
> complexion and appeared bloated (has to be from his swissed liver) but alert,
> coherent and cooperative.
> He says that he has not talked to anyone on behalf of the defense or to the
> press and that he has no intention of doing so. He was told that it's up to him
> whether he chooses to so however.

Email from J. Bottini, dated August 7, 2008, to W. Welch, B. Morris, J.
Goeke, N. Marsh and J. Bottini (ellipses in original)(DOJ Bates no.
CRM064609).

*See also* Email from J. Bottini, dated August 15, 2008, to N. Marsh, E. Sullivan, J. Goeke, B. Morris, Agent Joy, Agent Kepner, *et al*. ("We chatted [Mr. Williams] up about TS attorneys may reach out to him.  He says he will probably tell them he doesn't want to talk (I believe him) and promises to let us know if and when they try to make contact.") (DOJ Bates no. CRM006938); *Stevens*, Motion to Dismiss Indictment or For a Mistrial, dated Sept. 28, 2008, at 4 ("Shortly after the indictment in this case, defense counsel contacted Mr. Williams to request an interview. He declined."); Email from B. Morris, dated Sept. 29, 2008, to N. Marsh, E. Sullivan, J. Bottini, J. Goeke, Agent Kepner, Agent Joy, *et al*., ("Earlier, Rocky declined to be interviewed by the defense, but he called the defense on Friday, after he returned to Alaska") (DOJ Bates no. CRM025170).

   3.   On the Eve of Trial, Prosecutors Decide not to Call Mr. Williams as a Witness and He Returns to Alaska for Medical Attention

   a.   Trial Preparation Interviews in Washington, September 2008

        <u>September 20</u>:    Mr. Williams reiterates that VECO expenses were to be included in Christensen Builders' bills

Mr. Williams arrived in Washington on Sept. 15, one week before jury selection began. *See* Travel Agency Itinerary for Robert Williams, dated Sept. 12, 2008 (DOJ Bates no. CRM000511).  At the time, Mr. Marsh was slated to conduct the direct examination of Mr. Williams, but later that week Mr. Williams's direct was assigned to Mr. Bottini. Deposition of J. Bottini, Dec. 16, 2008, at 153.  Mr. Bottini met with Mr. Williams on Saturday, Sept. 20 and took notes of the interview in a typed outline of the direct examination. *See* Rocky Williams Direct Outline, dated Sept. 20, 2008 (DOJ Bates nos. CRM115117-162 (color version)). Mr. Marsh and Agent Joy attended that prep session. *See* Deposition of J. Bottini, Dec. 16, 2009, at 296, 309 & 322; Rocky Williams Direct Outline, dated Sept. 20, 2008 (DOJ Bates no. CRM115138); Affidavit of Mr. Marsh, dated Feb. 24, 2009, at ¶ 5 ("The second time I met with Mr. Williams was mid-to-late September 2008, in PIN's offices . . . with Mr. Bottini and Agent Joy . . . for approximately two hours.").

Mr. Williams reiterated that he reviewed the Christensen Builders' bills and sent them to VECO where, he assumed, his and Mr. Anderson's time was added. *See* Rocky Williams Direct Outline, at 13 ("[Christensen Builders' bills] went to VECO - assumed that my time and Dave's time - added on")(DOJ Bates no. CRM115139); *see also* Deposition of J. Bottini, Dec. 16, 2009, at 299 (Mr. Bottini read his notes on his outline of the direct into the record). According to Mr. Bottini's notes, Mr. Williams was cautioned during that interview that "They will try to get you to say that TS could have assumed that your time and Dave's time - in CB [Christensen Builders'] bills, etc." Rocky Williams Direct Outline, at 19 (DOJ Bates no. CRM115151).  Mr. Bottini could not remember who said that to Mr. Williams. Deposition of J. Bottini, Dec. 16, 2009, at 322-323.

Mr. Marsh testified that he did not remember ever learning that Mr. Williams said anything about his and Mr. Anderson's time being added to the Christensen Builders' bills. Deposition of N. Marsh, Feb. 2, 2010, at 304 & 308. However, in a post-trial affidavit, Mr. Marsh stated that he questioned Mr. Williams about that issue:

> 5. The second time I met with Mr. Williams was in mid-to-late September 2008, in PIN's offices. I met with Mr. Williams, along with Mr. Bottini and Agent Joy. This meeting lasted for approximately two hours, and during the meeting Mr. Bottini asked Mr. Williams a series of questions concerning his involvement with the renovation to Senator Stevens' chalet in Girdwood. I also asked Mr. Williams some questions from time to time.
>
> * * *
>
> 7. Second, I recall Mr. Bottini showing Mr. Williams a copy of an invoice from Christensen Builders that related to Christensen's work on the chalet. I remember asking Mr. Williams whether any reasonable person would think that a Christensen invoice would contain billing charges for Mr. Williams' time. Mr. Williams said no. He explained that he worked for VECO, and that it would not have made sense for a VECO employee's time to have been incorporated into a Christensen bill. I then asked Mr. Williams whether he had any opinion as to whether Senator Stevens could have had such a belief. Mr. Williams told me that he had no doubt that Senator Stevens knew Mr. Williams worked for VECO.

178

9. Fourth, I recall Mr. Bottini asking Mr. Williams a number of other questions about his involvement at the chalet. I do not remember Mr. Williams providing answers to Mr. Bottini's questions that deviated materially, if at all, from Mr. Williams' prior statements to the government, nor do I remember Mr. Williams providing any additional information that I viewed as exculpatory to the charges against Senator Stevens.

10. Fifth, after observing Mr. Williams for approximately two hours, I became more worried about his health, his ability to remain in Washington, D.C. for an extended period, and his ability to function as a trial witness in the Stevens case. Mr. Williams' physical condition had worsened since the time I saw him a few days previously. His abdomen looked to be more distended, and his color was, at least to me, more of a greenish color. Mr. Williams' breathing continued to be labored. I also noticed that, as Mr. Williams answered questions, he frequently needed to stop to catch his breath. His sentences were often punctuated with small belches that smelled strongly, with a smell that I cannot describe further.

11. Sixth, this was my last substantive meeting with Mr. Williams.

Affidavit of N. Marsh, dated Feb. 24, 2009, at ¶¶ 5, 7, 9-11 (DOJ Bates nos. CRM000346-365).

During the interview on Sept. 20, Mr. Williams also stated that he worked on the renovation of Senator Stevens's home "probably 3-4 hrs./day". *See* Rocky Williams Direct Outline, at DOJ Bates no. CRM115140); Deposition of J. Bottini, Dec. 16, 2008, at 308-309. This information contradicted VECO records which Mr. Marsh offered into evidence less than a week later through the testimony of VECO accountant Cheryl Boomershine, and which were admitted as Government Exhibits 1060 (time sheets), 1064 (wage records) and 177 (cost report). *Stevens*, Trial Transcript, Sept. 26, 2008 P.M., at 21, 24-25 & 43-44.

The prosecutors never disclosed to the defense Mr. Williams's statement that he worked on the renovation part-time. On Sunday, Sept. 28, 2008, after the trial had commenced and just after Ms. Boomershine had testified, Williams & Connolly lawyers obtained that information on their own and moved to dismiss the indictment the same day:

Mr. Williams informed defense counsel that he spent nowhere near 8 hours per day, 6-7 days per week, on the Girdwood home renovation project – in direct contrast to the timesheets that the government has placed in evidence to support its central theory that the unpaid cost of the project to Veco was $188,000. This new information gravely undercuts the government's case as described in its opening statement and as presented by government witnesses to date. Yet the government never disclosed this information to defense counsel pursuant to its unquestionable *Brady* obligations. Worse yet, the government has presented evidence at trial that, in light of the information now disclosed to defense counsel by Mr. Williams, can charitably be described as grossly misleading.

* * *

But the government never informed defense counsel of any of it. Instead, government counsel decided not to call Mr. Williams as a trial witness and sent him from D.C. back to Alaska on the first day of trial.

*Stevens*, Motion to Dismiss Indictment or For a Mistrial, dated Sept. 28, 2008, at 1 & 11 (Dkt. No. 103).


September 21:    Mock cross-examination of Mr. Williams

Mr. Goeke conducted a mock cross-examination of Mr. Williams on September 21. Deposition of J. Bottini, Dec. 16, 2008, at 307.  This mock cross-examination became an issue after the trial when, in November 2008, Agent Joy filed a written complaint with the FBI alleging misconduct by Agent Kepner and the prosecutors during the Polar Pen investigation and the trial of Senator Stevens. He alleged *inter alia* that Mr. Marsh devised a "scheme" to send Mr. Williams back to Alaska after his poor performance during the mock cross-examination:

Nick Marsh, DOJ Public Integrity Section, inappropriately created scheme to relocate prosecution witness that was also subpoenaed by defense during trial
a. During the trial of Ted Stevens, prosecutors subpoenaed Robert Williams. Williams was brought to Washington D.C. weeks before the trial for multiple trial preparatory sessions. Williams health was very poor. . . .  After the final preparatory session, which included a mock cross examination, prosecutors

180

decided Williams was not a witness the prosecution wanted to use. Nick
Marsh advised he came up with a great plan to send Williams home because
he was so "concerned" about Williams' health that it would allow prosecutors
to send him back to Alaska, even though Williams was also under a defense
subpoena.

Agent C. Joy Complaint, ¶ 11 (DOJ Bates no. CRM096527).

This allegation contradicted Agent Joy's previous statement, in an affidavit filed
with the Court during the trial, that prosecutors allowed Mr. Williams to return to
Alaska because his "health-related issues warranted medical attention". *See*
Affidavit of Agent C. Joy, dated Sept. 29, 2008, at ¶¶ 6&7 (DOJ Bates nos.
CRM025236-237).

In February, 2009, the O'Brien Team interviewed Agent Joy and the
prosecutors in preparation for responding to pending post-trial motions which were
based in large part on the allegations in his complaint.  Agent Joy stated that the
decision to return Mr. Williams to Alaska was made after Mr. Williams provided
"exculpatory evidence" during the mock cross-examination:

it was [Agent Joy's] opinion that during this session, Williams provided
what he believed was exculpatory evidence. Goeke was performing the role
of a defense attorney asking Williams leading questions as if they were in a
cross-examination session at trial. It was during these leading questions by
Goeke that it was apparent that Williams was going down the path and
answering questions that would be beneficial to the defense. Joy remembers
that the questions were in relation to [sic] and it was apparent that Goeke
was successful leading Williams down the path that would aid the defense.
Joy has no recollection if Goeke had any conversations with Williams at that
time or attempted to rehabilitate him during this mock cross-examination.
After the mock cross-examination, Goeke wrapped up the session and Joy
and Goeke went to speak with Nick Marsh.

*   *   *

Goeke had a negative attitude and expressed to Marsh that the mock
cross-examination portion with Williams did not go well. Joy recalls that he,
Marsh, and Goeke were in the office discussing this. It was Joy's recollection
that Marsh expressed a plan, which was more appropriate than the word

181

"scheme" Joy used to describe his actions in his complaint, to allow Williams to go back to Alaska. Marsh went on to say that he had a great plan because of Williams' health issues and that Williams was missing doctor's appointments, it would be best for him to go on back to Alaska.

> FBI 302 of Interview of Agent Joy, dated Feb. 21, 2009, at 11-12 (DOJ Bates nos. CRM000631-632).

Agent Joy explained why he did not disclose this "plan" in his trial affidavit:

> Joy indicated that he didn't write the affidavit initially and even though it is true about "the plan" to return Williams to Alaska, they wouldn't wanted to have that included it in his affidavit. Joy admitted his affidavit omits a portion of what occurred in regards to Williams' return to Alaska. At the time the affidavit was written, he didn't even consider putting "the plan" in the affidavit. It is Joy's opinion that this matter in regards to Williams bothered him, but his affidavit is still accurate in regards to what was said.

> *Id*. at 14 (DOJ Bates no. CRM000634).

Mr. Marsh also said that Mr. Williams' health became a concern after his poor performance in the mock cross-examination:

> MARSH was not present at WILLIAMS' third trial preparation session. MARSH heard this being described as a mock cross examination . . . MARSH recalled after the third session with WILLIAMS, GOEKE stated that ROCKY looked like shit and after five minutes of cross examination WILLIAMS was all over the place and easily led. MARSH got the impression WILLIAMS was performing badly due to his health problems. MARSH advised after this session, they began discussing WILLIAMS' deteriorating health.

> FBI 302 of Interview of N. Marsh on Feb. 23, 2009, at 6 (DOJ Bates no. CRM000684-696).

Mr. Goeke told the O'Brien Team that, despite the poor mock cross-examination, Mr. Williams remained "a positive government witness" who would not have assisted the defense:

> The mock cross went exactly as GOEKE had anticipated. GOEKE felt WILLIAMS could easily be led and confused. GOEKE felt most of WILLIAMS confusion was due to his physical problems. WILLIAMS physical problems seem to make him very fatigued and he was distracted. GOEKE was always of the opinion WILLIAMS would be called in the governments case in chief. GOEKE felt the cross examination was not that big of an issue considering how favorable his testimony was to the government. GOEKE stated in no way was there any sort of plan to ferry WILLIAMS out of Washington, D.C. so the defense would not have access to him. GOEKE advised this whole scenario seems preposterous considering WILLIAMS is a positive government witness. The investigative team had no worry that WILLIAMS would do anything to assist WILLIAMS and CONNOLLY's defense.
>
> FBI 302 of Interview of J. Goeke on Feb. 24, 2009, at 9 (DOJ Bates no. CRM000697-708).

Mr. Goeke could not recall "WILLIAMS really having any exculpatory evidence, but it was possible". *Id*. at 7 (DOJ Bates no. CRM000703); *see also* FBI 302 of Interview of J. Bottini on Feb. 24, 2009, at 7 ("AUSA Bottini knew he had some exculpatory material that he was going to have to deal within [Mr. Williams's] testimony"). Mr. Goeke described one occasion when he asked Agent Joy to write a 302 of a statement made by Mr. Williams:

> during one of the trial preparation sessions in Alaska WILLIAMS had provided some new information. WILLIAMS had answered that he never stated to STEVENS that he worked for another contractor only that he was a VECO employee. GOEKE directed CHAD to memorialize this as WILLIAMS had not previously mentioned it.
>
> FBI 302 of Interview of J. Goeke on Feb. 24, 2009, at 9 (DOJ Bates no. CRM000697-708).

Mr. Goeke stated that Mr. Williams had told him that "he would agree to an interview with WILLIAMS and CONNOLLY", and that he had "the impression that WILLIAMS was going to talk to the defense shortly." *Id*. at 8 (DOJ Bates no. CRM000697-708).

Mr. Goeke testified in this investigation that Mr. Williams did not do poorly on the mock cross-examination:

Q      And did you do a mock cross of Rocky?
A      I did.

Q      How did he do on the mock cross?
A      He did about as I expected. I crossed him -- the primary thing I crossed him on was, you know, his prior conviction for alcohol -- an alcohol related manslaughter conviction. General stuff about what he did at VECO and what he did at the job site.

Q      Did you conclude that he had done poorly on the mock cross?
A      I did not. I concluded that his health was affecting how he was able to focus and answer questions on the mock cross.

Q      Did you conclude that he could be easily led?
A      Yeah, but that's not a -- I knew that. There's no question he could be easily led. That was not a surprise to me.

Q      Did this -- did you cross him on this subject at all during that mock cross? His understanding with respect to the Christensen bills?
A      I don't recall. I very well could have.

Q      Was his understanding of the VECO time and material being added to the Christensen bills a factor in the decision not to call him as a witness?
A      Absolutely not.

Q      Did it come up at all?
A      Not -- not as a line of discussion about why we should or shouldn't call him as a witness, no. Not that I'm aware of.

184

Q        So this subject -- this information that Rocky provided you on August
         22 was not discussed at all a few weeks later with regard to the
         question of whether or not Rocky would be called as a witness?

A        I'm sure his testimony was discussed as it was of all the witness[es].
         But it wasn't a factor, at all, in whether he should be allowed to go
         back to Alaska and tend to his health.

 BY MR. SCHUELKE:

Q        Yeah, but the question was this particular aspect of what he'd had to
         say. Was that discussed?

A        I don't recall. And if it would have been in my mind, it would have
         been, that's good. Him saying that I -- "I didn't give them an
         impression one way or the other and didn't have any specific
         knowledge as to whether the bills were included or not. That's good
         for the government.["]

Deposition of J. Goeke, Jan. 8, 2010, at 142-144.

Mr. Bottini told the O'Brien Team that Mr. Williams "was a good witness"
for the government and there was "nothing nefarious about sending [him] back to
Alaska". *See* FBI 302 of Interview of J. Bottini on Feb. 24, 2009, at 7 & 10 (DOJ
Bates nos. CRM000608-620).  He said that, during trial preparation sessions in
Washington, Mr. Williams was in poor health, unfocused and "not giving answers
that made much sense". *Id*. at 8.  During the mock cross-examination, Mr. Williams
"wasn't feeling well and could not concentrate." *Id*.

Mr. Bottini testified in this investigation that Mr. Williams' poor
performance in the mock cross-examination was part of the reason that he was sent
back to Alaska, but not the primary reason:

Q              Okay. But four days later, he is out of town.

Mr. Bottini   He left on the 24th [of September 2008].

Q        After doing a bad mock cross. That's where we were. He did a lousy
         mock cross, and he was being led all over the place, wasn't he?

A        I wouldn't say that it was because he had a lousy mock cross. He was
         struggling through some of the direct, too.

185

Q     No, I said he had a bad mock cross, right? Goeke told You [sic], Goeke told O'Brien he was easily led. Morris told O'Brien, "He's easily led." So now you have a witness who, at the drop of a hat, is going to say, "I assumed it was all rolled into Christiansen." He has a bad mock cross, and he is off the witness list.

A     That was part of it. It wasn't the total reason.

Q     But that was part of the reason.

A     It was part of it, yes.

Q     The bad mock cross.

A     The fact that he, yes, was sitting there, not focusing on the questions, easily led. I think that's fair. You know, but it was more than just, you know, "This guy is going to be a disaster on cross examination." I was worried about him on direct, as well.

                              *  *  *

Q     You send him out of town. He's still under your subpoena, he's still under Williams & Connolly's subpoena. Williams & Connolly finds out and files a motion, and you explain that, "He was ill, and that's why we sent him back."

A     Right.

Q     Do you ever tell Sullivan, Judge Sullivan, that part of it was because he was a bad -- he did a lousy mock cross?

A     That wasn't the primary reason for sending the guy home.

Q     No, not the primary reason. I think the only reason you told the court he was sent home was because of his health. I don't think there was ever a statement that, "He also wasn't a good witness for us."

A     Well -- a good witness. The problem was he was not focusing, and was in no condition, physically, to be able to do that. That was my assessment.

Mr. WAINSTEIN:          To what did you attribute his failure to focus?
(attorney for Mr. Bottini)
THE WITNESS:            Me?

                              186

MR. WAINSTEIN:        Yes, what did you think that was the result of?

THE WITNESS:        He was miserable. He was sick, you know, coughing, hacking, sitting there -- it's 90 degrees, sweltering humidity here, and he's got a leather jacket, zipped up to the collar, squirming around in the chair, can't breath. The guy was ill. And that was, in my view, in my assessment, was absolutely affecting his ability to concentrate and focus and, you know –

                                     * * *

Q      -- there is no hint there that he is a bad witness and he is a dangerous witness for you, because the -- he can, in a drop of a hat, testify that, "I believed that all my time was being paid for through Christiansen Brothers (sic)." And that's poison to the government's case.

A      For me it went beyond that. I really thought, you know, he wasn't going to go on the stand until later that week, at the earliest, you know. By that time I may have said, "Mr. Williams, you know, what are you presently doing for a job," and he could have said, "I will have fries with that," you know? I mean, that's what I was concerned about. Not -- I'm using that as a facetious –

Q      An exaggeration, right.

A      -- example, you know.

Q      He was becoming non compos mentis is what you're saying.

A      Yes. And, plus, the guy looked -- I mean, he looked ghoulish. And I don't mean any disrespect to Williams about that. But, you know, to me it was just like, you know, are we going to want to start off our case with this guy, or do we send him back and, you know, get him treated, and bring him back? So -

Deposition of J. Bottini, Dec. 16, 2009, at 326-27, 328-30, 331-32 (parenthetical in original).

187

Mr. Bottini denied that Mr. Williams's understanding, that his and Mr. Anderson's time was to be included in the Christensen Builders' bills, was a factor in the decision to send Mr. Williams back to Alaska. *Id*. at 301-303.

b. Mr. Williams Returned to Alaska and Never Testified at Trial

Controversy arose when the defense learned that Mr. Williams had been sent back to Alaska just as the trial began. Mr. Marsh explained to the Court that Mr. Williams returned to Alaska for medical reasons on September 25, the day opening statements were given, with instructions from the prosecutors to call defense counsel after he got back to Alaska. *Stevens*, Trial Transcript, Sept. 29, 2008 A.M., at 23 ("Mr. Marsh: We specifically told him that once he got back to Alaska he needed to call defense counsel and contact them."). Mr. Williams did so, was interviewed by Williams & Connolly lawyers by phone on Sunday, Sept. 28, and he informed them of other significant exculpatory information which had not been disclosed by the prosecutors. *See Stevens*, Motion to Dismiss Indictment or For a Mistrial, dated Sept. 28, 2008, at 1 ("Among other things, Mr. Williams informed defense counsel that he spent nowhere near 8 hours per day, 6-7 days per week, on the Girdwood home renovation project – in direct contrast to the timesheets that the government has placed in evidence to support its central theory that the unpaid cost of the project to Veco was $188,000.") (Dkt. No. 103).

The defense moved to dismiss the indictment or for a mistrial on the grounds that the prosecutors had intentionally withheld *Brady* information which would have been used by the defense in its opening statement and in the cross-examination of government witnesses who had already left the stand, including VECO accountant Cheryl Boomershine. *Id*. at 2. Ms. Boomershine had "testified about Mr. Williams's billing entries on Veco timesheets, which inaccurately suggest that he worked full days, 6-7 days a week, with substantial overtime, on the Girdwood project." *Id*.

When Mr. Bottini learned of the motion, he told his colleagues that "Rocky has never told us that he did not work anywhere near the hours that VECO clocked for him on the Girdwood project." Email from J. Bottini, dated Sept. 29, 2008, to B. Morris, N. Marsh, J. Goeke, E. Sullivan, W. Welch, Agent Joy, *et al*. (DOJ Bates no. CRM025173). However, Mr. Bottini's notes of his interview of Mr. Williams

188

on September 20 reflect that Mr. Williams stated that he worked on the renovation
"probably 3-4 hrs./day". *See* Rocky Williams Direct Outline, at DOJ Bates no.
CRM057459/color version CRM115140).

Nevertheless, Mr. Bottini drafted parts of the government's response to the
motion, including the assertion that "Furthermore, Mr. Williams, during a recent
interview, estimated to the government that he spent approximately 2,000 hours
working on defendant's Girdwood residence." Government's Opposition to
Defendant's Motion to Dismiss Indictment or for a Mistrial, filed Sept. 29, 2008, at
5 (Dkt. No. 105); *Compare* email from J. Bottini, dated Sept. 29, 2008, to E.
Sullivan, Subject: "Emailing: RSP Mtn Dismiss & Mistrial drop in" ("Furthermore,
Williams recently estimated during [sic] to the government during the course of an
interview that he spent approximately 2,000 hours working on defendant's
Girdwood house . . .") (DOJ Bates no. CRM025204); *see also* Affidavit of N.
Marsh, dated Feb. 24, 2009, at ¶ 6 ("I recall several specific things about this
debriefing session with Mr. Williams [in mid-to-late September 2008]. First, I
recall asking Mr. Williams to approximate how many hours he spent working on
Senator Stevens' chalet. Mr. Williams said that he guessed he spent about 2,000
hours working on Senator Stevens' chalet.") (DOJ Bates nos. CRM000346-365).

However, in his deposition in this investigation, Mr. Bottini testified that the
"2,000 hour" statement by Mr. Williams was "not true":

> Q          The bad mock cross.
> Mr. Bottini The fact that he, yes, was sitting there, not focusing on
>            the questions, easily led. I think that's fair. You know, but
>            it was more than just, you know, "This guy is going to be
>            a disaster on cross examination." I was worried about him
>            on direct, as well.
>
> Q          Because of his failure to be able to –
> A          The 2,000 hour thing? That came out during a direct, not during
>            the mock cross, his estimation of -- "How many hours do you
>            think you spent down there?" "Oh, 2,000," you know, that was
>            during the direct, not the cross.
>
> Q          Well, that's not a bad number for you.

A      *But it's wildly high. I mean, it's not true.*

BY MR. SCHUELKE:

Q      It's a number that you knew he just pulled out of the air.

A      Yes. I mean, *there is no way that guy worked 2,000 hours on the house, under any way you slice it.* And that's what I mean when he's not focusing.

Deposition of J. Bottini, Dec. 16, 2009, at 327 (emphasis added).

In its response, the government accused the defense of "continuing their 'win at all costs' tactics" by "accusing the government of *Brady* violations and of proffering misleading evidence at trial" when "[n]othing could be farther from the truth". *Stevens*, Government's Opposition to Defendant's Motion to Dismiss Indictment or for a Mistrial, filed Sept. 29, 2010, at 1 (Dkt. No. 105). The government explained that it had attempted to prepare Mr. Williams to testify but it "became apparent, however, that [he] needed to attend to his medical issues." *Id*. at 2. The government denied any *Brady* violation had occurred and asserted that the discovery provided to the defense was "above and beyond" its obligations:

Defendant's motion is the proverbial "Hail Mary." Rather than focusing on the merits of the government's evidence or the flaws in defendant's response to this evidence, defendant resorts instead to leveling baseless accusations against the government. The faulty premise woven throughout defendant's motion is the idea that the government deliberately suppressed exculpatory evidence that should have been produced pursuant to Brady v. Maryland, 373 U.S. 83 (1963), United States v. Giglio, 405 U.S. 150 (1972), and their progeny.

Defendant erroneously suggests that the government withheld exculpatory information concerning Mr. Williams' involvement in the renovations on defendant's house. In fact, the opposite is true. As a result of the government's substantial discovery in this case, including its Brady-related disclosures, defendant has been give[n] access to material above and beyond the government's obligations.

*Id*. at 5.

190

Pursuant to the Court's order, affidavits were filed by Mr. Welch and Agent Joy describing the circumstances surrounding Mr. Williams's departure from Washington. *Id*., Exhibits 1 and 3. Mr. Welch stated:

> I ultimately authorized the decision for Mr. Williams to return back to Alaska. My reason for doing so was medical. I was very concerned about Mr. Williams' health given the reports leading up to September 24th and my own observations on September 24th. In my mind, Mr. Williams needed to return to Alaska and get medical attention from his primary physicians. In addition, when I learned that the appearance date on the defense subpoena was October 6th, I believed that this would provide Mr. Williams ample time to obtain medical attention and afford either the government or defense counsel the necessary time to bring Mr. Williams back to Washington, D.C. if either party compelled his appearance. . . .
>
> I further recall I was told that Special Agent Joy would tell Mr. Williams that he should try to re-contact Williams & Connolly. I understand that Special Agent Joy in fact passed that instruction onto Mr. Williams.

*Id*., Exhibit 3, Affidavit of William M. Welch II, ¶¶ 8 & 9.

Mr. Williams never returned to testify and died in Alaska on Dec. 30, 2008. *See* Email from Agent Joy, dated Dec. 31, 2008, to FBI SAC C. Seale and FBI SA M. Herrett ("Rocky Williams passed away yesterday.") (DOJ Bates no. CRM061326).

After lengthy argument, the Court denied the motion to dismiss or for a mistrial, and offered the defense a Rule 15 deposition of Mr. Williams (which was declined), recalled Ms. Boomershine for further cross-examination, and read a stipulation to the jury that four witnesses who had already testified, if recalled, would testify that they do not know how many hours Mr. Williams worked on the renovations or if he worked on other matters for Mr. Allen during the same time period that he worked on Senator Stevens's home. *Stevens*, Trial Transcript, Sept. 29, 2008 A.M., at 21-22, 45, 38-41; *id*., Trial Transcript, Sept. 29, 2008 P.M., at 15-16.

Judge Sullivan cautioned the prosecutors:

There may be an inference that could be drawn from this that the government chose not to call [Rocky Williams] to testify because the government finally realized that his testimony might not be helpful to the government. Now, that's not a conclusion the Court is prepared to reach at this point. It may well be for the [health] reasons discussed at the bench it was appropriate to -- for the government to advise Williams to leave, and, indeed, it may be appropriate -- it may have been appropriate for the government to help him leave, but I find that I find that very curious.

\* \* \*

I'm not concluding or even suggesting at this point that there's been misconduct on the part of government attorneys. I'm not suggesting that, but I want the parties to brief that issue because if that's the case, then I'm going to impose sanctions as appropriate. I find it very, very disturbing that this has happened.

*Id*., Trial Transcript, Sept. 29, 2008 P.M., at 5-6.[19]

Despite the Court's admonition and subsequent order that the prosecutors forthwith disclose all 302s, IRS memoranda of interviews and grand jury testimony of its witnesses, unredacted, to the defense (*id*., Trial Transcript, Oct. 2, 2008 A.M., at 19 & 20 and Oct. 2, 2008 P.M., at 51-52), Williams & Connolly never learned that the prosecutors possessed *Brady* information, provided to them repeatedly by Mr. Williams, which was not contained in any 302 or grand jury transcript and

---

[19] Judge Sullivan later struck portions of VECO's cost report for the renovation (Government exhibit 177) related to the time sheets for Mr. Williams and Mr. Anderson after the defense discovered additional undisclosed *Brady/Giglio* information, including the grand jury testimony by Mr. Anderson, which further contradicted the VECO records. *Stevens*, Trial Transcript, Oct. 8, 2008, P.M., at 89-90; *see also id*., Senator Stevens's Motion to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct, dated Oct. 5, 2008 (Dkt. No. 130). The Court also struck all evidence regarding Ms. Allen's transfer of a Land Rover to Senator Stevens because of the prosecutors' failure to provide discovery to the defense of a check (Government exhibit 1122) used by Mr. Allen to purchase the Land Rover. *Id*., Trial Transcript, Oct. 8, 2008, P.M., at 90; *see also id*., Senator Stevens's Motion to Dismiss the Indictment or for Mistrial Due to Government's Failure to Comply with Federal Rule of Criminal Procedure 16(a)(1)(E), filed Oct. 8, 2008 (Dkt. No. 142).

which would have independently corroborated Senator Stevens's "primary defense", that the VECO's costs for the renovation were supposed to be included in the Christensen Builders' bills.

4.   *In absentia*, Rocky Williams Remained a Key Figure Throughout the Trial

On the same day Mr. Williams left Washington, Brendan Sullivan opened and outlined Senator Stevens's defense to the jury:

> Bill Allen recommended the contractor [Christensen Builders]. He actually had the knowledge of how to build something. Bill Allen's people like Rocky Williams and Dave Anderson that you'll hear had certain skills but they were not home builders. At any rate, the project starts and guess what happens when projects start? Homeowners begin to get bills. And when Augie Paone [owner of Christensen Builders] was on the scene doing the job, closing in the house, building out the interior, regular bills came. The theme was for Augie Paone to give the bills to Rocky Williams or to Bill Allen and get them reviewed and they would send them on to the Stevens. They were sent basically to Catherine.

> And so over a period of time the first bill comes and guess what happens when the bill comes? It's paid. The second bill comes. Guess what happened? It's paid. And the third bill, it comes, and it's paid promptly, and the fourth bill comes and it's paid promptly. And the fifth bill comes and it's paid promptly. Because that's the way it should work, and Ted and Catherine believe that the bills that they received were covering the costs of the renovation. You'll see all that evidence.

*Stevens*, Trial Transcript, September 25, 2008 A.M., at 67-68.

Only two witnesses testified in support of that defense, Senator Stevens and Catherine Stevens.  On direct, Mrs. Stevens testified *inter alia* that:

-       she was in charge of the renovations (*Stevens* Trial Transcript, Oct. 16, 2008 A.M., at 56);

193

- "[Bill Allen] was a friend who volunteered to find some people that might be available to work to renovate the chalet and find a contractor for us." (*Id*. at 64);
- Augie Paone and his company Christensen Builders "were the general contractors. They were the ones responsible for all the renovation." (*Id*. at 63-64);
- "Rocky Williams was laborer who was introduced to us by Bill Allen, I think. . . . He was a laborer who had time off from his job. He had, as I understood it, he had worked for VECO, the company that Mr. Allen founded, and he had some personal issues, that he had time available to work." (*Id*. at 64-65);
- "[Rocky Williams] was working with Christensen Builders. He was on the job there. He was paid by them." (*Id*. at 65);
- Dave Anderson, Bill Allen's nephew, also worked on the renovation and, she assumed, was paid by Christensen Builders. (*Id*. at 65-66);
- she paid c. $132,000 to Christensen Builders in addition to payments to other contractors. *Id*. at 63-79.

On cross-examination, conducted by Ms. Morris, Mrs. Stevens repeatedly testified that Mr. Williams and the other workers were paid by Christensen Builders. *Stevens* Trial Transcript, Oct. 16, 2008 P.M., at 15, 40-41, 44-45, 46 and 48. One-third of the 74-page cross and re-cross-examination focused on Mr. Williams and Christensen Builders. *Id*. at 14-15, 19, 21-23, 39-50, 58-59, 69, 74-75 and 85-86.

Senator Stevens was the next and last witness in the case. He testified on direct that he never saw any of the bills for the renovation which were handled by Mrs. Stevens and that he and that Mrs. Stevens paid the cost of the renovation in full:

| Q. | And did you have the belief that you paid for everything that was done? |
| Sen. Stevens | Yes. I never saw any of the bills, as you know. I had asked Catherine. She said she paid every Bill [sic] she received. |

| Q. | Was that your belief at the time you lived it -- at the time, back then? |

A.    Absolutely. And, particularly, at the time we had this inquiry. The idea that VECO as a company, corporation, was involved in that project was wrong, as far as I was concerned. I did not note anything to the contrary at the time.

*Id.*, Trial Transcript, Oct. 17, 2008 P.M., at 27-28.

Under cross-examination by Ms. Morris, Senator Stevens testified that Mr. Williams and Mr. Anderson worked on the renovation and were paid for their services by him and Mrs. Stevens. *Id.* at 96.  He acknowledged that he knew that Mr. Williams worked for VECO but when he was "[w]orking on my house he's working for me." *Id.*, Trial Transcript, Oct. 20, 2008 A.M., at 51.

The last question posed to Senator Stevens was about Rocky Williams and his answer was the final testimony in his trial:

REDIRECT EXAMINATION
BY MR. B. SULLIVAN:
Q.              Did you have an understanding of who paid Rocky
                Williams for the work that was done at your house?
Sen. Stevens    Catherine paid for the work that was done at our house.
                She paid the bills she received, and that's all there was to
                it.

*Id.* at 120-121.

Rocky Williams remained a focal point during summations.  Mr. Bottini, who was told repeatedly by Mr. Williams, the foreman of the renovation, that his understanding was that his time, and the time of the other VECO employees, were to be added by Bill Allen to the Christensen Builders' bills, told the jury repeatedly in summation that Senator Stevens's and Mrs. Stevens's testimony to the same effect was "ridiculous" and "nonsense":

Now, again, [Senator Stevens's] explanation that he thought these guys, Rocky and Dave, were somehow just moonlighting, that they weren't on VECO's clock, is *just ridiculous*, and his story that, well, I thought we were paying these guys through Paone, *does that make any sense whatsoever?*

195

He's got these guys down there working on that house well before Paone shows up, well before Paone is brought in by VECO. . . . How could he possibly have thought that he was paying these guys through Paone? *That's just nonsense.*

\* \* \*

Now, you're supposed to believe that they thought Rocky and Dave were somehow working directly for Paone and Christensen Builders. *It's nonsense again,* ladies and gentlemen.

\* \* \*

Now he has to concede that Williams and Anderson were working on the house, and he has to concede, well, I knew they were long-time VECO workers, but now he says I thought they were working on their own. They weren't on VECO's clock. I thought we were paying them directly through Paone, and he also tries to make this differential between Allen and VECO. *Does that make any sense whatsoever?* Who told him that? He doesn't know that these guys worked for VECO. Bill Allen is one of his closest friends ever. You heard him describe that relationship on one of the conversations you listened to. He doesn't know that these guys worked for VECO? *It's just nonsense*, ladies and gentlemen. . . . *It's nonsense*, ladies and gentlemen, this notion that they didn't know that VECO was responsible for a substantial portion of this remodel and all of those add-ons and repairs later on.

*Id*., Trial Transcript, Oct. 21, 2008 A.M., at 40, 41 & 46-47 (emphasis added).

Brendan Sullivan argued in response that the testimony of Senator Stevens and his wife was corroborated by the fact that Rocky Williams signed the Christensen Builders' bills:

Let me also direct your attention to where *Rocky* signs various invoices, Beth.

Let me show you some other pages here, ladies and gentlemen of the jury. These are the bills that were received. I just listed them all with the checks, showed you a total.

Let's take a look at this. Look at that, Christian Brothers [sic] at the top. Guess who signs for Christian Brothers? Guess who signs? *Rocky Williams*. Today they see that *Rocky* was, unbeknownst to the Stevens, on

196

the payroll of VECO, but then they were sending bills to Catherine Stevens where *Rocky* was signing Christian Brothers, the general contractor sheets. Let's look at some more. Look, *Rocky Williams*. Look up at the top. Christian Brothers. The yellow at the top, ladies and gentlemen, is the same as in the yellow big block that we put in there. *Rocky Williams* signs again for Christensen Brothers. Christensen Builders. I always get that mixed up. Christensen Builders, Inc., CBI, Augie Paone's company. Look at them. Let's just run through them, please. Look at them again and again and again. All *Rocky Williams* signature on Christensen Builders invoices sent to Catherine Stevens.

Now go back as they lived it. You get a bill. *Rocky* is signing for Christian Brothers. Would that lead you to conclude *Rocky* is working with Christian Brothers and being paid on the labor bills of Christensen Builders?

*Id*. at 85-86 (emphasis added).

In rebuttal, Ms. Morris argued that the defense's proposition was "unreasonable and inconsistent with the facts":

Again, the defendant testified that Catherine Stevens paid for Rocky and Dave's services through Augie Paone. . . . What the defendant would have you believe is inconsistent with the facts and unreasonable.

*Id*., Trial Transcript, Oct. 21, 2008 P.M., at 59.

The jury never learned that Rocky Williams, the job foreman, labored under the same understanding as Senator Stevens and Catherine Stevens, namely, that the VECO costs were to be included in the Christensen Builders' bills.

197

B.    **Bambi Tyree**

<u>Summary</u>

Bambi Tyree was a juvenile prostitute who had a sexual relationship with
Mr. Allen in or around 1995 when she was 15 years old. She was indicted in 2004
with Josef Boehm a/k/a/ "Joe Millionaire" and others by the U.S. Attorney's Office
in Alaska on drug conspiracy and child sex trafficking charges and became a
cooperating witness against Mr. Boehm.  The prosecutors in their second *Brady*
disclosure letter to Williams & Connolly asserted that they had thoroughly
investigated the "suggestion" that Mr. Allen had asked Ms. Tyree to make a sworn
false statement about their relationship and had found "no evidence to support" that
suggestion. *Stevens*, Letter from B. Morris, dated Sept. 9, 2008, to A. Romain, at 5
(Dkt. No. 126-2).  The assertion, that there was "no evidence", was false and Mr.
Marsh, Mr. Bottini and Mr. Goeke knew at the time it was false.  They knew, since
at least October, 2007, that Ms. Tyree told AUSA Frank Russo, a colleague of Mr.
Bottini and Mr. Goeke in the U.S. Attorney's Office in Alaska, and FBI Agent John
Eckstein, during an interview on July 22, 2004 in an unrelated criminal
prosecution, *United States v. Josef Boehm*, which Mr. Goeke helped prosecute, that
she signed an affidavit at Mr. Allen's request in which she falsely stated that she
did not have sex with Mr. Allen.  Mr. Marsh, Mr. Bottini and Mr. Goeke possessed
documentary evidence of Mr. Allen's subornation of perjury by Ms. Tyree since at
least October, 2007, in the 302 written by Agent Eckstein of the interview of Ms.
Tyree, in Agent Eckstein's notes of that interview, and in a motion *in limine* filed
by AUSA Russo in *Boehm* which flatly stated that Ms. Tyree lied at Mr. Allen's
request.

That impeachment information about Mr. Allen was withheld not only from
the attorneys for Senator Stevens in 2008, it was also withheld from the attorneys
for two other Polar Pen defendants, Peter Kott and Victor Kohring, who were tried
and convicted in Anchorage in 2007, by Mr. Marsh and Mr. Goeke, who tried Mr.
Kott, and by Mr. Bottini and Mr. E. Sullivan, who tried Mr. Kohring.

In October 2007, after Mr. Kott's trial and before the trial of Mr. Kohring,
and again in December, 2007, after the trial of Mr. Kohring, Mr. Marsh consulted
with DOJ's Office of Professional Responsibility ("PRAO") on whether *Brady* and
*Giglio* required disclosure of that information to the attorneys for Mr. Kott and Mr.

198

Kohring. Mr. Marsh did not disclose to the PRAO attorneys the information contained in Agent Eckstein's 302, his notes, or in AUSA Russo's motion *in limine*. Mr. Marsh told the PRAO attorneys that the only evidence of Mr. Allen's subornation of perjury was a mistaken recollection by AUSA Russo of a statement by Ms. Tyree that Mr. Allen asked her to lie. The PRAO attorneys were also told that Ms. Tyree and Mr. Allen denied that she lied at his request. On both occasions, the PRAO attorneys advised that disclosure of mistaken information was not required.

      1. July, 2004      Interview of Bambi Tyree by Agent Eckstein and AUSA Frank Russo, and AUSA Russo's and Mr. Goeke's Motion *in limine* in *United States v. Boehm*

In January 2004, the Alaska U.S. Attorney's Office indicted Ms. Tyree, Josef Boehm and others on child sex trafficking and drug distribution charges. *See United States v. Boehm*, Tyree, *et al*., 3:04-cr-00003-JWS (D. Alaska (Anchorage)) ("*Boehm*"). Mr. Boehm was the principal defendant and Ms. Tyree agreed to testify against him. AUSA Frank Russo, whose office was next door to Mr. Bottini's, was the prosecutor in charge of the case, assisted by Mr. Goeke. *See* Deposition of F. Russo, March 24, 2010, at 20-21; Deposition of J. Goeke, Jan. 8, 2010, at 335. The trial was scheduled to commence on August 2, 2004. *Boehm*, Order from Chambers, dated July 28, 2004, at 2 (Dkt. No. 459; Dkt. No. 943 (Attachment no. 1)).

On July 22, 2004, AUSA Russo and FBI SA John Eckstein interviewed Ms. Tyree, who was incarcerated at the time, in the presence of her lawyer, Sue Ellen Tatter[20]. *See* FBI SA John Eckstein's 302 of interview of B. Tyree, dated Oct. 28, 2004, at 1 (DOJ Bates nos. CRM043377-378). Mr. Goeke was present when Ms. Tyree was interviewed by Agent Eckstein and AUSA Russo on April 1, 2004 (*see* Agent Eckstein's 302, dated May 13, 2004 (DOJ Bates nos. CRM053038-043)),

---

[20]Ms. Tatter was employed at the time by the Federal Public Defender. Deposition of F. Russo, March 24, 2010, at 83. Ms. Tatter told AUSA Russo that, when she was in private practice, she represented Ms. Tyree in a previous juvenile case and that Mr. Allen paid her fee in that case. *Id.*

but he did not attend this interview. Deposition of J. Goeke, Jan. 8, 2010, at 188-89.

Previously Ms. Tyree had told AUSA Russo and Agent Eckstein that she provided a false statement on Mr. Allen's behalf. Deposition of F. Russo, March 24, 2010, at 58.  AUSA Russo met with her again on July 22, 2004 to obtain *inter alia* additional information about the false statement for a motion *in limine* to exclude references to Mr. Allen during her cross-examination, which he planned to file in *Boehm* and which he did file four days later:

> It was a scenario where one thing, Tyree was uncomfortable talking about was Allen. She obviously cared for him very deeply, but the fact that she told me she had made a false statement implicated my duty to disclose it to the defense.
> I knew the defense certainly wanted to try to pull Allen into this, and my legal view of the situation is that who the person was that she was lying on behalf of was not particularly relevant.
> I wanted to get just some factual background to file the Motion In Limine with the Court to exclude the mention of Allen from this.

 Deposition of F. Russo, March 24, 2010, at 60.

Agent Eckstein testified that the main purpose of the interview of Ms. Tyree on July 22, 2004 was to question her about who asked her to make a sworn statement that she did not have sex with Mr. Allen. Deposition of Agent Eckstein, April 15, 2010, at 13 & 47.  Prior to that interview, she had stated that it was her idea to sign the affidavit, and Agent Eckstein, AUSA Russo and/or Mr. Goeke had concluded "that was not believable, that this 15 year old girl had concocted this idea to sign an affidavit to protect Bill Allen on her own, that just didn't seem reasonable to us." *Id*. at 16.  Agent Eckstein had several conversations with AUSA Russo and Mr. Goeke on the subject:

> I can't say how many times we had conversations about it, but I know prior to the July interview, I had conversations with both Mr. Goeke and Mr. Russo about how I did not believe Bambi's original statement about that, and I'm sure after that interview, we had subsequent conversations about that, leading up to the Boehm hearings and having her testify.

That was the main issue for her testifying, whether or not she was going to be honest and be credible. One of the things we felt she was lying about, up until that July 22 interview, was that issue.

Once we went down to SeaTac [the prison where Ms. Tyree was interviewed on July 22, 2004] and cleared that up with her, then the Government made the decision to use her as a witness in the Boehm hearings.

*Id*. at 36-37.

Agent Eckstein's two-page 302 of the interview on July 22, 2004, which was written on Oct. 28, 2004, reported in its first substantive paragraph that Ms. Tyree stated:

> TYREE had sex with BILL ALLEN when she was 15 years old. TYREE previously signed a sworn affidavit claiming she did not have sex with ALLEN. TYREE was given the affidavit by ALLEN's attorney, and she signed it at ALLEN's request. TYREE provided false information on the affidavit because she cared for ALLEN and did not want him to get into trouble with the law.

> FBI SA John Eckstein's 302 of Interview of Bambi Tyree, dated Oct. 28, 2004, at 1 (DOJ Bates nos. CRM043377-378).

Four days after that interview and before the 302 was written, AUSA Russo filed an *in limine* motion in *Boehm* which disclosed Mr. Allen's solicitation of a false sworn statement from Ms. Tyree and sought to exclude any reference to Mr. Allen during her cross-examination:

False Swearing

During debriefings, Bambi Tyree admitted to giving a false statement under oath when she was 15 years old. This statement is not in the United States' possession. However, Tyree identified the nature of the statement, which is as follows: When Tyree was 15 years old, she had sex with Bill Allen, president of VECO and publisher of the "Voice of the Times" section in the Anchorage Daily News. Tyree and Allen were introduced by Tyree's roommate, Lisa Moore, who apparently knew of the untoward and illegal

relationship, began blackmailing Allen, claiming she would go to the police and newspapers and tell them that Allen had sex with Tyree. Based on this threat, *Allen asked Tyree to meet with his attorney, James Gilmore, and give a sworn statement stating that she never had sex with Allen.* Tyree did so. The United States confirmed the existence of such statement from Mr. Gilmore. Mr. Gilmore stated that this statement was work product, and he declined to provide it to the United States.

The United States is turning over this information to the defense pursuant to its obligations under Giglio v. United States, 405 U.S. 150 (1972). The fact that Tyree gave a false statement under oath bears on her credibility. However, *the fact that Allen was the person who asked Tyree to swear to the statement* is irrelevant to any issue in this case. Therefore, the United States asks the Court to limit inquiry to the fact that Tyree gave a false statement under oath when she was 15 years old.

*Boehm*, Government's Motion *in limine* Regarding Impeachment Evidence Pertaining to Bambi Tyree, *Filed Under Seal*, dated July 26, 2004, at pp. 2-3 (emphasis added) (DOJ Bates nos. CRM119355-362).

The government's reply reiterated that "Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied." *Id.*, United States' Reply to Defendant's Opposition to Motion Regarding Impeachment Evidence Pertaining to Bambi Tyree, *Filed Under Seal*, dated August 17, 2004, at 3 (DOJ Bates nos. CRM119379-386). District Judge John W. Sedwick granted the government's motion and the defense moved for reconsideration.

Mr. Goeke signed the government's opposition to that motion (Deposition of F. Russo, March 24, 2010, at 105), which stated in pertinent part:

The following facts cannot be disputed: Tyree was a juvenile when the alleged sexual relationship with Allen occurred. There was a scheme to blackmail Allen based on his alleged sexual relationship with Tyree. The blackmail scheme caused Allen to hire an attorney, James Gilmore. Tyree agreed to give a sworn statement to Gilmore in which she denied having sex with Allen.

202

*Boehm*, U.S. Opposition to Defendant's Motion to Reconsider Court's Ruling Regarding Impeachment of Bambi Tyree, *Filed Under Seal*, dated October 6, 2004, at p. 8 (DOJ Bates nos. CRM119363-378).

| | | |
|---|---|---|
| 2. March, 2007 | | Mr. Goeke Raises a *Franks* Disclosure Issue Regarding Mr. Allen's Solicitation of Ms. Tyree's False Statement; Mr. Allen is interviewed and Agent Kepner writes a one sentence-302 that he "never encouraged others to make a false statement under oath": No Disclosure |

In March, 2007, preparations were underway to obtain a search warrant for Senator Stevens's Girdwood residence based in large part on information provided by Mr. Allen. Deposition of J. Bottini, Dec. 17, 2009, at 675-676. Mr. Goeke recalled the filings made in *Boehm* regarding Mr. Allen and Ms. Tyree and obtained copies from AUSA Russo. *See* Deposition of J. Goeke, Jan. 8, 2010, at 257-258; Email from F. Russo, dated March 5, 2007, to J. Goeke and J. Bottini, "Subject: Tyree briefing, Attachments: motion in limine Bambi bad acts.wpd; reconsider Tyree.wpd; reply re Tyree.wpd" (DOJ Bates nos. CRM0116398-425). Mr. Goeke testified that at the time, March 2007, he recalled interviewing Ms. Tyree in 2005 in preparation for the sentencing of Mr. Boehm and that she told him that her false statement to Mr. Allen's lawyer had been entirely her idea: "Bill didn't know I was going to lie." Deposition of J. Goeke, Jan. 8, 2010, at 216-217. Mr. Goeke believed what Ms. Tyree told him in 2005 and he "was always colored in this analysis by what I remember her telling me." *Id*. at 372; *see also id*. at 225-226 ("I reached a conclusion for myself that, as I look at the issue, it seemed to me that -- I took to -- I believed Tyree what she said initially to me back in 2005.").

Mr. Goeke recognized that the government's statements in its motion *in limine* in *Boehm* raised a disclosure issue regarding Mr. Allen's credibility under *Franks v. Delaware*, 438 U.S. 154 (1978), and he and Mr. Bottini obtained copies from AUSA Russo of the government's motion *in limine*, reply and opposition to the defendant's motion for reconsideration in *Boehm. See* Email from F. Russo to J. Goeke and J. Bottini, dated March 5, 2007, "Subject: "Tyree briefing" ("There were three of them.")(DOJ Bates nos. CRM116398-425). Mr. Goeke emailed excerpts from those filings to Mr. E. Sullivan and Mr. Bottini the same day. *See* Deposition of J. Goeke, Jan. 8, 2010, at 257-260; Email from J. Goeke, dated

March 5, 2007, to E. Sullivan and J. Bottini (DOJ Bates nos. CRM022276-279). In
addition to providing excerpts from the motion *in limine* in *Boehm*, including the
first two excerpts quoted above, Mr. Goeke pointed out that:

> Ultimately, the court ordered that the defendant in <u>United States v. Boehm</u>
> could inquire generically as to whether or not Tyree had made a false
> statement under oath and *the underlying facts ultimately did not become*
> *public.* In the context of the current investigation, the government has not
> questioned Allen or Tyree: (1) concerning Allen's relationship with Tyree;
> (2) concerning whether Allen asked Tyree to provide a deposition; and (3)
> concerning whether Allen asked Tyree to provide specific testimony at a
> deposition. Accordingly, at this time we do not have any information from
> Allen concerning Tyree's previous statements to the government concerning
> her deposition.

> Email from J. Goeke to E. Sullivan and J. Bottini, dated March 5, 2007 (DOJ
> Bates nos. CRM022276-279) (emphasis added).

On March 10, 2007, five days after Mr. Goeke's email to Mr. E. Sullivan and
Mr. Bottini, Mr. Allen was interviewed by Agent Kepner who wrote a one-sentence
302:

> [Mr. Allen] has never made a statement under oath that he[] knew was false
> or misleading nor has [Mr. Allen] encouraged others to make a false
> statement under oath.

> Agent Kepner's 302 of Interview of Bill Allen, dated March 28, 2007 (DOJ
> Bates no. CRM067062).

No disclosure of Mr. Allen's subornation of perjury was made in Agent
Kepner's Application and Affidavit for Search Warrant, dated July 27, 2007 (DOJ
Bates nos. CRM015930-016003). *See* Deposition of J. Goeke, Jan. 8, 2010, at 266
("Joe [Bottini] had a brief conference call with Welch and it was resolved that we
got an e-mail -- a communication of some kind came back that they've considered
that considered that we don't think we have [sic] don't have anything to disclose.").

204

3. September, 2007:    *United States v. Kott*, Mid-trial Sealed Proceeding: No Disclosure

Peter Kott, a former member of the Alaska House of Representatives, was indicted in the Polar Pen investigation in May, 2007 and his trial was held from September 5 to September 25, 2007. *United States v. Kott*, CR no. 3:07-cr-00056-JWS ("*Kott*") (Dkt. nos. 11 & 218-261). Mr. Allen was a "principal witness" at the trial (*id*., Order and Opinion, dated Jan. 13, 2010, at 2 (Dkt. No. 429)), which was conducted by Mr. Goeke and Mr. Marsh. Deposition of J. Goeke, Jan. 8, 2010, at 13.

During trial preparation in *Kott*, Mr. Goeke asked Mr. Allen if he had ever "caused a false statement" and Mr. Allen answered no. *Id*. at 271 & 274-75. Mr. Goeke testified that, despite that denial, he and Mr. Bottini discussed how to disclose the statements in the government's pleadings in *Boehm* that Mr. Allen solicited a false sworn statement by Ms. Tyree. *Id*. at 279-80. Mr. Goeke testified that a "stumbling block" was Mr. Marsh's position that there was nothing to disclose except statements in a brief which Mr. Goeke thought were inaccurate. *Id*. at 280. Mr. Goeke explained that, according to Mr. Marsh, disclosure of the pleadings was unwarranted because they were merely "arguments of lawyers":

> Mr. Goeke: . . .    The reason it was submitted to me that we don't have make [sic] any reference to the pleadings is because those are simply the arguments of lawyers which your government has established were on improper facts. That was the argument that was presented to my [sic] why we don't have to reference the pleadings.
>
> Q    So –
> BY MR. SHIELDS:
> Q    By whom?
> A    By Nick Marsh repeatedly.

*Id*. at 244.

Mr. Goeke testified that "it seem[ed] like we ha[d] to disclose something" and he and Mr. Bottini decided to raise the issue with the Court in a sealed proceeding. *Id*. at 280.

Mr. Welch testified that he was told at the time that the issue had been disclosed to and decided by Judge Sedwick:

> . . . it had been explained to me [by Mr. Marsh in October and December 2007] that Judge Sedwick had sua sponte decided that this issue [of AUSA Russo's mistaken recollection] would not be explored on cross.
>
> \* \* \*
>
> When presented to me in October of '07, in addition to being told that Allen had been interviewed, that Tyree had been interviewed, their explanation of the notes, I was also informed that Judge Sedwick, who had handled the underlying civil and criminal cases, had sua sponte said it wasn't going there. That they wouldn't -- he wouldn't allow the defense attorneys to go there.

> Deposition of W. Welch, Jan. 13, 2010, at 188, and Feb. 5, 2010, at 351-352.

*See also* Email from N. Marsh, dated Jan. 31, 2008, to W. Welch and B. Morris (cc: E. Sullivan) ("we held sealed hearings in Kott and Kohring to address the Bambi-relationship issue") (DOJ Bates no. CRM028628); *Stevens*, Government's Motion *in limine* to Exclude Inflammatory Impermissible Cross Examination Pursuant to Rule 608(b) *Filed Under Seal*, dated Aug. 14, 2008, at n. 1 ("On two separate occasions, this issue [regarding allegations that Mr. Allen had a sexual relationship with a female juvenile approximately ten years ago] was addressed in sealed hearings by a district court in Alaska. In both instances, the trial judge inquired as to whether defense counsel intended to raise this issue on cross examination with Bill Allen. The court was advised that respective counsel would not inquire into this particular issue. *United States v. Kott*, No. 3 :07-CR- 00056-JWS (D. Alaska); *United States v. Kohring*, No. 3:07-CR-00055-JWS.") (DOJ Bates nos. CRM031606-622).

A sealed hearing was held during the trial of Mr. Kott but, as Mr. Goeke explained, no disclosure was made:

> Q          Okay, so what happened?

206

Mr. Goeke        So then we had a closed hearing with the court with
                 defense counsel present.

BY MR. SHIELDS:

Q    Stay by the mic.

A    Sorry, with defense counsel present. I stood up and said, "Your Honor,
     I believe that defense counsel may wish to get into the general issue of
     the relationship of Bambi Tyree." *I was going to say that I could direct
     the court's attention to the briefing of X date, but I didn't get that far.*
     The court said, "I am well aware of the issues involving Mr. -- or Ms.
     Tyree. I'm very familiar with the facts of her case. I seen [sic] no
     reason to get into any of those issues."

                               *   *   *

Q    Was the issue that was being presented to the court the question or
     questions about his sexual relationship or questions about a false
     affidavit being –

A    I didn't specifically say, "False affidavit." *I intended to. It didn't get
     that far because the court said, "I'm well familiar with the facts of Ms.
     Tyree's case. I see no reason to get in any of those issues."* And this
     briefing had been presented to –

Q    So it wasn't clear at that point whether the court was ruling on
     questions about a sexual relationship or something else?

A    Correct.

Q    And you left it that way?

A    I left it that way. *I felt that the court had cut me off*. . . . Now, in
     hindsight, I wish I had stood up and said, "I want to direct the court's
     attention specifically to the briefing at this court record number." So
     we're talking about -- there's no ambiguity about what we're talking
     about.

     I didn't want -- you know, I don't want the court to have a
     misimpression about oh, it's just the sexual relationship. It's not the
     subordination [sic] issue. If I had to do it today, that's how I would do
     it.

BY MR. SCHUELKE:

                                    207

Q     Do you know whether or not the defense was aware of the earlier pleading?

A     It was under seal. So I don't believe they were aware. They could have been aware because I saw the - -

MR. MENCHEL:          Do you know?
(attorney for Mr. Goeke)
THE WITNESS:          I don't know.

MR. MENCHEL:  That's the answer.
THE WITNESS:   I don't know. They shouldn't have been aware because it was under seal.

  Deposition of J. Goeke, Jan. 8, 2010, at 281-84 (emphasis added).

*See also* Submission on Behalf of James A. Goeke to the Special Prosecutor, dated April 9, 2010, at 14 ("Mr. Goeke recalls that the team decided that Mr. Goeke would alert the Court to the issue [regarding Ms. Tyree's false affidavit] during the Kott trial, which, like the Boehm proceeding, was before Judge Sedwick.  When Mr. Goeke raised the issue of Tyree, however, Judge Sedwick - who had granted the Government's motion to preclude questioning on the false affidavit in the Boehm case - cut off Mr. Goeke, saying that he knew about Tyree and Allen and was not interested in delving into the matter again.  Therefore, no disclosure was made during that proceeding.").[21]

     However, the transcript of the sealed proceeding does not support Mr. Goeke's recollection that the Court thwarted his planned disclosure of the impeachment material in the government's pleadings in *Boehm*.  The transcript discloses that Mr. Goeke and Mr. Marsh withheld the information about Mr. Allen's subornation of perjury by Ms. Tyree and left the Court and defense counsel in the dark:

---

     [21]The statement in Mr. Goeke's Submission, that Judge Sedwick "preclude[d] questioning on the false affidavit in the Boehm case", is erroneous. As described above at pages 202 and 204, the Court granted the government's motion to limit cross-examination to the fact that Tyree gave a false statement under oath when she was 15-years-old and precluded any questioning about Mr. Allen's relationship with Ms. Tyree and his solicitation of the false statement.

208

| | |
|---|---|
| MR. GOEKE: | That there is one other matter, Your Honor, that -- it's become apparent to the Government through moving papers of previous co-defendant Weyhrauch's counsel, and there was also some suggest -- there was some reference to this individual on the recordings provided to Mr. Wendt, *there may be a line of inquiry concerning Mr. Allen's relationship with Bambi Tyree (ph), and the Government would posit that has no relevance whatsoever in this case.* |
| THE COURT: | Well, mis -- I don't think Mr. Wendt's done anything or Ms. Simonian's done anything on that, but let me just ask. Did you -- *were you going to ask him about Bambi Tyree?* |
| | (Pause - side conversation) |
| THE COURT: | I -- I don't see how it's relevant – |
| MR. WENDT: (Mr. Kott's attorney) | Oh, I'm sorry. I don't specifically know Ms. Tyree. I know -- I -- it's hard -- *the name Bambi Tyree does not ring a bell*, but I have heard of other potential involvements involving Mr. Smith with women, both through this case and through other means that -- I don't know their names. I don't know – |
| THE COURT: | Well, that's -- I mean, that's -- all right. But that's not something you would inquire into. |
| MR. WENDT: | I did -- well, I -- I can just tell the Court that I've -- I've -- |
| THE COURT: | *The fact that he's a philanderer isn't something one usually gets into on cross-examination in a criminal felony trial unless for some reason that's relevant.* |
| MR. WENDT: | *I don't know who Bambi Tyree is.* I -- I do know that I received information that -- that Mr. Allen was a friend and associate of Mr. Boehm's and that he visited Mr. Boehm's house on Oceanview and that the Government had information about that and were threatening him with that, for instance. |
| MR. GOEKE: | I -- I believe the Court, from its own knowledge of the <u>Boehm</u> case and from this prosecutor's knowledge of the <u>Boehm</u> case, knows that's absolutely not the case. |
| THE COURT: | Well, actually – |

209

| MR. WENDT: | Well, I – |
|---|---|
| THE COURT: | -- it isn't. I mean, I -- I tried Boehm and I know a lot about that case. |
| MR. WENDT: | All right. I -- I don't know, Your Honor, *but candidly I was not planning to bring that up. They're the one who brought up Bambi Tyree.* |
| THE COURT: | Yeah, all right. Well -- |
| MR. WENDT: | The only thing I can think of is maybe Bambi was over there. *I don't know where Bambi Tyree is or who she was.* |
| THE COURT: | Well, suffice it to say that *there's nothing that -- that I'm aware of, and I am aware of the* <u>Boehm</u> *case, that connects that case to this case in any way that has any relevance here.* There may be people who were mutual acquaintances of Boehm and others who might be involved in this case, but it goes no further than that. |
| MR. WENDT: | And -- and there is a -- there is a phone call -- I don't know if this is Bambi Tyree, but there was a phone call which we've been provided in which Rick Smith is giving advice to Mr. Allen about associating with a co-worker who is much younger. In fact -- well, that was -- wasn't that Marie? |
| THE COURT: | All right. We don't need to get into this – |
| MS. SIMONIAN: (Mr. Kott's attorney) | Not Bambi Tyree. |
| MR. WENDT: | Not Bambi Tyree. |
| MR. MA[R]SH: | *But you guys weren't planning on bringing that up.* |
| THE COURT: | We've -- we've got a jury waiting and we -- |
| MR. WENDT: | Not really. *It might come up.* |
| MR. MA[R]SH: | *Whoa, whoa, whoa. Hang on a second. You guys are going to* -- I'm sorry. I apologize. Sorry. |
| THE COURT: | Excuse me. We've got a -- we've got a jury waiting. We don't need to get into this -- |
| MR. WENDT: | All right. |
| THE COURT: | -- side show at this point. I -- I -- I've given you my rulings, and the rulings are based on <u>United States v. James</u> and my evaluation of those three factors. All right. |

> we'll -- let's take just a five-minute recess and then get
> back to the courtroom as quickly as we can.
>
> THE CLERK:    All rise.
>
> THE COURT:    *Any other questions?*
>
> THE COURT:    This matter stands in brief recess

*Kott*, *Sealed Transcript*, Sept. 13, 2007, at 48-51 (emphasis added).

The transcript reflects that Mr. Goeke raised the issue of "Mr. Allen's relationship with Bambi Tyree" and immediately dismissed it by asserting that it "has no relevance in this case". *Id.*  He allowed the Court to assume mistakenly that the issue related to Mr. Allen's "philander[ing]", remained silent when Mr. Kott's attorney stated he didn't "know who Bambi Tyree is", and called upon the Court's "own knowledge of the *Boehm* case" to counter the defense attorney's uninformed attempt to establish relevancy by linking Mr. Allen and Mr. Boehm. *Id.*  When the defense attempted to reserve the issue, Mr. Goeke allowed Mr. Marsh to deflect the attempt immediately.  As the hearing concluded, the Court invited further discussion and Mr. Goeke withheld the only information, impeachment information about Mr. Allen's subornation of perjury by Ms. Tyree, that was relevant to the hearing and which only he and Mr. Marsh possessed.

Mr. Goeke's deposition testimony that he intended and attempted to disclose that information is contradicted by the record. *See also* Deposition of W. Welch, Jan. 13, 2010, at 188-189 ("Prior to Sept. 8[, 2008] it had been explained to me [by Mr. Marsh] that Judge Sedwick had sua sponte decided that this issue [of Mr. Allen's procurement of a false sworn statement by Ms. Tyree] would not be explored on cross. . . . I know I have now looked at the transcript from the Kott hearing and that the issue was not tee'd up at all like it was represented to me."), and Feb. 5, 2010, at 351-352 (same); *Compare In Re: Girardi*, 611 F.3d 1027, 1037 (9th Cir. 2010) ("At the subsequent [attorney disciplinary] hearing before us, at which they appeared in person, both Lack and Traina strongly disavowed any intent to mislead the court. This position no doubt reflects Respondents' sincere wish that their statements about the Notary Affidavit had been true. Unfortunately, even if Respondents only 'chose to state as a fact what was at the best a guess and a hope, [they] engaged in misrepresentation.'") (citation omitted; brackets in original).

211

No disclosure was made in *Kott* until 2009, during the pendency of the appeal in the Ninth Circuit Court of Appeals. *See United States v. Kott*, Case no. 07-30496 (9th Cir.), Motion for Disclosure of *Brady* Material on Appeal, dated April 13, 2009, at 5-6 (Dkt. Entry 48-1); *United States v. Kott*, CR no. 3:07-cr-00056-JWS, Government's Disclosure Certification, dated Aug. 10, 2009 (Dkt. No. 401).

4. October 2007    After the *Kott* Trial and Before the *Kohring* Trial, Mr. Goeke Obtains Agent Eckstein's 302 and the Handwritten Notes of Agent Eckstein and AUSA Russo, Ms. Tyree is Reinterviewed and DOJ's Professional Responsibility Advisory Office ("PRAO") is Consulted: No Disclosure

a.    Agent Eckstein's notes and 302, and AUSA Russo's Notes

After the *Kott* trial, Agent Eckstein, at Mr. Goeke's request, faxed a copy of his 302 of the interview of Ms. Tyree to Mr. Bottini. *See* Deposition of J. Goeke, Jan. 8, 2010, at 284-286; fax from Agent Eckstein, dated Oct. 4, 2007, to J. Bottini (DOJ Bates nos. CRM Bottini 059455-457). On the same day, Mr. Bottini faxed the 302 to Mr. Marsh with a note:

> Subject: Tyree 302
> Looks like this interview took place on 7/22/04. It says that she signed the <u>affidavit</u> @ Allen's request, but doesn't say he knew it was false - the inference may be made by the way this is written though. Let's talk early tomorrow AM.                  J.B.

> Fax from J. Bottini, dated Oct. 4, 2007, to N. Marsh, with Agent Eckstein's 302 attached (emphasis in original)(DOJ Bates nos. CRM Bottini 059454-457).[22]

---

[22]These documents, the fax from Agent Eckstein to Mr. Bottini and the fax from Mr. Bottini to Mr. Marsh, were provided to us by Mr. Bottini's attorneys, Kenneth L. Wainstein and Jeff Nestler.

At or around the same time, Mr. Goeke also obtained Agent Eckstein's and AUSA Russo's notes of the interview. Deposition of J. Goeke, Jan. 8, 2010, at 288-289. Mr. Goeke reviewed his own notes but could not find any that related to the issue of whether Ms. Tyree made a false sworn statement at Mr. Allen's request. *Id*. at 290.

The first page of Agent Eckstein's notes correspond to his 302 and reflect, in pertinent part:

> B[ambi] had sex w/B[ill] A[llen] at
> 15 -> B[ambi] signed
> Affi[davit] saying she
> didn't - given to her
> by B[ill] A[llen]'s lawyer
> B[ambi] lied in affi[davit] cause
> didn't want to get B[ill] A[llen] in trouble. B[ambi]
> signed affi at B[ill] A[llen]'s request.

Notes of FBI SA John Eckstein, dated July 22, at 1 (DOJ Bates no. CRM081267).

*See also* Deposition of Agent Eckstein, April 15, 2010, at 14-15.

AUSA Russo's notes are similar but contain a significant cross-out and addition. The first entry on the first page of the notes originally reflected that Ms. Tyree signed a false affidavit "at the request of Bill"; however, "Bill" has been crossed out and "Bambi's idea" was added":

> Tyree 7/22/04
> Security                    Gilmore's office
> - me & him or me & her showering together
> - 15 yo, attorney, signed an affidavit
> - Bill & me have never had sex - <u>False</u>
> - Lisa blackmail
> - at the request of Bill ["Bill" is crossed out] Bambi's idea [added]
> - to avoid a lawsuit, criminal action
> - Bill cares about me.

- Fundraiser The Rose.

Deposition of F. Russo, March 24, 2010, at 65 & 80-82 (notes read into record)(emphasis in original).

This portion of AUSA Russo's notes is reproduced below:



Notes of AUSA F. Russo, dated July 22, 2004, p. 1 (DOJ Bates no. CRM 080943).

AUSA Russo testified that he recalled in 2009, that he might have crossed "Bill" out and added "Bambi's idea" in 2005, during a meeting with Ms. Tyree when he was preparing her to testify at Mr. Boehm's sentencing hearing and she insisted that signing the false affidavit was her idea, not Mr. Allen's. Deposition of F. Russo, March 24, 2010, at 56-58, 69-70, 74-76 & 78-79.

214

In 2009, AUSA Russo assisted newly assigned DOJ attorneys in post-trial *Brady* submissions to the District Court in *Kott* and *Kohring*. *Id*. at 17-18.  In that role, AUSA Russo interviewed Mr. Goeke who described a meeting with Ms. Tyree in 200<u>5</u> when she insisted that the false affidavit was her idea and not Mr. Allen's. *Id*. at 71-74.  Though Mr. Goeke had previously told AUSA Russo about this meeting (*id*. at 88 & 100), details about the meeting provided by Mr. Goeke in 2009 "triggered" AUSA Russo's recollection of attending that meeting and hearing Ms. Tyree say that the false affidavit was her idea. *Id*. at 71-72.  He further recalled that, during that meeting in 2005 with Ms. Tyree, he might have altered his July 22, 2004, notes, by crossing out "Bill" and adding "Bambi's idea". *Id*. at 74-77.  AUSA Russo searched without success for his original notes to determine whether the changes were made with a different pen; he last saw them in Mr. Goeke's hands in 2007, sometime between the Kott and Kohring trials. *Id*. at 70.  Mr. Goeke testified that he never saw AUSA Russo's original notes. Deposition of J. Goeke, Jan. 9, 2010, at 293.

AUSA Russo brought the issue of disclosing Mr. Allen's solicitation of a false statement by Ms. Tyree to Mr. Goeke's attention in or around March, 2007, in connection with a search warrant or a Title III application, and he emailed a complete set of the government's *in limine* motion in *Boehm* to Mr. Goeke and Mr. Bottini. *Id*. at 116-117; Email from F. Russo, dated March 5, 2007, to J. Goeke and J. Bottini, "Subject: Tyree briefing, Attachments: motion in limine Bambi bad acts.wpd; reconsider Tyree.wpd; reply re Tyree.wpd" (DOJ Bates nos. CRM0116398-425).  That was not the first time AUSA Russo raised the issue of Ms. Tyree's false affidavit and Mr. Allen's credibility with Mr. Goeke, Mr. Bottini and/or Mr. Marsh. *See* Deposition of F. Russo, March 24, 2010, at 116 ("I'm sure it was already an issue when I heard he was cooperating, you know. I'm sure I made some sarcastic remarks to them. . . . I can tell you it was before March of 2007").  Until the disclosure issue came up again after the Kott trial and before the Kohring trial (*id*. at 120), he assumed that it had been resolved. *Id*. at 115-116.

In October, 2007, Mr. Goeke and Mr. Marsh showed AUSA Russo his notes of the July 22, 2004, interview of Ms. Tyree containing his notation that signing a false affidavit was "Bambi's idea". *Id*. at 204.  AUSA Russo had just recently reviewed his motion *in limine* in *Boehm*, in which he had asserted that Ms. Tyree made a sworn false statement at Mr. Allen's request, and he was "taken aback and

surprised" by his notation.[23] *Id*. at 102 & 145.  When Mr. Marsh and Mr. Goeke
questioned him about its meaning, he told them that "if my notes say that, that
must be what she said." *Id*. at 205 & 207.  AUSA Russo testified that he may have
also told them that the statements in his motion *in limine* in *Boehm* were mistaken.
*Id*. at 121.

Mr. Marsh and Mr. Goeke did not show Agent Eckstein's notes or his 302
of the interview to AUSA Russo (*id*. at 108-109), but he was told around the same
time by someone (he could not remember who) that Agent Eckstein remembered
that Ms. Tyree said the false affidavit was her idea. *Id*. at 108 & 167.  After the
meeting with Mr. Marsh and Mr. Goeke, AUSA Russo spoke to Agent Eckstein
about what Ms. Tyree said during the interview:

> [Eckstein] also expressed that his memory was fuzzy about this whole thing,
> too.  You know, he couldn't be sure one way or the other.  You know, it sort
> of sounds right that she said it was her idea.
>
> *  *  *
>
> I might have talked to Eckstein about it and he might have expressed
> uncertainty about it, about whose idea it was, and he didn't have a real clear
> recollection.
> Then it got to the point where it became an issue, where we started being
> interviewed by OPR that I couldn't talk to Eckstein about it. You know, we
> never sat down and I never quizzed him about whether or not he had a clear
> recollection of that or not, or how he came to have a fuzzy recollection
> when his notes and his 302 are unequivocal
>
> *Id*. at 110 & 167.

AUSA Russo testified that he first saw Agent Eckstein's notes of the July 22,
2004, interview of Ms. Tyree when he was interviewed by OPR in December
2009, that he saw Agent Eckstein's 302 before the sentencing hearing in *Boehm* in

---

[23]At the time, AUSA Russo was conducting post-conviction litigation in *Boehm* and had
recently filed a 44-page opposition to a motion to vacate Mr. Boehm's sentence. *See Boehm*,
Government's Opposition to Motion to Vacate Sentence Under 28 U.S.C. § 2255, dated Sept. 5,
2007 (Dkt. No. 943).

2005, and next saw it in 2009 during the OPR investigation and the *Brady* review in *Kott* and *Kohring*. *Id*. at 106 & 142.

AUSA Russo testified that his discussion with Mr. Goeke and Mr. Marsh was "uncomfortable" and did not "sit well" with him:

> Q        You have said now a couple of times that the conversation on Thursday with Marsh and Goeke when they brought in your notes to show you didn't sit well. What is it about it that didn't sit well?
>
> Mr. Russo    Showing me my notes and it was more of -- it seemed like they definitely had a position on this, that Allen was telling the truth about all this.
> I didn't agree with that. I thought Allen obviously had to know about this. There was no other explanation other than him being part and parcel to this lie, so that didn't sit well with me because they were sort of taking the notes, even if they were true, and that's what she told me, a little out of context.
> It was all right, so she said this and therefore, you know, that absolves us because it didn't happen. Whose idea it was is the key factor here. To me, it was never the key factor, whose idea this was. It was did they act together in subordination [sic] of perjury.
> That's what didn't sit well with me. . . . [The meeting] was uncomfortable.

*Id*. at 208.

AUSA Russo advocated disclosure of Mr. Allen's involvement in Ms. Tyree's false statement during that meeting with Mr. Goeke and Mr. Marsh, and in subsequent discussions with Nelson Cohen, the Alaska U.S. Attorney, Mr. Bottini and Mr. Goeke. *Id*. at 121 & 130-132.  AUSA Russo testified that he told Mr. Bottini that he didn't agree with Mr. Marsh's and Mr. Goeke's view that disclosure was not required, and that he and Mr. Bottini discussed the issue with Mr. Cohen. *Id*. at 209.  AUSA Russo's position during these discussions was that disclosure was warranted, whether the false affidavit was Ms. Tyree's or Mr. Allen's idea, because Mr. Allen clearly facilitated its creation and use. *Id*. at 121-

122 & 198-200.  AUSA Russo, Mr. Bottini, and possibly Mr. Goeke, met with Mr.
Cohen, who agreed that disclosure was appropriate. *Id*. at 130.  However, DOJ's
Public Integrity Section, not the Alaska U.S. Attorney's Office, was in charge of
the Polar Pen cases. *Id*. at 112 & 130-131; *see also* Deposition of J. Bottini, Dec.
16, 2009, at 315; Deposition of W. Welch, Jan. 13, 2010, at 265.

An email exchange between Mr. Bottini and Mr. Marsh, a few days after
AUSA Russo's meeting with Mr. Marsh and Mr. Goeke, illustrates the
controversy:

Email from Mr. Bottini to Mr. Marsh, October 8, 2007:

. . . Also, Jim [Goeke] and I talked a number of times on Friday about the
Bill/Bambi stuff. After talking it over and getting the solicited and
unsolicited input of others in the office, both Jim and I think that we need to
run this by PRAO as soon as possible.  What concerns Jim is that both
Russo and John Eckstein now recall that Bambi told them that Allen asked
her to give the sworn statement that she had not had sex w/Allen when she
said that actually had had sex w/him.  Jim is very concerned that because he
crosses over in both cases, it will look like he in particular did not disclose
something that might have been inquired on cross of Bill - i.e., have you
ever asked someone to make a false statement under oath, etc.....

At this point, so many people in this office are aware of the issue (especially
Nelson [Cohen]) and have varying degrees of solutions to the problem, we
need to run it up the pole at PRAO.  Conjecture on my part, but I can see
them advising us to make an in camera disclosure to Sedwick both in
anticipation of the Kohring trial (do we have to turn it over?) and as a "here
it is, what do we do now" issue as to the Kott trial.
     JWB

Mr. Marsh's email reply on Oct. 9, 2007:

As for the Allen/Bambi stuff, when Jim and I were prepping for [the Kott]
trial, Jim's recollection - which I believe absolutely - was that Bambi stated
in debriefs that Allen <u>never</u> asked her to lie/make a false statement.  When
Jim and I talked to Frank [Russo] about this on Thursday, Frank said that

was his memory as well, although he believed one could "infer" something
else. Eckstein told Jim the same thing later Thursday. So I have to confess
that, to me, it's strange that Russo and Eckstein are saying something
completely different now. That said, if we need to run it by PRAO, we can
and should do that. I have a hard time, though, running it up as "should we
have disclosed this?," because this Russo/Eckstein version of the Bambi
statement is different than what Jim and I knew prior to the Kott trial, and
also doesn't square with what Russo and Eckstein were saying at the end of
last week.

> Deposition of J. Goeke, Jan. 8, 2010, Exh. 18, email exchange between J.
> Bottini and N. Marsh, dated Oct. 8 & 9, 2007 (emphasis in original; first
> ellipsis added).[24]

Agent Eckstein testified in this investigation that he did not recall ever
being asked by Mr. Goeke or by any prosecutor whether he might have made a
mistake in his notes or in his 302 of the interview of Ms. Tyree on July 22, 2004.
Deposition of Agent Eckstein, April 15, 2010, at 40 & 43. He never changed his
view that Ms. Tyree did not create the false affidavit on her own:

> Every conversation I've ever had with anybody on this issue, I stood by my
> original opinion prior to this interview, which was there's no way this 15
> year old girl came up with this on her own.
>
> * * *
>
> I believe any time that this subject came up, whether it was in the Boehm
> case or in connection with Polar Pen, my position on it has always been that
> I do not believe she came up with this on her own, that what she told us in
> July was consistent with what I believed was the truth.

> *Id*. at 51.

PRAO was consulted a few days after the email exchange between Mr.
Bottini and Mr. Marsh, and after Ms. Tyree was interviewed about what she told

---

[24]This email exchange has no DOJ Bates number; it was provided to us during the
deposition of Mr. Goeke by his attorneys, Matthew I. Menchel and Daniel L. Rashbaum.

219

AUSA Russo and Agent Eckstein three years earlier regarding her false sworn statement.

> b. Oct. 10, 2007   Mr. Bottini and Agent Kepner interview Ms. Tyree and the four-sentence 302 states that she "came up with an idea to sign a document to prevent further extortions [of Mr. Allen] . . . The content of the document was created solely by TYREE with the help of the attorney [for Mr. Allen]."

Mr. Bottini and Agent Kepner interviewed Ms. Tyree on Oct. 10, 2007, in the presence of her attorney, Ms. Tatter, who continued to represent her in post-conviction proceedings which were pending at the time and which continued through February, 2009. Ms. Tatter had recently filed a motion to modify the conditions of Ms. Tyree's post-release supervision, which was unopposed by the Alaska U.S. Attorney's Office. *See United States v. Tyree*, 3:04-cr-00003-JWS (D. Alaska (Anchorage)) (Dkt. No. 949), Unopposed Motion to Delete Special Condition of Supervision No. 6, dated Sept. 11, 2007, at 2 ("Assistant U.S. Attorney Frank Russo does not oppose the deletion of Special Condition No. 6. . . . The parties do not believe Ms. Tyree constitutes any danger to any minors at the present time."); *id*. (Dkt. No. 950), Order, dated Sept. 14, 2007 (unopposed motion granted); *see also id*., (Dkt. No. 998), Unopposed Motion to Terminate Supervised Release, dated Jan. 22, 2009, at 1 ("Assistant U.S. Attorney Frank Russo does not oppose this motion."); *id*. (Dkt. No. 999), Order, filed on Feb. 2, 2009 (terminating supervision, effective Feb. 6, 2009).

Agent Kepner wrote a four-sentence 302 of the interview:

Lisa LNU (last name unknown) was extorting BILL ALLEN regarding an alleged relationship between BAMBI TYREE and ALLEN. TYREE came up with an idea to sign a document to prevent further extortions by LISA. Tyree met with an attorney in a downtown office building close to Phil Weidner's office. The content of the document was created solely by TYREE with the help of the attorney.

220

Agent Kepner's 302 of Interview of Bambi Tyree, dated October 11, 2007 (parenthetical in original)(DOJ Bates no. CRM067063).

The unidentified attorney referred to in the last sentence of the 302 was the attorney for Mr. Allen. Deposition of J. Bottini, Dec. 17, 2009, at 695.

Mr. Bottini described the interview:

> Mr. Bottini   . . . So then we got Russo's notes That [sic] contradict the 302. Tatter says that's not what she said.  Bambi agrees to come in and submit to an interview. . . .
> Tatter [was] there. What I recall is we showed her the Eckstein 302, asked her if it accurately reflected what she recalled saying to Agent Eckstein and AUSA Russo.  She immediately disavows the part about Bill Allen asking me to do this.  She said that's not what I said.  There was something else in the 302, and I don't remember what the heck it is, but she also said this is wrong here too.
> But the key component that we're looking at right here, did Allen ask you to go give the statement, she says –

> Q      I never said that.
> A      "I never said that. That was my idea," and then she goes on to explain a little bit, that Allen was getting shaken down by some other woman, who was threatening to go to the press or something, you know, and was trying to basically shake him for money, and that she had heard of someone having a similar problem before.
> The way they solved it was to go give a sworn statement.  So what she says is Bill didn't ask me to do it, but I asked him, do you have a lawyer?  Who's your lawyer, and then she goes off and does this on her own.  That's what she says during the interview.
> So those are the facts and the information, as I recall it, that had been collected up until October the 12th of 2007.  All of that's going back to the Public Integrity Section, with the idea being –

> Q      In the person of Mr. Marsh?

221

A      Yeah. I think -- I can't remember -- thanks. Yeah, if you don't mind. I can't remember is [sic] Sullivan's being copied on all this or not. But you know, what I do remember is Nick [Marsh] having agreed that this should be run by PRAO, I think, took on the responsibility of making that contact.

Deposition of J. Bottini, Dec. 17, 2009, at 694-696.

Mr. Marsh described the circumstances that led to his consultation with PRAO:

Mr. Marsh    . . . What our issue was, between the Kott and Kohring trials in Alaska, Jim Goeke came across some documentation, came across a 302 and some notes, that reflected there might have been an issue with Bambi Tyree. The 302 said she made a statement. I can't remember. There were handwritten notes from the AUSA that was there.
The 302 at least in our view was kind of inconclusive, it didn't really say whether she made a false statement at Allen's request, but it raised an issue.
We then reviewed the AUSA's notes which made it pretty specifically clear at least in our view that it was Bambi's idea not Allen's, because there was a word scratched out and then "Bambi's idea."
We were concerned about it because it raised an issue. I don't recall in which order this happened, but we took it to Bill Welch and said this is what we have, we have this 302 that could be read a number of different ways. We have this set of information -- this set of notes from Frank Russo.

Q      Did you show him the 302?
A      I don't remember showing him the 302, but I know we read him the relevant portions as we did when we talked to PRAO. The relevant stuff here is like a sentence or two in each document. It was pretty straightforward. . . . What I remember him directing us to do is to contact Bambi and have her re-interviewed, which we did. . . .

222

As a result of that information, what we learned was that Bambi was emphatic that it was her decision to make a false statement, that Bill Allen was not involved. Bambi's attorney passed on to Jim or Joe, I can't remember which one, that she was in the same meeting and her memory was that Bambi was emphatic as well.

Goeke talked to the agent who had done the 302. The agent said I can't remember, I have a general memory that yeah, maybe you're right, maybe I got it wrong, I just don't remember.

\* \* \*

Q  Eckstein retreated from this 302?

A  What Jim told me is he had a conversation with Eckstein and Eckstein said I don't remember exactly what happened, I kind of think, Jim, you're right, you're right in the sense that Bambi said it was her idea and not Bill Allen's. That's my general memory.

Deposition of N. Marsh, Feb. 2, 2010, at 167-169 & 184.

Mr. Marsh characterized Agent Eckstein's 302 as "inconclusive" and "ambiguous" (*id*. at 167-168 & 238) because it didn't make a "direct link" to Mr. Allen:

Q  She signed an affidavit falsely denying that she had sex with him. That's what it says, isn't it?

Mr. Marsh  I respectfully disagree with that. I believe there is a jump in there that's not specifically dealt with in the 302. This was one of the reasons that -- I hate to keep going back to it -- what we wanted to do was to find out exactly what happened. We wanted to get the accurate answer. We were looking for evidence to go one way or the other. This says she made an affidavit at Allen's request in which she lied, but it doesn't –

Q  About having had sex with Allen. That's what it says.

A  Absolutely.

MR. LUSKIN:  When she was 15.
(attorney for Mr. Marsh)

223

BY MR. SCHUELKE:

Q      Yes.

A      There isn't a direct link indicating that Allen was aware of the contents of the affidavit or that she was going to lie in it, simply that Allen directed her to go talk to the lawyer or go meet with the attorneys, and then she signed it. Coupled with the notes from Russo, we had an ambiguity. We honestly thought that the materials that we had from the FBI didn't specifically make that link, and then with Goeke's recollection that Bambi said it was all her idea, coupled with Russo's notes from the same meeting that made clear it was Bambi's idea, what we tried to do was to try to figure out what happened in that meeting.

Q      Let me stop you there. I just heard you say that you concluded that this 302 was ambiguous when coupled with Russo's notes; is that right?

A      No, that's not correct.

Q      You think and you thought then that this 302 standing on its own was ambiguous?

A      Yeah. We looked at this. It didn't specifically say that Allen directed her to make a false statement. It was coupled at the same time with Jim Goeke's memory of a markedly different interaction with Bambi Tyree and statements that he remembered to be directly contradictory to that.

MR. SHIELDS:

Q      Statements he made on another case?

BY MR. SHIELDS:

Q      On a different occasion?

A      It very well could have been.

Q      You know he wasn't here for this one; right?

A      I believe that's correct. What we wanted to do was to -- shortly thereafter, we were able to obtain Russo's notes. That made it seemingly very clear it went the other way around. Again, I hate to keep going back to it, but we tried to find out what happened in that

224

meeting, and the more that we found out about it, the less comfort anybody had that Bambi had said Bill Allen caused me to make a false statement. It wasn't -- I didn't feel comfortable making that determination. What we needed to do was take it to PRAO. We had no control over what PRAO was going to do. They could have come and said you need to disclose this, and at that point, we have to do it.

*Id*. at 237-239.

Mr. Marsh acknowledged that AUSA Russo's motion *in limine* stated unambiguously that Ms. Tyree signed the false affidavit at Mr. Allen's request. *Id*. at 186. Mr. Marsh "had concerns about that [filing]" and he and the other prosecutors wanted to speak to PRAO about it. *Id*.

### c. Oct. 12, 2007    First of Two PRAO Consultations

PRAO attorney Ruth Plagenhoef was called by Mr. Marsh on Oct. 12, 2007 and she prepared an Inquiry Summary Sheet (DOJ Bates nos. CRM115164-165) which summarized the "Facts" provided, the "Question Presented" and the "Advice Rendered". In the "Facts" section, the Inquiry Summary Sheet reflects in pertinent part that Mr. Marsh told Ms. Plagenhoef that:

- AUSA Russo, "who worked on the old case [*Boehm*] expressed the
    thought that Bambi had told him that B[ill] A[llen] had in fact asked
    her to lie";
- "Jim [Goeke], who also worked on the old case, remembers Bambi saying
    it was her own idea";
- " FBI agent [Eckstein] on the old case remembers that Bambi said it was
    her own idea";
- "Bambi still says it was [her idea]";
- "B[ill]A[llen] says that he never asked her to lie";
- "Bambi's attorney believes that she did it on her own";
- Agent's Eckstein's 302 "is not clear, stating simply that she lied";
- AUSA Russo's "notes says that Bambi denied that B[ill]A[llen] asked her
    to lie".

225

PRAO Inquiry Summary Sheet, dated Oct. 12, 2007, p.1 (DOJ Bates no. CRM115163-169).[25]

The description of Agent Eckstein's 302 is inaccurate, and AUSA Russo's notes, before and after the cross-out of "Bill" and the addition of "Bambi's idea", do not reflect that Ms. Tyree "denied that Ms. Allen asked her to lie."  The Inquiry Summary Sheet does not reflect that Mr. Marsh disclosed to the PRAO attorney the government's motion *in limine* in *Boehm* which contains AUSA Russo's unequivocal assertion that Mr. Allen asked Ms. Tyree to make a false sworn statement.

---

[25]The "Facts" section in full recites:

In this public corruption investigation one jury trial has gone forward and another is set to start in a few weeks.  The USAO is recused except that AUSA Jim Gaichee (ph) is working with them on the case.  Several years ago one of their trial witness, BA [Bill Allen], a cooperating defendant, was involved in other criminal matters and maybe civil suits, involving the Tyree family, including Bambi, a young woman who had a lot of difficulty with the law.  (Cocaine, child prostitution, etc.) Bambi has said that she lied to an attorney by giving a false declaration during the litigation.  She says that the lying was her own idea, to protect BA, and that BA never asked her to lie.

      After the first trial (in which BA testified and was extensively cross-examined about all kinds of bad acts, including wanting to kill a relative), the media dug up the old dirt on Bambi and BA.  Another AUSA [Russo] who worked on the old case expressed the thought that Bambi had told him that BA had in fact asked her to lie.  Jim [Goeke], who also worked on the old case, remembers Bambi saying it was her own idea, the FBI agent on the old case remembers that Bambi said it was her own idea, Bambi still says it was, BA says that he never asked her to lie, and Bambi's attorney believes that she did it on her own. (Plus, BA will admit that he wanted the relative dead - they find him believable.)  They found the old FBI 302 - it is not clear, stating simply that she lied.  They found old notes by the AUSA [Russo] - the notes says that Bambi denied that BA asked her to lie.

PRAO Inquiry Summary Sheet, dated Oct. 12, 2007, p. 1 (DOJ Bates no. CRM115163-169).

PRAO's analysis was based on the absence of any information which corroborated AUSA Russo's "thought" that Ms. Tyree told him that Mr. Allen asked her to lie:

> Question Presented: Do prosecutors have to turn over the information that an AUSA thought that a person said that a star witness in a case had once asked her to lie, when no evidence corroborate [sic] that information, and all the evidence they can find rebuts that information?

> *Id*.

Ms. Plagenhoef answered that question in the negative:

> Advice Rendered: No. I agreed that under Brady/Giglio principles this information does not have to be turned over to the defense.
> I suggested that if they were concerned they might file something under seal ex parte with the judge, but they told me that the judge in the first trial was also the judge on the Bambi matters years ago, and that when some issues came up in the trial and the old matters were implicated, the judge ruled that no one was "going to go down that road."
> I told them that most courts hold that [Rule] 3.8(d) [of the Rules of Professional Conduct] is read to be consistent with the constitutional analysis and that they should write up everything they did to try to check the information out and keep it in the file. I asked how the defense might use the information (that an AUSA thought he remembered that Bambi said that B[ill] A[llen] asked her to lie) and they agreed that since BA would testify that he didn't, there would be no way to "impeach" him with the information. Also, they researched as much as they could independently about whether it was possible that BA did ask her to lie, and all the evidence they uncovered points to the other interpretation.
> The Alaska rule does not require more.

> *Id*.[26]

---

[26]The rule referenced is Rule 3.8(d) of the Alaska Rules of Professional Conduct, which was attached to the PRAO file, provides:

(continued...)

Ms. Plagenhoef was interviewed in this investigation. She stated that, as
reflected in her Inquiry Summary Sheet, she was called by Mr. Marsh and that
others may have been on the telephone call with him. *See* Memorandum of
Interview of PRAO attorneys Ruth Plagenhoef and Patricia Weiss, dated Feb. 18,
2010, at 3. She was not provided with a copy of Agent Eckstein's 302 and she did
not think that Mr. Marsh read it to her. *Id.* Having read the 302 during the course
of our interview, she said that, had she known the contents of the FBI 302, she
would not have written that it "is not clear" since the 302 states that the false
affidavit was done at Mr. Allen's request. *Id.* at 4. She could not recall what, if
anything, was said about a sealed briefing, and did not know what her handwritten
note, "sealed briefing ref whether Bambi lied" (DOJ Bates no. CRM115166),
referred to. *Id.* at 3. Ms. Plagenhoef explained that she would have written a much
different report if Mr. Marsh had informed her of the contents of the FBI 302 and
the motion *in limine* filed by AUSA Russo:

- she would not have written that there was "no evidence" that
  corroborated AUSA Russo's recollection that Mr. Tyree told him that
  Mr. Allen asked her to sign a false sworn statement, or that "all the
  evidence they uncovered points to the other interpretation". *Id.* at 4-5;
  and,
- she would not have agreed that there was no obligation to disclose the
  information and might have recommended *in camera* disclosure to the
  court. *Id.* at 5.

Ms. Plagenhoef was asked what her response would be if Mr. Marsh said that he
read the 302 to her. She replied, in sum and substance, that she did not think he

---

[26](...continued)
ALASKA
Rule 3.8. Special Responsibilities of a Prosecutor.
The prosecutor in a criminal case shall:
(d) make timely disclosure to the defense of all evidence or information known to the
prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in
connection with sentencing, disclose to the defense and to the tribunal all unprivileged
mitigating information known to the prosecutor, except when the prosecutor is relieved of
this responsibility by a protective order of the tribunal[.]

*Id.* at DOJ Bates no. CRM115168.

read the report to her because, if he did, she would not have written in her notes that the "agent's 302 is inconclusive". *Id*. at 4.

Mr. Marsh testified that he and Mr. Goeke called PRAO. Deposition of N. Marsh, Feb. 2, 2010, at 173.[27]  He reviewed with Ms. Plagenhoef the motion *in limine* by AUSA Russo, Agent Eckstein's 302 and AUSA Russo's notes (*id*. at 187-189); he testified that he "specifically [recalled] reading to them in October [] from the 302" (*id*. at 214), and "remember[ed] specifically talking about the filing." *Id*. at 225.  Mr. Marsh told Ms. Plagenhoef in October, 2007, or another PRAO attorney in December, 2007, that AUSA Russo stated in his motion that Mr. Allen directed Ms. Tyree to lie:

> Q          You're certain that you talked about the filing to the PRAO attorney when you first contacted them in October 2007?
> Mr. Marsh   I remember us informing the PRAO attorney. I believe it was in October of 2007. Perhaps it was in December 2007. I'm almost positive it was the first time in October 2007. We referenced the fact that there was a filing. I don't remember us reading any filing to them. It may be that -- I remember us referencing there had been representations made under seal in an unrelated case that Allen had directed her to lie, directed Tyree to lie.
>
> Q          You told them there was a filing that said Allen directed her to lie?
> A          Yes.
>
> Q          But didn't bother reading it to her?
> A          That's correct. I don't remember us reading it. It's possible that maybe Goeke did. I just don't remember that. I remember us describing it. It was one of the things we were trying to figure out what was going on.

*Id*. at 229-230.

---

[27]Mr. Goeke testified that he and Mr. Bottini were told about the October, 2007, consultation with PRAO after the fact. Deposition of J. Goeke, Jan. 8, 2010, at 297; *see also* Deposition of J. Bottini, Dec. 17, 2009, at 695-696 (same).  Mr. E. Sullivan testified that Mr. Marsh, Mr. Goeke, and possibly Mr. Bottini, were on the telephone call to PRAO in October 2007, and that he was not on the call. Deposition of E. Sullivan, Jan. 6, 2010, at 283-286.

Copies of the documents were not provided to PRAO because none were requested. *Id*. at 199.

Mr. Marsh disclosed "everything we had" to PRAO:

> What I recall is that we had in front of us at that time the 302, Russo's handwritten notes, and we had the filing. I don't recall us reading verbatim the substance of the filing. It may be we did. I just don't remember.
>
> I do remember us reading the relevant sentences from the 302, not the entire 302, but the relevant sentences, reading the one relevant line from Russo's notes, and describing the other information that we had.
>
> &ast; &ast; &ast;
>
> We had disclosed everything we had to PRAO and PRAO gave us the advice that we didn't have any Brady or Giglio obligations because from PRAO's perspective, we had looked into this as thoroughly as we could and we didn't have anything to support the idea that Bambi actually said to the Government that she lied at Bill Allen's request.

Q Except for the 302 and Eckstein's notes and the pleading that was filed in the Boehm case.

A The pleading in the Boehm case was very explicit as to what it was. I can tell you we did view some gaps in the 302. I don't recall the notes. What I can tell you is we presented that to PRAO, which is what we are supposed to do.

*Id*. at 188-189 & 196-197.

Mr. Marsh viewed PRAO's determination, that there was no *Brady* or *Giglio* obligation to disclose Mr. Allen's solicitation of Mr. Tyree's sworn false statement, as establishing "by definition" that there was "no evidence" that Ms. Tyree made a false statement at Mr. Allen's request:

> Mr. Marsh . . . We took it all to [PRAO]. We vetted it out. We read them the relevant portions. They came back and said very clearly and very emphatically you have no Brady or Giglio obligation. That's what we relied on.

Q    That's what you relied on to say in the September 9 [*Brady* disclosure] letter [to Williams & Connolly] that "The Government is aware of no evidence to support any suggestions that Allen asked [Ms. Tyree] to make a false statement under oath?"

A    Yes. When PRAO informed us they believed there was neither Brady or Giglio obligations, *by definition, there can be no evidence* to support the conclusion. We did --

                              *  *  *

A    . . . What we did with that set of information is we went to PRAO. That's what we are supposed to do. We went to them. We read them the relevant parts. We told them what it was. We talked to them about all the various issues around that. They came back and said you don't have any Brady/Giglio obligations.
    If we don't have Brady or Giglio, *if we had evidence, then we'd have Brady or Giglio. By definition when we're told we have no Brady or Giglio materials, then we have no evidence* to support --

                              *  *  *

A    Right. What we did with all this information was we went to PRAO with it. I remember one of the PRAO attorneys, and I think it was Ruth, but I'm not sure, I remember her saying all you have is a statement in a Government brief under seal that doesn't even -- that is inconsistent with the prosecutor's notes, *you have nothing to turn over*. I remember that because I thought it was kind of a funny thing for them to say.

                              *  *  *

A    Sure. I recall one of the [PRAO] people saying all you have is an AUSA's brief that is inconsistent with notes, *you have nothing*, and I remember there being some laughter, and it just stuck with me. I was kind of surprised to see PRAO -- it was a very emphatic statement by PRAO, by the person we talked to, so it stuck with me.

                              *  *  *

BY MR. SCHUELKE:

Q       I have one more question before you do. The statement in the
        September 9 letter that the Government is aware of no evidence
        to support any suggestion that Allen asked the other female to
        make a false statement under oath, would you explain to me
        how it was that you were comfortable in writing that portion of
        that sentence in view of the 302, Eckstein's notes, and the
        Boehm filing?
A       Sure. When we went to PRAO and PRAO informed us that this
        raised neither Brady or Giglio, by definition, there could be no
        evidence to support a Brady or Giglio issue. It's necessarily
        correct.

BY MR. SHIELDS:
Q       I'm sorry. Would you mind repeating that, please?
A       Sure. Maybe I should say it the other way. If there was
        evidence to support a Brady or Giglio issue, there would be a
        Brady or Giglio issue. If there is no Brady or Giglio disclosure
        obligation, there can be no evidence to support a Brady or
        Giglio obligation.

        I'm sorry, Mr. Schuelke. I'm trying to answer your question.
        What we had is we took all this material, we gave it to PRAO.
        They told us we didn't have anything. With respect to the 302
        and the notes, I respectfully apologize that you don't agree with
        the collective decision or the collective view of the team that
        there was some ambiguity in those. We thought there was.
        PRAO confirmed it. The only thing that we were left with was
        this statement in a brief and PRAO indicated to us it wasn't
        evidence. In fact, it's not evidence.

        *Id*. at 179-180, 182, 187, 195-196 & 201-202 (emphasis added).

*See also* Email from N. Marsh, dated Oct. 12, 2007, to B. Morris ("Brenda - we
spoke with PRAO today about the Bambi Tyree/Bill Allen stuff.  We took them
through the whole process.  PRAO strongly supported how we handled it and
agreed that there was no basis for disclosure/nothing to disclose.  In fact, the staff
attorney (who starts at OPR on Monday) seemed a little surprised that we thought

232

there was enough to even bring it to PRAO. Anyway, we got that resolved. Thanks for your help on this. Nick") (DOJ Bates no. CRM0127877).

Mr. Marsh concluded that the assertion in the government's *in limine* motion in *Boehm*, that "Allen convinced Tyree to give a false statement", was evidence of misconduct, but not by Mr. Allen; he thought the misconduct was by AUSA Russo, the author of the motion:

> Mr. Marsh  . . . I should point out that from my perspective, I was actually more concerned, and I articulated to this [sic] Joe and Jim, that we might have an OPR/PRAO obligation with respect to Russo's filing, the filing that he did, because Russo's notes directly contradicted what was in the filing, and there were some reasons why perhaps a filing of that nature would be affected in such a way. I'd be happy to go into that.
> Tyree was going to be a witness for the sentencing of Boehm. Tyree had admitted that she had made a false statement under oath and arguably it's better for rehabilitation of the witness to have that false statement be made at someone's request and direction rather than something that was made at the witness' request.
> 
> \* \* \*
>
> BY MR. SCHUELKE:
> Q    I didn't follow your last answer. What are you suggesting?
> A    I'm just suggesting that I actually had -- Tyree was going to be a witness.
>
> Q    In the Boehm sentencing?
> A    Right. Tyree had admitted to the Government that she made a false statement, prior false statement under oath. It would be more rehabilitatable -- a bad phrase -- a witness in that situation would have more credibility if she made the false statement at the direction of a third party rather than knowingly making a false statement free and unencumbered and of her own volition.

Q     Are you suggesting that Russo misstated it in the filing because it
      would be more advantageous to the Government in the Boehm
      sentencing?
A     I'm not making that claim.

Q     What are you saying?
A     I'm telling you that I did discuss that. It was something that concerned
      me. I discussed it with Joe and Jim and ultimately decided the record
      wasn't clear enough and that if Alaska wanted to do something, they
      could do it, but it wasn't - -

Q     So, that is what you are suggesting?
A     I was concerned about it.

Q     You were concerned about?

MR. LUSKIN:             You need to just say it.
(attorney for Mr. Marsh)
THE WITNESS:   I was concerned that there was an incentive to make
               Bambi look better and the incentive was to blame it on
               Bill Allen rather than being consistent with what Russo's
               notes were.

BY MR. SCHUELKE:
Q     Which would amount to AUSA Russo having made a knowingly false
      declaration in a pleading filed before the District Court in Alaska?
A     If that were correct. I remember talking it over with Joe and Jim and
      Joe and Jim believing there was enough confusion and they had a
      belief that Frank legitimately believed that he got it correct. I let it
      drop.

      *Id*. at 190-192.

*See also* Deposition of W. Welch, Jan. 13, 2010, at 201 ("[Mr. Bottini told me that
Russo had all but admitted that he had made a mistake [in his motion *in limine* in
*Boehm*] but was unwilling to concede it because he didn't want to invite an OPR
inquiry on himself."), and Feb. 5, 2010, at 321-322 (same).

On October 22, 2007, ten days after Mr. Marsh obtained the PRAO opinion, trial commenced in *United States v. Kohring*, a Polar Pen indictment of another member of the Alaska House of Representatives. *United States v. Kohring*, CR no. 3:07-cr-00055-JWS (D. Alaska)("*Kohring*"), Indictment, dated May 1, 2007, at ¶ 2 (Dkt. No. 2); *id.*, Minute Entry (Trial by Jury - Day 1), Oct. 22, 2007 (Dkt. No. 110).  The trial prosecutors were Mr. Bottini and Mr. E. Sullivan (Deposition of E. Sullivan, Jan. 6, 2010, at 237), and Mr. Allen was again "a primary witness" for the government. *Kohring*, Order and Opinion, dated August 11, 2010, at 3 (Dkt. No. 309); *see also Stevens*, Transcript of Motions Hearing, Sept. 10, 2008 10:09 a.m., at 72 ("E. Sullivan: Mr. Allen's testimony was crucial to both [Kott and Kohring].").

     5. Oct. 25, 2007    *United States v. Kohring*, Sealed Proceeding:
                                 No Disclosure

As in *Kott*, the scope of the cross-examination of Mr. Allen regarding Ms. Tyree was addressed briefly in a mid-trial, sealed hearing before Judge Sedwick, and the prosecutors again withheld from the District Court and the defense impeachment information regarding Mr. Allen's subornation of perjury by Ms. Tyree.

The hearing was sealed, over defense objections, on the government's sealed motion served the previous day, which sought *inter alia* to preclude cross-examination of Mr. Allen and Rick Smith, a VECO executive, about ongoing, government investigations. *Kohring*, Order, dated Oct. 25, 2007, Court Exhibit (Court-redacted copy of "United States' Motion In Limine to Exclude Evidence Concerning Other Individuals' Conduct and to Exclude Evidence and Argument Regarding Selective Prosecution", *Filed Under Seal*, Filed on Shortened Time, dated Oct. 24, 2007, at 1-2 ("The instant motion is filed under seal because in part the motion addresses aspects of other, non-public investigations. Public disclosure of the nature and scope of these other investigations would compromise those investigations."))(Dkt. No. 123).  The government's written motion did not seek to restrict cross-examination of Mr. Allen regarding Ms. Tyree.

 During the sealed hearing, Mr. Bottini identified the ongoing investigations of Senator Stevens, █████████████████and Jim Clark, the Chief of Staff to

Governor Murkowski, as three areas where the cross-examination of Mr. Allen and Mr. Smith by Mr. Brown, the lawyer for Mr. Kohring, should be limited. *Id.*, Transcript of *Sealed Hearing on Plaintiff's Sealed Motion in Limine*, dated Oct. 25, 2007, at 7-8 (DOJ Bates nos. CRM127882-923). During the hearing, Mr. Bottini added another subject, Mr. Allen's relationship with the "Tyree family":

| | |
|---|---|
| MR. BOTTINI: | . . . The last thing I wanted to say, Your Honor, is that we're also concerned about whether Mr. Brown is planning on exploring on cross examination any aspect of Mr. Allen's relationship with certain people. And primarily what we're concerned about is whether he's going to try and cross examine Mr. Allen about his relationship with any member of the Tyree family. This is an issue that we keep hearing, you know, rumors about. And I want to - - |
| THE COURT: | But how would that tie into the concern for compromising an on-going investigation? |
| MR. BOTTINI: | Well, it's sort of a different area and I think it's - - it would be totally improper cross examination under Rule 608(b). |
| THE COURT: | It might be and I - - while I have to hear from Mr. Brown, but I don't think that's something we need to hear on a sealed record, is it? |
| MR. BOTTINI: | I think it is something that we need to talk about on a sealed record because what we're concerned about is that Mr. Browne [sic] may be planning to cross examine Mr. Allen about a relationship that he allegedly had with someone who was a juvenile at the time, and I think Ms. Tyree's got, you know, certain issues and rights to not have that discussed on an open record. |
| THE COURT: | All right, so your concerns are the ███████████, the ████████████████and Ms. Tyree? |
| MR. BOTTINI: | Yes . . . |

* * *

236

| THE COURT: | All right. Mr. Browne [sic], I'd like to hear from you, sir, regarding whether you had anticipated or feel you have any need to cross examine these individuals regarding any of those three areas. |
| MR. BROWNE [sic]: | . . . I will, more because of the gentleman, I suppose, than anything else, I'm not going to go into anything about juvenile relationships - - |
| THE COURT: | All right, so the - - |
| MR. BROWNE [sic]: | - - to me that's completely - - |
| THE COURT: | - - the type - - |
| MR. BROWNE [sic]: | - - that's - - to me, whether that's true or not I have no idea, and, two, it's amazingly tacky and I would not do that. |
| THE COURT: | All right, well, enough said, and I don't think it would advance Mr. Kohring's interests in any event. |

*Id*. at 9-12.

Mr. Allen's subornation of perjury was not disclosed to Mr. Kohring's attorneys until 2009, when the case was on appeal in the Ninth Circuit Court of Appeals. *Kohring*, Government's Disclosure Certification, dated Aug. 10, 2009 (Dkt. No. 253); *see also id*., Motion to Dismiss, or in the Alternative, for an Order Granting a New Trial, dated March 23, 2010, at 56-57 (Dkt. No. 269).

6. Dec. 20, 2007    After the *Kohring* trial, Second PRAO Consultation: No
Disclosure

a.    PRAO's Advice is Again Based on Inaccurate and Incomplete Information

Mr. Marsh called PRAO again on Dec. 20, 2007, and asked PRAO attorney Patricia Weiss the same question about disclosure which he had put to PRAO's Ms. Plagenhoef on Oct. 12, 2007. *See* PRAO Inquiry Summary Sheet, dated Dec.

20, 2007, "Facts", p.1 (DOJ Bates nos. CRM115170-181).  Mr. E. Sullivan
participated in this telephone conversation with Ms. Weiss. Deposition of E.
Sullivan, Jan. 6, 2010, at 96 & 208.  The renewed inquiry was prompted by the
fact that Mr. Marsh had learned that an Alaskan newspaper was about to publish a
story about the relationship between Mr. Allen and Ms. Tyree and her family. *See*
PRAO Inquiry Summary Sheet, dated Dec. 20, 2007, "Facts", pp.1-2 (DOJ Bates
nos. CRM115171-172).[28]

Ms. Weiss was interviewed in this investigation and she told us that her
Inquiry Summary Sheet probably combined the information provided to her by
Mr. Marsh and the information which he had provided to Ms. Plagenhoef during
the consultation on October 12, 2007. *See* Memorandum of Interview of PRAO
attorneys Ruth Plagenhoef and Patricia Weiss, dated Feb. 18, 2010, at 7.
According to the Inquiry Summary Sheet, Mr. Marsh reported to Ms. Weiss *inter
alia* that:

- "the notes of [] agent [Eckstein] who interviewed Bambi in the
  [*Boehm*] Case reflect that at the time of the interview she was
  adamant that the lie was her own idea";
- "the notes of [AUSA Russo] do not indicate one way or the other
  whether [AUSA Russo] thought at the time of the interview, that [Mr.
  Allen] had pressed Bambi to lie";
- "Based upon the results of your inquiry and the absence of any
  evidence supporting the notion that [Mr. Allen] had pressed Bambi to
  lie in [*Boehm*], you and your team concluded that there is no evidence
  to support the notion that [Mr. Allen] had pressed Bambi to lie.  You
  and your team therefore concluded that [Mr. Allen] did not press
  Bambi to lie and that [] AUSA [Russo]'s recollection was either

---

[28]The newspaper article was published several weeks later. *See* Anchorage Daily News,
Feb. 3, 2008, "Allen teen sex inquiry reopened/BAMBI: Police look into claim ex-Veco boss had
sex with underage girl".  The article described *inter alia* Ms. Tyree's criminal history, her
relationships with Mr. Boehm and Mr. Allen, Mr. Allen's gifts to Ms. Tyree and her family, and
how her relationship with Mr. Allen was the subject of sealed hearings during the trials of Mr.
Kott and Mr. Kohring.  A few days earlier, another newspaper article appeared which described
Mr. Allen's relationship with Ms. Tyree and reported that the Anchorage Police Department
suspended a sex-crime investigation of Mr. Allen in 2004, at the request of the federal
government. *See* Anchorage Press, Jan. 29, 2008, "Full Disclosure".

mistaken or was based upon a hunch for which there was no concrete support."

PRAO Inquiry Summary Sheet, dated Dec. 20, 2007, "Facts", p.1 (DOJ Bates no. CRM115171).[29]

---

[29]The "Facts" section of Ms. Weiss's Inquiry Summary Sheet in full recites:

**Facts:** On October 12, 2007, you sought advice from this office about whether Rule 3.8 required you to disclose to defense counsel in a public corruption case in Alaska the fact that AUSA [Russo] who had prosecuted a case unrelated to yours ([*Boehm*] Case) recalled believing that a person who is a cooperating witness [Mr. Allen] in your case had encouraged a defendant (Bambi) in the [*Boehm*] Case to lie under oath.

    At that time, in seeking PRAO's advice, you recounted that your team had conducted a thorough inquiry into the matter, including, among other things,
interviewing Bambi,
reviewing the notes of [] AUSA [Russo],
reviewing the FBI's contemporaneous notes of the interview with Bambi in the
    [*Boehm*] Case, and
checking with another AUSA [Goeke] who had worked on the [*Boehm*] Case with
    [] AUSA [Russo].

From your inquiry, you learned
that Bambi in an interview convened for the purpose of your inquiry, denied that
    [Mr. Allen] had pressed her to lie;
that [Mr. Allen] himself denied having pressed her to lie;
that AUSA [Goeke] who had worked on the [*Boehm*] Case does not believe or
    recall believing that the Mr. Allen had pressed Bambi to lie;
that the notes of the agent [J. Eckstein] who interviewed Bambi in the [*Boehm*]
    Case reflect that at the time of the interview she was adamant that the lie
    was her own idea; and
that the notes of [] AUSA [Russo] do not indicate one way or the other whether []
    AUSA [Russo] thought at the time of the interview, that [Mr. Allen] had
    pressed Bambi to lie.

    Based upon the results of your inquiry and the absence of any evidence supporting the notion that [Mr. Allen] had pressed Bambi to lie in the [*Boehm*] Case, you and your team concluded that there is no evidence to support the notion that [Mr. Allen] had pressed Bambi to lie. You and your team therefore concluded that [Mr. Allen] did not press Bambi to lie and that [] AUSA [Russo]'s recollection was either mistaken or was based upon a hunch for which there was no concrete support. Based upon these

(continued...)

239

The information in Ms. Weiss's Inquiry Summary Sheet is inaccurate and incomplete.

Agent Eckstein's notes, like his 302, reflect that Ms. Tyree stated that she signed the false affidavit at Mr. Allen's request. The description of AUSA Russo's notes is mistaken; those notes, after the cross-out of "Bill" and the addition of "Bambi's idea", state that the false affidavit was Ms. Tyree's idea. Ms. Weiss's report contains no reference to Agent Eckstein's 302; Ms. Plagenhoef's earlier report referred to the 302 but described it inaccurately: "They found the old FBI 302 - it is not clear, stating simply that she lied." PRAO Inquiry Summary Sheet, dated Oct. 12, 2007, p.1 (DOJ Bates no. CRM115164). Ms. Weiss's report, like Ms. Plagenhoef's, does not describe or make any reference to AUSA Russo's motion *in limine* which states that "Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied." *Boehm*, United States' Reply to Defendant's Opposition to Motion Regarding Impeachment Evidence Pertaining to Bambi Tyree, *Filed Under Seal*, dated August 17, 2004, at 2-3 (DOJ Bates nos. CRM119379-386).

Ms. Weiss told us that she recalled almost nothing about the call from Mr. Marsh, that she either took no notes of the conversation or did not retain them, and

---

[29](...continued)
circumstances, PRAO advised that Rule 3.8(d) did not require you to notify defense attorney about [] AUSA [Russo]'s recollection.

Recently you have learned that an Alaska newspaper is about to publish a news story that you believe will focus on, among other things, the close family ties that [Mr. Allen] has with Bambi and her family and the many things of value that [Mr. Allen] has given to Bambi and her family over the years. In fact, you have already been aware of [Mr. Allen]'s history and practice of giving things of value to Bambi and her family over the years, and, in connection with the [previous PRAO] inquiry about [] AUSA [Russo]'s recollection, you satisfied yourself that there is no evidence that [Mr. Allen]'s gift-giving had any connection to Bambi's lies in the [*Boehm*] Case. Nevertheless, in the face of upcoming publicity, AUSAs in the Alaska [U.S. Attorney's Office] have asked you to re-check with PRAO about whether Rule 3.8(d) requires you to disclose to the defense counsel [] AUSA [Russo]'s recollection that [Mr. Allen] had pressed Bambi to lie in the [Boehm] Case.

PRAO Inquiry Summary Sheet, dated Dec. 20, 2007, "Facts", pp.1-2 (all indentations, spacing, and brackets added) (DOJ Bates nos. CRM115171-172).

that her practice was not to take notes. *See* Memorandum of Interview of PRAO attorneys Ruth Plagenhoef and Patricia Weiss, dated Feb. 18, 2010, at 6.  We showed Ms. Weiss copies of Agent Eckstein's 302 and AUSA Russo's motion in *Boehm* and she did not recall any mention of the 302 or the motion during her conversation with Mr. Marsh. *Id*. at 8 & 9.  Ms. Weiss acknowledged that they might have been mentioned and she missed them:

| | | |
|---|---|---|
| Q | | If you were told about the 302 of the interview attended by AUSA Russo and the Russo brief, would you have written in the email to N. Mar[s]h and Ed Sullivan that "AUSA's recollection was either mistaken or was based upon a hunch for which there was no concrete support"? |
| Ms. Weiss | | I would not have written that, if I caught that, if it penetrated my skull. |
| | | |
| Q | | If they had told you about them the way I just did, you would not have written that statement? |
| A | | I recall it was complex and I may not have captured it all.  It was a complicated scenario and it may well be . . . conceivable that the documents were mentioned and I did not glean their significance.  This call was just a follow-up to the earlier call with a new development. |
| | | |
| Q | | What is complex about the pleading filed by Russo? |
| A | | It's not complex.  What was complex was the situation presented to me on the phone - multiple suits, people, interviews.  I could easily have missed . . . |
| | | |
| Q | | You wrote in the email that "AUSA's recollection was either mistaken or was based upon a hunch for which there was no concrete support".  Had you been shown the 302 and Russo's pleading, could you have written that? |
| A | | Not if I was shown the documents.  I'm confident that I was not shown the documents.  If I had been shown them, it would not have come out that way.  I can't say that the documents were not mentioned. |

241

*Id*. at 9-10 (ellipses in original).

Based on the information received from Mr. Marsh and the information previously provided to Ms. Plagenhoef, Ms. Weiss concluded that no disclosure was required and recommended that Mr. Marsh consult with his Departmental Ethics Office and that he review DOJ's policy on disclosures:

> Advice rendered: I provided the following advice:
> As explained during our discussion, your learning about an upcoming news story having a focus on [Mr. Allen]'s gift-giving to Bambi and her family, without more, does not cause us to change our previous advice that Rule 3.8(d) does not require you to disclose [] AUSA [Russo]'s recollection that [Mr. Allen] had pressed Bambi to lie in the [*Boehm*] Case. Rule 3.8(d) requires the disclosure of evidence that tends to negate the guilt of the accused or mitigate the offense. The obligation imposed by the Rule is generally thought to be the same as or similar to the obligations identified in Brady/Giglio and their progeny, which focus on the government's obligations to disclose certain kinds of evidence to the defense in a criminal case. Here, despite that news stories may attempt to link [Mr. Allen]'s gift-giving practices to wrong-doing in the [*Boehm*] Case, at this point, after a thorough inquiry, you and your team are unaware of any such evidence. Thus, the fact of an upcoming new story does not change our view that Rule 3.8(d) does not require you to disclose AUSA [Russo]'s recollection. (Of course, if the news story disclosed such information, we should consult further).
>
> On another front, if you have not already done, I suggest that you double-check with your DEO [Departmental Ethics Office] about whether applicable Standards of Conduct might require action on your part in this situation. As you know, those standards, among other things, prohibit DOJ attorneys from engaging in conduct that has even the appearance of impropriety. While I assume that neither the appearance standard nor any other provision of the Standards is implicated here, interpreting the Standards is beyond our scope of authority so I mention it out of an abundance of caution. In addition, again if you have not already done so, you should double-check to ensure that DOJ's recently- adopted policy on disclosures in criminal cases, does not require a disclosure here, as I understand that the policy requires more in the way of disclosure than is

required under applicable case law.

PRAO Inquiry Summary Sheet, dated Dec. 20, 2007, "Advice Rendered",
p.2 (DOJ Bates no. CRM115172).


      b.      Significant Factual Errors in PRAO's Report: Not Detected or
              Corrected

On Dec. 21, 2007, the day after her telephone conversation with Mr. Marsh,
Ms. Weiss sent an email to Mr. Marsh and Mr. E. Sullivan which "memorialized
the advice I provided to you" by reproducing in full in the email the "Facts" and
"Advice Rendered" sections of her PRAO Inquiry Summary Sheet. *See* Email
from P. Weiss to N. Marsh and E. Sullivan, dated Dec. 21, 2007, "Subject: Your
Inquiry" (DOJ Bates nos. CRM115173-174). Ms. Weiss concluded her email by
inviting further questions and cautioning that "This advice is based on the facts
presented. If the facts are different or change, further analysis may be required. In
that event please contact PRAO by e-mail at DOJ.PRAO@usdoj.gov or by
telephone at (202) 514-0458." *Id*.

Ms. Weiss explained that her practice was to write the email first and then
the summary sheet, and that she "relies on the inquirer to check on my write-up."
*See* Memorandum of Interview of PRAO attorneys Ruth Plagenhoef and Patricia
Weiss P. Weiss, dated Feb. 18, 2010, at 8. After sending the email, Ms. Weiss was
not contacted by Mr. Marsh or Mr. E. Sullivan. *Id*.

Mr. Marsh received Ms. Weiss's email but he "[did not] remember going
through it for the purpose of trying to see if there were any mistakes or errors in
it." Deposition of N. Marsh, Feb. 2, 2010, at 220 & 232. He acknowledged that
Ms. Weiss's statement in the email that the agent's notes reflect that Ms. Tyree
"was adamant that the lie was her own idea" was incorrect; it appeared to him that
Ms. Weiss had confused Agent Eckstein's notes with AUSA Russo's. *Id*. at 213 &
218-219. He doubted he would have corrected the error:

      Q           Did you see this e-mail on December 21?
      Mr. Marsh:  I'm sure I did.

Q    Did you make any effort to correct it?

A    No. I doubt we would have. What was important was that we had
     presented and they understood there were two things. The one set of
     information from the agent that was ambiguous, or at least we viewed
     it as ambiguous, that we provided to them orally, and then Russo's
     notes. The fact that they got them flip flopped, I doubt we would have
     ever gone back to them and said hey, by the way, you got the
     substance right but you have the individuals wrong. It just wouldn't
     have occurred -- it certainly wouldn't have occurred to me to do that.
     It wasn't material.

                              *   *   *

Q    Do you remember when you got that e-mail in December 2007 [from
     PRAO] noting the errors that we have identified here today?

A    I don't.

Q    You didn't notice any errors that could have caused you to think about
     whether or not I should call PRAO and correct them?

A    Right. I don't remember going through it for the purpose of trying to
     see if there were any mistakes or errors in it.

        *Id*. at 220-221 & 231-232.

Mr. Marsh forwarded Ms. Weiss's email to Mr. Bottini and Mr. Goeke on Jan. 3,
2008. *See* Email from N. Marsh, dated Jan. 3, 2008, to Mr. Bottini and Mr. Goeke
(DOJ Bates nos. CRM115205-206).

    Mr. Bottini testified that either he didn't read the email at the time or didn't
notice the inaccuracies, and that he had only recently realized that the facts recited
in Ms. Weiss's email were inaccurate:

Q              And that's December '07?

Mr. Bottini    Yeah. I think it was December 21st of '07. Anyway,
               some time into the first week of January, there's an email
               exchange where Marsh and Sullivan send us the PRAO
               email, with an acknowledgment from Ed "Oh, I thought
               we sent this to them but apparently we didn't."
               So he emailed that out to Goeke and I.  I don't remember

                                    244

looking at the thing at the time and reading it and noticing that this isn't totally accurate.  But it's apparent when you look at the -- here's the facts That you gave me, that it's not 100 percent correct.  But I don't -- I'm going wait a second, you know.  That's not exactly right.

Q      You don't remember doing that?
A      I don't remember doing that.

BY MR. SCHUELKE:
Q      But apparently you have at some point?
A      Well, I have recently.

Mr. WAINSTEIN          Q      You just received those documents.
(attorney for Mr. Bottini)
THE WITNESS:          A      Yeah, we just got them from the Department. But in the production at the time --

BY MR. SHIELDS:
Q      Let me ask a question.  You looked at it.  It wasn't accurate, you saw that?
A      I don't think I read it at the time.

Q      But no.  I thought I heard you just say when you read it at the time, you saw that it wasn't accurate?
A      No.  I think when I read it at the time, I didn't notice it.  I don't remember going through it –

Q      You don't remember seeing any deficiencies?
A      I don't remember seeing any deficiencies.

Q      On the -- when you first got it?
A      Right, the email exchange between PRAO and Public Integrity.
                          *   *   *
 BY MR. SCHUELKE:
Q      Had you reviewed the PRAO opinion by That [sic] point [July 14, 2008]?

245

A       You know, I must have looked at the email when it first came out, but I don't remember reading that thing with a fine-toothed comb.

Q       No, I mean in preparation for this [Assistant Attorney General in charge of the Criminal Division] Friederich meeting?

A       Oh no, I didn't pull it out again in preparation for this meeting.

Q       So you didn't have occasion to tell him that there were aspects of the PRAO account of the facts which you thought were inaccurate?

A       No, I didn't review that and go hey, wait a second.

Deposition of J. Bottini, Dec. 17, 2009, at 703-705 & 708-709.[30]

Mr. Goeke testified that he read Ms. Weiss's email when he received it in January, 2008, but he did not see, or did not remember seeing, the inaccuracies in her statement of facts. Deposition of J. Goeke, Jan. 8, 2010, at 352-359. He was surprised that he didn't notice the material inaccuracies:

Q       Correct. But my question is, do you recall reading this recitation of the facts when this e-mail [from Ms. Weiss] came to you?

A       I don't recall it specifically, but I'm sure I read it.

Q       And do you have any recollection of noting to yourself, as you read it, that it's materially inaccurate?

A       I don't recall that, but as I read it through here, it's materially inaccurate.

Q       Yeah, I know. I want to know if you made that observation back in January of '08 when this came to you.

A       I don't remember.

---

[30]As further described below at pages 265-270, Mr. Bottini and other members of the *Stevens* trial team met with AAG Friedrich and Principal Deputy R. Glavin on July 14, 2008 to discuss the case. Mr. Bottini testified that during this meeting he told them "about the allegations involving the procurement of the false statement by Bambi Tyree, what had been done in relation to that as far as additional fact-gathering, that we had gone to PRAO twice with the issue, and that the advice that we had obtained was That [sic] we didn't have a disclosure obligation." Deposition of J. Bottini, Dec. 17, 2009, at 708.

Q    And so you don't remember having said to Mr. Marsh, for example, "Hey, you know, what you told these people is not entirely accurate?"

A    I don't remember that.

BY MR. SHIELDS:

Q    How could you miss it?

A    How could I miss it? Well, this came in on the heels of we had gone to PRAO twice, "Thou shalt not make any disclosure unless we order you to." My assumption is, when we went to PRAO the first time, we must have provided them all the source documents. We sent them to Public Integrity.

                    *   *   *

Q    But my question to you is if you read it, how could you miss the misstatements that it contained in here? Because you're the one that's been pushing this issue.

Mr. Goeke    Yeah, I'm the one that's been pushing –

Q    You're the one who collected the documents; the Eckstein's notes, the 302, Russo's notes, right? You collected all those documents.

A    I did.

Q    Circulated them with the Public Integrity lawyers, Marsh, right? How could you read a line that says that the notes of the agent who interviewed Bambi in the unrelated case reflect that at the time of the interview she was adamant that the lie was her own idea and not say, "What are they talking about?"

A    Because I read this with the idea that this was a subsequent contact and it could very well be that the subsequent contact, they got something wrong or this is a new person they got something wrong. I don't know, but –

Q    Let me back you up there. You're not being clear to me. Is -- you're telling us that's what you thought at the time that you read it, saw the mistake and concluded that --

A    No, I don't recall reading at the time and going, "Oh, there's an obvious mistake. I better -- we better recontact them again."

247

Q     You don't recall?

A     I don't recall that.


Q     And my question was --

A     I'm surprised that I didn't.

                        *   *   *

Q     No, be careful. I'm not understanding that answer. My question was
      you read it at the time, but didn't catch these errors? Is that --

A     Didn't catch these errors or didn't see the significance in them at the
      time because I read it quick. I don't know. I filed it away, "Okay,
      here's the PRAO advice. Okay, good."


BY MR. SCHUELKE:

Q     Okay.

A     A close read, that's wrong. It's wrong.


MR. MENCHEL:           Mind if I ask?

MR. SCHUELKE:          No, sir.

MR. MENCHEL:           Do you have a specific recollection of reading the

(attorney for Mr. Goeke) line that the notes of the agent who interviewed

                       Bambi in the unrelated case reflect that at the time
                       of the interview, she was adamant that the lie was
                       her own idea?

THE WITNESS:           I do not have a recollection of reading that.


BY MR. SHIELDS:

Q     And also, this makes no mention of the 302 or the motions in the U.S.
      V [sic] Boehm case.

A     Right, it does not.


Q     But it does say there's no concrete evidence.

A     It does.


Q     And when you read that, what did you think?

A     I don't have a recollection in reading that with that kind of a critical
      eye. Oh, this is all screwed up.


                              248

*Id*. at 353-359.

Mr. E. Sullivan was present when Mr. Marsh called Ms. Weiss in December 2007, but he had little participation in the conversation. *Id*. at 95. He testified that Mr. Marsh's presentation to PRAO was "pretty exhaustive", that PRAO was familiar with the topic and that Mr. Marsh "quickly gave [Ms. Weiss] a rundown of the issue again." *Id*. Mr. E. Sullivan recalled that Mr. Marsh "summariz[ed] a lot of the information for PRAO" (*id*. at 288), but he did not remember if Mr. Marsh told Ms. Weiss about Agent's Eckstein's 302 or AUSA Russo's briefing in *Boehm*. *Id*. at 209. He testified that none of the information provided to Ms. Weiss by Mr. Marsh was inaccurate or incomplete. *Id*. at 215.

However, Mr. E. Sullivan's knowledge of the relevant documents was limited at the time, and remained so. He testified that he has never read Agent Eckstein's 302 (*id*. at 93), does not recall that anyone ever read it to him (*id*. at 191-192), and might have seen the agent's and AUSA Russo's notes of the interview of Ms. Tyree for the first time in preparation for his deposition in this investigation. *Id*. at 176-178. The only document that he knew existed "for certain" was the motion *in limine* in Boehm, excerpts of which had been circulated by Mr. Goeke in March 2007. *Id*. at 195; *see also* Email from J. Goeke, dated March 5, 2007, to E. Sullivan and J. Bottini ("Here is information concerning the Bambi Tryee [sic] matter we discussed this morning. Below are pertinent excerpts from briefing filed in United States v. Boehm, a case in the District of Alaska in 2003-2004 in which I participated. . . . .")(DOJ Bates nos. CRM022276-279).

Mr. E. Sullivan testified that, at the time of the call to Ms. Weiss, he had not focused on the issue:

> . . . I'm not quite sure why the issue arose again in late 2007, but that's when I mentioned earlier that however the issue arose, whatever the issue was, I was not focused on it. I knew Mr. Goeke, Mr. Marsh and Ms. [sic] Bottini were focused on the issue, so I said, "Just go figure out the answer." And I think they did some additional leg work to try and figure out, because I think Mr. Goeke thought whatever the allegation was in the brief may not be right. It was inconsistent with his recollection. And so I think they made a determination that in fact Mr. Goeke's recollection was correct. That's what was taken to PRAO, I believe, was even in addition to all the legwork they

249

had done.

* * *

. . . The legwork done by I don't know which individuals, but at least they
talked. And I said "they," collectively, because I don't know which ones.
Somebody talked to Bambi. Somebody talked to Bambi's lawyer. Somebody
went and talked to the other AUSA. Somebody went and I think they pulled
the AUSA's notes and files. I think they may have even talked to the agent
that was involved. And, what I understood then was that the allegation was
not true, that there was a mistake in the brief. I believe Mr. Goeke and Mr.
Bottini, and maybe even Mr. Marsh. They thought, just to err on the side of
caution, we should still go to the professional responsibility advisory office
and make sure that this is the proper thing to do.

*Id*. at 91-92 & 94.

A few weeks after Ms. Weiss's email was received, Mr. E. Sullivan sent Mr.
Marsh an email inquiring whether he had "any thoughts" about the last paragraph
in Ms. Weiss's email, which suggested that they check with their
DEO/Departmental Ethics Office about applicable Standards of Conduct. *See*
Email from E. Sullivan to N. Marsh, dated Jan. 3, 2008 (DOJ Bates no.
CRM028095). Mr. Marsh replied: "I haven't checked the DEO standards but will
do so. Since we have nothing to turn over/no evidence of any wrongdoing, I'm
sure we're fine." *See* Email from N. Marsh, dated Jan. 3, 2008, to E. Sullivan
(DOJ Bates no. CRM028095).

Mr. Welch received a copy of Ms. Weiss's email on Jan. 3, 2008. *See*
Deposition of W. Welch, Jan. 13, 2010, at 270; *see also* Email from E. Sullivan,
dated Jan. 3, 2008, to W. Welch (cc: N. Marsh)("Bill - per your request attached is
the email that PRAO sent to us regarding the 'Bambi' issue. Please let us know if
you need anything else.") (DOJ Bates no. CRM028101). He did not read it "with
that specificity, meaning I didn't think that I would have to read the factual
recitations with an eye towards are my lawyers reporting anything inaccurately."
Deposition of W. Welch, Jan. 13, 2010, at 270. No one told him that the PRAO
opinion recited any of the facts erroneously. *Id*. at 271.

Mr. Welch described his understanding at the time regarding Ms. Tyree's
false statement:

Mr. Welch   My understanding was that in between the Kott and the
            Kohring trials, and I don't recall what the event was that
            prompted the discussion with me, meaning what precipitated
            them coming to me, but I recall that in October of 2008, they
            wanted to –

Q     2008?
A     I'm sorry; 2007. Thanks. They wanted to flag a new issue for me, and
      the issue as presented was in Morris' office. I recall that it was
      Marsh doing the talking but Ed Sullivan was there.
            They explained several facts, as I recall them. Number one, that
      Bill Allen had been interviewed about the issue of whether or not he
      had ever caused Tyree to submit or file a false affidavit and he had
      denied it.
            They had interviewed Tyree along the same lines, whether or
      not Bill Allen had caused her to file a false affidavit or submit a false
      affidavit and she had denied it.
            That Judge Sedwick sua sponte -- the issue had been flagged
      for him and he sua sponte in the Kott trial had foreclosed
      impeachment on that issue.
            That they had reviewed the notes of an Assistant U.S. Attorney
      who had apparently put in pleading's [sic] a statement that Allen in
      fact had done that and the notes reflected the exact opposite, meaning
      in notes of this interview with Ms. Tyree, the AUSA's notes were the
      complete opposite to what he had put in the pleading's [sic].
                              * * *
A     My understanding as of March of 2007, October 2007 and later,
      December 2007 and January 2008, that this notion came from a
      mistaken recollection of the Assistant U.S. Attorney who had written
      the pleading's [sic] in the underlying Boehm case, and that his notes
      contradicted what was in the pleading's [sic].
                              * * *
Q     But you didn't know at any of those junctures, Spring 2007, Fall 2007
      and January 2008, that there was an FBI 302 of that same Tyree
      interview? You didn't know that?
A     I didn't know that. I didn't know it, and if it had been mentioned, I
      certainly don't recall it. My vivid recollection of seeing and knowing

251

about the 302 for the first time was when the A[nchorage] P[olice]
D[epartment] file came in on late afternoon of October 14 [2008].
I can't recall if my review was that night or the next day, but that's
when I saw the 302 for the first time.

Q    October 14, 2008 in the midst of the Stevens' trial?
A    Correct. Prior to that, my understanding had been that the interview
     had been one that was post-indictment in the Boehm case, perhaps
     like a sentencing type interview, and that based on that, I believed
     there were simply notes and no 302.

Deposition of W. Welch, Jan. 13, 2010, at 29-30, 33 & 34-35.

On the same day Ms. Weiss advised Mr. Marsh and Mr. E. Sullivan, Mr.
Welch sent an email to all the Polar Pen prosecutors:

I understand PRAO rendered their advice. I tried to call Nelson [Cohen] to
talk to him, but he was in a meeting.
We've done all that we are going to do on the matter. I'm off for vacation
starting tomorrow, but will try to talk to Nelson sometime next week. In the
meantime, nothing will be filed in our case. Joe and Jim, per the recusal
notice, you work for PIN, and so these are your marching orders until I talk
to Nelson.

Email from W. Welch, dated Dec. 20, 2007, to Mr. Bottini, Mr. Goeke, Mr.
E. Sullivan, Mr. Marsh, and Ms. Morris (DOJ Bates no. CRM089170).


c.       Post PRAO, Disclosure Discussions "Die on the Vine"

After PRAO's decision, Mr. Bottini, Mr. Cohen and AUSA Russo discussed
whether disclosure should be made nevertheless:

Mr. Russo    Yeah. I know later it was broached with Bottini as well at the
             very least, in a later conversation, that although PRAO may say
             this, maybe we should turn it over nonetheless.

252

Q       Who said that?
A       Nelson Cohen.

Q       After the PRAO decision/advice had been rendered?
A       Yes. I know there was some indication that PRAO had blessed, so to
        speak, the fact that they didn't have to turn it over. That was the
        conversation I alluded to where Bottini said well, you're going to
        need to go to Bill Welch, can you talk to him about this, cut us out of
        the loop. He was fine with disclosure. It's not like he said we
        shouldn't disclose this. That wasn't his argument. He took the position
        that I understand, I think it's probably prudent but leave me out of
        this, can you be the heavy with Welch, essentially.

BY MR. SCHUELKE:
Q       This is what he said after Mr. Cohen said to him PRAO is not the be
        all and end all, you may be required to turn this over anyway?
A       Yes.

Q       Mr. Bottini replied in substance, I hear you, I don't necessarily
        disagree with you, but this is not my call to make, and I really don't
        want to be in the middle between you and Public Integrity, so why
        don't you, Mr. Cohen, talk to Bill Welch?
A       That's the substance of what I remember.

Deposition of F. Russo, March 24, 2010, at 152-153.

*See also* Deposition of J. Bottini, Dec. 17, 2009, at 701 ("Our folks, some of them
management people in our district, feel very strongly that even if PRAO comes
back and says you don't need to do this, we should do it anyway.  Go to the court
and make an ex parte disclosure.").

Mr. Bottini testified that Mr. Welch's email, dated Dec. 20, 2007, left him
and Mr. Goeke "whipsawed" and he wanted Mr. Cohen and Mr. Welch to resolve
the issue, but they never did and the controversy "died on the vine":

Mr. Bottini: . . . we get an email from Welch to Goeke and I the third week
             of December, which basically says my understanding that

253

PRAO has rendered their decision, which apparently they had by that time, not chapter and verse on this, not citing it verbatim.

But basically what it said is we're not going to be submitting any filings.  We've done all we're going to do.  You guys work for PIN, which we did under the terms of the recusal.  I'll talk to Nelson. . .

At that time, Goeke and I are saying you know, we're being whipsawed on this stuff.  These guys out in D.C. are telling us they don't think we need to do this.  Our folks here, including management people, are saying you'd better think strongly about doing this, regardless of what these guys are saying here.  It's like you guys work it out, you know. That's what we're telling these people, you know.

Q        These people?
A        I'm sorry, the folks at Public Integrity, you know.  What I wanted was Nelson Cohen and Bill Welch to talk about this, and avoid me being caught in the middle, when these guys are saying no, these guys are saying yes.  You guys work it out.  We'll do whatever you guys agree to do, you know.

That's what Jim and I were concerned about. So anyway, we get the email from Welch.  We've done all we're going to do.  I'll talk to Nelson.

*  *  *

I remember asking Mr. Cohen some time in January whether he and Mr. Welch have talked about this issue, and I remember him telling me "I've left a message for him.  We keep trading messages."  I don't think they ever talked.

BY MR. SCHUELKE:
Q        Okay.
A        And then it just kind of died on the vine after a while. The next time it comes up, I believe, is in relation to that strength and weaknesses chart that we looked at earlier, where I raise the issue, you know, should we say something about Allen's shady background here.

254

Deposition of J. Bottini, Dec. 17, 2009, at 701-703 & 705.

After the consultation with PRAO in December, 2007, Mr. Welch spoke on a conference call with Mr. Bottini, Mr. Marsh, Mr. E. Sullivan, and possibly Mr. Goeke, about Mr. Cohen's desire to "unravel the recusal" of the Alaska U.S. Attorney's Office from the Polar Pen cases. Deposition of W. Welch, Jan. 13, 2010, at 257-258 & 260.  During that call, he was told about the soon-to-be-published newspaper article which would focus on Bill Allen's gifts to Ms. Tyree and her family, and the question was raised whether, despite the PRAO opinion, the issue should be raised with Judge Sedwick in an *ex parte* filing. *Id*. at 258.  Mr. Welch testified that no one was pushing for disclosure:

Mr. Welch  Yes. So, we have this conference call. I follow up with them on this issue, this gift giving issue and say essentially is there new evidence or new information that possibly links gift giving with this false affidavit allegation. . . .

They assured me there's no new information on this issue of the false affidavit. I then talk about the giving of gifts. Is there any information that suggests that the gift giving is somehow linked with the allegation, and they tell me no, there is no information, there's not even an inference, there's not even a suggestion, there's absolutely nothing. There's simply gift giving.

I recall Bottini indicating that this was Bill's practice. He was known as being very generous. He gave not only to Bambi, but he gave to the Tyree family and he gave to a lot of other people who worked for VECO, so that gift giving was not solely to Tyree, but it was to everybody. They assured me there was no connection. I didn't have a problem with a filing. If we're going to file something, I want to be able to say we have a basis to do this filing.

*  *  *

Q    Were Bottini, Goeke, Sullivan and/or Marsh still pushing for disclosure?

A    No, none of them were pushing for disclosure. My understanding from the call is they all believed they didn't have to disclose, that they were just being extra cautious, running the facts by PRAO, and just

255

getting a PRAO decision to further bless what they believed to be the right decision.

\* \* \*

A        . . . Bottini didn't believe, as I recall, that there was any disclosure issue.

   *Id*. at 260-261, 263 & 264.

In his email, dated Dec. 20, 2007, Mr. Welch reserved the issue for further discussion when he returned after the holidays.  The issue was never raised again:

   What I was telling them was essentially, look, I have to go on the holidays, we are not doing a filing, but I'm happy to talk to Nelson on the recusal issue, and for some reason, he may have been involved in the filing issue, so I had no problem getting his input on what he thought about it.
   Then the issue just never materialized.

   *Id*. at 262.

*See also Id*. at 259 ("Mr. Welch: No. I tried to call [Nelson Cohen].  He called me back. I called him again. For whatever reason, he never called me back."); Email from Mr. Marsh, dated Jan. 3, 2008, to E. Sullivan ("Anything about the substance of the voicemails [traded between Mr. Welch and Mr. Cohen]? Joe mentioned yesterday that Nelson seemed to have moved on to other things - just curious if he and Bill got things resolved. Thanks.") (DOJ Bates no. CRM028107).

   7.    *Kott* and *Kohring* Postscript, Ninth Circuit, 2009-2010: Some Disclosure

   Disclosure of Mr. Allen's subornation of perjury by Ms. Tyree and other *Brady*/*Giglio* information was made in *Kott* and *Kohring* by a new team of DOJ lawyers in 2009-2010, during the pendency of Mr. Kott's and Mr. Kohring's direct appeals to the Court of Appeals for the Ninth Circuit. *Kott*, CR no. 3:07-cr-00056-JWS (D. Alaska)(Sedwick J.), Order and Opinion, dated Jan. 13, 2010, at 1-3 (Dkt. No. 429); *Kohring*, CR no. 3:07-cr-00055-JWS (D. Alaska)(Sedwick J.), Order and Opinion, dated August 24, 2010, at 3-4 (Dkt. No. 309).

On April 13, 2009, the day before their appeals were argued, Mr. Kott and Mr. Kohring moved in the Court of Appeals for a *Brady* disclosure order based on Judge Sullivan's Order, dated April 7, 2009, appointing the undersigned to investigate the prosecutors in *Stevens*, including Mr. Goeke and Mr. Marsh, who were also the trial prosecutors in *Kott*, and Mr. Bottini and Mr. E. Sullivan, the trial prosecutors in *Kohring*. *United States v. Kott*, Case no. 07-30496 (9th Cir.), Motion for Disclosure of *Brady* Material on Appeal, dated April 13, 2009, at 5-6 (Dkt. Entry 48-1); *United States v. Kohring*, Case no. 08-30170 (9th Cir.), Motion for Disclosure of *Brady* Material on Appeal, dated April 13, 2009, at 6 (Dkt. Entry 36-1).

The government responded to both motions "by reporting that it was conducting a review of the disclosures and would produce any *Brady* material it found that had not already been produced." *United States v. Kott*, Case no. 07-30496 (9th Cir.), Order, dated June 10, 2009, at 2 (Dkt. Entry 59); *United States v. Kohring*, Case no. 08-30170 (9th Cir.), Order, dated June 10, 2009, at 2 (Dkt. Entry 41). On the government's motion, the Court of Appeals remanded both cases to the District Court "to determine: (1) whether the government breached its obligation of full disclosure under *Brady* and *Giglio v. United States*, 405 U.S. 150, 154 (1972); (2) if so, whether the defendant was prejudiced by the violation; and (3) if the defendant was prejudiced, what the remedy should be." *Kott*, *supra* (9th Cir.), Order, dated June 10, 2009, at 3; *Kohring*, *supra* (9th Cir.), Order, dated June 10, 2009, at 6.

When the government completed its *Brady* disclosure, Mr. Kott and Mr. Kohring moved in the District Court to dismiss the indictment based on the government's suppression of *Brady* information, including Ms. Tyree's statement that she made a false sworn statement at Mr. Allen's request. *Kott*, CR no. 3:07-cr-00056-JWS (D. Alaska), Motion to Dismiss or, in the Alternative, for Discovery, dated Sept. 24, 2009, at 7 & 37-39 (Dkt. No. 404); *Kohring*, CR no. 3:07-cr-00055-JWS (D. Alaska), Motion to Dismiss, or in the Alternative, for an Order Granting a New Trial, dated March 23, 2010, at 56-57 (Dkt. No. 269). Judge Sedwick denied both motions. *See Kott*, Order and Opinion, dated Jan. 13, 2010 (Dkt. No. 429); *Kohring*, Order and Opinion, dated August 11, 2010 (Dkt. No. 309).

In *Kott*, the District Court found *inter alia* that the failure to disclose Mr. Allen's solicitation of a false sworn statement by Ms. Tyree, which "clearly suggest[s] that Allen's character for truthfulness was doubtful", was not material and did not prejudice Mr. Kott because, "assuming the court would permit the inquiry", had Mr. Allen denied the solicitation (as he had previously), Federal Rule of Evidence 608 would have barred its proof by extrinsic evidence. *Kott*, *supra*, Order and Opinion, dated Jan. 13, 2010, at 18 (Dkt. No. 429). In *Kohring*, the District Court incorporated its decision in *Kott* and reached the same conclusion. *Kohring*, *supra*, Order and Opinion, dated August 11, 2010, at 28-29 (Dkt. No. 309). *Compare United States v. Mahdi*, 598 F.3d 883, n. 11 (D.C. Cir. 2010) ("We recently recognized that Rule 608 leave[s] the admissibility of extrinsic evidence offered for other grounds of impeachment[,] such as contradiction, . . . to *rules 402 and 403*. . . . And evidence that would contradict [a witness's] trial testimony, even on a collateral subject is relevant under Rule 401 because it would undermine her credibility as a witness regarding facts of consequence.") (citations and internal quotation marks omitted; emphasis, brackets and first ellipsis in original). Both cases then returned to the Ninth Circuit.

The Court of Appeals granted Mr. Kott's and Mr. Kohring's motions for supplemental briefing and argument on the *Brady* issues decided by the District Court. *Kott*, Case no. 07-30496 (9th Cir.), Order, dated May 5, 2010 (unpublished) (Dkt. Entry 64); *Kohring*, Case no. 08-30170 (9th Cir.), Order, dated August 24, 2010 (unpublished) (Dkt. Entry 55). Oral argument was held in *Kott* and *Kohring* on Oct. 6, 2010, and at the conclusion of the government's argument in *Kott*, the Court inquired about the status of the investigations of the prosecutors' conduct in *Stevens*. *Kott*, *supra* (9th Cir., Oral Argument, Oct. 6, 2010), audio recording (download 08-30170.wma), at 31:35-32:37 (http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=0000006279)(last visited Nov. 14, 2011). The government replied that the investigations by OPR and by the "special counsel" appointed by Judge Sullivan were pending and that procedures were in place to ensure that any information favorable to Mr. Kott or Mr. Kohring that was found in those investigations would be "filtered through to us so we can turn them over". *Id*. The Court asked when those investigations were expected to conclude and the DOJ attorney replied that he did not know. *Id*.

Near the end of the argument in *Kohring*, after the government referred to the harmlessness of the trial prosecutors' "discovery missteps and mistakes in this

case", the following colloquy occurred:

| | |
|---|---|
| Judge Fletcher: | I would leave you with a final thought also. The government's conduct here was pretty reprehensible, and whether you wish to stake the reputation of the Court on this case where you have a pitiful figure who couldn't even buy his food sometimes and asked for a loan of $17,000 which is refused to him. Now take that thought back and talk it over with - with the government. |
| Government: | I understand your Honor, I understand the frustration of the Court and - |
| Judge Fletcher: | It's more than frustration. We like to have pride in our government and - conduct, and I recognize that you two were here before, you had no part of that but the question is whether you wish to buy into what they did. |
| Government: | I appreciate your words your Honor and I agree to some extent. I would with respect simply restate though that the focus in this case at the end of the day is about whether the defendant got a fair trial and and - |
| Judge Fletcher: | That's part of the focus, isn't it? |
| Government: | And so with respect, we feel that he did even given all the - again the missteps and the mistakes. |

*Kohring*, *supra* (9th Cir., Oral Argument, Oct. 6, 2010), audio recording (download 08-30170.wma), at 24:38-26:10 (http://www.ca9.uscourts.gov/media/view_subpage.php?pk_id=000000312 9) (last visited Nov. 14, 2011).

In rebuttal, Mr. Kohring's lawyer argued, in part:

The focus is not only on Mr. Kohring. Under the *Napue [v. Illinois*, 360 US 264, 269 (1959)] argument the focus is squarely, squarely on the behavior of the previous government lawyers. If they presented false evidence, if they allowed false evidence to go to the jury, it is about them as much as it is about Kohring and on the *Napue* issue the standard of materiality is in fact less. If there's basically any possibility that it could have affected the verdict, the Court should dismiss. We've laid out in our briefing why

there's a *Napue* violation.  I would respectfully suggest that false evidence
was presented.

*Id*., audio recording (download 08-30170.wma), at 26:18-26:55

Two weeks later, the government sent a letter to the Court of Appeals to
clarify the record on appeal in light of the Court's questions and comments:

We are writing in response to some of the Court's comments during oral
argument on October 6, 2010. In particular, certain of the Court's questions
in the *Kohring* case suggest that although the district court found it
unnecessary to address allegations of prosecutorial misconduct in light of its
conclusion that there were no *Brady* violations, this Court may nonetheless
be considering the remedy for a *Brady* violation.  For that reason, we want
to ensure that it is clear what information is and is not in the record before
the Court and what information has and has not been produced to
defendants [Kott and Kohring] during the course of the remand.  We have
searched for and produced to the defense all information that could arguably
be characterized as favorable information that should have been produced
before trial.  *We have not, however, produced the full range of materials,
either positive or negative, bearing on the decisionmaking and intent of the
trial team.*

*Kott*, *supra* (9th Cir.), Letter from Kevin R. Gingras and Peter M. Koski,
dated Oct. 22, 2010, to Molly C. Dwyer, Clerk, U.S. Court of Appeals for
the Ninth Circuit, at 1 (emphasis added) (Dkt. Entry 84-1).

The government sent a similar letter on the same day to Sheryl McCloud, Mr.
Kott's lawyer, with a copy to Mr. Kohring's lawyer, describing the *Brady*
disclosures made post-trial:

Since the onset of our involvement in June 2009, we have provided you
with access to extensive factual and investigative information. That
information has included thousands of pages of 302s, agent and attorney
notes, transcripts, emails and other documents. Throughout that process, we
have diligently produced all material potentially favorable to the defendant.
We have not, however, undertaken to produce all material bearing on the

question of what remedy might be appropriate were the Court to conclude that there had been a *Brady* violation, including information concerning the motives and decisionmaking of the trial team.

> *Id*., Letter from James M. Trusty, dated Oct. 22, 2010, to Sheryl McCloud, at 1 (Dkt. Entry 84-2).

Ms. McCloud filed a memorandum in reply arguing that the government's letters disclosed for the first time that the government, contrary to its prior representations, had suppressed "information that it unilaterally deem[ed] relevant to 'remedy'", and that the "continued suppression provides further support for the remedy of dismissal." *Id*., Appellant Mr. Kott's Memorandum Re: Government's October 22, 2010, Disclosure, at 2 & 7 (Dkt. Entry 85). Mr. Kohring's attorney filed a similar response. *Kohring*, *supra* (9th Cir.), Letter from Thomas W. Hillier, dated Oct. 26, 2010, to Molly C. Dwyer, Clerk, U.S. Court of Appeals for the Ninth Circuit (Dkt. Entry 71).

The Ninth Circuit recently reversed both convictions. *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011); *United States v. Kott*, 423 Fed. Appx. 736 (9th Cir. 2011). In *Kohring*, the Court found that the prosecutors (Mr. Marsh and Mr. Goeke were the trial prosecutors) had suppressed exculpatory and impeachment information, including "evidence that Allen attempted to suborn perjury from one of the alleged victims [of sexual misconduct]", and that "[t]he prosecution's suppression of evidence in this case undermines confidence in the outcome of the trial." *Kohring*, 637 F.3d at 904 & 912 (internal quotation marks and citation omitted). Judge Fletcher dissented in part and wrote that "these egregious violations of basic prosecutorial responsibilities" warranted a "stronger remedy" (*id*. at 914):

> I concur in Parts I and II of the majority's opinion, which unequivocally establish that the prosecution withheld and suppressed material that was favorable to the defense, in violation of *Brady* and *Giglio*, and that these suppressions undeniably prejudiced Kohring. I respectfully dissent, however, from Part III. Because this case exemplifies "flagrant prosecutorial misconduct," *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008), I would have this court exercise its supervisory authority to dismiss the Superceding Indictment with prejudice.

*Id*. at 913.

In *Kott*, the Court reversed for the reasons stated in *Kohring*:

> Specifically, the newly-disclosed evidence of Anchorage Police Department
> files suggesting that key prosecution witness Bill Allen sexually exploited
> minors, and attempted to conceal that behavior by soliciting perjury, would
> have been admissible and was not needlessly cumulative. Such evidence
> could have been used, at a minimum, on cross-examination to impeach
> Allen's testimony.
>
> *Kott*, *supra*, at *3 (citation omitted).

Judge Fletcher dissented in part again:

> I am deeply troubled by the government's lack of contrition in this case.
> Despite their assurances that they take this matter seriously, the government
> attorneys have attempted to minimize the extent and seriousness of the
> prosecutorial misconduct and even assert that Kott received a fair
> trial--despite the government's failure to disclose thousands of pages that
> reveal, in part, prior inconsistent statements by the government's star
> witnesses, Bill Allen and Rick Smith, regarding the payments Kott allegedly
> received. The undisclosed pages also reveal an ongoing investigation of
> Allen for sexual exploitation of minors and his attempts to suborn perjurious
> testimony from one of the minors, and information regarding Smith's
> questionable mental health around the time of Kott's trial.
> The government's stance on appeal leads me to conclude that it still has
> failed to fully grasp the egregiousness of its misconduct, as well as the
> importance of its constitutionally imposed discovery obligations. Because a
> new trial, in my view, is insufficient to remedy the violation of Kott's
> constitutional right to a fair trial and to deter future illegal conduct, I would
> exercise our supervisory authority to dismiss the indictment with prejudice.
>
> *Id*. at *5.

Mr. Bottini and Mr. E. Sullivan were the trial prosecutors in *Kott*.

Mr. Kott and Mr. Kohring filed petitions for a rehearing by the panel and an order remanding the cases to the district court for an evidentiary hearing on the question of the appropriate remedy. *United States v. Kott*, No. 07-30496 (9th Cir.), Petition for Panel Rehearing, dated April 6, 2011, at 3 (Dkt. Entry 88); *United States v. Kohring*, No. 08-30170 (9th Cir.), Petition for Rehearing, dated April 8, 2011 (Dkt. Entry 76). The panel recently denied both petitions in a split vote. *United States v. Kohring*, No. 08-30170 (9th Cir.), Order, dated May 20, 2011 (Dkt. Entry 77); *United States v. Kott*, No. 07-30496 (9th Cir.), Order, dated May 20, 2011 (Dkt. Entry. 89).

8. April 11, 2008 Prosecution Memo in *Stevens*: No Disclosure

Mr. Bottini testified that the issue regarding Ms. Tyree's false affidavit next arose in April, 2008, when a chart of the "strengths and weaknesses" of the case against Senator Stevens was prepared at the request of Alice Fisher, the Assistant Attorney General in charge of Criminal Division. Deposition of J. Bottini, Dec. 17, 2009, at 705; *see also* Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, at 1 ("Last week, you requested that we set forth what we anticipate will be STEVENS' best arguments at trial, along with our proposed responses to those arguments. Accordingly, annexed hereto as Exhibit A is a chart that presents STEVENS' strongest defenses and our responses to them.") (DOJ Bates no. CRM016377). Mr. Marsh's draft of that chart, which he circulated for comment, identified *inter alia* under "Attacks", Mr. Allen's "shady personal background", without elaboration. *See* Email from N. Marsh, dated April 7, 2008, to Mr. Bottini, Mr. Goeke and Mr. E. Sullivan, Exhibit A, p. 2 (DOJ Bates nos. CRM016133-135). Mr. Bottini in reply questioned whether more needed to be said about "the Bambi Tyree issue":

> Also, do we need to say or should we say anything more about the Bambi Tyree issue that we have discussed ad naseum [sic] w/ PRAO and the current "re-opened" APD [Anchorage Police Department] investigation of Allen.
> All of which falls into the "sketchy background" category of course and all of which should not be admissible to impeach Bill. Nevertheless, we have to assume that W & C already know about or will know about this and will attempt to get in front of a trial jury.

Email from Mr. Bottini, dated April 7, 2008, to Mr. Marsh, Mr. Goeke and Mr. E. Sullivan (DOJ Bates no. CRM16137).

Mr. Marsh replied: "My guess is that Bill will want us to deal with Bambi just with the 'shady background' reference, but we can kick that 'round tomorrow." Email from N. Marsh, dated April 7, 2009, to Mr. Bottini, Mr. Goeke and Mr. E. Sullivan (DOJ Bates no. CRM16149). Mr. E. Sullivan agreed with Mr. Marsh: "The chart looks good. I agree with Nick that we probably don't need to spell out in detail why or how BA has a shady background." Email from E. Sullivan, dated April 8, 2008, to Mr. Marsh, Mr. Bottini and Mr. Goeke (DOJ Bates no. CRM16162). The draft chart became the final, and no disclosure about Mr. Allen's solicitation of a false affidavit by Ms. Tyree was made to AAG Fisher:

> Allen's problems as a witness: Allen has speech issues and a shady personal background. Allen is also a cooperator with a motive to lie. W&C will also suggest that Allen has a faulty memory.
>
> Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and Brenda Morris, Chart (Exh. A) at 2 (emphasis in original)(DOJ Bates no. CRM16394).

Mr. Bottini testified that he did not recall any further discussion of the issue at or around the time of this memo to Ms. Fisher. Deposition of J. Bottini, Dec. 17, 2009, at 381.

Mr. Welch testified that he told Ms. Fisher that the Anchorage Police Department ("APD") had opened an investigation in February, 2008, of Mr. Allen regarding sex with minors; he did not recall if he mentioned Ms. Tyree in that context. Deposition of W. Welch, Jan. 13, 2010, at 75-76. Mr. Welch did not tell Ms. Fisher about the issue of Mr. Allen's solicitation of a false sworn statement by Ms. Tyree: "I did not because my understanding was from all the evidence or information that had been presented to me that that issue was an issue of a mistaken recollection of Russo." *Id*. at 76.

In a prosecution memorandum, dated June 23, 2008, the prosecutors wrote that they might not use Mr. Allen as a witness in another Polar Pen prosecution which was about to be brought against Alaskan state senator John Cowdery, due to

an unidentified "number of *Brady*-related issues":

> E. Testimony From Bill Allen
> As noted above, ALLEN testified in both the KOTT and KOHRING trials.
> ALLEN, however, is not a strong witness overall. He has speech problems
> due to a motorcycle accident in 2001, and he tends to fatigue easily and gets
> confused on the timing of historical events. There are also a number of
> *Brady*-related issues that would expose ALLEN to considerable cross-
> examination. We are therefore considering the possibility of not calling
> ALLEN in our case-in-chief and, instead, reserving him as a rebuttal
> witness.
>
> Memorandum to W. Welch, dated June 23, 2008, from N. Marsh, E.
> Sullivan, J. Bottini and J. Goeke, at 38 (DOJ Bates nos. CRM119402-403;
> redacted by DOJ).

There was no trial in that case. Mr. Cowdery was indicted on July 9, 2008 and he
pleaded guilty on Dec. 19, 2008, to Conspiracy to Commit Extortion under Color
of Official Right pursuant to a plea agreement. *See United States v. John Cowdery*,
Case 3:08-cr-00072-RRB (D. Alaska) (J. Beistline).

|   9. | July 14, 2008 | Prosecutors Meet with AAG M. Friedrich: |
|------|---------------|-----------------------------------------|
|      |               | Accounts Differ on Disclosures Made to the AAG |

On July 14, 2008, shortly before the indictment of Senator Stevens, Mr.
Bottini, Mr. Marsh, Mr. E. Sullivan, Mr. Goeke, Ms. Morris and Mr. Welch met
with Ms. Fisher's successor, AAG Matthew Friedrich, and his Principal Deputy,
Rita Glavin, to discuss the case against Senator Stevens. *See* Email from J. Bottini,
dated July 1, 2008, to N. Cohen)(". . . Matt Friederich (the new Alice Fisher) is
requesting that the entire trial team (all of us - Me, Jim, Nick and Ed) do a dog and
pony show for him and others on the T. Stevens case some time during the week
of July 14. . . . Not clear what this is all about, but I assume it will involve the
power point presentation that was done for Fisher and which was done for
Brendan Sullivan. . . .")(DOJ Bates no. CRM071899).

265

Mr. Bottini testified that he was determined to discuss Mr. Allen's "shady background" at that meeting:

> Mr. Bottini   I can tell you this, that I don't remember any substantive discussions at or near this time [of the April 11, 2008-memo to Ms. Fisher] or after this time about why would Bill just want to leave it as "shady background," without providing some more explanation about what's involved with shady background.
>
> I can tell you that when we came out in mid-July, "we" being James Goeke and I to attend a meeting with the then-acting AAG, Matt Friederich and Rita Glavin, that was on my mind.  In fact, the morning before we had that meeting, Goeke and I went and had breakfast, and I told him, you know, if they, they, the Public Integrity folks, don't raise this issue about Bill Allen being under investigation for sexual misconduct, including these allegations that he may have procured a false statement from somebody, we have to.
>
> Because ironically, I told him, I don't want to be sitting here down the road a year from now, having somebody ask me how come we didn't know that? So to answer your question though, on the heels of this, I don't remember there being any substantive discussion about why would we just leave it as shady background.

Deposition of J. Bottini, Dec. 17, 2008, at 381-382.

Mr. Bottini testified that, near the end of that meeting with Mr. Friedrich and Ms. Glavin, he thought he told them about Agent Eckstein's 302 and Mr. Allen's subornation of perjury by Ms. Tyree:

> Mr. Bottini   I waited until the very end of the meeting, because I figured that either they were in -- was there anything else we needed to know about this, you know, sort of a catch-all, or if they didn't say that, I was going to raise it and say there was one more thing you need to know.  But he did say –

BY MR. SCHUELKE:

266

Q      Not having vetted this intention with your colleagues at Public
       Integrity; correct?
A      We didn't do that.  Just Jim and I talked about it.
Q      Okay.

BY MR. SHIELDS:
Q      So he asks is there anything more I need to know?
A      He said "Is there anything more?"  I said "Yes, there is," and I fronted
       the issue.  I said you need to know about this issue with Bill Allen
       and the sexual misconduct allegations.  And he's like "Oh, what's
       That [sic] about?"
              So I explained it to him, and I told him about the allegations
       involving the procurement of the false statement by Bambi Tyree,
       what had been done in relation to that as far as additional
       fact-gathering, that we had gone to PRAO twice with the issue, and
       that the advice that we had obtained was That [sic] we didn't have a
       disclosure obligation.

BY MR. SCHUELKE:
Q      Had you reviewed the PRAO opinion by That [sic] point?
A      You know, I must have looked at the email when it first came out, but
       I don't remember reading that thing with a fine-toothed comb.

Q      No, I mean in preparation for this Friederich meeting?
A      Oh no, I didn't pull it out again in preparation for this meeting.

Q      So you didn't have occasion to tell him that there were aspects of the
       PRAO account of the facts which you thought were inaccurate?
A      No, I didn't review that and go hey, wait a second.

Q      Excuse me.  I think you said you told Friederich the whole story
       about the sexual relationship.  Did you tell him about the SEATAC
       interview in '04?
A      I think I did.  I think I recounted the facts and said she was
       interviewed, a 302 exists that says this.  She was interviewed after
       that, disavowed the accuracy of the 302 in that regard.  Her lawyer
       says she didn't say it; the AUSA's notes, who was there

267

contemporaneous, reflected it was her idea.  You know, I think I did
run through all the facts for him.

                     * * *

Q     So what's the upshot of the presentation to Friederich?

A     I don't get any direct feedback from them, like tell us more or this
causes us to, you know, take a step back and, you know, should we be
doing this? There was nothing like that.  I raised the issue.  They said
"Okay, thanks."

Q     Did you recommend at that point that it ought to be disclosed,
notwithstanding the PRAO opinion?

A     No.

Q     You just said look, these are the facts.

A     He'd know this is out there.

*Id*. at 707-709 & 711-712.

On the next day, Mr. Bottini informed Mr. Goeke that he had briefed the Polar Pen
staff in Alaska about his discussion with Mr. Friedrich and Ms. Glavin about
Bambi. *Id*. at 750-752; *see also* Email from J. Bottini, dated July 15, 2008, to Mr.
Goeke ("Group updated about our meeting with Matt and Rita.  I pointed out the
issue about bambi coming up and how they were interested.") (DOJ Bates no.
CRM071953).

    Mr. Welch and Mr. Marsh could not recall if Ms. Tyree was discussed at the
meeting. *See* Deposition of W. Welch, Jan. 13, 2010, at 178; Deposition of N.
Marsh, Feb. 2, 2010, at 344. Mr. E. Sullivan testified that Ms. Tyree was discussed
in the context of describing Mr. Allen and his background, but he could not recall
what was said; he did not recall that Mr. Bottini raised Ms. Tyree as a subject in
response to a general question by Mr. Friedrich. Deposition of E. Sullivan, Jan.6,
2010, at 78-80 & 142.  Ms. Morris could not recall whether Mr. Friedrich and Ms.
Glavin were told about Ms. Tyree's false sworn statement. Deposition of Ms.
Morris, Jan. 15, 2010, at 131.  Ms. Morris described her understanding at the time
of the facts regarding Ms. Tyree's false statement:

    Ms. Morris   Yes, but I also think that our understanding or my belief at the

time was that there -- Bambi had recanted. There was no -- and
Bill, I know, was asked about it, and his attorney was asked
about it and had repeatedly said no, he had not paid Bambi or
tried to pay Bambi to lie, never asked her to lie. And Bambi
had said, "No, I was going to" -- something along the lines, I
was going to lie because I cared for Bill or I liked him or I had
feelings for him, something along those lines.

BY MR. SCHUELKE:
Q     Let me ask you: Did you come to a conclusion yourself about what
      had happened based on what you were told?
A     Yes.

Q     And what was your conclusion?
A     That Bill never paid or asked Bambi to lie and that Bambi lied of her
      volition and said that -- told the truth that Bill never asked her to lie.

*Id*. at 132-133.

Mr. Friedrich and Ms. Glavin were interviewed in this investigation. Mr.
Friedrich recalled a meeting with the prosecutors, including Mr. Bottini, shortly
before the indictment of Senator Stevens, and a discussion regarding Mr. Allen's
relationship with an underage female. He recalled that the issue was whether Mr.
Allen had committed statutory rape. *See* Memorandum of Interview of Matthew
Friedrich, dated April 2, 2010, at 8. Mr. Friedrich did not recall ever hearing
anything about Mr. Allen suborning a false affidavit from the female, or about any
submission to PRAO. *Id*. at 8 & 10.

Ms. Glavin also recalled a pre-indictment meeting with Mr. Marsh, Mr. E.
Sullivan, Mr. Goeke and Mr. Bottini when they were asked to put on a "dog and
pony show" regarding the case against Senator Stevens. She did not recall that
Ms. Tyree was discussed at this meeting; nor did she recall that Mr. Bottini raised
any issues regarding Mr. Allen near the end of the meeting, but said that it was
possible. *See* Memorandum of Interview of Rita Glavin, dated March 31, 2010, at
6. Ms. Glavin said that she remembered a post-indictment meeting with Mr.
Welch and Ms. Morris when the subject of Mr. Allen having sex with an underage
Bambi Tyree and an APD investigation was discussed, but she did not recall any

269

discussion of an affidavit or subornation of perjury. *Id*. at 6-7. Ms. Glavin vaguely recalled that at this post-indictment meeting, Mr. Welch may have said that PRAO had been consulted, or was about to be consulted, on an issue related to Ms. Tyree. *Id*. at 7.

      10.    August 14, 2008    Sealed Government Motion *in limine* to Limit
                                           Cross-Examination of Mr. Allen: No Disclosure

      Mr. Bottini was the primary author of several motions *in limine* to restrict the cross-examination of Mr. Allen and other government witnesses, including the Government's Motion *in limine* to Exclude Inflammatory Impermissible Cross Examination Pursuant to Rule 608(b) *Under Seal*, dated Aug. 14, 2008 ("Rule 608(b) Motion")(DOJ Bates nos. CRM031606-622). *See* Email from J. Bottini, dated August 10, 2008, to W. Welch, N. Marsh, B. Morris, E. Sullivan and J. Goeke ("Attached are draft mtns in limine re: excluding prior convictions of Allen, Anderson and Williams as well as a draft 608(b) motion to keep out the sleazy stuff for Bill, Dave, and Rocky (sex and alcohol, etc,).") (DOJ Bates nos. CRM30291-317). Mr. Bottini sought to limit the cross-examination of Mr. Allen. Mr. Williams and Mr. Anderson to "*only those issues relevant to the truthfulness of their testimony*" and to exclude inquiry regarding *inter alia* "allegations of sexual misconduct - issues totally unrelated to a witness's character for truthfulness." *Id*., Draft Rule 608(b) Motion, at 2 (emphasis in original) (DOJ Bates no. CRM030309).

      Mr. Bottini omitted from the motion any disclosure of Mr. Allen's procurement of a false sworn statement from Ms. Tyree, the "Bambi allegations", in order to "smoke out how much [Williams & Connolly] know[s]":

      Need some input on the 608(b) one in particular. Jim and I talked today
      about keeping this pretty basic (i.e. no detailed info set out here re: Bambi
      allegations and rumors) to smoke out how much they know.
      Appreciate any comments, edits, etc........
      Thanks

      Email from J. Bottini, dated August 10, 2008, to W. Welch, N. Marsh, B. Morris, E. Sullivan and J. Goeke (ellipsis in original)(DOJ Bates nos.

CRM030291-317).

The draft motion did not disclose the information in Agent Eckstein's 302 and AUSA Russo's pleadings in *Boehm* that Ms. Tyree signed a false affidavit at Mr. Allen's request. The only disclosure made, which related to Ms. Tyree, was that Mr. Allen had been the subject of an investigation by the Anchorage Police Department ("APD") regarding:

> allegations that he engaged in a sexual relationship with a juvenile female [Ms. Tyree] some 10 years ago. Allen has not been charged with any criminal offense stemming from this investigation and the investigation (which was recently reopened) was recently again closed or suspended.

> Draft Rule 608(b) Motion, at 7 (footnote omitted)(attached to email from J. Bottini, dated August 10, 2008, to W. Welch, N. Marsh, B. Morris, E. Sullivan and J. Goeke)(DOJ Bates nos. CRM030308-317).

In an accompanying footnote, the draft Rule 608(b) Motion also denied that the Alaska U.S. Attorney's Office played a role in an earlier suspension of that investigation:

> The government is also aware of a rumor that the United States Attorney's Office in the District of Alaska played some role in an earlier investigation of Allen being suspended *due to Allen's status as a cooperating witness.* Such allegations are completely baseless and untrue. The initial sexual misconduct investigation involving Allen was suspended by the Anchorage Police Department 2 years before he was contacted by the government regarding the public corruption investigation which lead to his convictions and the charges in this case.

> *Id.*, n.4 (emphasis added).

Significant *Brady*/*Giglio* information was omitted from this draft and from the motion as filed.

a. "rumored procurement of the false statement from Bambi by Bill"

Mr. E. Sullivan and Mr. Bottini made minor changes to the draft motion, which was recirculated among the prosecutors by Mr. Bottini, who again raised the issue of disclosure regarding Mr. Allen's subornation of perjury. He worried that Williams & Connolly already knew about it and suggested making a "passing mention of it as a rumor which we investigated and disproved":

> The big question: This obviously does not front out the rumored procurement of the false statement from Bambi by Bill. Their response to this will possibly develop how much they know about that. Do we notice them up in the Giglio disclosure letter about this issue?? I worry that if we don't make some mention of it – passing mention of it as a rumor which we investigated and disproved - they may respond to the MIL [motion *in limine*] and raise it – thus possibly making it look like we potentially tried to hide something. Completely aware of what PRAO says, but do we run that risk? Just don't want to run afoul of Emmet G. over this.
>
> Email from Mr. Bottini, dated Aug. 14, 2008, to E. Sullivan, J. Goeke, N. Marsh, B. Morris, and W. Welch (DOJ Bates no. CRM064785).

At the same time that Mr. Bottini drafted the Rule 608(b) Motion, he also drafted the referenced "Giglio disclosure letter" which was sent to Williams & Connolly on Aug. 25, 2008. *See* Email from N. Marsh, dated Aug. 14, 2008, to J. Bottini, J. Goeke and E. Sullivan ("Guys – we probably need to get cranking on our omnibus Brady/Giglio letter to defense counsel, as well as identifying any GJ transcripts that we think should be given over in toto under Brady/Giglio. Thoughts?") (DOJ Bates no. CRM075555); Deposition of J. Bottini, Dec. 16, 2009, at 70 ("And the reason I drafted that [*Giglio*] letter is because I had been asked to do the motion -- to draft the motion in limine, restricting cross examination of witnesses related to certain topic areas: alcohol use, prior convictions, et cetera, et cetera. . . . I took on the responsibility of preparing this August 25th [*Giglio*] letter"); Email from Mr. Bottini, dated Aug. 25, 2008, to Williams & Connolly ("Attached is a letter (with a number of attachments) setting out potential impeachment information relating to a number of prospective witnesses [Mr. Allen, Mr. Williams, Mr. Anderson and Mr. R. Smith].")(DOJ Bates nos. CRM079371-079508).

Mr. Goeke was in favor of "some disclosure" in the *Giglio* letter:

. . . I also vote to make some disclosure of the rumored procurement of a false statement from Bambi by Bill in our Giglio letter along with a denial of the false assertion of federal help with the state's suspended sex investigation of Bill. I think Joe is right, the rumor about an alleged false statement is out there (could be repeated in an APD report from the recent reopened investigation for instance). We did our due diligence, and both parties deny that Bill procured the statement, therefore previous statements by the govt in the Boehm case to the contrary were an erroneous assumption. And I know this has been all dealt with by PRAO at least twice, but nonetheless, shouldn't we front the issue out and not have W&C suggesting to the DC court that we held something back. With the Alaska cases, Judge Sedwick handled Bambi's case, and had notice of the issues and context and there was no suggestion at that time that Bill's plea included federal help with any state investigation. Here the court does not have Judge Sedwick's background in both cases and there is now a false suggestion made after the Alaska trials that the govt helped Bill with the suspended state investigation. So, at the end of the day, the false statement issue coupled with the false suggestion that the govt helped Bill on the state investigation as part of his plea makes me vote to get out in front of both issues and make some mention of both the false suggestion of federal help with the state investigation and the rumored false statement procurement in our Giglio letter.

Email from Mr. Goeke, dated Aug. 14, 2008, to Mr. Bottini, E. Sullivan, N. Marsh, B. Morris, and W. Welch (DOJ Bates no. CRM064784).

Mr. Marsh replied that there was nothing to disclose, but "absolutely defer[red] to the collective on this one":

If we had something to turn over re: the alleged subornation of perjury, I would obviously vote yes to doing so. But given that we have nothing to turn over -- not even an independent allegation, just a mistake in a brief that's inconsistent with the brief writer's notes -- I don't think we have any disclosure to make, much less a disclosure obligation.

If we were to make a disclosure, I think it would be something like "another unrelated prosecutor mistakenly suggested in a sealed filing that Allen suborned perjury, but the prosecutor's notes directly contradict the suggestion, and subsequent investigation by the government revealed no evidence of Allen taking any steps whatsoever to suborn perjury." And when I read that, it seems like to me we shoudn't be making any disclosure at all. But I absolutely defer to the collective on this one.

Email from N. Marsh, dated Aug. 14, 2008, to J. Goeke, J. Bottini, E. Sullivan, B. Morris and W. Welch (DOJ Bates nos. CRM064783-784).

Mr. Welch replied last in this email chain but did not address the disclosure issue. *See* Email from W. Welch, dated August 14, 2008, to N. Marsh, J. Bottini, J. Goeke, E. Sullivan and B. Morris (DOJ Bates no. CRM064783).

The Government's Rule 608(b) Motion was filed under seal the same day these emails were exchanged, after it was sent to Ms. Glavin, Principal Deputy AAG, for her review. *See* Email from W. Welch, dated August 14, 2008, to R. Glavin, Subject: 608(b) Motion ("Attached") (DOJ Bates nos. CRM107828-845); Email from W. Welch, dated Sept. 1, 2008, to R. Glavin, N. Marsh, B. Morris and E. Sullivan, Subject: 608(b) Reply (attached) ("With final edits.") (DOJ Bates no. CRM0108302). At the request of AAG Friedrich, Ms. Glavin reviewed the government's motions *in limine* and other pleadings in *Stevens. See* Memorandum of Interview of Rita Glavin, dated March 31, 2010, at 2-3; *see also* Email from B. Morris, dated Aug. 13, 2008, to W. Welch, Subject: "Proposed 404(b) notice.msg" ("Read over this first thing in the am before I flip to Rita [Glavin]. She asked me if you read it. I told her it contained our edits. She again asked if you read it. Matt [Friedrich] has given strict instruction that you have to read all motions before she reads them. Sorry.") (DOJ Bates no. CRM064759). The Rule 608(b) Motion was filed under seal because *inter alia* it dealt with "personal matters [which] are wholly irrelevant to impeachment issues". Government's Motion to Seal, dated Aug. 14, 2008, at 1 (attached to email from E. Sullivan, dated Aug. 14, 2008, to A. Romain (cc: N. Marsh, B. Morris, J. Goeke and J. Bottini) (DOJ Bates nos. CRM031605-622).

The Rule 608(b) motion, like the draft, made no disclosure regarding Mr. Allen's subornation of perjury by Ms. Tyree. As further authority for excluding

274

cross-examination of Mr. Allen "regarding allegations that he engaged in a sexual relationship with a juvenile female", a footnote was added citing the sealed hearings in *Kott* and *Kohring* where "The court was advised that respective counsel would not inquire into this particular issue." *See* Government's Rule 608(b) Motion, *Filed Under Seal*, at n. 1 (attached to email from E. Sullivan, dated Aug. 14, 2008, to A. Romain (cc: N. Marsh, B. Morris, J. Goeke and J. Bottini) (DOJ Bates nos. CRM031605-622).

      b.      "rumor that the [government] played some role in an earlier investigation of Allen being suspended"

    The motion used the language in Mr. Bottini's draft to deny the "rumors" and "allegations" of government involvement in the APD's suspension of its earlier investigation of Mr. Allen:

> The government is also aware of a rumor that the United States Attorney's Office in the District of Alaska played some role in an earlier investigation of Allen being suspended due to Allen's status as a cooperating witness. Such allegations are completely baseless and untrue. The initial sexual misconduct investigation involving Allen was suspended by the Anchorage Police Department two years before he was contacted by the government regarding the public corruption investigation which lead to his convictions and the charges in this case.

> Government's Rule 608(b) Motion, at 3 (DOJ Bates nos. CRM031606-622).

The statement, that the "rumor" and "allegations" are "completely baseless and untrue", was not entirely true. However, it may be "literally true" because of its careful wording. *See Bronston v. United States*, 409 U.S. 352, 362 (1973)("It may well be that petitioner's answers were not guileless but were shrewdly calculated to evade. Nevertheless, we are constrained to agree . . . that any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution."); *see also United States v. Safavian*, 528 F.3d 957, 968 (D.C. Cir. 2008) ("Even a literally true statement may be misleading and so, unlike § 1001(a)(1), literal truth may not be a complete defense to obstruction.") (citation omitted).

APD Detective Kevin Vandegriff reported in 2004 that the investigation of
Mr. Allen was suspended at the request of the Alaska U.S. Attorney's Office:

> INFORMATION: In March 2004 I was advised by Assistant US Attorney
> FRANK RUSSO to not actively investigate this case as it might interfere
> with a Federal Investigation they were conducting involving ALLEN and
> JOSEF Boehm.
> CASE STATUS: Suspended.

> APD report by Det. Kevin Vandegriff, dated Nov. 4, 2004 (DOJ Bates no.
> CRM043360).[31]

Although the U.S. Attorney's Office asked the APD to close its
investigation of Mr. Allen in 2004, the request was apparently not made "due to
Allen's status as a cooperating witness" since Mr. Allen did not agree to cooperate
with the prosecutors until 2006. *See* Agent Kepner's 302 of Interview of Mr. Allen
on Aug. 30, 2006, dated Sept. 9, 2006, at 1 ("ALLEN was advised of the nature of
the investigation and the potential benefits of cooperation. . . . ALLEN agreed to
cooperate")(DOJ Bates no. CRM055122); Deposition of J. Bottini, Dec. 17, 2009,
at 713 ("But at the time that that happened [APD closing its investigation of Mr.
Allen at AUSA Russo's direction], Allen, it wasn't even on the radar screen on the
public corruption stuff.").

Mr. Goeke had worked on *Boehm*, was aware of Det. Vandegriff's report
and he recognized the need for careful wording in denying the government's role
in suspending the APD's investigation of Mr. Allen.  A draft of the Reply in
support of Government's Rule 608(b) Motion abbreviated the denial of the
"rumor":

---

[31]The government provided this APD report and the 467-page APD file regarding Mr.
Allen, including Agent Eckstein's 302 of the interview of Ms. Tyree on July 22, 2004, to
Williams & Connolly on Oct. 16, 2008, during Senator Stevens's testimony and four days before
both sides rested. *See* Letter from W. Welch, dated Oct. 16, 2008, to R. Cary ("Enclosed is the
Anchorage Police Department investigative file regarding the Bill J. Allen matter received from
the Child Exploitation and Obscenity Section [of the Department of Justice] on the afternoon of
October 14,2008." (DOJ Bates nos. CRM043315-783).

As the defendant full well knew from the government's August 25, 2008 letter, the government apprised the defendant of the rumor involving the United States Attorney's Office in the District of Alaska had played some role in the earlier investigation of Allen by the local police department. We stated in our August 25 letter and it remains to be true now, "Such allegations are completely baseless and untrue." Government's August 25, 2008 letter, attached as Ex. 1.

Government Draft Reply, at 2 (attached to email from B. Morris, dated Sept. 1, 2008, to W. Welch, E. Sullivan, N. Marsh, J. Bottini, and J. Goeke) (DOJ Bates nos. CRM020313-318).

When Ms. Morris sent that draft to the prosecution team and invited "any and all edits" (Email from B. Morris, dated Sept. 1, 2008, to W. Welch, E. Sullivan, N. Marsh, J. Bottini, and J. Goeke) (DOJ Bates nos. CRM020313-318), Mr. Goeke replied that the blanket denial needed some qualification:

Thanks Brenda, I've got a few edits.
I think we just need to be clear that the govt played no role in suspending the earlier APD investigation (the 2004 investigation) due to the public corruption investigation and played no role in suspending or resuspending the investigation after APD apparently reopened it in 2007/08. *Arguably the USAO was involved in the APD's earlier decision making process* simply because another AUSA asked the APD officers to focus on another unrelated investigation then pending trial--the AUSA and the USAO did not tell the APD to close any Allen investigation for any reason. The problem is that APD used language to that effect in a case report when they chose to close their earlier investigation back in 2004. That language was the focus of the press article last fall. Hope this makes sense.

Email from J. Goeke, dated Sept. 2, 2008, to B. Morris, W. Welch, E. Sullivan, N. Marsh and J. Bottini (emphasis added) (DOJ Bates no. CRM0799872).[32]

---

[32]A newspaper article in February, 2008, reported that an APD investigation of Mr. Allen had been suspended at the request of AUSA Russo:

(continued...)

Mr. E. Sullivan "revised [the draft Reply] to address Jim's concerns":

As defendant knows, however, the government has twice apprised him that
it was aware of a rumor that the United States Attorney's Office in the
District of Alaska had played some role in the suspension of an earlier
investigation of Allen by the Anchorage Police Department because of
Allen's status as a cooperating witness in the present corruption
investigation. In our motion *in limine* and in a letter to counsel dated August
25, 2008, we advised defendant that "[s]uch allegations are completely
baseless and untrue." The government has also informed defense counsel on
two separate occasions that Allen's cooperation in this present, unrelated,
<u>federal</u> matter arose approximately two years <u>after</u> the Anchorage Police
Department suspended its initial investigation.

* * *

Notwithstanding our representations as officers of the Court, defendant goes
even further with his argument. He asserts that, although the government
"denies it played a role in suspending the 'earlier investigation of Allen,' and

---

[32](...continued)
"It came up as part of the Boehm investigation," [Det. Vandegriff] said. "It just came out
as part of the interviews."
The initial case against Allen "wasn't very solid," he added. "We had some contradictory
information, but I was just kind of getting started."
Then federal prosecutors told him to "cease and desist," he said.
The joint city-federal prosecution was run by two assistant U.S. attorneys, Frank Russo
and James Goeke. Tyree testified that both prosecutors participated in the 15 to 20 hours
of debriefings she underwent with the FBI and detectives as part of her plea deal.
Goeke, now with the prosecution team pursuing the corruption cases, didn't return several
calls for comment.
Russo acknowledged "there were allegations along the lines of his (Allen's) involvement
with Bambi Tyree," but said he asked Vandegriff to suspend the Allen investigation for
purely practical reasons: The Boehm case was complex, with dozens of witnesses, and
Boehm himself had a high-powered, three-attorney defense team that fought at every
opportunity. Nearly 1,000 documents were filed, and that was in a case that never went to
trial.
"We said, 'Hey, why don't we put this aside until later. We have enough to focus on,' "
Russo said. That was his only concern, he said.

Anchorage Daily News, Feb. 3, 2008, "Allen teen sex inquiry reopened/BAMBI: Police
look into claim ex-Veco boss had sex with underage girl".

278

avers that the 'initial sexual misconduct investigation was suspended' before Mr. Allen began cooperating with the government, it does <u>not</u> deny that it had a role in shutting down the reopened case." Def. Opp. Br. at 7-8 (emphasis in original). This argument, again, is disingenuous . . . To be clear, the government denies it had any involvement in shutting down the reopened state matter because of Allen's status as a cooperating witness in this <u>federal</u> corruption matter.

Government Draft R 608(b) Reply, at 2&3 (attached to email from E. Sullivan, dated Sept. 2, 2008, to B. Morris and N. Marsh (brackets and emphasis in original)) (DOJ Bates nos. CRM020433-439).

Ms. Morris circulated that revised version to Mr. Goeke and the other prosecutors with the message: "Ed touched it up for me and specifically addressed your concerns Jim.  Let me know what you think so I can get it to Bill [Welch] and Rita [Glavin]. Thanks." Email from B. Morris, dated Sept. 2, 2008, to E. Sullivan, N. Marsh, J. Bottini, and J. Goeke (DOJ Bates nos. CRM020454-460).[33]  Mr. Bottini and Mr. Goeke approved the revised description:

<u>Mr. Bottini</u>: "Ed read me the language touch up over the phone and it accurately sets the facts out regarding the investigations of Allen."

Email from Mr. Bottini, dated Sept. 2, 2008, to B. Morris, E. Sullivan, N. Marsh and J. Goeke (DOJ Bates no. CRM079915);

<u>Mr. Goeke</u>: "Thanks Brenda.  I agree with Joe, it looks good.  I just wanted

---

[33]Ms. Morris testified that she did not know about Det. Vandegriff's report that the U.S. Attorney's Office asked the APD to suspend its investigation of Mr. Allen (Deposition of B. Morris, Jan. 15, 2010, at 120-121), and that "Goeke was adamant that no one had contacted Alaska or Anchorage P.D. . . . to try to shut down any investigation of – Bill Allen or any investigation involving him with minors. . . . I remember Jim was, like, outraged that they would suggest or there would be a suggestion that they did, that no one contacted Anchorage." *Id*. at 128.  Mr. E. Sullivan "understood [the issue] to be that the allegation in the paper was going to be that the U.S. Attorney's office shut down the investigation so that Allen could proceed in the public corruption investigation" and he did not recall ever being told that the APD investigation had been shut down by the U.S. Attorney's Office for a different reason. Deposition of E. Sullivan, Jan. 6, 2010, at 112-113 (brackets added).

to make sure we focused on the complete lack of any relationship to the corruption investigation, now or in the past. I think we are there."

Email from Mr. Goeke, dated Sept. 2, 2008, to B. Morris, J. Bottini, E. Sullivan and N. Marsh and J. Goeke (DOJ Bates no. CRM079915).

The revised description was included in the Reply, with a minor stylistic change. *See* Government's Reply in Support of Rule 608(b) Motion, dated Sept. 2, 2008 (attached to email from E. Sullivan, dated Sept 3. 2008, to Hon. Emmet G. Sullivan) (DOJ Bates nos. CRM20790-801).

The draft Reply in support of the government's motion to seal its Rule 608(b) Motion included the following statement regarding the suspension of the APD investigation:

The Anchorage Police Department is outside of the oversight or authority of the United States Attorney's Office. They make their investigative decisions on their own.

Draft Government Reply in Support of Motion to Seal, at 3 (attached to email from B. Morris, dated Sept. 1, 2008, to W. Welch, E. Sullivan, N. Marsh, J. Goeke and J. Bottini)(DOJ Bates nos. CRM0020287-297).

The prosecutors removed that statement and all descriptions and references to the suspension of the APD investigation from that Reply. *See* Government's Reply in Support of Its Motion to Seal and Request to Strike Defendant's Opposition to Governments's Motion *in limine* to Exclude Inflammatory, Impermissible Cross-Examination *Filed Under Seal*, September 2, 2008 ("Government's 608(b) Reply") (attached to email from E. Sullivan, dated Sept 3. 2008, to Hon. Emmet G. Sullivan)(DOJ Bates nos. CRM20790-801).

However, during a conference on the Government's Rule 608(b) Motion, Mr. Marsh stated unconditionally that the government played no role in closing APD's investigation of Mr. Allen:

MR. MARSH: . . . As we understand it, defendant is interested in pursuing a lead that they believe that they have that the

> government was involved in shutting down certain
> investigations of Mr. Allen. And as we've indicated, the
> government did not play a role in shutting down those 2
> investigations and we don't have any additional
> materials.

*Stevens*, Transcript of Chambers Conference (by telephone), September 5, 2008, 3:00 p.m., at 16-17.

c.  "rumored personal vices such as excessive alcohol consumption"

Though the prosecutors knew that Mr. Williams was an alcoholic, they attempted to prevent cross-examination of Mr. Williams on that subject by describing his alcoholism as a mere rumor. Government Rule 608(b) Motion, at 2 ("The government anticipates that defendant may attempt to cross-examine Allen, Anderson, and Williams about rumored personal vices such as excessive alcohol consumption, . . . "); *see also* Government's 608(b) Reply, at 3 ("Finally, with regard to alcohol and/or substance abuse, the government maintains that such questioning should be precluded if it is merely based on rumor and speculation.")(DOJ Bates nos. CRM020779-782).  The government also asserted in its *Giglio* letter to Williams & Connolly that it was "aware of *rumors* concerning excessive alcohol use by [Rick] Smith . . . . [and] by [Rocky] Williams." Letter from B. Morris to Williams & Connolly, dated Aug. 25, 2008 ("*Giglio* letter"), at 3&5 (emphasis added)(DOJ Bates nos. 079372-377).

Like the "rumor" that the U.S. Attorney's Office requested the APD to suspend its investigation of Mr. Allen, the "rumors" of Mr. Williams's and Mr. Smith's "excessive alcohol use" had firm foundations in fact, as the prosecutors well knew at the time and as they later admitted when they were forced to explain why they sent Mr. Williams back to Alaska. *See* Declaration of J. Bottini, Feb. 20, 200[9], at ¶ 30 ("We had information that *Williams was a long term alcoholic* and we fully expected him to be cross-examined about alcohol abuse issues.") (emphasis added)(DOJ Bates nos. CRM000039-51); Email from B. Morris, dated Sept. 30, 2008, to Hon. Emmet G. Sullivan ("According to Mr. Williams, his internist told him that he is suffering from advanced cirrhosis")(DOJ Bates no. CRM025558); *Stevens*, Trial Transcript (Bench Conference), Sept. 29, 2008 A.M.,

at 4 ("Mr. Marsh: We've worked with Mr. Williams for a very long time, since
2006, . . . [Mr. Williams is] a chronic alcoholic."); Email from J. Bottini, dated
Aug. 14, 2010, to E. Sullivan, J. Goeke, N. Marsh, B. Morris and W. Welch
("Here's an alternate version [of the Government's Rule 608(b) Motion] adding
Rick Smith [a VECO executive] into the mix under the theory that if we add him
to the motion to exclude prior convictions, why not throw him in with the "no
personal vices" crowd – *given that Rick is a stone alcoholic* and everyone appears
to know it. Granted, it's unlikely that we call him at trial, but it's possible. If
anyone thinks that is too disingenous [sic], then we can leave him out. Not much
heartburn about that.") (emphasis added)(DOJ Bates no. CRM030883).

     d.     Sealed Hearing and Rulings on Government's Motions: *Kott* and
             *Kohring* Hearings Redux

     Williams & Connolly opposed the Government's Rule 608(b) Motion and
the motion to seal. *See* Opposition to Government's Rule 608(b) Motion <u>Under
Seal</u>, dated Aug. 25, 2008 (DOJ Bates nos. CRM079355-370); Supplemental
Opposition, dated Aug. 27, 2008 (DOJ Bates nos. CRM079543-552); Opposition
to Government's Motion to Seal *Under Seal*, dated August 25, 2008 (DOJ Bates
nos. CRM079349-354).  In Reply, the government moved to strike their
Opposition as a sanction for revealing sealed information about the APD's
investigation of Mr. Allen and violating his privacy:

> Because the defendant publicly revealed the subject matter of a sealed
> motion pending before this Court, the government requests that the Court
> strike defendant's brief in opposition to the government's motion *in limine*
> as a consequence for defendant's decision to impermissibly reveal matters
> lodged under seal. . . .

> Defendant, in response to the government's motion *in limine* to exclude
> prior, stale convictions (*see* dkt. 21), included a publicly filed exhibit - an
> August 21, 2008, letter from defense counsel to the government - which
> disclosed the subject matter of the present motion including the allegation of
> misconduct that is being investigated by the Anchorage Police Department. .
> . . Unsurprisingly, and presumably as hoped for by defendant, the media
> immediately picked up on this issue and reported that the Anchorage Police

Department had investigated Allen for sexual abuse of a minor.

* * *

Indeed, unlike defendant, Mr. Allen has not been charged of [sic] any crime, and he is entitled to privacy if the Court concludes that the sexual misconduct allegations are beyond the permissible bounds of cross examination.

Government's Reply in Support of Its Motion to Seal and Request to Strike Defendant's Opposition to Government's Motion *in limine* to Exclude Inflammatory, Impermissible Cross-Examination, dated Sept. 2, 2008 ("Government's Reply and Request to Strike"), at 1-3 (DOJ Bates nos. CRM020784-789).

*See also* Email from E. Sullivan to J. Bottini, J. Goeke, N. Marsh and B. Morris, dated Aug. 27, 2008, Subject: "The gloves be off", Attachment: "Reply in support of motion to seal 608(b) motion" ("Before giving this to Ray so that one of the attorneys in our office can finish, please let me know if you have edits. It goes after W&C pretty hard.") (DOJ Bates no. CRM036628).

A hearing was held on the government's Rule 608(b) motion on Sept. 5, 2008. The record of that proceeding demonstrates that the Court and Williams & Connolly, like Judge Sedwick and the defense attorneys in the sealed hearings in *Kott* and *Kohring*, were left in the dark about the relevant impeachment information in the government's possession, i.e., Mr. Allen's subornation of perjury by Ms. Tyree as evidenced in Agent Eckstein's 302 and AUSA Russo's motion *in limine* in *United Sates v. Boehm*:

THE COURT:    . . . For all I know, neither one of these people will ever testify. I'm certainly not going to spend any time dealing with the permissible scope of cross-examination, given the time constraints, given the fact that there's at least 13 other motions pending on the Court's calendar.

So it's your call. If you want a ruling on it, then the ruling will be I'm going to deny the motion to seal, and then I'll focus on that issue. And what I'll probably do is deny it without prejudice to the government re-bringing it at the appropriate time, which would be at the

|             | conclusion of cross-examination. If you want to withdraw it, that's fine with me. |
| MS. MORRIS: | Well, if you're saying that we can withdraw it without any prejudice and resubmit it - - |
| THE COURT:  | Absolutely. |
| MS. MORRIS: | -- then that's what we'll do, judge. |
| The COURT:  | That's fine. I think that's appropriate. Now I can focus on matters that require my attention. So the government will withdraw its motion to seal and its motion in limine to exclude inflammatory impermissible cross-examination. Does the defendant object to that? |
| B. SULLIVAN: | Your Honor, let me note one thing, that we immediately advised the government, I believe by letter, on this issue of this motion, indicating that we would inform the Court and the government if and when we ever thought it appropriate to raise the issue about Mr. Allen's proclivity, apparently, to have sexual relations with minors. And we offered at that time to have them withdraw this motion or to block out that portion of it and file the rest of the motion on the record. We did that much in keeping, I think, with what your intentions are here. We offered that; that was rejected. |

*Stevens*, Transcript of Chambers Conference (by telephone), September 5, 2008, 3:00 p.m., at 6-7.

The Court and Senator Stevens's lawyers were still in the dark when the Court ruled on the scope of the cross-examination just before Mr. Allen took the witness stand:

| THE COURT:   | Allen is the next witness? |
| MR. BOTTINI: | He is, sir. Yes. . . . |
|              | * * * |
| THE COURT:   | . . . With respect to the statutory rape investigation, my |

284

|                |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
|----------------|---|
| | understanding is that there were two for Allen; is that correct? |
| MR. BOTTINI:   | I'm sorry, Your Honor. |
| THE COURT:     | The statutory rape investigations, there were two for Allen? |
| MR. BOTTINI:   | That's correct. |
| THE COURT:     | All right. I'm not sure if the government plans to go into that area but if you do, proceed very carefully. You may inquire if you want; I'd be surprised if you go into that area. But if you do go into that area, I don't want any references to the nature of the charge because I think that the nature of those charge might tend to inflame the prejudices or bias of those jurors. I think it's fair for both sides and the same restriction goes to defense counsel; you can inquire about those two investigations, but the nature of the offense, indeed, any reference to statutory rape will not be permitted because that would tend to inflame prejudices or biases. But I think it's fertile ground for an inquiry about the witness' state of mind and what he would like the government to do in an effort to curry favor. I think that goes to his bias, his motivation to speak the truth or not. I will allow that examination. With respect to the appropriate scope of any further cross-examination, I'll deal with that after direct examination is concluded. |
| MR. BOTTINI:   | Understood. |
| THE COURT:     | I don't think I need to make any additional rulings. . . |

*Stevens*, Trial Transcript, Sept. 30, 2008 P.M., at 46-47.

The government in its post-trial response to Senator Stevens's motion for a new trial labeled that ruling as "favorable" to the defense. *See Stevens*, Government's Opposition to Defendant's Motion for a New Trial, dated Jan. 16, 2009, at 65 ("The Court ruled for the defense . . . Armed with this favorable ruling, defense

counsel cross-examined Allen over the course of two days, without asking him a single question about the state investigations.") (Dkt. No. 269) (DOJ Bates nos. CRM050912-51001).

Mr. Allen was not questioned at trial by Mr. Bottini or by Brendan Sullivan about Ms. Tyree or the APD investigations. Mr. Allen testified in this investigation that Mr. Bundy, his lawyer, told Mr. Bottini and Agent Kepner that, if Mr. Allen was questioned about Ms. Tyree during his cross-examination, he would assert the Fifth Amendment. Deposition of B. Allen, March 6, 2010, at 61-62.

      11.    August 25, 2008    Government's *Giglio* Letter: No Disclosure

          a.    Drafts: Some Disclosure

Mr. Bottini's early draft of the *Giglio* letter proposed disclosing "allegations" of Mr. Allen's subornation of perjury by Ms. Tyree which "have been proven to be false":

> *[THIS IS WHAT WE NEED TO DECIDE - IN OR OUT?]*
>
> *"In connection with the investigation involving allegations of sexual misconduct, the government is also aware that Allen is alleged to have had some involvement in a witness creating a false statement. Those allegations have been investigated by the government and have been proven to be false."*
>
> Draft *Giglio* letter, dated August __, 2008, at 2 (bracketed material, quotation marks and emphasis in original)(attached to email from J. Bottini, dated Aug. 18, 2008, to B. Morris, N. Marsh, E. Sullivan, J. Goeke and Agent Kepner) (DOJ Bates nos. CRM034810-813).

The draft *Giglio* letter drew comments from E. Sullivan, Agent Kepner and Agent Joy about other parts of the letter but none addressed the question posed and the suggested disclosure*. See* Email from E. Sullivan, dated Aug. 18, 2008, to J. Bottini, B. Morris, N. Marsh, J. Goeke, and Agent Kepner (DOJ Bates no.

CRM034815); Email from Agent Kepner, dated Aug. 18, 2008, to J. Bottini, B.
Morris, N. Marsh, J. Goeke (DOJ Bates no. CRM034816); Email from Agent Joy,
dated Aug. 18, 2008, to J. Bottini (DOJ Bates no. CRM037889).

Mr. Bottini redrafted the paragraph and sent the new draft *Giglio* letter to
Mr. Goeke only:

> "*In connection with the earlier investigation, the government is also
> aware that Allen is alleged to have had some involvement in a witness
> creating a false statement. Those allegations have been investigated by the
> government and there was no credible evidence found to support such
> allegations.*"

Draft *Giglio* letter, dated August __, 2008, at 3 (quotation marks, emphasis
and italics in original)(attached to email from Mr. Bottini, dated Aug. 21,
2008, to Mr. Goeke)(DOJ Bates nos. CRM078455-461).

Mr. Goeke modified that paragraph and sent his draft to Mr. Bottini only:

> "*The government is also aware that the female subject of the earlier
> investigation has stated that she made a false statement regarding the
> nature of her relationship with Allen. The subject of the earlier
> investigation is emphatic that she made the false statement on her own
> initiative and Allen denies that he caused her to make the statement.*"

*Id*. at 2-3 (quotation marks, emphasis and italics in original)(attached to
email from Mr.Goeke, dated Aug. 21, 2008, to Mr. Bottini)(DOJ Bates nos.
CRM078463-469).

Mr. Bottini circulated a new draft of the letter to the prosecution team with
Mr. Goeke's version of that paragraph (and only that paragraph) highlighted in
bold print, italicized and in quotation marks, and with a message in the first line of
the email calling it to his colleagues' attention:

> Here is the latest cut - the italicized is stuff that needs extra
> scrutiny/discussion, etc. . . .
>
>           \*   \*   \*

*"The government is also aware that the female subject of the earlier investigation has stated that she made a false statement regarding the nature of her relationship with Allen. The subject of the earlier investigation is emphatic that she made the false statement on her own initiative and Allen denies that he caused her to make the statement."*

Email from J. Bottini, dated Aug. 21, 2008, to B. Morris, N. Marsh, E. Sullivan, J. Goeke, Agent Kepner, Agent Joy and IRS Agent Bateman, and attached draft *Giglio* letter, at 2-3 (quotation marks, emphasis and italics in original) (DOJ Bates nos. CRM035906-36036).

Mr. Goeke replied and suggested a more detailed description of the "false statement": "With regard to the false statement on page 3, we should describe the statement as a 'sworn false statement' or something along those lines.'" Email from J. Goeke, dated Aug. 22, 2008, to J. Bottini, B. Morris, N. Marsh, E. Sullivan, Agent Kepner, Agent Joy and IRS Agent Bateman (DOJ Bates no. CRM036164). Only Mr. Marsh replied to Mr. Goeke's email: "Guys - didn't we make a decision about this on yesterday's conference call?". Email from N. Marsh, dated Aug. 22, 2008, to J. Goeke, J. Bottini, B. Morris, E. Sullivan, Agent Kepner, Agent Joy and IRS Agent Bateman (DOJ Bates no. CRM036164). There were no other emailed replies, that were sent to the entire prosecution team, regarding the "false statements" paragraph highlighted by Mr. Bottini, Mr. Goeke's suggestion or Mr. Marsh's question.[34]

In an email to Ms. Morris and Mr. Marsh only, Mr. E. Sullivan sent a "cleaned up" draft which highlighted in yellow the paragraph relating to Ms. Tyree's false statement, but left the wording unchanged. Email from E. Sullivan, dated Aug. 22, 2008, to B. Morris and N. Marsh (DOJ Bates nos. CRM036151-156). Mr. Marsh, in a reply sent only to Ms. Morris and Mr. E. Sullivan, recommended deleting the entire paragraph:

Great, but I strongly believe that the highlighted paragraph should be

---

[34]Mr. Bottini sent a reply email to Mr. Goeke and to the prosecution team regarding payments made by the government to or for government witness D. Anderson, but he did not address or refer to Mr. Goeke's suggestion that the false statement be described as a "false sworn statement". Email from J. Bottini, dated Aug. 22, 2008, to J. Goeke, B. Morris, N. Marsh, E. Sullivan, Agent Kepner, Agent Joy and IRS Agent Bateman (DOJ Bates no. CRM079124).

deleted. We should not revisit the Bambi non-subornation of perjury stuff.
We have nothing to turn over, we have neither evidence nor an allegation
that Allen directed her to lie, we have investigated this till the end of time,
and we have been blessed by PRAO twice. There is simply no reason for us
to revisit it.

Email from N. Marsh, dated Aug. 22, 2008, to E. Sullivan and B. Morris
(DOJ Bates no. CRM036162).

Ms. Morris and Mr. E. Sullivan agreed. *See* Email from B. Morris, dated Aug. 22,
2008, to N. Mash and E. Sullivan ("I agree, but let me finish playing with it and
I'll send it back around to you two.")(DOJ Bates no. CRM036166); Email from E.
Sullivan, dated Aug. 22, 2008, to B. Morris and N. Marsh ("I agree.  I left it in b/c
it was highlighted in Joe's draft.")(DOJ Bates no. CRM036163); *see also*
Deposition of B. Morris, Jan. 15, 2010, at 113 & 138 (Ms. Morris "mostly" relied
on Mr. Marsh regarding the government's disclosures about Ms. Tyree and did not
recall why no disclosure regarding Ms. Tyree was made in the *Giglio* letter.).

b.      Final: No Disclosure

The paragraph regarding Ms. Tyree's false statement was deleted entirely
from the *Giglio* letter.  On August 25, 2008, while the Government's Rule 608(b)
Motion (under seal) was pending, Mr. Bottini emailed the *Giglio* letter to Williams
& Connolly disclosing "potential impeachment material relating to certain
potential government witnesses", including Mr. Allen.[35] Email from J. Bottini,
dated Aug. 25, 2008, to A. Romain (DOJ Bates CRM036475-612).  The *Giglio*
letter disclosed recent false statements by Mr. Allen to the government, but it did
not disclose the information in Agent Eckstein's 302 and notes of the interview of
Ms. Tyree on July 22, 2004 or in AUSA Russo's pleadings in *Boehm* that Mr.
Allen had suborned perjury by Ms. Tyree.

---

[35]The government characterized the letter as a "confidential communication" because it
"references matters that were the subject of the under seal [Rule 608(b)] filing". Letter from B.
Morris, dated Aug. 25, 2008, to Williams & Connolly ("*Giglio* letter"), at n. 2 (DOJ Bates
CRM036476-481).

The *Giglio* letter reiterated statements made in the Government's Rule 608(b) Motion about the "recently closed or suspended" APD investigation of Mr. Allen's "sexual relationship with a juvenile female [Ms. Tyree]" and the denial that the government played any role in "suspend[ing]" that investigation "due to Allen's status as a cooperating witness". *Giglio* letter, at 2. The letter disclosed for the first time that Mr. Allen was the subject of a new, pending APD investigation for statutory rape and that he had provided "financial benefits" to the victim in that investigation, and to Ms. Tyree and her family:

> On Aug. 20, 2008, the government learned that there is another pending investigation of Allen by the Anchorage Police Department. The government believes that the new investigation relates to allegations that, in the late 1990's Allen engaged in a sexual relationship with a different juvenile female".
>
>            * * *
>
> The government has learned that Allen has provided financial benefits to the individual who was the subject of the earlier investigation [Ms. Tyree] as well as to family members of the subject. The government is also aware that there are allegations that Allen has provided financial benefits in the past to the subject of the pending investigation.

*Id*. at 2 & 3.[36]

---

[36]The entire statement in the *Giglio* letter regarding Mr. Allen, other than the description of his prior criminal history, was as follows:

**Prior False Statements to the Government**
         Bill Allen was recently interviewed concerning a target of an unrelated criminal investigation. During the course of that interview, Allen was not truthful concerning financial benefits provided to an elected state public official. The following day, Allen contacted a government agent and volunteered that he had not been truthful about this subject matter in an effort to protect a family member.

**Investigations Involving Allegations of Sexual Misconduct**
         As we disclosed in our Motion in Limine to Exclude Inflammatory, Impermissible Cross-examination (filed under seal on August 14, 2008), the government is aware that Allen has previously been the subject of a criminal investigation conducted by the Anchorage Police Department (APD) regarding allegations that he engaged in a sexual
(continued...)

The information about the pending APD investigation and "financial benefits" provided by Mr. Allen to "another juvenile female" was new.  Mr. Allen's gifts to Ms. Tyree and her family were not; they were reported in an Anchorage Daily News article, dated Feb. 3, 2008, entitled "Allen teen sex inquiry reopened/ BAMBI: Police look into claim ex-Veco boss had sex with underage girl".  News of the imminent publication of that article had led the prosecutors to consult with PRAO for a second time on Dec. 20, 2007, about whether they had an obligation to disclose information regarding Mr. Allen's subornation of perjury by Ms. Tyree.

Williams & Connolly made a written *Brady* demand for details of the "financial benefits" provided by Mr. Allen to the two underage females involved in the closed and pending APD investigations. Letter from A. Romain, dated Sept. 5, 2008 (DOJ Bates nos. CRM080481-482).  The government replied promptly, but provided no information:

---

[36](...continued)
relationship with a juvenile female [Ms. Tyree] more than ten years ago.  As we noted in our filing, Allen has not been charged with any criminal offense stemming from this investigation and it was our understanding that the investigation - which was briefly reopened this year - was again recently closed or suspended.

On August 20, 2008, the government learned that there is another pending investigation of Allen by the Anchorage Police Department.  The government believes that the new investigation relates to allegations that, in the late 1990's Allen engaged in a sexual relationship with a different female juvenile.

As we also noted in our filing, the government is aware of a rumor that the United States Attorney's Office in the District of Alaska played some role in the earlier investigation of Allen being suspended by APD due to Allen's status as a cooperating witness.  Such allegations are completely baseless and untrue.  The initial sexual misconduct investigation involving Allen was suspended by the Anchorage Police Department two years before he was contacted by the government regarding the public corruption investigation.

The government has learned that Allen has provided financial benefits to the individual who was the subject of the earlier investigation [Ms. Tyree] as well as to family members of the subject.  The government is also aware that there are allegations that Allen has provided financial benefits in the past to the subject of the pending investigation.

*Id*. at 2-3 (footnote omitted; emphasis in original).

291

> This is in response to your letter sent this afternoon. The government is
> fully aware of our continuing duty to disclose information to the defense
> pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and its progeny. We
> will continue to abide by that duty and provide the defendant with
> information in our possession that is material to your client's defense.
>
> As always, if you have any additional questions or concerns, please do not
> hesitate to contact me.
>
> Letter from B. Morris, dated Sept. 5, 2008, to A. Romain (DOJ Bates no.
> CRM021519).

However, the prosecutors provided information about the new APD investigation
to Mr. Allen, the target of that investigation, the day they learned about it.

Agent Kepner informed Mr. Bottini on Aug. 21, 2008, that "[a]ccording to a
conversation [FBI Supervisory Special Agent/Chief Division Counsel]
("SSA/CDC") eric gonzalez had with [APD Detective] kevin vandergriff, the new
allegations have merit and that kevin will probably will be submitting the case to
prosecutors in the near future." Email from Agent Kepner, dated Aug. 21, 2008, to
E. Sullivan, J. Bottini, B. Morris, N. Marsh, J. Goeke, *et al*., Subject: "Bill allen
sex abuse case" (DOJ Bates no. CRM035898). On that same day, Mr. Bottini
informed Mr. Allen's attorney, Robert Bundy, about the new APD investigation,
and early the next morning, Mr. Allen called Agent Kepner, who counseled him
what to do, and what not to do, about that investigation:

> By the way, we told Bundy yesterday only that we had learned that an APD
> investigation of Bill is active. Didn't tell him for what, but he probably has a
> pretty good idea. He broke it to Bill, who is of course obsessing. Allen
> called MBK [Agent Kepner] this morning at 0710 am asking her "what's
> going on"? She had to tell him that she didn't really know and that it
> wouldn't be appropriate for us to inquire at this point about it. Thus, he is
> sitting over there at the house stewing right now.
>
> At one point Bill said something crazy like "maybe Bambi and I should just
> go down to APD and clear it up" - MBK told him "bad idea" and you need
> to listen to whatever Bundy advises you to do.....

Email from J. Bottini, dated Aug. 22, 2008, to E. Sullivan, N. Marsh, B. Morris and J. Goeke (ellipsis in original) (DOJ Bates no. CRM036123).[37]

*See also* Agent Kepner's 302, dated Aug. 22, 2008, "Synopsis: Contacts with source's [Mr. Allen's] attorney and source [Mr. Allen] regarding Anchorage Police Department investigation" ("The [APD] has disclosed they are investigating a new allegation that [Mr. Allen] had sex in 1999 with an under aged prostitute. . . . In a meeting with [Mr. Allen's] attorney, the government attorneys discussed that the APD investigation was still ongoing . . . [Mr. Allen] called SA Kepner to inquire about the APD investigation. SA Kepner told [Mr. Allen] that she knew the investigation was active but was not aware of the details nor would she be able to share them even if they were known.") (DOJ Bates no. CRM0127735).

SSA/CDC Gonzalez also reported that "Det. Vandergriff has offered to provide the FBI with any reports or interview transcripts he may have." SSA/CDC Gonzalez's 302 of Interview of Det. Vandegriff, dated Aug. 19, 2008, at 2 (DOJ Bates nos. CRM095734-735). On Sept. 3 and 4, 2008, the prosecutors considered whether to obtain more information from APD about its new investigation of Mr. Allen:

| | |
|---|---|
| Mr. E. Sullivan: | Do we have anything in our possession re: the Bambi local investigation? |
| Mr. Marsh: | Not that I am aware of, but I think we should make some effort to go get it from APD. W&C is going to have it, so we should have it too. What do you think? |

Email exchange between Mr. E. Sullivan and Mr. Marsh, dated Sept. 3, 2008 (DOJ Bates no. CRM020907).

| | |
|---|---|
| Mr. Marsh: | The consensus from our colleagues in Alaska is: (a) the APD investigative files are not public and can't be obtained via the state FOIA law; (b) W&C likely does |

_____

[37]Det. Vandegriff met with Alaska U.S. Attorney Nelson Cohen, AUSA K. Loeffler and AUSA A. Renschen on Sept. 3, 2008, to discuss the new investigation of Mr. Allen. *See* Memorandum from K. Loeffler to File, dated Oct. 2, 2008 (DOJ Bates nos. CRM058103-104). During that meeting, Detective Vandegriff stated that "his priority right now was to keep the investigation secret from Allen." *Id*. at 1.

> not have the records; and (c) we shouldn't reach out to
> APD and ask for a copy. Please let us know your
> thoughts and suggestions in response.

Email from N. Marsh, dated Sept. 4, 2008, to W. Welch, B. Morris and E.
Sullivan, Subject: "BA APD docs" (DOJ Bates no. CRM020960).

Before a decision was made on whether to obtain the APD files, a hearing
was held on the Government's Rule 608(b) Motion. During that hearing, the
government stated that it had no additional information or documents about the
APD investigations to provide to the defense. *Stevens*, Transcript of Chambers
Conference (by telephone), Sept. 5, 2008, 3:00 p.m., at 16-19. Mr. Marsh stated
that "as we've indicated in writing in our motion - - in our response to defendant's
motion to compel, we do not have any additional documents to pass on concerning
those allegations." *Id*. at 16. Mr. Marsh was referring to a statement in a
government filing made that afternoon: "The government further advises the Court
that it is presently not aware of any documents in its possession, custody or control
concerning any state or local investigation concerning Allen." Government's
Memorandum in Opposition to Defendant's Motion to Compel Discovery, dated
Sept. 5, 2008, at 5 (DOJ Bates nos. CRM080376-469).

The Court inquired further:

| | |
|---|---|
| THE COURT: | All right. With respect, though, to the specific requests for information, am I clear in saying that the government is saying that it's turned over all information it possesses to the defense team with respect to that sexual proclivity issue? |
| Ms. MORRIS: | Yes, judge, that is correct. |
| | |
| THE COURT: | Do you accept that, Mr. Sullivan? |
| Mr. B. SULLIVAN: | Yes, I accept that statement that they have turned over all information with respect to the sexual matter which they or their agents or anyone connected with this investigation has. If it's that complete, then I accept it. |

| THE COURT: | All right. |
| Mr. B. SULLIVAN: | Is it that complete? |
| | |
| THE COURT: | It sounded that complete to me. Ms. Morris? Let's ask government counsel. |
| Mr. E. SULLIVAN: | Just one point of clarification. When he's saying agent or individuals affiliated with the government, we are not of the view that we have to go to state authorities to inquire with them about what information they currently have. With that in mind, we are not presently aware of any additional information in our possession. |
| | |
| Mr. B. SULLIVAN: | Your Honor, if they are working with local authorities, they have to go and make inquiries about that. They can't engage in willful blindness on that kind of an issue. I can't imagine that the chief or most important witness in a case, the government will not make full inquiry about those matters. |
| Mr. MARSH: | Nicholas Marsh for the government. Your Honor, I believe it's not a federal matter, and to this point we're not aware of anybody on this prosecution team working with state or local authorities in connection with those investigations. |

*Stevens*, Transcript of Chambers Conference (by telephone), Sept. 5, 2008, 3:00 p.m., at 19-20.

On the same day, Agent Kepner informed Agent Eckstein that Senator Stevens's lawyers had requested information about state and local investigations of Mr. Allen, and she asked if he had any such reports. Email from Agent Kepner, dated Sept. 5, 2008, to Agent Eckstein (DOJ Bates no. CRM067060). Agent Eckstein replied that he did not; he told her that the APD detective conducting the investigation of Mr. Allen had asked him "for an old 302 of mine regarding a statement bambi made abut having sex with Allen." Email from Agent Eckstein, dated Sept. 5, 2008, to Agent Kepner (DOJ Bates no. CRM088337). APD

Detective Vandegriff had previously reviewed Agent Eckstein's file in *Boehm* on
Feb. 11, 2008, and "recover[ed] an FBI report which referenced an interview with
BAMBI TYREE and her attorney SUE ELLEN TATER . . . [when] she advised
the FBI that she had lied under oath.  She stated that she had sex with BILL
ALLEN when she was 14 years old, but she signed a sworn statement provided by
ALLEN's attorney stating she had not had sex with him." *See* APD Report, dated
Feb. 13, 2008 (DOJ Bates no. CRM058161).

On Sept. 7, 2008, Agent Kepner arranged for an exchange of investigative
documents between the FBI and the APD regarding Mr. Allen and Ms. Tyree:

> Subject: Reports to turn over to APD
>
> Eric, Everyone is in agreement to turn over the attached 302's to [APD
> Detective] Kevin Vandergriff.  Can you write a letter to APD and include
> the attached reports in hard copy?  Please ask them to treat them as
> confidential.  We also want to obtain all of the APD reports of their
> investigations of Bill Allen specifically the allegations involving Bambi
> Tyree, Paula Roberts [the "different juvenile female" referred to in the
> *Giglio* letter as the subject of the new, pending APD investigation] and any
> other similar allegations.  Apparently, Vandergriff is out next week but we
> need them sooner rather than later. Thanks, mbk.
>
> Email from Agent Kepner, dated Sept. 7, 2008, to SSA/CDC E. Gonzalez,
> Agent Eckstein and SAC C. Seale (DOJ Bates nos. CRM067061-065).

Agent Kepner attached the following FBI 302s to that email:

> - Agent Eckstein's 302 of his and AUSA Russo's interview of Ms. Tyree on
>   July 22, 2004, which recites in its first substantive paragraph:
>   "TYREE had sex with BILL ALLEN when she was 15 years old.
>   TYREE previously signed a sworn affidavit claiming she did not have
>   sex with ALLEN.  TYREE was given the affidavit by ALLEN's
>   attorney, and she signed it at ALLEN's request.  TYREE provided
>   false information on the affidavit because she cared for ALLEN and
>   did not want him to get into trouble with the law.";

- Agent Kepner's one-sentence 302 of her interview of Mr. Allen on March
10, 2007: "[Mr. Allen] has never made a statement under oath that
he[] knew was false or misleading nor has [Mr. Allen] encouraged
others to make a false statement under oath."

- Agent Kepner's four-sentence 302 of her and Mr. Bottini's interview of
Ms. Tyree on Oct. 10, 2007: "LISA LNU [last name unknown] was
extorting BILL ALLEN regarding an alleged relationship between
BAMBI TYREE and ALLEN. TYREE came up with an idea to sign
a document to prevent further extortions by LISA. TYREE met with
an attorney in a downtown office building close to Phil Weidner's
office. The content of the document was created solely by TYREE
with the help of the attorney."

*Id*. (last bracket in original)(DOJ Bates nos. CRM0067062-065).

Later the same day, Agent Kepner emailed SSA/CDC E. Gonzalez again and put a
hold on obtaining the APD files: "Hold off. Attorney's [sic] are changing their
minds. I will have a final answer on Tuesday regarding request of their reports."
Email from Agent Kepner, dated Sept. 7, 2008, to SSA/CDC E. Gonzalez, Agent
Eckstein and SAC C. Seale (DOJ Bates no. CRM088336).

Mr. Welch testified that the decision not to obtain the APD files was made
by AAG Friedrich and Ms. Glavin:

Mr. Welch:    At or about the same time [several days prior to Sept. 7], I had
a conversation with Marsh and Sullivan in which we have a
discussion about obtaining the APD file, let's get ahead of this
issue, let's get the file. There was an issue, should we do this. I
recall telling them there are two ways of doing it, one is to get
ahead of it, one is not. We should get ahead of it and get the
file. Somehow Glavin and Friederich find out about it and they
sort of put a halt to it, they want more information, and that
produces an e-mail on September 4 where they want to know
do we believe Williams & Connolly has gotten the file yet, do
we have reason to believe there has been a subpoena. That
leads to a meeting on the 5th in which I participate with Glavin

and Friederich in which they state that we shouldn't do it.

Q      Get access to the file?
A      Right. Since we're not in possession, custody and control of it, we don't have a responsibility, aren't we in a better position if we don't get it as opposed to if we get it.

Q      Because we can't turn over what we don't have?
A      Assuming Williams & Connolly doesn't have it. . . .

* * *

A      . . . But we definitely met on the 5th at 2:00 o'clock, sort of answered their questions, and then they laid out the position that it made much more sense not to get it now because then it wouldn't be in our possession, and if Williams and Connolly never got it, well then we'd be in the best position possible.

Q      And the file in question was the APD file of this new –
A      That's correct.

Q      -- pending investigation or renewed investigation of Bill Allen?
A      Correct. . . .

Deposition of W. Welch, Jan. 13, 2010, at 221-222, and Feb. 5, 2010, at 314-315.

Mr. Friedrich and Ms. Glavin denied giving any such instructions. Memorandum of Interview of Matthew Friedrich, dated April 2, 2010, at 18; Memorandum of Interview of Rita Glavin, dated March 31, 2010, at 11. *See In Re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999)("we reject as irrelevant the contention that the requested records may have been in the possession of the Metropolitan Police Department, or the FBI or DEA, rather than the U.S. Attorney's Office. As the Supreme Court held in *Kyles*, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' 514 U.S. at 437."); *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005)("In the course of their investigation, and in collecting and reviewing evidence, the prosecutors must ensure that any information relevant to this case that comes into the

possession, control, or custody of the Justice Department remains available for disclosure. *See United States v. Marshall*, 328 U.S. App. D.C. 8, 132 F.3d 63, 69 (D.C. Cir. 1998) (cautioning against government 'gamesmanship in discovery matters.')").

The APD files on Mr. Allen and Ms. Tyree, consisting of approximately 467 pages (DOJ Bates nos. CRM043317-783), were obtained by the prosecutors on Oct. 14, 2008, and were provided by Mr. Welch to Williams & Connolly on Oct. 16, 2008. *See* Letter from W. Welch, dated Oct. 16, 2008, to R. Cary (DOJ Bates no. CRM043315).[38]

| 12. | Sept. 9, 2008 | Government's *Brady* Letter: No Disclosure, Misrepresentations and Omissions |

"Because the government is aware of no evidence to support any suggestion that Allen asked the 'other female' [Ms. Tyree] to make a false statement under oath, neither <u>Brady</u> nor <u>Giglio</u> apply."
*Brady* Letter at 5.

The prosecutors made their second and last voluntary *Brady* disclosure to Senator Stevens on Sept. 9, 2008. *See* Letter from B. Morris, dated Sept. 9, 2008, to Williams & Connolly ("*Brady* Letter")(DOJ Bates nos. CRM022547-22551). They did not disclose the evidence of Mr. Allen's subornation of perjury which was contained in Agent Eckstein's 302 of his interview of Ms. Tyree on July 22, 2004, in his notes of that interview and in the government's motion *in limine* in *Boehm*, its reply and opposition to the motion for reconsideration. All these documents were well-known to Mr. Bottini, Mr. Goeke, Mr. Marsh and Mr. E. Sullivan since at least October, 2007. The prosecutors stated that no such evidence existed:

we are also providing you with some additional information that, as

_____

[38]Included in the APD file were Agent Eckstein's 302 of his and AUSA Russo's interview of Ms. Tyree on July 22, 2004, and APD Det. Vandegriff's report that AUSA Russo asked him to suspend APD's investigation of Mr. Allen in March 2004 (DOJ Bates nos. CRM043377-378 and 043360).

described below, is neither *Brady* nor *Giglio*. In 2007, the government
became aware of a *suggestion* that, a number of years ago, Allen asked the
"other female" [Ms. Tyree] to make a sworn, false statement concerning
their relationship. After hearing that suggestion, the government conducted
a *thorough investigation and was unable to find any evidence* to support it.
The investigation included: (a) an inquiry to the "other female" [Ms. Tyree],
who denied the suggestion; (b) an inquiry to Allen, who denied the
suggestion; (c) a review of notes taken by a federal law enforcement agent
[Agent Eckstein] during a 2004 interview of the "other female," [Ms.
Tyree]; and (d) a review of notes taken by a federal prosecutor [AUSA
Russo] during a 2004 interview of the "other female" [Ms. Tyree]. Because
*the government is aware of no evidence to support any suggestion that
Allen asked the "other female" [Ms. Tyree] to make a false statement under
oath*, neither *Brady* nor *Giglio* apply.

*Brady* Letter at 5 (emphasis added).

Documents and information well known to the prosecutors, which put the lie to
that statement, were omitted from the *Brady* disclosure letter.

      a.      Documents evidencing Mr. Allen's subornation of perjury circulated
                among the prosecutors as they drafted the *Brady* letter

      i. Agent Eckstein's 302 and notes

Agent Kepner emailed Agent Eckstein's 302 to the prosecutors on Sept. 6,
2008, as they began drafting the *Brady* letter. *See* Email from Agent Kepner, dated
Sept. 6, 2008, to B. Morris, Agent Joy, J. Goeke, J. Bottini, E. Sullivan and N.
Marsh, Subject: "Bambi related 302"s [attached]" (DOJ Bates nos. CRM021588-
596). The first substantive paragraph of that two-page 302 stated:

TYREE had sex with BILL ALLEN when she was 15 years old. TYREE
previously signed a sworn statement claiming that she did not have sex with
ALLEN. TYREE was given the affidavit by ALLEN's attorney, and she
signed it at ALLEN's request. TRYEE provided false information on the
affidavit because she cared for ALLEN and did not want him to get into

trouble with the law.

Agent Eckstein's 302 of Interview of Ms. Tyree on July 22, 2004 (DOJ Bates nos. CRM021593-594).

Agent Kepner also attached to that email her 302s of Mr. Allen's and Ms. Tyree's terse denials of subornation of perjury and perjury respectively. *See* Agent Kepner's 302 of Interview of Mr. Allen on March 10, 2007 ("[Mr. Allen] has never made a statement under oath that [he] knew was false or misleading nor has [Mr. Allen] encouraged others to make a false statement under oath.") (DOJ Bates no. CRM067062); Agent Kepner's 302 of Interview of Ms. Tyree on October 10, 2007 (LISA LNU [last name unknown] was extorting BILL ALLEN regarding an alleged relationship between BAMBI TYREE and ALLEN. TYREE came up with an idea to sign a document to prevent further extortions by LISA. TYREE met with an attorney in a downtown office building close to Phil Weidner's office. The content of the document was created solely by TYREE with the help of the attorney.") (brackets in original) (DOJ Bates no. CRM067063).

Mr. Goeke emailed Agent Eckstein's notes of the interview of Ms. Tyree to his colleagues on Sept. 8, 2008, the day before the *Brady* letter was sent to Williams & Connolly. *See* Email from J. Goeke, dated Sept. 8, 2008, to J. Bottini, B. Morris, W. Welch, N. Marsh and E. Sullivan, Subject: "Tyree debrief notes" (DOJ Bates nos. CRM081272-277). The first paragraph on the first page of those notes, transcribed and reproduced below, reflects:

> B[ambi] had sex w/B[ill] A[llen] at
> 15 -> B[ambi] signed
> Affi[davit] saying she
> didn't - given to her
> by b[ill] A[llen]'s lawyer
> B[ambi] lied in affi[davit] cause
> didn't want to get B[ill] A[llen] in trouble. B[ambi]
> signed affi at B[ill] A[llen]'s request.

301



Notes of FBI SA John Eckstein of Interview of Ms. Tyree on July 22, 2004,
at 1 (attached to Email from J. Goeke, dated Sept. 8, 2008, to J. Bottini, B.
Morris, W. Welch, N. Marsh and E. Sullivan, Subject: "Tyree debrief notes"
(DOJ Bates nos. CRM081272-277)).

*See also* Deposition of Agent Eckstein, April 15, 2010, at 13-15 (Agent Eckstein
read his notes into the record).

Mr. Goeke in his accompanying email described the notes as "ambiguous"
and reported a conversation he had just had with Agent Eckstein:

> Here are the notes from the 302. They are ambiguous. The agent also just
> told me that he does not remember asking Bambi if Bill asked her lie [sic]
> and that he doesn't think he would have asked that question because the
> point of the inquiry was simply whether she believed she had made a false
> sworn statement and Bambi did not want to talk about Allen.

Email from J. Goeke, dated Sept. 8, 2008, to J. Bottini, B. Morris, W.

302

Welch, N. Marsh and E. Sullivan, Subject: "Tyree debrief notes" (DOJ Bates nos. CRM081272-277).

Mr. Goeke's colleagues did not reply to his email. *See* Deposition of J. Goeke, Jan. 8, 2010, at 379-380.

Agent Eckstein testified in this investigation and disputed Mr. Goeke's description of their conversation regarding the interview of Ms. Tyree:

BY MR. SCHUELKE:

Q     [reading from Exhibit 3 (email from J. Goeke, dated Sept. 8, 2008, to J. Bottini, B. Morris, W. Welch, N. Marsh and E. Sullivan, Subject: "Tyree debrief notes" (DOJ Bates nos. CRM081272-277))] "The agent also just told me he doesn't remember asking Bambi if Bill asked her to lie, and he doesn't think he would have asked that question, because the point of the inquiry was whether she believed she made a false statement" and she didn't want to talk about Allen. Do you believe that you may have said that to him on or about September 8?

A     I don't believe I would have said to Mr. Goeke that I didn't remember asking Bambi if Bill asked her to lie. I don't recall making that statement.

Q     This is entirely contradictory to your testimony here today, that the point and purpose of the interview at SeaTac was to ascertain whether it was so that Allen had asked her to submit this false affidavit.

A     Well, it was to ascertain who asked her.

Q     Okay, who asked her.

A     Going down there, I believed that she did not come up with this idea on her own. Bill Allen could have been one potential person who did. My point of going down there, and maybe that's the confusion here, my point of going down there was to ask her -- to find out who put her up to it, so to speak. Who asked her to do it, who asked her to sign the affidavit. Whether that was Bill Allen or somebody else, I don't know.

True, I specifically did not ask in my -- it does not appear that I asked

in the interview her specifically did Bill Allen ask you to lie. That's true. I don't think I came -- that I specifically asked her that.

Q    As opposed to asking her did somebody ask you, and she said yeah, Allen?
A    Right.

\* \* \*

Q    Do you have any recollection of this conversation [with Mr. Goeke] at all?
A    Not much. I remember we were standing outside of my desk area. I remember handing him the notes. I remember having a brief conversation. It couldn't have been more than a couple of minutes.

Q    What if anything do you remember of that conversation?
A    Well, my recollection is that I said the only thing that made sense to me was that she did this not on her own but at Bill's request, but I don't specifically remember the conversation.

Q    Are you saying you remember you said that or are you speculating that is likely what you said?
A    I'm speculating. Every conversation I've ever had with anybody on this issue, I stood by my original opinion prior to this interview, which was there's no way this 15 year old girl came up with this on her own.

Deposition of Agent Eckstein, April 15, 2010, at 46-47 & 50-51.

Mr. Goeke testified in this investigation that Agent Eckstein's notes and 302 are *not* ambiguous:

BY MR. SCHUELKE:
Q    You find the first, second and third sentences [of Agent Eckstein's 302] to be ambiguous?
A    I do not. That can be read to say that Allen caused her to sign false [sic] statement, yes.

304

Q      How else could it be read?

A      You could read it to say that -- it's not clear from the 302 that --
       there's a third party involved. This statement is provided by Allen's
       lawyer and she had asked him to sign it. So it's not clear for -- you
       could -- or make an argument that it's not clear that Allen knew that
       the statement provided by his lawyer was false. But I agree with you,
       this -- I read it to say that Tyree made a false statement at Allen's
       request, yes.

Q      Does somebody else, to your knowledge, read it differently?
       Somebody else among the Stevens trial team?

A      I've heard other people on the Stevens trial team read -- characterize
       this incident differently.

BY MR. SHIELDS:

Q      As what?

A      Characterize it -- say that there is ambiguity in this, yes.

BY MR. SCHUELKE:

Q      Who?

A      Nick Marsh has said that.

Q      Who else?

A      I -- other people may have said that, too, but I can't recall specifically.
       I've heard it advanced before.

Q      By more than one, but at least by Nick Marsh?

A      Yes.

                                      *  *  *

MR. MENCHEL:              Okay, is there anything that's in the notes
(Attorney for Mr. Goeke)  [of Agent Eckstein] themselves that you
                          find to be ambiguous?

THE WITNESS:             Not in the notes themselves, no.

MR. MENCHEL:             What is it about the notes that you find ambiguous
                         generally?

THE WITNESS:             The context of what they convey, What – who

                                      305

knew what when.  I think there's a lot of questions that can be asked about that.  That's what I find to be ambiguous.  Not the words.

BY MR. SCHUELKE:

Q     Saying [probably should be "same"] with respect to the 302, I take it?
A     Yes.

BY MR. SHIELDS

Q     I'm sorry.  I want to make sure I understand it.  Are you saying the notes are ambiguous or not ambiguous?
A     What they say is not ambiguous.

Q     Okay, what else – what are you saying then that is ambiguous?
A     What they convey could be ambiguous in terms of what – they don't paint the full story of the lead up, follow up questions or well, what did Allen know when the things was signed.  It doesn't answer the question of what Allen –

*   *   *

BY MR. SCHUELKE:

Q     Well, as we've discussed earlier, the notes themselves are not ambiguous at all, are they?
A     I agree.

Deposition of J. Goeke, Jan. 8, 2010, at 192-194, 209-210 & 376.

     Mr. Bottini also testified that Agent Eckstein's 302 was not ambiguous, that the agent's notes exactly state that Mr. Allen asked Ms. Tyree to lie, and that he couldn't explain Mr. Goeke's description of the notes as ambiguous. Deposition of J. Bottini, Dec. 17, 2009, at 673, 784 & 782-783.  Mr. E. Sullivan testified that he had not read Agent Eckstein's 302 or seen his notes other than in connection with this investigation. Deposition of E. Sullivan, Jan. 6, 2010, at 93 & 211.  Ms. Morris testified that she saw Agent Eckstein's 302 but could not recall if she read it, and she could not recall whether she saw the agent's notes, AUSA Russo's notes or the pleadings filed in *Boehm*. Deposition of B. Morris, Jan. 15, 2010, at 169-170.

Mr. Marsh testified that his and the collective view of the *Stevens* prosecution team was that Agent Eckstein's 302 and his notes were ambiguous:

BY MR. SCHUELKE
Q       This paragraph, these two sentences, three sentences [in Agent Eckstein's 302] that I just read ["Tyree had sex with Bill Allen when she was 15 years old. Tyree previously signed a sworn affidavit claiming that she did not have sex with Allen. Tyree was given the affidavit by Allen's attorney and she signed it at Allen's request."], is that what you characterized as a "suggestion" in the September 9 Brady letter?
A       I don't think it's that specific. What we were able to determine is that reading this 302, it seemed to some degree ambiguous as to whether she was specifically directed to make a false statement at Allen's request.
        We then came across Frank Russo's –

Q       What is ambiguous about it?
A       It indicates that she signed a statement but there's no indication she was directed to make a false statement at Allen's request.

Q       You're going to have to explain that to me.
A       I'm trying, sir.

Q       She signed a sworn affidavit claiming she did not have sex with Allen. She was given the affidavit by Allen's attorney and she signed it at Allen's request. What is ambiguous?
A       Mr. Schuelke, from my perspective, from our collective perspectives, all the people who looked at it, it indicates she made a false statement. It indicates that she at least to some degree believed she was going to contact Allen's attorney at his request.
        It did fall short of making an explicit connection that she was directed to make the false statement by Mr. Allen. What we did at the same time was we also found Frank Russo's notes in the same meeting which made explicit that it was Bambi's idea, not Bill Allen's.
                            *   *   *

307

Q     Eckstein's notes are also unambiguous, aren't they, that it was Allen's idea to have Bambi sign the false affidavit?

A     My memory is that Eckstein's notes were generally consistent with the 302, that it was the same ambiguity that we saw. That's my memory of Eckstein's notes. . . .

* * *

A     . . . With respect to the 302 and the notes, I respectfully apologize that you don't agree with the collective decision or the collective view of the team that there was some ambiguity in those. We thought there was. PRAO confirmed it.

The only thing that we were left with was this statement in a brief and PRAO indicated to us it wasn't evidence. In fact, it's not evidence.

Deposition of N. Marsh, Feb. 2, 2010, at 175-177, 189 & 202.

The *Brady* letter cited and summarized only Agent Kepner's 302s of Mr. Allen's and Ms. Tyree's denials of any role by him in her false sworn statement, omitted any reference to Agent Eckstein's 302 and the information it contained, and misrepresented that his notes supported the proposition that "the government is aware of no evidence to support any suggestion that Allen asked the 'other female' [Ms. Tyree] to make a false statement under oath". *Brady* letter at 5.

ii. AUSA Russo's and AUSA Goeke's pleadings in *Boehm*

Mr. Goeke also forwarded to his colleagues on Sept. 8, 2008, an email chain containing "pertinent excerpts from briefing filed in United States v. Boehm, a case prosecuted in the District of Alaska during 2003-2004 in which I participated". Email from J. Goeke, dated Sept. 8, 2008, to N. Marsh, E. Sullivan, B. Morris, W. Welch and J. Bottini, Subject: "FW: Tyree" (DOJ Bates nos. CRM080938-941). Mr. Goeke had sent the same excerpts to Mr. E. Sullivan and Mr. Bottini on March 5, 2007, and to Mr. Marsh on Oct. 4, 2007. *See* Email from J. Goeke, dated Match 5, 2007, to E. Sullivan and J. Bottini, Subject: "Tyree"; email from J. Goeke, dated Oct. 4, 2007, to N. Marsh, Subject: "FW: Tyree" (DOJ Bates nos. CRM080938-941). The following excerpts were included:

308

Excerpt from United States' motion in limine (filed July 2004) in <u>United States v. Boehm</u> regarding testimony of Bambi Tyree:

During debriefings, Bambi Tyree admitted to giving a false statement under oath when she was 15 years old. This statement is not in the United States' possession. However, Tyree identified the nature of the statement, which is as follows: When Tyree was 15 years old, she had sex with Bill Allen, president of VECO and publisher of the "Voice of the Times" section in the Anchorage Daily News. Tyree and Allen were introduced by Tyree's roommate, Lisa Moore. Moore, who apparently knew of the untoward and illegal relationship, began blackmailing Allen, claiming that she would go to the police and newspapers and tell them that Allen had sex with Tyree. Based on this threat, *Allen asked Tyree to meet with his attorney, James Gilmore, and give a sworn statement stating that she never had sex with Allen. Tyree did so.* The United States confirmed the existence of such statement from Mr. Gilmore. Mr. Gilmore stated that this statement was work product, and he declined to provide it to the United States.

The United States is turning over this information to the defense pursuant to its obligations under <u>Giglio v. United States</u>, 405 U.S. 150 (1972). The fact that Tyree gave a false statement under oath bears on her credibility. However, *the fact that Allen was the person who asked Tyree to swear to the statement is irrelevant to any issue in this case*. . . .

Excerpt from United States' reply in <u>United States v. Boehm</u> to defendant's opposition to United States' motion in limine (reply filed August 2004):

. . . Moore introduced Tyree to Allen, who had sex with Tyree. Moore became jealous of Tyree's relationship with Allen and began blackmailing him, telling him that she would go to the authorities and tell them of Allen's relationship with the juvenile Tyree. As a result, *Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied*. . . .

Email from J. Goeke, dated Sept. 8, 2008, to N. Marsh, E. Sullivan, B. Morris, W. Welch and J. Bottini, Subject: "FW: Tyree" (DOJ Bates nos. CRM080938-941)(first ellipsis in original; emphasis added).

Mr. Goeke's "excerpts" email was circulated repeatedly that day in other emails among the prosecutors. *See* Email from B. Morris, dated Sept. 8, 2008, to J. Goeke, N. Marsh, E. Sullivan, W. Welch and J. Bottini, Subject: "Tyree" (DOJ Bates nos. CRM022276-279); Email from J. Goeke, dated Sept. 8, 2008, to B. Morris, N. Marsh, E. Sullivan, W. Welch and J. Bottini, Subject: "Tyree" (DOJ Bates nos. CRM080960-964); Email from J. Goeke, dated Sept. 8, 2008, to B. Morris, N. Marsh, E. Sullivan, W. Welch and J. Bottini, Subject: "Tyree" (DOJ Bates nos. CRM081247-251); Email from J. Bottini, dated Sept. 8, 2008, to J. Goeke, N. Marsh, E. Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch, Subject: "BA disclosure" (DOJ Bates nos. CRM022047-050); Email from E. Sullivan, dated Sept. 8, 2008, to W. Welch, B. Morris and N. Marsh, Attachment, "FW Tyree.msg" (DOJ Bates nos. CRM022280-289); *see also* Email from N. Marsh, dated Sept. 8, 2008, to J. Bottini, J. Goeke and E. Sullivan ("Fellas - Bill [Welch] and Brenda have asked to see (1) the page of Frank [Russo]'s brief re: Bambi and Bill, and (2) a copy of the page of Frank's notes. Could y'all fax them/PDF them to us?") (DOJ Bates no. CRM022136); Email from B. Morris, dated Sept. 8, 2008, to N. Marsh and E. Sullivan, Subject: "I think you have, but please make sure that Bill [Welch] is cc"d on all of the Brady issues") (DOJ Bates no. CRM055730).

Among the emails listed in the preceding paragraph, is one from Mr. E. Sullivan to Ms. Morris, Mr. Welch and Mr. Marsh which included, among "the germane materials on Bambi . . . of particular note", an email he had sent to Mr. Welch on March 5, 2007, which forwarded Mr. Goeke's original "excerpts", email, summarized the government's briefs in *Boehm* and identified the "credibility issue" which concerned Mr. Bottini and Mr. Goeke:

> Bill – attached is an email from Jim/Joe that gives the details re: Bambi Tyree. It's probably more than you'll ever want to know about her. In sum, she was deposed by the govt. a number of years ago. While being debriefed by the govt. in another matter in 2003-04, Tyree told the govt. she lied in her prior depo when she said she did not have sex w/BA when she was 15.

> *The govt's briefs in the 2003-04 matter indicate that Allen had sex w/Tyree,* and that when Tyree's roommate blackmailed Allen re: the underage relationship, *Allen had Tyree sign an affidavit indicating that there was no sexual relationship*. Allen has apparently denied the relationship.

The only issue for us to decide is whether we should include something in
the affidavit that flags the potential credibility of Allen as an informant.
Although a Franks hearing can occur when an affiant omits facts that bear
on an informant's credibility, this seems to be a stretch in my view in this
instance. Nonetheless, Joe/Jim wanted me to flag it b/c Judge Sedwick was
involved in the rulings in the 2003-04 matter and has reviewed many of our
T3 [Title 3 wiretap] applications in this case. *They are concerned that
Sedwick will be aware of this credibility issue and may raise it* if he has to
review the Stevens SW affidavit in Alaska.

Please let me know your thoughts. Thx.

Email from E. Sullivan, dated March 5, 2007, to W. Welch; Subject: "FW:
Tyree" (emphasis added) (included in Email from E. Sullivan, dated Sept. 8,
2008, to W. Welch, B. Morris and N. Marsh, Attachment, "FW Tyree.msg")
(DOJ Bates nos. CRM022280-289).

Mr. Goeke, in another email on Sept. 8, 2008, acknowledged signing one of
the government's pleadings in *Boehm* but disclaimed authorship: "I did not draft
these motions, but signed a response to a defense motion to reconsider on the topic
for 'Frank Russo'". Email from J. Goeke, dated Sept. 8, 2008, to N. Marsh, J.
Bottini, E. Sullivan, B. Morris, W. Welch and Agent Joy, Subject: "BA
disclosure" (DOJ Bates nos. CRM022047-050).  The government's response in
*Boehm* signed by Mr. Goeke included the following statement:

The following facts cannot be disputed: Tyree was a juvenile when the
alleged sexual relationship with Allen occurred.  There was a scheme to
blackmail Allen based on his alleged sexual relationship with Tyree.  The
blackmail scheme caused Allen to hire an attorney, James Gilmore.  Tyree
agreed to give a sworn statement to Gilmore in which she denied having sex
with Allen.

*Boehm*, U.S. Opposition to Defendant's Motion to Reconsider Court's
Ruling Regarding Impeachment of Bambi Tyree, <u>Filed Under Seal</u>, dated
October 6, 2004, at p. 8 (DOJ Bates nos. CRM119363-378).

None of the government's pleadings in *Boehm*, their existence, or the statements and information they contained, were disclosed in the *Brady* letter.

iii. PRAO opinions

On Sept. 6, 2008, Mr. E. Sullivan forwarded to Ms. Morris and Mr. Marsh the opinion that was sent by PRAO attorney P. Weiss to him and Mr. Marsh on Dec. 21, 2007. Email from E. Sullivan, dated Sept. 6, 2008, to B. Morris and N. Marsh (DOJ Bates nos. CRM021602-605). The erroneous factual predicates recited in that opinion rendered it defective on its face to anyone familiar with Agent Eckstein's 302, his notes and/or the government's *in limine* motion in *Boehm*, and nullified Mr. Marsh's statement that "we have been blessed by PRAO twice." Email from N. Marsh, dated Aug. 22, 2008, to E. Sullivan and B. Morris (DOJ Bates no. CRM036162).

The question posed to PRAO assumed that the only evidence of Mr. Allen's subornation of perjury was merely a "recollection" by AUSA Russo: "whether Rule 3.8 [of the Rules of Professional Conduct] requires you to disclose to defense counsel the AUSA's recollection that [Mr. Allen] had pressed Bambi to lie in [*Boehm*]." Email from P. Weiss, dated Dec. 21, 2007, to N. Marsh and E. Sullivan (at DOJ Bates no. CRM021604). Ms. Weiss's opinion in response to that question, and Ms. Plagenhoef's earlier opinion, which was recapitulated and adopted by Ms. Weiss, contained significant misstatements of fact, omitted material facts, and relied on Mr. Marsh's conclusion, based on his "thorough inquiry into the matter", that there was "no evidence to support the notion that [Mr. Allen] had pressed Bambi to lie". *Id*. (at DOJ Bates no. CRM021603); *see also id*. ("You and you team therefore concluded that [Mr. Allen] did not press Bambi to lie and that [] AUSA [Russo]'s recollection was either mistaken or was based upon a hunch for which there was no concrete support.").

The misstatements and omissions of relevant and material facts in the PRAO opinion were glaring:

• "the notes of the agent [Eckstein] who interviewed Bambi in [U.S. v. Boehm] reflect that at the time of the interview she was adamant that the lie was her own idea". *Id*. Agent Eckstein's notes state just the

312

opposite;

- The opinion makes no reference to the existence of, or the information in, Agent Eckstein's 302 which reported Ms. Tyree's statement that she signed a false affidavit at Mr. Allen's request;

- The opinion makes no reference to the existence of, or the information in, the government's pleadings in *Boehm* which asserted, for example, that "Allen convinced Tyree to give a false statement to his attorney to defend against any prospective criminal action. Tyree complied." *See Boehm*, United States' Reply to Defendant's Opposition to Motion Regarding Impeachment Evidence Pertaining to Bambi Tyree, Filed Under Seal, dated August 17, 2004, at 3 (DOJ Bates nos. CRM119379-386).

The circulation of those key documents alongside the PRAO opinion by and among the prosecutors and agents as they drafted the *Brady* disclosure letter, made those misstatements and omissions in the opinion even more conspicuous, if not unavoidable. *See* Deposition of J. Bottini, Dec. 17, 2009, at 703-704 ("I don't remember looking at [the Dec. 21, 2007-PRAO opinion] at the time and reading it and noticing that this isn't totally accurate. But it's apparent when you look at the -- here's the facts That [sic] you gave me, that it's not 100 percent correct."); Deposition of J . Goeke, Jan. 8, 2010, at ("No, I don't recall reading [the Dec. 21, 2007-PRAO opinion] at the time and going, 'Oh, there's an obvious mistake. I better -- we better recontact them again.' . . . I don't recall that. . . . I'm surprised that I didn't.").

       b.    Prosecutors re-interview Mr. Allen and obtain more denials and self-serving statements

On Sept. 6, 2008, the day after the government represented that it had disclosed to Williams & Connolly all information in its possession regarding previous investigations of Mr. Allen for sexual misconduct (*Stevens*, Transcript of Chambers Conference (by telephone), Sept. 5, 2008, 3:00 p.m., at 19-20), Mr. Goeke emailed to his colleagues APD reports of an interview of Lisa Moore by Det. Vandegriff, AUSA Russo and Agent Eckstein on Feb. 10, 2004, at the U.S. Attorney's Office in Alaska, and a proposed "summary disclosure" of the information in those reports. *See* Email from J. Goeke, dated Sept. 6, 2008, to W.

Welch, B. Morris, N. Marsh, E. Sullivan, J. Bottini, Agent Kepner and Agent Joy) (DOJ Bates nos. CRM080532-537). According to the attached APD reports, Lisa Moore stated *inter alia* that:

- when she was 19-years-old, she was a prostitute and Mr. Allen was her client;
- she introduced Ms. Tyree to Mr. Allen and she "watched" Mr. Allen have sexual relations with Ms. Tyree, who was 15-years-old at the time;
- Mr. Allen "had sex with several young girls who were 15-years-old";
- Mr. Allen's attorney offered her $5000 in return for "her [] sign[ing] a piece of paper swearing that she never had a relationship with BILL and to never disclose to anyone that she had a relationship";
- she refused to "take the money thinking she could probably get more"; and
- she had been subpoenaed to testify in another APD case and "BILL was afraid that his name would come up and flew her and her family out of state."

APD Reports by Det. K. Vandegriff, dated Feb. 12, 2004 and Feb. 19, 2004 (attached to email from J. Goeke, dated Sept. 6, 2008, to W. Welch, B. Morris, N. Marsh, E. Sullivan, J. Bottini, Agent Kepner and Agent Joy) (DOJ Bates nos. CRM080532-537).

The next day Mr. Allen was interviewed in the presence of his attorney, Mr. Bundy, by Mr. Bottini, Mr. Goeke and Agent Kepner about Ms. Moore and Ms. Tyree. Agent Kepner's two-paragraph 302 of that interview, emailed to prosecutors the same day, reported:

[Mr. Allen] had a sexual relationship with MOORE who was an adult prostitute at the time. [Mr. Allen] recalled paying for airline tickets for LISA MOORE and her mother to move to Spokane Washington. The airline tickets were not purchased to hide MOORE but rather to help MOORE to make a fresh start in a new area. [Mr. Allen] paid for MOORE's rent before she moved to Spokane. After returning from Spokane, MOORE tried to extort $25,000 from [Mr. Allen] by threatening to expose his relationship with her and an under aged female, BAMBI TYREE. [Mr. Allen] refused to pay MOORE and hired JIM GILMORE, an attorney, to advise him on this matter. After the arrest of JOSEPH BOEHM and BAMBI

TYREE, MOORE renewed her extortion attempts. MOORE's mother also participated in this extortion attempt. [Mr. Allen] shared with TYREE that MOORE was trying to extort money from him. TYREE said that she would stop MOORE. TYREE then asked to speak with [Mr. Allen's] attorney. [Mr. Allen] does not know the outcome of the conversation or what TYREE discussed with his attorney. [Mr. Allen] did not ask TYREE to make a false statement. [Mr. Allen] denied ever offering to pay anyone money to make a false statement.

Sometime after BOEHM was arrested, BILL BITTNER, a civil attorney representing BOEHM, asked [Mr. Allen] to say that TYREE was extorting him. [Mr. Allen] said it wasn't true and refused to make that statement. BITTNER said that if [Mr. Allen] made this statement then [Mr. Allen] would not be subpoenaed in the BOEHM case.

Agent Kepner's FBI 302 of Interview of Mr. Allen on Sept. 7, 2008 (attached to email from Agent Kepner, dated Sept. 7, 2008, to B. Morris, J. Goeke, J. Bottini, N. Marsh, E. Sullivan and Agent Joy) (DOJ Bates nos. CRM022030-032).

Bill Bittner, referenced in the last paragraph of the 302, was Senator Stevens's brother-in-law. Deposition of J. Bottini, Dec. 17, 2009, at 773-774.

Mr. E. Sullivan redrafted Mr. Goeke's summary of Lisa Moore's statements and sent it to Mr. Goeke, Mr. Bottini and Agent Kepner, with the message:

Jim/Joe/Mary Beth - given your discussion with Allen, please determine which portions of allegations need to be included in a Brady/Giglio letter and what we should say re: the discussion with Bill. Thx.

Email from E. Sullivan, dated Sept. 7, 2008, to J. Goeke, J. Bottini, N. Marsh, B. Morris and M. Kepner (DOJ Bates nos. CRM021923-924).

Mr. Marsh "took a first crack at streamlining the Allen *Giglio* disclosure". Email from N. Marsh, dated Sept. 7, 2008, to J. Goeke, J. Bottini, E. Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch (DOJ Bates nos. CRM021997-998).

c.      None of the drafts of the *Brady* letter disclosed Agent Eckstein's 302, the government's pleadings in *Boehm*, or the information contained in those documents

i.      Initial drafts disclose additional allegations of sexual misconduct by Mr. Allen but no information about his subornation of perjury

Mr. Marsh redrafted Mr. Goeke's and Mr. E. Sullivan's summaries of the APD report of Lisa Moore's interview in 2004, but he did not disclose Mr. Allen's subornation of perjury by Ms. Tyree.  His draft contained one reference to Ms. Tyree: "[Lisa Moore] believed Allen had a contemporaneous sexual relationship with a 15-year-old female [Ms. Tyree]. ([Ms. Tyree] is one of the individuals disclosed in our August 25, 2008, letter to you."). *Id*.[39]

Mr. Marsh's draft disclosed *inter alia* Lisa Moore's relationship as a prostitute with Mr. Allen, her attempt to blackmail him, the offer by Mr. Allen's attorney to pay her $5000 in return for her agreement not to disclose, and to deny, her sexual relationship with Mr. Allen, and her rejection of that offer because she wanted more money. *Id*.  He added information provided by Mr. Allen during his interview on Sept. 7, 2008, including his denial that he "ever offer[ed] to pay anyone money to make a false statement." *Id*.  Mr. Marsh's draft did not include Mr. Allen's denial that "he did not ask TYREE to make a false statement." Agent Kepner's FBI 302 of Interview of Mr. Allen, dated Sept. 7, 2008, at 1 (DOJ Bates no. CRM022031).  Mr. Marsh also added the following statement about Bill Bittner, Senator Stevens's brother-in-law, which was also drawn from Mr. Allen's interview that day, but which had nothing to do with the APD report or Ms. Moore:

> Allen further stated that Bill Bittner, an attorney in Anchorage, once asked Allen to make a statement that the "other female" [Ms. Tyree] referenced above had extorted him and/or blackmailed him. Allen stated that he told Mr. Bittner that any such allegations were false.

---

[39]According to the APD report, Lisa Moore had more than a belief that Mr. Allen had sexual relations with Ms. Tyree.  Lisa Moore stated that she introduced Ms. Tyree to Mr. Allen and "watched" them having sex, which she graphically described. APD Report, dated Feb. 19, 2004, at 1 (DOJ Bates no. CRM 080535).

Email from N. Marsh, dated Sept. 7, 2008, to J. Goeke, J. Bottini, E.
Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch (DOJ Bates
nos. CRM021997-998).

Mr. Marsh's draft regarding Ms. Moore's allegations was used in the final
version of the *Brady* letter with one minor change and two additional sentences
containing another allegation made by Lisa Moore and a matching denial by Mr.
Allen:

> The adult female [Lisa Moore] also alleged that Allen provided her with a
> trip outside Alaska for purposes of preventing the adult female to testify in
> an unspecified proceeding.
>
> \* \* \*
>
> . . . [Allen] denied ever causing anyone to leave the state of Alaska to
> prevent testimony in any type of proceeding.

> *Brady* Letter at 4 & 5 (DOJ Bates no. CRM022551).[40]

The statement about Mr. Bittner was re-drafted by Mr. Marsh on Sept. 8, 2008 and
inserted after the paragraph regarding Mr. Allen and Ms. Tyree's false sworn
statement which he drafted that day.

Mr. Goeke replied to Mr. Marsh's email of his "streamlined" draft and
suggested disclosing Ms. Tyree's contact with Mr. Allen's lawyer and Mr. Allen's
denial of any knowledge of what she told his lawyer:

> I think we need to keep something in along the lines of:

> Allen stated that at some point, he told the "other female" [Ms. Tyree] about
> the blackmail/extortion attempts and that she then asked to speak to Allen's
> lawyer.  Allen stated that he did not ask the "other female" [Ms. Tyree] to
> speak to his lawyer and is not aware of what the other female [Ms. Tyree]

---

[40]Lisa Moore did not identify the "proceeding", but did identify the APD detective who
issued the subpoena: "She related that she had been involved in another APD case as a witness
during this time frame.  She said that she had been subpoenaed to testify by Det. LORRAINE
SHORE.  She said that BILL was afraid that his name would come up and flew her and her
family out of state." APD Report, dated Feb. 19, 2004, at 2 (DOJ Bates no. CRM 080535).

told his lawyer.

It doesn't have to be precisely that language, but I think it should be stated.

Email from J. Goeke, dated Sept. 7, 2008, to N. Marsh, J. Bottini, E. Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch (DOJ Bates nos. CRM080905-906).

Mr. Goeke reiterated that suggestion in his reply to Mr. E. Sullivan's email of "the current version of the Brady/Giglio letter" which included Mr. Marsh's draft. Email from J. Goeke, dated Sept. 7, 2008, to N. Marsh, J. Bottini, E. Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch (DOJ Bates no. CRM097502). Mr. Goeke's suggested disclosure was not added to the next draft of the *Brady* letter that was circulated. *See* Email from E. Sullivan, dated Sept. 8, 2008, to W. Welch, Agent Kepner, Agent Joy, B. Morris, J. Goeke, J. Bottini, N. Marsh, IRS SA D. Roberts and IRS SA L. Bateman (DOJ Bates nos. CRM022268-275).

In another email on Sept. 8, 2008, Mr. Goeke reported on his recent review of the *Boehm* files and recounted the prosecutors' accumulation of documents and information regarding Mr. Allen's solicitation of Ms. Tyree's false, sworn statement:

> . . . Copies of the government's motions – that we have previously discussed at length – . . . wherein the government stated through a motion in limine, reply, and response to a motion for reconsideration . . . that Bambi signed a false affidavit at Allen's direction. . . . These motions are under seal in the Boehm case. . .
> On this topic, as we have discussed this at length in the past, I recall Bambi stating during a prep session before Boehm's sentencing in spring 2005 that the idea to make a statement was hers, that Allen did not ask her to lie, and that the decision to lie was a decision she made when she met with the attorney.
> As a result, we asked Allen whether he ever asked anyone to lie under oath and similar questions before Kott and he denied that he had done so.
> After the Kott trial, we found out about the [Agent Eckstein] 302 that MBK [Agent Kepner] just sent around yesterday regarding Bambi from a 7/22/04 interview in Seattle. I did not participate in the interview of Bambi in

Seattle related in the 302, did not recall that it had even occurred, and did not know that a 302 existed that could be read to suggest that Tyree signed an affidavit at Allen's request that contained false material. . . .

As a result of learning of the 302 after Kott, we interviewed Bambi, found that the AUSA's notes from that meeting state "at the request of [then with "Bill" crossed out"] Bambi's idea", and went to PRAO.

Bambi's attorney also told me that she had recalled Bambi describing the situation as I recalled it.

PRAO then said we had no disclosure obligation because there was in essence nothing to disclose. . . .

Email from J. Goeke, dated Sept. 8, 2008, to N. Marsh, J. Bottini, E. Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch (last bracket in original; all paragraphs, spacing and ellipses added) (DOJ Bates nos. CRM022047-050).

Though Mr Goeke was "keen to make sure our disclosure is as accurate as possible" and anticipated that the defense will "claim that the government is failing to disclose that Bambi made a false statement at Allen's direction", he did not recommend disclosure of Agent Eckstein's 302 or the government's pleadings in *Boehm*; instead, he recommended disclosing only Mr. Allen's and Ms. Tyree's complementary statements and denials:

For what it's worth, at a minimum, based on the foregoing, I think we add language along the lines of:

Allen stated that at some point, he told the "other female" [Ms. Tyree] about the blackmail/extortion attempts and that she then asked to speak to Allen's lawyer. Allen stated that he did not ask the "other female" [Ms. Tyree] to speak to his lawyer, did not ask the other female [Ms. Tyree] to lie, and is not aware of what the other female [Ms. Tyree] told his lawyer. The government has also interviewed the "other female" [Ms. Tyree] and she stated that she met with the attorney and the content of the document was created solely by her with the help of the attorney.

I note, though, a minor point, that Bambi's 302 on this point says that the idea to meet with the lawyer was hers and Allen's.

319

I think it is particularly important to add that we interviewed Bambi on this topic because Bittner was apparently one of Boehm's civil attorneys. Accordingly, we have to assume that they will claim that the government is failing to disclose that Bambi made a false statement at Allen's direction. While we all know that we have investigated that issue in detail and that both Allen and Bambi deny that such a thing occurred, we should put W&C on effective notice that both Allen and Bambi deny that Allen asked Bambi to make a false statement. Then any such allegations that the government is suppressing anything can be more easily dealt with in front of the Court. Joe and I spoke about this today and he agrees with this approach.

I realize that we have beaten this topic to death, but please bear with me. Because I was involved in both cases and then also charged the woman in a federal drug case who is the apparent accuser of Allen in the new APD investigation, I am keen to make sure our disclosure is as accurate as possible.

*Id*. (emphasis and red text in original).

In reply, Mr. Bottini agreed with Mr. Goeke's assumption that the defense knew that the government had previously (but erroneously) asserted in *Boehm* that Ms. Tyree lied at Mr. Allen's direction but made no comment on Mr. Goeke's suggested disclosure:

We have to approach this assuming that they have access to everything from Boehm, including the under seal filings by the US which erroneously assert that Allen asked Bambi to make a false statement. I didn't know until yesterday that Bittner represented Boehm in the civil litigation. To me that means that its confirmation that know [sic] that the government has previously represented in filings that Allen procured Bambis [sic] false statement.

Email from J. Bottini, dated Sept. 8, 2008, to J. Goeke, N. Marsh, E. Sullivan, B. Morris, Agent Kepner, Agent Joy and W. Welch (DOJ Bates nos. CRM022047-050).

      ii.     Mr. Welch, Ms. Morris, Mr. Marsh and Mr. E. Sullivan meet and
                determine the *Brady* disclosure regarding Mr. Allen and Ms. Tyree

Early on Sept. 8, 2008, Ms. Morris asked Mr. Marsh and Mr. E. Sullivan to copy Mr. Welch "on all of the Brady issues". Email from B. Morris, dated Sept. 8, 2008, to N. Marsh and E. Sullivan (DOJ Bates CRM055730). Later that day, in reply to Mr. Goeke's "excerpts" email, Ms. Morris suggested meeting that afternoon with Mr. Welch. *See* Email from B. Morris, dated Sept. 8, 2008, to J. Goeke, N. Marsh, E. Sullivan, W. Welch and J. Bottini ("Can we all meet/teleconference at 4:00 EST. I know Joe [Bottini] is traveling, but I'd like to get Bill [Welch] in on the conversation.")(DOJ Bates no. CRM022276).

Ms. Morris testified that she had asked Mr. Welch for help on the *Brady* issues:

> So I recall around this time going to Bill and saying, look, there's some Brady issues. You got to -- you got to help me with this. You got to focus on this because I can't focus on it right now. I was totally trying to figure out which witnesses and how to massage things and get my footing so that I felt comfortable with witnesses that, you know, I had only met once. So that's where my head was. I had a lot of pressure on me about what the opening was and how they wanted me to conduct the motions hearings, and we were having motions hearings all throughout this.
> 
>                   * * *
> 
> . . . I was relying on Bill [Welch] to take the lead on really focusing on [the *Brady* issues].

Deposition of B. Morris, Jan. 15, 2010, at 162-163 & 21.

Ms. Morris testified that she "didn't have the knowledge to write this [*Brady*] letter [and] couldn't have written this letter." *Id*. at 164. She took over as the lead trial attorney in *Stevens*, at the request of AAG Friedrich, on July 27, 2008, two days before Senator Stevens was indicted. *Id*. at 40 & 45–46; *see also* Email from N. Marsh, dated July 29, 2008, to M. Stennes and E. Sullivan ("Bill conveniently failed to mention how Ed and I were displaced yesterday by new lead trial counsel Brenda Morris. There is no joy in Mudville right now with Team Polar Pen")(DOJ Bates no. CRM019873).

Mr. Welch testified that his understanding of the "Bambi issue", at this time and since 2007, was that an AUSA in another case had filed pleadings which asserted that Mr. Allen had caused Ms. Tyree to make a false affidavit, that those pleadings were based on the AUSA's "mistaken recollection" of an interview of Ms. Tyree which was contradicted by the AUSA's own notes of the interview and by Ms. Tyree and Mr. Allen, and that "the issue had been flagged for [Judge Sedwick] and he sua sponte in the Kott trial had foreclosed impeachment on that issue." Deposition of W. Welch, Jan. 13, 2010, at 28-30 & 33. This "mistaken recollection" explanation had been provided to Mr. Welch by Mr. Marsh, Mr. Bottini and Mr. Goeke; he could not recall whether he had "an individual conversation with Sullivan" on the subject. *Id*. at 192.

Mr. Welch believed that no 302 existed because the 2004 interview of Ms. Tyree occurred post-indictment. *Id*. at 181. He became aware of Agent Eckstein's 302 for the first time on Oct. 14 or 15, 2008, when he reviewed the APD file which contained a copy of the 302, knew it had to be disclosed, and he disclosed it to Williams & Connolly on Oct. 16, 2008. *Id*. at 10 & 183; *see also* Letter via Hand Delivery from W. Welch, dated Oct. 16, 2008, to Robert Cary (DOJ Bates no. CRM043315).

On Monday, Sept. 8, 2008, Mr. Marsh and Mr. E. Sullivan told Mr. Welch that "Goeke had been driving them crazy all weekend on the Tyree issue and that could [Mr. Welch] decide, you know, the issue of whether or not to turn over or produce the mistaken recollection of Russo." Deposition of W. Welch, Jan. 13, 2010, at 187; *see also* Email from E. Sullivan, dated Sept. 8, 2008, to N. Marsh ("on phone with JAG [Mr. Goeke] again") (DOJ Bates no. CRM022291). Their request prompted Mr. Welch to ask for the notes of AUSA Russo and Agent Eckstein:

> . . . For me, what was of paramount importance was Russo's notes because I had been operating under the belief that this was the mistaken recollection of Russo.
>
> If Russo's notes of the interview did not accord with that, you know, that would have stunned me.
>
> What happened is I got the notes of Russo, and as you probably have seen, the notes have the scratch out and "Bambi's idea."
>
> At that point, I felt okay, good, this is just what they have been saying

it is, and it was shortly after receipt of those notes that we had the meeting about the Bambi Tyree allegation and whether or not it should go into the discovery letter, and I told them it should go in any way.

Deposition of W. Welch, Jan. 13, 2010, at 185-186.

*See also* Email from N. Marsh, dated Sept. 8, 2008, to J. Bottini, J. Goeke, cc: E. Sullivan ("Fellas - Bill [Welch] and Brenda have asked to see (1) the page of Frank [Russo]'s brief re: Bambi and Bill, and (2) a copy of the page of Frank's notes. Could y'all fax them/PDF them to us? Thanks, Nick/Ed ") (DOJ Bates no. CRM022136).

Mr. Welch had also been told that AUSA Russo had essentially admitted that his statements in the motion *in limine* in *Boehm* were mistaken:

BY MR. SCHUELKE:

Q      Do you recall that pleading -- actually, there were a couple of them because there was a motion in limine filed by the Government. There was a reply by the defense in opposition to the motion in limine. Were you aware that in those Government pleading's [sic], which were authored by and signed and filed by AUSA Russo, it is stated unequivocally that Bambi Tyree had sex with Bill Allen when she was 15, she at Allen's request swore to an affidavit which denied the relationship?

A      Yes, I am aware of that, which is why the notes of Russo were of such primary interest to me, since as of September of 2008, it had been represented to me that this was the mistaken recollection of Russo, that his notes contradicted the pleading's [sic], so when I saw the notes of Russo and the scratch out and "Bambi's idea," that was consistent with what had been represented to me, that the explanation for the pleading's [sic] must have been a mistaken recollection.

BY MR. SHIELDS:

Q      Represented to you by?

A      By Marsh, in a conversation with Bottini, in a conversation with Goeke, and I can't say for sure whether I had an individual conversation with Sullivan.

* * *

BY MR. SCHUELKE:

Q     July 22, 2004. The pleading which Mr. Russo authored and filed, it was filed four days after the interview. The pleading that he authored, as we earlier discussed, stated unequivocally that she had lied in this affidavit and at Allen's request.

Did it ever occur to you to question how it was that this Assistant U.S. Attorney wrote a pleading based on an interview that he attended four days earlier and somehow got it wrong and a couple of years later, had to go and look at his notes to explain how and why he had gotten it wrong?

A     It did occur to me.

Q     Did you reach some conclusion?

A     I asked Bottini about it.

Q     And?

A     I said to Bottini how did this happen. Have you talked to Russo about it. He told me that Russo had all but admitted that he had made a mistake but was unwilling to concede it because he didn't want to invite an OPR inquiry on himself.

Deposition of W. Welch, Jan. 13, 2010, at 191-192 & 201.

Mr. Welch, Ms. Morris, Mr. Marsh and Mr. E. Sullivan met on Sept. 8, 2008 to discuss whether to disclose AUSA Russo's "mistaken recollection" in the *Brady* letter. *Id.* at 187. Mr. Welch testified that Mr. Marsh's position at that meeting was the same position he took when the same issue arose in connection with the government's earlier *Giglio* letter, dated Aug. 25, 2008:

Q     [reading email from N. Marsh, dated Aug. 22, 2008, to E. Sullivan and B. Morris (DOJ Bates no.CRM036162)] "We should not revisit the Bambi non-subornation of perjury stuff. We have nothing to turn over. We have neither evidence nor an allegation that Allen directed her to lie. We have investigated this till the end of time, and we have been blessed by PRAO twice. There is simply no reason for us to revisit it."

       Is that the position Mr. Marsh and others took with respect to Bambi
       Tyree disclosures?

A     I can tell you that's the position they took on the afternoon of
       September 8, 2008 when we visited the issue. That was the position
       of Mr. Marsh.

*Id*. at 179-180.

During the meeting, Mr. Welch directed the disclosure of AUSA Russo's notes:

A     . . . We had a meeting. I told them turn over the allegation because in
       my view, it was as framed, this mistaken recollection, it was so
       inconsequential. Fine, we'll turn it over.

Q     What were you telling them to turn over exactly?

A     At that time, I didn't know there was a summary brief [probably
       should be "*Brady*"] letter, so I was essentially saying turn over the
       notes of Russo.

BY MR. SHIELDS:

Q     This is September 8?

A     8th. That's when I said just turn it over. Morris said why. I explained
       that first of all, we have a completely different Judge. Prior to
       September 8, it had been explained to me that Judge Sedwick had sua
       sponte decided that this issue would not be explored on cross.

Q     Who told you that?

A     That had been explained to me in October of 2007 and then explained
       again in late December 2007 when this issue arose for the second
       time.

Q     Who told you that Sedwick -- did you say sua sponte decided there
       would be no cross on this issue?

A     Right.

Q     Who told you that?

A     Marsh.

Q     Do you know whether that's true or not?
A     I know I have now looked at the transcript from the Kott hearing and
       that the issue was not tee'd up at all like it was represented to me.

*Id*. at 187-189.

*See also* Notes of B. Morris ("9/8/08 Welch/Marsh/Sullivan <u>Bambi</u> <u>Issue</u> - BW
believes we should disclosure [sic], B/c he doesn't want to Δ [sic] go forward &
front-load w/J. Sullivan - Put it in letter to W&C - Review of FBI/Exstein [sic] &
double-check what was said.")(emphasis in original)(DOJ Bates no.
CRM127881); Deposition of B. Morris, Jan. 15, 2010, at 212-213 ("there was a
meeting or something where Bill was like we've got to address this [*Brady* issue].
We've got to put it in a letter or something along those lines.").

       Mr. Welch learned during this meeting that the *Brady* disclosure would be
made by means of a summary letter and not by providing source documents to the
defense. Deposition of W. Welch, Jan. 13, 2010, at 148-149; *see also* Email from
E. Sullivan, dated Sept. 6, 2008, to J. Bottini, J. Goeke, N. Marsh, B. Morris,
Agent Kepner, Agent Joy, IRS SA Bateman, IRS SA Roberts, J. Bradison and K.
Walker (". . . Also, collectively, the team needs to decide if we are producing the
302/notes/transcripts [containing *Brady* information] in either: (1) full form; (2)
redacted form; or (3) summary letter form.")(ellipsis and brackets added)(DOJ
Bates no. CRM021597).  Mr. Marsh asked Mr. Welch how to describe the
information in the *Brady* letter:

       A     . . . Marsh then said, well, how do we put this in the letter, and I said
              put it in the letter exactly how it occurred. There was an allegation
              regarding X, that you followed up on the allegation by interviewing
              Allen, by interviewing Tyree, you reviewed the notes of the AUSA,
              and you reviewed the notes of the Agent, and be as accurate as
              possible and just lay it all out.

*Id*. at 194.

The portion of the *Brady* letter containing the disclosure regarding Mr. Allen and
Ms. Tyree, which was written by Mr. Marsh (Deposition of N. Marsh, Feb. 2,

2010, at 167), followed the outline suggested by Mr. Welch.[41]

Mr. Welch testified that, as far as he knew at the time, the *Brady* letter sent to Williams & Connolly on Sept. 9, 2008 was accurate:

BY MR. SCHUELKE:
Q     Did you thereafter read what he had written?
A     The morning of September 10.

BY MR. SHIELDS:
Q     Did you have a problem at that time with anything that was written?
A     Well, what I had a problem with was this use of the word "suggestion." I don't know why that's what clicked. When I read it and I saw this word "suggestion," I didn't think that quite captured what they had been describing to me, but then by the same token, I thought well, maybe I'm just wordsmithing too much, is there a big difference between "suggestion" and "allegation." As far as the factual information that was in the letter, that's what I understood to be the case.

*Id*. at 194-195.

Ms. Morris also testified that, when she signed the *Brady* letter, and throughout the trial, she believed it to be accurate, and that no one told her that there was a

---

[41]*Compare Brady* letter at 5 ("Given the foregoing allegation from the adult female [Lisa Moore], we are also providing you with some additional information that, as described below, is neither <u>Brady</u> nor <u>Giglio</u>. In 2007, the government became aware of a suggestion that, a number of years ago, Allen asked the 'other female'  [Ms. Tyree] to make a sworn, false statement concerning their relationship. After hearing that suggestion, the government conducted a thorough investigation and was unable to find any evidence to support it. The investigation included: (a) an inquiry to the 'other female' [Ms. Tyree], who denied the suggestion; (b) an inquiry to Allen, who denied the suggestion; (c) a review of notes taken by a federal law enforcement agent [Agent Eckstein] during a 2004 interview of the 'other female,' [Ms. Tyree]; and (d) a review of notes taken by a federal prosecutor [AUSA Russo] during a 2004 interview of the 'other female' [Ms. Tyree].  Because the government is aware of no evidence to support any suggestion that Allen asked the 'other female' [Ms. Tyree] to make a false statement under oath, neither <u>Brady</u> nor <u>Giglio</u> apply.")(DOJ Bates nos. CRM 022547-551).

problem with, or mistake in, the letter. Deposition of B. Morris, Jan. 15, 2010, at 155 & 181-182.

After the meeting with Ms. Morris, Mr. Marsh and Mr. E. Sullivan, Mr. Welch received Mr. Goeke's email with Agent Eckstein's notes attached and the accompanying message: "Here are the notes from the 302. They are ambiguous. The agent also just told me that he does not remember asking Bambi if Bill asked her lie [sic] and that he doesn't think he would have asked that question . . ." Email from J. Goeke, dated Sept. 8, 2008, to J. Bottini, B. Morris, W. Welch, N. Marsh and E. Sullivan (DOJ Bates nos. CRM081272-277); *see also* Deposition of W. Welch, Jan. 13, 2010, at 210-214. Having just directed the disclosure of the "allegation" regarding Mr. Allen and Ms. Tyree's false statement, Mr. Welch read Mr. Goeke's email message but he did not read the attached notes of Agent Eckstein:

BY MR. SCHUELKE:
Q   Did you ever see Agent Eckstein's handwritten notes as well as the 302?
A   To the best of my memory, what happened was the e-mail chain shows I asked for the notes for that July 2004 interview. . . . Later that evening, Goeke forwarded the notes of Eckstein, and I don't believe I read the notes because I had already told them turn it over. I had seen Russo's notes. I do recall reading his e-mail caption, his description of the notes, but by then, I had already made the disclosure decision, so I don't think I then took a second step and looked at his notes.

* * *

BY MR. SHIELDS:
Q   When you got this e-mail, did you read the notes?
A   I think I explained that I did not, that I relied on (a) Goeke's characterization, but (b) he then clarified the ambiguity by talking to the Agent, and that is what I was reading this e-mail to convey.

BY MR. SCHUELKE:
Q   He told you that the Agent said he didn't think he would have asked her about whether she had sex with Bill Allen?
A   Yes, that's what it says here in the e-mail.

BY MR. SHIELDS:
Q      You had not read the notes at the time you read this Exhibit 2,
         September 9 Brady letter, which you read on September 10?
A      I had not read the notes; right.

Q      That's your recollection?
A      That's my recollection.

MS. ROSS:                    May I just ask one question here?
(Attorney for Mr. Welch)
MR. SHIELDS:                 Of course.
MS. ROSS:                    At the time you received this e-mail, had the
                             meeting that you described where you told the
                             team to turn over the information already
                             occurred?
THE WITNESS:                 It had.

MS. ROSS:        I'm going to ask two; sorry. Did that play any part in
                 whether or not you read the e-mail versus the notes?
THE WITNESS:     Yes, because I had already made the disclosure issue --
                 sorry. I had already made the disclosure decision. I told
                 them to disclose the allegation, just lay out exactly what
                 you did. In my mind, I was comfortable that we were
                 now disclosing the information, so when this e-mail
                 came in later, I just read the characterization by Goeke
                 and didn't go into the notes because I felt comfortable we
                 were now handling the Brady issue.

Deposition of W. Welch, Jan. 13, 2010, at 185-186 & 213-215.


         d.      Final draft: written by Mr. Marsh, approved by Mr. Goeke, and
                 "skimmed" by Mr. Bottini, with Mr. E. Sullivan as "scrivener"

         On the evening of Sept. 8, 2008, Mr. Marsh revised the draft *Brady* letter
"to include the Bambi Tyree stuff we discussed earlier today, as well as a tuneup
to the Bill Bittner discussion below it." Email from N. Marsh, dated Sept. 8, 2008,

329

to J. Bottini, J. Goeke, E. Sullivan, B. Morris and W. Welch (DOJ Bates nos. CRM022386-393).  Mr. Marsh added two paragraphs to the draft *Brady* letter which did not disclose the existence of Agent Eckstein's 302, the pleadings filed in *Boehm* or the information contained in those documents:

> Given the foregoing allegation from the adult female [Lisa Moore], we are also providing you with some additional information that, as described below, is neither *Brady* nor *Giglio*. In 2007, the government became aware of a suggestion that, a number of years ago, Allen asked the "other female" [Ms. Tyree] to make a sworn, false statement concerning their relationship. After hearing that suggestion, the government conducted a thorough investigation and was unable to find any evidence to support it. The investigation included: (a) an inquiry to the "other female" [Ms. Tyree], who denied the suggestion; (b) an inquiry to Allen, who denied the suggestion; (c) a review of notes taken by a federal law enforcement agent [Agent Eckstein] during a 2004 interview of the "other female," [Ms. Tyree]; and (d) a review of notes taken by a federal prosecutor [AUSA Russo] during a 2004 interview of the "other female" [Ms. Tyree]. Because the government is aware of **no evidence whatsoever** to support any suggestion that Allen caused the "other female" [Ms. Tyree] to make a false statement under oath, neither <u>Brady</u> nor <u>Giglio</u> apply.

> Finally, we note that during debriefs with the government, Allen stated that Bill Bittner, an attorney in Anchorage, once asked Allen to make a statement that the "other female" [Ms. Tyree] referenced above had extorted him and/or blackmailed him, for the purpose of benefitting one of Mr. Bittner's clients. Allen stated that he told Mr. Bittner that any such allegations were false and refused to make the statement.

> Draft Brady letter, dated Sept. 8, 2008, at 7 (attached to email from N. Marsh, dated Sept. 8, 2008, to J. Bottini, J. Goeke, E. Sullivan, B. Morris and W. Welch (emphasis added)(DOJ Bates nos. CRM022386-393).

These two paragraphs were carried over to the final *Brady* letter with one minor change - at the end of the first paragraph, "whatsoever" (after "no evidence") was deleted.  The second paragraph in Mr. Marsh's draft, which became the last

paragraph in the *Brady* letter, disclosed no *Brady* information, and contained only an oblique reference to *Boehm*.

Mr. Goeke approved Mr. Marsh's draft. *See* Email from J. Goeke, dated Sept. 9, 2008, to N. Marsh ("Nick, Looks pretty good. I want to read through the BA [Bill Allen] stuff one last time before we send it if that's ok.") (DOJ Bates no. CRM081286). Mr. Goeke's earlier suggestions regarding disclosure of Ms. Tyree's false sworn statement, like Mr. Marsh's draft, did not disclose Agent Eckstein's 302, the pleadings in *Boehm* or the *Brady* information they contained.

Mr. E. Sullivan acknowledged receipt of Mr. Marsh's draft (Email from E. Sullivan, dated Sept. 8, 2008 ("Thanks, Nick.") (DOJ Bates no. CRM022395)) and incorporated it into subsequent drafts of the *Brady* letter which he circulated the next day. *See* Email from E. Sullivan, dated Sept. 9, 2008, to J. Bottini, J. Goeke, N. Marsh, B. Morris, W. Welch, Agent Kepner, Agent Joy, IRS SA D. Roberts and IRS SA L. Bateman (DOJ Bates nos. CRM022404-413); Email from E. Sullivan, dated Sept. 9, 2008, to N. Marsh (DOJ Bates nos. CRM022414-419).

On the evening of Sept. 9, shortly before the *Brady* letter was emailed to Williams & Connolly, Mr. Marsh circulated the draft letter with those same two paragraphs, calling his colleagues' attention to "the revised Bambi disclosure":

> This includes all of the 302 B/G [*Brady/Giglio*] to date, the revised Bambi disclosure, and all BA [Bill Allen] 302-based Brady except for a very limited category of arguable B/G relating exclusively to the 404(b) evidence. Should the Court rule in our favor tomorrow on the 404(b), we'd then turn it over to W&C.

> Please take a look and let us know what you think.

> Email from N. Marsh, dated Sept. 9, 2008 6:50 PM, to J. Bottini, J. Goeke, E. Sullivan, B. Morris and W. Welch, Subject: "Revised B/G letter" (DOJ Bates nos. CRM022533-538).

*See also* Email from N. Marsh, dated Sept. 9, 2008 8:09 PM, to J. Bottini, J. Goeke, E. Sullivan, B. Morris and W. Welch, Subject: "Revised B/G letter" (DOJ Bates nos. CRM022539-545).

Mr. E. Sullivan emailed the *Brady* letter to Williams & Connolly a few minutes
later. *See* Email from E. Sullivan, dated Sept. 9, 2008 8:36 pm, to B. Sullivan, R.
Cary and A. Romain ("Attached is a letter addressing Brady-related issues.").
Other than Mr. Goeke's comment ("Looks pretty good"), no other prosecutor, or
agent, emailed any comment on Mr. Marsh's disclosure regarding Ms. Tyree and
Mr. Allen, before or after the *Brady* letter was sent to Williams & Connolly.

Mr. Marsh testified that he "was certainly very involved in the last stages of
drafting the Brady letter", that he was the primary draftsman of the three
paragraphs which summarized the allegations by Lisa Moore (the "adult female")
which were in the APD report, and that he drafted the paragraph regarding Mr.
Allen and Ms. Tyree. Deposition of N. Marsh, Feb. 2, 2010, at 56, 152 & 167.  He
remembered a discussion that occurred around the time these portions of the *Brady*
letter were drafted but could not recall who participated, except to say that Mr.
Goeke, Mr. Bottini and Mr. E. Sullivan would usually participate in such
discussions, and that he assumed Ms. Morris and Mr. Welch were also involved.
*Id*. at 158; *see also* N. Marsh email, dated Sept. 8, 2008, to J. Bottini, J. Goeke, E.
Sullivan, B. Morris and W. Welch ("Subsection 3 revised to include the Bambi
Tyree stuff we discussed earlier today, as well as a tuneup to the Bill Bittner
discussion below it.") (DOJ Bates nos. CRM022386-393).[42]

Mr. Marsh testified that although PRAO had opined that there was no *Brady*
or *Giglio* obligation to disclose anything regarding the allegation that Mr. Allen
asked Ms. Tyree to make a false sworn statement, the newly disclosed allegations
by Lisa Moore created a problem:

Mr. Marsh    The problem from our perspective is that the new allegation [by
             Lisa Moore] or the allegations that are set forth in the first part

---

[42]"Subsection 3" in the attached draft was entitled "Local Investigations Of Bill Allen"
and had five paragraphs: the first two summarized the allegations by Lisa Moore in the APD
report, dated Feb. 19, 2004; the third paragraph contained Mr. Allen's responses to those
allegations which were obtained during his interview on Sept. 7, 2008 by Agent Kepner, Mr.
Bottini and Mr. Goeke; the fourth paragraph contained the statement regarding the "suggestion
that, a number of years ago, Allen asked 'the other female' [Ms. Tyree] to make a sworn, false
statement regarding their relationship"; and the fifth contained the statement regarding Mr.
Bittner.  These five paragraphs, with a few minor changes, became the last five paragraphs in the
*Brady* letter, dated Sept. 9, 2008, at 4-5 (DOJ Bates nos. CRM095717-721).

of the paragraph, seemed generally consistent with the idea that
Allen was alleged to have taken steps to cause a witness not to
testify or not to provide information that would possibly reflect
negatively on him.

\* \* \*

Q     The earlier three paragraphs which refer to Lisa Moore issues, you
thought it would be wise to add something with respect to Bambi?

A     Right.

Q     If it is neither Brady or Giglio, what is it?

A     That's the point. We had a hard time trying to figure out -- on the one
hand, we had gone to PRAO. We told them everything that we had.
We got a ruling from them. We got it twice. They had indicated they
didn't see Brady or Giglio obligations.

On the other hand, we had been able to -- we had no evidence to
support the contention that Bambi Tyree was directed or caused by
Bill Allen to lie, but on the other hand, we had gone through these
steps and we felt like it just seemed like it needed to be turned over,
even though PRAO had told us it wasn't Brady or Giglio, it just
seemed like it needed to be turned over.

\* \* \*

Q     What was the point of this disclosure?

A     Well, the point was that -- it's a little hard to describe. Basically, we
had gotten to the point where we had done everything with respect to
trying to investigate this Bambi Tyree issue and we had come up with
no evidence to support the fact that Allen had encouraged her to lie.
Then we got this other indication that Allen did substantially the same
thing with respect to -- is alleged to have done very similar things
with another woman [Lisa Moore].

I think all of us felt like -- I personally couldn't put a finger on it. It
just didn't feel -- it just seemed so -- given there was a second set of
allegations from a completely different woman alleging the same type
of stuff, it just seemed like we should -- that we needed to be able to
put this out and say this is what happened, this is the information we
have, we didn't have anything to support it but nonetheless, here it is.

333

Q    Even though we don't think it constitutes Brady or Giglio, we think
     you ought to know about this?
A    Right.

Deposition of N. Marsh, Feb. 2, 2010, at 159-160, 162 & 163-164.

Mr. Marsh described Agent Eckstein's 302 as "inconclusive": "it didn't really say whether she made a false statement at Allen's request, but it raised an issue" but "was not supported by anything else we had." *Id*. at 167-168 & 180; *see also id*. at 176 ("[The 302] did fall short of making an explicit connection that she was directed to make the false statement by Allen."). Agent Eckstein's notes were similarly ambiguous: they "were generally consistent with the 302, that it was the same ambiguity that we saw." *Id*. at 189. There was "no specific link" in the notes "that Allen directed [Ms. Tyree] to make a false statement." *Id*. at 206. In addition, Mr.Goeke told Mr. Marsh that Agent Eckstein said the false statement was Ms. Tyree's idea: in or around October 2007, "[Mr. Goeke] had a conversation with Eckstein and Eckstein said I don't remember exactly what happened, I kind of think, Jim, you're right, you're right in the sense that Bambi said it was her idea and not Bill Allen's." *Id*. at 184. AUSA Russo's notes "made it pretty specifically clear at least in our view that it was Bambi's idea not Allen's, because there was a word scratched out and then 'Bambi's idea.'" *Id*. at 168; *see also id*. at 182 ("to my knowledge, there was nobody in that room who said anything other than Bambi - - I remember Bambi being emphatic it was her decision to lie.").

Mr. Marsh was "concerned" about AUSA Russo's motion *in limine* in *Boehm*: "I was concerned that there was an incentive to make Bambi look better and the incentive was to blame it on Bill Allen rather than being consistent with what Russo's notes were." *Id*. at 192. *See also id*. at 261 ("Jim [Goeke] had indicated to me previously that Russo had a memory that Tyree did it on her own. This very well could have been one of the things that caused me to have some concern about Russo's possible exposure on this."); *Compare* Deposition of W. Welch, Jan. 13, 2010, at 201 ("[Mr. Bottini told me that Russo had all but admitted that he had made a mistake [in his motion *in limine* in *Boehm*] but was unwilling to concede it because he didn't want to invite an OPR inquiry on himself."), and Feb. 5, 2010, at 321-322 (same).

Mr. Bottini testified that he did not recall who drafted the penultimate paragraph in the *Brady* letter which identified the "suggestion" that Mr. Allen suborned perjury by Ms. Tyree and concluded that there was "no evidence to support [that] suggestion". Deposition of J. Bottini, Dec. 17, 2009, at 703. He testified that, in light of Agent Eckstein's 302, the assertion that the government "was unable to find any evidence to support [the suggestion]", was an "overstate[ment]", though he did not "recall reading through this thing and flagging that." *Id*. at 730-731; *see also id*. at 675 ("[Ms. Tyree] said [she] made a false statement . . . at Mr. Allen's request"). He described Agent Eckstein's notes as consistent with his 302. *Id*. at 732 & 733. Mr. Bottini never spoke to Agent Eckstein about his 302 or his notes, however, he was told by Mr. Goeke that Agent Eckstein told him that "he could have gotten [his 302 and his notes] wrong during that interview of Bambi Tyree." *Id*. at 731-732. Mr. Bottini also testified that AUSA Russo's pleadings in *Boehm* were consistent with Agent Eckstein's 302 in their unequivocal assertion that Ms. Tyree lied at Mr. Allen's request. *Id*. at 680-681 & 734-735.

Mr. Bottini could not explain the failure of the *Brady* letter to disclose Agent Eckstein's 302 or AUSA Russo's motion *in limine*. He was "pretty sure" that he did not read the *Brady* letter during the trial; he did not remember whether he read it after the trial, and did not know, and did not remember, whether he realized the *Brady* letter was inaccurate and incomplete prior to his review of that letter during his deposition in this investigation:

> Q      Okay.  But there's no reference in this [*Brady*] letter to the fact that
>          our investigation has also uncovered an FBI 302 that says he did ask
>          her to falsely deny?
>
> A      It doesn't say that.
>
> Q      And it doesn't say that we have a filing filed by the Department of
>          Justice in Alaska saying that he asked her to file a sworn affidavit;
>          correct?
>
> A      It doesn't say that.
>
> Q      Right.  So how does this letter go out in this form?
>
> A      I don't know, to be honest with you.  You know, I don't recall sitting
>          there in the Public Integrity offices on the evening of September 9th

or night, whenever it was circulating, going through this thing and saying "wait a second, that's not right."

Q    When did you first learn that this was not right, this letter, Exhibit 2?
A    To be honest, I don't know.

Q    Well, today's December '09.  Did you learn it only after the Stevens trial?

MR. WAINSTEIN:        Can you define "it"?
(attorney for Mr. Bottini)

MR. SHIELDS:    Oh sorry, that this letter is inaccurate, this September 9th letter, these statements in here are inaccurate and incomplete, when it writes that "The government's aware of a suggestion" herein, and after hearing that, it conducted a thorough investigation and was unable to find any evidence to support it, when the government had its own 302 supporting it, "that suggestion" quote-unquote. It also had a pleading filed by an Assistant U.S. Attorney in Alaska that also supports it? When did you first realize that that paragraph has got very big problems?

THE WITNESS:    I don't know.  I don't remember. I don't remember who was -- I'm pretty sure I didn't read this letter during the trial.  I didn't have any time for that, quite frankly.  I don't remember reading it after the trial.

                              *   *   *

Q    . . . When did you first become aware of what we just identified as the problems in this letter?
A    I don't remember.

Q    Well, you're aware now?
A    I'm aware now.

Q    You were aware yesterday?
A    About the problems with this paragraph?

336

Q      Well, you began your recital by telling us there is a 302 that says
       Allen solicited the full [sic] statement.  There was a false filing made
       by a federal -- there was a filing made by a federal prosecutor saying
       it.

A      Right.

Q      That was the history that you recounted to us.

A      Right.

Q      When did you learn all that and realize that this letter doesn't take any
       of that into consideration?

A      I don't remember.  I don't.  I don't remember -- actually, I don't
       remember until going over this with you here today.  I don't
       remember looking at this thing prior to today and going this isn't
       right.  I don't remember if I did that or not.

BY MR. SCHUELKE:

Q      So it may well be today, the first time that you have realized the
       shortcomings of this paragraph?

A      Yeah.  What I don't remember is if that issue about this letter being
       inaccurate, whether that was fronted out in any post-trial filings or
       not.  Nothing --

BY MR. SHIELDS:

Q      Post-trial?  When you say "fronted out," you mean disclosed?

A      Somebody raising the issue.

                              *   *   *

Q      But it seems, this is September 8th. The letter goes out September 9th.

A      Correct.

Q      But if I understood you correctly, you didn't even bother reading the
       final letter?

A      I skimmed it.  I didn't say that I didn't read it, but I didn't read it in any
       detail for accuracy.

Q      Despite all the previous controversy over it?

A      Despite all the previous controversy over it. I was otherwise

337

occupied. But I did take it, I did glance at it. I don't recall reading that section about this issue, and looking at it and going this isn't right.

*Id*. at 735-736, 738-740 & 774.

Mr. Goeke testified that he drafted initial versions of the *Brady* letter regarding Ms. Moore's allegations, Mr. Allen and Ms. Tyree, which were then edited by others. Deposition of J. Goeke, Jan. 8, 2010, at 178-179. Although he approved the penultimate paragraph in the *Brady* letter, which includes the statement that "the government is aware of no evidence to support any suggestion that Allen asked the 'other female' [Ms. Tyree] to make a false statement under oath", Mr. Goeke testified that it was "inaccurate":

• there were "documents that could be read to suggest that Allen - - had suborned perjury". *Id*. at 184;

• Agent Eckstein's 302 was unambiguous and "can be read to say that Allen asked her to sign false statement". *Id*. at 192;

• in light of Agent Eckstein's 302, the statement that there was "no evidence" is "inaccurate". *Id*. at 198;

• Agent Eckstein's notes are "not ambiguous" and unequivocally state that Ms. Tyree made a false statement at Mr. Allen's request. *Id*. at 209 & 229-230;[43]

• the *Brady* letter contained no reference to the government's filings in *Boehm*, which stated unequivocally that Mr. Allen asked Ms. Tyree to make a false statement, because they were viewed by Mr. Marsh as

---

[43]On the day before the *Brady* letter was sent to Williams & Connolly, Mr. Goeke described Agent Eckstein's notes to his colleagues as "ambiguous". *See* Email from J. Goeke, dated Sept. 8, 2008, J. Bottini, B. Morris, W. Welch, N. Marsh and E. Sullivan ("Here are the notes from the 302. They are ambiguous. The agent also just told me that he does not remember asking Bambi if Bill asked her lie and that he doesn't think he would have asked that question because the point of the inquiry was simply whether she believed she had made a false sworn statement and Bambi did not want to talk about Allen.")(DOJ Bates nos. CRM081272-277).

338

"simply the arguments of lawyers" which were based on "improper facts". *Id*. at 244-245.

Mr. Goeke explained that the expression "no evidence" was used in the *Brady* letter because "[t]hey believed that their investigation, the government's investigation, had revealed that there was no evidence to their satisfaction. Therefore, they can make that statement." *Id*. at 198. The position taken by Mr. Marsh and other prosecutors was that there was "no evidence", because the government had developed sufficient evidence to contradict Agent Eckstein's 302:

Q      But do you recall anybody saying, "We can say we have no evidence despite the 302 because we think we've developed subsequent information that contradicts it?"
A      In general terms, yes. That's the position that was taken by several people.

Q      Who?
A      Nick Marsh.

Q      Who else?
A      That's the one that comes to mind.

Q      But you said several.
A      I've heard that people -- when I say, "Several," I mean I've heard people agree with that.

Q      But you can't remember who?
A      I can't remember who.

BY MR. SHIELDS:
Q      You can't remember one other person who agreed with Marsh?
A      Well, I can by inference admit these issues were --

MR. MENCHEL:                    Don't answer by inference. Do
(Attorney for Mr. Goeke)        you remember anybody agreeing with it or
                                not?

339

THE WITNESS:                    In an explicit way, no. And I'm thinking
                                about that and if I --
BY MR. SHIELDS:
Q      Well, Brenda Morris signed the letter. Did she agree?
A      Yeah, as I was just gonna say, I would say that Brenda agreed with
       that as well.

*Id*. at 199-200.

Mr. Goeke believed Ms. Tyree when she volunteered to him in 2005 that she had
lied on her own and that "always colored" his analysis:

. . . [Ms. Tyree] said, "You guys have asked me about Bill Allen and his
false statements." Something to the effect of -- this was -- I can't quote you
exactly what was said. And she said, "I want you to understand, that was all
my idea. I did that all on my own. Bill didn't know I was going to lie."
Okay?
It wasn't in response to a question. She just said it in anticipation of a
debrief ahead of her testimony and sentencing. Okay?
                          *   *   *
I was always colored in this analysis by what I remember her telling me
[that it was her idea].

*Id*. at 216-217&372-373.

     Mr. Goeke testified that he was told that he was "covered" with respect to
the *Brady* letter.  He remembered a telephone conference with Ms. Morris and, he
assumed, Mr. Marsh, Mr. Bottini, Mr. E. Sullivan and, possibly, Mr. Welch,
"before or after this [*Brady*] letter was finalized", when he again raised the
disclosure issue and he "was told, you know, by everyone on the phone, Brenda
included, 'You're covered on it. You've raised it. We've done what we need to do.'"
*Id*. at 201 & 203. *See also* Deposition of F. Russo, March 24, 2010, at 122 (AUSA
Russo told "[Mr.] Goeke, hey, this may be a Public Integrity case you're being
supervised on but keep in mind, it's your career. He said I know and I've covered
myself or words to that effect.").

340

Mr. E. Sullivan described his role, vis à vis the *Brady* letter, as a "scrivener":

> . . .people would give me edits and they may have said it orally to me, and I'd have to put it in, you know, into written language. I probably was not putting in exactly how they said it. So phraseology, some of that, and, I mean, you could see. If you look at the various drafts you could see what I put in and how the drafts changed over time.
>
> \* \* \*
>
> . . . what I've tried to emphasize through this deposition is that I am in fact the scrivener. I'm just trying to put what people are telling me to do, and I've got no track record in this area -- zero.

Deposition of E. Sullivan, Jan. 6, 2010, at 194-195 & 445.

He "basically follow[ed] the lead of what other prosecutors were doing", knowing that the *Brady* letters in *Stevens* "were being reviewed by senior managers." *Id*. at 127.

Mr. E. Sullivan was aware since 2007 of AUSA Russo's motion *in limine* in *Boehm* and its contents.[44]  His understanding at the time the *Brady* letter was written was "that there was a dispute about the recollections and whether the brief was accurate, and that's what they were trying to figure out." Deposition of E. Sullivan, Jan. 6, 2010, at 253.  He did not know who made the decision to omit from the *Brady* letter any reference to the government motion in limine in *Boehm*,

---

[44]Mr. E. Sullivan received Mr. Goeke's March 5, 2007-email containing excerpts from AUSA Russo's motion (email from G. Goeke, dated March 5, 2007, to E. Sullivan and J. Bottini (DOJ Bates nos. CRM022283-286)), which he summarized and forwarded to Mr. Welch the same day: "The govt's briefs in the 2003-04 matter indicate that Allen had sex with Tyree and that . . . Allen had Tyree sign an affidavit indicating that there was no sexual relationship." Email from E. Sullivan, dated March 5, 2007, to W. Welch (DOJ Bates no. CRM022282).  Later in 2007, he forwarded those two emails to Mr. Bottini, Mr. Goeke and Mr. Marsh. *See* Email from E. Sullivan, dated Oct. 9, 2007, to J. Bottini, N. Marsh and J. Goeke (DOJ CRM022281-286). On Sept. 8, 2008, he forwarded that entire email chain, along with the PRAO opinion which had been emailed to him and Mr. Marsh on Dec. 21, 2007 by Ms. Weiss (DOJ Bates nos. CRM022287-289), to Mr. Welch and Ms. Morris: "Bill/Brenda - just so you have the germane material on Bambi, here's what I have that's of particular value." Email from E. Sullivan, dated Sept. 8, 2008, to B. Morris, W. Welch and N. Marsh (DOJ Bates nos. CRM022280-289).

or how that decision was made. *Id*. at 240.

He testified that, prior to preparing for his deposition in this investigation, he had never read Agent Eckstein's 302, his notes or AUSA Russo's notes of their interview of Ms. Tyree. *Id*. at 93 & 176-178. He did not open the attachments to the series of emails sent by Mr. Goeke between Sept. 5-8; he "thought the issue was being fully handled by Chief Welch, Brenda Morris, and Joe and Jim and Nick - - all the individuals who seemed to know the issue very well - - so, I'm not focused on this." *Id*. at 177-178; *see also id*. at 186 ("there were a series of e-mails where I was not opening the - - my recollection is that I wasn't opening the e-mails because I was focused on other issues."). Around the time the *Brady* letter was drafted, Mr. E. Sullivan was preparing for oral arguments that week in *Stevens* and in the D.C. Circuit Court of Appeals in *United States v. Turner*, 548 F.3d 1094 (D.C. Cir. 2008) (argued Sept. 12, 2008):

> I've got an oral argument in that Turner case that's set up for this week, the week of September 8th. And so I ended up asking Mr. Marsh at some point, just "Could you start taking this stuff over, because I don't have time for this. I need to get prepared for the oral argument." I had a moot court on the 11th, and I wasn't prepared. There were also arguments on September 10th for the Stevens case, and I had been asked to do an argument for it. So that, you know, it's a long-winded way of saying I wasn't terribly focused on this.

> *Id*. at 175.

Mr. E. Sullivan testified that he had no reason to believe that Mr. Marsh's statement, that "we have nothing to turn over -- not even an independent allegation -- just a mistake in the brief that's inconsistent with the brief writer's notes, I don't think we have any disclosure to make, much less a disclosure obligation" (Email from N. Marsh, dated Aug. 14, 2008, to J. Goeke, J. Bottini, E. Sullivan, B. Morris and W. Welch (DOJ Bates nos. CRM064783-784)), was inaccurate:

> At this particular point in time, I think based on what they -- when I say "they," Mr. Goeke, Mr. Marsh and Mr. Bottini -- had focused on this issue in particular. I didn't have any reason to believe at this time, I guess, that it was incorrect.

342

*Id*. at 86.

Mr. E. Sullivan testified that the purpose of the prosecutors' investigation into the assertion in AUSA Russo's motion *in limine*, that Mr. Allen asked Ms. Tyree to make a false sworn statement, was to do the "right thing" with respect to *Brady* disclosure, but he had not formed an opinion on whether that was accomplished:

Q    Right. So Goeke says, "That's not how I remember it," so he wasn't at the interview. So then they go back and they get the agent's notes, get the 302, get Russo's, the AUSA's notes. What was the purpose of all this? What was the reason?

A    As I understood it then, just that there was -- I only viewed it as an issue of whether there was a misstatement in any brief that you had some AUSA's with different recollections -- so the way I was viewing it was figure out what recollection is right and get to the bottom of it. And we have something to disclose and turn it over. If we don't; we don't.

Q    All in the context of Brady, the Brady issue?
A    That's Brady-Giglio. Yeah.

Q    Right?
A    Yes.

\* \* \*

Q    But was the object to justify non-disclosure? Is it that someone didn't want to disclose this?

A    No. I didn't view it. That was not my understanding at the time. My understanding was to actually do what I thought was the right thing; you know, to figure out if we had something to disclose or not. That's how I viewed the issue.

Q    And did they do the right thing here?
A    Are we talking about my existing knowledge?

Q    The Stevens team, did it do the right thing based on what the documents you've seen that everyone had available to them in

343

September?

MR. HEBERLIG:    Are you asking sitting here today whether
(Attorney for       he has an opinion whether this is done correctly? I just
Mr. E. Sullivan)   want to make sure.

MR. SHIELDS:     Yes, based on what he's looking at now. Was the right
                   thing done?

THE WITNESS:    Look. I haven't really formulated, and we haven't talked
                   about this issue in this kind of depth. And this is going
                   back to what we just talked about earlier. I thought this
                   was going to be a narrow topic, and now we've spent 6, 7
                   hours on this. I haven't really formulated an opinion on
                   this point.

*Id*. at 255-257.

        e.      Oct. 14-16, 2008: Mr. Welch discovered Agent Eckstein's 302
               in the APD file, read it for the first time and provided it to
               Williams & Connolly

On October 14, 2008, Mr. Welch received a copy of APD's file of its
investigation of Mr. Allen from DOJ's Child Exploitation and Obscenity Section
("CEOS"). *See* Deposition of W. Welch, Feb. 5, 2010, at 310.  The APD had
attempted to refer the investigation to the Alaska U.S. Attorney's Office, which
recused itself; DOJ then assigned the investigation to CEOS.[45] *Id*. at 311-313.
Williams & Connolly made a *Brady* demand for "current information in the
government's possession regarding the status of any investigations of Bill Allen"
(Letter from C. Singer, dated Oct.12, 2008, to B. Morris (DOJ Bates no.
CRM101474)), and Mr. Welch decided, in light of the controversy on Oct. 1,

---

    [45]On October 3, 2008, Ms. Morris notified Williams & Connolly that she had learned that
day that the APD investigation had been referred to the U.S. Attorney's Office for the Western
District of Washington. Letter from B. Morris, dated Oct. 3, 2008, to A. Romain (DOJ Bates no.
CRM038517).  On October 13, 2008, she informed Williams & Connolly that the investigation
had been assigned to CEOS. *See* Letter from B. Morris, dated Oct. 13, 2008, to C. Singer (DOJ
Bates no. CRM041293).

2008, regarding the over-redaction of Agent Pluta's 302 of her interview of Mr. Allen, to review the APD file himself. *See* Deposition of W. Welch, Feb. 5, 2010, at 315-316.

He found Agent Eckstein's 302 in the APD file and read it for the first time:

Q     To the best of your recollection, you never saw the 302 of that interview until October 14 or 15, 2008?
A     Correct.

Q     Mid-Stevens' trial.
A     Yes.

Q     When you saw that 302, didn't that 302 spell out pretty clearly that according to the Agent's notes, Bambi Tyree submitted a false affidavit denying that she had sexual relations with Bill Allen at Bill Allen's request?
A     Yes. When I saw the 302, I became quite upset.

Q     What happened at that point when you saw it and became upset?
A     I became upset because I had been under the belief there was no information suggesting that the false affidavit was as a result of any prompting by Bill Allen.

Q     Which is exactly how it's described in that September 9 letter, the Brady letter, Exhibit 2.
A     Correct. When I saw the 302 for the first time, I became upset. I know I went down to Ray Hulser's office because I had asked him to assist me with the APD file, meaning let's do an initial review so we understand what's in here.

Q     He was a Deputy to you?
A     Correct. I said to him how can they -- I want to make sure --

Q     Take your time. I know it's a complicated area trying to recall your level of knowledge at various points. Take it slow.
A     To the best of my recollection, I said to him how is this fucking

345

ambiguous, meaning prior to seeing the 302 at best, I had gotten an
e-mail from Mr. Goeke in which he summarized the notes of the
Agent as ambiguous but then had followed up by talking to the
Agent who had indicated he didn't believe the question had ever been
asked.

When I saw the 302 for the first time, that e-mail was still fresh in my
memory, and I was upset. That's what I said to Mr. Hulser. . . .

Deposition of W. Welch, Jan. 13, 2010, at 183-185.

Mr. Welch knew that Agent Eckstein's 302 had to be disclosed (*id*. at 10) and he
"became concerned that we had an ethical obligation to almost report out that the
summary Brady letter was misleading, inaccurate." Deposition of W. Welch, Feb.
5, 2010, at 316.

He consulted Ms. Weiss at PRAO and posed the question whether, in light
of Agent Eckstein's 302, he had an ethical obligation to disclose that the *Brady*
letter "may be misleading or inaccurate." *Id*. at 317. Ms. Weiss, apparently
misapprehended his question and advised him that he should disclose the APD file
to Williams & Connolly, which he had already decided to do. *Id*. at 316-317.
Instead of pursuing the question with PRAO, Mr. Welch decided to send a letter
directing Williams & Connolly's attention to the 302:

A        . . . And so at that point I decided that what I wanted to do was
         highlight to Williams and Connolly here is this October 28, 2004 302,
         and this is the 302 that's purportedly being summarized in the
         summary Brady letter. So that's what I was attempting to do in the
         cover letter here was trying to direct their attention to the 302 and the
         summary Brady letter. Because my concern was, you know, we had
         been down this path three times, and I still do not know what the heck
         went on on October 28th, 2004 in these pleadings by Russo.
             On the one hand, there were these notes that seemed
         completely inconsistent with his pleadings. By this point, there had
         been numerous representations that from Goeke and from others, that
         from day one, Bambi Tyree had always said that it was her idea and –

Q        When you say from Goeke and others, who were the others?

346

A     Well, Goeke, Marsh. It was in this timeframe I believed -- I don't want to say this timeframe meaning the 15th or the 16th -- that I had this conversation with Bottini. It's somewhere in the middle of September-October of 2008 where he had told me that Russo had all but admitted that he'd made a mistake and the only reason he didn't want to admit it is to invite an OPR inquiry.

Q     A mistake in his filing?

A     In his filing.

[]    So, you know, on the one hand, I was concerned that, you know, I could just be getting it wrong, that it really was this mistake, and so I thought it best that I would point Williams and Connolly to the 302 which I thought was unambiguous, point them to the Brady letter and let them go ahead and, you know, draw their own conclusion as to, you know, what was going on, because –

BY MR. SCHUELKE:

Q     So I take it you never did get an answer from PRAO to the question you actually wanted them to answer, namely, do I have an obligation to tell the defense that the Brady letter of September 9th --

A     Right.

Q      -- was inaccurate or misleading or both?

A     Correct. And I –

*Id*. at 320-322.

On Oct. 16, 2008, while Senator Stevens was on direct-examination, Mr. Welch sent the 467-page APD file (DOJ Bates nos. CRM43317-783) to Williams & Connolly by hand, with a cover letter:

Enclosed is the Anchorage Police Department investigative file regarding the Bill J. Allen matter received from the Child Exploitation and Obscenity Section on the afternoon of October 14, 2008. We have removed two non-Anchorage Police Department documents from this file that we believe to be protected by DOJ attorney-client and work product privileges. We can submit those to the court for an ex-parte, in camera inspection if

347

necessary.

Please note that the information [regarding Lisa Moore] contained in the Anchorage Police Department statement dated February 19, 2004 was previously summarized in our September 9th, 2008 letter to you. The other Anchorage Police Department reports have not previously been in our possession, custody or control.

The information regarding the false sworn statement allegation contained in the FBI 302 dated October 28, 2004 and follow-up investigation of that allegation was also summarized in the September 9th, 2008 letter. You received production of the FBI 302s dated March 28, 2007 in which Allen denied the false sworn statement allegation and dated October 11, 2007 in which Tyree denied the false sworn statement allegation on October 3, 2008.

Letter from W. Welch, dated Oct. 16, 2008, to Robert Cary (DOJ Bates no. CRM043315).

Only Agent Eckstein's 302 was provided to Williams & Connolly; AUSA Russo's motion *in limine* in *Boehm*, which was not in the APD file received from DOJ's CEOS, was not disclosed. *See* Deposition of W. Welch, Feb. 5, 2010, at 348-349.

Mr. Welch testified that his letter, intended to alert Williams & Connolly to the fact that the *Brady* letter was misleading (*id*. at 323), could have made that point more clearly:

BY MR. SCHUELKE:
Q     I don't mean to criticize the drafting of this paragraph, but tell me, am I right that to convey more clearly what you had in mind, you might have said something like "included in this investigative file is a 302 dated October 28, 2004 reflecting an interview of Bambi Tyree. The September 9th Brady letter purported to summarize this very 302. Now you have the 302. You can see for yourself what it says." Is that --
A     Yeah, that definitely would have been better.

*Id*. at 324-325.

348

Mr. Welch discussed his discovery of Agent Eckstein's "unambiguous" 302 (*id*. at 322) only with Mr. Hulser, and not with Ms. Morris, Mr. Bottini, Mr. Marsh, Mr. Goeke, or anyone else:

A      The reason was that by -- well, the reason was twofold. The first one was that by this point there had been at least one if not two OPR referrals and that I knew that I would discuss this with OPR, and I thought that OPR was in the best position to investigate it. And the second reason was, quite frankly, by the 16th, 17th, 18th, I was just trying to get the team to the goal line, if you will, and the [sic] secondly, was just so disgusted where we are -- where we were with respect to discovery at that point that I was going to let OPR handle it and I would tell them what I thought, why I wrote the letter and the things that I've told you today.

Q      And did you ever disclose it to OPR?

A      I haven't been contacted by OPR yet.

Q      Oh, okay. And did you ever disclose your apparent shock when you saw the 302 on October 14th to anyone else?

A      Other than Mr. Hulser, no.

Q      Other than Hulser, right.

A      No.

Q      Not to Glavin or Friederich or Morris or anyone else?

A      No. No.

*Id*. at 337-338.

Anticipating that Judge Sullivan might hold a hearing or allow Mr. Allen to be cross-examined further, Mr. Welch instructed Mr. Goeke to direct Mr. Allen to return to Washington and to subpoena Ms. Tyree; he also instructed Mr. Goeke not to disclose to them, or their lawyers, why their presence was required. *Id*. at 377. Mr. Allen returned to Washington (*id*.), but Williams & Connolly was not informed that he was available for further cross-examination and no additional testimony was taken:

MR. CARY:      This has to do with the Bill Allen issue, and we reviewed the [APD] file. Mr. Romain actually did. We attempted to read the [sic] stipulation with the Government, and it is a very serious matter, very serious investigation that's now at Main Justice and we feel as though we should be -- *we can't get Mr. Allen back.* At this point we feel like there should be some instruction at the very least. The file and the disclosure letters became part of the record under seal. That's all, Your Honor.

MR. MARSH:     We strongly disagree. I mean, what we know in this is that at the time that Mr. Allen -- I mean, first of all, we've given over everything that we had as we got it. And secondly, with respect to the investigation, Defendant was aware, at the time Mr. Allen was on the stand, of these other pending investigations. They were given the right to cross-examine. They chose not to.

               The fact that it's now a federal investigation, we submit that it's -- it would only be relevant if for some reason the Government had notified Mr. Allen that -- or had reason to believe that Mr. Allen knew it was federal. We have no -- we certainly, none of us -- no one on the prosecutor team has mentioned anything of that to Mr. Allen or Mr. Allen's attorney. We think it would be absolutely improper to do so.

               Absent that, Your Honor, we don't see how an additional investigation along the same lines, whether state or federal, adds anything to the next information they had at the time of trial.

*Stevens*, Trial Transcript, Oct. 18, 2008, 4:00 P.M., Conference Jury Instructions, at 96-97 (emphasis added).

On Oct. 20, 2008, Senator Stevens concluded his testimony and both sides rested. *Stevens*, Trial Transcript, Oct. 20, 2008 A.M., at 121.

13.    Sept. 30-Oct. 7, 2008    Mr. Allen was not questioned at trial about
                                Ms. Tyree or the APD investigations

Neither side questioned Mr. Allen about Ms. Tyree or the APD investigations.  Mr. Allen testified in this investigation that when Mr. Bottini was preparing him for cross-examination, Mr. Bundy told him and Agent Kepner that, if Mr. Allen was cross-examined about Ms. Tyree, he would assert the Fifth Amendment. Deposition of B. Allen, March 6, 2010, at 61-62. *See also* FBI SA Brian Burns 302 of interview of Agent M. Kepner on Feb. 25, 2009, at 26 ("ALLEN would become unglued whenever an article would appear involving allegations related to the APD sexual investigation.")(DOJ Bates nos. CRM000652-683).

C.    **The Torricelli Note, the Interviews of Mr. Allen on April 15 and 18 and Sept. 9 and 14, 2008, and Mr. Allen's CYA Testimony**

<u>Summary</u>

On April 8, 2008, Williams & Connolly voluntarily produced documents to the government which included two handwritten notes from Senator Stevens to Mr. Allen, dated Oct. 6 and Nov. 8, 2002 (the "Torricelli note" and "Torricelli notes"), in which he asked Mr. Allen to send him bills for the work done on his house in Alaska.  In the first note, dated Oct. 6, 2002, Senator Stevens informed Mr. Allen *inter alia* that he "asked Bob P[ersons] to talk to you about [sending bills for all the work on the chalet] so don't get P.O'd at him - it just has to be done right."

These notes immediately became and remained objects of concern and attention by Mr. Marsh, Mr. Bottini, Mr. Goeke, Mr. E. Sullivan and Agent Kepner:

April 8:    the prosecutors arranged to meet with Mr. Allen on April 15, 2008 to question him about the Torricelli notes and other documents received from Williams & Connolly;

April 11:   the Torricelli notes were discussed in, and attached as one of two exhibits to, a memorandum to AAG Fisher, dated April 11,

351

2008, which described them as "both helpful and harmful" to the defense, questioned their authenticity and announced the prosecutors' intention to interview Senator Stevens's archivist about them;

April 15     Mr. Bottini, Mr. Goeke and Agent Kepner met with Mr. Allen and his attorney, Mr. Bundy, in Alaska; Mr. Marsh and Mr. E. Sullivan participated by phone. According to the handwritten notes of Mr. Bottini, Mr. Goeke, Mr. E. Sullivan and Agent Kepner, Mr. Allen told them that he remembered receiving the Torricelli notes from Senator Stevens but did *not* remember speaking to Mr. Persons about the bills requested by Senator Stevens. During the interview, Mr. Bottini, Mr. E. Sullivan, Mr. Marsh and Mr. Goeke exchanged emails expressing disappointment in Mr. Allen's statements about the Torricelli notes. Agent Kepner did not write a 302 for this interview;

April 18     Mr. Allen was interviewed again by Mr. Bottini, Mr. Goeke, Agent Kepner and Mr. Marsh, who participated by phone, and he told them (again) that the work on Senator Stevens's home in Alaska was worth about $80,000, and not $250,000 as would be later alleged in the indictment. Agent Kepner did not write a 302 for this interview;

April 24     Mr. Bottini, Mr. Goeke, Mr. Marsh, Mr. E. Sullivan and Agent Kepner interviewed William Arthur, Senator Stevens's archivist. Agent Kepner wrote a 302 for this interview;

April 25     Mr. Marsh and Mr. Bottini circulate emails commenting about an email exchange in December, 2002, between Senator Stevens and his assistant, Barbara Flanders, which discussed bills that were expected to be received for the renovation work and which Mr. Persons was "riding herd [on] to make certain we get charged for what they have done." Mr. Marsh commented that "these emails are not good" and Mr. Bottini agreed, "not good, but obviously not fatal either.";

May 1     Mr. Marsh, Mr. E. Sullivan, Mr. Bottini (by phone) and Mr. Goeke (by phone), interviewed Ms. Flanders. No 302 was written;

May 8     Mr. Bottini, Mr. Goeke, Mr. Marsh and Mr. E. Sullivan interviewed Mr. Persons in Alaska. No questions were asked

|          | about the Torricelli notes.  A 302 was written; |
|----------|-------------------------------------------------|
| May 15   | Mr. Marsh added a two-page discussion of the Torricelli notes and the emails between Ms. Flanders and Senator Stevens to the Prosecution Memorandum for Senator Stevens; |
| July 25  | Mr. Marsh and Mr. E. Sullivan presented the Torricelli notes to the grand jury, through the testimony of Agent Kepner, in its next to last session before indicting Senator Stevens; |
| Sept. 9  | As Mr. Marsh wrote the final draft of the *Brady* letter, Agent Kepner questioned Mr. Allen by phone about the Torricelli notes and why he never sent a bill to Senator Stevens.  Agent Kepner wrote a 302 for this interview; |
| Sept. 14 | During a trial prep session, Mr. Allen told Mr. Bottini and Agent Kepner that he recalled speaking with Mr. Persons in 2002 about Senator Stevens's requests for a bill in the Torricelli note and that Mr. Persons told him that Senator Stevens was "just covering his ass" by asking for a bill.  Agent Kepner did not write a 302 for this interview. |

Mr. Allen testified in this investigation that, shortly before he traveled to Washington for the trial, Agent Kepner told him that he "better figure out or remember" what happened after he received the Torricelli note.  Mr. Allen testified that, during the plane trip to Washington, he recalled that he spoke to Mr. Persons after he received the Torricelli note and that Mr. Persons told him that Senator Stevens was "just covering his ass".  Mr. Allen and Mr. Bundy arrived in Washington on the evening of Sept. 12, 2008, and they met with Mr. Bottini and Agent Kepner the following day (Sept. 13) for trial preparation. Email from Mr. Bundy, dated Thursday, Sept. 11, 2008, to J. Bottini ("We get into DC Friday night and will be ready to meet Saturday at your convenience.")(DOJ Bates no. CRM082120); Agent's Kepner notes of meeting with Mr. Allen, Mr. Bottini and Mr. Bundy on Sept. 13, 2008 (DOJ Bates no. CRM066742).  Mr. Allen first told Mr. Bottini and Agent Kepner about his recent recollection of his 2002-CYA conversation with Mr. Persons during the second trial prep session on Sept. 14, 2008.  Mr. Bottini and Agent Kepner immediately recognized that this was significant, new information and quickly shared it with the trial team and Mr. Welch.  However, Agent Kepner did not write a 302 to memorialize this new information.

Mr. Bottini, Mr. Marsh, Mr. Goeke, Mr. E. Sullivan and Agent Kepner testified in this investigation that they forgot that they had previously questioned Mr. Allen about the Torricelli note on April 15, 2008 and that he told them that he did not recall speaking to Mr. Persons about the Torricelli note. They did not remember that interview and/or that statement until 2009, when they were questioned by the O'Brien Team and when they, except for Mr. Marsh and Agent Kepner, found their notes of that interview.

On Sept. 25, 2008, Brendan Sullivan read the Torricelli note to the jury in his opening statement, describing it as evidence that "jumps off the page and grabs you by the throat to show you what the intent of Ted Stevens was". He learned of Mr. Allen's recollection of his CYA conversation in 2002 with Mr. Persons for the first time on Oct. 1, 2008, from the witness stand during Mr. Allen's direct testimony.

On cross-examination, Brendan Sullivan attacked Mr. Allen's CYA testimony as a recent fabrication. Using the 302 of Mr. Allen's interview on Sept. 9, 2008, when he enumerated five reasons for not sending a bill to Senator Stevens without mentioning his CYA conversation with Mr. Persons, Mr. Sullivan asked Mr. Allen if he had "just recently" told the government about the CYA conversation, and he answered "No. No." Mr. Allen's denial was false and Mr. Bottini knew it was false. Mr. Allen told Mr. Bottini and Agent Kepner about his CYA conversation with Mr. Persons for the first time three weeks earlier, on Sept. 14, 2008. Mr. Bottini knew at the time that he was obliged to correct Mr. Allen's false denial, he did not, and he later argued in summation that Mr. Allen's CYA testimony was not a recent fabrication. Mr. Bottini testified in this investigation that Mr. Allen's testimony was "factually inaccurate" but not false because he knew from working with Mr. Allen that he misunderstood the question.

1.    April 2007-March 2008   Prosecutors believe that Senator Stevens's oral requests for invoices from Mr. Allen are "pretextual" and that "ALLEN has stated as much"

In a draft prosecution memorandum written during the investigation of Senator Stevens in April, 2007, the prosecutors stated their belief that his oral

requests to Mr. Allen for invoices "were simply pretextual" and "that ALLEN has stated as much":

> During interviews with the government, ALLEN recalled two additional conversations with STEVENS regarding the Girdwood Residence. . . . STEVENS then told ALLEN that STEVENS needed to reimburse ALLEN for some of the expenses that VECO had incurred and requested that ALLEN give him an invoice.
>
> After this conversation, ALLEN never provided an invoice to STEVENS for the work that VECO had performed up until that point in time, and STEVENS never again asked ALLEN for an invoice concerning the Girdwood Residence remodeling project.
>
>                      * * *
>
> Notwithstanding this evidence, STEVENS may raise two fact-based defenses to demonstrate the absence of intent. . . .
>
> Second, STEVENS may assert that, although he knew VECO was working on the project, he asked on at least two occasions to have invoices sent to him. We believe these requests were simply pretextual, and that STEVENS never had any intention to pay them. During interviews with the government, ALLEN has stated as much, indicating that STEVENS never followed-up on any of the requests that he made for invoices relating to the Girdwood Residence.
>
> Draft Prosecution Memorandum, dated April 30, 2007, at 29 (footnote omitted) & 46-47 (DOJ Bates nos. CRM096333-394).

This "pretextual" characterization was reiterated in almost identical language in two prosecution memos in March, 2008. *See* Draft Prosecution Memo, dated March 3, 2008, at 44-45 & 58 (DOJ Bates nos. CRM014142-203); Draft Prosecution Memo, dated March 12, 2008, at 42 & 55 (DOJ Bates nos. CRM015244-303).

    The "pretext" characterization was omitted from subsequent versions of the prosecution memorandum. Refashioned versions of that argument later appeared in emails exchanged by the prosecutors during heir interview of Mr. Allen on April 15, 2008, which described the Torricelli note as "a wink and a nod" and as "paper[ing] the file", and in later prosecution memoranda which asserted that

"there appears to be some evidence that as early as 2000, STEVENS was creating a 'cover story' concerning the Girdwood Residence renovations". *See* Emails between N. Marsh, J. Bottini, J. Goeke and J. Bottini, dated April 15, 2008 (DOJ Bates nos. CRM16532-533); Prosecution Memorandum, dated May 15, 2008, at 45 (DOJ Bates nos. CRM016874-17018).

 

      2.      April 8, 2008      Prosecutors receive the Torricelli note from Williams & Connolly

On April 8, 2008, Williams & Connolly voluntarily produced to the prosecutors, as part of a rolling production, five boxes of documents, including two handwritten notes from Senator Stevens, dated Oct. 6 and Nov. 8, 2002, to Mr. Allen asking for a bill for the work done on his home:

> 10/6/02
> Dear Bill -
>     When I think of the many ways in which you make my life easier and more enjoyable, I lose count!
>     Thanks for all the work on the chalet.  You owe me a bill - remember Torricelli, my friend.  Friendship is one thing - compliance with these ethics rules entirely different.  I asked Bob P[ersons] to talk to you about this so don't get P.O'd at him - it just has to be done right.
>     Hope to see you soon.
>         My best,
>           Ted

*Stevens*, Government Trial Exh. 495 (DOJ Bates no. CRM016375; Williams & Connolly control no. 000035);

•    •    •

> 11/8/02
> Dear Bill:
> Many thanks for all you've done to make our lives easier and our home more enjoyable. . . . (Don't forget we need a bill for what's been done out at the chalet) . . .
>     My best
>     Ted

*Stevens*, Government Trial Exh. 509 (DOJ Bates no. CRM016376; Williams
& Connolly control no. 000034).

*See also* Letter "Via Courier" from S. Latcovich, dated April 8, 2008, to N. Marsh
("We are continuing to gather and review documents pursuant to your document
requests. Enclosed please find 5 boxes containing documents bearing control
numbers 000001 to 009306 . . .") (DOJ Bates no. CRM043196); Email from J.
Bottini, dated Sept. 27, 2008, to R. Cary, *et al*. ("I just realized that the
government's list of exhibits that we intend to introduce through Bill Allen
inadvertently omitted Government Exhibits 495 and 509.  These are respectively -
the handwritten note from Senator Stevens to Bill Allen dated October 6, 2002
(GX 495) and the handwritten note from Senator Stevens to Bill Allen dated
November 8, 2002 (GX 509) I assume that you would have no objection to the
introduction of these exhibits.") (DOJ Bates no. CRM025002).

These two documents became known as the "Torricelli note(s)" because of the
reference to Senator Torricelli, who, shortly before the Oct. 6-note was written,
withdrew his re-election bid due to publicity about his receipt of gifts. *See*
Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and
Brenda Morris, at 14 (DOJ Bates no. CRM016390) ("We note that in July 2002,
Senator Torricelli was publicly admonished by the United States Senate for
accepting numerous gifts from a wealthy fundraiser, and that on September 30,
2002 – one week before STEVENS wrote the note to Allen – Senator Torricelli
withdrew from his Senate re-election race.").

On the same day the Torricelli notes were received from Williams &
Connolly, the prosecutors asked Agent Kepner to arrange a meeting with Mr.
Allen to discuss them:

> Subject: Bill Allen is available at anytime in the next week
> I thought you guys were joking initially. I wish you had been. I left a
> message for [Bob] Bundy [attorney for Mr. Allen] and got a hold of Bill. I
> will call Bob's office and talk to his assistant to confirm when Bob will
> return. Bill said he is available to come up whenever we need him.

Email from Agent Kepner, dated April 8, 2008, to N. Marsh and E. Sullivan
(DOJ Bates no. CRM016182);

• • •

MBK [Agent Kepner] just called in and left a message – she heard back
from Bundy - and he is back in town this coming Sunday night. She did not
say how much she gave him in the way of a heads up concerning why we
need to talk to Allen now. Bill is flying up on Monday. Thus, we will set up
a debrief of Bill regarding the recent revelations (and be able to shove
documents in front of him) as of next Tuesday (4/15).

Email from J. Bottini, dated April 8, 2008, to N. Marsh, J. Goeke and E.
Sullivan (DOJ Bates no. CRM016184).

In another email that same day, Agent Kepner voiced concern to her supervisor
that the Torricelli notes might be "fatal" to the prosecution:

Bill Welch did not seem to be too upset about the notes that were found
related to Stevens asking Bill for invoices.  I got ahold of Bundy and Bill
Allen.  We will debrief Bill on Tuesday regarding the new documents
received from Stevens.  Too early to tell if this issue will be fatal or not.
I'm worried that this may give DOJ an out if they were looking for one.

Email from Agent Kepner to FBI SAC C. Seale, dated April 8, 2008 (DOJ
Bates no. CRM067322).

Agent Kepner testified that, despite her statements in this email, she was not
worried about the Torricelli notes, but Mr. Marsh was. Deposition of Agent
Kepner, Aug. 24, 2009, at 249.  She saw the Torricelli notes as a problem, but not
an insurmountable one. *Id.* at 329.

    At the time, Mr. Marsh was drafting a supplemental memorandum and an
accompanying chart of the strengths and weaknesses of the case for AAG Fisher
and her deputy, Barry Sabin, which he sent to his colleagues on April 7 for
comment. *See* Email from N. Marsh, dated April 7, 2008, to J. Bottini, J. Goeke
and E. Sullivan, Subject: "strengths/weakness" (DOJ Bates nos. CRM016133).
On April 8, 2008, the day the Torricelli notes were received, Mr. E. Sullivan
emailed his comments on the chart and, though he was the most junior member of
the trial team, he accurately predicted Senator Stevens's defense more than five
months before the trial:

The chart looks good . . . We may want to point out that "TS though [sic] CAS paid for work" defense also works in tandem w/the "VECO overbilled for work" theory. That is, TS will likely contend that he knew VECO worked on the site, thought the VECO costs were rolled into the CB [Christens Builders] invoices, and thought the $138K covered everything given what the finished work product look like. . . .

Email from E. Sullivan, dated April 8, 2008, to N. Marsh, J. Bottini and J. Goeke (DOJ Bates no. CRM016162).

3.    April 11, 2008    Torricelli notes featured in memorandum to AAG Fisher, "troubling irregularities" identified

Mr. Marsh sent the memorandum, with the Torricelli notes attached, to AAG Fisher three days after their receipt and described them as "both helpful and harmful to STEVENS":

III    **Additional Correspondence Between STEVENS and Allen from 2000-2002.**

Three days ago, STEVENS' office voluntarily produced records concerning STEVENS' correspondence with Bill Allen. . . .

* * *

* On October 6, 2002 and November 18 [sic], 2002, STEVENS sent Allen two handwritten notes in which STEVENS requested that Allen provide STEVENS with an invoice for the work that was being done at the time by VECO at the Girdwood Residence. . . . Copies of these two notes are annexed hereto as Exhibit B.

The October and November 2002 notes are both helpful and harmful to STEVENS. First, because they acknowledge VECO's work at that time, and because they acknowledge STEVENS' need to pay for the work, the notes will make it difficult for STEVENS to claim that he believed the fall 2002 work was incorporated into Christensen Builders' spring 2001 bills. Second, because they demonstrate STEVENS' knowledge of these two issues, the notes will likely preclude STEVENS from arguing that he simply forgot to

pay Allen for the work.

The notes, however, are helpful to STEVENS' remaining argument here: that he wanted to pay for the work all along, and that the failure to pay for it was the result of a miscommunication between STEVENS and Catherine Stevens. On one hand, they permit STEVENS to portray himself as someone who truly wanted to comply with the Senate ethics rules. On the other hand, they also portray STEVENS as an individual knowledgeable about what he was getting and from whom he was receiving it. We have addressed this argument in the chart attached hereto.

Memorandum to Alice S. Fisher, dated April 11, 2008, from William M. Welch and Brenda K. Morris, "Additional Information Concerning the Prosecution of Senator Ted Stevens", at 13-15 (emphasis in original) (DOJ Bates nos. CRM016389-391).

In its concluding paragraphs, the memorandum questioned the authenticity of the Torricelli note:

Finally, we have noted two troubling irregularities concerning the October 6, 2002, note. First, as indicated above, STEVENS' office uses a computer system to track STEVENS' correspondence. Although STEVENS produced what purports to be a copy of the note he sent to Allen on October 6, 2002, the corresponding computer database contains no record of the October 6, 2002 note.

Second, it appears that STEVENS sometimes sent Allen letters using his U.S. Senate franking privileges, while other times sent Allen letters using personal stationery and affixing a stamp to the envelope. In the latter situation – where the personal stationery was used – STEVENS' staff appears to have copied the envelope with the stamp affixed to it. The October 6, 2002, letter was sent on STEVENS' personal stationery, but the copy of the envelope shows that no stamp was affixed.

Although we deem it somewhat unlikely that STEVENS created the October 6, 2002, note after the fact, we nonetheless have some concerns about the document's authenticity. Next week, we intend to schedule an interview

with STEVENS' archivist to explore the manner in which this document
was located and produced.

*Id*. at 15 (DOJ Bates no. CRM016367).

In addition to attaching the Torricelli notes to the memorandum as Exhibit
B, the prosecutors attached "as Exhibit A [] a chart that presents STEVENS'
strongest defenses and our responses to them". *Id*. at 1. The first defense "Attack"
identified in the chart was based on the Torricelli notes:

Attacks
TS did not pay because he never received a bill. Here, W&C focuses on the
fact that no bills were sent by VECO to TS, and as such he could never
repay Allen the amount VECO incurred for the renovation. Supported by
fact that in early 2001 TS asked Allen to send TS an invoice for the work.
Supported by two fall 2002 notes in which TS asked Allen for an invoice for
the fall 2002 work.

Responses
This will require TS to admit that he knew VECO did the work and that he
knew that he never paid VECO for the work done. Absence of invoices
irrelevant to financial disclosure forms, because TS could have estimated
the value (which TS has done at least once in the past). Also inconsistent
with TS' continued use of VECO's services in 2002 and beyond – i.e., if TS
really wanted an invoice and couldn't get one, why continue to ask the same
individuals to do more work?

*Id*., Exhibit A (emphasis in original).

361

4.    April 15, 2008        Mr. Allen tells Mr. Bottini, Mr. Goeke, Mr.
                            Marsh, Mr. E. Sullivan and Agent Kepner that he
                            does not remember speaking with Mr. Persons
                            about the Torricelli note, interview notes are
                            taken, but no 302 is written because "the
                            debriefing . . . did not go well"

On April 15, 2008, Mr. Bottini, Mr. Goeke, Agent Kepner, Mr. Marsh (by phone) and Mr. E. Sullivan (by phone) interviewed Mr. Allen, in the presence of his attorney, Mr. Bundy, about documents recently received from Williams & Connolly, including the Torricelli note in which Senator Stevens asked Mr. Allen for a bill and told him that he "asked Bob P[ersons] to talk to you about this so don't get P.O'd at him." *Stevens*, Government Trial Exh. 495 (DOJ Bates no. CRM016375; Williams & Connolly control no. 000035). The interview lasted more than two hours and Mr. Marsh did most of the questioning. *See* Deposition of J. Bottini, Dec. 17, 2009, at 482 & 483.

According to the notes of Agent Kepner and three prosecutors, Mr. Allen stated *inter alia* that he received, or probably received, the Torricelli note, and that he did not recall speaking to Mr. Persons about Senator Stevens's requests for a bill. Mr. Marsh testified that he did not recall taking any notes during the interview and that he searched his file and found none. Deposition of N. Marsh, Feb. 2, 2010, at 365; *see also id*. at 367-368 ("It would have been not normal for me to have taken notes in the context of an Allen de-brief on the phone. I didn't find them productive."); *Compare* Deposition of W. Welch, Jan. 13, 2010, at 66 ("I thought that [Mr. Marsh] was a copious note taker.").

Mr. Bottini took 39 pages of notes (DOJ Bates nos. CRM013688-710; 13749-752; 13757-769). Three-plus pages relate to the Torricelli note and the value of VECO's work on Senator Stevens's home:

RB [R. Bundy], BA [B. Allen], JAG [J Goeke], MBK [Agent Mary Beth Kepner] , JWB [J. Bottini], on phone: NAM [N. Marsh], EPS [E. Sullivan]
4/15/08 Debrief/Meeting w/Bill Allen
                    *   *   *
Document No. 035    10/6/02

362

Handwritten note from TS –> BA
        \sent to home address
*Recall Bob P[ersons]. Talking to you about this?*
        *\ BA:  No.*
*"Remember Torricelli"*

Recall getting this? –
BA: "Probably did"
\ Don't recall ever doing up a bill for TS.
\ Never got any invoices b/cuz of Rocky & Dave
\They were screwed up, etc.
Don't think that they made up any invoices -
                •        •        •
–> Never gave TS invoices, etc.
    \Didn't want TS to pay for this -
        \ Just ignore the note?
            Didn't discuss this w/TS!
– Only recall talking about the boiler
    w/TS. – Later when that went out.
        \If he had pressed him on this.
            \I would have given him an invoice!
                \Would have been hard,
                but would have done it.
Would not have dummied something up.
– Would have been difficult to figure expenses,
                •        •        •
– Dave Anderson never did any accounting, etc.
– Dave & Rocky screwed this up -
        \Cost so much $ b/cuz of
         their incompetence, being drunk -
        \ Not efficient.
– Even if they had done it right -
        \it would have cost about 80K
        \cost something like 250K!?
- Rocky/Dave –
        \Screw offs – not there to
        direct the VECO employees –

363



BA believes that this added
to the cost, etc.
       •     •     •
– <u>Re</u>: John Hess there – billing, etc.
  \ Recall TS asking about that?
    \ Bill for his (Hess's) time –
       \Don't recall that. – <u>No</u>.
—>

_____
– BREAK –

Notes of Mr. Bottini of Interview of Mr. Allen on April 15, 2008 (emphasis added)(DOJ Bates nos. CRM013705-708).

Mr. Bottini testified that Mr. Allen stated during this interview that he did not recall speaking to Mr. Persons about the Torricelli notes. Deposition of J. Bottini, Dec. 17, 2010, at 589-590.

Mr. E. Sullivan's four pages of notes contain similar entries:

|  | Bill Allen Interview | Alaska |
|---|---|---|
|  |  | 4/15/08 Tu |

                          \*   \*   \*

WC 35     10/6/02 note from TS to BA
              *- BA recalls receiving note from TS. Doesn't Recall talking to BP [Bob Persons] re: giving bill to TS*
              *- BA not saying it didn't happen, just doesn't recall.*
              Doesn't recall having VECO put bill together
              - BA didn't want TS to have to pay for it. Doesn't recall talking to TS re:
              this note.  Doesn't recall Brian Byrne working on deck @ this point.
              - BA would not have put together a false invoice. To prepare a fair estimate BA would have had to consult with Dave Anderson.

- DA/RW [Dave Anderson/Rocky Williams] always
drunk. screwed the project up; allowed the workers to
waste time; sit around; inefficient. Didn't supervise well.
\* But, if they had done the work efficient
then FMV = $80,000 (estimate)

- DS re: whether other employees asked/told BA that TS
wanted a bill. BA would not
have wanted any VECO employee to send out an invoice
to TS w/o BA first reviewing it.

W+C 34 [note from Senator Stevens to Mr. Allen, dated Nov. 8,
2002]
BA wouldn't have given him an invoice re: X-mas lights.

Notes of E. Sullivan of Interview of Mr. Allen on April 15, 2008 (emphasis
added)(DOJ Bates nos. CRM044068-071).

Mr. Goeke's five pages of notes are similar:

Bill Allen 4/15/08
\* \* \*
000035
\note to Bill from TS
\refers to Torricelli and
TS needing a bill for the work
\*Allen does not recall Bob P[ersons] talking to
him about a bill for Ted S*
\If TS had pressed - would have
created an invoice
\Rocky and Dave screwed this up
b/c always drunk.
\* \* \*
000034 Note to BA from TS
\note re lights

Notes of J. Goeke of Interview of Mr. Allen on April 15, 2008

365

(emphasis added) (DOJ Bates nos. CRM000775-779).

Agent Kepner's three pages are also similar:

> Bill Allen, Bob Bundy, JG, ES, NM, JB        4/15/08
>                  * * *
>
> 35    10/6/02 - Handwritten note from TS to BA
>         *Probably got the note. Doesn't recall BP [Bob Persons]*
>         *talking to him about an invoice.* BA didn't
>         have any invoices.  Never asked anyone to produce
>         Would have given TS an invoice if he pushed.
>
>         John Hess didn't talk to BA about a bill for the
>         work on TS house.
>         Doesn't recall TS talking to BA about JH work.
>
> 34    11/8/02 HWN from TS
>         BA would have never given him an invoice
>         lights was a Xmas present.
>               * * *
>         projects costs minimal for VECO.
>         VECO work 80,000-100,000

> Notes of Agent Kepner of Interview of Mr. Allen on April 15, 2008
> (emphasis added) (DOJ Bates nos. CRM0118392-394).

Agent Kepner's notes of the interview were found by OPR on Jan. 14, 2010 and were provided to us on the same day by DOJ. *See* Email from K. Harris, dated Jan. 14, 2010, to H. Schuelke and B. Shields ("Attached are several documents that we recently received from the FBI, bates numbered CRM 118378 to CRM 118394. These documents include: . . . Mary Beth Kepner's handwritten notes from the April 15, 2008 interview with Bill Allen.  OPR located these notes today in the boxes of material recently shipped from the FBI's office in Anchorage, Alaska.").

Mr. Bundy's ten pages of notes reflect in pertinent part:

> 4/15/08        B. Allen; MB Kepner, J. Bottini

re documents from Ted S.

            *   *   *

Doc 000035       Note TS-BA      10/6/02

       Thanks for all the work on chalet

       You owe me a bill - remember

               Torricelli

       *asked Bob P to talk to you*

       *DNR [does not remember] Persons talking to him about*

           *getting an invoice*

           *- could have, but no memory*

       - BA never asked anyone at VECO

           to produce a bill for Ted

       - Bill never got any invoices because

           Rocky & Dave screwed things

           up.

       MBK [Agent Kepner]: deck (bottom deck) by Brian Bern - had

           worked for Augie

           - he gave VECO a bill

       BA never discussed note with TS

       Bill wanted to give this to Ted

       if TS pressed, he would have had

           Veco put together an invoice   - would have been hard

               •     •     •

       - BA wouldn't have made a false

           invoice

       - BA would have got ahold of Dave A and figured out

           what to do

       BA thought Dave A would have

           given an invoice to someone

           in VECO

       BA DNR [does not remember] Ted asking about

           John Hess' invoice

       BA would have been angry if

           TS sent invoice by VECO w/o

           going through BA

Doc 00034

> Note TS - BA   11/8/02
> thanks for lights etc.
> Don't forget we need a bill
> Bill wouldn't have given invoice for
>> light because it was Xmas present

Notes of R. Bundy of Interview of Mr. Allen on April 15, 2008 (emphasis added)(Bates nos. RB-AWP000320-329).

*See also* Deposition of R. Bundy, Nov. 4, 2009, at 47-50 (Mr. Bundy read his notes into the record).[46]

Mr. Bundy testified that he and Mr. Allen met with the prosecutors and Agent Kepner for "at least a couple hours". *Id.* at 44. At the end of the meeting, Mr. Marsh "clearly g[o]t after Allen" about the Torricelli note:

Q    Does that refresh your memory whether or not Mr. Marsh was pushing Mr. Allen on any of these documents or issues?

A    Well, you know, obviously I've looked at my notes. So towards the end of the session, Marsh did clearly get after Allen on well, how can it be that you get this memo from Ted Stevens saying -- which I refer to as the Torricelli memo -- and then you never give him an invoice. Why not. You know, why -- how could you have gotten this and then never given him an invoice. What happened. And I, you know, I want you to think about that. You know, it's not logical. So what's the deal. Why didn't you give him an invoice after you go [sic] this stuff.

* * *

Q    I gather, from what you were saying, they were unsatisfied with Mr. Allen's answers to the question why didn't he send a bill after getting

---

[46]Mr. Bundy's notes and testimony were obtained pursuant to this Court's sealed order directing compliance with a subpoena issued to Mr. Bundy, dated Oct. 15, 2009. *See In Re Special Proceedings*, Misc. No. 09-MC-0098-EGS, Sealed Order, dated Oct. 22, 2009; *see also id.*, Order, dated July 28, 2009 (authorizing the issuance of subpoenas, for testimony and/or documents, to W. Welch, B. Morris, E. Sullivan, J. Bottini, M. Kepner, J. Goeke, Bill Allen and Mr. Allen's attorney, Robert Bundy).  Two subpoenas were issued in this investigation: the subpoena to Mr. Bundy and a subpoena to Mr. Allen, dated Jan. 26, 2010, for testimony only.

368

the notes referred to here; is that correct?

A     It certainly sounds that way, yes.

Q     And how was that evidenced to their satisfaction?

A     Well, at the end of the section, Mr. Marsh, who was on the phone, said, "After you got this note, why didn't you give him an invoice? What was the reason?" And he pushed him on that. "I want you to think about that."

                              *   *   *

BY MR. SCHUELKE:

Q     Aside from whether or not my interpretation is right, do you have any recollection that Nick Marsh, assuming that it was he, as the notes seem to indicate, was suggesting to Mr. Allen that what he ought to give some thought to was the notion that he, Allen, was trying to set things up with Stevens so Stevens wouldn't have to pay it back. In other words, was he suggesting that response?

A     You know, I want to be careful here because I don't want to say something that I don't remember.

Q     And I don't want you to either.

A     So I guess the best I can say is, these notes refresh my recollection to the extent that Marsh wanted Bill Allen to think about it. He said, you know, why -- how can you possibly explain this. Were you trying to get it so that Stevens wouldn't have to pay you back. I think that's accurate.

                              *   *   *

A     . . . I mean, you didn't have to be a genius to know that Morris [probably should be Marsh] was really having trouble understanding how Bill could say, "I just didn't give him an invoice." You know, there has to be some reason. What is the reason. And that -- it was tough to do. "Want you to think about that." He told him that.

*Id*. at 45-46, 51-52, 54-55 & 63-64.

Mr. Bundy's notes reflected that exchange between Mr. Marsh and Mr. Allen:

        Nick: Bill, give some thoughts about what your motivations were to

369

> do what you did re not giving invoice
> [illegible word] - trying not to get things such that Ted would
> have to pay it back
> 
> BA - knew would had to give
> Ted some invoices
> - but never got invoices
> - *Bill thought about $80k*
>   *would have been OK*
>   *for what VECO did on*
>   *house*
> 
> Bill would have thought he would have
> had some invoices
> 
> If Bill would have got invoices
> from VECO empl[oyees] he
> *would have cut back*
> *a lot on invoice for Ted*
> *if the VECO invoices were $250k or*
> *anything like that*
>                   * * *
> Nick: re when Dave went to press (Dec 2004)
> - talked to Ted
> - why no invoice then?
> Next mtg. Fri. 4/18 - 10:00 a.m.

Notes of R. Bundy of Interview of Mr. Allen on April 15, 2008 (emphasis added)(Bates nos. RB-AWP000328-329).

*See also* Deposition of R. Bundy, Nov. 4, 2009, at 53-56 (Mr. Bundy read his notes into the record).

Mr. Marsh testified that he did not recall discussing the Torricelli note with Mr. Allen but recalled "getting under [Mr. Allen's] skin" on one occasion about his inability to issue an invoice:

BY MR. SCHUELKE:
Q      Do you recall discussing the Torricelli note with Mr. Allen?
A      I don't. One of the -- I found it difficult to follow a lot of de-briefs by

telephone and specifically Mr. Allen. I had been in a lot of interviews
with Allen and he was difficult to follow in person, and on the phone,
it was very difficult.
To be perfectly frank, a lot of times I would multi-task and do other
things. I would work on briefs or I would review documents, all kinds
of stuff.
I didn't find them as useful on the telephone and I probably didn't pay
as much attention as I should have, and that was generally consistent.

Q    I take it that in the course of your preparation for this deposition you
have seen the e-mail exchange among yourself and the others during
the course of that interview [on April 15, 2008]?

A    I recall seeing an e-mail exchange during the course of an interview. I
don't remember if it was on the 15th or not.

Q    Well, it was.

A    Okay.

Q    I will represent to you. It seems like you were paying attention to that
one.

A    What I remember is during this time, right around the time being on a
call and hearing Allen say something to the effect of I wouldn't have
even been able to come up with an invoice if I wanted to because I
didn't know how. I remember hearing that and really pushing Allen
on it. I thought it was ludicrous, the idea that this guy is in the process
at this time of selling this company for $500 million and he's going to
try to claim there is no way he can get an invoice. I have no idea if
that's what I was referring to in those e-mails.

Q    When you asked [in an email] "Am I pushing too hard?"

A    Right.

Q    Is that what you're referring to?

A    Yes. I don't recall if that's what was going on. I don't recall if it was
something else. I do recall around that time really getting under his
skin about that issue.

Deposition of N. Marsh, Feb. 2, 2010, at 361-363.

Mr. Bottini testified that Mr. Allen became very angry when Mr. Marsh questioned him about the Torricelli note:

> Mr. Bottini   . . . But I was present during that April 15th meeting. I wasn't asking the questions.  He was shown the notes.  My notes reflect that he was. My notes reflect that he was asked do you remember getting this, and he said I probably did, and then my notes reflect do you recall -- somebody, I think it was Marsh asking the questions.  Do you recall talking to Bob Persons about that, and he said no.
>
> Q      Right.
> A      And then shortly thereafter, off we go into the stratosphere.
>
> Q      What's the stratosphere?
> A      Allen wound up becoming extremely angry right after looking at that note and being asked did you ever give Ted Stevens a bill for the work you had done.  He spins off into Dave and Rocky, how they screwed everything up.  There was no paper work, there were no invoices. . . .

Deposition of J. Bottini, Dec. 17, 2009, at 446-447.

After that "blow-up", a 15-minute break was taken to allow Mr. Allen to "cool down". *Id*. at 492-493.

Mr. Bottini testified that, when the interview resumed, he and his colleagues exchanged the following emails (*id*. at 492-493):


| From: | Marsh, Nicholas |
|---|---|
| To: | Bottini, Joe (USAAK); Goeke, James (USAAK); Sullivan, Edward |
| Sent: | Tue Apr 15 12:13:46 2008 |
| Subject: | am I pushing too hard? |

372

-----------

| From: | Bottini, Joe (USAAK) [mailto:Joe.Bottini@usdoj.gov] |
| Sent: | Tuesday, April 15, 2008 4:15 PM |
| To: | Marsh, Nicholas; Goeke, James (USAAK); Sullivan, Edward |
| Subject: | Re: am I pushing too hard? |

Let's call it for today.....

-----------

| From: | Marsh, Nicholas |
| Sent: | Tuesday, April 15, 2008 4:15 PM |
| To: | Bottini, Joe (USAAK); Goeke, James (USAAK); Sullivan, Edward |
| Subject: | RE: am I pushing too hard? |

Ok. Thanks.

-----------

| From: | Sullivan, Edward |
| Sent: | Tuesday, April 15, 2008 4:22 PM |
| To: | Marsh, Nicholas; Bottini, Joe (USAAK); 'Goeke, James (USAAK) |
| Subject: | RE: am I pushing too hard? |

We may want to talk to Bundy immediately afterwards and get him to push BA on this issue and get him to focus. BA's position makes no sense and is directly contradicted by his contemporaneous acts.

I'd also like to push BA re: why TS is asking for a bill in 10/02 and 11/02. The timing is bothering me. Is it b/c the project is out of control? Only VECO guys are on the site? Neighbors are snooping around? Public is about to find out?

-----------

| From: | Marsh, Nicholas |
| Sent: | Tuesday, April 15, 2008 4:24 PM |
| To: | Sullivan, Edward; Bottini, Joe (USAAK); 'Goeke, James (USAAK)' |

373

Subject:     RE: am I pushing too hard?

Re: #2, do you think it's probably that his friend Torricelli withdrew from his reelection campaign a week before the 10/02 note?

-----------

From:      Sullivan, Edward
Sent:      Tuesday, April 15, 2008 4:27 PM
To:        Marsh, Nicholas; Bottini, Joe (USAAK); 'Goeke, James (USAAK)'
Subject:     RE: am I pushing too hard?

Could be. Could also be that it's a wink and a nod -- that he knows BA won't send him an invoice, but he can paper the file. Could be a lot of things. I was hoping BA might be able to shed some light on the timing/context.

-----------

From:      Marsh, Nicholas
To:        Sullivan, Edward; Bottini, Joe (USAAK); "Goeke, James (USAAK)";
Subject:     RE: am I pushing too hard?
Date:      Tuesday, April 15, 2008 4:29:14 PM

Sorry -- I thought we all believed it's a wink and a nod, and we're just trying to figure out why TS was nervous at that particular moment and decided to paper the file with something. Am I wrong?

Emails between N. Marsh, J. Bottini, J. Goeke and E. Sullivan, dated April 15, 2008 (DOJ Bates nos. CRM16532-533).

During the post-trial investigation by the O'Brien Team, Mr. Marsh was asked about these emails. He stated that they might relate to a false statement Mr. Allen made to protect his son:

MARSH was displayed a printout of an email from Department of Justice, Public Integrity Section, Attorney EDWARD SULLIVAN to MARSH,

374

BOTTINI and GOEKE. The email is dated April 15, 2008 and subject line is, RE: am I pushing too hard. MARSH advised he does not recall a meeting at this time, but that it is clear from the contents of this email chain the prosecutors were talking with ALLEN. . . . MARSH advised it appeared that emails were occurring during the course of the discussions with ALLEN. MARSH cannot recall exactly what he was referring to with the line, am I pushing too hard. MARSH cannot recall what area of questioning may be occurring or which documents he was possibly reviewing if any. . . .

MARSH believes the email, RE: am I pushing too hard, may be related to the time when ALLEN was not being candid and had lied about his son's involvement in a bribe payment. MARSH advised ultimately ALLEN did admit he had been lying in an attempt to protect his son. It is possible these emails relate to that situation but he cannot say definitively. MARSH cannot recall, but would assume, an agent was present. MARSH cannot recall if an agent was present because he cannot recall the meetings. MARSH was unaware if an FD-302 had been created relating to these interviews.

FBI 302 of Interview of N. Marsh on March 18 & 19, 2009, at 8-9 (DOJ Bates no. CRM000752-764).[47]

---

[47]The incident described by Mr. Marsh occurred on July 15, 2008, when Mr. Allen failed to disclose to Agent Kepner his payment of a $2000 bribe to Beverly Masek, a member of the Alaska House of Representatives, because he wanted to protect his son who was involved in a previous payment to Ms. Masek. *See* Agent Kepner's 302 of Interview of Mr. Allen on July 16, 2008 (DOJ Bates no. CRM118384); *see also* Agent Kepner's 302 of Interview of Mr. Allen on July 15, 2008 (DOJ Bates nos. CRM118385-387). The government disclosed this false statement in its first *Brady* letter to Williams & Connolly and Mr. Bottini questioned Mr. Allen at trial about the incident during his direct examination. *See* Letter from B. Morris, dated Aug. 25, 2008, to A. Romain, at 2 ("**Prior False Statements to the Government** Bill Allen was recently interviewed concerning a target of an unrelated criminal investigation. During the course of that interview, Allen was not truthful concerning financial benefits provided to an elected state public official. The following day, Allen contacted a government agent and volunteered that he had not been truthful about this subject matter in an effort to protect a family member.")(emphasis in original)(DOJ Bates nos. CRM036476-481); *Stevens*, Trial Transcript, Oct. 1, 2008 A.M., at 100-101.

Mr. Marsh was interviewed again the next day at his request:

On March 19, 2009 a telephonic interview was conducted of MARSH. Present during the interview in person with MARSH were O'Brien, Stuckwisch and Jaffe.

At the initiation of the interview it was explained MARSH had left O'Brien a voice mail indicating that he had more information that he had recalled and wanted to provide.

MARSH advised subsequent to the interview the previous evening he began reflecting on the emails that had been displayed to him. MARSH advised the emails did surprise him, because he had not recalled the events surrounding them. MARSH recalls one specific incident, but cannot say definitely if it relates to these emails and these debriefs of ALLEN.

MARSH was frustrated, at one point approximate to the time frame of the emails, based on one of ALLENS statement [sic] concerning an issue. MARSH explained ALLEN, during a previous OPP [Operation Polar Pen] trial in Alaska, testified during cross examination related to benefits received by STEVENS and his son, from ALLEN. MARSH advised these benefits related to the chalet and other gifts. MARSH stated during cross examination ALLEN was questioned whether the benefits received by STEVENS were a gift and answered that they were not a gift. MARSH advised his direct supervisor, WILLIAM MELCH [sic], had questions concerning what prompted this response and wanted the issue reviewed further. MARSH advised ALLEN was interviewed concerning why he answered in this fashion. MARSH advised they questioned ALLEN and the circumstances surrounding STEVENS request for an invoice related to the boiler. ALLEN responded he didn't know how to find the cost and put the invoice together. MARSH did recall pushing ALLEN about this issue. MARSH was pushing ALLEN because he was a little confused as to why a CEO who ran the company would not be able to get the bill together. MARSH cannot recall whether the time that he was pushing ALLEN concerning this answer took place in person or on the telephone. ALLEN has maintained the same story throughout every interview concerning why he had trouble generating the invoice which led to the trial statement that is [sic] wasn't a gift. MARSH advised the emails on April 15, 2008 and April 18, 2008 may relate to his questioning ALLEN on this issue.

*Id*. at 11-12.

Agent Kepner did not write a 302 of Mr. Allen's interview on April 15, 2008 (Deposition of Agent Kepner, Aug. 24, 2009, at 277) and, as of the date of her deposition, she had not found her notes of that interview.[48]  She acknowledged that FBI rules required the preparation of a 302 for all investigative interviews. *Id*. at 288-289.[49]

During the post-trial investigation by the O'Brien Team, Agent Kepner told FBI investigators that:

---

[48]OPR investigators found Agent Kepner's notes on Jan. 14, 2010, and DOJ provided copies to us on the same day. *See* Email from K. Harris, dated Jan. 14, 2010, to H. Schuelke and B. Shields ("Attached are several documents that we recently received from the FBI . . .These documents include: . . . Mary Beth Kepner's handwritten notes from the April 15, 2008 interview with Bill Allen.  OPR located these notes today in the boxes of material recently shipped from the FBI's office in Anchorage, Alaska.").

[49]The FBI Manual of Administrative Operations and Procedures ("MAOP") provides:

Part II, Section 10 Written Communications
§ 10-13 Reporting Information That May Become Testimony
§ 10-13.3 Recording Results of Information on Report Form (FD-302)
(3) Whenever a person being interviewed could be called upon to testify at any time in the future in a trial, administrative-type hearing, or quasi-judicial proceeding, the results of the interview shall be reported on FD-302 . . . It is not necessary that FD-302 be utilized when the results of the interview with an individual are not pertinent. If the interview goes to the merits of the case or is of value to the USA for the purpose of determining the desirability of prosecution, the interview shall be recorded on FD-302. . .
(13) On occasion, an Agent will be requested to participate in an interview with an Assistant United States Attorney or with a Department of Justice attorney and will be specifically directed not to record the interview on an FD-302.  Because of the disadvantage that this would create for the Agent should he/she be later called to testify concerning that interview, if such a request is made, the Agent should decline to participate in the interview and should not be present when the interview takes place.

FBI MAOP, Part 2, § 10-13 (3 & 13)
http://vault.fbi.gov/maop/maop-part-07-of-07/view (at pp. 36 & 39-40)(last visited November 14, 2011).

no FD-302 was ever prepared because it was her recollection that the debriefing of Bill Allen did not go well.  Specifically, SA Kepner stated that on 4/15/08, while debriefing Allen, she and AUSA Joseph Bottini were having a difficult time keeping Allen focused on the subject matter of the debriefing.

> FBI SSA/CDC Eric Gonzalez's 302 of Interview of Agent Kepner, dated March 28, 2009 (DOJ Bates no. CRM000838).

Agent Kepner testified that the above-quoted statement from the 302 by Agent Gonzalez is inaccurate:

> Q    What about it is inaccurate?
> A    Well, when he adds on the end, "it did not go well," that implies that I intentionally didn't write something up because it was negative for the case, and that was not -- that's not the impression that I was trying to relay to Eric Gonzalez.
>
> Q    What would be an, in your view, an accurate account of what you told him?
> A    That the debriefing -- that I couldn't get him focused on the debriefing subject. And to be honest, I'm speculating, in terms of why there is no 302. I don't know why no 302 was prepared. But I know it was not intentionally to hide some sort of exculpatory information.
> But I do not know, for the life of me -- I've wracked my brain, trying to figure out why, you know, there is no report and there is no notes –

> Deposition of Agent Kepner, Aug. 24, 2009, at 282-283.

*See also id*. at 274 ("Right, but I can't find any notes.  So either I didn't take them, or I took them and lost them.").[50]

---

[50]During her sworn testimony in the OPR investigation, Agent Kepner identified two other interviews of Mr. Allen, on Sept. 20 and Dec. 29, 2006, that were not reported in any 302. Six pages of undated, handwritten notes by Agent Kepner of an interview of Mr. Allen, which were she found in March 2009, correspond to notes taken by Mr. Bundy during an interview conducted on Sept. 20, 2006, a few weeks after Mr. Allen began cooperating in the Polar Pen

(continued...)

Mr. Allen testified in this investigation and confirmed that when he met with the prosecutors and Agent Kepner in April, 2008, he was shown the Torricelli note and he told them that he did not remember if he spoke to Bob Persons about Senator Stevens's requests for a bill.[51] Deposition of B. Allen, March 6, 2010, at 20. After the meeting, Agent Kepner told him that "you need to think a little bit

---

[50](...continued)
investigation. In Re: Investigation of Misconduct Allegations, OPR Interview of Agent Kepner, Feb. 18, 2010, Exh. 22, at 329-338. Mr. Bundy's ten pages of notes reflect that Mr. Goeke, Agent Joy and Agent Kepner attended this interview. Notes of R. Bundy of Interview of Mr. Allen on Sept. 20, 2006, at 1 (Bates nos. RB-AWP000041-000050). Agent Kepner testified that no 302 was written for this interview. In Re: Investigation of Misconduct Allegations, *supra*, at 339. Agent Kepner's notes reflect a detailed discussion of the renovation of Senator Stevens's home in Alaska, including the following entries: "Never saw invoices. Doesn't know if VECO invoiced Ted for work on his house. Bill would want to bill ted", "Should have cost 100K-125K if done correctly", "Rocky [Williams] and Dave [Anderson] were alcoholics", and "VECO paid to get Rocky Alcohol treatment". *Id.*, Exh. 22.

On Aug. 21, 2009, a clerk in the FBI's Anchorage office found a steno notebook containing five pages of notes by Agent Kepner of an interview of Mr. Allen on Dec. 29, 2006. *Id.*, Exh. 15. OPR discovered, and Agent Kepner confirmed, that no 302 was written for this interview. *Id.* at 269 & 271. These notes contain the following entries, among others, regarding the renovation and one of the car swap transactions: "Cathy [Stevens] talked w/Rocky. Cathy liked Rocky, when Rocky left, Cathy was upset. Ted and Cathy were told at some point that Rocky quit", "Bill didn't have a lot of conversations w/ted and Cathy about the progress - Bob Persons and Rocky did" and "Bill said Land Rover worth 20K and difference was 13K. Conversation with Lilly [Stevens]. Bill told Lilly he owed Ted for guns and she said no I need to pay for it". *Id.*, Exh. 16, at 268.

OPR's investigation also discovered that, during and after the trial of Senator Stevens, Agent Kepner created two 302s of interviews of Mr. Allen conducted by her in September 2006 which she backdated to make it appear that they were written in September 2006. Agent Kepner confirmed in sworn testimony to OPR that she backdated those 302s, including one that was written in connection with the *Brady* letter and another that was created in May 2009, when she discovered notes of interviews for which she could not find corresponding 302s. *Id.* at 119-120 & 138. Those backdated 302s were not provided to Williams & Connolly despite the Court's order to provide all 302s to the defense. Agent Kepner testified that she did not know that those 302s were not provided to Williams & Connolly and that she must have forgotten to include them in the production. *Id.* at 148-150.

[51]Mr. Allen cooperated with this investigation by providing testimony and other information. He was deposed on March 6, 2010, at the Bureau of Prisons, Federal Correctional Institution in Terminal Island, California where he is serving a 36-month sentence imposed by U.S. District Judge John W. Sedwick on Oct. 28, 2009.

more what they really -- what people -- what they really done" and that the prosecutors "were upset . . . that I didn't do very good". *Id*. at 27 & 28. Agent Kepner told him the prosecutors "weren't very happy", but she did not tell him why they were unhappy. *Id*. at 31 & 32.

Mr. Bottini testified that at the end of the meeting on April 15, 2008, Mr. Bundy was asked to "talk to Bill and clear up what he's saying when he says I didn't want Ted to pay for it, but I knew I had to send him a bill." Deposition of J. Bottini, Dec. 17, 2009, at 499-500. According to Mr. Bottini, Mr. Allen "cleared that up" in the next meeting on April 18, 2008:

> My notes for April 18th reflect they came back and cleared that up, and what Bill was trying to say, Mr. Allen was trying to say is in 2002, when I get this note, I didn't want to send him a bill. I didn't want Ted to pay for it.

> *Id*. at 500.

5.      April 15 & 18, 2008      The Value of VECO's Work on Senator Stevens's Home

a.      Mr. Allen told Mr. Bottini, Mr. Goeke, Mr. Marsh, Mr. E. Sullivan and Agent Kepner that the value of VECO's work on Senator Stevens's home was approximately $80,000 and not $250,000, the amount later alleged in the indictment

Mr. Allen testified that, during the interview on April 15, 2008, he told the prosecutors and Agent Kepner that, if he had billed Senator Stevens for the value of VECO's work, "around [$]80,000", Senator Stevens would have paid the bill, and that "they didn't like that":

> Mr. Allen:   . . . they asked me about Ted, and I said, If Ted would -- if I had to give Ted a bill, he would have paid for it. But I told him that I don't think that it's 250,000. Probably be around 80,000.

>  BY MR. SHIELDS:
> Q.     Dollars?

A.   Yes.  And they didn't like that, according to -- well, all I know was
     they were upset, according to what Mary Beth [Kepner] told me, that
     I didn't do very good.

                          *   *   *

Q.   Okay.  What do you recall her saying?

A.   She just said they felt I didn't do very good.  So I said, Well, I'm
     telling you the truth. So when me and Bundy got out by ourselves, I
     said, Man, they didn't like very much what I done.  And he said, Well,
     they didn't. . . .

Deposition of B. Allen, March 6, 2010, at 27-29.

Mr. Bundy testified that, during the meeting on April 15, 2008, Mr. Allen
was "pretty vociferous" in maintaining that the value of VECO's services was not
$250,000 and could not have been more than $80,000. Deposition of R. Bundy,
Nov. 4, 2009, at 63.  The government's position was "more or less we have the
VECO books that show $250,000 was billed to this.  And that was sort of the
impasse." *Id*. at 69.

The notes taken by Mr. Bottini, Mr. E. Sullivan, Agent Kepner and Mr.
Bundy confirm that Mr. Allen told them on April 15, 2008 that VECO's work on
Senator Stevens's home was worth about $80,000:

- Mr. Bottini's notes:
    – Dave & Rocky screwed this up -
        \Cost so much $ b/cuz of
         their incompetence, being drunk -
        \Not efficient.
    – Even if they had done it right -
        \it would have cost about 80K
        \cost something like 250K!?
  - Rocky/Dave –
        \Screw offs – not there to
        direct the VECO employees –
        BA believes that this added
            to the cost, etc.

381

(DOJ Bates nos. CRM13707);

• Mr. Sullivan's notes:
        - DA/RW [D. Anderson/R. Williams] always drunk. screwed the
        project up; allowed
        the workers to waste time; sit around;
        inefficient. Didn't supervise well.
        * But, if they had done the work efficient
        then FMV = $80,000 (estimate)

(DOJ Bates nos. CRM044071);

• Agent Kepner's notes:
        projects costs minimal for VECO.
        VECO work 80,000-100,000.

(DOJ Bates nos. CRM118394);

•      Mr. Bundy's notes:
        BA - knew would had to give
            Ted some invoices
            - but never got invoices
            - Bill thought about $80k
             would have been OK
             for what VECO did on
             house
        Bill would have thought he would have
            had some invoices
        If Bill would have got invoices
            from VECO empl. he
            would have cut back
            a lot on invoice for Ted
            if the VECO invoices were $250k or
            anything like that

(Bates nos. RB-AWP000328).

On April 18, 2008, Mr. Allen met again with Mr. Bottini, Mr. Goeke, Agent Kepner and Mr. Marsh (by phone); Mr. E. Sullivan did not participate in this interview. *See* Deposition of E. Sullivan, Jan. 6, 2010, at 314; Email from N. Marsh, dated April 18, 2008, to E. Sullivan, Subject: "BA on phone" ("When you get back, if you want to be patched in just let me know and I'll do so.") (DOJ Bates no. CRM053835). Mr. Allen testified that he reiterated that the value of VECO's work was about $80,000:

> Q. You met with them on or about April 15th, they showed you this note, you told them about what you thought the value of the work that VECO did for Senator Stevens was worth; right?
>
> A. Yeah.
>
> Q. And then you met with them again a few days later?
>
> A. Yes.
>
> Q. And you explained to them again why you thought it was worth $80,000 and not $250,000?
>
> A. Yes.
>
> Q. And the number 250,000, that was coming from Agent Kepner?
>
> A. Yes.
>
> Q. And from the prosecutors?
>
> A. I know it came from Mary Beth, but I don't know if the prosecutors said that or not.
>
> Q. And correct me if I'm wrong, you had several conversations with just Mary Beth Kepner about this subject?
>
> A. Yes.
>
> Q. Not just the times you met with the prosecutors. There were other times when you and she discussed this?
>
> A. Uh-huh, yeah.

Deposition of B. Allen, March 6, 2010, at 36-37.

Mr. Allen and Agent Kepner "had a lot of arguments" about the value of
VECO's work:

Q.    We were talking about after the first time you were shown this note
      from Senator Stevens.  As you were leaving, Agent Kepner said the
      prosecutors weren't happy with what you had to say.
A.    Yeah.

Q.    Did you ever find out what they were unhappy with?  At any time.
A.    You know, I think it was in that meeting. Mary Beth, before even the
      meetings, before that, she would tell me that 200 -- it was worth about
      250,000.  And I said, Mary Beth, it couldn't be that much.  I said,
      Hell, the house is not worth that. Well, you look at all the -- look at
      what all happened.  And then they had a camera in each room and
      you'd go -- they'd say, Okay, what happened here?  What happened
      there?  What did you do here?
                         *   *   *
Q.    [Augie Paone had] already given the bill to Ted Stevens?
A.    Yes, somewhere in there.  And I said, Mary Beth, that doesn't add up.
      I said, it's -- I know there was a lot of labor there, but it wasn't
      efficient.  Rocky and Dave didn't do their job.  And I said that from
      the beginning until -- but they wanted the 250,000 from VECO.  And
      they may have had that much labor on the thing.

Q.    They may have had that much labor charged to the job?
A.    Yes.

BY MR. SHIELDS:
Q.    When you say they wanted 250,000, who is "they"?
A.    Mary Beth.

Q.    Just Mary Beth?
A.    Mostly it was just her, yeah.  I don't think Joe or any of them ever did
      push the 250,000.

Q.    Now, the conversation you just described, did that happen before the
      meeting that we were talking about earlier on April 15th when they

384

showed you this note along with other documents?

A.     You know, I can't remember if it was on that meeting, but I know that I had a lot of arguments with Mary Beth about the 250,000.

*Id*. at 33-35.

Mr. Allen explained to Agent Kepner that he had the same problem when VECO renovated his home: "And I'd tell her this. I'd say, Hey, they redone my house. And I said, My God, by the time it was over, it was $900,000. And I said, so I – this same thing has happened at Ted's house." *Id*. at 38; *see also* Grand Jury Testimony (Alaska) of C. Boomershine, VECO accounting systems manager, Feb. 8, 2007, at 31 (VECO job cost report for remodel project on Mr. Allen's house reflected total costs of $902,000) (DOJ Bates no. CRM001692).

Mr. Bundy's two pages of notes of the interview on April 18, 2008, reflect that Mr. Allen was shown a VECO cost spreadsheet and invoice for work done on Senator Stevens's home and he maintained that the value of the work was $80,000 had it been "done right":

> 4/18/08     B. Allen, J. Bottini, J. Goeke
>                    MB Kepner
>                               *   *   *
> VECO spreadsheet job cost detail – Girdwood
>          - VECO 00002502 - invoice VECO AK -> VECO Corp
>            approved by Bill Allen
>            with back-up
> Bill only concerned that work was getting
>          done –  not accounting details
> –  BA didn't know how much
>      billed until – showed by FBI in '07
> After Bill's house problem, he assumed
>          TS's would be a problem too.
>          – blew the budget
>                               *   *   *
> figured it would have been about
>          $80K if done right

Notes of R. Bundy of Interview of Mr. Allen on April 18, 2008 (Bates nos. RB-AWP000330-331).

*See also* Deposition of R. Bundy, Nov. 4, 2009, at 161-162 & 164 (Mr. Bundy read his notes into the record).

Mr. Goeke's notes (two pages) contain the following entry: "2004 - - - - had to do something with Ted - [illegible] work done $80,000 or so." Notes of Mr. Goeke of Interview of Mr. Allen on April 18, 2008, at 2 (emphasis in original)(DOJ Bates nos. CRM000780-781). Mr. Bottini's notes (1½ pages; DOJ Bates nos. CRM013686-687) and Agent Kepner's notes (one page; DOJ Bates nos. CRM000773) contain no reference to any statement by Mr. Allen regarding the value of VECO's work. Mr. Marsh could not find any notes taken by him of the interviews of Mr. Allen in April, 2008. Deposition of N. Marsh, Feb. 2, 2010, at 367–368. Agent Kepner did not write a 302 for the interview of Mr. Allen on April 18, 2008. Deposition of Agent Kepner, Aug. 24, 2009, at 277.

Agent Kepner wrote at least 62 FBI 302s reporting on meetings and interviews of Mr. Allen during the period from August 30, 2006, through Sept. 16, 2008, including a detailed, six-page 302 of the occasion, described in the excerpt of Mr. Allen's deposition testimony quoted above, when he was shown pictures of "each room and . . . they'd say, Okay, what happened here? What happened there? What did you do here?". *See* Deposition of B. Allen, March 6, 2010, at 33; *see also* Agent Kepner's 302 of Interview of B. Allen on Nov. 2, 2007, dated Nov. 2, 2007 ("[Mr. Allen] reviewed a number of photographs, both still and spherical, of SENATOR TED STEVENS' home located in Girdwood, Alaska.")(DOJ Bates nos. CRM005971-5976). However, with the exception of a 302, dated Sept. 9, 2008 (described below), none contains any reference to Mr. Allen's statements that the value of VECO's work was significantly less than the amount reflected in VECO's books and records. *Compare* Deposition of B. Allen, March 6, 2010, at 35 ( ". . . I know that I had a lot of arguments with Mary Beth about the 250,000.").

In 2007, Agent Kepner testified in the grand jury that Mr. Allen's initial estimate of the value of VECO's work was "about $100,000" but he did "not contest" the "substantially higher" value reflected in VECO's records:

| Mr. Goeke | Okay, approximately how much -- well, what types of and how much value has Mr. Allen provided for the Girdwood residence in terms of renovations and materials that, that VECO or Bill Allen has paid for? |
| --- | --- |
| Agent Kepner | His estimate is quite a bit lower than what we've been able to show from VECO Corporation records. He's seen those records now and he acknowledges that, but when we first -- sorry about that -- when we first inquired about that, I think his estimate would probably have been about $100,000 when we first asked him those sorts of questions. |
| Mr. Goeke | Right, and Mr. Allen has been shown documents that place the value -- at least the value that VECO Corporation has placed on those improvements at, at Girdwood to be substantially higher than that? |
| Agent Kepner | Yes. |
| Mr. Goeke | *And Mr. Allen does not contest that?* |
| Agent Kepner | *That's correct.* |

Grand Jury Testimony (D.C.) of Agent Kepner, May 9, 2007, at 35-36
(emphasis added) (DOJ Bates nos. CRM004075-4076).

b.   Although the prosecutors anticipated that Senator Stevens would assert as part of his defense that "the $250K value of VECO's work is over-inflated", they never disclosed Mr. Allen's statements that the value of VECO's work was $80,000

The indictment alleged that the value of VECO's work was $250,000:

 2000-2006: Improvements to the Girdwood Residence by VECO 

Beginning in the spring and summer of 2000, STEVENS and ALLEN discussed whether VECO could renovate the Girdwood Residence. After

that conversation, spanning over the next approximately six years, STEVENS accepted from ALLEN and VECO more than $250,000 in free labor, materials, and other things of value in connection with the substantial renovation, improvement, repair and maintenance to the Girdwood Residence.

*Stevens*, Indictment, Count 1, ¶ 19 (emphasis in original).

Months before the indictment was filed, prosecutors informed AAG Fisher that one of "Stevens's best arguments at trial" and "strongest defenses" would be an attack on the value of VECO's work:

I.    STEVENS' Best Arguments/DOJ's Best Responses

Last week, you requested that we set forth what we anticipate will be STEVENS' best arguments at trial, along with our proposed responses to those arguments. Accordingly, annexed hereto as Exhibit A is a chart that presents STEVENS' strongest defenses and our responses to them.

* * *

Attacks

* * *

Value of the work was not worth what VECO's billing records/other invoices reflect: Here, TS would suggest that the $250K value of VECO's work is over-inflated. This could take a number of forms, including (a) comparisons of actual or assessed value over time, (b) analysis of work performed by an expert/neutral third party, and (c) suggestions of ineffiencies [sic], shoddiness, or other similar overruns on VECO's part.

Responses

* * *

Inconsistent with rapid increase of assessed value for house over time. Wildly inconsistent with the material issues in the case. Irrelevant whether VECO's benefits were worth $250K or $150K, because the question is whether TS knew that the value was greater than $260 per year.

>     Memorandum to Alice S. Fisher, dated April 11, 2008, from William
>     Welch and Brenda Morris, at 1 and Exh. A (emphasis in original)
>     (DOJ Bates no. CRM016377-395).

The memorandum to AAG Fisher did not disclose that Mr. Allen, "the Chief
Executive Officer and part-owner of VECO" (Indictment, ¶ 4), had told Agent
Kepner in 2007 that the value of VECO's work on Senator Stevens's home was
about $100,000. *See* Grand Jury Testimony (D.C.) of Agent Kepner, May 9, 2007,
at 35-36 (DOJ Bates nos. CRM004075-4076).

　　Prosecution memos written before and after the interviews of Mr. Allen on
April 15 & 18, 2008 stated, in identical language, that the value of the VECO's
work on Senator Stevens's home was more than $250,000:

>     II.　　Benefits Provided By VECO To STEVENS Relating To The
>     　　　Girdwood Residence
>
>     Of the benefits charged in the proposed Indictment, the largest and most
>     significant is the home renovation work and repair done by VECO at the
>     Girdwood Residence. Spanning seven years and totaling more than
>     $250,000 in value, VECO's home renovation benefits were both substantial
>     and consistent.
>
>     Prosecution Memorandum, dated March 3, 2008, at 4 (emphasis in original)
>     (DOJ Bates nos. CRM014142-203).

*See also* Prosecution Memorandum, dated March 14, 2008, at 4 (same) (DOJ
Bates nos. CRM015438-015497); Prosecution Memorandum, dated May 15, 2008,
at 4 (same) (DOJ Bates nos. CRM017063-017140); Prosecution Memorandum,
dated May 21, 2008, at 4 (same) (DOJ Bates nos. CRM048387-465).

None disclosed Mr. Allen's statements that the value of VECO's work was
significantly less than $250,000.

　　The prosecutors calculated the $250,000 figure using a VECO record, the
"'Boomershine Cost Report'", which reflected that VECO's "Quantified Costs"
on the Girdwood Residence, from October 2000 to April 9, 2001, were

$188,928.82; the balance of the government's $250,000 figure was calculated using actual and estimated costs for work performed from 2002 to 2006. *See* Prosecution Memorandum, dated May 21, 2008, at 18-20 & 33 (DOJ Bates nos. CRM048387-465). The "Boomershine Cost Report", which became government exhibit ("GX") 177, was substantially redacted during the trial at the Court's instruction when Williams & Connolly discovered that it included labor costs for VECO employees, Rocky Williams and David Anderson, for periods when they were not working on Senator Stevens's home. *See Stevens*, Trial Transcript, Oct. 8, 2008, P.M., at 90-91. The elimination of those expenses reduced the total cost recorded on GX 177 ($188,928) by at least $80,000. *See Stevens*, Trial Transcript, Oct. 21, 2008 A.M., Summation by Brendan Sullivan, at 97 ("It's Exhibit 177. It's going to be blacked out. There will be some blocking on it. . . . But at least $80,000 of that bill has been thrown out the window in the blocking.").

The prosecutors never disclosed to Williams & Connolly the statements by Mr. Allen on April 15 & 18, 2008 that the value of VECO's services was about $80,000, less than one-third of the amount alleged in the indictment. Although the second *Brady* letter purported to disclose statements made by Mr. Allen "[f]rom August 30, 2006 to the present", the only disclosure made regarding the value of VECO's work was that Mr. Allen "felt that VECO's costs were higher than they needed to be":

> 17.  From August 30, 2006 to the present, Allen has made the following statements:
>
> * * *
>
> c.  Allen stated that on at least two occasions defendant asked Allen for invoices for VECO's work at the Girdwood residence. Allen stated he never sent an invoice to defendant or caused an invoice to be sent to defendant. Allen stated that he believed that defendant would not have paid the actual costs incurred by VECO, even if Allen had sent defendant an invoice, because defendant would not have wanted to pay that high of a bill. Allen stated that defendant probably would have paid a reduced invoice if he had received one from Allen or VECO. *Allen did not want to give defendant a bill partly because he felt that VECO's costs were higher than they needed to be*, and partly because he simply did not want defendant to have to pay.

390

*Brady* Letter, at 3 (emphasis added) (DOJ Bates nos. CRM095717-721).

Mr. Marsh wrote this paragraph on the evening of Sept. 9, 2008, shortly before the *Brady* letter was emailed to Williams & Connolly. *See* Deposition of N. Marsh, Feb. 2, 2010, at 122-123 & 125; Email from E. Sullivan, dated Sept. 9, 2008 (8:36 p.m.), to B. Sullivan, *et al*. ("Attached is a letter addressing Brady-related issues.") (DOJ Bates nos. CRM022546-551).

Mr. Marsh testified that on Sept. 9, 2008, Agent Kepner told him and Mr. Bottini about a statement by Mr. Allen, that Senator Stevens "would have paid for any invoice that he received", which was contained in a spreadsheet that summarized *Brady*/*Giglio* information contained in FBI 302s. Deposition of N. Marsh, Feb. 2, 2010, at 121 & 123.  Agent Kepner told Mr. Marsh and Mr. Bottini that she did not believe the entry was correct, which caused them to become concerned about the reliability of the information in the *Brady* spreadsheet. *Id*. at 123-124.

In the interests of accuracy, Mr. Marsh directed Agent Kepner to call Mr. Allen immediately:

> What I asked Mary Beth to do was to call Bill Allen and ask him about the statement. Not ask him to confirm or deny any particular statement, but ask him what his reviews [sic] were on whether Stevens would want to pay -- what he thought Stevens would want to do.
> She came back with a detailed statement that said he thought Stevens would have paid reduced invoices but wouldn't have wanted to pay the full thing and he didn't send Stevens a bill partly because he thought -- he felt bad for Stevens.
> That seemed to me to be consistent with what Mary Beth was telling me. It also seemed to be consistent with what Joe and I remembered as ultimately reflected in the search warrant affidavit, so I plugged it in.
> What I was concerned about was trying to be accurate. It didn't seem like we had accurate information.

> *Id*. at 126-127.

Mr. Marsh testified that he "literally spent probably three to five minutes on this entire thing, on this issue." *Id*. at 125.

Agent Kepner testified that she called Mr. Allen, at Mr. Marsh's direction, to ask him a question which had never been asked before:

Agent Kepner       Nick called me into his office, and asked me a series of questions that related to would Ted Stevens have paid an invoice of $188,000 if he was given it, and other questions. I could not answer -- I didn't know the answers to the questions that Nick Marsh was asking.

\* \* \*

Q    What would he have said, or what did he say, or --

A    What did he say, and I didn't have an answer, because I didn't ever ask him that question.

\* \* \*

Q    All right. And do you remember specifically what Mr. Marsh asked you about that subject, about Bill Allen's statements about that subject?

A    I remember him specifically asking a question along the lines, you know, "What did Bill say -- did Bill say if Ted would have paid an invoice this high?"

\* \* \*

Q    What -- you've told us that the subject of invoices had been addressed, at least in part, during the earlier interviews. Do you recall what specific information was included in Mr. Marsh's question that had not been included?

A    We had never talked with -- I don't believe we had ever talked with Bill Allen about what the grand total, from what we found on the VECO spreadsheets -- we had never talked to him about those figures, is my recollection. So, this was -- you know, I guess in the indictment they had charged $188,000. And so Nick's question was, you know, "If Bill Allen had sent that to Ted, did he think Ted would have objected, or would he have paid that invoice?"

Deposition of Agent Kepner, August 24, 2009, at 89-93.

Agent Kepner spoke with Mr. Allen on the phone for five to ten minutes, took no notes, reported his response to Mr. Marsh who added it to the *Brady* letter. *Id*. at 96-97 & 101-102.

392

Agent Kepner testified that Mr. Marsh "seemed pleased by the answer." *Id.* at 119-120. *Compare United States v. Kott*, CR no. 3:07-cr-00056-JWS (Dkt. No. 412-3), Joint Motion to Substitute Redacted Appendices B, C, F, and G for Sealed Appendices B, C, F, and G (Dkt. No. 405), filed Oct. 21, 2009, Appendix C ("*Brady* Documents Released by Government Filed Under Seal"), at Appendix C-48 (Email from N. Marsh, dated Sept. 10, 2007, to W. Welch and B. Morris: "Allen is a horrible witness. No shock there, but he's been backsliding significantly on us the past day or two. He has now taken to volunteering, even when not asked, things like 'Pete Kott was my friend' and 'he never extorted me.' We finally had a heart-to-heart with him tonight where we went through the tapes again and talked to him about his own statements, on the tapes, where he linked the VECO job to gaining Pete's official support. He seemed to get it by the end. I think he's in a good place right now, but the guy is like mercury on a plate glass window. We won't know what we'll get until he takes the stand.").

Agent Kepner testified that one week later, Sept. 16, 2008, she wrote a 302 of that conversation with Mr. Allen, by copying ¶ 17(c) of the *Brady* letter, in order to comply with the order issued that day by Judge Sullivan which directed the prosecutors to produce the information contained in the *Brady* letter to the defense in useable format. Deposition of Agent Kepner, Aug. 24, 2009, at 96-97 & 102-103; *see also Stevens*, Trial Transcript, Sept. 16, 2008, at 30 ("THE COURT: All right. I'm going being to direct that the government produce the redacted 302s and do it by tomorrow."). Her one-paragraph 302 duplicates ¶ 17(c) of the *Brady* letter:

> [Mr. Allen] said that at least on two different occasions, TED STEVENS asked him[] for an invoice for the work that VECO Corporation performed on STEVENS' Girdwood residence. [Mr. Allen] never sent an invoice to STEVENS because he[] wasn't sure how to produce an invoice. If [Mr. Allen] had sent an invoice for the actual costs incurred by VECO, [Mr. Allen] does not believe that STEVENS would have paid it because STEVENS would not have wanted to pay that high of a bill. [Mr. Allen] thought that STEVENS would probably have paid a bill from VECO if it was a lesser amount than the actual costs. Part of the reason that [Mr. Allen] did not want to provide an invoice was that *[Mr. Allen] felt that VECO's costs were higher than they needed to be.* The other rationale was that [Mr. Allen] simply wanted to do the work for STEVENS.

Agent Kepner's 302 of Interview of B. Allen on Sept. 9, 2008, dated Sept. 16, 2008 (emphasis added) (DOJ Bates no. CRM043293).[52]

      c.      The value of VECO's work and the cost of the renovation were significant, contested issues throughout the trial

      i.      Opening Statements

Ms. Morris declared in her opening that VECO kept track of the cost of its work on Senator Stevens's home "down to the penny", though it could be "a little high" or "a little low":

> VECO kept track of most of the costs right down to the penny. You'll see VECO's internal billing system and accounting records for the chalet project, and you'll see that VECO's portion of the work during this period of time and VECO's cost totaled more than $188,000, again during this period of time. That figure, $188,000, could be possibly a little high because VECO built oil wells, not houses. They probably could have been a little more efficient at times, but, hey, the cost is always good when the price is free. So you'll always learn that the same figure – you may also learn that the same figure is a little low because the architect, Hess' time was billed in there along with the electricians and some other stuff, but at the end of the day, whether it's $188,000 or whether it's $240,000 or whether it's $120,000, the defendant still got it for nothing.

*Stevens*, Trial Transcript, Sept. 25, 2008 A.M., at 42.

Brendan Sullivan's opening addressed the valuation issue in the case by describing the tax assessment of Senator Stevens's home before the renovation (land: $50,000; structure: $70,000), a bank appraisal which estimated that its value after the renovations were completed would be $202,000, and the $150,000 in financing arranged by Senator Stevens and Mrs. Stevens to pay for the renovations ($50,000 from a trust and a $100,000 mortgage). *Id*. at 61, 65 & 70. He identified

---

[52]The FBI form used for the report of this interview was FBI 1023, a form used in certain circumstances for confidential sources. For ease of reference, this report uses "302" to identify all FBI memoranda of interviews.

the increase in the value of the renovated home/structure as the difference between its value per the pre-renovation tax assessment ($70,000) and the bank's appraisal ($202,000), and attributed the difference as roughly equivalent to the amount paid by Senator and Mrs. Stevens for the renovation, approximately $130,000 to $160,000, which included approximately $130,000 paid to Christensen Builders: "This project cost them $160,000, and that's about what it should have cost them." *Id*. at 74.

Armed only with the information provided in the *Brady* letter, that "[Mr. Allen] felt that VECO's costs were higher than they needed to be", Brendan Sullivan said little about the government's claim that VECO's costs exceeded $188,000:

> Now, the government states that, and they use the figure $188,000 of labor costs that were unbilled, maybe some other things. It ended up on the VECO books and records.  Never billed, never told about that. . . . *Well, I guess you'll hear from [Mr. Allen] he thought the costs were too high.* His decision, because, you know, in part he sent out his nephew [D. Anderson] to work there. Maybe they spent a little more time than they should have, and if the renovation is really worth $166,000 how can you send a bill for something like all of these other costs that were run up on the VECO bill when Ted and Catherine live three thousand miles away?

> *Id*. at 69-70 (emphasis added).

ii.     Mr. Allen's Testimony, the Pluta 302 and the Redaction of VECO's Cost Report (GX 177)

Mr. Bottini asked Mr. Allen no questions about the total value of VECO's work on direct or re-direct examination.  Mr. Allen's direct examination began on Sept. 30, 2008 and was interrupted when the government disclosed on Oct. 1 that *Brady* information, i.e., statements by Mr. Allen that if he had sent Senator Stevens a bill for the work done on the renovation by VECO then Senator Stevens would have paid it, had been redacted from an FBI 302 written by FBI Agent Pluta (the "Pluta 302").  The redacted Pluta 302 had been provided to Williams & Connolly pursuant to the Court's pre-trial discovery order. *Stevens*, Letter from B. Morris, dated Oct. 1, 2008, to R. Cary ( Dkt. No. 130-10 (Exh. J)); *Stevens*, Trial

Transcript, Sept. 16, 2008, at 30 ("THE COURT: I'm going being to direct that the government produce the redacted 302s and do it by tomorrow.").

On the evening of Oct. 1, 2008, Ms. Morris provided Williams & Connolly with another, less redacted copy of the Pluta 302 containing the *Brady* information and a redacted IRS Memorandum of Interview ("MOI"), which had not been previously provided and which contained the statement by Mr. Allen that "If Rocky Williams or Dave Anderson had invoiced Ted and Catherine Stevens for VECO's work, BILL ALLEN believes they would have paid the bill." MOI of B. Allen, dated Dec. 13, 2006, at 9 (reproduced in *Stevens*, Dkt. No. 130-10, p. 10 of 11 (filed Oct. 5, 2008)). Ms. Morris explained to the Court that the exculpatory information had been inadvertently redacted from the Pluta 302. *Stevens*, Trial Transcript, Oct. 2, 2008 A.M., at 6-9. Judge Sullivan ordered the prosecutors to immediately provide the defense with unredacted copies of all FBI 302s, IRS MOIs and grand jury testimony for all witnesses. *Stevens*, Trial Transcript, Oct. 2, 2008 A.M., at 19 & 20; *id*., Trial Transcript, Oct. 2, 2008 P.M., at 51 & 52-53.

The government provided the defense with unredacted 302s, MOIs and grand jury transcripts; however, Mr. Allen's statements, that the value of VECO's work was about $80,000, were not reflected in any 302, MOI or grand jury testimony and that *Brady* information was never disclosed to Williams & Connolly. Nevertheless, Williams & Connolly lawyers discovered in the documents that were disclosed evidence that VECO's cost report (GX 177) was inflated by the inclusion of labor costs for VECO employees, Rocky Williams and David Anderson, when they were not working on Senator Stevens's home. A motion to dismiss was immediately filed on the ground that the prosecutors had again withheld *Brady* information. *See Stevens*, Senator Stevens' Motion to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct, dated Oct. 5, 2008 (Dkt. No. 130). While that motion was pending, Mr. Allen's direct examination resumed and was concluded.

Brendan Sullivan's cross-examination of Mr. Allen on the value of VECO's work on the home was brief and was restricted to the incomplete information provided in the *Brady* letter, ¶ 17(c) ("[Mr. Allen] felt that VECO's costs were higher than they needed to be.") and to the recently discovered information that the VECO cost report (GX 177) included false entries for Mr. Williams's and Mr. Anderson's time:

Q.      Isn't it a fact that you believe that some of the costs in Ted Stevens'
        house was excessive?

A.      Yes. It was too much money.

Q       It was too much money. In fact, you concluded you were
        embarrassed to bill for some, of the time that Rocky had spent out
        there, or Dave Anderson, right?

A.      Yep.

                                * * *

Q.      And one of the reasons you were embarrassed to send bills was
        because you thought their time was excessive at the Stevens house,
        isn't that clear?

A.      No. No. Here's the problem. They did really screw up on my house. I
        mean, it was way too much, but I never really seen how much time or
        the money that was spent on Ted's house. I didn't really good [sic] -- I
        didn't -- I had never seen an invoice and so I had no idea how much,
        but I thought it was probably going to be too much.

Q.      And that was your conclusion, that it was too much?

A.      Yeah.

Q.      Right?

A.      I had never seen anybody. I mean, I never had seen all the figures on
        it, but I figured it was going to probably be too much.

Q.      Did you ever see the hours of labor that supposedly Rocky Williams
        had spent on the project?

A.      No.

Q.      You never saw them at all?

A.      No.

Q.      Did you ever see the hours that Dave Anderson supposedly spent on
        the project?

A.      No.

Q       So you had no idea whether they were excessive or not excessive?

A       Well, I figured they would be that way, though.

                                397

Q      You figured it would be excessive?
A      Yeah.

Q.     Because you can't just send two people down to Girdwood for months
       and really add value or be that productive, right?
A.     Yeah.

*Stevens*, Trial Transcript, Oct. 6, 2008 A.M., at 91-93;

Q.     Did you indicate [to an FBI agent on Sept. 9, 2008] that part of the
       reason you didn't send a bill was that you felt VECOs costs were
       higher than they needed to be?
A.     I probably told them that, yeah.
                                      *   *   *
Q.     So you were the only guy in the whole world who could figured [sic]
       out a fair bill, right?
A.     That's right.

Q.     You knew it wasn't fair on the books and records; am I right?
A.     Right.

Q.     You couldn't have sent him the bill that was reflected on the books
       and the records, some $188,000. That wouldn't be right, now, would
       it?
A.     Yes, that's right.

*Stevens*, Trial Transcript, Oct. 6, 2008 P.M., at 77 & 79.

    Mr. Allen's testimony ended on Oct. 7, and on Oct. 8, after further briefing
and argument, Judge Sullivan denied the motion to dismiss and ordered the
redaction of the VECO cost report (GX 177):

    THE COURT:      It's very troubling that the government would utilize
                    records that the government knows were false. And
                    there's just no excuse for that whatsoever, and, therefore
                    the sanction for the utilization of those records for
                    Williams and and other gentleman, Anderson, is that
                    they'll be stricken from the evidentiary record and also

                                    398

the jurors will be instructed tomorrow that the
government presented evidence to those jurors that the
government knew was not true and therefore, the court
has stricken the records, the business records for those
two gentlemen, and the Court will instruct the jury not to
consider that evidence at all.

*Stevens*, Trial Transcript, Oct. 8, 2008, P.M., at 90-91.

During the defense case, Mr. Sullivan called two witnesses who testified
about the value of Senator Stevens's home before and after the renovations:
Gerald Randall, an appraiser for the bank which provided a mortgage loan of
$100,000 to finance the renovations, and Shan Forshee, an appraiser for the
Municipality of Anchorage. *Stevens*, Trial Transcript, Oct. 10, 2008 A.M. (G.
Randall) & Oct. 10, 20008 P.M. (S. Forshee). Senator Stevens testified that he
paid the costs of the renovation by mortgaging his home in Alaska for $100,000,
obtaining $50,000 by terminating a trust account and using $10,000 in personal
funds. *Stevens*, Trial Transcript, Oct. 17, 2008 A.M., at 19 & 40; *see also Stevens*,
Testimony of Catherine Stevens, Trial Transcript, Oct. 16, 2008 A.M., at 89
(mortgage loan of $100,000 used to pay for remodeling).

iii. Summations

Mr. Bottini made no reference to VECO's cost report in his summation;
instead, he offered the jury a wide range of values for VECO's work, and argued
that its precise value was not the issue:

- "May it please the Court, counsel, gentlemen, ladies and gentlemen,
  Ted Stevens had a good friend, and his name was Bill Allen. Ted
  Stevens knew that his friend, Bill Allen was wealthy. He knew that
  Bill Allen was generous, and he knew that his good friend, Bill Allen
  would help him and give him *hundreds of thousands* of free
  benefits.";

- "You heard about the renovation, the add-ons, and repairs that took
  place over the years for over seven years. When all was said and
  done, all that work that VECO did down there is worth *well over a*

*hundred thousand dollars.*";

• "It doesn't matter if VECO accounted for these and figured they were *$188,000, $250,000, $100,000, or $50,000. That's not the issue.* The issue is what did he think. What did he think the value of all this work was that was done down there? More specifically, did he think it was worth more than $260 or $305 at any given year.";

• "Now, VECO, as you know, supplied *a substantial amount of labor and materials* that were used in the construction of that home for free, just like the defendant expected.";

• "There's no doubt that VECO spent *a ton of money* on the remodel of that house. . . . Again, the issue is not what the value of VECO [sic] for that work, what does he think it's worth, what does he think that free labor is worth by him?".

*Stevens*, Trial Transcript, Oct. 21, 2008 A.M., at 9, 31, 32, 39 & 51 (emphasis added).

Brendan Sullivan devoted a significant part of his summation addressing the value of VECO's work and the reasonableness of Senator Stevens's and Catherine Stevens's belief that their payment of approximately $160,000 paid for all the work on their home. *See, e.g., Stevens*, Trial Transcript, Oct. 21, 2008 A.M., at 67 ("The Stevens family paid $160,000 plus for this renovation. They paid fair value for what was received."), 73-77 (obtained financing of $150,000 to pay for renovations), 80-86 (slide show of bills paid by Senator and Mrs. Stevens), 86 ("All Rocky Williams signature on Christensen Builders invoices sent to Catherine Stevens. . . . You get a bill. Rocky is signing for Christian Brothers. Would that lead you to conclude Rocky is working with Christian Brothers and being paid on the labor bills of Christensen Builders?") and 97 ("[Veco cost report (GX 177)] is worthless, it's trash. You can do with it what you want. But at least $80,000 of that bill has been thrown out the window in the blocking. It just can't be. It's just out of the case. So this business about $188,000, you can forget that."); *id*., Trial Transcript, Oct. 21 P.M., at 19 ("Ted believed that he paid for [the generator], that it was included in cost, in the $160,000; that's what he believed at the time."), and at 26 ("By the way, no evidence of value is there? The furniture taken out could have been as valuable as the furniture he brought in.").

In rebuttal, Ms. Morris offered no figure for the value of VECO's work and sidestepped the VECO cost report:

> The defendant accepted multiple gifts which were easily valued over $260 to $305. That's all we're talking about.
>
>                     * * *
>
> Now, the defendant can try to argue that there is something wrong with the VECO spreadsheet and that, you know, the dollars fluctuated with regard to how much VECO actually spent on this project. . . . So then finally they had to open a specific coding for Girdwood; still didn't mention Senator Stevens. It just said "Girdwood". . . . So I submit to you, ladies and gentlemen, it's not about the final number of how much VECO paid, Bill Allen paid, for this renovation and the gifts that the defendant received, it's the fact that he knew he got it.

*Id*. at 45 & 55.

      6.      April 24, 2008:    William Arthur, Senator Stevens's archivist, is interviewed

      In their memorandum to AAG Fisher, dated April 11, 2008, the prosecutors noted "two troubling irregularities concerning the October 6, 2002, [Torricelli] note", their "concerns about the document's authenticity" and their plan to schedule an interview the following week with "STEVENS' archivist to explore the manner in which this document was located and produced." Memorandum to Alice S. Fisher, dated April 11, 2008, from William M. Welch and Brenda K. Morris, at 15 (DOJ Bates nos. CRM016391). William Arthur, Senator Stevens's archivist, was interviewed on April 24, 2008. *See* Agent Kepner's 302 of Interview of W. Arthur on April 24, 2008, dated Aug. 17, 2008 (DOJ Bates nos. CRM013809-810). Agent Kepner wrote the 302 almost four months after the interview after a request was made for copies of the 302s of interviews of Senator Stevens's staff. *See* Email from R. Pilger, dated Aug. 15, 2008, to E. Sullivan, Agent Kepner, *et al*. ("Let me have copies of the three staffer transcripts . . . and the 302s"); email from E. Sullivan, dated Aug. 17, 2008, to R. Pilger, Agent Kepner, *et al*. ("Here's most of the 302s for the staffers. We appear to be missing one for Will Arthur, who is a Senate archivist."); email from Agent Kepner, dated Aug. 17, 2008, to E. Sullivan, *et al*. ("Attached is the Will Arthur, the archivist,

302. mbk") (DOJ Bates no. CRM034213).

Messrs. Bottini, Goeke, Marsh, E. Sullivan and Agent Kepner attended the interview of Mr. Arthur which was conducted in Washington, D.C. *Id.* at 1. He was questioned *inter alia* about the handling and storage of Senator Stevens's correspondence, including handwritten notes, and searches conducted for documents as a result of the FBI's investigation. *Id.* The 302 does not reflect that Mr. Arthur was shown, or asked about, the handwritten notes from Senator Stevens to Mr. Allen, dated Oct. 6, 2002 and Nov. 8, 2002 (the Torricelli notes). Mr. Bottini testified that he had a "vague recollection of attending this interview" but did not remember much about it. Deposition of J. Bottini, Dec. 17, 2009, at 596-597.

Mr. Goeke said that Mr. Arthur was interviewed shortly after the Torricelli notes were received by the government and that he was questioned about their provenance. Deposition of J. Goeke, Jan. 8, 2010, at 417 & 418-419. Mr. E. Sullivan testified that he thought that he attended the interview of Mr. Arthur and that the purpose of the interview related to documents that came out of the Senate server. Deposition of E. Sullivan, Jan. 6, 2010, at 314-315. Mr. Marsh remembered that Mr. Arthur was interviewed but thought that the "troubling irregularities" of the Torricelli note were addressed during the interview of Barbara Flanders, Senator Stevens's staff assistant. Deposition of N. Marsh, Feb. 2, 2010, at 390; *see also* Deposition of W. Welch, Jan. 13, 2010, at 52 ("I do recall that was a second primary concern, ensuring those [Torricelli notes] would be admissible at trial because there was a potential issue as to whether or not the letters were authentic.").

|   |   |   |
|---|---|---|
| 7. | May 1, 2008 | Prosecutors interview Barbara Flanders, Senator Stevens's assistant, who exchanged emails with Senator Stevens in December 2002 about Bob Persons "riding herd" on getting bills for the work on the Girdwood residence; no 302 is written |

On April 25, 2008, Williams & Connolly voluntarily produced eight more boxes of documents to the prosecutors. *See* Email from N. Marsh, dated April 25, 2008, to J. Bottini, J. Goeke, E. Sullivan and Agent Kepner ("I did a very quick eyeball of the last eight boxes from W&C (which just arrived about an hour ago). .

. Unless it's hidden, it doesn't appear that we got any invoices from Christensen Builders, Inc., or additional Girdwood renovation information.") (DOJ Bates no. CRM016603).  Among the documents, Mr. Marsh found an email exchange in December 2002 between Senator Stevens and Barbara Flanders, his staff assistant, about invoices expected for work done on his home which Mr. Persons was "riding herd" on:

>From:      Ted Stevens
>To:        Barbara Flanders
>Sent:      Dec. 17, 2002
>Subject:   Re[3]: personal
>
>Barb: there will be bills coming in. I do not expect them before the first of the year, they are not done yet. Bob Persons is riding herd to make sure we get charged for what they have done. Some of it they just did, I didn't order it. thanks. teds
>------------------------
>
>From:      Barbara Flanders
>Sent:      Dec. 17, 2002
>Subject:   Re[4]: personal
>
>Senator,
>I'll watch for the bills and show you everything before payment is made. Barb
>
>DOJ Bates no. CRM016610-611 (brackets in original; dotted line separating emails added).

Mr. Marsh's forwarded these emails to his colleagues the same day they were received, with the comment that "these emails are not good":

>Subject: hmmm
>Everyone should take a look at these. We don't have the prior email correspondence with Flanders, so it's difficult to make sense of these. I would imagine it's in response to Flanders asking about what's going on at the house, which could be good for us, but taken in the abstract these emails are not good.

403

Case 1:09-cr-00056-1-APS Document 335-3 Filed 06/25/21 Page 416 of 526
Case 1:09-mc-00198-EGS Document 84 Filed 05/15/12 Page 415 of 525

Email from N. Marsh, dated April 25, 2008, to J. Bottini, J. Goeke, E. Sullivan and Agent Kepner (DOJ Bates no. CRM016609).

Mr. Bottini agreed and pointed out that the emails were consistent with the Torricelli notes and supported Senator Stevens's defense:

It tracks with the October and November handwritten notes to Bill………….. I agree, not good, but obviously not fatal either.

It does support, however, his inevitable defense that come the following May 15, he was still on the lookout for those invoices for the second deck, the heat tape, etc. Hence, they were most certainly NOT gifts in his mind as of 5/15/03…….

Email from J. Bottini, dated April 25, 2008, to N. Marsh, J. Goeke, E. Sullivan and Agent Kepner (ellipses in original)(DOJ Bates no. CRM016609).[53]

On May 2, 2008, Mr. Marsh sent his colleagues more documents received from Williams & Connolly, including the "precursor email" between Ms. Flanders and Senator Stevens described above:

Folks - here are some hot docs from the most relevant box in the last TS production (Box 43, if you're keeping score at home). . . . We also have the precursor email to the "personal[3]/personal[4]" email we've seen previously. . . .

Nick

[Attachment]
Stevens, Ted (Stevens) _____
Senator,
FYI
Per CAS, I wire transfered $5,000 from your Senate Credit Union account to

---

[53]Senator Stevens was required to file an annual Senate Financial Disclosure Report on or before May 15. *See* 5 U.S.C. § 101(d).

your Wells Fargo checking account in Alaska.
Barb
-------------------------
Subject:       Re: personal
Author:        Ted Stevens
Date:          12/17/2002 8:38 AM
Barb: ok. did we pay off that loan? teds
-------------------------
From:          Barbara Flanders [Barbara Flanders at stevens-dc]
Sent:          Tuesday, December 17, 2002 12:47 PM
Subject:       Re[2]: personal
Yes sir, paid in full. CAS [Catherine A. Stevens] thought there would be
some bills coming in for work done on the chalet recently.
Barb

Email from N. Marsh, dated May 2, 2008, to J. Bottini, J. Goeke, E. Sullivan
and Agent Kepner (dotted lines separating emails added)(DOJ Bates nos.
CRM016747 and CRM016775).

　　Ms. Flanders was interviewed on May 1, 2008, in Washington, D.C., in the
presence of her attorney, J. O'Toole, by Messrs. Bottini, Goeke, Marsh and
Sullivan. *See* Email from E. Sullivan, dated May 1, 2008, to Agent M. Herrett, J.
Bottini, J. Goeke, I. Brown (Inspector General's Office, U.S. Department of the
Interior)("We have Flanders coming in at 1 . . .")(DOJ Bates no. CRM016701);
email from J. O'Toole, dated May 1, 2008, to N. Marsh ("Thanks for the call,
Nick. See you at 1:00")(DOJ Bates no. CRM016696).  Mr. Bottini and Mr. Goeke
participated by phone, exchanging emails with Mr. Marsh and Mr. Sullivan during
the interview. *See* Email from J. Bottini, dated May 1, 2008, to N. Marsh, E.
Sullivan and J. Goeke ("Should we ask her if she was tasked to pull anything
together in relation to the Tundra Times inquiry in 12/04 – or in general was she
asked to compile docs in relation to the G-wood house…….")(ellipsis in original)
and Reply Email from E. Sullivan, dated May 1, 2008, to J. Bottini, J. Goeke and
N. Marsh ("I think he's getting there.") (DOJ Bates no. CRM016733).  Agent
Kepner planned to participate by telephone. *See* Email from N. Marsh, dated April
28, 2008, to J. Bottini, J. Goeke, E. Sullivan and Agent Kepner, Subject:
"Flanders: Thursday, 1 pm ET" ("Joe/Jim: if that time works for you, we'll punch
you guys in from a conference room. Mary Beth - should Ed or I call [Agent]
Kevin Luebke to see if he can sit in?"), and Reply email from Agent Kepner, dated

April 29, 2008, to N. Marsh, J. Bottini, J. Goeke and E. Sullivan ("If you are okay, I will just sit in telephonically. mbk") (DOJ Bates no. CRM016646).

Agent Kepner testified that Ms. Flanders was interviewed after the interview of Mr. Allen on April 15, 2008, and after Mr. Marsh found the December 2002-emails between Ms. Flanders and Senator Stevens about bills for the renovation work which were expected and which Bob Persons was "riding herd" on. Deposition of Agent Kepner, Aug. 24, 2009, at 352 & 354. She testified that the references in those emails to bills for work done on the chalet led to the interview of Ms. Flanders. *Id*. at 354-356. Agent Kepner did not recall if she or another agent participated in that interview or whether a 302 was written. *Id*. at 356-358; *see also* Email from E. Sullivan, dated Aug. 17, 2008, to J. Bottini, B. Morris, N. Marsh, J. Goeke and W. Welch ("Here are two more [an IRS MOI and an FBI 302 of interviews of B. Flanders in 2007]. . . . We also have not received from the FBI the 302 for an interview of Flanders that occurred earlier this year.")

(DOJ Bates nos. CRM032844-878). Neither our investigation nor OPR's found a 302 for the interview of Ms. Flanders on May 8, 2008.

Mr. Bottini testified that he remembered the email exchange between Senator Stevens and Ms. Flanders in December, 2002, and that he commented about them at the time, "not good but not fatal or something like that." Deposition of J. Bottini, Dec. 17, 2009, at 431. He explained his statements in his April 25, 2008-email, that the email between Ms. Flanders and Senator Stevens "tracks with the October and November handwritten notes to Bill" and were "not good, but obviously not fatal either":

Q    When you say tracks the October and November notes, those are what we've been calling the October Torricelli note and the second note from Ted Stevens on November 8th, 2002?

A    I believe that's what I was referring to.

Q    When you say "tracks," can you elaborate on what you mean by that?

A    Well, it looked like this tracked with the concept that some bills might be expected for the work that had been done on the chalet recently, December of 2002. The recent work done to the chalet would have been September-October-November and December of 2002, the work that was done by VECO or either paid for by VECO.

406

Q       Well, what do you mean "not good but not fatal"?

A       Well, if the idea again was that the Senator was waiting for a bill from Allen or VECO for the work that had been done, and was going to pay that bill, then it certainly cuts against the concept that he thought that work was a gift that he should report on his following year disclosure form, which would have been his May 15th, 2003 disclosure form.

Because what I'm saying here is he would be able to show this and say "I was waiting for the bill to come in. I didn't think this was a gift that I had to disclose."

Q       Right, because that's a December email exchange between him and Ms. Flanders, which follows on the heels of the October and November request for bills to Bill Allen.

A       Correct. I think "obviously not fatal either," I think what I'm referring to there, it's also goes along with the concept that he knows he owes Allen and VECO for the work that's done, and doesn't report it as a liability.

Furthermore, he never pays for the work and he files financial disclosure forms in ensuing years and doesn't report it as a gift or a liability thereafter. I think that's what I'm saying.

*Id*. at 601-602.

Mr. Bottini was aware in or around May, 2008, that "they were wanting to interview [Ms. Flanders]" but was "confident that I didn't sit in on the Barbara Flanders interview." Deposition of J. Bottini, Dec. 16, 2009, at 239 & 240. Mr. Bottini thought that Ms. Flanders was interviewed, couldn't remember when, did not think that he was present and did not remember participating by phone. Deposition of J. Bottini, Dec. 17, 2009, at 431 & 610.

Mr. Bottini testified that the primary purpose of the interview of Ms. Flanders was to investigate Senator Stevens's use of his staff to handle his personal affairs:

Q       They brought in the archivist to investigate the authenticity of the notes; they brought in Flanders, they brought in Persons. But they only spoke to Flanders and the archivist about the notes?

A       To be honest, what the purpose of -- well Flanders, my understanding
        of the interview of Flanders was they were -- they being Public
        Integrity, were still looking at this --

Q       Instead of, just so we're precise, because we're investigating all these
        individuals.  If you would use -- I've been making the same mistake.
        Use names, if you can, for who you're referring to?

A       Okay.  There was a concern by -- well I know Nick expressed it.  I
        think Ed shared that concern.

BY MR. SCHUELKE:
Q       Marsh and Sullivan.
A       Marsh and Sullivan, I'm sorry.  I don't remember if it extended to their
        management or not. But –

BY MR. SHIELDS:
Q       Management being Welch?
A       Bill Welch and Brenda Morris, about the Senator's use of his Senate
        staff to handle personal affairs for he and his wife.  Barbara Flanders,
        for instance, my recollection is in the production that Williams and
        Connolly was making, there were numerous documents which
        appeared to show that she was basically handling the Senator and the
        Senator's wife personal affairs, paying their bills for them, you know,
        arranging for insurance for their daughter's car, things of those nature,
        that one would perhaps consider purely personal in nature, not having
        to do with the Senator's function as a United States Senator.
        My understanding of interviewing Flanders at or near that time was to
        explore that, to show her these documents and say what was this
        related to?  To the Senator's personal business, or does this have
        anything to do with his role as a United States Senator.
                                    *  *  *
Q       They say it in the memo.  There's troubling irregularities; we're going
        to bring the archivist in. That's Will Arthur, he's brought in and he's
        asked about how the documents were produced and located. They
        bring Barbara Flanders in for the same reason, don't they?
A       I don't know.  I thought that the primary reason –

                                    408

Q    That is, to investigate the documents produced?

A    Well, I thought the -- my recollection of the primary reason for contacting Flanders and interviewing her was related to her performing work for the Senator and his wife on her government time.

Deposition of J. Bottini, Dec. 17, 2009, at 428-430 & 432-433.

Mr. E. Sullivan was not sure he attended the interview of Ms. Flanders but thought that the emails between her and Senator Stevens in December, 2002, may have been addressed. Deposition of E. Sullivan, Jan. 6, 2010, at 318.  He did not know if that was the only reason "they reached out to Flanders." *Id.* at 320.  Mr. Sullivan recalled that the "point" of the interview was her work on Senator Stevens's personal matters:

. . . And that's what I recall the point of talking to Flanders was; that there was a series of e-mails, and not just e-mails. I think part of it was a conversation with her about there was a point in time when we were actually considering charging Catherine Stevens and Senator Stevens with a conspiracy on a 641 [theft of government property] charge.
The vast majority of the documents that we were getting in that dealt with a lot of his personal finances, so my recollection is we wanted to talk to Flanders, because it seemed that she was the one that was getting a lot of his -- she took care of a lot of his personal expenses after he would basically ask her to go do.

*Id.* at 319.[54]

_____

[54]On May 15, 2008, an draft addendum was written for a new section of the prosecution memorandum entitled "Uncharged Conduct Cognizable Under 18 U.S.C. § 641". *See* Email from J. Goeke, dated May 15, 2008, to J. Bottini, N. Marsh and E. Sullivan, Subject: "Emailing: 641 Addendum.wpd" ("Here's a draft 641 section") (DOJ Bates nos. CRM090949-90953).  The draft described the use by Senator and Mrs. Stevens of Senate staff for non-official, personal services and specifically referred to Ms. Flanders.  A version of that draft, entitled "Use of Senate Staff to Perform Personal Tasks for STEVENS and Catherine", which included the references to Ms. Flanders, was added to the Prosecution Memorandum, dated May 15, 2008 (*see* Email from N. Marsh, dated May 15, 2008, to W. Welch and E. Sullivan (DOJ Bates nos. CRM017374-497)), and remained part of the final version of the Prosecution Memorandum, dated May 21, 2008. *See*

(continued...)

Mr. Marsh recalled that Ms. Flanders was asked about the Torricelli notes:

I thought the irregularity of the [Torricelli] notes came up in a conversation with Barbara Flanders.

\* \* \*

I can't tell you all the purposes, but I do remember at some point asking Barbara Flanders to go through the material. There did seem to be some sort of regularity [sic] with one of -- the two notes looked a little bit different in some ways. I remember asking her -- I would assume it was that conversation -- to walk through whether that was an issue, and she -- I don't remember exactly what she said.
I remember feeling like okay, this is consistent with normal practice, this is not something that was created after the fact.

Deposition of N. Marsh, Feb. 2, 2010, at 390 & 391.

One week after Ms. Flanders was questioned about the Torricelli notes and the email which she received from Senator Stevens about "Bob Persons [] riding herd to make sure we get charged for what they have done", the prosecutors interviewed Mr. Persons.


8.      May 8, 2008        Bob Persons is interviewed, but not about the
                           Torricelli note

On May 1, 2008, the prosecutors made an appointment to meet with Bob Persons on May 8, 2008. *See* Email from J. Goeke, dated May 1, 2008, to N. Marsh, E. Sullivan and J. Bottini, Subject: "Persons" ("Is actually showing up on Thursday per a message we just received from Col. Sanders.") (DOJ Bates no. CRM016745). The Sanders referred to in the email is Eric Sanders, the attorney for Mr. Persons. *See* Grand Jury Testimony (D.C.) of Robert Persons, May 30, 2007, at 4.

Mr. Persons was interviewed, in the presence of his attorney, on May 8,

---

[54](...continued)
Email from B. Morris, dated Jan. 2, 2009, to L. Collery (DOJ Appeals Section attorney), N. Marsh, E. Sullivan, *et ano*. ("Attached is the pros memo")(DOJ Bates nos. CRM048385-465).

2008, in the U.S. Attorney's Office in Alaska by Messrs. Bottini, Goeke, Marsh, Sullivan and FBI Intelligence Analyst ("IA") Jessica Newton. *See* FBI IA J. Newton's 302 of Interview of B. Persons on May 8, 2008, dated May 9, 2008, at 1 (DOJ CRM033666-669). The 302 reflects that Mr. Persons was questioned about, *inter alia*, his grand jury testimony, the remodeling of Senator Stevens's home, conversations with Senator Stevens, and was shown related emails. The 302 does not reflect that Mr. Persons was shown or asked about the Torricelli notes or the December 2002, emails between Ms. Flanders and Senator Stevens, though he is mentioned in them by name:

> 10/6/02
> Dear Bill -
>     When I think of the many ways in which you make my life easier and more enjoyable, I lose count!
>     Thanks for all the work on the chalet. You owe me a bill - remember Torricelli, my friend. Friendship is one thing - compliance with these ethics rules entirely different. I asked Bob P[ersons] to talk to you about this so don't get P.O'd at him - it just has to be done right.
>     Hope to see you soon.
>                         My best,
>                             Ted

*Stevens*, Government Trial Exh. 495 (DOJ Bates no. CRM016375; Williams & Connolly control no. 000035).

* * *

Subject:     Re[3]: personal
Barb: there will be bills coming in. I do not expect them before the first of the year, they are not done yet. Bob Persons is riding herd to make sure we get charged for what they have done. Some of it they just did, I didn't order it. thanks. teds

Email from Senator Stevens, dated Dec. 17, 2002, to B. Flanders (DOJ Bates no. CRM016610).

Mr. Bottini testified that the purpose of the interview was to ask him about discrepancies between his grand jury testimony and documents received from Williams & Connolly. Deposition of J. Bottini, Dec. 17, 2009, at 427-428 & 434-435; *see also* Email from J. Bottini, dated May 1, 2008, to J. Goeke, N. Marsh and

E. Sullivan, Subject: "(TENTATIVE) MEETING W/ BOB PERSONS AND ERIC
SANDERS RE: DISCREPANCIES" (no other message)(DOJ Bates no.
CRM016746).[55]  Mr. Bottini testified that Mr. Persons was not questioned about
the Torricelli notes (*id*. at 436):

> [Mr. Bottini]:     . . . I don't remember sitting there thinking, you know,
> maybe we should ask him about this [Torricelli] note.
> That wasn't the purpose for having him come in.

> MR. WAINSTEIN:      I guess the follow-on would be who asked
> (attorney for Mr. Bottini)  the questions?
> THE WITNESS:        My recollection is that Marsh, Nick Marsh
> was doing the bulk of the interview, if you
> will.  Sullivan and Goeke may -- all four
> were there.  They may have jumped in.  I
> just don't think I asked any questions at all,
> because I wasn't conversant enough with the
> subject matter.
> I don't even remember -- I think I did look at
> Persons' grand jury testimony before he
> came in.  But I certainly wasn't familiar
> enough with the documents that would
> appear to contrast with his testimony, to be
> able to sit there and have a conversation
> with him about it.

> MR. WAINSTEIN:      Do you recall any discussion with Marsh and/or
> Sullivan about whether to ask Persons about the
> October 6, '02 note?
> THE WITNESS:        I don't.

> MR. WAINSTEIN:      Before the interview or after?
> THE WITNESS:        I don't.

---

[55]This email does not contain a date.  The date listed above for this email, May 1, 2008,
appears in the accompanying chronological listing of emails for the month of May 2008.

*Id*. at 438-439.

Mr. Bottini testified that, though he expected that Mr. Persons would be a defense witness at trial, it never crossed his mind to ask Mr. Persons about the Torricelli note before, during or after the interview. *Id*. at 445-446.

Mr. Bottini told the O'Brien Team in 2009, that it made no sense to ask Mr. Persons about the Torricelli note because he was not friendly to the government:

> BOTTINI did not really give consideration to asking PERSON [sic] about the TORRICELLI note. BOTTINI explained they had no confidence in PERSON being cooperative with the government. PERSON had gone in front of the Federal Grand Jury in approximately June of 2007. PERSON appeared to be intentionally vague with his recollection stating that he cannot remember many things and he has a family history of Alzheimer's disease. It became apparent that PERSON would be more of a STEVENS' witness. BOTTINI did meet with PERSON in May of 2008 for an interview. BOTTINI had not handled the Federal Grand Jury session with PERSON, but was aware of his less than clear testimony. During the May 2008 interview with PERSON and his Attorney, they mainly went over the Federal Grand Jury testimony of PERSON. BOTTINI advised it would not make sense to ask PERSON about the TORRICELLI note as he was not a friendly witness for the government. The May 2008 interview with PERSON took place in Alaska. BOTTINI recalled an Agent was present, but cannot recall if that Agent was KEPNER. BOTTINI advised PERSON was vague. BOTTINI believes they had the TORRICELLI note at the time they interviewed PERSON but did not ask him about it.

FBI 302 of Interview of J. Bottini, dated March 23, 2009, at 3 (DOJ Bates nos. CRM000765-769)

Mr. Marsh did not recall if Mr. Persons was ever asked if he had spoken to Mr. Allen. Deposition of N. Marsh, Feb. 2, 2010, at 399. He recalled that he questioned Mr. Persons about documents which had been recently produced by Williams & Connolly. *Id*. at 399-401. Those documents "very plainly indicated that this man perjured himself in the Grand Jury." *Id*. at 402. Mr. Marsh did not recall deciding during that interview not to question Mr. Persons about the Torricelli notes or discussing whether to ask that question with Mr. Bottini or Mr.

Goeke. *Id*. at 404.  He ended the interview when he concluded that Mr. Persons was lying:

> Q     Did you make a decision during that interview not to ask him about the Torricelli note?
>
> A     That, I don't recall. I don't recall if I would have gotten into it if he was going to be productive or if I had decided I was just going to focus on -- I just don't remember.
>       What I remember is thinking there's no point in going forward with this guy because there is nothing to gain. This guy is not telling us the truth. I just shut it down.

> *Id*.

Mr. Goeke recalled that he was present when Mr. Persons was interviewed on May 8, 2008; he did not recall why no questions were asked during that interview about the Torricelli note and had no knowledge of any decision not to ask such questions. Deposition of J. Goeke, Jan. 8, 2010, at 412.  Mr. E. Sullivan testified that he was present when Mr. Persons was interviewed after the Torricelli note was received from Williams & Connolly, that he and his colleagues were considering charging Mr. Persons with perjury based on his grand jury testimony, and that it was a "very short session" which ended when it became "very apparent that he was not cooperative, that he was not being helpful". Deposition of E. Sullivan, Jan. 6, 2010, at 324-326.  He never considered asking Mr. Persons if he had spoken to Mr. Allen about sending bills to Senator Stevens, as the Torricelli note suggested, and he did not discuss with his colleagues before the interview whether or not to ask such questions. *Id*. at 326-327.

|  |  |  |
|---|---|---|
| 9. | May 15, 2008 | A revised prosecution memo addresses the Torricelli notes, the emails between Ms. Flanders and Senator Stevens, and Senator Stevens's "cover story" |

On May 15, 2008, Mr. Marsh revised the Prosecution Memorandum, dated March 14, 2008, by adding *inter alia* descriptions and discussions of documents recently received from Williams & Connolly.  Under "Potential Defenses", "B. STEVENS Never Received an Invoice for VECO's Work", Mr. Marsh added a

two-page discussion of the Torricelli notes and the emails between Ms. Flanders and Senator Stevens, which "are both helpful and harmful to STEVENS":

> In support of this argument [that he never received an invoice from ALLEN or VECO regarding VECO's work at the Girdwood Residence], we anticipate STEVENS will attempt to rely on a series of documents that were created in the fall of 2002.

> First, we believe STEVENS will try to make use of two handwritten notes that he sent ALLEN in the fall of 2002. . . .

> The third set of documents are a series of emails on December 17, 2002, between STEVENS and Barbara Flanders, concerning invoices for the work done in the fall of 2002 on the Girdwood Residence. . . .

> Taken together, these documents are both helpful and harmful to STEVENS. First, because they acknowledge VECO's work at that time, and because they acknowledge STEVENS' need to pay for the work, the notes will make it difficult for STEVENS to claim that he believed the fall 2002 work was incorporated into Christensen Builders' spring 2001 bills. Because they demonstrate STEVENS' knowledge, the notes will likely also preclude STEVENS from arguing that he simply forgot to pay ALLEN for the work. Additionally, with respect to the September [sic] 2002 request for an invoice, we note that STEVENS' request came just days after Senator Torricelli withdrew from his reelection campaign because of Torricelli's receipt of things of value from a wealthy fundraiser and constituent. We thus believe that STEVENS' motivation was not out of a sense of duty, but rather because such concerns were on the forefront of his mind.

> Second, we acknowledge that, to some degree, these requests for invoices permit STEVENS to portray himself as someone who truly wanted to comply with the Senate ethics rules. On the other hand, they also portray STEVENS as an individual knowledgeable about what he was getting and from whom he was receiving it. Furthermore, given the degree to which STEVENS was involved in his personal finances, we believe it will be difficult for STEVENS to persuade a jury that he simply overlooked the fact that $60,000 worth of work went unpaid. This is especially true given Flanders' December 17, 2002, email that she would make sure she presented

415

STEVENS with invoices before she paid them. We will be able to show
that, during the time period from December 2002 to May 2003, Flanders and
STEVENS had significant and frequent discussions about STEVENS'
personal finances. It will be difficult for STEVENS to maintain credibly that
he was unaware that no substantial checks to ALLEN or VECO left
STEVENS' account during that time period.

Prosecution Memorandum, dated May 15, 2008, at 67-69 (DOJ Bates nos.
CRM016947-17018) (attached to email from N. Marsh, dated May 14,
2008, to J. Bottini, J. Goeke and E. Sullivan (DOJ Bates no. CRM016873)).

Another revision evidenced the prosecutors' planned opposition to the
admission of the Torricelli notes at trial: "Should STEVENS be successful in
introducing evidence of his requests for invoices from ALLEN, we will be able to
argue that, even absent a detailed invoice, STEVENS was still under an obligation
to list these benefits on his financial disclosure forms." *Id*. at 69.  By the time the
trial began, that plan had changed and the prosecutors, armed with Mr. Allen's
recollection of his CYA conversation with Mr. Persons, included the Torricelli
notes on their exhibit list*. See* Email from J. Bottini, dated Sept. 27, 2008, to R.
Cary, *et al*. ("I just realized that the government's list of exhibits that we intend to
introduce through Bill Allen inadvertently omitted Government Exhibits 495 and
509.  There are respectively - the handwritten note from Senator Stevens to Bill
Allen dated October 6, 2002 (GX 495) and the handwritten note from Senator
Stevens to Bill Allen dated November 8, 2002 (GX 509) I assume that you would
have no objection to the introduction of these exhibits.") (DOJ Bates no.
CRM025002).

Mr. Marsh also added a paragraph asserting that Senator Stevens had
created a "cover story" for the renovations using emails to his children:

Finally, there appears to be some evidence suggesting that as early as 2000,
STEVENS was creating a "cover story" concerning the Girdwood
Residence renovations. As stated previously, by October 2000, STEVENS
was aware that VECO was involved in renovating the Girdwood Residence,
and was also aware that Christensen Builders had been subcontracted to do
certain portions of the work. However, in two emails to his children – one
on October 24, 2000, and one on November 30, 2000 – STEVENS
described the renovations as being managed and completed by Bob Persons.

> In neither of those emails did STEVENS reference ALLEN, VECO, Christensen Builders, or any other individual or entity involved in the renovation.
>
> Prosecution Memorandum, dated May 15, 2008, at 45 (DOJ Bates nos. CRM016947-17018).

This "cover story" argument is similar to the "pretext" argument made in earlier prosecution memos. *See* Prosecution Memorandum, dated March 12, 2008, at 55 ("We believe that request [for invoices] was pretext, and that STEVENS never had any intention to pay VECO's costs associated with the renovation.")(DOJ Bates nos.CRM015156-215); Draft Prosecution Memorandum, dated April 30, 2007, at 47 ("We believe these requests [for invoices] were simply pretextual, and that STEVENS never had any intention to pay them. During interviews with the government, ALLEN has stated as much, indicating that STEVENS never followed-up on any of the requests that he made for invoices relating to the Girdwood Residence.")(DOJ Bates nos. CRM096333-394).

These revisions of the prosecution memorandum were carried verbatim into the final version of that memorandum. *See* Prosecution Memorandum, dated May 21, 2008, at 47 & 70-72 (DOJ Bates nos. CRM48387-465).

|    |    |    |
|----|----|----|
| 10. | July 25, 2008 | During its next to last meeting before voting to indict, the grand jury hears testimony about the Torricelli note and Senator Stevens's request to Mr. Allen for a boiler repair bill in 2006 because "it fits TS's m.o. of asking for invoices from BA only when it looks like he can't hide it" |

During the grand jury's next-to-last session before it indicted Senator Stevens, Mr. Marsh, assisted by Mr. E. Sullivan, presented the Torricelli note through the testimony of Agent Kepner. *See* Grand Jury Testimony (D.C.) of Agent Kepner, July 25, 2008, at 31-33 (DOJ Bates nos. CRM003950-3989).

Agent Kepner also testified that Mr. Allen arranged for repairs to be made in 2006 to Senator Stevens's boiler by a private contractor, Chugach Sewer & Drain, which was instructed by Mr. Allen to bill him for the labor ($1080) and to

send a separate invoice to Senator Stevens for the material ($1118). *Id*. at 11-12;
*see also* Chugach Sewer & Drain invoice no. 9423a, dated Jan. 11, 2006, to "Ted
Stevens Girdwood Attn: Bob Persons", in the amount of $1,118, "Repair Materials
for Heating System Labor paid by Bill." (attached to email from N. Marsh, dated
May 12, 2008, to J. Bottini, E. Sullivan, J. Goeke and Agent Kepner ("Folks –
here's a selection from a small stack of documents that W&C produced last
Thursday. . . .")(DOJ Bates no. CRM016846-872)). When Senator Stevens
received the bill, which reflected that Mr. Allen paid for the labor, he sent an email
to Mr. Allen stating that he wanted to pay for the labor. *See* Grand Jury Testimony
(D.C.) of Agent Kepner, July 25, 2008, at 13.[56] Agent Kepner testified in the
grand jury that Senator Stevens never reimbursed Mr. Allen for his payment and
never paid the contractor for the labor portion of the repair. *Id*. at 13-14.

Evidence about the boiler repair was presented at the request of Mr. Welch.
*See* Email from N. Marsh, dated July 17, 2008, to E. Sullivan, J. Bottini, J. Goeke
and Agent Kepner ("Welch has asked us to (a) extend the scheme through 2006 to
incorporate the boiler bill and (b) add a seventh count for the 2006 F[inancial]
D[isclosure] form. Thoughts everyone? Nick/Ed". (DOJ Bates no. CRM019077).
Mr. E. Sullivan listed reasons for adding the boiler bill, including that it "fits TS's
m.o. of asking for invoices" from Mr. Allen and it "dirties up Persons":

> I'm in favor of adding the boiler bill. On the downside, it supports TS's
> general argument that, when he is aware of an outstanding liability, TS asks
> for a bill and attempts to pay it. On the upside, however, it (1) dirties up

---

[56]The email from Senator Stevens to Mr. Allen was not read to the grand jury or used as a
government exhibit at trial, and we have not located a copy. Williams & Connolly has no copy
and never received one from the prosecutors. According to Agent Kepner's affidavit in support
of the warrant to search Senator Stevens's Alaskan home in July 2007, Mr. Allen received the
email on or about Feb. 16, 2006 and it contained the following message:

> Bill, I just got a bill from Chugach Sewer and Drain. It says labor paid by BILL. I should
> pay those plumbers. Please have someone send me a bill. The materials bill was $1,118.
> I have paid it. Thanks for all your help. Bob P. says all the systems are working well.
> See you on March 4 if you're around.

> Affidavit of Agent Kepner in Support of Application for Search Warrant, dated July 27,
> 2007, ¶ 120 (DOJ Bates nos. CRM015934-16001).

Persons – the caretaker and messenger for TS; (2) it fits TS's m.o. of asking for invoices from BA only when it looks like he can't hide it; (3) it gives BA, when testifying, another example of how he blows off TS's "requests" for a bill and how BA and Persons wanted to keep quiet the benefits given to TS; and (4) causes TS to have to explain why he didn't pay the outstanding liab [sic], even when he became aware of it.

Email from E. Sullivan, dated July 17, 2008, to N. Marsh, J. Bottini, J. Goeke and Agent Kepner (DOJ Bates no. CRM019077).

That same day, Mr. Marsh added a new section to the draft indictment describing the boiler repair transaction, including Senator Stevens's request to Mr. Allen for a bill for the labor:

Improvements to the Girdwood Residence by VECO in 2006

* * *

39.  On or about February 16, 2006, STEVENS sent ALLEN an e-mail concerning the boiler and heating system repair. Although STEVENS was aware that ALLEN paid for the labor costs, and was aware of the name and contact information of the outside contractor who performed the work, STEVENS asked ALLEN to have the outside contractor send STEVENS an invoice for the labor costs.

40.  STEVENS never reimbursed ALLEN for the labor costs paid by ALLEN, despite STEVENS' obligation to do so.

41.  STEVENS never paid the outside contractor for the labor costs paid by ALLEN, despite STEVENS' obligation to do so.

Draft indictment, ¶¶ 34-41 (DOJ Bates nos. CRM019084-19136)(attached to email from N. Marsh, dated July 17, 2008, to W. Welch, B. Morris and E. Sullivan (DOJ Bates no. CRM019083)).

With minor changes, Mr. Marsh's draft remained in the indictment as filed. *See Stevens*, Indictment, filed July 29, 2008, "2006: Improvements to the Girdwood Residence by VECO", ¶¶ 32-36.

419

11.    Sept. 9, 2008       As the *Brady* letter is drafted, Mr. Allen is questioned again about Senator Stevens's requests for bills and why none was sent

The *Brady* letter provided several explanations for Mr. Allen's failure to send invoices to Senator Stevens after he received the Torricelli notes:

17.    From August 30, 2006 to the present, Allen has made the following statements:

*   *   *

(c) Allen stated that on at least two occasions defendant asked Allen for invoices for VECO's work at the Girdwood residence. Allen stated he never sent an invoice to defendant or caused an invoice to be sent to defendant. Allen stated that he believed that defendant would not have paid the actual costs incurred by VECO, even if Allen had sent defendant an invoice, because defendant would not have wanted to pay that high of a bill. Allen stated that defendant probably would have paid a reduced invoice if he had received one from Allen or VECO. Allen did not want to give defendant a bill partly because he felt that VECO's costs were higher than they needed to be, and partly because he simply did not want defendant to have to pay.

*Brady* letter, ¶ 17(c) (DOJ Bates nos. CRM022547-551).

The heading of this paragraph was misleading. The information provided was not based on statements made by Mr. Allen over the three-year period from "August 30, 2006 to the present". It was obtained entirely by Agent Kepner during a brief telephone interview of Mr. Allen on Sept. 9, 2008, moments before the paragraph was written by Mr. Marsh. *See* Agent Kepner's 302 of Interview of B. Allen on Sept. 9, 2008, dated Sept. 16, 2008 (DOJ Bates no. CRM043293); Deposition of Agent Kepner, August 24, 2009, at 101.

Mr. Marsh testified that he directed Agent Kepner to interview Mr. Allen by telephone after he, Mr. Bottini and Agent Kepner reviewed the draft *Brady* letter and noticed an entry in the agents' *Brady/Giglio* spreadsheet that "Allen (sic) [probably should be Stevens] would have paid for any invoice that he received, something to that effect." Deposition of N. Marsh, February 2, 2010, at 123; *compare* Agent's *Brady/Giglio* spreadsheet ("On February 28, 2007, Bill Allen stated that he believed that Td [sic] Stevens would have paid an invoice if he

420

received one.") (DOJ Bates no. CRM000743). Agent Kepner told Mr. Marsh and
Mr. Bottini that she did not believe the statement in the spreadsheet was accurate
because she thought that Mr. Allen "was talking about something smaller, one of
the smaller bills." Deposition of N. Marsh, *supra*, at 123.[57] Mr. Marsh also
noticed that the draft *Brady* letter did not contain "any statement that Allen
believed that Stevens wouldn't have wanted to pay for the full cost because
Stevens was too cheap." Deposition of N. Marsh, *supra*, at 123. The apparent
misstatement in the spreadsheet and the omission from the *Brady* letter caused Mr.
Marsh and Mr. Bottini to become concerned that the *Brady* spreadsheet was not
reliable. *Id*. at 124-125. Mr. Marsh asked Agent Kepner to call Mr. Allen for
clarification:

> What I asked Mary Beth to do was to call Bill Allen and ask him about the
> statement. Not ask him to confirm or deny any particular statement, but ask
> him what his reviews [sic; probably should be "views"] were on whether
> Stevens would want to pay -- what he thought Stevens would want to do.
> She came back with a detailed statement that said he thought Stevens would
> have paid reduced invoices but wouldn't have wanted to pay the full thing
> and he didn't send Stevens a bill partly because he thought -- he felt bad for
> Stevens.
> That seemed to me to be consistent with what Mary Beth was telling me. It
> also seemed to be consistent with what Joe and I remembered as ultimately
> reflected in the search warrant affidavit, so I plugged it in.
>
> What I was concerned about was trying to be accurate. . . .
>
> Id. at 126.

---

[57]The spreadsheet entry is from the Pluta 302, the 302 of the interview of Mr. Allen by
Agent Kepner and Agent Pluta on Feb. 28, 2007. The entire sentence in the 302 is: "The source
[Mr. Allen] did not invoice STEVENS for the work that [VECO architect] HESS performed;
however, the source [Mr. Allen] believes that STEVENS would have paid an invoice if he had
received one." Most of the Pluta 302, including that sentence, was redacted by Agent Kepner
from the copy provided to Williams & Connolly pursuant to the Court's order to the government
on Sept. 16, 2008 to provide the *Brady* information contained in *Brady* letter to the defense in
useable format. Deposition of Agent Kepner, August 24, 2009, at 155-157; *Compare Stevens*,
Dkt. No. 130-9, pp. 2 & 3 (redacted Pluta 302) and Dkt. No. 130-3, pp. 2-5 (unredacted Pluta
302).

Agent Kepner took no notes of her conversation with Mr. Allen and immediately reported Mr. Allen's statements to Mr. Marsh, who then and there wrote paragraph 17(c) based entirely on the information provided by her. Deposition of Agent Kepner, August 24, 2009, at 132, 102 ("I immediately went back into Nick's office and then basically almost dictated to him") & 123 ("he was typing it in as I was telling him."); *see also* Deposition of N. Marsh, Feb. 2, 2010, at 136 (¶ 17(c) is a product of the interview which Mr. Marsh directed Agent Kepner to conduct with Mr. Allen); FBI 302 of Interview of N. Marsh on March 18 & 19, 2009, at 10 ("Marsh advised whatever KEPNER relayed to him he placed in the letter.") (DOJ Bates no. CRM000752-764). Agent Kepner testified that, when she questioned Mr. Allen on Sept. 9, 2008 about Senator Stevens's requests for bills for the renovation work done on his home, she did not remember that Mr. Allen had been questioned about the Torricelli notes in April, 2008. Deposition of Agent Kepner, Aug. 24, 2009, at 106.

Ms. Morris, the lead prosecutor who signed the *Brady* letter, did not know when the information in paragraph 17(c) was obtained from Mr. Allen, and she told Judge Sullivan that Mr. Allen was *not* interviewed on Sept. 9, 2008:

| | |
|---|---|
| THE COURT: | But that statement [in ¶ 17(c)] was made very late by Allen, though, wasn't it; that statement? |
| MS. MORRIS: | No, Judge. It was, actually, Mr. Allen -- there were like five different 302s that we pulled form [sic] to get the information that was in 17(c), and you asked that I submit an affidavit . . . |
| THE COURT: | Was Allen interviewed that day? |
| MS. MORRIS: | No. No. He was not interviewed that day. |
| THE COURT: | He was not interviewed. |
| MS. MORRIS: | That was when we compiled the letter that had the -- it was the six-page -- five-page letter. |
| THE COURT: | Because a reader would look at that and say, well, Allen was just interviewed by the FBI agent, isn't that – |
| MS. MORRIS: | No, sir. It was in 2006 and beyond when those statements were made . . . |

| THE COURT: | I'm sorry, but this 302, this 1023 or whatever it is, says the contact date was September 9th, 2008. It appears to be an interview with Allen by an FBI agent September the 9th of this year. |
| MS. MORRIS: | I'm not sure, but I'll double check, Judge, but if I could just explain to you what was provided to them. |
| THE COURT: | All right. |

*Stevens*, Trial Transcript, Oct. 2, 2008 P.M., at 19-20.

Agent Kepner testified that she wrote the 302 of that interview of Mr. Allen a week later, on Sept. 16, 2008, essentially by copying ¶ 17(c) of the *Brady* letter. Deposition of Agent Kepner, August 24, 2009, at 102-103.  However, her 302 contained a reason given by Mr. Allen for not sending Senator Stevens a bill that was not contained in ¶ 17(c), i.e., Mr. Allen "wasn't sure how to produce an invoice." *See* Agent Kepner's 302 of Interview of B. Allen on Sept. 9, 2008, dated Sept. 16, 2008 (DOJ Bates no. CRM043293).  Mr. Allen had provided that same reason to Messrs. Marsh, Bottini, Goeke, E. Sullivan and Agent Kepner on April 15, 2008, when they showed him the Torricelli notes for the first time; when Mr. Marsh pressed him on his claimed inability to create an invoice, Mr. Allen "bl[e]w-up", forcing the prosecutors to terminate the interview. *See* Deposition of J. Bottini, Dec. 17, 2009, at 492-495; *see also* Deposition of N. Marsh, Feb. 2, 2010, at 362-363; Email from N. Marsh, dated April 15, 2008, to J. Bottini, J. Goeke and E. Sullivan, Subject: "am I pushing too hard" and reply email from J. Bottini, dated April 15, 2008, to N. Marsh, J. Goeke and E. Sullivan ("Let's call it for today") (DOJ Bates no. CRM016533).

12. Sept. 14, 2008        Mr. Allen is questioned again about the Torricelli
                          note and remembers his CYA conversation with
                          Mr. Persons in 2002; Mr. Bottini, Mr. Goeke, Mr.
                          E. Sullivan, Mr. Marsh and Agent Kepner forget
                          their interview of Mr. Allen in April 2008, Ms.
                          Morris remembers it, and no one checks their
                          notes

Agent Kepner testified in this investigation that she and Mr. Bottini "got the
truth out of Bill Allen" on Sept. 14, 2008, during a pre-trial witness preparation
session, when he stated for the first time that he remembered that Mr. Persons told
him in 2002, that Senator Stevens "was just covering his ass" with the Torricelli
note. Deposition of Agent Kepner, Aug. 24, 2009, at 330; *see also* Notes of Agent
Kepner, dated Sept. 14, 2008, at 2 ("BP said he was just covering his ass.")(DOJ
Bates no. CRM066743-745).  Agent Kepner did not write a 302 of this interview
because it was her practice not to write 302s of "witness prep sessions".
Deposition of Agent Kepner, Aug. 24, 2009, at 290.  Her notes of that interview
reflect that, when shown the Torricelli note, Mr. Allen said:

> 10/6/02 074019     Note TS to BA
> #495  - BP [Bob Persons] didn't push this,
>         - TS is covering his ass by the note.
>         - BP said he was just covering his ass.
>         - BA recognizes.

Notes of Agent Kepner, dated Sept. 14, 2008, at 2 (DOJ Bates no.
CRM066743-745).[58]

Agent Kepner was not surprised by Mr. Allen's statement because she viewed the
Torricelli note as "a cover your ass note" and "It fit. In my mind, it made sense."

---

[58]When we deposed Agent Kepner on Aug. 24, 2009, her notes of the interview of Mr.
Allen on April 15, 2008 had not been located.  OPR found her notes on Feb. 24, 2010 and DOJ
provided us with a copy that same day. *See* email from K. Harris (DOJ), dated Feb. 24, 2010, to
H. Schuelke & W. Shields ("OPR located these notes today in the boxes of material recently
shipped from the FBI's office in Anchorage, Alaska.")

Deposition of Agent Kepner, Aug. 24, 2009, at 215-216; *see also id*. at 270-271
(she viewed the Torricelli notes as "pretextual") & at 307-308 (well in advance of
this trial prep session, she believed that Senator Stevens was "covering his ass"
with the Torricelli note).

Agent Kepner did not remember on Sept. 14, 2008, or during her deposition
in this investigation, that Mr. Allen had been shown the Torricelli note during the
interview on April 15, 2008 and did not recall speaking to Mr. Persons about it. *Id*.
at 243-244 & 295.  She acknowledged, in light of the prosecutors' notes of that
interview, that Mr Allen was asked about the Torricelli note on April 15, 2008,
and that her statement in an affidavit, dated Feb. 20, 2009, "the first time that
Allen was asked about that section of the [Torricelli] note" was during a pre-trial
prep session, was "incorrect". *Id*. at 302.  She was not alone in that error.  After
the trial and until March, 2009, when the O'Brien Team discovered emails
exchanged by the prosecutors during the interview and obtained Mr. E. Sullivan's
and Mr. Goeke's notes of the interview, the prosecutors also contended that Mr.
Allen had not been asked about the Torricelli notes "until shortly before trial":

> In claiming that Allen's testimony was false, defendant relies first on the
> fact that Persons's comment was not recorded in the government's
> memoranda of its interviews with Allen. This fact proves nothing, however,
> because the government was not even aware of the October 6, 2002 note
> until defendant produced it in early 2008, long after most of the memoranda
> were prepared. Moreover, it was not until shortly before trial that the
> government questioned Allen about defendant's statement that he had asked
> Persons to speak to Allen about a bill, and thereby learned about Persons's
> remark. Allen's recollection on this point was not recorded in an FBI 302
> because it was disclosed during a trial preparation session.

> *Stevens*, Government's Opposition to Defendant's Motion for a New Trial,
> dated Jan. 16, 2009, at 42-43 (Dkt. No. 269).

*See also Stevens*, Motion of the United States to Set Aside the Verdict and Dismiss
the Indictment with Prejudice, filed April 1, 2009, at 2 ("The Government also
acknowledges that the Government's Opposition to Defendant's Motion for a New
Trial provided an account of the Government's interviews of Bill Allen that is
inaccurate. *See* Opposition at 42-43 (Dkt. No. 269).") (Dkt. No. 324).

Agent Kepner testified that she would not have recognized the significance of Mr. Allen's prior inconsistent statement under *Brady* had she remembered it. She testified that she did not "specifically" know that *Giglio* information included prior inconsistent statements by a witness and that "when I was reviewing the materials for Brady, I wasn't looking for that." Deposition of Agent Kepner, Aug. 24, 2009, at 55; *see also id*. at 42 (during her review for *Brady* information in *Stevens*, she did not look for inconsistencies between a witness's grand jury testimony and a witness's statements reported in 302s).

Agent Kepner recognized the significance of Mr. Allen's recollection of the CYA statement for the prosecution's case and she informed the entire trial team about it as soon as she returned to the office.[59]  No one remembered Mr. Allen's statement on April 15, 2008 that he did not remember talking to Mr. Persons about the Torricelli note:

| | |
|---|---|
| Q | No, but I'm focusing on the CYA statement. When you got back to the office after that September 14th meeting with Allen, Bundy, yourself, and Mr. Bottini, you went back to your office and told the other members of the team about the CYA statement? |
| Agent Kepner | I'm pretty confident we did. |

Q    Who did you tell?
A    You know, I believe we told the other attorneys.

Q    Well, there is lots of attorneys in this case.
A    Well, it would have been the trial team attorneys. It could have been –

Q    Please name them.
A     -- Brenda Morris, Nick Marsh, and Ed Sullivan.

Q    Morris, Marsh, and Sullivan?
A    And Goeke.

Q    And Goeke. The entire team?

---

[59]The meeting with Mr. Allen on Sept. 14, 2008 was held at the Washington, D.C.-offices of Mr. Bundy's firm, Dorsey & Whitney. Deposition of J. Bottini, Dec. 17, 2009, at 516.

A       It would have been the entire team, or a subset of the entire team.

BY MR. SCHUELKE:
Q       What about Bill Welch?
A       You know, I'm sure it was relayed to him, but it wasn't done by me.

Q       Well, why are you sure it was relayed?
A       You know, it's -- I'm not sure. I would think that that would have been relayed to him.

BY MR. SHIELDS:
Q       Why do you think that?
A       It was helpful to the prosecution.

Q       Was it a significant piece of evidence?
A       It was -- I would say it was significant.

Q       Was it the best piece of significant evidence obtained in that session on September 14th?
A       You mean new?

Q       New, yes.
A       New, yes. But I don't believe that was the most significant piece of evidence that we had for the case, by any means.

Q       Was that the first piece you told them about when you got back to the office --
A       I don't know --

Q       -- that Bill remembers something about the October 6, 2002 note?
A       I think it was significant, and we would have brought it up early in the conversation.

Q       Because this was a problem that had been long running, right? The note surfaced on April 8th.
A       You know –

Q       And it was seen as a problem since then, wasn't it?

427

A     It was seen as a problem, but obviously, the Department of Justice did approve the indictment, given that we had unexplained notes. So I don't think it was an, as I said before, insurmountable, you know, problem.

So, yes, it was a problem, but it wasn't an insurmountable problem.

                    * * *

Q     It was a long-standing problem that you had obtained a cure for on September 14th, through Bill Allen's recollection of the CYA statement.

A     Well, I don't think it was a cure. I mean, I think we got the truth out of Bill Allen.

Q     But when I say that, I mean it was a significant enough event for you to go back and to announce to the trial team, in words and substance, "Remember that October 6, 2002 handwritten note to Bill that Bob Persons is going to chase you for bills? Bill remembered something today."

A     Yes.

Q     Would that be a fair words and substance description?

A     Yes.

Q     And what was the reaction of the other members, Marsh, Morris, Sullivan, and Goeke?

A     I don't remember the specific people's reaction, but the reaction was positive.

Q     Did anyone say, "That's interesting, since he didn't remember that when we interviewed him on April 15, 2008?"

A     No.

Q     Did anyone reference to you at that time, or any time thereafter, that there had been an earlier interview of Bill, when he had no recollection of having such a conversation with Persons?

A     No.

                    * * *

Q     And during that September 4th meeting -- September 14th meeting -- there was no reference made by anyone at the meeting -- yourself, Mr.

Bottini, Mr. Bundy, or Mr. Allen -- to the April 15th meeting?
A    Well, I certainly didn't remember the April 15th meeting, and -- nor do I recall anybody else mentioning it or saying anything about it.

*Id.* at 327-331.

Agent Kepner testified that she did not recall pursuing the issue of the Torricelli notes with Mr. Allen or his attorney, Mr. Bundy, after the interview on April 15, 2008, and denied telling Mr. Allen that he had to "do better" with respect to the Torricelli notes:

Q    And I think you told us that you did not remember, yourself, pushing either the witness or his lawyer back in April of 2008. Is that true?
A    I don't.

Q    Between April of 2008 and September the 14th, did you pursue this subject with either Allen, or Bundy, or both? That is, whether he remembered Persons speaking to him, as the note suggested he would.
A    I don't recall that.

Q    You don't recall telling Allen that he had to do better in this regard?
A    You know, I don't know where you got that statement from. But I definitely would not have told him he had to come up with something to explain a note. That would not have been how I handled Bill Allen.

Q    I didn't ask you whether you told him he had to come up with something. I asked you whether or not you told him that he had to do better.
A    I don't specifically recall –

Q    He had to work on it.
A    -- telling him that.

Q    Did you tell him he had to work on his memory?
A    I don't specifically recall telling him that.

Q    Do you generally recall telling him that?

429

A       You know, it wouldn't surprise me if I had told him he needed to, you
        know, to work on remembering things, because he needs to focus on
        them --

Q       This --
A       -- in order to remember them.

Q       This thing.
A       But this situation? No, no.

Q       This thing.
A       No. Absolutely not. I don't remember it.

*Id*. at 296-298.

Mr. Allen testified that, during the interview in April 2008, he did not remember speaking with Mr. Persons about the Torricelli note, but by the time he testified at trial, he remembered that Mr. Persons told him "[t]hat's just Ted covering his ass." Deposition of B. Allen, March 6, 2010, at 20. He recovered that memory after Agent Kepner told him that he "better figure out or remember" what happened after he received the Torricelli note:

BY MR. SCHUELKE:
Q.      So the question was, what do you recall having happened between
        April of 2008 and October of 2008 that may have helped you to
        remember this conversation with Bob Persons?
A.      Okay. She called me from D.C.

Q.      Ms. Kepner?
A.      Yes. And that was right before I got on a plane going back to D.C. to
        testify in Ted Stevens' trial. And she told me that you better figure
        out or remember what you done with this Torricelli note from Ted.

Q.      You better remember what you did with respect to this note from
        Ted?
A.      Yeah, figure out what.
                                *   *   *

430

THE WITNESS:    So I was on our plane and I could lay down and really think about what I really talked about when I had.  So I thought and I thought and I remember how and when I thought that.

BY MR. SCHUELKE:

Q.    Now, you're on your plane en route to Washington?

A.    Yes.

Q.    For the trial?

A.    Yes.

Q.    A couple of days after Agent Kepner had telephoned you; right?

A.    Yep.

Q.    And she told you, You'd better think about whatever you did with respect to this Torricelli note; right?

A.    Yeah, uh-huh.

Q.    So there you are on the plane, you got, I don't know, five hours or whatever it is flying from the west coast to think about this, and so you did; right?

A.    Yes.

*Q.    When she called you a couple of days earlier, did she ask you to think specifically about whether you had spoken to Persons?*

*A.    No, she didn't.*

Q.    She just asked you to think about whatever you did or knew in connection with this Torricelli note?

A.    That's true.

Q.    Right?

A.    Yes.

Q.    Okay.  So there you are on the airplane thinking about it and you remembered what?  What exactly did you remember?

A.    I talked -- I went to Bob Persons' restaurant in Alaska.

431

Q.    That would be the Double Musky; right?
A.    Double Musky, yeah.

Q.    Okay.
A.    And I went in and I got there just before a lot of people got there
      because he has a lot of good business.  And I said, What about this
      note that Ted wants a bill?  And he said, Oh, hell, don't worry about
      that.  That's just Ted covering his ass. So I hadn't -- I didn't do
      anything about it.

Q.    Meaning you didn't send him a bill?
A.    Yes.
                            *   *   *
Q.    Can I ask you a different question that might help, Mr. Allen?  You
      said earlier you had this conversation with Kepner before you came to
      D.C. on your plane.
A.    Yeah.

Q.    And on your plane you're thinking about whether or not you spoke to
      Bob Persons after you got this note, Exhibit 1?
A.    Yeah.

Q.    What, if anything, did Kepner say to you that made you think about
      that during the plane flight?
A.    She asked me about this (indicating).

Q.    Tell us what she asked you.
MR. SCHUELKE:         Pointing to Exhibit 1, the note, the Torricelli note?
THE WITNESS:          Yeah.  *She said we need to figure out, what did
                      you tell Bob Persons?*  So I got on the plane and I
                      _

BY MR. SHIELDS:
Q.    And thought about it?
A.    Yeah.

Q.    Is this the first time this note, Exhibit 1, was mentioned by Mary Beth
      since your meeting in April with the prosecutors and Mary Beth?
      Do you understand that question?

                            432

A.      Yes, I do.  I understand it.

Q.      They show you the note in April.  Did you talk to Persons?  You say, I don't remember.  Then you get on the plane and Mary Beth said, Do you remember whether you spoke to Persons; right?
A.      Yes.

Q.      Were there any conversations in between the first time they showed you the note and this conversation?
A.      I don't think so.

Q.      So just out of the blue before you get on the plane to Washington, she raises the issue of whether you spoke to Persons after you got the note?
A.      Yes.

Q.      And did she say it was important for you to remember?
A.      No.

Q.      Well, why --
A.      She didn't.

Q.      Why did you spend the whole plane trip thinking about it?
A.      Well, she must have really pushed me.

Q.      That's what I'm asking you.  Bill, that's what I'm asking you.  Did she push you on this?
A.      Yes.

*Q.      What did she say that made you think that she was pushing you on it?*
*A.      You got to figure out what you done and when did you talk to Bob Persons.*

Q.      And is that the only time she pushed you on this note?
A.      Yes, but I can't detail it.

*Id*. at 21-24 & 39-42 (emphasis added).

433

Mt. Allen testified that he didn't want anyone to think he lied:

> Q.    You need to think, Bill, about this note, what you did about it, and whether or not Persons spoke to you; is that what she told you?
>
> A.    Yeah, she -- more than -- I wasn't so worried about her really when I got on the plane, even though she did tell me to do that, but was Bill, you're going to be on the stand in D.C. with a federal judge and you better make sure that you are doing right.  You know, that I'm not doing right – I'm not saying that right, but you got to know that you are really -- know what you're talking about because it's going to come back and bite me if I don't.

> BY MR. SHIELDS:
> Q.    How is it going to bite you?  Did she explain?
> A.    Well, people might have said that I didn't or something, you know.

> Q.    Now, you had a deal with the government. You were cooperating with them; right?
> A.    Yep.

> Q.    And they were going to help you when it came time for you to be sentenced?
> A.    That's right.

> Q.    That was your part -- that's what you were most interested in; right?
> A.    No, no, no.  I didn't want to be -- no, I didn't.  In my mind, it was, I don't want to be that I fabricated or something, you know.

> Q.    That you lied?
> A.    That I lied.

> Q.    You didn't want to be accused of lying; right?
> A.    I didn't want them to think I lied.

> Q.    Well, if you lied, that would break the deal with the government; right?
> A.    Yes, it would.

Q.      Were you ever told that the government may decide not to keep the deal because you weren't cooperating?

A.      Yes.

Q.      Who told you that?

A.      If you lie -- if you told -- if you lied to them, then they could break the deal.

Q.      Were you ever told by Agent Kepner that whether or not you recalled something might cause the government to break the deal?

A.      No.

Q.      Did she ever say, Look, Bill, if your memory doesn't improve about this Torricelli note and whether you spoke to Persons, you may lose the deal?

A.      No.

Q.      She never suggested that?

A.      No.

*Id*. at 43-45.

Mr. Allen testified that neither Agent Kepner nor the prosecutors suggested the "covering his ass" memory to him:

BY MR. SCHUELKE:

Q.      Okay.  Here's what I really want to understand.  Did the government -- Mary Beth Kepner, Joe Bottini, Jim Goeke, Nick Marsh, Ed Sullivan, any of them -- did any of them put this idea that you spoke to Persons and he said Ted was just covering his ass in your head?

A.      No.

Q.      You have testified a few moments ago that as you were thinking about it and trying to remember what had occurred while you were on the plane coming to Washington, you spontaneously on your own remembered this conversation you had with Persons at the Double Musky; right?

A.      Yep.

435

Q.   And nobody from the government suggested that memory to you; is
     that correct?
A.   That's right.

Q.   You're here under oath, okay?
A.   It's true.

Q.   And you testified here today under oath that nobody from the
     government's side put the notion of Persons telling you Ted was
     covering his ass in your head.
A.   That's right.

Q.   This was your own independent, honest recollection of the events at
     the Double Musky on that night?
A.   That's exactly right.

Q.   And as I understand it, the only contribution that Agent Kepner made
     to that process of you remembering was that a couple days before you
     got on the plane to come to Washington, she told you, You better
     think about whatever happened with respect to this note; correct?
A.   That's true.

*Id*. at 25-27.

Mr. Bundy accompanied Mr. Allen to the trial preparation meeting with Mr.
Bottini and Agent Kepner on Sept. 14, 2008, and he recalled that Mr. Allen stated
during that meeting, for the first time to Mr. Bundy's knowledge, that he spoke
with Mr. Persons about the Torricelli note and that Mr. Persons told him "Don't
worry. Ted is just covering his ass." Deposition of R. Bundy, Nov. 4, 2009, at 74
& 88-89.  Mr. Bundy did not recall at the time that Mr. Allen had previously told
the prosecutors and Agent Kepner, during the meeting on April 15, 2008, that he
did not remember talking to Mr. Persons about the Torricelli note. *Id*. at 74.

Mr. Bottini testified that he and Agent Kepner met with Mr. Allen on Sept.
13, 14 and 15, 2008. Deposition of J. Bottini, Dec. 17, 2009, at 515-516; *see also*
Agent Kepner's notes, Sept. 13-15 (DOJ Bates nos. CRM066742-748).  He
testified that it was his practice to create a typewritten outline of a witness's direct
examination based on his notes of past interviews of the witness and to add

436

handwritten notes to the outline during trial preparation interviews. Deposition of J. Bottini, Dec. 16, 2009, at 34.  Mr. Bottini created several iterations of such an outline for Mr. Allen's direct examination ("Bill Allen Direct Outline", DOJ Bates nos. CRM089173-266), including one bearing his notes taken during his interview of Mr. Allen on Sept. 14, 2008. "Bill Allen Direct Outline", DOJ Bates nos. CRM089205-266.  Mr. Bottini's notes of his and Agent Kepner's interview of Mr. Allen on Sept. 14, 2008, which were taken on that outline, are reproduced below:

BA SEEN THIS!!

| |10/6/2002 | | Persons never |
|HW note from TS->BA | | pushed me on |
|You owe me a bill - remember Toricelli?| | this, etc - |
|You need to send me a bill. | | BOB NEVER DID |
|BA SEEN THIS? | | PUSH ME ON |
|Ted is covering his ass here (BA) . . . . | | THIS — |
|Mentioning Toricelli, etc. | | HE DIDN'T WANT |
| | | TS TO HAVE TO |
| | | PUT MORE $$ – |

THINK THAT PERSONS SAID —
HE IS JUST COVERING HIS ASS, ETC.



437

"Bill Allen Direct Outline", p. 33 (reverse side) (color in original)
DOJ Bates nos. CRM089242.[60]

*See* Deposition of J. Bottini, Dec. 17, 2009, at 516-526.

Mr. Bottini described the question and answer sequence reflected in those notes when Mr. Allen was shown the Torricelli note:

> Mr. Bottini:  So my recollection of the sequence of events was he was asked do you recognize this [the Torricelli note]?  He responded in the affirmative.  I think he made a spontaneous comment about that note, is what I recall.  "Yeah, he's just covering his ass here."
>
> Q       As an expression of his opinion?
> A       I think so, yes.  Then he was asked do you remember talking to Bob Persons about this?  He reflected that Persons never pushed me on this.  He never did push me on this.  He didn't want TS to have to put more money in, and then he said I think that Persons said he was just covering his ass.  That's what I interpret the sequence of my notes to mean.

Deposition of J. Bottini, Dec. 17, 2008, at 525-526.

Mr. Bottini testified that his experience with Mr. Allen during the Kohring prosecution was that Mr. Allen would ponder a question and "would remember stuff later on about that. You'd be going over it another time and he would give you some more detail about it." Deposition of J. Bottini, Dec. 17, 2008, at 527.  He

---

[60]Mr. Bottini testified that there might not be any significance to his use of different colored inks in his outlines:

The short answer is there may not be any significance. I go to an interview, and I've always got a couple of pens. A lot of times I pick them up interchangeably. When we get to my Bill Allen outline, that had been driving me crazy on that one, because I, you know, drew boxes and all that, and then caps and lower case, and all that. But it may not be any significance. It may be I picked up this pen, you know, or I picked up that one.

Deposition of J. Bottini, Dec. 16, 2009, at 279.

testified that he did not ask Agent Kepner to push Mr. Allen about the Torricelli notes, that no one pushed Mr. Allen or Mr. Bundy about the Torricelli notes, and that no one asked Mr. Bundy to talk to Mr. Allen about them. *Id.* at 558-559. Mr. Bottini testified that Mr. Allen recalled his CYA conversation with Mr. Persons entirely on his own:

> BY MR. SCHUELKE:
> Q     And as we have also observed, until September the 14th, we have no
>       evidence that these notes are pretextual.
>       But we certainly have it once we hear Allen's recollection of this
>       conversation with Persons, and we are to understand that Allen,
>       notwithstanding his cognitive difficulties as a result of his motorcycle
>       accident, arrived at this recollection in September 14th, utterly
>       unbidden by you or Kepner or anyone else.
>       That's what I'm to understand, yes?
> A     Yes.

> *Id.* at 558.

Mr. Bottini recognized that Mr. Allen's recollection of the CYA statement was a significant development:

> MR. WAINSTEIN:              And when you heard it, did you recognize
> (attorney for Mr. Bottini)  the significance of the recollection?
> THE WITNESS:                Well, it was significant that he remembered
>                             getting the note, and he didn't send Ted
>                             Stevens a bill, and the reason he didn't send
>                             Ted Stevens a bill is because Bob Persons
>                             told him he doesn't really want a bill; he's
>                             just covering his ass. Sure, that was
>                             significant.

> *Id.* at 535.

When he returned to the Public Integrity offices, he informed the entire team of Mr. Allen's CYA recollection, Ms. Morris, Mr. Marsh, Mr. E. Sullivan and Agent

Joy, except for Mr. Goeke who was still in Alaska.[61] *Id*. at 535-536. Everyone recognized its significance. *Id*. at 537-538.

Mr. Bottini did not recall at the time that Mr. Allen had told him and other members of the team in April 2008, that he had no recollection of talking to Mr. Persons about the Torricelli note. *Id*. at 527. Mr. Bottini knew that prosecutors' and agents' notes can contain *Brady* information (*id*. at 564-565 & 587), and he reviewed all his notes for *Brady* purposes, except the notes of the interviews of Mr. Allen on April 15 and 18, 2008. *Id*. at 567. He did not find those notes. *Id*. at 569. He missed those notes because he didn't remember the meeting in April, 2008 (*id*. at 563), or "having any notes, quite frankly, related to Bill Allen and his testimony in this trial" (*id*. at 560-561), and because the folder containing them was mislabeled:

> . . . I think I missed those notes because of the way that folder was labeled. If I would have written on that tab "Notes of Interview of Bill Allen on April 15 and April 18, 2006 [sic]," I probably would have pulled it and looked at it.

> BY MR. SHIELDS:
> Q    Is that were [sic] they both were, April 18 and April 15, in that same folder?
> A    Well, my folder that says "Documents to show to BA on April 15th," has my notes for April 18th written on the cover of the manila folder, and then on the inside lap of the folder. That's how I think I missed it.

> * * *

> Q    And in the course of doing that, organizing it that way by subject matter and breaking up the notes, you had forgotten about the April 15th interview and the notes you took then?
> A    I had.

> Q    And they were in those documents to be shown to Bill Allen file during that entire time?
> A    Correct.

---

[61]Mr. Goeke arrived in Washington on Sept. 15, 2008. *See* Deposition of J. Goeke, Jan. 8, 2010, at 395-396.

Q     And I gather I'm correct that you never looked in that file?

A     I didn't look in that file.

*Id*. at 571 & 575-576.

*See also* File folder, "Documents To Show BA (4/15/2008)" (DOJ CRM013686-687); Deposition of J. Bottini, Dec. 17, 2009, at 592 ("Yes. These are my handwritten notes from a follow-up meeting with Mr. Allen and Mr. Bundy on April 18th, 2008. I believe I wrote these on the outside of a file folder [labeled "Documents To Show BA (4/15/2008)" (DOJ Bates no. CRM013686)]."

     Mr. Bottini was asked by Mr. Welch on or about March 20, 2009 for any notes of the meeting with Mr. Allen on April 15, 2008. *Id*. at 576. He spent days searching for the notes in his files in Alaska without success; during the third week in April, 2009, his notes for the interviews of Mr. Allen on April 15 and 18, 2008, were found among five boxes of files which had been left behind in the Public Integrity Section in Washington. *Id*. at 576-587; *see also* Email from J. Bottini (USAAK), dated April 1, 2009, to K. Loeffler (USAAK), Subject: "Notes" ("Do you think that I should go back to DC and search through the PIN offices myself? I raised that w/ O'Brien and the others yesterday morning when they called, but they didn't seem to think that it was necessary. I'm almost positive that I would have taken any notes related to the April, 2008 meeting w/ Allen back there in my 'Allen' box that I had packed up (but don't actually recall seeing them back there). We've searched our war room here in office, the FBI war room, the FBI grand jury room, and PIN claims that they went through everything back there…….. We got back a bunch of stuff from PIN that arrived on Monday, but according to Kelli, there is a fair amount of stuff – things like other witness folders (other than Allen) , etc. that no one can account for now.") (ellipsis in original) (DOJ Bates no. CRM071829).

     Mr. E. Sullivan testified that he did not recall learning on or about Sept. 14, 2008, that Mr. Allen stated, during a pre-trial prep session, that Senator Stevens was "covering his ass" with the Torricelli note. Deposition of E. Sullivan, Jan. 6, 2010, at 308-309 & 334. He learned about Mr. Allen's CYA description of the Torricelli note "at or near the time he actually testified." *Id*. at 307. When he learned of Mr. Allen's CYA testimony, Mr. Allen's statements during the interview on April 15, 2008, "did not register":

A                          . . . The statement that he made in that April 15th issue in and of itself –

MR. HEBERLIG:          Interview.
(attorney for Mr. E. Sullivan)
THE WITNESS:           Interview, by not recall [sic] Bob Persons being there didn't register as anything, one way or the other; didn't make the notes more helpful or less helpful.

MR. SCHUELKE:          Well, yeah. But did it not register when he came up with a contrary recollection?
THE WITNESS:           Well, that's what I was trying. Later on, again, I earlier testified, I'm not sure when I became aware, but it was at or near the time they testified. And no, it did not register that some six or seven months earlier he had said in one sentence that he didn't recall Bob Persons or talking to Bob Persons. That did not register. But just to be clear, I was not involved in any of the prep sessions in between.

Id. at 331-332.

Mr. E. Sullivan testified that he did not remember at the time of Mr. Allen's CYA testimony, or during his deposition in this investigation, the interview of Mr. Allen on April 15, 2008. Id. at 310-311 & 349-350.

Mr. E. Sullivan never reviewed his interview notes for *Brady* information. (*Id*. at 157), though he recognized their importance for pre-trial witness preparation. *See* Email from E. Sullivan, dated Aug. 19, 2008, to N. Marsh, J. Goeke, J. Bottini and B. Morris, Subject: Charlie Hart ("In addition to the GJ transcript Nick sent around, attached are the following for Hart: (1) his 302; (2) transcript of the BA/Bob Persons call wherein they discussing [sic] destroying the Chugach Sewer invoice; (3) [my] rough notes [of interview on June 5, 2007]; and (4) Chugach Sewer invoices.")(DOJ Bates nos. CRM0035235-305); Email from E. Sullivan, dated Aug. 17, 2008, to N. Marsh, J. Goeke, J. Bottini, B. Morris and W. Welch, Subject: Stiefel ("Team – In preparation for next Thursday's meeting with

Stiefel, attached is a rough direct exam outline; the 302 from his initial interview with the FBI in 9/06; notes from two subsequent interviews with prosecutors; his GJ testimony; and underlying dox relating to his exposure with VECO. . . . Please note that we will also need to have MBK [Agent Kepner] send us the 302 from his second interview with Nick, MBK, and me. Please also let me know if you need anything else. Thanks. Ed")(DOJ Bates no. CRM032844).

He testified that no one asked him to review his notes of witness interviews for *Brady* disclosure purposes, and he never reviewed his notes of the interview of Mr. Allen, or of any witness in *Stevens*, for *Brady* information, though he was aware of the decision in *United States v. Andrews*, 532 F.3d 900 (D.C. Cir. 2008), which was decided on July 15, 2008. Deposition of E. Sullivan, Jan. 6, 2010, at 157-158. In *Andrews*, the D.C. Circuit stated that the government is obliged to disclose *Brady* information contained in "rough notes":

> Contrary to the government's contention in the district court, "[i]t seems too plain for argument that rough notes from any witness interview could prove to be *Brady* material." *United States v. Harrison*, 173 U.S. App. D.C. 260, 524 F.2d 421, 427 (D.C. Cir. 1975). As we have previously explained, the "possible importance of the rough notes" for the purpose of providing leads or of impeaching a witness for discrepancies between the notes and the witness' testimony "is not diminished in cases where" the notes form the basis of a final report that the prosecution turns over to the defense. *Id*. Nor is the prosecutor relieved of her *Brady* obligation if the notes are kept by the agent and never reviewed by the prosecutor.

> *Andrews*, 532 F.3d at 906 (brackets in original).

*Andrews* was prosecuted by the Public Integrity Section and Mr. E. Sullivan argued a related appeal:

> Q     I'm thinking of "U.S. v. Andrews." Did you work on that?
> A     I did not work on Andrews. I handled an appellate argument for a co-defendant in that case, Turner [*United States v. Turner*, 548 F.3d 1094 (D.C. Cir. Dec. 5, 2008) (argued on Sept. 12, 2008)], but I wasn't assigned to step in to do the oral argument until I think July of 2008.

Q      The oral argument for Turner?

A      The co-defendant.


Q      Right. But were you familiar with Andrews?

A      I familiarized myself with the Andrews case, Andrews and Turner, as part of getting ready for the appellate argument in Turner.


Q      And in part that was a Brady case too. Wasn't it?

A      In Andrews, yes.


Q      And that dealt with at least with respect to the Brady part, the handwritten notes were an issue.

A      That's my recollection.


Q      Right; and the circuit said that handwritten notes can contain Brady?

A      Yes.


Q      And that came down, I think, July 15, '08?

A      I don't know the exact date, but sometime then.


Q      Sometime in July. I have the decision handy if you want to look at it.

A      Sure.


Q      And I think it was July 15th.

A      Okay.


Q      And did that spark any -- in terms of Stevens did that spark any review of notes?

A      It actually did. The entire group went up to Alaska sometime. I don't know exactly when in August, but one of the discussions, the early sort of discussion with the agents is there was a meeting in a war cube in the U.S. Attorney's office up there, and I wasn't terribly focused on the meeting because I was working on some other stuff. But I did hear in the background what they were discussing with the agents is the trial team wanted the agents to go back and pull their notes to compare them to the FBI, the FBI 302s or the MOIs for the IRS to see if there's any inconsistencies for purposes of complying with the Andrews decision.

444

Q      Is this post-Stevens indictment?
A      Yes.

Q      And did they review the notes?
A      It's my understanding they did.

Q      And who was in charge of that?
A      In charge of doing the review?

Q      Seeing that it was done.
A      I don't think any specific person was tasked with it. I know the individual agents went and pulled their 302s or individual 302s together.

Q      And who was at the meeting when this was discussed?
A      As I said, I think I was sitting a [sic] computer, like across the room, but the meeting I think was primarily with Brenda Morris, Nick Marsh, Joe Bottini. I'm not sure, but I imagine Jim Goeke was there, all the agents: Larry Bateman, Mary Beth Kepner; Dennis Roberts may have been there. Chad Joy may have been there.

Q      And this was all about agent's notes?
A      In that context, it was, yes.

Q      Did any attorney notes get reviewed?
A      I personally did not review my notes, and nobody asked me to review my notes.

BY MR. SCHUELKE:
Q      Why did you not?
A      I wasn't number one. And I wasn't on the trial team. I wasn't handling witnesses, so nobody came to me and said do you have notes? Nobody came and asked me to say could you review your notes to do a Brady-Giglio review of your prosecutor notes of any witness.

Q      Why would someone have had to tell you that?
A      Well, I think that the members of the trial team that are handling the witnesses and that are in charge of making disclosures for

Brady-Giglio purposes -- you know, if they were concerned about that
-- they should have come and asked me about that.

BY MR. SHIELDS:

Q     But Andrews just came down and said notes could contain Brady.
      Right?

A     Yeah. I don't have the exact holding, but I think the focus in sort of
      the context in which it was raised was to make sure that the agents
      notes, because that's how the context came up in the Andrews
      decision. I think there was an issue about agent's notes being
      inconsistent with a 302.

Q     But notes are notes, whether they're written by an agent or by a
      lawyer, aren't they?

A     Notes are notes. I will say this. We talked earlier about formal
      training. I didn't receive any formal training on this, and nobody ever
      told me as part of the process that I should go back and look at
      prosecutor notes. And specific to Stevens, nobody asked me to go
      back and look at my notes.

*Id*. at 154-158.

*See also* Deposition of W. Welch, Jan. 13, 2010, at 91-92 ("We circulated the
[*Andrews*] opinion within Public Integrity within a day or two of it coming down
and just told prosecutors to pay heed to what the D.C. Circuit had decided and in
particular, the dissenting opinion of Judge Rogers. Judge Rogers had found or had
opined that the Brady error was not harmless."); Email from D. Petalas, dated July
15, 2008, to R. Hulser, A. Brickley, B. Morris, P. Ainsworth and W. Welch,
Subject: "DC Cir Andrews Opinion released" ("All: The DC Cir has affirmed the
conviction . . . The opinion of the court holds that there was no Brady violation . . .
In a concurring opinion, however, Judge Roberts [sic] (who clearly has an agenda
here) takes a swipe at us, asserts that she would have found Brady error, but that
she agrees with the court that it was not plain and thus not reversible. . . . The
opinion is attached.") (DOJ Bates no. CRM0118935-417).

     *Andrews* was cited by Williams & Connolly and by the government before
and during the trial. *See Stevens*, Government's Memorandum in Opposition to
Defendant's Motion to Compel Discovery, filed Sept. 9, 2008, at 10 ("Rough

notes of interviews are not subject to production unless they constitute statements falling under the Jencks Act or contain <u>Brady</u> material. <u>United States v. Andrews</u>, 532 F.3d 900, 906 (D.C. Cir. 2008) . . .")(Dkt. No. 63); *id*., Senator Stevens's Emergency Motion to Dismiss Indictment or for a Mistral Due to Government's Continuing *Brady* Violations, dated Oct. 2, 2008 ("Emergency Motion"), at 9-10 (Dkt. No. 126); *id*., Senator Stevens's Motion to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct, filed Oct. 5, 2008, at 26 (Dkt. No. 130); *id*., Government's Opposition to Defendant's Motion to Dismiss Due to Alleged Misconduct, filed Oct. 6, 2008, at 10 ("<u>Andrews</u>, 532 F.3d at 907 (no Brady violation where defendant received notes of agent immediately before defense case was to begin and had them in time to make effective use of them)") (Dkt. No. 134); *see also id*. at 8-9, 22 & 30; *id*., Trial Transcript, Oct. 8, 2008, P.M., at 70 ("Mr. Marsh: . . . As the Andrews' case from this Circuit recognized, [a *Brady* violation is] all about timing.").

Mr. E. Sullivan helped draft the Government's Opposition to Defendant's Motion to Dismiss Due to Alleged Misconduct, filed Oct. 6, 2008. *See* Email from E. Sullivan, dated Oct. 5, 2008, to W. Welch, N. Morris, J. Bottini, J. Goeke, N. Marsh, Agent Kepner, *et al*. ("Gang - here's the current draft of the motion. . . .") (DOJ Bates nos. CRM038864-908); *see also* Email from E. Sullivan, dated Oct. 6, 2008, W. Welch, B. Morris, *et al*., Subject: "Section C insert" ("Draft section C for the brief")(DOJ Bates nos. CRM039428-440); email from E. Sullivan, dated Oct. 6, 2008, to W. Welch, B. Morris, *et al*. ("Please provide hand written edits to this version to me.") (DOJ Bates nos. CRM039446-478); Email from E. Sullivan, dated Oct. 6, 2008, B. Morris, Attachments: "US Opp to D MTD (final).pdf." (DOJ Bates nos. CRM039489-521).

In his draft of the government's response to Senator Stevens's Emergency Motion, Mr. E. Sullivan cited *Andrews* specifically for the principle that "rough notes" containing *Brady* information must be disclosed to the defense:

Rough notes of interviews are not subject to production unless they constitute statements falling under the Jencks Act or contain <u>Brady</u> material. <u>United States v. Andrews</u>, 532 F.3d 900, 906 (D.C. Cir. 2008) (citing <u>United States v. Harrison</u>, 524 F.2d 421, 427 (D.C. Cir. 1975)); <u>United States v. Safavian</u>, 233 F.R.D. 205, 207 (D.D.C. 2005); <u>Trie</u>, 21 F. Supp.2d at 26.

447

Draft Government Memorandum in Opposition to Defendant's Motion to
Dismiss or for a New Trial, at 6 (attached to email from E. Sullivan, dated
Oct. 2, 2008, to J. Bottini, J. Goeke and N. Marsh) (DOJ Bates nos.
CRM037363-378).

*See also* Email from E. Sullivan, dated Sept. 4, 2008, to IRS SA L. Bateman, IRS
SA D. Roberts, Agent Kepner, J. Goeke, J. Bottini, N. Marsh, B. Morris, Agent
Joy, *et al*., ("Larry – Thanks. Please copy the rest of the team, too, so we can all
stay on top of this. We will need to see the notes for Rocky. The [*Brady*]
spreadsheet also makes reference to 'possible Giglio #10 Hess.' I'm not sure what
that refers to, but if it's possible Giglio, then we'll need to see it.  Just a reminder
that we should err on the side of caution and, to the extent information it [sic] is
potentially Giglio or Brady, we should produce it.")(DOJ Bates no.CRM055481).

Mr. Goeke learned about Mr. Allen's recent recollection of his CYA
conversation with Mr. Persons, "a significant piece of evidence for the
government", after he arrived in Washington on Sept. 15, 2008. Deposition of J.
Goeke, Jan. 8, 2010, at 395-396.  He testified that, at the time, he did not recall
Mr. Allen's prior inconsistent statement on April 15, 2008. *Id*. at 397.  He did not
review his notes for *Brady* information because "I didn't have time to and I wasn't
asked to", though he recognized that notes can contain *Brady* material. *Id*. at 19-20
& 435-436; *see also id*. at 22-23("I absolutely recognize [my *Brady* obligation].
And if I had believed that there was Brady/Giglio material in my notes, I
absolutely would have reviewed them.").

Mr. Goeke testified that he forgot Mr. Allen's prior inconsistent statement
because it had "no significance to me at the time". *Id*. 400.  He had a different
reaction when he found his notes of the April 15, 2008 interview during the
investigation by the O'Brien Team in 2009:

Q	And when you discovered your notes post-trial, did you read them?
A	I did.

Q	And how did you react at that point?
A	That's not good.

Q	Because?
A	That was an important part of the trial. Or it was an issue that

448

Williams & Connolly certainly thought was an important part of the trial. It was an issue that was -- there were a lot of discussion about it at trial.

*Id*.

Mr. Marsh recalled that, prior to trial, Mr. Bottini and Agent Kepner stated that they showed Mr. Allen the Torricelli note and that he remembered that Mr. Persons told him "that's just Ted covering his ass." Deposition of N. Marsh, Feb. 2, 2010, at 374. He testified that Mr. Allen's conversation with Mr. Persons was "good for the case on the gift giving". *Id*.; *see also* FBI 302 of Interview of N. Marsh on March 18 & 19, 2009, at 7-8 ("MARSH remembers during trial preparation either KEPNER or BOTTINI had shown ALLEN the November or October 2002 TORRECELLI [sic] note. It was explained to MARSH that the note jogged ALLEN's memory. MARSH recalled ALLEN indicated he had remembered two specific conversations. . . . MARSH's understanding is that the first conversation was between ALLEN and BOB PERSONS. PERSONS indicated to him, not to worry about sending a bill to STEVENS because STEVENS was just covering his ass. . . . These statements MARSH felt were good, not monumental, but generally helpful. MARSH was not surprised that ALLEN would remember these. As MARSH noted previously it was not uncommon for ALLEN's memory to be triggered and he would subsequently have a very specific memory. . . . MARSH was unsure if they had shown ALLEN the TORRECELLI [sic] note previously.") (DOJ Bates nos. CRM000752-764).

Mr. Marsh did not remember at that time, or during his deposition in this investigation, that Mr. Allen had been interviewed on April 15, 2008 and had stated that he did not recall speaking with Mr. Persons about the Torricelli note. Deposition of N. Marsh, Feb. 2, 2010, at 361 & 374-375. Mr. Marsh testified that he did not recall taking any notes during that interview, that he searched his file for notes and found none. *Id*. at 365. He acknowledged that handwritten notes of agents and prosecutors should be reviewed for *Brady* information (*id*. at 21), but he "didn't specifically remember" if he reviewed his notes:

Q     Did you retain notes?
A     Whatever notes I took, I would have retained.

Q     In connection with the Stevens' case and the Brady review, did you

449

review those notes?

A    Notes that I had taken? I don't specifically remember going through my notes. I know I would have gone through anything I had with respect to -- if I had information concerning witnesses I was doing, I don't recall that I went through every part of my file. I tended to keep my notes in kind of a haphazard fashion.

BY MR. SCHUELKE:

Q    The answer is you did not do a systematic review of your notes for Brady disclosure purposes; is that right?

A    Well, I remember reviewing everything that I -- I just don't remember either way. I remember reviewing a lot of notes. I remember going through a lot of documents. I don't know if I got -- I believe I got most everything. I would have gone through everything -- I just don't have a specific memory of having sat down at one single point and going through all of my notes. It would have been customary for me to have gone through whatever I had available just to double check.

\* \* \*

Q    Sorry if I've asked you this earlier, just to be sure. Were any prosecutor's notes of interviews reviewed in connection with the Brady review?

A    Well, I think we were all generally responsible for reviewing our own notes. Like I said, I don't have a specific memory. I'm sorry.

Q    I'm sorry. You said earlier, I think, in terms of preparing witnesses, people were assigned various witnesses to present to trial. My question is specifically with respect to the Brady review. Were any lawyer's notes reviewed for Brady purposes?

A    I don't know.

Q    Did you review any of your notes for Brady purposes?

A    I have a general memory of reviewing some of my notes. I don't specifically remember sitting down and going through all of my notes. I didn't look at it as needing to do a separate secondary -- my view on it was I reviewed everything as I had it. If I saw something that was Brady, I would note it or disclose it. I don't -- I generally remember going through my notes from time to time. I don't remember sitting down as a discrete fashion irrespective of

450

everything else and specifically going through my notes. I just don't remember one way or the other whether I did that specific task. I know that I was generally keeping up with the material I had and reviewing it to make sure that if I saw anything, I would be sure to note it.

Q       Were the prosecutors ever told to review their notes for Brady purposes?

A       Not that I'm aware of.

Q       Were the prosecutors aware of their obligation to review their notes for Brady purposes?

A       I'm not aware.

Q       Were you aware of your obligation to review your notes for Brady purposes?

A       I was aware generally that I needed to make sure that I reviewed anything that was in my possession.

Q       For Brady?

A       Yeah.

Q       Were you familiar with the case that had just come down weeks earlier in the D.C. Circuit Court, a PIN case, U.S. vs. Andrews?

A       Yes.

Q       Dealing with Brady material and notes?

A       Yes, I was familiar with that.

Q       If you recall, that case made it perfectly clear that notes, handwritten notes of witness interviews, can contain Brady material and need to be reviewed.

A       Right, although if I remember correctly, that was a slightly different circumstance, but generally speaking, yes. We have an obligation to go through everything we can get our hands on.

Q       The circumstance in Andrews was what? They were agents' notes, not prosecutors' notes?

451

A    I could be wrong, but I thought the issue in Andrews was that there was material -- it was Giglio as to the testifying agent. In other words, there was a discrepancy between the 302 and the agent's notes. The issue wasn't whether there was Brady material in the notes -- I could be wrong. I thought it was more an issue of the fact that the agent couldn't be cross examined or the material was turned over late and it arguably impinged upon the ability to cross examine the agent about the fact that there was a discrepancy between the 302 and the notes.

Q    Giglio is part of Brady; right?
A    Excuse me. Yes.

*Id*. at 20-21 & 115-118.

Mr. Welch testified that he learned about Mr. Allen's recollection of Mr. Persons's "CYA comment" shortly after the interview on Sept. 14, 2008, from Mr. Marsh who told him about "the nuggets that Bill Allen has come up with":

I recall in September of 2008, some time after Mr. Allen obviously had arrived in D.C. but before the start of the trial, Mr. Marsh stopped me in the hallway and said have you heard about a couple of the nuggets that Bill Allen has come up with or words to that effect. I said no. At that time, he told me in the prep interview that Mr. Allen had recalled the "CYA" comment from Mr. Persons. That was the first time I had heard it and it surprised me.

* * *

He proceeded to tell me that in the course of a pre-trial prep interview, Mr. Allen had recalled in the context of the Torricelli letter, Mr. Persons characterizing the letter as a "CYA" comment or letter, meaning that was the information that Marsh knew had come from the prep interview and he was relating it to me.

My recollection is, as I indicated, I was surprised. I had not heard that before, meaning that was a piece of information that I believed I would have remembered if I had been told that before.

I recall that I went into the war room, which was the room where all the Stevens' documents were, where the agents were working out of, and Mr. Bottini and Ms. Kepner were in there.

I said to Mr. Bottini did Bill say that, I hadn't heard that before, and Mr.

Bottini had indicated yes, that he had, and that -- I asked how did that happen. Mr. Bottini stated they had shown the letters to Mr. Allen and that had prompted Mr. Allen's memory.

\* \* \*

My sense from the way it was being reported was that that interview had maybe been a day, two days, three days before. I'm not entirely sure.

\* \* \*

BY MR. SCHUELKE:

Q    Did you ask Marsh or Bottini, you've never shown Allen these notes before or why didn't you ask him about this before?

A    I didn't ask those questions. I believe I had asked when was the first time he had said that and they had said it was in the prep interview and it had been prompted by the showing of the Torricelli letters.

Deposition of W. Welch, Jan. 13, 2010, at 47-50.

Mr. Welch testified that he did not learn of the April 15, 2008-interview of Mr. Allen, the related emails, and Mr. Sullivan's and Mr. Goeke's notes of that interview, until March 31, 2009, the day before the government moved to set aside the conviction and to dismiss the indictment with prejudice. *Id*. at 61 & 65.

Ms. Morris testified that she became aware of the Torricelli note produced by Williams & Connolly almost immediately upon its receipt. Deposition of B. Morris, Jan. 15, 2010, at 283-284. She was told about the Torricelli notes by Mr. Marsh; she believed that they were "pretextual" and "that the Senator had created them for the production":

Q    Okay. And what do you remember about how [the Torricelli note] came to your attention?

A    I know that we were in anticipation of receiving the documents from Williams & Connolly, and I know that Nick in particular was very excited about diving into the documents. I can see him in my mind with the box going down -- he said, you know, like they're here. It was giddy, and he was in his office and starts tearing through them. And he was going through them, and I have a recollection of stopping by his office to say, "How's it going, anything good?"
He said, "There's some interesting stuff here."
You know, he was just tearing through them. And I believe that day

453

or the next day or within a day and a half, something along those lines, Nick showing me the letters. And I -- my initial reaction is I didn't think they were a problem at all. I thought that the Senator had created them for the production. I –

Q     So you thought they were pretextual?

A     Totally. I --

BY MR. SHIELDS:

Q     And forged and back-dated, you mean?

A     Yes, I totally did not believe that he gave that to Bill Allen, and my first instinct was to call Bill. And the whole -- you know, I bet Bill never even -- he never saw those, and he never received them. And just the tone of the letter and talking about Torricelli, Bill Allen wouldn't -- I would be shocked if he even knew who Torricelli was. I said something along those lines.

And I don't know if it was that same time. I remember having a conversation with Nick one-on-one like that, and then I remember we were in group at some point talking about it. And, again, you know, somebody was expressing, well, you know, this could be bad because he's asking for a bill. And I said -- my -- I remember using the term. I said, "Big deal, it gives him a defense, but it doesn't give him a winning defense." I said, "To me, it's a perfect example of gator arms."

And they were like what do you mean?

Q     Of what, what did you say?

A     Gator arms, you know, have you been to dinner or lunch with somebody, the check comes and you have a friend whose arms aren't quite long enough to reach the bill. They make the feigned pass, but they don't actually get it. So I said, "He seems like a perfect example of gator arms to me."

And I was -- you know, I remember we laughed about it, and somebody said you got to -- at some point later, somebody told me you have to work that in your opening when you do your opening. Remember you talked about the alligator arms. So, I mean, I just always -- I never -- I was never afraid of it. I just thought big deal, it gives him a defense, but it's not a winning one. And I doubt that Bill

454

even saw it.

*Id*. at 284-286.

*Compare* Deposition of W. Welch, dated Dec. 16, 2009, at 42-43 ("I thought that the [Torricelli] letters were quite helpful because at the time, as we were beginning to shape the indictment, I was telling them that I believe the best theory under which we should draft the indictment was to allege false statements, not just for gifts, but for the failure to report liabilities. . . . For a period of time, I would say a month or so, it took Morris and Marsh a bit of time to sort of understand that concept. . . .  Over time, I convinced them this was the best way to approach because we would get them either way, meaning if he claimed it was a gift, the disclosures were false. Once the liability accrued, he still had false statements that he was filing. He was going to have a difficult position at a trial explaining the letters away.").

Ms. Morris testified that she may have been told soon after the Torricelli notes were received that an interview with Mr. Allen had been set up to question him about the notes. *Id*. at 287.  She later learned that Mr. Allen did not recall seeing the Torricelli note and/or speaking to Mr. Persons about it:

Q      And what did you learn?
A      I think it was that Bill didn't recall. He didn't recall seeing the note, and I didn't think that was a big deal, either.

Q      He didn't recall seeing the note or he didn't recall talking to Persons?
A      I don't remember which one. It could have been both or Persons rings a bell, too, but I just didn't think it was a big deal.
                              * * *
Q      Did [Mr. Marsh] tell you we did ask him and he doesn't remember talking to Persons?
A      My -- my memory was that he remembered getting the note. He remembered the note which I remember I was shocked at that because I was thinking –

Q      Allen remembered the note, yeah.
A      Yes. And I remember being shocked at that because I didn't think Allen -- I thought Allen was going to say, no, I didn't get the note,

and I wouldn't think he'd remember it. So –

Q    And you also, as you told us, suspected that the note was bogus
     anyway?
A    Correct, correct.

Q    Right.
A    So I don't know the sequence, but I remember more about I was
     shocked more -- my reaction or my focus was more on the fact that he
     got the note than anything else.

BY MR. SHIELDS:
Q    And this is back shortly after the notes came in when they --
A    That's correct.

Q    -- had him on the phone?
A    That's correct.

Q    And you remembered that they asked and you weren't sure what --
     what he said in terms of his memory, whether it was not talking to
     Bob Persons or --
A    I don't -- I don't recall Bob Persons coming up. Again, my focus was
     that he got the note. I was just shocked that he got the note.

*Id*. at 288-289 & 299-300.

    Ms. Morris remembered a later conversation with Mr. Marsh about the
Torricelli note when he told her, after a prep session with Mr. Allen (*id*. at 295),
that Mr. Allen had remembered the CYA conversation with Mr. Persons; that was
"a big deal":

A    Yeah. I don't -- I don't recall the distinction with Persons until later
     when I definitely have a memory of Nick being giddy and coming
     into my office and saying, "Guess what, you know, Bill says that Ted
     was just covering his ass."
     And we were just kind of laughing about how Bill just gets straight to
     the point, doesn't he? I mean, it wasn't –

456

Q     Right. I'll get to that in a moment.

A     All right.

BY MR. SHIELDS:

Q     I don't understand what you mean you didn't recognize the distinction until later.

A     The -- my understanding was initially that Bill had received -- I was going to say that maybe he didn't remember the note or that he hadn't remembered talking to Persons. It was something like that initially, I remember. But I still didn't see it as a problem. I didn't see it as a big issue. But I do remember some time later, Nick specifically coming in saying, "Bill -- you know, Bill does remember talking about Persons and Bob Persons told him, oh, that's just Ted covering his ass."
I remember that being a big deal.

*Id*. at 290-291.

Ms. Morris testified that, when Mr. Marsh told her about Mr. Allen's CYA statement, she remembered that he had been previously interviewed about the Torricelli note, but she didn't recall "there being a difference" in his statements:

BY MR. SCHUELKE:

Q     When Marsh told you about this piece of evidence that Bottini had just heard from Mr. Allen in September, did you ask Marsh, well, hadn't we ever asked him that before? Why is this new? Why are we only learning this now?

A     No, I don't believe I asked him that.

BY MR. SHIELDS:

Q     But they had asked him before.

A     I just don't recall. I believe so, but I don't recall me focusing in on that with Nick or asking that question.

Q     So at the time that Nick told you about what he had just said –

A     About the cover your ass.

Q     -- did you recall he had been previously questioned about the notes?

A     Yes.

Q      But you didn't recall what he was asked or what he said?

A      No. My focus again was just that I was shocked he got the note. I really was thinking Bill was going to say I've never seen that before so that was my focus. I didn't focus on the other --

BY MR. SCHUELKE:

Q      So in short, based on your memory of what you'd been told about the April 15th interview, when you heard about the cover your ass statement in September --

A      Uh-huh.

Q      -- it's your testimony that you were not in a position to say wait a minute, that's different from what he said in April. In April, he said he didn't remember talking to Persons.

A      I didn't recall there being a difference, no.

                         * * *

Q      -- pretrial in September when you're told he has now described these as CYA notes, do you recall then that he had been previously questioned and remembered the notes and that's all you remembered he had said, that he had remembered it?

A      I knew that. I knew that he had been previously questioned. I knew that he acknowledged the notes, but I didn't connect up that, well, why didn't he say that earlier or --

Q      And it came to your mind in September when Marsh tells you about the CYA statement?

A      What came to mind was more of -- you know, see, great, just ask him. I remember it was something along those lines.

Q      And did --

A      Maybe I didn't think he knew or been asked. I don't recall.

Q      Did the question come to your mind why didn't he tell us this six months ago?

A      No.

Q      Did you have this -- did you discuss that with anyone else, that he had been previously questioned about the notes and hadn't made this

statement?

A    No, not that I recall, no.

Q    Did -- did you discuss with any of the other members that he had been
     previously interviewed about the notes?

A    No, not that I recall.

Q    And the question didn't occur to you, why is he coming up with it
     now when he didn't come up with it earlier?

A    No, and Bill Allen, I think, was just -- he would just take a lot of time
     in dealing with him. And I knew that with Joe, that he had had to take
     a lot of time with Bill. It didn't seem abnormal or weird given that it
     was Bill. I mean, he just needs -- any kind of prep session with him
     took time.

                              *  *  *

Q    . . . But at the time the CYA comes up, you recall that they had gone
     and met with him after the notes first came in?

A    That's correct.

     *Id.* at 301-302, 306-308 & 311.

Ms. Morris testified that she had no reason to think that Mr. Allen's CYA
statement was anything other than an honest recollection of a conversation he had
with Mr. Persons. *Id*. at 304-305.

     Ms. Morris did not supervise the composition of the two *Brady* letters sent
to Williams & Connolly and played no role in identifying the information that was
disclosed in those letters. *Id*. at 53.[62]  Ms. Morris testified that it was her
understanding that agents' notes were reviewed for *Brady* material, but could not
identify the source of her understanding or whether in fact the notes were
reviewed. *Id*. at 58, 60 & 62-63.  Reviewing agents' notes for *Brady* information is
"not uncommon", "[i]t doesn't happen all the time, but it does happen." *Id*. at 58-
59.

---

[62]Each *Brady* letter was sent out over her name.  Ms. Morris signed the second *Brady*
letter, dated Sept. 9, 2008 (DOJ Bates nos. CRM022547-551), and she believed that Mr. Bottini
signed the first *Brady* letter, dated Aug. 25, 2008 (DOJ Bates nos. CRM079372-377). *Id*. at 83 &
155.

Ms. Morris did not review her notes for *Brady* material and was not aware that any prosecutors' notes in *Stevens* were reviewed; she thought that the prosecutors reviewed their notes <u>after</u> the trial, when Agent Joy filed his complaint. *Id*. at 62.  She testified that, though she was familiar with *Andrews*, reviewing prosecutors' notes for *Brady* material "would never even cross my mind":

> Q    Did you ever ask whether they were reviewing -- that is, the trial team were reviewing their own handwritten notes of witness interviews for possible Brady?
>
> A    No, and to be quite honest, until all of this happened, that's something I would have never asked another trial attorney or a junior trial attorney, nothing. I mean, unless something would trigger that I was aware that there was some kind of meeting or interview that took place where something may have happened that someone may recollect something that someone else didn't recollect. So, no, that would never even cross my mind.
>
> \* \* \*
>
> Q    When you say it would never cross your mind to ask someone to review their handwritten notes of a witness interview, is it because you would assume they would have done that themselves or that -- or is it because you didn't think it was necessary?
>
> A    Well, kind of twofold, I would -- unless there was something that was contrary to any information in a 302 that a attorney may have reviewed and they may have been part of an interview, I don't see where it would ever come up.

BY MR. SCHUELKE:
> Q    Well, how could you possibly know if there's anything contrary if you don't review the notes?
>
> A    I know it might sound crazy now, but the bottom line is I don't know of any prosecutor that looked at any other attorney's notes. It's not -- it's not a common practice.
>
> \* \* \*
>
> Q    I don't understand your -- your answer on the notes. You told -- you said that you wouldn't expect one attorney to review another attorney's notes.
>
> A    Right.

460

Q       My question was: Regardless of who's doing the review, were
        attorneys' notes reviewed in connection with the Brady review?
A       Normally, no.

                            *   *   *

Q       But there was a case -- and I have the decision if you need to refer to
        it. Wasn't there a case handed down in the D.C. Circuit on July 15th
        of '08, U.S. v. Andrews, which was a Public Integrity case. Do you
        recall the case?
A       Yes.

Q       And one of the issues in that case was Brady and notes containing
        Brady material, and the Court found that it was too plain -- I'm
        paraphrasing the language the Court used -- too plain to dispute that
        notes, handwritten notes, can contain Brady material.

MR. ROSENBERG:          Agent notes or attorney notes?
(attorney for Ms. Morris)
MR. SHIELDS:            Notes.

BY MR. SHIELDS:
Q       Are you familiar with that case or that concept?
A       I am familiar with the concept, yes.

Q       So why wouldn't it -- notes be routinely -- notes of witness interviews
        be routinely reviewed for Brady purposes, especially when you have a
        case that's got two years' worth of notes?
A       Attorneys take different kind of notes. Like my notes are very cryptic,
        and, usually, my notes if I sit in with a witness and I'm asking
        questions, my notes are to remind me to look at another witness'
        something or to look at another document or to follow up on this on
        an issue. My notes aren't necessarily or verbatim of what happened
        during the course of the interview. And, again, I've had occasion
        where I may have said, you know, or taken a note to go let me make
        sure to follow up on something that's really important. But as a
        normal course, attorneys' notes are not reviewed. At least they weren't
        at this time. They weren't reviewed for Brady.

                                461

Q     And were agents' notes routinely reviewed for Brady?
A     Not routinely, but they were.

Q     Were they reviewed in the Stevens case?
A     I don't know.

*Id*. at 54-55, 57 & 59-60.

13.   Sept. 25, 2008     Brendan Sullivan features the Torricelli note
                          prominently in his opening statement

Senator Stevens's trial began less than two weeks later and the Torricelli
notes were immediately at center stage, as the prosecutors had anticipated since
April 11, 2008, three days after the notes were received from Williams &
Connolly.[63]  Unaware of the recent CYA recollection of the government's
principal witness and uninformed of his prior inconsistent statement, Brendan
Sullivan read the Torricelli note to the jury and described it as evidence that
"jumps off the page and grabs you by the throat to show you what the intent of
Ted Stevens was":

A lower deck was built to match the upper deck in the year 2002. And again
going back to intent, listen to the e-mail traffic. This is now months and
months past the original renovation. This is on the deck that was talked
about. He writes to Bill Allen: Listen, listen, thanks for the work. He's
writing to Bill Allen. Bill Allen. Thanks for the work. You owe me a bill.

---

[63]*See* Memorandum to Alice S. Fisher, dated April 11, 2008, from William Welch and
Brenda Morris, at 14-15 ("The October and November 2002 notes are both helpful and harmful
to STEVENS. . . .The notes, however, are helpful to STEVENS' remaining argument here: that
he wanted to pay for the work all along, and that the failure to pay for it was the result of a
miscommunication between STEVENS and Catherine Stevens. On one hand, they permit
STEVENS to portray himself as someone who truly wanted to comply with the Senate ethics
rules.") (DOJ Bates no. CRM016377-395); *see also* Prosecution Memo, dated May 21, 2008, 70-
71 ("we anticipate STEVENS will attempt to rely on a series of documents that were created in
the fall of 2002. First, we believe STEVENS will try to make use of two handwritten notes that
he sent ALLEN in the fall of 2002. . . .The third set of documents are a series of emails on
December 17, 2002, between STEVENS and Barbara Flanders, concerning invoices for the work
done in the fall of 2002 on the Girdwood Residence.") (DOJ Bates nos. CRM048387-465).

Remember Torichelli, another Congress person who got in trouble.
Friendship is one thing, compliance with the ethics rule, entirely different. I
asked Bob Persons to talk to you about this, the bill. Don't be angry at him.
It just has to be done right. It jumps off the page and grabs you by the throat
to show you what the intent of Ted Stevens was. That's in October 2002. A
month later he's writing to Bill Allen saying don't forget we need a bill for
what's been done at the chalet. He writes to his staff person in his office and
he says, There will be bills coming in after the first of the year. Bob Persons
is writing her [probably should be "riding herd"] to make sure we get them.
And the staff person writes back to Ted Stevens and says Catherine thought
there would be some bills coming in for the recent work. All this is
indication, the most power [sic] evidence of the intent on his part. He had no
intent to make a false statement. He had no intent to file any form with the
Senate that was not true.

*Stevens*, Trial Transcript, Sept. 25, 2008 A.M., at 73.

14.    Oct. 1, 2008          On direct, Mr. Allen testifies that Mr. Persons told
                             him in 2002 that "Ted is just covering his ass"
                             with the Torricelli note

Less than a week later, Mr. Allen provided the government's answer to the
Torricelli note, with some initial difficulty:

BY MR. BOTTINI:
Q.    *At some point, Mr. Allen, did Senator Stevens ask you to send him a
      bill for the work that had been done in 2002?*
A.    *I don't think so.*

Q.    All right. Let me show you what has been marked for identification
      only at this point, Government's Exhibit No. 495. Mr. Allen, just take
      a moment to read that to yourself. Can you read it okay on the screen,
      or would reading it on a piece of paper be better?
A.    I think I can do it here.

Q.    Okay.
A.    When I think of the many –

463

Q.      Just read it to yourself for just a moment. Don't read it out loud at this
        point, okay?
A.      Okay.

Q.      Because I just want to make sure you recognize what that is.
A.      Okay.

Q.      Do you recognize that?
A.      Yes.

Q.      What is that?
A.      It was a note from me to Ted.

Q.      From you to Ted or from?
A.      Huh?

Q.      Who's the note from?
A.      The note from Ted -- it's from Ted.

Q.      To who?
A.      To me.

Q.      Okay.
MR. BOTTINI:            We'd offer 495 at this time, your Honor.

THE COURT:             Any objection?
MR. B. SULLIVAN:       No.

THE COURT:             Admitted.
(Government Exhibit No. 495 admitted into evidence at about 10:52 a.m.)

BY MR. BOTTINI:
Q.      Mr. Allen, up at the top there do you see a date?
A.      Yes. It's 10/6/02.

Q.      All right. And it reads, Dear Bill, when I think of the many ways in
        which you make my life easier and more enjoyable I lose count.
        Thanks for all the work on the chalet. You owe me a bill. Remember

464

Toricelli, my friend. Did you understand what he was referring to
there?

A.      Not at that time I didn't.


Q.      Okay. Friendship is one thing, compliance with the ethics rules
entirely different. I asked Bob P. to talk to you about this so don't get
PO'd at him. It just has to be done right. Did you understand who the
reference to Bob P. was?

A.      Bob Person [sic].


Q.      All right. Hope see to you soon. My best, Ted. Did you send Senator
Stevens a bill or an invoice after you received this note from him?

A.      No.


Q.      Do you recall whether Bob Persons came over and talked to you
about this?

A.      Yeah, and I asked him what –

                                   *   *   *

BY MR. BOTTINI:

Q.      You said you didn't send Senator Stevens a bill; is that correct?

A.      That's right.

                                   *   *   *

Q.      Mr. Allen, do you remember having a conversation with Mr.
Persons after you got the note from Senator Stevens?

A.      Yes.


Q.      What did Mr. Persons tell you?

A.      He said oh, bill, don't worry about getting a bill. He
said, Ted is just covering his ass. Maybe I shouldn't say ass,
but that's ...


*Stevens*, Trial Transcript, Oct. 1, 2008 A.M., at 49-52 (last ellipsis and
"[sic]" in original; emphasis added).


Mr. Allen stumbled on the second note and needed some reminding:


Q.      Okay. Mr. Allen, let me ask, if we can, have Exhibit No. 509,
Government's Exhibit 509, which is only marked for identification at

this point, displayed for you.

A.      All right.

Q.      Can you read that okay on your screen, Mr. Allen?
A.      Yes.

Q.      All right. Do you recognize what that is? Just tell me whether you recognize it or not.
A.      Yes.

Q.      Okay. And what is that?
A.      That's a note from Ted to me.

Q.      All right. Is there a date on the top of that note?
A.      Yeah. 11th, 8, '02.

Q. Okay.
MR. BOTTINI:            Now we'd offer Exhibit 509 at this time, your
                       Honor.

THE COURT:             Any objection?
MR. B. SULLIVAN:       No.

THE COURT:             Admitted.
(Government Exhibit No. 509 was admitted into evidence at about 11:37
a.m.)

BY MR. BOTTINI:
Q.      Mr. Allen, this one says, Dear Bill, many thanks for all you've done to make our lives easier and our home more enjoyable. The Christmas lights top it all. Something-foot tree lighted to the highest point. Did you understand what that reference was to?
A.      Yes.

Q.      Okay. What did you understand that to mean?
A.      The Christmas lights on the -- the lights up on the tree way at the top.

Q.      Was that the tree that we had looked at earlier?

466

A.     I'm sorry?

Q.     Was that the tree that we had earlier looked at in the one picture?
A.     Yes, uh-huh.

Q.     *Okay. And then in parentheses it says, Don't forget we need a bill for what's been done out at the chalet. Did you send Senator Stevens a bill after you received this note from him?*
A.     *No.*

Q.     *Why not?*
A.     *I don't know why.*

Q.     *All right. Do you remember when you had had this conversation with Mr. Persons that we had talked about just before the break?*
A.     *Yes.*

Q.     *When you had that conversation with Mr. Persons?*
A.     *I don't remember -- oh, you mean -- okay. The other note, when was that?*

Q.     Let's put it back up on the screen. That's Exhibit No. 495, which has been admitted. Can you see the date up at the top there?
A.     Yeah.

Q.     All right. Do you recall whether you had that conversation with Mr. Persons after you received this note that we see, Exhibit 495?
A.     Yes. I would have seen it right after, on ...

Q.     Okay. And what's the date up at the top of this note?
A.     It's the 10th, 6, '02.

Q.     All right. Now, let's go back to Exhibit --
A.     That would have -- it would be October.

Q.     Okay. And let's go back to Exhibit 509, the second note. You see up at the top the date of that note?
A.     That was November, isn't it?

467

Q.     All right. Did the conversation that you had with --

MR. B. SULLIVAN: Objection.
THE COURT: Sustained.

BY MR. BOTTINI:
Q.     Why didn't you send Senator Stevens a bill after you got this note in
       November of 2002?
A.     Because I had talked to Bob Person [sic] before this but I thought,
       well, it's the same thing, you know.

*Id*. at 64-67 (emphasis added; "[sic]" in original).

Proceedings recessed early on Oct. 1 (no afternoon session was held) to accommodate a juror and Mr. Allen's direct examination was scheduled to resume the next morning. *Stevens*, Trial Transcript, Oct. 1 P.M., at 4. Late that evening, at 11:29 p.m., Ms. Morris emailed a letter to Williams & Connolly, with a copy to Judge Sullivan, enclosing *Brady* material relating to Mr. Allen's testimony, i.e., less redacted versions of a 302 of an interview of Mr. Allen by Agent Pluta (the "Pluta 302") which had been produced in redacted form to the defense on Sept. 17, 2008, pursuant to the Court's pre-trial order to provide *Brady* information in useable format (*see id*., Trial Transcript, Sept. 16, 2008, at 30), and a newly discovered and redacted IRS MOI:

> In connection with the ongoing trial testimony of Bill J. Allen, this evening we undertook a re-review of, among other information, all memoranda of interviews between federal law enforcement agents and Mr. Allen. During the course of that re-review, we have located two memoranda that, out of an abundance of caution, we are providing to you in redacted form. The unredacted portions of these memoranda could arguably constitute cumulative *Brady* material that was provided in summary fashion in our August 25 and September 9 letters but was not provided to you in redacted format and could arguably constitute *Giglio* material concerning certain parts of Mr. Allen's trial testimony.
> The redacted memoranda have been attached hereto. In an additional abundance of caution, we are sending the Court, by separate cover, both the redacted and unredacted memoranda for <u>in camera</u> review.

468

Letter from B. Morris, dated Oct. 1, 2008, to R. Cary, cc: Hon. Emmet G. Sullivan (attached to email from B. Morris, dated Oct. 1, 2008) (DOJ Bates nos. CRM037169-178 and *Stevens*, Dkt. No. 130-10).

Williams & Connolly filed a motion to dismiss the next day. *See Stevens*, Senator Stevens's Emergency Motion to Dismiss Indictment or for a Mistrial Due to Government's Continuing *Brady* Violations, dated Oct. 2, 2008 ("Emergency Motion"), at 9-10 (Dkt. No. 126).

Mr. Allen did not resume his testimony on Oct 2.  Instead, after a day-long hearing on the motion, the Court found that the government had violated *Brady* and ordered it to provide the defense "forthwith" with all 302s, MOIs and grand jury testimony. *Id*., Trial Transcript, Oct. 2, 2008 P.M., at 51 & 52-53.

On Oct. 5, 2008, Williams & Connolly filed another motion to dismiss based on its discovery of more undisclosed *Brady* information in the grand jury testimony and 302s provided by the government pursuant to the Court's order. *Id*., Senator Stevens's Motion to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct, dated Oct. 5, 2008 (Dkt. No. 130).  On Monday, Oct. 6, 2008, while that motion was pending, Mr. Allen's direct examination resumed and concluded.

| 15. | Oct. 6, 2008 | On cross, Mr. Allen testifies that he did not tell the government "just recently" about his CYA conversation with Mr. Persons and the prosecutors do not correct his false testimony |
|---|---|---|

Despite the Court's *Brady* disclosure orders on Sept. 16 and Oct. 2, 2008, which directed the disclosure of redacted 302s and unredacted 302s and MOIs and grand jury transcripts, Brendan Sullivan conducted his cross-examination of Mr. Allen unaware of his prior inconsistent statement on April 15, 2008, that he did not remember speaking to Mr. Persons about the Torricelli note.  That impeachment information, contained in the prosecutors' and FBI agent's handwritten notes of the April 15, 2008, interview, was never disclosed to the defense by the prosecutors, who testified that, by Sept. 14, 2008, when Mr. Allen recalled his CYA conversation with Mr. Persons, they had forgotten that earlier interview and Mr. Allen's prior inconsistent statement. *See* Deposition of J.

Bottini, Dec. 17, 2009, at 509 & 641-642; Deposition of J. Goeke, Jan. 8, 2010, at 397; Deposition of N. Marsh, Feb. 2, 2010, at 374-375 & 381-382; Deposition of E. Sullivan, Jan. 6, 2010, at 309-311 & 379-382; *see also* Deposition of Agent Kepner, Aug. 24, 2009, at 104-106 & 331.

Mr. Sullivan was also unaware of the fact that Mr. Allen first told the prosecutors about his October, 2002, CYA conversation with Mr. Persons on Sept. 14, 2008, nine days before jury selection began. During cross-examination, Mr. Sullivan became entitled to, and was deprived of, that additional impeachment information when the prosecutors failed to correct Mr. Allen's false testimony that he did not tell the prosecutors "just recently" about that CYA-conversation. *See United States v Mejia*, 597 F.3d 1329, 1338 (D.C. Cir. 2010) ("the government 'may not knowingly use . . . false testimony[] to obtain a tainted conviction,' including testimony that goes to the credibility of a witness, *see Napue v. Illinois, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)*") (ellipsis and brackets in original); *Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003) ("Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution.").

Pursuant to Judge Sullivan's order on Sept. 16, 2008, directing the prosecutors to provide the defense with *Brady* information in useable format (*Stevens*, Trial Transcript, Sept. 16, 2008, at 30), Mr. Sullivan received Agent Kepner's 302 of her telephone interview of Mr. Allen on Sept. 9, 2008. Armed with that 302, Mr. Sullivan attacked Mr. Allen's CYA testimony as a recent fabrication. He drew Mr. Allen's attention to his statements during that interview about the reasons he never sent a bill to Senator Stevens:

> Q. Did you indicate that part of the reason you didn't send a bill was that you felt VECOs costs were higher than they needed to be?
> A. I probably told them that, yeah.
>
> Q. And isn't it a fact that you also told them that the other rationale for not sending a bill was simply that you wanted to do the work for Ted Stevens?
> A. Yeah. I wished that I could have just done it, and didn't have to -- because he -- because I really did like him.

Q.     And isn't it also true that the third reason -- you have agreed to two --
       the third reason was that you weren't sure how to go about it and
       produce a fair bill?

A.     Right now it would be a hell of a time to get that done, you know.

*Stevens*, Trial Transcript, Oct. 6, 2008 P.M., at 77.

*Compare* Agent Kepner's 302 of Interview of B. Allen on Sept. 9, 2008, dated
Sept. 16, 2008 ("[Mr. Allen] said that at least on two different occasions, TED
STEVENS asked him[] for an invoice for the work that VECO Corporation
performed on STEVENS' Girdwood residence. *[Mr. Allen] never sent an invoice
to STEVENS because he[] wasn't sure how to produce an invoice.* If [Mr. Allen]
had sent an invoice for the actual costs incurred by VECO, [Mr. Allen] does not
believe that STEVENS would have paid it because STEVENS would not have
wanted to pay that high of a bill. [Mr. Allen] thought that STEVENS would
probably have paid a bill from VECO if it was a lesser amount than the actual
costs. *Part of the reason that [Mr. Allen] did not want to provide an invoice was
that [Mr. Allen] felt that VECO's costs were higher than they needed to be. The
other rationale was that [Mr. Allen] simply wanted to do the work for
STEVENS.*") (emphasis added) (DOJ Bates no. CRM043293).

Mr. Sullivan then turned to the Torricelli note and when Mr. Allen first told
the prosecutors about his CYA conversation with Mr. Persons:

Q.     Could I have that exhibit? Remember this letter we looked at with the
       Torrocelli [sic] in it and so forth and so on in October.

A.     Yeah, uh-huh.

Q.     Then you remember the letter that came a month later where he put in
       paren, send me a bill?

A.     Yeah.

Q.     Well, you came in here the other day on your direct examination, and
       you said, well, despite the fact that I saw this letter, I heard from Mr.
       Persons I shouldn't send a bill because this was just Ted covering his
       ass; do you remember that testimony?

A.     That's exactly right.

471

Q.     When did you first tell that story? When did you first say those
       words? Was it in the last -- since September 9th? Was it since
       September 9th?

A.     It's been so long that I can't tell you how many days before I talked to
       him, but I did, and I asked him, hey, I got to get something done. I've
       got to get some invoices. And he said, hell, don't worry about the
       invoices. Ted is just covering his ass. That's exactly what he said.

Q.     My question to you, sir, is when did you first tell the government that
       because on September 9th, 2008, you were giving them three other
       reasons why you didn't send the bill.

A.     *I don't know.*

Q.     When did it come to you, sir?
A.     *What?*

Q.     When did you first tell the government that Persons toll [sic] you Ted
       was covering his ass and these notes were meaningless? It was just
       recently, wasn't it?

A.     *No. No.*

Q.     On September 9th, you didn't tell them that, did you?
A.     *Hell, I don't know whatever* --

Q.     You gave them reasons why you didn't send a bill. You answered you
       simply wanted to do the work was one of them, and another was part
       of the reason was that the costs were higher than they needed to be.
       You didn't tell them then about Persons' conversation with you, did
       you?

A.     *You know what, I don't know when I talked to them,* but I did talk to
       him, and it's been quite aback, quite awhile back. Whether you like it
       or you don't.

Q.     When did you first come up with this, sir?
A.     *When did I come up with it?*

Q.     When did you first tell somebody?
A.     *Huh?*

472

Q.   When did you first tell a government agent?

A.   *Hell, I don't know I don't know what day it was.*

*Stevens*, Trial Transcript, Oct. 6, 2008 P.M., at 79-81 (emphasis added).

After the last exchange, Mr. Sullivan asked the Court if it was "a good time for a break", and proceedings were recessed for the day. *Id*. at 81.

The following morning, Mr. Sullivan abandoned his cross-examination on the Torricelli notes and when Mr. Allen first told the prosecutors about his CYA conversation with Mr. Persons, and he concluded his cross-examination without returning to either subject. During a brief redirect, Mr. Bottini covered several other subjects raised during Mr. Sullivan's cross-examination and asked no questions about the Torricelli note or the CYA conversation with Mr. Persons. *Id*., Trial Transcript, Oct. 7, 2008 A.M., at 79-95. There was no re-cross.[64]

_____

[64]During the cross-examination, Mr. Sullivan asked Mr. Allen if he had any records that showed how much he paid for a 1999 Land Rover, which the indictment alleged cost "approximately $44,000" and which he allegedly transferred to Senator Stevens in 1999 in exchange for $5,000 and a 1964½ Ford Mustang worth less than $20,000. *See Stevens*, Trial Transcript, Oct. 6, 2008 P.M., at 43-46; *id*., Indictment, ¶ 18 ("A. Things of Value from ALLEN and VECO to Benefit STEVENS", "1999: A New 1999 Land Rover Discovery"). Mr. Allen answered that he had no such records. *Id*. at 43. On redirect, Mr. Bottini produced Mr. Allen's check to Land Rover of Anchorage, dated May 25, 1999, in the amount of $44,339.51, which was marked into evidence as GX 1122 (DOJ Bates no. CRM057544) and published to the jury. *Id*., Trial Transcript, Oct. 7, 2008 A.M., at 87-88 & 95. That evening, Williams & Connolly inquired whether that check had been provided to them in discovery, and Mr. Bottini confirmed that the check had not been provided, explaining that "We introduced it during redirect after you had impeached Allen with the records used during his cross examination." Email from J. Bottini, dated Oct. 7, 2008, to R. Cary (DOJ Bates nos. CRM040465-466).

The next day, Williams & Connolly moved to dismiss on the ground that the government's failure to disclose the check until after cross-examination was part of "the government's pattern of failing to abide by orders of this Court, constitutional mandates and the Federal Rules of Criminal Procedure. *See* Mot. to Compel Emergency Relief and Discovery (Dkt. 65) (Sept. 12, 2008); Mot. to Dismiss Indictment or for a Mistrial (Dkt. 103) (Sept. 28, 2008); Emergency Mot. to Dismiss Indictment or for a Mistrial Due to Government's Continuing *Brady* Violations (Dkt. 126) (Oct. 2, 2008); Mot. to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct (Dkt. 130) (Oct. 5, 2008)." *Stevens*, Motion to Dismiss the Indictment or for a Mistrial Due to the Government's Failure to Comply with Federal Rule of

(continued...)

Truthful answers by Mr. Allen to Mr. Sullivan's questions about when he first told the government about his CYA conversation, or a correction by the prosecutors, would have fueled the cross-examination and supported the defense theory that Mr. Allen's testimony about his CYA conversation with Mr. Persons, not previously mentioned by him in more than 55 government interviews from August 2006 to Sept. 13, 2008, was a recent fabrication. *See* Letter from S. Latcovich, Williams & Connolly, dated Nov. 19, 2009, to W. Shields, Janis, Schuelke & Wechsler ("Pursuant to your request . . . enclosed please find all Bill Allen FD-302s produced by the government in [*Stevens*].").  Instead, that significant impeachment information was concealed by Mr. Allen and by the prosecutors.[65]  Mr. Allen's false denial defeated the cross-examination and Mr. Sullivan abandoned what would have been a fruitful line of cross-examination had he known the truth, that Mr. Allen first told the government about his CYA conversation on Sept. 14, 2008.[66]

---

[64](...continued)
Criminal Procedure 16(a)(1)(E), filed Oct. 8, 2008, at 2 (Dkt. No. 142).

After lengthy argument on the several pending motions to dismiss, Judge Sullivan struck all evidence relating to the automobile transactions:

> With respect to the check for $44,000, it's clear to the Court that that evidence is, indeed, material. It's evidence that should have been produced to the defendant, and it's inexcusable that the government did not produce that evidence to the defendant, so, therefore, the Court will strike the evidence with respect to the automobile issue and will also instruct the jury that the government had an obligation to produce all material evidence to the defendant, and it failed to do so; therefore, the court has stricken the evidence with respect to the automobile issue and it will instruct the jury not to consider it.

*Id*., Trial Transcript, Oct. 8, 2008 P.M., at 90.

[65]References in this Report that Mr. Allen's testimony was "false" represent only a conclusion that his testimony was incorrect.  References to Mr. Allen's "concealing" information during his testimony do not represent a determination that he intentionally concealed information.  Our mandate did not include making any determination whether his testimony was intentionally incorrect or whether he intentionally concealed information during his testimony.

[66]In *United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004), the Second Circuit reversed a conviction for drug smuggling where the prosecutor failed to disclose exculpatory information provided by his key witness during an interview on the first day of the trial.  The Court found that the witness's false testimony, about when he last met with government agents, "prevented defense counsel" from learning about exculpatory information provided during "the concealed interview":

> . . . we note with some dismay the prosecutor's failure during the trial to correct the falsity of Pulgar's testimony that his last meeting with Government officials had occurred on January 3, when in fact he had met with them on January 6, the day the trial started.

(continued...)

Napue was already an issue in the trial by the time Mr. Allen testified. Williams & Connolly questioned the prosecutors' compliance with *Napue* the day before Mr. Allen was cross-examined about his CYA conversation and the day after he completed his testimony.  On Oct. 5, 2008, Williams & Connolly moved to dismiss the indictment on the ground *inter alia* that the prosecutors violated their duty under *Napue* by knowingly introducing false VECO accounting records (GX 177) into evidence:

1.      **Presentation of false testimony and other conduct prejudicial to the administration of justice.**

In *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that the Due Process Clause forbids the government from introducing or failing to correct testimony that it knows or reasonably should know to be false.

> "The principle that <u>a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction</u>, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

> *Napue*, 360 U.S. at 1177 [should be "at 269"] (citations omitted) (emphasis added) . . .

---

[66](...continued)
This is not just a minor discrepancy about dates. The false testimony prevented defense counsel and likely the jury from learning that during the concealed interview Pulgar had admitted bringing the cocaine on board the ship. The prosecutor could readily have asked Pulgar on redirect about the last interview, or, at a minimum, alerted defense counsel and the Court to the fact that Pulgar's account was significantly incorrect. . . . The Government's 'tactical reason[]' for non-disclosure--that having Pulgar recount his receipt of the narcotics 'might well have confused him'--is totally unacceptable.

*Id*. at 199-200 (brackets in original).

*Stevens*, Motion to Dismiss the Indictment Due to the Government's Intentional and Repeated Misconduct, filed Oct. 5, 2008, at 19 (Dkt. No. 130)(emphasis in original).

On Oct. 8, 2008, the day after Mr. Allen left the witness stand, *Napue* was repeatedly cited during a lengthy hearing on several pending motions to dismiss. *Id*., Trial Transcript, Oct. 8, 2008 P.M., at 37, 47, 74-76 & 83.

Immediately following that hearing, the Court struck portions of VECO's cost report (GX 177) because it contained false information:

> THE COURT: It's very troubling that the government would utilize records that the government knows were false. And there's just no excuse for that whatsoever, and, therefore the sanction for the utilization of those records for Williams and and [sic] other gentleman, Anderson, is that they'll be stricken from the evidentiary record and also the jurors will be instructed tomorrow that the government presented evidence to those jurors that the government knew was not true and, therefore, the court has stricken the records, the business records for those two gentlemen, and the Court will instruct the jury not to consider that evidence at all.

*Id*. at 89-90.

Though Mr. Bottini conducted the trial prep session of Mr. Allen on Sept. 14, 2008, when Mr. Allen reported his CYA conversation for the first time, he argued in summation that Mr. Allen's testimony was not a recent fabrication:

> [Senator Stevens] says I did ask for a bill for 2002 work. Government 495 is the note he sent on October 6th, 2002, the Torricelli note, and you remember what Bill Allen said after that? Bob Persons did pay him a visit, came by and he told him, look, he doesn't really want a bill. He's just – pardon my French -- covering his ass. Now the defendant says, well, Allen just made that up, that's a lie, that never happened. Again, you saw and you heard from Bill Allen and you saw and you heard from Bob Persons. You can judge yourself the credibility of those two individuals. Again, if that were so, if

Allen just made that up, wouldn't the story be better about that?

*Stevens*, Trial Transcript, Oct. 21, 2008 A.M., at 54.[67]

In his summation, Brendan Sullivan attacked Mr. Allen's CYA testimony as a recent fabrication which was procured by the prosecutors and used to negate "the key document in the case that shows this man's intent":

> If you take this Exhibit 495 [the Torricelli note], it will take you straight into the mind of Ted Stevens on that day. That shows his intent, that shows why he's not guilty, that shows why he didn't do anything willfully or knowingly to violate the law. Let's just read it. . . . Next, I asked Bob P -- you know that to be Bob Persons -- to talk to you about this, so don't get pissed off at him. Think about that. He so much wants a bill he says to Bob Persons go and tell Bill Allen to send a bill. Why in the world would you put that in a letter if you didn't mean what you said? Lastly, It just has to be done right. Five thoughts. I beg you, hold it in your hands; remember 495. Straight into his mind. That shows his innocence. And I'm going to tell you a story that will make you sick.
>
> The government of the United States tries to take that and erase it out, put it off with a false testimony of a witness they brought in this courtroom who got on that stand and said to you Mr. Persons told me don't pay any attention to that letter, that's just Ted covering his ass. An explosion in the courtroom, wipes out a letter that was written by a man on October 6th, 2000 [sic]. I'm going to prove to you that's an absolute lie that brought this lie into the court. They're trying to convict a senator and they put that testimony on the witness stand.
>
> \* \* \*
>
> That's called recent fabrication. He didn't even know when he told the government about [sic].
>
> \* \* \*
>
> Ted Stevens' reaction on the boiler bill is consistent with the October 6th, 2002 letter, 495, that they want to wipe off the screen with the false testimony of Bill Allen that it is not to be taken seriously, it's just covering

---

[67]Mr. Persons testified during the defense case that he did not tell Mr. Allen, "Bill, don't worry about getting a bill, Ted is just covering his ass". *Stevens*, Trial Transcript, Oct. 15, 2008 P.M., at 44.

his ass.

*   *   *

. . . this note, which is the heart of the case, that shows the clear intent of Ted Stevens that shows the complete absence of willfulness or knowledge or intention to make a false statement. Look for it. And then not getting a bill, a month later, on November 8th, he sends another one, Don't forget, we need a bill. Even Bill Allen said that when he first was captured by the FBI and brought into the little fold, the little family there, to become a cooperating witness, that he said to them then Ted Stevens wanted to pay for everything he got.

*Stevens*, Trial Transcript, Oct. 21, 2008 A.M., at 62-63, 69, 88 & 89-90;

But the government presents a witness to you that says: Don't pay attention to the key document in the case that shows this man's intent. He was just trying to cover his ass. He made up the statement, and Persons came to court here and told you that he didn't say it.

But I'm not -- the defense doesn't have [sic] prove anything, but I'm going to prove to you that it is a lie.

*   *   *

And then the question is: Question: You said you didn't send Senator Stephens a bill; is that correct? Answer: That's right. And then this question and answer; here it is. Here is the delivery to you, ladies and gentlemen. Of a bombshell in a courtroom. Because cover-your-ass statement would be regarded by anybody as a bombshell. . . . Here's how it was delivered: Question: Mr. Allen, do you remember having a conversation with Mr. Persons after you got the note from Senator Stevens? Answer: Yes. Question: What did Mr. Persons tell you? Answer: He said, oh, Bill, don't worry about getting a bill, he said. Ted is just covering his ass. Bang! Out of nowhere.

Now, how do we know it's a lie? Want more? I'll show you more why it's a lie. Because Bill Allen had been asked on other occasions why he didn't send bills to Ted Stevens, and he offered three reasons, and among the three, there was never cover your ass. So we know that testimony is recently created. Here is what he said when asked about why he didn't send bills on earlier occasions. . . .

So, on a previous occasion, he's asked about why you don't send a bill, he offers up three reasons; but when he comes to talk to you to convict the

478

Senator, he says, I didn't send the bill after I got this letter on the screen because Persons told me that's just Ted covering his ass.

                   \*   \*   \*

I asked Bill Allen, well, when is the first time you came up with that? He couldn't remember. Question: When did you first tell somebody? Answer: Huh? Question: When did you first tell a government agent? Answer: Hell, I don't know. I don't know what day it was. . . .

*Id.*, Trial Transcript, Oct. 21, 2008 P.M., at 7, 8-9 & 14-15.

In rebuttal, Ms. Morris described the Torricelli note as Senator Stevens "trying to paper the trail" and as "direct cover":

> Now, ladies and gentlemen, the defense counsel kept talking about Government's Exhibit 495 or Defendant's Exhibit 495 and that was that October 6th, 2002 handwritten note from the defendant to Bill Allen. I submit to you, ladies and gentlemen, that handwritten note to Bill Allen came seven days after Senator Torricelli had been censored [sic] by the Senate Select Committee on Ethics. He knew full well; he was *trying to paper the trail.* This is a very smart man.
> The defendant would have you believe, oh, no, he would never start doing something like that, you know, for way back then and that he never thought that this day would come.  He never hoped this day would come. *This was direct cover,* ladies and gentlemen, because if he can write that in his handwriting, he can write a check, but that didn't happen.

*Id.*, Trial Transcript, Oct. 21, 2008 P.M., at 51 (emphasis added).

This theme had been long rehearsed by the prosecutors, before and after they received the Torricelli note on April 8, 2008, and the evidence to support it long anticipated before it materialized on Sept. 14, 2008, in the form of Mr. Allen's sudden recollection of his CYA conversation with Mr. Persons in October 2002. *See* Draft Prosecution Memorandum, dated April 30, 2007, at 47 ("*We believe* these requests [for invoices] were simply *pretextual*, and that STEVENS never had any intention to pay them. During interviews with the government, *ALLEN has stated as much,* indicating that STEVENS never followed-up on any of the requests that he made for invoices relating to the Girdwood Residence.") (emphasis added)(DOJ Bates nos. CRM096333-394); Prosecution Memorandum,

479

dated March 12, 2008, at 55 ("*We believe that request [for invoices] was pretext,*
and that STEVENS never had any intention to pay VECO's costs associated with
the renovation.")(emphasis added)(DOJ Bates nos. CRM015156-215); Emails
between N. Marsh, E. Sullivan, J. Bottini and J. Goeke, dated April 15, 2008 (E.
Sullivan: "Could also be that it's *a wink and a nod* -- that he knows BA won't send
him an invoice, but he can *paper the file*. Could be a lot of things. *I was hoping BA
might be able to shed some light* on the timing/context"; N. Marsh reply: "*I
thought we all believed it's a wink and a nod,* and we're just trying to figure out
why TS was nervous at that particular moment and decided to *paper the file* with
something. Am I wrong?") (DOJ Bates nos. CRM16532-533); Prosecution
Memorandum, dated May 15, 2008, at 45 ("Finally, *there appears to be some
evidence* suggesting that as early as 2000, STEVENS was creating *a 'cover story'*
concerning the Girdwood Residence renovations.") (emphasis added)(DOJ Bates
nos. CRM016947-17018); Prosecution Memorandum, dated May 21, 2008, at 47
(DOJ Bates nos. CRM48387-465) (same).

After the trial, the prosecutors conceded facts which constituted a *Napue*
violation, without acknowledging the violation. In their opposition to Senator
Stevens's new trial motion, they explained the absence of a 302 of the interview of
Mr. Allen when he first reported his recollection of Mr. Persons's CYA statement:

> **D. The Testimony of Bill Allen.** Defendant contends (Mem. 36-39) that
> the government elicited "demonstrably false" testimony from Allen, and that
> "the prosecution team must have known" this testimony was false. The
> argument focuses on Allen's statement that, when he discussed with Persons
> defendant's October 6, 2002 request for a bill, Persons told Allen not worry
> [sic] about this request as "Ted is just covering his ass * * * ." 10/1/08 A.M.
> Tr. 51-52. In arguing that this testimony was false, defendant offers the
> Court the same combination of conjecture and wishful thinking that he
> previously presented to the jury. Tr. 10/21/08 P.M. 7 ("I'm going to prove to
> you that it is a lie."); *see id*. at 7-15. The jury was unconvinced, and the
> present motion provides no basis for questioning its conclusion (let alone
> finding government misconduct).
> * * *
> In claiming that Allen's testimony was false, defendant relies first on
> the fact that Persons's comment was not recorded in the government's
> memoranda of its interviews with Allen. This fact proves nothing, however,
> because the government was not even aware of the October 6, 2002 note

until defendant produced it in early 2008, long after most of the memoranda were prepared. *Moreover, it was not until shortly before trial that the government questioned Allen about defendant's statement that he had asked Persons to speak to Allen about a bill, and thereby learned about Persons's remark.* Allen's recollection on this point was not recorded in an FBI 302 because it was disclosed during a trial preparation session.

*Stevens*, Government's Opposition to Defendant's Motion for a New Trial, dated Jan. 16, 2009, at 42-43 (Dkt. No. 269)(first ellipsis and first emphasis in original).[68]

Months after the trial, Mr. Bottini described his "vivid[]" recollection of Brendan Sullivan's accusation that Mr. Allen "manufactur[ed] that [CYA] testimony just before trial", in an email to Mr. Marsh who had requested information for the government's response to Williams & Connolly's proposed discovery plan:

| | |
|---|---|
| From: | N. Marsh |
| To: | J. Bottini, W. Welch, B. Morris, E. Sullivan, J. Goeke, *et al.* |
| Sent: | Jan. 26, 2009 |
| Subject: | Re: Response to Discovery Plan |

Wasn't Allen also cross-examined specifically about the September 9 conversation as well as the timing of his "cover your ass" statement?

| | |
|---|---|
| From: | J. Bottini |
| Sent: | Monday, January 26, 2009 2:07 PM |
| To: | N. Marsh, W. Welch, B. Morris, E. Sullivan, E. Goeke, *et al* |
| Subject: | RE: Response to Discovery Plan |

---

[68]The prosecutors' statement that they interviewed Mr. Allen "shortly before trial" about the Torricelli note is true. Mr. Allen first reported his new-found memory of his CYA conversation to Mr. Bottini and Agent Kepner on Sept. 14, 2008. The assertion that he was not questioned about the Torricelli note "until" then is false, and DOJ acknowledged its falsity in its motion to dismiss the indictment. *See Stevens*, Motion of the United States to Set Aside the Verdict and Dismiss the Indictment with Prejudice, filed April 1, 2009, at 2 ("The Government also acknowledges that the Government's Opposition to Defendant's Motion for a New Trial provided an account of the Government's interviews of Bill Allen that is inaccurate. *See* Opposition at 42-43 (Dkt. No. 269).") (Dkt. No. 324).

Yes - absolutely.

I don't recall all that much about the cross related to the September 9 statement, but vividly recall the "cover his ass" cross.

Maybe a response along the lines of something like this:

**Allen was also aggressively cross-examined about his testimony concerning the statement made to him by Bob Persons about the defendant "covering his ass" in the October 6, 2002 note requesting Allen to send him a bill. Allen was pointedly asked during cross-examination when he had first told the government about the statement made to him by Person [sic] and was accused by defense counsel of manufacturing that testimony just before trial in effort to please the government. This point was later emphasized at length during the defendant's closing argument**.

DOJ Bates no. CRM105103-104 (emphasis in original).[69]

Mr. Bottini testified in this investigation that he was in the courtroom during Mr. Allen's cross-examination and took notes in two columns, "Allen Cross" and "Re-direct issues". Deposition of J. Bottini, Dec. 17, 2009, at 624-626 & 654-655; *see also* Mr. Bottini's notes (DOJ Bates nos. CRM057670-721 & 57734-769). Mr. Sullivan's cross on the CYA conversation generated entries in the "Allen Cross" column but none in the "Re-direct issues" column:

> – Bob Persons       |
>     \*when first tell*   |
>     *that story to the*  |
>     *Govt -*          |
>                    |
> – *How long ago - ?*   |
>                    |

---

[69]Mr. Bottini's draft was incorporated verbatim into the government's response with the addition of citations to pages 79-81 of the transcript, which contain the portions of the cross-examination of Mr. Allen reproduced above. *See Stevens*, Government's Opposition to Defendant's Proposed Discovery Plan, dated Jan. 26, 2009, at 17 (Dkt. No. 277).

> –> I talked to
>   Bob Persons –
>     \He said don't
>     worry about the
>     invoices
>     \>
> When [line drawn
> through "When"]
> That's exactly what
>   he said
>
> – *When first tell the*
>   *Govt that TS said*
>
> – *Just recently*
>
> –  Didn't tell them
>    that on 9/9/08
>
> –  They
> [line drawn
> through "They"]
> You gave them
>   reasons why you
> didn't send the bill –
>
> – *When first come up*
>     *w/ it*
>     *\when first tell*
>     *Govt agent*

      Mr. Bottini's notes of Mr. Allen's cross-examination (emphasis added)(DOJ Bates nos. CRM057767-769).

*See also* Deposition of J. Bottini, Dec. 17, 2009, at 656-661.

      Mr. Bottini testified that he understood that Mr. Sullivan's questions were intended to establish that Mr. Allen informed the government only recently about

his CYA conversation with Mr. Persons and that Mr. Allen's testimony was a
recent fabrication. *Id*. at 633-635 & 649. He testified that he was aware of his
obligation to correct the record if Mr. Allen testified falsely. *Id*. at 630 & 653. Mr.
Bottini testified that he understood Mr. Sullivan's question, that he knew Mr.
Allen's answer, about when he first told the government about the CYA
conversation, was "factually inaccurate" but not false because he believed that Mr.
Allen misunderstood the question.

Mr. Bottini testified that he understood Mr. Sullivan's question and he knew
what the truthful answer was:

> BY MR. SCHUELKE:
> Q      Before you do, let me ask you one question about that. I take your
>        point. But you did understand the thrust of Brendan Sullivan's
>        question?
> A      I understood what he was trying to get him to say, what the question
>        was.
>
> Q      You understood the question.
> A      Right.
>
> Q      The question itself was pretty clear, was it not, to you?
> A      I understood where he was going with it, sure.
>
> Q      Yeah, and you knew the answer to that question as well yourself?
> A      Well, the answer would be September 14th.
>
> Q      Recently, and because it was three weeks before this day of the trial
>        testimony, it would have been accurate to say yes, it was recent?
> A      Depending on what your interpretation of recently is. But I don't
>        want to quibble about it. Sure, it could be read as recently.
>
> Q      And certainly given the history of the investigation and the
>        government's interaction with Mr. Allen since the end of August of
>        2006, it was quite recent?
> A      If you use that as a benchmark, yes.

*Id*. at 639-640.

Mr. Bottini understood at the time that Mr. Allen's response, that he had not "just recently" told the prosecutors about his CYA conversation with Mr. Persons, was "factually inaccurate", but he did not think about correcting the record:

BY MR. SCHUELKE:

Q    You did understand it to be factually inaccurate, even if it had not been knowingly and willfully false on Allen's part, for the reasons you've indicated?

A    Right.  But again, you know, yes.  In my mind again, the first time Allen had ever been asked about this was September the 14th. Granted, you can read that to be recently before trial, three weeks, whatever it was.
But to me, when he's having this exchange with Mr. Sullivan and he's jumping back and forth, and clearly referencing when he talked to Persons about this –

Q    Now I understand your point about intentional falsehood on the part of the witness.  I understand your point that the witness may not have understood the question, given his responses before and after.

A    Right.

Q    I got that.  And I've asked you this before, and I think I understand your answer.  But I'll give you yet another opportunity.  You understood that Brendan Sullivan wanted to know whether or not Allen had told the government the cover your ass story recently.  You understood that's what he wanted to know –

A    I understood the purpose for his question.

Q    And you -- had it been yourself on the witness stand, you would have said no, I guess it depends on how you define recently, but it was September the 14th?

A    Probably would have been an answer like that.

Q    So my question is simply since you understood the thrust of the question, since you knew the answer was at least mistakenly inaccurate, did you think you were obliged to correct the record? Your answer before was I don't think I thought about it, right?

A    Right.  I don't remember thinking, you know, should I jump up.  I

485

don't remember thinking about that at the time.  You know, the way it was left with Allen, when did you first tell somebody?  Huh?  When did you first tell the government agent?  Hell, I don't know. I don't know what day it was.

I think that's -- well, I didn't think about it at the time.

MR. WAINSTEIN: (attorney for Mr. Bottini)

Okay, and you've been in that situation before, where you've seen a cross-examination by another defense attorney, other cases where their questions sow confusion in the minds of the witness?

THE WITNESS: I'm sure I have.  But I think it's always been a situation I felt I could easily address it.  I mean if it was something clear cut, like if the witness was just wrong, you know, and didn't hear the questioning correctly or whatever.  I think it's, you know, I'm sure I've been in a situation where I thought I could easily correct it on redirect.  With this guy with Mr. Allen, you know, I don't know what I would do if I had a chance to do it over again.  I really don't.  I mean I just don't remember thinking at the time should I get up and say something to Judge Sullivan.

Q    To the jury?
A    I don't know how I'd do that.

Q    You were aware of your obligations under Matthew [sic] v. Illinois?  Are you familiar with that case, that the government's not allowed the use perjury as testimony in its case?
A    I didn't under this to be perjurious, but you know.

MR. WAINSTEIN: (attorney for Mr. Bottini)

But if I could, because I'm concerned about that.  Isn't it common in your experience that defense attorneys get up there and they lead the witnesses toward an answer that the defense attorney wants.  Is that correct?

THE WITNESS: That's correct.

486

| MR. WAINSTEIN: | And is it, in your experience sometimes do those answers, you believe them to be factually inaccurate? |
|---|---|
| THE WITNESS: | Sometimes. |

| MR. WAINSTEIN: | And is it your experience that with some frequency, defense attorneys will get the witnesses confused and they'll stumble through their testimony? |
|---|---|
| THE WITNESS: | Many times. |

| MR. WAINSTEIN: | And is that just the nature of cross-examination? |
|---|---|
| THE WITNESS: | Yes. |

| MR. WAINSTEIN: | And if you think that there is a factual inaccuracy that's been laid out on the record, beyond just this general confusion that you find – |
|---|---|
| THE WITNESS: | Right. |

| MR. WAINSTEIN: | Do you feel like you have an obligation to correct that? |
|---|---|
| THE WITNESS: | I do. |

*Id*. at 650-654.

Mr. Bottini testified that, although Mr. Allen's answer to Mr. Sullivan's question was "factually inaccurate", it was not a false because Mr. Allen did not understand the question:

| Q | And Allen's answer "no, no, not recently," completely extinguished that line of cross? |
|---|---|
| A | I don't think it extinguished that line of cross.  He continued to carry on with the line of cross. |

| Q | But he denied that it was made just before trial, in response to as you call it "pointed cross-examination"? |
|---|---|
| A | Right.  Well, it was pointed cross-examination. |

487

Q      And you were sitting there when Allen said "No, not recently, not
       shortly before trial" as you later describe it in this email, and said
       nothing when you knew the testimony was false?
A      I didn't think that his testimony was false. It wasn't clear to me that
       Mr. Allen fully understood what Mr. Sullivan was asking him.
       Again, if you look at what he said before and after that, he's jumping
       – go ahead.

Q      But as you told Mr. Schuelke, you understood Sullivan's question.
A      I understood his question.

Q      He raised the question that you had just made this up shortly before
       trial.  That's how you describe it months after, when you vividly recall
       it, that the thrust of the question was you made this up recently, just
       before trial?
A      That's what I understood him to be asking.

Q      And Allen's answer was no, and you knew that was a false answer,
       because he had told you for the first time just before trial, on
       September 14th; correct?
A      Again, given --

Q      Is that correct?
A      That's not correct.  I didn't understand that to be a false statement,
       given what Allen had said right before this and right after.  It wasn't
       clear to me that he understood what Mr. Sullivan was asking him.

BY MR. SCHUELKE:
Q      You did understand it to be factually inaccurate, even if it had not
       been knowingly and willfully false on Allen's part, for the reasons
       you've indicated?
A      Right.  But again, you know, yes.  In my mind again, the first time
       Allen had ever been asked about this was September the 14th.
       Granted, you can read that to be recently before trial, three weeks,
       whatever it was.
       But to me, when he's having this exchange with Mr. Sullivan and he's
       jumping back and forth, and clearly referencing when he talked to
       Persons about this --

488

*Id*. at 648-650.

Mr. Bottini testified that he thought that Mr. Allen misunderstood the question to be whether he had spoken to Mr. Persons recently:

BY MR. SCHUELKE:

Q    So you interpreted this testimony to be in response to Brendan Sullivan's question, when did you first tell that story. When did you first say those words? You interpreted his answer to be a reference to when he had the conversation with Persons.

A    That's right, that's right. I think he sort of intersperses that throughout this exchange. So to me, it was very characteristic of Allen and the way he -- Mr. Sullivan is very aggressive at this point, and he's asking compound questions. I should have objected at some point obviously here, now looking at the transcript.

                              *   *   *

Q    There's nothing -- you don't have anything for redirect on that, do you?

A    Again, when he gives that answer, to "It was just recently, wasn't it," to me, Allen is not saying or understanding the question to be when did you first tell the government this. I think it's clear when you look at what he's saying before and after that, when he's talking about "I talked to Bob Persons way back when."

*Id*. at 632 & 661.

Mr. Bottini testified that his "experience and knowledge about Mr. Allen" helped him realize that Mr. Allen misunderstood the question:

Q    But in that exchange there, that question and that answer, there's a question and he makes the answer. "It was just recently wasn't it?" Answer: "No," to mean not recently. What's unclear about that question and what's unclear about that answer?

A    If you don't take into consideration what's going on here in the entire exchange, or my experience and knowledge about Mr. Allen, then I'd have to agree with you.
      But I don't think it's fair to just take that in a vacuum and say "Well, he asked him when did he first tell" -- because it's very clear that he's,

Allen is getting this confused.
He's jumping back -- both before and after this, making reference to
when he first talked to Persons about this.

*  *  *

Q     Isn't that a fact? Eight days before trial, on September 14th and trial
         started on September 22?
A     He first made that statement on September 14th.

Q     And the trial began on September 22 with jury selection?
A     That's correct.

Q     And that's exactly what Sullivan was trying to bring out, and Allen
         answered "no, not recently."
A     But again Mr. Shields, his answer at that point to that question, I did
         not think was the product of him understanding what the question
         was. You have to read this to be fair, I think, in the context of what
         he's saying right before that and what he says right after that.

Q     Right. But the only people in the courtroom who could do that kind
         of analysis were the government prosecutors. No one else knew
         Allen as well as you, to come to that conclusion. Everyone else heard
         a question and an answer, isn't that correct?
A     Well, I definitely had a better sense of Bill Allen than anybody in the
         jury box. I think that's fair.

*Id*. at 638-639 & 658-659.

Agent Kepner heard Mr. Allen's testimony on cross-examination about his
CYA conversation with Mr. Persons. Deposition of Agent Kepner, Aug. 24, 2010,
at 324. She testified that she did not know what his testimony meant and that it
seemed that Mr. Allen was frustrated and not answering the questions:

Q     Do you recall, in particular, hearing Mr. Allen testify that he had first
         told the government about the Persons cover-your-ass conversation --
         I'm sorry, that he denied telling the government about that
         cover-your-ass conversation just recently?
A     I don't think you can read that into the testimony. What line in
         particular are you looking for?

Q        Line 16, page 80, "When did you first tell the government that
         Persons told you Ted was covering his ass and these notes were
         meaningless? It was just recently, wasn't it?" Answer, "No, no."
         Now, if you can't read that he is denying he first told the government
         recently, then I guess I can't read.

A        You know, I don't know what that meant at that point in time, but it
         looks like he was getting frustrated, and not answering the questions
         at that point.

Q        Well, he did answer the question. He said, "No, no."

A        I don't think you can read into it what you just read into it.

*Id*. at 324-325.

Mr. Allen testified that the correct answer to Mr. Sullivan's question was
yes, he had "just recently" told the government about his CYA conversation, but
he answered "No, no" because he misunderstood the question:

Q.       My question is, if you turn to page 80, you were asked by Senator
         Stevens' lawyer, "When did you first tell the government that Persons
         told you Ted was covering his ass and these notes were meaningless?
         It was just recently, wasn't it?"
         And you answered, "No, no."
         But it had been just recently that you told the government; isn't that
         correct, Mr. Allen?

A.       That's right.

Q.       You had just told him a few days before the trial started.

A.       Yeah.

                              *  *  *

MR. TERWILLIGER:        May I?
(attorney for Mr. Allen)

MR. SHIELDS:            Sure, go ahead.

MR. TERWILLIGER:        As you read this now on page 80 what Bill just
                        read to you and your answer "No, no," as you read
                        that now, do you think you understood what
                        Senator Stevens' lawyer, Mr. Sullivan, was asking

                              491

|  | you there?  Were you trying to say that you had not told them recently about the Persons conversation? |
|---|---|
| THE WITNESS: | I was saying, "No, no," they hadn't. |

BY MR. SCHUELKE:

Q.     They hadn't what?

A.     Let's see.  He says –

Q.     Let me ask you this: Brendan Sullivan, Senator Stevens' lawyer, was trying to make an argument through his cross-examination of you that you had come up with this cover-your-ass recollection only very recently.  Okay?  That's the point he was trying to make.  Are you with me so far?

A.     Yeah.

Q.     And so when he said to you, Isn't it true that the first time you even told the prosecutors about this memory was just recently?  And you said, No.  But in fact, you had told the prosecutors about the memory that you had on the airplane pretty recently; right?

A.     Yeah.

Q.     During the week before you testified; right?

A.     Yeah.

Q.     So did you intentionally lie when you said, No, I didn't tell them about it recently?

A.     I didn't know what he was really telling me there.

Q.     You think you misunderstood the question?

A.     Yeah.

Q.     Because you didn't -- you're telling me here today that you're confident you didn't intentionally lie about it?

A.     That's right.

Deposition of B. Allen, March 6, 2010, at 50-53.

492

Ms. Morris testified that she was present when Mr. Allen testified on direct and cross-examination and that Mr. Sullivan "called Bill a liar as many ways as he could and Bill just held his ground." Deposition of B. Morris, Jan. 15, 2010, at 315 &316. She testified that Mr. Allen's testimony on cross-examination, that he had not "just recently" told the government about his CYA conversation with Mr. Persons, "sounded familiar", and she knew at the time that he had told the government about that conversation only a few weeks earlier. *Id.* at 316. She would have corrected the record but she did not recognize the discrepancy:

Q     Why do you suppose you failed to recognize that since you knew the relevant facts?

A     By the time Bill got on the stand, it was near the end, towards the end of our case. I was so fatigued. I mean, we were getting maybe -- well, I was getting maybe three to four hours of sleep. It just -- I just so wanted it over, and I didn't focus on it. I just was exhausted. I didn't recognize that to be an issue.

\* \* \*

Q     And you knew that Allen's denial that he told the government only recently was untrue, right?

A     I didn't focus on it, but you're correct. If I did, I would have recognized it, yes.

Q     And I -- you -- you -- as the -- as the proponent of Allen's testimony, did you -- did you not take umbrage at the suggestion that you were presenting a recent fabrication? Because that's also an accusation against the government, right?

A     There were many allegations being thrown –

Q     Yeah.

A     -- at us on a daily basis.

Q     But I only want to talk about this one at the moment.

A     No, it was just one of many, and more than anything, it was something for Mr. Sullivan to yell about which he did every time he got up to the podium.

\* \* \*

Q     Did it ever occur to you at any time thereafter that that was a problem for the prosecution, what they call -- what's known as a Napue violation, Napue v. Illinois, when the prosecutor allows a witness to

493

testify falsely without correcting it, did that ever occur to you or to your knowledge to any other member of the prosecution team?

A    No, no.

Q    And I gather it didn't -- it hadn't occurred to you until this moment?

A    I haven't focused on it until now.

* * *

| | |
|---|---|
| MR. ROSENBERG: (attorney for Ms. Morris) | Brenda, I don't know if this is fair, and I'll admit to my own fallacies here. But if I'm trying a case with somebody and it's not my witness on the stand, I'm frankly thinking about my next witness or something else. Is it fair that you weren't focusing as closely perhaps on Bill because Bill was simply not your witness? |
| THE WITNESS: | And I was -- I was getting ready for cross of -- of Mrs. Stevens because at this point, I didn't even know I was crossing Ted Stevens. So I was focusing on other things. |
| MR. ROSENBERG: | So some of the questions assume that she heard it and ignored it. It's also possible that you didn't hear it and you heard it but didn't pay attention. |
| THE WITNESS: | I heard it. I -- I just didn't focus on it. |

*Id*. at 318-319, 320, 321-322 & 324-325.

Mr. Marsh did not remember being present for Mr. Sullivan's cross-examination of Mr. Allen about the CYA conversation with Mr. Persons. Deposition of N. Marsh, Feb. 2, 2010, at 384.  He testified that he remembered that Mr. Sullivan asked Mr. Allen whether he had just recently told the government about his CYA conversation, that Mr. Allen's answer, "no", "rings a bell", but that he was focused on getting ready for his next witness, Agent Pluta (who testified two days later), and correcting the record never crossed his mind:

Q    Do you recall that exchange?

A    Yeah, I do.

494

Q      Do you recall being present or you recall being told about it?
A      Mr. Schuelke, I'm sorry.

Q      You don't have to be sorry. I just want to know what the answer is.
A      I just don't remember. A lot of it ran together for me. I remember getting a blow by blow. I remember us all talking about it. I don't remember if I was there or not.

Q      Mr. Allen denied that he had told the Government only recently.
A      Okay.

Q      Mr. Brendan Sullivan pressed him on this point. "And you only told them recently?" "No, no." Did you learn that had been the essence of the exchange?
A      That rings a bell. I think I remember learning –

                              *   *   *

Q      Did anybody discuss with you the fact that he had incorrectly denied he had told us about this only recently?
A      I don't remember it coming up.

Q      And inquire whether or not we had any obligation?
A      I don't recall –

                              *   *   *

Q      You don't recall any discussion of this issue at all; right?
A      I don't remember any discussion of saying -- I don't remember anybody saying we think Allen made a materially inaccurate statement and we need to figure out what we are going to do. I don't remember that ever coming up.

Q      That thought never crossed your mind?
A      It didn't. Again, to be honest, I was concerned I wasn't going to be able to pull together the stuff for Pluta. I was really focused on that. In retrospect, you know, in hindsight -- I was so overwhelmed with what I had to do, I probably paid perhaps less attention than I would have normally to what was going on in other contexts. I don't recall.

*Id*. at 385-386, 387 & 388-389.

                                495

The trial transcript reflects that Mr. Marsh addressed the Court on an unrelated evidentiary issue shortly after Mr. Sullivan's cross-examination of Mr. Allen ended for that day. *Stevens*, Trial Transcript, Oct. 6, 2008 P.M., at 95-101.

Mr. Goeke testified that he walked into the courtroom while Mr. Allen was testifying and remained there for only five to ten minutes. Deposition of J. Goeke, Jan. 8, 2010, at 427.  He did not remember learning that on cross-examination Mr. Allen denied that he just recently told the government about his CYA conversation with Mr. Persons, though he "may have seen it in the briefing". *Id*. at 433.

Mr. E. Sullivan testified that the first time he learned about Mr. Allen's CYA conversation with Mr. Persons was "at or near the time he actually testified". Deposition of E. Sullivan, Jan. 6, 2010, at 307 & 309.  He missed most of Mr. Allen's testimony and was not sure if he was in the courtroom when Mr. Allen testified about the CYA conversation. *Id*. at 309.[70]

Mr. Welch testified that he did not believe he was present when Mr. Allen was cross-examined about his CYA conversation and he did not recall anyone telling him that Mr. Allen denied telling the government about his CYA conversation just recently. Deposition of W. Welch, Feb. 5, 2010, at 382-382.

---

[70]The trial transcript lists Mr. Goeke and Mr. E. Sullivan as among those appearing that day for the government but does not reflect their participation in the proceedings. *See Stevens*, Trial Transcript, Oct. 6, 2008 P.M., at 1.

**Discussion and Conclusion**

1.    Favorable Evidence was Concealed From Senator Stevens which
      would have Directly Corroborated His Defense and Significantly
      Impeached the Credibility of the Government's Key Witness

a. *Brady* and *Giglio*

The Court of Appeals for the D.C. Circuit recently summarized the state of
the law regarding *Brady* and *Giglio*:

> The Supreme Court held in *Brady* that "the suppression by the prosecution
> of evidence favorable to an accused upon request violates due process
> where the evidence is material either to guilt or to punishment, irrespective
> of the good faith or bad faith of the prosecution." 373 U.S. at 87. Thereafter
> the Court held that such disclosure is mandatory regardless of whether a
> defendant requests it, *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct.
> 2392, 49 L. Ed. 2d 342 (1976), and that impeachment evidence must also be
> disclosed, *see Bagley*, 473 U.S. at 676; *Giglio*, 405 U.S. at 154. To
> determine whether there has been a *Brady* violation, courts apply a
> three-part test. "The evidence at issue must [1] be favorable to the accused,
> either because it is exculpatory, or because it is impeaching; that evidence
> must [2] have been suppressed by the [government], either willfully or
> inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527
> U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). For prejudice
> to have ensued, there must be a "reasonable probability that, had the
> evidence been disclosed to the defense, the result of the proceeding would
> have been different," *Id*. at 280 (internal quotation marks omitted), i.e., "the
> favorable evidence could reasonably be taken to put the whole case in such
> a different light as to undermine confidence in the verdict," *Kyles v. Whitley*,
> 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *see Bagley*,
> 473 U.S. at 682.

*United States v. Wilson*, 605 F.3d 985, 1004-1005 (D.C. Cir. 2010)(brackets
in original).[71]

---

[71]*Wilson* added that "This court has held that to be 'material' under *Brady*, undisclosed
(continued...)

*United States v Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005)(Friedman, J.) held that prosecutors must disclose "any potentially exculpatory or otherwise favorable evidence . . . without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." (citations omitted). *Safavian* rejected the use by trial prosecutors of the appellate standard for determining whether *Brady* had been violated because it gave them too much discretion:

it permits prosecutors to withhold admittedly favorable evidence whenever

---

[71](...continued)
information or evidence acquired through that information must be admissible" and noted that "the appellants do not maintain that their knowledge of [the undisclosed *Brady* information] could have led to admissible evidence." *Id*. at 1005 (citations omitted). *See also United States v. Kohring*, 637 F.3d 895, 907 (9th Cir. 2011)("to be material under *Brady*/*Giglio*, the information must be either admissible, lead to information that will be admissible, or capable of being used for impeachment.")(citation omitted); *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) ("There is no difference between exculpatory and impeachment evidence for purposes of *Brady*. *Kyles*, 514 U.S. at 433 (citing *Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481). The suppressed evidence need not be admissible to be material under *Brady*; but it must, somehow, create a reasonable probability that the result of the proceeding would be different.")(footnote omitted); *United States v. Triumph Capital Group*, 544 F.3d 149, 162-163 (2d Cir. 2008)("*Brady* material need not be admissible if it could lead to admissible evidence or would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise")(citation and internal quotation marks omitted); *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007)("the Government's obligations under *Brady* to disclose such information does not depend on whether the information to be disclosed is admissible as evidence in its present form. The objectives of fairness to the defendant, as well as the legal system's objective of convicting the guilty rather than the innocent, require that the prosecution make the defense aware of material information potentially leading to admissible evidence favorable to the defense.").
   *United States v Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010) noted a circuit split on the issue of admissibility: "there is some question in the circuits about whether, in order to make out a *Brady* violation, the undisclosed information must constitute admissible evidence. *See Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (en banc); *cf. United States v. Derr*, 990 F.2d 1330, 1335-36, 301 U.S. App. D.C. 60 (D.C. Cir. 1993)."). *See Ellsworth v. Warden*, *supra* ("The circuits are split on whether a petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible. Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence. . . . given the policy underlying *Brady*, we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew*, 516 U.S. 1, 6-8, 133 L. Ed. 2d 1, 116 S. Ct. 7 (1995), implicitly assumes this is so.") (emphasis in original; internal citations omitted).

the prosecutors, in their wisdom, conclude that it would not make a difference to the outcome of the trial. Most prosecutors are neither neutral (nor should they be) nor prescient, and any such judgment necessarily is speculative on so many matters that simply are unknown and unknowable before trial begins: which government witnesses will be available for trial, how they will testify and be evaluated by the jury, which objections to testimony and evidence the trial judge will sustain and which he will overrule, what the nature of the defense will be, what witnesses and evidence will support that defense, what instructions the Court ultimately will give, what questions the jury may pose during deliberations (and how they may be answered), and whether the jury finds guilt on all counts or only on some (and which ones).

The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed -- with the benefit of hindsight -- as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed.

In its decision denying the government's Motion for Clarification in *Safavian*, Judge Friedman emphasized the need for a "broad and open" approach by prosecutors to their *Brady* obligations:

The Court fully understands that its reading of the term 'favorable to the accused' under *Brady* and its opinion that the post-trial 'materiality' standard is irrelevant to pretrial and in-trial *Brady* decisions to be made by prosecutors and trial judges are inconsistent with the way some Justice Department lawyers have approached their *Brady* obligations in the past. But there is no need for clarification. There simply is a need for the Justice Department to change the mindset of its trial prosecutors to assure that its approach to *Brady* is broad and open, "consistent with the special role of the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 301-02, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed.

499

1314 (1935) (the interest of the Justice Department 'in a criminal
prosecution is not that it shall win a case, but that justice shall be done.')).
The Court's December 23, 2005 Opinion stands as it is.

*United States v. Safavian*, 233 F.R.D. 205, 206-207 (D.D.C. 2006)(footnote
omitted).

Judge Sullivan repeatedly reminded the prosecutors in *Stevens* of their
*Brady* disclosure obligation, citing *Safavian*, among other decisions, as recounted
above at pp. 19, *et seq*. *See Stevens*, Government's Memorandum in Opposition to
Defendant's Motion to Dismiss or for a New Trial, filed Oct. 2, 2008 (Dkt. No.
127), at 9 ("The Court has previously instructed the parties to consider <u>United
States v. Safavian</u>, 233 F.R.D. 12 (D.D.C. 2005), for guidance on interpreting the
<u>Brady</u> doctrine. The government has taken this decision into account when
producing its <u>Brady</u>-related material.")(footnote omitted); *id*., Government's
Opposition to Defendant's Motion for a New Trial, filed Jan. 16, 2009, at 37 ("We
acknowledge that, to avoid unnecessary disputes over discovery, the better
practice would have been to disclose all of Allen's various statements. This is
especially true here because, the day after the [*Brady*] letter was produced, this
Court agreed with <u>United States v. Safavian</u>, 233 F.R.D. 12, 16 (D.D.C. 2005),
that the government is required to produce any evidence 'favorable' to the
accused, regardless of whether it would affect the outcome at trial. 10/10/08
[should be 9/10/08] Tr. 67. *But see* <u>Boyd v. United States</u>, 908 A.2d 39, 60-61 &
n.32 (D.C. 2006) (concluding that <u>Safavian</u> 'cannot be reconciled' with three
separate Supreme Court cases).") ( Dkt. No. 269).

By any standard, the information provided to the prosecutors by Rocky
Williams and Bambi Tyree was *Brady* material.  Mr. Williams's statements to Mr.
Bottini, Mr. Goeke and Agent Joy during trial preparation interviews in August
and September 2008, days before the trial began, that he understood, based on
conversations with Mr. Allen and Senator Stevens, that VECO expenses were to
be included in the Christensen Builders' bills, directly supported and corroborated
Senator Steven's principal defense and his and Catherine Stevens's testimony at
trial.  Mr. Williams's statements constituted quintessential *Brady* information
which Mr. Bottini and Mr. Goeke withheld and concealed from Senator Stevens
and Williams & Connolly.

The information provided by Ms. Tyree to Agent Eckstein and AUSA Russo in July 2004, that Mr. Allen asked and caused her to commit perjury, was quintessential *Giglio* impeachment information that related directly to Mr. Allen's character for truthfulness:

> **Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . .

Fed. R. Evid. 608(b) (emphasis in original).

*See United States v. Kohring*, 637 F.3d 895, 904 (9th Cir. 2011) ("Evidence that Allen attempted to suborn perjurious testimony from one of the minors . . . would have been highly probative of his 'character for truthfulness.' *See Rule 608(b)* (permitting cross-examination on specific instances of misconduct 'if probative of truthfulness or untruthfulness')."); *United States v. Kott*, 423 Fed. Appx. 736, 727 (9th Cir. 2011)("Specifically, the newly-disclosed evidence of Anchorage Police Department files suggesting that key prosecution witness Bill Allen sexually exploited minors, and attempted to conceal that behavior by soliciting perjury, would have been admissible and was not needlessly cumulative. Such evidence could have been used, at a minimum, on cross-examination to impeach Allen's testimony.")(citation omitted); *United States v. Whitmore*, 359 F.3d 609, 619 (D.C. Cir. 2004)("Nothing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath.").[72]

---

[72]In the Court's discretion, evidence regarding Mr. Allen's solicitation of Ms. Tyree's false sworn statement would not have been limited to Mr. Allen's answers on cross-examination. Had Mr. Allen denied soliciting Ms. Tyree's perjury, the Court would have had the discretion to admit extrinsic evidence of his conduct:

> At times the trial court and the parties made reference to Federal Rule of Evidence 608 as prohibiting impeachment by extrinsic evidence on a collateral matter. We recently recognized that Rule 608 "'leave[s] the admissibility of extrinsic evidence offered for other grounds of impeachment[,] such as contradiction, . . . to rules 402 and 403.'" *United*
> (continued...)

501

Instead of disclosing this *Giglio* material in *Stevens*, *Kott* and *Kohring*, Mr. Bottini, Mr. Goeke and Mr. Marsh testified that they investigated the circumstances surrounding Ms. Tyree's statements to Agent Eckstein and AUSA Russo and determined that Agent Eckstein's 302, his and AUSA Russo's notes, and the motion *in limine* in *Boehm* were mistaken and were not *Brady*/*Giglio* information. They had no such prerogative. *See Disimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) ("if there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel -- and not of the prosecution -- to exercise judgment in determining whether the defendant should make use of it. . . . If the evidence is favorable to the accused, * * * then it must be disclosed, even if the prosecution believes the evidence is not thoroughly reliable. To allow otherwise would be to appoint the fox as henhouse guard." (internal quotation marks and citations omitted; asterisks in original); *Zanders v. United States*, 999 A.2d 149, 163-164 (D.C. 2010) ("It should by now be clear that in making judgments about whether to disclose potentially exculpatory information, the guiding principle must be that the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest than the police or prosecutor. . . . It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder.").

Instead of disclosing information that was on its face, and in fact, *Giglio* material, Mr. Bottini, Mr. Goeke and Mr. Marsh told Williams & Connolly that no such evidence existed: "Because the government is aware of no evidence to support any suggestion that Allen asked the 'other female' [Ms. Tyree] to make a false statement under oath, neither *Brady* nor *Giglio* apply." *Brady* letter, at 5. In

---

[72](...continued)

*States v. Fonseca*, 435 F.3d 369, 375, 369 U.S. App. D.C. 257 (D.C. Cir. 2006) (quoting *Fed. R. Evid. 608* advisory committee's notes to 2003 amendments). Thus, "such evidence is admissible provided that it is 'relevant' and not otherwise prescribed by law or rule." *Id.* (citing *Fed. R. Evid. 402*). "And evidence that would contradict [a witness's] trial testimony, even on a collateral subject" is relevant under Rule 401 "because it would undermine her credibility as a witness regarding facts of consequence." *Id.*

*United States v. Mahdi*, 598 F.3d 883, n. 11 (D.C. Cir. 2010)(ellipsis and brackets in original).

*United States v. Bagley*, 473 U.S. 667, 682-683 (1985), the Supreme Court *and the Government* identified the danger to the defense when prosecutors make an incomplete response to a specific request for *Brady* material:

> *The Government notes that an incomplete response to a specific [Brady] request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist.* In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.
>
> We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.
>
> (emphasis added; citation omitted).

The *Brady* disclosure in *Stevens* was not just incomplete. Mr. Bottini, Mr. Goeke and Mr. Marsh falsely represented that there was "no evidence" that Mr. Allen asked Ms. Tyree to lie.

### b. *Napue*

In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court held that a prosecutor may not knowingly use false testimony, including testimony that relates only to the credibility of the witness, to obtain a conviction, or allow such testimony to go uncorrected:

> it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.
>
> The principle that a State may not knowingly use false evidence, including

503

false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

(citations omitted).

*See also United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011)("*Napue* does not require that the witness could be successfully prosecuted for perjury. *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995). In this area of the law, the governing principle is simply that the prosecutor may not knowingly use false testimony. This includes 'half-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury. *Id*. ('It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false.').").

Though "[t]he rule of *Brady* arguably applies" to *Napue* violations (*United States v. Agurs*, 427 U.S. 97, at 103 (1976)), the standard of review under *Napue* is stricter than the *Brady* standard: a *Napue* violation is a "hair trigger" for reversal. *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir.), reh'g denied, 326 F.3d 228 (D.C. Cir. 2003)("Whereas the prosecution's knowing use of false testimony entails a veritable hair trigger for setting aside the conviction ('any reasonable likelihood that the false testimony could have affected the judgment of the jury,' *see Agurs*, 427 U.S. at 103), non-disclosure of exculpatory evidence (including impeachment evidence) is governed by a more general standard: 'Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'").

Mr. Allen's eve-of-trial recollection of his CYA conversation with Mr. Persons in 2002 contradicted his statement on April 15, 2008 to Mr. Bottini, Mr. Goeke, Mr. Marsh, Mr. E. Sullivan and Agent Kepner that he did not remember speaking to Mr. Persons about the Torricelli note. Those inconsistent statements were *Brady*/*Giglio* information which were required to be disclosed to Williams & Connolly, but were not. The prosecutors and Agent Kepner testified in this

investigation that the reason for the non-disclosure was that they forgot the interview on April 15, 2008 and Mr. Allen's statements during it.

The uniform forgetfulness of all four prosecutors and Agent Kepner about that meeting with their key witness, despite their urgent need to question him about the recently received and worrisome Torricelli note that was sent to him by Senator Stevens, their copious notes of the meeting (except for Mr. Marsh), their emails during it, and the prosecution memos featuring the note that were written before and after the meeting, strains credulity. That suspicious pattern of forgetfulness is made more unnatural by the fact that Ms. Morris, who did not attend that meeting, testified that she vaguely remembered that her colleagues met with Mr. Allen soon after the Torricelli note was received.

Mr. Allen's statement on April 15, 2008, that he did not remember speaking to Mr. Persons about Senator Stevens's requests for bills in the Torricelli notes, did not become a prior inconsistent statement and *Brady/Giglio* information until Sept. 14, 2008. It was only then that Mr. Allen's memory improved, at Agent Kepner's urging, and he provided the prosecutors with a powerful and dramatic antidote to the Torricelli note: his CYA conversation with Mr. Persons six years earlier. Although there is substantial evidence that Mr. Bottini, Mr. Marsh, Mr. Goeke, Mr. E. Sullivan and Agent Kepner had reason to remember, and to be reminded, before and during the trial, of Mr. Allen's statement on April 15, 2008, the evidence does not establish beyond a reasonable doubt that any one or more of them remembered and intentionally withheld that information from Senator Stevens.

However, Mr. Bottini had not forgotten during Mr. Allen's cross-examination on Oct. 6, 2008, when Mr. Sullivan attempted to demonstrate that his CYA testimony was a recent fabrication, that Mr. Allen told him about that CYA conversation for the first time on Sept. 14, 2008. He failed to correct Mr. Allen's false testimony that he had <u>not</u> told the prosecutors "just recently" about his CYA conversation with Mr. Persons. Mr. Bottini knew that he was obliged by *Brady*, *Giglio* and *Napue* to correct that false testimony and/or disclose the truth to Williams & Connolly and the Court, and he chose not to. Mr. Bottini's explanation, that he knew from his experience with Mr. Allen that he was confused and misunderstood Mr. Sullivan's question (Deposition of J. Bottini, Dec. 17, 2009, at 628, 631, 634-636 and 638), does not excuse his failure to correct testimony which he knew was false. *Id*. at 642 ("It didn't, I don't think it

crossed my mind [to correct the testimony], independent of getting up on redirect
and perhaps confusing the issue even more than it was right now, at the end of this
cross, it didn't cross my mind to do that.  I didn't think about it at the time.").
*Compare United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004) ("The
prosecutor could readily have asked Pulgar on redirect about the last interview, or,
at a minimum, alerted defense counsel and the Court to the fact that Pulgar's
account was significantly incorrect. . . .  The Government's 'tactical reason[]' for
non-disclosure--that having Pulgar recount his receipt of the narcotics 'might well
have confused him'--is totally unacceptable.") (brackets in original).

As is understandable and sensible, the Office of the Assistant Attorney
General for the Criminal Division of the Department of Justice took a keen interest
in the prospective indictment and subsequent prosecution of a senior United States
Senator.  Paradoxically, however, the role of the "front office" in the management
of the prosecution contributed to the failures of effective supervision of the trial
team by the leadership of the Public Integrity Section.

Shortly before the indictment was returned, AAG Friedrich appointed Ms.
Morris, the Principal Deputy Chief of Public Integrity, to serve as lead trial
counsel in the *Stevens* case, causing discontent and poor morale among the
balance of the team.  As a consequence both of the need for Ms. Morris to devote
her time and energy to the prodigious task of mastering the facts assembled over
two years, preparing witnesses and arguing motions in a tightly compressed period
of time and avoiding second-guessing of the decisions of the balance of the trial
team in an effort to avoid further demoralizing them, Ms. Morris abdicated any
meaningful supervisory role with respect to the matters which gave rise to this
investigation.  Rather, she deferred to the judgment of Messrs. Bottini, Goeke and
Marsh and accepted on faith their representations concerning matters about which
she had little or no personal knowledge.  We uncovered no evidence, however,
that Ms. Morris knowingly and willfully withheld *Brady* or *Giglio* information
from Senator Stevens and his attorneys.

Since the Office of the AAG also actively managed the conduct of the
prosecution in matters ranging from review and approval of pleadings, opening
statements and closing arguments and witness examination assignments to the
seating of government counsel in the courtroom, Mr. Welch perceived himself
effectively to have been eliminated from the "chain of command."  Moreover,
since his principal deputy was now fully otherwise occupied, the supervision of

the balance of the Public Integrity Section's docket fell to him.  The net result was
that Mr. Welch directly supervised the conduct of the prosecution only when
discrete matters were brought to his attention after controversies arose.  To his
credit, on each occasion that *Brady*/*Giglio* disclosure issues were brought to him
for decision, he directed that disclosure be made.

Mr. E. Sullivan was the most junior member of the *Stevens* prosecution team
and had neither experience nor training concerning *Brady*/*Giglio* issues.  While
the record demonstrates that he was privy to relevant facts and internal discussions
concerning information which should have been disclosed to the defense but was
not, we think it fair to say that he deferred to the judgment of his seniors on the
team and made no independent decisions.


2.      The Essential Elements of Criminal Contempt

A prosecution for criminal contempt is authorized and governed by
Section 401 of Title 18 of the United States Code.  The statue provides:

A Court of the United States shall have power to punish by fine or
imprisonment, or both, at its discretion, such contempt of its authority, and
none other, as –
(1) misbehavior of any person in its presence or so near thereto as to
obstruct the administration of justice;
(2) misbehavior of any of its officers in their official transactions;
(3) disobedience or resistance to its lawful writ, process, order, rule, decree,
or command.

A criminal contempt prosecution, if any, arising from *Brady* and/or *Giglio*
nondisclosures in *Stevens* would lie only under 18 U.S.C. §401, subsection (3).[73]

---

[73]18 U.S.C. §401, subsection (1) limits the power of the Court to punish only such
misbehavior as is committed in or so near to the presence of the Court as to obstruct the
administration of justice; disclosures of exculpatory or impeachment evidence routinely occur
(and did in this case) between counsel for the parties, out-of-Court; necessarily, so too the
failures to disclose.

The current governing statute, 18 U.S.C. §401, is based on an act of Congress passed in
(continued...)

[73](...continued)

1831 (4 Stat. 487) and codified as section 268 of the Judicial Code, 36 Stat. 1163, 28 U.S.C. 5385; that Act was designed to limit the broad and undefined contempt power of the inferior federal courts as granted by the Judiciary Act of 1789, as a result of abuses of that power. The operative language of 18 U.S.C. §401 is identical to that of Section 268 of the Judicial Code, which provided:

> The said Courts shall have power to impose and administer the necessary oaths, and to punish, by fine or imprisonment, at the discretion of the Court, contempts of their authority: provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the offices of said courts in their official transactions, and the disobedience or resistance of any such officer, or by any party, juror, witness or any other person to any lawful writ, process, order, rule, decree or command of the said courts.

In *Nye et al. v. United States, et al.*, 313 U.S. 33 (1941), the Supreme Court held that the words "so near thereto" as used in the clause "the misbehavior of any person in their presence, or so near thereto as obstruct the administration of justice," have a geographical rather than a causal connotation and that, therefore, to be actionable as contempt, the misbehavior must be in the vicinity of the Court, *e.g.*, in the jury room or in the hallway immediately adjoining the courtroom. Nye, acting as the agent for a defendant in a civil action, induced the plaintiff, who was "illiterate and feeble in mind and body," *Nye, supra*, at 39, to seek a dismissal of the action. This was accomplished by the drafting of letters for the plaintiff's signature and posting them both to the District Court and to plaintiff's Court-appointed attorney. These acts took place some 100 miles distant from the District Court.

In reversing Nye's contempt conviction, the Court observed:

> The fact that in purpose and effect there was an obstruction in the administration of justice did not bring the condemned conduct within the vicinity of the Court in any normal meaning of the term. It was not misbehavior in the vicinity of the court disrupting to quiet and order or actually interrupting the Court in the conduct of its business. (Citation omitted.) Hence, it was not embraced within §268 of the Judicial Code. If petitioners can be punished for their misconduct, it must be under the Criminal Code where they will be afforded the normal safeguards surrounding criminal prosecutions. *Nye, supra*, at 52, 53.

Accord, *Shepherd, et al. v. Florida*, 341 U.S. 50 (1951); *Bloom v. Illinois*, 391 U.S. 194 (1968); *Branzburg v. Hayes, et al., Judges*, 408 U.S. 665 (1972); *United States v. Wilson, et al.*, 421 U.S.

(continued...)

The elements of that offense, each of which must be proved beyond a reasonable doubt, are:

> 1) The Court issued to the Defendant a clear and reasonably specific order;
> 2) The Defendant violated that order;
> 3) The Defendant acted willfully in violating the Court's Order.[74]

As we analyze the evidence which might support proof of the first element of the offense of criminal contempt, we first note that even a willful violation of the Government's *Brady* or *Giglio* obligations as imposed by the substantive law does not give rise to a contempt prosecution under 18 U.S.C. §401 in the absence of a clear and reasonably specific order addressed to the prosecutor defining and commanding compliance with that substantive law.

As a matter of long-standing practice, federal prosecutors respond to defense requests for *Brady* and *Giglio* information as well as to inquiries by our District Judges concerning the status of pre-trial discovery with assurances that they are aware of their obligation and have complied or are in the process of doing so.  Until quite recently, District Judges understandably relied on such assurances and did not find it necessary to issue *Brady* orders unless and until it became apparent in a given case that reliance on the assurances of the prosecutor had been

---

[73](...continued)
309 (1975).

With respect to 18 U.S.C. §401, subsection (2) our Court of Appeals has held, "It is clear that the second subdivision does not cover the situation at bar for, as the Supreme Court has held, an attorney is not an officer of the Court within the meaning of its provision." *In re Darwin Charles Brown*, 454 F.2d 999 (1971), citing *Cammer v. United States*, 350 U.S. 399, 404-408 (1956).

[74]*United States v. Rapone*, 131 F.3rd 188 (D.C. Cir. 1997); *United States v. Young*, 107 F.3rd 903 (D.C. Cir. 1997); accord, *United States v. Landerman*, 109 F.3rd 1053 (5th Cir. 1997); *In re Hipp*, 5 F.3rd (5th Cir. 1993); *United States v. Eichorst*, 544 F.2d 1383 (7th Cir. 1976); *United States v. Bernardine*, 237 F.3rd 1279 (11th Cir. 2001); *In Re McDonald*, 819 F.2d 1020 (11th Cir. 1987); *United States v. Joyce*, 498 F.2d 592 (7th Cir. 1974).

misplaced.[75]  So it was here.

Notwithstanding the compressed pretrial schedule (some fifty-one days between arraignment and trial) – indeed, because of it – the Court remained vigilant and made extraordinary efforts to ensure complete and timely discovery and to accommodate the parties in the process.  The Court made itself available in the evening and during weekends to entertain the submission of pleadings and to convene hearings on extremely short notice. *See Smith v. Phillips*, 455 U.S. 209, 217 (1982)("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.").

As recounted above, in response to Senator Stevens' Motion to Compel as supplemented by additional pleadings and the arguments of counsel in the course of four hearings held both before and during trial, the Court addressed the subject of an order of compulsion as sought by Senator Stevens in the following terms:

- On September 10, 2008:
  The Court: "I'll just issue an order as a general reminder to the government to remind it of its daily ongoing obligation to produce that material."
  September 10, 2008, Hrg. Tr. p. 74.

- On September 16, 2008:
  The Court: "All right.  I'm going to . . . direct that the government produce the redacted 302s and do it by tomorrow."

---

[75]Unmet expectations in this regard have led to the adoption of local rules and standing orders of individual District Judges mandating the production of exculpatory and impeachment material. *See, e.g.*, Rule 116.2 of the Local Rules of the United States District Court for the District of Massachusetts; standing pre-trial order of the Honorable Emmet G. Sullivan, United States District Judge for the District of Columbia, adopted subsequent to the *Stevens* case. According to a recent report of the Federal Judicial Center, 38 of the 94 district courts have local rules or standing orders which impose broader disclosure requirements for *Brady* and *Giglio* information than Rule 16. *See* Federal Judicial Center, A Summary of Responses to a National Survey of Rule 16 of the Federal Rules of Criminal Procedure and Disclosure Practices in Criminal Cases, *Final Report to the Advisory Committee on Criminal Rules*, February 2011, at 11.

September 16, 2008, Hrg. Tr. p. 30.

- On October 2, 2008:
  The Court: "I want all the 302s turned over to defense counsel . . .
  Every last one . . . . Every Memorandum of Interview . . . Forthwith."
  October 2, 2008, Trial Tr. p. 19, a.m. session.

  The Court: "What's the prejudice to the government if they get the
  unredacted material at this point for Allen? . . . Turn it over . . .
  Unredacted. The MOIs as well as the 302s . . . [to defense counsel:]
  You're getting the 302s and MOIs for every witness in this case."
  October 2, 2008, Trial Tr., p. 29, a.m. session.

  In response to a defense request that, in addition to 302s and MOIs,
  the grand jury testimony of Government witnesses be turned over,

  The Court: "Fine. Turn it over. Turn it over."
  October 2, 2008, Trial Tr., p. 53, p.m. session.

As our Court of Appeals has observed:

The elements of contempt under §401(3) are straightforward. First, the
alleged contemnor must "disobe[y] or resist[] . . . [the] lawful writ, process,
order, rule, decree, or command' of the Court. 18 U.S.C. §401(3). Of
course, the relevant order or command must be sufficiently "clear and
unequivocal at the time it is issued." *Traub v. United States*, 98 U.S. App.
D.C. 43, 232 F.2d 43, 47 (D.C. Cir. 1955). Whether an order is clear
enough depends on the context in which it is issued and the audience to
which it is addressed. *See*, *e.g.*, *United States v. Robinson*, 922 F.2d 1531,
1534 (11th Cir. 1991). *Accord United States v. Turner*, 812 F.2d 1552, 1567
(11th Cir. 1987) ("even an egregiously vague order may be thought
adequate to cover conduct so gross as to fall within its core.")

*In Re: James R. Holloway*, 995 F.2d 1080, 1082 (D.C. Cir. 1993)(ellipsis
and all brackets in original).

In *In re Brown*, 454 F.2d 999, 1008 (D.C. Cir. 1971), the Court also observed, "It
seems worth noting, too, that 'before one may be punished for contempt for

511

violating a court order, the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed.' *McFarland v. United States*, 295 F. 648, 650 (7th Cir. 1933)."

With these principles in mind, we analyze the pronouncements of Judge Sullivan in *United States v. Stevens* as they relate to those instances of *Brady/Giglio* nondisclosure as to which we have found evidence of wilfulness.

The Court's several responses to Senator Stevens' Motion to Compel fall within two categories. First are those of September 10, 2008, on the subject of the Government's broad *Brady* obligations and the second are those of September 16, 2008, and October 2, 2008, on the subject of the disclosure and production of FBI 302s, IRS Memoranda of Interviews and transcripts of the grand jury testimony of the Government's witnesses.

In our view, the Court issued clear and unequivocal orders on September 16, 2008, and on October 2, 2008. On September 10, 2008, however, the Court first admonished the Government to "follow the law" and "comply with your *Brady* obligations" and "issue[d] an order as a general reminder to the Government . . . of its daily ongoing obligation . . ." Ultimately, the Court declined to "write an order that says 'follow the law'." Rather, accepting the Government's professed familiarity with governing law and its good faith, the Court concluded that the issues raised by the Motion to Compel had been resolved.

Although the simultaneous failure by Mr. Bottini, Mr. Marsh, Mr. Goeke and Mr. E. Sullivan to recall their interview of Mr. Allen on April 15, 2008, and his statement that he did not recall speaking with Mr. Persons about the Torricelli notes, is difficult to believe, there is no evidence that would establish beyond a reasonable doubt that any one or more of them did in fact recall that information and concealed it from Williams & Connolly and the Court.

512

We have found evidence of willful nondisclosure of *Brady* and *Giglio* material on three occasions[76]:

- Mr. Bottini and Mr. Goeke intentionally withheld and concealed significant exculpatory information which they obtained from Rocky Williams during pre-trial witness preparation interviews in August and September, 2008;

- Mr. Bottini and Mr. Goeke intentionally withheld and concealed significant impeachment information regarding Mr. Allen's subornation of perjury by Ms. Tyree; and

- Mr. Bottini withheld significant impeachment information by his intentional failure to correct materially false testimony given by Mr. Allen during his cross-examination, which Mr. Bottini knew at the time was false.

Were there a clear, specific and unequivocal order of the Court which commanded the disclosure of this information, we are satisfied that a criminal contempt prosecution would lie.[77]  We conclude, however, that the record demonstrates that Judge Sullivan admonished the Government to "follow the law" and did not issue a clear, specific and unequivocal order such that it would support a finding by a District Court, beyond a reasonable doubt, that 18 U.S.C. §401(3) had been violated.

It should go without saying that neither Judge Sullivan, nor any District Judge, should have to order the Government to comply with its constitutional obligations, let alone that he should feel compelled to craft such an order with a view toward a criminal contempt prosecution, anticipating its willful violation.

---

[76]Mr. Marsh passed away on Sept. 26, 2010, and, for that reason, we express no conclusion regarding his conduct.

[77]We find no evidence of willfulness with respect to any violation of Judge Sullivan's several orders of October 2, 2008.  While among the documentary evidence of Ms. Tyree's statement was an unproduced FBI Form 302, she was not a Government trial witness, i.e., a "witness in this case."

In the circumstances here described and measured against the standard established by the Principles of Federal Prosecution, USAM 9-27.220, we do not believe that a criminal contempt prosecution under 18 U.S.C. §401(3) should be initiated against any of the subject government attorneys.[78]

Respectfully submitted,

_____
/s/     Henry F. Schuelke III
        Special Counsel
        D.C. Bar no. 91579

        William Shields
        D.C. Bar no. 451036
        Janis, Schuelke & Wechsler

Washington, D.C.
Dated: November 14, 2011

---

[78]We offer no opinion as to whether a prosecution for Obstruction of Justice under 18 U.S.C. §1503 might lie against one or more of the subject attorneys and might meet the standard enunciated in 9-27.220 of the Principles of Federal Prosecution. *See United States v. Convertino, et al.*, Indictment, U.S. District Court, Eastern District of Michigan, Southern Division, No. 2:06-cr-20173.

514