

Martin Garbus, Esq.
590 Madison Ave., 6th Floor
New York, NY 10022
(347) 589-8513
mgarbus@offitkurman.com

July 12, 2021

**VIA ECF**

Honorable Loretta Preska
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

RE: *Chevron v. Donziger*, Case No. 19 Cr. 561 (LAP)

Dear Judge Preska:

I am in receipt of the Court's Order requesting further briefing on the changed factors under 18 U.S.C. § 3142 that would support the release of Mr. Donziger after an unheard 707 days of home confinement on the misdemeanor charges in this case. While this information was already provided in the original submission the Order provides an opportunity to revisit how patently unjust and inappropriate it is to detain Mr. Donziger under the factors. These factors are summarized below.

There never has been any claim of community safety concern in this case, so the only inquiry under § 3142(g) is what it would take to "reasonably assure the appearance" of Mr. Donziger to these proceedings. The factors the Court is directed to consider are as follows:

**(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;**

Mere recital of this factor makes clear how fundamentally incompatible the charges in this case are with the deadly and dangerous felony crimes listed in the statute. The charges in this matter are considered misdemeanors. In fact, the longest sentence ever imposed on a lawyer in New York convicted of the charge of criminal contempt is 90 days of home confinement. Mr. Donziger already has served over eight times that amount without even a conviction. The charges concern alleged non-compliance and late compliance with civil litigation discovery orders, the core of which arise from an ethically-grounded and openly-communicated course of action Mr. Donziger voluntarily undertook in order to protect his rights and rights of others on a temporary basis pending appeal. No person was ever threatened or harmed—quite the opposite. Nor was Mr. Donziger's vicious and hyper-resourced civil litigation opponent, Chevron, harmed in any

appreciable way by his appeal. This entire ugly affair—which is now attracting opprobrium from human rights groups around the world, *see, e.g.*, Dkt. 336 n.1, 3, questioning the fairness and legitimacy of the federal courts in cases involving the interests of "company[ies] of considerable importance to the U.S. economy," to quote the district judge in the underlying civil case—could have been avoided if Judge Kaplan had merely allowed Mr. Donziger to pursue his appeal and protect his rights the way countless other litigants have using the mechanism of post-judgment contempt jurisdiction without being charged with criminal contempt.

The reason Judge Kaplan did not allow Mr. Donziger to pursue this course of action similar to thousands of other lawyers in the United States is now clear: Mr. Donziger ultimately prevailed on the core component of his appeal, winning recognition by the Court of the Appeals of the legitimacy of his fund-raising actions in support of the Ecuador environmental case. If this appellate ruling had been received in the proper course, the post-judgment proceedings would have been appropriately dismissed out of hand. But because Judge Kaplan, Your Honor, Chevron, and Chevron-linked lawyers from the Gibson Dunn and Seward & Kissel law firms (who we now know are jointly running this prosecution) have coordinated for years, at taxpayers expense, to pile on layer after layer of strategic contempt sanctions and corporatized criminal process, this case persists as an embarrassing stain on the integrity of the federal courts. That stain becomes larger with every passing day, while Mr. Donziger becomes stronger.

> **(2) the weight of the evidence against the person;**

This factors was addressed in detail at pp. 2-3 in the original submission. I will not rehash it here, except the reiterate that the weight of the evidence argument has collapsed not only as to the merits of the charges but in relation to the legality and constitutionality of this corporate prosecution at the foundational level. Judge Kaplan's abuse of the private appointment power in Fed. R. Crim. P. 42 to end run the Executive's considered non-prosecution judgment and set loose a free-floating, unsupervised agent of Executive Power provides a striking illustration of exactly the concerns that animated Justice Scalia's concurrence in *Young v. United States ex rel. Vuitton*, 481 U.S. 787 (1987) and triggers the limits of the appointment power in light of that decision and Appointments Clause principles generally. The Supreme Court's recent *Anthrex* decision only reinforces the view that this entire prosecution has been and is unconstitutional at a foundational level.

> **(3) the history and characteristics of the person, including— (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and**

Again, the inappropriateness of detention under the inquiry sketched out by this factor is self evident. Sub-section (B) does not apply at all, not does any indicated factor in sub-section (A). Mr. Donziger has:

Hon. Loretta A. Preska
July 12, 2021
Page 3 of 4

- *no* criminal record;
- *no* history of drug or alcohol abuse;
- *deep* family ties to New York, where he lives with his wife and young son and where his son attends school;
- *decades* of time residing in New York with extensive community ties;
- a *perfect* attendance record concerning court appearances and a record of past conduct in which Mr. Donziger has never done anything suggesting a risk of flight, but quite to the contrary has always stood up for and fought for himself, his clients, and his beliefs; and
- a personal character that has been vouched for time and again, including, for example, by numerous witnesses under oath at the collateral attorney disciplinary hearings the Court is familiar with, where the likes of John Keker, a former Marine, Yale Law grad, Supreme Court clerk, and one of the country's leading legal figures. Indeed on the strength of the character evidence the neutral hearing officer, former U.S. Attorney John Horan, recommended in a considered 45-page decision that Mr. Donziger be immediately reinstated to the practice of law.

And finally:

> **(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.**

Again this factor is conceded to be inapposite, no claim has ever been made nor could it be made.

How then *is it even possible* that Mr. Donziger and his family are still suffering the consequences of the Court's effective home confinement sentence, on these misdemeanor charges, after more than 700 days when the maximum sentence should he be convicted is only 180 days? Human rights groups and individuals of conscience have been asking this question for almost two years and are demanding an answer. They demand an answer not just out of frustration with the Court's decision-making here, but out of deep concern—even fear. The Court and Judge Kaplan have gone to stunning lengths to create and sustain a process that so clearly serves the private interests of "a company of considerable importance to our economy" in attacking a human rights defender. Worse, it is obvious that it is part of a private agenda expressly acknowledged by Chevron as a "demonization" effort aimed at defeating an environmental liability owed by the company to tens of thousands of marginalized and suffering Indigenous peoples and farmer communities in Ecuador's Amazon. Without exaggeration, the chilling specter presented by this corporate prosecution is dire for the rule of law and people know it.

Finally, the Court's Order appears to elide the specific request for a bail *amount* made in the submission. The Court's prior home confinement decisions were all made in light of a bail amount fixed with minimal consideration at the initial appearance. Mr. Donziger now asks for a new calculation: what amount, however high, would provide the Court with the additional assurance so as to "reasonably assure the [continued] appearance" of Mr. Donziger in these proceedings? The amount has not been challenged earlier because it is already wildly excessive—$800,000 for a misdemeanor case. But as Mr. Donziger is out of options and suffering greatly under home confinement, he reiterates his request to know what amount, however high, would

provide the necessary assurance. Two million? Five million? $100 million? If the Court is taking the almost incomprehensible position that *no* amount would provide the Court with assurance that Mr. Donziger will not abandon his family and attempt to spend the rest of his life as a fugitive from misdemeanor charges threatening a maximum penalty of six months imprisonment, then it should say so.

Respectfully,

/s

Martin Garbus, Esq.
OFFIT | KURMAN
590 Madison Ave., 6th Floor
New York, NY 10022
Tel. 347.589.8513
mgarbus@offitkurman.com
*Counsel for defendant*