# GLAVIN PLLC
2585 Broadway #211
New York, New York 10025
646-693-5505

July 23, 2021

**VIA ECF**
Honorable Loretta A. Preska
U.S. District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    United States v. Donziger, 19 Cr. 561 (LAP); [11 Civ. 691 (LAK)]

Dear Judge Preska:

I write on behalf of the United States in opposition to the defendant's letters dated July 6, 2021 (Dkt. 336), July 12, 2021 (Dkt. 339) and July 21, 2021 (Dkt. 344) seeking to modify his release conditions following the trial conducted in this case from May 10 – May 17, 2021 for which this Court has not yet rendered a verdict on the six charged counts of criminal contempt. The defense requests that the Court eliminate the condition of home confinement and release Donziger on his own recognizance or, in the alternative, require Donziger to post additional bail as security at "whatever amount [the Court] thinks necessary." *See* Dkt. 336 at 1, 4. The defense's application should be denied. Donziger cites to no change in circumstances that warrants a departure from this Court's multiple prior findings that Donziger poses a flight risk. Indeed, the only changed circumstance is the overwhelming evidence presented at trial of the defendant's guilt.

    **A.**    **Background**

The defendant has made repeated requests to modify his release conditions, and this Court has found on each occasion that Donziger poses a flight risk and denied those requests to eliminate the conditions of home detention and electronic monitoring.

    *1.*    *August 6, 2019 Bail Hearing and Flight Risk Finding*

On August 6, 2019, at the defendant's initial appearance, this Court heard oral argument from the parties on the issue of release conditions for the defendant. The Special Prosecutors argued in favor of a secured bond, home detention and electronic monitoring—as recommended by Pretrial Services ("PTS")—because of Donziger's flight risk given the criminal charges, likely jail time, the strength of the evidence, financial issues stemming from the Civil Case, his frequent travel and ties to Ecuador, and Ecuador's unreliable extradition process. Dkt. 18 at 21-24. Donziger—who was represented by temporary advisory CJA counsel at the proceeding because he declined to fill out a financial affidavit for the appointment of CJA counsel—objected

to the conditions of home detention, a secured bond and surrender of his passport. In support of his position, the defendant noted his obligations with his son, community and family ties, history of appearing in court and pending appeals. *Id*. at 17-20.

After hearing lengthy argument, the Court considered the factors set forth in 18 U.S.C. § 3142 and concluded:

> . . .[T]his is a new type of proceeding, and although Mr. Donziger has appeared in the civil case, we are in a brave new world now. He is facing jail time. The weight of the evidence seems to be very strong. I acknowledge Mr. Donziger's place in the community and his community ties, but I'm also quite troubled by Mr. Donziger's past refusal to comply with orders of the court. I am troubled by the frequent travel to Ecuador which. . . has less than a reliable system for extradition. I am also concerned that without any security on the bond there will be no moral imperative or any financial imperative to show up.

*Id*. at 27-28.

The Court then ordered Donziger released on the following conditions, which were recommended by PTS: a secured $800,000 bond with two co-signors;[1] pretrial supervision with location monitoring and home detention; travel restricted to Eastern and Southern Districts of New York; and surrender of any passport and no new applications for a passport. Dkts. 4, 18 at 27-28. The condition of home detention specifically allowed Donziger to leave his residence for family obligations, employment, attorney visits, religious services, medical appointments, and other activities approved in advance by PTS. Dkt. 4 at 5.

Donziger's $800,000 bond was not secured by any of his own or his family's assets. Rather, a Donziger supporter based in California—Bill Twist—secured the bond with real estate.

    2.    *November 25, 2019 Bail Hearing and Flight Risk Finding*

Three months after the Court's initial bail determination, by letters dated November 4, 18, 22 and at a November 25, 2019 hearing, Donziger moved to eliminate the conditions of home detention and electronic monitoring based on: PTS's new position that Donziger could be subject to a curfew with location monitoring given Donziger's prior compliance with his release conditions; 27 people were willing to co-sign Donziger's bond; the argument that Donziger was not a flight risk who would abandon his family, friends, supporters and his cause; Donziger's track record of appearing in court and engagement in his appeals, the criminal and civil cases, and disciplinary hearing; Donziger's representation that, at defense counsel's direction, he recently made images of the devices at issue in Count Two of the July 31, 2019 Order to Show Cause and those images "are secure;" and the Special Prosecutors' November 21 letter stating its

---

[1]     PTS recommended one co-signor instead of two. Dkt. 18 at 13.

present intention not to seek more than six months' imprisonment if Donziger is convicted. Dkts. 30, 32, 36, 44 at 2-5, 9-11.

