**LAW OFFICE OF RONALD L. KUBY**
ATTORNEYS AT LAW
119 WEST 23ᴿᴰ STREET, SUITE 900
NEW YORK, NEW YORK 10011

TELEPHONE: (212) 529-0223
FAX: (212) 529-0644
WWW.KUBYLAW.COM

RONALD L. KUBY
RHIYA TRIVEDI

OF COUNSEL
GEORGE WACHTEL
LEAH BUSBY

STAFF
SUSAN BAILEY
PROCESS SERVER
LUIS R. AYALA 1952-2012

September 21, 2021

The Hon. Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY
VIA ECF

Re: *United States v. Steven Donziger*, 19-cr-561 (LAP)

Dear Judge Preska:

Please accept this letter as Mr. Donziger's Sentencing Memorandum.

## INTRODUCTION

> *"Our L[ong] T[erm] strategy is to demonize Donziger"*
>
>   --Chevron PR firm, March 26, 2009, CVX-RICO-4875277
>
> *"[N]ow, do the phrases Hobbs Act, extortion, RICO have any bearing here?"*
>
>   --Hon. Lewis A. Kaplan. 11-22-2010, Dkt. # 153-3

On October 1, 2021, Chevron's decades-long efforts to demonize Steven Donziger will reach their culmination. These efforts were willfully and creatively aided and abetted by Judge Lewis D. Kaplan, a tobacco-company lawyer turned federal judge. Over the past eleven years, the latter, working in tandem with Chevron's own lawyers, thrice attempted to have Mr. Donziger criminalized. The first effort came during the November 22, 2010 hearing when Judge Kaplan channeled his inner Richard II calling out to Chevron's hirelings about the Hobbs Act, extortion, and RICO. They listened. Just days later, in early

December of that year, Chevron lawyers met with federal prosecutors from the Southern District of New York, trying and failing to persuade them to prosecute Mr. Donziger. Judge Kaplan's second effort took place in or about July 2019, when he again attempted, and failed to persuade, Southern District federal prosecutors to prosecute Mr. Donziger. This time, Judge Kaplan was rebuffed on the specious basis that the SDNY lacked the resources to pursue such a case. Undeterred and unenlightened by two decisions of the Executive branch that prosecuting Mr. Donziger was not warranted or worthwhile — decisions issued a decade apart — Judge Kaplan picked the charges, picked the private prosecutors, picked the judge, and remained a judge on the case. Finally, he succeeded — at least for the time being.

The private prosecution impresses upon this Court the need to impose an "appropriate" sentence in the interests of "respect" for the law. These proceedings have gone on far too long for that. The only question that remains is just how much *disrespect* for the law this Court is willing to promote to fulfill Chevron's and Judge Kaplan's pro-corporate and pro-business agenda.

In its submission regarding Mr. Donziger's sentencing, the private prosecutors notably refused to request a term of incarceration. After earning somewhere on the order of one million dollars in taxpayer money for her prosecution of Mr. Donziger on misdemeanor offenses out of the Chevron law firm Seward & Kissel, the hand-picked prosecutor is now content to walk away from this case leaving Mr. Donziger at liberty. The defense suggests this Court do likewise and impose a sentence of time served; 787 days of home confinement—more than eight times the longest sentence given to an attorney-contemnor for the same level of offense.[1]

---

[1]   Both this Court and the private prosecutor have periodically suggested that the extraordinary period of pre-trial confinement was somehow the "fault" of Mr. Donziger. The record is clear, however, that every adjournment was granted due to the Covid-19 pandemic, with the exception of the adjournment granted in response to the prosecution's tardy motion for a Curcio hearing. This Court had multiple choices. It could have forced counsel to proceed with the guilt-phase of the trial, as the alleged conflict related only to sentencing issues. It could have ordered unconflicted counsel, Ms. Reagan, to appear in person. This Court, wisely in our view, granted an adjournment—albeit for a date where Mr. Donziger would not have counsel in place. Again, the Court could have forced Ms. Reagan to proceed. Again, wisely, the Court did not. As the January 10, 2021 date approached, this Court had the authority to declare this trial of such great importance that it would be held despite the pandemic. Again, this Court wisely chose not to put everyone at risk. But none of these things were Mr. Donziger's fault—nor did they lessen the burden imposed upon him by home confinement.

