

Offit | Kurman®
Attorneys At Law

Trust. Knowledge. Confidence.

Martin Garbus, Esq.
590 Madison Ave., 6th Floor
New York, NY 10022
(347) 589-8513
mgarbus@offitkurman.com

September 27, 2021

**VIA ECF**

Honorable Loretta Preska
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

RE:    *Chevron v. Donziger*, Case No. 19 Cr. 561 (LAP)

Dear Judge Preska:

I have represented Steven Donziger in this criminal case and in parallel proceedings regarding his bar license for several years.

Neither I nor any of the pro bono lawyers who have represented Steven in these proceedings over the last few years have had anything close to the institutional resources needed to match the mind-numbing legal firepower that Chevron and its multiple law firms and consultancies (especially the Gibson Dunn firm) have thrown at Steven. But I have done what I can.

I have dedicated hundreds if not thousands of hours to helping Steven, all pro bono. I have advised him as a lawyer and served as a sounding board as he has wrestled through the grueling ethical dilemmas and personal consequences that this process has confronted him with. I was there for him, as a lawyer and a friend, when he decided that his ethical obligations prevented him from turning over sensitive client information to Chevron before his ultimately meritorious appeal could be heard by the Second Circuit. I saw how hard this decision was for him and I was deeply moved.

My heart went out and continues to go out to him and his family, who have endured so much.

I have been fortunate to have a long career marked by cases of conscience. I represented Daniel Ellsberg, who faced choices very similar to those faced by Steven Donziger. In fact, as a careful lawyer, I advised Dan not to undertake the course of action with which we are all familiar. We can all be thankful that Dan's passion (and judgment) overrode mine.

Hon. Loretta A. Preska
September 27, 2021
Page 2 of 3

I represented Vaclav Havel. He also ignored my advice and received a three-year sentence for challenging his government's ties to the Soviet Union. We are also thankful he did so, and later went on to become president of his country and an historic force for the spread of democracy and world peace.

I represented Nelson Mandela, whose persistent refusals to back down or sell out left him to serve 27 years in brutal prison conditions. He waited until the overwhelming and corrupt forces in his society came to *him*, bowing in recognition to the clarity of *his* conscience. He also served as president of his country and profoundly changed the ethical foundation of our world.

Your Honor, Steven Donziger and his efforts belong in this pantheon of struggles of conscience. This is no exaggeration. Steven began leveraging his Harvard Law degree for justice for Indigenous and impoverished Ecuadorians almost 30 years ago, as a very young man. He has never wavered in his loyalty to his clients. As I know from hundreds of hours of conversations with Steven and with people close to him, Steven is driven not only by client loyalty but also by a profound vision of global justice that braids together human rights, environmentalism, anti-colonialism, and the fight to save our planet from the threat of climate change.

In the events giving rise to this case, Steven was presented with the dilemma of Judge Kaplan's orders, which would have required him to harm his clients by producing information under the false pretenses of post-judgment proceedings that, as the Second Circuit has now affirmed, were always ill-founded. It would have been an immense betrayal of his clients and his cause to comply with those orders prior to exhausting all available legal remedies.

Our trial team was not allowed to explain how Steven genuinely believed that a voluntary civil contempt citation was a legitimate and therefore ethically-required available legal remedy. So be it—those facts are on their way to the Second Circuit.

The dilemma was grueling for Steven because of what it could mean for his family. And indeed, Steven and his family have suffered immensely over the last two years.

But the dilemma was never difficult otherwise. As other recent letters to the Court have demonstrated, Steven's tenacity and loyalty to his clients are legendary in the human rights, environmental, and global justice fields. 99 out of 100 lawyers would never have considered making such a personal sacrifice for their legal work. Steven, by his character, could never have seriously considered anything else.

Your Honor, Steven Donziger has been terribly punished through this ordeal. The personal and psychological stresses, limitations, and indignities of 24-hour electronic monitoring and home confinement are severe. I have borne witness to his suffering over countless long conversations, as well as meetings with his family. It has been a long, hard road for everyone.

The Court has made its point. If the Court's verdict stands, it will have been accompanied by punishment sufficient by far. If the verdict is overturned, any additional punishment the Court might impose now will face the judgment of history in a particularly harsh light.

Hon. Loretta A. Preska
September 27, 2021
Page 3 of 3

  Steven Donziger has suffered enough. The Court should sentence him to no more than time served.

           Respectfully,

           /s

           Martin Garbus, Esq.
           OFFIT | KURMAN
           590 Madison Ave., 6th Floor
           New York, NY 10022
           Tel. 347.589.8513
           mgarbus@offitkurman.com
           *Counsel for defendant*



**RICHARD H. FRIEDMAN**
*Attorney at Law... Admitted in AK, CA, KY, NV & WA*
1126 HIGHLAND AVENUE  |  BREMERTON, WASHINGTON 98337  |  P: 360.782.4300  |  F: 360.782.4358  |  WWW.FRIEDMANRUBIN.COM
EMAIL: *rfriedman@friedmanrubin.com*

**BREMERTON OFFICE**

September 27, 2021

Honorable Loretta A. Preska
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Preska:

I write this letter in the hope that it may assist you in formulating a sentence for Steven Donziger.

By way of introduction, I have practiced law for 42 years. My practice has always been trial-oriented, focused on representing individuals and small businesses. I have tried almost any type of case you can imagine, in state and federal courts, in 15 or more states. For the first 15 years of my practice approximately fifty percent of my trials were criminal trials ranging from DUI to first degree murder.

Sometime in mid to late September, 2013, I was contacted by a lawyer friend who was active in the environmental/legal community. Up to that point, I had never heard of Steven Donziger. My friend explained that Mr. Donziger had been representing himself in the RICO litigation for some time, and was about to go into trial without a lawyer. I was asked if I would represent Mr. Donziger.

I agreed to represent Mr. Donziger pro bono because I believed in his cause. I also was skeptical of him as a person and as a lawyer, due to Chevron's harsh descriptions of him in its pleadings and press accounts that I quickly found and read.

With the help of two attorneys who are my friends, Zoe Littlepage and Rainey Booth, I represented Mr. Donziger in the RICO trial.

By the time the trial was over, I would say that Mr. Donziger and I were friends. Trials are intense experiences and I saw Mr. Donziger's character up close when he was under almost unimaginable pressure. He always acted with professionalism and integrity during this time. I also realized as I examined the evidence that the initial characterizations made by Chevron and Judge Kaplan of Mr. Donziger's character were not consistent with the fine, amiable, and committed person I had gotten to know. At the end of the RICO proceeding, both Mr. Donziger and I considered my representation of him complete. As a result, my contacts with Mr. Donziger over the next few years were relatively infrequent.



Judge Preska
Page 2
September 27, 2021

In December 2016, Judge Kevin Castel wrote to the Manhattan Attorney Grievance Committee suggesting that the Committee bring disciplinary charges against Mr. Donziger based on Judge Kaplan's non-jury civil RICO findings, and recommending that it adopt the strategy of invoking collateral estoppel so that the facts found by Judge Kaplan in the RICO case could not be re-examined.

I have had quite a bit of experience with collateral estoppel, and volunteered to represent Mr. Donziger for free in the bar proceedings. As a result, over the next five years I have had much more contact with Mr. Donziger.

Finally, as you know, when Mr. Donziger's criminal lawyer withdrew from representing him in this matter, I agreed to represent him for free, and did so for a few months before being conflicted out.

In short, over the 8 years I have known Mr. Donziger, I have seen him in a variety of legal contexts, always under enormous pressure, and always under-represented. By "under-represented" I mean that he has frequently had to represent himself, or rely on lawyers not well-equipped to deal with a highly complex legal situation and the limited resources available.

In this letter I would like to address the allegation of the prosecutor and Chevron that Mr. Donziger has no respect for the legal system or rule of law. Despite all of his personal experience to the contrary, I have come to learn that Mr. Donziger has a deep respect for the law and its ability to hasten positive social change.

The first thing I would point out is that Mr. Donziger has never been involved in civil litigation outside of the Chevron case. When he was sued in the RICO case, his lawyer—the head of a powerful and respected law firm—lasted only a matter of months before being forced to withdraw. In the brief supporting the motion to withdraw, Mr. Donziger's lawyer summarized what had taken place to that point:

> It is with regret that undersigned is forced to make this motion to withdraw. This is an extraordinary case which has degenerated into a Dickensian farce. Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather merit. Instead, it will continue its endless drumbeat of motions – for summary judgment, for attachment, to reinstate long-dismissed claims, for penetration of attorney-client privilege, for contempt and case-ending sanctions, to compel discovery already denied or deemed moot, etc., etc. – to have the case resolved in its favor without a trial. Encouraged by this Court's implacable hostility toward Donziger, Chevron will file any motion, however meritless, in the hope that the Court will use it to hurt Donziger.


FRIEDMAN | RUBIN PLLP

Judge Preska
Page 3
September 27, 2021

(cv-00691-LAK, Dkt 691.)

Ex. 14, p. 5. This passage, written by a former editor of the Yale Law Review, former U.S. Supreme Court law clerk, and litigator with 40-plus years of experience, gives some sense of the pressure Mr. Donziger was under once he was left to represent himself. While he certainly knew more about the litigation process than the average American, he was nowhere near as sophisticated about the process as any of the hundreds of lawyers opposing him.

