

UNITED NATIONS
**HUMAN RIGHTS**
SPECIAL PROCEDURES
SPECIAL RAPPORTEURS, INDEPENDENT EXPERTS & WORKING GROUPS

PALAIS DES NATIONS • 1211 GENEVA 10, SWITZERLAND
www.ohchr.org • TEL: +41 22 917 9000 • FAX: +41 22 917 9006 • E-MAIL: wgad@ohchr.org

**Working Group on Arbitrary Detention**

24 September 2021

Dear Ms. Holmlund,

I would like to refer to the 91 session of the Working Group on Arbitrary Detention, during which the Working Group adopted several opinions on cases of deprivation of liberty submitted to it.

In accordance with paragraph 18 of the Working Group's revised methods of work, I am sending to you, attached herewith, the text of Opinion No. 24 (United States of America) adopted on 6 September 2021, regarding a case submitted by your organization.

In conformity with its revised methods of work, the Working Group transmits its Opinions to the source of the petitions, forty eight hours after having transmitted it to the relevant Government.

This Opinion will be published on the website of the Working Group and reflected in its annual report to the Human Rights Council. In the meanwhile, we would encourage you to treat the information given to you by the Working Group on this matter with discretion.

Yours sincerely,

Lucie Viersma
Secretary
Working Group on Arbitrary Detention

Ms. Anna-Karin Holmlund

A/HRC/WGAD/2021/24

# Advance Unedited Version

Distr.: General
17 September 2021

Original: English

**Human Rights Council**
**Working Group on Arbitrary Detention**

## Opinions adopted by the Working Group on Arbitrary Detention at its 91st session, 6-10 September 2021

### Opinion No. 24/2021 concerning Mr. Steven Donziger (United States of America)*

1.      The Working Group on Arbitrary Detention was established in resolution 1991/42 of the Commission on Human Rights. In its resolution 1997/50, the Commission extended and clarified the mandate of the Working Group. Pursuant to General Assembly resolution 60/251 and Human Rights Council decision 1/102, the Council assumed the mandate of the Commission. The Council most recently extended the mandate of the Working Group for a three-year period in its resolution 42/22.

2.      In accordance with its methods of work (A/HRC/36/38), on 3 February 2021 the Working Group transmitted to the Government of United States of America a communication concerning Mr. Steven Donziger. The Government has not replied to the communication. The State is a party to the International Covenant on Civil and Political Rights.

3.      The Working Group regards deprivation of liberty as arbitrary in the following cases:

(a)      When it is clearly impossible to invoke any legal basis justifying the deprivation of liberty (as when a person is kept in detention after the completion of his or her sentence or despite an amnesty law applicable to him or her) (category I);

(b)      When the deprivation of liberty results from the exercise of the rights or freedoms guaranteed by articles 7, 13, 14, 18, 19, 20 and 21 of the Universal Declaration of Human Rights and, insofar as States parties are concerned, by articles 12, 18, 19, 21, 22, 25, 26 and 27 of the Covenant (category II);

(c)      When the total or partial non-observance of the international norms relating to the right to a fair trial, established in the Universal Declaration of Human Rights and in the relevant international instruments accepted by the States concerned, is of such gravity as to give the deprivation of liberty an arbitrary character (category III);

(d)      When asylum seekers, immigrants or refugees are subjected to prolonged administrative custody without the possibility of administrative or judicial review or remedy (category IV);

(e)      When the deprivation of liberty constitutes a violation of international law on the grounds of discrimination based on birth, national, ethnic or social origin, language, religion, economic condition, political or other opinion, gender, sexual orientation, disability,

---

* In accordance with para. 5 of the Working Group's methods of work, Ms. Miriam Estrada-Castillo did not participate in the discussion of the present case.

or any other status, that aims towards or can result in ignoring the equality of human beings (category V).

**Submissions**

*Communication from the source*

4.      **Steven Donziger** is a national of the United States of America, born in 1961, a lawyer, usually residing in New York City. Mr. Donziger has been in pre-trial house arrest since 6 August 2019, under charges of contempt of court.

5.      According to the information received, in February 2011, a court in Ecuador found Chevron Corporation liable for causing serious environmental and health damage to the Amazon rainforest and the communities who lived in this region between 1964 and 1992. Among other findings, the court determined that Chevron had deliberately discharged billions of gallons of oil waste over a period of decades onto Indigenous ancestral lands as a cost-saving measure.

6.      Chevron was reportedly ordered to pay USD 19 billion to remediate the damages, later reduced to USD 9.4 billion on appeal. The judgment against Chevron has been confirmed on the merits, or for enforcement purposes, by Ecuador's Supreme Court, as well as by the Supreme Court of Canada.

7.      The source states that, to avoid paying the damages, Chevron moved its assets out of the country during the trial, leading the plaintiffs to seek enforcement actions in other countries. Chevron officials reportedly threatened the claimants with "a lifetime of litigation" unless they dropped their case, and promised that the company would "fight until hell freezes over and then fight it out on the ice".

8.      It is reported that, days before the trial decision of the Ecuadorian court in February 2011, Chevron filed a lawsuit in the United States District Court for the Southern District of New York under the Racketeering and Corrupt Organizations Act, against all plaintiffs named in the Ecuador lawsuit, all their lawyers (including Mr. Donziger), the main NGO representing the communities, and a number of experts. Chevron accused them of winning the case by using fraudulent and corrupt means.

9.      Chevron allegedly used administrative procedures available in the US federal courts to direct the racketeering case to a judge who had presided over related document discovery litigation. According to the source, in the course of that litigation, "Judge K" did not "disguise his disdain" for Mr. Donziger and "suggested from the bench that the suit against Chevron was nothing more than a cynical con." Judge K also seemed to indicate to Chevron attorneys that he would be supportive of a racketeering lawsuit against Mr. Donziger, were the company to file one.

