

# The Environmental Law Society
## Elisabeth Haub
## School of Law
PACE UNIVERSITY



The Hon. Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Steven Donziger, 19-cr-561 (LAP)*

Dear Judge Preska:

    We students and faculty of the Environmental Law Society at the Elisabeth Haub School of Law at Pace University are writing to respectfully request that you sentence Mr. Steven Donziger to time served on October 1, 2021.

    This case all started when Mr. Donziger took on a field of work that many attorneys would not: representing some of the most vulnerable members of society. Because of this choice, Mr. Donziger pit himself against one of the largest companies in the world, Chevron, for injuries that the company's pollution caused to the people of Ecuador. Fortunately for the people of Ecuador, they won. However, because of the gravity of Mr. Donziger's work and Chevron's persistence to avoid paying the $9.5 billion settlement, his battle against the company has lasted for decades. For many aspiring lawyers, this story is inspiring. However, for those same people, Mr. Donziger's story is also a cautionary tale.

    As part of Mr. Donziger's case, the Court requested that he provide his phone and laptop that stored sensitive client information during discovery. Instead of exposing his clients' identities, Mr. Donziger chose to go into contempt of court, risking punishment in exchange for his clients' confidentiality. By doing so, Mr. Donziger risked his career for his clients.

    As future attorneys, we are expected to understand professional responsibility. When an attorney breaks the rules of professional conduct, a court imposes appropriate sanctions. Going off of precedent, Mr. Donziger believed he would receive backlash from the Court, but not to the extent that he has endured. 90 days is the longest any attorney has been under house arrest for a similar offense as Mr. Donziger. On the day of his sentencing, Mr. Donziger will have far exceeded those 90 days by being on house arrest for 787 days. Now, he is facing up to six months incarceration. From our perspective, Mr. Donziger is not being punished for contempt of court. To us, it seems that Mr. Donziger is being punished for helping his clients sue Chevron and that the Court is criminalizing environmental advocacy. This sentiment is felt strongly by many students at Pace. Our law school has the top environmental law program in the country, and many students attend in hopes of working in environmental advocacy. For many aspiring lawyers at our school, this case highlights some of the challenges and possible repercussions that

environmental lawyers may face in pursuit of protecting the environment and the people impacted by pollution.

    Judges have to make difficult decisions often. It is their duty to make tough choices that balance the public's interest with the integrity of the courts and the legal profession. From our perspective, it seems that the Court wants to punish Mr. Donziger and deter others from taking similar actions as him. If the Court has been trying to send a message, it has been heard. Legal professionals and others around the country have heard about this case. To those who have been listening, there is a concern of what precedent this case may set for attorneys who represent the most vulnerable members of society when they go against corporate behemoths. The most vulnerable people are the ones who need attorneys the most, and some attorneys in this area may have to make difficult decisions for their clients. We do not support or condone breaking the rules of professional conduct, but it takes a certain type of person to risk their wellbeing for their clients' wellbeing. Attorneys must respect the court's rules, but it is also important for the court to consider its impact on attorneys and the public.

    Although this case impacts many of us, no one has been impacted more than Mr. Donziger. During his legal battle, Mr. Donziger was disbarred and can no longer represent the clients he has worked to protect. The corporation that Mr. Donziger fought against also sued him for millions of dollars. Now, he is on day 787 of house arrest and faces up to six months in jail for a misdemeanor. Mr. Donziger has suffered enough, and it is time that he is let free.

    For these foregoing reasons, we respectfully request that Mr. Donziger be sentenced to time served.

| Name | Pace Email |
| --- | --- |
| Aric Prazeres | aprazeres@law.pace.edu |
| Carolyn Drell | cdrell@law.pace.edu |
| Zach Roy | zroy@law.pace.edu |
| Alexandra Lao | alao@law.pace.edu |
| Daniel Guarracino | dguarracino@law.pace.edu |
| Logan O'Connell | loconnell@law.pace.edu |
| Daniel von Staats | dvonstaats@law.pace.edu |
| Sara Uzatmaciyan | suzatmaciyan@law.pace.edu |
| Caitlin Boas | Cboas@law.pace.edu |
| Samantha M. Howard | Showard@law.pace.edu |
| Joshua Briggs | Jbriggs2@law.pace.edu |
| Mariah Bowman | mbowman@law.pace.edu |
| Kaitlynn Dixon | kdixon@law.pace.edu |
| Analyse Peña | Apena@law.pace.edu |
| Gabriella Mickel (President of the Environmental Law Society) | Gmickel@law.pace.edu |
| Haleigh Catalano | hcatalano@law.pace.edu |
| Fiona Herzig | fherzig@law.pace.edu |
| Samantha Blend | sblend@law.pace.edu |