The Special Prosecutors opposed modification of the release conditions in letters dated November 13 and 21 and at the November 25 hearing, arguing that Donziger posed the same flight risk as he did in August and nothing warranted changing those conditions. Dkts. 31, 35, 44 at 5-9. The Special Prosecutors cited: Donziger's travel to Ecuador and strong ties to Ecuador, including to high-level officials such as former President Correa; Ecuador's unreliable extradition; Donziger's history of failing to comply with court orders and ongoing failure to comply with the March 5, 2019 order regarding surrendering his devices for imaging; the findings that Donziger engaged in fraud and corruption to obtain the Ecuador judgment; the fact that the bond was already fully secured by property, and the proposed co-signors were therefore not at financial risk; this is a criminal case where he faces likely jail; the fact that he is facing the loss of his law license and civil proceedings seeking enforcement of the $813,602.71 money judgment against him; and the fact that Donziger cannot enforce the Ecuadorian judgment in the U.S. or profit from it. *Id.*

After hearing argument at a November 25, 2019 hearing, the Court found that Donziger remained a flight risk and denied the defendant's request to eliminate the conditions of home detention and electronic monitoring. The Court stated:

> Counsel, I think we are in the same position we were in August when we were together. We know that Mr. Donziger has ties to Ecuador; we know indeed to high-ranking government officials. We know he has traveled to Ecuador on numerous, numerous occasions. We know that he has been found to have failed to comply with numerous court orders in the past. I think I read in the recent exchange of letters that [the PTS] Officer [] did not know that Mr. Donziger has still failed to comply with Judge Kaplan's March 5 order. With respect to the people who have offered to be co-signatures and the folks who have already signed the bond . . . because the bond is fully secured, these folks are really facing no monetary risk. With respect to the engagement that counsel talks about, certainly Mr. Donziger has every incentive to fight the efforts to disbar him and to fight the civil suit. What has changed, however, is that Mr. Donziger is facing a criminal trial and facing the real prospects of incarceration. For these reasons, I find that he remains a flight risk, and accordingly, the request to eliminate monitoring and confinement is denied.

Dkt. 44 at 12-13.

       3.     *December 3, 2019 Defense Motion for Reconsideration and First Appeal to the Second Circuit*

On December 3, 2019, Donziger submitted a letter seeking reconsideration of the Court's November 25, 2019 decision regarding his bail modification request and, at a December 4, 2019 status conference, the District Court heard argument from Donziger on that application. Dkts. 38,

39, 42. Donziger argued that he was not a flight risk because former Ecuadorian President Correa was not in a position to help him flee, he had always appeared in court, he could not flee to Ecuador without a passport and in the current Ecuadorian political climate, and "nobody in the world . . . has any incentive to help [Donziger] run away from this case or to violate American law." Dkts. 38, 39, 42 at 4, 7-8. The Court expressed its concern that "I wouldn't presume that the individuals whom Mr. Donziger represented all these years and fought for all these years would not be inclined to take care of him." Dkt. 42 at 7. The District Court then granted the Special Prosecutors' request to submit a written response to Donziger's reconsideration motion. *Id*. at 9-10.

On December 10, 2019, the Special Prosecutors responded to the defense motion for reconsideration, arguing that Donziger remained the same flight risk he posed on August 6, 2019, due to: his historical and ongoing violation of court orders; his strong ties to Ecuador over the last 25 years, including to Ecuadorian community leaders, the thousands of Ecuadorians he purports to represent, his client Frente de Defensa de la Amazonia whom Donziger has stated "enjoys wide influence in Ecuador" and can "command meetings with government ministers," his Ecuadorian co-conspirator (Luis Yanza) in the fraud and corruption who is a defaulted defendant in the Civil Case, and to Ecuadorian government officials; Ecuador's unreliable extradition process, including the Ecuadorian President's June 2019 refusal to extradite a U.S. citizen fugitive charged with fraud in S.D.N.Y. (even after the Ecuador National Court of Justice approved extradition) who somehow made his way to Ecuador despite having surrendered travel documents to PTS and being on electronic monitoring; after years of defiance of court orders and legal obligations in civil proceedings, Donziger faced criminal prosecution and incarceration upon conviction for a crime with no statutory maximum penalty; and the strong weight of the evidence. Dkt. 40.