## RELEVANT STANDARDS

The defense concurs with the prosecution that the now-advisory Guidelines provide no guidance when it comes to sentencing on these offenses, which, as a matter of law, are defined as "petty offenses." However, Amendment 811 to §5C1.1 captioned *"Application Notes"* added the following note: "If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment."

The defense similarly concurs that the factors set forth in 18 U.S.C. Sec. 3553(a) are controlling.

## APPLICATION OF 18 USC. § 3553(a) FACTORS

### I. Avoiding Sentencing Disparities, Promoting Respect for the Law, General Deterrence, and Specific Deterrence.

The defense agrees with the prosecution that "[p]romoting respect for the law is paramount in a case such as this…." Pros. Mem. at 10 and concurs with this Court's observation that our society "holds the rule of law among its cardinal virtues." Dkt. 346 at 1-2.

*Respect* for the law (as opposed to coerced obedience) is promoted when a defendant is sentenced in accordance with sentences imposed upon those similarly situated. The need to avoid sentencing disparities is a specific requirement under 18 U.S.C. § 3553(a). A nation that holds the rule of law among its cardinal virtues permits no special treatment treatment for those who are wealthy or powerful, and no harsher treatment for those who endure the disapprobation of the former.

In Mr. Donziger's case, that fundamental principle has been recognized most often by its violation. Mr. Donziger has been treated in a manner different and harsher than other litigants similarly situated. The list of "firsts" include Mr. Donziger being first person charged with a "B" misdemeanor to be placed on home confinement, prior to trial, with an ankle monitor; the first person charged with any misdemeanor to be so held for over two years; the first attorney ever to be charged with criminal contempt over a discovery dispute in a civil case where the attorney went into voluntary contempt to pursue an appeal; the first person to be prosecuted under Rule 42 by a private prosecutor with financial ties to the entity and industry that was a litigant in the underlying civil dispute that gave rise to the orders; the first person to be tried by a private prosecutor who had *ex parte* communications with the charging judge while that judge remained (and remains) unrecused judge on the criminal case.

It is not too late, even now, for this Court, even in this case where Mr. Donziger already has been subject to harshly disparate treatment compared to other lawyers convicted of criminal contempt, to salvage something of the respect the law is due.

After what no doubt was an exhaustive search (or at least a well-compensated one), the prosecution has located a total of two attorneys who, prior to this case, have been convicted of B misdemeanor contempt under 18 U.S.C. § 401(3) since the Southern District's first sitting in 1789. United States v. Cutler, 58 F.3d 825 (2d Cir. 1995) (Ninety days home confinement and three years 'probation); In re Pollack, 2008 WL 4327000 (E.D.N.Y. Sept. 22, 2008) (Three years 'probation and *45-day* suspension of law license with no confinement). Both were convicted after trial. Unlike Mr. Donziger, neither suffered any pre-trial deprivation of liberty. Mr. Donziger, of course, will have endured 787 days of home confinement under the watchful eye of the Probation department, has had an ankle monitoring device for longer than many people wear wedding rings, and has been disbarred without a hearing where he could challenge the facts against him. A sentence of time-served would still be far harsher than prior precedent.

The prosecution correctly argues that this Court "should consider a sentence to deter those who would seek to undermine the rule of law in this way...." Pros. Mem. at 6. This Court already has achieved that goal *before* trial and sentencing. Indeed, the non-carceral sentences imposed upon attorneys Cutler and Pollack did not encourage attorneys to become contemnors. No attorney looking at the Donziger case will draw inspiration to violate court orders because Mr. Donziger suffered "only" two years of home confinement, disbarment, and financial ruin.

Finally, when it comes to specific deterrence, Mr. Donziger's disbarment effectively precludes him from representing anyone other than himself in the United States of America or any other jurisdiction. This includes the Indigenous peoples and rural farmer communities on whose behalf Mr. Donziger incurred the contempt citations.

The prosecution elides past this fact by arguing that Mr. Donziger remains in non-compliance with the Protocol Order for the turnover of his electronic devices. Pros. Mem. at 10. The chronology of this case demonstrates that this argument is not only odd, but grossly mistaken and unfair to Mr. Donziger.