The RICO trial itself was a grotesque imitation of an American trial. It actually bore more resemblance to a Soviet-era political show trial. I say this not to re-litigate the trial, but to again illustrate Mr. Donziger's respect for the legal system. The result of the trial was never in question, not because there was strong evidence against Mr. Donziger—there was not—but because there was a federal judge manifestly determined to reach a particular result.

At several points during the trial, Mr. Donziger was advised by people close to him to stop participating in the trial because his participation gave unwarranted legitimacy to the proceedings. Mr. Donziger's view, as I heard him express it to these people, was that it was important for his clients that he stay and fight.

When the First Department's Grievance Committee followed Judge Castel's request to file charges based on collateral estoppel, I was confident the charges could be defeated. This was based upon two things. First, well-established New York black-letter law on collateral estoppel demonstrated that the doctrine was inapplicable under the circumstances. Second, without collateral estoppel to bar examination of Judge Kaplan's findings, no fair-minded person in my view could find credible evidence to support the most serious allegations.

Without explanation, the New York appellate courts ignored their own precedents and overturned their own hearing officer's recommendation. Here again, my purpose in recounting these facts is not to re-litigate the issues, but to point out that a strong case could be made that Mr. Donziger has shown more respect for the rule of law over the last eight years than those prosecuting or purporting to judge him.

After sorting through the facts during the RICO trial, and coming to my own conclusions about them, I have never in the last eight years had occasion to question Mr. Donziger's character or integrity. Like all of us, he has personality quirks and blind spots, but I honestly believe that at all times he has tried to stay within the law while advocating for the best interests of his clients.

I understand that one of the factors this Court is to consider in fashioning a sentence is "to promote respect for the law." 18 U.S.C. Sec. 3553. It is ironic that the



Judge Preska
Page 4
September 27, 2021

criminal contempt process, intended to foster respect for the law, has been used in a way that has done the opposite.

At the risk of sounding presumptuous, I suggest that what would most promote respect for the law would be a minimal sentence, reflecting the facts that:

1. Mr. Donziger was representing himself at the time the conduct occurred.

2. Although more sophisticated than the average person, he was not particularly knowledgeable about how to properly litigate discovery issues.

3. Civil discovery disputes rarely, if ever, result in criminal contempt charges.

4. Mr. Donziger has been under house arrest for more than two years, a substantial infringement of his liberty.

5. A period of incarceration will add to the public perception that Chevron is able to bend the Southern District to its will, and erode, rather than foster respect for the law.

I urge the court to sentence Mr. Donziger to time served.

Sincerely,

FRIEDMAN | RUBIN

Richard H. Friedman

# HARVARD LAW SCHOOL

CAMBRIDGE · MASSACHUSETTS · 02138

Charles R. Nesson
*Weld Professor of Law*
*Founder, Berkman Klein Center for Internet & Society*

*Phone: 617-495-8351*
*Fax: 617-495-4299*
*nesson@law.harvard.edu*

September 25, 2021

The Honorable Judge Loretta A. Preska
U.S. District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

*Re: United States v. Steven Donziger, 19-CR-561 (LAP)*

Dear Judge Preska:

As a law professor concerned with evidence, proof, and the fairness of trials, I urge that your assessment of Steven Donziger's character is essential to your sentencing judgment. I focus on an unresolved issue with respect to Donziger's character; to wit, the probative value to your sentencing decision of Judge Kaplan's finding that Donziger bribed Judge Zambrano. I analyze the evidence in support of this bribery finding and demonstrate that it fails to support the finding, even to the point of it being clearly erroneous. I explain why Donziger's failure to appeal the finding should not be deemed to validate it. I address whether, as a matter of proof, Judge Kaplan's other findings should be taken as a true reflection of Donziger's character. Each of those findings was contested. Each was made by a judge whose mindstate was convinced that Donziger bribed Zambrano as part of the pattern of racketeering that he oversaw. There is no way that Kaplan's lesser findings about the litigation preliminaries, all of which were resolved against Donziger, could have been uninfluenced by his erroneous bribery finding. His declarations that these findings were "independent" of his bribery finding is true only in the sense that there was sufficient non-Guerra testimony to support them, not in the sense that his resolution of them was uninfluenced by his firm conviction that Donziger was bent on and did indeed win the judgment against Chevron by bribing his way to victory.

Judge Kaplan's bribery finding supports his whole RICO judgment. His bribery finding was affirmed without review by the Second Circuit Court of Appeals, and the United States Supreme Court denied certiorari. Donziger's disbarment in New York State's Appellate Division, First Department, at Judge Kaplan's behest, was then based upon the bribery finding. Judge Kaplan's orders at issue in your conviction of Donziger for criminal contempt were based upon it too. All hang by the thread of Guerra's testimony.

## A. DONZIGER'S CHARACTER IS AN ESSENTIAL ISSUE IN SENTENCING HIM

1

At Mr. Donziger's contempt trial, this Court prevented Mr. Donziger from challenging the bribery allegation that has brought him down. In its 245-page-long Findings of Fact and Conclusions of Law, the Court mentioned bribery only once -- and even then just as historical context for the litigation. See dkt. no. 346 at 8.

Whatever the validity of this court's interpretation of the law of contempt, the effect and proper weight to be given to Judge Kaplan's bribery finding must finally be brought front-and-center. At sentencing, the Court must give statutory consideration to a defendant's "history and characteristics." 18 U.S.C. 3553(a)(1); See Pepper v. United States, 562 U.S. 476, 488 (2011) (quoting Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55 (1937)). See also United States v. Stewart, 590 F.3d 93, 140 (2d Cir. 2009) (stating that the sentencing court should "make determinations about the character of the defendant and whether, given such a character, the defendant is more or less likely to return to criminal behavior or constitute a danger to society.") (internal quotation marks omitted).

No complete account of Mr. Donziger's "history and characteristics" could possibly omit a determination about whether he bribed a judge. See United States v. Booker, 543 U.S. 220, 250 (2005) (explaining that a "judge must conduct a *comprehensive examination* of the characteristics of the particular offense and the particular offender.") (emphasis added) (citation omitted). If that allegation were true, his character would be deeply corrupted. See United States v. Zacher, 586 F.2d 912, 915 (2d Cir. 1978) (explaining that "[t]here can be no question but that any crime of bribery involves moral turpitude."). Strip that allegation away, however, and Mr. Donziger is merely a zealous human rights lawyer, who has been perhaps overzealous at times, but is nonetheless "an honorable, committed, fearless, and passionate human rights activist whose sole mission has been to help victims of human rights abuses around the world." See Letters of Support, Ex. C, dkt. no. 368 at 5. Which of these two Donzigers stands before you? A briber of judges who shows no remorse, or a human-rights plaintiff's lawyer whose life has been destroyed by a false finding of criminality made at Chevron's behest by a single equity judge and never subsequently reviewed on its merits by any other judge. See Report of Referee John Horan, In re Steven R. Donziger, RP No. 2018.7008 (N.Y. App. Div. 2020)[1]

That the probity of the bribery finding is essential to Mr. Donziger's character follows from common sense. If any more proof were required, however, it is provided by the public relations campaign Chevron Corporation has waged against Mr. Donziger. See, e.g., Ecuador Lawsuit Homepage, www.chevron.com/ecuador, (last visited Sept. 18, 2021). Or Google "Donziger" and see the Chevron-paid ad that comes up.

## B.  YOU ARE NOT LEGALLY BOUND ON THE ISSUE OF DONZIGER'S CHARACTER BY JUDGE KAPLAN'S FACTUAL FINDING THAT DONZIGER BRIBED ZAMBRANO

---

[1] Available at: https://www.courthousenews.com/wp-content/uploads/2020/02/Donziger-Report-02.24.20-complete.pdf

Judge Kaplan's civil bribery finding is not preclusive authority in this criminal sentencing. First, giving a civil finding preclusive effect in a criminal sentencing would violate 18 U.S.C. § 3661's demand that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Indeed, several circuits have held that "to apply the doctrine of non-mutual collateral estoppel to criminal cases makes little sense." United States v. Stines, 313 F.3d 912, 919 (6th Cir. 2002). See also United States v. Montes, 976 F.2d 235, 238-40 (5th Cir. 1992) (holding that the civil concept of non-mutual collateral estoppel cannot not be used to establish a fact in a criminal sentencing); United States v. Valdez-Soto, 31 F.3d 1467, 1476 (9th Cir. 1994) (same). While the Second Circuit does not appear to have confronted this issue, there is no reason to believe it would split with its sister circuits.

Moreover, even if the Court believes that a civil order *could* be entitled to issue preclusion in *some* criminal cases, this case should not be one of them. Federal courts have long recognized that issue preclusion is only appropriate when the issue was necessary to the original decision. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979) (explaining that "[u]nder the doctrine of collateral estoppel . . . [a] judgment in [a] prior suit precludes relitigation of issues actually litigated and *necessary to the outcome of the first action*.") (emphasis added). See also San Remo Hotel, L.P. v. City & Cty. of San Francisco, Cal., 545 U.S. 323, 336 n.16 (2005) (reaffirming that "once a court has decided an issue of fact or law *necessary to its judgment*, that decision may preclude relitigation of the issue.") (emphasis added); Winters v. Lavine, 574 F.2d 46, 66 (2d Cir. 1978) (explaining that "the doctrine of collateral estoppel *only bars the relitigation of issues* which were not only actually litigated and determined in the original action but *which were also necessary to the judgment* entered in that suit.") (emphasis added) (citation omitted). Judge Kaplan's bribery finding was not necessary to his original decision. He has said exactly that: "[T]he Court held that this fraudulent behavior warranted equitable relief with respect to the Ecuadorian judgment. *It did so without necessary regard to whether Donziger and the LAPs bribed former Judge Zambrano*, the only point on which Guerra's testimony was critical." Civ. dkt. no. 1959 at 13 (emphasis added). Therefore, even if this were a civil case instead of a criminal sentencing, issue preclusion would be inappropriate.