10.     According to the source, Chevron initially brought claims for roughly USD 60 billion in damages. This claim granted Mr. Donziger the right to a jury trial. However, two weeks before the trial was scheduled to begin, Chevron dropped its claims for money damages, removing the legal basis for a jury. Consequently, the fact-finding decision was left to the sole discretion of Judge K.

11.     It is reported that, during the trial, Judge K denied the defendants the opportunity to present scientific evidence of Chevron's alleged pollution and corrupt activities in Ecuador, including the results of 64,000 chemical sampling results. Judge K also refused to examine or consider the evidence used by Ecuador's courts to reach the verdict. However, he allowed Chevron to present "secret" and anonymous witnesses who could not be effectively cross-examined due to purported security threats. In addition, Judge K allowed Chevron to present a witness who conceded that the company was paying him a monthly "stipend" twenty times his former salary.

12.     In 2014, Judge K ruled that Mr. Donziger had committed or participated in acts that fell within the definition of "racketeering activity", including "extortive" efforts to pressure Chevron through "celebrity advocacy", government lobbying, a disinvestment campaign, and an NGO-driven media strategy. Judge K enjoined enforcement of the Ecuadorian judgement in the USA and pre-emptively seized any "profit" that Mr. Donziger might personally earn

as a lawyer from any enforcement of the judgement. Judge K ordered that he transfer to Chevron all property that he had or might later obtain that could be traced to the Ecuadorian judgement.

13.     According to the information received, in 2018, shortly after a success in the enforcement process in Canada, including a favourable decision from the Supreme Court of Canada, Chevron initiated a post-judgement discovery and "civil contempt" litigation before Judge K. The "contempt" litigation was based on the allegation that funds Mr. Donziger raised from donors or third-party investors to support the enforcement process and paid to lawyers as legal fees or for expenses counted as "profit" on enforcement of the judgement, even prior to a collection on the judgement. Chevron also used the discovery process to demand confidential information identifying all of Mr. Donziger's assets and those of his spouse to determine whether he had complied with an $800,000 costs order that was imposed after the racketeering trial, which remains under appeal. Mr. Donziger was required by the judge to turn over all of his electronic devices and passwords to all his online accounts to a forensic expert, for ultimate review by Chevron.

14.     Mr. Donziger submitted a letter to Judge K explaining that he would be unable to comply with the orders since it would give Chevron access to confidential, privileged and protected documents and requested the court permission to go into voluntary contempt, in order to obtain appellate review. He explained that his ethical obligations towards his clients prevented him from turning over the devices, given that the order appeared to violate multiple legal protections under US and international law and would put the lives of his clients in danger. Mr. Donziger also repeatedly assured the court that he would fully comply with all discovery demands if unable to obtain relief on appeal.

15.     On 23 May 2019, Judge K reportedly held Mr. Donziger in civil contempt for his refusal to comply with the protocol and for several other acts of non-compliance, including failing to transfer quickly enough his right, title and interest to Ecuadorian case fees (which he reportedly did transfer) and separately for failing to transfer to Chevron funds provided from third-party investors who had been financing the litigation for the affected communities.

16.     Mr. Donziger reportedly exercised his right to appeal this decision by going into voluntary civil contempt, rather than surrender his devices and accounts to the forensic experts. Judge K then drafted criminal contempt charges against Mr. Donziger. Judge K referred the case to the Attorney's Office for the Southern District of New York, which declined to pursue prosecution. Judge K took the allegedly unusual and extraordinary decision to appoint a private law firm, that later admitted to a conflict of interest as Chevron had been a client of the firm in 2018, to prosecute Mr. Donziger in the criminal contempt case.

17.     The source claims that Judge K also selected a Senior District Judge, "Judge P", to preside over the criminal case, which allegedly bypassed Rule 16 of the SDNY Rules for the Division of Business Among District Judges, which states "the assignment committee shall transfer the case by lot".

18.     It is reported that, on 6 August 2019, Judge P ordered Mr. Donziger to surrender his passport, wear a GPS tracking ankle bracelet, and be placed in home confinement. Judge P justified the pre-trial house arrest on grounds of flight risk, specifically that Mr. Donziger had previously defied unspecified "court orders" and had a history of travel to Ecuador.

19.     From September 2019 to January 2020, Mr. Donziger repeatedly requested reconsideration of this ruling, arguing inter alia that: (a) his appeal of the court order was transparent and pursuant to a legitimate appellate strategy; (b) he had complied with hundreds of court orders throughout the racketeering process, including order that he submit to an unprecedented total of 19 days of pre-trial depositions under oath; (c) his travel to Ecuador was a key part of his human rights work and representation of his clients; (d) he had voluntarily returned from international travel to face the criminal contempt charges; and (e) it was implausible to claim that he would abandon his wife, young son, and life in the USA, and submit himself to felony abscondment charges and a life as an international fugitive, to avoid the misdemeanor charges. On December 2019, the Court refused to reconsider its detention parameters. Mr. Donziger filed and argued an appeal of the pre-trial detention, which was rejected in a one-sentence order on 18 February 2020.

20.     Mr. Donziger has been detained at home for over 500 days, even though the longest sentence possible if he were convicted is six months in prison, and the longest sentence actually imposed for similar charges is three months of home detention. On 18 May 2020, Judge P reportedly denied Mr. Donziger's demand for a jury trial on the basis that the possible punishment does not exceed six-month incarceration or a $5,000 fine.

21.     According to the source, the trial has been repeatedly postponed due to health and safety issues relating to the COVID-19 pandemic.