**global witness**

The Honourable Loretta A. Preska
United States District Court – Southern District of New York
500 Pearl Street, New York, NY 10007

29th September 2021

Dear Judge Preska,

### Re: United States v. Donziger, No. 19-cr-561 (LAP), 11-civ-691 (LAK)

I am a Co-founder and Director of Global Witness, a non-profit anti-corruption organization with headquarters in London. Together with Transparency International, we were one of the founding organisations of the global anti-corruption movement. Since we set up Global Witness in the early 1990's, I have directed and participated in multiple investigations and exposés, and in litigation and the filing of criminal complaints related to the role of the extractives sector (oil, gas and mining) in the driving of conflict, mass human rights abuses, grand-scale pollution, and the looting of entire nations. We conceived, and I was the co-founder of, the Publish What You Pay campaign (PWYP), now an international movement of more than 1,000 organisations across the world, determined to hold the extractives sector to account. The launch of PWYP led directly to the creation of the Extractives Industry Transparency Initiative (EITI), the global extractives sector governance initiative, whose participants include civil society organisations, oil, gas and mining companies, investors, and extractives-producing countries. The United States is a supporting country member of the EITI International Board, of which I am also a board member. In 2003, Global Witness was a co-nominee for the Nobel Peace Prize, for our work bringing the crisis of "Blood Diamonds" to the World's attention.

For more than 20 years, my work has focussed on investigating the malfeasance and institutionally corrupt nature of the oil and gas industry. Thinking back to Global Witness' origins, I was already aware of the effort, led by Mr Donziger and colleagues, to hold Texaco (now Chevron) to account for its catastrophic pollution of the Amazon in Ecuador. One cannot forget the dire health and welfare implications for tens of thousands of people forced to live with the consequences. Texaco's appallingly lax attitude to pollution control in Ecuador is a typical industry-wide modus operandi, that I have personally observed in many parts of the world. Today, the impunity enjoyed by some companies for these kinds of practices has, in effect, profound implications for humanity's collective survival. For these reasons alone, Steven Donziger's undimmed efforts to hold Chevron accountable deserve a medal - the asymmetrical "judicial warfare" he has instead been subjected to, in my view, only adds to the misconduct of his detractors.

Mr. Donziger's work provided an immense stimulus and inspiration to the work of my colleagues and I at Global Witness, not to mention far beyond us to multiple human rights and environmental organisations that I work with around the world. I first had the privilege to meet Steven in 2013, after one of my colleagues who had heard him speak at Columbia University, asked him to speak at our London office about his work. The case against Chevron had been won in Ecuador, and Chevron's retaliatory attacks were well underway. I was both profoundly shocked by what was described, but also hugely impressed by Mr. Donziger's articulation of the case and the professionalism of his work. That year, Mr. Donziger also attended the prestigious Hay Festival in Wales as a speaker on a panel, together with my fellow Global Witness founding-Director, Patrick Alley. I decided that I would visit Mr Donziger on my next visit to New York, and I began to look into his case for myself, and I have been in regular contact with him since.

I have found Mr. Donziger to be a man of immense integrity. His work is seen by many persons in the human rights and anti-corruption movements around the world as a vital part of the Global effort to hold the extractives sector to account, a group of industries that even the OECD has labelled as the most corrupt. When I think of Chevron's efforts, in effect using the US judicial system to avoid the consequences of its conviction in Ecuadorian courts, there could not be a greater contrast to the punishment rightly meted out to BP, following its Deepwater Horizon accident. To be clear, BP's liabilities (some US$65 billion and counting) were rightly set out and enforced on the company by the US judicial system, and other actors. But for Chevron, whose predecessor Texaco was found by multiple Ecuadorian Courts to have deliberately dumped some 70+ times the volume of pollution as that of the Deepwater Horizon accident – only, instead of doing so in the US, this was done in Ecuador in the territory of some of the poorest people on the planet - the US courts appear to have come rushing to the rescue, accepting as credible, the company's cynical use of perjured, and paid for fact-witness testimony (admitted on oath as perjury by the perjurer), all of it designed to taint Mr Donziger's integrity – to "demonize Donziger," the key part of Chevron's strategy.