On December 17, 2019, Donziger informed the District Court that he was withdrawing his motion for reconsideration of the Court's denial of his application for modification of the conditions of his release. Dkt. 47. On January 9, 2020, Donziger filed a motion with the Second Circuit appealing this Court's bail determination and seeking elimination of home confinement and electronic monitoring. 2d Cir. No. 19-4155, Dkt. 16. After hearing oral argument, on February 18, 2020, the Second Circuit affirmed the District Court's denial of Donziger's request to modify his bail conditions.  2d Cir. No. 19-4155, Dkt. 53.

> 4. *May 18, 2020 Flight Risk Finding, June 3, 2020 Order, and Second Appeal to the Second Circuit*

On May 18, 2020, following the Court's denial of the defendant's pretrial motions, the parties appeared for a telephonic conference, at which time the Court adjourned the June 15 trial date to September 9, 2020 due to the pandemic, and announced that the Court would sentence Donziger to no more than six months' imprisonment or a $5,000 fine if he is convicted after trial. Dkt. 87 at 5-6. Donziger then sought elimination of the release conditions of home detention and electronic monitoring. *Id*. at 9-11. The defendant made the following arguments: he has been on home confinement for approximately ten months and the maximum penalty he faces is six months' jail; the referee in Donziger's disciplinary disbarment hearing found Donziger's testimony to be "candid and clear with no sign of evasiveness," and Donziger has the support of

"29 Nobel Laureates and many others;" "international travel is especially difficult right now…because of the pandemic, and especially in Ecuador…which is the specific country to which the prosecutor has previously referred…is just not possible at this point, let alone that Mr. Donziger would have to cross eight international borders without a passport"; "resources of pretrial services can be far better devoted than tracking Mr. Donziger's comings and goings;" and he has no incentive to flee, is "not a risk of flight," and "he's not going anywhere." *Id.*

The Special Prosecutors opposed Donziger's request, arguing Donziger still remained a flight risk for the same reasons the Court found on August 6, November 25 and again on December 4, 2019. *Id*. at 11-12. The Special Prosecutors also noted that with a September 9 trial date, "as we get closer to trial…flight risk becomes actually more of an issue…," and the New York State bar disciplinary committee had appealed to the First Department the disciplinary decision of the referee in Donziger's disbarment hearing.[2] *Id*.

The Court denied the request to modify the release conditions and stated:

> Counsel, nothing really has changed of significance from the Court's prior findings that the defendant is a risk of flight…that was based on the defendant's history of violating court orders, based on his strong ties and extensive travel to Ecuador, and the fact that this is a criminal case where the defendant faces jail time, I take Mr. Frisch's note that today the Court has set six months as the maximum period of imprisonment in the case of a conviction, but prison time is prison time. The only other changed circumstance is the outbreak of COVID-19. As we all know, and as counsel has alluded to, residents of New York have strongly been encouraged to stay in their homes. What Mr. Donziger is requesting is the opposite; that is, to go out into the community where the risk of infection is higher. If that is the current request, it does cast some doubt on the good-faith in which the request is made, but, in any event, based on my prior findings of his risk of flight, the request to delete electronic monitoring and home confinement is denied.

Dkt. 87 at 13-14.

Donziger then made a second modification request at the May 18 hearing: that the Court consider a curfew, rather than home confinement, such that Donziger would be at home from 10 p.m. until 6 a.m. with electronic monitoring in place and remain between 96th and 116th Street on the Upper West Side. *Id*. at 14-15, 16. The defense principally argued that his apartment is "not a big place," the current release conditions placed difficulties on his "day-to-day life and

---

[2] In an August 13, 2020 *per curiam* order, the New York State Appellate Division, First Department, disbarred Donziger from the practice of law in the State of New York. *Matter of Donziger*, 186 A.D.3d 27 (1st Dep't 2020) (*per curiam*). Donziger's motion for leave to appeal his disbarment to the Court of Appeals was denied on May 6, 2021. *Matter of Donziger*, 36 N.Y.3d 913 (2021).