Mr. Donziger did not ignore the Protocol and discovery Orders; he actively engaged the district court to modify the orders in ways that would protect privilege and scope of discovery. He later went into voluntary civil contempt to obtain a direct appeal of those orders just like other lawyers have done throughout our history with none suffering a criminal contempt charge as a result. He reasonably believed that prevailing upon the

4

foundational order would cause the Jenga-tower of orders Judge Kaplan built on that foundation to fall. The Court of Appeals decision in *Chevron Corp. v. Donziger*, 990 F.3d 191 (2d Cir. 2021) decided the foundational issue giving rise to the contempts regarding Mr. Donziger's electronic devices and documents. The Second Circuit held that Mr. Donziger reasonably believed that Judge Kaplan issued an order allowing him to continue fundraising in the manner he had done so in the past.

While not overruling the other contempts, the Second Circuit's decision provides that all of the discovery orders and forensic protocols that were based, in whole or in part, upon the perception that Mr. Donziger was deliberately trying to conceal material information require re-evaluation by Judge Kaplan in the underlying civil proceeding. The private prosecutors go well beyond the scope of their retainer in advocating Chevron's position in the underlying civil case, although they no doubt would be welcomed as co-counsel.

## II.     The Character of the Defendant

Despite its vital importance as a sentencing factor, the private prosecution spends virtually no time discussing the "history and characteristics" of the defendant. Setting aside the offenses of conviction, on which the prosecution dwells for almost its entire submission, Mr. Donziger's life has been lived largely in selfless service to those who are poor and oppressed. He did this mostly by challenging the most powerful of entrenched interests in our society, including the major players in the fossil fuel industry who (like Chevron) are or have been clients of the corporate law firm (Seward & Kissel) Judge Kaplan named to carry out this prosecution after it was declined by the SDNY. From the beginning of his career, starting as a journalist documenting human rights violations and war crimes in Nicaragua during the Contra war, Mr. Donziger worked to make the world a better place by using the opportunities inherent in his birth and class to combat injustice.

As a Harvard-educated lawyer, he could have cashed in his degree for a cushy firm job with a six-figure salary.[2] Instead, he used his training to fight for people who have had their land stolen, their water tainted, and their homes destroyed. His selfless career stretches

---

[2] Periodically during these long proceedings, Chevron repeatedly and risibly claims the personal financial gain was Mr. Donziger's motivation in devoting his entire legal career to fighting Chevron in the Amazon. Of course, when motivated by mendacity, it is impossible to see a motivation other than greed. Of course, if Chevron believed that to be true, it would have attempted to buy off Mr. Donziger a long time ago—Chevron certainly was not stingy when it came to paying off its opponents. And there are far easier ways for Harvard lawyers to get big pay days without fighting the industry with arguably the greatest concentration of corporate wealth and power the world has ever seen.

over three decades and is amply documented in the letters of support from his friends and colleagues around the world. Steven Donziger is among the best that the legal community has to offer. And despite Judge Kaplan's and Chevron's protestations to the country, his incredible work in Ecuador (for which has has been recognized the world over including by 68 Nobel laureates), has been affirmed on appeal by six different appellate courts, including the Supreme Courts of Ecuador and Canada (the latter for judgement enforcement purposes.)

In 1993, then two years out of law school, Mr. Donziger was part of a team of international lawyers that sued Texaco in New York for its undisputed dumping of billions of gallons of cancer-causing oil waste in the Amazon rainforest of Ecuador. As found by courts in Chevron's preferred forum of Ecuador where the company accepted jurisdiction, by deliberately draining its toxic waste into rivers and streams that five Indigenous groups and dozens of farmer communities relied on for their drinking water, Texaco poisoned the Lago Agrio region of Ecuador, an ancestral homeland populated by over 30,000 people. They created what is now known as the "Amazon Chernobyl." In the decades that followed, Mr. Donziger's single-minded determination to obtain justice for his clients would ultimately lead to his own victimization by Chevron and its enablers. He is not the first "people's lawyer" to face the dock.[3]

The letters sent to this court by prominent lawyers alone attest to Mr. Donziger's high character, integrity, and professionalism. From Sarah Leah Whitson, a classmate from Harvard, former associate at Cleary Gottlieb and Goldman Sachs, and the former Executive Director of Human Rights Watch's Middle East Division: "I have known Steven Donziger for over 30 years. Over the course of this time, I have known Steven to be an honorable, committed, fearless, and passionate human rights advocate who sole mission has been to help victims of human rights abuses … using the tools of law and advocacy." From Jason Adkins, also a Harvard Law classmate and friend for 30 years: Steven has demonstrated a "persistent, lifelong concern for and work on behalf of disadvantaged communities with a commitment to the rule of law." From John Cuti, a close friend and civil rights lawyer in New York in practice for over 30 years: "Steve is as committed and passionate an advocate for the oppressed, abused and disadvantaged as any lawyer I know." From Chris Jochnick, a Harvard Law grad and a former attorney at Paul Weiss (Judge Kaplan's former law firm):