## C. THE EVIDENCE THAT SUPPOSEDLY PROVED BRIBERY IN MR. DONZIGER'S CIVIL CASE HAS BEEN DISCREDITED

Alberto Guerra, Chevron's star witness against Donziger who singlehandedly supported the bribery charge, was never credible. Even during the RICO proceeding, Judge Kaplan acknowledged that Guerra had "substantial credibility issues" and was a "deeply flawed witness." Id. at 221-22. Judge Kaplan likened Guerra to "accomplice witnesses who 'turn state's evidence' by testifying for the prosecution in exchange for what they trust will be reduced sentences for their own crimes." Id. Kaplan explained that Guerra was "the beneficiary of what amounts to a private witness protection program created for him by Chevron, which facilitated his relocation from Ecuador to the United States and has been supporting and assisting him since his arrival here." Id. Moreover, Judge Kaplan noted that Guerra "often has been dishonest. His professional history includes multiple instances in which he has accepted bribes, lied, and facilitated illegal relationships between parties and judges." Id. at 250-51. Guerra's testimony at

trial also contained several "possibly troublesome" inconsistencies. Id. at 252-55. In short, Guerra was a career liar with a substantial motive to lie who gave inconsistent testimony at Donziger's RICO trial. All of this, Kaplan acknowledged, placed Guerra's credibility "in serious doubt." Id.

Judge Kaplan tacitly acknowledged that his bribery finding was shaky. In his opinion, he asserted that his finding was supported by extensive independent corroborating evidence:

> *Having concluded based entirely on direct and uncontroverted evidence that the LAPs wrote the Judgment, the Court credits Guerra's explanation that they got Zambrano to sign it by bribing him. Although Guerra's credibility is not impeccable, that portion of his account was corroborated extensively by independent evidence.* Id. at 184.

Judge Kaplan listed all this assertedly corroborative independent circumstantial evidence of bribery in his RICO Opinion: (1) Judge Zambrano had financial troubles, (2) Mr. Donziger wanted Judge Zambrano to rule in his favor, (3) Mr. Donziger was hoping to get specific findings-of-fact, in addition to winning the case overall, and (4) "there was no lack of opportunity" for Mr. Donziger to bribe Judge Zambrano. Id. at 279-82. None of this 'corroborating' evidence bears directly on the veracity of Guerra's testimony that Donziger bribed Zambrano.

Guerra's credibility issues did not stop accruing at the conclusion of the RICO trial. In 2015, Guerra was called to testify before the Permanent Court of Arbitration at The Hague. See Tr. at 598, Chevron Corp. & Texaco Petroleum Corp. v. Ecuador (II), PCA Case No. 2009-23.[2] There, Guerra admitted that much of the testimony he gave before Judge Kaplan was false. See, e.g., id. at 731. He explained that he lied about the bribery scheme in order to secure money for himself and relocation to the U.S. for his family. See, e.g., id. at 630-31; 743-44 ("**Q:** And among the ways you tried to leverage your position was to falsely tell the Chevron representatives that the Plaintiffs had offered you $300,000; isn't that right? **A:** Yes, sir. I lied there. I recognize it. I wasn't truthful. That statement was never made by the representatives of the Plaintiffs.").

Guerra also described in detail the actions of Chevron in obtaining his false testimony. Chevron paid Guerra $12,000-per-month while they prepared him to testify on their behalf -- totaling $144,000. Id. at 853. See also Sworn Declaration of Professor Erwin Chemerinsky (explaining that these payments violated the ABA's Rules of Professional Conduct by far exceeding the $40-per-day that litigants may pay fact witnesses).[3] Chevron also gave Guerra several intermittent cash bonuses, including one for $10,000 and another for $18,000. Id. at 304. Additionally, Chevron paid to have him relocated to the United States, and paid immigration attorneys to represent him and his son. Id. at 815; 602; 304. Guerra recounted one meeting with Chevron's representatives in a hotel room where they literally tempted him with a pile of cash: "As far as I can recall, one of them took me by the arm and said, 'Look, look, look what's down

---

[2] Available at: https://www.italaw.com/cases/257
[3] Available at: https://chevroninecuador.org/assets/docs/2013-07-26-chemerinsky-declaration.pdf

there. We have $20,000 there.'" Id. at 736-37. Guerra's stunning admissions at The Hague completely discredit his already-dubious testimony.

Judge Kaplan accepted Guerra's testimony that Donziger bribed Zambrano not because Guerra was credible but because "the bribery claim is the explanation that makes sense and is persuasive." Civ. dkt. no. 1959 at 240. By crediting the bribery claim, Kaplan saw a pattern of RICO racketeering that he was looking for. He conceptualized Donziger's overall aim as winning against Chevron by fraud. The bribery finding, shaky as it might be, persuasively expressed to him the purpose of the racketeering enterprise he inferred from it. His non-Guerra findings dealt with the litigation's preliminaries; his bribery finding tied it all together. "[T]he bribery claim is the explanation that makes sense and is persuasive." Id.

### D. WITHOUT RELIANCE ON GUERRA'S TESTIMONY, THERE IS NO EVIDENCE TO ESTABLISH THAT DONZIGER BRIBED ZAMBRANO

After Guerra's testimony at The Hague, when Donziger brought Guerra's admitted perjury to Judge Kaplan's attention, he declined to defend his bribery finding as a support for his RICO judgment. Instead, he carefully reiterated five other findings that did not turn on Guerra's credibility and rested his judgment on those. "The first four of those findings," he said, "were made entirely without regard to Guerra's testimony. And Guerra's testimony was not essential to the fifth." Id. at 12-13. He distinguished these non-Guerra findings from his bribery finding, which he acknowledged rested critically on Guerra's credibility: "the only point on which *Guerra's testimony was critical*" Id. (emphasis added). Here, for the first time, Judge Kaplan acknowledged that his bribery finding rested totally on Guerra. But, instead of addressing Guerra's perjury, Judge Kaplan dismissed it as irrelevant because, as he had asserted in his RICO opinion, his non-Guerra findings supported his RICO judgment "even absent bribery." Civ. dkt. no. 1959 at 327; 330.

### E. DONZIGER'S FAILURE TO APPEAL JUDGE KAPLAN'S BRIBERY FINDING TO THE SECOND CIRCUIT COURT OF APPEALS DOES NOT BIND YOU TO ACCEPT THE BRIBERY FINDING AS TRUE FACT

Donziger's failure to appeal Judge Kaplan's bribery finding stands as an apparent barrier to judicial reconsideration of it. The Second Circuit's affirmation of Judge Kaplan's RICO judgment may seem to have affirmed the bribery finding, no matter how weak it may now appear. However, the Second Circuit's opinion affirming Judge Kaplan is, itself, written on the assumption that the bribery finding is true. The Court did not question the validity of the finding; instead, it simply credited Kaplan's finding in the absence of a legal challenge to it. What else but accept it was a reviewing court to do? What does this acceptance mean in terms of the downstream effect that a judge considering Donziger's character should give to it? Are you bound to respect the finding absolutely, regardless of what you learn about how little substance it actually has? Why did Donziger fail to appeal the bribery finding? Should his failure to appeal it be taken as an admission of its truth? No.

Donziger failed to appeal the bribery finding because the finding was not itself appealable. Only the racketeering judgment was appealable, not the individual predicate findings on which the judgment rested. To reverse the judgment based on even a clearly erroneous predicate finding, Donziger would have had to reverse all but one of Judge Kaplan's six predicate findings in order to demonstrate the absence of the required two predicate RICO crimes necessary to find a "pattern of racketeering activity." Given Judge Kaplan's multiple predicate findings and the "clearly erroneous" standard by which challenges to each finding would be judged, Deepak Gupta, Donziger's appellate counsel, considered appeal on the facts to be hopeless.

Moreover, Judge Kaplan made appeal of his bribery finding particularly difficult by declaring all his other findings to be "independent" of it. This insulated his bribery finding from appellate challenge. Judge Kaplan later demonstrated exactly this insulation from challenge in his cost order by turning away Donziger's post-trial proof of Guerra's perfidy because his RICO judgment rested entirely on his non-Guerra findings "even absent bribery."

In retrospect, it is clear that Donziger should have appealed the bribery finding regardless. His appellate counsel should have known that his decision not to appeal on the facts would put the Court of Appeals in a serious bind. Leaving the bribery finding unchallenged meant that ruling Donziger's way on any of his legal challenges would give the appearance of overlooking his bribery! Failure to legally challenge the bribery finding on Donziger's behalf very badly framed the legal issue of whether a private litigant can use civil RICO to obtain equitable relief without maintaining a claim for legal damages. Donziger and his appellate counsel seem never to have seen that, had he shown the Court of Appeals that the bribery finding was clearly erroneous, he might then also have successfully challenged the asserted independence of all the other non-Guerra findings and tipped over the whole judgment. After all, a judge who is convinced without good proof that Donziger's bribery of Zambrano was the key and central purpose of his racketeering enterprise is not an impartial factfinder with respect to his other predicate findings.