*Legal analysis*

22.     The source claims that international norms relating to the right to a fair trial have been violated. In this context, the source argues that "detention" comprises all forms of deprivation of liberty, including house arrest, when it is carried out in close premises where the person is not allowed to leave. Mr. Donziger has allegedly been under pre-trial house arrest, unable to leave his apartment for more than two years. In addition, an arrest or detention authorized by domestic law could be nonetheless arbitrary, considering elements of injustice, reasonableness, necessity, proportionality, lack of predictability and due process.

*Apparent lack of impartiality on the part of the judge during the racketeering trial*

23.     The source stresses that, to guarantee the right to a fair trial, and therefore prevent arbitrary detentions, the independence and impartiality of courts is essential. The obligation of impartiality demands that each of the decision-makers be unbiased and be seen to be unbiased. Actual impartiality and the appearance of impartiality are both fundamental.

24.     The source recalls that the Human Rights Committee established in *Karttunen v. Finland*, that "impartiality" implies that Judges must not allow their discernment to be influenced by personal bias or prejudice, nor harbour preconceptions about the particular case before them, nor behave in ways that improperly promote the interest of one of the parties to the detriment of the other. The actions of the judge must appear to be impartial for a reasonable observer. Judges must not only be impartial, but they must also be seen to be impartial.

25.     The source claims that there have been concerns about perceived bias of Judge K, who made public his personal opinion of Mr. Donziger's character before the racketeering lawsuit had been filed. In September 2010, Judge K reportedly stated that Mr. Donziger was "trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning... The object of the whole game, according to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it ... to persuade Chevron to come up with some money". He asked "now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?" Four months later, Chevron filed its racketeering complaint.

26.     In addition, Judge K reportedly also made remarks about the villagers in Ecuador who sued Chevron, referring to them as the "so-called" plaintiffs and calling Mr. Donziger's work in Ecuador a "not bona-fide litigation". By contrast, Judge K referred to Chevron as a "company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day", and postulating that "I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [the Ecuadorians] have attached it in Singapore or wherever else."

27.     Allegedly, these concerns over Judge K's perceived bias did not stop him from assigning the RICO case to his own court in 2011, instead of letting it be randomly assigned.

28.     The source adds that, during the trial, Judge K denied the defendants the opportunity to present scientific evidence of Chevron's pollution, and refused to examine or consider the evidence (including 105 technical evidentiary reports) relied on by Ecuador's courts to reach the verdict against Chevron. Even after a witness presented by Chevron admitted to having received large amounts of money and other benefits from the company prior to testifying in

court against Mr. Donziger, Judge K concluded that the witness was telling the truth about essential facts of the case.

*Apparent lack of impartiality of the judiciary during the criminal contempt case*

29.     Reportedly, in response to the ruling in the racketeering trial, and as Mr. Donziger and others were making progress enforcing the Ecuador judgment in other jurisdictions, Chevron sought post-judgement discovery to identify all of Mr. Donziger's assets to determine whether he had complied with an $800,000 costs order imposed without a jury. After Mr. Donziger appealed the order to surrender his devices and accounts to the forensic experts, Judge K filed extraordinary criminal contempt charges against him, while the appeal was pending.

30.     According to the source, under US Federal Rule of Criminal Procedure 42, the Court must request an attorney for the government to prosecute contempt. The case against Mr. Donziger was referred to the Attorney's Office for the Southern District of New York, which declined to pursue prosecution. In response, Judge K took the allegedly unusual decision to appoint a private law firm, (which later admitted to a conflict of interest as Chevron had been its client in 2018), as private prosecutors in the criminal contempt case.

31.     The source reports that Judge K also personally selected Senior District Judge P to preside over the criminal contempt charges, which according to the source, bypassed Rule 16 of the Rules for the Division of Business Among District Judges which states that "the assignment committee shall transfer the case by lot".

32.     Since the filing of these charges, Mr. Donziger reportedly filed a number of pre-trial motions, raising concerns about the impartiality of Judge P, each of which were denied by the same Judge P and were not referred out to another judge. These motions were denied on a number of grounds, including that bias was not a reason for transferring the case to another court.

33.     On 13 July 2020, two retired US federal judges took the unusual step of publicly criticizing the sitting federal judges pursuing the criminal contempt case against Mr. Donziger, writing that they were "deeply troubled" by the "grave risk" to due process. Reportedly, an expert in legal ethics filed a sworn declaration stating that the law firm from which the private prosecutors were appointed had "a disqualifying conflict of interest, because of their indirect ties to companies related to Chevron", pointing that "the legitimacy of the Rule 42 process and, ultimately, the criminal justice system may be undermined". A prominent trial lawyer in the United States and an emeritus Professor of Law at Duke University also raised questions publicly after the presiding judge tried to force Mr. Donziger into trial during the COVID-19 pandemic, when witnesses and lawyers could not appear in person. He reportedly expressed that "the wielding of the criminal contempt power, without the oversight of a jury, during a health crisis, is beyond the pale". He added: "None of this paints a picture of fair trials and constitutional protections".

34.     For the source, considering Judge K's conflicts of interest and bias against Mr. Donziger, it is worrying that he decided to hold Mr. Donziger in criminal contempt, appointing prosecutors with links to Chevron and personally selecting a judge to preside over the case. The Human Rights Committee has explained that a trial cannot be fair when "the defendant in criminal proceedings is faced with the expression of a hostile attitude from the public or support for one party in the courtroom that is tolerated by the court, thereby impinging on the right to defense". In this case, the hostile expressions are allegedly coming directly from the judge, who is supposed to fairly and impartially preside over the case.

35.     Based on these allegations, the source claims that Judge K's statements and actions raise serious questions about his impartiality, which itself may amount to a form of reprisal against Mr. Donziger's human rights work. The right to an impartial tribunal requires that judges have no interest or stake in the particular case, do not have pre-formed opinions about it, and do not act in ways that promote the interests of one of the parties. It is alleged that the principle of impartiality of the courts has not been respected.