When taken all together, these malignant efforts stretch the bounds of credibility, and have created a kind of Kafkaesque world of collective cruel and unusual punishment for Mr Donziger and his family, especially for his young son whom I have met. In my view, there is no credible way to describe these circumstances, other than as a kind of vindictive scorched-earth SLAPP attack by Chevron-the-bully, designed to help the company avoid being held to account – instead, in effect, ensuring the further victimisation of its victims, by seeking to shut down Mr Donziger's work.

In September 2019, I travelled from Spain where I reside to New York, specifically to testify at Mr Donziger's Bar Grievance Hearing as to his impeccable character. And I would do it again in an instant – and indeed, I would have been present throughout the trial, had it not been for the restrictions of Covid. The Bar hearing adjudicating officer, Mr. John Horan, was forced to preside over a process in which Mr Donziger was, in effect, put up for target practice with his hands tied behind his back. He was unable to present evidence to challenge Judge Kaplan's findings which had already been rejected by the courts of other countries, including courts in Ecuador and Canada. The limitations forced on the process unquestionably denied Mr Donziger's "right" to a hearing – or a least a fair one! However, after four days of testimony, Mr Horan nevertheless concluded that Mr Donziger's law licence should be reinstated. Having sat through the testimony, it would have been impossible for any reasonable person to have concluded otherwise. Shockingly, and without so much as any credible response to Mr Horan's

report findings, a subsequent court procedure held without a hearing, concluded the matter by completely ignoring Mr Horan's findings and recommendations, and overturned them.

I am not a lawyer, and I would not presume to offer expertise in matters legal. But, after 25 years, I am a global expert on corruption and on the corrosive effects of the corrupt on the sound and accountable function of our civil institutions. It is unfortunate that discussions about corruption tend so often to gravitate towards that which is legally proscribed. Such thinking is extremely limiting, for corruption is a much more insidious and wider matter than that, and it represents an existential threat to the operation of our democracies. At its worst, it can represent an assault by those with massive resources that, in effect, manifests itself as a denial of basic rights for those with less - and all this before any kind of law has been breached.

During the past twenty years, I have also been immensely privileged to work, both directly and indirectly through colleagues, with some extraordinary law enforcement and international corruption investigation and prosecution officials in the Southern District of New York (SDNY). I reference this because of my respect and admiration for the SDNY jurisdiction on matters to do with corruption. It is unfortunately my conclusion that the cases mounted by Chevron against Steven Donziger, beginning with the Civil RICO case and running through to the present day, collectively represent a massive stain on the SDNY's reputation. There is something that "stinks" about their overall collective conduct thus far – and it is very obviously not Mr Donziger.

I will not add my own specific views here about the current case before you – other than in reference to Mr Donziger's loss of liberty below. An independent Monitoring Team, headed up by Ambassador Stephen Rapp and Catherine Morris, which has been monitoring this criminal contempt case, will make their findings public in due course.

However, the UN Working Group on Arbitrary Detention (UNWGAD) recently concluded its investigation into the procedures currently underway. It's report has also commented on the underpinning for the case - namely the civil RICO case itself. The Working Group has referred those matters and it's concerns to additional UN Special Procedures teams, for their further consideration, and their separate findings will, no doubt, be issued in due course.

For now though, the UNWGAD's report makes for damning reading. The following are some of the key findings, abbreviated here for ease of reference, and they appear noteworthy under the circumstances:

- Mr Donziger has been deprived of his liberty since the 6th August 2019, and that this deprivation of liberty is "arbitrary," under International Human Rights Standards.
- That, "in the Present case, the Working Group is of the view that Judge P did not act in a manner which was independent, objective and impartial in relation to Mr Donziger's case." It continued, "Consequently, the Working Group concludes that the imposition of pre-trial detention upon Mr Donziger violated Article 9 (3) of the International Covenant on Civil and Political Rights [the Covenant].
- That Judge K has demonstrated "a staggering display of lack of objectivity and impartiality," in violation of Article 14 (1) of the Covenant.
- The Working group expressed that it was "appalled" by this case, and that the "…charges against and detention of Mr Donziger appears to be retaliation for his work…"