especially on his family," that the curfew would allow him to leave the apartment with his son and walk around the neighborhood without advance permission, and that "[h]e's defending himself." *Id.*

The Special Prosecutors opposed the curfew request because: (1) "the Court's findings on risk of flight are still there," and the curfew meant that Mr. Donziger would be out from 6:00 a.m. to 10:00 p.m. at night, which would mean many hours of him being unaccounted for; and (2) the Court already tailored the home detention condition to allow for Donziger to leave the apartment for family obligations, but they must be preapproved by PTS.  *Id.* at 15.

The Court "adhere[d] to [its] prior findings" and denied the defense request, noting that "the circumstances that Mr. Frisch relates are really the inconvenience that befalls anyone who's been found to be a risk of flight." *Id.* at 18. The defense then made a third modification request at the May 18 hearing, asking that Donziger "be permitted every afternoon to leave home, provided he stays on the Upper West Side, for, say, a period of three hours…for whatever purpose, for shopping, to go to the pharmacy, if necessary, to hang out with his son." *Id*. at 19-20.  The Special Prosecutors stated that it was not in a "position to consent to [him] out every day for three hours without having a sense from pretrial about how this is handled with defendants similarly situated with these conditions," and that it wanted "to make sure this is done in the usual course." *Id*. at 19-20. The Court asked the prosecutors to confer with PTS, and noted its concern that "with a blanket three-hour block, I could be to the airport and on an airplane in three hours, so I'm not sure I'm ready for that." *Id*. at 20.

Two days later, by letter dated May 20, 2020, Donziger again requested that the District Court modify his release conditions to permit him to be outside his apartment from 4:00 p.m. to 6:00 p.m. each day within 96th and 116th Streets on the Upper West Side. Dkt. 77. The defense indicated that Donziger's PTS Officer did not oppose this proposal. *Id.*

By letter dated May 26, 2020, the Special Prosecutors opposed the requested modification for three reasons. Dkt. 79. First, as discussed at the May 18 hearing, the prosecutors conferred with an S.D.N.Y. PTS location monitoring specialist on the issue of the practice of allowing defendants on home detention with electronic monitoring to be out every day for several hours absent a specific reason and advance PTS approval. The specialist reported that "allowing a defendant on home detention with electronic monitoring to be outside each day for two hours—even within a certain radius—would be unusual absent a specific reason. For defendants with home detention and location monitoring release conditions, the specialist indicated that requests to be outside are addressed with their PTS officer on a case-by-case basis." *Id*. at 1. Thus, there was no reason to deviate from that standard practice of PTS, given the findings the Court had already made regarding Donziger's flight risk. *Id*.

Second, the Special Prosecutors pointed out that Donziger had not been fully compliant with his release conditions, which was concerning given the defendant's history of violating court orders—a factor among the numerous reasons the Court found Donziger to be a flight risk. *Id*. Specifically, in March 2020, PTS approved Donziger to attend an event at Madison Square Garden with his son. Without informing PTS, Donziger did not go to that event and went someplace in Brooklyn instead. PTS only learned about the noncompliance when it later

reviewed GPS data from his ankle monitor. *Id*. Third, the Special Prosecutors noted that Donziger's release conditions expressly permitted him to leave his apartment for family obligations, employment, education, religious services, medical treatment, attorney visits, court appearances, and other activities approved in advance by PTS. *Id*. at 2. In line with those conditions, PTS had permitted Donziger to leave his apartment with PTS approving each activity in advance such that PTS knew exactly where Donziger would be and the duration. *Id.* Thus, there was no reason to vary from the practice given Donziger's flight risk.