---

[3] To name but a few: Clarence Darrow was tried for bribery of a witness. William M. Kunstler was sentenced for four years for contempt of court for his role in defending the Chicago 7, and for his role advocating for the defendants in the Central Park jogger case. Arthur Kinoy was convicted of disorderly conduct when he was forcibly removed from hearings conducted by the House of Un-American Activities. Samuel Leibowitz (attorney for the "Scottsboro Boys" and later a New York State Supreme Court Justice) was accused and indicted for perjury. All have been vindicated by history. Their accusers, and the Courts that enabled them, have not fared as well.

"I know Steven well and I can saw a few things with great assurance: for his entire legal career, his commitment to doing the right thing has been unwavering, he has never been motivated by financial gain, he loves his family and friends in the US, and he has never presented any flight risk."

Other lawyers, businesspersons, and civic leaders of the highest caliber also vouch for Mr. Donziger's integrity. From Rex Weyler, the Co-founder of Greenpeace, and a friend of Mr. Donziger: "I have come to know and respect Steven Donziger as a dedicated lawyer and advocate for hjs clients, as a man of integrity and of the highest ethical standards." Josh Zinner, a lawyer, former housing advocate at South Brooklyn Legal Services, and the CEO of the Interfaith Center on Corporate Responsibility: "I can attest to Steven's integrity as a lawyer, to his profound commitment to seeking justice, and to his deep commitment to family, friends, and community." From James Bernard, a Harvard Law grad and classmate: "Steven is exactly the same person I remember who spoke for his love and reverence for the law when we were in our 20s." From Margaret Waddell, a prominent Canadian lawyer whose firm worked with Steven in Ontario on the judgement enforcement action against Chevron: "In all my dealings with Mr. Donziger, I found him to be a highly honourable lawyer, doing his utmost to achieve justice for the Indigenous peoples of the Amazon… he was respectful of the Canadian court processes and its officials."

Letters of support from these individuals and other lawyers and prominent citizens, including Nobel Peace Prize winner Jody Williams, are being sent to the court under separate filing.

### III.   Seriousness of the Offense; Nature and Quality of Offense

Despite its platitudinous statements about the sanctity of court orders and that the entire justice system requires unconditional obedience to them, the private prosecution stops well short of asserting that Mr. Donziger is guilty of serious misconduct. For good reason. The Executive Branch of the government of the United States of America, after duly considering Mr. Donziger's conduct, elected not to pursue charges on the ground that his alleged misconduct *literally* was not worth its time. Undeterred, Judge Kaplan then directly reached into the pockets of taxpayers to appoint and pay a trio of special prosecutors from a private law firm with extensive financial ties to the oil and gas industry.

Subsequently, this Court, which was personally selected by Judge Kaplan, elected to reduce the charges from Class A misdemeanors to Class B misdemeanors—effectively depriving Mr. Donziger of his original right to trial by jury while further minimizing the severity of the charges.

Class B misdemeanors are, by definition, "petty offenses." And "petty" is generally defined as "of little or no importance or consequence." https://www.dictionary.com/browse/petty. With both the executive branch and the judicial branch of our government declaring Mr. Donziger's offenses to be trivial and of little importance, the high dudgeon of the prosecution about the sacred nature of court orders is more than a little discordant. For this Court to impose the most serious consequence—incarceration—upon a person this Court found to be guilty of matters of little or no consequence would defy law, language, logic and precedent.

The private prosecution focuses almost exclusively on the details of the offense conduct, writing a shorter regurgitation of its own Proposed Finding of Fact and Conclusions of Law, and a Spark's Notes[4] version of this Court's own opus. There is nothing in any of these pounding recitations that offers any reason to suggest that the Court should choose one sentence as opposed to another.