## CONCLUSION

Donziger does not deserve more punishment for his contempt of Judge Kaplan's orders. A full examination of his character demonstrates that his only alleged crimes of moral turpitude – those crimes that Judge Kaplan singlehandedly declared him guilty of – are unsupported. You should therefore sentence him to time served and discharge him.

Respectfully Submitted,

*Charles R. Nesson*

Charles R. Nesson, Esq.
William F. Weld Professor of Law
Harvard Law School[4]

---

[4] With thanks to Matt Besman for assistance in preparing this letter.

*Anton Tabuns, J.D., MES*

September 27, 2021

Hon. Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, N. Y. 10007
Via ECF.

Re: United States v. Donziger, No. 19-cr-561 (LAP), 11-civ-691 (LAK)

Dear Judge Preska:

I am a Canadian attorney who represented the Ecuadorian plaintiffs (known as the "Afectados" or "affected ones") in their litigation against Chevron from 2012-2014. At that time, I worked as a sole practitioner in Toronto and had a retainer directly with the Indigenous peoples and rural communities through the non-profit organization in Ecuador that was the representative plaintiff in the lawsuit. During this time, I visited Ecuador regularly and worked closely with many community leaders and with the Ecuadorian legal team, including with Steven Donziger. I also assisted Indigenous leaders when they made the long trip to North America from the Amazon for court appearances in Canada and elsewhere. I am fluent in Spanish and had previously spent time working and living in Latin America. This cultural and linguistic understanding allowed me to forge close relationships with my Ecuadorian colleagues and clients.

Following my work on the case, I went into business and became Associate General Counsel with a focus on regulatory compliance for Waterton Global Resource Management, Inc., a private equity firm in Toronto with more than $2 billion of assets under management. I now serve at Manifest Climate Inc., one of the world's leading climate-focused management consulting firms.

Steven and I worked closely together on the case during the time I was involved and have forged an enduring and vital friendship that has lasted to this day. I also have spent substantial time with Steven and his family in New York and Canada. I have watched Steven's son, Matthew, grow up from being a child to the young man he is now. I've spent time with Steven and Matthew at their home in New York and on various outings and have spent much time listening to Steven recounting their adventures together. The bond they have is special, and that's directly due to the emphasis and love Steven places on their relationship. He is as dedicated a father as I know.

During my time on the case, I witnessed many North American lawyers interacting with local community leaders Ecuador. While all of the interactions I witnessed came from a place of fighting for a common (and just) cause, no other North American lawyer I interacted with had established a level of confidence with the affected communities as Steven had. The genuine affection that the community members had for Steven was manifest in his many interactions in Ecuador, including in town hall meetings in remote areas of the Amazon where people were suffering from

*Anton Tabuns, J.D., MES*

---

cancers and other health impacts. Of course, the trust that Steven forged with the Ecuadorian plaintiffs has come from the decades he has spent working with them to seek a remedy for the impacts of oil pollution on their ancestral lands, from the time he has spent fighting on their behalf, and from the time he took to get to know the people themselves. In my opinion, Steven has litigated this case because he is truly dedicated to helping the Afectados remediate contamination that still leads to increased incidence of disease and death throughout their communities. The affection between Steven and these communities cannot be feigned. Neither can the dedication Steven has shown to their interests, even when his own freedom is at stake. Steven easily could have pursued a lucrative legal career in another area, but his sense of integrity would not let him abandon vulnerable peoples that continue to have a genuine need for assistance.

I also observed firsthand how Steven always acted with the highest of ethical standards and how seriously he took his ethical obligations to his clients. I have witnessed this same dedication to living ethically in his approach to his personal life. Steven was in Canada working on the case when Judge Kaplan issued his Order to Show Cause. I had lunch with him just before he got on a plane to return to the U.S. when it was clear that it was a real possibility he would be arrested and incarcerated. As Steven always does, he conducted himself bravely and professionally and returned to New York to face these charges head-on with his family, friends, and colleagues standing at his side. I was proud to call Steven a colleague and I am still proud to call him a friend.

I was the person on the legal team who found, in a morass of disclosure documents, the Chevron email from 2009 explicitly outlining the company's strategy of "demonizing" Steven when it became obvious Chevron had begun to lose the legal case in Ecuador. The attempt by Chevron and others to frame Steven's vigorous defense of his clients as something sinister or unethical is one of the greater legal tragedies in recent memory.

Finally, I also translated the transcript documenting a meeting in Ecuador between Alberto Guerra (the disgraced former judge whose perjured testimony was a key part of Chevron's RICO lawsuit against Steven), a member of Chevron's legal team in Ecuador, and an operative from the investigations firms Kroll. In this transcript, Guerra negotiated his "price" for testifying for Chevron (one of multiple recorded instances that he engages in such negotiations with Chevron lawyers). Chevron's lawyer and the Kroll agent then handed Guerra a backpack with $15,000 USD in cash. Contrasting how Steven has continued to persevere for close to three decades and has always taken the ethical and legal high ground, contrasted with the highly disturbing behavior by his opponents, could not put this situation in any starker relief. I would kindly ask that you take into account this information, Steven's demonstrated commitment to human rights, and the length of Steven's home detention, and sentence Steven to time served.

Sincerely,

Anton Tabuns, J.D., MES

1

September 16, 2021

**By ECF**

The Honorable Loretta Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *U.S. v. Steven R. Donziger*, 19 Cr. 561 (LAP)

Dear Judge Preska:

I have known Steven R. Donziger for more than a year and have worked intimately with him throughout that period. In that time, we have become friends and allies in the fight to bring accountability to the industries that have destroyed communities and ecologies all across the world in pursuit of unethically-rendered profit. In nearly every interaction I have had with him, he has made sure to focus on how the case Chevron brought against him has prevented his clients from accessing the much needed remedies won in the Ecuador Judgment. It is obvious to those of us who have worked with him and known him that Steven cares deeply about the people he represents and for many others struggling to fight against forces with nearly indomitable strength. I also know Steven to be a good friend to many, many great people, big and small, known and unknown, people who have changed and will continue to change the world for the better. This is testament to his quality.

Steven, I have learned, is a lot of things – including passionate and, at times, stubborn – but a criminal mastermind he is not.  He can barely operate basic 21st century technology. The notion that he has maintained a nearly 3 decades long conspiracy against a global oil giant and its inexhaustible roster of Big Law minions beggars belief. Yet that notion is at the root of the contempt charges against him, based on a mere discovery dispute. Indeed, this inequality of arms – first for the Ecuadorians in their struggle for remedy and now for Steven in his struggle for freedom – may be the defining characteristic of this entire Chevron/Ecuador saga.

Before this Court's judgment in his petty contempt trial, Steven had not been charged with, much less convicted of, any crimes.  His connections with and commitment to his community were well established. His alleged bad acts at issue here were not gross or violent, caused no real injury, were in fact deemed "petty" both pre-trial and during trial (and therefore, by definition, are not "serious"), and were done, in Steven's sincere belief, in furtherance of his clients and his ability to represent them, as he noted repeatedly throughout the record. I and the people – friends, colleagues, family members – who have stepped up to try to defend and support Steven, have and would attest to the genuineness of his commitment to his clients and his fight to bring them the remedy they deserve. Steven believes in the constitutionality and the moral and ethical appropriateness of his efforts to defend his clients and his ability to advocate on their behalf. And so do countless others all over the world. This is a testament to his character.

I find it terribly difficult, in light of this case, to encourage my students to become human rights, civil rights, or environmental justice advocates without describing the now very personal risks they could face.  The steps Steven took to prepare himself for good advocacy have been used against him as proof of flight risk: mastering the language of the people he represents, traveling countless times at great distance to meet with the victims to see, first-hand, the industrial devastation wrought upon their community, becoming their dedicated champion in the face of extremely difficult odds. But the private prosecutors in this case offered those as reasons to hold Steven in home confinement for two years. I wonder if I must now tell them to be less quality advocates,

that taking steps to connect with one's clients may actually put them in danger, and that they must keep complete cultural distance from international clients. I must now tell students that the companies they take on can use a civil RICO suit, with no DOJ oversight, to yield massively burdensome discovery orders. And that if they are unable to comply with every order, eventually private prosecutors will warp their good advocacy practices into proof that they are a flight risk that must be confined indefinitely, during which they will experience professional demise through disbarment. I must tell my students that taking on the Chevrons of the world will not just be a battle of legal arguments fought on the merits in the courtroom; I must tell them that if they go against a multinational extractive corporation with a strong claim, one good enough to win in a foreign nation's court system, that they should prepare to be personally targeted by the corporation who will spend endless sums to destroy them and ensure their clients never access the remedy they deserve.

The message being sent to the world from our legal system is that if an attorney has the courage to take on an extractive industry for environmental destruction and human rights violations, the US justice system itself can be wielded by the extractive industry against them personally. The real risks to other legal advocates and communities pursuing justice anywhere are now very tangible. A huge international community of human rights and environmental advocates has been appalled by Steven's unprecedented pre-trial confinement given his lack of a criminal record, the non-violent nature of these paper contempt charges, and the obvious righteousness of the cause of the people the Ecuadorian Amazon. I and tens of thousands of others who support Steven ask this Court to right this wrong and issue a sentence releasing Steven from confinements for time served. The international human rights and environmental advocate community will breathe a sigh of relief if this simple, humane step is taken.