*The interference with Mr. Donziger's liberty to allegedly circumvent attorney/client privilege*

36.     The right to equality before courts requires that similar cases be dealt with in similar ways. The right to equality before the courts therefore prohibits the creation of exceptional procedures or special courts for certain categories of offences or groups of people, unless there are objective and reasonable justifications. Moreover, the decision to impose a deprivation of liberty "must be taken in accordance with the applicable law and procedure" and be "proportional to the aim sought, reasonable and necessary".

37.     The source reports that former judges have expressed their concern at the excessive charges imposed against Mr. Donziger. In an article published on 13 July 2020, they stated they had "never heard of criminal charges being initiated under circumstances in which the lawyer, in apparent good faith, was seeking more judicial review, as opposed to openly flouting the court". According to the judges, Mr. Donziger was seeking a judicial review "so he could properly resolve the important constitutional issues at stake, given the dangers faced by his clients in Ecuador". They further argued that "to protect both the court's contempt power and the purpose of criminal sanction, criminal contempt should be reserved only for acts so grave and abhorrent that they amount to an offense not just against the presiding judge, but one that has potential for undermining public confidence in the authority and dignity of our courts". In particular, these legal experts questioned the necessity and proportionality of the use of criminal contempt in this case, considering that civil contempt already provided the necessary tools to manage the situation.

38.     The source argues that international human rights law protects the right to privacy, and prohibits arbitrary interfere with a person's privacy, family, home or correspondence. In the case of *Michaud v. France*, in which the communications between a lawyer and his client were intercepted, the European Court of Human Rights ("European Court") recognized that there can be no interference with the right to privacy unless it is in accordance with the law, pursues one or more legitimate aim and is necessary in a democratic society. Such restrictions must respond to a pressing social need and must be proportional to the legitimate aim pursued.

39.     According to the source, lawyers have a professional duty to protect the privacy and confidentiality of their communications with clients under international law. The UN Basic Principles on the Role of Lawyers declare that lawyers have the duty and responsibility to maintain the honour and dignity of their profession by being loyal and respectful of their clients' interests. According to these principles, lawyers shall "at all times act freely and diligently in accordance with the law and recognized standards and ethics of the legal profession". Importantly, the Principles also determine that governments have the obligation to protect lawyers from prosecution or other sanctions "for any action taken in accordance with recognized professional duties, standards and ethics", and to "recognize and respect that all communications and consultations between lawyers and their clients within their professional relationship are confidential".

40.     In *Michaud v. France*, the European Court established that article 8 of the European Convention on Human Rights protects the confidentiality of private communications, whatever the content of the concerned correspondence and whatever form it may take. The Court asserted that article 8 affords strengthened protection to the communication between lawyers and their clients, "justified by the fact that lawyers are assigned a fundamental role in a democratic society, that of defending litigants. Yet lawyers cannot carry out this essential task if they are unable to guarantee to those they are defending that their exchanges will remain confidential."

41.     In *Leotsakos v. Greece*, the European Court held that the seizure of several items and documents in the framework of a criminal investigation against a lawyer had been done with insufficient safeguards for the protection of attorney-client privilege. On *Wolland v. Norway*, the same Court established that in order for an interference to be legitimate under article 8, sufficient and adequate guarantees against arbitrariness should be granted. The Court acknowledged that it is possible for domestic law to allow searches of lawyer's documents as long as proper safeguards are provided, for example through the presence of a representative of a bar association.

42.     Similarly, the Inter-American Court of Human Rights has found that the disclosure of the communications between a lawyer and his client were a violation of the right to privacy. In the case of *Tristan Donoso v. Panamá*, the Court analysed whether the wiretapping and recording of a telephone conversation between a lawyer and the father of his client, and the subsequent disclosure of its contents, had violated article 11 of the American Convention on Human Rights. The Court took under consideration the private nature of the telephone conversation and that neither of the two persons consented to it being known by third parties; and that such a conversation, being conducted between the alleged victim and one of his clients, should be afforded a higher degree of protection due to the legal professional secrecy.

43.     The UN Special Rapporteur on the independence of judges and lawyers has also emphasized that lawyers' files and documents should be protected from seizure or inspection and that communications should not be intercepted.

44.     In the current case, the Protocol created by the judge for the collection, imaging and examination of Mr. Donziger's electronic devices allegedly did not provide any safeguards to protect confidential information about the indigenous and campesino he represents, including information related to core litigation strategies to enforce their judgment against Chevron around the world. The Protocol reportedly provides a backdoor for Chevron to virtually access all of the confidential information and attorney/client communications related to the case, allowing the corporation to have access to information that they could not otherwise obtain legally. Even if a pressing need were to be found for the surrender of Mr. Donziger's computer and telephone, the role of legal professional privilege must be weighed against this need.

45.     The source stresses that criminal contempt is a rare and extraordinary measure that the US Supreme Court has repeatedly emphasized should be exercised only with great caution given that it provides the court with the authority to define the crime, appoint a prosecutor and preside over the case, without the normal safeguards provided in every other criminal prosecution. The use of criminal contempt in Mr. Donziger's case does not appear to comply with this exhortation towards restraint, especially given that Mr. Donziger clarified that he was seeking a judicial review and that he would comply with the order if his appeal were to be rejected.

46.     The decision to hold Mr. Donziger in pre-trial detention based on a criminal charge of contempt is allegedly of concern given that it stems from his decision to uphold his professional duty towards confidentiality. The decision to deprive Mr. Donziger from his liberty allegedly appears to be a rather punitive measure intended to force him to reveal the privileged communications between an attorney and his clients, and a punishment for upholding his professional duty.