- The Working Group noted the "exceptional level of cooperation provided by Mr Donziger to all authorities...", specifically referencing Mr Donziger's proffering of "various options on how he could cooperate [...] without violating his professional duty of confidentiality towards his clients..."
- The "deprivation of liberty of Mr Steven Donziger, is found to be in contravention of articles 2, 3, 7, 10, 11 of the Universal Declaration of Human Rights and Articles 2 (1), 9, 14, and 26 of the Covenant, is arbitrary and falls within Categories I, III, and V."
- The Working Group referred its concerns to the Special Rapporteur on the Independence of Judges and Lawyers; the Special Rapporteur on a Healthy Environment; the Working Group on Business and Human Rights; the Special Rapporteur on a Healthy Environment; The Special Rapporteur on Hazardous Wastes; the Special Rapporteur on Human Rights Defenders, and specifically cited concerns raised about the case by the Chair of the European Parliament Subcommittee on Human Rights.
- The Working group called on the US Government to "...ensure a full and independent investigation of the circumstances surrounding the arbitrary deprivation of liberty of Mr Steven Donziger and to take appropriate measures against those responsible for the violation of his rights."
- The Working Group concluded that, "...taking into account all the circumstances of the case, the appropriate remedy would be to release Mr Steven Donziger immediately and accord him an enforceable right to compensation and other reparations, in accordance with International Law."

Given the above, I want to reference your decision to deprive Mr Donziger of his liberty, all the more so given that the period of time he has spent under house arrest has long since passed from the surreal to the ridiculous. Leaving aside the UN Working Group's conclusions that Mr Donziger's detention has been and is arbitrary, I must raise the very basis for his detention in the first place, which I understand must be predicated on the principle of proportionality and there being a <u>credible</u> assessment of a flight risk. I have heard the arguments put forward by the prosecutor about this, and I have to say they are utterly ridiculous – they do not, and never did stand up to the slightest interrogation. With due respect to all involved, those of us who know Steven Donziger well, and have worked with him, understand his circumstances and most of all, his motivations - self-evidently, and as a matter of fact, far better than a prosecutor could ever hope to do so. While I would appreciate such strong assertions in the case of a serious crime, such as a murder – the precautionary principle would surely demand it - conversely, given the dearth of credibility to the arguments put forward by the prosecutor in this case, the precautionary principle should have demanded the opposite for Mr Donziger. The disparity between previous sentencing and pre-trial conditions for others facing such charges compared to that which Mr Donziger has been forced to endure, only escalates the enormity of my sense that this has been not just a massive injustice, but in the absence of a better explanation, it feels more like an exercise in retribution.

The prosecutor's, in effect, misleading of the court as to flight risk, has since resulted in a cruel punishment - one that has not only been borne by Steven Donziger, but also, and unconscionably, by the rest of his family. It has also thoroughly damaged the US' reputation as a country that stands for civil, political, and human rights. As such I urge you to bring this to an immediate end. Mr Donziger has been unjustly deprived of his liberty for far too long. It is time to do the right thing and I ask you, please, to end this case now by freeing Mr Donziger.

Yours sincerely,

*[signature: Simon Taylor]*

Simon Taylor
Co-Founder & Director
Global Witness
www.globalwitness.org
Tel:  +44 7957 142 121



# American Federation of Government Employees Local 704

September 29, 2021

Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Donziger*, No. 19-cr-561 (LAP), 11-civ-691 (LAK)

Dear Judge Preska,

We write to you today as the elected labor representatives of the American Federation of Government Employees, Local 704, representing the workers of the Great Lakes Region of the U.S. Environmental Protection Agency. We represent scientists, engineers, staff, and environmental attorneys who have devoted their careers to serving the public interest and the public health.

We learned of Mr. Steven Donziger's case this year and of his commendable dedication to seeking justice on behalf of his indigenous clients in the Ecuadorian Amazon who had their health, lives, and legacy devastated by a massive act of environmental destruction and pollution by Texaco's, now Chevron, oil drilling operations. Members of our elected leadership have visited Mr. Donziger in his home during his house arrest in New York City and we express our deep distress at his continued detention.

As American civil servants who have devoted our careers to a similar cause as Mr. Donziger, we are writing to express our sympathy and solidarity to Mr. Donziger for his endurance of over 780 days on house arrest. Mr. Donziger's valiant efforts to protect vulnerable communities in Ecuador from environmental harm and harm to the public health is not unlike the efforts of AFGE 704's many great attorneys, scientists, and engineers, who have valiantly challenged the hegemony of fossil fuel interests to win a better quality of life for the American people in the Great Lakes Region - transforming a region with rivers on fire into a region that protects its clean water, clean air, and clean land to support healthy human existence for the generations to come.