In a June 3, 2020 order, the Court denied Donziger's request for "blanket permission to depart his residence, despite being on home confinement, every day to roam his neighborhood for several hours for any of a number of activities" given that he had "not proffered any specific reason that he should be treated differently from any other pretrial defendant, and, even if he had, his prior material breach of the terms and conditions of his home confinement counsel against making the exception requested." Dkt. 90. The Court specifically noted that the prosecutors consulted with a PTS location monitoring specialist who indicated that allowing a defendant to be outside each day for two hours within a certain radius would be "unusual absent a specific reason," and that such requests are typically made on a case-by-case basis, *which was exactly the terms of Donziger's home confinement. Id*. at 2. The Court observed that the defendant's "desire to be outside [is] shared by every other defendant who is on home confinement, and, indeed, by the many people in New York City who have sheltered in place over the last several months." *Id*. The Court also found the March 2020 violation to be "a material breach of the terms and conditions of his home confinement," which, combined with the Court's multiple previous findings that Donziger constitutes a flight risk, justified the Court's concern that freedom to roam would create an opportunity to get to the airport and depart the country. *Id*. at 2-3. Thus, the Court denied Donziger's "request to leave his apartment daily *without advance permission*." *Id*. at 3 (emphasis added).

The defendant appealed from that June 3, 2020 order. *See* 2d Cir. No. 20-1710. As described in more detail *infra*, after hearing oral argument, on March 29, 2021, the Second Circuit affirmed the District Court's denial of Donziger's requests to eliminate or modify his bail conditions under the circumstances presented. 2d Cir. No. 20-1710, Dkts. 80 (Summary Order), 98 (Amended Summary Order).

> 5. *September 3, 2020 Flight Risk Finding, and the Court's December 31, 2020 Denial of the Defendant's December 17, 2020 Motion to Discontinue Home Confinement and Electronic Monitoring*

In a September 3, 2020 order denying a defense motion for a jury trial, the Court reiterated its flight risk finding in response to arguments by Donziger that his pretrial release conditions indicate that his charges are "serious" for Sixth Amendment purposes. Dkt. 163 ("[] Mr. Donziger's pretrial release conditions do not indicate that his charges are 'serious' for Sixth Amendment purposes; they instead reflect the Court's assessment that he is a flight risk given his ties to Ecuador, the strength of the evidence, his past refusal to abide by court orders, and the fact that he now faces possible incarceration.").

Hon. Loretta A. Preska
July 23, 2021
Page 8

On December 17, 2020, Donziger submitted another motion to discontinue his home confinement and electronic monitoring. Dkt. 227. He argued that he was not a flight risk because he only faced six months in jail; he was a "respected and successful human rights attorney with decades of good standing;" he would not abandon his long-time New York residence and family; he would not abandon his efforts to overturn his disbarment and civil contempt findings in his pending appeal; he could not travel abroad without a passport; and he would not want to live his life as a fugitive in Ecuador. *Id*.

By letter dated December 29, 2020, the Special Prosecutors argued in response that Donziger proffered no new facts in arguing he was not a flight risk, and that the one new argument Donziger raised – that the Court was somehow treating Donziger differently than other pretrial defendants when it stated on June 3, 2020 that "[t]here is no reason why Mr. Donziger should be treated any differently from any other pretrial defendant" (Dkt. 90 at 2) by imposing the release conditions of home detention and electronic monitoring – should be rejected because Donziger had taken the Court's statement out of context. *Id*.

In a December 31, 2020 order, the Court denied Donziger's motion to discontinue the conditions of home confinement and electronic monitoring because nothing of significance had changed. Dkt. 237. The Court found that Donziger had "unmoored the Court's statement from its underlying context;" the "mere fact that Mr. Donziger's conditions of pretrial release differ from those impose on other misdemeanor defendants does not mean that Mr. Donziger's conditions are not necessary to assure his appearance;" that the "bail inquiry is one that is individualized to the particular defendant;" that Mr. Donziger does not explain how other courts' releasing other defendants before trial somehow shows that he is not a flight risk;" that the Court rested its flight risk determination on the weight of the evidence in addition to the possibility of incarceration; and that Donziger's "long travel history to Ecuador and extensive contacts there…support the Court's risk-of-flight finding." *Id*. (emphasis in original). Finally, as to Donziger's "bevy of arguments that he has marshaled before," including that he is not a flight risk because "(1) he faces less than six months in prison if convicted; (2) he would not abandon his longtime residence in New York; (3) he would not abandon his wife, 14-year-old son, or extended family; (4) he would not give up his appeal efforts related to his disbarment or the civil contempt findings; and (5) he would not commit a felony to find himself living as a fugitive without the ability to travel outside Ecuador," the Court noted that it had "already concluded that those arguments do not overcome its initial finding that Mr. Donziger is a flight risk." *Id*.