The defense has little to add to this incessant repetition, except to briefly note what it has already stated. Within *days* of being ordered to divest himself of his contingency fee interest in a form required by Judge Kaplan, Mr. Donziger did so, effectuating a perfectly valid transfer on August 22, 2018. In that transfer, all "Donziger" entities transferred all their interests to Chevron, including the interests created in the 2017 retainer. As to Count 6, Mr. Zelman, who was sympathetic to Mr. Donziger's work, had little interest and less expectation that he would ever be paid his $14,000.00 in exchange for life coaching services designed to improve Mr. Donziger's management skills. After Chevron's legal community began harassing him, Dr. Zelman abandoned the agreement and simply donated his services. It is noteworthy that, based upon known billing records and reasonable extrapolations therefrom, Chevron spent millions of dollars in legal fees to uncover Mr. Donziger's receipt of $14,000 in professional services. This compels the conclusion that Chevron's goals (and the orders enabling them) were to harass and demonize Mr. Donziger in retaliation for his litigation success in Ecuador.

Mr. Donziger's defense to the first three counts related to his discovery dispute with Chevron was precluded under this Court's collateral bar ruling. Again, Mr. Donziger's resistance to providing lists of his devices and handing said devices over was predicated upon his belief, ultimately vindicated, that Judge Kaplan had expressly permitted him to do the things he was doing, and therefore, the discovery orders needed to be re-issued with a proper justification, if at all. Mr. Donziger might have erred in believing his justified disobedience to the *foundational* discovery order would necessarily overturn all the orders that were built atop it. But that is an error in advanced appellate procedure, not something that is *malum in se*. Judge Kaplan's order that Mr. Donziger turn over his passport was an

---

[4] A later generation's iteration of "Classics Illustrated," better known as Classic Comics.

additional coercive sanction to compel his compliance with the orders Mr. Donziger thought were under appeal.[5]

We do not suggest that Mr. Donziger, in his fight against Chevron on behalf of the Indigenous peoples of Ecuador, has been perfect. A veritable army of Chevron lawyers billing $1,000 dollars an hour and given unlimited hours could (and did) find a handful of procedural decisions made by Mr. Donziger to attack since Chevron turned its exclusive focus toward him in 2018, after winning its underlying case in 2017. No doubt Mr.

---

[5] Since all three of these counts arose from the same "zone of refusal," this Court may sentence Mr. Donziger only on one of them. In *Yates v. United States*, 355 U.S. 66 (1957), the Supreme Court reversed ten of eleven counts of criminal contempt that had been imposed when petitioner refused to answer eleven questions relating to whether persons other than herself were members of the Communist Party because she feared that they might "be hurt by" such testimony. 355 U.S. at 69. The Court held that the Due Process Clause compelled the conclusion that "only one contempt had been committed." 355 U.S. at 68.

Petitioner contended before the Supreme Court that her eleven refusals constituted "no more than a single contempt because the questions asked all related to identification of others as Communists, after she made it clear on [prior occasion] that she would not be an informer." 355 U.S. at 73. The Court ultimately agreed that "every question fell within the area of refusal established by petitioner on the first day of her cross-examination." *Id.* The Court paid no mind that her refusals were based upon a generalized objection that the elicited testimony could "hurt" her comrades.

Here, counts 1, 2, and 3 constitute an improper multiplication of contempts stemming from a single refusal; Counts 1, 2, and 3 all punish conduct that falls within an 'area of refusal' established by Mr. Donziger. Indeed, from the outset of Chevron's post-judgment discovery campaign, Mr. Donziger grounded his refusal to comply in two arguments: first, that Chevron's money judgment discovery lacked basis, because Mr. Donziger was not prohibited from leveraging the interests of others for third-party litigation finance purposes. And second, that disclosure of the information sought would trigger retaliatory action by Chevron and leave many supporters of the Ecuador litigation — individual and organizational — irreparably harmed. Dkt. 2026. That Mr. Donziger sought to protect the identities of supporters of the Ecuador litigation was thus clear, at the latest, by June 2018; that he also declined to disclose information sought on the basis that Chevron lacked justification for money-judgment discovery was also apparent from the outset.

The Forensic Protocol — the subject of Counts 1, 2, and 3 — was issued specifically to compel discovery compliance — discovery compliance specifically and repeatedly resisted by Mr. Donziger on the two bases already described. Dkt. 2108. To punish Mr. Donziger thrice is thus to violate *Yates*, and the principle that contempts may not be multiplied for conduct that falls within an already articulated zone of refusal.