The extractive industry is watching this as a test case in how to leverage their virtually limitless financial resources to turn victims and their lawyers into criminal racketeers using US courts, and ultimately, to jail them. But, young lawyers, law students, and the international community are watching this case, too, making it an historic turning point in corporate accountability. It is also, most specifically, a vital moment in a good man's life. Please grant Steven R. Donziger full reprieve from further confinement. Please show the world that we do not throw lawyers in jail for principled lawyering.

Sincerely,

Scott Wilson Badenoch, Jr., Esq., MDR*
Senior Clinical Fellow
UC Irvine School of Law, Environmental Law Clinic
Visiting Attorney, Environmental Law Institute
Advisory Counsel, Dignity Rights Initiative, ABA Center for Human Rights
Co-Chair, Environmental Justice Committee, ABA-CRSJ
badenochjr@gmail.com
248-229-8190

* Entities listed are for identification purposes only



**National Lawyers Guild International Committee**

**International Association of Democratic Lawyers**



September 14, 2021

Honorable Judge Preska:

As legal organizations and attorneys from the United States and around the world, we have closely monitored the case of Mr. Steven Donziger, a human rights attorney who, since 1993, has led an international team representing Indigenous communities and rural farmer communities struggling for environmental, economic, and health justice against Chevron for its role in the toxic pollution, environmental damage and health crisis caused in the Ecuadorian Amazon. Mr. Donziger ultimately helped these communities win a $9.5 billion pollution judgment against Chevron in the company's preferred venue of Ecuador, where it insisted the trial take place and where it had accepted jurisdiction. This judgment has been confirmed by three layers of appellate courts in Ecuador, including the country's Constitutional Court. It was also validated for enforcement purposes by Canada's Supreme Court in a unanimous decision issued in 2015. Chevron vowed never to pay the judgement and threatened the affected communities with a "lifetime of litigation" unless they dropped their claims.

As a result of these successful efforts to hold the company accountable, for over a decade Chevron has pursued aggressive retaliatory litigation against Mr. Donziger in United States courts to silence, bankrupt and jail him. Because Mr. Donziger refused on ethical and legal grounds to turn over privileged documents to Chevron without first allowing for appellate review, Mr. Donziger faced civil contempt charges issued by Judge Kaplan. In July 2019, Judge Kaplan referred the case to the U.S. Attorney's Office for the Southern District of New York for criminal contempt prosecution, which the Office declined. Thereafter, Judge Kaplan took the extraordinary step of appointing a private law firm, Seward & Kissel (a firm with known ties to Chevron and Chevron-related entities), to prosecute Mr. Donziger despite the firm's well-documented conflict of interest. The Seward firm pushed for Mr. Donziger's unprecedented pre-trial detention and opposed his request for a jury trial.

Mr. Donziger has served over two years of home detention–incredibly considered a "flight risk" in the middle of a global pandemic–after vigorously participating in his defense and never before missing a court date.  By his sentencing on October 1, 2021,  Mr. Donziger will have been subject to 787 days of house arrest while the misdemeanor charge he faces carries a maximum sentence of six months and the longest sentence ever imposed on a lawyer in New York for the crime of contempt is 90 days of home detention

We, the undersigned concerned bar organizations and jurists from around the world, thus urge you to sentence Mr. Donziger to time-served based on the length of his home detention and the unusual nature of a private prosecution where the charges were rejected by the U.S. Attorney Southern District of New York. We note that Mr. Donziger maintains his innocence and has a demonstrated commitment for almost three decades to the cause of human rights and to helping his Indigenous and *campesino* clients in Ecuador deal with on-going health and land issues as a

result of oil contamination. The extraordinary length of his pretrial home detention (over two years) alone warrants leniency at this time.

Signed,

**Legal Organizations:**

1. International Association of Democratic Lawyers
2. National Lawyers Guild
3. Alberto Lovera Bolivarian Circle , New York City US
4. Alfonso David Barrientos Zapata, La Paz - Bolivia
5. Amazon Watch, Oakland
6. Asociación Americana de Juristas
7. Asociación Americana de Juristas Colombia, Bogota, Colombia
8. Asociación Nacional de Abogados Democráticos, Ciudad de México
9. Central Arizona National Lawyers Guild, Phoenix, AZ
10. Centro de Documentación en Derechos Humanos "Segundo Montes Mozo S.J." (CSMM), Ecuador
11. Chicago ALBA Solidarity, Chicago, US
12. Comite Dialogo Ambiental, Salinas, Puerto Rico
13. Common Sense Legal Counseling, Somerville  MA
14. Community Housing Transformation Centre, Montreal, Canada
15. Community Justice Center Fresno, FRESNO
16. CORAP, Kinshasa, RDC
17. CRED, Rome, Rome
18. Defending Rights & Dissent, Washington, DC USA
19. Democratic Lawyers Association of Bangladesh (DLAB), Dhaka, Bangladesh
20. Detroit & Michigan Chapter of the NLG, Detroit, USA
21. Ecojustice Legal Action Centre, Dundrum, Co Down, Ireland
22. European Association of Lawyers for Democracy and World Human Rights (ELDH), Düsseldorf, Germany
23. Future Law Institute (UK) , Bath, United Kingdom
24. Haldane Society of Socialist Lawyers , London
25. Hawai'i Institute for Human Rights, HONOLULU
26. HICHRP(Hawaii Committee for Human Rights in the Philippines ), Honolulu, USA
27. Housing and Land Rights Network - Habitat International Coalition, Giza, Egypt
28. Indian Association of Lawyers,  Mumbai , India
29. Interfaith Worker Justice - New Mexico, SANTA FE
30. International Association of People's Lawyers-Australia, Woy Woy, NSW, Australia
31. International Federation For The Protection Of The Rights Of Ethnic, Religious, Linguistic & Other Minorities (IFPRERLOM), Geneva, Switzerland
32. International-Lawyers.org, Geneva, Switzerland

33. Law and Disorder Radio, Cohost, Law and Disorder Radio
34. Legal Centre Lesvos, Mytilene, Lesbos, Greece
35. Mazingira Istitute, Nairobi, Kenya
36. Monitoring Committee on Attacks on Lawyers, International Association of People's Lawyers, Bordeaux France
37. Nakuru Reproductive Health Centre, Nakuru
38. National Association of Democratic Lawyers (South Africa), Durban , South Africa
39. National Lawyers Guild - SF Bay Area, San Francisco, California
40. National Lawyers Guild, Maryland Chapter, Baltimore City, MD, USA
41. National Union of Peoples' Lawyers (Philippines), Philippines
42. Native Justice, LLC, Boulder, Colorado USA
43. New Economy Law, Totnes, UK
44. New Mexico Environmental Law Center, Santa Fe, New Mexico
45. NLG University of San Diego, School of Law, San Diego, USA
46. NorCal Resist, Sacramento, CA, US
47. Notre Affaire à Tous, Lyon, France
48. OrinocoTribune.com, Caracas, Venezuela
49. Pachamama Alliance , San Francisco, United States
50. Palestine Legal, Chicago, New York, San Francisco Bay Area
51. Parable of the Sower Intentional Community Cooperative, Richmond, CA.
52. Partnership for Civil Justice Fund, Washington, DC, USA
53. Plan B.Earth, London, UK
54. Progress Lawyers Network Brussels , Brussels
55. Project Blueprint, Marshfield, Massachusetts
56. Rainforest Action Network, San Francisco
57. Rainforest Relief, Minneola, Florida, USA
58. Resource Generation (NYC Chapter), New York City
59. Samidoun Palestinian Prisoner Solidarity Network
60. Social Economic Action and Transformation for Humanity, Masvingo
61. Ukrainian Association of Democratic Lawyers  , Kiev, Ukraine
62. University of Arizona College of Law National Lawyers Guild Student Chapter, Tucson, Arizona
63. Water Protector Legal Collective , USA
64. WESPAC Foundation, Inc., White Plains, NY, USA
65. Women Protection Organisation ( WOPO ) , Lagos State, Nigeria
66. Women's Federation for World Peace International, Wien
67. World's Youth for Climate Justice Brazil, São Paulo, Brazil