*The deprivation of liberty has continued beyond the maximum period foreseen by the charges*

47.     The source submits that pre-trial detention must be exceptional and based on an individualized determination that it is reasonable and necessary, specified in law and without vague and expansive standards. The burden rests on the State to establish that it is necessary and proportionate to detain pending trial and must establish that release would create a substantial risk of flight, harm to others or interfere with the evidence or investigation. If the length of time that the defendant has been held in pre-trial detention reaches the length of the longest possible sentence, the defendant should be released.

48.     The right to be tried without undue delay aims to avoid keeping people too long in a state of uncertainty about their fate, and to ensure that the deprivation of liberty does not last longer than necessary. What is reasonable should be assessed according to the circumstances of each case.

49.     Under article 9(3) of the International Covenant on Civil and Political Rights, pretrial detention should not be a general rule, it must only be used as an exceptional measure and must be as short as possible. Unjustified and prolonged pretrial detention constitutes arbitrary deprivation of liberty.

50.     In ordering the imposition of the precautionary measure of pre-trial house arrest, the judge presiding over the criminal contempt case claimed that this measure was necessary to prevent Mr. Donziger from leaving the country. However, Mr. Donziger has never missed any court dates in almost a decade, he surrendered his passport and has worn a GPS tracking device around his ankle 24 hours a day. He voluntarily returned from abroad to face the criminal charges and has a wife and son with whom he has lived in the same residence in the USA for 14 years.

51.     According to the judge in Mr. Donziger's criminal contempt case, because of the denial of his jury trial rights, he can only be punished by imprisonment for a maximum of 6 months. Mr. Donziger has been in pre-trial house detention for over two years.

52.     The source claims that the pre-trial house arrest of Mr. Donziger raises serious concerns as to the lawfulness of the deprivation of liberty, both in terms of the apparent lack of necessity and the requirement to release defendants when the time of detention reaches the length of the longest possible sentence.

*The detention as a reprisal*

53.     The source recalls that the UN Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms defines a human rights defender as any individual who acts, individually or in association with others, to promote or protect human rights. It protects the rights of individuals to strive for the protection and realisation of human rights at the national and international level, to offer and provide professionally qualified legal assistance and to solicit, receive and utilise resources for the purpose of promoting or protecting human rights.

54.     The source reminds that defenders may work to address concerns related to toxic waste and its impact on the environment, and to protect the rights to life and to the highest attainable standard of health, as well as the rights of indigenous peoples. The source notes that human rights defenders may provide professional legal advice and represent victims in judicial processes and many human rights defenders work to secure accountability for human rights violations.

55.     Mr. Donziger's work as a human rights defender reportedly spans four decades and multiple continents, representing individuals from a wide range of backgrounds in cases implicating a range of human rights violations. Mr. Donziger visited Ecuador in 1993 and subsequently was part of a legal team that brought a class-action lawsuit in New York on behalf of the 30,000 indigenous people from the Ecuadorean Amazon, in response to the widespread and systematic oil dumping in the region and the associated health impacts on the communities.

56.     In 2017, the UN Special Rapporteur on the rights to freedom of peaceful assembly and of association expressed her concern over a "worrying new approach" in the USA of litigants using the racketeering statute to "intimidate advocacy groups and activists." The UN Special Rapporteur on the situation of human rights defenders has also expressed concern over the restrictions faced by environmental defenders in the USA. The source reports an alarming trend since 2019, in which human rights defenders were being targeted and harassed through the criminal justice system in the USA.

57.     The Inter-American Commission on Human Rights has also expressed its concern over businesses and corporations that lodge criminal complaints against human rights defenders to diminish their activities. According to the Commission, private companies not only file complaints within unfounded criminal prosecutions, but sometimes conduct smear campaigns against human rights defenders to tarnish their credibility.

58.     On July 2020, the Chair of the Subcommittee on Human Rights of the European Parliament, expressed concern over the detention of Mr. Donziger as a form of reprisal for his human rights work. Addressing two US Congressional Committees, the letter asks the US Congress to look into Mr. Donziger's case.

59.     The judicial proceedings against Mr. Donziger reportedly follow the same pattern, and appear to be intended to obstruct his work defending the rights of victims of human rights

violations. The immediate reason for the criminal contempt charges that led to Mr. Donziger's detention was his refusal to surrender devices that would give Chevron near wholesale access to confidential, privileged and protected documents in a way that would have compromised his ability to provide legal assistance to the people he was defending, which would have posed a great risk to their lives.

60.     The source recalls that the detention of human rights defenders that stem solely from their legitimate activities is arbitrary. Targeting persons on the basis of their activities as human rights defenders is discriminatory and violates the rights to equality before the law and equal protection of the law under articles 2 and 7 of the Universal Declaration and article 26 of the Covenant.

*Response from the Government*

61.     On 3 February 2021 the Working Group transmitted the allegations from the source to the Government under its regular communications procedure. The Working Group requested the Government to provide, by 6 April 2021, detailed information about the current situation of Mr. Donziger and to clarify the legal provisions justifying his continued detention, as well as its compatibility with United States of Americas' obligations under international human rights law, and in particular with regard to the treaties ratified by the State. The Working Group called upon the Government of the United States of America to ensure his physical and mental integrity.

62.     The Working Group regrets that it received no reply from the Government nor did it request an extension in accordance with para 16 of Working Group's methods of work. The Working Group regrets that the Government had not engaged with it since 2017 as it has not responded to any of communications sent by the Working Group since.[1] The Working Group encourages the Government to avail itself of the opportunities to engage with the Working Group constructively.

**Discussion**

63.     In the absence of a response from the Government, the Working Group has decided to render the present opinion, in conformity with paragraph 15 of its methods of work.