We wish to express our deep respect for Mr. Donziger and for what he and his family have endured during his home detention. We are in admiration of Mr. Donziger's devotion to environmental justice, human rights, and his work ethic and expertise that he used over the course of his career to advocate for the rights of people struggling to survive in the midst of overwhelming oil contamination. We believe any further jail sentence for Mr. Donziger would be unjust.

We humbly and respectfully request that this Court sentence Mr. Donziger to time-served.

Thank you for your attention and kind consideration.

Sincerely,

Executive Board of the American Federation of Government Employees
Local 704



**BYRON SIGCHO-LOPEZ** 盧漢士
**25TH WARD ALDERMAN (25區區長)**

Office of Alderman Byron Sigcho-Lopez
2100 W. Cermak Road
Chicago IL. 60608

September 29, 2021

Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

<u>Re: *United States v. Donziger*, No. 19-cr-561 (LAP), 11-civ-691 (LAK)</u>

Dear Judge Preska,

My name is Byron Sigcho-Lopez and I am the first Ecuadorian-American elected to the City Council in the City of Chicago, proudly representing the residents of the beautiful 25th Ward. I am very proud to have indigenous roots in the Americas. I came to the United States in 2001 as an unaccompanied minor at the age of 17, after Ecuador experienced extreme financial and political instability while my family simultaneously experienced a tragic car accident that left my mother in a coma for weeks. Thanks to the generosity of my host family, teachers, mentors, and peers in Tennessee, I was able to learn English, finish high school, and earn a scholarship to play soccer at Cumberland University, graduating with high honors. After working in the private sector, I changed my career to become a bilingual adult educator with the University of Illinois in Chicago for a decade. In 2019, I was elected Alderman and every day, I am proud to give back to the country that I now call home as a naturalized citizen.

I have had the great privilege to know Steven for about a year and half, but I have known of his work since I was a teenager in Ecuador. As a young person, I would hear stories and see images of the devastation that Texaco, now Chevron, caused indigenous communities and the Ecuadorian Amazon environment. As the grandson of gold miners from the town of Portovelo, Ecuador, I have seen the exploitation and generational harm caused by international companies operating with no regard for the health and welfare of the human beings living and working in mining and fossil fuel industries in Ecuador. In the time that my family worked in the gold mines of Portovelo, many residents would suffer from illnesses caused by widespread environmental mercury contamination and other toxic substances in the environment. Today, it is the indigenous communities in the Ecuadorian Amazon that are fighting to survive corporate human rights abuses and usher in an era of environmental and health justice for the next generation. I have tremendous gratitude to Mr. Steven Donziger for his professional service and his care for the people of my native Ecuador in their struggle for dignity, justice, and human rights.

I visited Mr. Donziger in person, in New York City in the summer of in 2021. In his home, I met a humble and compassionate man. I saw notes and tokens of appreciation from the myriad Ecuadorians that Mr. Donziger has served with integrity for over a generation. Mr. Donziger's deep love for his fellow man, and his exceptional skill to defend the human rights of the people of Ecuador against the environmental and

hazardous abuses of Chevron, is something that continues to inspire me as I seek to advocate for my constituents on Chicago's Southwest side. Mr. Donziger is a role model to me because he has shown throughout his career, throughout his life, that he is consistently a servant of the people. Unlike so many others who ignored communities marginalized by institutional power, Mr. Donziger refused to look away and chose to extend his love and empathy to help people who deeply needed a skilled and devoted advocate. For many Ecuadorians, his advocacy was and continues to be a blessing that was Heaven-sent.

Mr. Donziger has lived an admirable life. He is an honest, hard working, family man who lives up to the values we hold so dear as Americans. Before I was old enough to make my voice heard, he was raising his voice so that the people of my native Ecuador could seek justice against a powerful polluter. I have seen Mr. Donziger restricted from leaving his home for too long. I respectfully request that this Court sentence Mr. Donziger to time-served.

Thank you for your consideration.

Sincerely,

*[signature: Byron Sigcho]*

Alderman Byron Sigcho-Lopez
25th Ward, City of Chicago