Specifically, the Court stated:

> "[T]he Court has already concluded that those arguments do not overcome its initial finding that Mr. Donziger is a flight risk, especially given (1) his history of disobeying court orders, (2) his extensive travel history and contacts in Ecuador, including with high-level officials, and (3) the fact that, for the first time, he faces incarceration rather than just civil penalties…because nothing of significance has changed regarding those findings, the Court declines to discontinue the conditions of home confinement and electronic location monitoring."

*Id.*

> 6. *January 5, 2021 Trial Continuance Order, the Second Circuit's March 2021 Affirmance of this Court's Ruling on the Release Conditions, and the May 10, 2021 Trial*

On January 10, 2021, the Court granted, "albeit reluctantly," Donziger's request to adjourn the trial date from January 19, 2021 to May 10, 2021, detailing the procedural history up to that point. Dkt. 242. ("Mr. Donziger has repeatedly requested adjournments of the trial date throughout his now more than 500 days of home confinement. In light of this history, but cognizant of the fact that it is both Mr. Donziger (who remains in home confinement) and the Government who seek yet another adjournment of the trial date--this time for another 111 days, no less--the Court reluctantly GRANTS the request of Mr. Donziger and the Government to adjourn the trial date from January 19, 2021 to May 10, 2021."). Donziger's trial adjournment request was at least his eighth such adjournment request. *See, e.g.*, Dkts. 111, 130, 180, 187, 194, 200-1, 204, 207.

On March 29, 2021 (as amended April 23, 2021), after oral argument on March 10, 2021, the Second Circuit affirmed the District Court's June 3, 2020 denial of Donziger's requests to eliminate or modify his bail conditions under the circumstances presented. 2d Cir. No. 20-1710, Dkts. 80 (Summary Order), 98 (Amended Summary Order). In the affirmance, the Second Circuit took note of "the flexible conditions of his home confinement" which allow Donziger to "leave his apartment for family obligations, employment, education, religious services, medical treatment, attorney visits, court appearances, and 'other activities approved in advance' by [pretrial services.]'" Dkt 98. at 5 (internal quotations omitted). Donziger did not dispute that he had been outside his home over 100 times for, among other things, walking his son to and from school, engaging in various family obligations, and attending certain events. *Id.*

Trial in this matter commenced on May 10, 2021 and concluded on May 17, 2021. Donziger did not call any defense witnesses at trial and declined to testify in his own defense. Subsequent to trial, the parties submitted proposed findings of fact on June 8 and 9, 2021. Dkts. 326, 327, 328. A verdict by the Court is pending.

**B.     Argument**

This Court has considered the 18 U.S.C. § 3142(g) factors on numerous occasions, and on each occasion, has found Donziger's release conditions necessary to reasonably assure his appearance. Most recently, this Court ruled on December 31, 2020:

> "[T]he Court has already concluded that those arguments do not overcome its initial finding that Mr. Donziger is a flight risk, especially given (1) his history of disobeying court orders, (2) his extensive travel history and contacts in Ecuador, including with high-level officials, and (3) the fact that, for the first time, he faces incarceration rather than just civil penalties…because nothing of significance has changed regarding those findings, the Court

> declines to discontinue the conditions of home confinement and
> electronic location monitoring."

Dkt. 237 at 11. Now, after the close of evidence in this case, Donziger again seeks modification of his release conditions pending the verdict of his trial, i.e., elimination of home confinement. His latest bail application, however, once again cites to no change in circumstances that warrants modification of the conditions of his release.

Despite the Court's July 7, 2021 directive to inform the Court "which of the 18 U.S.C. 3142 factors have changed since the Court's previous bail rulings, which have been twice affirmed by the Court of Appeals" (Dkt. 337), Donziger rehashes arguments previously made and rejected by this Court and affirmed by the Second Circuit, as set forth *supra*: his maximum possible sentence is 180 days; he has no criminal record or history of drug or alcohol abuse; he would "not abandon his wife and adolescent child and embark on a life as an international fugitive to avoid misdemeanor liability;" his extensive ties to New York; a perfect attendance record for court appearances; his personal character has been vouched for before; the charges against him are considered misdemeanors; and the longest sentence ever imposed on a lawyer in New York convicted of criminal contempt is 90 days of home confinement.[3] Dkts. 336, 339.