Donziger, acting *pro se* from his kitchen against more than 100 Chevron lawyers, should have appealed *here* and *there*, should have moved for a stay *there* and *here*, and should have filed a mandamus petition *here* and a supersedeas bond *there*. No doubt Mr. Donziger should not have voluntarily gone into civil contempt to appeal the legality of Judge Kaplan's discovery orders without recognizing that he *could be* the first attorney in history charged with criminal contempt for that conduct. No doubt that by 2018, Mr. Donziger found himself without counsel, without funds, and facing the full wrath of Chevron and its unlimited supply of BigLaw legal lackeys determined not simply to win the case (which they had already done), but to destroy Mr. Donziger and his ability to advocate for his clients.

## CONCLUSION

Promoting respect for the law requires judges to look beyond their own courtrooms and determine what impact their cases are having on the rule of law and its perception in society. See United States v. Musgrave, 647 F. App'x 529 (6th Cir. 2016) (explaining that a sentencing court may consider "the public perception" that a particular sentence would create); United States v. Mattox, 417 F. Supp. 343, 345 (S.D.N.Y. 1976) (declining to incarcerate a disabled person facing 192 months because a "society that sets an example of naked, pitiless vengeance will not promote respect for the law."). Of course, no one would suggest that judges should outsource their sentencing decisions and rule by opinion poll. A federal judge is probably not doing her job if she does not take an unpopular stance from time to time. See The Federalist No. 78 (Alexander Hamilton). Yet, when a case becomes a singular symbol of injustice in society — which after 787 days of home detention on a misdemeanor this case become — judges should not close their ears to the public that they serve.

To many, this litigation saga represents a low point for the rule of law by the federal judiciary — not because of anything Mr. Donziger has done (even if wrong), but because of the extraordinary nature of a private prosecution funded in large part by Chevron and carried out by a Chevron law firm. It is not hard to see why. If Mr. Donziger had not decided to represent historically marginalized people in their fight against one of the most powerful oil giants in the world, he would be a free man with a law license and, if he wanted it, a comfortable partnership. Having just turned sixty, he would be nearing a well-furnished retirement; instead, he wears an ankle bracelet and is awaiting sentencing. Because Mr. Donziger took on Chevron, and its judicial enablers, he now finds himself fighting for his own freedom.

The public has taken notice. Amnesty International has called this case a "misuse of the justice system." USA: Misuse of the Justice System Against Human Rights Lawyer

Who Sued Chevron Must End, Joint Public Statement of Amnesty International (May 6, 2021).[6] Sixty-eight Nobel Laureates have agreed that it is a "shameful attempt by Chevron, a multinational fossil fuel polluter, to manipulate and abuse the federal courts to silence, punish, and intimidate the defendant." Jody Willians et al., Letter from Nobel Laureates to Attorney General Garland (May 4, 2021).[7] Several prominent Members of Congress have declared roughly the same. Letter from Congressional Representatives to Attorney General Merrick Garland (April 27, 2021).[8] Two prominent U.S. Senators, Edward Markey (D-MA) and Sheldon Whitehouse (D-RI), have raised serious questions about the deeply problematic nature of the private prosecution.[9]

Mr. Donziger has been punished enough. He has been humiliated, denigrated, and disbarred. He has been attacked by professional PR firms and prosecuted by private law firms. He has been confined to his home for 787 days.

We respectfully request time served.

Ronald L. Kuby
Rhidaya Trivedi
Law Office of Ronald L. Kuby
119 West 23rd Street
New York, New York. 10011


Martin Garbus
Offit Kurman
590 Madison Avenue
New York, New York 10022

---

[6] Available at: https://www.amnesty.org/en/documents/amr51/4090/2021/en/
[7] Available at: https://www.freedonziger.org/post/letter-from-nobel-laureates-to-attorney-general-garland
[8] Available at: https://mcgovern.house.gov/uploadedfiles/donziger_042621.pdf
[9] https://lawandcrime.com/environment/democratic-senators-question-highly-unusual-private-prosecution-of-chevron-foe-steven-donziger/

Attorneys for Steven Donziger[10]

Dated: New York, NY
September 21, 2021

---

[10] Counsel wish to thank Matthew Besman, a third-year law student at Harvard University School of Law, for his assistance in preparing this Memorandum.

12