**Individual Attorneys:**

1. Achim Rollhaeuser, Lawyer, Lawyers' union for the defence of fundamental rights, Greece, Athens/Greece
2. Adé Olaiya, M.A., UNESCO Inclusive Policy Lab Expert, Bristol, UK
3. Adnan Mohammed, Sanaa Yemen
4. Alain Bali, Los Angeles
5. Alan Herzfeld, Boise, USA
6. Alan Podber, Brattleboro, Vermont, USA
7. AlanTimothy C. Lunceford-Stevens JD, National Lawyers Guild, NEW YORK
8. Alaric Ohlson, Hamilton, New Zealand
9. Aleta Alston Toure, Parable of the Sower Intentional Community Cooperative, Richmond, CA.
10. Alex Galle-From, Minneapolis, MN, USA
11. Alex King, Tucson
12. Alexander Cameron, Washington, DC
13. Alexander Sanchez Jr, San Diego, California
14. Alice D Ellis Gaut, JD, PI, Capital Defense Mitigation Specialist, Tigard, Oregon, USA
15. Alice Jennings, Edwards & Jennings, PC, Detroit
16. Alice Slater, JD, New York
17. Amanda Rude, Washington, DC US
18. Amith Gupta, Atlanta, GA
19. Andrea MacNevin, Lawyer/Mediator, MacNevin Law & Mediation, Halifax, Canada
20. Andrew Bearkland, Washington, DC
21. Andrew Fischer, partner, Jason & Fischer, Attorneys at law, Brookline, Massachusetts, United States
22. Andrew Reid, JD, LLM, Native Justice, LLC, Boulder, Colorado USA
23. Angelo Guisado, Staff Attorney, Center for Constitutional Rights, New York, NY
24. Ann M Schneider, NYC Chapter Board member, National Lawyers Guild, NYC
25. Ann Wilcox, Esq, NLG, DC chapter, Washington DC
26. Anne Else, Omaha, NE, USA
27. Anne Kaufman, National Lawyers Guild, Boston MA
28. Anne Scheetz, Chicago
29. Annie Bevis, Southampton, Hampshire, UK
30. Antonio A. Oposa Jr., Cebu City, Philippines
31. Antonio Oposa, Environmental lawyer, Manila, Philippines
32. Aoife Fleming, UN Youth Representative for the Netherlands, Leiden, Netherlands
33. Apple Joy L. Collados, Philippines
34. Arnold Gore, Brooklyn for Peace, Brooklyn
35. Ashlee Albies, Albies & Stark LLC, Portland, OR
36. Auden Perino, DC Legal Aid, Washington DC
37. Audrey Bomse, NLG, Brooklyn
38. Ayo Figueroa, Chapter Co-Chair, NLG Maryland, Baltimore, MD
39. Banbose Shango, AFGJ, Oklahoma City

40. Belhassen Ennouri, Ennouri Law Office, Tunis, Tunisia
41. Benjamin E Apple, Chapel Hill, NC
42. Benjamin Hiller, Medford, Massachusetts
43. Benjamin L. Rundall, Esq., Lawyer, Phoenix, USA
44. Bern Haggerty, Laramie, USA
45. Beth S. Lyons, IADL Alternate Representative to U.N. (New York), U.S.
46. Bethany Spielman, Chatham
47. Betsie Weil, Chicago Anti-War Coalition, 60643
48. Betsy G. Cunningham, Attorney at Law, Baltimore City, MD USA
49. Bhavleen Sabharwal, New York City, USA
50. Bill Montross, National Lawyers Guild, Bethesda, MD. USA
51. Bill Twist, Co-Founder, CEO, Pachamama Alliance, San Francisco, United States
52. Bill Waddell, Attorney, San Diego, CA
53. BJ Sachs Steinhardt, South America
54. Bob Rossi, National Writers Union and Communication Workers of America (retired), Salem, Oregon, United States
55. Brenna L. Torres, Esq., Attorney at Law, New York, NY
56. Brett Hartmann, Salinas, USA
57. Brian Concannon, Executive Director, Project Blueprint, Marshfield, Massachusetts
58. Brian J. Donovan, Esq., ChinAmerica Legal Advisors, PLLC, Tampa, Florida, U.S.A.
59. Bridget Feldmann, Tucson, AZ, USA
60. Bruce D. Nestor, Past President, National Lawyers Guild (2000-2003), Minneapolis, MN
61. Bruce Ellison, Rapid City, South Dakota
62. C. William Michaels, Esq., Law Offices, Baltimore
63. Camilo Pérez-Bustillo, Task Force on the Americas, NLG, Oakland
64. Carl Hamad-Lipscombe, Brooklyn Community Bail Fund, Brooklyn
65. Carlos J Bichet Nicoletti, Panama City, Panama
66. Carson Tabiolo, Aiea, HI, USA
67. Casey J. Mulligan, Boulder, CO, USA
68. Casey Mitchell, National Lawyers Guild, Henderson, Nevada, United States
69. Catz O'Neill, Ottawa Canada
70. Channa Samkalden, Prakken d'Oliveira Human Rights Lawyers, Amsterdam, the Netherlands
71. Charles H Nadler, Colorado Licensed Attorney (Active: 37698), Highlands Ranch, Colorado, USA
72. Charles R. Miller, Birmingham, Alabama, United States
73. Cheri Ibes, Santa Fe, NM
74. Chris Kapilla, Edmonds WA
75. Christen DeBard, Indianapolis, Indiana
76. Christiane Henker, Germany, Chemnitz
77. Christina Himes, Boston, USA
78. Christine Kumar, Staff Attorney, Legal Aid Society of DC, Washington, DC

79. Claribel P. Maduena, Law Office of Claribel P. Maduena, PC, Alameda, California, United States
80. Claudia Kuhns, Yogarden Life, Denver, CO USA
81. Colin Bradley, Colin Bradley Law PLLC, Phoenix
82. Collins Mbuyang, Kumasi Ghana
83. Colonel Ann Wright, Veterans For Peace Chapter 113-Hawai'i, Honolulu, Hawai'i
84. Conor Bednarski, Attorney, Brooklyn, NY USA
85. Conor Klerekoper, NLG, Tucson
86. Cormac Cullinan, Cullinan & Associates Inc. (firm of attorneys), Cape Town, South Africa
87. Cory Jane Rodas, Glendale, AZ
88. Courtney Crowe, PORTLAND
89. Craig Jago Beauchamp  ESQ., Santa Ana, California
90. D. Zachary Wall, Washington, D.C.
91. Dale Lehman, Neighbors for Peace, Chicago Committee against War and Racism, Chicago Illinois
92. Damon J. Brinson, Saint Paul, MN USA
93. Dan Mayfield, San Jose CA
94. Dan Parziale, Ojai, USA
95. Daniel Goodwin, New York, USA
96. Daniel L Meyers, Esq., NLG admitted SDNY, NEW YORK, NY
97. Daphne Silverman, Austin, USA
98. Daren Garshelis, Director, The Forefront Project, Berkeley, CA
99. David Hunter, Solicitor of the Supreme Court of England & Wales, Bristol, England
100. David L. Mandel, Elected member, California Democratic Party Central Committee, Sacramento, USA
101. David Leeper, Retired District Attorney and professor, Madison WI US
102. David Luna, Chicago, Illinois, USA
103. David Norken, National Lawyers Guild Maryland Chapter, Davidsonville, Maryland, USA
104. David Smokler, NLG-Detroit...member., Detroit, USA
105. Dean Guiliotis, Lancaster, CA USA
106. Deborah C. Anderson, Esq., Anderson Law, Washington, DC
107. Debra L Link, SANTA FE
108. Denise D Fort (Professor Emerita), University Of New Mexico School of Law, Santa Fe New Mexico USA
109. Devon Paul, Toronto, Canada
110. Diana Bohn, Berkeley, CA, USA
111. Diane Pontius, Mishawaka, IN U.S.A.
112. Donna Nevins, Houston
113. Dora Rizzardo, Padova, Italy
114. Doris Lin, Law Offices of Doris Lin, Esq., Freehold, NJ, USA

115.   Dorothy Knable, 350.org, NYC, USA
116.   Dr. Jeff Handmaker, Lawyer and Associate Professor, Erasmus University Rotterdam, The Hague, The Netherlands
117.   Dumonde Slam Dunkley, Tuscon, Arizona, United States
118.   Dylan M. LeValley, Seattle
119.   Earl MacFarlane, Middletown, DE --USA
120.   Eda Gordon, New Mexico Criminal Defense Lawyers Association, Santa Fe, New Mexico
121.   Edre U. Olalia, President, National Union of Peoples' Lawyers (Philippines), Philippines
122.   Eduardo Estevez, Hillsboro
123.   Edward Terrar, National Lawyers Guild, Washington, D.C.
124.   Edwin Dela Cruz, President ISAC Philippines, Manila, Philippines
125.   Eilidh Innes, UK
126.   Eirik Cheverud, Attorney, Hyattsville, Maryland, United States
127.   Eleanor Stein, Esq., Troy, New York
128.   Elena Hodges, NYU Law student, New York City, USA
129.   Elisabeth Hills, Memphis TN USA
130.   Elizabeth Barad, Esq., NYC Bar, ABA Committees on Interntional Human Rights and Civil Rights and Social Justice, New York, NY
131.   Elizabeth Lee, St Anthony  NF
132.   Elizabeth M. Molchany, Attorney at Law, Member, Virginia State Bar, Front Royal, Warren County, Virginia
133.   Emilie N Junge, Member of National Lawyers Guild, Portland, Oregon Chapter, Portland, Oregon, USA
134.   Emily Hawley, Portland, OR
135.   Eric Esqueda, University of Houston, Houston, TX
136.   Erica Askin, St. Petersburg, Florida, USA
137.   Erin Sobat, Canadian Articling Student, Toronto
138.   Eva Golinger, Esq., New York City, USA
139.   Evelyn Chorush, Houston
140.   Fausto Jarrín Terán, Asambleísta, Quito - Ecuador
141.   Ford Law PLC, Phoenix, Arizona, USA
142.   Franz Bruggemeier, Staff attorney for Oregon Justice Resource Center's Civil Rights Project, Portland, Oregon, United States
143.   Galahad Pe Benito, Quezon City, Philippines
144.   Garrett Wright, Member, National Lawyers Guild, Portland, OR
145.   George Kegoro, Human rights lawyer, Kenya
146.   George Symonds, London, UK
147.   Geraldine Sadoway, Law Union of Ontario, Toronto, Canada
148.   Gill Boehringer, International Association of People's Lawyers-Australia; Co-Chair, Monitoring Committee on Attacks on Lawyers, Woy Woy, NSW, Australia