64.     The Working Group has in its jurisprudence established the ways in which it deals with evidentiary issues. If the source has established a *prima facie* case for breach of international law constituting arbitrary detention, the burden of proof should be understood to rest upon the Government if it wishes to refute the allegations.[2] In the present case, the Government has chosen not to challenge the prima facie credible allegations made by the source.

65.     A preliminary issue for the Working Group is whether Mr. Donziger is currently deprived of his liberty. On 6 August 2019, pre-trial house arrest was imposed upon Mr. Donziger, meaning that since that date, which is now over 2 years ago, he has not been allowed to leave his apartment at will. According to the source, this means that Mr. Donziger is confined to his apartment, has had to surrender his passport and wear a GPS tracking ankle bracelet. The Working Group notes, with regret, the choice of the Government not to address any of these allegations.

66.     As the Working Group has previously stated, "deprivation of liberty is not only a question of legal definition, but also of fact. If the person concerned is not at liberty to leave [a place of detention], then all the appropriate safeguards that are in place to guard against arbitrary detention must be respected".[3] Moreover, in its jurisprudence, the Working Group maintains that house arrest amounts to a deprivation of liberty provided that it is carried out in closed premises, which the person is not allowed to leave.[4] In determining whether this is

---

[1]  See Opinions Nos. 32/2021, 49/2020, 85/2019, 70/2019.
[2]  A/HRC/19/57, para. 68
[3]  See A/HRC/36/37, para. 56; see also e.g. Opinions No. 37/2018
[4]  See e.g. Opinions Nos. 37/2018, 13/2007, para. 24; and Deliberation No. 1 on House Arrest, E/CN.4/1993/24, 12 January 1993, para. 20.

the case, the Working Group considers whether there are limitations on the person's physical movements, on receiving visits from others, and on various means of communication, as well as the level of security around the place where the person is allegedly detained.[5] Consequently, the assessment of whether a house arrest constitutes deprivation of liberty is to be carried out on a case-by-case basis.[6]

67.     In the present case, the source has argued, and the Government has not contested, that Mr. Donziger has been confined to his apartment since 6 August 2019 by a Court order, he has been required to wear an electronic monitoring device and has had to surrender his passport. The Working Group further notes that the trial against Mr. Donziger continues. In these circumstances the Working Group is of the view that Mr. Donziger has indeed been deprived of his liberty since 6 August 2019.

68.     Having established that Mr. Donziger is deprived of his liberty since 6 August 2019, the Working Group shall now proceed to examine whether this deprivation of liberty amounts to arbitrary deprivation of liberty.

69.     The Working Group initially wishes to observe that it is presented with two sets of proceedings, although both are very closely interlinked. One set of proceedings dates back to 2011 and concerns the racketeering charges brought against Mr. Danziger. These proceedings are presided over by Judge K and their outcome is still unknown, as the proceedings are ongoing. Although linked to these proceedings, but nevertheless separate and presided over by Judge P are the criminal contempt of court proceedings, which commenced in 2018 and lead to imposition of the pre-trial house arrest upon Mr. Donziger, on 6 August 2019.

70.     The Working Group notes that the source has made numerous and very serious allegations concerning the first set of proceedings which were commenced by Chevron in 2011, including allegations of bias of Judge K (see paras 9, 11, 25-28 above) and refusal to allow witness statements and other violations of equality of arms principle (see paras 11 and 28). The Working Group notes the reported severe criticism of fairness of these proceedings (see paras 33, 37 above). However, these proceedings have not lead to Mr. Donziger's deprivation of liberty. Rather, it was the criminal contempt of court charge that lead to his deprivation of liberty. Consequently the former set of proceedings fall outside the mandate of the Working Group. Nevertheless, noting the serious and uncontested allegations, the Working Group refers the case to (i) the Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment; (ii) Working Group on the issue of human rights and transnational corporations and other business enterprises; and (iii) Special Rapporteur on the implications for human rights of the environmentally sound management and disposal of hazardous substances and wastes for further consideration and appropriate action.

71.     Turning to the latter set of proceedings, namely the criminal contempt of court charges, the Working Group recalls the uncontested submissions by the source that on 6 August 2019, Judge P ordered Mr. Donziger to surrender his passport, wear a GPS tracking ankle bracelet, and be placed in home confinement. Judge P justified the pre-trial house arrest on grounds of flight risk, specifically that Mr. Donziger had previously defied unspecified "court orders" and had a history of travel to Ecuador. The source has submitted and the Government has not contested that Mr. Donziger repeatedly and unsuccessfully challenged this decision from September 2019 to January 2020. Mr. Donziger filed and argued an appeal of the pre-trial detention, which was rejected in a one-sentence order on 18 February 2020.

72.     The Working Group recalls that it is a well-established norm of international law that pre-trial detention shall be the exception and not the rule, and that it should be ordered for as

---

[5] See e.g. Opinion No. 16/2011 in which an individual under house arrest could not meet with foreign diplomats, journalists or other visitors at her apartment, and her mobile telephone and the internet were cut off. She was not allowed to leave her apartment, except on short, approved trips and under police escort, and the entrance to the compound was guarded by security agents (para. 7). See also Opinion Nos. 39/2013, 30/2012, 12/2010, 47/2006, 18/2005, 11/2005, 11/2001, 4/2001, 41/1993, 21/1992.