Donziger's only actual cited change in circumstance – the evidence at trial – fails to overcome the Court's previous findings, and in fact solidifies the weight of the evidence against him. Dkt. 336 at 1. Donziger argues in conclusory fashion and without support in law or fact that the "government's evidence…was shown to be woefully insufficient and/or entirely dependent on the Court's disturbing collateral bar ruling, which essentially barred Mr. Donziger from mounting a defense…" Dkt. 336 at 1, 2. Donziger is wrong.

The Special Prosecutors introduced overwhelming and irrefutable evidence of Donziger's guilt, which reinforces that he remains a flight risk. The evidence at Donziger's trial demonstrated beyond any reasonable doubt that he intentionally violated numerous court orders for years, and remains in violation to this day. As set forth in detail in the Special Prosecutors' Proposed Findings of Fact, Donziger is guilty of Counts One through Six. *See, e.g.*, Dkt. 327 at ¶ 158 ("For months leading up to the entry of the Protocol, Donziger openly refused to comply with orders directing him to produce documents and continued to withhold documents on First Amendment grounds that had previously been rejected in rulings by Judge Kaplan…."); *id*. at ¶ 156 ("Donziger never surrendered any of his devices to Krehel for imaging despite acknowledging that he had devices…."); *id*. at ¶ 163 ("despite Donziger's claims that he planned

---

[3] Donziger also continues to raise incorrect characterizations that have no bearing on his bail determination. For example, Donziger's false assertions that "trial also revealed this case to be a functional 'Chevron prosecution,' that "the private prosecutor worked for a Chevron law firm when she was appointed," that "Gibson Dunn and Seward & Kissel law firms…are jointly running this prosecution," Dkt. 336 at 3, Dkt. 339 at 2, are wholly without merit. The Special Prosecutors were appointed under Fed. R. Crim. P. 42, are not funded by and do not work for Chevron or Gibson Dunn, and Gibson Dunn does not make prosecutorial decisions or in any way "run" this prosecution.

to appeal the order directing him to surrender his devices for imaging and the civil contempt finding for his deliberate disobedience of that order, he did not challenge the order or that contempt finding in his appeal."); *id.* at ¶ 170 ( "Donziger never surrendered his passports to the Clerk of the Court as directed."); *id.* at ¶ 177 (". . .[Donziger] played a shell game regarding his property rights, refusing to timely, completely, and properly transfer his interests in the Ecuadorian judgment in whichever form they existed."); *id.* at ¶ 186 ("[O]n December 23, 2016. . .Donziger agreed to compensate Zelman for The Transitions Process program by pledging a portion of his personal interest in the Ecuadorian Judgment.").

Contrary to the defense's argument, nothing the Court did at trial "barred" Donziger from "mounting a defense" or in any way limited his testimony if he elected to testify. Donziger strategically chose not to put on a defense case at trial. As the Court noted prior to trial, "it would seem that the most important witness as to 'willfulness' element in this case is Mr. Donziger himself." Dkt. 124 at 6 n.3. Donziger nevertheless decided against taking the witness stand and testifying under oath subject to penalty of perjury—where he would be subject to rigorous cross-examination—despite that "Mr. Donziger [was] more than invited to the witness stand." Tr. at 849:12-13. The defense notified the Court via email on Saturday, May 15, 2021 that Donziger planned to waive his right to testify at trial, claiming that the Court's "decision on the collateral bar question" rendered irrelevant Donziger's intended testimony about "why he chose to go into voluntary civil contempt to test the validity of the underlying order." Dkt. 308. In an order issued that same day, the Court made clear that none of its rulings impacted Donziger's right to testify:

> To be clear, nothing the Court did at trial, including but not limited to its rulings on the applicability of the collateral bar rule, addresses or circumscribes in any way or to any extent Mr. Donziger's absolute and unfettered constitutional right to testify at this criminal trial. The decision to do so is his and his alone, as advised by his counsel. Any suggestion to the contrary is baseless.