149.   Grace Lempp, Virginia Indigent Defense Commission - Assistant Public Defender, Manassas, VA
150.   Hajime Inoue, JALISA Japan, Yokohama, Japan
151.   Heather Kuhn, Student, Member of NLG, Buffalo, NY U.S.
152.   Helene Kim, New York, New York
153.   Henry Rodriguez, Esq., Law Office of Henry Rodriguez, Portland, OR, USA
154.   Henry Wofford, Production Assistant, Los Angeles, United States of America
155.   Hilary Zhou, National Coordinator, Zimbabwe People's Land Rights Movement, Harare, Zimbabwe
156.   Hillary Exter, NYC
157.   Howard Silverman, Retired attorney, Newton, United States
158.   Ian McCurley, NLG Legal Observer Coordinator for Portland Chapter, Portland, OR
159.   Issa Samandar, Ramallah, Palestine
160.   Ivanne D'Laureil I. Hisoler, Cebu City, Philippines
161.   Jacob Erwin, Tucson
162.   Jacques Beaudoin, Director of Public and Legal Affairs, Réseau Québécois des OSBL d'Habitation, Montreal, Canada
163.   Jaime Hayden, Duluth, MN USA
164.   James Love, Honoka, HI USA
165.   James Marc Leas, Law Office of James Marc Leas, S. Burlington Vermont US
166.   james squire, seattle, WA
167.   Jamil Dakwar, ACLU, New York City, USA
168.   Jan Susler, CHICAGO, IL USA
169.   JANG KYUNG UK, SEOUL, SOUTH KOREA
170.   Jasmine Harris, New York City, USA
171.   Jason Smith, Key West
172.   Jason Sullivan, Pittsburgh
173.   Jayaram Thapa, Centre for legal consultancy, Kathmandu, Nepal
174.   Jeanne Mirer, NLG IADL, New York, New York  USA
175.   Jeff Petrucelly, National Lawyers Guild, Cambridge, MA
176.   Jeffrey Frank, National Lawyers Guild, Chicago, USA
177.   Jeffrey Haas, Water Protector Legal Collective, Board, Santa Fe, NM
178.   Jeffrey Lake, National Lawyers Guild, San Jose, CA USA
179.   Jeffrey M. Feuer, Esq., Goldstein and Feuer, Cambridge, MA, USA
180.   Jeneva R. Kame Parks, Law Student, University of Arizona, Tucson, USA
181.   Jeremy Penn, Washington, DC
182.   Jerry Dohnal, NSW Law Society, Australia, Dublin, Ireland
183.   Jessica Coffrin-St. Julien, NYU Law School, New York, USA
184.   Jesus Rodriguez-Espinoza, OrinocoTribune.com, Caracas, Venezuela
185.   Joan Andersson, National Lawyers Guild, Berkeley USA
186.   Joan Levitt, Tijeras
187.   Joanna Rothchild, Attorney, Brooklyn, NY, USA

188.    Joe Emersberger, author, Windsor, Canada
189.    Joel Newey, Attorney, Portland, Oregon,  US
190.    Joelle Eliza Lingat, Jersey City, USA
191.    John Chadwck, Veterans For Peace, Bellingham
192.    John Gear, Founder, Salem, Oregon
193.    John L. Stainthorp, Chicago
194.    John Mage, New York, NY
195.    John O. Curry, Seattle, USA
196.    John Philpot, Barreau du Québec, Montréal
197.    John Quigley, Emeritus Professor of Law Loyola University New Orleans, New
        Orleans Louisiana US
198.    John R. Evans, Esq., Kernersville, North Carolina
199.    John Ryan, Winnipeg
200.    John T. Fussell, West Hartford, Connecticut, USA
201.    John T. Mitchell, Interaction Law, Washington, DC, U.S.A.
202.    John Wheat Gibson, P.C., National Lawyers Guild, Dallas, U.S.A.
203.    Joie Peña, Santa Fe, USA
204.    Jon Sternberg, California Nurses Association/National Nurses United (ret),
        Oakkand/Berkeley,  California
205.    Jonathan Boud, Middlesex England
206.    Jonathan Padwe, Associate professor of Anthropology, Honolulu, Hawa'i, USA
207.    Jordan Kushner, Civil Rights Attorney, Minnepaolis
208.    Jorge Cortez, Dallas, Texas
209.    Josafath Salazar, Lawyer at Hogan Lovells, Monterrey, Mexico
210.    Josalee S. Deinla, National Union of Peoples' Lawyers, Philippines
211.    Josephine Smalls Miller, Law Office of Josephine Smalls Miller, Danbury
212.    Joshua Chavanne, California
213.    Joshua Cooper, Executive Director, Hawai'i Institute for Human Rights, HONOLULU
214.    Judy Somberg, National Lawyers Guild International Committee, Cambridge, MA,
        USA
215.    Jule Schnakenberg, World's Youth for Climate Justice, Hamburg, Germany
216.    Julie Stowasser, San Luis Obispo, USA
217.    Jun Sasamoto, JALISA, COLAP, TOKYO, Japan
218.    Justin Orlove, Baltimore
219.    K. Dean Hubbard, Jr., Executive Director, Professional Staff Congress-CUNY, New
        York, NY USA
220.    K. Jeff Wang, Ann Arbor, MI
221.    Kafahni Nkrumah, Arlington,  Tennessee, USA
222.    Rev. Karen Harrison, Canadian Buddhist Civil Liberties and Human Rights
        Association
223.    Karen Smith, New York State Retired Acting Supreme Court Justice, New York
224.    Kate Sinon, Bellevue, WA USA

225.  Katherine Holcombe, Attorney at Law, Washington, DC
226.  Kathleen Johnson, National Lawyers Guild member, Fairhope, Alabama
227.  Kendra Cruikshank, Oregon City, USA
228.  Kent Autrey, Koloa, US
229.  Kiman A. Lucas, Bainbridge Island
230.  Krish Govender, National Association of Democratic Lawyers, Durban, South Africa
231.  Kristina Mazzocchi, Partner, Mirer Mazzocchi & Julien, PLLC., BROOKLYN
232.  Kyle Barbour, MD, Rochester, NY, USA
233.  Larry Hildes, National Lawyers Guild, Bellingham, WA
234.  Larry Redmond, Attorney at law, Chicagp
235.  Leonard Polletta, New York, New York
236.  Les Wallerstein, Lexington, MA/USA
237.  Linus Lancaster, California Teachers Association., Sebastopol, USA
238.  Lisa Knox, Legal Director, Oakland, CA, US
239.  Lord Hendy QC, Member of the Bar of England and Wales and member of the House of Lords, London, UK
240.  Lorna Paisley, Lake Balbo CA USA
241.  Lorne Franks, Senior Associate, Maurice Blackburn Lawyers, Melbourne, Australia
242.  Lorraine Leete, Attorney, New York, Legal Centre Lesvos, Mytilene, Lesbos, Greece
243.  Lucy Lippard, Galisteo, USA
244.  Lucy Rodriguez, Immigration Attorney, KENSINGTON,USA
245.  Luís Carlos Moro, General Secretary, American Association of Jurists, São Paulo, Brazil.
246.  Luis Dussan, Presidente, Asociación Americana de Juristas Colombia, Bogota, Colombia
247.  Luke Laughlin, Law Office of Luke Laughlin, PLLC, Olympia, U.S.
248.  Maggie Ellinger-Locke, Washington, DC
249.  Maira Rios, Bakersfield, CA USA
250.  Mara Verheyden-Hilliard, constitutional rights lawyer and co-founder, Partnership for Civil Justice Fund, Washington, DC, USA
251.  Marc B. Lucier, Esq., Palm Beach, FL
252.  Margaret Rose, Director, Future Law Institute (UK), Bath, United Kingdom
253.  Margaretha Wewerinke-Singh, Assistant Professor of Public International Law, Grotius Centre for International Legal Studies (Leiden University), The Hague, The Netherlands
254.  Mari Inoue, Attorney, New York City, NY, USA
255.  Maria Cecilia Herrera, Quito
256.  Marie Toussaint, Lawyer & Member of the European Parliament, Paris, France
257.  Marie Vincent, Attorney, Pangea Legal Services, Berkeley, CA, USA
258.  Marilyn Winter-Tamkin, Santa Fe, NM
259.  Mário R. Cunha, São Brás de Alportel, Portugal
260.  Marjorie Cohn, National Lawyers Guild, San Diego