[6] Deliberation No. 1 on House Arrest, E/CN.4/1993/24, 12 January 1993, para. 20.

short a time as possible.[7] Article 9(3) of the Covenant provides that it shall not be the general rule that persons awaiting trial shall be detained, but release may be subject to guarantees to appear for trial and at any other stage of the judicial proceedings. It follows that liberty is recognised as a principle and detention as an exception in the interests of justice.[8]

73.     In order to give effect to this principle, pre-trial detention must be based on an individualised determination that it is reasonable and necessary, for such purposes as to prevent flight, interference with evidence or the recurrence of crime.[9] The courts must examine whether alternatives to detention, such as bail, would render custodial measures unnecessary.[10] According to the source, Mr. Donziger's applications contesting pre-trial detention were rejected by court on numerous occasions with his final appeal being unsuccessful on 18 February 2020. On this occasion the source has argued and the Government has not contested that the court provided one-sentence judgment. The Working Group cannot accept that this satisfies the requirements of Article 9 (3) of the Covenant and therefore cannot accept that Mr. Donziger's pre-trial detention was properly constituted in accordance with article 9(3) of the Covenant.

74.     Furthermore, the Working Group notes the serious allegations of bias on behalf of Judge K reported by the source (see paras 9, 11, 25-28 above) and uncontested by the Government. In this regard, the Working Group notes that it was the same Judge K who personally selected Judge P to preside over the contempt of court charge levied against by Judge K against Mr. Donziger and did so bypassing the established rules and procedures (see paras 17 and 31 above). When Mr. Donziger challenged the decision to appoint Judge P, Judge P was the one who examined the challenge and dismissed it stating, *inter alia*, that bias is not a valid ground.

75.     The Working Group recalls that it is inherent to the proper exercise of judicial power that it be exercised by an authority which is independent, objective and impartial in relation to the issues dealt with[11] as argued by the Human Rights Committee in relation to Article 9 (3) of the Covenant. In the present case, the Working Group is of the view that Judge P did not act in a manner which was independent, objective and impartial in relation to Mr. Donziger's case. Consequently the Working Group concludes that the imposition of pre-trial detention upon Mr. Donziger violated Article 9 (3) of the Covenant.

76.     Further, as the source submits and the Government does not contest, the maximum penalty for the crime Mr. Donziger is accused of is 6 months imprisonment (see para 20 above), which means Mr. Donziger, having been under house arrest since 6 August 2019, has already served the maximum possible penalty some four times over. In this regard the Working Group recalls that the Human Rights Committee has argued that "[I]f the length of time that the defendant has been detained reaches the length of the longest sentence that could be imposed for the crimes charged, the defendant should be released."[12] This is a further breach of Article 9 (3) of the Covenant.

77.     Noting all the above, the Working Group concludes that the detention of Mr. Donziger lacks legal basis and is therefore arbitrary, falling under category I of the Working Group. The Working Group refers the case to the Special Rapporteur on the independence of judges and lawyers for further consideration and appropriate action.

78.     The source has submitted and the Government has chosen not to contest that Mr. Donziger has been in pre-trial detention since 6 August 2019. This is a very long period of over two years now. In these circumstances the Working Group considers Mr. Donziger is being denied his right to be tried without undue delay. It is true that the reasonableness of any delay in bringing a case to trial must be assessed in the circumstances of each case, taking into account the complexity of the case, the conduct of the accused, and the manner in which

[7]   Opinion Nos. 8/2020, para. 54; 1/2020, para. 53; 57/2014, para. 26; 49/2014, para. 23; 28/2014, para. 43; Human Rights Committee, General comment No. 35, para. 38; A/HRC/19/57, paras. 48-58
[8]   A/HRC/19/57, para. 54.
[9]   Human Rights Committee, General comment No. 35, para. 38.
[10]   Ibid; Opinion No. 83/2019, para. 68; A/HRC/30/37, guideline 15.
[11]   Human Righrs Committee; Communication 521/1992, *Kulomin* v. *Hungary*, para. 11.3.
[12]   General Comment No. 35 at para 38. See also Opinion 14/2019.

ADVANCE UNEDITED VERSION
A/HRC/WGAD/2021/24

the matter was dealt with by the authorities.[13] In the present case, the Working Group notes the exceptional level of cooperation provided by Mr. Donziger to all authorities; moreover, as noted earlier, the maximum penalty that could be imposed amounts to 6 months of imprisonment. Given that he has now been detained for more than 2 years, the Working Group considers the courts must reconsider alternatives to detention.[14] The Working Group also recalls that even circumstances of public health emergency cannot justify denial of the fair trial rights, as elaborated in its Deliberation No. 11 on prevention of arbitrary deprivation of liberty in the context of public health emergencies.[15]

79.     The right to be tried within a reasonable time and without undue delay is one of the essential fair trial guarantees embodied in articles 10 and 11(1) of the Universal Declaration of Human Rights and articles 9(3) and 14(3)(c) of the Covenant, and it has been violated in the present case. If Mr. Donziger cannot be tried within a reasonable time, he is entitled to release under articles 9(3) and 14 (3) (c) of the Covenant.[16] Since this has not taken place, a violation of Mr. Donziger's rights under these articles has occurred.

80.     Moreover, the Working Group recalls the uncontested allegations that Mr. Donziger was not given a reasoned decision for the application of pre-trial detention (see para 72 above). The Working Group therefore finds a breach of Article 14 (1) of the Covenant.

81.     Finally, the Working Group has already examined the multiple allegations of bias displayed by judge K against Mr. Donziger (see paras 73-74 above). The Working Group also notes that Mr. Donziger was denied the right to be tried by jury in a bias fashion as well as it was Judge K who in fact drafted charges against Mr. Donziger. This is a staggering display of lack of objectivity and impartiality, and the Working Group therefore finds a further breach of Article 14 (1) of the Covenant.

82.     Noting this and as well as the exceptional length of pre-trial detention, which exceeds over four times the maximum possible penalty, the Working Group considers that the detention of Mr. Donziger falls under category III. In arriving at this decision, the Working Group is also mindful of its views under category V (see paras 80-84 below).