Dkt. 308 at 1-2. Donziger acknowledged at trial that he understood his right to testify on his own behalf was his alone, and that he knowingly waived his right to do so:

> THE COURT: And you also understand that your decision whether or not to testify is yours, and yours alone? While counsel has an obligation to advise you about the benefits and the hazards of testifying or not testifying, the decision to do so is yours, and yours alone. Do you understand that, sir?
> THE DEFENDANT: Yes, I do.
> …
> THE COURT: And sir, in light of those facts, am I correct that it is your intention to waive your right to testify on your own behalf?
> THE DEFENDANT: Yes.

Tr. at 847:16-21, 848:3-6.

Donziger also argues that he has a "strong incentive to vigorously challenge any conviction he might receive on appeal" and that "issues of constitutional due process and conflict-of-interest add to [his] likelihood of success on appeal," which may last "a year or more." Dkt. 336 at 2. But this does not affect the Court's findings supporting the imposition of the current release conditions – namely Donziger's "(1)…history of disobeying court orders, (2)…extensive travel history and contacts in Ecuador, including with high-level officials, and (3) the fact that, for the first time, he faces incarceration rather than just civil penalties". Dkt. 237 at 11. With respect to Donziger's likelihood of success on appeal, this Court has not yet issued any decision from which he can appeal and, therefore, such arguments are premature.

As for Donziger's July 21, 2021 supplemental letter alleging that "Judge Kaplan's withdrawal of his bribery finding as support for his RICO judgment should be a factor" in the Court's bail determination (Dkt. 344), Judge Kaplan did not withdraw his bribery findings. Judge Kaplan's factual findings with respect to bribery were detailed in the RICO Decision and not challenged on appeal. Civ. Dkt. 1874 at 101-107, 194-252; *Chevron v. Donziger*, 833 F.3d 74, 81 (2d Cir. 2016) (noting the "absence of challenges to the district court's factual findings" and affirming Judge Kaplan's RICO decision). The defense cites to Judge Kaplan's February 28, 2018 decision awarding costs (Civ. Dkt. 1959) for the claim that Judge Kaplan withdrew the Judge Zambrano bribery finding. Nowhere in that decision did Judge Kaplan withdraw that affirmed factual finding. Indeed, in that decision Judge Kaplan specifically reiterated his post-trial findings that Donziger and his co-conspirators attempted to extort billions of dollars from Chevron through, among other things: "foisting fraudulent evidence on an Ecuadorian court, coercing Ecuadorian judges, illegally writing all or much of the Ecuadorian court's purported decision, and then procuring the signature of an Ecuadorian judge on a $19 billion judgment against Chevron that the co-conspirators had written, in part by the promise of a $500,000 bribe." Civ. Dkt. 1959 at 1-2.

With respect to the defense request that the Court "[s]et a concrete bail amount" (Dkt. 336 at 3)—the Court already has: an $800,000 secured bond. The Court set that amount after considering the § 3142 factors and imposing that amount coupled with release conditions tailored to the flight risk the Court determined Donziger posed.

Donziger argues that the flexible conditions of his home confinement are "onerous" and claims that he has been "imprisoned in his home for the last 700 days." *See* Dkt. 336 at 1. In fact, Donziger leaves his apartment almost daily for activities pre-approved by his Pretrial Services Officer. I spoke with his Pretrial Services Officer today, and Ms. Harmon informed me that Donziger is "outside daily" for various activities, including: walking his son to school and basketball practice each day, regularly going to the park with his son, attending sporting events such as professional baseball games with his son, going to the grocery store, and attending legal

meetings several times a week.[4]  Consistent with the release conditions, his Pretrial Services Officer approves Donziger's activities in advance and monitors his whereabouts with the GPS monitor.

In sum, Donziger remains a flight risk for all the reasons the Special Prosecutors previously articulated on August 6, November 13, November 21, December 10, 2019, May 18, May 26, and December 29, 2020, and as the Court previously found on August 6, November 25, December 4, 2019, May 18, June 3, and December 31, 2020.  The defendant has cited to no change in circumstances warranting a departure from those findings.  His release conditions should remain unchanged pending a verdict by the Court.

Respectfully submitted,

_____/s/_____
Rita M. Glavin

*Special Prosecutor on behalf
of the United States*

cc:  Pretrial Services Officer L. Harmon (email)

---

[4] Pretrial Services even approved Donziger attending the ballet with his son, but Donziger ultimately decided not to attend.