261.  Mark Brodin, Boston College Law School, Newton
262.  Mark Hickernell, Waltham, USA
263.  Mark Jacquinot, Schenectady, New York USA
264.  Mark Stern, MEmber international committee, Boston
265.  Martha L Schmidt, Co-Chair, Task Force on the Americas, NLG, Bothell, Washington, USA
266.  Mary Dryovage, San Francisco USA
267.  Mary Louise Dagatan, Talisay City, Cebu
268.  Matthew Laird, Thomas Keel & Laird, Denver
269.  Matthew McHale, Ypsilanti, MI, USA
270.  Maya Rinta, Portland, United States
271.  Meena Jagannath, New York, USA
272.  Mela Masi, Swindon
273.  Melinda Drew, Attorney/Law Professor, Arlington, MA USA
274.  Melinda Power, Managing Attorney, West Town Law Office, Chicago
275.  Michael Avery, Professor Emeritus, Suffolk Law School, Professor Emeritus, Suffolk Law School, Albuquerque
276.  Michael Letwin, Former President, Association of Legal Aid Attorneys/UAW 2325, BROOKLYN
277.  Michael S Goodman, Madison WI  USA
278.  Michael Steven Smith, Law and Disorder Radio, Call Hass, Law and Disorder Radio, Cohost, Law and Disorder Radio
279.  Michael Ward, USA
280.  Michelle Lerner, Flanders, NJ
281.  Miguel Régio de Almeida, Law Professor, Portugal
282.  Miranda Rivers, Washington DC
283.  Mireille Fanon Mendes France Frantz Fanon Foundation, Chair, France/Martinique
284.  Miriam Stohs, NLG Colorado, Denver
285.  Mohamed Tahari, Tahari Lawyers law firm, Casablanca, Morocco
286.  Morgan Kendall, Kendall Carot senc, Montreal, Canada
287.  Mothiur Rahman, Lawyer, New Economy Law, Totnes, UK
288.  Nada Khader, Executive Director, WESPAC Foundation, Inc., White Plains, NY, USA
289.  Nadia Sindi, Freelance Court/Medical Arabic Educator/Interpreter/Translator, Eugene
290.  Nafe Hasan Yousef, Professor of international law, Palestine Shiya University Beitlehem
291.  Nakuru Reproductive Health Centre, Nakuru
292.  Nancy Hormachea, Berkeley, CA
293.  Nancy S Vann, President, Safe Energy Rights Group, Peekskill, NY, USA
294.  Nancy Sharp, Wilmington
295.  Nancy Taylor, LOS ANGELES
296.  Naomi G Harrison, Santa Fe
297.  Natali Segovia, Human Rights Attorney, New Mexico, USA

298.  Nathaniel Damren, Brooklyn Defender Services, Westmont, Illinois
299.  Natsu Taylor Saito, Attorney, Atlanta, Georgia, USA
300.  Nazune Menka, Lawyer, Oakland, CA USA
301.  Nicol Tobar Salazar, Potsdam, Germany
302.  Nikos Valance, West Hartford, Ct. USA.
303.  Niloufer Bhagwat, Vice President Indian Association of Lawyers,  Mumbai, India
304.  Ollie Jefferson, Attorney at law, Fort Worth
305.  Osamu Niikura, Professor emeritus and Attorney at law, Tokyo, Japan
306.  Patricia Handlin, Water Protector  Legal Collective, Chicago, Illinois, USA
307.  Patrick Goggins, Esq., Hollywood, Florida
308.  Patrick McCann, Lake Worth, FL
309.  Paul E. Merrell, J.D., Retired attorney, Springfield
310.  Paul Kaufman, M.D., J.D., Atlanta, Georgia, USA
311.  Peter Beattie, Woodville, VA, USA
312.  Peter Craig MARTIN, Legal Translator & Court Interpreter (retired), Seattle, USA
313.  Peter Frans Hoelandt, Private global citizen, South Africa
314.  Peter Lipman, Bristol, UK
315.  Phillip J. Crawford, Salinas, California, United States
316.  Pierre Serge Heger, avocat, Independent lawyer, Bulle Switzerland
317.  Pilar Noriega Garcia, México
318.  Pooja Gehi, National Lawyers Guild, BROOKLYN
319.  Professor Curtis FJ Doebbler, The Law Office of Dr Curtis FJ Doebbler, San Antonio, Texas, USA
320.  Rachael Moshman, Washington, DC
321.  Rachel Treichler, Law Office of Rachel Treichler, Hammondsport, NY
322.  Raji Sourani, Executive Director, Palestinian Center for Human Rights,
323.  Raymond Lahoud, Esquire, Partner and Chair, Immigration Law Group, Norris McLaughlin, P.A., Allentown, Pennsylvania, United States of America
324.  Regina Gregory, Honolulu, Hawai'i
325.  Renate Amesbauer, Women's Federation for World Peace international NGO-ECOSOC, Wien, Austria
326.  Rev. Dr. Holly Beaumont, Organizing Director, Interfaith Worker Justice - New Mexico, SANTA FE
327.  Ria Julien, Mirer Mazzocchi & Julien, PLLC, New York, NY, USA
328.  Ricardo F Raphael, Jacksonville Duval
329.  Richard File-Muriel, Salud Integral, University of New Mexico, Associate Professor, Albuquerque
330.  Richard L Giovanoni, Morton Grove, IL USA
331.  Richard P. Koch, National Lawyers Guild, San Francisco, USA
332.  Richard Wagner, Laguna Hills, United States
333.  Richard Ward, USA
334.  Rita Jacobs, Member State Bar of Michigan, Lansing, Michigan

335. Ritchie Eppink, Boise, Idaho, USA
336. Robert Cheasty, Cheasty, Cheasty & Malek, LLP, Albany, California
337. Robert Gold, Charlotte,NC
338. Rodney Saenz, Manor, Texas, U.S.A.
339. Ronald G. Isaac, National Conference of Black Lawyers, Silver Spring, MD, USA
340. Ronke Adeyemi, Partner, Ronke Adeyemi & Co, Ilorin
341. Rosemary Hnatiuk, Landmark, Manitoba
342. Rosie Hinnebusch, Sarasota
343. Rosie O'Malley, Chicago, Illinois
344. Rouzanna Paladin, Marina del rey
345. Ruth Santiago, Comite Dialogo Ambiental, Salinas, Puerto Rico
346. Ruzzel Morales, Climate Reality Leader / Mentee of Atty Antonio Oposa, NCR, Philippines
347. Ryan Bestford, GMIAU, Manchester, UK
348. Sally Frank, Professor of Law, Drake University, Des Moines
349. Samira Ben Ali, CAEN (France)
350. Sara Matlin, Redwood City, California, United States
351. Sarah Beth Cain, Knoxville, TN
352. Sarah McKee, Formerly General Counsel, Interpol U.S. National Central Bureau, Amherst, MA
353. Şerife Ceren Uysal, Vienna, Austria
354. Shan Khan, Kirkland & Ellis LLP, Dallas, USA
355. Shirley Pate, Haiti Oye!, Washington, DC, U. S.
356. Sierra Rhodes, University of Arizona James E. Rogers College of Law, Tucson, AZ, USA
357. Sinnai Pedro, Tuscon, USA
358. Siobhan M Gilchrist, Atlanta
359. Siobhan Miller, Co-Facilitator, National Lawyers Guild, Maryland Chapter, Baltimore City, MD, USA
360. Siti Kasim, Kuala Lumpur, Malaysia
361. Solomon Yeo, Honiara, Solomon Islands
362. Stepan Wood, Professor, Allard School of Law, University of British Columbia, Vancouver, Canada
363. Stéphan Corriveau, Executive Director, Community Housing Transformation Centre, Montreal, Canada
364. Stephen A. Justino, Denver, CO, USA
365. Stephen A. Justino, Denver, USA
366. Stephen Cheng, Valley Stream, USA
367. Stephen D Livingston, Chicago
368. Stephen Wasserman, Swampscott, Massachusetts
369. Steve Ellner, Associate Managing Editor of Latin American Perspectives, Gaithersburg, MD

370.  Steven Goldberg, Retired Attorney, Portland, Oregon USA
371.  Steven L. Varnis, Nee York, NY. USA
372.  Stuart Russell (Professor, retired), International Association of People's Lawyers (IAPL), Bordeaux France
373.  Sue Udry, Executive Director, Defending Rights & Dissent, Washington, DC USA
374.  Susan Scott, National Lawyers Guild, Inverness,
375.  Sven Ahlen, Arlington
376.  Tanya Smith, Kahuku, Hawaii
377.  Taylor Macy, Tucson, AZ, USA
378.  Tendai Chidochashe Mafuka, Director, Social Economic Action and Transformation for Humanity, Masvingo
379.  Teodoro Manuel da Silva, Canoas/RS, Brasil
380.  Thomas F. Baker, Doctor of Veterinary Medicine, Veterinary Epidemiologist, Hamilton, Canada
381.  Tim Crosland, Director, Plan B, London, UK
382.  Toby Zimbalist, Lawyer, Phoenix AZ, USA
383.  Tom Hennessey, Solicitor, London
384.  Tom Rhule, Charleston Wv USA
385.  Verena GRAF, International Federation For The Protection Of The Rights Of Ethnic, Religious, Linguistic & Other Minorities (IFPRERLOM), Geneva, Switzerland
386.  Veronica Musa, Salta, Argentina
387.  Victor B. Olson, Progressive Legal Solutions LLP, Winnipeg
388.  Vivienne Simon, JD, Northampton, MA USA
389.  VJ Furio, Yonkers- USA
390.  Will Bourne, Brooklyn NY
391.  Will Merrifield, WASHINGTON DC
392.  William Louis Ryan, Public Defender, Kennett, MO, USA
393.  William Reilly, Los Angeles, U.S.A.
394.  Yevgenii Gerasymenko, President, Ukrainian Association of Democratic Lawyers , Kiev, Ukraine
395.  Yolanda Rondon, New York, U.S.
396.  Zachary Lown, Lown Law Firm, Boston