83.     Finally, the Working Group turns to the examination of the uncontested allegation that Mr. Donziger is held in pre-trial detention based on a criminal charge of contempt, as it stems from his decision to uphold his professional duty as a lawyer towards confidentiality of his clients.

84.     The Working Group is appalled by uncontested allegations in this case. The charges against and detention of Mr. Donziger appears to be retaliation for his work as a legal representative of indigenous communities, as he refused to disclose confidential correspondence with his clients in a very high profile case against multi-national business enterprise. In this regard the Working Group recalls that the UN Basic Principles on the Role of Lawyers, Principle 14 requires lawyers to act freely and diligently in accordance with the law and recognized standards and ethics of the legal profession at all times. Principle 22, in turn, requires Governments to "recognize and respect that all communications and consultations between lawyers and their clients within their professional relationship are confidential". In the present case, Mr. Donziger provided various options on how he could cooperate with the judiciary of the United States of America without violating his professional duty of confidentiality towards his clients, making explicit his concerns over the need to uphold his ethical duty as a lawyer. Yet, he was arbitrarily deprived of his liberty on 6 August 2019, as the Working Group has established above.

85.     Moreover, the Working Group is also mindful that Mr. Donziger was the legal representative of indigenous communities and in fact acted as a human rights defender, a conclusion similar to that arrived at by the Chair of the Subcommittee on Human Rights of the European Parliament in June 2020.

---

[13]  Human Rights Committee, General comments No. 35, para. 37 and No. 32, para. 35.
[14]  See CCPR/C/GC/35, para. 37.
[15]  Para 20-21.
[16]  See A/HRC/19/57, paras. 48–58. See also Opinion No. 18/2018, para. 50.

ADVANCE UNEDITED VERSION
A/HRC/WGAD/2021/24

86.     The Working Group has in the past concluded that being a human rights defender is a status protected by article 26 of the Covenant.[17] Accordingly, the Working Group finds that Mr. Donziger was deprived of his liberty on discriminatory grounds, that is, due to his status as a lawyer and a human rights defender, in violation of articles 2 and 7 of the Universal Declaration of Human Rights and articles 2(1) and 26 of the Covenant. His deprivation of liberty is arbitrary according to category V. The Working Group refers this case to the Special Rapporteur on the situation of human rights defenders for consideration and appropriate action.

87.     The Working Group wishes to emphasize that the findings in this case regarding category V are strictly limited to the very specific circumstances of Mr. Donziger's case.

**Disposition**

88.     In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Mr. Steven Donziger, being in contravention of articles 2, 3, 7, 10, 11 of the Universal Declaration of Human Rights and articles 2 (1), 9, 14 and 26 of the International Covenant on Civil and Political Rights, is arbitrary and falls within categories I, III and V.

89.     The Working Group requests the Government of United States of America to take the steps necessary to remedy the situation of Mr. Steven Donziger without delay and bring it into conformity with the relevant international norms, including those set out in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

90.     The Working Group considers that, taking into account all the circumstances of the case, the appropriate remedy would be to release Mr. Steven Donziger immediately and accord him an enforceable right to compensation and other reparations, in accordance with international law.

91.     The Working Group urges the Government to ensure a full and independent investigation of the circumstances surrounding the arbitrary deprivation of liberty of Mr. Steven Donziger and to take appropriate measures against those responsible for the violation of his rights.

92.     In accordance with paragraph 33 (a) of its methods of work, the Working Group refers the present case to (i) the Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment; (ii) the Special Rapporteur on the independence of judges and lawyers; (iii) Working Group on the issue of human rights and transnational corporations and other business enterprises; (iv) Special Rapporteur on the implications for human rights of the environmentally sound management and disposal of hazardous substances and wastes; and (v) the Special Rapporteur on Human Rights Defenders, for appropriate action.

93.     The Working Group requests the Government to disseminate the present opinion through all available means and as widely as possible.

**Follow-up procedure**

94.     In accordance with paragraph 20 of its methods of work, the Working Group requests the source and the Government to provide it with information on action taken in follow-up to the recommendations made in the present opinion, including:

> (a)     Whether Mr. Steven Donziger has been released unconditionally and, if so, on what date;

> (b)     Whether compensation or other reparations have been made to Mr. Steven Donziger;

> (c)     Whether an investigation has been conducted into the violation of Mr. Steven Donziger's rights and, if so, the outcome of the investigation;

---

17  See e.g. Opinion Nos. 19/2018, 50/2017, 48/2017 and A/HRC/36/37, para. 49.

ADVANCE UNEDITED VERSION
A/HRC/WGAD/2021/24

(d)    Whether any legislative amendments or changes in practice have been made to harmonize the laws and practices of United States of America with its international obligations in line with the present opinion;

(e)    Whether any other action has been taken to implement the present opinion.

95.    The Government is invited to inform the Working Group of any difficulties it may have encountered in implementing the recommendations made in the present opinion and whether further technical assistance is required, for example through a visit by the Working Group.

96.    The Working Group requests the source and the Government to provide the above-mentioned information within six months of the date of transmission of the present opinion. However, the Working Group reserves the right to take its own action in follow-up to the opinion if new concerns in relation to the case are brought to its attention. Such action would enable the Working Group to inform the Human Rights Council of progress made in implementing its recommendations, as well as any failure to take action.

97.    The Working Group recalls that the Human Rights Council has encouraged all States to cooperate with the Working Group and has requested them to take account of its views and, where necessary, to take appropriate steps to remedy the situation of persons arbitrarily deprived of their liberty, and to inform the Working Group of the steps they have taken.[18]

[*Adopted on 6 September 2021*]

---

[18]  See Human Rights Council resolution 42/22, paras. 3 and 7.